**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RUTH V. BRIGGS | Civil Action No. 16-0248 |
| Plaintiff, | |
| v. | |
| TEMPLE UNIVERSITY | FILED VIA ECF |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**TEMPLE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ........................................................................................ 1

II.   STATEMENT OF FACTS ........................................................................ 1

      A.    About Temple University ............................................................... 1

      B.    Ms. Briggs's Employment and Job Duties .................................... 2

      C.    Temple Prohibits Discrimination and Harassment ....................... 3

      D.    Ms. Briggs's Performance and Behavioral Issues Result in Counseling and
            Disciplinary Actions ..................................................................... 3

            1.    Temple Informally Counsels Ms. Briggs ............................ 3

            2.    Mr. Wacker Asks Mr. DiMeo to Participate in Ms. Briggs's
                  Meetings with Dr. Wu ........................................................ 4

            3.    Temple Formally Disciplines Ms. Briggs ............................ 5

      E.    Ms. Briggs Complains to Temple About Her Treatment ................ 11

            1.    Ms. Briggs Communicates with Temple's Legal Office ........ 11

            2.    Ms. Briggs Communicates with Sandy Foehl (Equal Opportunity
                  Compliance) ....................................................................... 12

III.  LEGAL ARGUMENT ............................................................................... 16

      A.    Summary Judgment Standard ........................................................ 16

      B.    Ms. Briggs Cannot Establish a Prima Facie Case of Disparate Treatment .......... 17

            1.    Dr. Wu's Alleged Comments About Women Retiring in China Do
                  Not Constitute Direct Evidence of Age or Gender Discrimination ........ 18

            2.    Ms. Briggs Cannot Sustain Her Claim Using Circumstantial
                  Evidence ............................................................................ 20

      C.    Ms. Briggs Cannot Show That Temple's Legitimate Non-Discriminatory
            Reason for Its Actions Is Pretext for Discrimination ............................................ 24

            1.    No Reasonable Factfinder Could Disbelieve Temple's Reason for
                  Disciplining and Discharging Ms. Briggs ............................... 25

TABLE OF CONTENTS
(CONTINUED)

PAGE

2.      Ms. Briggs Cannot Prove That an Invidious, Discriminatory
        Reason Motivated Temple .......................................................... 26

D.      Ms. Briggs Cannot Sustain a Claim of Gender- or Age-Based Harassment ....... 28

        1.      Ms. Briggs Was Not Subjected To Age- or Gender-Based
                Harassment .............................................................. 29

        2.      Any Harassment to Which Ms. Briggs Was Subjected Was Not
                Severe or Pervasive .................................................... 30

E.      Ms. Briggs's Retaliation Claim Fails as a Matter of Law ................... 32

        1.      Ms. Briggs Cannot Establish a Prima Face Case of Retaliation ............. 33

IV.     CONCLUSION ........................................................................ 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Haverford Coll.*,
868 F. Supp. 741 (E.D. Pa. 1994) ........................................................................22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...............................................................................................16

*Barber v. CSX Distrib. Servs.*,
68 F.3d 694 (3d Cir. 1995)......................................................................................33

*Bedford v. Se. Pa. Transp. Auth.*,
867 F. Supp. 288 (E.D. Pa. 1994) ..........................................................................34

*Billet v. CIGNA Corp.*,
940 F.2d 812 (3d Cir. 1991)....................................................................................25

*Boner v. Bd. of Comm'rs of Little Rock Mun. Water Works*,
674 F.2d 693 (8th Cir. 1982) ..................................................................................21

*Boykins v. Lucent Techs., Inc.*,
78 F. Supp. 2d 402 (E.D. Pa. 2000) .......................................................................26

*Carvalho-Grevious v. Del. State Univ.*,
851 F.3d 259 (3d Cir. 2017)..............................................................................32, 33

*Cellucci v. RBS Citizens, N.A.*,
987 F. Supp. 2d 578 (E.D. Pa. 2013) .....................................................................19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...............................................................................................16

*Connors v. Chrysler Fin. Corp.*,
160 F.3d 971 (3d Cir. 1998)....................................................................................17

*Crumpton v. Potter*,
305 F. Supp. 2d 465 (E.D. Pa. 2004) .....................................................................23

*Cuffee v. Dover Wipes Co.*,
334 F. Supp. 2d 565 (D. Del. 2004), *aff'd*, 163 F. App'x 107 (3d Cir. 2006) ........33

*Dean v. Specialized Sec. Response*,
No. 09-515, 2011 U.S. Dist. LEXIS 94722 (W.D. Pa. Aug. 24, 2011) ...................24

*EEOC v. MCI Int'l, Inc.*,
  829 F. Supp. 1438 (D.N.J. 1993) ........................................................................18

*Ezold v. Wolf, Block, Schorr & Solis-Cohen*,
  983 F.2d 509 (3d Cir. 1992).........................................................................19, 25

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998) ..........................................................................................31

*Fichter v. AMG Resources Corp.*,
  528 F. App'x 225 (3d Cir. 2013) .......................................................................30

*Fuentes v. Perskie*,
  32 F.3d 759 (3d Cir. 1994)......................................................................24, 25, 26

*Glanzman v. Metro. Mgmt. Corp.*,
  391 F.3d 506 (3d Cir. 2004) ..............................................................................18

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 (2009) ...........................................................................................17

*Hairston v. Runyon*,
  No. CIV. A. 96-CV-8707, 1997 WL 798240 (E.D. Pa. Dec. 11, 1997) ................21

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993)..................................................................................29, 30, 31

*Harris v. Mercy Health Corp.*,
  Civil Action No. 97-7802, 2000 U.S. Dist. LEXIS 11228 (E.D. Pa. Aug. 10,
  2000) ..................................................................................................................26

*Hazen Paper Co. v. Biggins*,
  507 U.S. 604 (1993) ...........................................................................................27

*Helfrich v. Lehigh Valley Hosp.*,
  No. 03-cv-05793, 2005 U.S. Dist. LEXIS 4420 (E.D. Pa. Mar. 22, 2005) ............17

*Jensen v. Potter*,
  435 F.3d 444 (3d Cir. 2006).........................................................................28, 31

*Jones v. Se. Pa. Transp. Auth.*,
  796 F.3d 323 (3d Cir. 2015)........................................................................20, 23, 35

*Kaucher v. Cnty. of Bucks*,
  455 F.3d 418 (3d Cir. 2006).............................................................................16

*Keller v. ORIX Credit Alliance, Inc.*,
  130 F.3d 1101 (3d Cir. 1997)............................................................................25

*Kelly v. Drexel Univ.*,
  907 F. Supp. 864 (E.D. Pa. 1995), *aff'd*, 94 F.3d 102 (3d Cir. 1996)....................................20

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973)..................................................................................................17, 32

*McKinnon v. Gonzales*,
  642 F. Supp. 2d 410 (D.N.J. 2009) ..........................................................................30

*in P.P. ex rel. Michael P. v. Westchester Area Sch. Dist.*,
  585 F.3d 727 (3d Cir. 2009)......................................................................................17

*Nelson v. DeVry, Inc.*,
  No. 07-4436, 2009 U.S. Dist. LEXIS 38161 (E.D. Pa. Apr. 23, 2009) ..................21

*Peace-Wickham v. Walls*,
  C.A. No. 07-598-MPT, 2009 WL 4036101 (D. Del. Nov. 23, 2009)......................31

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989)..................................................................................................19

*Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*,
  172 F.3d 238 (3d Cir. 1999), *superseded in part by statute on other grounds*.......17

*Ryan v. CBS Corp.*,
  No. 06-2385, 2007 WL 2317380 (E.D. Pa. Aug. 7, 2007) ................................31, 32

*Salkovitz v. Pioneer Elecs. (USA) Inc.*,
  188 F. App'x 90 (3d Cir. 2006) ................................................................................18

*Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*,
  470 F.3d 535 (3d Cir. 2006)......................................................................................17

*Shramban v. Aetna*,
  115 F. App'x 578 (3d Cir. 2004) ..............................................................................30

*Simpson v. Key Jewelers, Div. of Sterling, Inc.*,
  142 F.3d 639 (3d Cir. 1998)................................................................................26, 27

*Watson v. Eastman Kodak Co.*,
  235 F.3d 851 (3d Cir. 2000)......................................................................................19

*Willis v. UPMC Children's Hosp. of Pittsburgh*,
  808 F.3d 638 (3d Cir. 2015)................................................................................17, 24

## Other Authorities

Federal Rule of Civil Procedure 56 ....................................................................................16

## I.   INTRODUCTION

Plaintiff Ruth Briggs is a former employee of Defendant Temple University who was discharged in April 2014 due to her behavioral and performance deficiencies.  Refusing to accept responsibility for her poor performance, Ms. Briggs claims that Temple discriminated against her because of her age and gender by disciplining her and ultimately terminating her employment.

Distilled to their essence, Ms. Briggs's allegations are based on nothing more than her disagreement with Temple's decisions to discipline and discharge her because of her continuing performance deficiencies.  Simply put, Ms. Briggs asks the Court to second-guess and overrule Temple's business decision.  It is well settled that Ms. Briggs's own subjective belief as to whether Temple's decision was fair, wise, or even correct, is immaterial, and neither Ms. Briggs nor the Court may function as a super-personnel department weighing the prudence of Temple's personnel decisions.  Thus, Temple respectfully requests that the Court enter an order granting summary judgment and dismissing Ms. Briggs's Complaint with prejudice.

## II.   STATEMENT OF FACTS[1]

### A.   About Temple University

Temple University is a deeply rooted, integral part of the Philadelphia (higher education) community.  (Declaration of Andrew DiMeo ("DiMeo Dec.), attached hereto as Exhibit A, ¶ 6.) Temple's history begins in 1884, when a young working man asked Russell Conwell if he could tutor him at night.  (DiMeo Dec. ¶ 7.)  A well-known Philadelphia minister, Conwell quickly said yes.  (DiMeo Dec. ¶ 7.)

In 1888, Conwell received a charter of incorporation for "The Temple College."  (DiMeo Dec. ¶ 8.)  His founding vision for the school was to provide superior educational opportunities

---

[1] This statement of "facts" is taken largely from Ms. Briggs's deposition testimony and documents authored by her or on her behalf.  These "facts" are taken as true for purposes of this Motion only.

for academically talented and highly motivated students, regardless of their backgrounds or means.  (DiMeo Dec. ¶ 9.)

Today, Temple's more than 35,000 students continue to follow the university's official motto—*Perseverantia Vincit*, or "Perseverance Conquers"—with their supreme dedication to excellence in academics, research, athletics, the arts, and more.  (DiMeo Dec. ¶¶ 10-12.)

### B.      Ms. Briggs's Employment and Job Duties

Temple hired Ms. Briggs, who was born in 1954, as an Editorial Assistant in the Center for Neurovirology and Cancer Biology in 2001.  (Deposition of Ruth V. Briggs ("Briggs Dep."), attached hereto as Exhibit B, 93:15-19, 97:9-12.)  In February 2005, Ms. Briggs applied and was selected for the position of Executive Assistant to the Dean of the College of Science and Technology.  (Briggs Dep. 107:17-108:5, 111:15-112:5.)  Over the following four years, Ms. Briggs's supervisors changed, and included Dean Allen Nicholson, Acting Dean Keya Sadeghipour, Dean Hai-Lung Dai, and Vice Dean George Palladino.  (Briggs Dep. 109:24-110:2, 112:6-8, 114:1-20, 127:7-23, 131:19-132:14.)  Around August or September 2009, Ms. Briggs learned that she would be on loan to (*i.e.* working temporarily for) the new Chair of the Department of Computer and Information Sciences, Dr. Jie Wu, who then became her supervisor.  (Briggs Dep. 130:22-131:2, 134:19-135:1; Deposition of Jie Wu ("Wu Dep."), attached hereto as Exhibit C, 7:12-17, 9:7-12.)  After about eighteen months, Ms. Briggs became Dr. Wu's permanent (and only) Executive Assistant.  (Briggs Dep. 136:4-10, 139:17-23.)  Dr. Wu was born in China in 1961, and immigrated to the United States in 1987.  (Wu Dep. 9:19-24.)

Ms. Briggs viewed Dr. Wu as having an important job, and she felt that her role was important to him.  (Briggs Dep. 170:14-19.)  Ms. Briggs's job responsibilities included keeping Dr. Wu organized, managing his schedule correctly, and booking travel for him.  (Briggs Dep.

166:12-167:7, 243:3-8.)  Ms. Briggs understood that her job was essential to Dr. Wu's position, and she felt he could be more effective if he was organized, which would reflect well on both of them.  (Briggs Dep. 166:12-14, 167:8-13.)

### C. Temple Prohibits Discrimination and Harassment.

Temple maintains an electronic Policies and Procedures Manual, which includes policies that explicitly prohibit discrimination and harassment.  (Briggs Dep. 179:17-21, Ex. D-6.)  Ms. Briggs had access to the Policies and Procedures Manual during her employment, and she understood that Temple prohibits discrimination and harassment.  (Briggs Dep. 180:10-181:2.)

### D. Ms. Briggs's Performance and Behavioral Issues Result in Counseling and Disciplinary Actions.

#### 1. Temple Informally Counsels Ms. Briggs.

Although Dr. Wu initially was pleased that Ms. Briggs would be working with him because she was very friendly when he interviewed at Temple, that changed shortly after they started working together.  (Wu Dep. 112:16-113:9.)  Almost from the outset of her employment, Ms. Briggs made repeated errors that affected Dr. Wu's ability to perform his job, blamed others for her errors and lack of timeliness, and refused to take ownership of her mistakes.  For example, on November 8, 2010, Ms. Briggs failed to complete a proofreading assignment for Dr. Wu.  (Wu Dep. 74:16-20, Ex. P-9.)  Ms. Briggs told Dr. Wu she completed the assignment, but left it at home.  (Wu Dep. Ex. P-9.)  A few hours later she forwarded some of the work to Dr. Wu and blamed the delay on technical issues.  (Wu Dep. Ex. P-9.)  Ms. Briggs stated that "[i]t would be nice to have fairness in treatment and equal standards applied for staff members," but that she was the only one who stayed late and worked on weekends for him and, "[w]hen something goes wrong in this department, it makes sense to blame it on someone who is working because the [sic] if you are not working, mistakes are less likely to happen."  (Wu Dep. Ex. P-9.)

3.

Dr. Wu interpreted Ms. Briggs's email as an attempt to excuse her failure to complete a simple assignment.  (Wu Dep. 78:9-79:2.)

As another example, on August 1, 2012, Dr. Wu emailed Ms. Briggs asking her to arrange travel for an upcoming conference and requested to arrive on the Monday before the conference.  (Briggs Dep. 244:17-245:15, Ex. D-11.)  Instead, Ms. Briggs purchased a flight for Dr. Wu on Sunday without his knowledge.  (Briggs Dep. Ex. D-11.)  Although she does not recall the incident, she does not dispute it occurred.  (Briggs Dep. 245:18-246:19.)

> **2.** **Mr. Wacker Asks Mr. DiMeo to Participate in Ms. Briggs's Meetings with Dr. Wu.**

In the fall of 2013, Dr. Wu and Andrew DiMeo, who was, at that time, the Assistant Director of Finance in the Dean's Office of the College of Science and Technology, began meeting with Ms. Briggs three times per week to address her performance issues.  (Briggs Dep. 289:21-290:5, 294:24-295:6.)  Greg Wacker, who was, at that time, the Director of Finance in the Dean's Office of the College of Science and Technology, asked Mr. DiMeo to attend the meetings, hoping Mr. DiMeo could help Ms. Briggs better understand the expectations of her job.  (Deposition of Gregory G. Wacker ("Wacker Dep."), attached hereto as Exhibit D, 53:6-10, 54:5-23.)  During the meetings, Dr. Wu and Mr. DiMeo identified Ms. Briggs' performance issues, which Ms. Briggs understood were areas they expected her to improve.  (Briggs Dep. 303:10-20.)

Ms. Briggs initially valued Mr. DiMeo's input and insight.  (Briggs Dep. 69:22-24, 71:21-23.)  But, she ceased valuing his input when he started agreeing with Dr. Wu about a month after he began attending the meetings.  (Briggs Dep. 70:1-13, 71:2-6.)  Ms. Briggs also felt that her relationship with Mr. DiMeo "got a little confrontive."  (Briggs Dep. 59:24-60:3, 63:14-24.)

Ms. Briggs often contacted Deidre Walton who was, at the time, Temple's Director of Labor/Employee Relations,[2] about Dr. Wu, Mr. DiMeo, and Mr. Wacker.  Ms. Briggs told Ms. Walton it was demeaning to have Mr. DiMeo participate in her meetings with Dr. Wu and relayed that her work environment was hostile.  (Deposition of Deirdre Walton ("Walton Dep."), attached hereto as Exhibit E, 13-30:8, 35:2-36:9.)  To her, Ms. Briggs's environment was "hostile" whenever she received discipline, others acknowledged her errors, and when Dr. Wu yelled at students in Chinese.  (Walton Dep. 35:2-36:9, 43:19-3.)  Ms. Walton knew Ms. Briggs also sometimes raised her voice and became hostile, and she believed, as Ms. Briggs did, that Ms. Briggs's and Dr. Wu's relationship was simply a matter of "two people that didn't see eye to eye and sometimes did not get along."  (Walton Dep. 27:1-29:3, 75:5-76:3.)

### 3.    Temple Formally Disciplines Ms. Briggs.

#### a.    Temple's Disciplinary Procedure

Temple maintains Rules of Conduct, which Ms. Briggs understood she was expected to follow.  (Briggs Dep. 175:12-176:16, Ex. D-5.)  Temple's Rules of Conduct state under the heading "Disciplinary Procedure" that:

> Any employee who violates a Rule of Conduct is subject to the appropriate corrective disciplinary action, which is based on the category of the work rule violation (A, B, C or D) and the number or frequency of previous violations within the preceding 12-month period.  Repeated violations of work rules within a specific category over a 12-month period will lead to the next step in the disciplinary process.

(Briggs Dep. 176:17-177:5, Ex. D-5 at TEMPLE0152.)  Ms. Briggs understood this procedure. (Briggs Dep. 177:8-11.)

When Ms. Briggs failed to meet expectations, Dr. Wu or Mr. DiMeo reported the facts to

---

[2] Ms. Walton's responsibilities include employee relations issues involving conflicts with supervisors, performance management, and discipline.  (Walton Dep. 11:24-12:6.)

Mr. Wacker, and Mr. Wacker helped Dr. Wu identify the appropriate course of action with the assistance of Labor Relations.  (Wu Dep. 37:10-22, 40:4-11; Wacker Dep. 95:4-20; 99:8-16.)

Each time she received a formal disciplinary action because of her behavior or her performance deficiencies, Ms. Briggs refused to take responsibility for her failings.  Instead, she made excuses and complained about the "unfairness" of being disciplined.

### b.    November 2011 Discipline

On November 11, 2011, Mr. Wacker issued Ms. Briggs a written warning for violating Rule B.11, unprofessional/inappropriate conduct.   (Briggs Dep. 214:15-215:1, 215:10-19, 216:24-217:4, Ex. D-9.)  During their meeting, Mr. Wacker allegedly told Ms. Briggs that Dr. Wu reported to him she behaved inappropriately by saying something she should not have said. (Briggs Dep. 217:7-12.)  According to Ms. Briggs, she received this disciplinary action because she responded to Dr. Wu's alleged comment that women in China "are put out to pasture by [her] age" by telling him that "we are in America right now."[3]  (Briggs Dep. 215:20-216:10.)  Ms. Briggs claims that Dr. Wu told her a short time earlier that women in China retire at 55, and that is "why [she] lost it.  Well, not lost it, but . . . [she is] generally not one to be confrontive, but [she] just said, "'We're not in China.'"  (Briggs Dep. 218:24-219:15, 224:10-22.)

Shortly thereafter, on December 14, 2011, Ms. Briggs complained to Mr. DiMeo and Mr. Wacker about the conduct of another employee, Judy Lennon, who was, at the time, a secretary in Dr. Wu's office.  (Briggs Dep. 366:1-23, Ex. D-27.)  According to Ms. Briggs, she "stumbled upon" three unsealed boxes containing confidential documents outside the office.  (Briggs Dep. 366:1-23, Ex. D-27.)  She asked Ms. Lennon about the boxes and Ms. Lennon told her they

---

[3] Although Dr. Wu denies making this comment, (Wu Dep. 19:18-14), Ms. Briggs's allegations are accepted as true for purposes of this Motion.

would be picked up by the shredding service the following day.  (Briggs Dep. 366:1-23, Ex. D-27.)  In response, Ms. Briggs told Ms. Lennon the boxes needed to be sealed and locked until the shredding service arrived.  (Briggs Dep. 366:1-23, Ex. D-27.)  Later, Ms. Briggs found the boxes "taped half-heartedly" so documents were showing.  (Briggs Dep. 366:1-23, Ex. D-27.)  Ms. Briggs "wonder[ed] how it [was] that [she could] be disciplined for violations and others in the office come and go as they please, violate policies about student records and social security numbers with no consequences at all."  (Briggs Dep. 366:1-23, Ex. D-27.)  Ms. Briggs acknowledges that she was never disciplined for violating any policies about student records or Social Security numbers.  (Briggs Dep. 367:2-15.)  Ms. Lennon is older than Ms. Briggs, approximately 65 years of age.  (Briggs Dep. 284:20-22.)

### c.      March 2013 Discipline

One essential component of Dr. Wu's job was to recruit faculty for Temple, and Ms. Briggs assisted him by coordinating logistics for faculty candidates when they visited Temple to interview, including booking travel for certain candidates when they visited.  (Briggs Dep. 247:12-18, 248:2-13, 248:22-249:1.)   In February/March 2013, Ms. Briggs was supposed to book travel for a candidate named Clint Whaley, but she failed to do so.  (Briggs Dep. 249:9-14, Ex. D-12.)  Dr. Whaley ultimately did not visit, and therefore, was not hired by Temple.  (Briggs Dep. 272:1-21.)  Ms. Briggs understood that it was her responsibility to book his travel and that it was problematic that she failed to do so.  (Briggs Dep. 271:9-24.)

Because of the incident, on March 26, 2013, Ms. Briggs received a three-day suspension without pay for violating Rule C.4, neglecting job duties or responsibilities, or failing to carry out instructions given by a supervisor.  (Briggs Dep. 272:22-23, 273:7-14, 274:6-18, Ex. D-13.)  Ms. Briggs acknowledges she "dropped the ball" by failing to carry out Dr. Wu's instruction and she understood why her discipline was a categorized as a Level C.  (Briggs Dep. 274:19-275:12,

277:1-18, 278:13-20.)  She also understood that, after she received the disciplinary action, she was on probation for a year and an additional Level C infraction could lead to the end of her employment with Temple.  (Briggs Dep. 287:19-24.)  Ms. Briggs is not aware of anyone else who worked in Dr. Wu's office who failed to book travel arrangements for a visiting candidate. (Briggs Dep. 285:13-17.)

On April 8, 2013, Ms. Briggs emailed Ms. Walton complaining about the level of discipline she received, and claiming that "[n]egligence, carelessness and poor job performance [was] not uncommon" in the department, but there were "different standards for performance and productivity."  (Walton Dep. 58:12-17, 59:15-60:6, Ex. P-26.)  Ms. Walton relayed Ms. Briggs's concerns to Mr. Wacker, who already knew of the situation.  (Walton Dep. 59:4-14.)  Messrs. Wacker and DiMeo assured Ms. Walton that everyone was treated equally and that no other employee made as many mistakes as Ms. Briggs.  (Walton Dep. 60:8-17.)

### d.      January 2014 Discipline

On January 20, 2014, Ms. Briggs was three hours late for work, for which she believes she received a written warning for violating Work Rule B.10, failing to meet expected standards of performance, productivity or efficiency.[4]  (Briggs Dep. 305:2-7, 307:4-12, Ex. D-16.) Although she claims she called the office when she woke up and told a student worker who answered the phone she overslept and would be there in ten minutes, she admits that she did not call Dr. Wu on his cell phone, nor did she send him an email or text message to let him know she would be late.  (Briggs Dep. 208:19-209:5, 314:11-22, 315:6-8.)  When she was given the disciplinary action, Ms. Briggs became argumentative because she felt Dr. Wu and Mr. DiMeo

---

[4] Ms. Briggs acknowledges she was late on previous occasions, and Dr. Wu was flexible, until she was three hours late and did not call in.  (Briggs Dep. 207:19-208:5, 209:6-18, 209:23-210:10.)  There was no other occasion on which she was more than thirty minutes late without notifying Dr. Wu.  (Briggs Dep. 210:22-211:1.)

were "lying" about her because they said she had not called in and refused her request they investigate the incident.[5]  (Briggs Dep. 313:22-314:10, 314:23-315:5.)

On February 22, 2014, Ms. Briggs contacted Ms. Walton about her January 20, 2014 discipline.  (Briggs Dep. 436:18-437:6, Ex. D-40.)  Ms. Briggs forwarded to Ms. Walton calendars for January and February "to defend [herself] from Drew DiMeo's and Greg Wacker's unsubstantiated accusations, for which [she] received a second serious discipline."  Ms. Briggs further stated that she "truly overslept and missed the meeting" on one day, and then closed by stating that she was "appealing to [Ms. Walton] to assign someone who is fair and unbiased to conduct an investigation for the truth about these two incidences without prejudice in a timely manner."  (Briggs Dep. 432:10-16, Ex. D-40.)  As she always did when Ms. Briggs contacted her, Ms. Walton contacted Mr. Wacker and/or Mr. DiMeo and asked them to look into the situation.  (Walton Dep. 81:12-82:4.)

On March 13, 2014, Ms. Briggs complained to Ms. Walton that she believed Mr. Wacker's assertion she failed to the notify the department she overslept, was false, and stating that she "want[ed] to settle this matter internally with the HR department regarding [her] request to rescind this discipline simply because Greg Wacker lied in his statement to [Ms. Walton] about [Ms. Briggs]."  (Briggs Dep. 444:7-13, Ex. D-43.)  She further complained that she was not given the opportunity to defend herself and complained about the "authoritarian leadership" of "staff members in managerial positions."  (Briggs Dep. Ex. D-43.)  She also stated that, "[i]n the eyes of the law, this could be viewed as unfair labor practices and discrimination, both of which violate federal and state laws."  (Briggs Dep. Ex. D-43.)  Ms. Walton responded to the

---

[5] Ms. Briggs was disciplined because she was late and did not come in until mid-day; she did not call in until mid-day, and then spoke with a student rather than her supervisor (Dr. Wu), an administrator, or a regular employee; and she did not send an email to Dr. Wu once she knew that he was not available by phone.  (Walton Dep. 69:3-14, 70:18-71:23; Briggs Dep. Ex. D-44.)

email later that same day, offering to meet with Ms. Briggs to discuss her concerns.  (Briggs Dep. 444:14-19, Ex. D-43.)

### e.      April 2014 Discharge

As part of her job duties, Ms. Briggs was also expected to submit Dr. Wu's expense reports, and admits that sometimes she failed to submit the reports timely.  (Briggs Dep. 312:20-313:12.)  In one such incident, on March 20, 2014, Dr. Wu instructed Ms. Briggs to complete a travel expense reimbursement for him by the end of the day, and she failed to do so.  (Briggs Dep. Ex. D-18.)  Although she claimed she could not do so because of technical issues, Mr. DiMeo confirmed no technical issues existed.  (Briggs Dep. Ex. D-18; *see also* Wacker Dep. 38:1-22.)  On March 21, 2014, when Dr. Wu and Mr. DiMeo approached Ms. Briggs about her deficiency, Ms. Briggs was argumentative and unprofessional, insisting that Dr. Wu and Mr. DiMeo were calling her a liar.[6]  (Briggs Dep. Ex. D-18.)  Not long before that, Ms. Briggs was instructed to book a hotel reservation for a colloquium speaker for his upcoming visit to Temple on March 13th and 14th, and she booked the room for the wrong dates.  (Briggs Dep. Ex. D-18.)  Dr. Wu reported these two incidents to the Dean's Office, and Mr. DiMeo investigated the facts; Mr. Wacker then turned the information over to and discussed the situation with Ms. Walton, and together with Dr. Wu, Mr. Wacker, and Mr. DiMeo, they decided termination was the appropriate level of discipline.  (Wacker Dep. 34:9-35:9, 62:22-63:10, 64:17-65:2, 65:18-66:5, 66:18-67:10, 67:18-23; Walton Dep. 100:13-18.)

---

[6] On March 23, 2014, Ms. Briggs again emailed Ms. Walton, stating that her work situation with Dr. Wu and Mr. DiMeo was "escalating."  (Briggs Dep. 450:21-451:7, Ex. D-44.)  Ms. Briggs complained about being required to meet with Dr. Wu and Mr. DiMeo three times a week "within the earshot of [her] co-workers and visitors" and about the incident the previous Friday (March 21, 2014).  (Briggs Dep. Ex. D-44.)  Additionally, Ms. Briggs complained that some of her duties were given to Hailey King, and that she (Ms. Briggs) was being required to perform accounting-related tasks with greater frequency.  (Briggs Dep. Ex. D-44.)  Ms. Walton responded to Ms. Briggs's email the following day (March 24, 2014), and addressed each of Ms. Briggs's concerns.  (Briggs Dep. 451:8-10, Ex. D- 44.)

Early on the morning of April 1, 2014, Mr. Wacker called Ms. Briggs and asked to meet with her at 10:00 AM.  (Briggs Dep. 453:18-455:2.)  Ms. Briggs responded that she had another meeting, but could meet at 10:30 AM, to which he agreed.  (Briggs Dep. 453:18-455:2.)  When Ms. Briggs went to the Dean's Office to meet with Mr. Wacker, Ms. Walton was also present.  (Briggs Dep. 323:13-324:6.)  Of their meeting, Ms. Briggs only remembers that Mr. Wacker gave her a letter.  (Briggs Dep. 323:5-12, 325:10-23, Ex. D-18.)  The letter advised Ms. Briggs that Temple investigated the two work-related items (discussed above) brought to the attention of the Dean's Office, which constituted violations of two Level C work rules: C.4 (negligence/carelessness) and C.3 (disruptive or disorderly conduct), that the disciplinary action for a second Level C violation is termination, and therefore, her employment was being terminated that day.  (Briggs Dep. 325:24-326:9, Ex. D-18.)  During that meeting, Mr. Wacker also offered Ms. Briggs the option of resigning, (Walton Dep. 98:2-9), which Ms. Briggs ultimately accepted.[7]  (Briggs Dep. 320:4-13.)  On April 3, 2014, Ms. Briggs submitted a resignation email, in which she stated, in part, that she had "great admiration" for "our amazing faculty."  (Briggs Dep. 320:23-321:6, Ex. D-17.)

### E.    Ms. Briggs Complains to Temple About Her Treatment.

#### 1.    Ms. Briggs Communicates with Temple's Legal Office.

On February 9, 2013, Ms. Briggs emailed Associate University Counsel Cameron Etezady requesting a confidential conversation "to discuss disparate treatment" she believed was related to her age.  (Briggs Dep. 410:11-411:12, Ex. D-35.)  Mr. Etezady suggested that Ms.

---

[7] Additionally, Ms. Walton told Ms. Briggs that Temple would not challenge her claim for unemployment compensation benefits, and she was able to collect unemployment from the time of her resignation.  (Briggs Dep. 321:18-322:21.)

Briggs contact Sandy Foehl or Tracey Hamilton in EOC[8], which was an unsatisfactory response to Ms. Briggs.  (Briggs Dep. 411:23-412:15, 413:14-414:1, Ex. D-35.)  Mr. Etezady then offered to refer Ms. Briggs to Fay Trachtenberg in the legal office.  (Briggs Dep. 411:23-412:15, 413:14-414:1, Ex. D-35.)  Ms. Briggs responded that she "would feel most comfortable meeting with" Ms. Trachtenberg, and Mr. Etezady provided instructions for arranging a call or meeting.  (Briggs Dep. 414:17-23, Ex. D-35.)  Ms. Briggs found Mr. Etezady responsive and helpful.  (Briggs Dep. 414:14-16.)

On August 6, 2013, Ms. Briggs forwarded to Mr. Etezady a portion of their email communications from February 2013, stated that she contacted Fay (Trachtenberg), who referred her to Deirdre Walton, and that she (Ms. Briggs) asked Ms. Walton to serve as a mediator in meetings with Dr. Wu and Mr. DiMeo.  (Briggs Dep. 427:18-429:3, Ex. D-38.)  Mr. Etezady again suggested that Ms. Briggs speak with Ms. Trachtenberg.  (Briggs Dep. 430:7-12, Ex. D-38.)

### 2. Ms. Briggs Communicates with Sandy Foehl (Equal Opportunity Compliance).

Ms. Briggs's first contact with EOC was a July 25, 2012 email to Sandy Foehl, Temple's EOC Director, in which Ms. Briggs requested a meeting.  (Briggs Dep. 382:13-383:4, 384:7-9, Ex. D-29.)  Ms. Briggs met with Ms. Foehl on July 30, 2012.  (Briggs Dep. 386:5-7.)  During the meeting, Ms. Briggs told Ms. Foehl about the problems she was having in the department and "the comments Dr. Wu had made about [her] age," in particular his alleged comment that women in China are "put out to pasture" around a certain age or retire at 55.  (Briggs Dep. 386:13-

---

[8] Temple's Equal Opportunity Compliance ("EOC") Department investigates all discrimination and harassment complaints that are brought to their attention from students, faculty, and employees.  (Walton Dep. 13:2-9; Deposition of Sandra Foehl ("Foehl Dep."), attached hereto as Exhibit F, 6:18-7:9.)  The EOC is separate from Human Resources.  (Walton Dep. 6:15-7:2.)

387:2.)  Ms. Briggs also reported that Mr. Wu yelled[9] and made demeaning comments like, "Are you stupid?"  (Foehl Dep. 28:7-29:4, 29:14-24, Ex. P-32.)  Ms. Briggs told Ms. Foehl she gave Dr. Wu the "benefit of the doubt" for his remarks, "allowing for cultural differences and [his] difficulty with English."  (Foehl Dep. Ex. P-32.)  Ms. Foehl "walked through the [EOC] process" with Ms. Briggs, but Ms. Briggs "asked [Ms. Foehl] to hold off" on doing anything because her son was about to undergo spinal surgery.  (Briggs Dep. 387:22-388:6, 399:5-16.)

On August 2, 2012, Ms. Briggs asked Ms. Foehl if she could to review EOC's letter on her behalf before it was sent, and if not, said she "would appreciate a synopsis of the content presented in the 'complaint.'"  (Briggs Dep. 388:24-389:5, Ex. D-29.)  Ms. Foehl advised Ms. Briggs that EOC "doesn't have grievants review the complaint notices [they] send."  (Briggs Dep. 388:7-23, 389:6-390:7, Ex. D-29.)  Ms. Foehl also explicitly asked Ms. Briggs to provide a written statement including "the present treatment [she found] discriminatory and/or harassing, the source of the disparate treatment and/or unwelcome conduct, and the basis for the unfair treatment from [her] perspective."  (Briggs Dep. 388:7-23, 389:6-390:7, Ex. D-29.)

On September 9, 2012, Ms. Briggs forwarded Ms. Foehl an email chain regarding a grant proposal Dr. Wu assigned to a student worker, and complaining that it was "yet another of [her] job functions assigned to" the student, which she found "shaming and embarrassing"; Ms. Briggs also complained that she was paid less than "two male staff members in the dean's office who were [her] equals."  (Briggs Dep. 391:24-392:7, Ex. D-30.)  The complaint about Ms. Briggs's compensation related to compensation purportedly paid to two male staff members around 2006; Ms. Briggs never previously complained about this issue.[10]  (Briggs Dep. 395:20-397:2, 397:19-

---

[9] Ms. Briggs acknowledged that Dr. Wu also yelled at his students, both male and female.  (Briggs Dep. 521:2-9.)

[10] Ms. Briggs's concern about her compensation is the only issue Ms. Briggs raised with Ms. Foehl that Ms. Foehl discussed with Ms. Walton.  (Foehl Dep. 43:3-7, 44:13-19, 64:8-17.)  Ms. Foehl did not discuss with Ms. Walton the

13.

22.)  Ms. Briggs also, again, reiterated that she was not authorizing any action by Ms. Foehl. (Briggs Dep. 397:23-398:6, 399:17-24, Ex. D-30.)

On November 2, 2012, Ms. Briggs inquired about the status of her complaint with Ms. Foehl.  (Briggs Dep. 400:9-11, Ex. D-31.)  Ms. Foehl responded by referring Ms. Briggs to Ms. Briggs's prior statement that she was not authorizing any action, and Ms. Foehl repeated her request for a written statement if Ms. Briggs was authorizing action.  (Briggs Dep. 403:2-404:3, Ex. D-32.)  Ms. Foehl also asked Ms. Briggs to provide specifics about the compensation issue. (Briggs Dep. 404:4-17, Ex. D-32.)  Finally, Ms. Foehl advised Ms. Briggs that complaints of unlawful discrimination also could be made to governmental compliance agencies, and provided Ms. Briggs with information about how Ms. Briggs could make such a complaint.  (Briggs Dep. 405:9-24, Ex. D-32.)  Ms. Briggs did not file a complaint at that time.  (Briggs Dep. 406:1-6.)

Ms. Briggs's sent her apparent response approximately three months later—on February 8, 2013, when she emailed Ms. Foehl, stating that she was "so bullied and harassed all day," she had to meet with Dr. Wu and Mr. DiMeo every morning "to discuss [her] failure to comply with a directive that prohibit[ed] any work activity that ha[d] not been approved by [her] supervisor"; she further complained that "[n]o other staff member [was] required to meet daily for a dose of public humiliation," and when she requested clarification on an assignment, it was "reported to the dean's office as a challenge to [her supervisor's] authority."  (Briggs Dep. 409:3-12, Ex. D-34.)  Ms. Foehl responded, advising Ms. Briggs that the issue was one for Human Resources, and instructed her to address her concerns with Ms. Walton.  (Briggs Dep. 409:13-20, Ex. D-34.)

More than a year later, on February 25, 2014, Ms. Briggs asked Ms. Foehl for an appointment to file a complaint.  (Briggs Dep. 441:8-15, Ex. D-42.)  This was Ms. Briggs's first

---

issue Ms. Briggs raised concerning Dr. Wu's comment about women in China, because Ms. Foehl's office – rather than Human Resources – was responsible for investigating that issue.  (Foehl Dep. 45:8-13.)

communication with Ms. Foehl since their February 2013 email exchange.  (Briggs Dep. 442:21-443:2.)  Ms. Briggs stated that she already had a phone intake with the Equal Employment Opportunity Commission ("EEOC") and she planned to file a complaint internally.  (Briggs Dep. 443:3-7, Ex. D-42.)

Ms. Briggs met with Ms. Foehl at 10:00 AM on April 1, 2014.  (Briggs Dep. 452:3-6.) During the meeting, Ms. Briggs complained she was being discriminated against because of her age and her gender.[11]  (Briggs Dep. 452:7-12.)  Ms. Briggs relayed that she wished to file a complaint of age discrimination, mentioned her January 20 disciplinary action, and compared her treatment to that of Hailey King.[12]  (Foehl Dep. 65:17-66:7, 68:1-16, Ex. P-36.)  Ms. Briggs never provided a written statement of her allegations, as Ms. Foehl requested during, and subsequent to, their meeting.  (Foehl Dep. 60:5-12.)

On April 4, 2014, Ms. Foehl met with Dr. Wu to discuss Ms. Briggs's allegations.  (Foehl Dep. 68:24-68:2, Ex. P-37.)  Dr. Wu reported that Ms. Briggs resigned the prior day.  (Foehl Dep. Ex. P-37.)  When Ms. Foehl asked Dr. Wu about his comment concerning women retiring in China, he explained that he regularly discussed cultural differences between China and the United States with all of his staff (not just Ms. Briggs), and the comment was simply an observation he made in one such discussion, which was not meant to be upsetting to Ms. Briggs.

---

[11] Although Ms. Briggs believes she conveyed to Ms. Foehl that she wanted to make a complaint of age and gender discrimination, and maybe retaliation, she believes it is possible that Ms. Foehl did not understand that.  (Briggs Dep. 458:10-19.)

[12] Ms. Briggs contends that Ms. King was once absent for three days without reporting she would be out and she was not disciplined for the incident; she acknowledges, however, that Dr. Wu or someone spoke with Ms. King about the incident.  (Briggs Dep. 359:1-360:8.)  According to Ms. Briggs, another employee told her there was another occasion on which Ms. King did not report to work for two days.  (Briggs Dep. 360:9-16.)  Ms. Briggs admits that she does not know the circumstances surrounding Ms. King's absences.  (Briggs Dep. 308:12-16, 309:2-7, 361:2-17.)  Ms. King was absent for two days and did not call in or email Dr. Wu because of the hurricane.  (Wu Dep. 130:24-131:19.)  When Ms. King returned to work, Dr. Wu gave her a "very serious verbal warning."  (Wu Dep. 130:8-9.)

(Foehl Dep. 32:6-16, 69:16-70:11.)

## III.   LEGAL ARGUMENT

### A.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  The U.S. Supreme Court has explained the movant's burden:

> In our view, the plain language of [then] Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis added).  An issue is "genuine" only when there is a sufficient evidentiary basis from which a reasonable jury could find for the non-moving party.  *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006).  An issue is "material" only if it is a legal element of the claim under the substantive law, which might affect the outcome.  *Anderson,* 477 U.S. at 248; *Kaucher,* 455 F.3d at 423.

To defeat a properly supported motion for summary judgment, the non-moving party must present *affirmative evidence* showing a genuine issue of material fact.  *Anderson*, 477 U.S. at 252.  A mere "scintilla" of evidence for the non-moving party, or evidence that is "merely colorable" or "not significantly probative" is not enough.  *Id.*  Speculation and conclusory

allegations are insufficient to avoid summary judgment. *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,* 172 F.3d 238, 252 (3d Cir. 1999), *superseded in part by statute on other grounds*; Amendments to the Individuals with Disabilities Education Act, Pub. L. No. 108-446, 118 Stat. 2647, *as recognized in P.P. ex rel. Michael P. v. Westchester Area Sch. Dist.*, 585 F.3d 727 (3d Cir. 2009); *see also Helfrich v. Lehigh Valley Hosp.*, Civil Action No. 03-cv-05793, 2005 U.S. Dist. LEXIS 4420, at *38 n.12 (E.D. Pa. Mar. 22, 2005) ("Summary judgment is not based upon the production of feelings, but the production of record facts.").

As set forth more fully below, Ms. Briggs cannot establish the essential elements of her causes of action.  Therefore, Temple is entitled to summary judgment on all of her claims.

### B.    Ms. Briggs Cannot Establish a *Prima Facie* Case of Disparate Treatment.

Ms. Briggs cannot demonstrate that Temple discriminated against her because of her gender or her age.  As discussed below, Ms. Briggs does not have any direct evidence of age or gender discrimination.  Absent direct evidence, discrimination claims are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[13]  *See, e.g.*, *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015).  Under this framework, if Ms. Briggs establishes a *prima facie* case, the burden shifts to Temple to articulate a legitimate, non-discriminatory reason for the challenged employment decisions.  *Id.*  Then, the burden shifts back to Ms. Briggs, who bears the ultimate burden of establishing that the proffered reason was pretext for discrimination.  *Id.*  To establish a disparate treatment claim under the ADEA, Ms. Briggs must prove that age was the "but-for" cause of her termination.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).  Ms. Briggs cannot

---

[13] Gender and age discrimination claims asserted under the PHRA are analyzed using the same framework as claims asserted under Title VII and the ADEA.  *See, e.g.*, *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 n.5 (3d Cir. 2006) (gender); *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998) (age).

sustain her burden to prove gender or age discrimination.

### 1. Dr. Wu's Alleged Comments About Women Retiring in China Do Not Constitute Direct Evidence of Age or Gender Discrimination.

Ms. Briggs claims that, in or around November 2011, Dr. Wu mentioned that women in China retire at 55, told her that women her age in China are "put out to pasture," and told her she should travel, which she interpreted to mean she should retire.[14]  (Briggs Dep. 218:24-219:15, 219:24-220:18, 222:12-223:6.)   These alleged comments do not prove the existence of discrimination without inference or presumption, as required to constitute direct evidence.  *See, e.g.*, *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 513 (3d Cir. 2004) (finding district court correctly concluded that alleged question by plaintiff's supervisor asking her about her retirement plans did not constitute direct evidence of discrimination because the question "could just as easily be explained by a desire on [defendant's] part to do some long-term planning").  To constitute "direct" evidence, the evidence must prove without inference or presumption that the decision makers "placed substantial negative reliance" on the plaintiff's age or gender in reaching their decision.  *Salkovitz v. Pioneer Elecs. (USA) Inc.*, 188 F. App'x 90, 93 (3d Cir. 2006) (internal quotation marks omitted).  Even if true, the isolated and vague comments Dr. Wu allegedly made about women in China are not direct evidence of gender or age discrimination.

Ms. Briggs's claim rests upon the notion that any mention of retirement is *per se* discriminatory.  It is not.  *See, e.g.*, *EEOC v. MCI Int'l, Inc.*, 829 F. Supp. 1438, 1449 (D.N.J. 1993) ("[T]here is nothing *per se* discriminatory about an employer asking an employee about retirement plans . . . .").  Moreover, Ms. Briggs admits that Dr. Wu *never* told her she should

---

[14] Dr. Wu testified that he had one conversation with Ms. Briggs in which they discussed many cultural differences, including eating and working, and that he mentioned as a small piece of that conversation that women in China sometimes retire "very early."  (Wu Dep. 12:5-13:14, 13:22-14:1, 14:10-21, 18:22-19:4.)  When he said "very early," he meant as young as 40.  (Wu Dep. 13:15-17.)

retire.  (Briggs Dep. 232:6-9.)  Even if he had, that too would not constitute direct evidence of discrimination.  *Cellucci v. RBS Citizens, N.A.*, 987 F. Supp. 2d 578 (E.D. Pa. 2013) (Robreno, J.), is illustrative.  There, the plaintiff alleged that her supervisor asked her several times when she planned to retire, commented that she "probably had a fat 401(k) and a pension," and told the plaintiff that "the bank is changing and it needs new younger faces."  *Id.* at 583.  The court concluded that, "[a]lthough the combination of the retirement questions and the 'younger faces' comment could potentially suggest an age-based bias, [the supervisor's comments] fail to directly show the necessary discrimination without inference or presumption, and thus they do not meet the rigorous direct evidence requirement."  *Id.* at 588 (alteration and internal quotation marks omitted).  Also pertinent to the court's decision was that some of the supervisor's alleged comments were made almost a year before the contested employment decision and were not made during the conversations between the plaintiff and her supervisor about her poor performance and possible termination.  *Id.*

Similarly, here, Dr. Wu's alleged comments in November 2011 were "stray remarks" that were not connected to the allegedly discriminatory discipline Ms. Briggs received over two years later in January 2014 or to her discharge in April 2014.[15]  It is well settled that "[s]tray remarks . . . by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 533 (3d Cir. 1992) (citing *Price Waterhouse v.*

---

[15] In her EEOC Charge of Discrimination, Ms. Briggs alleges that Temple discriminated against her by disciplining her on January 20, 2014 and discharging her on April 1, 2014.  *See* Compl. (ECF No. 1) Ex. 1.  Ms. Briggs does not allege that any other actions taken by Temple, including her other disciplinary actions, were discriminatory.  Nor could she do so, as a charge of discrimination must be filed with the EEOC within 300 days from the alleged unlawful employment practice.  *See* 42 U.S.C. § 2000e-5(e)(1).  Ms. Briggs filed her Charge on or about April 23, 2014.  *See* Compl. Ex. 1.  Therefore, claims based upon any alleged discriminatory acts occurring more than 300 days before she field her Charge (June 27, 2013) are time-barred.  *See, e.g., Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000).

*Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).   By Ms. Briggs's own admission, Dr. Wu's comments about women in China retiring were part of a discussion about the cultural differences between China and the United States, and were unrelated to either of her challenged employment decisions.   As such, Dr. Wu's purported comments are, at most, stray remarks that do not constitute direct evidence of age discrimination.  *See Kelly v. Drexel Univ.*, 907 F. Supp. 864, 872 (E.D. Pa. 1995) (finding question posed by plaintiff's supervisor around time that plaintiff's son graduated from college as to when plaintiff planned to retire did not constitute direct evidence of age discrimination, where inquiry was made in year prior to plaintiff's discharge and "was a stray remark that reflected a common and casual reference to the often-anticipated completion of a parent's financial obligations to his children and not age bias"), *aff'd*, 94 F.3d 102 (3d Cir. 1996).   Therefore, if Ms. Briggs is to prove a *prima facie* case of discrimination, she must do so using circumstantial evidence.

**2.      Ms. Briggs Cannot Sustain Her Claim Using Circumstantial Evidence.**

Just as Ms. Briggs cannot prove discrimination based upon direct evidence, she also cannot show that Temple discriminated against her based upon circumstantial evidence.

To establish a *prima facie* case of disparate treatment, Ms. Briggs must show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances of the adverse action give rise to an inference of discrimination.   *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015). Temple does not dispute that Ms. Briggs is a member of a protected class and that she experienced an adverse employment action (her discharge).   However, Ms. Briggs cannot establish a *prima facie* case because she cannot show that she was qualified for her position, and she has no evidence giving rise to an inference of discrimination.

20.

### a. Ms. Briggs Cannot Show That She Was Qualified for Her Position.

Ms. Briggs cannot establish that she was qualified for her position at the time of her discharge.  Although Temple believes Ms. Briggs had the education and technical skills required for the position of Executive Assistant, her repeated, admitted mistakes and violations of Temple's policies rendered her unqualified to remain in her position.  *See Nelson v. DeVry, Inc.*, Civil Action No. 07-4436, 2009 U.S. Dist. LEXIS 38161, at *6 (E.D. Pa. Apr. 23, 2009) (finding plaintiffs failed to establish they were qualified for their positions because they "had criminal backgrounds that the record indicates could have led [defendant] to the belief that they were disqualified"); *Hairston v. Runyon*, No. CIV. A. 96-CV-8707, 1997 WL 798240, at *2 (E.D. Pa. Dec. 11, 1997) ("By violating a legitimate USPS policy (to refrain from heated verbal exchanges), [plaintiff] has failed to show he was qualified for [his] position, and failed to satisfy the second requirement of his *prima facie* case."); *see also Boner v. Bd. of Comm'rs of Little Rock Mun. Water Works*, 674 F.2d 693, 696 (8th Cir. 1982) (finding lower court did not err in concluding plaintiff was not qualified due to his poor job performance).  The undisputed evidence shows that Ms. Briggs was disciplined and discharged because of her performance deficiencies and repeated violation of Temple's legitimate policies.  Therefore, she cannot show that she was qualified for her position and cannot establish a *prima facie* case.

### b. Ms. Briggs Cannot Establish an Inference of Discrimination.

Ms. Briggs's discrimination claims are premised on her allegations that: (1) Dr. Wu commented about women in China retiring at 55; (2) Dr. Wu "protected" or "let stuff slide" for six other employees; (3) Hailey King was disciplined less severely for her unexcused absence; and (4) Dr. Wu reassigned some of her job duties to Ms. King.  None of these allegations, however, give rise to an inference of age or gender discrimination; thus, Ms. Briggs's

discrimination claims fail at the *prima facie* stage.

Ms. Briggs cannot establish an inference of discrimination by showing that Temple treated similarly situated employees outside her protected class more favorably than it treated her. To the extent she attempts to make this showing by listing other employees Dr. Wu allegedly "protected" or for whom he "let stuff slide," these individuals are not appropriate comparators. Ms. Briggs identifies six such persons, including five women (Judy Lennon, Alexandra Grinshpun, Jackie Harriz, Hailey King, and Laurie Shteir), and one man (Tom Stauffer). (Briggs Dep. 282:17-283:5, 284:10-19, 285:2-12, 286:3-5, 365:19-20.) Two of those individuals (Ms. Lennon and Ms. Harriz) were in their sixties, i.e., older than Ms. Briggs, and one (Ms. Shteir) was "fifty-ish." (Briggs Dep. 284:20-22, 285:18-20, 285:23-24.) Thus, five of the six individuals who Ms. Briggs named are also women, two are older than Ms. Briggs, and one is close in age. Because these individuals were in Ms. Briggs's protected class, they are not appropriate comparators.

Further, to rely on comparators, Ms. Briggs "must establish that the other employee's acts were of comparable seriousness to [her] own infraction" and that she and the other employee "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Anderson v. Haverford Coll.*, 868 F. Supp. 741, 745 (E.D. Pa. 1994) (internal quotation marks omitted). Ms. Briggs's has identified only two specific instances of misconduct by her putative comparators. The first is the December 2011 incident in which Judy Lennon reportedly failed to properly secure student records containing Social Security numbers. *See* Briggs Dep. Ex. D-27. Notably, however, Temple never disciplined Ms. Briggs for violations of policies about student records or Social Security numbers. Ms. Lennon also is both a female and older than Ms. Briggs.

Therefore, she is not an appropriate comparator.

The second incident Ms. Briggs identified is when Hailey King was absent for two or three days without calling in.  (Briggs Dep. 359:9-19.)  But, the undisputed evidence is that Ms. King's unexcused absences occurred during a hurricane when she could not call in, and Dr. Wu gave her a verbal warning as a result of the incident.  (Wu Dep. 130:6-131:23.)  Ms. Briggs contrasts this with her own failure to notify Dr. Wu when she was three hours late, and, while she had the ability to do so, she affirmatively chose not follow office protocol and send him an email.  (Briggs Dep. Ex. D-44.)  There were "differentiating or mitigating circumstances" between her conduct and Ms. King's conduct that distinguishes their treatment.  *See, e.g., Jones*, 796 F.3d at 328-29 (finding conduct of plaintiff's proposed comparator who underreported his vacation time to compensate for overtime work was materially different from plaintiff's misconduct in claiming pay for work he never performed).  And, the January 2014 written warning that Ms. Briggs received for this misconduct does not constitute an adverse employment action.  As such, it is immaterial.

Simply stated, there is no evidence that any other employee, much less an employee in Dr. Wu's reporting structure, engaged in misconduct similar to the misconduct that led to Ms. Briggs's discharge:  Ms. Briggs identified no other employee who failed to book travel reservations for a visiting professor or hotel reservations for a colloquium speaker, (Briggs Dep. 285:13-17), who engaged in disruptive or disorderly conduct by becoming argumentative and unprofessional with her superiors, or who failed to complete assignments within the time requested.  Without any such evidence, Ms. Briggs cannot establish a *prima facie* case of discrimination.  *See, e.g.*, *Crumpton v. Potter*, 305 F. Supp. 2d 465, 474 (E.D. Pa. 2004) (finding plaintiff failed to make out *prima facie* case and granting summary judgment for defendant on

23.

discrimination claim because "plaintiff has not identified any similarly situated non-protected person who was treated more favorably than he").

Finally, as discussed in section III(B)(1), *supra*, Dr. Wu's alleged comments about the retirement age for women in China do not give rise to an inference of discrimination because they are wholly unrelated to and temporally remote from Ms. Briggs's termination.

### C.    Ms. Briggs Cannot Show That Temple's Legitimate Non-Discriminatory Reason for Its Actions Is Pretext for Discrimination.

Even if Ms. Briggs could establish a *prima facie* case of disparate treatment (and she cannot), Temple rebuts the inference of discrimination by "provid[ing] evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons." *Willis*, 808 F.3d at 644.  Temple need not *disprove* an improper motive; rather, it merely must *identify* a legitimate motive for the challenged employment decision. *See, e.g.*, *Dean v. Specialized Sec. Response*, Civil Action No. 09-515, 2011 U.S. Dist. LEXIS 94722, at *38 (W.D. Pa. Aug. 24, 2011).  The inquiry focuses on the perception of the decision-maker; thus, the employer need only have "an honest belief that the incident occurred." *Id.* at *39.  Temple had a legitimate, non-discriminatory reason for disciplining and discharging Ms. Briggs:  her repeated behavioral and job performance issues, which violated Temple's Rules of Conduct.

Given Temple's legitimate non-discriminatory reason for Ms. Briggs's termination, to defeat summary judgment, Ms. Briggs must adduce evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  She cannot do either.

1.    **No Reasonable Factfinder Could Disbelieve Temple's Reason for Disciplining and Discharging Ms. Briggs.**

The first method of establishing pretext focuses on whether the plaintiff has adduced evidence from which a fact-finder could reasonably disbelieve the defendant's articulated legitimate reasons for the challenged actions.  As the Third Circuit has explained, to discredit the employer's reason, a plaintiff must:

> demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence" and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

*Fuentes*, 32 F.3d at 765 (alteration in original) (citation and internal quotation marks omitted).

At this stage of the analysis, the question is "not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [an unlawful motive]."  *Keller v. ORIX Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (internal quotation marks omitted).  As the Third Circuit explained, the plaintiff "has the burden of casting doubt on an employer's articulated reasons for an employment decision.  Without some evidence to cast this doubt, this court will not intervene in an otherwise valid management decision.  To require less would be to expose to litigation every management decision impacting on a protected party."  *Billet v. CIGNA Corp.*, 940 F.2d 812, 828 (3d Cir. 1991); *see also Ezold*, 983 F.2d at 533.

Ms. Briggs has no evidence to cast doubt on the reasons given by Temple for disciplining and discharging her.  She does not dispute that the incidents for which she was disciplined occurred (even though she disagrees with the reasonableness of her behavior and the level of discipline imposed).  (Briggs Dep. 274:19-275:2, 307:4-12, 312:20-313:5.)  And, she has no evidence that the persons involved in the decisions – Dr. Wu, Mr. DiMeo, Mr. Wacker, and Ms. Walton – did not honestly believe she engaged in the alleged misconduct.  As such, no

reasonable factfinder could disbelieve Temple's rationale for its decisions.

> **2.    Ms. Briggs Cannot Prove That an Invidious, Discriminatory Reason Motivated Temple.**

To show pretext under the second method identified in *Fuentes*, a plaintiff must demonstrate, through admissible record evidence, that discrimination "was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762. A plaintiff cannot rely on her own subjective beliefs or feelings to establish that discrimination was the reason for her termination decision. *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 413 (E.D. Pa. 2000) ("Pretext cannot be established based on speculation and mere conclusory allegations."). Rather, she must proffer *actual evidence* to support her claim of pretext. *Harris v. Mercy Health Corp.*, Civil Action No. 97-7802, 2000 U.S. Dist. LEXIS 11228, at *29 (E.D. Pa. Aug. 10, 2000) (finding plaintiff's unsupported allegations insufficient to avoid summary judgment where he "offer[ed] no evidence suggesting that defendant's asserted reasons for its actions . . . were either objectively false or merely pretextual").

Ms. Briggs has no evidence to support a finding that the decisions to discipline and discharge her were motivated by discriminatory intent. Ms. Briggs's evidence is limited to Dr. Wu's vague and temporally remote comments about the retirement age of women in China, her non-specific allegations that Dr. Wu treated other employees more favorably than he treated her, and her allegations that Ms. King was given only a verbal warning for failing to call in or report to work in the aftermath of a hurricane. As the Third Circuit has noted, "[a] decision adversely affecting an older employee does not become discriminatory merely because one younger employee is treated differently." *Simpson v. Key Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998). Instead, there must be some "evidence from which to infer discrimination apart from the fact that some members of one group are sometimes treated better and sometimes

treated worse than members of another group." *Id.* Ms. Briggs has no such evidence. While she contends that Dr. Wu treated five other female employees more favorably than he treated her, her own allegations about the employees' gender and ages dispel any notion that Dr. Wu possesses age or gender animus.

The reasons Ms. Briggs believes Dr. Wu wanted to "get rid of" her are all unrelated to her age or gender. She believes Dr. Wu "wanted her out" because he wanted a secretary, which she does not consider herself to be, and someone who "wasn't as problematic to his budget, and it seemed likely that it be [her]," as she was "the only one who wasn't in a union in the department, and [she] had no recourse." (Briggs Dep. 280:1-13, 319:1-320:3.) Although she apparently believes that a desire to replace a more senior worker with someone who costs less is *per se* discriminatory, the Supreme Court long ago held otherwise. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612 (1993) ("[A] decision by the company to fire an older employee solely because he has nine-plus years of service and therefore [his pension benefits are] 'close to vesting' would not constitute discriminatory treatment on the basis of age.").

Even viewing the evidence in the light most favorable to Ms. Briggs, she cannot show that her age was even ***a factor*** in – much less ***the but-for cause of*** –the challenged employment decisions. Nor does she have any evidence that her gender was in any way related to her discipline or discharge. Rather than showing that Dr. Wu singled her out because of her age or gender, the evidence shows he disciplined Ms. Briggs because she repeatedly failed to perform as expected and made serious errors. Ms. Briggs has no competent evidence to show otherwise. As such, she cannot show pretext, and Temple is entitled to judgment as a matter of law on Ms. Briggs's age and gender discrimination claims.

**D.      Ms. Briggs Cannot Sustain a Claim of Gender- or Age-Based Harassment.**

To prevail on a claim of gender or age discrimination under a theory of a hostile or abusive work environment, Ms. Briggs must establish that: (1) she suffered intentional discrimination because of her age or gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and (5) there is a basis for holding Temple liable.  *See, e.g., Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006).  Even assuming Ms. Briggs's allegations are true, she does not meet this standard.

According to Ms. Briggs, Mr. Wacker created a hostile work environment by: (1) threatening to fire her if she did not cooperate with him by ceasing to assist Judy Lennon, (Briggs Dep. 187:15-20);[16] (2) "not responding" to her "requests for help, mediation, something between Dr. Wu and [herself]," (Briggs Dep. 188:11-16); (3) having Mr. DiMeo sit in on the meetings and report back to him so Mr. Wacker "always knew what happened," (Briggs Dep. 190:5-11); (4) calling her and telling her to do whatever Dr. Wu asked her to do because Mr. Wacker was "tired of [Dr. Wu] coming over here," (Briggs Dep. 190:12-21); (5) Mr. Wacker "being involved" even though she was not in his office, (Briggs Dep. 190:22-191:6); (6) causing her to fear Mr. Wacker would find a reason to discipline her because she "saw what happened, what he wanted [her] to do to one person, another person, and she was . . . fearful that it would

---

[16] According to Ms. Briggs, Mr. Wacker told her "that they were trying to find something on" their department secretary Judy Lennon "to get rid of her," and he told Ms. Briggs that he would discipline her if he caught her helping Ms. Lennon again.  (Briggs Dep. 77:14-78:1.)  Ms. Lennon struggled with her computer skills, and Ms. Briggs tried to help her.  (Briggs Dep. 78:2-7.)  Ms. Briggs acknowledged that helping Ms. Lennon with her computer skills prevented a proper assessment of those skills.  (Briggs Dep. 79:9-22.)

happen to [her]," (Briggs Dep. 191:7-15);[17] and meeting with Dr. Wu outside her presence, (Briggs Dep. 191:19-22).

Mr. DiMeo allegedly created a hostile work environment after he sat in on Ms. Briggs's thrice-weekly meetings with Dr. Wu under Mr. Wacker's supervision, and she was told in those meetings what she had done wrong and was not given a chance to explain.  (Briggs Dep. 194:7-195:2.)   Mr. DiMeo also allegedly created a hostile work environment by not believing or trusting Ms. Briggs.  (Briggs Dep. 195:3-10.)

According to Ms. Briggs, Dr. Wu created a hostile work environment by yelling at and degrading her in public settings, including asking her if she was stupid; criticizing her finances; and "[j]ust generalized fear."  (Briggs Dep. 197:2-9, 197:22-198:11.)

### 1.    Ms. Briggs Was Not Subjected To Age- or Gender-Based Harassment.

In *Oncale v. Sundowner Offshore Services*, the Supreme Court reiterated the threshold that must be met to establish an unlawful "hostile work environment" claim under Title VII:

> When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.

523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).  The Court emphasized that harassment, no matter how severe or pervasive, only violates Title VII if it occurs "because of" the victim's membership in a protected class (*e.g.*, sex or age).  *Oncale*, 523 U.S. at 80 (quoting *Harris,* 510 U.S. at 25 (Ginsburg, J., concurring)).

---

[17] In 2004 or 2005, there was an employee named Tanya Hunnewell who was on intermittent medical leave who Mr. Wacker believed was "faking it," so he allegedly asked Ms. Briggs to "find something" on Ms. Hunnewell "to get rid of her" and to call Ms. Hunnewell's doctor's office to find out if she was really sick when she had called out. (Briggs Dep. 75:9-22, 76:9-17, 88:23-89:4.)   Ms. Briggs believes that Mr. Wacker asked her to call Ms. Hunnewell's doctor because he did not believe that she was sick, and that he told Ms. Briggs to find something on Ms. Hunnewell to get rid of her because he thought she was lying.  (Briggs Dep. 181:15-182:21.)  Although Mr. Wacker was senior to her, Ms. Briggs did not call the doctor's office as he had directed her to do.  (Briggs Dep. 89:5-90:6.)

There is no evidence that the actions that Ms. Briggs contends constituted a hostile work environment were related to her age or her gender.  Rather, as delineated above, she complains about how Temple addressed her performance issues, including Mr. Wacker not responding to her requests for "mediation" with Dr. Wu in the manner she preferred, having meetings with Dr. Wu outside her presence, and being involved in her disciplined.  Ms. Briggs's allegations that her workplace was "hostile" are tied directly to Temple's efforts to correct her behavioral and performance deficiencies.  The actions she alleges created a hostile work environment are managerial functions.  *See Fichter v. AMG Resources Corp.*, 528 F. App'x 225, 231 (3d Cir. 2013) ("Title VII does not guarantee a Utopian workplace.") (internal quotation marks omitted).  Contrary to Ms. Briggs's belief, being closely supervised or having one's work micromanaged does not give rise to a hostile work environment claim.  *McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 423 (D.N.J. 2009).

### 2.     Any Harassment to Which Ms. Briggs Was Subjected Was Not Severe or Pervasive.

Even assuming that the actions about which Ms. Briggs complains reasonably could be construed as related to her age or gender (and they cannot), her allegations do not evidence a severe or pervasive workplace.

To establish the second prong of a *prima facie* case, a plaintiff must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Oncale*, 523 U.S. at 78 (quoting *Harris,* 510 U.S. at 21).  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Shramban v. Aetna*, 115 F. App'x 578, 580 (3d Cir. 2004) (internal quotation marks omitted).  Title VII is not violated by

"the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted).

To determine whether challenged conduct is sufficiently "severe" or "pervasive," the Court must consider the totality of the circumstances, including the frequency of the conduct; its severity; whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with the employee's job performance. *Jensen*, 435 F.3d at 452 (citing *Harris*, 510 U.S. at 23). Ms. Briggs's subjective belief she suffered severe or pervasive treatment is insufficient to survive summary judgment. *See Peace-Wickham v. Walls*, C.A. No. 07-598-MPT, 2009 WL 4036101, at *6 n.94 (D. Del. Nov. 23, 2009) (citing cases), *aff'd*, 409 F. App'x 512 (3d Cir. 2010).

Here, the actions of which Ms. Briggs complains do not even come close to the level of severity or pervasiveness required to constitute an actionable hostile work environment. Although she complains of a myriad of actions she believes made her work environment "hostile," she cannot show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult." To the contrary, she complained that the workplace was "hostile" simply because – and as a direct result of – Temple's reasonable efforts to address her performance deficiencies. The actions about which Ms. Briggs complains occurred sporadically over a number of years, were not physically threatening, and amounted to "ordinary tribulations of the workplace," which are non-actionable as a matter of law.

Ms. Briggs's allegations are remarkably less severe than those in *Ryan v. CBS Corp.*, Civil Action No. 06-2385, 2007 WL 2317380 (E.D. Pa. Aug. 7, 2007) (Kelly, J.), which the court held did not constitute actionable harassment. In *Ryan*, the plaintiff alleged, among other

31.

actions, that his supervisor often asked him if he would retire, another manager talked to plaintiff about retiring, two managers repeatedly made "old man" jokes and comments about plaintiff and remarks about his age at a marketing luncheon, including telling a client she would have to cut up plaintiff's food so he could chew it and that his food needed to be put in a blender, a manager emailed to all account executives, including plaintiff, telling them that two new accounts executives right of out college would start soon, and everyone needed to "step it up," and some of plaintiff's most lucrative advertising accounts were given to younger salespeople.  *Id.* at *3-4. The court found these incidents were insufficiently severe or pervasive to constitute actionable harassment, and granted summary judgment for the defendant.  *Id.* at *10.

Even accepting her allegations as true and viewing the evidence in the light most favorable to Ms. Briggs, she was not subjected to harassment "because of" her age or gender, and the actions about which she complains are neither severe nor pervasive.  As such, she cannot sustain her hostile work environment claims, and Temple is entitled to judgment as a matter of law.

### E.    Ms. Briggs's Retaliation Claim Fails as a Matter of Law.

The *McDonnell Douglas* burden-shifting analysis also applies to claims of retaliation. *See, e.g.*, *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 259, 257 (3d Cir. 2017).  Similar to an age discrimination claim, a plaintiff alleging retaliation must show that her protected activity was the "but-for" cause of the challenged employment action.  *Id.*  Ms. Briggs cannot make this showing as she has no evidence that her alleged protected activity was *a factor* – let alone the *but-for cause of* – her discipline or discharge.

### 1.    Ms. Briggs Cannot Establish a *Prima Face* Case of Retaliation.

To establish a *prima facie* case of retaliation Ms. Briggs must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal

connection between the protected activity and the adverse action.  *Id.*

### a.     Ms. Briggs Did Not Engage In Protected Activity.

For this Motion only, Temple accepts that Ms. Briggs engaged in protected activity when she complained to Sandy Foehl (EOC), on April 1, 2014, about what she perceived as age discrimination.  However, her complaints to Deirdre Walton are another matter—Ms. Briggs said nothing in those complaints to indicate she believed she was being discriminated against because of her age or gender.  It is well established that, for a complaint to qualify as protected activity, the complaint must sufficiently convey to the employer that the employee is asserting statutory rights.  *See, e.g.*, *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995).  "A general complaint of unfair treatment does not translate into a charge of illegal *age* discrimination."  *Id.* In her emails to and conversations with Ms. Walton, Ms. Briggs did not mention alleged age or gender discrimination, nor did she otherwise say anything to indicate she believed she was being discriminated against because of her age or gender.  (*See* Walton Dep. Ex. P-26; Briggs Dep. Ex. D-37, Ex. D-40, D-43, D-44.)  Rather, in her communications with Ms. Walton, Ms. Briggs complained generally about alleged unfair treatment.  A reasonable, objective person would not have construed Ms. Briggs's communications with Ms. Walton as an assertion of rights under the ADEA, Title VII, or the PHRA, because Ms. Briggs did not tell Ms. Walton, in any way, that she was being treated unfavorably because of her age or gender.  Under the circumstances, they did not constitute statutorily protected activity.  *See, e.g.*, *Cuffee v. Dover Wipes Co.*, 334 F. Supp. 2d 565, 575 (D. Del. 2004) (complaints about unfair treatment without "any express complaint about discriminatory activity" cannot be a protected activity), *aff'd*, 163 F. App'x 107 (3d Cir. 2006).

      **b.**      **Even If Ms. Briggs Engaged In Protected Activity, There Is No Connection Between Her Complaints And Her Discharge.**

Ms. Briggs also cannot establish the requisite causal link between her complaints to Ms. Foehl (or anyone else at Temple) and her discharge. Although she may attempt to show causation by relying on the fact that she was advised of Temple's termination decision on the same day she met with Ms. Foehl, Dr. Wu initiated the termination decision *before* Ms. Foehl's meeting with Ms. Briggs. *First*, Dr. Wu brought Ms. Briggs's latest performance and behavioral issues to the attention of Mr. Wacker. *Then*, Mr. Wacker had Mr. DiMeo investigate those issues, and, *then*, Mr. Wacker, Mr. DiMeo, Dr. Wu, in consultation with Ms. Walton, decided to discharge Ms. Briggs. Those decisions all pre-dated Ms. Briggs's meeting with Ms. Foehl. Mr. Wacker also requested to meet with Ms. Briggs about her discharge before she met with Ms. Foehl.

Further, it is undisputed that Dr. Wu did not know that Ms. Briggs communicated with Ms. Foehl (or anyone else) about her belief she had been discriminated against, or even that she had complained to anyone at Temple about him. (Wu Dep. 67:23-68:12, 110:11-19.) Mr. Wacker and Mr. DiMeo likewise did not know prior to Ms. Briggs's discharge that she had complained or raised any concerns with Ms. Foehl. (Wacker Dep. 68:21-69:1; DiMeo Dec. ¶ 5.) Without any knowledge of Ms. Briggs's discussions with Ms. Foehl, Mr. Wacker, Mr. DiMeo, and Dr. Wu could not have retaliated against Ms. Briggs for her alleged complaints. *See, e.g., Bedford v. Se. Pa. Transp. Auth.*, 867 F. Supp. 288, 293 (E.D. Pa. 1994) (noting that "[i]f the person who decided that plaintiff's employment should be terminated had no knowledge that she had engaged in the protected activity in question, then clearly he could not have retaliated against [plaintiff] for so doing").

Because Ms. Briggs cannot show a causal connection between her complaints and her

termination, she cannot establish a *prima facie* case and cannot survive summary judgment. *See, e.g.*, *Jones*, 796 F.3d at 331 (affirming summary judgment for employer on retaliation claim where plaintiff failed to show a causal connection between her protected activity and her termination).

## IV.    CONCLUSION

There are no genuine issues of material fact and Temple is entitled to judgment as a matter of law.  Temple respectfully requests that the court enter summary judgment in its favor and dismiss Ms. Briggs's Complaint in its entirety.

Respectfully submitted,

*/s/ Richard R. Harris*
Richard R. Harris
Rachel Fendell Satinsky
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3000 – telephone
267.402.3131 – facsimile
rharris@littler.com
rsatinsky@littler.com

*Attorneys for Defendant*
Dated: July 31, 2017                *Temple University*

35.

## **CERTIFICATE OF SERVICE**

I, Rachel Fendell Satinsky, hereby certify that, on this 31st day of July, 2017, the foregoing document was filed using the Eastern District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon all counsel of record.

/s/ Rachel Fendell Satinsky
Rachel Fendell Satinsky