# EXHIBIT B

RUTH V. BRIGGS

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

RUTH V. BRIGGS,                    : No. 16-cv-00248
            Plaintiff     :
                          :
        vs.               :
                          :
TEMPLE UNIVERSITY,        :
            Defendant     :

- - -

Thursday, May 25, 2017

- - -

            Videotaped deposition of RUTH V.
BRIGGS, taken pursuant to notice, was held at the
offices of Littler Mendelson, Three Parkway, 1601
Cherry Street, Suite 1400, Philadelphia,
Pennsylvania 19102, beginning at 10:07 a.m., on
the above date, before DEBRA ANNE GERSTEMEIER,
Registered Professional Reporter and Notary
Public of the Commonwealth of Pennsylvania.

- - -

ELITE LITIGATION SOLUTIONS, LLC
1518 Walnut Street, Suite 300
Philadelphia, Pennsylvania  19102
www.elitelsllc.com ~ (215) 563-3703

RUTH V. BRIGGS

Page 2

```
 1

 2   A P P E A R A N C E S:

 3

 4   CONSOLE MATTIACCI LAW
     BY:   RAHUL MUNSHI, ESQUIRE
 5   1525 Locust Street, 9th Floor
     Philadelphia, Pennsylvania 19102
 6   Telephone:  (215) 545-7676
     E-mail:  munshi@consolelaw.com
 7   --Representing the Plaintiff

 8

 9

10   LITTLER MENDELSON
     BY:   RACHEL FENDELL-SATINSKY, ESQUIRE
11   Three Parkway
     1601 Cherry Street, Suite 1400
12   Philadelphia, Pennsylvania 19102
     Telephone: (267) 402-3000
13   E-mail: rsatinsky@littler.com
     --Representing the Defendant
14

15

16

17   ALSO PRESENT:

18   Fay R. Trachtenberg - Temple counsel

19   Keith Weidenauer & Rick Christian - Videographers

20

21

22

23

24
```

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 59

1           you can.  We don't want you

2           guessing.

3                THE WITNESS:  It would be a

4           guess.

5    BY MS. FENDELL-SATINSKY:

6    Q.    Did you apply for more than five jobs

7    in 2010 internally at Temple?

8    A.    I would say, yes.

9    Q.    More than ten?

10   A.    I can't say for sure.

11   Q.    So somewhere between five and ten?

12   A.    Yes.

13                MR. MUNSHI:  Just objection to

14           form.  She said she couldn't say.

15   BY MS. FENDELL-SATINSKY:

16   Q.    Did you interview for any of the jobs

17   you applied for in 2010?

18   A.    No.

19   Q.    Who is Andrew DiMeo?

20   A.    He was, when I was there, Andrew was

21   the assistant director of finance, I believe

22   is his title, in the College of Science and

23   Technology dean's office.

24   Q.    Did you interact with him during your

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 60

```
 1   employment at Temple?

 2   A.    Yes, I did.

 3   Q.    And what did you think of him?

 4              MR. MUNSHI:   Just objection to

 5         form.

 6              You can answer if you

 7         understand.

 8              THE WITNESS:   Uhm, I thought

 9         he was a nice young man initially.

10   BY MS. FENDELL-SATINSKY:

11   Q.    Anything else?

12   A.    Say the question again.

13   Q.    Sure.

14         I asked you what did you think of

15   Mr. DiMeo, and you testified that you

16   thought he was a nice young man initially.

17   A.    Right.

18   Q.    Did you have any other thoughts

19   about --

20   A.    I did.

21   Q.    -- Mr. DiMeo?

22   A.    I did.

23   Q.    And what were those or what are

24   those?
```

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 62

1                THE WITNESS:  Those are --

2    BY MS. FENDELL-SATINSKY:

3    Q.    In asking your thoughts about him,

4    you testified that your relationship with

5    Mr. DiMeo at some point became confrontive;

6    is that correct?

7    A.    Yes, it did.

8    Q.    And so I asked you what did you mean

9    by confrontive.

10   A.    Uhm, I distrusted him.

11   Q.    Why?

12   A.    Because I -- he wasn't advocating for

13   me.

14   Q.    Any other reason you distrusted him?

15   A.    He lied about me.

16   Q.    Any other reason you distrusted him?

17   A.    He, he allowed Dr. Wu to yell at me

18   in front of him, and I wanted him to stand

19   up for me.

20   Q.    Any other reasons that you found

21   Mr. DiMeo -- that you distrusted Mr. DiMeo?

22   A.    Honestly, yes.  I, I thought because

23   he reported to Greg Wacker, who was the

24   director of finance in the dean's office,

RUTH V. BRIGGS

Page 63

1   that --

2   Q.   So -- I'm sorry.

3          MR. MUNSHI:   She's still --

4   BY MS. FENDELL-SATINSKY:

5   Q.   Go ahead.

6   A.   That he was just there for Greg.   You

7   know, he was just Greg's message.   It didn't

8   seem like his message.

9   Q.   And that made you distrust him?

10  A.   Yes.

11  Q.   Any other reasons that you distrusted

12  him?

13  A.   No.

14  Q.   You said at some point that you --

15  that your relationship became confrontive.

16  A.   Yes.

17  Q.   Which you've described confrontive as

18  distrusting, correct?

19  A.   Yes.

20  Q.   When did that happen?

21  A.   Approximately 2012 to '13, around

22  that time period when he was told that he

23  would sit in on Dr. Wu's and my morning

24  meetings.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 69

1    A.    No, he did not say that.

2    Q.    How old is Mr. DiMeo?

3    A.    I'm going to guess.  I'm going to

4    say --

5    Q.    I don't want you to guess, but if you

6    have --

7    A.    I don't know.

8    Q.    -- an estimate, that's fine.

9    A.    40 years old.

10   Q.    So Mr. DiMeo is younger than you,

11   right?

12   A.    Yes.

13   Q.    Did you view him as being younger

14   than you?

15   A.    No.

16             MR. MUNSHI:  Just objection to

17        form.

18   BY MS. FENDELL-SATINSKY:

19   Q.    Did you view Mr. DiMeo as having less

20   experience than you?

21   A.    No.

22   Q.    Did you value Mr. DiMeo's input into

23   your meetings with Dr. Wu?

24   A.    Initially, yes.

RUTH V. BRIGGS

Page 70

1    Q.    And did that change at some point?

2    A.    Yes.

3    Q.    When did that change?

4    A.    When he agreed with Dr. Wu.

5    Q.    When was that?

6    A.    Just about every morning.  I don't

7    know.  Yeah, I don't know.  Often,

8    frequently.

9    Q.    So am I correct that when Mr. DiMeo

10   agreed with Dr. Wu you did not value that

11   input?

12   A.    I did not value, value it.  No, I did

13   not.

14   Q.    But you did value his input when he

15   didn't agree with Dr. Wu?

16   A.    It was -- yeah, I did value him, but

17   it wasn't about that meeting.  When I first

18   met him, I liked him; he was a great guy,

19   you know.

20   Q.    So you said that your valuing of

21   Dr. -- of Mr. DiMeo changed when he agreed

22   with Dr. Wu, correct?

23   A.    It -- can I -- that's wrong.

24   Q.    Okay.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 71

1   A.    It --

2   Q.    So what did -- so when did your

3   valuing of Mr. DiMeo change?

4   A.    When he was assigned to attend those

5   morning meetings.  Within, I'd say, a month

6   or so.

7   Q.    And what happened in a month or so

8   that made you change your valuation of

9   Mr. DiMeo?

10  A.    They lied about me.  I was written

11  up, disciplined.

12  Q.    Were you disciplined by Mr. DiMeo?

13  A.    No.  By proxy.

14  Q.    Mr. DiMeo never signed any of your

15  discipline, correct?

16  A.    I can't say for sure if he did.  I

17  think it was Greg Wacker most of the time.

18  Q.    Mr. DiMeo was not somebody you

19  reported to, correct?

20  A.    I report -- no.  No, I did not.

21  Q.    Did you find Mr. DiMeo's input to you

22  helpful?

23  A.    Initially, yes.

24  Q.    And then when did that change?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 75

1            THE WITNESS:  Uhm, I was
2       afraid of him.
3   BY MS. FENDELL-SATINSKY:
4    Q.   Throughout your employment at Temple?
5    A.   Yes.
6    Q.   Why?
7    A.   He asked me to do things that were, I
8   felt, morally objectionable, if not illegal.
9    Q.   What did he ask you to do that you
10   found morally objectionable, if not illegal?
11    A.   The first thing he asked me to do was
12   to find something on an employee in our
13   office to get rid of her, that he didn't
14   believe she had -- she had gotten family
15   medical leave, intermittent leave, uhm, that
16   she was faking it.
17    Q.   And who was that employee?
18    A.   Her name is Tanya.  And I'm going to
19   have to guess the spelling on her last name,
20   Andrzjewski.  Her married name is Hunnewell,
21   but at the time it -- A-N-D -- I, I don't
22   know.
23    Q.   What else did Mr. Wacker ask you to
24   do that you viewed as morally objectionable,

RUTH V. BRIGGS

Page 76

1    if not illegal?

2    A.    He coached me before we met with an

3    attorney about her lawsuit against Temple.

4    Q.    When was that?

5    A.    That would have been 2004.

6    Q.    And that was related to Tanya

7    Hunnewell?

8    A.    Yes, it was.

9    Q.    What else did Mr. Wacker ask you to

10   do that you found morally objectionable, if

11   not illegal?

12   A.    To call her doctor's office.

13   Q.    To call Tanya Hunnewell's doctor's

14   office?

15   A.    Yes.

16   Q.    Was that also around 2005?

17   A.    2004 or '05, yeah.

18   Q.    Why don't you give me a list of

19   everything that you found that Mr. Wacker

20   asked you to do that you found morally

21   objectionable, if not illegal.

22            MR. MUNSHI:   Beyond what she's

23        already said, or recap?

24

RUTH V. BRIGGS

Page 77

1    BY MS. FENDELL-SATINSKY:

2    Q.    Beyond what you've already told me.

3    A.    To just that -- to do what people

4    tell me to do, that my superiors tell me to

5    do even if I struggle with, struggle with it

6    morally, ethically.

7    Q.    Anything else?

8    A.    No.

9    Q.    So there are four things you told me

10   that Dr. -- that Mr. Wacker asked you to do

11   that you found morally objectionable, if not

12   illegal, correct?

13   A.    Correct.

14   Q.    Is there anything in addition to

15   those four things that you've already

16   testified about that Mr. Wacker asked you to

17   do that you found morally objectionable, if

18   not illegal?

19   A.    Other than what -- yes.

20   Q.    What else?

21   A.    Judy Lennon, who was our department

22   secretary, he told me that they were trying

23   to find something on her to get rid of her

24   and that if he caught me helping her again

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 78

1    that he would discipline me.

2    Q.    Did Ms. Lennon struggle with some of

3    her job responsibilities?

4    A.    With her computer skills.

5    Q.    And did you help her with her

6    computer skills?

7    A.    I did.

8    Q.    Uhm, and did you understand that when

9    you helped her with her computer skills

10   Mr. Wacker couldn't assess what Ms. Lennon's

11   skills were?

12   A.    He didn't -- he wasn't the one who

13   assessed her.

14   Q.    Who did assess her?

15   A.    Dr. Wu.

16   Q.    When you helped Ms. Lennon with her

17   computer skills, did you understand that

18   Dr. Wu could not assess Ms. Lennon's

19   computer skills?

20   A.    Please read the question again.

21   Q.    Sure.

22            MS. FENDELL-SATINSKY:  Could

23        you read it back, please.

24            THE COURT REPORTER:  Uh-huh.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 79

1               MS. FENDELL-SATINSKY:  Thank

2        you.

3                   - - -

4               (Whereupon, the court reporter

5        read the last question.)

6                   - - -

7               THE WITNESS:  No, I did not.

8   BY MS. FENDELL-SATINSKY:

9   Q.    So if you help somebody with their

10  computer skills, then it's part -- their

11  performance of their computer skills is part

12  you, correct?

13  A.    Yes.

14  Q.    So it's not -- so when you helped

15  Ms. Lennon with her computer skills, that

16  was not adequately displaying her

17  performance, correct?

18  A.    Yes.

19  Q.    And if somebody is not adequately

20  displaying their own personal performance,

21  then they can't be properly assessed, right?

22  A.    Yes.

23  Q.    Any other things that Mr. Wacker

24  asked you to do that you found morally

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 88

1   A.    No.

2              MR. MUNSHI:  We've been going

3         about an hour.  Can we take five?

4              MS. FENDELL-SATINSKY:  I just

5         want to finish this line of

6         questioning.

7              MR. MUNSHI:  Okay.  Yeah,

8         whenever you're done with this line

9         of questions.

10  BY MS. FENDELL-SATINSKY:

11   Q.    The incident involving Keya where you

12  say Keya asked you for information and

13  Mr. Wacker told you not to give it to him,

14  when did that occur?

15   A.    Right after his appointment as acting

16  dean.  So, the date is not clear to me.  I'm

17  thinking it's probably July, the summer of

18  2003-'04.

19   Q.    That did not happen in 2013?

20   A.    With Keya?

21   Q.    Yes.

22   A.    No, uh-uh.

23   Q.    What did Mr. Wacker ask you to do in

24  regards to calling Tanya Hunnewell's

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 89

1   doctor's office in 2005?

2    A.    If she -- she was out, had called

3   out, and he wanted her doctor to say that

4   she was sick.

5    Q.    Did you call her doctor's office?

6    A.    No, I did not.

7    Q.    Did he ask you to call her doctor's

8   office?

9    A.    He did.

10    Q.    And in 2005 Mr. Wacker was senior to

11   you, correct?

12    A.    Yes.

13           MR. MUNSHI:  Just objection to

14       form.

15           THE WITNESS:  Yeah, yes.

16   BY MS. FENDELL-SATINSKY:

17    Q.    Do you understand what -- when I say

18   the word "senior," what do you mean?  What

19   did you understand that to mean?

20    A.    It means that his grade level is

21   higher than me and he was also the, you

22   know, the director of finance in the college

23   dean's office.

24    Q.    So Mr. Wacker asked you to call

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 90

1    Ms. Hunnewell's doctor, and you did not do

2    that, correct?

3    A.    No, I did not.

4    Q.    And by not doing that, you didn't

5    listen to a direction he gave you, correct?

6    A.    That is true, yes.

7    Q.    You said Mr. Wacker told you to do

8    what your superiors tell you to do even if

9    you struggle morally or ethically with it?

10   A.    That -- not then.  Later.

11   Q.    When did he tell you that?

12   A.    With Dr. Wu.  That would have been

13   2000 -- like 2009 to my termination.

14   Q.    Did he tell you that in regard to a

15   specific incident or did he make the

16   statement generally?

17   A.    It was a specific incident, but I

18   can't -- it would have been something I

19   questioned about.

20   Q.    What was the specific incident?

21   A.    It would have been about reporting,

22   you know, the grant numbers and what I could

23   do with them.

24   Q.    You said it would have been.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 93

1    Q.    Did you have anyone else who reported

2    to you during the time you worked at Temple?

3    A.    Not direct report, no.

4    Q.    Do you know how old Mr. Wacker is?

5    A.    No, I do not.

6    Q.    Do you have an estimate of how old he

7    is?

8    A.    55, maybe.

9    Q.    At some point, you asked Mr. Wacker

10   to serve as a reference for you, correct?

11   A.    I did not.

12   Q.    You don't believe you ever asked

13   Mr. Wacker to serve as a reference for you?

14   A.    I don't recall doing that.

15   Q.    You started working at Temple in

16   February 2001 --

17   A.    That is --

18   Q.    -- is that right?

19   A.    Yes.

20   Q.    And you stopped working at Temple on

21   April 1st, 2014?

22   A.    Yes.

23   Q.    At the time your employment at Temple

24   ended, how much did you earn?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 97

1    Q.    And in some instances the next step

2    of the discipline process could be

3    termination?

4    A.    Could you repeat that?

5    Q.    Sure.  The next step in the

6    discipline process in some instances could

7    be termination?

8    A.    Yes, I did know that.

9    Q.    What was your first job at Temple?

10   A.    I was the editorial assistant to

11   Kamel Khalili in the Center for

12   Neurovirology and Cancer Biology.

13   Q.    What was your pay in that job?

14   A.    I believe it was 34,000.

15   Q.    Who was your supervisor?

16   A.    Kamel Khalili, K-A-M, as in Mary,

17   E-L.  Last name is K-H-A-L-I-L-I.

18   Q.    Does Mr. Khalili --

19   A.    Doctor.

20   Q.    Dr. Khalili, does Dr. Khalili still

21   work at Temple?

22   A.    Yes, he does.

23   Q.    What did you think of Dr. Khalili as

24   a supervisor?

RUTH V. BRIGGS

Page 107

```
 1                  - - -

 2                 (Whereupon, the court reporter

 3          read back the last question.)

 4                  - - -

 5                 THE WITNESS:  Uh, no.

 6   BY MS. FENDELL-SATINSKY:

 7    Q.    And going back to something you told

 8   me earlier, you mentioned an experience when

 9   Dr. Khalili asked you about going to the

10   restroom and why you were not at your desk,

11   correct?

12    A.    Where I had been, yes.

13    Q.    Do you know if he asked anyone else

14   why they left their desk and went to the

15   bathroom or where they had been?

16    A.    No, I don't.

17    Q.    After your job as editorial

18   assistant, did you have another job at

19   Temple?

20    A.    Yes.

21    Q.    What was your next job?

22    A.    Executive assistant to the dean in

23   the College of Science and Technology.

24    Q.    When did you obtain that role?
```

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 108

1    A.    It was 2002.

2    Q.    Did you apply for that job?

3    A.    Yes, I did.

4    Q.    And you were selected?

5    A.    Yes.

6    Q.    Did you want that job?

7    A.    Yes.

8    Q.    Why did you want that job?

9    A.    Because I was told by the development

10   director that I would be helping him more

11   than anyone.  And my background is in

12   development and fundraising; I was excited

13   about that.

14   Q.    Who was the development director?

15   A.    His name was Gregory Murphy, and he

16   was the director of development for the

17   College of Science and Technology.

18   Q.    But when you applied for the role of

19   executive assistant, you understood that you

20   would be reporting to the dean; is that

21   right?

22   A.    Yes.  But he was part of the, the

23   group that interviewed me.

24   Q.    But you understood when you applied

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 109

1    for the job that you would not be reporting

2    to Mr. Murphy, correct?

3    A.    Supervisor.  I understood that, yes.

4              MR. MUNSHI:  You can put that

5         to the side.

6              THE WITNESS:  I don't know

7         what this is.

8              MR. MUNSHI:  You can put it to

9         the side.  It's okay.  She'll tell

10        you if you --

11             THE WITNESS:  Okay.

12   BY MS. FENDELL-SATINSKY:

13   Q.    Did your salary change when you

14   became an executive assistant?

15   A.    Yes, it did.

16   Q.    And what did -- how did your pay

17   change?

18   A.    It went -- I'm thinking around 40,

19   maybe a little less.

20   Q.    Did you have additional

21   responsibilities as executive assistant that

22   you had not had as an editorial assistant?

23   A.    Oh, yes.

24   Q.    And who was the dean of the College

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 110

1    of Science and Technology at that time?

2    A.    Allen Nicholson.

3    Q.    Had you worked with Dean Nicholson in

4    your role as an editorial assistant?

5    A.    No.

6    Q.    What did you think of Dean Nicholson?

7              MR. MUNSHI:  Objection to

8         form.

9              THE WITNESS:  Very fine --

10             MR. MUNSHI:  Go ahead.

11             THE WITNESS:  Very -- a fine

12        man, very -- a good man.  I really

13        liked Dr. Nicholson.

14   BY MS. FENDELL-SATINSKY:

15   Q.    Did you like him as a supervisor?

16   A.    Yes.

17   Q.    Did you think he was a fair

18   supervisor?

19   A.    Yes.

20             THE COURT REPORTER:  D-2.

21             MR. MUNSHI:  Thank you.

22              -  -  -

23             (Whereupon, 2/14/05 Temple HR

24        Affirmative Action Authorization,

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 111

1          Bates No. TEMPLE0078-80, was marked

2          as D Exhibit No. 2 for

3          identification.)

4                    - - -

5    BY MS. FENDELL-SATINSKY:

6    Q.    The court reporter has given you a

7    document that was marked as D-2.

8    A.    Uh-huh.

9    Q.    Same first question; I'm going to ask

10   whether you've seen this document before.

11   A.    No, I have not.  I don't --

12             MR. MUNSHI:  Take your time.

13             THE WITNESS:  No, I have not.

14   BY MS. FENDELL-SATINSKY:

15   Q.    On the first page, it says the date

16   this was issued was February 14th, 2005.

17          Do you see that?

18   A.    I see that.

19   Q.    Does that refresh your recollection

20   about when you started as the executive

21   assistant to Dean Nicholson?

22   A.    2005, this says?  Is that what --

23   Q.    That's what it says.

24   A.    Yeah, okay.  Yeah, okay.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 112

1   Q.   So I'm asking:  Does that refresh

2   your recollection as to when you --

3   A.   Yes.

4   Q.   -- started working in that role?

5   A.   Yes.

6   Q.   So do you believe you started working

7   for Dean Nicholson in 2005?

8   A.   Yes.

9   Q.   And it says recommended starting

10  salary $45,500.

11       Do you see that?

12  A.   I see that.

13  Q.   Does that refresh your recollection

14  about what your salary was when you were --

15  started as the executive assistant for

16  Dean Nicholson?

17  A.   I don't remember it now, but I see

18  it, yeah.

19  Q.   Do you have any reason to doubt

20  that's what your salary was when you

21  started --

22  A.   I have no reason --

23  Q.   -- reporting to Dean Nicholson?

24  A.   No, I don't doubt it.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 114

```
 1    Q.    Who booked Dean Nicholson's travel?
 2    A.    I don't know.  He wasn't there -- he
 3    was only there for the first two months or
 4    three months I was there.
 5    Q.    Dean Nicholson was?
 6    A.    Yes.
 7    Q.    And then what happened to him?
 8    A.    He was replaced with Keya Sadeghipour
 9    as the acting dean.  I believe it was July
10    1st is the -- yeah.
11    Q.    July 1st of 2005?
12    A.    Yes.
13    Q.    Do you know why Dean Nicholson was
14    replaced by Keya Sadeghipour?
15    A.    No, I do not.
16    Q.    And when Dean Nicholson was replaced
17    by Mr. Sadeghipour -- Dr. Sadeghipour, did
18    you keep your position as executive
19    assistant?
20    A.    Yes.
21    Q.    Had you worked with Mr. Sadeghipour
22    prior to 2005?
23    A.    No.
24    Q.    So you had no interactions with
```

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 127

1   anything about the medical information.

2   A.    I didn't ask.  Yeah.

3   Q.    So you don't know what Tanya's

4   medical information said about when she was

5   entitled to leave, correct?

6   A.    No, I don't.  You're right.

7   Q.    Going back to your work for Dean

8   Sadeghipour, how long did Dean Sadeghipour

9   stay in the role as the dean of College of

10  Science and Technology?

11  A.    About 18 months.  And I'm

12  approximating.

13  Q.    After about 18 months, did someone

14  else become the dean of the College of

15  Science and Technology?

16  A.    Yes.

17  Q.    Who was that?

18  A.    That was Hai-Lung, H-A-I, hyphen,

19  L-U-N-G.  Last name is Dai, D-A-I.

20  Q.    And when Dean Dai became the dean,

21  did you stay in your role as executive

22  assistant?

23  A.    Yes.

24  Q.    Did you have the same

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 130

```
1           him.
2    BY MS. FENDELL-SATINSKY:
3    Q.    Did you think he was fair?
4    A.    Uh-huh.
5    Q.    Is that a "yes"?
6    A.    Yes.  I'm sorry.
7    Q.    What did you think of Dean Dai?
8                MR. MUNSHI:  Same objection to
9           form.
10               You can answer.
11               THE WITNESS:  I welcomed
12          Dean Dai with open arms.  I was so
13          happy to see him.  I could see the
14          dean's office was really going to
15          take off instead of just sort of
16          limping along.  And I was very
17          excited, and I felt we had a really
18          good relationship initially.
19   BY MS. FENDELL-SATINSKY:
20   Q.    And did that change at some point?
21   A.    Uhm, towards the end, yes.
22   Q.    And why did it change?
23   A.    Because I was, because I was told I
24   was on loan to Dr. Wu in the other
```

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 131

1    department.  And that was all I knew, just

2    to help him get off.  He was a new chair.

3        Q.    Were you upset that Dean Dai had put

4    you on loan to Dr. Wu?

5        A.    No, not at all.  It was just that I

6    was forgotten.

7        Q.    By who?

8        A.    The dean's office.

9        Q.    And by Dean Dai?

10       A.    Dean Dai and Vice-Dean George

11   Palladino.

12       Q.    In what way do you believe you were

13   forgotten?

14       A.    Because I was told I was on loan,

15   and, like, you know, a year-and-a-half

16   passed.  I'm like, When am I coming back?

17   But then I reported directly to Palladino at

18   that point.

19       Q.    When did you start reporting to

20   Palladino?

21       A.    When Dean Dai was appointed dean, the

22   permanent dean.

23       Q.    When did that happen?

24       A.    Oh, that happened -- once again,

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 132

1    year, I'm going to say he started January

2    1st of 2006 or '07.  That was his official

3    date.

4    Q.    And at that point in time,

5    Vice-Dean Palladino became your supervisor?

6    A.    Well, Vice-Dean was there before

7    Dean Dai.  He came in during the transition.

8    Q.    Right.  But did you start to report

9    to Vice-Dean Palladino in January 2006 or

10   2007?

11   A.    Before.  When Dr. Palladino came

12   over, I'm guessing, the fall before.  When

13   he came over, I reported to him because

14   Dean Dai wasn't here -- there.

15   Q.    And you did not report to -- was

16   there a time when there was no dean?

17   A.    There were acting deans.

18   Q.    Right.  So, I understand Dean

19   Sadeghipour was an acting dean.

20         And he was there about 18 months, you

21   told me?

22   A.    Yes.

23   Q.    And then you told me after Dean

24   Sadeghipour, Dean Dai became the dean?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 134

1    did you continue to report to Dr. --

2    A.    I continued --

3    Q.    -- Palladino?

4    A.    -- to report to Palladino.

5    Q.    Let me finish my questions.

6    A.    I'm sorry.

7    Q.    That's okay.

8          What did you think of Dean Palladino

9    as a supervisor?

10   A.    He was a tough guy, but I liked him.

11   Q.    Did you think --

12   A.    He was -- go ahead.

13   Q.    I'm sorry.  Go ahead.  It sounded

14   like you were going to say something else.

15   A.    Yeah, yeah.  I just thought he was a

16   good guy.

17   Q.    Did you think he was fair?

18   A.    He was fair.

19   Q.    When did you -- when were you, what

20   you said, given on loan to Dr. Wu?

21   A.    That would have been the end of

22   August/beginning of September of 2009.

23   Q.    At that point in time, did Dean Wu

24   become your supervisor?

RUTH V. BRIGGS

Page 135

1    A.    Yes.

2    Q.    And you said after about a

3    year-and-a-half in that role you wanted to

4    go -- well, let me ask you:  Did there come

5    a point in time when you understood that you

6    were going to be Dr. Wu's executive

7    assistant?

8    A.    Well, temporarily, immediately when

9    he asked.

10   Q.    Okay.  Well, did there come a point

11   in time when you understood that was going

12   to be your permanent position?

13   A.    Not officially, no.

14   Q.    So no one ever told you that your

15   role was to be Dr. Wu's executive assistant;

16   is that your testimony?

17   A.    That is.

18   Q.    So the whole time that you worked for

19   Dr. Wu, you believed that you were on loan

20   to him?

21   A.    For the first 18 months, I did, yeah.

22   Q.    And then what did you believe after

23   the first 18 months?

24   A.    I felt forgotten.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 136

1    Q.    Okay.  So did you believe that you

2    were on loan after the first 18 months?

3    A.    No, I did not anymore.

4    Q.    So what did you believe then after

5    the first 18 months?

6    A.    That I was there, I was -- it was

7    permanent.

8    Q.    So that you were going to be Dr. Wu's

9    permanent executive assistant?

10   A.    Right, exactly.

11   Q.    As Dr. Wu's executive assistant, did

12   you have the same kinds of responsibilities

13   you had had for Dean Nicholson --

14   A.    Yes.

15   Q.    -- Dr. Palladino, and Dean --

16   A.    Sadeghipour.

17   Q.    -- Sadeghipour?

18              MR. MUNSHI:  Objection to

19         form.

20              Go ahead and answer.

21              THE WITNESS:  Yes.

22   BY MS. FENDELL-SATINSKY:

23   Q.    So you were responsible for Dr. Wu's

24   travel?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 139

```
 1   distinguished guest from another university
 2   come in.
 3    Q.    Did that change your responsibilities
 4   or did it just make the events themselves
 5   different?
 6    A.    Just different, just different.
 7    Q.    So it did not change your
 8   responsibilities in regard to organizing the
 9   events?
10    A.    No.
11    Q.    And in your role as executive
12   assistant for Dr. Wu, you didn't have any
13   responsibility for staff supervision --
14    A.    No.
15    Q.    -- correct?
16    A.    No, I did not.
17    Q.    Were you the only executive assistant
18   for Dr. Wu?
19    A.    Yes.
20    Q.    So Dr. Wu did not have any other
21   executive assistants while you were his
22   executive assistant?
23    A.    That is correct.
24    Q.    Did anyone else report to Dr. Wu
```

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 166

1   description.

2    A.    Dependability; clear communication --

3   they're all.  Problem-solving;

4   decision-making; and team work is always

5   important.  Yeah.

6    Q.    As Dr. Wu's executive assistant, you

7   had a lot of responsibility?

8    A.    I did.

9    Q.    Uhm, and a lot of different kinds of

10  responsibilities?

11   A.    Yes.

12   Q.    And you understood that your job was

13  essential to Dr. Wu's job?

14   A.    Yes, I did.

15   Q.    And Dr. Wu, was he a busy person?

16   A.    Very busy.

17   Q.    He had a busy schedule?

18   A.    Very busy.

19   Q.    So it was very important to manage

20  his schedule correctly, right?

21   A.    Yes.

22   Q.    And that was part of your

23  responsibility?

24   A.    That was part, yes.

RUTH V. BRIGGS

Page 167

1    Q.    And since Dr. Wu was a busy person,

2    it was also important for you to keep him

3    organized, correct?

4    A.    Yes.

5    Q.    And that was one of your

6    responsibilities, right?

7    A.    Yes.

8    Q.    And if Dr. Wu was more organized, he

9    could be more effective, did you feel?

10   A.    Yes.

11   Q.    And if he was more effective, did you

12   feel that would reflect well on both of you?

13   A.    Yes.

14   Q.    Where did you physically work when

15   you worked for Dr. Wu?

16   A.    Two different places.  Initially, I

17   worked outside of his office on the third

18   floor in Walkman Hall.

19   Q.    Did you work physically somewhere

20   else?

21   A.    Yes.

22   Q.    Where was that?

23   A.    Uhm, it was Thanks -- the night

24   before Thanksgiving of, let me see, 2007, I

RUTH V. BRIGGS

Page 170

1          MS. FENDELL-SATINSKY:  Yup.

2      I'll just ask a couple more

3      questions.

4          MR. MUNSHI:  Sure.

5          MS. FENDELL-SATINSKY:  And

6      then we'll take a break.

7          THE WITNESS:  Yeah.  It

8      doesn't feel finished yet.  Okay.

9   BY MS. FENDELL-SATINSKY:

10   Q.   Are you okay to keep going for a --

11   A.   Yeah.

12   Q.   -- few more minutes?

13   A.   Uh-huh.

14   Q.   Uhm, did you view Dr. Wu as having an

15   important job?

16   A.   Yes.

17   Q.   And did you feel that you were

18   important, your role was important to him?

19   A.   Yes, I did.

20            - - -

21          (Whereupon, 12/31/12 email re

22      Happy New Year, Bates No. TEMPLE

23      UNIVERSITY (R.BRIGGS)-000363-368 AND

24      362, was marked as D Exhibit No. 4

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 175

```
 1    Q.    So you don't recall exchanging

 2   holiday or New Year's wishes with Dr. Wu

 3   other than this D-4?

 4    A.    I'm not sure.

 5                    - - -

 6              (Whereupon, Temple University

 7        Rules of Conduct, Bates No.

 8        TEMPLE0148-164, was marked as D

 9        Exhibit No. 5 for identification.)

10                    - - -

11   BY MS. FENDELL-SATINSKY:

12    Q.    Ms. Briggs, the court reporter has

13   given you a document that's been marked as

14   D-5.  I'm going to have the same first

15   question for you, which is whether you've

16   ever seen this document before.

17    A.    Yes, I have.

18    Q.    And is this Temple University's Rules

19   of Conduct?

20    A.    Yes, it is.

21    Q.    Did you have access to this during

22   your employment at Temple?

23    A.    Yes, I did.

24    Q.    I'd like you to turn to TEMPLE0152.
```

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 176

1   A.      (Witness complies with request.)

2           Okay.

3   Q.      So the top of this page says, "Rules

4   of Conduct," and then the second sentence

5   says, "Temple expects its employees to abide

6   by the following Rules of Conduct."

7           Do you see that?

8   A.      Uh-huh.

9   Q.      Is that a "yes"?

10  A.      Yes.  I'm sorry.

11  Q.      That's okay.

12          Did you understand that Temple

13  expected its employees, including you, to

14  abide by the bullet-pointed Rules of Conduct

15  listed on TEMPLE0152?

16  A.      Yes.

17  Q.      If you go down to the bottom, it says

18  "Disciplinary Procedure."

19  A.      Uh-huh.

20  Q.      Do you see that?

21  A.      Yes, I do.

22  Q.      And I'm going to the last para -- the

23  last sentence of this paragraph.  It says,

24  "Repeated violations of work rules within a

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 177

1   specific category over a 12-month period

2   will lead to the next step in the

3   progressive discipline process."

4         Do you see that?

5   A.    Yes, I do.

6   Q.    Do you understand that?

7   A.    Yes, I do.

8   Q.    And did you understand that during

9   your -- the time you worked at Temple?

10  A.    I understood that it was a

11  possibility, yes.

12  Q.    Well, did you understand that

13  violations of work rules within a specific

14  category over a 12-month period would lead

15  to the next step in the progressive

16  discipline process?

17  A.    I didn't understand it to be true all

18  the time, to be honest with you.

19  Q.    You told me earlier that you were on

20  probation in 2012 and 2013 and 2014,

21  correct?

22  A.    That is correct.

23  Q.    And why did you believe that you were

24  on probation those years?  I apologize if I

RUTH V. BRIGGS

Page 179

1    A.    I did know that it was a policy, yes.

2              - - -

3              (Whereupon, Temple University

4         Polices and Procedures Manual memo,

5         Bates No. BRIGGS 94-96, was marked

6         as D Exhibit No. 6 for

7         identification.)

8              - - -

9              THE WITNESS:  There's nothing

10        more with this (indicating)?

11             MS. FENDELL-SATINSKY:  Not

12        right now.

13             THE WITNESS:  Okay.

14             MS. FENDELL-SATINSKY:  You can

15        put it to the side.

16   BY MS. FENDELL-SATINSKY:

17    Q.    The court reporter has given you a

18   document that's been marked as D-6.

19    A.    Uh-huh.

20    Q.    Is that a "yes"?

21    A.    Yes.  I'm sorry.  "Yes."

22    Q.    That's okay.

23        Same first question to you is whether

24   you've seen this document before.

RUTH V. BRIGGS

Page 180

1    A.    Yes, I have.

2    Q.    And if you look down at the Bates

3    numbers in right-hand corner, you see it

4    says "BRIGGS 94" on the first page?

5    A.    Yes, I do.

6    Q.    And I will tell you that means that

7    this is a document that you or your attorney

8    produced to us from you.  Okay?

9    A.    Yes.

10   Q.    Did you have access to this document

11   throughout your employment at Temple?

12   A.    Yes.

13   Q.    And did you understand this document

14   during your employment at Temple?

15   A.    Yes.

16   Q.    And you understand that Temple

17   prohibits discrimination and harassment,

18   correct?

19   A.    Yes.

20             MR. MUNSHI:   Objection to

21        form.

22             Go ahead.

23   BY MS. FENDELL-SATINSKY:

24   Q.    You understood that was Temple's

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 181

1    policy during your employment, correct?

2    A.    Yes.

3    Q.    I want to go back quickly to earlier

4    we talked about Mr. Wacker.

5    A.    The --

6    Q.    You can put that aside --

7    A.    Oh, okay.

8    Q.    -- for now.

9    A.    Okay, okay.

10   Q.    And when we talked about Dr.

11   Wacker --

12   A.    Mr. Wacker.

13   Q.    Mr. Wacker.  I'm giving everybody

14   additional titles or not enough titles.

15         When we talked about Mr. Wacker, you

16   gave me a list of things that Dr. Wacker

17   asked you to do that you found morally

18   objectionable, if not illegal.

19         Do you remember that?

20   A.    Yes.

21   Q.    Why do you think Dr. -- let me ask it

22   again.

23         Why do you think Mr. Wacker asked you

24   to do those things you identified as morally

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 182

1    objectionable, if not illegal?

2                    MR. MUNSHI:  Objection to

3           form.

4    BY MS. FENDELL-SATINSKY:

5    Q.    Do you understand my question?

6    A.    Yes, I do.

7    Q.    Okay.

8    A.    Uhm, I was surprised that he asked me

9    to do it.  It was against the law.

10   Q.    Why do you --

11   A.    And it --

12   Q.    Why do you think he asked you to do

13   it?

14   A.    Because he told me he did not believe

15   that Tanya was sick.

16   Q.    Why do you believe that he did not

17   believe Tanya was sick?

18   A.    I don't know.

19   Q.    Why do you believe he told you to

20   find something on Tanya to get rid of her?

21   A.    Because he thought she was lying.

22   Q.    Why do you believe he coached you

23   before your meeting with an attorney about

24   Tanya's lawsuit?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 187

1    discriminated against you because of your

2    age and your sex, and you said Dr. Wu.

3    A.    Specifically, yes.

4    Q.    Okay.  Anyone else aside from Dr. Wu?

5    A.    No.

6    Q.    Your Complaint also alleges that

7    Temple subjected you to a hostile work

8    environment --

9    A.    Yes.

10   Q.    -- correct?

11   A.    Yes.  That is the true.

12   Q.    Who do you believe created a hostile

13   work environment?

14   A.    Greg Wacker; Drew DiMeo; Dr. Wu.

15   Q.    And how do you believe Mr. Wacker

16   created a hostile work environment?

17   A.    By threatening me if I didn't

18   cooperate with him that he would fire me.

19   Q.    When did he do that?

20   A.    It was about Judy, helping Judy out.

21   Q.    Did he ever threaten you on any other

22   occasion?

23   A.    My first day in the dean's office,

24   but that's a long time ago.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 188

1   Q.    And the first day in the dean's

2   office, was that when you worked for Dean

3   Nicholson?

4   A.    Yes, uh-huh.

5   Q.    And what did he threaten you with in

6   regards to that occasion?

7   A.    He stood over my desk when everyone

8   was gone and told me that I probably

9   shouldn't mess with him, because I wouldn't

10  win.  And I said to him, "I won't."

11  Q.    Any other way that you believe

12  Mr. Wacker created a hostile work

13  environment for you?

14  A.    By not responding to my, my requests

15  for help, mediation, something between

16  Dr. Wu and myself.

17  Q.    Did he assign, uhm, Drew DiMeo to

18  that role?

19  A.    It wasn't happen -- yes, he did,

20  but...

21  Q.    So he did respond to your request,

22  just not in a way that you were satisfied

23  with?

24  A.    I didn't request Drew to be in on the

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 190

1    Q.    And why do you think Mr. Wacker

2    singled you out?

3    A.    I don't know the answer to that

4    question.

5    Q.    Uhm, any other way in which you

6    believe Mr. Wacker created a hostile work

7    environment for you?

8    A.    By, uhm, reporting -- having Drew,

9    his, his report, sit in our meetings and

10   then report back to him.  He always knew

11   what happened.

12   Q.    Any other way in which you believe

13   Dr. Wacker created a hostile work

14   environment for you?

15   A.    He just -- he would call me and say,

16   "I just want you to just do whatever he

17   says.  I'm tired of him coming over here,"

18   those kind of things.  It just was I felt

19   stressed all the time.

20   Q.    Do whatever who says?

21   A.    Dr. Wu.

22   Q.    Okay.  And anything else that

23   Dr. Wacker did that you believe created a

24   hostile work environment for you?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 191

1    A.    By being involved.  I don't know why

2    he was involved in my -- I wasn't in his

3    office.  I don't know what his involvement

4    was.

5          I mean when I was with Dr. Wu.  Prior

6    to that, I was in his office.

7    Q.    Okay.  Anything else?

8    A.    Fear.  I saw what happened, what he

9    wanted me to do to one person, another

10   person, and I was, I was fearful that it

11   would happen to me.

12   Q.    So you were fearful that he would

13   want to do what?

14   A.    To find a reason to get -- you know,

15   to, to discipline me.

16   Q.    Why did you think he wanted to

17   discipline you?

18   A.    I don't know.

19   Q.    Anything else Mr. Wacker did that you

20   thought created a hostile work environment?

21   A.    Yeah.  He and Dr. Wu would meet

22   behind my -- you know, without me.

23   Q.    Okay.  Anything else?

24   A.    Not that I can -- no.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 194

1    A.    I don't know the answer to that

2    question.

3    Q.    Okay.  You also told me that you

4    believe Drew DiMeo subjected you to a

5    hostile work environment, correct?

6    A.    Yes.

7    Q.    What did Drew DiMeo do that you

8    believe made a hostile work environment?

9    A.    He -- in our morning meetings, it was

10   really he and Dr. Wu.  And this was three

11   days a week they would meet with me and

12   just -- it wasn't about what we're going to

13   do.  It's going to be "what did you do

14   wrong."  And Greg, I never would have, you

15   know, a chance to defend, to say "that's not

16   true" or...

17         Drew, I felt like Drew was my friend

18   for a while, and -- and that changed.

19   Q.    And so when that changed, did you

20   feel at that point that he started to create

21   a hostile work environment for you?

22   A.    The hostile work environment created

23   started when he was asked to sit in on the

24   meetings with Dr. Wu and I in the morning

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 195

1    but under Greg Well's -- Greg Wacker's

2    supervision.

3     Q.    And other than the mornings meetings

4    with Mr. DiMeo, did Mr. DiMeo do anything

5    else that you believe created a hostile work

6    environment for you?

7     A.    Yes.  His -- he was unwilling to

8    believe me or trust me.

9     Q.    Anything else?

10    A.    No.

11    Q.    Why do you believe that Mr. DiMeo was

12    asked to sit in on your morning meetings

13    with Dr. Wu?

14    A.    I don't know.

15    Q.    Why do you believe Mr. DiMeo was

16    unwilling to believe or trust you?

17    A.    I don't know.

18    Q.    You also said that Dr. Wu created a

19    hostile work environment for you; is that

20    correct?

21    A.    Yes, he did, uh-huh.

22    Q.    Yes?

23    A.    Yes, he did.

24    Q.    Okay.  What did Dr. Wu do that

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 197

1    A.    Correct.

2    Q.    So I want to know what Dr. Wu did

3    that created a hostile work environment for

4    you?

5    A.    He would, he would degrade, yell at

6    me, I mean literally yell at me in public

7    settings - front office, elevator, hallway -

8    in front of external constituents, staff,

9    other faculty.

10   Q.    Would it be accurate to say that

11   Dr. Wu was a yeller?

12   A.    Yes.

13   Q.    And so he yelled at a lot of people,

14   right?

15   A.    Not -- no.

16   Q.    Did you ever see him yell at

17   students?

18   A.    His graduate students I did, yes.

19   Q.    Did you ever see him yell at any

20   other employees?

21   A.    No, I did not.

22   Q.    What else did Dr. Wu do that made you

23   feel that you were subjected to a hostile

24   work environment?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 198

1    A.    He thought -- he said.  He would

2    often say, "Are you stupid or something?"

3    You know, it was degrading.

4          He would criticize my, my finances.

5    I mean, just really weird stuff that was...

6    Q.    So I want to know everything that he

7    did that you believe contributed to a

8    hostile work environment for you, and I --

9    you've given me a couple things already, so

10   I want to know if there's anything else.

11   A.    No.  Just generalized fear.

12   Q.    Why do you believe Dr. Wu yelled at

13   you?

14   A.    I don't know.

15   Q.    Well, why do you believe Dr. Wu said

16   you were stupid?

17   A.    I don't know.

18   Q.    Why do you believe Dr. Wu criticized

19   your finances?

20   A.    I don't know.

21   Q.    The final claim in your Complaint is

22   that Temple retaliated against you because

23   of internal reports of discrimination you

24   made, correct?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 207

1    wasn't available.

2    Q.    And did Dr. Wu have a voicemail on

3    his phone?

4    A.    It was always full.

5    Q.    Was that part of your responsibility,

6    to check his voicemails?

7    A.    No, it was not.

8    Q.    Did he ever ask you to do that?

9    A.    No, he did not.

10   Q.    Did you ever offer to do that?

11   A.    No.  He really used his cell phone,

12   so...

13   Q.    Did you have Dr. Wu's cell phone

14   number?

15   A.    His number, yes, uh-huh.

16   Q.    Do you know if his cell phone had a

17   voicemail?

18   A.    I don't know.  I'm assuming.

19   Q.    And there were instances in which you

20   were late, correct?

21   A.    Yes.

22   Q.    And was Dr. Wu generally flexible

23   about that?

24   A.    Until, yeah, until one time he

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

1    wasn't.

2     Q.    And when was that one time?

3     A.    The time I overslept three hours.

4    And I don't -- the date would have been

5    probably 2014.

6     Q.    And what happened on the occasion on

7    which you overslept for three hours?

8     A.    I woke up, had a "Home Alone" moment,

9    called work, and asked for Dr. Wu.  He was

10   in a meeting.  I asked for Judy.  They

11   didn't know where she was, so I told the

12   student worker who was answering the phones.

13   I said, "Please tell Dr. Wu I'm" -- and I

14   live within five minutes of the University.

15   "I'm coming right now.  I overslept."

16    Q.    Did you call Dr. Wu's cell phone that

17   day?

18    A.    No.  She said he was in a meeting.

19    Q.    My question was:  Did you call his

20   cell phone?

21    A.    No, I did not, no.

22    Q.    Did you email him that day?

23    A.    No, I did not.

24    Q.    Did you ever text message with Dr. Wu

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 209

1    on his personal cell phone?

2    A.    Probably, yeah.

3    Q.    Did you send him a text message on

4    that day?

5    A.    No, I did not.

6    Q.    And do you -- how late were you when

7    you --

8    A.    I was three hours late.

9              MR. MUNSHI:  Just wait until

10         the question is done.

11             THE WITNESS:  Okay.  I'm

12         sorry.

13             MR. MUNSHI:  That's okay.

14    BY MS. FENDELL-SATINSKY:

15    Q.    So you were three hours late --

16    A.    Uh-huh.

17    Q.    -- on that occasion?

18    A.    Yes, I was.

19    Q.    And -- strike that.

20    A.    I'm sorry?

21    Q.    I just said "strike that."

22    A.    Oh, okay.

23    Q.    Yup.  And you didn't call in that

24    lateness until you were three hours late,

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 210

1    correct?

2    A.    I, I woke up.  Yeah, right.

3    Q.    But by the time you'd woke up, you

4    were three hours late?

5    A.    Yes, yes.

6    Q.    But other than that particular

7    occasion, Dr. Wu was flexible with you being

8    late?

9    A.    Generally, in the department.  I

10   wasn't late that often.

11   Q.    Were -- was there any other time in

12   which you were three hours late --

13   A.    Never.

14   Q.    -- without notifying?

15         Was there any other time when you

16   were more than two hours late without

17   notifying him?

18   A.    No.

19   Q.    Was there any other time in which you

20   were an hour late notifying him?

21   A.    No.

22   Q.    Was there any time in which you were

23   more than 30 minutes late without notifying

24   him?

RUTH V. BRIGGS

Page 211

1    A.    No.

2    Q.    Was there ever a time in which you

3    were more than 15 minutes late without

4    notifying him?

5    A.    Not that I recall.

6    Q.    Was there ever a time that you were

7    more than ten minutes late without notifying

8    him?

9    A.    I think maybe I could have been.

10   Q.    Sometimes did you leave during the

11   day to run errands?

12   A.    No.

13   Q.    You never left for errands?

14   A.    For him maybe.

15   Q.    You never left to run a personal

16   errand yourself?

17   A.    At lunchtime.

18   Q.    Did you ever leave anytime other than

19   lunchtime to run a personal errand for

20   yourself?

21   A.    Can you give me -- like a doctor's

22   appointment?  I don't know what you mean.

23   Q.    So I'm asking if you recall any time

24   that you left during the day to run an

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 214

1    A.    I'm sorry.  I didn't hear the last

2    thing you said.

3    Q.    I said I don't have any other --

4    A.    Oh, okay.

5    Q.    -- questions --

6    A.    Oh, okay.

7    Q.    -- about that document at this time.

8                    - - -

9              (Whereupon, 11/09/11

10         Disciplinary Report, Bates No.

11         BRIGGS 23, was marked as D Exhibit

12         No. 9 for identification.)

13                  - - -

14   BY MS. FENDELL-SATINSKY:

15   Q.    Ms. Briggs, the court reporter has

16   given you an exhibit that's marked as D-9.

17   A.    Uh-huh.

18   Q.    Take a look at the exhibit, and my

19   first question to you is going to be whether

20   you've ever seen this before.

21   A.    Yes, I have.

22   Q.    And is this the disciplinary report

23   from Dr. Wu to you on November -- in

24   November 2011?

RUTH V. BRIGGS

Page 215

1    A.    That is correct.

2    Q.    And if you look down at the Bates

3    number in the bottom right-hand corner of

4    this document, it says "BRIGGS 23."

5          Do you see that?

6    A.    Yes, I do.

7    Q.    And that means that's a document that

8    your attorney provided to us.

9    A.    Okay.

10   Q.    So you received a copy of this

11   document, correct?

12   A.    Yes.

13   Q.    And it says it's a written warning;

14   is that right?

15   A.    Yes, it does.

16   Q.    And it was for a violation of Rule

17   B.11, unprofessional/inappropriate conduct,

18   correct?

19   A.    That is correct.

20   Q.    What led to this disciplinary report?

21   A.    Uhm, Dr. Wu was standing in front of

22   my desk, and it was -- actually, it was the

23   day after my birthday, and, uhm, he asked me

24   how old I turned.  And I guess I was 58 or

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 216

1    something.  He said, uh, "You know, in China

2    women are put out to pasture by your age."

3         And he made a similar comment before,

4    and I just said, "Well, with all due

5    respect, we are in America right now."

6         And then the next thing I knew, I got

7    called to the dean's office and I was

8    written up for unprofessional conduct.  And

9    I asked Greg if he knew what Dr. Wu had said

10   to me.  He didn't know.

11   Q.    If you look down at the bottom of the

12   document where it says "print name," is that

13   your signature?

14   A.    That's my signature.

15   Q.    And then below that there's another

16   signature.

17         Do you know whose that is?

18   A.    That's Dr. Wu's.

19   Q.    And was this presented to you by

20   Dr. Wack -- by Mr. Wacker and Dr. Wu?

21   A.    You know, I don't recall who

22   report -- I don't recall if it was just him

23   or Greg was there.  I don't know.

24   Q.    What occurred at the meeting during

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 217

1  which this was given to you?

2  A.    I do remember.  I went to -- Greg

3  called me to his office and gave it to me

4  for unprofessional conduct, yeah.

5  Q.    So was Dr. Wu not present?

6  A.    No, he wasn't there, no.

7  Q.    And what did Greg tell you when he

8  gave this to you?

9  A.    He said, "Dr. Wu just said that you

10  had been inappropriate in public," he said,

11  "Something that was" -- you know, I

12  shouldn't said.

13        And I said, "Did he tell you what I

14  said?"  And I repeated it back.  I said, "He

15  said something about my age, and I said,

16  'Well, we're not there.  We're in America

17  now.'"

18  Q.    Did Greg tell you anything else about

19  why you received this discipline?

20  A.    No, he did not.

21  Q.    Did you ask him anything else about

22  why you received this discipline?

23  A.    No, I did not.

24  Q.    Did you ask Dr. Wu why you received

RUTH V. BRIGGS

Page 218

1    this discipline?

2    A.    No, I did not.

3    Q.    When you told Dr. Wu that, what you

4    said was, "We're in America now" or "We're

5    in America," what was his response?

6    A.    Nothing.  I mean, it didn't seem

7    unusual.  He just walked away.  I mean, it

8    wasn't like he was upset about it or

9    anything.  He just walked away.

10   Q.    And you said he had made that comment

11   previously?

12   A.    Yes.

13   Q.    When did he make that comment

14   previously to you?

15   A.    With, you know, within a period of

16   four or five months, he would make reference

17   to -- it usually had to do with my age and

18   my salary.  I mean, I would talk to him

19   about that.  And then I don't know how it

20   got onto that women being put out to pasture

21   at 55.  I'm like...

22   Q.    So, my question is a little

23   different.

24         When did he -- was there another

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 219

1    occasion on which he said to you that women

2    are put out to pasture by that age?

3    A.    Well, he didn't use that term, but he

4    did say something about women in China are

5    required to retire earlier.  He didn't use

6    the get out -- you know, "put out to

7    pasture" thing.

8    Q.    Retire earlier than what?

9    A.    At 55, he told me.

10   Q.    So on another occasion Dr. Wu told

11   you women in China retire at 55?

12   A.    Yes.

13   Q.    And when was that?

14   A.    Around the same, you know, very close

15   to the same time.

16   Q.    Where were you when he said that?

17   A.    We were in his office.

18   Q.    Was the door shut?

19   A.    I don't recall.

20   Q.    Did anyone else sit close to Dr. Wu's

21   office?

22   A.    It was pretty open.  Yeah, yeah; the

23   student workers and Judy.

24   Q.    What was the conversation you were

RUTH V. BRIGGS

Page 220

1   having with Dr. Wu in which he allegedly

2   told you that women in China retire at 55?

3   A.     It was about my, uhm -- he was

4   telling me that I should, I should go -- I

5   should travel, and I said, "Well, I really

6   don't have the money to travel."

7          And he said, "Well, you must be a

8   poor money manager.  I know how much money

9   you're making."

10         I was like, "Dr. Wu, I'm a single

11  mother.  I can't go."  And I said, "Plus, I

12  have a job.  I just can't drop my job and

13  go."

14         That was, you know -- it -- I

15  don't -- I can't say that he said that women

16  were -- I should retire, but the implication

17  was "it's time for you to travel and get out

18  of here."

19  Q.     So --

20  A.     And it was -- and then this happened

21  a couple weeks later.

22  Q.     So he didn't actually say women in

23  China retire --

24  A.     No, but he did question me.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 222

1    certain age anytime other than the day on

2    which Mr. Wacker gave you this discipline,

3    and you told me "no."

4    A.    Not that terminology, right.

5    Q.    Right.  And so I asked you -- you

6    told me -- I asked you what else did he say

7    sort of in that vein, and you told me that

8    he told you that women in China retire at 55

9    and that he said that during a conversation

10   in which he was telling you that you should

11   travel.

12   A.    Okay.  Well, let me rephrase that.

13   Okay?

14   Q.    Sure.

15   A.    That I am, that I -- what I took from

16   that was that he was telling me that I

17   needed to travel and I needed to be a better

18   money manager and travel; there's no reason

19   I can't.  "You've been" -- I'm a single

20   mother, "go."  So I, I read into that.

21   Q.    Okay.  So Dr. Wu did not actually

22   tell you that you should retire?

23   A.    No.

24   Q.    Correct?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 223

1    A.    He told me -- no, he did not tell me

2    to retire.

3    Q.    You interpreted from what he was

4    saying you felt that he was saying that you

5    should retire?

6    A.    Yes.

7    Q.    Was it in that conversation when he

8    told you women in China retire at 55?

9    A.    No.  That was this day (indicating).

10   No, it wasn't.

11   Q.    Okay.  So the women -- so was that

12   the same comment as "women are put out to

13   pasture" by that age?  I'm just confused.

14   A.    Yeah, I am too now, when which

15   happened and in what order.

16   Q.    So I'm not concerned about the order

17   right now.  I understand your testimony that

18   on the day that you received this

19   disciplinary report, you're saying that

20   Dr. Wu told you that women are put out to

21   pasture by a certain age in China.

22   A.    Right.

23   Q.    I understand that.

24   A.    Okay.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 224

1    Q.    So then I asked you if he ever said

2    that again, and you said "no," correct?

3    A.    "Put out to pasture"?

4    Q.    Yes.

5    A.    No.

6    Q.    That was your testimony.

7    A.    No, he didn't.

8    Q.    He never said that again?

9    A.    No, he did not say that.

10   Q.    And then I asked you if he made

11   comments that were similar, and you said

12   that he told you that women in China retire

13   at 55; so I want to know what conversation

14   you had with him during which he told you

15   that women in China retire at 55.

16   A.    With, with absolute certainty, I

17   can't give you the date or the exact

18   wordage, but I know that it happened before

19   this.  That's why I lost it.  Well, not lost

20   it, but I -- I'm not generally one to be

21   confrontive, but I just said, "We're not in

22   China."

23   Q.    In what context did that conversation

24   occur?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 243

1    A.    No, I don't remember calling and

2    telling him.

3    Q.    We talked about earlier one of your

4    responsibilities was to book Dr. Wu's

5    travel.

6    A.    Yes.

7    Q.    Correct?

8    A.    Yes.

9    Q.    And we also talked about earlier the

10   importance of booking travel correctly for

11   him, right?

12   A.    Yes.

13            MR. MUNSHI:  You can put the

14       document to the side.

15            THE WITNESS:  Okay.  Is this

16       over?

17            MR. MUNSHI:  Just listen to

18       the question.

19            THE WITNESS:  Okay.

20            MR. MUNSHI:  The questions

21       that she has.

22   BY MS. FENDELL-SATINSKY:

23   Q.    I think I may have just asked this,

24   but I apologize because --

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 244

1   A.    Okay.

2   Q.    -- Mr. Munshi's comment threw me off.

3         You told me you understood the

4   importance --

5   A.    Yes.

6   Q.    -- of making correct travel

7   arrangements?

8   A.    I do.

9                    - - -

10             (Whereupon, 8/2/12 email

11        string, Bates No. TEMPLE UNIVERSITY

12        (R.BRIGGS)-0000150-155, was marked

13        as D Exhibit No. 11 for

14        identification.)

15                   - - -

16  BY MS. FENDELL-SATINSKY:

17   Q.    Ms. Briggs, the court reporter has

18  given you a document that's been marked as

19  D-11.  I'm going to ask you to review this

20  and let me know if you've seen it before.

21  A.    (Witness complies with request.)

22        Okay.

23  Q.    Have you seen this document before?

24  A.    Yes.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 245

1    Q.    Starting on the first page of this

2    document, looking at the second email, it's

3    an email from August 1st, 2012 from Dr. Wu

4    to you.

5    A.    Uh-huh.

6    Q.    Do you see that?

7    A.    I do.

8    Q.    And in the email he asks you to check

9    a direct flight from Philly to Napa or

10   nearby, leaving Monday afternoon and coming

11   back on Thursday morning.

12         Do you see that?

13   A.    Uh-huh.

14   Q.    Is that a "yes"?

15   A.    I see it, yes.  I'm sorry.

16   Q.    That's okay.

17   A.    Uh-huh.

18   Q.    And did you book that flight for

19   Dr. Wu?

20   A.    I'm -- yes.  I, I -- yes.

21   Q.    Did you book the flight on an

22   incorrect date?

23   A.    It says I purchased it on Monday.

24   I'm not going to argue with that, but...

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 246

1   Q.    So the email that's above the email

2   we just discussed is an email from Dr. Wu to

3   Justin Shi and Drew DiMeo saying that you

4   stated "clearly leaving on Monday," but you,

5   Ruth, changed it to Sunday and purchased it

6   without his knowledge.

7          Do you know what Dr. Wu is referring

8   to?

9   A.    Uhm, I don't recall.

10  Q.    Did you -- was there an occasion, any

11  occasion on which you incorrectly booked

12  flights for Dr. Wu?

13  A.    Not to my knowledge.

14  Q.    So you --

15  A.    Not without being directed, no.

16  Q.    So you don't recall any occasion on

17  which you booked incorrect travel for

18  Dr. Wu?

19  A.    No, I don't.

20         MR. MUNSHI:  You can put that

21         to the side.  Just wait for her

22         question.

23         THE WITNESS:  Oh, I wanted to

24         make sure I know what it's about.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 247

```
 1              MR. MUNSHI:  Just listen to

 2        the question.

 3   BY MS. FENDELL-SATINSKY:

 4    Q.    You told me earlier that when you

 5   started working for Dr. Wu that Dr. Wu was

 6   more focused on events with speakers and

 7   visiting speakers.

 8    A.    Yes.

 9    Q.    Is that correct?

10    A.    He had an emphasis on it, yes,

11   absolutely.

12    Q.    And was Dr. Wu involved with

13   recruiting faculty from -- recruiting

14   faculty?

15    A.    Faculty internally for Temple?

16    Q.    Yes.

17    A.    He was part of it.  Yes, he was part

18   of it.

19    Q.    And did you assist him in helping

20   coordinate --

21    A.    Yes.

22    Q.    -- the logistics --

23    A.    Yes.

24    Q.    Let me finish my question.
```

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 248

1   A.    Uh-huh.

2   Q.    Did you assist him in coordinating

3   logistics for faculty when they came to

4   interview at Temple?

5   A.    Candidates, right?

6   Q.    Candidates.

7   A.    Yes.

8   Q.    Yes.

9         So faculty from other universities or

10  schools that came to interview --

11  A.    Right.

12  Q.    -- at Temple, correct?

13  A.    That is correct.

14  Q.    And when you had candidates come

15  visit, it was important to ensure they had

16  the best visit possible, right?

17  A.    Yes.

18  Q.    Because if they were a candidate it

19  was somebody that Temple potentially wanted

20  to hire, right?

21  A.    That is correct.

22  Q.    And were you responsible for, in some

23  occasions, in booking travel for candidates

24  when they came to visit?

RUTH V. BRIGGS

Page 249

1    A.    The tenured faculty, yes.

2    Q.    And you told me before you understood

3    the importance of booking correct travel,

4    right?

5    A.    Absolutely.

6    Q.    And that would hold true for

7    candidates visiting as well?

8    A.    Yes.

9    Q.    While working under Dr. Wu, was there

10   an instance in which you forgot to book

11   plane reservations for a visiting candidate?

12   A.    Well, I didn't forget, but Clint

13   Whaley, yes, his ticket was not purchased.

14   Q.    And you said you didn't forget.

15         What do you mean?

16   A.    He and I were -- Clint Whaley and I

17   were going back and forth.  I'd get him an

18   itinerary, and he'd say it's not working,

19   try another one, and it just went back and

20   forth and...

21   Q.    Let me show you an email maybe to

22   refresh your recollection.

23   A.    I'm the one who admitted that I

24   didn't.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 271

1         And as soon as I realized it was

2   Clint Whaley, I went right in and told

3   Dr. Wu.

4   Q.   So Dr. -- is it your testimony that

5   because Dr. Wu asked you to work on another

6   project you did not follow up with

7   Dr. Whaley?

8   A.   Yes.

9   Q.   And I believe you testified to this

10  before, but ultimately you did take

11  responsibility for not booking Dr. Whaley's

12  travel, correct?

13  A.   At the end, yes.  At the end, it

14  falls on me.

15  Q.   You recognized --

16  A.   I dropped the ball.

17  Q.   So you recognized that --

18  A.   Yes.

19  Q.   -- you did not complete something

20  that you were supposed to?

21  A.   Yes, I do.

22  Q.   And you understood that not booking

23  his travel was problematic; is that correct?

24  A.   Oh, absolutely.

RUTH V. BRIGGS

Page 272

1    Q.    Did Dr. Whaley ultimately come visit

2    Temple?

3    A.    No, he did not.

4    Q.    And was that because his travel was

5    not booked?  If you know.

6    A.    I don't know.

7    Q.    And was Dr. Whaley hired by Temple?

8    A.    No.

9    Q.    And to become hired by Temple, in

10   your experience, does the person have to

11   interview in-person?

12   A.    This is -- yes.  Several.  You know,

13   there's a process.

14   Q.    And to be hired as a faculty at

15   Temple, in your experience, the person must

16   interview several times in-person?

17   A.    Yes.

18   Q.    So because Dr. Whaley did not

19   actually visit, he could not have been hired

20   for the position?

21   A.    That is correct.

22   Q.    And were you disciplined for this?

23   A.    Three days suspension without pay.

24                    - - -

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 273

1          (Whereupon, 3/26/13

2          Disciplinary Report, Bates No.

3          BRIGGS 49, was marked as D Exhibit

4          No. 13 for identification.)

5                  - - -

6    BY MS. FENDELL-SATINSKY:

7      Q.    Ms. Briggs, my first question to you

8    is going to be whether you're seen this

9    document before.

10     A.    Yes, I have.

11     Q.    And is this the discipline you

12   received as a result of the incident with

13   Dr. Whaley you just testified about?

14     A.    Yes, I -- yes, it is.

15     Q.    And where it says "employee

16   signature," is that your signature?

17     A.    That is mine.

18     Q.    And where it says "Ruth Briggs" in

19   the handwritten text, is that your

20   handwriting?

21     A.    Yes.

22     Q.    And below that it says "Jie Wu."

23          Do you recognize --

24     A.    I do recog --

RUTH V. BRIGGS

Page 274

1    Q.    -- the signature as Dr. Wu's

2    signature?

3    A.    Uh-huh.

4    Q.    Is that a "yes"?

5    A.    Yes, it is.  I'm sorry.

6    Q.    And this, uh, was a three-day

7    suspension without pay, correct?

8    A.    Correct.

9    Q.    And this was issued to you on March

10    26th, 2013, right?

11    A.    Yes.

12    Q.    In "explanation," it says, "C.4 -

13    Neglecting job duties or responsibilities or

14    failing to carry out instructions given by a

15    supervisor (sic)."

16    A.    Correct.

17    Q.    Do you see that?

18    A.    Yes.

19    Q.    And do you understand, uhm, that you

20    had committed a Level C disciplinary

21    infraction?

22    A.    I disagree with the level, but, yes,

23    I do.  I dropped the ball.

24    Q.    So you disagreed with the severity of

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 275

1    the discipline?

2    A.    Yes.

3    Q.    But you understood that you were

4    issued a Level C discipline?

5    A.    Yes.

6    Q.    And you understood -- you told me

7    before that you dropped the ball.

8         And in "dropping the ball," which

9    were your words, did you fail to carry out

10   an instruction given by Dr. Wu to book

11   travel for Dr. Whaley?

12   A.    To complete it, yes.

13   Q.    And if you need to pull it back out,

14   that's fine, but the first time that there's

15   a Level C infraction, that leads to a

16   suspension without pay, correct?

17   A.    Right, correct.

18   Q.    And you understood that, correct?

19   A.    I didn't know that then, but I did

20   after, yeah.

21   Q.    But you did have access to the Rules

22   of Conduct throughout your --

23   A.    I did.

24   Q.    -- employment?

RUTH V. BRIGGS

Page 277

1    Q.    Okay.  And you said you disagreed

2    with the severity of the discipline?

3    A.    Uh-huh.

4    Q.    Is that a "yes"?

5    A.    Yes, it is.

6    Q.    Why?

7    A.    Because it wasn't willful.  It was a

8    mistake, and there are mitigating factors.

9    I was alone in the office.  There was Judy

10   Lennon was on family medical leave because

11   her mom died.  I mean, there was no one in

12   the office, and I was pulling it, so...

13        I'm not going to make excuses for

14   dropping the ball, but I -- there was a lot

15   of other things.  And I -- Dr. Kwatny says

16   people in our department don't make

17   mistakes.  Well, I did, and I owned up to it

18   and I took my three-day suspension.

19   Q.    The, uh, the instruction to book

20   Dr. Whaley's travel, that was given solely

21   to you, correct?

22   A.    I believe, yes.  That's my knowledge.

23   Q.    So you don't have any knowledge that

24   Ms. Lennon was involved?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 278

1    A.    No, I don't have any.

2    Q.    Or that she was asked to be involved?

3    A.    I don't have any knowledge if she

4    was.

5    Q.    And you did not ask Ms. Lennon to be

6    involved, correct?

7    A.    No, I didn't, no.

8    Q.    No, you did not ask her --

9    A.    I did not --

10   Q.    -- to be involved?

11   A.    -- ask her, no.

12   Q.    Why did you feel -- let me step back.

13         I understand from what you've told me

14   that you disagreed with the severity of the

15   discipline, correct?

16   A.    Correct.

17   Q.    Although you disagreed with it, did

18   you understand why it had been a Level C

19   infraction?

20   A.    Yes, I did.

21   Q.    And although you disagreed with it,

22   did you understand Dr. Wu's position about

23   why it was a Level C infraction?

24   A.    No.

RUTH V. BRIGGS

Page 280

1    Q.    Okay.  And why do you think Dr. Wu

2    gave you a Level C infraction?

3    A.    I believe he wanted me out of there.

4    Q.    Why?

5    A.    He didn't like me.  Not that he

6    didn't like me personally.  He didn't want

7    me to -- he wanted a secretary, basically,

8    and he didn't -- what Justin Shi, who is

9    that associate chair, told me is that "Dr.

10   Wu doesn't want you to ask questions.  He

11   doesn't want you to make suggestions.  He

12   just wants you to listen to him and do what

13   he says."

14   Q.    Why do you believe that Dr. Wu,

15   uhm -- you said, you said that Dr. Wu -- you

16   don't believe Dr. Wu didn't like you; is

17   that right?

18   A.    He didn't want me where I was, right.

19   Q.    So why do you believe that?

20   A.    I don't know.  I don't know.  I don't

21   know.  I, I do believe Dr. Wu liked me, and

22   I liked him, you know, when things were

23   good.

24   Q.    So --

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 282

1    A.    I can tell you what I think --

2    Q.    Sure.

3    A.    -- is the reason.  Well, being in

4    another building doesn't help.  Uhm, getting

5    emails like "do this," "do" -- I mean, it

6    was not clear, and then it would change and

7    then it would be he'd, you know, change it,

8    "Judy, you do it."  It just flipped around

9    all the time.

10          And I was always called off of

11   something I was doing without -- oh, I

12   always went, "I'll do it.  I'll do it."

13   Q.    Did he -- is he somebody who has high

14   demands of people who work for him?

15   A.    Uhm, yes, he does.  His faculty.  Not

16   all staff, but his faculty.

17   Q.    And he -- is it fair to say he

18   expects a lot of his employees?

19   A.    Some, yeah.

20   Q.    Uhm, and you say "some."

21          Does he not expect --

22   A.    He protected some.

23   Q.    -- a lot from other employees?

24   A.    Yeah, yeah.  He protected some

RUTH V. BRIGGS

Page 283

1    people.

2    Q.    So who did he protect?

3    A.    He protected Judy from -- and I

4    wanted to -- myself, I didn't want to see

5    Judy lose her job either.

6    Q.    Why do you feel he protected Judy?

7    A.    Because he just -- you know, he

8    allowed her, he -- I kept saying, "Dr. Wu,

9    she needs training.  She needs to go to

10   computer classes."

11   Q.    And in what way did he protect her?

12   A.    He said, "I think the computer" --

13   "the typewriter is cute."

14   Q.    And --

15   A.    "Cute" is the word he used.

16   Q.    Do you know how long Judy worked for

17   Dr. Wu?

18   A.    Well, Dr. Wu -- she's been in that

19   department for, I -- you know, from high

20   school or Temple from high school; so she

21   just recently retired, I guess.  But I don't

22   know.  I mean, the whole -- she was there

23   when he came in.  So when he was recruited

24   by Dr. Dai, who I was part of, you know,

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 284

1    doing his travel, he, uhm -- she was already

2    there.

3    Q.    So Judy --

4    A.    So he inherited her.

5    Q.    Okay.  So Judy was with Dr. Wu from

6    the start of Dr. Wu's employment --

7    A.    Yes.

8    Q.    -- at Temple?

9    A.    Yes.

10    Q.    And anyone else that you felt Dr. Wu

11    protected other than Judy?

12    A.    When Alexandra Grinshpun was there.

13    It wasn't protection.  It was just not --

14    letting stuff slide, but yelling at me all

15    the time about that.

16    Q.    So your opinion was that he let stuff

17    slide for Judy and Alexandra but not for

18    you?

19    A.    Right.

20    Q.    And how old is Judy?

21    A.    Oh, geeze.  She's older than me.  I

22    would say she's 65, maybe.

23    Q.    And how old was Alexandra?

24    A.    Forty-ish.  She had small children,

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 285

1    so I'm just guessing.

2    Q.    And let me correct that both Judy and

3    Alexandra are both women?

4    A.    Yes.

5    Q.    Anyone else that you felt Dr. Wu

6    protected?

7    A.    Jackie Harriz; Hailey King; Laurie

8    Shteir.

9    Q.    Anyone else?

10   A.    Tom Stauffer.  I mean, there was some

11   pretty serious mistakes no one ever got in

12   trouble for, and that's why I was surprised.

13   Q.    Are you aware of anyone else who

14   worked in Dr. Wu's office who failed to book

15   travel arrangements for a visiting

16   candidate?

17   A.    No, I am not aware of anyone.

18   Q.    How old is Jackie Harriz?

19   A.    Well, she retired from Temple, so I'm

20   guessing.  I don't know, 60-ish, 65.

21   Q.    How old is Hailey King?

22   A.    In her late 20s, early 30s.

23   Q.    How old was Laurie Shteir?

24   A.    Fifty-ish.

RUTH V. BRIGGS

Page 286

1    Q.    How old was Tom Stauffer?

2    A.    Forty-ish.

3    Q.    Anyone else that you felt Dr. Wu

4    tried to protect?

5    A.    Not that comes to mind, no.

6    Q.    You said that, uhm -- Dr. Gi (sic),

7    is that correct, the assistant chair?

8    A.    (No response.)

9    Q.    You said that --

10            MR. MUNSHI:  Shi?

11            THE WITNESS:  Shi?

12            MS. FENDELL-SATINSKY:  Shi.

13            THE WITNESS:  Oh, Dr., yeah,

14        Justin Shi, yeah.

15            MS. FENDELL-SATINSKY:  Thank

16        you.

17            THE WITNESS:  Uh-huh.

18    BY MS. FENDELL-SATINSKY:

19    Q.    You said that Dr. Shi told you that

20    Dr. Wu wanted a secretary?

21    A.    No.  He said, "He just wants you to

22    not give feedback, not make suggestions.

23    Don't ask any questions.  Just do as he

24    says."  So if I ask him to clarify

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 287

1    something, that was challenging him.

2    Q.    Did you ask Dr. Shi for input or did

3    Dr. --

4    A.    I did.  I did.

5            MR. MUNSHI:  Just wait until

6        she's done --

7            THE WITNESS:  I'm sorry.

8            MR. MUNSHI:  -- asking the

9        question.

10   BY MS. FENDELL-SATINSKY:

11   Q.    So you asked Dr. Shi for input?

12   A.    Yes.

13   Q.    And this is -- what you just

14   testified to is what Dr. Shi told you?

15   A.    Yes.

16   Q.    Do you know why Dr. Wu did not want

17   you to give feedback or make suggestions?

18   A.    I don't.

19   Q.    After receiving the disciplinary

20   report at D-13, did you understand that you

21   were on probation for a year and that any

22   further Level C infraction could lead to the

23   end of your employment at Temple?

24   A.    Yes, I did.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 289

1    sending you a written --

2    A.      Right.

3    Q.      -- reminder of that; is that correct?

4    A.      That is correct.  But I didn't make

5    these charges.

6    Q.      But it is accurate that you've had

7    several meetings with -- you had had several

8    meetings with Dr. Wu and Drew regarding not

9    using Dr. Wu's credit card for departmental

10   usage?

11   A.      That is correct.  And these were made

12   by someone else, I want you to know.  His

13   card number everyone had.

14   Q.      Did you monitor his credit card bills

15   as part of your job?

16   A.      I did.

17   Q.      And did you tell him when there were

18   charges to his credit card that shouldn't

19   appear?

20   A.      I did.

21   Q.      Following the suspension notice that

22   was D-13 --

23   A.      D -- okay.

24   Q.      -- between then and the end of your

RUTH V. BRIGGS

Page 290

1    employment at Temple, did Dr. Wu and

2    Mr. DiMeo address other performance issues

3    with you?

4    A.    Yes; Monday, Wednesday, and Friday

5    mornings.

6    Q.    Was one of the things they spoke with

7    you about your delay in responding to

8    communications?

9    A.    To, to whom?

10   Q.    Sure.  So you told me that Dr. Wu and

11   Mr. DiMeo spoke with you about other

12   performance issues between your suspension

13   notice and the end of your employment at

14   Temple, correct?

15   A.    Yes.

16   Q.    So I asked if one of the things they

17   spoke with you about was your delay in

18   responding to communications.

19   A.    He did.  But I didn't delay.  I don't

20   believe I delayed.  Five minutes I don't

21   think, is his email, is not a delay.

22                    - - -

23              (Whereupon, 11/20/13 email

24         regarding another example, Bates No.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

1          want me to tell you that.

2                    Rahul, I'm going to ask you --

3                    THE WITNESS:  Okay.

4                    MS. FENDELL-SATINSKY:  -- to

5          stop telling the witness that if she

6          doesn't understand the question she

7          should tell me that.  I've given her

8          that instruction numerous times

9          today, and she's indicated she

10         understands that instruction.

11                   MR. MUNSHI:  Fine.  Now you

12         remember.

13                    - - -

14                   (Whereupon, the court reporter

15         read back the following question:

16              Q  Does seeing this exhibit at

17         D-15 refresh your recollection that

18         there were instances in which you

19         were delayed in responding to

20         communications?)

21                    - - -

22                   THE WITNESS:  No.

23    BY MS. FENDELL-SATINSKY:

24    Q.    You mentioned earlier that you had

RUTH V. BRIGGS

1   three-times-a-week meetings with Andrew

2   DiMeo and Dr. Wu; is that correct?

3   A.    That is correct.

4   Q.    And when did those meetings start?

5   A.    I think they started probably the

6   fall of 2013.

7   Q.    Did those meetings start after you

8   spoke with Mr. Wacker about needing somebody

9   or wanting somebody to help "mediate," I

10  think were your words, between you and

11  Dr. Wu?

12  A.    Actually, I didn't ask Greg.  I asked

13  Deirdre.  But I -- these -- the meetings

14  started out more as like let's go over

15  what's going on in the department.  They

16  started out as informative, no problem at

17  all.

18        So, that's not how they started out.

19  It's just the tone of them changed, the door

20  was shut, and, you know, staff are like,

21  "What's going on with Ruth?"  I -- they just

22  changed in tone to be -- to being, you know,

23  confrontive.  It really wasn't about what's

24  going on in the department.  It's like where

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

1    BY MS. FENDELL-SATINSKY:

2      Q.    Did you understand that the meetings

3    were partially intended to help improve

4    communications between --

5      A.    That's what I was told.

6      Q.    -- you and Dr. Wu?

7      A.    Yes.  That's what I was told.

8      Q.    And who told you that?

9      A.    Greg and Drew.

10     Q.    And you said during the meetings Drew

11   and Dr. Wu would discuss performance issues;

12   is that right?

13     A.    Yeah.

14     Q.    And did they identify performance

15   issues during the meetings?

16     A.    Yeah.

17     Q.    And by identifying the performance

18   issues, did you understand those were areas

19   in which they expected improvement from you?

20     A.    Yes.

21               MS. FENDELL-SATINSKY:  We can

22         take a quick break.

23               MR. MUNSHI:  Thank you.

24               THE VIDEOGRAPHER:  This

RUTH V. BRIGGS

Page 305

1    BY MS. FENDELL-SATINSKY:

2    Q.    Have you seen this document marked as

3    D-16 before?

4    A.    Yes, I have.

5    Q.    And is this a disciplinary report

6    from January 20th, 2014 from Dr. Wu to you?

7    A.    Correct.

8    Q.    If you look down at the bottom where

9    it says "employee signature," is that your

10   name and your signature?

11   A.    That is my name, yes.

12   Q.    And your signature?

13   A.    Uh-huh.

14   Q.    Is that a "yes"?

15   A.    Yes.  I'm sorry.

16   Q.    And below you, is that Andrew DiMeo's

17   name and signature?

18   A.    That -- uh, it is.  I can't justify

19   to whether it's his, but that is what it

20   says.

21   Q.    Did Mr. DiMeo meet with you to issue

22   this discipline?

23   A.    I don't know, because I can't

24   remember what it was for.  This -- there was

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 307

1    in which you overslept and reported to work

2    three hours late that we have not discussed?

3    A.    Could you, could you --

4    Q.    Sure.  So, earlier you testified

5    about an instance in which you reported to

6    work three hours late.

7    A.    Right.

8    Q.    Because you overslept, correct?

9    A.    Correct.

10    Q.    And that's what this discipline that

11    was marked as D-16 was for, correct?

12    A.    Correct.

13    Q.    So I was asking whether there's

14    anything related to the incident that

15    resulted in the discipline at D-16 that we

16    have not talked about.

17    A.    Yes.

18    Q.    What?

19    A.    I was basically called a liar.  No

20    one would even contact -- when they talk

21    about there being procedures and protocol,

22    there was no protocol in that department.

23    Q.    Did you ever observe anyone in your

24    office reporting to work three hours late

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 308

1    without informing somebody else in the

2    office?

3    A.    I don't know if it was three hours.

4    I know someone who didn't come in for three

5    days.

6    Q.    Without reporting that they --

7    A.    Without reporting.

8    Q.    -- were going to be out?

9    A.    Yup.

10   Q.    Who was that?

11   A.    Hailey King.

12   Q.    Do you know of the circumstances why

13   Ms. King did not report to work for three

14   days?

15   A.    Well, she didn't call -- no, I don't,

16   no.  Dr. Wu was traveling at the time and...

17   Q.    Do you know if she had previously

18   spoken with Dr. Wu about that?

19   A.    She did not.

20   Q.    How do you know that?

21   A.    Because Dr. Wu didn't know about it,

22   he said.

23   Q.    Do you know if Ms. King was ill?

24   A.    I didn't ask her.  She was pretty

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

1   new.  I didn't ask her.

2   Q.    Did you ask -- did you know if

3   Ms. King had an emergency?

4   A.    I don't know.

5   Q.    So you don't know why Ms. King was --

6   did not report to work for three days?

7   A.    No, I don't.

8   Q.    Okay.  Was there anyone else who

9   reported to work three hours late and did

10  not report that they were going to be three

11  hours late?

12  A.    Three hours or just --

13  Q.    Yes.

14  A.    -- tardiness?

15        Okay.  I don't know of anyone, but

16  I'm not nosey.

17  Q.    And who called you a liar?

18  A.    I can't say that anybody called me a

19  liar.  They said I was lying.

20  Q.    About what?

21  A.    About Dr. Wu's accusations.

22  Q.    About what?

23  A.    About all of these emails.

24  Q.    Okay.  So, I am focused right now --

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 312

1    Q.    Tell me about that.

2    A.    I booked the reservations at Club

3    Quarters for the speaker as I was told to.

4    Dr. Wu had the date wrong.

5    Q.    So was it your position that the

6    error was not your fault?

7    A.    That one was not my fault.

8    Q.    Did you ever fail to submit Dr. Wu's

9    expense reports in a timely manner?

10   A.    No, I did not.

11   Q.    Your testimony is that you always

12   submitted Dr. Wu's expense --

13   A.    In a timely manner, yes.

14   Q.    It's your testimony that you always

15   submitted Dr. Wu's expense reports in a

16   timely manner?

17   A.    Right.

18   Q.    Is that "yes"?

19   A.    That is "yes."

20   Q.    Is it your testimony that you always

21   submitted Dr. Wu's expense reports within

22   the time that he requested they be

23   completed?

24   A.    No, I did not.

RUTH V. BRIGGS

Page 313

1   Q.    So there were instances in which you

2   did not complete Dr. Wu's expense reports

3   within the time Dr. Wu wanted you to

4   complete them?

5   A.    That is correct.

6   Q.    And we talked about earlier expense

7   reports were a part of your job

8   responsibilities in working for Dr. Wu,

9   right?

10   A.    Yes.  I did them.

11   Q.    Just not on time.

12   A.    Not in three hours, no.

13   Q.    Your employment with Temple ended on

14   April 1st, 2014; is that correct?

15   A.    That is correct.

16   Q.    Do you recall an incident in March of

17   2014 when you were instructed to complete a

18   travel reimbursement expense for Dr. Wu by

19   the end of the day?

20   A.    Not specifically, but there are

21   times, yes, uh-huh.

22   Q.    Do you -- during the meetings you had

23   with Drew and Dr. Wu, did you become

24   argumentative in any of those meetings?

RUTH V. BRIGGS

Page 314

1    A.     In the end, I did.  I hadn't -- I

2    felt -- they were lying about me, and no one

3    would listen to me.  H.R. wouldn't listen to

4    me.  No one would listen to me.

5    Q.     What were they lying about?

6    A.     Well, they were saying I didn't call

7    in on that day that I was three hours late,

8    which is not the truth.  I asked them to

9    please investigate it, I'm not lying, and

10   they said they wouldn't.

11   Q.     And on that day when you were three

12   hours late, you didn't call in until you

13   were three hours late, correct?

14   A.     As soon as I got up.  And I came to

15   work immediately.  I mean, I was there to

16   work in ten minutes.

17   Q.     And that was three hours after you

18   were due to report to work, correct?

19   A.     Yes.

20   Q.     And you did not call in until you

21   woke up, which was three hours late?

22   A.     That is correct.

23   Q.     Anything else that you told Drew and

24   Dr. Wu were calling you a liar about?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 315

1    A.    Well, one of them is that they

2    wouldn't -- that I had called in.  They kept

3    saying I didn't.  I said, "I did call in."

4    Q.    And --

5    A.    And it was their word against mine.

6    Q.    You said that when you called in you

7    reported it to a student worker, correct?

8    A.    That's the only person who was there.

9    Q.    Anything else that you felt Drew and

10   Dr. Wu were lying about with regard to you?

11   A.    I don't believe that it was Drew

12   doing it intentionally to me.  I will say

13   that first.  But looking at these emails, I

14   don't -- I can -- him forwarding an email

15   saying I didn't complete something when he

16   didn't answer my question makes it look out

17   to me -- that is just what -- the general

18   way it went for me.

19   Q.    Why did you believe Dr. Wu was

20   calling you a liar?

21   A.    I really believe he just wanted me to

22   go, disappear.

23   Q.    And is that because you believed that

24   he wanted you to do different tasks than you

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 319

1          Again, for the third or fourth time,
2    my question is:  Why do you believe that
3    Dr. Wu wanted you out?  And, again, those
4    are your words.
5    A.    I believe he wanted a younger
6    secretary that wasn't as problematic to his
7    budget, and it seemed likely that it be
8    Ruth.  I was the only one who wasn't in a
9    union in the department, and I had no
10   recourse.
11   Q.    So you believe that he wanted a
12   younger secretary?
13   A.    He wanted a secretary, right.
14   Q.    He wanted a secretary.
15   A.    A secretary, yes.
16   Q.    And you were not a secretary,
17   correct?
18   A.    I am not a secretary.
19   Q.    So you believe he wanted somebody in
20   a different role than you?
21   A.    I do.
22   Q.    And somebody who cost less than you
23   cost?
24   A.    Yes.

RUTH V. BRIGGS

Page 320

1    Q.    Is there any other reasons that you

2    believed that Dr. Wu wanted you out?

3    A.    No.

4    Q.    Ultimately, you resigned from Temple,

5    correct?

6    A.    Under duress.  I was given a chance

7    to be terminated or submit my resignation.

8    Q.    So you were given a choice, correct?

9    A.    Yes.

10   Q.    And you chose resignation, correct?

11   A.    I did.  And the reason is that

12   Deirdre said I could continue to bid on

13   internal jobs at Temple.

14              - - -

15              (Whereupon, 4/3/14 resignation

16         email, Bates No. TEMPLE0088, was

17         marked as D Exhibit No. 17 for

18         identification.)

19              - - -

20              THE COURT REPORTER:

21         Seventeen.

22   BY MS. FENDELL-SATINSKY:

23   Q.    Ms. Briggs, have you seen this

24   document before?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 321

1   A.    Yes.

2   Q.    And is this your resignation letter?

3   A.    Yes, it is.

4   Q.    This is dated April 3rd, 2014,

5   correct?

6   A.    That is correct.

7   Q.    And it indicates that your

8   resignation is effective April 1st, 2014,

9   correct?

10  A.    That is correct.

11  Q.    The fact that you resigned from

12  Temple, has that enabled you to tell

13  potential employers that you resigned?

14  A.    I only had two interviews since then,

15  and it came up and I said I resigned.  One

16  of them was internal, and one was at the

17  Community College of Philadelphia.

18  Q.    In connection with your resignation,

19  were you told that no challenges would be

20  made to your application for Unemployment

21  Compensation?

22  A.    When I asked a question, yes, Deirdre

23  told me that it fell on Temple.  If they say

24  that they are going to agree to it, then

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 322

1    that's where the appeal thing starts.

2    Q.    And did Deirdre tell you that no

3    challenge would be made to your request?

4    A.    She did tell me that.

5    Q.    And was no challenge, in fact, made?

6    A.    No challenge was made, but they also

7    told me to write down that I resigned.

8    Q.    Did you ultimately receive

9    Unemployment Compensation?

10    A.    Uhm, after appeal.

11    Q.    But you ultimately received

12    Unemployment Compensation; is that correct?

13    A.    Yes; about eight weeks afterwards.

14    Q.    And the Unemployment Compensation you

15    received, was that backdated?  So did you

16    receive it going back --

17    A.    It was back --

18    Q.    -- to the time of --

19    A.    Yes, it was.

20    Q.    -- your resignation?

21    A.    Yes, it was.

22                    -  -  -

23              (Whereupon, 4/1/14 letter,

24         Bates No. TEMPLE0171, was marked as

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 323

1          D Exhibit No. 18 for

2          identification.)

3                    - - -

4    BY MS. FENDELL-SATINSKY:

5    Q.    Ms. Briggs, I've given you a document

6    that's been marked as D-18.  Again, my first

7    question to you is going to be whether

8    you've seen this document before.

9    A.    Yes, I have.

10   Q.    And this is a letter from Mr. Wacker

11   to you, correct?

12   A.    That's correct.

13   Q.    Did Mr. Wacker give you this letter

14   in-person?

15   A.    Yes.

16   Q.    Was there anyone else in the meeting

17   for --

18   A.    Deirdre Walton.

19   Q.    Let me finish my question.

20   A.    I'm sorry.

21   Q.    Was there anyone else in the meeting

22   with Dr. -- with Mr. Wacker when he gave you

23   D-18?

24   A.    Deirdre Walton.

RUTH V. BRIGGS

Page 324

1   Q.   Anyone else?

2   A.   No.

3   Q.   Where was the meeting?

4   A.   It was in the third-floor dean's

5   office conference room in Walkman Hall --

6   no.  Conwell, I'm sorry, Conwell.

7   Q.   What were -- were you told there was

8   a purpose to the meeting?

9   A.   No.  I didn't...

10   Q.   And what occurred during the meeting?

11   A.   I walked in the room.  I didn't see

12   Deirdre immediately.  I just -- Greg had

13   called me.  When I came in, he said, "Look,

14   we have a meeting.  Can you come down?"

15        And I was actually meeting with Sandy

16   Foehl that morning, and I didn't want to

17   cancel the meeting.  And I told him I

18   couldn't be there till 10:30.

19        He said, "Well, when you get," you

20   know -- "just come to my office when you get

21   back."

22        So, I did.  I'm like, "I'm back."

23        And he said, "Let's go in the

24   conference room."

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 325

1          So I just started walking ahead of

2     him, and he was behind me.  And then I heard

3     Deirdre, and I looked.  I went, "This is

4     probably not an April Fools joke," but...

5     Q.    And so --

6     A.    But then they handed me this letter.

7     Q.    Okay.  And what did they tell you?

8     A.    I can't -- you know what, I cannot

9     remember.  I was shocked.  I was in shock.

10    Q.    So do you not remember any discussion

11    that occurred at that meeting?

12    A.    No.

13    Q.    Is it your testimony that the only

14    thing you recall about that meeting is where

15    the meeting occurred, going into the

16    meeting, receiving this letter, and who was

17    at the meeting?

18    A.    Yes.  I remember reading the last

19    line of the letter.

20    Q.    Okay.  Is there anything else about

21    the meeting in which you received D-18 that

22    you recall?

23    A.    No.

24    Q.    And this letter states that you were

RUTH V. BRIGGS

Page 326

1    in violation of two Category C work rules,

2    correct?

3    A.     Uh-huh.

4    Q.     Is that a "yes"?

5    A.     That is, I'm sorry, yes.

6    Q.     And those violations were related to

7    incidents, the incidents referenced above in

8    the letter in bullet points, correct?

9    A.     Uh-huh.  That -- yes, uh-huh.  Sorry.

10   Q.     And you told me earlier that when you

11   received the March 2013 suspension you

12   understood that you were on probation for a

13   year, correct?

14   A.     Correct.

15   Q.     And you understood then that any

16   further Level C infraction could lead to the

17   end of your employment at Temple, correct?

18   A.     I did know that.  But, quite

19   honestly, I didn't really know it was a

20   Level C until a week later when I got my

21   stuff from the office.

22   Q.     You didn't know that the March

23   2013 --

24   A.     No.  Because I just -- I was --

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 359

1    Q.    Earlier you identified some employees

2    that you felt Dr. Wu protected.

3    A.    Uh-huh.

4    Q.    Do you recall that?

5    A.    Yes, I do.

6    Q.    And one of those employees you

7    referred to is Hailey King, correct?

8    A.    Yes.

9    Q.    And you told me there was an instance

10   in which Hailey King did not report to work

11   for three days and was not disciplined --

12   A.    Yes.

13   Q.    -- is that correct?

14         How do you know Ms. King was not

15   disciplined?

16   A.    Because her office was right next to

17   mine and she didn't show up.  We were -- we

18   were concerned, where is she.  We called,

19   tried to call her, couldn't get her.

20   Q.    My question was:  How do you know

21   that Ms. King was not disciplined?

22   A.    Because she didn't show up for work.

23   Q.    How do you know she was not

24   disciplined?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 360

1    A.    Because I was told.  It's in one of

2    the emails.  I mean, she -- I can't, I can't

3    remember why, how I know, but I know that

4    she wasn't.

5    Q.    Do you know if Dr. Wu or anyone else

6    had a conversation with her about it?

7    A.    I think that they did speak to her,

8    yes.

9    Q.    And after that incident, was there

10   any other occasion on which Ms. King did not

11   report to work?

12   A.    There was another incident where she

13   didn't report for two days.  I did not know

14   about that.  The timekeeper told me because

15   she was very upset about what was going on,

16   and she actually resigned as a result.

17   Q.    Who was the timekeeper?

18   A.    Antoinette Newton.

19   Q.    Was Ms. King a union employee?

20   A.    I don't know that.

21   Q.    Why did Ms. King have to keep her

22   time if she was not a union employee?

23   A.    Well, Toni kept a time for everyone

24   in the department.  It wasn't like a time

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 361

1    clock.  She just...

2     Q.    Do you know why Ms. King was absent

3    those two days?

4     A.    No, I don't.

5     Q.    Do you know if Ms. King had an

6    emergency?

7     A.    I don't.

8     Q.    Do you know if Ms. King had any FMLA

9    leave?

10    A.    No.

11    Q.    Do you know if Ms. King had any

12   medical accommodation?

13    A.    No, I don't know that.

14    Q.    Do you know if Ms. King was

15   disciplined for the time that she did not

16   report for two days?

17    A.    I don't know that.

18                - - -

19              (Whereupon, 12/14/11 email,

20          Bates No. TEMPLE UNIVERSITY

21          (R.BRIGGS)-0000327-328, was marked

22          as D Exhibit No. 27 for

23          identification.)

24                - - -

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 365

1    Q.    -- once you moved to the tenth floor,

2    you could not see if she was coming late or

3    leaving early, correct?

4    A.    No, correct.

5    Q.    And do you know what Ms. King's

6    salary was?

7    A.    No.  I have -- don't.

8    Q.    Do you know if Ms. King was paid more

9    than you or less than you?

10   A.    I don't know.

11   Q.    Do you know what Ms. King's job

12   description was?

13   A.    No, I don't know what her job

14   description was.

15   Q.    Did you ever review Ms. King's job

16   description?

17   A.    No.

18   Q.    Did you -- strike that.

19        Ms. King is also a woman, correct?

20   A.    Yes.

21   Q.    Any other way in which you believe

22   Ms. King was treated better than you by

23   Dr. Wu?

24   A.    No.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 366

1   Q.   So, I believe the court reporter gave

2   you a document marked as D-27.

3   A.   Uh-huh.

4   Q.   Have you seen this email before?

5   A.   Uh-huh.

6   Q.   Is that a "yes"?

7   A.   Yes.  I'm sorry.  "Yes."

8   Q.   And is this an email from you to

9   Mr. Wacker and Mr. DiMeo?

10   A.   Yes.

11   Q.   And have you seen this document

12   before?  I think you just said "yes."

13   A.   Yes.

14   Q.   If you go down to the third to last

15   paragraph.

16   A.   Uh-huh.

17   Q.   You write, "I am wondering how it is

18   that I can be disciplined for violations and

19   others in the office come and go as they

20   please, violate policies about student

21   records and Social Security numbers, with no

22   consequences at all."

23   A.   Uh-huh.

24   Q.   Do you see that?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 367

1    A.    Yes, I do.

2    Q.    Did you ever violate policies about

3    student records or Social Security numbers?

4    A.    I didn't, no.

5    Q.    Were you disciplined for any

6    violations other than those that we reviewed

7    today?

8    A.    The, the --

9    Q.    So today we reviewed some

10   disciplinary actions, correct?

11   A.    Yes.

12   Q.    Did you receive any disciplinary

13   actions other than the disciplinary actions

14   we reviewed today?

15   A.    No.

16                  - - -

17           (Whereupon, Plaintiff's

18       complaint was marked as D Exhibit

19       No. 28 for identification.)

20                  - - -

21   BY MS. FENDELL-SATINSKY:

22   Q.    Ms. Briggs, have you seen this

23   document before?

24   A.    Yes, I have.

RUTH V. BRIGGS

Page 382

1    other way in which you believe Dr. Wu

2    retaliated against you?

3    A.    No.

4                        - - -

5              (Whereupon, 8/2/12 email

6         string regarding scheduling a

7         meeting, Bates No. TEMPLE UNIVERSITY

8         (R.BRIGGS)-0000210-212 and 2098, was

9         marked as D Exhibit No. 29 for

10        identification.)

11                       - - -

12   BY MS. FENDELL-SATINSKY:

13   Q.    Ms. Briggs, this document is marked

14   as Exhibit D-29.  The Bates numbers are 210,

15   211, 212, and then 208 --

16   A.    Uh-huh.

17   Q.    -- is the last one.

18         Do you see that?

19   A.    208, yes.

20   Q.    Okay.  Have you seen these emails

21   before?

22   A.    Yes, I have.

23   Q.    So I want to start on 211, please.

24   A.    Okay.

ELITE LITIGATION SOLUTIONS, LLC