RUTH V. BRIGGS

Page 383

1    Q.    And on the bottom of 211, that's an

2    email from you to Sandy Foehl on July 25th,

3    2012, correct?

4    A.    Yes.

5    Q.    And this email says that you spoke

6    with Rhonda Brown?

7    A.    Yes.

8    Q.    Who is Rhonda Brown?

9    A.    She was the, the director or chair of

10   the -- I think they changed the name of the

11   office.  I think it was called -- I don't

12   know.  It was for Equal Opportunity.  She

13   worked with Sandy for a while.  I don't know

14   what they called it.

15   Q.    And Rhonda suggested that you reach

16   out to Sandy?

17   A.    That's what she said, yes.

18   Q.    And this email on July 25th, 2012, is

19   this the first time that you had spoken with

20   anyone in EEO about -- let me just step

21   back.

22         Is this email from July 25th, 2012

23   the first time you spoke with anyone in EEO

24   during your employment at Temple?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 384

1   A.    She wasn't in EEO.  Is that --

2   Rhonda, you mean?

3   Q.    I'm talking about Sandy.

4   A.    Oh, Sandy.  Uhm, yes, it was.

5   Q.    Okay.

6   A.    Uh-huh.

7   Q.    So July 25th, 2012 was the first time

8   you spoke with anyone in EEO?

9   A.    Yes.

10   Q.    And you emailed Sandy on July 25th.

11   Sandy wrote back to you on July 26th and

12   said when -- what her availability was.

13         Do you see that?

14   A.    I do.

15   Q.    And then on July 29th you wrote back

16   to Sandy and you gave her your availability,

17   correct?

18   A.    Which one?  I'm sorry.  Which one?

19   Q.    Sure.  So if you go to --

20   A.    Which page?

21   Q.    -- the first page, 210.

22   A.    Uh-huh.

23   Q.    On July 29th, you emailed Sandy.

24   A.    Right.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 386

1   your meeting with Sandy was sometime between

2   July 30th and August 2nd, 2012?

3   A.   Well, it says that I met with her on

4   July 30th.

5   Q.   Okay.  So your meeting with Sandy was

6   on July 30th, correct?

7   A.   That is correct.  I'm sorry.

8   Q.   Where did you meet with Sandy?

9   A.   In her office.

10   Q.   How long did you meet with her for?

11   A.   Half an hour to forty-five minutes,

12   maybe.

13   Q.   What did you discuss with her during

14   that meeting?

15   A.   About the problems I was having in

16   the department and that I -- the comments

17   Dr. Wu had made about my age and my -- I, I

18   just needed to talk to her, but I decided to

19   withdraw.

20   Q.   And when you say the comments Dr. Wu

21   made about age, are you referring to the

22   comments that you testified to where Dr. Wu

23   said that in China women are put out to

24   pasture around a certain age and that in

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

```
                                          Page 387
 1    China women retire at 55?

 2    A.    That is correct.

 3    Q.    And those comments were not about

 4    you, correct?

 5              MR. MUNSHI:  Just objection to

 6         form.

 7    BY MS. FENDELL-SATINSKY:

 8    Q.    Were those comments about you?

 9    A.    About me?

10    Q.    Yes.

11    A.    Oh, I don't know.  I mean, no.  He

12    just said it to me.

13    Q.    Right.

14    A.    Okay.

15    Q.    He said it to you.

16    A.    To me, right, right.

17    Q.    But they weren't about you, correct?

18    A.    Not to my -- no, uh-uh.

19    Q.    You -- "no"?

20    A.    "No."  I'm sorry.

21    Q.    That's okay.

22         Anything else you discussed with

23    Sandy during that meeting?

24    A.    She, you know, she just walked
```

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 388

1    through the process with me.  And I asked

2    her to hold off on it, because I have a son

3    with a spinal cord injury.  He was having

4    surgery, and I was concerned about that; so

5    I asked her to just hold on, don't release

6    anything.

7    Q.    So if you turn to the last page,

8    which is 208.

9    A.    (Witness complies with request.)

10   Q.    This is an August 3rd email from

11   Sandy to you, correct?

12   A.    Yes, it is.

13   Q.    And this is in response to the email

14   that you sent Sandy on August 2nd, correct?

15   A.    Yes.  August 3rd?

16   Q.    In response to the email --

17   A.    Oh.

18   Q.    -- you sent on August 2nd.

19   A.    Oh, okay.

20   Q.    Which is the first page.

21   A.    Okay.

22   Q.    Is that right?

23   A.    Yes.

24   Q.    And in your email on August 2nd, you

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 389

1    had asked to review the letter to Michael

2    Klein.

3            Who is Michael Klein?

4    A.    He's the dean of the College of

5    Science and Technology.

6    Q.    And here in this email on August 3rd,

7    Sandy told you that, "Equal Opportunity

8    Compliance does not have grievants review

9    the complaint notices," but you can inform

10   the notice by sending your own written

11   statement of the issues, correct?

12   A.    Correct.

13   Q.    And she goes on to actually request

14   your statement, right?

15   A.    Correct.

16   Q.    And she said to please set out in

17   writing the treatment that you find

18   discriminatory or harassment, the sources of

19   the dis -- the source of the disparate

20   treatment and/or unwelcome conduct, and the

21   basis for the unfair treatment from your

22   perspective, correct?

23   A.    Correct.

24   Q.    And she says that you can provide as

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 390

1    much detail as you wish, right?

2    A.    Correct.

3    Q.    And she encourages you to keep a

4    record of pertinent new events going

5    forward.

6          Do you see that?

7    A.    Yes.

8    Q.    Did you do that?

9    A.    Yes.

10   Q.    How did you keep a record of

11   pertinent new events going forward?

12   A.    Email.  Sometimes notes, just email

13   notes to myself.

14   Q.    Your record that you kept, would that

15   have been included in the documents you

16   imported to your gmail?

17   A.    That would have -- prob -- yes.

18   Q.    Were there any records you kept that

19   were not imported into your gmail?

20   A.    Ask the question again.

21   Q.    Sure.

22         So Ms. Foehl told you to keep a

23   record of pertinent new events, right?

24   A.    Right.

RUTH V. BRIGGS

Page 391

1    Q.    And you told me you did keep a

2  record --

3    A.    Yes.

4    Q.    -- correct?

5          And so now I want to know if there's

6  anything in that record you kept other than

7  the emails that you imported to your gmail.

8    A.    No -- well, wait a minute.  The

9  disciplinary, they were scanned, but that

10  wasn't from my email.

11   Q.    Okay.  So the record that you kept

12  were -- was the emails that you imported and

13  your written discipline; is that right?

14   A.    Right, yes.

15   Q.    Okay.

16   A.    Uh-huh.

17                    - - -

18              (Whereupon, 9/9/12 email

19         string, Bates No. BRIGGS 24-29, was

20         marked as D Exhibit No. 30 for

21         identification.)

22                    - - -

23  BY MS. FENDELL-SATINSKY:

24   Q.    Ms. Briggs, this is D-30.  Take a

RUTH V. BRIGGS

Page 392

1    look at this and let me know if you've seen

2    it before.

3    A.    I have.  Yes, I have.

4    Q.    Okay.  So starting on the first page,

5    which is BRIGGS 24, there is a September 9th

6    email from you to Sandy Foehl, correct?

7    A.    Yes.

8    Q.    And you respond that you're uncertain

9    about the status of your complaint, correct?

10              MR. MUNSHI:  I'm sorry.  Are

11         you reading from somewhere?  I

12         missed that.

13              MS. FENDELL-SATINSKY:  Yup.

14         So the email from September 9th.

15         The first sentence says, "I am

16         uncertain about the status of the

17         complaint."

18   BY MS. FENDELL-SATINSKY:

19   Q.    Do you see that?

20              MR. MUNSHI:  Oh.

21   BY MS. FENDELL-SATINSKY:

22   Q.    Ms. Briggs, do you see that?

23   A.    I see that, yes.  I'm sorry.  I

24   didn't know you were talking to me.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 395

1    Q.    The last sentence of that paragraph

2    says, "I do know I was paid significantly

3    lower than two male staff members in the

4    dean's office who were my equals."

5           Who were they?

6    A.    I'd rather not give their names.

7    Q.    You have to give their names.

8    A.    I have to, okay.  Uhm, Vinodh

9    Ganesan.  Do you want me to spell that?

10   Q.    We can do it off the record.

11   A.    Okay.

12   Q.    And who was the other person?

13   A.    There's a student worker.  He's no

14   longer -- I don't --

15   Q.    It was a student worker who was paid

16   more than you?

17   A.    No, he wasn't paid more than me.

18   Q.    Okay.

19   A.    But he told me that he knew.

20   Q.    So, so I'm asking:  That last

21   sentence says, I know -- "I do know that I

22   was paid significantly lower than two male

23   staff members in the dean's office who were

24   my equals."  And I want to know who the two

RUTH V. BRIGGS

Page 396

1    male staff members were in the dean's office

2    who were your equals who were paid more than

3    you.

4      A.    Vinodh Ganesan, V-I-N-O-D-H, Ganesan,

5    G-A-N-E-S-A-N.

6      Q.    And who was the other one?

7      A.    I'm sorry.  Roger Catedo (sic).

8      Q.    And what was Roger's position?

9      A.    He was in facili -- I don't know what

10   his title is, facilities.

11     Q.    And what was Vinodh's position?

12     A.    He was the IT per -- head of the IT

13   in the dean's office.

14     Q.    And they were not within Dr. Wu's

15   office, correct?

16     A.    This is before Dr. Wu's.

17     Q.    You told me that you started working

18   for Dr. Wu in 2009.  This is be -- this is

19   in 2012.

20     A.    I know, but these people that this

21   was -- they told me when I was in the dean's

22   office under Keya Sadeghipour.

23     Q.    So that's back from 2006?

24     A.    That would be, yup.

RUTH V. BRIGGS

Page 397

1    Q.    Around 2006?

2    A.    Around, around, yes.

3    Q.    And did you ask them what their

4    salaries were?

5    A.    No, I didn't.

6    Q.    How did you know what their salaries

7    were?

8    A.    One of them came to me and told me

9    that I needed to stand up for myself and

10   gave me suggestions about how to do it.

11   Q.    And who was that?

12   A.    Vinodh.

13   Q.    And how did you know the other

14   person's salary?

15   A.    That was hearsay from Vinodh.

16   Q.    From who?

17   A.    From Vinodh.

18   Q.    Got it.

19         And did you ever complain about being

20   paid less than them prior to this email on

21   September 9th?

22   A.    Not to my knowledge.

23   Q.    In the last sentence -- the last --

24   second to last sentence of your email says,

RUTH V. BRIGGS

Page 398

1    "I am not authorizing any action on my part,

2    because I am waiting to be cleared for FMLA

3    for a short period to care for my son, who

4    has a spinal cord injury."

5         Do you see that?

6    A.    Yes, I do.

7    Q.    And then in the email above this

8    email we just reviewed, it's a September 9th

9    email from you to Rhonda Brown, correct?

10   A.    Correct.

11   Q.    And you say, "I regret having seen

12   Sandy Foehl, because I could not see the

13   original complaint, nor have I heard if it

14   was filed or how it will be addressed,"

15   correct?

16   A.    Correct.

17   Q.    But you told me previously that you

18   told Sandy Foehl not to do anything with

19   your complaint because you were going out on

20   FMLA leave, correct?

21   A.    I didn't understand really what she

22   was going to do.  I didn't know if, the

23   letter, she was waiting to send the letter

24   to Dean Klein after my approval or if I had

RUTH V. BRIGGS

Page 399

1    set things in motion.  I didn't know.  I

2    had, I had no idea if I'd set things kind of

3    in motion and once she knew it she had to

4    act on it.

5      Q.    Your testimony was, correct me if I'm

6    wrong, but your testimony was that you told

7    Sandy Foehl in the meeting on July 20th not

8    to do anything with your complaint

9    because --

10     A.    I did.

11     Q.    -- you were taking FMLA leave.

12     A.    I know, but I did --

13     Q.    Correct?

14     A.    Correct.

15     Q.    Okay.

16     A.    Correct, yes.

17     Q.    And so -- and you told Sandy Foehl

18   again on September 9th not to -- you did not

19   authorize any action on September 9th,

20   correct?

21     A.    I did.

22     Q.    You specifically told her that you

23   were not authorizing any action, right?

24     A.    Yes.  That's true.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 400

1           - - -

2                (Whereupon, 11/2/12 email

3           regarding job description, Bates No.

4           TEMPLE UNIVERSITY

5           (R.BRIGGS)-0000202, was marked as D

6           Exhibit No. 31 for identification.)

7           - - -

8    BY MS. FENDELL-SATINSKY:

9     Q.    Ms. Briggs, have you seen this

10   exhibit marked as D-31 before?

11    A.    Yes.

12    Q.    Am I correct that you had no

13   communications with Ms. Foehl between

14   September 2012 and this email on November

15   2nd, 2012?

16    A.    Can you ask the question again,

17   please?

18    Q.    Sure.

19          Am I correct that you had no

20   communications with Sandy Foehl between your

21   email on September 9th, 2012, which we just

22   reviewed at D-30, and this email from

23   November 2nd, 2012, which is marked as D-31?

24    A.    No.   Not to my knowledge, no.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 403

1    BY MS. FENDELL-SATINSKY:

2      Q.    Ms. Briggs, this is a document marked

3    as D-32.  And so if you go to the second

4    page of this document, this is the email

5    that we just reviewed from November 12 that

6    was marked as D-31, and here on D-32 is

7    Ms. Foehl's response to you, correct?

8      A.    Correct.

9      Q.    And Ms. Foehl in her email to you

10   from November 5th says that you had written

11   that you were not authorizing any action on

12   her part on Septem -- on your part, excuse

13   me, on September 9th, correct?

14     A.    To file the Complaint, yes.

15     Q.    And so Ms. Foehl says, "If you are

16   now authorizing action, will you please

17   respond to my request of April 30th, 2012

18   for a written statement setting out the

19   particular instances of bullying, threats of

20   dismissal, and expressions of age bias by

21   Dr. Wu and/or Mr. Wacker," correct?

22     A.    Correct.

23     Q.    And she says the email forwarded from

24   Dr. Wu -- "the email from Dr. Wu forwarded

RUTH V. BRIGGS

Page 404

1  by you on September 9th, 2012 is not

2  discriminatory on its face," correct?

3  A.    Yes.

4  Q.    And then if you go down, she asks,

5  "Who is paid more than you for the same

6  work?"  In the second paragraph, the last

7  sentence.

8  A.    Are we on 199?

9  Q.    Yup.

10 A.    Okay.

11 Q.    The last sentence of the second

12 paragraph on 199.

13 A.    (No response.)

14 Q.    Do you see that?

15 A.    Uh-huh.

16 Q.    Yes?

17 A.    Yes.

18 Q.    And were those the two males that you

19 replied to or that you told me about earlier

20 who were paid more than you?

21 A.    Yes.

22 Q.    Was there anyone else other than

23 those two males who you believe was paid

24 more than you for the same work?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 405

```
 1    A.    No.

 2    Q.    How old were those two individuals?

 3    A.    Thirty to mid-thirties, something.

 4    Q.    Both of them?

 5    A.    Vin was mid-thirties, mid-thirties at

 6    the time.

 7    Q.    Okay.

 8    A.    Uhm --

 9    Q.    And I don't have the attachment to

10    this email, but Ms. Foehl says that she

11    attached direction to the federal, state,

12    and municipal offices in Philadelphia.

13          Do you see that?

14    A.    Yes.

15    Q.    And if you look up at attachments, it

16    shows there was --

17    A.    Right.

18    Q.    -- "agency list_eoc.doc."

19          Do you see that?

20    A.    Yes, uh-huh.

21    Q.    And so Ms. Foehl provided you with

22    information about how you could make a

23    complaint to a government agency, correct?

24    A.    Correct.
```

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 406

1    Q.    And you did not file any complaint

2    with a government agency at this time,

3    correct?

4    A.    I did not.

5    Q.    You did not at this time, correct?

6    A.    Not at that time, no.

7                      - - -

8              (Whereupon, 2/8/13 email

9         string, Bates No. BRIGGS 38, was

10        marked as D Exhibit No. 33 for

11        identification.)

12                     - - -

13   BY MS. FENDELL-SATINSKY:

14   Q.    Ms. Briggs, have you seen this

15   document before?

16   A.    Yes, I have.

17   Q.    You say, "Rhonda, I am so bullied and

18   harassed all day."

19        Does the bullying and harassment

20   relate to anything more than what we've

21   talked about already today?

22   A.    No, it does not.

23   Q.    And you say, "Two people in the

24   dean's office tell me that I can find

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 409

```
 1              - - -
 2   BY MS. FENDELL-SATINSKY:
 3   Q.    Ms. Briggs, this is a document that's
 4   been marked as D-34.
 5         Have you seen this document before?
 6   A.    Yes, I have.
 7   Q.    And the bottom email, the first
 8   email, is an email from you to Sandy Foehl
 9   on February 8th, 2013.
10   A.    Yes.
11   Q.    Correct?
12   A.    Correct.
13   Q.    And in response to your email,
14   Ms. Foehl told you, "This is an issue for
15   Human Resources first," correct?
16   A.    Correct.
17   Q.    And she said to address the situation
18   with Deirdre Walton in Labor & Employee
19   Relations, correct?
20   A.    Correct.
21   Q.    And did you contact Ms. Walton after
22   receiving this email?
23   A.    Yes.
24   Q.    How quickly after this email did you
```

RUTH V. BRIGGS

Page 410

1    contact Ms. Walton?

2    A.    I don't remember the dates.

3                    - - -

4                 (Whereupon, 2/11/13 email

5          string regarding Confidential

6          communication, Bates No.

7          TEMPLE0196-199, was marked as D

8          Exhibit No. 35 for identification.)

9                    - - -

10   BY MS. FENDELL-SATINSKY:

11    Q.    Ms. Briggs, have you seen this

12   document before?

13    A.    Yes, I have.

14    Q.    I want you to turn to TEMPLE0198.

15    A.    (Witness complies with request.)

16    Q.    It's the first email in this chain.

17    A.    Okay.

18    Q.    Do you see it?

19    A.    Uh-huh.

20    Q.    Is that a "yes"?

21    A.    Yeah.  I'm sorry.  Yes.

22    Q.    Is this a February -- this is a

23   February 9th, 2013 email from you to Cameron

24   Etezady.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 411

1    A.    Yes.

2    Q.    Did I pronounce his last name right?

3    A.    I don't know the...

4    Q.    Okay.  We'll just say from you to

5    Cameron.

6    A.    Yes.

7    Q.    And you reached out to Cameron to

8    request a confidential in -- a confidential

9    conversation to discuss disparate treatment

10   which you believe is related to your age of

11   58, correct?

12   A.    Correct.

13   Q.    Why did you reach out to Cameron?

14   A.    Because I was always referred back to

15   Sandy -- I mean to Deirdre Walton.  And I

16   had met Cameron.  I believe he was outside

17   counsel.  I can't say that for sure, but

18   he's the one who interviewed me for the

19   Hunnewell thing and I felt really -- he was

20   a very trusting -- I felt trusting.  And

21   then I heard he came to Temple, and I

22   contacted him.

23   Q.    And Cameron then responded to you,

24   and he told you about his schedule and

RUTH V. BRIGGS

Page 412

1    recommended that you speak with Sandy Foehl

2    or Tracey Hamilton in EOC, correct?

3    A.    That is correct.

4    Q.    And then you replied to Cameron and

5    you relayed to him various things, including

6    since you provided a statement years ago for

7    a discrimination lawsuit by Tanya Hunnewell

8    in which I did not -- "in which I

9    contradicted the story that I was coached to

10   report, I do not trust she has my best

11   interest at heart."

12         And that was what you were saying

13   about Sandy Foehl, correct?

14   A.    I was saying that about Deirdre

15   Walton, actually.

16   Q.    Okay.  And you told me before that it

17   was Greg Wacker who coached you to say

18   something different than what happened with

19   regards to Ms. Hunnewell?

20   A.    It was Greg Wacker, but -- say your

21   question again.

22   Q.    Sure.

23   A.    I'm sorry.

24   Q.    You told me before it was Greg Wacker

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 413

1    who coached you to report --

2    A.    Yes.

3    Q.    -- something wrong about -- something

4    that was incorrect about Ms. Hunnewell; is

5    that correct?

6    A.    Yes.

7    Q.    And here you're saying that you don't

8    trust Deirdre because Greg coached you to

9    report something different; is that correct?

10   A.    That is correct.

11   Q.    Deirdre did not coach you to report

12   something different?

13   A.    No, she did not.

14   Q.    In response to this email, Cameron

15   referred you to Fay Trachtenberg in his

16   office, correct?

17   A.    Yes.

18   Q.    Or he said he could meet with you the

19   following week; is that right?

20   A.    That is correct.

21   Q.    And you explain in your response to

22   him on February 11th that you're not

23   uncomfortable with Sandy, but Sandy referred

24   you to Deirdre, correct?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 414

1    A.    Correct.

2    Q.    And you say that you have no history

3   with Fay and should you contact her on your

4   own, correct?

5    A.    What page is that?

6              MR. MUNSHI:  First page.

7   BY MS. FENDELL-SATINSKY:

8    Q.    196, the first page.

9    A.    Okay.

10    Q.    The bottom email from you to Cameron.

11    A.    Looks familiar, yeah, I guess.

12    Q.    And you found --

13    A.    Yes.

14    Q.    Did you find Cameron helpful and

15   responsive?

16    A.    I did.

17    Q.    And Cameron responds to you and says

18   that he had given Fay a heads-up and she is

19   on this email, you can call her to set up a

20   time or use her email --

21    A.    Yes.

22    Q.    -- correct?

23    A.    That is correct.

24              - - -

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 419

1    Q.    And you're asking her for her

2    feedback, right?

3    A.    Yes.

4    Q.    In the second paragraph, you say, "I

5    received reports from three faculty members

6    about Dr. Wu making untrue and disparaging

7    remarks about me in the presence of

8    faculty."

9         Who are the three faculty members?

10   A.    Alex Yates, Alexander Yates; Frank

11   Friedman; and Robert Aiken.

12   Q.    Did they speak to you together or

13   individually?

14   A.    They were separate conversations.

15   Q.    Were they oral conversations?

16   A.    Yes.

17   Q.    Where did the conversations occur?

18   A.    Probably in their office or -- I

19   would say in their office.

20   Q.    Did you reach out to them to discuss

21   Dr. Wu?

22   A.    No, I did not.

23   Q.    Is it your testimony that each of

24   them approached you to speak with you about

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 420

```
 1   Dr. Wu?
 2   A.    That's not how it happened either.
 3   Q.    Okay.  So why don't you tell me --
 4   A.    Listen.
 5   Q.    -- how it happened.
 6   A.    I can't say for sure why I was
 7   meeting with them.  I might have been
 8   working on an event and...
 9   Q.    So during meetings with Alexander
10   Yates, Frank Friedman, and Robert Akin, they
11   told you that Dr. Wu was making untrue and
12   disparaging remarks about you?
13   A.    (No response.)
14   Q.    Let me ask you something else.
15         What did they -- what did Alexander
16   Yates tell you that Dr. Wu said about you?
17   A.    When, when I made a mistake, they
18   would be said to faculty.
19   Q.    Anything else?
20   A.    Like a discipline.
21         It was told to one -- well, actually,
22   it might have been at a faculty meeting, I
23   don't know, but that I had, uhm, made a
24   mistake -- not a mistake, but I had not
```

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 421

1    followed through on a promotion and tenure

2    timeline.

3    Q.    Anything else that Alexander Yates

4    told you --

5    A.    Well --

6    Q.    -- that Dr. Wu said about you?

7    A.    No.

8    Q.    And did Alexander Yates say that the

9    statements, those statements that you just

10   testified to, were untrue and disparaging,

11   or did you believe those statements were

12   untrue and disparaging?

13   A.    I believed they were untrue.

14   Q.    What did Frank Friedman tell you that

15   Dr. Wu said about you?

16   A.    Pretty much the same thing.  It was a

17   lot about faculty promotion and tenure and

18   hiring faculty.

19   Q.    Was there only -- was there just one

20   conversation with Alexander Yates about

21   this?

22   A.    It was -- yeah.  It was in passing, I

23   have to tell you.  It wasn't like a meeting.

24   He didn't --

RUTH V. BRIGGS

Page 422

1    Q.    Okay.  Before, you told me that it

2    was during meetings in their --

3    A.    Well, I mean, I went in their office

4    for something, and I can't remember what it

5    was.

6    Q.    Okay.  So did Alexander Yates tell

7    you on more than one occasion that Dr. Wu

8    made remarks about you?

9    A.    Just one occasion.

10   Q.    Frank Friedman, you said, relayed

11   similar comments as Alexander Yates,

12   correct?

13   A.    That is true.

14   Q.    And did Frank Friedman relay that to

15   you on one occasion or more than one?

16   A.    About the remarks, no.  One occasion.

17   Q.    And, again, did Frank Friedman say

18   those comments were untrue and disparaging

19   or did you interpret the comments Frank

20   Friedman relayed to you as untrue and

21   disparaging?

22   A.    I interpreted them as untrue and

23   disparaging.

24   Q.    Robert Aiken, what did he tell you

RUTH V. BRIGGS

Page 423

1    that Dr. Wu said about you?

2    A.    It was all about, it was all about

3    the same thing, promotion and tenure.

4    Q.    Did Robert Aiken tell you that more

5    than once?

6    A.    No.

7    Q.    Did Robert Aiken say the statements

8    were untrue and disparaging, or did you feel

9    that the statements that Robert Aiken

10   relayed were untrue and disparaging?

11   A.    I believed that they were untrue and

12   disparaging.

13   Q.    The next sentence says, "Two staff

14   members and a student worker reported to me

15   that they overheard Dr. Wu talking about the

16   disciplinary action in the public setting."

17         Who were the two staff members and

18   the student worker?

19   A.    Taylor Lentz was one of them, and

20   Mary Kate Galenski (ph) was another one, and

21   it was after I was on probation for three

22   days.

23   Q.    So Taylor Lentz was a student worker,

24   correct?

RUTH V. BRIGGS

Page 427

1    A.    Yes.

2    Q.    This is communication from you to

3    Deirdre Walton regarding two positions, and

4    you're asking her thoughts on them, correct?

5    A.    Uh-huh, yes.

6    Q.    And the last page of this packet is

7    an email from you to Deirdre Walton about

8    another position, correct?

9    A.    Yes.

10   Q.    Did you bid for any of the positions

11   that are referenced in these emails?

12   A.    I think I did.  I can't remember

13   which ones.  But I did want her feedback,

14   which I didn't get.  I might have -- I'm

15   sure there's a record of what I bid on.  I

16   don't -- but she didn't get back to me about

17   that.

18   Q.    Okay.  Let's turn back to D-38.

19   A.    (Witness complies with request.)

20   Q.    So have you seen this document

21   before?

22   A.    Yes, I have.

23   Q.    And these are a series of emails

24   between you and Cameron, correct?

RUTH V. BRIGGS

Page 428

1    A.    Yes.

2    Q.    And they go back to the emails, uhm,

3    that we previously stock -- that we

4    previously reviewed, I apologize, from

5    February 2013, right?

6    A.    Are we on 38?  Is that the name, the

7    number of the document?

8    Q.    Yup.  It's on Exhibit 38.

9    A.    Okay.

10   Q.    And if you go to Page 66 and 67 --

11   A.    Okay.

12   Q.    -- these are the emails we previously

13   reviewed between you and Cameron from

14   February 2013, correct?

15   A.    Yes.

16   Q.    And then if you go to BRIGGS 64,

17   which is the first page, that is an email

18   from you to Cameron from August 6th, 2013,

19   right?

20   A.    Yes.

21   Q.    And you say that you're forwarding

22   the email you sent him in February; that you

23   contacted Fay and she referred you to

24   Deirdre Walton; you did reach out to Deirdre

RUTH V. BRIGGS

Page 429

1   and ask if she would agree to meet with

2   Dr. Wu and Andrew DiMeo to serve in a

3   mediator-like role.

4        Was that the meeting that you had

5   with Deirdre Walton in April of 2013 that we

6   referred to before?

7   A.   No, it wasn't.

8   Q.   Okay.  So what meeting was that that

9   you had with Deirdre in which you asked her

10  if she would agree to meet with Dr. Wu,

11  Drew DiMeo, and you to serve as a

12  mediator-like role?

13  A.   She and I did not meet about that.

14  Q.   Did you send her an email about that?

15  A.   On several occasions.  I don't know

16  if it was this date, though.

17           THE COURT REPORTER:  You don't

18           know if it was?

19           THE WITNESS:  Huh?  Oh, I'm

20           sorry.  I did email her and ask her

21           for her to help me, but I don't know

22           if it's in response to this.

23  BY MS. FENDELL-SATINSKY:

24  Q.   You then write below you did not --

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 430

1   on the next page, you did not hear from her,

2   Deirdre, after your initial conversation

3   until you made contact with her in April

4   when you returned from a three-day

5   suspension without pay, correct?

6   A.    Correct.

7   Q.    And in response to this email,

8   Cameron told you that because you had worked

9   with Fay in the past, he would direct you to

10   her, as she generally handles employment

11   matters, correct?

12   A.    Correct.

13   Q.    And you told Cameron that Fay can --

14   he can provide Fay with the background and

15   Fay can contact you, correct?

16   A.    Correct.

17            - - -

18            (Whereupon, 2/6/14 email

19            follow-up, Bates No. BRIGGS 69, was

20            marked as D Exhibit No. 39 for

21            identification.)

22            - - -

23            THE COURT REPORTER:

24            Thirty-nine.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 432

1                      - - -

2              (Whereupon, 2/22/14 email

3        regarding supporting defense

4        documents, Bates No. EEOC 0062-65,

5        was marked as D Exhibit No. 40 for

6        identification.)

7                      - - -

8              THE COURT REPORTER:  Forty.

9   BY MS. FENDELL-SATINSKY:

10   Q.    Ms. Briggs, have you seen this email

11   before?

12   A.    Yes, I have.

13   Q.    And this is from February 22nd, 2014.

14   It's an email from you to Deirdre Walton,

15   correct?

16   A.    Correct.

17   Q.    Uhm, if you look back at the email

18   that was D-39, the prior exhibit.

19   A.    Okay.

20   Q.    So the last exhibit we just looked

21   at.

22   A.    Oh, okay.

23   Q.    Up on the right-hand corner there is

24   a notation that says "6/20/14, 1:38 p.m."

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 436

1   A.    Correct.

2   Q.    And in printing this email on June

3   20th, 2014, you were doing something other

4   than importing emails from your Temple email

5   to your gmail following the end of your

6   employment at Temple, correct?

7   A.    I'm sorry.  I don't -- I'm sure -- I

8   don't understand the question.

9   Q.    Sure.

10          MS. FENDELL-SATINSKY:  Can you

11      read it back, please.

12              - - -

13          (Whereupon, the court reporter

14      read back the last question.)

15              - - -

16          THE WITNESS:  Yes, yes?

17  BY MS. FENDELL-SATINSKY:

18   Q.    So let's turn now to D-40.

19          And this is an email from you to Ms.

20  Walton.

21   A.    Uh-huh.

22   Q.    Correct?

23   A.    Yes.

24   Q.    And from February 22nd, 2014,

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 437

1   correct?

2   A.      Correct.

3   Q.      And this is in regards to the

4   discipline you received in January of 2014,

5   correct?

6   A.      Correct, uh-huh, yes.

7   Q.      Did you have communications with

8   Ms. Walton between February 6th, 2014 and

9   February 22nd, 2014?

10  A.      I, I don't -- prob -- I, I don't know

11  when, but I don't -- yeah.

12  Q.      I don't want you to guess.

13  A.      Okay.  Then I don't know.

14  Q.      So if you don't remember --

15  A.      I don't know.

16  Q.      -- or you don't know, that's fine.

17          But which is it, you don't know or

18  you don't remember?

19  A.      I don't know.

20  Q.      Okay.  On the upper right-hand corner

21  of this document --

22  A.      Uh-huh.

23  Q.      -- there is a date.  It says 4/21/14.

24          Do you see that?

RUTH V. BRIGGS

Page 441

```
 1                  - - -

 2            (Whereupon, 2/25/14 email,

 3       Bates No. TEMPLE0324, was marked as

 4       D Exhibit No. 42 for

 5       identification.)

 6                  - - -

 7  BY MS. FENDELL-SATINSKY:

 8   Q.   Ms. Briggs, have you seen D-42

 9  before?

10   A.   Yes.

11   Q.   And this is an email from February

12  25th from you to Sandy Foehl in which you

13  say, "I want to schedule an appointment to

14  file a complaint," correct?

15   A.   Correct.

16   Q.   And other than the emails that we've

17  reviewed, did you have any other

18  conversations with Sandy Foehl -- let me ask

19  a different question.

20   A.   Okay.

21   Q.   Other than the emails we've

22  reviewed --

23   A.   Okay.

24   Q.   -- and the communications and
```

RUTH V. BRIGGS

Page 442

1    conversations you had with Sandy reflected

2    in those emails, did you have any other

3    conversations with Sandy before February

4    25th, 2014?

5    A.    Yes; in 2012.

6    Q.    Right.  And we went over an email --

7    A.    Oh, besides that.

8    Q.    -- from 2012.

9    A.    Oh, okay.  Yeah, okay.

10   Q.    So my question was:  Other than the

11   emails that we've gone over and the meetings

12   that are relayed or contained --

13   A.    Uh-huh.

14   Q.    -- in those emails, did you have any

15   other conversations with Sandy Foehl before

16   February 25th, 2014?

17   A.    About the case, right?  I mean, I --

18   Q.    Any conversations, period.

19   A.    -- could have seen her in passing.  I

20   don't --

21   Q.    Sure.  So did you have any

22   conversations about yourself with Sandy

23   Foehl before February 25th, 2014 other than

24   the communications that we've reviewed and

RUTH V. BRIGGS

Page 443

1    the emails that we reviewed?

2    A.    No, I did not.

3    Q.    And in this email you tell Sandy that

4    you plan to file an EEOC complaint

5    internally and that you've already had a

6    phone intake with the EEOC, correct?

7    A.    Correct.

8    Q.    When did you have your phone intake

9    with the EEOC?

10   A.    I don't know.  I mean, it's around

11   the same time.

12   Q.    At the time you had a phone intake

13   with the EEOC, had you retained an attorney?

14   A.    No.

15   Q.    When did you retain an attorney?

16   A.    I think in June.  June, maybe.

17   Q.    June 2014?

18   A.    Yes.

19   Q.    Did you retain an attorney after the

20   end of your employment at Temple?

21   A.    Yes.

22                    - - -

23             (Whereupon, 3/14/14 email

24             string, Bates No. BRIGGS 74-76, was

RUTH V. BRIGGS

Page 444

```
 1         marked as D Exhibit No. 43 for

 2         identification.)

 3               - - -

 4             THE COURT REPORTER:

 5         Forty-three.

 6  BY MS. FENDELL-SATINSKY:

 7   Q.    Ms. Briggs, have you seen these

 8  emails before?

 9   A.    Yes.

10   Q.    And in the top email, it's an email

11  from Deirdre to you dated March 14th, 2014,

12  correct?

13   A.    Yes.

14   Q.    And she's asking -- you're exchanging

15  questions about poten -- exchanging e-mails

16  about having a meeting.

17   A.    Yes.

18   Q.    Correct?

19   A.    Yes.

20   Q.    Was there any meeting that followed

21  these emails?

22   A.    I don't know the date that we met.  I

23  really don't know.  I can look at the email.

24  There was only one where she came to my
```

RUTH V. BRIGGS

Page 450

1    your probation?

2    A.    I don't know if that was the time.

3    Q.    Okay.

4    A.    I don't know.  I know there's another

5    email, and I don't see it here.  But, but

6    it's probably around that time.

7    Q.    Okay.

8    A.    But it was a separate email.

9                    - - -

10                (Whereupon, 3/25/14 email

11            string, Bates No. BRIGGS 79-83, was

12            marked as D Exhibit No. 44 for

13            identification.)

14                    - - -

15                THE COURT REPORTER:

16            Forty-four.

17                MS. FENDELL-SATINSKY:

18            Forty-four?

19                THE COURT REPORTER:  Yup.

20    BY MS. FENDELL-SATINSKY:

21    Q.    Ms. Briggs, have you seen this email

22    before?

23    A.    Yes, I have.

24    Q.    And these are emails between you and

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 451

1    Ms. Walton, correct?

2    A.    Yes.

3    Q.    So if we go back to the first email

4    in this chain, it's a March 23rd email from

5    you to Ms. Walton that starts on BRIGGS 81;

6    is that correct?

7    A.    Yes, it is.

8    Q.    And Ms. Walton responded to you the

9    next day, correct?

10   A.    Yes.

11   Q.    And then you responded to Ms. Walton

12   the next day, March 25th, right?

13   A.    Yes.

14   Q.    And Ms. Walton responded to you then

15   in the final email of this exhibit on the

16   same day, right?

17   A.    Yes.

18                  - - -

19          (Whereupon, 3/28/14 email

20          string, Bates No. EEOC 0067-71, was

21          marked as D Exhibit No. 45 for

22          identification.)

23                  - - -

24          THE COURT REPORTER:

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 452

1        Forty-five.

2     BY MS. FENDELL-SATINSKY:

3     Q.    Ms. Briggs, you told me earlier that

4     on April 1st you did make a complaint to

5     Sandra Foehl, correct?

6     A.    Yes.

7     Q.    And what was the content of your

8     complaint to Sandra Foehl on April 1st?

9     A.    That I was being discriminated based

10    on my age and my gender, and retaliation.  I

11    think I said retaliation.  I don't -- I'm

12    not sure.  Age and gender.

13    Q.    There are notes on this Exhibit D-45,

14    correct?

15    A.    There are, yes.

16    Q.    And are those your notes?

17    A.    That's my handwriting, yes.

18    Q.    What did you make those notes?

19    A.    April 1st.  I don't know exactly

20    when, but...

21    Q.    Did you meet make them on April

22    1st --

23    A.    I don't know.

24    Q.    -- or?

RUTH V. BRIGGS

Page 453

1   A.   I don't really know.

2   Q.   You don't know.

3        You don't know when those notes were

4   made?

5   A.   (No response.)

6   Q.   Am I correct that you don't know

7   when --

8   A.   And I'm just reading what I wrote.

9   Q.   Sure.

10   A.   Okay.  (Brief pause while reading.)

11       I don't know the answer to the

12   question.

13   Q.   Okay.  And your notes say that you

14   met with Ms. Foehl at 10:00 a.m. and you

15   were asked to meet with Mr. Wacker at 10:30

16   a.m.?

17   A.   Correct.

18   Q.   Earlier, you testified that Mr.

19   Wacker called you first thing in the morning

20   and asked to meet with you.  You said that

21   you had a meeting and that you would let him

22   know when you were back.

23   A.   Yes.

24   Q.   So Mr. Wacker did not ask to meet

RUTH V. BRIGGS

Page 454

1   with you at 10:30, did he?

2     A.     When I called him, he asked me to

3   come at 10:30.

4     Q.     So you called him when you returned,

5   and he said to come.  And that was at 10:30?

6     A.     No, that's not, not how it happened.

7     Q.     Okay.  So what happened?

8     A.     He called me first thing in the

9   morning --

10    Q.     Right.

11    A.     -- when I got there and said that

12  there was a dean's office meeting.  And I

13  said, "Well, I can't come at that time, but

14  I can be there at 10:30."

15           And he said that would be fine.  So I

16  went right from Sandy's office to his

17  office.

18    Q.     So he did not ask you to meet at

19  10:30, correct?

20    A.     (No response.)

21    Q.     You offered to meet at 10:30.

22    A.     Well, I said I could meet with him at

23  10:30, right.

24    Q.     So he did not ask you to meet at

RUTH V. BRIGGS

Page 455

1    10:30, correct?

2    A.    He asked me to meet at 10:00.

3                    - - -

4              (Whereupon, 4/21/14 email

5         string, Bates No. TEMPLE0174-175,

6         was marked as D Exhibit No. 46 for

7         identification.)

8                    - - -

9              THE COURT REPORTER:

10        Forty-six.

11   BY MS. FENDELL-SATINSKY:

12   Q.    Ms. Briggs, have you seen this

13   document before?

14   A.    Yes, I have.

15   Q.    If you turn to the last page of this

16   document, this is an April 2nd email from

17   Ms. Foehl to you.

18        Do you see that?

19   A.    Yes, I do.

20   Q.    And she says, "Ruth, I appreciate

21   that you are able to send me correspondence

22   you referenced in our meeting yesterday.  I

23   will conduct an investigation of your

24   complaint of age discrimination."

RUTH V. BRIGGS

Page 458

1    BY MS. FENDELL-SATINSKY:

2    Q.    So my question was that:  If Ms.

3    Foehl said that you only complained about

4    age discrimination, would she be lying?

5    A.    I would not say she was lying.

6    Q.    So there may have been a

7    misunderstanding?

8    A.    Yes.  I don't think of her as a

9    person who would lie.

10   Q.    So you believe, you believe that you

11   conveyed to Ms. Foehl that you wanted to

12   make a complaint of age and gender

13   discrimination and maybe retaliation,

14   correct?

15   A.    Yes.

16   Q.    And you believe it's possible,

17   however, that Ms. Foehl did not understand

18   that; is that correct?

19   A.    Yes.

20           MR. MUNSHI:  Just objection to

21       form.

22           THE WITNESS:  Yes.

23   BY MS. FENDELL-SATINSKY:

24   Q.    When you got the email on April 2nd

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 521

1   follow-up questions.

2         Earlier today you testified that

3   Dr. Wu yelled at his students, correct?

4   A.    Yes.

5   Q.    Is that a "yes"?

6   A.    Yes.

7   Q.    Did he yell at male and female

8   students?

9   A.    Yes.

10   Q.    In response to a question from

11   Mr. Munshi, you indicated that you were

12   hospitalized in the end of 2016.

13         Did your hospitalization relate in

14   any way to your employment at Temple?

15   A.    No.

16   Q.    Did your hospitalization relate in

17   any way to the end of your employment at

18   Temple?

19   A.    No.

20   Q.    I understand that you maintained your

21   Temple email address as a Temple student.

22         Did you understand that after the end

23   of your employment at Temple that you were

24   only to be accessing your Temple email for

ELITE LITIGATION SOLUTIONS, LLC



# Temple University

## Rules of Conduct

Revised Fall 2012

TEMPLE0148

**Disclaimer**

The Temple University Employee Manual sets forth the expected standards of conduct and performance of Temple University employees. The official copy of policies and procedures in the Employee Manual, including any revisions, is found on the Human Resources website: www.temple.edu/hr. The policies and procedures in this manual govern workplace behavior, and in all cases, supersede any conflicting guidance.

The Rules of Conduct contained in this document supplement the Employee Manual by providing further guidance on expected conduct and performance. They are not intended to, nor do they, create any contractual relationship between any employee and Temple University with respect to the conduct the university may prohibit or the discipline the university may impose.

Unless otherwise covered by a collective bargaining agreement, your employment with Temple University is "at will" and strictly voluntary. Temple University may terminate the employment relationship of an at-will employee at any time, if, in its sole discretion, it believes it is in the university's interest to do so. Temple University may terminate the employment relationship with a bargaining unit employee as provided by these Rules of Conduct (otherwise known as "work rules") and in accordance with the applicable collective bargaining agreement.

These Rules of Conduct may be modified by the president, University Counsel or the associate vice president of Human Resources at any time, with or without advance notice to university employees

Revised Fall 2012

## Table of Contents

### Rules of Conduct

**Category Violations**
Excessive Sick Days
Excessive Lateness ..... 7
Encouraging Category A Violation ..... 7
..... 7

Unauthorized Absence ..... 8
Chronic Sick Day Abuse ..... 8
Chronic Lateness ..... 8
Failure to Record Time In or Out ..... 8
Leaving Assigned Area without Permission  Other than Security or Patient Care ..... 8
Early Out ..... 8

Slowdowns ..... 9
Performing Work Other than Temple work ..... 9
Unauthorized Extra Work by Non-exempt Employee ..... 9
Inefficiency ..... 9
Unprofessional or Inappropriate Conduct ..... 9
Unauthorized Use of Temple Property ..... 9
Safety ..... 9

Visitors ..... 10
Care of Temple Property ..... 10
Unsanitary Conditions ..... 10
Loafing, Loitering, Visiting ..... 10
Encouraging Category B Violation ..... 10

Unauthorized Absence for Two Consecutive Workdays ..... 11
Sleeping  Other than Security or Patient Care ..... 11
Disruptive or Disorderly Conduct ..... 11
Negligence Carelessness ..... 11
Unauthorized Persons in Temple University Vehicles ..... 11

Gambling ..... 12
Leaving Assigned Building without Permission  Other than Security or Patient Care ..... 12
Encouraging Category C Violation ..... 12

Unauthorized Absence for Three Consecutive Days ..... 13
Fraudulent Statements or Misrepresentation in Employment ..... 13
Falsification or Misrepresentation of Time Records ..... 13
Falsification or Misrepresentation of Records ..... 13
Leaving Assigned Work Area without Permission: Security or Patient Care ..... 13
Leaving Campus without Permission ..... 13
Sleeping  Security or Patient Care ..... 14
Insubordination ..... 14
Gross Neglect ..... 14

Revised: Fall 2012

Unauthorized Use of Temple University Property Causing Injury    14
Vehicle Accident    14
Stealing    15
Bribery    15
Drugs and Alcohol    15
Explosives and Weapons    15
Threatening Behavior or Causing Disturbance    16
Destruction of Property    16
Harassment or Unwelcome Behavior    16
Unauthorized Use or Disclosure of Confidential Information or Records    16
Encouraging Category D Violation    16

Revised Fall 2012

TEMPLE0151

## Rules of Conduct

Temple University has certain expectations regarding employee conduct and job performance necessary for the orderly administration of business.

Temple expects its employees to abide by the following *Rules of Conduct*.

- Abide by all policies and procedures
- Meet established expectations of job performance
- Comply with attendance policies, including coming to work on time and regularly and leaving when scheduled.
- Meet stated standards of efficiency.
- Respect the personal and property rights of Temple, other employees, students, patients, clients and visitors to the Temple community.
- Support management's goals and objectives by following job instructions
- Observe all safety policies, regulations and procedures.
- Follow specific university and departmental rules
- Maintain a courteous and professional demeanor when dealing with students, co-workers, supervisors, faculty, visitors and other customers.
- Engage in appropriate conduct in the performance of duties, during working hours and otherwise, while on Temple University property.

Unfortunately, conduct sometimes occurs that includes violations of the law, acts of incompetence or negligence, and acts of willful misconduct. Employees are prohibited from engaging in the violations listed on the following pages, which are not intended to be all-inclusive and do not cover every situation that may arise or every behavior that would be considered unbecoming a Temple employee. Any conduct that violates common decency or threatens the maintenance of safety, order, efficiency, effectiveness or productivity in the workplace is cause for disciplinary action even if such conduct is not specifically defined by the Rules of Conduct.

Temple will take the appropriate corrective disciplinary action for violation of any policy or procedure set forth by the Temple University Employee Manual, Temple University Policy or established department rules. When the Rules of Conduct do not specify the appropriate discipline for violation of a policy, procedure or department rule, the university will determine the appropriate level of discipline.

## Disciplinary Procedure

Any employee who violates a Rule of Conduct is subject to the appropriate corrective discipline ry action, which is based on the category of the work rule violation (A, B, C or D) and the number of frequency of previous violations within the preceding 12-month period. Repeated violations of work rules with in a specific category over a 12-month period will lead to the next step in the progressive discipline process.

Revised. Fall 2012

TEMPLE0152

The chart shown below has been developed to assist supervisors in determining the appropriate level of discipline for violations of the Rules of Conduct. The university reserves the right to modify the discipline prescribed by these rules at any time, with or without notice, if, in its sole discretion, it believes a modification is appropriate.

## Disciplinary Action by Violation Category

| | Category A | Category B | Category C | Category D |
|---|---|---|---|---|
| 1st Action | general counseling | written warning | 3-day suspension without pay | termination |
| 2nd Action | verbal counseling | 3-day suspension without pay | termination | |
| 3rd Action | written warning | termination | | |
| 4th Action | final written warning | | | |
| 5th Action | 3-day suspension without pay | | | |
| 6th Action | termination | | | |

Notes:

Violations B.2 Chronic Sick Day Abuse or Violation B.3 Chronic Lateness resulting in suspension during a current fiscal year will result in a probationary status in the following year.

Excessive sick day abuse or lateness resulting in suspension two consecutive years will be grounds for termination.

Violation D.1 Unauthorized Absence for Three Consecutive Days will be considered a voluntary resignation

Revised Fall 2012

TEMPLE0153

## Enforcement

The employee's supervisor or other university designee is responsible for the enforcement of the Rules of Conduct and the administration of any disciplinary action that may be imposed. In the case of a bargaining unit employee, a Disciplinary Report Form should be used to document the offense. The shop steward and/or union delegate may also attend any meeting with the employee, upon the employee's request, which may result in discipline under these work rules. Both the employee and the shop steward or union delegate should sign the Disciplinary Report Form as a record of the discipline. Such signatures indicate receipt only. If the employee refuses to sign, the supervisor shall note on the written record that the employee was given the opportunity to sign and refused.

When a Disciplinary Report Form is used, copies should be distributed as follows:

| | |
|---|---|
| Original | to Employee |
| 1st Copy | to Human Resources/Labor Relations |
| 2nd Copy | to Union, if a union employee |
| 3rd Copy | to Supervisor |

Only disciplines at the levels of written warning or above must be sent to Human Resources and Labor Relations. General counselings and verbal warnings should be retained in the department for record-keeping purposes.

Revised Fall 2012

TEMPLE0154

## Category A Violations

### A.1   Excessive Sick Days

Taking six (6) or more sick days with or without pay, from work in any fiscal year.

- No disciplinary action usually will be taken for the use of fewer than six (6) days for illness in any fiscal year. Each sick day taken subsequently is a separate violation.
- Four or more consecutive days of absence will be counted as four (4) occurrences.
- Failure to complete half a workday or more will be counted as one (1) occurrence.
- Failure to complete less than half a workday will be counted as half (1/2) an occurrence.
- Failure to report to work as scheduled for at least a quarter of the workday will be counted as half (1/2) an occurrence.

### A.2   Excessive Lateness

a) Failing to report to work as scheduled six (6) or more times in any fiscal year.

- Each subsequent lateness is a separate violation.

b) Failing to report to work as scheduled for at least a quarter of the workday will be counted as half (1/2) an occurrence under *Violation A.1 Excessive Sick Days*.

### A.3   Encouraging Category A Violation

Encouraging, facilitating, coercing, inciting or otherwise inducing any employee or student to engage in any practice of Category A violation.

Revised: Fall 2012

TEMPLE0155

## Category B Violations

**B.1    Unauthorized Absence**

Including, but not limited to:

* Failure to notify supervision or appropriate managerial employee of work absence in the established and timely manner.
* Failure to provide proper documentation for work absence.
* Any unapproved work absence.

**B.2    Chronic Sick Day Abuse**

Taking three (3) or more sick days, with or without pay, when suspended under *Violation A.1 Excessive Sick Days* in the prior fiscal year.

* Each sick day taken subsequently is a separate violation of this rule
* occurrences will be counted as described in A.1 (a) and (b) above

**B.3    Chronic Lateness**

Failing to report to work as scheduled three (3) or more times when suspended under *Violation A.2 Excessive Lateness* in the prior fiscal year.

* Each subsequent lateness is a separate violation of this rule

**B.4    Failure to Record Time In or Out**

Failing to record one's own start time, end time or break time in the manner required by department.

**B.5    Leaving Assigned Area without Permission, Other than Security or Patient Care**

Leaving the assigned area during work time, even if within assigned building, without approval or notice as required by department procedures.

**B.6    Early Quit**

Leaving or preparing to leave prior to the end of the workday without authorization.

Revised: Fall 2012

TEMPLE0156

B.7    *Slowdowns*

- Willfully holding back, slowing down or limiting performance, or hindering another's performance.

B.8    *Performing Work Other than Temple Work*

Performing work other than officially assigned duties on university premises, unless authorized by a supervisor.

B.9    *Unauthorized Extra Work by Non-exempt Employee*

Beginning work more than 15 minutes prior to the start of the regularly scheduled workday or continuing to work more than 15 minutes beyond the regularly scheduled workday without prior permission of supervision

B.10    *Inefficiency*

Failing to meet expected standards of performance, productivity or efficiency.

B.11    *Unprofessional or Inappropriate Conduct*

a)    Failing to conduct oneself in a professional manner while performing duties during work hours or while on Temple property.

b)    Failing to maintain a courteous and professional demeanor when dealing with students, co-workers, faculty, patients, visitors, and other customers.

B.12    *Unauthorized Use of Temple Property*

Using Temple property, equipment or materials, including but not limited to bulletin boards, computers, telephones, cell phones and other electronic devices, whether owned or leased, without permission

B.13    *Safety*

a)    Failing to comply with safety rules posted by the university while performing work or using university facilities for any purpose.
b)    Failing to comply with smoking regulations
c)    Failing to comply with federal, state, or local safety regulations or procedures of which the employee is aware or should have been aware.

Revised Fall 2012

TEMPLE0157

d) Failing to report accidents or personal injury immediately to supervisor.

B.14    *Visitors*

Bringing unauthorized persons into any building on the work site or on Temple grounds during work hours.

B.15    *Care of Temple Property*

Failing to exercise reasonable care and precaution to prevent damage to, or loss of, Temple property or equipment.

B.16    *Unsanitary Conditions*

Failing to observe housekeeping rules or otherwise creating unsanitary conditions.

B.17    *Loafing, Loitering, Visiting*

a) Loafing, loitering or otherwise engaging in personal conversations (in person, by telephone, cell phone, computer or otherwise) during work hours that may or does interfere with the work, productivity or approved activity of any student or employee.

b) Loitering or otherwise engaging in personal conversations after work hours that may or does interfere with the work, productivity or approved activity of any student or employee.

B.18    *Encouraging Category B Violation*

Encouraging, facilitating, coercing, inciting or otherwise inducing any employee or student to engage in any practice of Category B violation.

Revised Fall 2012

TEMPLE0158

## Category C Violations

C.1  *Unauthorized Absence for Two Consecutive Workdays*

Including, but not limited to:

- Failure to notify supervision or appropriate managerial employee of work absence in the established and timely manner for two (2) consecutive absences.
- Failure to provide proper documentation for work absence.
- Any unapproved work absence of 3 consecutive days.

C.2  *Sleeping Other than Security or Patient Care*

Sleeping during work hours

C.3  *Disruptive or Disorderly Conduct*

- Engaging in any unruly, erratic or undisciplined behavior that disrupts or may disrupt the workplace.
- Engaging in any course of conduct that does or may undermine or interfere with supervision.
- Using any unprofessional, inappropriate, profane, abusive, threatening or obscene language towards a supervisor, other employees, students, patients, clients, visitors or the public.
- Engaging in, encouraging or otherwise inciting others to engage in disorderly conduct.
- Participating in any behavior that does or may result in injury to another person or Temple University, including but not limited to: practical jokes, pushing, running, throwing objects or other acts of horseplay.

C.4  *Negligence/Carelessness*

a) Neglecting job duties or responsibilities, or failing to carry out instructions given by supervision.

b) Performing negligent or careless acts during work time, or on or with Temple property.

Revised Fall 2012

TEMPLE0159

C.5   *Unauthorized Persons in Temple University Vehicles*

Allowing unauthorized persons in a Temple vehicle at any time.

C.6   *Gambling*

Gambling during working time or on university property.

C.7   *Leaving Assigned Building without Permission —
Other than Security or Patient Care*

Leaving an assigned building during work hours without permission.

C.8   *Encouraging Category C Violation*

Encouraging, facilitating, coercing, inciting or otherwise inducing any employee or student to engage in any practice of Category C violation.

Revised Fall 2012

TEMPLE0160

## Category D Violations

D.1   *Unauthorized Absence for Three Consecutive Days*

Including, but not limited to:

* Failure to notify supervision or appropriate managerial employee of work absence in the established and timely manner for three (3) consecutive absences.
* Failure to provide proper documentation for work absence.
* Any unapproved work absence of 3 consecutive days.

D.2   *Fraudulent Statements or Misrepresentation in Employment*

a) Giving false statements when applying for employment, promotion or transfer, or when physical or other examinations are made.

b) Providing false information in connection with employment, including but not limited to an audit, investigation or disciplinary process.

D.3   *Falsification or Misrepresentation of Time Records*

Falsifying or misrepresenting one's own or another employee's time or time records, or recording another employee's time record

D.4   *Falsification or Misrepresentation of Records*

a) Falsifying or misrepresenting any university record or data, including but not limited to data used in research

b) Altering or destroying any university record without authorization

D.5   *Leaving Assigned Work Area without Permission: Security or Patient Care*

Leaving an assigned work area without permission and without proper relief when responsible for patient or client care, or the security of an area or person.

D.6   *Leaving Campus without Permission*

Leaving Temple Campus during work hours without permission.

Revised Fa12012

TEMPLE0161

D.7    *Sleeping Security or Patient Care*

Sleeping on the job when responsible for patient or client care, or the security of an area or person.

D.8    *Insubordination*

a)   Refusing or willfully failing to accept a work shift, work location or task assigned by a supervisor.

b)   Refusing or willfully failing to follow management directions.

c)   Refusing or willfully failing to carry out a work assignment.

d)   Performing actions or making statements in defiance of instructions given by a supervisor or other Temple administrator acting within the scope of his or her authority.

e)   Encouraging, urging, causing or otherwise inciting other persons to be insubordinate.

D.9    *Gross Neglect*

Performing negligent or careless acts during work time or on Temple property that could or do result in personal injury or property damage, or that could or do cause expenses to be incurred by Temple, whether or not such injury, damage or expenses are actually incurred.

D.10   *Unauthorized Use of Temple University Property Causing Injury*

a)   Obtaining or using Temple University property—including but not limited to: records, T Unit numbers, Tax ID numbers, credit cards, or bank or financial accounts—by fraudulent means or without permission that does or may result in injury or economic loss to another person or to Temple University.

b)   Assisting another person in the unauthorized use of Temple property that does or may cause injury or economic loss to another person or to Temple University.

c)   Refusing or willfully failing to follow management directions.

D.11   *Vehicle Accident*

a)       Failing to report an accident of any type involving a Temple-assigned vehicle

Revised Fall 2012

TEMPLE0162

D.12  Stealing

   a)  Stealing or otherwise misappropriating university property or the property of other employees, patients, clients, students or visitors.

   b)  Obtaining any Temple University property by improper means or assisting another person to do so.

D.13  Bribery

   a)  Offering, soliciting, giving or taking of a monetary payment or any non-monetary benefit of any kind in exchange for a job, a better working place, the covering of a shift or any change in working conditions; or offering or soliciting a promise of such payment or benefit.

   b)  Offering, soliciting, giving or taking of a monetary payment or non-monetary benefit of any kind in exchange for a change in academic grade or any other academic benefit or offering or soliciting a promise of such payment or benefit.

   c)  Offering, soliciting, giving or taking of a monetary benefit or any non-monetary benefit of any kind in exchange for the performance or promise of any act, including but not limited to, altering or disclosing records, or altering or falsifying performance development plans, tenure or promotion documents or any other employment records.

D.14  Drugs and Alcohol

   a)  Possessing, using or selling any illegal drug during work hours or on Temple University property.

   b)  Illegally using prescription drugs during work hours or on Temple University property.

   c)  Reporting to or being at work or on Temple University property at any time in an intoxicated condition or under the influence of illegal drugs or alcohol.

   d)  Failing to submit to a drug or alcohol test requested pursuant to Temple University's Drug and Alcohol Abuse and Testing policies.

D.15  Explosives and Weapons

   Possessing explosives, firearms or a weapon during work time or on university property.

Revised: Fall 2013

TEMPLE0163

D.16   Threatening Behavior or Causing Disturbance

a)   Threatening or intimidating, or attempting to threaten or intimidate, management personnel, employees, patients, clients, students or visitors.

b)   Inciting or attempting to incite a disturbance.

c)   Fighting or engaging in any behavior that is physically threatening to another person or Temple property.

D.17   Destruction of Property

Destroying, causing or contributing to the destruction of Temple University property or the property of other employees, patients, clients, students or visitors, whether by deliberate act or the willful disregard of such property.

D.18   Harassment or Unwelcome Behavior

Harassing or subjecting to harassment another employee, student, client, patient, customer, visitor or any other individual on Temple University property, where harassment is in violation of Temple University policy.

D.19   Unauthorized Use or Disclosure of Confidential Information or Records

a)   Disclosing confidential information, proprietary research or business information or trade secrets.
Releasing any confidential employee record without authorization or in violation of university policy.

b)   Releasing any student record without authorization or in violation of university policy.

D.20   Encouraging Category D Violation

Encouraging, facilitating, coercing, inciting or otherwise inducing any employee or student to engage in any practice of Category D violation.

Revised Fall 2012

TEMPLF0164



# TEMPLE UNIVERSITY
## BOARD OF TRUSTEES
### POLICIES AND PROCEDURES MANUAL

Title: Policy on Preventing and Addressing Discrimination and Harassment
Policy Number: 04.81.11
Issuing Authority: Executive Office of the President
Responsible Officer: University Counsel

Date Created: January 8, 2010
Date Last Amended/Reviewed: January 8, 2010
Date Scheduled for Review: January 2015
Reviewing Office: Office of University Counsel

## Scope of Policy

The university is committed to providing a workplace and educational environment, programs, and activities, free of unlawful discrimination and harassment. This policy does not allow curtailment or censorship of constitutionally protected expression.
This policy is based on federal and state laws, including but not limited to Executive Order 11246, Titles VI and VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, Title IX of the Education Amendments of 1972, the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, the Genetic Information Nondiscrimination Act of 2008, and the Pennsylvania Human Relations Act.

## Definitions

Complaint: Allegation(s) of discrimination, harassment, and/or retaliation, filed in good faith and in accordance with the complaint procedures of the Office of Equal Opportunity Compliance ("EOC").
Discrimination: Disparate treatment of a person based on one or more of that person's Protected Characteristics/Statuses, excepting any treatment permitted or required by law.
Harassment: Unwelcome conduct directed against a person based on one or more of that person's Protected Characteristics/Statuses, which conduct is so severe or pervasive that it interferes with an individual's employment, academic performance or participation in university programs or activities, and creates a working, learning, program or activity environment that a reasonable person would find intimidating, hostile or offensive.
Protected Characteristics/Statuses: Age, color, disability, marital status, national or ethnic origin, race, religion, sex (including pregnancy), sexual orientation, gender identity, veteran status and genetic information.
Supervisor: As used throughout this Policy, "supervisor" refers to any person who has authority to undertake or recommend tangible employment decisions affecting an employee or academic

1

BRIGGS 94

decisions affecting a student; or to direct an employee's work activities or a student's academic activities.

Policy

The university will not tolerate unlawful discrimination or harassment in the workplace, academic setting or its programs or activities based on individual's age, color, disability, marital status, national or ethnic origin, race, religion, sex (including pregnancy), sexual orientation, gender identity, genetic information or veteran status. This policy is intended to be consistent with applicable federal, state and local laws and other university policies. This policy does not allow curtailment or censorship of constitutionally protected expression and will not be applied in a way that infringes upon an individual's constitutional rights of freedom of expression. The EOC is responsible for enforcing this policy on behalf of the university and has complaint procedures available to enable it do so.

All members of management, supervisors, and faculty are responsible for successfully completing the university's non-discrimination, anti-harassment, and anti-retaliation training upon initial employment and from time to time thereafter as determined in the sole discretion of the president or the president's designee.
In addition, managers and supervisors are responsible for:
- knowing and understanding this policy;
- explaining this policy to persons under their supervision;
- taking appropriate action to prevent unlawful discrimination and harassment;
- being receptive to concerns and complaints of unlawful discrimination and/or harassment;
- taking appropriate action (including consultation with EOC and/or EO Ombudspersons) when they become aware of potential violations of this policy; and
- following up with a person who makes a complaint of unlawful discrimination or harassment (in consultation with EOC and/or EO Ombudspersons) to assure that person that the complaint was investigated and to determine the complainant's level of satisfaction with its resolution. A failure of a manager or supervisor to perform his/her responsibilities under this policy will be reflected in his/her performance evaluation and may subject him/her to disciplinary action, up to and including termination of employment.

Procedures: Any present or former employee of the university, student, applicant for admission or employment, or participant in a university program or activity, who believes he/she has been discriminated against or harassed in violation of law or this policy may contact EOC to pursue a formal or informal complaint. Any such complaint must be made within 300 calendar days of the incident. This policy as well as the EOC complaint procedures are accessible online and in printed materials. In addition, this policy is included in online and live training offered by EOC, the Department of Human Resources, and the Division of Student Services.

2

BRIGGS 95

Notes

1. Dates of official enactment and amendments:

2. History:

   Initial Policy Effective Date: January 8, 2010

   Last Amended:

3. Cross References/Appendix:
Presidential Policy #04.82.01, Temple University Policy on Sexual Harassment
Presidential Policy #04.82.02, Temple University Policy on Sexual Assault
Board of Trustees Policy #04.81.01, Ratification of Nondiscrimination Policy
Board of Trustees Policy #04.81.02, Nondiscriminatory Policy as to Students
Board of Trustees Policy #04.81.03, Ethnic Intimidation Policy

3

BRIGGS 96



PLEASE PRINT WHERE POSSIBLE AND PRESS HARD IF WRITING.

## Temple University

## Disciplinary Report

| Department Computer and Information Sciences | Date | 11/09/2011 |
|---|---|---|

| Employee's Name  Ruth Briggs | | Title | Executive Assistant |
|---|---|---|---|

| TUid  908672981 | | | |
|---|---|---|---|

| Immediate Supervisor  Jie Wu | Title | Chair | 11/17/01 |
|---|---|---|---|

Check disciplinary action taken.  If prior disciplinary action had been given in the same category of the work rule violation, indicate the date(s) action was taken.

| General Counseling ☐ | Final Written Warning ☐ |
|---|---|
| Date(s) of Action: | Date(s) of Action: |
| Verbal Counseling ☐ | 3 Day Suspension w/o Pay ☐ |
| Date(s) of Action: | Date(s) of Action: |
| Written Warning ☑ | Termination ☐ |
| Date(s) of Action:        11/09/2011 | Date(s) of Action: |

Explanation (Use reverse side if needed):

Violation of Rule B.11 Unprofessional/Inappropriate Conduct

| Employee's Signature (SIGNING INDICATES RECEIPT ONLY!) | | Date |
|---|---|---|
| | | 11/11/2011 Date |
| PRINT Name (Organization/Delegate) (needed only if Bargaining Unit position) | Organization/Delegate Signature (sign only if Bargaining Unit member) | |
| PRINT Name (Department Head or Designee) | Department Head or Designee Signature | 11/11/11 Date |

Distribution:  Original to: Employee  Copies to:  Supervisor, Human Resources/Labor Relations*, Union (if union employee)
* Only disciplines at the level of written warning or above must be sent to Human Resources and Labor Relations

Revised 07/25/2011

BRIGGS 23

Message

| | |
|---|---|
| From: | Jie Wu [jiewu13@gmail.com] |
| Sent: | 8/2/2012 5:54:34 PM |
| To: | Just n Yuan Shi [shi@temple edu] |
| BCC: | Drew Dimeo [andrew.dimeo@temple edu] |
| Subject | Fwd: Napa Conference Deadlines & More - Wu |
| Attachments | CCC2012_Agendav3[2] pdf |

FYI. I stated clearly leaving on Monday (and just to check), but Ruth changed it to Sunday and purchased it without my knowledge.

Jie

--------- Forwarded message ---------
From: Jie Wu <jiewu13@gmail.com>
Date: Wed, Aug 1, 2012 at 10:57 PM
Subject: Fwd: Napa Conference Deadlines & More - Wu
To: "Ruth V. Briggs" <rbriggs@temple.edu>

Ruth,

Please help to check a direct flight from Philly to Napa (or nearby). Leaving Monday early afternoon, and back on Thur morning.

Thanks.

Jie Wu

--------- Forwarded message ---------
From: Nunes, Erica <nunes22@llnl.gov>
Date: Wed, Aug 1, 2012 at 10:28 PM
Subject: Napa Conference Deadlines & More - Wu
To: "jiewu13@gmail.com" <jiewu13@gmail.com>, "jiewu@temple.edu" <jiewu@temple.edu>

Hi Jie,

I'm sending everyone reminders again today and didn't want to leave you off the list... :)

If you haven't already, please remember to make your hotel reservations at The Meritage Resort by this **Friday, August 3**. Our guaranteed rate of $147/night is only valid through this date. You can reach them at 866-370-NAPA (6272), and reference the Lawrence Livermore Workshop. Further details are available on the web – www.regonline.com/CCubed2012NetworkScience.

At the conference, you will be given an expense report which we will use to process a $250 stipend to be applied towards your travel expenses afterwards.

Confidential

**TEMPLE UNIVERSITY (R BRIGGS) - 0000150**

The most recent version of our agenda is attached for your reference. Activities begin on Monday evening with a wine tasting reception and desserts. However, a check-in table will be set up between 4:30-6:00pm on Monday afternoon. Please bring your poster with you at this time. Our staff will take care of temporary storage and displaying it on your designated presentation day. We recently updated the website to clarify that our poster board walls are 6 feet long by 4 feet tall.

Per our previous correspondence, please email your poster title and abstract to me no later than **Friday, August 17**

Finally, if things have changed since you registered and you would like to bring a guest to our Wine Cave Banquet on Wednesday evening, please remember there will be a $55.00 fee to be collected at the registration table, per the hotel's request. There is no charge for conference attendees for meals throughout the event (with some alcoholic beverage exceptions).

If you have any questions or concerns, feel free to contact me by phone or email at any time.

Thank you again for participating in our event!

Erica
--------------------------------------------------------

**Erica M. Nunes (previously Dannenberg)**
*Institute for Scientific Computing Research (ISCR)*
*High Performance Computing Innovation Center (HPCIC)*
Lawrence Livermore National Laboratory
P.O. Box 808, L-780
Livermore, CA 94550-9698
PHONE: (925) 423-2167 / FAX: (925) 422-7819
E-MAIL: emd@llnl.gov

From: "jiewu13@gmail.com" <jiewu13@gmail.com>
Reply-To: "jiewu13@gmail.com" <jiewu13@gmail.com>
To: Erica Nunes <nunes22@llnl.gov>
Cc: Madhav Marathe <mmarathe@vbi.vt.edu>
Subject: Re: Current Challenges in Computing 2012: Network Science

Ok
Sent via BlackBerry from T-Mobile

From: "Nunes, Erica" <nunes22@llnl.gov>
Date: Fri, 27 Jul 2012 18:02:41 -0700
To: jiewu13@gmail.com<jiewu13@gmail.com>
Cc: Madhav Marathe<mmarathe@vbi.vt.edu>
Subject: Re: Current Challenges in Computing 2012: Network Science

Confidential

TEMPLE UNIVERSITY (R. BRIGGS) - 0000151

If you haven't already, please call the Meritage Resort ASAP (or before August 3) at 866-370-6272 to make your reservations at the discounted government rate of $147/night. Please refer to the Lawrence Livermore Workshop

I will provide a reimbursement form to you at the conference that will require your signature in order to issue the $250 stipend towards your travel expenses after the conference.

FYI, the poster board walls are 6 feet long by 4 feet tall. We will provide hanging clips.

I see that your poster title/abstract was not uploaded when you registered. Please either update your record or email that information to me as soon as possible (preferably no later than Friday, August 17.)

If you have any other questions or concerns, please don't hesitate to contact me at any time.

Thank you and enjoy your trip!
Erica

P.S. The email address associated with your registration record is jiewu@temple.edu.
.................................................................................

**Erica M. Nunes (previously Dannenberg)**
*Institute for Scientific Computing Research (ISCR)*
*High Performance Computing Innovation Center (HPCIC)*
Lawrence Livermore National Laboratory
P.O. Box 808, L-780
Livermore, CA 94550-9698
PHONE: (925) 423-2167 / FAX: (925) 422-7819
E-MAIL: emd@llnl.gov

-----Original Message-----
From: Madhav Marathe <mmarathe@vbi.vt.edu>
To: Erica Nunes <nunes22@llnl.gov>
Subject: Fwd: Conference organized by LLNL

Erica

I recd this email from Jie. Can you kindly let him the details
Madhav

------ Forwarded Message ------
From: 'Jie Wu" <jiewu13@gmail.com>
To: "Madhav Marathe" <mmarathe@vbi.vt.edu>
Sent: Friday, July 27, 2012 5:18:07 AM
Subject: Re: Conference organized by LLNL

Madhav,

Confidential

TEMPLE UNIVERSITY (R. BRIGGS) - 0000153

Hope all is well. I did not hear any news about the logistic of this
workshop, such as lodging, and more importantly, poster. (I will be
out of country until mid-Aug.)

Jie

On Apr 27, 2012, at 4:51 PM, Fred Streitz wrote:

If you are having trouble viewing this email try viewing it in a browser



## Current Challenges in Computing 2012: Network Science

Dear Jie,

I am writing to invite you to submit a poster abstract for the

August 27 - August 29, 2012
The Meritage Resort & Spa, Napa, California

TEMPLE UNIVERSITY (R. BRIGGS) - 0000154



This email communication was sent by
Lawrence Livermore National Security, LLC
PO Box 808 L-760
Livermore CA 94550

View our Privacy Policy

Confidential

TEMPLE UNIVERSITY (R. BRIGGS) - 0000155

From: jiewu13@gmail.com
To: EUGENE KWATNY <gkwatny@temple.edu>;Jie Wu <jiewu@temple edu>
Sent: 3/24/2013 7 11 04 PM
Subject: Re: Fwd Fwd Fwd: Lodging during your visit to the Department of Computer and Information Sciences at Temple University

That is very typical of her to make the story "he says and she says". We need to document it anyway. Jie
Sent via BlackBerry from T-Mobile

-----Original Message-----
From: Eugene Kwatny <gkwatny@temple.edu>
Date: Sun, 24 Mar 2013 19:05:25
To: Jie Wu<jiewu@temple.edu>
Reply-To: gkwatny@temple.edu
Subject: Fwd: Fwd: Fwd: Lodging during your visit to the Department of Computer and Information Sciences at Temple University

This is nonsense. Why would I do that and what does that have to do with her not following up with him?

Gene

> *From:* Ruth V. Briggs <rbriggs@temple.edu>
> *Date:* March 24, 2013 6:53 PM
> *To:* Eugene Kwatny <gkwatny@temple.edu>
> *Subject:* Fwd: Fwd: Lodging during your visit to the Department of
> Computer and Information Sciences at Temple University
>
> Dr. Kwatny,
>
> You told me that you would suggest to Dr. ...! .leythat he purchase the
> ticket to keep the cost down.
>
> Let me know as soon as possible.
>
> Ruth,
> /Ruth V. Briggs
> Department of Computer and Information Science
> Temple University
> 215-204-8659 - Direct line
> 215 204-8450 Department line
> /*
> *
>
>
> ---------- Forwarded message ---- - ...
> From: *Clint Whaley* <rcwhaley@gmail.com <mailto:rcwhaley@gmail.com>>
> Date: Sat, Mar 23, 2013 at 9:12 PM
> Subject: Re: Fwd: Lodging during your visit to the Department of
> Computer and Information Sciences at Temple University
> To: gkwatny@temple.edu <mailto:gkwatny@temple.edu>, rbriggs@temple.edu
> <mailto:rbriggs@temple.edu>
>
>
> Guys,
>
> Looking through my e-mail, i don't have any actual e-ticket for this
> trip' I had a proposed flight from Ruth, but I don't have any e-mail
> confirming after i approved the flight. I tried looking up that
> flight that Ruth sent me, and Delta does not seem to know about it.
> If the ticket was really booked, can someone reforward? Sorry for all
> the last-minute stuff, but the last month has kind of been a blur :)

TEMPLE0000571

```
> .
> Tnanks,
> Clint
>
> On Sat, Mar 23, 2013 at 8:00 PM, Clint Whaley <rcwhaley@gmail.com
> <mailto:rcwhaley@gmail.com>> wrote:
>
> Great, thanks for the info.
>
> See you soon,
> Clint
>
>
> On Fri, Mar 22, 2013 at 5:41 PM, Eugene Kwatny <gkwatny@temple.edu
> <mailto:gkwatny@temple.edu>> wrote:
>
> Hi Clint,
>
> Sorry about the lack of contact. Certainly, the interview is
> on and we really look forward to your visit.
>
> The best route for you on Sunday is to take a taxi to the
> Conwell Inn from the airport. The hotel is on Temple's campus.
>
> I am attaching the current schedule for your visit. Either I
> or Jie Wu ( our Chair) will pick you up at 8:50 AM Monday at
> the Conwell Inn to bring you to the department.
>
> Regards,
> Gene
>
>> Clint Whaley <mailto:rcwhaley@gmail.com>
>> March 22, 2013 3:47 PM
>> Gene,
>>
>> I assume the interview is still scheduled for Monday? If so,
>> do you
>> know someone who could answer the below questions?
>>
>> Many thanks,
>> Clint
>>
>> ---------- Forwarded message ----------
>> From: Clint Whaley <rcwhaley@gmail.com>
>> <mailto:rcwhaley@gmail.com>
>> Date: Fri, Mar 22, 2013 at 8:54 AM
>> Subject: Re: Lodging during your visit to the Department of
>> Computer
>> and Information Sciences at Temple University
>> To: "Ruth V. Briggs" <rbriggs@temple.edu>
>> <mailto:rbriggs@temple.edu>
>>
>>
>> Ruth,
>>
>> OK, visit is now around the corner! I was wondering if there
>> is an
>> itinerary for the visit itself yet? Also, I assume I am just
>> going to
>> take a taxi from the airport to the hotel?
>>
>> Thanks,
>> Clint
>>
>>
>>
>> --
>> ****************************************************************
>> ** R. Clint Whaley, PhD ** Assoc Prof, UTSA **
>> www.cs.utsa.edu/~whaley <http://www.cs.utsa.edu/%7Ewhaley> **
>> ****************************************************************
>>
```

TEMPLE0000572

>> *
>> Ruth V. Briggs <mailto:rbriggs@temple.edu>
>> February 20, 2013 12:16 PM
>> Dear Dr. Whaley,
>>
>> During your visit to the Department of Computer and
>> Information Sciences at Temple University, you have
>> reservations for lodging at the Conwell Inn on the
>> university's main campus. Your confirmation number is
>> 29352 with arrival on March 24, 2013 and departure on March
>> 25, 2013. I have provided the URL to the Inn's website for
>> your convenience.
>>
>> <http://www.conwellinn.com/>
>>
>> We look forward to your visit to Temple University's CIS
>> Department. Please let me know if I can be of further
>> assistance to you.
>>
>> Kind regards,/
>>
>>
>> Ruth V. Briggs
>> Executive Assistant
>> Department of Computer and Information Science
>> College of Science and Technology
>> Temple University Wachman Hall, 3rd Floor
>> 1805 N. Broad Street (038-24)
>> Philadelphia, PA 19122
>> /215-204-8659 <tel:215-204-8659>/  Direct  line
>> 215-204-8450 <tel:215-204-8450> Department line
>> /*
>> *
>>
>> /Ruth V. Briggs
>> Department of Computer and Information Science
>> Temple University
>> 215-204-8659 <tel:215-204-8659>  Direct line
>> 215-204-8450 <tel:215-204-8450> Department line
>> /*
>> *
>
> --
> Eugene Kwatny, Ph.D.
> Professor
> Computer & Information Sciences
> gkwatny(at)temple.edu <mailto:gkwatny@temple.edu>
> 215-204-1679 <tel:215-204-1679>
>
>
>
>
> -
> .................................................................
> ** R. Clint Whaley, PhD ** Assoc Prof, UTSA **
> www.cs.utsa.edu/~whaley <http://www.cs.utsa.edu/ /Ewhaley> **
> .................................................................
>
>
>
>
>
> --
> .................................................................
> ** R. Clint Whaley, PhD ** Assoc Prof, UTSA ** www.cs.utsa.edu/~whaley
> <http://www.cs.utsa.edu/%7Ewhaley> **
> .................................................................
>
>
> *From:* Clint Whaley <rcwhaley@gmail.com>
> *Date:* March 23, 2013 9:12 PM
> *To:* gkwatny@temple.edu, rbriggs@temple.edu

TEMPLE0000573

```
> "Subject:" Fwd: Lodging during your visit to the Department of
> Computer and Information Sciences at Temple University
] > Guys,
>
> Looking through my e-mail, I don't have any actual e-ticket for this
> trip! I had a proposed flight from Ruth, but I don't have any e-mail
> confirming after I approved the flight. I tried looking up that
> flight that Ruth sent me, and Delta does not seem to know about it.
> If the ticket was really booked, can someone reforward? Sorry for all
> the last-minute stuff, but the last month has kind of been a blur :)
>
> Thanks,
> Clint
>
>
>
>
> --
> .....................................................................................
> ** R. Clint Whaley, PhD ** Assoc Prof, UTSA ** www.cs.utsa.edu/~whaley
> <http://www.cs.utsa.edu/%7Ewhaley> **
> .....................................................................................
>
> 'From:' Clint Whaley <rcwhaley@gmail.com>
> 'Date:' March 23, 2013 9:00 PM
> 'To:' gkwatny@temple.edu
> 'Subject:' Fwd: Lodging during your visit to the Department of
> Computer and Information Sciences at Temple University
> Great, thanks for the info.
>
> See you soon,
> Clint
>
>
>
>
> --
> .....................................................................................
> ** R. Clint Whaley, PhD ** Assoc Prof, UTSA ** www.cs.utsa.edu/~whaley
> <http://www.cs.utsa.edu/%7Ewhaley> **
> .....................................................................................
>
> 'From:' Eugene Kwatny <gkwatny@temple.edu>
> 'Date:' March 22, 2013 6:41 PM
> 'To:' Clint Whaley <rcwhaley@gmail.com>
> 'Subject:' Fwd: Lodging during your visit to the Department of
> Computer and Information Sciences at Temple University
> Hi Clint,
>
> Sorry about the lack of contact. Certainly, the interview is on and we
> really look forward to your visit.
>
> The best route for you on Sunday is to take a taxi to the Conwell Inn
> from the airport. The hotel is on Temple's campus.
>
> I am attaching the current schedule for your visit. Either I or Jie Wu
> ( our Chair) will pick you up at 8:50 AM Monday at the Conwell Inn to
> bring you to the department.
>
> Regards,
> Gene
>
>
> 'From:' Clint Whaley <rcwhaley@gmail.com>
> 'Date:' March 22, 2013 3:47 PM
> 'To:' gkwatny@temple.edu
> 'Subject:' Fwd: Lodging during your visit to the Department of
> Computer and Information Sciences at Temple University
> Gene,
>
> I assume the interview is still scheduled for Monday? If so, do you
> know someone who could answer the below questions?
```

TEMPLE0000574

> Many thanks,
> Clint
>
> ---------- Forwarded message ----------
> From: Clint Whaley<rcwhaley@gmail.com>
> Date: Fri, Mar 22, 2013 at 9:54 AM
> Subject: Re: Lodging during your visit to the Department of Computer
> and Information Sciences at Temple University
> To: "Ruth V. Briggs"<rbriggs@temple.edu>
>
> Ruth,
>
> OK, visit is now around the corner! I was wondering if there is an
> itinerary for the visit itself yet? Also, I assume I am just going to
> take a taxi from the airport to the hotel?
>
> Thanks,
> Clint
>
> On Wed, Feb 20, 2013 at 11:16 AM, Ruth V. Briggs<rbriggs@temple.edu> wrote:
>> Dear Dr. Whaley,
>>
>> During your visit to the Department of Computer and Information Sciences at
>> Temple University, you have reservations for lodging at the Conwell Inn on
>> the university's main campus. Your confirmation number is 29352 with
>> arrival on March 24, 2013 and departure on March 25, 2013. I have provided
>> the URL to the Inn's website for your convenience.
>>
>> <http://www.conwellinn.com/>
>>
>> We look forward to your visit to Temple University's CIS Department. Please
>> let me know if I can be of further assistance to you.
>>
>> Kind regards,
>>
>>
>> Ruth V. Briggs
>> Executive Assistant
>> Department of Computer and Information Science
>> College of Science and Technology
>> Temple University Wachman Hall, 3rd Floor
>> 1805 N. Broad Street (038-24)
>> Philadelphia, PA 19122
>> 215-204-8659 - Direct line
>> 215-204-8450 Department line
>>
>>
>> Ruth V. Briggs
>> Department of Computer and Information Science
>> Temple University
>> 215-204-8659 - Direct line
>> 215-204-8450 Department line
>>
>
>
>
> ..
> *************************************************************************
> ** R. Clint Whaley, PhD ** Assoc Prof, UTSA ** www.cs.utsa.edu/~whaley **
> *************************************************************************
>
>

TEMPLE0000575



PLEASE PRINT WHERE POSSIBLE AND PRESS HARD IF WRITING.



## Temple University

### Disciplinary Report

| Department   Computer and Information Sciences | Date   03/26/2013 |
|---|---|
| Employee's Name   Ruth Briggs | Title   Executive Assistant |
| TUid   908672981 | |
| Immediate Supervisor   Jie Wu | Title   CIS Dept. Chair / Professor |

Check disciplinary action taken.  If prior disciplinary action had been given in the same category of the work rule violation, indicate the date(s) action was taken.

| General Counseling ☐ | Final Written Warning ☐ |
|---|---|
| Date(s) of Action: | Date(s) of Action: |
| Verbal Counseling ☐ | 3 Day Suspension w/o Pay ☑ |
| Date(s) of Action: | Date(s) of Action: |
| Written Warning ☐ | Termination ☐ |
| Date(s) of Action: | Date(s) of Action: |

Explanation (Use reverse side if needed):

C 4 - Neglecting job duties or responsibilities, or failing to carry out

instructions given by a supervision

| | | |
|---|---|---|
| Employee's Signature (SIGNING INDICATES RECEIPT ONLY!)   Ruth Briggs | | Date   3/26/2013 |
| | | |
| PRINT Name (Organization/Delegate) (needed only if Bargaining Unit position) | Organization/Delegate Signature (sign only if Bargaining Unit member) | Date |
| Jie Wu | | |
| PRINT Name (Department Head or Designee) | Department Head or Designee Signature   Jie Wn | Date   3/26/2013 |

Distribution:  Original to: Employee  Copies to:  Supervisor, Human Resources/Labor Relations*, Union (if union employee)
* Only disciplines at the level of written warning or above must be sent to Human Resources and Labor Relations.

Revised 07/15/2011



PLEASE PRINT WHERE POSSIBLE AND PRESS HARD IF WRITING.    **RECEIVED**

**Temple University**

**Disciplinary Report**                                      MAR 3 1 2014

**HUMAN RESOURCES**
**EMPLOYEE RELATIONS**

| Department  CiS | | Date | 01/20/2014 |
|---|---|---|---|
| Employee's Name  Ruth Briggs | | Title | Executive Assistant |
| TUid  908672981 | | | |
| Immediate Supervisor  Jie Wu | | Title | Professor & Chair |

Check disciplinary action taken. If prior disciplinary action had been given in the same category of the work rule violation, indicate the date(s) action was taken.

| General Counseling ☐ Date(s) of Action. | Final Written Warning ☐ Date(s) of Action: |
|---|---|
| Verbal Counseling ☐ Date(s) of Action: | 3 Day Suspension w/o Pay ☐ Date(s) of Action: |
| Written Warning ☑ Date(s) of Action    01/20/2014 | Termination ☐ Date(s) of Action: |

Explanation (Use reverse side if needed):
Violation of work rule B 10
Inefficiency Failing to meet expected standards of performance, productivity or efficiency

| Employee's Signature (SIGNING INDICATES RECEIPT ONLY!) | | Date |
|---|---|---|
| *Ruth V. Briggs* | | 1/20/2014 |
| PRINT Name If (regular)-or-(delegate) located with Bargaining Unit position) | (Regular)-or-(delegate) Signature (sign only if Bargaining Unit member) | Date |
| *Andrew DMc* | *signature* | 1/20/14 |
| PRINT Name (Department Head or Designee) | (Department Head or Designee) Signature | Date |

Distributions: (Original to: Employee  Copies to:  Supervisor, Human Resources/Employee Relations*, Local Union (if union employee)
* Only discipline as at the level of written warning or above must be sent to Human Resources and Labor Relations.

Revised 07/25/2011

CONFIDENTIAL

TEMPLE0170



Temple University Mail - My resignation                                          4/11/14, 10.07 PM



**TEMPLE**
UNIVERSITY*

## My resignation

Ruth V. Briggs <rbriggs@temple.edu>                    Thu, Apr 3, 2014 at 10:39 AM
To: Deidre Walton <Deidre.Walton@temple.edu>

Dear Deidre,

It is with great sadness that I resign my from my position, Executive Assistant in the Department
of Computer and Information Sciences in the College of Science and Technology effective April 1,
2014.

I have great admiration for our students, both undergraduate and graduate and our amazing
faculty. I miss my family and my community.

Regretfully,

Ruth

Ruth V. Briggs
Temple University
Department of Computer and Information Science
1805 N Broad Street (038-24)
Wachman Hall, Room 324
Philadelphia, PA 19122
215-204-8659 · Direct line
215-204-8450  Department line

CONFIDENTIAL

TEMPLE0088



 College of
Science and Technology
**TEMPLE UNIVERSITY**

Office of the Dean
Curtis Hall, Suite 400
1801 N Broad Street (041 03)
Philadelphia PA 19122-6095

phone 215-204-2058
fax 215-204-1255
e-mail cst@temple.edu
web www.temple.edu/cst

April 1, 2014

Ruth Briggs,

Over the last week, we have investigated two work related items that were brought to the Dean's Office attention. Specifically,

- On March 20th, 2014 at 3:56pm you were instructed to complete a concur travel expense reimbursement for Dr. Wu by the end of the workday. At 5:30pm you contacted Drew and indicated that the FOAPAL was still not available in Concur. Drew confirmed the FOAPAL was available. You failed to complete the task as requested. On Friday, March 21st, you met with Dr. Wu and Drew as scheduled. During this meeting you became argumentative and unprofessional. You insisted that Drew and Dr. Wu were calling you a liar.

- You were directed to book a room reservation for colloquium speaker Dr. Ness Shroff for his upcoming visit to Temple University on Thursday, March 13th and 14th, 2014. You booked a reservation at the Conwell Inn however; it was booked for the wrong dates. On the day of his visit, at the last minute you were able to secure a room at the Doubletree in Center City.

In accordance with Temple University Rules of Conduct – Revised Fall 2012, you are in violation of the following work rules.

*C.4 Negligence/Carelessness*
a) Neglecting job duties or responsibilities, or failing to carry out instructions given by supervisor.

*C.3 Disruptive or Disorderly Conduct*
a) Engaging in any unruly, erratic or undisciplined behavior that disrupts or may disrupt the workplace.
b) Engaging in any course of conduct that does or may undermine or interfere with supervision.

These infractions occurred despite previous counseling's and written warnings, issued 3/26/2013 and 1/20/2014. The disciplinary action for a 2nd violation of category C rules of conduct is termination. Effective the end of the day today, your employment at Temple University is being terminated.

Sincerely,

Greg Wacker

CONFIDENTIAL

TEMPLE0171

Message

| | |
|---|---|
| From: | Ruth V. Briggs [rbriggs@temple edu] |
| Sent: | 12/14/2011 1:36 29 PM |
| To | GREGORY WACKER [gwacker@temple edu], ANDREW DIMEO [andrew.dimeo@temple.edu] |
| Subject: | Confidential student files to be shredded sitting outside 313 Wachman |

I was wondering why neither of your responded until I saw that this email did not send and was in my outbox.

Ruth

Dear Greg and Drew,

There are three open boxes filled with IST student advising files, some of which have social security numbers on them, sitting outside 313 Wachman. I was not looking for them but stumbled upon them walking back to the "kitchen" area. I asked Judy if she was aware that confidential files are sitting in unsealed boxes in front of 313 and she told me that she took them out for Pro-Shred to pick up tomorrow.

I said that they needed to be locked up until the shredding people arrive, and the boxes must be closed and sealed and locked up until Tuesday morning but they sat there until the afternoon. When I was getting ready to leave around 6:30 (because Judy left a 4:00 today rather than her new time 4:30 (I am taking 1/2 personal day for a doctor's appointment on Tuesday) I found the boxes taped half-heartedly and sitting next to the proshred container near the front door. There were 3 boxes so poorly packed that documents were showing...all student advising documents from Dr. Baram's office. There were several graduate students remaining so I opened the boxes to re-seal them and found that the about 60-75 tabs were thrown in the basket and each students' advising records were in perfectly good manilla folders. I separated them, removed the folder tabs, sealed them and moved them inside the front office to be locked up when I get around to leaving at 10.30pm.

I am wondering how it is that I can be disciplined for violations and others in the office come and go as they please, violate policies about student records and social security numbers with no consequences at all.

I retained a couple of the files that were in open boxes in the hallway most of the day (they are locked away), the small bucket of tabs that were thrown out in the boxes and the manila folders I recovered so that I can show you.

I have feel like I have no allies and that the rules apply only when I violate them.

Ruth
Ruth V. Briggs
Executive Assistant
Department of Computer and Information Science
College of Science and Technology
Temple University Wachman Hall, 3rd Floor

TEMPLE UNIVERSITY (R. BRIGGS) - 0000327

*1805 N. Broad Street (018 24)*
*Philadelphia, PA 19122*
*215-204-8659 - Direct Lne*
*214-204-8459   Department Lne*

Confidential

TEMPLE UNIVERSITY (R  BRIGGS) - 0000328



**Message**

**From:** Ruth V. Briggs [rbriggs@temple edu]
**Sent:** 8/2/2012 6 20 30 PM
**To:** Sandra A. Foehl [sfoehl@temple edu]
**Subject:** Re: Scheduling a meeting with you

Dear Sandy,

Thank you for meeting with me on Monday, July 30th to discuss several issues regarding my employment with the university. If it is possible to review the letter to Michael Klein before sending, please let me know.

If not, I would appreciate a synopsis of the content presented in the "complaint," so that I will be prepared for my return to work after my son's surgery. I am not having "buyers' remorse" but I am nervous about the manner with which I will be treated when I return after my son's surgery.

I will be out of the office tomorrow, Friday, September 3rd, but will check my email.

Thank you so much for your help. I am greatly appreciative of your guidance.

Best regards,

Ruth

Ruth V. Briggs
Executive Assistant
Department of Computer and Information Science
College of Science and Technology
Temple University Wachman Hall, 3rd Floor
1805 N. Broad Street (038-24)
Philadelphia, PA 19122
215-204-8659 - Direct line
215-204-8450 Department line

On Mon, Jul 30, 2012 at 8:35 AM, Sandra A. Foehl <5Foehl@temple.edu> wrote:

Ruth, if 11:30 good? If not suggest another time. Sandy

**From:** Ruth V. Briggs [mailto:rbriggs@temple.edu]
**Sent:** Sunday, July 29, 2012 12:50 PM
**To:** Sandra A. Foehl
**Cc:** Rhonda L Brown
**Subject:** Scheduling a meeting with you

TEMPLE UNIVERSITY (R. BRIGGS) - 0000210

Dear Sandy,

Thank you for responding to my email.  My boss is traveling for the next two weeks, allowing me flexibility.  I can meet Monday anytime.  I start at 8:30 am.  The same is true for any day throughout the week.

I am located in Wachman and can get to your office quickly.

Thank you,
Ruth
Ruth V. Briggs
Executive Assistant
Department of Computer and Information Science
College of Science and Technology
Temple University Wachman Hall, 3rd Floor
1805 N. Broad Street (038-24)
Philadelphia, PA 19122
215-204-8659 - Direct line
215-204-8450   Department line

On Thu, Jul 26, 2012 at 11:53 AM, Sandra A. Foehl <Sfoehl@temple.edu> wrote

Ruth, in the two weeks beginning July 30 I have time every day except Tuesday the 31st in the afternoon and Wednesday the 1st in the morning.  Please suggest a time convenient for you.  Sandy

-----Original Message-----
From: Ruth V. Briggs [mailto:rbriggs@temple.edu]
Sent: Wednesday, July 25, 2012 9:05 PM
To: sandra.foehl@temple.edu
Cc: Rhonda L Brown
Subject: Request to meet with you

Dear Sandy,

I spoke to Rhonda Brown regarding personal employment issues, about which I was encouraged to meet with you.  Please let me know if you have availabilty to meet during the two weeks that begin next Monday, July 30th.

Best regards, Ruth

Ruth V. Briggs (cell phone-484-557-6234) Executive Assistant Department of Computer and Information Science College of Science and Technology Temple University Wachman Hall, 3rd Floor
1805 N. Broad Street (038-24)
Philadelphia, PA 19122
215-204-8659 - Direct line
215-204-8450   Department line

TEMPLE UNIVERSITY (R BRIGGS) - 0000211

TEMPLE UNIVERSITY (R BRIGGS) - 0000212

Message

| From: | Sandra A. Foehl [/O=TEMPLE UNIVERSITY/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SFOEHL] |
|---|---|
| Sent | 8/3/2012 4 00 53 PM |
| To | Ruth V. Briggs [rbriggs@temple.edu] |
| Subject | Complaint notice |

Ruth V. Briggs

Executive Assistant

Department of Computer and Information Science

College of Science and Technology

Temple University

Dear Ruth,

Equal Opportunity Compliance doesn't have grievants review the complaint notices we send. However, you can inform the knowledge from which I will work by sending me your own written statement of the issues. In fact I am requesting your statement. Our conversation Monday of this week ranged widely through several years of history. So please set out for me in writing the present treatment you find discriminatory and/or harassing, the source of the disparate treatment and/or unwelcome conduct, and the basis for the unfair treatment from your perspective. That is, set out how you are being treated differently at present, who is treating you differently, and the basis of the different treatment as you see it, sex, race, national or ethnic origin, age, religion, disability, …

You may provide as much detail as you wish. This is your opportunity to record and relate events so that you and I have the same frame of reference as I investigate your complaint. In addition to asking for the written account of your experience to date, I encourage you to keep a record of pertinent new events going forward

Sincerely yours,

Sandra

Sandra A. Foehl

Director, Equal Opportunity Compliance

Temple University

(215) 204-6772

Confidential

TEMPLE UNIVERSITY (R. BRIGGS) - 0000208





From: Ruth V. Briggs rbriggs@temp.e.edu
Subject: Fwd: Confidential
Date: September 9, 2012 at 7:18 PM
To: RHONDA L BROWN rbrown@temple.edu

Dear Rhonda,

I regret having seen Sandy Foehl because I could not see the original complaint, nor have I heard if it was filed nor how it will be addressed.

I am over my head now taking care of an invalid 24 year old and don't want to have the threat of joblessness in the face of this crisis.

Sorry that I do not have time to write more about the complaints that I wished to be researched. My son needs me now.

Ruth

———— Forwarded message ————
From: Ruth V. Briggs <rbriggs@temple.edu>
Date: Sun, Sep 9, 2012 at 7:08 PM
Subject: Confidential
To: "Sandra A. Foehl" <sfoehl@temple.edu>

Dear Sandy,

I am uncertain about the status of the complaint, about which we spoke regarding my job description, my performance development plan and adjusting my salary to the 2011 maximum salary level new hire range for a T26. I did receive a 1.75% salary increase and a one time $1,000 bonus, but I heard that other non-bargaining staff members also received a small salary increase. My earnings for 2011 was $51,651.12. With this increase, my salary will be $51,529, which is $2975.00 less than the maximum salary permitted for a new hire.

T-scale salaries for 2011-T26

| Minimum | 75%title(Max for new hire) | Target / Mid | Control Pt 75% tile | Maximum T26 |
|---------|---------------------------|--------------|---------------------|-------------|
| $42,300 | $53,600 | $50,500 | $71,200 | $80,900 |

The position I held before I came to Temple was Assistant Director of Foundation Relations at the Academy of Natural Sciences. The position I held before that was Director of Development the PA Home of the Sparrow and the Prison Society. I have a BA in History and political science and I am 12 credits short of a master's in counseling psychology.

Dr. Wu knows that I have years of experience in grant writing, scientific publishing, event planning, but he is giving these functions to one of our student workers, as well as a private office. My primary functions are those of our department secretary. Judy Lennon, the department secretary is limited to tasks that can be completed on a typewriter and a copy machine because she was allowed to perform her job using decade old office technology. Her computer literacy is extremely limited because there was no one in department leadership directly mentoring her through her PDP to attend computer training classes offered by the university. Before I was moved to CIS, this was a problem identified by Greg Wacker in the CST Dean's Office. I was told not to help her with any of her work so that her lack of skills could be documented as poor job performance. In fact, Greg threatened me with a disciplinary report for insubordination if he found out that I was helping her on the computer. He told me to refuse to help her and send her to the Dean's Office so that he could have just reason to let her go. I told him that I would not "throw the widow with cancer" under the bus because I have no supervisory role over her. If his goal was to document her inefficiency in order to fire her, he would also have to catch me helping her because I believe her inefficiency is a symptom of poor leadership.

The reason for reporting this to you is unrelated to Judy's performance but relevant to bullying tactics from a man who has threatened me with dismissal for lack of loyalty to him. As a single mother of four children he knew that I was afraid that he was in a position to fire me. I do know that I was paid significantly lower than two male staff members in the Dean's office who were my equals.

Regarding our discussion related to Dr. Wu's comments about my age, I am forwarding an email that was sent to a student worker in our office about yet another of my job functions assigned to her. I was copied on the email, as you can see in the email header, as was Michele Mascucci, an associate director in the sponsored research department, which is shaming and embarrassing for me. Additionally, last week, I was informed in front of Mary Kate that she would be handling all his travel arrangements, too.

I am not authorizing any action on my part because I am waiting to be cleared for FMLA for a short period to care for my son who has a spinal cord injury.

Please let me know what and when to expect my original complaints to be addressed.

Sincerely,
Ruth

Ruth V. Briggs
Temple University

BRIGGS 24

*Department of Computer and Information Sciences*
*College of Science and Technology*
*Temple University Wachman Hall, 3rd Floor*
*1805 N. Broad Street (038 21)*
*Philadelphia, PA 19122*
*215 204-8450 Direct*
*215 204-5125 Department Fax*

———— Forwarded message ————
From: <Lewyn13@temple.edu>
Date: Fri, Sep 7, 2012 at 8:01 AM
Subject: Re: Fwd: FW: Due Oct 1: Submit Your Proposal for Temple University Internationalization Grants of up to $4,000
To: Mary Katherine Gasewski <katy31213?temple.edu>
Cc: "Ruth V. Briggs" <rthbriggs@temple.edu>, "MICHELE M MASUCCI" <masucci@temple.edu>

Mary Kate,

Also, mention the fact that I have talked to Michele from research office about the importance of Latin America (future powerhouse: Brazil, Argentina, and to some extent Chile). However, there are very little activities there related to Temple international programs.

There are many research collaboration opportunities and student sources for Temple.

I was a board member in this large consortium when I was I Florida. I'd like to renew the effort there to contribute to the Temple globalization.

Sent via BlackBerry from T-Mobile

From: Jie Wu <jiewu13@temple.edu>
Date: Thu, 6 Sep 2012 22:46:56 -0400
To: Mary Katherine Gasewski<katy31213?temple.edu>
Cc: Ruth V. Briggs<rthbriggs@temple.edu>
Subject: Fwd: FW: Due Oct 1: Submit Your Proposal for Temple University Internationalization Grants of up to $4,000

Help me to draft such a proposal

In category 3: attend LACCEI annual conference for globalization of campus collaboration as a board member

In category of outreach (the conference is usually in June).

Establish connections to a consortium with over 100 universities from latin america

Cost: 1,000 membership, 1,000 airfare, 100 local transportation. 1,250, 5 days hotels and per diem.

———— Forwarded message ————
From: JOAN P. SHAPIRO <joan.shapiro@temple.edu>
Date: Thu, Sep 6, 2012 at 1:27 PM
Subject: Fwd: FW: Due Oct 1: Submit Your Proposal for Temple University Internationalization Grants of up to $4,000
To: FACULTY-SENATE-APPOINTMENTS@listserv.temple.edu

Hello Colleagues,

Provost Dai suggested that I send this Call to you (see forwarded message). Hopefully, you might consider applying for a travel grant.
All good wishes,
Joan

From: Global Temple Faculty and Staff Listserv [mailto:GLOBALTEMPLE-LIST@LISTSERV.TEMPLE.EDU] On Behalf Of Ingrid S Spangler
Sent: Thursday, September 05, 2012 10:08 AM
To: GLOBALTEMPLE-LIST@LISTSERV.TEMPLE.EDU
Subject: Due Oct 1: Submit Your Proposal for Temple University Internationalization Grants of up to $4,000

Temple University Internationalization Grants

Internationalization Grants have been created by the Office of International Affairs to provide faculty and staff with funding to engage in projects that will help the University integrate international and intercultural perspectives and content into teaching, learning, research, and campus life.

The Office of International Affairs is pleased to support proposals that extend across disciplines, enhance the international reputation of Temple University and extend the University's globalization mission. Preference will be given to projects that result in participants making a direct contribution to internationalization efforts at Temple University.

BRIGGS 25

2

Downloads

International Integration Grant Program Application Form

Proposals that fall within the following four categories will be considered:

**Category 1. Faculty Exchange with International Partner Universities**

Grants in this category will target projects where a faculty member travels to one of Temple University's international university partners and participates in an activity that will enhance his/her international experience and knowledge and foster relations between Temple and its partner institutions. Activities include but are not limited to: delivering lectures, teaching a course in the summer (typically July), taking a sabbatical, and developing collaborative research. Faculty may visit multiple partner universities in the same country or in multiple countries.

Temple University's partner universities can be found online

www.international.temple.edu/research?index.php

Grant Amount: Up to $4,000

**Category 2. Faculty – Collaborative Research**

Grants in this category will support investigators to travel for existing or future research projects that either involve working cooperatively with scholars abroad and/or cover a research topic with an international component. Activities include but are not limited to, efforts toward developing arrangements (including MOU) and proposals for collaborative research, co-authoring publication, conducting joint research projects, or establishing joint research centers.

Grant Amount: Up to $4,000

**Category 3. Faculty - Globalization of Curriculum**

Grants within this category will fund faculty travel with the purpose of developing and implementing international components into specific courses. During the travel the faculty is expected to forge connections with international scholars and institutions that are crucial for the curriculum development. This grant is intended to provide a means to enable the addition of an international element to the course or greater depth to an international topic that previously present in the course. Faculty may visit multiple universities in the same country or in multiple countries.

Grant Amount: Up to $4,000

**Category 4. Faculty and Staff - Globalizing the Campus**

Grants in this category are open to Temple University faculty and staff members whose proposed international travel aims to 1) improve the campus life for international students at Temple, 2) serve Temple students engaging in study abroad, 3) assist in recruiting international students to Temple, and 4) assist in forging relations between Temple and international institutions. For example, traveling abroad to learn how programs and universities abroad receive and serve American students or other international students can be a valuable experience to help improve upon Temple's protocols and make a direct contribution to campus internationalization efforts.

Grant Amount: Up to $4,000

BRIGGS 26

## Process and Deadlines for Submission

Upon approval from faculty's department chair and dean or administrator's direct supervisor and division head, the proposals (see below for format) can be sent directly to Ingrid Spangler Communications Manager for International Affairs, at spangler@temple.edu. The submitted proposal will be reviewed two times a year. See the subsequent schedule for exact dates.

Awards will be decided upon by a committee composed of faculty/staff members from the International Advisory Council. The grantees will be notified of results of the proposals within one month of the proposal submission deadline.

## Schedule for Submission:

### Cycle 1

March 1 proposal submission deadline for travel intended for September-February

### Cycle 2

October 1 proposal submission deadline for travel intended for March-August

Information sessions to promote the available grant funds will be held in November for Cycle 1 and April for Cycle 2, so faculty then have winter and summer breaks to work on proposal ideas.

## Proposal Checklist

- Complete the Internationalization grant application form. This form includes applicant and project summary information, applicant contact information, title of the project, name(s) of the director(s), project goals, objectives, timelines, proposed outcomes, a list of other Temple University or outside funding applications for the same project and the status of such requests, the total amount of funding requested from the Office of International Affairs, and the time period for which funding is requested.

- Budget outline. A template is provided.

- The department chair and dean of the school/college is required to endorse (physically sign) the application prior to submission. For staff, supervisor and division head must sign.

## Eligibility and Requirements

- Internationalization grants are open to tenured, tenure track faculty, non-tenure track faculty (NTT), and full-time staff. Adjunct faculty are not eligible to apply for grants at this time.

- Proposals should demonstrate ability to reach the university's goal of integrating international and intercultural perspectives and content into teaching, learning, research and campus life.

- The dean and chair of the department must endorse (physically sign) the application prior to submission. For staff, supervisor and division head must sign.

- "Other" or "Miscellaneous" expenses should constitute no more than 10 percent of the total budget for the proposal.

BRIGGS 27

- Faculty members are permitted to apply for internationalization grants during their sabbatical

- Limit of two proposals per person per cycle

- Preference is given to new initiatives and excludes annual reoccurring projects

Report

A summary report on the project is due within three months after use of the funds. All reports should include the following components:

- An accounting of how internationalization grant funds were expended

- A description of the activities undertaken and how each of these activities advanced the project goals

- A discussion of the ways in which the project contributed to faculty professional development, curriculum innovations, research collaboration or internationalization efforts at Temple University

- Any future plans or goals to continue the project upon return and any recommendations for how the Office of International Affairs can help

- The summary report should be emailed to Ingrid Spangler at spangler@temple.edu

- Grantees will also participate in a debriefing meeting with the Office of International Affairs and the International Advisory Council Committee upon return (once in the fall and once in the spring)

Sharing Results of Internationalization Grants

You may be asked to present the results of your internationalization grant at OIA's annual Global Temple Conference held in the fall.  For more information or questions about the Global Temple Conference, please contact Denise Connerty, Assistant Vice President of International Affairs, at global@temple.edu

Contact for Internationalization Grants

Ingrid Spangler

Communications Manager

Office of International Affairs

400 Conwell Hall

(215) 204-2334

spangler@temple.edu

Denise Palmer Spangler

BRIGGS 28

Professor, Educational Leadership
Dept. of Psychological, Organizational and Leadership Studies
President, Temple University Faculty Senate
Temple University
College of Education
Ritter Hall 238
Philadelphia, PA 19122
Phone: (215)204-5445

BRIGGS 29



Message

| | |
|---|---|
| **From** | Ruth V Briggs [rbriggs@temple edu] |
| **Sent** | 11/2/2012 12 03 30 PM |
| **To** | Sandra A Foehl [sfoehl@temple edu] |
| **Subject** | My request for job description and salary adjustment |

Dear Sandy,

I can't believe that it has been nearly three months since I met with you to discuss the issues related to my position in the CIS department. I spoke to you the week before my adult son underwent revision surgery for his spinal cord injury on August 20th and have been out on intermittent family medical leave to care for him during his post surgical needs and now it is November.   I am happy to report the painful recovery from the spine surgery paid off really well...so well, in fact, that he is returning to his own apartment this weekend and will be living independent.

I wanted to touch base with you to ask about the status of my request or complaint.  I have not heard from the Dean's office about addressing the issues about which we spoke.

At your convenience, I would appreciate your letting me know where this stands.

Thank you,

Ruth

*Ruth V Briggs*
*Executive Assistant*
*Department of Computer and Information Science*
*College of Science and Technology*
*Temple University Wachman Hall, 3rd Floor*
*1805 N. Broad Street (038 24)*
*Philadelphia, PA 19122*
*215 204-8659  Direct line*
*215 204-8150  Department line*

TEMPLE UNIVERSITY (R  BRIGGS) - 0000202

**Message**

| | |
|---|---|
| **From** | Sandra A Foehl [/O=TEMPLE UNIVERSITY/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SFOEHL] |
| **Sent** | 11/5/2012 3 03:12 PM |
| **To** | Ruth V. Briggs [rbriggs@temple edu] |
| **Subject** | RE: My request for job description and salary adjustment |
| **Attachments** | agency list_eoc.doc |

Ruth V. Briggs

Executive Assistant

Department of Computer and Information Science

College of Science and Technology

Temple University

Dear Ruth,

Did I misread the line in your previous e-mail? You wrote on September 9, 2012, "I am not authorizing any action on my part because I am waiting to be cleared for FMLA. " If you are now authorizing action, will you please respond to my request of August 30, 2012, for a written statement setting out the particular instances of bullying, threats of dismissal, and expressions of age bias by Dr Wu and/or Mr. Wacker. The e mail from Dr. Wu, forwarded by you on September 9, 2012, is not discriminatory on its face and so does not answer my request.

Your concern that you are not correctly compensated for the work you do may be addressed by you to your dean or to Human Resources without a finding of discrimination by this office. If, however, it is your position that because of age or race or gender discrimination you are paid less than similarly situated others, please make a direct comparison. Who is paid more than you for the same work?

Please be advised that complaints of unlawful discrimination may be made to government compliance agencies as well as to this office. The attachment here gives direction to the federal, state and municipal offices in Philadelphia.

Sincerely yours,

Sandra

Sandra Foehl

Director, Equal Opportunity Compliance

Temple University

(215) 204-6772

TEMPLE UNIVERSITY (R. BRIGGS) - 0000199

**From:** Ruth V. Briggs [mailto:rbriggs@temple.edu]
**Sent:** Friday, November 02, 2012 12:04 PM
**To:** Sandra A. Foehl
**Subject:** My request for job description and salary adjustment

Dear Sandy,

I can't believe that it has been nearly three months since I met with you to discuss the issues related to my position in the CIS department. I spoke to you the week before my adult son underwent revision surgery for his spinal cord injury on August 20th and have been out on intermittent family medical leave to care for him during his post surgical needs and now it is November. I am happy to report the painful recovery from the spine surgery paid off really well...so well, in fact, that he is returning to his own apartment this weekend and will be living independent.

I wanted to touch base with you to ask about the status of my request or complaint. I have not heard from the Dean's office about addressing the issues about which we spoke.

At your convenience, I would appreciate your letting me know where this stands.

Thank you,

Ruth

*Ruth V. Briggs*
*Executive Assistant*
*Department of Computer and Information Science*
*College of Science and Technology*
*Temple University Wachman Hall, 3rd Floor*
*1805 N. Broad Street (038 21)*
*Philadelphia, PA 19122*
*215 204 8659 · Direct line*
*215 204 8450 · Department line*

TEMPLE UNIVERSITY (R. BRIGGS) - 0000200



Message

| | |
|---|---|
| From: | Sandra A. Foehl [/O=TEMPLE UNIVERSITY/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SFOEHL] |
| Sent | 2/8/2013 9 03 06 AM |
| To | Ruth V. Briggs [rbriggs@temple edu] |
| Subject | RE Urgent |

Ruth Briggs

Department of Computer and Information Science

College of Science and Technology

Temple University

Ruth this is an issue for Human Resources first. Address the situation and your concerns to Deirdre Walton in Labor and Employee Relations  Sandy

Sandra A Foehl

Office of Equal Opportunity Compliance

Temple University

(215) 204 6772

**From:** Ruth V. Briggs [mailto:rbriggs@temple.edu]
**Sent:** Friday, February 08, 2013 8:26 AM
**To:** Sandra A. Foehl
**Subject:** Urgent

Sandy,

I am so bullied and harassed all day.  Everyday morning, I must meet with, my direct supervisor and  Greg Wachker's assistant, Drew DiMeo for  "staff meeting" to discuss my failure to comply with a directive that prohibits any work activity  that has not been approved by my supervisor, all of which are related to performing daily functions in the office...such as answering questions from students or visitors to our building.  The threat of discipline for assisting a visitor or responding to a request from another office does not seem to have any actions of wrong doing, rather fulfilling a "customer service" expectation for the university.  No other staff member is required to meet daily for a dose of public humiliation and my request to move the meetings to a private location was flat out denied.

When I asked for clarification on an assignment, it is reported to the dean's office as a challenge to his authority.  If he can have a someone there to protect his interests, there is more than an element of unfairness.  It is beginning to feel like psychological abuse.

If my only resource to address this problem is through HR, this is unacceptable.  Can I contact a

TEMPLE UNIVERSITY (R. BRIGGS) - 0000197



mediator?

Ruth

*Ruth V. Briggs*
*Executive Assistant*
*Department of Computer and Information Science*
*College of Science and Technology*
*Temple University Wachman Hall, 3rd Floor*
*1805 N  Broad Street (038-24)*
*Philadelphia, PA 19122*
*215-204-6659  Direct line*
*215-204-6450  Department line*

TEMPLE UNIVERSITY (R  BRIGGS) - 0000198



**Cameron Etezady**

| | |
|---|---|
| From | Cameron Etezady |
| Sent | Monday, February 11, 2013 11.35 AM |
| To: | Fay. R Trachtenberg, Ruth V. Briggs |
| Subject | Fwd Confidential Communication |

Dear Ruth,

I have given Fay a heads up on this matter and she is on this email. Just let us know how best to reach you (phone or email and when you are free to talk)  You can call Fay to set up a time to meet at 215 204.6542 or use her email.

Cameron
Office  215-204-6542

Sent from my iPhone.

Begin forwarded message:

> From: "Ruth V. Briggs" <rbriggs@temple.edu>
> Date: February 11, 2013, 10.58.48 AM EST
> To: Cameron Etezady <etezady@temple.edu>
> Subject: Re: Confidential Communication

Dear Cameron,

I will answer your questions. I am very uncomfortable with Deidre Walton. No I am not uncomfortable with Sandy but she referred me to Deidre. I believe that Tracey is in Sandy's office and Sandy referred me to HR.

I have no history with Faye Trachtenberg and I would feel most comfortable meeting with her to discuss this with someone who has unfamiliar with this situation. Should I contact he on my own?

Ruth

*Ruth V. Briggs*
*Executive Assistant*
*Department of Computer and Information Science*
*College of Science and Technology*
*Temple University Wachman Hall, 3rd Floor*
*1805 N. Broad Street (035-24)*
*Philadelphia, PA 19122*
*215-204-8359 - Direct Line*
*215-204-5450   Department Line*

On Mon. Feb 11, 2013 at 9 09 AM, Cameron Etezady <etezady@temple.edu> wrote:

TEMPLE0196

Dear Ruth:

Please call me Cameron.

I apologize for doing this by email, but as I said, I am working out of the office most of this week. I was unclear about your email. Are you uncomfortable with Sandy, Tracey, and Deirdre? Any of the three would be able to accomplish a mediation that you requested.

I can also refer you to Fay Trachtenberg in my office who could provide you with more prompt attention and discuss the options with you. If none of those options are acceptable, let's set up a meeting for next week, to talk things through.

Cameron
Office: 215-204-6542

Sent from my iPhone

On Feb 10, 2013, a, 10:32 PM, "Ruth V. Briggs" <rbriggs@temple.edu> wrote:

> Dear Mr. Etezady,
>
> I appreciate your prompt response and thank you for taking your time to reply over the weekend.
>
> After a week of unrelenting bullying, I sent an email to Rhonda Grown and she told me to contact Sandy, Sandy told me to contact Deidre Walton. Since I provided a statement several years ago for a discrimination lawsuit by Tanya Hunnawell, in which I contradicted the story that I was coached to report, I do not trust that she has my best interests at heart.
>
> On numerous occasions, Jie Wu has mentioned that the professional lives of women my age (58) in China are over and I wrote it off as cultural differences. It was when he would make a comment that referenced my age and failure to attain the financial stability to be able to travel when I felt defensive and offended. I did not want to make an issue about it, but I told him privately that I was embarrassed when he insinuated that I was a poor manager of money. In an attempt to demonstrate that I was a dedicated mother, I told him that the departure of my husband and father of my children was unexpected and unplanned for a stay at home mother and I have given everything I could to my children's benefit rather than exposing myself to world travel. He also knows that my youngest child has another year at Temple University and that I depend on the tuition remission.
>
> I do not want to take anymore of your time nor do want to re-

1

TEMPLE0197

visit the events from which I am already distraught I just want to know where the "buck stops." I am a Quaker and I just want someone to assist me to mediate a personnel problem to find a mutually acceptable solution rather than another adversarial relationship within the university.

Most sincerely,
Ruth
Ruth V. Briggs
Executive Assistant
Department of Computer and Information Sciences
College of Science and Technology
Temple University Wachman Hall, 3rd Floor
1805 N. Broad Street (035-24)
Philadelphia, PA 19122
215-204-8655 - Direct Line
215-204-8450  Department Line

On Sun, Feb 10, 2013 at 8:28 AM, Cameron Etezady <etezady@temple.edu> wrote:
Hi Ruth,

Thank you for trusting me and contacting me with what I am sure is a very difficult matter.

I am happy to speak with you but while I will keep our conversation confidential, I cannot promise anonymity in the event you raise something that I must investigate further. My obligation is to ensure the university complies with applicable laws. I want to assure you, however, that Temple does not tolerate retaliation.

Unfortunately, I will be attending a trial for most of next week and I am out 2/16 so I have extremely limited time unless you wanted to talk by phone after regular work hours.

I would also recommend you speak with sandy loeb or Tracey Hamilton in EOC. They are fantastic and can help guide you through your options.

Again, thank you for reaching out.

Cameron
Office: 215-204-6542

Sent from my iPhone

On Feb 9, 2013, at 2:37 PM, "Ruth V. Briggs" <rbriggs@temple.edu> wrote:

Dear Mr. Etezady,

I am contacting you to request a **CONFIDENTIAL** conversation to discuss  disparate treatment for me, which I believe is related to my age of 58.

1

TEMPLE0198

I am concerned about retaliation. If you are unable to guarantee confidentiality, please say so in your reply.

Sincerely,

Ruth

Ruth V. Briggs
Executive Assistant
Department of Computer and Information Science
College of Science and Technology
Temple University Wachman Hall, 3rd Floor
1805 N Broad Street (038-24)
Philadelphia, PA 19122
215 204 8559 - Direct line
215 204 5450 - Department line

TEMPLE0199

Temple University Mail ~ Assistant Program Director, 011 ANNENBERG HALL, 06/20/2013



6/20/14 1 11 PM

**TEMPLE UNIVERSITY®**

Ruth V. Briggs

Deidre Walton

## Assistant Program Director, 011 ANNENBERG HALL, 06/20/2013

Ruth V. Briggs <rbriggs@temple.edu>
To: Deidre Walton <Deirdre.Walton@temple.edu>

Wed, Jun 26, 2013 at 9.13 PM

Dear Deidre,

I am contacting you about a recent job posting in the School of Media and Communication, about which I would like you feedback. I am confident that I have the skills and knowledge to perform the essential functions of this job but intimidated and shaken by the level C disciplinary action on my employment record. As you know, I was granted permission to review my employment record so that I could see the manner with which this error was reported to Human Resources. In our meeting, I took responsibility for the error and offered my opinion about the unfairness of the punishment that was rendered against me without considering a list of mitigating factors for my defense. Not one person on leadership in the department took into consideration the poor oversight on the part of management in regards to staffing issues.

I worry that a hiring manager will read the letter out of context because I was not given the opportunity to respond to Dr. Kwatney's complaint. Additionally, I received reports from three faculty members about Dr. Wu making untrue and disparaging remarks about me in the presence of faculty. Two staff members and a student worker reported to me that they overheard Dr. Wu talking about the disciplinary action in a public setting

How do I recover my reputation at this point in my life. The disciplinary action in isolation is enough to ruin me but the unsubstantiated comments made in public settings that are reported to me from concerned staff or faculty is beginning to feel like a character assassination. If I were valued for my work ethic, as a team player and my reputation with external constituents, students and alumni, the dean's office would intervene rather than suggest I look outside for employment opportunities, I could hold tight for the remainder of my probation because I don't want to leave a community of students, faculty and alumni, for whom I have great respect and admiration, nor do I want to jeopardize my son's senior year at Temple.

I would greatly appreciate it if you would give me an straightforward and honest assessment about my future prospects within the university. It has become so difficult for me to be objective and I am certain that I my personal and professional life is negatively affected as a result. I am not asking for your to give me information about the hiring manager for the position, but I would like your opinion about be damaged goods

### Assistant Program Director, 011 ANNENBERG HALL, 06/20/2013

Thank you so much for your guidance.

Ruth

*Ruth V. Briggs*
*Department of Computer and Information Science*
*Temple University*
*215-201-8559 • Direct line*
*215-204-8450  Department line*

https://mail.google.com/mail/u/0/?ui=2&ik=51fb3514935&view=pt&q  &qmr=100&search=apps&ll=thread-f:1j18j30db7:2275b&simpl=13f8310ab9c2275b   Page 1 of 1

BRIGGS 53

Temple University Mail – Interested in position that was posted recently                    6/20/14 1 13 PM

*Interact with diverse and distinguished guests, university trustees, alumni, donors, visiting dignitaries, community leaders, faculty, staff, and students.

*Perform other duties as assigned

Required Education and Experience:

Bachelor's degree and a minimum of four years of event experience. An equivalent combination of education and experience may be considered.

Required Skills and Abilities:

*Ability to travel and work mornings, evenings and weekends as needed.

*Ability to move and transport materials weighing up to 30 pounds.

*Demonstrated success in organizing and planning events requiring attention to multiple details.

*Strong written and verbal communications skills.

*Proficiency in Microsoft Suite and Internet programs.

*Problem-solves, resolves issues, communicate with tact, and work with grace under pressure.

*Demonstrated success in multi-tasking environment.


Preferred:

*Experience in higher education.

*Ruth V. Briggs*
*Department of Computer and Information Science*
*Temple University*
*215-204-8659 - Direct line*
*215-204-8450  Department line*

BRIGGS 55

6/20/14 1:16 PM

 **TEMPLE** UNIVERSITY®

Ruth V. Briggs <rbriggs@temple.edu>

## Re: TU-16763-open position

Deirdra L Culbreath-Walton <DLWalton@temple.edu>
To: "Ruth V. Briggs" <rbriggs@temple.edu>

Sat, Jul 13, 2013 at 7:13 AM

Hi Ruth

I'm sorry I haven't talked to you yet.  I have received your emails with the jobs you are interested in.  I will give you a call on Monday to go over the status of each job.

Have a good weekend.

Deirdre

Sent from my iPhone

On Jul 12, 2013, at 11:04 PM, "Ruth V  Briggs" <rbriggs@temple.edu> wrote:

> Dear Deidre,
>
> Here is another position that is of great interest to me.
>
> Job Title        Assistant Director
> Location        041 CONWELL HALL
> Campus        Main Campus
> Full/Part Time  Full
> Job Number    TU-16763
> Date Posted    06/20/2013
>
>
> Thanks, Ruth
>
>
> Ruth V  Briggs
> Department of Computer and Information Science
> Temple University
> 215-204-8659 - Direct line
> 215-204-8450   Department line

BRIGGS 56

Temple University Mai – open possibility

6/30/14 1:18 PM



Ruth v. Briggs <rbriggs@temple.edu>

## open possibility
1 message

Ruth V. Briggs <rbriggs@temple.edu>
To: Deidre Walton <Deirdre.Walton@temple.edu>

Sun, Aug 4, 2013 at 4:21 AM

Deidre,  This is another fit for me.

| | |
|---|---|
| Job Title | Associate Director, Alumni Engagement |
| Location | 007 SULLIVAN HALL |
| Campus | Main Campus |
| Full/Part Time | Full |
| Job Number | TU-16926 |
| Date Posted | 08/01/2013 |
| Bargaining Unit | |
| Salary Grade | T26 |

Ruth

*Ruth V. Briggs*
*Department of Computer and Information Science*
*Temple University*
*215-204-8659 · Direct line*
*215-204-8450  Department line*

BRIGGS 57

Temple University/Mail - Re: Confidential Communication



6/20/14 1 23 PM

![TEMPLE UNIVERSITY logo] **TEMPLE**
**UNIVERSITY**



## Re: Confidential Communication

Ruth V. Briggs <rbriggs@temple edu>
To Cameron Etezady <etezady@temple.edu>

Thu, Aug 8, 2013 at 8 34 AM

Dear Cameron,

Yes, you can have Fay provide the background I have shared with you
and have her contact me.

Thank you very much.

Ruth
Ruth V. Briggs
Department of Computer and Information Science
Temple University
215-204-8659 - Direct line
215-204-8450  Department line

On Tue, Aug 6, 2013 at 6 25 PM, Cameron Etezady <etezady@temple edu> wrote
> Dear Ruth,
>
> Thank you for your kind words about me regarding our interactions in 2008
>
> I am sorry to hear about your disciplinary issues  I am unfamiliar with them
>
> I wasn't quite clear about your interactions with Deirdre  Have you been able to work with her since April?
>
> As you have worked with Fay in the past and spoken to her once before on this topic, I would direct you to her as
> she generally handles employment matters such as this. If you like, I can have Fay reach out to you with or without
> the background you have provided.
>
> Sincerely,
> Cameron
>
> -----Original Message-----
> From  Ruth V. Briggs [mailto rbriggs@temple edu]
> Sent  Tuesday, August 06, 2013 11 45 AM
> To  Cameron Etezady
> Subject  Fwd  Confidential Communication
>
> Dear Cameron,
>
> I am forwarding the email that I sent in February of this year to refresh you memory regarding my reason for
> reaching out to you about my situation  I did contact Faye Trachenberg, as suggested and she referred me to Deidre
> Walton  I did reach out to her and asked her if she would agree to meet with Dr. Wu, Andrew DiMeo and me to serve
> in as a mediator-like role at one of our daily morning meetings followed by a private meeting for her to offer feedback
> and suggestions for leveling the playing field to establish some sense of fair play in the work day that commences in a

BRIGGS 64

Temple University Mail - Re: Confidential Communication

6/20/14 1 23 PM

> 1805 N. Broad Street (038-24)
> Philadelphia, PA 19122
> 215-204-8659 - Direct line
> 215-204-8450   Department line
>
>
>
> On Sun, Feb 10, 2013 at 8 28 AM  Cameron Etezady <etezady@temple edu> wrote
>>
>> Hi Ruth,
>>
>> Thank you for trusting me and contacting me with what I am sure is a very difficult matter.
>>
>> I am happy to speak with you but while I will keep our conversation confidential, I cannot promise anonymity in the event you raise something that I must investigate further. My obligation is to ensure the university complies with applicable law  I want to assure you, however, that Temple does not tolerate retaliation
>>
>> Unfortunately, I will be attending a trial for most of next week and I am out 2 18 so I have extremely limited time unless you wanted to talk by phone after regular work hours
>>
>> I would also recommend you speak with sandy foehl or Tracey Hamilton in EOC  They are fantastic and can help guide you through your options
>>
>> Again, thank you for reaching out,
>>
>> Cameron
>> Office   215-204-6542
>>
>> Sent from my iPhone
>>
>> On Feb 9, 2013, at 2 37 PM  "Ruth V. Briggs"  <rbriggs@temple edu> wrote
>>
>> Dear Mr. Etezady,
>>
>> I am contacting you to request a CONFIDENTIAL conversation to discuss disparate treatment for me, which I believe is related to my age of 58
>>
>> I am concerned about retaliation.  If you are unable to guarantee confidentiality  please say so in your reply.
>>
>> Sincerely,
>>
>> Ruth
>>
>> Ruth V. Briggs
>> Executive Assistant
>> Department of Computer and Information Science College of Science and
>> Technology Temple University Wachman Hall, 3rd Floor
>> 1805 N. Broad Street (038-24)
>> Philadelphia, PA 19122
>> 215-204-8659 - Direct line
>> 215-204-8450   Department line
>>

BRIGGS 67



Temple University Mail - Providing supporting documentation in my defense

4/21/14  9 54 PM



# TEMPLE
UNIVERSITY*

## Providing supporting documentation in my defense

Ruth V. Briggs <rbriggs@temple.edu>

To: Deidre Walton <Deirdre.Walton@temple.edu>

Sat, Feb 22, 2014 at 1:25 AM

Deidre,

I am asking you to review the  attached calendars for January and February to defend myself from Drew DiMeo's and Greg Wacker's undocumented and unsubstantiated accusations, for which I received a second serious discipline.  The disciplinary action form listed a generic level B violation for failing to carry out basic functions of my job, which you accepted from Greg Wacker at face value even though he is known throughout the college for being less than honest and fair in his "leadership."  Is it the university's policy to allow persons in positions of power to retaliate and bully the rank and file staff without the opportunity to provide a statement of events and facts?  I have only my experience with disciplinary actions as a frame of reference, for which no one sought a response from me.

I created this calendar to illustrate that there is no intention on my part to interrupt the the regularity of the meetings and a level of hypocrisy that is demonstrated by  adults in positions of leadership who practice an outdated and ineffective management style: "do as I say and not as I do."

There were a number of times that Dr. Wu cancelled or postponed our regularly scheduled meetings (8:45 am on Mondays, Wednesdays and Fridays) with very little notice and  Drew did not attend 2 meetings and was late today. Two scheduled meetings were cancelled because the university closed for snow emergencies, one of which I had to work because Dr. Wu, two speakers from China and his students commuted to campus to work. I don't know if I had the right to refuse but this was the day after I received this disciplinary action and was AFRAID of him.  I do not have a record of the day that I was 5 minutes late but I admit to being tardy.  On one day, I

EEOC 0062



Temple University Mail - Providing supporting documents  in my defense

4/22/14, 9 54 PM

truly overslept and missed the meeting and reported the four hours to our time keeper even though I worked until 9:00 pm that evening. There were two sick days and two previously scheduled personal days. The scheduled personal day I took last Friday was requested so that I could volunteer at the CRC's Surplus Office Supply Swap to help Jonathan's student worker, Emily, to re-configure and organize the shelving in the room and stock the shelves with surplus supplies. That day, I was made aware of a problem with one of our faculty member's case for promotion and tenure and called Dr. Wu after I was finished at the CRC to offer my help and he accepted my offer of last Friday when I worked 4.5 hours without compensation.

I want you to understand how distressing it is when I have no one in the department and no one in human resources who will listen to me. I am honest and operate with integrity in every arena of my life and five days out of the week I d/battered emotionally, insulted, ignore, yelled at in front of peers and the department scapegoat. I am often accused for the mistakes and the misconduct of others. And there is not shortage of misconduct around here. It is the irony of my life to be the "identified patient" in an environment that is beyond hostile. I am appealing to you to assign someone who is fair and unbiased to conduct an investigation for the truth about these two incidences without prejudice in a timely manner.

Ruth

Ruth V. Briggs
Temple University
Department of Computer and Information Science
1805 N Broad Street (038-24)
Wachman Hall, Room 324
Philadelphia, PA 19122
215-204-8659 - Direct line
215-204-8450  Department line



🗐  JanFebCalendar_RuthforHR.pdf
    232K

EEOC 0063

# February 2014

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | | | | *1* |
| *2* | *3* Meeting held all attended | *4* | *5* Temple closed for snow—no meeting | *6* | *7* Meeting held all attended | *8* |
| *9* | | *11* | *12* Meeting held all attended | *13* | [illegible] | *15* |
| *16* | *17* Meeting held all attended | *18* | *19* Meeting held all attended | *20* | *21* Meeting held Judy out Drew 5-10 minutes late, arrived after I was asked to make coffee | *22* |
| *23* | *24* | *25* | *26* | *27* | *28* | |

EEOC 0064

# January 2014

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
|  |  |  | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 Meeting held all attended | 9 | 10 | 11 |
| 12 | 13 Meeting held all attended | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 on the Temple | 21 | 22 Temple closed for mens Ruth worked at Jie Walls request | 23 | 24 Meeting held all attended | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 Meeting held all attended | |

EEOC 0065



**From:**      Ruth V. Briggs <rbriggs@temple.edu>
**Sent:**      Tuesday, February 25, 2014 10 51 PM
**To:**        Sandra A. Foehl
**Subject:**   I want to schedule an appointment to file a complaint

Dear Sandy,

I have tried desperately to make my work situation tolerable, while my family and friends say that I need to take a pro-active defense against my supervisor and two managers in the Dean's Office. But I have reached my breaking point and need to be concerned with repairing my professional reputation. On numerous occasions, I have spoken to Deidre Walton who has not been helpful or timely at all. I plan to file an EEOC complaint internally and have already had a phone intake with the EEOC.

Please let me know when we can meet.

Thank you, Ruth

*Ruth V. Briggs*
*Temple University*

*Department of Computer and Information Science*
*1805 N Broad Street (038-24)*

*Wachman Hall, Room 324*
*Philadelphia, PA 19122*
*215-204-8659 - Direct line*
*215-204-8450   Department line*

1

TEMPLE0324

Temple University Mail – Re: My recent disciplinary action





TEMPLE
UNIVERSITY®

Ruth Briggs <rbriggs@temple.edu>

## Re: My recent disciplinary action
1 message

Deirdre L Culbreath-Walton <DLWalton@temple.edu>                    Fri, Mar 14, 2014 at 10:40 AM
To: "Ruth V. Briggs" <rbriggs@temple.edu>

Hi Ruth

Thanks for getting back to me. I had a meeting at 9:00 and I am available now. If you are tied up I understand. I hoped we could talk with Drew and clarify some of your concerns. Please reply back to me if you have availability this morning.

Thanks

Deirdre

Sent from my iPhone

On Mar 13, 2014, at 9.39 PM, "Ruth V. Briggs" <rbriggs@temple.edu> wrote:

> Dear Deidre,
>
> We have a visitor tomorrow to speak in our "Distinguished Lecture Series." The event begins at 11:00 am, for which I need to start setting up around 10:00 am in Barton Hall. I can meet sometime between 9 to 10. If that is acceptable to you, please let me know.
>
> Ruth
>
> *Ruth V. Briggs*
> *Temple University*
> *Department of Computer and Information Science*
> *1805 N Broad Street (038-24)*
> *Wachman Hall, Room 324*
> *Philadelphia, PA 19122*
> *215-204-8659 - Direct line*
> *215-204-8450   Department line*
>
>
> On Thu, Mar 13, 2014 at 5 49 PM, Deirdre L Culbreath-Walton <DLWalton@temple.edu> wrote
>
>> Hi Ruth
>>
>>
>> . . . . . . . . . . . . . . . . . . . . . . . . . I have a meeting on main campus at 9:00 if you
>> . . . . . . . . . . . . . . . . . .

BRIGGS 74

Temple University Mail - Re: My recent disciplinary action                                          6/20/14 1:31 PM

Thanks

Deirdre

From: Ruth V. Briggs [mailto:rbriggs@temple.edu]
Sent: Thursday, March 13, 2014 1:38 AM
To: Deidre Walton
Subject: My recent disciplinary action

Hi Deidre,

When we last spoke, I challenged Greg Wacker's assertion that I failed to notify the department that I had overslept and would be in within the hour. I would think that you would take Greg's false allegation as a serious violation of employee conduct enough to look into the matter in a timely fashion. Clearly, issues of "fairness" are of no concern to you but I am hopeful that the falsification of employee records is an issue of concern to you.

I want to settle this matter internally with the HR department regarding my request to rescind this discipline simply because Greg Wacker lied in his statement to you about me. But this is contingent upon your good faith effort to investigate this issue. I have been disciplined twice in the 14 years I have been at Temple, for which I was not given the opportunity to defend myself against half-truths and bold faced lies. It appears as staff members in managerial positions are free to practice authoritarian leadership over inferiors because they are not accountable to the Rules of Conduct. "Do as I say and not as I do" is a poor style of management that depletes employee morale. I know that my productivity is affected, which I attribute to feeling a total lack of control because my livelihood and integrity feel scrutinized and diminished.

Please show me the same respect that you give to the person who has had a grudge against me for many years. In the eyes of the law, this could be viewed as unfair labor practices and discrimination, both of which violate federal and state laws.

I always have wait for you to get back to me because it is not your priority. Two weeks ago, I sent Sandy Foehl an email, in which I requested her help. She, too, is ignoring me. I am saddened, angry and worried because I cannot get help internally. Is it necessary to file a legal complaint to remedy this situation? I think that you, Greg Wacker, Drew DiMeo and Jie Wu have no regard for my service to the university, our students, faculty, staff and external constituents and subscribe to the double standard. I

BRIGGS 75

hope that this is not the case but it is difficult to assess in a vacuum.

Respectfully, Ruth


*Ruth V. Briggs*

*Temple University*

*Department of Computer and Information Science*

*1805 N Broad Street (038-24)*

*Wachman Hall, Room 324*

*Philadelphia, PA 19122*

*215-204-8659 - Direct line*
*215-204-8450   Department line*

BRIGGS 76

dacraig



# dacraig

147965156_1.PDF

07/27/17   05:02 PM

Xerox® WorkCentre® 7970



Temple University Mail - Re: URCENT: PLEASE CONTACT ME ON MONDAY



Ruth V. Briggs <rbriggs@temple.edu>

---

## Re: URGENT: PLEASE CONTACT ME ON MONDAY

1 message

---

**Deirdre L Culbreath-Walton** <DLWalton@temple.edu>
To: "Ruth V. Briggs" <rbriggs@temple.edu>

Tue, Mar 25, 2014 at 9.39 AM

Good Morning Ruth

Every time you have reached out to me I have talked with you and looked into your complaints and concerns. I will agree, not always timely for you because of other responsibilities and scheduled obligations. I did not ask you to lie about being discipline but offered you the ability to bid out by letting the Generalist know to not reject your application because of the discipline.

You told me that you reached out to Sandra Foehl for help and did not hear from her. I talked with Sandra and she replied to you and offered her services to you several weeks ago and you have not replied back to her.

I did not contact Greg or Drew but they did call me concerning your Friday meeting and Dr.Wu expense report. Greg and Drew gave me the facts of the situation.

If you would like to discuss further or dispute any of my facts please contact me at 7-2296.

Sincerely

Deirdre

Sent from my iPhone

On Mar 25, 2014, at 9.15 AM, "Ruth V. Briggs" <rbriggs@temple.edu> wrote:

Deidre,

I do not know how to respond to this email. I am drowning here and have reached out to you numerous times and waited and waited. This is affecting the quality of my work life and my person life. All I want is to continue to work without being harassed. Based on the content of your email, I assume that you contacted Drew, Greg and Dr. Wu when I asked that you refrain from doing so because I know that the harassment will escalate without the protection of human resources.

The story that you are telling me about my discipline is the third story I have been told. Drew said that I did not call in and you believe him. I have not idea what Greg said other than what Drew told me and he wanted me fired and you told me that I had not called in or followed procedures. We have no written procedures and I did call in and rushed to work rather than said another 5 minutes to start my computer to send an email stating the same thing I told Taylor.

I was held to a unequal standard and I am suffering the consequences because I cannot bid out on another job. I was told by you to that I could bid on a job without stating that I have been disciplined and I will not lie on an application.

BRIGGS 79

6/20/14 1 48 PM

I will not retract the comments I made because I believe the to be true. Faculty and staff members tell me frequently that they feel bad about the matter with which I am treated and diminished in public.

I have nothing more to say.

Ruth

Ruth V. Briggs
Temple University
Department of Computer and Information Science
1805 N Broad Street (038-24)
Wachman Hall, Room 324
Philadelphia, PA 19122
215-204-8659 · Direct line
215-204-8450    Department line

On Mon, Mar 24, 2014 at 5:30 PM, Deirdre L Culbreath-Walton <DLWalton@temple.edu> wrote:

> Hi Ruth
>
> You have made some serious accusations against Dr. Wu, Drew and Greg. You are accusing them of fabricating records and information and lying to make you look bad.  I am going to address your issues in the order you have laid them out.  Your meeting with Dr. Wu and Drew are in Dr. Wu's office and they are not in public places.  Because you and Dr. Wu have had problems communicating in the past and you do not have the best work relationship, Drew does attend these meetings to assist both you and Dr. Wu.  Drew does not attend to take sides but mediate the conversation between you and Dr. Wu
>
> The disciplined that you received was because you were late and did not come into the office until mid-day.  No notification was received from you until mid-day and you talked with a student, not your supervisor, Dr. Wu nor any other Administrator or Regular employee.  You also did not send an email to Dr. Wu to notify him of your lateness once you knew he was not available by phone. Because you did not follow proper call out procedures Dr. Wu asked for you to be disciplined.  This discipline is not a false report unless any of the facts I stated above are incorrect.
>
> Regarding the expense report in CONCUR and the update of the FOPAL, Account Payable has confirmed that Dr. Wu's FOAPAL in question was added to concur Monday , March 17, 2014 in the nightly update and was available for you to use. You are accusing Drew of lying about doing his job when Account Payable has confirmed that he updated the FOPAL

BRIGGS 80

Lastly, you are Dr. Wu's Assistant and you get paid for handling his things. If you are not happy with your responsibilities then we may need to review exactly what you do every day and make changes. Ultimately, this may not be a good fit for you and you may need to explore work option that are more satisfying to you.

If the facts as I have stated here are incorrect please let me know and I will look into your concerns further. Also if you would like help identifying other positions please give me a call or reply to my email.

Deirdre

From: Ruth V. Briggs [mailto:rbriggs@temple.edu]
Sent: Sunday, March 23, 2014 11:35 PM
To: Deidre Walton
Subject: URGENT: PLEASE CONTACT ME ON MONDAY

CONFIDENTIAL COMMUNICATION.  DO NOT SHARE WITH GREG WACKER, DREW DI MEO NOR JIE WU

Dear Daidre,

My work situation with Drew DiMeo and Dr. Wu is escalating and I need your help. This issue is not just something that affects my work week, but is causing anxiety and depression throughout my weekends. To mask this from my grown children and grandchildren, I report that I have the flu so that they stay away.

I am actually afraid to go to work, especially Mondays, Wednesdays and Fridays, when I meet with Drew and Dr. Wu.   Before I go to sleep and as soon as I wake, the anxiety I experience is palpable and impacting the quality of my personal life. As the only staff member required to meet with Dr. Wu and Drew, I would think that my "superiors"

BRIGGS 81

6/20/14 1.45 PM

would behave as professionals by respecting my privacy. In fact, the meetings occur within the earshot of my co-workers and visitors (students, external constituents, faculty). The fact that I am singled out and verbally assaulted in an open public area has been the "gristmill" for gossip and rumors, which have been reported back to me from employees in other departments. Dr. Wu said that Drew is there for protection and as a witness but I have no protection and feel like an abuse victim. GREG WACKER HAS NEVER BEEN PRESENT FOR ONE MEETING but still recommended termination for me, for what was reported to me by Drew when he gave me the discipline form for "lateness." The first time I reached out to HR, I learned that I was disciplined for using tardiness for intentionally avoiding these meetings. The next time we spoke, you told me that it was because I failed to report that I would be late. The truth is that I overslept, called the office and reported this to Taylor Lentz, who told Dr. Wu but chose to follow through with the discipline when he knew that I had called. Apparently, they are immune to discipline for what I find intolerable, filing a falsified discipline report against me. Apparently, the word of three bullies carries more weight than the truth.

I talked to Taylor Lentz, the student worker who you were going to call to confirm that I called the morning I overslept last week to ask if you had her after spring break. When she inquired why you needed to talk to her, I told her that you wanted to confirm that I called to report the morning I overslept. She said that she did not know where Judy Lennon had gone (she disappears on a daily basis and gives no explanation) so she personally went into Dr. Wu's office and told him that I had called, overslept and was on my way in. This means that he endorsed the disciplinary actions against me even after he had been given my message. I hope you can understand why it feels like there is a concerted effort to get rid of me.

There was another incident on Friday when Drew made an accusation that I had provided evidence for my defense that was manufactured afterward rather than admit the truth. Knowing that Drew had lied about the day I overslept and suffered no consequences for lying did not contribute to my confidence in defending my integrity when I was in the presence of two bullies. I offered to log into the travel reimbursement system, Concur, because Drew suggested that I had manufactured the screen shot I produced from the night before. I only wanted to defend myself against another lie. When I saw the cost centers that were missing the day before on the screen, I was in a state of disbelief because I knew that Drew chose to cast doubt on my character rather than admitting that he had not added Dr. Wu's new grant numbers as Dr. Wu requested last week. I did not leave the office until after 9:00, using the tutorials in Concur, so that I could allocate travel expenses to the grant for Dr. Wu. My access level was limited and I could only request access to the new grant FOAPALs, so my screenshot listed the new grant numbers as "Access pending." If the numbers were pending at 9:00 the night before and were available the following morning, they were added after the screen shot taken.

I do not want to spend anymore personal time about job related matters on my personal time, but I want to discuss changes made to my job description and responsibilities that have been given to Haley King, Jackie Harriz's replacement. My essential functions have been diminished to elementary clerical functions. I am performing entry level data entry tasks, while one student worker and Haley King are performing the functions of my job description. The essential functions that were performed by our former business

BRIGGS 82

manager, Alex Grinshpun and were taken over by Drew are assigned to me with more and more frequency.  Performing accounting functions are not in my area of expertise and not an essential function for my position.  I am a team player but I object to performing the department secretary's job, or being summoned from the 10th floor to the 3rd floor to make coffee and bring cookies to Dr. Wu and his guests when Judy and a student worker are available in the front office.  It appears to be another strategy to diminish me, discount my experience and talents in an effort to get my resignation or termination.

You can reach me on my cell phone (484-557-6234) or work land line (215-204-8659).

*Ruth V. Briggs*

*Temple University*

*Department of Computer and Information Science*

*1805 N Broad Street (038-24)*

*Wachman Hall, Room 324*

*Philadelphia, PA 19122*

*215-204-8659 - Direct line*
*215-204-8450   Department line*

BRIGGS 83