# EXHIBIT C

**In The Matter Of:**
*RUTH V. BRIGGS v.*
*TEMPLE UNIVERSITY*

*JIE WU*
*May 31, 2017*

*Terry Burke Reporting*
*Registered Professional Reporters*
*terryburkermr@gmail.com*
*(215) 205-9079*

Min-U-Script® with Word Index

**JIE WU**                                              1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                 -       -       -

 4   RUTH V. BRIGGS,                :
                                    :
 5            Plaintiff,            :
                                    :   Civil Action
 6   v.                             :   No. 16-00248
                                    :
 7   TEMPLE UNIVERSITY,             :
                                    :
 8            Defendant.            :

 9                 -       -       -

10            Philadelphia, Pennsylvania
              Wednesday, May 31, 2017
11                 -       -       -

12

13            Deposition of JIE WU, taken pursuant

14   to notice, held at Console Mattiacci Law, LLC,

15   1525 Locust Street, Ninth Floor, Philadelphia,

16   Pennsylvania, beginning at 10:00 a.m., on

17   Wednesday, May 31, 2017, before Terry Barbano

18   Burke, RMR-CRR.

19

20

21

22            TERRY BURKE REPORTING
                 (215) 205-9079
23            terryburkermr@gmail.com

24
```

**TERRY BURKE REPORTING**

**JIE WU**                                            2

```
 1    APPEARANCES:

 2          RAHUL MUNSHI, ESQUIRE
            Console Mattiacci Law, LLC
 3            1525 Locust Street, Ninth Floor
              Philadelphia Pennsylvania 19102
 4
                 Counsel for the Plaintiff
 5
            RACHEL FENDELL SATINSKY, ESQUIRE
 6          Littler Mendelson, P.C.
              Three Parkway
 7            1601 Cherry Street, Suite 1400
              Philadelphia, Pennsylvania 19102
 8
                 Counsel for the Defendant
 9

10                    -      -      -

11                    JIE WU,

12        SERC Center, 035-10, 1925 North 12th

13        Street, Room 362, Philadelphia,

14        Pennsylvania, having been duly sworn, was

15        examined and testified as follows:

16   BY MR. MUNSHI:

17        Q.  Good morning, Dr. Wu.

18        A.  Good morning.  How are you?

19        Q.  My name is Rahul Munshi.  I am an

20   attorney here at Console Mattiacci Law, and I

21   have the privilege of representing Ruth Briggs

22   in this action that has been brought against

23   Temple.

24              You are here for your deposition.
```

**TERRY BURKE REPORTING**

1   Temple?

2        A.   I'm a professor computer science --

3   computer and information sciences, and also I'm

4   a center director.  The center name is called

5   Center for Networked Computing.

6                  And also I have a side job as

7   associate vice provost for international

8   affairs.

9        Q.   And that is at Temple University as

10  well?

11       A.   Yes, that's at Temple University.

12       Q.   Are you the chair of any department

13  currently?

14       A.   Not.  I resigned last year.

15       Q.   What were you the chair of?

16       A.   Chair of department of computer and

17  information sciences.

18       Q.   And you resigned from that position in

19  the year 2016?

20       A.   Yes.

21       Q.   Why did you resign?

22       A.   It's like my term ends, two terms.  I

23  extended one year.

24       Q.   Your term ended, is that what you said?

**TERRY BURKE REPORTING**

```
 1       A.   And at Temple, there is a Confucius
 2   Institute in the university.  So there are two
 3   directors.  Both directors report to me.
 4       Q.   Anybody else report to you directly
 5   right now?
 6       A.   No.
 7       Q.   In the year 2014, 2013/2014 period, were
 8   you the chairman of the department back then?
 9       A.   Yes.
10       Q.   And you were also a professor back then;
11   correct?
12       A.   Yes.
13       Q.   And back in the years 2013/2014, can you
14   estimate for me the number of people who
15   reported directly to you?
16       A.   It's about 50.
17       Q.   Five zero?
18       A.   Yes, five zero.
19       Q.   What is your date of birth, Dr. Wu?
20       A.   July 5th, '61.
21       Q.   Where were you born?
22       A.   Shanghai, China.
23       Q.   When did you move to the United States?
24       A.   January 16, 1987.
```

1           MS. SATINSKY:  Objection to form.

2    You can answer the question.

3           THE WITNESS:  Yes, yes.

4    BY MR. MUNSHI:

5      Q.  Did you ever have a discussion with Ruth

6    Briggs about China's retirement law?

7      A.  We never discussed from the law

8    perspective.  But we discuss after my travel, I

9    usually always have discussion with Ruth, share

10   my experience of my travel.  So I think at one

11   point we discussed about it.  But nothing for

12   retirement.  Just say womens retire early.

13     Q.  What do you recall about those

14   conversations you had with Ruth Briggs?

15     A.  When?

16     Q.  What do you recall about it?

17     A.  Oh, just it's kind of very casual

18   conversation.  We just shared experience of

19   culture.  I just mentioned that, you know, women

20   retire early.

21     Q.  Did you tell her that in China it is

22   actually the age 55 for some women?

23     A.  No, no, no.

24     Q.  So you just said women retire early, but

```
 1   you didn't say what age?
 2       A.  Yes, actually I mentioned --
 3               MS. SATINSKY:  Just wait until he is
 4   finished asking the question.
 5               THE WITNESS:  Sorry.
 6               MS. SATINSKY:  That is okay.  It
 7   will come out cleaner for the transcript.
 8   BY MR. MUNSHI:
 9       Q.  Did you say anything about the age,
10   specific number of age, or did you just say
11   early?
12       A.  I don't remember exactly, but I do
13   mention cases women retire very early, including
14   my sister.
15       Q.  When you said "very early," what were
16   you referring to?
17       A.  Early could be 40, 50, women last job.
18       Q.  Do you remember when you had this
19   conversation with Ruth Briggs?
20       A.  It's awhile ago.  Maybe five years, six
21   years ago.
22       Q.  And was this one conversation or did you
23   have multiple conversations with her regarding
24   the culture in China?
```

JIE WU                                    14

```
 1       A.   I just remember once.
 2       Q.   Do you remember where this conversation
 3  took place?
 4       A.   In my office.
 5       Q.   And what prompted this conversation?
 6  Did she ask you about the culture in China or
 7  did you just offer it yourself?
 8       A.   No.   I don't remember the content, but
 9  we discussed many things.
10       Q.   And we are just talking right now about
11  this concept that over in China --
12       A.   Yeah.
13       Q.   -- there is this mandatory law; right?
14       A.   No, no, I never discussed mandatory law.
15  I just said women retired early and there are
16  many cases, certain job -- for certain
17  discipline, they required young women.   Like in
18  the restaurant.   More labor.
19       Q.   And now we are talking about China;
20  right?
21       A.   Yes, China.
22       Q.   And is it your understanding that this
23  is a cultural characteristic of China?
24       A.   No, not really, because Chinese, after
```

JIE WU                                    18

```
 1 │ Ruth.  Okay?
 2 │     A.  Yeah.
 3 │     Q.  Did you have an understanding when you
 4 │ had this conversation with Ruth that she was in
 5 │ her 50s?
 6 │             MS. SATINSKY:  Objection.  Asked and
 7 │ answered.  You can answer the question.
 8 │             THE WITNESS:  Yeah, I think so,
 9 │ because she and I probably similar age.
10 │ BY MR. MUNSHI:
11 │     Q.  Did you ever say to her words to the
12 │ effect of most women in China do retire at the
13 │ age of 55?
14 │             MS. SATINSKY:  Objection.  Asked and
15 │ answered.
16 │             You can answer the question.
17 │             THE WITNESS:  I don't think so.  I
18 │ don't put a number, like 55.  But even we have
19 │ these conversations, nothing to do with
20 │ retirement.  Just discussed the culture things.
21 │ BY MR. MUNSHI:
22 │     Q.  When you say it had nothing to do with
23 │ retirement, what do you mean by that?
24 │     A.  Because we have a long conversation,
```

JIE WU                                    19

1    like a one-hour conversation, so we talk about

2    different culture, the habit of eating, the

3    habit of working.  So this is just like a very

4    small piece of conversation.

5        Q.  And do you make it known at your job at

6    Temple that you are from China?

7        A.  Oh, everyone knows by looking.

8        Q.  Everyone knows that you are from China?

9        A.  Yes.

10       Q.  Did you ever say, Dr. Wu, words to the

11   effect that women in China are put out to

12   pasture at age 55?

13       A.  No, I never say that word.  I don't even

14   know that word.

15       Q.  Which word?

16       A.  The word you just said.

17       Q.  Pasture?

18       A.  Pasture, yeah.

19       Q.  Never heard that word before in your

20   life?

21       A.  No.

22            MR. MUNSHI:  Let's have this

23   document marked as P-3.

24            (P-3 was marked for identification.)

**TERRY BURKE REPORTING**

JIE WU                                    37

```
1       Q.   With whom did you discuss this specific
2    discipline in the dean's office?
3       A.   Usually Greg and Drew.
4       Q.   I just want to be super specific here,
5    so I don't want to talk about what usually
6    happens or what typically happens or what
7    generally happens.  Just looking specifically at
8    this disciplinary report that is P-6.
9       A.   Uh-huh.
10      Q.   Do you recall speaking with anybody in
11   the dean's office prior to issuing this
12   discipline to Ruth Briggs?
13      A.   I would say yes, because for any
14   unwritten disciplinary things, I consult with
15   the dean's office.  They help me to identify or
16   suggest the level of violation.
17      Q.   Do you recall having any conversation
18   with Greg Wacker prior to issuing this
19   discipline that is P-6 regarding this
20   discipline?
21      A.   I don't remember exact procedure, but I
22   always consult with dean's office.
23      Q.   Again, my question is just going to be
24   your specific knowledge.  If you don't know, you
```

JIE WU                                    40

```
1              THE WITNESS:  I don't recall who.
2    But I would say Greg and Drew together.
3    BY MR. MUNSHI:
4        Q.  Who was the first person to raise the
5    issue of potentially giving Ruth Briggs a
6    discipline at this time?
7        A.  Again, I don't recall who's the person
8    who initiate this, but it's just a sequence of
9    this misconduct.  Then I contact the dean's
10   office.  Then they suggest that we can do --
11   first verbal and then written.
12       Q.  Verbal what?
13       A.  Verbal to inform Ruth.  Because we have
14   a weekly meeting.
15       Q.  Verbal to inform Ruth about the
16   discipline?
17       A.  Yeah.
18       Q.  Or about what?
19       A.  About whatever the misconduct or her
20   performance.
21       Q.  What verbal conversations did you have
22   with Ruth regarding this discipline prior to
23   giving it to her, if any?
24       A.  Again, I don't remember the exact
```

**TERRY BURKE REPORTING**

JIE WU                                    67

1       A.   Again, I talked to several people in HR.

2  I think she's one of them.

3       Q.   Do you recall the names of anybody else

4  in human resources who you spoke with about Ruth

5  Briggs?

6       A.   Either Deidre or Sharon, yeah.

7       Q.   Sharon Boyle?

8       A.   Yes.

9       Q.   Anybody else besides Deidre and Sharon

10  Boyle who you recall speaking with in human

11  resources about Ruth Briggs prior to her

12  termination?

13      A.   I don't recall.  I only remember these

14  two names.

15      Q.   Did Deidre Walton ever tell you that

16  Ruth Briggs had conversations with her about

17  you?

18      A.   She didn't tell me.

19      Q.   Did Sharon Boyle ever tell you that

20  Miss Briggs had conversations with her about

21  you?

22      A.   No, she didn't.

23      Q.   Did you ever learn from Greg Wacker that

24  Miss Briggs had gone to human resources or the

**TERRY BURKE REPORTING**

```
 1   EEO office or legal about you?
 2              MS. SATINSKY:  Prior to the end of
 3   her employment at Temple?
 4              MR. MUNSHI:  Correct.
 5              THE WITNESS:  No, I did not know.
 6   BY MR. MUNSHI:
 7      Q.  Did you ever learn from Drew DiMeo that
 8   Ruth Briggs had gone to human resources, EEO or
 9   legal prior to her termination about you?
10              MS. SATINSKY:  Objection to form.
11   You can answer.
12              THE WITNESS:  He did not.
13   BY MR. MUNSHI:
14      Q.  Prior to joining Temple, you had worked
15   at a different university; right?
16      A.  Yes.
17      Q.  Would you say that you have been
18   managing employees in one capacity or another
19   for over 20 years?
20      A.  Employee sounds like research associate,
21   TA's in some programs, and at the National
22   Science Foundation I managed the whole program.
23      Q.  And in the year 2014, within your prior
24   capacity as the chair, you were managing around
```

**TERRY BURKE REPORTING**

JIE WU                              74

1    faculty or from staff.

2        Q.  Do you think that would be something you

3    would remember if Ruth Briggs did in fact

4    complain to you?

5        A.  Oh, yeah, yeah.  Because I feel very

6    proud after working seven years no one made any

7    complaint to me.

8        Q.  Did Ruth Briggs ever complain to you

9    that she felt like you were treating her

10   differently than other staff members?

11       A.  She never directly complained to me.

12            MR. MUNSHI:  Let's have this

13   document marked as P-9, please.

14            (P-9 was marked for identification.)

15   BY MR. MUNSHI:

16       Q.  Dr. Wu, in front of you is a document

17   that has been marked as P-9.  Please take time

18   to read it.

19       A.  (Pause.)

20            Okay.

21       Q.  On the first page of P-9, there is an

22   e-mail from Ruth Briggs to you dated

23   November 9th, 2010.

24            Do you see that?

**TERRY BURKE REPORTING**

JIE WU                                78

1    Dr. Kwanty about Ruth Briggs' e-mail to you that

2    she writes in here in P-9 about her treatment in

3    the workplace?

4            MS. SATINSKY:  Objection to form.

5            THE WITNESS:  Again, I don't recall.

6    BY MR. MUNSHI:

7        Q.  How about Justin Shi?

8        A.  I don't recall.

9        Q.  How did it make you feel to receive an

10   e-mail from Ruth Briggs where she talks to you

11   about fairness and treatment and equal applying

12   standards applied for staff members?

13       A.  I feel that I gave her simple work.  She

14   didn't complete it.  And she not giving the

15   truth that she complete it.  She told me that

16   she complete it, but never sent the result back

17   to me.  Then she complain all this problem with

18   computer.  That's her practice always, the

19   tactic.

20            Instead of admitting the errors or

21   problems, she comes up with all kinds of

22   excuses.

23       Q.  And did you consider her e-mail to you

24   in November of 2010 explaining an excuse?

**TERRY BURKE REPORTING**

1      A.   Yes.   I just feel that it's her opinion
2   about the fairness and the standard.
3      Q.   Was that upsetting to you to have a
4   staff member for the first time raising an issue
5   with you about fairness in the workplace?
6      A.   No, it's not upsetting.   I'm not really
7   upsetting about her as a person.   Just upsetting
8   her performance.
9      Q.   So the fact that she wrote this e-mail
10  to you, her manager, about how she feels she is
11  being treated, that didn't upset you?
12     A.   Again, she upset me on many other
13  things.   I don't recall this stand out.
14     Q.   Were you surprised to get an e-mail from
15  her where she talks about her treatment in the
16  workplace?
17           MS. SATINSKY:   Objection to form.
18           THE WITNESS:   Obviously there was
19  some surprise, but not to the extent that I
20  report to HR.
21  BY MR. MUNSHI:
22     Q.   Did you think that she had any basis to
23  complain to you about how the standards are
24  being applied to her?

JIE WU                                    110

```
 1        Q.   Did anybody from HR or the EEO office or

 2   anybody at Temple ever ask you if you were

 3   treating Ruth the same way as other people prior

 4   to her termination?

 5              MS. SATINSKY:   Objection to form.

 6   You can answer.

 7              THE WITNESS:   Again, no one

 8   questioned the way I treat Ruth.   I treat

 9   everyone just the same.

10   BY MR. MUNSHI:

11        Q.   And did anybody at Temple ever inform

12   you that they were looking into concerns that

13   Ruth raised about you?

14              MS. SATINSKY:   Objection to form.

15   Prior to the end of her employment?

16   BY MR. MUNSHI:

17        Q.   Prior to the end of her termination?

18        A.   No.   Actually, I never know that Ruth is

19   complaining about me.

20        Q.   At any point did you learn that Ruth

21   Briggs was submitting job applications

22   internally at Temple?

23        A.   This I know.   I think she tried many

24   places, but was not successful.
```

**TERRY BURKE REPORTING**

JIE WU                                          112

```
 1        Q.  Do you have any understanding as to why
 2   she wanted to transfer away from you?
 3                  MS. SATINSKY:  Objection to form.
 4                  THE WITNESS:  Oh, it's clear because
 5   she understand that she's not suitable for her
 6   job as the executive assistant.
 7   BY MR. MUNSHI:
 8        Q.  Do you know what her job was before she
 9   started reporting to you?
10        A.  Yes.
11        Q.  What was that?
12        A.  She's executive assistant to dean.
13        Q.  So she had the same job title before you
14   were even --
15        A.  Oh, yes, yes.
16        Q.  And when she was the executive assistant
17   to the dean, are you aware of any conversations
18   about potentially firing her for bad
19   performance?
20        A.  I do not know.  Actually, when I joined
21   Temple I was very happy that Ruth can work with
22   me because she's very friendly when I interview.
23   She's the one like meet and greet me.  So I feel
24   very happy that she can work with me.
```

**TERRY BURKE REPORTING**

JIE WU                                                    113

```
 1        Q.  Did that change at some point that you
 2   no longer felt happy working with her?
 3        A.  Oh, yeah, once you start working with
 4   her, you know her performance.
 5        Q.  At what point did you reach that
 6   conclusion?
 7        A.  Oh, very early.  Because she some time
 8   make a decision by her own without informing me.
 9   Like her office, she make a huge office.
10        Q.  What do you mean by that?
11        A.  You know, her office like a cubicle.  So
12   she just decide to up the size of her office
13   just the first few days of her work.
14        Q.  When did you first think about firing
15   her?
16               MS. SATINSKY:  Objection to form.
17               THE WITNESS:  I don't recall.  But
18   this is after at least a year with all the
19   struggles.
20   BY MR. MUNSHI:
21        Q.  When was the first time, if ever, you
22   have a discussion with somebody about firing
23   her?
24               MS. SATINSKY:  Objection to form.
```

JIE WU                    117

1    earlier, I don't want to know usually or

2    generally or typically.

3        A.  Yeah, I'm pretty sure it was Greg.

4        Q.  Do you have a specific recollection of

5    talking with Greg about issuing Ruth Briggs this

6    discipline?

7        A.  Yes, because this is everyone in the

8    department knows this incident.

9        Q.  What do you recall discussing with Greg

10   prior to issuing this discipline?

11       A.  I don't recall.  I just report the fact.

12   Then we have a long discussion.  Then we come up

13   the level of disciplinary.

14       Q.  Do you recall having conversations with

15   anybody else besides Greg about issuing this

16   discipline to Ruth Briggs?

17       A.  Oh, yes, I always discuss with two

18   associate chair.

19       Q.  And again, I just want to caution you

20   that I am not talking about usually or always.

21       A.  No, definitely I talked to both

22   associate chairs.

23       Q.  What do you recall discussing with

24   Justin Shi about issuing this discipline?

**TERRY BURKE REPORTING**

JIE WU                                   118

1          A.   I don't recall the exact conversation.

2    Because the whole department is waiting for the

3    candidate to come to conduct interview.  We set

4    up itinerary, then the same day find out the

5    ticket never issue.

6          Q.   Whose decision was it to give her a

7    three-day suspension instead of a written

8    warning or any other form of discipline?

9          A.   Again, it's a collective decision.

10         Q.   And collective in this instance of who?

11   Not usually in this instance.  Collectively

12   means who?

13         A.   It means me and Greg, maybe Drew.

14         Q.   And Drew, you said?

15         A.   Yeah, and Drew.  Drew's always in the

16   loop.

17         Q.   Do you recall any conversations with

18   Drew DiMeo about issuing Ruth Briggs this

19   specific discipline?

20         A.   I don't recall.

21         Q.   Whose decision was it to classify this

22   as a Level C discipline?

23         A.   I'm not expert in terms of deciding the

24   level.  I always consult with the dean's office.

JIE WU                          130

1   discipline or written warning to Judy Lennon?

2       A.  I don't recall.  It could be one, but

3   maybe not.  I issued many times verbal warning.

4   I never issued written warning without a verbal

5   warning first.

6       Q.  And Hailey King, did you ever give her a

7   written warning about --

8       A.  No.  But I have a very serious verbal

9   warning with her.  That's during the hurricanes.

10      Q.  Was the very serious --

11              MS. SATINSKY:  I don't think he was

12  finished.

13              THE WITNESS:  During the hurricane.

14  BY MR. MUNSHI:

15      Q.  During the hurricane?

16      A.  Yes.  She was absent for a couple days.

17      Q.  This very serious verbal warning that

18  you gave to Hailey King, is there any note about

19  it?

20      A.  No.

21      Q.  Did you inform anybody in writing?

22      A.  No.  It's not in writing, but many

23  people knows.  Justin Shi knows.

24      Q.  And what was the issue with Hailey King?

JIE WU                                        131

```
1        A.  Oh, she just disappear.  Not disappear.
2    But out of reach, maybe out of power for a
3    couple days and no one knows where she is, she
4    was.  So when she come back, then we have
5    serious conversation with her.
6        Q.  So there were a couple of days where she
7    didn't show up to work?
8        A.  No.
9        Q.  And there were a couple of days where
10   she didn't inform you about whatever her
11   situation was?
12       A.  Yeah, yeah.  But that's during the
13   hurricane.
14       Q.  And during that hurricane for a couple
15   of days she didn't e-mail you?
16       A.  She didn't e-mail me.
17       Q.  And during that hurricane for a couple
18   of days she didn't call you; right?
19       A.  She didn't call me.
20       Q.  She didn't call anybody in the office;
21   right?
22       A.  Yeah, probably not.  That's why we have
23   serious conversation.
24       Q.  But nothing written down?
```

**TERRY BURKE REPORTING**

Message

| | |
|---|---|
| From: | jiewu13@gmail.com [jiewu13@gmail.com] |
| Sent: | 11/9/2010 7:30:09 AM |
| To: | Ruth V. Briggs [rbriggs@temple.edu]; JIE WU [jiewu@temple.edu] |
| CC: | Alexandra Grinshpun [alexg@temple.edu] |
| Subject: | Re: Issues related to proofread |

Ruth, for Li's paper (assigned last Fri) please send me your proof (acrobat) on Thursday after you complete the proof of CIS booklet on Wed. Please note that the submission deadline is Fri. I really need it by Thur. Thanks again for your help.
Jie Wu

Sent via BlackBerry from T-Mobile

From: "Ruth V. Briggs" <rbriggs@temple.edu>
Date: Tue, 9 Nov 2010 05:17:29 -0500
To: JIE WU<jiewu@temple.edu>
Cc: Alexandra Grinshpun<alexg@temple.edu>
Subject: Re: Issues related to proofread

Dr. Wu,

Please note that it is nearly 4:30 am. Attached you will find three versions of the responses to the reviewers' questions. While I am certain that you will you will believe me to be incompetent, both of the publisher proofs on which I worked diligently throughout the evening and night were in pdf format. I used acrobat professional for my edits. I encountered not problems with the reviewer's document. The first save I attempted on Li's proof, I got an error message, so I tried to print it so that I would not lose my work. I got a similar error message with a different code. Pulled out all the tricks I could remember and when I was so filled with anxiety that I could not breath, the application crashed, then the computer crashed. Rebooted to find two documents (proofs) with none of my comments. I did a "save as" for the reviewer's doc earlier, but it was too much on a night when I was exhausted from a stressful week of work in one day and one more admonishing email from you to expect a disciplinary action upon your return. It is really difficult be in battle. While I have no defense against anything that comes my way, it would be nice to have fairness in treatment and equal applying standards applied for staff members.

So I will wait for my disciplinary action. Because it doesn't matter that I am the only one who will stay here for you past work hours or work on the weekends for you... When something goes wrong in this department, it makes sense to blame it on someone who is working because the if you are not working, mistakes are less likely to happen. I have heard that other department staff and faculty use my name in vain also.

Let me know if you want me to do hand written comments on Li's proof and see is I can find a scanned to send to you.

Have a great trip.

On Mon, Nov 8, 2010 at 11:35 PM, JIE WU <jiewu@temple.edu> wrote:



Confidential

TEMPLE UNIVERSITY (R. BRIGGS) - 0000411

Ruth,

I would like to put this in our record that you never gave me back the paper proof given to you last Friday. I was told today that you have done that, but left at home. So far, I have not received anything from you nor with
the 6 page proofread of another document that I gave you today.

I want to make sure that all these should not be any reason for possible delay of your Tuesday and Wednesday assignment, i.e. to complete the proofread of CIS department booklet that we have agreed last week.
--
Jie Wu, Ph.D
Professor and Chairman, Fellow of the IEEE
Computer and Information Sciences
Temple University
Tel: 215-204-8450, Fax: 215-204-5082
Email: jiewu@temple.edu

Confidential

TEMPLE UNIVERSITY (R. BRIGGS) - 0000412