# EXHIBIT D

# In The Matter Of:
## *RUTH V. BRIGGS v. TEMPLE UNIVERSITY*

## *GREGORY G. WACKER*
## *June 29, 2017*

*Terry Burke Reporting*
*Registered Professional Reporters*
*terryburkermr@gmail.com*
*(215) 205-9079*

Min-U-Script® with Word Index

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                      -      -      -
 4   RUTH V. BRIGGS,                :
 5           Plaintiff,             :
                                    :  Civil Action
 6   v.                             :  No. 16-00248
                                    :
 7   TEMPLE UNIVERSITY,             :
                                    :
 8           Defendant.             :
 9                      -      -      -
10              Philadelphia, Pennsylvania
                Thursday, June 29, 2017
11
                        -      -      -
12
13            Deposition of GREGORY G. WACKER,
14   taken pursuant to notice, held at Littler
15   Mendelson, P.C., Three Parkway, 1601 Cherry
16   Street, Suite 1400, Philadelphia, Pennsylvania,
17   beginning at 10:10 a.m., on Thursday, June 29,
18   2017, before Terry Barbano Burke, RMR-CRR.
19
20
21
22              TERRY BURKE REPORTING
                    (215) 205-9079
23              terryburkemr@gmail.com
24
```

```
 1  APPEARANCES:
 2       RAHUL MUNSHI, ESQUIRE
         Console Mattiacci Law, LLC
 3         1525 Locust Street, Ninth Floor
           Philadelphia Pennsylvania 19102
 4
             Counsel for the Plaintiff
 5
         RACHEL FENDELL SATINSKY, ESQUIRE
 6       Littler Mendelson, P.C.
           Three Parkway
 7         1601 Cherry Street, Suite 1400
           Philadelphia, Pennsylvania 19102
 8
             Counsel for the Defendant
 9
10                  -    -    -
11              GREGORY G. WACKER,
12       125 Archbishop Drive, Conshohocken,
13       Pennsylvania, 19428, having been duly
14       sworn, was examined and testified as
15       follows:
16  BY MR. MUNSHI:
17     Q.  Good morning, Mr. Wacker.
18     A.  Good morning.
19     Q.  We just met, but my name is Rahul
20  Munshi.  I am an attorney at Console Mattiacci
21  Law, and I have the privilege of representing
22  Ruth Briggs in this action she has brought
23  against Temple University.
24              You are here today for your
```

1    Q. Did Judy Lennon ever come to you for
2    advice or guidance?
3    A. Not that I'm aware of.
4    Q. Is Miss Newton still working at Temple?
5    A. No. I believe she retired as well.
6    Q. Did you ever have a conversation with
7    Miss Briggs about Miss Newton?
8    A. No.
9    Q. Regarding Ruth Briggs, what role, if
10   any, did you play in the decision to terminate
11   her employment?
12              MS. SATINSKY: Objection to form.
13              THE WITNESS: I facilitated the
14   analysis of Dr. Wu's request that she be
15   terminated.
16   BY MR. MUNSHI:
17   Q. Who made the decision to terminate?
18              MS. SATINSKY: Objection to form.
19              THE WITNESS: Dr. Wu initiates the
20   request. Drew, who works under me, investigated
21   the details. Gets the details to me.
22              We then hand those details over to
23   labor relations, which would be Deirdre Walton's
24   group. And then it is assessed where the issue

1  that was brought up falls under the work rules.
2  BY MR. MUNSHI:
3      Q. And then during that multi-step process,
4  when is the decision made with regard to Ruth
5  Briggs?
6      A. Once it's reviewed by HR, labor
7  relations, and confirmed that the appropriate
8  work rule has been identified, and then the
9  appropriate discipline is issued.
10     Q. Did Dr. Wu initiate the request to
11 terminate Miss Briggs to you or Mr. DiMeo or
12 somebody else?
13         MS. SATINSKY: Objection to form.
14         You can answer the question.
15         THE WITNESS: To Drew.
16 BY MR. MUNSHI:
17     Q. When did that take place?
18     A. I do not recall.
19     Q. In what format was that request to
20 terminate Miss Briggs made?
21         MS. SATINSKY: Objection to form.
22 BY MR. MUNSHI:
23     Q. And by "format," I mean orally, e-mail,
24 memo to the file, phone call?

1  Do you recall specifically what Drew
2  DiMeo specifically told you was an issue that
3  Dr. Wu wanted to fire Miss Briggs over?
4  MS. SATINSKY: Objection to form.
5  THE WITNESS: I believe the issue
6  may have been about a reimbursement for Dr. Wu.
7  Something Ruth had to put into one of the
8  systems, university systems that she was unable
9  to do for multiple days.
10 BY MR. MUNSHI:
11 Q. Did Drew DiMeo tell you what she did
12 wrong, if anything?
13 A. Once again, from what I recall, it was
14 she put in, Dr. Wu had a reimbursement -- if
15 this is the correct incident that I'm thinking
16 of -- she was supposed to put in a reimbursement
17 for Dr. Wu a week ago and she wasn't able to get
18 it in because she was having -- she said -- she
19 indicated she was having problems. It was
20 investigated and the problem she said she had
21 was not substantiated and she became
22 argumentative and combative and disruptive.
23 Q. Did Drew DiMeo explain to you why Dr. Wu
24 wanted to actually fire her over this issue --

```
 1  have already told me about?
 2           MS. SATINSKY: Objection. Asked and
 3  answered.
 4           THE WITNESS: No.
 5  BY MR. MUNSHI:
 6     Q. Did you ever consider putting Ruth
 7  Briggs on a performance improvement plan?
 8     A. I believe that is what was being done by
 9  interjecting Drew into meeting with her and
10  Dr. Wu.
11     Q. Is there a formal performance
12  improvement plan system at Temple?
13           MS. SATINSKY: Objection to form.
14           THE WITNESS: Not that I'm aware of.
15  BY MR. MUNSHI:
16     Q. Is there any sort of documentation that
17  you are aware of that states any goals or
18  objectives that Ruth Briggs had to meet by
19  certain periods of time?
20     A. There is an annual performance
21  development plan that the supervisor and the
22  employee are supposed to be meeting and going
23  over and discussing those issues.
24           Hence Drew was put into the equation
```

1  to make sure that Ruth and Dr. Wu would meet
2  weekly and discuss what's coming up the next
3  week, what needed to be done in terms of the
4  work for that upcoming week.
5     Q. And whose decision was it to place Drew
6  DiMeo in that position?
7     A. Mine, in conjunction with talking to one
8  of the other senior associate deans.
9     Q. Who is that person?
10    A. At the time that would have been Ralph
11 Jenkins. He's deceased.
12    Q. Approximately when did Drew DiMeo begin
13 that role?
14    A. I believe when he was hired. I'm going
15 to say five, six years ago.
16    Q. This role that Drew DiMeo had where he
17 would be meeting with Dr. Wu and Ruth Briggs,
18 did that take place over months or years? How
19 long would that go on?
20    A. I don't know how long the overlap was,
21 but as long as Drew and Ruth were both in their
22 positions, they were -- Drew was interjected to
23 help facilitate between Dr. Wu and Ruth.
24    Q. Let's take a look at this document that

1  had heard Ruth yelling?
2     A. No.
3     Q. Did you ever hear about that incident
4  beyond from what Drew told you?
5     A. No.
6     Q. Did you ever talk to Dr. Wu about that
7  incident?
8     A. No.
9     Q. The second bullet point here, in this
10 April 1st, 2014, letter that you signed, it is
11 regarding a room reservation for the wrong date.
12       Do you see that?
13    A. Yes.
14    Q. Who gave you that information?
15    A. That would be Drew.
16    Q. Anybody else?
17    A. It would be Drew in consultation with
18 Dr. Wu.
19    Q. Did you ever have a conversation with
20 Dr. Wu about this issue?
21    A. Not that I recall.
22    Q. So did you have a conversation with
23 anybody besides Drew?
24       MS. SATINSKY: Objection to form.

1       THE WITNESS: Possibly Deirdre in
2  HR.
3  BY MR. MUNSHI:
4       Q.  Do you have a specific recollection of
5  that?
6       A.  Yes, I would have.
7       Q.  What do you recall talking to Deirdre
8  Walton about?
9       A.  About these two incidents and the
10 discipline that should go with it.
11      Q.  Did you provide her with any additional
12 information besides the few sentences in the
13 second bullet point?
14          MS. SATINSKY: Objection to form.
15 Asked and answered.
16 BY MR. MUNSHI:
17      Q.  Regarding this hotel issue?
18      A.  It would have been provided with
19 whatever Drew was able to provide and Dr. Wu.
20      Q.  Did you provide Deirdre Walton or
21 anybody in labor relations with any
22 correspondence or documentation regarding the
23 issues set forth in the second bullet point?
24          MS. SATINSKY: Objection. Asked and

1  answered.  You can answer it one more time,
2  Greg.
3           THE WITNESS:  Whatever would have
4  been provided by Drew and Dr. Wu.
5  BY MR. MUNSHI:
6     Q.  But sitting here right now, can you tell
7  me what that is?
8     A.  I don't recall.
9     Q.  Did you at any point ever see any
10 documentation regarding the booking of the wrong
11 dates allegedly by Ruth Briggs as set forth in
12 the second bullet point?
13    A.  I don't recall.
14    Q.  Did you ever ask Ruth Briggs about what
15 took place there?
16    A.  No.
17    Q.  Did you ever talk to Dr. Wu about it?
18    A.  No.
19    Q.  Just learned this from Drew DiMeo?
20    A.  Once again, the normal process is that
21 the individual involved with supervising and
22 helping monitor this handles all of the details.
23 I get summary information, determine whether
24 there is sufficient documentation to proceed or

1  not, and then that gets passed to HR/labor
2  relations.
3      Q. I know. We are talking about normal
4  procedure again.
5          MS. SATINSKY: I understand. Rahul,
6  he is entitled to testify as to what his
7  practice is, and that is what he is doing.
8  BY MR. MUNSHI:
9      Q. So I will ask the question again. Did
10 you talk to anybody else besides Drew DiMeo
11 about the second bullet point?
12     A. Possibly Deirdre Walton.
13     Q. Is it possible that Dr. Wu gave Ruth
14 Briggs the wrong dates to book?
15         MS. SATINSKY: Objection.
16         THE WITNESS: I don't know.
17 BY MR. MUNSHI:
18     Q. Then the letter continues to state that
19 Miss Briggs is in violation of the following
20 work rules.
21         Who made the decision that her
22 conduct warranted a violation of C.4
23 Negligence/Carelessness?
24     A. In consultation with labor relations,

1  that's what was decided.
2  Q. When you say "in consultation," you mean
3  you in consultation? Who in consultation with
4  labor relations?
5  A. Drew, myself, and Deirdre Walton.
6  Q. Did you ever participate in a
7  conversation, phone or otherwise, with both
8  Deirdre and Drew together?
9  A. Yes.
10 Q. Regarding Ruth Briggs?
11 A. Yes.
12 Q. How many of those did you have?
13 A. I don't recall.
14 Q. Are these the same conversations you
15 mentioned earlier with Deirdre Walton, or are
16 these separate conversations?
17 A. I don't recall.
18 Q. Do you recall any conversations, only
19 you and Deirdre, without Drew, regarding Ruth
20 Briggs and the termination?
21 A. Yes.
22 Q. Now, separate from that, do you recall
23 any conversations with both Deirdre and Drew and
24 yourself regarding Ruth Briggs and the

Case 2:16-cv-00248-RK Document 26-6 Filed 07/31/17 Page 15 of 19

**GREGORY G. WACKER** 67

```
 1  termination?
 2      A.  Yes.
 3      Q.  Of the three of you, how many of those
 4  conversations were there?
 5      A.  I don't recall.
 6      Q.  What was discussed?
 7      A.  The specific incidents that were put up
 8  and the work rules that they would have violated
 9  and the appropriate disciplinary action to go
10  with this.
11      Q.  Is that any different from what you
12  discussed with Deirdre Walton, just the two of
13  you?
14      A.  No.
15      Q.  Same conversations, just one time with
16  Drew and one time without Drew; is that right?
17      A.  Yes.
18      Q.  "C.3, Disruptive Or Disorderly Conduct."
19          Whose decision was it to determine
20  that she violated that rule?
21      A.  In consultation with Deirdre Walton and
22  HR, it was decided that that was a violation as
23  well.
24      Q.  What conduct did she do that was
```

1 disorderly?
2  A. The disruptive, argumentative and
3 unprofessional behavior in front of Drew and
4 Dr. Wu.
5  Q. Do you know if anyone could hear them
6 outside of the office?
7  A. I was not there. I do not know.
8  Q. So what was disruptive?
9  A. She was argumentative and
10 unprofessional.
11  Q. From what you heard; right?
12  A. From what I heard, yes.
13  Q. At any point prior to Miss Briggs'
14 termination or resignation, I guess, did you
15 learn that she had complained about Dr. Wu?
16  A. No.
17  Q. Did you ever have a discussion with
18 Deirdre Walton about Miss Briggs raising
19 concerns with her?
20  A. No.
21  Q. At any point prior to Miss Briggs'
22 employment at Temple ending, did you learn that
23 she raised any complaints or concerns with Sandy
24 Foehl?

```
1      A.   No.
2      Q.   How about anybody in the EEO office?
3      A.   Not that I recall.
4      Q.   Are you aware of her raising any
5  concerns or complaints about Dr. Wu's treatment
6  of her with anybody in the dean's office?
7           MS. SATINSKY:  Prior to the end of
8  her employment at Temple?
9           MR. MUNSHI:  Yes.
10          THE WITNESS:  Not that I recall.
11 BY MR. MUNSHI:
12     Q.   Did she ever complain to you directly
13 about how Dr. Wu was treating her in the
14 workplace?
15     A.   She may have once, at which point I
16 would direct her to Sandy Foehl to get Sandy's
17 group involved.
18     Q.   Is that one incident, the one you
19 already told me about, with the alleged comment
20 about China?
21     A.   I don't recall.
22     Q.   Putting aside the situation about the
23 alleged comment regarding China, any other
24 instance that you recall that she complained
```

1  Q. Did you hand this disciplinary report to
2  Ruth Briggs?
3  A. I don't recall.
4  Q. Whose decision was it to issue this
5  discipline?
6  A. In consultation with labor relations and
7  Dr. Wu, Dr. Wu initiating, following up with
8  labor relations, it was determined this is the
9  appropriate violation of the rule.
10 Q. And just so I am clear, you said Dr. Wu
11 initiating. Initiating with whom?
12 A. He was initiating with whoever the --
13 I'm not sure if it was Drew at the time. I
14 believe it's Drew.
15 Q. Did you play any role in the decision or
16 the issuing of this disciplinary report?
17 A. The usual role that I play in getting
18 the information passed up to me, evaluating
19 whether to pass it through to HR or not is the
20 standard process that I go by.
21 Q. With regard to this specific
22 disciplinary report, do you have a specific
23 recollection of facilitating it or doing
24 anything with it?

1  anywhere what it was that Ruth Briggs did that
2  warranted this conduct?
3           MS. SATINSKY:  Objection.  Asked and
4  answered.
5           You can answer it again, Greg.
6           THE WITNESS:  No.
7  BY MR. MUNSHI:
8      Q.  Now, do you have a recollection -- I
9  understand your practice -- but do you have a
10 recollection of speaking with anyone in labor
11 relations about the issuance of this specific
12 disciplinary report?
13     A.  Yes.
14     Q.  And was that Deirdre Walton?
15     A.  It would have been labor relations.  I
16 don't recall who it was.
17     Q.  And do you recall telling that person
18 what the unprofessional/inappropriate conduct
19 was that Miss Briggs allegedly did?
20     A.  I don't recall.
21     Q.  Do you recall Miss Briggs ever
22 complaining to you that she got this discipline
23 unfairly?
24     A.  I don't recall.