# EXHIBIT E

# In The Matter Of:

*RUTH V. BRIGGS v.*

*TEMPLE UNIVERSITY*

---

*DEIRDRE CULBREATH-WALTON*

*June 30, 2017*

---

*Terry Burke Reporting*

*Registered Professional Reporters*

*terryburkermr@gmail.com*

*(215) 205-9079*

Min-U-Script® with Word Index

**DEIRDRE CULBREATH-WALTON**                    1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                  -      -      -

 4   RUTH V. BRIGGS,                 :
                                     :
 5            Plaintiff,             :
                                     :   Civil Action
 6   v.                              :   No. 16-00248
                                     :
 7   TEMPLE UNIVERSITY,              :
                                     :
 8            Defendant.             :

 9                  -      -      -

10            Philadelphia, Pennsylvania
                 Friday, June 30, 2017
11
                    -      -      -
12

13            Deposition of DEIRDRE

14   CULBREATH-WALTON, taken pursuant to notice, held

15   at Console Mattiacci Law, LLC, 1525 Locust

16   Street, Ninth Floor, Philadelphia, Pennsylvania,

17   beginning at 10:15 a.m., on Friday, June 30,

18   2017, before Terry Barbano Burke, RMR-CRR.

19

20

21

22            TERRY BURKE REPORTING
                  (215) 205-9079
23            terryburkermr@gmail.com

24
```

**TERRY BURKE REPORTING**

```
1   APPEARANCES:

2         RAHUL MUNSHI, ESQUIRE
          Console Mattiacci Law, LLC
3           1525 Locust Street, Ninth Floor
            Philadelphia Pennsylvania 19102
4
                Counsel for the Plaintiff
5
          RACHEL FENDELL SATINSKY, ESQUIRE
6         Littler Mendelson, P.C.
            Three Parkway
7           1601 Cherry Street, Suite 1400
            Philadelphia, Pennsylvania 19102
8
                Counsel for the Defendant
9

10                  -      -      -

11             DEIRDRE CULBREATH-WALTON,

12       493 East Harmon Road, Philadelphia,

13       Pennsylvania, 19128, having been duly

14       sworn, was examined and testified as

15       follows:

16  BY MR. MUNSHI:

17       Q.  Good morning, Miss Walton.

18       A.  Good morning.

19       Q.  My name is Rahul Munshi.  I am an

20  attorney here at Console Mattiacci Law, and I

21  have the privilege of representing Ruth Briggs

22  in this action that has been brought against

23  Temple.

24             You are here today for your
```

**TERRY BURKE REPORTING**

1      Q.  Have you ever been deposed in an action

2  where the underlying claim included an

3  allegation of retaliation?

4      A.  Not that I recall.

5      Q.  You are an HR professional; correct?

6      A.  Yes.

7      Q.  When did you first start working in HR

8  in any capacity for any company?

9      A.  At Temple or for my career?

10     Q.  For any company.

11     A.  I have been working in HR since 1987.

12     Q.  You are currently employed by Temple;

13 correct?

14     A.  Yes, I am.

15     Q.  What is your current job title?

16     A.  I'm the director for labor employee

17 relations.

18     Q.  Is that within any specific department?

19     A.  It's within HR.

20     Q.  Do you also have any capacity within the

21 EEO office?

22     A.  No, I don't work with the EEO office.  I

23 mean I don't work in their office.

24     Q.  At Temple is the EEO office separate and

1    apart from HR?

2        A.   Yes, it is.

3        Q.   When did you first start working at

4    Temple?

5        A.   In February of 1999.

6        Q.   And what position did you have when you

7    first started working at Temple?

8        A.   I was employee relations specialist.

9        Q.   And that was an HR position; correct?

10       A.   Yes.

11       Q.   How long did you hold that position?

12       A.   About two years.

13       Q.   What was next for you?

14       A.   I was then promoted to employee

15   relations manager.

16       Q.   And how long did you hold that title?

17       A.   And I was in that position maybe another

18   two to three years.

19       Q.   What about after that?

20       A.   And I was the assistant director for

21   employee relations.

22       Q.   For how long?

23       A.   Two years.

24       Q.   And that was another promotion?

1       A.   2014?  It was probably the same as it is

2   today.  I report to Sharon Boyle, who is our

3   associate vice president for human resources,

4   and Sharon reports to Ken Kaiser, who is our

5   CFO.

6       Q.   Back in that 2014 time period, did

7   anybody report directly to you?

8       A.   Yes.  I had two direct reports.  I had

9   an administrative assistant, administrative

10  specialist, as well as employee relations

11  manager.

12      Q.   And who were those direct reports, what

13  are their names?

14      A.   Felisha Brown was my administrative

15  specialist.  Ebony Jones was the employee

16  relations manager.

17      Q.   I may have missed it.  Were there only

18  two or were there four in total direct reports?

19      A.   Two.

20      Q.   Okay.

21              Ebony Jones was an HR professional

22  as well?

23      A.   Yes.

24      Q.   Back in that 2014 time period, describe

1   for me what your general job duties and

2   responsibilities were?

3       A.  In my capacity, I'm responsible for all

4   employee relation issues at the university that

5   deal with conflict issues for supervisors,

6   discipline, performance management.

7               I'm responsible for all the

8   processing.  It gets done under my supervision,

9   all processing and terminations.  Unemployment.

10  ADA, the American with Disability Act, all those

11  claims come through my office.  Coaching and

12  counseling supervisors.

13      Q.  Did you have any job duties or

14  responsibilities pertaining to EEO policies?

15      A.  In my role and as a person who is

16  responsible for holding the university work

17  rules, as well as the university policies that

18  include EEOC, yes.  So departments would contact

19  me with any issues.  Employees contact me with

20  any concerns or issues regarding EEOC.  But I

21  work very closely with the EOC department when

22  we do get those claims.

23      Q.  The internal EEO office at Temple, you

24  mean?

1      Q.   Coming back to Ruth Briggs here, at any

2   point prior to Miss Briggs' termination of

3   employment at Temple, did you learn that she had

4   complained about Dr. Wu?

5      A.   Yes.

6      Q.   Do you recall when the first time you

7   learned about that was?

8      A.   Do you want the exact date?

9      Q.   If you can give me the year.

10     A.   Just my memory, when did Tanya leave?

11     Q.   You mean Ruth?

12     A.   When did Ruth leave?

13     Q.   Ruth left in April of 2014.

14     A.   Okay.   So Ruth may have contacted me to

15  complain about her work situation maybe a year,

16  it might have been two years, maybe a year and a

17  half before.

18     Q.   And the first time that she contacted

19  you regarding Dr. Wu, can you describe for me

20  what the circumstances were?

21     A.   She just called to tell me that she felt

22  that Dr. Wu was demanding and that she and he

23  many times didn't see eye to eye on things.

24     Q.   Anything else you recall about the

1   circumstances around Miss Briggs' first
2   complaint to you regarding Dr. Wu?
3       A.  I think that was it.  It was just really
4   being like oil and water.
5       Q.  Did you understand at that time when she
6   raised a complaint about Dr. Wu that she was
7   complaining about how he was treating her in the
8   workplace?
9       A.  Yes.
10      Q.  Approximately how many times do you
11  recall having learned of any complaints by
12  Miss Briggs regarding Dr. Wu?
13          MS. SATINSKY:  Outside of what you
14  might have learned from an in-house or external
15  lawyer for Temple.
16  BY MR. MUNSHI:
17      Q.  Yes.  And that is going to apply for
18  this whole, I am not going to ask you about any
19  complaints you had with any attorney.
20      A.  Okay.  So any complaint?
21      Q.  From Miss Briggs regarding Dr. Wu?
22      A.  Regarding Dr. Wu?
23      Q.  Yes.
24          MS. SATINSKY:  That you did not

1    learn through counsel.

2              THE WITNESS:  Well over 10 or 11

3    times.  It may have been more.

4    BY MR. MUNSHI:

5        Q.  Did Miss Briggs ever complain to you

6    that she felt the relationship was abusive, or

7    words to that effect?

8              MS. SATINSKY:  Objection to form.

9              THE WITNESS:  I don't think she ever

10   used abusive, but she felt it was harsh, you

11   know, or demanding.

12   BY MR. MUNSHI:

13       Q.  Did she describe any instances or

14   occurrences between her and Dr. Wu where she

15   felt demeaned?

16       A.  Not that I recall.

17              Can I go back on that question?

18       Q.  Sure.

19       A.  She would talk about the interaction

20   between herself, Dr. Wu, and Drew, and she felt

21   that situation was demeaning.

22       Q.  Did she describe what aspect of that

23   relationship was demeaning?

24       A.  She didn't like the fact that Drew

1   participated in a meeting with her and Dr. Wu to

2   go over her work.  She thought that was

3   demeaning.

4        Q.  Anything else you recall her describing

5   as demeaning?

6        A.  Just that situation.  Just that I think

7   it was maybe a weekly meeting and she wasn't

8   happy with that circumstance.

9        Q.  Did you have an understanding that

10  Mr. DiMeo reported to Greg Wacker?

11       A.  Yes.

12       Q.  Did you ever speak with Mr. DiMeo about

13  his relationship with Miss Briggs?

14       A.  Yes.

15       Q.  Approximately how many times did you do

16  that?

17       A.  Again, that's well over ten, 11, 12.

18  Numerous times.

19       Q.  Did you express to Mr. DiMeo that

20  Miss Briggs expressed to you that she felt there

21  was something demeaning about the relationship?

22       A.  Yes.

23       Q.  How did he respond?

24       A.  Many times he expressed -- she expressed

1    have, but I don't recall specifically.

2        Q.  Do you recall Ruth Briggs ever

3    complaining directly to you that she felt that

4    the environment was hostile?

5        A.  Yes.

6        Q.  Approximately how many times did she do

7    that with you?

8        A.  Maybe five or six times.

9        Q.  Do you recall the circumstances around

10   the first time that she raised hostile work

11   environment with you?

12           MS. SATINSKY:  Objection to form.

13           THE WITNESS:  I don't recall the

14   first time.  I had a lot of conversations with

15   Ruth Briggs, or she sent me e-mails.  So what

16   stands out for me is whenever she was

17   disciplined for something, she would consider

18   that to be hostile.

19   BY MR. MUNSHI:

20       Q.  Do you remember any of the circumstances

21   around her allegations to you about hostile work

22   environment?

23           MS. SATINSKY:  Objection to form.

24           THE WITNESS:  Just whenever she was

1  disciplined or if she was talked to about errors

2  that she made where, you know, Dr. Wu, you know,

3  talked to her about those errors or complained

4  to her about things that weren't getting done,

5  that's when she called me and said, you know,

6  Dr. Wu's complaining about I didn't do this or

7  she didn't do something correctly.  Usually

8  those were the circumstances that she considered

9  to be hostile.

10  BY MR. MUNSHI:

11     Q.  And then would you do anything as a

12  result of her complaining about hostile work

13  environment?

14              MS. SATINSKY:  Objection to form.

15              You can answer the question.

16              THE WITNESS:  Yes, I would talk with

17  Greg and Drew.

18  BY MR. MUNSHI:

19     Q.  Greg and Drew didn't work within the

20  same department as Ruth and Dr. Wu; correct?

21     A.  No, they didn't.

22     Q.  Were either one of them physically

23  located in the same building as Dr. Wu?

24     A.  I believe they were in the same

1      Q.   And then up on top of P-11, Greg Wacker

2   then forwards this e-mail to you.  Do you see

3   that?

4      A.   Yes.

5      Q.   And then Greg says, "I'll call you later

6   to discuss."

7              Do you see that?

8      A.   Yes.

9      Q.   And do you recall having a conversation

10  with Greg Wacker about this e-mail that's P-11?

11     A.   I don't recall specifically this

12  discussion with him.

13     Q.   Do you recall having a discussion with

14  Ruth Briggs about the e-mail that was forwarded

15  to you?

16     A.   Okay, so not the e-mail specifically,

17  but she's complained, like I mentioned earlier,

18  him yelling at students in Chinese.

19     Q.   And how about what she writes here about

20  frankly it borders on harassment, do you recall

21  any conversations with Ruth Briggs where she

22  used that word, "harassment" or "harass"?

23     A.   I don't specifically recall, but she may

24  have, but I don't specifically recall.

1    Specifically I'm not sure.

2        Q.   Do you know of any e-mails or memos to

3    the file or notes regarding what the conduct was

4    that Miss Briggs allegedly did that resulted in

5    this discipline?

6        A.   I don't recall offhand.

7        Q.   Do you recall ever discussing this

8    discipline with Ruth Briggs?

9        A.   I just don't remember.

10       Q.   Do you recall ever having a conversation

11   with Ruth Briggs where she expressed that Dr. Wu

12   made a comment to her about the retirement age

13   in China?

14       A.   I recall her relaying to me that Dr. Wu

15   was having a conversation where he mentioned

16   that, yes.

17       Q.   Do you recall what she mentioned to you?

18       A.   She said that he had just -- that he was

19   generally speaking in the office and talking to

20   others and talking about the retirement age in

21   the country that he came from.

22       Q.   China?

23       A.   China.

24       Q.   Was this over the phone or in person

1    where she expressed this to you?

2        A.   It was over the phone, definitely.

3        Q.   And do you recall her expressing or your

4    perception that she was offended by it?

5               MS. SATINSKY:   Objection to form.

6               THE WITNESS:   She was complaining

7    about it, yeah.

8    BY MR. MUNSHI:

9        Q.   Do you recall her saying to you that he

10   said words to the effect of women in China must

11   retire at the age of 55?

12              MS. SATINSKY:   Objection to form.

13   Asked and answered.

14              You can answer the question.

15              THE WITNESS:   I don't recall her

16   specifically saying that.   Just that he was

17   talking about the retirement age in China.

18   BY MR. MUNSHI:

19       Q.   And do you recall her saying it was

20   specifically about women?

21       A.   She mentioned women, yes.   But she also

22   mentioned that he was talking generally as well,

23   but she mentioned, she did mention women.

24       Q.   In your capacity as an HR professional

1        A.   Ultimately it's the department's
2    decision.   I basically give them my advice based
3    on our rules of conduct.
4        Q.   Did you ever discuss this particular
5    discipline with Dr. Wu?
6        A.   I don't know if I talked to Dr. Wu.
7             MR. MUNSHI:   Let's have this
8    document marked as P-26.
9             (P-26 was marked for
10   identification.)
11   BY MR. MUNSHI:
12       Q.   Take your time and review P-26.
13       A.   (Pause.)
14       Q.   In reviewing P-26, do you recall
15   Miss Briggs objecting to the severity of this
16   discipline to you?
17       A.   Yes.
18       Q.   Did you ever have a discussion with Greg
19   Wacker about Ruth Briggs' objection to the
20   severity?
21       A.   I'm sure we discussed it.
22       Q.   Did you have an understanding from Ruth
23   Briggs that she felt that she was being treated
24   unfairly with regard to this punishment?

1      A.   Yes.

2      Q.   Did you talk with Ruth about that?

3      A.   Yes, I did.

4      Q.   Did you tell Greg Wacker -- he's not on

5  this e-mail -- did you tell Greg Wacker that

6  Miss Briggs felt she was being treated unfairly

7  with this punishment?

8      A.   Greg and I discussed this situation.  He

9  was already aware that she felt this way, so we

10 had discussion.  I told him that she had

11 e-mailed me.  He told me that he was aware.  I

12 guess she may have talked to Drew or even Greg

13 directly about her concerns.  So yeah, I had a

14 conversation with him about it.

15     Q.   And did Ruth Briggs express to you that

16 she felt like she was being singled out with

17 regard to this punishment?

18     A.   Well, I think in the letter she states

19 that.

20     Q.   She writes here, quote, There are

21 different standards for performance and

22 productivity which are not justified."

23          Did she express to you that she felt

24 basically she was held to a double standard by

1   Dr. Wu?

2              MS. SATINSKY:  Objection to form.

3              THE WITNESS:  Not a double standard,

4   but she felt that, you know, in her mind, others

5   make mistakes and they are not dealt with, but

6   she makes mistakes and she is.

7   BY MR. MUNSHI:

8       Q.  Did you similarly ask Greg or Drew to

9   look into Miss Briggs' concerns about how she

10  was being punished here?

11             MS. SATINSKY:  Objection to form.

12             THE WITNESS:  I talked with them

13  about it.  We talked about her accusations of

14  other people in the office.  They assured me

15  that everyone was treated equally and that there

16  weren't -- there was no one in the office making

17  the mistakes that she was making.

18  BY MR. MUNSHI:

19      Q.  And did you ask Greg or Drew to follow

20  up with Dr. Wu and say, "This is what Ruth is

21  saying about how she is being treated"?

22             MS. SATINSKY:  Objection to form.

23             THE WITNESS:  Just to be clear, you

24  are asking did I ask them to follow up with

```
1    student-worker?
2         A.  No, I didn't.
3         Q.  Do you know if Greg Wacker ever did or
4    Drew DiMeo ever did?
5         A.  It's my understanding that they did.
6         Q.  And did they report back to you what
7    this person said?
8         A.  Yes, I'm sure -- yes, they did.
9         Q.  Any recollection of what they told you?
10        A.  From my memory of the situation, Ruth
11   did not report to work timely.  When she called
12   in, she didn't call her supervisor or anyone in
13   a leadership role.  She called a student and the
14   student confirmed that.
15        Q.  Do you recall Ruth saying that Dr. Wu
16   wasn't available at the time that she called?
17        A.  Yes.
18        Q.  And do you know Judy Lennon?
19        A.  I've heard of her.  I don't know her.
20        Q.  Do you recall her being an
21   administrative assistant in that department?
22              MS. SATINSKY:  Objection to form.
23              THE WITNESS:  No.
24   BY MR. MUNSHI:
```

1      Q.  Do you recall Ruth Briggs telling you

2   she also tried contacting Judy Lennon but she

3   was not available?

4      A.  Yes.  Not Judy specifically.  I don't

5   remember her name.  But she did say she tried to

6   contact someone else in the office.

7      Q.  Did you give any sort of a

8   recommendation with regard to this discipline

9   that is P-18?

10     A.  Yes, I'm sure they contacted me.

11     Q.  And the discipline that is given here is

12  a written warning.  Do you see that?

13     A.  Yes.

14     Q.  And prior to January 20th, 2014, did

15  Ruth Briggs have any ongoing issues with being

16  tardy or not showing up to work?

17     A.  I don't know.

18     Q.  What did Ruth Briggs do wrong to warrant

19  a written warning?

20         MS. SATINSKY:  Objection to form.

21         THE WITNESS:  Well, she didn't, she

22  didn't arrive to work at her report time, and

23  she didn't call out.  And then when she did

24  call, which was way after her shift had started,

1    she did not contact the proper people to report

2    that she was not going to be at work.  And

3    contacting a student wasn't sufficient.  My

4    understanding, from my memory, I don't believe

5    the student had passed that message on.

6               So what she did wrong was that she

7    did not report, nor did she show up.

8    BY MR. MUNSHI:

9        Q.  You understood from her that she said

10   that she did call Dr. Wu but he wasn't

11   available; right?

12       A.  Yes.

13       Q.  Did you look into that if that was true?

14       A.  I believed her that she did, that she

15   attempted to call Dr. Wu.  In speaking with her

16   specifically, I said to her that there were a

17   number of other avenues.  She could have called

18   the dean's office.  She could have called Greg

19   Wacker.  She could have called Drew DiMeo.  She

20   could have sent an e-mail.  There were many

21   other ways she could have communicated if she

22   was not reaching Dr. Wu other than report to a

23   student.

24       Q.  Well, was it your understanding that she

DEIRDRE CULBREATH-WALTON                    98

1        A.   Not that I recall.

2        Q.   Did Greg Wacker say anything during this

3    meeting between the three of you?

4        A.   He talked with Ruth.  He explained the

5    reason that we were there, which is to give her

6    this termination letter.

7             In that same meeting, you know, he

8    talked about the gist of this letter and at the

9    same time gave her the option to resign.

10       Q.   Did you say anything during this

11   meeting?

12       A.   I said to her, you know, the things that

13   she would need.  What I usually do is talk

14   about, you know, if she had any questions

15   regarding the termination, any questions in

16   regards to the difference between doing the term

17   or resigning.  Talked to her about next steps.

18   If she needed any information in regards to

19   benefits, things like that, and I told her she

20   could contact me with any questions.

21       Q.   How did Ruth Briggs appear during this

22   meeting?

23       A.   She was surprised and a little taken

24   back.

**TERRY BURKE REPORTING**

1              THE WITNESS:  Can you ask that

2     again?

3     BY MR. MUNSHI:

4        Q.  Sure.  Based on your experience as an HR

5     professional of about 30 years, do you agree

6     with me that if Ruth Briggs was terminated for

7     raising complaints of hostile work environment,

8     that could potentially be a violation of

9     Temple's policies?

10             MS. SATINSKY:  Objection to form.

11             THE WITNESS:  Yes.

12     BY MR. MUNSHI:

13        Q.  Whose decision was it to give

14     Miss Briggs a termination letter?

15        A.  In consultation with my office,

16     specifically me, Greg made the decision.  And

17     again, I'm sure he also collaborated with

18     Dr. Wu.

19        Q.  But do you know that for a fact that he

20     collaborated with Dr. Wu on the decision to give

21     the termination letter?

22        A.  I know that he talked to Dr. Wu

23     concerning the situation.  I'm sure Dr. Wu was

24     on board with the termination.  So I think the

**TERRY BURKE REPORTING**

Message

| From: | Ruth V. Briggs [rbriggs@temple.edu] |
|---|---|
| Sent: | 4/8/2013 10:29:35 PM |
| To: | Deidre Walton [Deirdre.Walton@temple.edu] |
| Subject: | Request to discuss my recent disciplinary action |

Dear Deidre,

I did not plan to contact you regarding my recent suspension without pay. I requested to review my personnel to read Eugene Kwatny's email regarding the incident because I was denied access to his allegations on the day I was suspended. I was surprised by the severity of the discipline. After reading his email, his failure to mention numerous mitigating factors that contributed to the error I made. When I discovered my oversight, I immediately approached Dr. Kwatny, Dr. Wu and Andrew DiMeo individually and took ownership of my error, for which I expected a verbal discipline. The complaint from Dr. Kwatny does not mention that the other front office staff member was absent for long periods of time for for a personal health problem, for which she had FMLA since before the holiday. Since January, she needed to return to her mother's home in North Carolina for a week or more at time because of her mother's deteriorating health and most recently, her funeral. The error I made was not the result of negligence, nor carelessness. While I admit responsibility for dropping the ball on an assignment, I was working on several projects during this time, all of which required shifting priorities. During the week of the incident, Dr. Wu told me that he needed me to drop everything for a workshop that he and another professor were organizing with the help of a student worker. Until the week before the workshop, I was not involved and knew very little about it. My involvement in this project started a week before it was scheduled and I worked 10 or more hours a day that week.

I am responsible for this error, but not because I was negligent nor careless. The insinuation is far from the truth. In fact, I took on additional responsibilities to demonstrate my concern for my colleague and for the department. While I do feel horrible for my error, Dr. Kwatny's insisting that staff and faculty mistakes are unacceptable smacks of hypocrisy. I am the only person for whom he finds mistakes unacceptable. Negligence, carelessness and poor job performance is not uncommon in the department. There are different standards for performance and productivity, which are not justified.

The punishment does not fit the crime and will leave a terrible legacy on my service to the university at the age of 58. I am defending my honor.

Is iTotWiB., Thwal Thly  an
I
 my
my

you

, andn

*Ruth V. Briggs*
*Department of Computer and Information Science*
*Temple University*
*215-204-8659 - Direct line*
*215-204-8450   Department line*



TEMPLE UNIVERSITY (R. BRIGGS) - 0000108