# EXHIBIT F

# In The Matter Of:

*RUTH V. BRIGGS v.*
*TEMPLE UNIVERSITY*

*SANDRA A. FOEHL*
*June 30, 2017*

*Terry Burke Reporting*
*Registered Professional Reporters*
*terryburkermr@gmail.com*
*(215) 205-9079*

Min-U-Script® with Word Index

**SANDRA A. FOEHL**

1

```
1              IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                  -        -        -

4   RUTH V. BRIGGS,                    :
                                       :
5              Plaintiff,              :
                                       :   Civil Action
6   v.                                 :   No. 16-00248
                                       :
7   TEMPLE UNIVERSITY,                 :
                                       :
8              Defendant.              :

9                  -        -        -

10            Philadelphia, Pennsylvania
              Friday, June 30, 2017
11
                   -        -        -
12

13            Deposition of SANDRA A. FOEHL, taken

14   pursuant to notice, held at Console Mattiacci

15   Law, LLC, 1525 Locust Street, Ninth Floor,

16   Philadelphia, Pennsylvania, beginning at

17   1:40 p.m., on Friday, June 30, 2017, before

18   Terry Barbano Burke, RMR-CRR.

19

20

21

22            TERRY BURKE REPORTING
                 (215) 205-9079
23            terryburkermr@gmail.com

24
```

**TERRY BURKE REPORTING**

```
 1   APPEARANCES:

 2         RAHUL MUNSHI, ESQUIRE
           Console Mattiacci Law, LLC
 3            1525 Locust Street, Ninth Floor
              Philadelphia Pennsylvania 19102
 4
              Counsel for the Plaintiff
 5
           RACHEL FENDELL SATINSKY, ESQUIRE
 6         Littler Mendelson, P.C.
             Three Parkway
 7           1601 Cherry Street, Suite 1400
             Philadelphia, Pennsylvania 19102
 8
              Counsel for the Defendant
 9

10              -        -        -

11                    SANDRA A. FOEHL,

12      3443 West Penn Street, Philadelphia,

13      Pennsylvania, having been duly sworn,

14      was examined and testified as follows:

15   BY MR. MUNSHI:

16      Q.  Good afternoon, Miss Foehl.

17      A.  Hello.

18      Q.  We just met, but my name is Rahul

19   Munshi.  I'm an attorney here at Console

20   Mattiacci Law, and I have the privilege of

21   representing Ruth Briggs in this action against

22   Temple University.  You are here today for your

23   deposition.

24              Do you understand that?
```

**TERRY BURKE REPORTING**

1      Q.  Have you ever worked in human resources

2  before?

3      A.  No.

4      Q.  When did you start working at Temple?

5      A.  1973.

6      Q.  What position did you hold back then?

7      A.  I think it was titled affirmative action

8  specialist in the office of affirmative action

9  plans and programs.

10      Q.  Are you an attorney?

11      A.  No.

12      Q.  Have you taken any courses on the law?

13      A.  Does sitting in a course count?  I don't

14  think so.  No.

15      Q.  Do you have any legal education

16  background, I should ask?

17      A.  No.

18      Q.  What are your general job duties and

19  responsibilities as the director of EOC?

20      A.  As the name of the office suggests, EOC

21  is responsible for university compliance with

22  federal, state, and municipal civil rights laws.

23  So we do report filing for the university.

24  We're responsible for the university's

1  affirmative action program plan.  And we do
2  complaint investigations for the university.
3  That is unlawful discrimination complaint
4  investigations.
5      Q.  Employment discrimination or all types
6  of discrimination?
7      A.  All types.  That is, we respond to
8  student complaints, staff, faculty, and visitors
9  to the university.
10     Q.  The civil rights laws that you
11 mentioned, do they include Title VII of the
12 Civil Rights Act?
13     A.  Yes.
14     Q.  And the Age Discrimination in Employment
15 Act?
16     A.  Yes.
17     Q.  You said investigating discrimination
18 claims.  Do you also investigate retaliation
19 claims?
20     A.  Yes.
21     Q.  Do you also investigate claims of
22 hostile work environment?
23     A.  If they allege a violation of the civil
24 rights laws.

1    complaints.

2              MR. MUNSHI:  Let's have this marked

3    as P-32, please.

4              (P-32 was marked for

5    identification.)

6    BY MR. MUNSHI:

7       Q.  Miss Foehl, in front of you is a

8    three-page document.  The top of the first page

9    says "7-30-2012," and then the top of the second

10   page says "two," and then the top of the third

11   page says "8-3-2012."

12              Do you see that?

13      A.  Uh-huh.

14      Q.  Just verbalize for the transcript,

15   please.

16      A.  Yes.  I see that.

17      Q.  Everyone does it.  That is okay.

18              Are these your notes?

19      A.  Yes, they are.

20      Q.  These are your handwritten notes?

21      A.  Yes.

22      Q.  Did you take them while you were meeting

23   with Ruth Briggs?

24              MS. SATINSKY:  The first two pages

1    are you focused on?

2              MR. MUNSHI:  Yes.  The 7-30-2012.

3              THE WITNESS:  I usually work up my

4    notes immediately following a conversation.

5    BY MR. MUNSHI:

6        Q.  Did you then type up these notes?

7        A.  I don't type them up.

8        Q.  Did you share your notes with anybody

9    around this time?

10       A.  No.

11       Q.  Approximately how long was your meeting

12   with Ruth Briggs on 7-30-2012?

13       A.  I don't really remember.

14       Q.  On the first page under "problems," it

15   says here, "Dr. Wu yells and says demeaning

16   things, e.g., 'Are you stupid?'"

17              Do you see that?

18       A.  Yes, I see that.

19       Q.  That is information that Ruth Briggs

20   gave to you?

21       A.  That's Ruth's report to me about Dr. Wu.

22       Q.  Did she give you any other examples of

23   demeaning things?

24       A.  No.

1      A.   This is the initial meeting, so if I

2  noted something new, and that may be where the

3  issue of discipline was, that would have been in

4  the April notes.  So I would have drawn on the

5  April notes for my conversation with Dr. Wu.

6      Q.   Do you recall how he responded to you

7  when you asked him about the remark that

8  Miss Briggs relayed to you?

9      A.   Not without reference to my notes, I

10  don't.

11      Q.   Do you recall if he denied saying it?

12      A.   My best recollection is that he said he

13  regularly discussed cultural differences and

14  language differences with the staff,

15  Miss Briggs, other members of the office staff.

16  And that that was a general conversation.

17      Q.   And at this meeting that you are talking

18  about with Dr. Wu, did you also explain to him

19  that you are conducting an investigation?

20      A.   That would have been the way I

21  introduced myself.

22      Q.   And did you inform him that you are

23  conducting an investigation because Ruth Briggs

24  raised complaints?

1    evaluations.  But that would have been why I
2    called or reached out to Eric Brunner.
3        Q.  And your subsequent conversation with
4    Miss Walton, did you talk about anything else
5    besides salary?
6        A.  I don't think so.  Salary is what I
7    remember discussing, that would be true.
8        Q.  Did you ask her about the comments that
9    Dr. Wu said about China and women?
10       A.  I don't think so.  That would have been
11   an issue for my office if that was -- if it was
12   a matter for investigating, it would have been
13   my office, not human resources.
14       Q.  Did you have an understanding as to
15   whether or not Miss Walton already knew about
16   that allegation?
17       A.  No recollection that she did.
18       Q.  Did you ever discuss that allegation
19   with Miss Walton?
20       A.  I don't remember doing that.
21       Q.  Why didn't you ask Dr. Wu at that time
22   if he said that comment?
23       A.  I'm sorry.
24       Q.  At that time that you learned about the

1  comment from Ruth Briggs, why didn't you reach

2  out to Dr. Wu and say, "Did you say this?"

3            MS. SATINSKY:  Objection to form.

4            THE WITNESS:  If I'm keeping the

5  timeline straight in my own head, she sent this

6  July 30th, but she did not say, "I want you to

7  investigate."

8  BY MR. MUNSHI:

9     Q.  This is a document that had been

10  previously marked as P-8.  It doesn't have a

11  sticker on it, so the same thing we did before,

12  if we could just throw a P-8 on there.

13            Before we get there, in your

14  conversation with Miss Walton, did she inform

15  you that she had been in contact with Ruth

16  Briggs about any workplace issues?

17     A.  My best recollection is Ruth had

18  discussed her concern about salary with Deirdre.

19  That's all I recall hearing they discussed.

20     Q.  Ruth, when she was having her

21  conversation with you about salary, was she

22  blaming that on Dr. Wu specifically or anybody

23  in particular?

24     A.  I don't remember that she was laying it

1    at any particular individual's door.

2        Q.   But certainly within your meeting on

3    July 30th, putting aside allegations about

4    salary, you did understand that Miss Briggs was

5    raising a concern or a complaint with you

6    specifically about Dr. Wu; right?

7        A.   Yes.

8        Q.   And then did you ever ask Miss Walton if

9    she also had communications with Ruth Briggs

10   about Dr. Wu specifically?

11       A.   I don't recall doing that.

12       Q.   Do you recall asking Miss Walton if she

13   had any communications with Greg Wacker about

14   the relationship between Miss Briggs and Dr. Wu?

15       A.   You're asking about Deirdre's

16   conversation with Greg?

17       Q.   Current.

18       A.   Did they have any?

19             I don't remember asking.

20       Q.   Well, did you have an understanding that

21   those conversations were happening?

22       A.   I don't remember Deirdre saying yes, I

23   have been talking to Greg Wacker.  I don't

24   remember if she did that.

SANDRA A. FOEHL                    60

1    was another side to the story in February of

2    2013?

3        A.  Not in February 2013.  In April of 2014

4    when Ruth said investigate, I did.

5        Q.  So at this point, you only had Ruth's

6    side of the story; right?

7                MS. SATINSKY:  Objection to form.

8                THE WITNESS:  I had Ruth's several

9    sides of what was going on with Ruth since her

10   story moved in several different directions over

11   time.  Which is why I asked her to please put a

12   statement in writing to me, which she never did.

13   BY MR. MUNSHI:

14       Q.  Her story that Dr. Wu, her direct

15   supervisor, had made a comment to her about age

16   and women in China, did that ever change?

17               MS. SATINSKY:  Objection to form.

18               THE WITNESS:  Basically, no.

19   BY MR. MUNSHI:

20       Q.  Did she ever come to you and say,

21   "Actually, Sandy, I made it up"?

22               MS. SATINSKY:  Objection to form.

23               THE WITNESS:  Ruth never withdrew

24   that remark that she attributed to Dr. Wu.

**TERRY BURKE REPORTING**

1    A.  Yes.

2    Q.  And then Deirdre sends this to you and

3  says, "FYI and for discussion."

4           Did you have a discussion with

5  Deirdre about this?

6    A.  I don't remember discussing these with

7  Deirdre.

8    Q.  At any point did Deirdre inform you that

9  she was looking into Ruth's complaints?

10   A.  The only conversation I remember with

11  Deirdre about Ruth's complaints was a salary

12  issue and how she would go about raising that.

13  So that's the only one I remember having a

14  conversation.

15   Q.  And that was back in 2012, the salary

16  issue?

17   A.  Yes, I think so.

18   Q.  Did Deirdre ever inform you that she was

19  having Greg Wacker or Drew DiMeo look into any

20  concerns or complaints by Ruth Briggs?

21   A.  I don't remember that she did.

22   Q.  Did she ever inform you that she was

23  speaking with Dr. Wu about Ruth Briggs'

24  complaints or concerns?

1      A.   No.

2      Q.   Did she ever inform you that Greg Wacker

3   and Drew DiMeo were speaking with Dr. Wu and

4   then reporting back to her about Ruth's

5   complaints?

6      A.   No.

7      Q.   And then you met with Ruth Briggs in

8   April of 2014; correct?

9      A.   Yes.

10          MR. MUNSHI:   Let's have this marked

11   as P-36.

12          (P-36 was marked for

13   identification.)

14          THE WITNESS:   (Pause.)

15          Okay.

16   BY MR. MUNSHI:

17      Q.   P-36, are these your handwritten notes?

18      A.   They are.

19      Q.   Are these your notes from your meeting

20   with Ruth Briggs on April 1st, 2014?

21      A.   Yes.

22      Q.   Under the heading which says "Mtg with

23   Ruth Briggs," it appears the word right

24   underneath it is "age."

1            Do you see that?

2      A.  Yes.

3      Q.  Why did you write that?

4      A.  This is the meeting at which Ruth said

5  investigate my complaint, and I would have made

6  sure I knew the grounds for the complaint, and

7  she said age.

8      Q.  Did you discuss an intake questionnaire

9  that she filed with the EEOC and that point?

10     A.  Never reviewed the intake questionnaire

11 with Ruth that I recall.

12     Q.  Did you discuss her going to the EEOC

13 during this meeting?

14     A.  I don't remember whether she brought it

15 up.  I didn't.

16     Q.  This meeting took place, obviously,

17 before her employment was terminated; correct?

18            MS. SATINSKY:  Objection to form.

19            THE WITNESS:  I didn't know about, I

20 don't think Ruth knew about her termination when

21 we met.  That came afterward, and I don't even

22 remember exactly when I learned.  Maybe she told

23 me that she had been terminated that day.

24 BY MR. MUNSHI:

1      Q.   During this meeting, did Miss Briggs

2  expressly ask you to investigate her complaint?

3      A.   That's my recollection, yes.

4      Q.   And did she give you any more

5  information as to the basis of her complaint

6  that she wanted you to investigate?

7           MS. SATINSKY:  Objection.  Asked and

8  answered.

9           You can answer the question.

10          THE WITNESS:  We were, our

11  conversation, there was agreement it was an age

12  discrimination complaint.  If there was anything

13  new, it might have been some of the specific --

14  this was probably the first time she had

15  introduced Hailey King as a comparator.  The

16  only comparator she ever gave me.

17          MR. MUNSHI:  Let's have this marked

18  as P-37, please.

19          (P-37 was marked for

20  identification.)

21          THE WITNESS:  (Pause.)

22          Okay.

23  BY MR. MUNSHI:

24      Q.   Are these your notes from April 4th,

1    2014, from your meeting with Dr. Wu?

2        A.  Yes.

3        Q.  Was it during this meeting where you had

4    a conversation with him about whether he made a

5    comment regarding women in China?

6        A.  I think so.

7        Q.  Is there anything in your notes about

8    that?

9        A.  No.

10       Q.  Did you ask Dr. Wu if he had ever

11   exhibited any sort of age bias towards Ruth

12   Briggs during this meeting?

13       A.  Even though it's not noted here, I did

14   ask him about the comment because what he said

15   to me -- oh, I can't answer that.

16       Q.  Well, if it took place during this

17   meeting, then you can tell me what Dr. Wu said

18   to you.

19       A.  Yes.

20            MS. SATINSKY:  If it took place

21   during this meeting and it didn't concern Dr. Wu

22   relaying information that he told you he learned

23   through counsel, then you can testify about it.

24            THE WITNESS:  Okay.

1          What he said to me about the remark
2     was that he had regular discussions with staff,
3     not Ruth only, but with staff, about cultural
4     difference, China, the United States.
5     Difficulties or differences in languages that
6     created some difficulties.
7          He said his observation about women
8     working in China, not beyond age 55, was an
9     observation made to Ruth and/or others.   And
10    that it was not meant to be upsetting to Ruth
11    Briggs.
12    BY MR. MUNSHI:
13       Q.  Did you ask him if he ever did bully or
14    threaten Ruth Briggs?
15       A.  I believe he answered that question.  In
16    my notes it said he never had any intention to
17    terminate her employment, and my recollection in
18    going over the materials today is that when she
19    talked to me, the bullying was a charge that she
20    made -- she laid at Greg Wacker's door.  The
21    clearest example that she gave with regard to
22    Greg Wacker was what she called bullying of the
23    department secretary, not of herself.
24       Q.  When you met with Ruth Briggs on

EXHIBIT
P-32
6/30/17 TB

Mtg requested by Ruth Briggs                                7/30/2012

Ms Briggs has been in the Dept of Computer Information Sciences for the past 3 yrs — since Sept 2009 — working with the Dept Chr. Dr. Hu

George Palladino arranged the temporary placement, "on loan" from the Dean's Office.
Greg Thacker has history of arrangement.

Problems

Dr. Hu yells and says demeaning things, e.g. "Are you stupid?", "In China women your age are done."

Ms Briggs gives Dr. Hu the benefit of the doubt for his remarks, allowing for cultural differences and difficulty with English.

Write up for insubordination.

Dept Sec'ty Judy Lennon is a 30 yr employee — but not adept with technology.
Dr Hu's instructions to Ms Briggs: "Don't help her." "Send her to Dean's Office."
Greg Thacker adds, "I'll discipline you if you help her."
Ms Briggs' position — Of course I'm going to help her.

Dr. Hu gives my work to student workers.
• e.g. Mary Beth goes to the hotel with Dr. Hu to meet the conference planner.

Salary
My salary level is T26 but I'm paid at a lower rate than technical T26.
My position is non bargaining unit — no recourse through union.
Current job description — Executive Assistant as in Dean's Office
I believe I am still paid from dean's office cost center.

Performance evaluation?  PDP in 2012 of 1.5, + previous PDPs 2011, 2010 based on undefined various functions and Dr. Hu's comments

(over)

Remedy?   Ms Briggs wants to return to her initial job duties: editing papers, editing web content, supervising - I oversaw front office operations. Clear PDP. Functions defined. Salary commensurate with job + years in service.

File age discrimination complaint?

I'm scared.

I'd like to get away from Greg Whacker. I feel he's retaliating because of what happened with the Tanya Hummewell complaint + my testimony. As if Greg is thinking "they moved with the wrong person + I'll find a way to take them down."

And I'm taking time in August for which I've requested FMLA (post operative care of son)

Salary + PDP concerns to HR?   Human Resources hasn't been helpful. Ask advice of new Interim Dean, Michael Klein? Ms Briggs said she hasn't done so but I may do so on her behalf ]

8/3/2012   Phone conversation with Eric Brunner, HR Learning + Development
in re Ruth Briggs
    Same performance criticisms were made in previous PDP's
    She never had a 3.0 rating.
    Mr. Brunner's recommendation to Ms. Briggs was to have a conversation
    with her supervisor.   Clarify with him what he expects in her work.

Mtg with Ruth Briggs                                                          4/1/2014

Uge                                                    no contract coverage

standard for me extraordinary

4/20     written up     apologist          called in     reached student worker
         for being late? said Drew Demaia     Asd Dir of Finance
                              Dimeo

always confrontational with me

coming in late intentionally on days scheduled for mtgs
then failed to call in

     failed to follow dept procedure

just b.cos        out three days without calling in
Hailey King        contract?

10th St location   - works for Ruth     can concentrate on proofreading
but resps have been diminished              doing financial records

Ruth's
Asks abt for mtgs with Dr. Wu.

ask Deudie about bidding - checked box (in no active discipline)

ref


EXHIBIT
P-36

## DISCRIMINATION CASE WORKSHEET

CASE _Ruth Buggs_          DATE _April 4, 2014_

INTERNAL ☒
EXTERNAL ☐     AGENCY _____

| | NAME | DEPT/TITLE |
|---|---|---|
| ACTIVITY: with<br>PHONE CALL ☐<br>CONFERENCE ☒ | Jie Wu, Ph.D. | Laura H. Carnell Professor and Chair, Dept. of Computer + Information Sciences, College of Science and Technology |

Dr. Wu said -

Ruth Buggs worked in CIS for 5 yrs
She had been assigned to CIS by George Palladino, Vice-Dean at the time.

Ruth is very nice, a friendly person, always willing to help.
And she's not efficient,
    could be too emotional about her own family problems and in sympathies with other employees
    forgetful,
    make mountains out of molehills

She resigned yesterday.

Her position was administrative assistant to Chair and Center Director. — Dr. Wu
She was supposed to supervise others. — that changed.
She was assigned away — 10th floor of Carnell Hall. — because she was disruptive,
    talked all day                    [college admin or study?]

Dr. Wu sought HR's advice because he was spending 25% of his time directing or
redirecting Ruth.
Dr. Wu, Greg Whacker, Director of Finance + Admin, and Drew Dimen, Asst. Dir.
Finance - Admin, conferred about Ruth Buggs' performance:
                                                        (cont'd)

EXHIBIT
P-37
6/30/17

2.

Biggs 4/4/2014
NKU interview)

meeting deadlines was a problem

serial conversations were necessary because she forgets instructions

she was to edit Dr. Nu's papers - could she focus / concentrate?

She was good at organizing events, e.g. party

She never raised a concern about her treatment to Dr Nu, he said,
and there was no intention on his part to dismiss her
Cumulative infractions brought her to dismissal.

Example of Ms. Biggs' inefficiency -
She was to handle a reimbursement request - routine task for Admin asst.
Next day she assured Dr Nu, 'I'm doing it now.'
But then reported back that the grant account to be charged 'wasn't in
the system.'
Dran Dimes was consulted.
Ms Biggs was advised, 'The account is in the system. Please complete
the transaction by the end of the day.'
She still couldn't complete the task
and she accused Drew Dimes of entering the account in the system after
she reported the absence of the account.

Annual evaluations are PDP?      Yes.

Dr Nu suggested that I also ask Drew Dimes and faculty members Eugene
Kwatny and Justin Shi about Ms Biggs' performance.
              saf