# IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| RUTH BRIGGS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 16-cv-0248 |
| | : | |
| TEMPLE UNIVERSITY | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

## PLAINTIFF RUTH BRIGGS' BRIEF IN OPPOSITION TO
## DEFENDANT TEMPLE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT

---

**CONSOLE MATTIACCI LAW, LLC**

/s/ Rahul Munshi
Rahul Munshi, Esquire
1525 Locust St.
Ninth Floor
Philadelphia, PA 19102

Counsel for Plaintiff, Ruth Briggs

Dated: August 9, 2017

## TABLE OF CONTENTS

I.   INTRODUCTION ...........................................................................................1

II.  STATEMENT OF MATERIAL FACTS THAT PRECLUDE ENTRY OF SUMMARY
     JUDGMENT IN FAVOR OF DEFENDANT TEMPLE UNIVERSITY ..........................3

     A.  Plaintiff Ruth Briggs' Employment at Defendant Temple University .........................3

     B.  Plaintiff Complains in October 2010 About Unequal Treatment, Harassment, and
         Hostile Work Environment and Dr. Wu Begins a Campaign of Retaliation Against
         Plaintiff ...........................................................................................................4

     C.  Dr. Wu Makes an Age and Sex Discriminatory Comment to Plaintiff About Women in
         China Being Forced to Retire When They Reach Plaintiff's Age.................................6

     D.  Plaintiff Engages in Protected Activity by Complaining About Dr. Wu's Age and Sex
         Discriminatory Comment and Behavior......................................................................7

     E.  Plaintiff Continues to Complain in 2013 About Discrimination and Ms. Foehl Does
         Nothing to Address the Toxic Environment Created by Dr. Wu.................................10

     F.  HR Director Walton Specifically Instructs Director Wacker and Mr. DiMeo to Talk
         with Dr. Wu About Plaintiff's Complaints ................................................................ 11

     G.  With No Progress Being Made to Remedy the Situation, Plaintiff Complains to
         Temple's In-House Counsel About the Discrimination and Hostile Environment She is
         Facing at Work................................................................................................12

     H.  Defendant Retaliates Against Plaintiff in 2013 By Giving Her Severe Punishment
         After She Admits to Making a Mistake ......................................................................13

     I.  Defendant Continues to Retaliate Against Plaintiff in January 2014 By Giving Her a
         Written Warning for Over-sleeping on One (1) Occasion...........................................14

     J.  Plaintiff is Retaliated Against and Continues to Complain About Dr. Wu in 2014 ...17

     K.  Defendant Terminates Plaintiff's Employment on April 1, 2014................................20

III. STANDARD OF REVIEW .........................................................................................20

IV.  LEGAL ARGUMENT..................................................................................................23

     A.  Defendant's Motion for Summary Judgment Should Be Denied With Regards to
         Plaintiff's Underlying Claims of Age and Sex Discrimination Because a Jury Could
         Conclude That Plaintiff Was Subjected to Unlawful Discrimination by Defendant .. 23

1.  Plaintiff Clears the Low Bar of Establishing a *Prima Facie* Case .................23

    i.  Plaintiff Was Qualified For Her Position of Executive Assistant........24

    ii.  Plaintiff Was Terminated Under Circumstances That Give Rise to An Inference of Discrimination ...............................................................27

2.  Plaintiff Has Set Forth Sufficient Evidence Such That a Reasonable Jury Could Conclude That Defendant's Asserted Reasons for Terminating Her Employment Are Pretextual.............................................................................31

B.  Plaintiff Has Set Forth Sufficient Evidence From Which a Reasonable Jury Could Conclude that Defendant Retaliated Against Her Because She Engaged in Protected Activity ...............................................................................................................35

C.  Plaintiff Has Set Forth Sufficient Evidence From Which a Reasonable Jury Could Conclude that Defendant Subjected Plaintiff to a Hostile Work Environment ..........40

D.  Defendant's Motion for Summary Judgment Should Be Denied as There are Material Facts in Dispute, Namely Whether Defendant Terminated Plaintiff's Employment Because of Her Age and/or Sex and/or Protected Activity........................................42

V.  CONCLUSION.................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

Aman v. Cort Furniture Rental Corp.
  85 F.3d 1074 (3d Cir. 1996)....................................................................................36

AMTRAK v. Morgan
  536 U.S. 101 (2002)...............................................................................................41

Anderson v. Liberty Lobby, Inc.
  477 U.S. 242 (1986).........................................................................................41, 42

Andrews v. City of Philadelphia
  895 F.2d 1469(3d Cir. 1990)..................................................................................41

Barber v CSX Dist. Servs.
  68 F.3d 694(3d Cir. 1995)......................................................................................31

Burlington v. Ellerth
  524 U.S. 742 (1998)...............................................................................................45

Burrage v. United States
  134 S.Ct. 881 (2014)..............................................................................................32

Burton v. Teleflex Inc.
  707 F.3d 417 (3d Cir. 2013)..............................................................................32, 44

Castleberry v. STI Grp.
  No. 16-3131, 2017 U.S. App. LEXIS 12611 (3d Cir. July 14, 2017)....................41

Celotex Corp v. Catrett
  477 U.S. 317 (1986)...............................................................................................21

Corbetto v. Wyeth Pharma.
  619 F.Supp.2d 142 (W.D. Pa. 2007)......................................................................24

Doe v. C.A.R.S. Protection Plus, Inc.
  527 F.3d 358 (3d Cir. 2008).................................................................21, 22, 32, 42

Ezold v. Wolf Block
  983 F.2d 509 (3d Cir. 1993)...................................................................................24

Fasold v. Justice
  409 F.3d 178 (3d Cir. 2005)...................................................................................35

Fuentes v. Perskie
    32 F.3d 759 (3d Cir. 1994)......................................................................31, 35, 44

Gerundo v. AT&T Servs.
    2016 U.S. Dist. LEXIS 177583 (E.D. Pa. Dec. 20, 2016) ......................................43

Golod v. Bank of Am. Corp.
    403 Fed. Appx. 699 (3d Cir. 2010) ......................................................................30

Goosby v. Johnson & Johnson Med., Inc.
    228 F.3d 313 (3d Cir. 2000)............................................................................22, 42

Graham v. F.B. Leopold Co., Inc.
    779 F.2d 170 (3d Cir. 1985)..................................................................................29

Gross v. FBL Fin. Servs.
    129 S.Ct. 2343 (2009)...........................................................................................32

Hunt v. Cromartie
    526 U.S. 541 (1999)..............................................................................................21

Iadimarco v. Runyon
    190 F.3d 151 (3d Cir. 1999)..................................................................................32

Idahoan Fresh v. Advantage Produce, Inc.
    157 F.3d 197 (3d Cir. 1998)..................................................................................23

Jalil v. Avdel Corp.
    873 F.2d 701 (3d Cir. 1988)............................................................................22, 32

Jones v. Sch. Dist. Of Philadelphia
    198 F.3d 403 (3d Cir. 1999)..................................................................................25

Lauren W. v. Deflaminis
    480 F.3d 259 (3d Cir. 2007)..................................................................................38

Leaphart v. Am. Friends Serv. Committee
    No. 07-4919, 2008 U.S. Dist. LEXIS 85530 (E.D. Pa. Oct. 23, 2008) .................22

Makky v. Chertoff
    541 F.3d 205(3d Cir. 2008).................................................................................25

Marra v. Philadelphia Housing Auth.
    497 F.3d 286(3d Cir. 2007)..................................................................................38

Marzano v. Computer Science Corp.
  91 F.3d 497(3d Cir. 1996)........................................................................21

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.
  475 U.S. 574(1986)................................................................................21

McDonnell Douglas Corp. v. Green
  411 U.S. 792 (1973)........................................................................ *passim*

Neiderlander v. Am. Video Glass Co.
  80 Fed.Appx. 256 (3d Cir. 2003)...............................................................25

Nelson v. DeVry, Inc.
  No. 07-4436, 2009 U.S. Dist. LEXIS 38161 (E.D. Pa. Apr. 23, 2009)..................26

Ness v. Marshall
  620 F.2d 517 (3d Cir. 1981).....................................................................22

Oakley v. Orthopedic Assocs. of Allentown, Ltd., et al.
  742 F.Supp.2d 601 (E.D. Pa. 2010)............................................................22

Reeves v. Sanderson Plumbing Prods. Inc.
  530 U.S. 133 (2000)....................................................................27, 34, 44

Robinson v. City of Philadelphia
  491 Fed. Appx. 295 (3d Cir. 2012).............................................................32

Sarullo v. U.S. Postal Serv.
  352 F.3d 789 (3d Cir. 2003)................................................................24, 27

Scheidemantle v. Slippery Rock Univ.
  470 F.3d 535 (3d Cir. 2006)................................................................24, 27

Scott v. Genesis Healthcare, Inc.
  No. 15-0916, 2016 U.S. Dist. LEXIS 111262 (E.D. Pa. Aug. 22, 2016)...............26

Sheridan v. E.I. Dupont de Nemours & Co.
  100 F.3d 1061 (3d Cir. 1996)....................................................................32

Smith v. Pittsburgh Gage & Supply Co.
  464 F.2d 870 (3d Cir. 1972).....................................................................21

Sorba v. PA Drilling Co.
  821 F.2d 200 (3d Cir. 1987).....................................................................31

Stewart v. Rutgers Univ.
    120 F.3d 426 (3d Cir. 1997).................................................................22

St. Mary's Honor Center v. Hicks
    509 U.S. 502 (1993)..........................................................31, 35, 42

Tomasso v. Boeing Co.
    445 F.3d 702 (3d Cir. 2006)...............................................................44

Weldon v. Kraft, Inc.
    896 F.2d 793 (3d Cir. 1990)..........................................................25, 26, 29

**Statutes**

Age Discrimination in Employment Act
    29 U.S.C. §621, *et seq* ................................................................ *passim*

Title VII of the Civil Rights Act of 1964
    42 U.S.C. §2000e, *et seq*............................................................ *passim*

Pennsylvania Human Relations Act
    43 P.S. §951, *et seq*................................................................... *passim*

**Other Authorities**

Fed.R.Civ.P. 56.......................................................................... passim

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RUTH BRIGGS,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | **CIVIL ACTION NO.** |
| v. | : | **16-cv-0248** |
| | : | |
| **TEMPLE UNIVERSITY** | : | |
| | : | |
| Defendant. | : | |
| | : | |

## PLAINTIFF RUTH BRIGGS'S MEMORANDUM OF LAW
## IN SUPPORT OF HER OPPOSITION TO DEFENDANT
## <u>TEMPLE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT</u>

### I.   <u>INTRODUCTION</u>

*I want you to understand how distressing it is when I have no one in the department and no one in human resources who will listen to me. I am honest and operate with integrity in every arena of my life and five days out of the week I a[m] battered emotionally, insulted, ignore[d], yelled at in front of peers and the department scapegoat. I am often accused for the mistakes and the misconduct of others.*

* * * * * * *

*I am so bullied and harassed all day. . . . No other staff member is required to meet daily for a dose of public humiliation and my request to move the meetings to a private location was flat out denied.*

*When I asked for clarification on an assignment, it is reported to the dean's office as a challenge to his authority. If he can have a someone there to protect his interests, there is more than an element of unfairness. It is beginning to feel like psychological abuse.*

* * * * * * *

*I have very strong personal beliefs regarding our litigious society and feel a moral obligation to find solutions to problems in a manner that is not adversarial. BUT NO ONE WILL RESPOND TO ME AND MY PROFESSIONAL LIFE IS ON THE LINE. . . . My situation I believe is now compounded because of my age, my gender, and perhaps ethnicity. I am begging for someone within Temple to help mediate this problem.*

1

\* \* \* \* \* \* \*

*I am drowning here and have reached out to you numerous times and waited and waited. This is affecting the quality of my work life and my person[al] life. All I want is to continue to work without being harassed.*

These are only some of the written pleas for help from Plaintiff Ruth Briggs, a long-service employee of Defendant Temple University who was terminated in April 2014 after complaining that she was being discriminated against because of her age and sex and that she was being retaliated against and subjected to a hostile work environment by upper management. Ms. Briggs began begging – literally – for assistance after she started reporting to Dr. Jie Wu, the Chair of the Department of Computer Information Services ("CIS"). She continued to complain up to the day that Defendant terminated her employment.

In 2011, Dr. Wu (a Chinese national) remarked to Ms. Briggs – the day before her 57th birthday – that in China women of her age are "put out to pasture," which Ms. Briggs clearly understood to be an admonition to retire from her supervisor because of her age and sex. Ms. Briggs brought her complaints to Human Resources. She brought her complaints to the Equal Opportunity Compliance Office. She even went to Defendant Temple's in-house counsel, specifically stating that she was being discriminated against and feared retaliation. Her complaints were allegedly "looked into" but no progress was made to remediate the toxic environment. When all else failed, she alerted Temple that she would be bringing a complaint to the Equal Employment Opportunity Commission ("EEOC"). Weeks later, she was fired.

Ms. Briggs was discriminated against because of her age in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. §621, *et seq.* ("ADEA") and the Pennsylvania Human Relations Act, as amended, 43 P.S. §951, *et seq.* ("PHRA"), and because of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et*

*seq.* ("Title VII") and the PHRA.  Ms. Briggs was further subjected to a hostile work environment and retaliated against by Defendant for complaining of age and sex discrimination in the workplace.

As set forth in detail herein, Ms. Briggs has met her burden at this stage to present sufficient evidence from which a reasonable jury could conclude that Defendant discriminated and retaliated against her, and subjected her to a hostile work environment.  As such, Defendant's Motion for Summary Judgment should be denied, and Plaintiff should be permitted to present her case to a jury.

## II. STATEMENT OF MATERIAL FACTS THAT PRECLUDE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF DEFENDANT TEMPLE UNIVERSITY.

### A. Plaintiff Ruth Briggs' Employment at Defendant Temple University.

Plaintiff was born in 1954 and is almost sixty-three (63) years old.  Deposition of Ruth Briggs ("Briggs Dep.") at 12:23-24.[1]  At her termination date in April 2014, she was fifty-nine (59) years old.  Plaintiff commenced employment with Defendant in or around February 2001 as an Editorial Assistant in the Center for Neurovirology and Cancer Biology.  Id. at 97:9-12.  In or around 2005, Plaintiff became an Executive Assistant to Interim Dean Allen Nicholson of the College of Science and Technology at Defendant.  Id. at 107:17-23; 109:24-110:2; 112:6-8.

In or around October 2009, Plaintiff was transferred by Defendant and became the Executive Assistant to Dr. Jie Wu, the Chair of the Department of CIS.  Id. at 134:19-135:1; Deposition of Jie Wu ("Wu Dep.") at 7:12-20.  Plaintiff indirectly reported to Greg Wacker ("Director Wacker"), former Director of Finance and Administration and current Assistant Dean of Finance and Administration.  Deposition of Greg Wacker ("Wacker Dep.") at 8:5-7; 6:14-16.

---

[1] Exhibits 26, 27, 28, 29, and 30 are the deposition transcripts of Plaintiff Ruth Briggs, Dr. Jie Wu, Greg Wacker, Deirdre Walton, and Sandra Foehl, respectively.

As Executive Assistant to Dr. Wu, Plaintiff provided administrative support and performed a variety of functions, including directing all ongoing and special projects, developing programs and systems to manage daily activities, and planning and coordinating events. See generally Exhibit 1, attached hereto. The essential functions of the job included serving as a liaison for Dr. Wu with representatives of other University administrative and academic offices, and working with a wide array of University-wide constituents while ensuring the administrative operation of the department. Id.

Each annual performance evaluation that Plaintiff received from Defendant throughout her employment resulted in a score that fell between a 2.0 ("Performance meets minimal expectations and standards") and a 3.0 ("Performance meets job expectations. GOOD SOLID PERFORMANCE."). See Exhibit 2, attached hereto. For the 2013 performance evaluation, Defendant implemented a new scoring system and abandoned its numerical scales. For that evaluation, Plaintiff received a score of "Partially Meets Expectations." See Exhibit 3, attached hereto. Plaintiff was never at any point during her career at Defendant placed on a performance improvement plan. Wu Dep. at 108:3-16.

**B. Plaintiff Complains in October 2010 About Unequal Treatment, Harassment, and Hostile Work Environment and Dr. Wu Begins a Campaign of Retaliation Against Plaintiff.**

Throughout her reporting relationship to Dr. Wu, Plaintiff would be subjected to arbitrary yelling, degradation, and public humiliation by Dr. Wu. Briggs Dep. at 197:5-9 ("He would, he would degrade, yell at me, I mean literally yell at me in public settings – front office, elevator, hallway – in front of external constituents, staff, other faculty.") Plaintiff had never seen him yell at any other employee of Defendant. Id. at 197:19-21. Dr. Wu would often say to Plaintiff, "Are you stupid or something?" and struck fear in Plaintiff. Id. at 197:22-198:11; 514:5-9. Dr. Wu

often required Plaintiff to get him coffee and cookies and do other subservient tasks that were not within her job duties.  Id. at 511:8-512:7.  Plaintiff never heard Dr. Wu ask a man to get him coffee. Id. at 514:10-14.   The verbal abuse by Dr. Wu started within one (1) month of Plaintiff commencing employment under him and would occur several times per month.  Id. at 203:13-23.

On October 29, 2010, Plaintiff emailed Director Wacker, who indirectly supervised all staff members within the department:

> I cannot come in here day in and day out, not knowing if I am going to be applauded or punched.  It is stressful to me and everyone around me.  If I wanted [to] change jobs at Temple, it would be impossible because of him [Dr. Wu].  Frankly, it borders on harassment. . . . The environment is hostile.  Even faculty members have told me that they are uncomfortable about the way he treats me.

See Exhibit 4, attached hereto.

Director Wacker forwarded Plaintiff's email to Deirdre Walton ("HR Director Walton"), the Director of Labor Relations within Defendant's Human Resources department.  See Exhibit 5, attached hereto; Deposition of Deirdre Walton ("Walton Dep.") at 6:15-17.   Director Wacker testified that it is possible that he told Dr. Wu that he spoke with HR Director Walton about Plaintiff's email and that he spoke with Dr. Wu about the email itself.  Wacker Dep. at 84:9-85:10; 88:16-22.

A few weeks later, on November 9, 2010, Plaintiff emailed to Dr. Wu directly: "While I have no defense against anything that comes my way, it would be nice to have **fairness in treatment and equal applying standards applied for staff members**." See Exhibit 6, attached hereto (emphasis added).  Just ten (10) days later, on November 19, 2010, Dr. Wu sent an email to HR, specifically asking if he could have assistance in replacing Plaintiff in her Executive Assistant role.  See Exhibit 7, attached hereto.  The alleged performance issues of Plaintiff raised by Dr. Wu

5

in his letter to HR had not been raised with HR before, even though they allegedly had been taking place for years.

On December 9, 2010, Sharon Boyle of Defendant's HR office responded to Dr. Wu's letter, stating that she investigated Dr. Wu's allegations about Plaintiff's alleged work deficiencies and found **no basis** to discipline her.  See Exhibit 8, attached hereto ("I am writing to follow up on our meeting regarding the performance with Ruth Briggs.  Following our meeting, I met with Ruth Briggs.  Based on the discussion and information received in both meetings, **there is no basis for disciplining Ruth at this time**.") (emphasis added).

### C. Dr. Wu Makes an Age and Sex Discriminatory Comment to Plaintiff About Women in China Being Forced to Retire When They Reach Plaintiff's Age.

Dr. Wu was born in China in 1961 and lived there until 1987.  Wu Dep. at 9:19-10:7.  Dr. Wu knows that in China there is a mandatory retirement law that requires white collar, professional women to retire at the age of fifty-five (55).   Wu Dep. at 10:8-11; 10:19-11:20.

On November 9, 2011, Dr. Wu stated to Plaintiff, who was turning fifty-seven (57) years old the next day, words to the effect of, "You know, in China women are put out to pasture by your age."  Briggs Dep. at 215:20-216:2.  Dr. Wu had made a similar comment to Plaintiff in the past.  Id. at 216:3-5; 218:13-21.  Dr. Wu admits to having a conversation with Plaintiff about how in China women retire early.  Wu Dep. at 12:5-12; 14:15-18 ("I just said women retired early and there are many cases, certain job – for certain discipline, they required young women.  Like in the restaurant.  More labor.").  He even stated to Plaintiff that his own sister retired "very early" in China.  Id. at 13:9-14.  To Dr. Wu, "[e]arly could be 40, 50, women last job."  Id. at 13:15-17.  As Dr. Wu explained at his deposition about China's mandatory retirement law, "So I think the main purpose is that you don't want a person to hold a position for too long, especially like a leadership position."  Id. at 15:9-11.

When Dr. Wu made these comments to Plaintiff, he knew that Plaintiff was in her 50s. Id. at 18:3-9. The November 9, 2011 comment was made within the context of Plaintiff's birthday – which was the next day – and Dr. Wu had asked how old she was turning or had turned. Briggs Dep. at 215:20-24. Plaintiff interpreted Dr. Wu's comment, which was made to her right before her birthday and clearly referenced her age and sex, to mean that Plaintiff should no longer be in the workforce and should retire. Id. at 223:3-6. Obviously, she was offended by the comment coming from her supervisor. Id. at 233:1-9.

Plaintiff replied to Dr. Wu by stating words to the effect of, "Well, with all due respect, we're in America right now." Briggs Dep. at 216:3-5; Walton Dep. at 54:5-11; Deposition of Sandra Foehl ("Foehl Dep.") at 35:4-7. **For challenging Dr. Wu's biased view and discriminatory comment, Plaintiff was given a written warning for allegedly acting unprofessionally and inappropriately.** Briggs Dep. at 216:6-10; Exhibit 9, attached hereto.

The November 9, 2011 discipline was issued to Plaintiff by Dr. Wu, who consulted with Director Wacker on the decision. Wacker Dep. at 95:4-14. This was the first written warning that Dr. Wu had given to anyone in his entire career. Wu Dep. at 49:18-50:3. Neither Dr. Wu nor Director Wacker could testify as to why exactly Plaintiff received this discipline. Wacker Dep. at 97:11-16; Wu Dep. at 35:15-36:1. Neither Dr. Wu nor Director Wacker wrote down anywhere what it was that Plaintiff allegedly did to warrant this discipline. Wacker Dep. at 98:24-99:6; Wu Dep. at 41:22-42:13. Dr. Wu was not reprimanded in any way for making his discriminatory comment to Plaintiff. Wu Dep. at 27:5-9.

### D. Plaintiff Engages in Protected Activity by Complaining About Dr. Wu's Age and Sex Discriminatory Comment and Behavior.

Plaintiff complained directly to HR Director Walton about Dr. Wu's discriminatory and offensive comment to her. Walton Dep. at 50:10-16. HR Director Walton understood that Dr.

Wu's comment was specifically about women of a certain age, and that Plaintiff was raising a complaint to her. Id. at 51:19-23; 51:3-7 ("She was complaining about it, yeah."). HR Director Walton thought it was appropriate for Plaintiff to come to her and complain about Dr. Wu's comment. Id. at 52:13-17.

As a result of Plaintiff's complaint, HR Director Walton specifically instructed Director Wacker and Andrew DiMeo (a direct report of Director Wacker) to **ask Dr. Wu about the comment** and report back to her. Id. at 52:22-53:1 ("I talked with – again, I talked with Greg [Wacker] and Drew [DiMeo] and I asked them to talk with Dr. Wu and find out if this occurred in the way that Ruth presented it."). Director Wacker and Mr. DiMeo did as they were instructed by HR Director Walton, and reported back to her that **Dr. Wu told them** that the conversation did not occur in the way that Plaintiff described. Id. at 53:13-18.

Plaintiff also complained to Director Wacker directly about Dr. Wu's comment to her about the policy of women of a certain age being forced into retirement in China. Briggs Dep. at 217:13-17; 463:21-24; 465:2-8; Wacker Dep. at 98:5-12 ("[I]t had to do with either women in retirement, or something along those lines."). Director Wacker understood that Plaintiff felt that Dr. Wu made an inappropriate comment to her about her age and/or gender, and therefore suggested that Plaintiff speak with Sandra Foehl, Director of Defendant's Equal Opportunity Compliance Office ("EOC"), to file a complaint. Wacker Dep. at 14:2-2 ("At that point, she felt it had something to do with either her age or her gender, and I suggested that she go to Sandra Foehl's office to file a complaint if indeed that was said."). Director Wacker knew that Ms. Foehl and the EOC office handle personnel complaints, and that Ms. Foehl, within her capacity in the EOC office, deals with age and gender issues in the workplace. Id. at 16:9-10; 18:23-24; 20:4-11; see also id. at 16:1-4 ("And

once again, my direction was if you feel that adamant about a complaint, this office handles that type of complaint, go seek that.").

Plaintiff stated to Ms. Foehl of Temple's Equal Opportunity Compliance Office that she felt that she was being discriminated against, and she specifically relayed Dr. Wu's comment about older women being "put out to pasture" in China.  Foehl Dep. at 12:2-16 (Plaintiff told Ms. Foehl that Dr. Wu said that in China, "women who reach the age of 55 are done in the workforce").[2]  Ms. Foehl and Plaintiff met on or around July 30, 2012 to discuss these issues.  In Ms. Foehl's handwritten notes from that meeting, she states that Plaintiff relayed to her: "Problems.  Dr. Wu yells and says demeaning things, e.g., 'Are you stupid?'  'In China, women your age are done.'" See Exhibit 11, attached hereto.  Ms. Foehl and Plaintiff discussed filing a formal complaint of discrimination during this meeting; however, Plaintiff expressed that she was scared.  Id. ("File age discrimination complaint?  I'm scared.").  Immediately after this meeting, Ms. Foehl reached out to HR Director Walton and Eric Brunner of HR to solicit information about Plaintiff.  In her email, Ms. Foehl specifically describes the situation with Plaintiff as "Employee complaint."  See Exhibit 12, attached hereto.

The following month, on September 9, 2012, Plaintiff circled back to Ms. Foehl to follow up on their meeting from earlier that summer.  In her email correspondence to Ms. Foehl, Plaintiff specifically references back to their conversation where Plaintiff complained to Ms. Foehl about the discriminatory comments of Dr. Wu.  See Exhibit 13, attached hereto ("Regarding our discussion related to Dr. Wu's comments about my age . . .").  In response, Ms. Foehl sent Plaintiff information on how to file an internal complaint with Temple.  See Exhibit 14, attached hereto

---

[2] Plaintiff also discussed these issues with Rhonda Brown of Temple's Office of Institutional Diversity in 2012.  See Exhibit 10, attached hereto (email from Plaintiff to Ms. Foehl dated July 25, 2012) ("I spoke to Rhonda Brown regarding personal employment issues, about which I was encouraged to meet with you.").

("Please be advised that complaints of unlawful discrimination may be made to government compliance agencies as well as to this office.  The attachment here gives you direction to the federal, state and municipal offices in Philadelphia.").

### E.  Plaintiff Continues to Complain in 2013 About Discrimination and Ms. Foehl Does Nothing to Address the Toxic Environment Created by Dr. Wu.

In early 2013, Plaintiff continued to be harassed and bullied by Dr. Wu.  Plaintiff again raised her concerns with Ms. Foehl and Ms. Brown.  On February 7, 2013, Plaintiff wrote to Ms. Brown, "I am so bullied and harassed all day."  See Exhibit 15, attached hereto.  Ms. Brown responded to Plaintiff and told her to "[g]o to Sandy."  Id.  Plaintiff then emailed Ms. Foehl on February 8, 2013, stating:

> I am so bullied and harassed all day. . . . No other staff member is required to meet daily for a dose of public humiliation and my request to move the meetings to a private location was flat out denied.
>
> When I asked for clarification on an assignment, it is reported to the dean's office as a challenge to his authority.  If he can have a someone there to protect his interests, there is more than an element of unfairness.  It is beginning to feel like psychological abuse.

See Exhibit 16, attached hereto.

Even though Ms. Foehl had just met and communicated with Plaintiff months earlier about Dr. Wu's discriminatory treatment towards, and comments about, Plaintiff, and even though they had been discussing the process of filing internal and external discrimination complaints, and even though Ms. Foehl is specifically tasked with handling these types of complaints, instead of stepping in to mediate the situation Ms. Foehl simply kicked the can down the road to HR.  Id. ("Ruth, this is an issue for Human Resources first.  Address the situation and your concerns to Deirdre Walton in Labor and Employee Relations.").  Even more shocking, Ms. Foehl forwarded

Plaintiff's email to HR Director Walton, and remarked that she did not "see a claim of unlawful discrimination/harassment in Ruth Briggs' message." Id.

### F. HR Director Walton Specifically Instructs Director Wacker and Mr. DiMeo to Talk with Dr. Wu About Plaintiff's Complaints.

At Ms. Foehl's direction, Plaintiff did contact HR Director Walton again to discuss the workplace harassment to which she was subjected by Dr. Wu, but the hostile work environment continued to escalate. HR Director Walton confirmed that Plaintiff complained to her about Dr. Wu on numerous occasions, including about how he was treating her in the workplace and that she felt demeaned by Dr. Wu. Walton Dep. at 27:1-5; 28:5-9; 29:19-21. HR Director Walton estimated that Plaintiff complained at least ten (10) times to her about Dr. Wu. Id. at 28:5-29:3.

HR Director Walton testified at length that whenever Plaintiff would come to her with workplace concerns, she would then follow up with Director Wacker and Mr. DiMeo about what Plaintiff had told her. Id. at 31:6-16. She estimated she had approximately five (5) or six (6) conversations with Director Wacker about Plaintiff raising concerns about Dr. Wu. Id. at 33:3-6.

More specifically, HR Director Walton estimated that Plaintiff complained at least five (5) or six (6) times to her that she felt that the workplace environment was hostile. Id. at 35:2-8. HR Director Walton understood that Plaintiff's feelings of hostile work environment stemmed directly from Plaintiff's working relationship with Dr. Wu. Id. at 45:11-14. As a result of Plaintiff complaining to her about hostile work environment created by Dr. Wu, HR Director Walton would speak with Director Wacker and Mr. DiMeo and instruct them to "look into" the concerns. Id. at 36:11-17; 37:23-38:2 ("When she called to complain about something, I contacted Drew [DiMeo] and Greg [Wacker]. They told me they would look into it. They would call back. And then I would, you know, give them advice on, you know, how they should handle it.").

11

HR Director Walton estimated that she spoke with Director Wacker well over six (6) times about Plaintiff's complaints that the workplace environment was hostile. Id. at 40:1-10. By "look into" the concerns, HR Director Walton specifically meant that Director Wacker and Mr. DiMeo **would talk with Dr. Wu** about Plaintiff's complaints. Id. at 38:3-6.

### G. With No Progress Being Made to Remedy the Situation, Plaintiff Complains to Temple's In-House Counsel About the Discrimination and Hostile Environment She is Facing at Work.

In February 2013, Plaintiff sought the help of Cameron Etezady, Esq. of Temple's Office of University Counsel. Plaintiff had previously communicated with Mr. Etezady regarding a former employee of Temple who planned to bring an action of workplace discrimination against Temple. In emails dated February 9, February 10, and February 11, 2013, Plaintiff specifically communicated to Mr. Etezady that she was being discriminated against on the basis of her age and sex, and that she feared retaliation by Dr. Wu.

On February 9, 2013, Plaintiff wrote to Mr. Etezady: "I am contacting you to request a CONFIDENTIAL conversation **to discuss disparate treatment for me, which I believe is related to my age of 58. I am concerned about retaliation**." See Exhibit 17 at p.4, attached hereto (February 9, 2013 email from Plaintiff to Mr. Etezady) (emphasis added).

The following day, Plaintiff more fully explained why she was reaching out to Mr. Etezady:

> After a week of unrelenting bullying, I sent an email to Rhonda Brown and she told me to contact Sandy, Sandy told me to contact Diedre Walton. Since I provided a statement several years ago for a discrimination lawsuit by Tanya Hunnewell, in which I contradicted the story that I was coached to report, I do not trust that she has my best interests at heart. On numerous occasions, Jie Wu has mentioned that the professional lives of women my age (58) in China are over and I wrote it off to cultural differences. It was when he would make a comment that referenced my age and failure to attain the financial stability to be able to travel when I felt defensive and offended.

12

See Id.

Plaintiff further stated that she had already spoken to Ms. Brown, Ms. Foehl, and Ms. Walton, but no one was able to alleviate the situation. Mr. Etezady directed Plaintiff to reach out to Fay Trachtenberg, Esq. of Temple's Office of University Counsel, which she did on or about February 14, 2013. Plaintiff again relayed her concerns and again no action was taken by Temple.

## H. Defendant Retaliates Against Plaintiff in 2013 By Giving Her Severe Punishment After She Admits to Making a Mistake.

Shortly after Plaintiff complained to Ms. Foehl, Ms. Brown, HR Director Walton, and in-house counsel Mr. Etezady, Plaintiff was given a three-day suspension for making an error in connection with an administrative duty. Briggs Dep. at 272:22-23. Plaintiff noticed the error herself and took ownership of the mistake. Id. at 277:1-18. It was within Dr. Wu's discretion to levy punishment on Plaintiff in regard to this issue. Wu Dep. at 119:1-8. At around this time, Dr. Wu had approximately fifty (50) employees reporting to him, and he admits that his employees make mistakes. Id. at 9:13-16; 127:18-21. Nevertheless, Plaintiff is the **only** employee that Dr. Wu has ever given discipline to for making a mistake. Id. at 128:9-13. Furthermore, Plaintiff is the **only** employee who Dr. Wu issued a three-day suspension to at any time in his career. Id. at 127:5-11.

Plaintiff complained to HR Director Walton that the three-day suspension was too severe and that numerous mitigating factors were not taken into account when Dr. Wu issued this sentence. Walton Dep. at 57:5-7. For example, Plaintiff herself recognized the error she made and brought it to the supervisors' attention; she took ownership of the mistake; she had been helping to cover another employee's workload while that person was on FMLA leave; and earlier that week, Dr. Wu had instructed Plaintiff to drop everything she was doing to work on an emergency project. See Exhibit 18, attached hereto. HR Director Walton understood that Plaintiff

13

felt she was being treated unfairly and singled out with regard to the punishment.  Walton Dep. at 58:22-59:1; 59:15-19.

In August 2013, Plaintiff again reached out to Ms. Trachtenberg and Mr. Etezady of Temple's in-house counsel office because she continued to feel singled out by Dr. Wu and Mr. DiMeo, who had been working closely with Dr. Wu and had been meeting with Plaintiff routinely during this period.  Plaintiff's email to Mr. Etezady on August 6, 2013 stated that she was literally begging for help because she felt targeted by her supervisor.  She specifically wrote to Mr. Etezady:

> I have very strong personal beliefs regarding our litigious society and feel a moral obligation to find solutions to problems in a manner that is not adversarial.  BUT NO ONE WILL RESPOND TO ME AND MY PROFESSIONAL LIFE IS ON THE LINE. . . .
>
> **My situation I believe is now compounded because of my age, my gender, and perhaps ethnicity.  I am begging for someone within Temple to help mediate this problem. . . .**
>
> My confidence has never been so low and at 58 years old, I have no[] options to change the course of my plummeting professional life because I am relegated to making coffee, secretarial functions even though I have never been a secretary.  Young female student workers occupy my former office area where they carry out my job functions while I was re-located from the third floor of Wachman to the 10th floor of Carnell.

See Exhibit 17, at p.2.  Notwithstanding her cries for help, Temple continued to do nothing to assist in the situation.

**I.  Defendant Continues to Retaliate Against Plaintiff in January 2014 By Giving Her a Written Warning for Over-sleeping on One (1) Occasion.**

In January 2014, Plaintiff again received a disciplinary notice from Dr. Wu and Mr. DiMeo. Plaintiff overslept and arrived to work approximately three (3) hours late.  Briggs Dep. at 208:2-15.  Before coming in, Plaintiff notified a student-worker that she overslept and was leaving her home soon.  Id.  Plaintiff asked to speak with Judy Lennon (CIS Department secretary), who was

nowhere to be found.  Id.  Plaintiff asked to speak with Dr. Wu himself, but he was in a meeting.
Id.  Consequently, Plaintiff told the student-worker to inform them that she would be arriving at
work shortly.  Id.  For this one incident, Plaintiff received a disciplinary note and a written warning.
See Exhibit 19, attached hereto.

Plaintiff was surprised to get this discipline because she did not have a history of tardiness
or absenteeism, and she would routinely work past her scheduled hours to get her work done.
Briggs Dep. at 310:10-19.  For example, on this day where she overslept, she stayed at work until
9pm or 10pm to finish her assignments.  Id.

Dr. Wu testified that he maintains an "informal rule" that if a staff member is late then that
person should email Dr. Wu directly.  Wu Dep. at 128:15-22.  However, he testified that it would
be appropriate notice if someone is running late to call the office and ask to speak with him.  Id. at
134:1-11.  He further explained that if he is unavailable, it would be appropriate for the person
running late to tell Ms. Lennon about the situation.  Id. at 134:12-16.  And if Dr. Wu is not available
and Ms. Lennon is not available, it would be appropriate to tell the person answering the call in
the office to tell Dr. Wu about being late.  Id. at 134:17-21.

Frustrated that she just received a written warning even though she complied with Dr. Wu's
rules on how to call out if running late, Plaintiff went back to HR Director Walton on February 22,
2014 and expressed her exasperation with the retaliation she was facing:

> I want you to understand how distressing it is when I have no one in
> the department and no one in human resources who will listen to me.
> I am honest and operate with integrity in every arena of my life and
> five days out of the week I a[m] battered emotionally, insulted,
> ignore[d], yelled at in front of peers and the department scapegoat.
> I am often accused for the mistakes and the misconduct of others.

See Exhibit 20, attached hereto.

As she had done in the past, HR Director Walton – upon receipt of this email from Plaintiff – contacted Director Wacker and Mr. DiMeo and instructed them to look into these issues being raised by Plaintiff.  Walton Dep. at 82:19-22 ("I asked, as I always did when she contacted me, I asked them to look into the situation that was going on between Dr. Wu and Ruth.").   HR Director Walton understood that Director Wacker and Mr. DiMeo **went to Dr. Wu** with these complaints by Plaintiff, and he denied making any comments to Plaintiff that were insulting.  Id. at 79:21-80:18.

From 2010 to 2014, there were **no** complaints or concerns that Plaintiff raised with HR Director Walton that she did not look into herself or direct someone else to look into.  Id. at 89:24-90:14.  To put a finer point on it, HR Director Walton understood that **both** Director Wacker **and** Mr. DiMeo had conversations **directly with Dr. Wu about Plaintiff's concerns**.  Id. at 84:20-85:3; see also Exhibit 21 at p.1, attached hereto (March 25, 2014 email from HR Director Walton to Plaintiff) **("Every time you have reached out to me I have talked with you and looked into your complaints and concerns.").**[3]

At the same time that Plaintiff received written discipline for over-sleeping one (1) time, one (1) of Plaintiff's co-workers, a new hire named Hailey King (late 20s), was a no call/no show for three (3) straight days. Briggs Dep. at 307:23-308:11.  Both Plaintiff and Ms. King were staff members who were required to punch in and out at work. Wu Dep. at 131:14-23.  According to Dr. Wu, Ms. King was once absent for "a couple of days" without informing Dr. Wu where she was.  Id. at 130:16; 131:9-13.  Ms. King did not call or email Dr. Wu for a "couple of days."  Id. at 131:14-23; see also id. at 131:1-5 ("Oh, she disappear.  Not disappear.  But out of reach, maybe

---

[3] Dr. Wu denies that he **ever** learned prior to Plaintiff's termination that she had complained about him.  Wu Dep. at 110:1-19.  He likewise denies that he **ever** learned from Director Wacker or Mr. DiMeo prior to Plaintiff's termination that she had gone to HR or the EOC office about him.  Id. at 67:23-68:12.  At a minimum, this is a highly disputed material fact upon which denial of summary judgment is appropriate.

out of power for a couple of days and no one knows where she is, she was.  So when she come back, then we have a serious conversation with her.").  Dr. Wu gave Ms. King a "very serious verbal warning" but no written warning.  Id. at 130:6-9.  He did not inform anyone in writing about the verbal warning he allegedly gave to Ms. King.  Id. at 130:17-23.

Moreover, during this same period Dr. Wu gave certain responsibilities of Plaintiff to Ms. King, who was substantially younger than Plaintiff.  For example, job duties related to organizing an awards banquet and other responsibilities regarding events were taken from Plaintiff and given to Ms. King by Dr. Wu.  Briggs Dep. at 362:2-13.  These were job duties that Plaintiff had been performing successfully for years, and Dr. Wu did not explain why they were suddenly being removed from Plaintiff's scope of employment.  Id. at 362:2-16.

### J.  Plaintiff is Retaliated Against and Continues to Complain About Dr. Wu in 2014.

Following the unwarranted discipline in January 2014, Plaintiff again contacted Ms. Foehl and HR Director Walton.  On February 25, 2014, Plaintiff specifically informed Ms. Foehl that she already had a phone intake with the EEOC:

> I have tried desperately to make my work situation tolerable, while my family and friends say that I need to take a pro-active defense against my supervisor and two managers in the Dean's office.  But I have reached my breaking point and need to be concerned with repairing my professional reputation.  On numerous occasions, I have spoken to Diedre Walton who has not been helpful or timely at all.  **I plan to file an EEOC complaint internally and have already had a phone intake with the EEOC.**

See Exhibit 22, attached hereto.

Ms. Foehl then forwarded Plaintiff's email to HR Director Walton.  Id.  HR Director Walton informed Ms. Foehl that every time Plaintiff would raise a complaint with her, she would instruct Director Wacker and Mr. DiMeo to look into these complaints, and by that she meant she

would have them **speak to Dr. Wu** about Plaintiff's concerns.  Walton Dep. at 95:8-21.[4]  Ms. Foehl likewise told HR Director Walton that Plaintiff had complained to her about Plaintiff's working situation, and Ms. Foehl may have also told HR Director Walton that Plaintiff complained about age comments by Dr. Wu.  Id. at 62:4-13; 65:5-12.

On March 13, 2014, Plaintiff wrote to HR Director Walton that she felt singled out, was being pushed out of Temple by her supervisors, and that Temple's actions were in violation of state and federal law.  See Exhibit 23 at p.2, attached hereto.  Plaintiff pleaded with HR Director Walton:  "Please show me the same respect that you give to the person who has had a grudge against me for many years.  In the eyes of the law, this could be viewed as unfair labor practices and discrimination, both of which violate federal and state laws."  Id.

Plaintiff's growing frustration at the retaliation she was facing culminated in a March 23, 2014 email to HR Director Walton, where she explained: "My work situation with Drew DiMeo and Dr. Wu is escalating and I need your help.  The issue is not just something that affects my work week, but is causing anxiety and depression throughout my weekends."  See Exhibit 24 at p.4, attached hereto.  Plaintiff further complained:

> I do not want to spend anymore personal time about job related matters on my personal time, but I want to discuss changes made to my job description and responsibilities that have been given to Hailey King, Jackie Harriz's replacement.  My essential functions have been diminished to elementary clerical functions.  I am performing entry level data entry tasks, while one student worker and Haley King are performing the functions of my job description. . . . I am a team player but I object to performing the department secretary's job, or being summoned from the 10th floor to the 3rd floor to make coffee and bring cookies to Dr. Wu and his guests when Judy [Lennon, Department Secretary] and a student worker are available in the front office.  It appears to be another strategy to

---

[4] Ms. Foehl denies that HR Director Walton ever told her that she was having Director Wacker and Mr. DiMeo look into complaints or that they were speaking with Dr. Wu and reporting back to HR Director Walton.  Foehl Dep. at 64:18-65:6.

diminish me, discount my experience and talents in an effort to get my resignation or termination.

Id. at p.5.

A few days later, Plaintiff again emailed HR Director Walton: "I am drowning here and have reached out to you numerous times and waited and waited. This is affecting the quality of my work life and my person[al] life. **All I want is to continue to work without being harassed.**" Id. at p.2.

Again, as she had done in the past, HR Director Walton talked with Director Wacker and Mr. DiMeo and **had them speak with Dr. Wu about Plaintiff's complaint.** Walton Dep. at 92:2-15. See Exhibit 21 at p.1, attached hereto (March 25, 2014 email from HR Director Walton to Plaintiff) **("Every time you have reached out to me I have talked with you and looked into your complaints and concerns.").**

Plaintiff also directly told Mr. DiMeo herself that she was speaking with Ms. Foehl about Dr. Wu's treatment of her, including Dr. Wu's comments about Plaintiff's age and sex. Briggs Dep. at 380:5-14.[5]  In 2014, Plaintiff explained to Mr. DiMeo that she was "being treated differently than other people in the department because of [her] age and because of [her] gender," and Mr. DiMeo was angry at Plaintiff for stating this. Id. at 468:19-469:7. Furthermore, Mr. DiMeo explained to Plaintiff that Dr. Wu knew that Plaintiff had been discussing her work situation with Ms. Walton and Ms. Foehl. Mr. DiMeo stated to Plaintiff, "Dr. Wu knows what you're doing. He knows about this" – meaning, Plaintiff going to Ms. Walton and Ms. Foehl about Dr. Wu. Id. at 376:23-377:17. Even Director Wacker told Plaintiff that Dr. Wu knew that Plaintiff

---

[5] Mr. DiMeo denies that he had any knowledge of Plaintiff raising concerns with Ms. Foehl of Temple's Equal Opportunity Compliance Office. See Declaration of Andrew DiMeo, attached to Defendant's Motion for Summary Judgment, at ¶5.

had reported workplace issues to Ms. Walton and Ms. Foehl.  Id. at 378:12-20.  Director Wacker threatened Plaintiff, stating, "If you want your job, you need to, you need to cut it out."  Id.

### K.  Defendant Terminates Plaintiff's Employment on April 1, 2014.

On April 1, 2014, Plaintiff met with Ms. Foehl in-person again to discuss the discrimination she was facing at Temple.  Briggs Dep. at 452:3-12.  It is undisputed that at this meeting Plaintiff's age discrimination complaint was discussed.  Foehl Dep. at 68:1-15.

Upon leaving the meeting, Plaintiff was instructed to meet with Director Wacker.  Plaintiff was then given a termination notice stating that she was being terminated for negligence/carelessness and disruptive or disorderly conduct.  See Exhibit 25, attached hereto. The termination came on the heels of Plaintiff literally leaving Temple's EEO office where she again complained that she was being pushed out of Temple on a discriminatory basis, and after she repeatedly complained she had been retaliated against for raising these complaints.

Director Wacker facilitated the termination, which began as a termination request from Dr. Wu to Mr. DiMeo.  Wacker Dep. at 34:13-35:9; 35:10-15.  Mr. DiMeo informed Director Wacker that Dr. Wu wanted to terminate Plaintiff's employment.  Id. at 37:6-13.  Thereafter, Director Wacker communicated with HR Director Walton and informed her that it was Dr. Wu's request to terminate Plaintiff's employment.  Id. at 45:7-13; 48:21-24.  The ultimate decision to terminate Plaintiff's employment for violation of workplace rules was made by a combination of Dr. Wu, Director Wacker, HR Director Walton, and Mr. DiMeo.  Id. at 67:19-23.

## III.  STANDARD OF REVIEW

Summary judgment under Fed.R.Civ.P. 56 may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c). If there are any genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiff, summary judgment should be denied. Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 362 (3d Cir. 2008).

At the summary judgment stage, the role of the trial judge is to determine whether or not there is a genuine dispute of material fact, as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The Court must view the facts in the **light most favorable** to the non-moving party – here Plaintiff – and must draw **all inferences** in favor of the Plaintiff. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). On a motion for summary judgment, a "district court must resolve all inferences, doubts, and issues of credibility against the moving party." Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 874 (3d Cir. 1972) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)).

The Third Circuit has made clear: "The burden of persuasion on summary judgment remains unalterably with the employer as movant." C.A.R.S., 527 F.3d at 362. The employer retains the burden of persuading the Court that, "even if all the inferences which would reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, **no reasonable jury** could find in the plaintiff's favor." Marzano v. Computer Science Corp., 91 F.3d 497, 502 (3d Cir. 1996) (emphasis added). Thus, if there is any record evidence from which a reasonable inference may be drawn in favor of the non-moving party, then "the moving party simply cannot obtain summary judgment." Celotex Corp v. Catrett, 477 U.S. 317, 330 n.2 (1986).

Even when the facts are not in dispute, summary judgment must be denied if competing inferences can be drawn from the undisputed facts on material issues. Hunt v. Cromartie, 526 U.S.

541, 552-53 (1999) ("Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible to different interpretations or inferences by the trier of fact."). "Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment." Leaphart v. Am. Friends Serv. Committee, No. 07-4919, 2008 U.S. Dist. LEXIS 85530, at *1 (E.D. Pa. Oct. 23, 2008) (citing Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 744 (3d Cir. 1996)).

**"When the defendant's intent has been called into question, the matter is within the sole province of the factfinder."** Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1988). As the Third Circuit has noted, "because intent is a substantive element of the cause of action – generally to be inferred from the facts and conduct of the parties – the principle is particularly apt that courts should not draw factual inferences in favor of the moving party and should not resolve any genuine issues of credibility." Ness v. Marshall, 620 F.2d 517, 519 (3d Cir. 1981). At the summary judgment stage, "all that is required [for the non-moving party to survive the motion] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve [at trial] the parties' differing versions of the truth." Oakley v. Orthopedic Assocs. of Allentown, Ltd., et al., 742 F.Supp.2d 601, 604 (E.D. Pa. 2010) (quoting Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 233 (3d Cir. 1987)).

Summary judgment is to be used **sparingly** in employment discrimination cases. C.A.R.S., 527 F.3d at 369. The Third Circuit urges particular caution about granting summary judgment to an employer when intent is at issue, particularly in discrimination cases. Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 321 (3d Cir. 2000); see also Stewart v. Rutgers Univ., 120 F.3d 426, 431 (3d Cir. 1997) (explaining that the summary judgment standard is to be "**applied with added rigor in employment discrimination cases, where intent and credibility are crucial**

**issues**.").    Additionally, the relevant laws in this matter (ADEA, Title VII, and PHRA) are remedial statutes, and therefore must be interpreted broadly to protect the rights of individuals. Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 202 (3d Cir. 1998) (noting that the court must construe remedial statutes broadly).

Defendant cannot prevail on its Motion because Defendant has not demonstrated by admissible evidence that no reasonable jury could find in Plaintiff's favor on her claims of age discrimination, sex discrimination, retaliation, and/or hostile work environment.   There are genuine issues of material fact in dispute, including as to motivation and credibility, which must be decided by a jury, and from which a jury could infer from the record evidence that Defendant discriminated against Plaintiff because of her age and/or her sex, retaliated against her because she engaged in protected activity, and subjected her to a hostile work environment.

## IV.   LEGAL ARGUMENT

### A. Defendant's Motion for Summary Judgment Should Be Denied With Regards to Plaintiff's Underlying Claims of Age and Sex Discrimination Because a Jury Could Conclude That Plaintiff Was Subjected to Unlawful Discrimination by Defendant.

Defendant's Motion for Summary Judgment should be denied outright with regards to Plaintiff's underlying discrimination claims.  As set forth below, Plaintiff meets her low burden in establishing a *prima facie* case of discrimination.  In short, a jury could conclude – based on his own words – that Dr. Wu has a bias against older females in the workplace, as demonstrated by his several references to China's mandatory retirement law to Plaintiff herself.  Dr. Wu acted with unchecked authority to harass, demean, and push out Plaintiff, and ultimately Defendant did **nothing** to stop Dr. Wu from exhibiting his bias by requesting the termination of Plaintiff.  Dr. Wu at the same time treated Plaintiff's substantially younger co-worker Hailey King more favorably than Plaintiff, giving Ms. King Plaintiff's job duties and not meaningfully disciplining

her for disappearing for several days without any notice (as opposed to giving Plaintiff a written warning for oversleeping by three (3) hours on one (1) occasion).

Furthermore, a jury could conclude that Defendant's stated reasons for terminating Plaintiff's employment are pretext. In addition to the evidence in support of Plaintiff's satisfaction of the fourth prong of the *prima facie* case, Plaintiff can point to numerous facts that could lead a reasonable jury to either disbelieve Defendant's asserted reasons for terminating Plaintiff's employment or believe that a discriminatory reason more likely than not caused the action.

### 1. Plaintiff Clears the Low Bar of Establishing a *Prima Facie* Case.

Plaintiff's claims of age and sex discrimination are analyzed pursuant to the burden-shifting test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, Plaintiff must establish a *prima facie* case by proffering sufficient evidence from which a jury could determine that: (1) she is a member of the protected class; (2) she was qualified for the position; (3) she suffered an adverse employment decision; and (4) under circumstances raising an inference of discriminatory action.[6] See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).

Courts routinely find that there is a **low bar** for establishing a *prima facie* case of employment discrimination. See Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 (3d Cir. 2006); Ezold v. Wolf Block, 983 F.2d 509, 523 (3d Cir. 1993) ("Because the *prima facie* case is easily made out, it is rarely the focus of the ultimate disagreement."). Establishing a *prima facie* case is not an onerous burden and is easily met. See Corbetto v. Wyeth Pharma., 619 F.Supp.2d 142 (W.D. Pa. 2007) (quoting Sempier v. Johnson & Higgins, 45 F.2d 724, 728 (3d Cir. 1995)). Cases in the Third Circuit hold that strict interpretations of the *prima facie* case should not be used to deny the plaintiff an opportunity to demonstrate that an employer's justifications for its actions

---

[6] Defendant does not dispute that Plaintiff has met the first and third prongs of the *prima facie* case. See Defendant's Motion for Summary Judgment at p.20.

are pretextual.  See Sempier, 45 F.3d at 729; see also Neiderlander v. Am. Video Glass Co., 80 Fed.Appx. 256, 261 (3d Cir. 2003) (the burden of establishing a *prima facie* case is "not onerous" and is a "low threshold").  The *prima facie* case should be flexible, tailored to fit the specific context in which it is applied and not squeezed into a one-size-fits-all formula.  Jones v. Sch. Dist. Of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999); Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990) ("The framework set forth in McDonnell Douglas . . . was never intended to be rigid, mechanized or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.") (internal citations omitted).

### i.    Plaintiff Was Qualified For Her Position of Executive Assistant.

Defendant argues that Plaintiff cannot meet the second prong of the *prima facie* case because she was not qualified for her position as Executive Assistant.  At the outset, the issue of qualification "will ordinarily be a question of fact" and "will turn on whether plaintiff is able to perform or has satisfactorily performed the job, an issue that entails a subjective evaluation **to be evaluated by the factfinder**."  Makky v. Chertoff, 541 F.3d 205, 215 (3d Cir. 2008).

For this second prong of the *prima facie* case, the Court must "determine a plaintiff's qualifications for purposes of proving a prima facie case by an objective standard."  Sempier, 45 F.3d at 729.  Here, Plaintiff has set forth sufficient evidence that she was qualified for the Executive Assistant position that she held for nearly ten (10) years under several supervisors.  In or around 2005, Plaintiff became an Executive Assistant to Interim Dean Allen Nicholson of the College of Science and Technology at Defendant.  Briggs Dep. at 107:17-23; 109:24-110:2; 112:6-8.  In or around October 2009, Plaintiff was transferred by Defendant and became the Executive Assistant to Dr. Wu, the Chair of the Department of CIS.  Id. at 134:19-135:1; Wu Dep. at 7:12-20.  Plaintiff

was never at any point during her career at Defendant placed on a performance improvement plan. Wu Dep. at 108:3-16. Rather, each annual performance evaluation that Plaintiff received from Defendant throughout her employment resulted in a score that fell between a 2.0 ("Performance meets minimal expectations and standards") and a 3.0 ("Performance meets job expectations. GOOD SOLID PERFORMANCE."). See Exhibit 2, attached hereto. For the 2013 performance evaluation, Defendant implemented a new scoring system and abandoned its numerical scales. For that evaluation, Plaintiff received a score of "Partially Meets Expectations." See Exhibit 3, attached hereto. At no point during Plaintiff's career at Defendant did she receive an annual evaluation that stated that she failed to meet the overall expectations of the job.[7]

To the extent that Defendant argues that Plaintiff was not "qualified" for the position based on alleged performance deficiencies, those issues are not properly before the Court at the *prima facie* stage. See Weldon, 896 F.2d at 798 ("We have held that while objective job qualifications should be considered in evaluating the plaintiff's *prima facie* case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to the later stage of the *McDonnell Douglas* analysis."); see also Scott v. Genesis Healthcare, Inc., No. 15-0916, 2016 U.S. Dist. LEXIS 111262, at *30 (E.D. Pa. Aug. 22, 2016) (finding that plaintiff established a *prima facie* case and with regard to the second prong, stating, "[t]hough Defendants presented a history of work performance issues with Plaintiff, the evidence supports a finding that Plaintiff was at least objectively qualified for the" position at issue). At this stage, the question is whether Plaintiff was objectively qualified for her job as Executive Assistant. The evidence clearly

---

[7] Nelson v. DeVry, Inc., No. 07-4436, 2009 U.S. Dist. LEXIS 38161 (E.D. Pa. Apr. 23, 2009), cited by Defendant, is inapposite for this present matter. In Nelson, the plaintiff employees were not objectively qualified for their positions with defendant because of their criminal background records. Here, Defendant admits that Plaintiff was objectively qualified for her role based on her "education and technical skills required for the position of Executive Assistant." See Defendant's Motion at p.21.

shows, based on her long tenure within the position, lack of performance improvement plan, and satisfactory performance evaluations, that she has met her low burden on this second prong of the *prima facie* analysis.[8]

> ### ii.   Plaintiff Was Terminated Under Circumstances That Give Rise to An Inference of Discrimination.

Plaintiff satisfies the "fourth prong" by introducing evidence from which a jury could conclude that Defendant's termination of Plaintiff occurred under circumstances which give rise to an inference of discrimination.  Sarullo, 352 F.3d at 797.  Taking the evidence on the record in the light most favorable to Plaintiff, she has certainly presented ample evidence to satisfy this prong of the *prima facie* case, which, again, the Third Circuit has explained is a **low bar**.  Scheidemantle, 470 F.3d at 539.  Plaintiff has identified the following facts, and reasonable inferences therefrom, that lead to an inference of discrimination.

*First*, Dr. Wu exhibited his age and sex discriminatory bias against older female workers by **telling** Plaintiff – the day before her 57th birthday - that in his home country, women of Plaintiff's age are "put out to pasture," or words to that effect.  Briggs Dep. at 215:20-216:2.  Dr. Wu had made a similar comment to Plaintiff in the past.  Id. at 216:3-5; 218:13-21.  Dr. Wu explained at his deposition about China's mandatory retirement law, "So I think the main purpose is that you don't want a person to hold a position for too long, especially like a leadership position."  Id. at 15:9-11.

---

[8] Defendant's blanket argument that Plaintiff cannot establish that she was "qualified" for her position because of her alleged performance deficiencies would – if accepted – uproot the entire *McDonnell Douglas* doctrine for employment discrimination claims.  In essence, Defendant argues that no employee can survive summary judgment where they were disciplined or discharged for alleged performance issues, notwithstanding the employee's evidence of pretext or any other evidence that discrimination and/or retaliation were the real reasons for the adverse action.  That is not and cannot be the law.  Moreover, to the extent that Defendant points to evidence of alleged subjective performance deficiencies of Plaintiff, a jury is not required to accept challenged testimony from interested sources.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000).

Dr. Wu agrees that if he said that women are "put out to pasture" at a certain age, that would be an inappropriate comment in the workplace and could be a violation of Temple's policies. Wu Dep. at 24:3-18.  He further agrees that it would be appropriate for a person to complain if he did say words to the effect of women are "put out to pasture" at age 55. Id. at 26:20-27:3.  Dr. Wu himself explained that if someone said to him that men of a certain age are "put out to pasture" in China, **he would be offended, would think that he's being forced to retire early, and would understand that the person saying the comment does not want him to work anymore**. Id. at 27:14-28:4.

Defendant is free to argue that Dr. Wu did not intend to offend Plaintiff, and that this is all just a misunderstanding.  But that is an argument that Defendant should make to the jury, not to the Court on Summary Judgment.  At this stage, the question for the Court can be boiled down to this: assuming this conversation did take place how Plaintiff describes (and Dr. Wu largely admits to the content of the communication), could a jury find that Dr. Wu had a bias against Plaintiff because she was an older female who, in Dr. Wu's home country, would have retired by her 57th birthday, as he explained to her?  Dr. Wu even noted to Plaintiff that his own sister in China retired at an "early" age. Id. at 13:9-14.  To Dr. Wu, "[e]arly could be 40, 50, women last job." Id. at 13:15-17.  It is undisputed that Plaintiff was almost 57 years old when he made this comment to her, and he knew she was in her 50s. Id. at 18:3-9.

Defendant may argue to the jury that he was simply sharing cultural experiences with Plaintiff when they had this one-on-one conversation before Plaintiff's birthday, and that he does not even believe that the law of his home country is proper.  But, again, that is for the jury to consider when weighing the credibility of the witnesses.  For the purposes of this Summary Judgment Motion, the Court must take all facts **and inferences** in the light most favorable to

Plaintiff.  The plain inference of Dr. Wu's statement to Plaintiff is that he wanted her out of the workplace not because of her alleged lack of merit or skill but because of her age and sex.

*Second*, viewing the facts in the light most favorable to Plaintiff, it is clear that Dr. Wu's treatment of Plaintiff in the workplace was outrageous.  Throughout her reporting relationship to Dr. Wu, Plaintiff would be subjected to arbitrary yelling, degradation, and public humiliation by Dr. Wu.  Briggs Dep. at 197:5-9 ("He would, he would degrade, yell at me, I mean literally yell at me in public settings – front office, elevator, hallway – in front of external constituents, staff, other faculty.")  Plaintiff had never seen him yell at any other employee of Defendant.  Id. at 197:19-21.  Dr. Wu would often say to Plaintiff, "Are you stupid or something?" and struck fear in Plaintiff.  Id. at 197:22-198:11; 514:5-9.  Dr. Wu often required Plaintiff to get him coffee and cookies and do other subservient tasks that were not within her job duties.  Id. at 511:8-512:7.  Plaintiff never heard Dr. Wu ask a man to get him coffee.  Id. at 514:10-14.  The verbal abuse by Dr. Wu started within one (1) month of Plaintiff commencing employment under him and would occur several times per month.  Id. at 203:13-23.

Of course, Dr. Wu denies treating Plaintiff in this manner.  Importantly, however, a plaintiff's testimony **alone** is sufficient to create a genuine issue of fact about this issue.  See Weldon, 896 F.2d at 800 (noting that "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion"); Graham v. F.B. Leopold Co., Inc., 779 F.2d 170, 173 (3d Cir. 1985) (observing that plaintiff's deposition testimony could suffice to create a genuine dispute about a material issue).  It is for the jury to decide who to believe – Plaintiff or Dr. Wu.  And if the jury believes Plaintiff, the jury will have to decide why Dr. Wu yelled at Plaintiff – and no other

employee – in the workplace, and why he made Plaintiff perform secretarial tasks even though those were not within her scope of duty.

**Third**, a reasonable jury could also find that Dr. Wu's bias against Plaintiff manifested in how he treated Plaintiff as compared to Hailey King, a substantially younger employee who worked in the same department.[9] Even before Defendant terminated Plaintiff, Dr. Wu began taking away certain job duties from her and giving them to Ms. King. For example, job duties related to organizing an awards banquet and other responsibilities regarding events were taken from Plaintiff and given to Ms. King by Dr. Wu. Briggs Dep. at 362:2-13. These were job duties that Plaintiff had been performing successfully for years, and Dr. Wu did not explain why they were suddenly being removed from Plaintiff's scope of employment. Id. at 362:2-16.

Dr. Wu also showed favorable treatment to Ms. King by not giving her a written warning when she "disappeared" for several days, but he issued discipline to Plaintiff for oversleeping for three (3) hours on one (1) occasion and even followed Dr. Wu's protocol on how to call in when running late. Both Plaintiff and Ms. King were staff members who were required to punch in and out at work. Wu Dep. at 131:14-23. According to Dr. Wu, Ms. King was once absent for "a couple of days" without informing Dr. Wu where she was. Id. at 130:16; 131:9-13. Ms. King did not call or email Dr. Wu for a "couple of days." Id. at 131:14-23; see also id. at 131:1-5 ("Oh, she disappear. Not disappear. But out of reach, maybe out of power for a couple of days and no one knows where she is, she was. So when she come back, then we have a serious conversation with her."). Dr. Wu gave Ms. King a "very serious verbal warning" but no written warning. Id. at 130:6-9. He did not inform anyone in writing about the verbal warning he allegedly gave to Ms. King. Id. at 130:17-23.

---

[9] It should be noted that Plaintiff is not *required* to establish comparator evidence to support an inference of discrimination. See Golod v. Bank of Am. Corp., 403 Fed. Appx. 699, 702 n.2 (3d Cir. 2010).

30

Dr. Wu's admissions coupled with his actions clearly evidence a bias against Plaintiff because she was an older, female worker.  At the Summary Judgment stage, the Court must draw all inferences in Plaintiff's favor.  C.A.R.S., 527 F.3d at 362.  Therefore, in light of the above facts and inferences, Defendant cannot meet its burden of proving that no reasonable jury could find that Plaintiff was terminated under circumstances giving rise to an inference of discrimination.

### 2. Plaintiff Has Set Forth Sufficient Evidence Such That a Reasonable Jury Could Conclude That Defendant's Asserted Reasons for Terminating Her Employment Are Pretextual.

"Once a plaintiff establishes a *prima facie* case the law creates a presumption of unlawful discrimination, and the defendant employer must articulate a legitimate nondiscriminatory explanation for the employer's adverse employment action." Barber v CSX Dist. Servs., 68 F.3d 694, 698 (3d Cir. 1995) (quoting Seman v. Coplay Cement Co., 26 F.3d 428, 432 (3d Cir. 1994)).

If the employer is able to meet its burden, then the plaintiff will be able to defeat summary judgment by demonstrating evidence from which a jury could conclude that the employer's stated reason is a pretext for discrimination.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993).  At summary judgment, the issue "is whether [the plaintiff] has pointed to evidence of inconsistencies and implausibilities in the employer's proffered reasons for [the employment actions] that *could* support an inference that the employer did not act for nondiscriminatory reasons." Sorba v. PA Drilling Co., 821 F.2d 200, 205 (3d Cir. 1987) (citing Chipollini v. Spencer Gifts, 814 F.2d 893, 900 (3d Cir. 1987)).  In other words, Plaintiff can defeat summary judgment by pointing to some evidence from which a rational factfinder could reasonably either disbelieve the employer's articulated explanation or "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  Thus, "rejection of the defendant's proffered reasons

will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." Sheridan v. E.I. Dupont de Nemours & Co., 100 F.3d 1061, 1071 (3d Cir. 1996). The plaintiff is not required to produce direct evidence of discriminatory intent to demonstrate pretext and survive a motion for summary judgment. Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013).[10]

"The *prima facie* case and pretext inquiries often overlap." C.A.R.S., 527 F.3d at 370. Therefore, "evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the McDonnell Douglas formula requires [the Court] to ration the evidence between one stage or the other." Id. (citing Farrell v. Planters Lifesavers, Co., 206 F.3d 271, 286 (3d Cir. 2001)); Iadimarco v. Runyon, 190 F.3d 151, 166 (3d Cir. 1999) (explicitly referring to the evidence of the *prima facie* case in finding evidence supporting pretext); Jalil, 873 F.2d at 709 n.6 ("Although this fact is important in establishing plaintiff's *prima facie* case, there is nothing preventing it from also being used to rebut the defendant's proffered explanation.").

Here, in addition to the evidence set forth above in support of Plaintiff's satisfaction of the fourth prong of the *prima facie* case, Plaintiff can point to numerous facts that could lead a reasonable jury to either disbelieve Defendant's asserted reasons for terminating Plaintiff's employment or believe that a discriminatory reason more likely than not caused the action.

For example, and as discussed below with regard to Plaintiff's retaliation claim, there is a significant, fundamental dispute in this case: whether Dr. Wu knew that Plaintiff raised concerns

---

[10] Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §623(a)(1). In Gross v. FBL Fin. Servs., 129 S.Ct. 2343, 2351 (2009), the Supreme Court held that under the ADEA, the plaintiff must prove that the defendant employer would not have taken the adverse action "but for" the plaintiff's age. More recently, the Supreme Court has explained that under a "but for" causation standard, a plaintiff must prove that age was a "but for" cause of the employer's adverse action, not **the** "but for" cause of the same. Burrage v. United States, 134 S.Ct. 881, 888-89 (2014). Further, neither the ADEA nor the PHRA requires proof that the illegal factor was the **only** reason. In fact, "it is reversible error" for a district court "to require proof that age discrimination was the sole cause for an adverse employment decision." Robinson v. City of Philadelphia, 491 Fed. Appx. 295, 299 (3d Cir. 2012).

about him to HR, the EOC, Director Wacker, and/or Mr. DiMeo.  Dr. Wu denies that he **ever** learned prior to Plaintiff's termination that she had complained about him.  Wu Dep. at 110:1-19. He likewise denies that he **ever** learned from Director Wacker or Mr. DiMeo prior to Plaintiff's termination that she had gone to HR or the EOC office about him.  Id. at 67:23-68:12.  This is plainly disputed by, among other things, the testimony of HR Director Walton.  As explained above, from 2010 to 2014, there were **no** complaints or concerns that Plaintiff raised with HR Director Walton that she did not look into herself or direct someone else to look into.  Id. at 89:24-90:14.  To put a finer point on it, HR Director Walton understood that **both** Director Wacker **and** Mr. DiMeo had conversations **directly with Dr. Wu about Plaintiff's concerns**.  Id. at 84:20-85:3; see also Exhibit 21 at p.1, attached hereto (March 25, 2014 email from HR Director Walton to Plaintiff) **("Every time you have reached out to me I have talked with you and looked into your complaints and concerns.").**

It is for the jury to decide which of Defendant's witnesses is telling the truth.  Perhaps Dr. Wu is lying when he says that he had no idea that Plaintiff was repeatedly going to everyone under the sun to complain about his harassing and discriminatory behavior.  Or perhaps HR Director Walton is lying and she never did "look into" Plaintiff's complaints, as she told Plaintiff and as she testified under oath.  They both cannot be telling the truth.  And that's why jury trials must take place, so that a jury can assess the credibility of each witness and decide the facts.

If a jury decides that Dr. Wu is not telling the truth, and that he did in fact know that Plaintiff was raising concerns and complaints about him, his entire testimony may be disregarded as false and pretextual.  Or if a jury decides that HR Director Walton is not telling the truth, then the jury may decide that HR at Temple is so grossly incompetent that it never even bothered to ask

Dr. Wu questions about complaints it was receiving, which would show that HR has zero interest in protecting its employees in the face of complaints of discrimination.

The same credibility determinations need to be made by a jury regarding Ms. Foehl. For example, there is a factual dispute about whether she knew that HR Director Walton was having Director Wacker and Mr. DiMeo ask Dr. Wu about the complaints raised by Plaintiff. HR Director Walton informed Ms. Foehl that every time Plaintiff would raise a complaint with her, she would instruct Director Wacker and Mr. DiMeo to look into these complaints, and by that she meant she would have them **speak to Dr. Wu** about Plaintiff's concerns. Walton Dep. at 95:8-21. Ms. Foehl denies that HR Director Walton ever told her that she was having Director Wacker and Mr. DiMeo look into complaints or that they were speaking with Dr. Wu and reporting back to HR Director Walton. Foehl Dep. at 64:18-65:6. Again, only one of Defendant's witnesses is telling the truth. And if a jury finds that Ms. Foehl is lying – and coupled with her abject failure to do **<u>anything</u>** even though Plaintiff specifically told her in 2012 that she was being discriminated against and relayed Dr. Wu's age and sex discriminatory comment to her – then a jury may find that Defendant is "dissembling to cover up a discriminatory purpose." <u>Reeves</u>, 530 U.S. at 147.

Likewise, Director Wacker's credibility is squarely in question in this case. At his deposition, Director Wacker denied outright that Plaintiff ever expressed to him that her working relationship with Dr. Wu caused her stress, that she felt harassed by Dr. Wu, that the work environment was hostile, or that Dr. Wu was raising his voice in the office. Wacker Dep. at 71:14-72:2. Only after Director Wacker was confronted with Plaintiff's email to him dated October 29, 2010 (Exhibit 4, attached hereto) – where Plaintiff complains of those exact things – did he relent and admit to knowing of Plaintiff's complaints. The "bury my head in the sand" defense must be

weighed by a jury, especially in an employment discrimination case where the Defendant's motives are the ultimate issue for trial.

Furthermore, Defendant's position is that neither age nor sex played a role in the decision to terminate Plaintiff's employment, and, of course, Plaintiff disagrees based on the evidence set forth above. This is ultimately a question of fact for the jury to decide. Based on the facts in the light most favorable to Plaintiff and inferences therefrom, a jury could conclude that Plaintiff's age and/or sex did in fact cause her termination. If the jury thinks a decisionmaker is lying when he or she says that the decision was not motivated by a protected trait, the jury may on that basis conclude that there was a civil rights violation. See Hicks, 509 U.S. at 510-11 ("[T]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."). Based on the foregoing, a reasonable jury could conclude that an invidious discriminatory reason was more likely than not the reason for Defendant's action, and therefore summary judgment should be denied. Fuentes, 32 F.3d at 764.

**B. Plaintiff Has Set Forth Sufficient Evidence From Which a Reasonable Jury Could Conclude that Defendant Retaliated Against Her Because She Engaged in Protected Activity.**

To establish a claim of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) she was subjected to a materially adverse action by the employer; and (3) there was a causal connection between the protected activity and the employer's adverse action. Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005).

Defendant argues in its Motion that Plaintiff did not engage in protected activity until April 1, 2014 (the day of her termination) when she spoke with Ms. Foehl about filing a discrimination complaint. See Defendant's Motion at p.33. To accept Defendant's argument, the Court would

have to ignore the following facts, all of which must be reviewed in their totality.  See, e.g., Aman

v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996) ("A play cannot be understood

on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination

analysis must concentrate not on individual incidents, but the overall scenario.") (internal citations

omitted).

1. On October 29, 2010, Plaintiff emailed Director Wacker that she was being harassed and subjected to a hostile work environment, and Director Wacker forwarded the same to HR Director Walton.  See Exhibits 4 and 5, attached hereto.

2. On November 9, 2010, Plaintiff emailed Dr. Wu directly, asking for "fairness in treatment and equal applying standards applied for staff members."  See Exhibit 6, attached hereto.

3. Plaintiff immediately challenged Dr. Wu's age and sex discriminatory comment, telling him that, "Well, with all due respect, we're in America right now."  Briggs Dep. at 216:3-5.

4. Plaintiff complained directly to HR Director Walton about Dr. Wu's discriminatory and offensive comment to her.  Walton Dep. at 50:10-16.  HR Director Walton understood that Dr. Wu's comment was specifically about women of a certain age, and that Plaintiff was raising a complaint to her.  Id. at 51:19-23; 51:3-7 ("She was complaining about it, yeah.").  HR Director Walton thought it was appropriate for Plaintiff to come to her and complain about Dr. Wu's comment.  Id. at 52:13-17.

5. Plaintiff also complained to Director Wacker directly about Dr. Wu's comment to her about the policy of women of a certain age being forced into retirement in China.  Briggs Dep. at 217:13-17; 463:21-24; 465:2-8; Wacker Dep. at 98:5-12.

6. Plaintiff stated to Ms. Foehl of Temple's Equal Opportunity Compliance Office that she felt that she was being discriminated against, and she specifically relayed Dr. Wu's comment about older women being "put out to pasture" in China.  Foehl Dep. at 12:2-16 (Plaintiff told Ms. Foehl that Dr. Wu said that in China, "women who reach the age of 55 are done in the workforce").  Ms. Foehl and Plaintiff met on or around July 30, 2012 to discuss these issues.  In Ms. Foehl's handwritten notes from that meeting, she states that Plaintiff relayed to her: "Problems.  Dr. Wu yells and says demeaning things, e.g., 'Are you stupid?' 'In China, women your age are done.'" See Exhibit 11, attached hereto.

7. On February 7, 2013, Plaintiff wrote to Ms. Brown, "I am so bullied and harassed all day." See Exhibit 15, attached hereto.

8.  Plaintiff then emailed Ms. Foehl on February 8, 2013, stating: "I am so bullied and harassed all day. . . . No other staff member is required to meet daily for a dose of public humiliation and my request to move the meetings to a private location was flat out denied." See Exhibit 16, attached hereto.

9.  HR Director Walton confirmed that Plaintiff complained to her about Dr. Wu on numerous occasions, including about how he was treating her in the workplace and that she felt demeaned by Dr. Wu. Walton Dep. at 27:1-5; 28:5-9; 29:19-21. HR Director Walton estimated that Plaintiff complained at least ten (10) times to her about Dr. Wu. Id. at 28:5-29:3.

10. More specifically, HR Director Walton estimated that Plaintiff complained at least five (5) or six (6) times to her that she felt that the workplace environment was hostile. Id. at 35:2-8.

11. On February 9, 2013, Plaintiff wrote to Mr. Etezady: "I am contacting you to request a CONFIDENTIAL conversation **to discuss disparate treatment for me, which I believe is related to my age of 58. I am concerned about retaliation**." See Exhibit 17 at p.4, attached hereto (February 9, 2013 email from Plaintiff to Mr. Etezady) (emphasis added).

12. Plaintiff's email to Mr. Etezady on August 6, 2013 stated that she was literally begging for help because she felt targeted by her supervisor. She specifically wrote to Mr. Etezady: "**My situation I believe is now compounded because of my age, my gender, and perhaps ethnicity. I am begging for someone within Temple to help mediate this problem. . . .**" See Exhibit 17, at p.2, attached hereto.

13. On February 25, 2014, Plaintiff specifically informed Ms. Foehl that she already had a phone intake with the EEOC. See Exhibit 22, attached hereto ("**I plan to file an EEOC complaint internally and have already had a phone intake with the EEOC.**")

14. On March 13, 2014, Plaintiff wrote to HR Director Walton that she felt singled out, was being pushed out of Temple by her supervisors, and that Temple's actions were in violation of state and federal law. See Exhibit 23 at p.2, attached hereto.

15. A few days later, Plaintiff again emailed HR Director Walton: "I am drowning here and have reached out to you numerous times and waited and waited. This is affecting the quality of my work life and my person[al] life. **All I want is to continue to work without being harassed.**" See Exhibit 24 at p.2, attached hereto.

16. Plaintiff also directly told Mr. DiMeo herself that she was speaking with Ms. Foehl about Dr. Wu's treatment of her, including Dr. Wu's comments about Plaintiff's age and sex. Briggs Dep. at 380:5-14.[11] In 2014, Plaintiff explained to Mr. DiMeo that she

---

[11] Mr. DiMeo denies that he had any knowledge of Plaintiff raising concerns with Ms. Foehl of Temple's Equal Opportunity Compliance Office. See Declaration of Andrew DiMeo, attached to Defendant's Motion for Summary Judgment, at ¶5.

was "being treated differently than other people in the department because of [her] age and because of [her] gender," and Mr. DiMeo was angry at Plaintiff for stating this. Briggs Dep. at 468:19-469:7.

In light of the overwhelming evidence of protected activity by Plaintiff, the subsequent question, therefore, is whether Plaintiff has established sufficient evidence of a causal link between her protected activity and the adverse actions taken against her. A plaintiff may rely on a "broad array of evidence" to demonstrate a causal link between his protected activity and the adverse action taken against her. Marra v. Philadelphia Housing Auth., 497 F.3d 286, 302 (3d Cir. 2007). To establish a causal link in a retaliation case, a plaintiff may show either "(1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007).

Viewing all facts in the light most favorable to Plaintiff, it is clear that Dr. Wu had direct knowledge that Plaintiff was making repeated complaints about him (even though Dr. Wu denies this). HR Director Walton testified that she instructed Director Wacker and Mr. DiMeo to ask Dr. Wu about **every** complaint that Plaintiff raised with her. Mr. DiMeo explained to Plaintiff that Dr. Wu knew that Plaintiff had been discussing her work situation with Ms. Walton and Ms. Foehl. Mr. DiMeo stated to Plaintiff, "Dr. Wu knows what you're doing. He knows about this" – meaning, Plaintiff going to Ms. Walton and Ms. Foehl about Dr. Wu. Briggs Dep. at 376:23-377:17. Even Director Wacker told Plaintiff that Dr. Wu knew that Plaintiff had reported workplace issues to Ms. Walton and Ms. Foehl. Id. at 378:12-20. Director Wacker threatened Plaintiff, stating, "If you want your job, you need to, you need to cut it out." Id.[12]

---

[12] Notably, Dr. Wu was not the sole decisionmaker in this action. The termination decision was made by a combination of Dr. Wu, Director Wacker, HR Director Walton, and Mr. DiMeo. Wacker Dep. at at 67:19-23. Even if the Court finds, despite the above evidence, that Dr. Wu had no knowledge of Plaintiff's protected activity, there can be no dispute that the other decisionmakers were fully aware of Plaintiff's complaints.

The evidence plainly supports Plaintiff's core allegation that Dr. Wu is not a supervisor who reacts well to having his authority challenged. Immediately after Plaintiff objected to Dr. Wu's age and sex discriminatory comment about women of a certain age retiring in China, Dr. Wu issued the first written discipline that Plaintiff had ever received during her career at Defendant. There is no doubt that **for challenging Dr. Wu's biased view and discriminatory comment, Plaintiff was given a written warning for allegedly acting unprofessionally and inappropriately.** Briggs Dep. at 216:6-10; Exhibit 9, attached hereto. The November 9, 2011 discipline was issued to Plaintiff by Dr. Wu, who consulted with Director Wacker on the decision. Wacker Dep. at 95:4-14. This was the first written warning that Dr. Wu had given to anyone in his entire career. Wu Dep. at 49:18-50:3. Neither Dr. Wu nor Director Wacker could testify as to why exactly Plaintiff received this discipline. Wacker Dep. at 97:11-16; Wu Dep. at 35:15-36:1. Neither Dr. Wu nor Director Wacker wrote down anywhere what it was that Plaintiff allegedly did to warrant this discipline. Wacker Dep. at 98:24-99:6; Wu Dep. at 41:22-42:13.

By way of further example, in 2010, Plaintiff emailed Dr. Wu directly, asking for "fairness in treatment and equal applying standards applied for staff members." See Exhibit 6, attached hereto. Just ten (10) days later, on November 19, 2010, Dr. Wu sent an email to HR, specifically asking if he could have assistance in replacing Plaintiff in her Executive Assistant role. See Exhibit 7, attached hereto. The alleged performance issues of Plaintiff raised by Dr. Wu in his letter to HR had not been raised with HR before, even though they allegedly had been taking place for years. On December 9, 2010, Sharon Boyle of Defendant's HR office responded to Dr. Wu's letter, stating that she investigated Dr. Wu's allegations about Plaintiff's alleged work deficiencies and found **no basis** to discipline her. See Exhibit 8, attached hereto ("I am writing to follow up on our meeting regarding the performance with Ruth Briggs. Following our meeting, I met with

Ruth Briggs.  Based on the discussion and information received in both meetings, **there is no basis for disciplining Ruth at this time**.") (emphasis added).

Dr. Wu repeatedly issued severe and unwarranted discipline to Plaintiff.  For example, shortly after Plaintiff complained to Ms. Foehl, Ms. Brown, HR Director Walton, and in-house counsel Mr. Etezady, Plaintiff was given a three-day suspension for making an error in connection with an administrative duty.  Briggs Dep. at 272:22-23.  Plaintiff noticed the error herself and took ownership of the mistake.  Id. at 277:1-18.  It was within Dr. Wu's discretion to levy punishment on Plaintiff in regard to this issue.  Wu Dep. at 119:1-8.  At around this time, Dr. Wu had approximately fifty (50) employees reporting to him, and he admits that his employees make mistakes.  Id. at 9:13-16; 127:18-21.  Nevertheless, Plaintiff is the **only** employee that Dr. Wu has ever given discipline to for making a mistake.  Id. at 128:9-13.  Furthermore, Plaintiff is the **only** employee who Dr. Wu issued a three-day suspension to at any time in his career.  Id. at 127:5-11.  By way of further example, again shortly after she complained about Dr. Wu's treatment of her, Plaintiff received written discipline for oversleeping for three (3) hours on one (1) occasion even though she followed Dr. Wu's protocol on how to call in when running late.

Finally, the termination decision itself came mere weeks after Plaintiff's repeated complaints to HR Director Walton, and her specific assertion to Ms. Foehl that she had a phone intake with the EEOC.  See Exhibit 22, attached hereto.  As set forth above, this is the precise situation where a causal link can be established based on "a pattern of antagonism coupled with timing to establish a causal link."  Deflaminis, 480 F.3d at 267.

### C.  Plaintiff Has Set Forth Sufficient Evidence From Which a Reasonable Jury Could Conclude that Defendant Subjected Plaintiff to a Hostile Work Environment.

To succeed in a claim for hostile work environment, a plaintiff must establish that she: (1) suffered intentional discrimination because of a protected trait; (2) the discrimination was severe

or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination detrimentally affected a reasonable person in like circumstances; and (5) the existence of respondeat superior liability.  See Castleberry v. STI Grp., No. 16-3131, 2017 U.S. App. LEXIS 12611, at *5 (3d Cir. July 14, 2017).  It is well established that evaluation of a hostile work environment claim requires consideration of the totality of the circumstances; a court must not focus on individual incidents, but on the overall scenario.  Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990). By their very nature, such claims involve unlawful employment practices that "occur over a series of days or perhaps years."  AMTRAK v. Morgan, 536 U.S. 101, 115 (2002).

For the reasons set forth above, the ongoing harassment, discrimination, and retaliation that Plaintiff faced at work was pervasive and because of her protected traits and activities.  The evidence shows that Plaintiff was treated differently by Dr. Wu because she is an older woman and Dr. Wu harbors a bias based on gender stereotypes of women in the workforce.  Further, there is no question that Defendant's treatment of Plaintiff – including the utter failure of anyone in HR, the EOC, or the legal department to remediate the toxic environment – detrimentally affected her. See, e.g., Exhibit 16, attached hereto ("It is beginning to feel like psychological abuse."); Exhibit 24 at p.2, attached hereto ("All I want is to continue to work without being harassed."); Exhibit 20, attached hereto ("I want you to understand how distressing it is when I have no one in the department and no one in human resources who will listen to me.").

Moreover, even Dr. Wu himself admitted that if a supervisor made a comment to him that men of a certain age are forced to retire, he would find that comment offensive, would think that he's being forced to retire early, and would understand that the person saying the comment does not want him to work anymore.  Wu Dep. at 27:14-28:4.  Accordingly, Plaintiff has set forth sufficient evidence of a hostile work environment to survive the instant motion.

**D. Defendant's Motion for Summary Judgment Should Be Denied as There are Material Facts in Dispute, Namely Whether Defendant Terminated Plaintiff's Employment Because of Her Age and/or Sex and/or Protected Activity.**

The single most important fact in this matter is unquestionably in dispute – whether age and/or sex and/or protected activity caused Defendant to terminate Plaintiff's employment. As stated above, the Third Circuit urges particular caution about granting summary judgment when intent is at issue, particularly in employment discrimination cases. See Goosby, 228 F.3d at 321. This is because the jury could simply disbelieve the reasons put forward by Defendant for terminating Plaintiff, and therefore find in Plaintiff's favor. Importantly, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. It follows logically, then, that watching the witnesses testify at trial is critical to this analysis.

At this stage, the Court is required to draw every inference in Plaintiff's favor. C.A.R.S., 527 F.3d at 362. As such, the Court must recognize that when Defendant's witnesses testify at trial – presumably – that Plaintiff was not terminated for discriminatory or retaliatory reasons, the jury may not believe their testimony. Defendant's witnesses' actions on the witness stand may reflect doubt or deception in the juror's minds. For example, if Dr. Wu is asked at trial – "did you terminate Ms. Briggs due to her age" or "did you terminate Ms. Briggs because she is a female" or "did you terminate Ms. Briggs out of retaliation" – to which he responds by pausing, taking a sip of water, asking counsel to repeat the question, starts sweating, and then, finally, answering "no," a reasonable jury could certainly conclude that he is not being truthful in his response. If the jury thinks that a decision maker is lying when he says the decision was not motivated by a protected trait or protected activity, the jury may on that basis alone conclude that there was a civil rights violation. Hicks, 509 U.S. at 510-11. Only the jury should be tasked with weighing factual

42

disputes and contradicting testimonies, and for deciding whether Defendant's witnesses answered questions honestly.

Along those lines, in <u>Gerundo v. AT&T Servs.</u>, 2016 U.S. Dist. LEXIS 177583 (E.D. Pa. Dec. 20, 2016), Judge Schmehl denied the defendant's renewed motion for judgment as a matter of law following a jury verdict in favor of the plaintiff in an age discrimination case, noting the following in its opinion:

> Indeed, the Court recalls that Roth [the plaintiff's supervisor] was an extremely evasive, and, at times, disingenuous witness. Roth was impeached several times by plaintiff's counsel [citations omitted], including a particularly effective video impeachment concerning the reason why Roth would simply not keep plaintiff on the Fiserv account since he was doing a good job.  On some occasions, the Court had to directly question Roth in order to elicit a non-evasive response [citations omitted].  Roth rarely answered a question with a "yes," "no," "I don't know," or "I don't remember" and then providing an explanation.  ***Having witnessed Roth's demeanor on the stand, the jury apparently did not credit Roth's trial testimony that she was not the relevant decision-maker.***
>
> The jury further heard evidence that Roth had met plaintiff in person on one occasion in the fall of 2012.  The jury heard Roth testify that upon meeting plaintiff in person in 2012, she believed him to be in his "mid to late 40s."  With no offense to plaintiff, it would be obvious to any reasonable individual that met plaintiff, that he appears to be substantially older than in his "mid to late 40s."  Even Roth herself testified that at some point during their meeting, she said to plaintiff, "You're not planning on retiring anytime soon, are you?"  Why would she ask that to someone she thought was in his mid to late forties?  Her statement borders on ridiculous.  ***Obviously, the jury did not find Roth's belief as to plaintiff's age to be credible.***

2016 U.S. Dist. LEXIS 177583, at **11-13 (emphasis added).

Therefore, since Plaintiff can establish a *prima facie* case, Defendant's Motion for Summary Judgment should be denied because, given that Defendant's witnesses' credibility are squarely at issue, a jury could certainly disbelieve them when they articulate reasons for Plaintiff's

termination.  Once Plaintiff has pointed to evidence sufficient to discredit Defendant's proffered reasons, "the plaintiff need not also come forward with additional evidence of discrimination beyond his or her *prima facie* case" to survive summary judgment.  Fuentes, 32 F.3d at 764; Burton, 707 F.3d at 427 ("This is because the factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason.").  As the Supreme Court has stated, grounds for disbelieving the proffered reasons for a challenged action, together with Plaintiff's *prima facie* case, can by themselves support a finding of discrimination.  Reeves, 530 U.S. at 146-148 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it might be quite persuasive.").

A jury could reasonably infer from the falsity of the Defendant's explanation that the Defendant is "dissembling to cover up a discriminatory purpose."  Id. at 147.  In other words, Plaintiff can defeat summary judgment by presenting evidence from which a reasonable factfinder could find the Defendant's asserted justification "unworthy of credence." Fuentes, 32 F.3d at 764; Tomasso v. Boeing Co., 445 F.3d 702, 710 (3d Cir. 2006) (reversing a grant of summary judgment, in part because, even though certain reasons given by the employer for the challenged action may be true, "a rational factfinder could conclude that [they] do not adequately explain the decision to terminate him.").  For the reasons set forth above, a reasonable jury could easily conclude that Defendant's proffered reasons are simply false, and that it is more likely than not that discrimination and retaliation caused Plaintiff's termination.

## V.    **CONCLUSION**

It is anticipated that Defendant will respond to Plaintiff's arguments by stating that Defendant merely exercised its discretion and made business judgments that cannot be challenged. Of course, this is not the law.  Courts routinely find that when a defendant employer's motivation and credibility are at issue, the case should go before for the jury.  When a plaintiff has set forth sufficient evidence of pretext, the case should go before the jury.  When inferences can be drawn in favor of discrimination and retaliation, the case should go before the jury.  Employers are not given carte blanche to take adverse actions against employees under the guise of "business judgment."  To allow a defendant employer unfettered discretion would undercut the fundamental premise of anti-discrimination laws, which are remedial in nature and must be viewed broadly.  In its Motion, Defendant is employing a common tactic of viewing each piece of evidence in a vacuum, arguing that each separate piece of evidence standing alone cannot support a claim of discrimination.  However, the Third Circuit has often ruled that the Court must view the record as a whole picture, **especially** in employment discrimination cases where direct evidence is rare and plaintiffs must rely on circumstantial evidence to make their case.  As the Supreme Court has found, whether the discriminatory action was made for a legitimate business reason or was a mere pretext is a question of fact that could only be resolved by the jury.  Burlington v. Ellerth, 524 U.S. 742 (1998).  Accordingly, Plaintiff respectfully requests that this Court deny Defendant's Motion for Summary Judgment and permit this action to go before a jury.

Respectfully submitted,

**CONSOLE MATTIACCI LAW, LLC**

Rahul Munshi
1525 Locust St., Ninth Floor
Philadelphia, PA 19102

45

Counsel for Plaintiff, Ruth Briggs

Date:   August 9, 2017