# EXHIBIT 26

# RUTH V. BRIGGS

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

RUTH V. BRIGGS,      : No. 16-cv-00248
      Plaintiff  :
             :
    vs.       :
             :
TEMPLE UNIVERSITY,    :
      Defendant  :

- - -

Thursday, May 25, 2017

- - -

Videotaped deposition of RUTH V.
BRIGGS, taken pursuant to notice, was held at the
offices of Littler Mendelson, Three Parkway, 1601
Cherry Street, Suite 1400, Philadelphia,
Pennsylvania 19102, beginning at 10:07 a.m., on
the above date, before DEBRA ANNE GERSTEMEIER,
Registered Professional Reporter and Notary
Public of the Commonwealth of Pennsylvania.

- - -

ELITE LITIGATION SOLUTIONS, LLC
1518 Walnut Street, Suite 300
Philadelphia, Pennsylvania  19102
www.elitelsllc.com ~ (215) 563-3703

## Page 2

1
2   A P P E A R A N C E S :
3
4   CONSOLE MATTIACCI LAW
    BY:  RAHUL MUNSHI, ESQUIRE
5   1525 Locust Street, 9th Floor
    Philadelphia, Pennsylvania 19102
6   Telephone:  (215) 545-7676
    E-mail:  munshi@consolelaw.com
7   --Representing the Plaintiff
8
9
10  LITTLER MENDELSON
    BY:  RACHEL FENDELL-SATINSKY, ESQUIRE
11  Three Parkway
    1601 Cherry Street, Suite 1400
12  Philadelphia, Pennsylvania 19102
    Telephone: (267) 402-3000
13  E-mail: rsatinsky@littler.com
    --Representing the Defendant
14
15
16
17  ALSO PRESENT:
18  Fay R. Trachtenberg - Temple counsel
19  Keith Weidenauer & Rick Christian - Videographers
20
21
22
23
24

## Page 3

1
2             C O N T E N T S
             - - - - - - - - -
3
4   TESTIMONY OF:    RUTH V. BRIGGS
5                    Page Number
6   By: Ms. Fendell-Satinsky...........8, 520
    By: Mr. Munshi......................510
7
8             E X H I B I T S
             - - - - - - - - -
9

10  "D" DEPOSITION EXHIBIT NO.    PAGE MARKED
11  1  Hire sheet            105
    (TEMPLE0076-77)
12  2  HR Affirmative Action Authorization  110
    (TEMPLE0078-80)
13  3  10/20/09 email         153
    (TEMPLE0081-86)
14  4  12/31/12 email string     170
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000362-8)
15  5  Temple Rules of Conduct    175
    (TEMPLE0148-164)
16  6  Temple discrimination memo   179
    (BRIGGS 94-96)
17  7  12/18/12 email        205
    (TEMPLE0000392)
18  8  1/25/13 email        212
    (TEMPLE0000382)
19  9  11/9/11 Discipline report  214
    (BRIGGS 23)
20  10  6/18/12 email string    238
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000318-9)
21  11  8/2/12 email string     244
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000150-5)
22  12  3/24/13 email        250
    (TEMPLE0000571-5)
23  13  3/26/13 Discipline report  273
    (BRIGGS 49)
24  14  11/20/13 email       288

## Page 4

1   15  11/20/13 email string    290
    (TEMPLE0000666-70)
2   16  1/20/14 discipline report  304
    (TEMPLE0170)
3   17  4/3/14 email re resignation  320
    (TEMPLE0088)
4   18  4/1/14 letter        322
    (TEMPLE0171)
5   19  6/23/05 Employee Perform Develop Plan  344
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000224-234)
6   20  11/15/05 Employee Perform Develop Plan  346
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000235-42)
7   21  8/17/06 Employee Perform Develop Plan  348
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000243-251)
8   22  2/25/08 Employee Perform Develop Plan  349
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000252-258)
9   23  10/01/08 Employee Perform Develop Plan  351
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000259-264)
10  24  6/14/11 Employee Perform Develop Plan  352
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000265-70)
11  25  6/12/12 Employee Perform Develop Plan  353
    (TEMPLE0137-142)
12  26  5/28/13 Employee Perform Develop Plan  354
    (TEMPLE0143-146)
13  27  12/14/11 email       361
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000327-8)
14  28  Complaint          367
15  29  8/2/12 email string      382
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000710-2, 208)
16  30  9/9/12 email string      391
    (BRIGGS 24-29)
17  31  11/2/12 email        400
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000202)
18  32  11/5/12 email string    402
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000199-200)
19  33  2/7/13 email         406
    (Briggs 38)
20  34  2/8/13 email         408
    (TEMPLE UNIVERSITY (R.BRIGGS)-0000197-198)
21  35  2/11/13 email string    410
    (TEMPLE0196-199)
22  36  4/25/13 email string    415
    (BRIGGS 51-52)
23  37  6/26/13 email string    418
    (BRIGGS 53-57)
24  38  8/8/13 email string     426

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

**Page 5**

| | | |
|---|---|---|
| 1 | 39 2/6/14 email | 430 |
| | (BRIGGS 69) | |
| 2 | 40 2/22/14 email | 432 |
| | (EEOC 0062-65) | |
| 3 | 41 2/26/14 email | 438 |
| | (EEOC 0066) | |
| 4 | 42 2/25/14 email | 441 |
| | (TEMPLE0324) | |
| 5 | 43 3/14/14 email string | 443 |
| | (BRIGGS 74-76) | |
| 6 | 44 3/25/14 email string | 450 |
| | (BRIGGS 79-83) | |
| 7 | 45 3/28/14 email string | 451 |
| | (EEOC 0067-71) | |
| 8 | 46 4/21/14 email string | 455 |
| | (TEMPLE0174-175) | |
| 9 | 47 Temple application list | 484 |
| | (BRIGGS 97-99) | |
| 10 | 48 Briggs Resume | 489 |
| | (BRIGGS 1-22) | |
| 11 | 49 Response to Interrogatories | 504 |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

**Page 6**

1
2          DEPOSITION SUPPORT INDEX
3                 - - - - - -
4     Direction to Witness Not to Answer
      Page
5
      None
6
7
8     Request for Production of Documents
      Page    Line
9
      32    7
10    258   6
      268   13
11    297   21
      472   24
12    482   5
13
14    Stipulations
      Page
15
      Federal Rules
16
17
18    Question Marked
      Page
19
      None
20
21
22    Confidential Portions
      Page
23
      None
24

**Page 7**

1         THE VIDEOGRAPHER:  We are now
2    on the record.
3         My name is Keith Weidenauer.
4    I'm the videographer retained by
5    Elite Litigation Solutions.
6         This is a video deposition for
7    the United States District Court for
8    the Eastern District of
9    Pennsylvania.  Today's date is May
10   25th, 2017, and the video time is
11   10:07 a.m.
12        This deposition is being held
13   at Littler Mendelson in
14   Philadelphia, Pennsylvania in the
15   matter of Briggs vs Temple
16   University.  The deponent is Ruth
17   Briggs.
18        All counsel will be noted on
19   the stenographic record.
20        The court reporter is Debbie
21   Gerstemeier, and will now swear in
22   the witness.
23             - - -
24        RUTH V. BRIGGS, having been

**Page 8**

1    duly sworn, was examined and testified
2    as follows:
3             - - -
4         E X A M I N A T I O N
5             - - -
6    BY MS. FENDELL-SATINSKY:
7    Q.   Good morning, Ms. Briggs.
8    A.   Good morning.
9    Q.   We met off the record, and for the
10   record, my name is Rachel Fendell-Satinsky.
11   I'm an attorney at Little Mendelson.
12   A.   Okay.
13   Q.   And myself and my colleague, Rich
14   Harris, we represent the Defendant, Temple
15   University --
16   A.   Okay.
17   Q.   -- in the lawsuit that you've brought
18   against them.
19        Today I'm going to refer to Temple
20   University as "Temple."  Okay?
21   A.   That's fine.
22   Q.   So you'll understand when I refer to
23   "Temple" that I'm referring to Temple
24   University, right?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 9

1   A.   Yes.
2   Q.   Have you ever been deposed before?
3   A.   No.
4   Q.   I'm going to give you some ground
5   rules that will make things easier today for
6   you, for me, and for the court reporter
7   especially.  Okay?
8   A.   Uh-huh.
9   Q.   So that's a good, good first way to
10  start.  All of your answers have to be
11  verbal.  You can't say "uh-huh" or
12  "uh-uh" --
13  A.   Yes.
14  Q.   -- or shake your head "yes" or "no,"
15  because the court reporter can't record that
16  on the record.  So can you keep all of your
17  answers oral, please?
18  A.   Yes, I will.
19  Q.   I'm going to ask you questions, and
20  you're going to give answers to my
21  questions.
22  A.   Uh-huh, yes.
23  Q.   You've been sworn in by the court
24  reporter today.

Page 10

1        Do you understand that you're under
2   oath?
3   A.   Yes, I do.
4   Q.   And do you understand what an oath
5   is?
6   A.   Yes, I do.
7   Q.   Your answers are under the penalty of
8   perjury today just as if we were in court,
9   although we're in a conference room.
10       Do you understand that?
11  A.   Yes, I do.
12  Q.   You must answer truthfully and
13  completely.
14       Do you understand that?
15  A.   Yes, I do.
16  Q.   I don't want you to guess today.  If
17  your only answer to my question would be a
18  guess, please tell me that, but you can
19  estimate.
20       Do you understand the difference
21  between a guess --
22  A.   Yes.
23  Q.   -- and an estimate?
24       I am, as I mentioned, entitled to ask

Page 11

1   you questions and for you to give oral
2   responses.  And you're doing a great job --
3   A.   Yeah.
4   Q.   -- by giving oral responses.
5   A.   Okay.
6   Q.   Okay?
7   A.   I understand.
8   Q.   Although it's not normal
9   conversation, please wait until I finish
10  asking my question before you give your
11  answer.  You may know what I'm going to ask,
12  but the court reporter can only take one of
13  us speaking, take down one of us speaking at
14  once.  Okay?
15  A.   Yes.
16  Q.   If you don't hear my questions,
17  please let me know.  Okay?
18  A.   Yes.
19  Q.   If you need me to repeat a question,
20  feel free to ask me to repeat a question.
21  Okay?
22  A.   I will.
23  Q.   Feel free at any time to take a
24  break.  You're welcome to do that.  The only

Page 12

1   thing I would ask is that if I have a
2   question pending to you, you answer my
3   question before you take the break.
4   A.   I understand.
5   Q.   Is there any reason you can't hear my
6   questions?
7   A.   No.
8   Q.   Are you under the influence of any
9   substance that affects your ability to
10  testify truthfully?
11  A.   No.
12  Q.   Can you state and spell your full
13  name for the record.
14  A.   Sure.  It's Ruth, R-U-T-H, Virginia,
15  V-I-R-G-I-N-I-A, Briggs, B --
16  Q.   And --
17  A.   Oh, just my --
18  Q.   Go ahead.
19  A.   B-R-I-G-G-S.
20  Q.   What is your current address?
21  A.   1700 North 5th Street, Apartment 1B,
22  as in boy, Philadelphia, PA 19122.
23  Q.   What is your date of birth?
24  A.   ████

3 (Pages 9 to 12)

RUTH V. BRIGGS

Page 13

1  Q.   Have you ever used any name other
2  than "Ruth Briggs"?
3  A.   I -- yes.
4  Q.   And what are those?
5  A.   Uhm, it was Fandek, my married name,
6  but I never really took it officially.
7  Q.   And how do you spell "Fandek"?
8  A.   F, as in Frank, A-N, as in Nancy, D,
9  as in David, E-K, as in kangaroo.
10  Q.   Do you have an email address?
11  A.   Yes, I do.
12  Q.   And what is your email address?
13  A.   It is rbriggs02@gmail.com.
14  Q.   Have you ever declared bankruptcy?
15  A.   No.
16  Q.   Have you used email to communicate
17  about Temple or your lawsuit against the
18  university other than communications with
19  your attorney?
20  A.   I don't understand the question.
21  Again?
22  Q.   Sure.  Have you used email to
23  communicate about Temple or your lawsuit
24  against Temple other than communications

Page 14

1  you've had with your attorney?
2       MR. MUNSHI:  Just objection to
3  form.
4       At any time?
5       MS. FENDELL-SATINSKY:  At any
6  time.
7       THE WITNESS:  To Temple, to
8  the -- my supervise -- is that what
9  you mean?
10       MS. FENDELL-SATINSKY:  Sure.
11  So, let's take a step back.
12  BY MS. FENDELL-SATINSKY:
13  Q.   At any time, did you use your
14  personal email address to communicate about
15  your employment at Temple?
16  A.   To -- no, I did not, except for to
17  Rahul.
18  Q.   Okay.  At any time, did you use your
19  email to communicate with people at Temple?
20  A.   Yes.
21  Q.   Since you left Temple, have you used
22  your email to communicate with people at
23  Temple?
24  A.   Yes.

Page 15

1  Q.   And who was that?
2  A.   Uh, their names?
3  Q.   Yes.
4  A.   Be ready to spell some of these.
5  Uhm, graduate students Gang, G-A-N-G --
6  G-A-N-G, last name W-A-N-G.  He was a
7  graduate student, PhD candidate in our
8  department.
9  Q.   Any other individuals at Temple
10  you've communicated with since the end of
11  your employment with Temple?
12  A.   Can I ask a question?  If they've
13  already graduated, does that count?  Yeah,
14  okay.
15  Q.   Sure.
16  A.   All right.  So then Avi Sill, A-V, as
17  in Victor, I.  Last name is S, as in Sam,
18  I-L.  He was -- had left.  He was a PhD
19  candidate while I was there.
20  Q.   Anyone other than the two individuals
21  you've mentioned who you've communicated
22  with since your employment ended at Temple
23  who are from Temple?
24  A.   Who are from Temple?  Uhm, Karen

Page 16

1  Woods-Wilson.  It's a hyphenated name,
2  Karen, and it's Woods, W-O-O-D-S, as in Sam,
3  hyphen, Wilson, W-I-L-S-O-N.
4  Q.   Anyone else?
5  A.   I'm thinking.  Oh, uh, Judy Lennon.
6  She was the department secretary.
7  Q.   Anyone else?
8  A.   Not that I recall.  Oh, one more.
9  Marjatta Lyyra.  Do you want me to spell
10  that for you?
11  Q.   Sure.
12  A.   M, as in Mary, A-R-J-A-T-T-A.  Last
13  name is L-Y-R-R-E (sic), professor in the
14  Physics Department.
15  Q.   Anyone else?
16  A.   Not that comes to mind.
17  Q.   Ms. Lyyra --
18  A.   Lyyra, yeah, uh-huh.
19  Q.   Lyyra.
20  A.   It's "Dr." there.
21  Q.   Doctor.  What did you communicate
22  with her about?
23  A.   Just she was asking me how I was
24  doing.  Just general, you know, "I hope

4 (Pages 13 to 16)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 17

1  you're okay," "thinking about you."
2     Q.   Did you communicate with her anything
3  about your lawsuit against Temple?
4     A.   She knew that if -- no, no, not the
5  lawsuit, no.
6     Q.   You started to say she knew
7  something.
8     A.   About the EEOC.
9     Q.   She -- she knew that you filed an
10  EEOC charge?
11     A.   Yes.
12     Q.   And how did she know that?
13     A.   Because I told her.
14     Q.   How did you tell her?
15     A.   In a conversation at lunch one day.
16     Q.   Do you have any email communications
17  with Dr. Lyyra regarding your EEOC charge?
18     A.   Yeah, I do.  Oh, I don't think --
19  about the EEOC?  No, I don't think I -- no.
20  After I left was more, "How are you doing?"
21     Q.   Have you reviewed your emails to see
22  whether you have communications with Ms. --
23  with Dr. Lyyra about your EEOC charge?
24     A.   No, I have not.

Page 18

1     Q.   You also mentioned that you spoke
2  with Ms. Lennon?
3     A.   Uh-huh.
4     Q.   Is that a "yes"?
5     A.   Yes.  I'm sorry.
6     Q.   That's okay.
7          What did you speak with Ms. Lennon
8  about?
9     A.   Actually, she called me after I left.
10     Q.   And --
11     A.   About just com -- about how to do
12  something in the department.
13     Q.   Did you email with Ms. Lennon as
14  well?
15     A.   Email and phone, uh-huh.
16     Q.   Did you have any communication with
17  Ms. Lennon about your lawsuit against
18  Temple?
19     A.   No, I did not.
20     Q.   Did you have any communication with
21  Ms. Lennon about your EEOC charge?
22     A.   No.
23     Q.   You also mentioned Karen
24  Woods-Wilson?

Page 19

1     A.   Uh-huh.
2     Q.   Who is Ms. Woods-Wilson?
3     A.   She was my counterpart in Physics.
4     Q.   What does that mean?
5     A.   She was the assistant to the chair of
6  that department.
7     Q.   And who was the chair of that
8  department?
9     A.   At the time, it was Rongjia Tao,
10  R-O-N-J-A (sic).  Last name is T-A-O.
11     Q.   What did you communicate with Ms.
12  Woods-Wilson about following the end of your
13  employment at Temple?
14     A.   More about how, "How are you doing,"
15  "thinking about you," "let's have lunch"
16  or...
17     Q.   Did you communicate with Ms.
18  Woods-Wilson about your lawsuit or your --
19     A.   She did --
20     Q.   -- EEOC charge?
21     A.   -- know about it.
22          MR. MUNSHI:  Just do your best
23     to wait until the question has been
24     asked.

Page 20

1          THE WITNESS:  I'm sorry.
2          MR. MUNSHI:  That's okay.
3     Everyone does it.  It's okay.
4          THE WITNESS:  Yes.
5          MS. FENDELL-SATINSKY:  That's
6     okay.  I'll ask the question again
7     just so the record is clean.
8  BY MS. FENDELL-SATINSKY:
9     Q.   Did you have any communications with
10  Ms. Woods-Wilson about your EEOC charge or
11  your lawsuit against Temple?
12     A.   Yes, I did.
13     Q.   And what conversations did you have
14  with her?
15     A.   Just confirming that, told her that I
16  had followed through on that.
17     Q.   What did you tell her specifically?
18     A.   That I had gone to the EEOC and that
19  I had met with Sandy Foehl to file an
20  internal.
21     Q.   Did you tell her anything else about
22  your lawsuit against Temple or your EEOC
23  charge?
24     A.   I know that she -- I told her that I

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 21

1   saw an attorney. I think that's about as
2   far as it went.
3       Q.   The conversations you reference, were
4   those oral or written?
5       A.   They were both.
6       Q.   The written communications you had,
7   were those on your personal email account?
8       A.   It could have been both.
9       Q.   And when you say both, you mean both
10  personal and your Temple email account?
11      A.   Before I left Temple, right.
12      Q.   Have you reviewed your emails to
13  determine whether you have any
14  communications on your personal email with
15  Ms. Woods-Wilson about your lawsuit against
16  Temple or your EEOC charge?
17      A.   No, I have not.
18      Q.   Have you had any other communications
19  with Ms. Woods-Wilson about your lawsuit
20  against Temple or your EEOC charge other
21  than what you've already told me?
22      A.   No, I don't.
23      Q.   You also mentioned that you've spoken
24  with a former student name Avi Sill?

Page 22

1       A.   Uh-huh.
2       Q.   And what did you --
3           MR. MUNSHI:  Just verbalize.
4           THE WITNESS:  "Yes."
5   BY MS. FENDELL-SATINSKY:
6       Q.   What did you speak with Avi Sill
7   about?
8       A.   Just about his new job was. Just --
9   he didn't even know. I think he thought I
10  was still there.
11      Q.   Did you reach out to him or did he
12  reach out to you?
13      A.   He reached out to me.
14          MR. MUNSHI:  Sorry. Just do
15      the best you can to wait. Even
16      though you know where she's going
17      with it, just do the best you can.
18      It's okay.
19          THE WITNESS:  Okay.
20  BY MS. FENDELL-SATINSKY:
21      Q.   How did he have your personal email
22  address?
23      A.   It was through Facebook, actually.
24      Q.   Did he contact you through the

Page 23

1   Facebook Messenger?
2       A.   Yes.
3       Q.   And did he contact you through the
4   Facebook Messenger after your employment
5   ended at Temple?
6       A.   Yes.
7       Q.   Did you communicate -- or let me ask
8   a better question.
9           Did you respond to Avi after he sent
10  you an initial message?
11      A.   Yes.
12      Q.   And did you have further exchange
13  with Avi other than a response to his
14  original --
15      A.   Yes.
16      Q.   -- message?
17          What did you speak with him about?
18      A.   About his new job. He told me that
19  he missed his American mother. Uhm, just
20  gen -- it wasn't nothing. That was it.
21      Q.   Did you tell him that your employment
22  with Temple had ended?
23      A.   When it did, I said that I'm no
24  longer with them.

Page 24

1       Q.   How many conversations did you have
2   with Avi Sill over Facebook Messenger?
3       A.   On pretty regular -- like, maybe
4   every three or four months, I'd say.
5       Q.   Do you still communicate with Avi
6   Sill?
7       A.   Uh-huh, I do.
8       Q.   On Facebook Messenger?
9       A.   Yes.
10      Q.   Have you also communicated with Avi
11  Sill on email?
12      A.   I -- no, I don't -- my personal,
13  you're talking about. No.
14      Q.   Have you had any communications with
15  Avi Sill about your EEOC charge or your
16  litigation --
17      A.   No, I have not.
18      Q.   -- against Temple? Just wait until I
19  finish asking my question.
20      A.   Sorry.
21      Q.   That's okay.
22      A.   Try --
23      Q.   Have you had any communications with
24  Avi Sill about your EEOC charge or your

6 (Pages 21 to 24)

RUTH V. BRIGGS

Page 25

1  lawsuit against Temple?
2  A.   No, I have not.
3  Q.   Finally, you mentioned a grad student
4  who's last name is Wang?
5  A.   Wang, yes, uh-huh.
6  Q.   Is that correct?
7  A.   Gang Wang, right.
8  Q.   "Wang."
9  A.   It's still A-N-G.
10 Q.   A-N-G, but sounded like "Wong."
11 A.   "Gong Wong."
12 Q.   Understood.
13      And what did you speak with him about
14 following the end of your employment at
15 Temple?
16 A.   About his passing his English
17 proficiency.
18 Q.   Did he reach out to you?
19 A.   Yes.
20 Q.   By email?
21 A.   Through Facebook.
22 Q.   Was that Facebook Messenger as well?
23 A.   Uh-huh.
24 Q.   Is that a "yes"?

Page 26

1  A.   Yes.  I'm sorry.
2  Q.   It's okay.
3      Did you respond to his initial
4  communication?
5  A.   Yes, I did.
6  Q.   Have you continued to communicate
7  with him?
8  A.   No.
9  Q.   So the only communication you had
10 with him was a message he sent you and a
11 response to that message by you?
12 A.   There -- there could have been more
13 than one.  It was setting up a date to meet
14 with him.
15 Q.   What was the meeting for?
16 A.   To help him just to talk in
17 conversational English, just to practice
18 English.
19 Q.   Did you meet with him?
20 A.   Uh-huh.
21 Q.   Is that a "yes"?
22 A.   Yes, it is.  Yeah, "yes."
23 Q.   How many times did you meet with him?
24 A.   One time.

Page 27

1  Q.   And where was that meeting?
2  A.   It was in the Starbucks on Temple's
3  campus.
4  Q.   Did that meeting occur while you were
5  still working at Temple?
6  A.   No.
7  Q.   Other than people we've talked about,
8  have you communicated with anyone who worked
9  or went to school at Temple following the
10 end of your employment at Temple?
11 A.   There was another graduate student,
12 Nemanja.  Let me spell that for you.
13 N-E-M-A-N -- wait a minute.  I have to spell
14 it.  Can I use your pen?
15 Q.   That's okay.  We can --
16 A.   Okay.
17 Q.   We can do it after.
18 A.   I can -- let me spell his last name.
19 I know it.
20 Q.   Sure.
21 A.   It's D, as in David, J-U-R-I-C.
22 Q.   And did he reach out to you or did
23 you reach out to him?
24 A.   He reached out to me.

Page 28

1  Q.   How did he reach out to you?
2  A.   About a soccer game through Facebook.
3  Q.   Facebook --
4  A.   Uh-huh.
5  Q.   -- Messenger?
6  A.   Uh-huh, yeah.
7  Q.   What about a soccer game?
8  A.   About an -- he works for Google,
9  about their team.
10 Q.   Did you respond to him?
11 A.   Yes, I did.
12 Q.   And aside from his initial contact
13 and your response, did you have any other
14 communications with him?
15 A.   I could have.  Yes, yes.
16 Q.   Did you tell him that your employment
17 at Temple ended?
18 A.   Yes.
19 Q.   Have you talked to him about your
20 EEOC charge or your lawsuit against Temple?
21 A.   No, I have not.
22 Q.   Other than the people we've spoken
23 about, is there anyone else who worked or
24 went to school at Temple that you've spoken

7 (Pages 25 to 28)

RUTH V. BRIGGS

Page 29

1   with since the end of your employment at
2   Temple?
3   A.   No.  That come -- no.
4   Q.   The Facebook messages that you've
5   referenced, do you still have those
6   messages?
7   A.   Probably.  I haven't looked at them,
8   but I would say, yes.
9   Q.   We've spoken a little bit about
10  Facebook.
11       When did you open your Facebook
12  account?
13  A.   I don't know the answer to that
14  question.
15  Q.   Did you open your Facebook account
16  while you worked at Temple?
17  A.   Yes.
18           MS. FENDELL-SATINSKY:  Can we
19  go off the record for a moment,
20  please.
21           THE VIDEOGRAPHER:  Going off
22  the record, 10:25.
23               - - -
24           (Whereupon, a brief pause was

Page 30

1   taken from 10:25 until 10:26 a.m.)
2               - - -
3           THE VIDEOGRAPHER:  Going back
4   on the record, 10:26.
5           MS. FENDELL-SATINSKY:  Can you
6   repeat the last question?
7           THE COURT REPORTER:  I can't
8   read it now after it shut off.
9           MS. FENDELL-SATINSKY:  Okay.
10  BY MS. FENDELL-SATINSKY:
11  Q.   We were speaking about Facebook
12  before we went off the record, correct?
13  A.   That's correct.
14  Q.   And I asked you when you opened your
15  Facebook account, and you told me it was
16  while you were working at Temple, correct?
17  A.   Yes.
18  Q.   Are you -- other than the people that
19  we've spoken about already, are you
20  connecting with anyone else who worked or
21  went to school at Temple on your Facebook
22  page?
23  A.   Yes.
24  Q.   Have you posted anything about your

Page 31

1   work at Temple on your Facebook page?
2   A.   About my -- could you?
3   Q.   Sure.  Have you posted on Facebook
4   anything about your work at Temple?
5   A.   Yeah.
6   Q.   What have you posted about?
7   A.   Well, when I would do things for the
8   college and would post about graduation or
9   award ceremonies or -- while I worked there.
10  Q.   Would you post those things on your
11  personal Facebook account?
12  A.   We had a department page, but it
13  wasn't -- it was like a private group, so it
14  would be through there.
15  Q.   Did you post anything on your
16  personal Facebook account about your
17  employment at Temple?
18  A.   Yes.
19  Q.   What did you post on your personal
20  Facebook account --
21  A.   About --
22  Q.   -- about your employment at Temple?
23  A.   About students or an event or...
24  Q.   Anything else?

Page 32

1   A.   Graduation.  Mostly about events, I
2   would say.
3   Q.   Have you posted anything on Facebook
4   about your EEOC charge or your lawsuit
5   against Temple?
6   A.   No, I have not.
7           MS. FENDELL-SATINSKY:  And,
8   Rahul, we can do this at the end,
9   but I'll just put on the record that
10  we don't have any of these Facebook
11  Messenger exchanges or Facebook
12  posts about Temple, which would be
13  responsive to the requests.
14          MR. MUNSHI:  We'll talk about
15  it.  I mean, she just testified as
16  to the communications, and nothing
17  had to do with the EEOC charge or
18  the complaint that she filed or the
19  lawsuit; so we can have a
20  conversation as to what actually is
21  responsive and relevant.
22          MS. FENDELL-SATINSKY:  Sure.
23  She also testified that she posted
24  about the end of her employment, but

8 (Pages 29 to 32)

RUTH V. BRIGGS

Page 33

1    we can definitely discuss that off
2    the record.
3         MR. MUNSHI:  About the end of
4    her employment?  I don't think she
5    ever said that.
6         THE WITNESS:  I didn't.
7    BY MS. FENDELL-SATINSKY:
8    Q.   You told me earlier that you posted
9    at Temple, you had communications on
10   Facebook Messenger regarding the end of your
11   employment with Temple, correct?
12   A.   Right.
13        MR. MUNSHI:  You said
14   "posted."
15   BY MS. FENDELL-SATINSKY:
16   Q.   Do you have an Instagram account?
17   A.   I do.
18   Q.   Have you posted anything on Instagram
19   about your employment at Temple?
20   A.   No, I have not.
21   Q.   Do you use LinkedIn?
22   A.   Yes.
23   Q.   Have you posted anything about your
24   employment at Temple on LinkedIn?

Page 34

1    A.   That I worked there.  It was on my
2    resumé.
3    Q.   Anything else?
4    A.   No.
5    Q.   Have you posted on -- anything on
6    LinkedIn about the end of your employment at
7    Temple?
8    A.   No; unless my resumé counts.  I'm
9    sorry.
10   Q.   And what did you do on your resumé to
11   indicate that your employment at Temple
12   ended?
13   A.   I just put the date of term -- of
14   separation.
15   Q.   What was that?
16   A.   April 1st, 2014.
17   Q.   Anything else?
18   A.   No.
19   Q.   Did you discuss your deposition today
20   with anyone other than your attorney?
21   A.   My adult children.
22   Q.   How many children do you have?
23   A.   Four.
24   Q.   And did you discuss your deposition

Page 35

1    today with all four of your children?
2    A.   No.  My daughters.
3    Q.   Your daughters?
4    A.   Uh-huh.
5    Q.   How many daughters do you have?
6    A.   Two.
7    Q.   And what are their names?
8    A.   Anne Elizabeth, and she's --
9    Q.   And --
10   A.   Oh, Briggs-Fandek.  I'm sorry.
11   Q.   Okay.
12   A.   Briggs, hyphen, Fandek.
13   Q.   And?
14   A.   And Abigail Briggs-Fandek.
15   Q.   Did you speak with them together or
16   separately?
17   A.   Separately.
18   Q.   And your communications with them,
19   were they by phone, in-person, email, some
20   other method?
21   A.   By phone and text message.
22   Q.   Did you speak with both of them by
23   phone?
24   A.   Just -- no.

Page 36

1    Q.   Who did you speak with by phone --
2    A.   Abigail.
3    Q.   -- about your deposition?
4    A.   Abigail.
5    Q.   Just wait until I finish asking --
6    A.   Okay.
7    Q.   -- my question, even though you might
8    know what I'm going to ask.
9         And so you did not speak with Anne by
10   phone about your deposition?
11   A.   Not by phone, no.
12   Q.   Did you speak with Anne by text
13   message --
14   A.   Yes.
15   Q.   -- about your deposition?
16        What did you tell Abigail about your
17   deposition?
18   A.   That I couldn't watch her children;
19   that today was my deposition, pretty much.
20   Q.   Did you tell her anything else about
21   your deposition?
22   A.   That I was nervous.
23   Q.   Anything else?
24   A.   No.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 37

1   Q.   Did she ask you anything about your
2   deposition?
3   A.   No.
4   Q.   You said you communicated with Anne
5   by text message about your deposition.
6   A.   Uh-huh.
7   Q.   Is that a "yes"?
8   A.   Yes.  I'm sorry.
9   Q.   What did you communicate with Anne
10  about regarding your deposition?
11  A.   That I'd have to get back to her
12  about wedding flowers that I was -- this
13  week.  Basically, that I had something that
14  was big.
15  Q.   Did you tell her you had a
16  deposition?
17  A.   Yes.
18  Q.   Did you tell her anything else about
19  your deposition?
20  A.   No.
21  Q.   Did you tell her how you felt about
22  your deposition?
23  A.   I did.
24  Q.   What did you tell her about how you

Page 38

1   felt?
2   A.   I was nervous.
3   Q.   Did you tell her anything else about
4   your deposition?
5   A.   No.
6   Q.   You have two other children in
7   addition to Abigail and Anne --
8   A.   Yes.
9   Q.   -- correct?
10  A.   Yes.
11  Q.   Are they aware that you filed a
12  lawsuit against Temple?
13  A.   Yes.
14  Q.   Have you communicated with them about
15  your EEOC charge or your lawsuit against
16  Temple in written form?
17  A.   Did I write to them?
18  Q.   Did you have any conversations with
19  your two other children --
20  A.   Oh, yes.
21  Q.   -- regarding your EEOC charge or your
22  lawsuit against Temple in written form?
23  A.   Yes.
24  Q.   In what kind of written form?

Page 39

1   A.   I'm not sure I under -- that I had,
2   that I had -- that I, that I had filed a
3   written complaint, is that what you're
4   saying?
5   Q.   Sure.
6   A.   Okay.
7   Q.   So let me --
8   A.   Okay, I get --
9   Q.   -- ask my question differently.
10  A.   All right.
11  Q.   You have two other children --
12  A.   Uh-huh.
13  Q.   -- in addition to Abigail and Anne,
14  correct?
15  A.   Yes.
16  Q.   And what are their names?
17  A.   Gabriel Briggs-Fandek and Zachary
18  Briggs-Fandek.
19  Q.   How have you communicated with
20  Gabriel about your EEOC charge or your
21  lawsuit against Temple?
22  A.   Orally.
23  Q.   And what have you told Gabriel about
24  your lawsuit or your EEOC charge against

Page 40

1   Temple?
2   A.   He is aware that I filed the charge
3   with the EEOC.
4   Q.   What did you tell him?
5   A.   That I filed it because of
6   discrimination.
7   Q.   Did you tell him anything else about
8   your EEOC charge or your lawsuit against
9   Temple?
10  A.   Prob -- yes.
11  Q.   What else?
12  A.   Over the -- I don't know how to
13  answer that.  Umh, he would -- we would talk
14  about it.  I mean, no specifics, because he
15  wasn't really interested, but I would say --
16  he would, "So how's that going, Ma?"
17       And I'd say, "It's going.  I'm still
18  working on it.  Nothing has come out of it
19  yet."
20  Q.   When you say nothing has come out of
21  it yet, what do you mean?
22  A.   He would ask me where, where are we,
23  you know, where are you in the process, have
24  you withdrawn it, you haven't talked about

10  (Pages 37 to 40)

RUTH V. BRIGGS

Page 41

1  it, something like that.  And I would say,
2  no, it's still in process.
3       MS. FENDELL-SATINSKY:  Can you
4   read back her prior answer to the
5   second to last question, please.
6       THE COURT REPORTER:  Okay.
7   "And I'd say, 'It's going.  I'm
8   still working on it.  Nothing has
9   come out of it yet,'" that one?
10      MS. FENDELL-SATINSKY:  Yes.
11  Thank you.
12      THE COURT REPORTER:  Uh-huh.
13 BY MS. FENDELL-SATINSKY:
14  Q.   You said that you've told Gabriel
15 nothing has come out of your lawsuit,
16 correct?
17  A.  I was talking about the EEOC thing.
18  Q.  So I want to know, when you said to
19 him nothing has come out of your lawsuit,
20 what you meant by that.
21  A.  I meant that they sent me a letter
22 saying they found no grounds for
23 discrimination.
24  Q.  Anything else?

Page 42

1  A.  He knew -- he knows about the
2  lawsuit, the lawsuit, yes.
3  Q.  So when you referred to speaking with
4  Gabriel and saying that nothing has come out
5  of the lawsuit yet, you said that you meant
6  that the EEOC said there's no grounds for
7  discrimination, correct?
8  A.  I didn't -- no.  That's not true.
9  Q.  Okay.  So --
10  A.  The answer -- okay.
11  Q.  So if that's not true, I want to
12 know, when you said to him that nothing has
13 come out of the lawsuit, what you meant by
14 that.
15  A.  Nothing has come out of the EEOC --
16  Q.  And what --
17  A.  -- grievance.  That's what I said to
18 him.  I didn't -- the lawsuit, I haven't
19 talked to him about that.
20  Q.  When you said nothing has come out of
21 the EEOC grievance, what did you mean by
22 that?
23  A.  The letter.
24  Q.  What letter?

Page 43

1  A.   That I got from the EEOC saying that
2  they found no grounds and that they -- I was
3  being re -- I don't know what the term is,
4  released or -- I don't know what the term
5  is.
6  Q.  Have you had any written
7  communications with Gabriel about your
8  lawsuit?
9  A.  No, I have not.
10  Q.  Have you had any written
11 communications with Zachary about your
12 lawsuit?
13  A.  No, I have not.
14  Q.  What did you communicate with Zachary
15 about your lawsuit?
16  A.  That I'd -- he knew about the EEOC
17 thing.  He knows that this is in litigation
18 now, but -- and that's about it.
19  Q.  What did you tell him about the EEOC
20 thing?
21  A.  That I -- the whole thing?  That --
22  Q.  So, you told me that you told
23 Gabriel --
24  A.  Zach.

Page 44

1  Q.  You told Zachary, my apologies,
2  orally.  Let me step back.
3       You testified that Zachary knew about
4  the EEOC thing, correct?
5  A.  Correct.
6  Q.  So I want to know what you told him
7  about the EEOC thing.
8  A.  That I had gone to them and filed it
9  and that I had filed internally too,
10 internally with Temple, their officer,
11 Sandy Foehl.
12  Q.  And then you said that Zachary knows
13 that you're in litigation?
14  A.  Yes.
15  Q.  What did you tell him about you being
16 in litigation?
17  A.  That I'm in litigation.
18  Q.  Anything else?
19  A.  No.
20  Q.  Other than the text messages with
21 Anne that you told me about already, have
22 you had any written communications with Anne
23 about your lawsuit against Temple?
24  A.  No.

## Page 45

1  Q. Have you had any written
2  communications with Abigail about your
3  lawsuit against Temple?
4  A. No.
5  Q. Other than the people that we've
6  spoken about, have you spoken with anyone
7  else about your lawsuit against Temple?
8      MR. MUNSHI: Besides me.
9      MS. FENDELL-SATINSKY: And I
10     don't want to know today anything
11     that you have spoken with Mr. Munshi
12     or any other attorneys about.
13     THE WITNESS: Okay.
14 BY MS. FENDELL-SATINSKY:
15  Q. So other than Mr. Munshi or any other
16 attorneys, have you communicated with anyone
17 other than the people we've talked about
18 already about your lawsuit against Temple?
19  A. Yes.
20  Q. Who?
21  A. Keya Sadeghipour, and he is the dean
22 of the College of Engineering. I can spell
23 his name.
24     MR. MUNSHI: Yeah, you might

## Page 46

1      have to do that.
2      THE WITNESS: Do you want me,
3      do you want me to spell it?
4      MS. FENDELL-SATINSKY: We can
5      do it off the record.
6      THE WITNESS: Okay.
7  BY MS. FENDELL-SATINSKY:
8  Q. Anyone else?
9  A. Can I -- did you ask me if I talked
10 to him about the lawsuit or if I've spoken
11 to him since I've left? I can't --
12  Q. So, right now my question was: Have
13 you spoken, other than Mr. Munshi, with
14 anyone other than the people we've talked
15 about about your lawsuit against Temple?
16  A. No, no.
17  Q. So you spoke with the dean of
18 engineering since you've left Temple?
19  A. Yes.
20  Q. Have you spoken with anyone else
21 other than the people who we've talked about
22 since you've left Temple?
23     Let me ask you a better question.
24 Have you spoken with anyone who worked at

## Page 47

1  Temple about your lawsuit against Temple
2  other than the people we've talked about?
3  A. No.
4  Q. The dean of engineering, what did you
5  speak with him about following the end of
6  your employment at Temple?
7  A. About a letter of recommendation.
8  Q. How did you -- did you reach out to
9  ask him for a letter of recommendation?
10  A. Yes, I did.
11  Q. How did you reach out to him?
12  A. By email.
13  Q. Did he respond to your email?
14  A. Yes, he did.
15  Q. And what did he say?
16  A. He said he would be happy to provide
17 one.
18  Q. Did he provide one for you?
19  A. I didn't need one, but, yeah, no, he
20 did not.
21  Q. The communication you had with him,
22 was that on your personal email account?
23  A. I don't know for sure.
24  Q. You haven't checked; is that correct?

## Page 48

1  A. No, I haven't checked.
2  Q. And just to close the loop on it,
3  other than the people we've already talked
4  about, is there anyone else who worked at
5  Temple that you've spoken to about -- is
6  there anyone else -- let's start from the
7  beginning.
8      Other than the people that we've
9  already talked about, is there anyone else
10 who worked at Temple who you have spoken to
11 since the end of your employment at Temple?
12  A. Not that I can recall. I think I've
13 been exhausted.
14  Q. You said that you asked the dean of
15 engineering for a letter of recommendation
16 and ultimately did not need it, correct?
17  A. Correct.
18  Q. Why did you not need the letter of
19 recommendation?
20  A. Because I didn't get any job offers.
21  Q. Have you been asked at any time since
22 the end of your employment at Temple for a
23 letter of recommendation?
24  A. No, I have not.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 49

1     Q.   Have you been asked at any time since
2  the end of your employment at Temple for a
3  reference?
4          MR. MUNSHI:  I'm sorry.  Did
5       she ask somebody or did someone ask
6       her?
7  BY MS. FENDELL-SATINSKY:
8     Q.   Have you been asked at any time since
9  the end of your employment for a reference?
10    A.   I've -- yes.  On job applications.
11    Q.   Have you listed anyone who worked at
12  Temple as a reference on any job
13  application?
14    A.   Yes.
15    Q.   Who?
16    A.   Keya Sadeghipour, Marjatta Lyyra,
17  Shohreh Amini, Frank Friedman, Allen
18  Nicholson, and Bruce Conrad.
19    Q.   Who is Shohreh Amini?
20    A.   She's a professor in the College of
21  Science and Technology in the Department of
22  Biology.
23    Q.   Did you ask her to serve as a
24  reference for you?

Page 50

1     A.   I did.
2     Q.   How did you ask her?
3     A.   I asked her if I could use her name
4  just for a reference.
5     Q.   Did you ask her by email?
6     A.   No.  I asked her it orally.
7     Q.   And where did you ask her orally?
8     A.   In the office, in her office.
9     Q.   Did you ask her to serve as a
10  reference for you prior to the end of your
11  employment at Temple?
12    A.   Yes, yeah.
13    Q.   Who is Frank Friedman?
14    A.   He is a -- well, he's a professor
15  emeritus now from the Department of Computer
16  and Information Sciences.
17    Q.   Did you ask him by email to serve as
18  a reference for you?
19    A.   I asked him orally.  No, I asked him
20  orally.
21    Q.   Did you ask him orally to serve as a
22  reference for you prior to the end of your
23  employment at Temple?
24    A.   Yes, I did.

Page 51

1     Q.   Did he agree to serve as a reference
2  for you?
3     A.   Yes.
4     Q.   Did Shohreh Amini agree to serve as a
5  reference?
6     A.   Yes.
7     Q.   Who is Aaron (sic) Nicholson?
8     A.   Allen.
9     Q.   Allen?
10    A.   Allen, yeah.
11    Q.   My apologies.
12    A.   Uhm, he is a professor in the
13  Department of Biology and Biochem.  He might
14  still be the chair of biology, I'm not sure.
15    Q.   Did you ask him orally or in writing
16  to serve as a reference for you?
17    A.   I believe I emailed him.
18    Q.   Did you email him while you still
19  worked at Temple?
20    A.   Yes, I did.
21    Q.   Did he agree to serve as a reference
22  for you?
23    A.   Yes, he did.
24    Q.   Who is Bruce Conrad?

Page 52

1     A.   Uhm, he's -- was a profess -- he was
2  a professor for math, but he worked in the
3  dean's office as the coord -- the director
4  of undergraduate studies in the College of
5  Science and Technology.
6     Q.   Did you ask him orally to serve as a
7  reference for you?
8     A.   Yes.
9     Q.   Did you ask him while you were still
10  working at Temple --
11    A.   Yes.
12    Q.   Let me just finish my question.
13    A.   Oh, I'm sorry.
14    Q.   That's okay.
15       Did you ask him before the end of
16  your employment at Temple to serve as a
17  reference for you?
18    A.   Yes, I did.
19    Q.   Do you know if any -- let me strike
20  that.
21       Do you know if Kiera -- if Keya, the
22  dean of engineering, Marjatta Lyyra, Shohreh
23  Amini, Frank Friedman, Allen Nicholson, or
24  Bruce Conrad has been called as a reference

13  (Pages 49 to 52)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 53

1  for you?
2    A.  I don't know.
3        MR. MUNSHI:  At any time?
4  BY MS. FENDELL-SATINSKY:
5    Q.   Since you've asked Keya, Marjatta
6  Lyyra, Shohreh Amini, Frank Friedman, Allen
7  Nicholson, and Bruce Conrad to serve as
8  references for you, do you know if any of
9  them have been contacted as a reference for
10  you?
11    A.  I don't know the answer to that
12  question.
13    Q.   You also, uh, mentioned Marjatta
14  Lyyra?
15    A.  Uh-huh.
16    Q.   Yes?
17    A.  Yes, I did.
18    Q.   I know we spoke about her earlier.
19        How did you ask her to serve as a
20  reference for you?
21    A.  I asked her if it was okay if I put
22  her down as a reference.
23    Q.   Did you ask her orally?
24    A.  Yes.

Page 54

1    Q.   Did you ask her prior to the end of
2  your employment at Temple?
3    A.  Yes.
4    Q.   When did you ask Marjatta Lyyra to
5  serve as a reference for you?
6    A.  I'm going to have to give
7  approximates.  2009 --
8    Q.  Did you ask --
9    A.  -- ish.
10    Q.  I'm sorry.  It sounded like I cut you
11  off.
12    A.  "Ish."
13    Q.  Did you ask her anytime other than
14  2009 to serve as a reference for you?
15    A.  Yes, I did.
16    Q.  When?
17    A.  In June of 2014.
18    Q.  That was after the end of your
19  employment --
20    A.  Yes, it was.
21    Q.  -- at Temple --
22    A.  Yes.
23    Q.  -- correct?
24    A.  Uh-huh.

Page 55

1    Q.   Before, you told me that you only
2  asked Marjatta Lyyra to serve as a reference
3  for you prior to the end of your employment
4  at Temple.
5        MR. MUNSHI:  Objection to
6  form.
7  BY MS. FENDELL-SATINSKY:
8    Q.   Did you ask Ms. Lyyra to serve as a
9  reference for you after the end of your
10  employment at Temple as well?
11    A.  Yes.
12    Q.   How did you ask her to serve as a
13  reference for you after the end of your
14  employment at Temple?
15    A.  By email and -- go ahead.
16    Q.  Go ahead.
17    A.  For a letter --
18    Q.  It sounded --
19    A.  -- for a job I applied.
20    Q.  What job?
21    A.  It was at the Community College of
22  Philadelphia in the dean's office.
23    Q.   Did you send her an email from your
24  personal email address?

Page 56

1    A.  It could have been from Temple.  It
2  was still open.
3    Q.   How long was your email at Temple
4  open following the end of your employment at
5  Temple?
6    A.  Six to seven months.
7    Q.  Do you know why it was open?
8    A.  Uhm, no, I don't.
9    Q.  Did you continue to access your
10  Temple email following the end of your
11  employment with Temple?
12    A.  Yeah.  Yes, I did.
13    Q.  Did Ms. Lyyra respond to your email?
14    A.  Yes.
15    Q.  Shohreh Amini, when did you ask her
16  to serve as a reference for you?
17    A.  Probably around 2005, '06.
18    Q.  Any other time?
19    A.  Yes.
20    Q.  When?
21    A.  I'm going to say 2010-ish.
22    Q.  Any other time?
23    A.  Not that I recall.
24    Q.  When did you ask Frank Friedman to

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 57

1    serve as a reference for you?
2    A.   2010.  Approximately 2000 -- yeah.
3    Q.   Did you ask him to serve as a
4    reference for you any other time?
5    A.   No, I have not.
6    Q.   When did you ask Allen Nicholson to
7    serve as a reference for you?
8    A.   I'm going -- 2004, '05-ish.
9    Q.   Did you ask Allen Nicholson to serve
10   as a reference for you anytime other than
11   around 2004, 2005?
12   A.   No.
13   Q.   When did you ask Bruce Conrad to
14   serve as a reference for you?
15   A.   Around the same time, 2004, '05.
16   Q.   Did you ask Bruce Conrad to serve as
17   a reference for you anytime other than 2004
18   to 2005?
19   A.   No, I did not.
20   Q.   Why did you ask -- let me ask you a
21   different question.
22        When did you ask Keya, the dean of
23   engineering, to serve as a reference for
24   you?

Page 58

1        MR. MUNSHI:  Objection to
2    form.
3        Go ahead, you can answer
4    again.
5        THE WITNESS:  Uhm, before I
6    left.  It was -- I'm going to -- you
7    know, around 2011, '12.
8    BY MS. FENDELL-SATINSKY:
9    Q.   Why did you ask Shohreh Amini and
10   Frank Friedman to serve as references for
11   you in 2010?
12   A.   For internal job bids.
13   Q.   Were you seeking other jobs around
14   2010?
15   A.   Internally.  Yes, yes.
16   Q.   Why?
17   A.   Uhm, increased growth opportunity.
18   Q.   Did you apply for any jobs internally
19   in 2010?
20   A.   Yes.
21   Q.   How many?
22   A.   Num -- I don't, I don't know.
23   Q.   Can you estimate?
24        MR. MUNSHI:  To the best that

Page 59

1    you can.  We don't want you
2    guessing.
3        THE WITNESS:  It would be a
4    guess.
5    BY MS. FENDELL-SATINSKY:
6    Q.   Did you apply for more than five jobs
7    in 2010 internally at Temple?
8    A.   I would say, yes.
9    Q.   More than ten?
10   A.   I can't say for sure.
11   Q.   So somewhere between five and ten?
12   A.   Yes.
13        MR. MUNSHI:  Just objection to
14   form.  She said she couldn't say.
15   BY MS. FENDELL-SATINSKY:
16   Q.   Did you interview for any of the jobs
17   you applied for in 2010?
18   A.   No.
19   Q.   Who is Andrew DiMeo?
20   A.   He was, when I was there, Andrew was
21   the assistant director of finance, I believe
22   is his title, in the College of Science and
23   Technology dean's office.
24   Q.   Did you interact with him during your

Page 60

1    employment at Temple?
2    A.   Yes, I did.
3    Q.   And what did you think of him?
4        MR. MUNSIII:  Just objection to
5    form.
6        You can answer if you
7    understand.
8        THE WITNESS:  Uhm, I thought
9    he was a nice young man initially.
10   BY MS. FENDELL-SATINSKY:
11   Q.   Anything else?
12   A.   Say the question again.
13   Q.   Sure.
14        I asked you what did you think of
15   Mr. DiMeo, and you testified that you
16   thought he was a nice young man initially.
17   A.   Right.
18   Q.   Did you have any other thoughts
19   about --
20   A.   I did.
21   Q.   -- Mr. DiMeo?
22   A.   I did.
23   Q.   And what were those or what are
24   those?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 61

1    A.    When he was in on Dr. Wu's and my
2  morning meetings, our relationship got a
3  little confrontive.
4    Q.    What do you mean?
5    A.    He was -- he would be in on our
6  meeting with Dr. Wu, and he would just be
7  there and just sort of say the same thing he
8  did, Dr. Wu is right.
9          I don't know.  I was told he was
10 there to be an advocate for me.
11   Q.    I think my question was a little bit
12 different.
13   A.    Okay.
14         MS. FENDELL-SATINSKY:  Could
15 you read back my question, please.
16         THE COURT REPORTER:  Uh-huh.
17 Well, technically it was, "What do
18 you mean?"  Did you want the one
19 before that?
20         MS. FENDELL-SATINSKY:  The
21 question before that.
22         THE COURT REPORTER:  Question,
23 "And what were those and what are
24 those?"

Page 62

1          THE WITNESS:  Those are --
2  BY MS. FENDELL-SATINSKY:
3    Q.    In asking your thoughts about him,
4  you testified that your relationship with
5  Mr. DiMeo at some point became confrontive;
6  is that correct?
7    A.    Yes, it did.
8    Q.    And so I asked you what did you mean
9  by confrontive.
10   A.    Uhm, I distrusted him.
11   Q.    Why?
12   A.    Because I -- he wasn't advocating for
13 me.
14   Q.    Any other reason you distrusted him?
15   A.    He lied about me.
16   Q.    Any other reason you distrusted him?
17   A.    He, he allowed Dr. Wu to yell at me
18 in front of him, and I wanted him to stand
19 up for me.
20   Q.    Any other reasons that you found
21 Mr. DiMeo -- that you distrusted Mr. DiMeo?
22   A.    Honestly, yes.  I, I thought because
23 he reported to Greg Wacker, who was the
24 director of finance in the dean's office,

Page 63

1  that --
2    Q.    So -- I'm sorry.
3          MR. MUNSHI:  She's still --
4  BY MS. FENDELL-SATINSKY:
5    Q.    Go ahead.
6    A.    That he was just there for Greg.  You
7  know, he was just Greg's message.  It didn't
8  seem like his message.
9    Q.    And that made you distrust him?
10   A.    Yes.
11   Q.    Any other reasons that you distrusted
12 him?
13   A.    No.
14   Q.    You said at some point that you --
15 that your relationship became confrontive.
16   A.    Yes.
17   Q.    Which you've described confrontive as
18 distrusting, correct?
19   A.    Yes.
20   Q.    When did that happen?
21   A.    Approximately 2012 to '13, around
22 that time period when he was told that he
23 would sit in on Dr. Wu's and my morning
24 meetings.

Page 64

1    Q.    You testified that you wanted
2  Mr. DiMeo to be your advocate, correct?
3          MR. MUNSHI:  Objection to
4  form.
5          THE WITNESS:  I was told he
6  would be my advocate.
7  BY MS. FENDELL-SATINSKY:
8    Q.    Who told you that?
9    A.    Mr. Wacker.
10   Q.    What did Mr. Wacker tell you?
11   A.    He told me that Andrew was there --
12 or Drew was there.  His name is "Drew."  He
13 was there as like a mediator or a, you know,
14 neutral person.
15   Q.    So not as a advocate, but as a
16 mediator or a neutral person?
17   A.    I see.  And advocacy.  I mean,
18 someone who would be between Dr. Wu and
19 myself to -- sometimes he would just repeat
20 back what Dr. Wu means.
21   Q.    So I want to know what Mr. Wacker
22 told you, so --
23   A.    Oh, that's what he told me.  That's
24 why Drew was there.  I asked him why Drew

16 (Pages 61 to 64)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 65

1  was there.
2      Q.   And what did he say?
3      A.   He said as an -- you know, to --
4  "It's to help you, Ruth."
5      Q.   Did he use the word "advocate"?
6      A.   I, I, I can't say for sure.  No, I
7  can't say for sure.
8      Q.   Did anyone else tell you that
9  Mr. DiMeo was supposed to be an advocate for
10  you?
11      A.   No.  I -- I'm sorry.
12      Q.   Go ahead.
13      A.   Uh, yeah, Deirdre Walton did.
14      Q.   And what did Ms. Walton tell you?
15      A.   The same thing.  I asked her why he
16  was in on the meetings, and she reported
17  that he was there to help me and to
18  communicate back to the dean's office.
19      Q.   And based on what she said, you
20  interpreted that to mean that he was your
21  advocate?
22      A.   Yes, I -- yes.
23      Q.   Ms. Walton did not use the word
24  "advocate"; is that correct?

Page 66

1      A.   I can't, I can't -- that's correct.
2  I...
3          MR. MUNSHI:  Were you done
4      answering?  You said "I."
5          MS. FENDELL-SATINSKY:  At any
6      point today if you're not --
7          MR. MUNSHI:  Wait, hold on.
8      Did you finish your --
9          MS. FENDELL-SATINSKY:  -- done
10      answering, please let me know.
11          MR. MUNSHI:  Oh, I'm sorry.
12          THE WITNESS:  Yeah.
13          MS. FENDELL-SATINSKY:  Okay?
14          THE WITNESS:  Yeah.
15  BY MS. FENDELL-SATINSKY:
16      Q.   Did I cut off your answer?
17      A.   No.  I'm just -- I think I probably
18  assumed advocate, but it was implied that
19  they would -- he was there to help me.
20      Q.   But she did not use the word
21  "advocate"?
22      A.   No, she didn't.  I can't say that she
23  did, no.
24      Q.   That was your interpretation of her

Page 67

1  message?
2      A.   Yes, it was.
3      Q.   And that was your interpretation of
4  Mr. Wacker's message --
5      A.   Yes, it was.
6      Q.   -- correct?
7      A.   (Witness nods head.)
8      Q.   Not what Mr. Wacker actually said,
9  right?
10          MR. MUNSHI:  Just objection to
11      form.  We've already gone over this.
12  BY MS. FENDELL-SATINSKY:
13      Q.   Do you understand my question?
14          THE WITNESS:  I don't know
15      what you mean.
16          MS. FENDELL-SATINSKY:  Sure.
17  BY MS. FENDELL-SATINSKY:
18      Q.   So, Ms. Briggs, today your attorney
19  may object to some of my questions.
20      A.   Okay.
21      Q.   Unless he tells you not to answer the
22  question, you should still answer the
23  question.
24      A.   Okay.

Page 68

1      Q.   If you don't understand my questions
2  at any time, just let me know and I'll
3  rephrase them for you.
4      A.   I don't understand --
5      Q.   Okay?
6      A.   -- what he said.
7          MR. MUNSHI:  I said objection
8      to form.  Go ahead and answer it.
9          THE WITNESS:  Oh, okay, all
10      right.  I didn't hear him.
11          MS. FENDELL-SATINSKY:  Sure.
12          THE WITNESS:  Okay.
13  BY MS. FENDELL-SATINSKY:
14      Q.   So you told me that based on your
15  conversation with Mr. Wacker you understood
16  and interpreted that Mr. DiMeo was to be
17  your advocate --
18      A.   Yes.
19      Q.   -- correct?
20      A.   Yes, that is correct.
21      Q.   And Mr. Wacker did not tell you that
22  Mr. DiMeo was to be your advocate, right?
23      A.   No.
24      Q.   No, he did not say that?

17 (Pages 65 to 68)

RUTH V. BRIGGS

Page 69

1    A.   No, he did not say that.
2    Q.   How old is Mr. DiMeo?
3    A.   I'm going to guess.  I'm going to
4  say --
5    Q.   I don't want you to guess, but if you
6  have --
7    A.   I don't know.
8    Q.   -- an estimate, that's fine.
9    A.   40 years old.
10   Q.   So Mr. DiMeo is younger than you,
11  right?
12   A.   Yes.
13   Q.   Did you view him as being younger
14  than you?
15   A.   No.
16        MR. MUNSHI:  Just objection to
17  form.
18  BY MS. FENDELL-SATINSKY:
19   Q.   Did you view Mr. DiMeo as having less
20  experience than you?
21   A.   No.
22   Q.   Did you value Mr. DiMeo's input into
23  your meetings with Dr. Wu?
24   A.   Initially, yes.

Page 70

1    Q.   And did that change at some point?
2    A.   Yes.
3    Q.   When did that change?
4    A.   When he agreed with Dr. Wu.
5    Q.   When was that?
6    A.   Just about every morning.  I don't
7  know.  Yeah, I don't know.  Often,
8  frequently.
9    Q.   So am I correct that when Mr. DiMeo
10  agreed with Dr. Wu you did not value that
11  input?
12   A.   I did not value, value it.  No, I did
13  not.
14   Q.   But you did value his input when he
15  didn't agree with Dr. Wu?
16   A.   It was -- yeah, I did value him, but
17  it wasn't about that meeting.  When I first
18  met him, I liked him; he was a great guy,
19  you know.
20   Q.   So you said that your valuing of
21  Dr. -- of Mr. DiMeo changed when he agreed
22  with Dr. Wu, correct?
23   A.   It -- can I -- that's wrong.
24   Q.   Okay.

Page 71

1    A.   It --
2    Q.   So what did -- so when did your
3  valuing of Mr. DiMeo change?
4    A.   When he was assigned to attend those
5  morning meetings.  Within, I'd say, a month
6  or so.
7    Q.   And what happened in a month or so
8  that made you change your valuation of
9  Mr. DiMeo?
10   A.   They lied about me.  I was written
11  up, disciplined.
12   Q.   Were you disciplined by Mr. DiMeo?
13   A.   No.  By proxy.
14   Q.   Mr. DiMeo never signed any of your
15  discipline, correct?
16   A.   I can't say for sure if he did.  I
17  think it was Greg Wacker most of the time.
18   Q.   Mr. DiMeo was not somebody you
19  reported to, correct?
20   A.   I report -- no.  No, I did not.
21  .Q.   Did you find Mr. DiMeo's input to you
22  helpful?
23   A.   Initially, yes.
24   Q.   And then when did that change?

Page 72

1    A.   I would say about nine months before
2  I was terminated.
3    Q.   And why was his input no longer
4  helpful nine months prior to the time your
5  employment at Temple ended?
6    A.   Because he -- I was not permitted to
7  give a statement for what they were accusing
8  me of.
9    Q.   And what were they accusing you of?
10   A.   Not -- spelling somebody's name
11  wrong.  Or, uhm, the big one that I got, the
12  big discipline was when I overslept.  They
13  wouldn't let me get the person I talked to
14  when I called in late.  They said I didn't
15  go through protocol.  We had no protocol,
16  so...
17   Q.   So nine months before the end of your
18  employment at Temple, you no longer found
19  Mr. DiMeo helpful to you?
20   A.   No, I didn't, no.
21   Q.   No, you did not find him helpful?
22   A.   No, I did not find him helpful.
23   Q.   Any other reason you did not find
24  Mr. DiMeo helpful other than he did not

18  (Pages 69 to 72)

RUTH V. BRIGGS

Page 73

1   permit you to give a statement?
2   A.   Distrust, did I say that?  Distrust.
3   Q.   And were those the reasons we spoke
4   about earlier?
5   A.   Yes.
6   Q.   Anything else?
7   A.   No.
8   Q.   You said you did have a good
9   relationship with Dr. -- with Mr. DiMeo at
10  one point, correct?
11  A.   Yes.
12  Q.   And at one point you sent him a
13  GoFundMe request to contribute to a fund for
14  your son?
15  A.   Yes.  And he did, yeah.
16  Q.   And he did contribute?
17  A.   His foundation did, yes.
18  Q.   And did you appreciate that?
19  A.   I did.
20  Q.   Did you send the GoFundMe request to
21  everyone you worked with?
22  A.   Actually, I -- it came from my
23  daughter, yes.  But I think it went to a lot
24  of them, yes.

Page 74

1   Q.   Did you give your daughter names of
2   people?
3   A.   Yes, I did.
4   Q.   And the names you gave her, were
5   how many names did you give her of people
6   you worked with at Temple?
7   A.   I'm going to guess again.
8   Q.   I want you to estimate --
9   A.   Okay, estimate.
10  Q.   -- if you can, not guess.
11  A.   Estimate, I would say 30 to 50-ish on
12  the...
13  Q.   Who is Greg Wacker?
14  A.   He's the director of finance in the
15  dean's office of the College of Science and
16  Technology.
17  Q.   And did you interact with Mr. Wacker
18  during your employment at Temple?
19  A.   Yes.
20  Q.   What did you think of him?
21      MR. MUNSHI:  Just objection to
22      form.
23      You can answer if you
24      understand.

Page 75

1      THE WITNESS:  Uhm, I was
2      afraid of him.
3   BY MS. FENDELL-SATINSKY:
4   Q.   Throughout your employment at Temple?
5   A.   Yes.
6   Q.   Why?
7   A.   He asked me to do things that were, I
8   felt, morally objectionable, if not illegal.
9   Q.   What did he ask you to do that you
10  found morally objectionable, if not illegal?
11  A.   The first thing he asked me to do was
12  to find something on an employee in our
13  office to get rid of her, that he didn't
14  believe she had -- she had gotten family
15  medical leave, intermittent leave, uhm, that
16  she was faking it.
17  Q.   And who was that employee?
18  A.   Her name is Tanya.  And I'm going to
19  have to guess the spelling on her last name,
20  Andrzjewski.  Her married name is Hunnewell,
21  but at the time it -- A-N-D -- I, I don't
22  know.
23  Q.   What else did Mr. Wacker ask you to
24  do that you viewed as morally objectionable,

Page 76

1   if not illegal?
2   A.   He coached me before we met with an
3   attorney about her lawsuit against Temple.
4   Q.   When was that?
5   A.   That would have been 2004.
6   Q.   And that was related to Tanya
7   Hunnewell?
8   A.   Yes, it was.
9   Q.   What else did Mr. Wacker ask you to
10  do that you found morally objectionable, if
11  not illegal?
12  A.   To call her doctor's office.
13  Q.   To call Tanya Hunnewell's doctor's
14  office?
15  A.   Yes.
16  Q.   Was that also around 2005?
17  A.   2004 or '05, yeah.
18  Q.   Why don't you give me a list of
19  everything that you found that Mr. Wacker
20  asked you to do that you found morally
21  objectionable, if not illegal.
22      MR. MUNSHI:  Beyond what she's
23      already said, or recap?
24

19 (Pages 73 to 76)

RUTH V. BRIGGS

Page 77

1   BY MS. FENDELL-SATINSKY:
2   Q.   Beyond what you've already told me.
3   A.   To just that -- to do what people
4   tell me to do, that my superiors tell me to
5   do even if I struggle with, struggle with it
6   morally, ethically.
7   Q.   Anything else?
8   A.   No.
9   Q.   So there are four things you told me
10  that Dr. -- that Mr. Wacker asked you to do
11  that you found morally objectionable, if not
12  illegal, correct?
13  A.   Correct.
14  Q.   Is there anything in addition to
15  those four things that you've already
16  testified about that Mr. Wacker asked you to
17  do that you found morally objectionable, if
18  not illegal?
19  A.   Other than what -- yes.
20  Q.   What else?
21  A.   Judy Lennon, who was our department
22  secretary, he told me that they were trying
23  to find something on her to get rid of her
24  and that if he caught me helping her again

Page 78

1   that he would discipline me.
2   Q.   Did Ms. Lennon struggle with some of
3   her job responsibilities?
4   A.   With her computer skills.
5   Q.   And did you help her with her
6   computer skills?
7   A.   I did.
8   Q.   Uhm, and did you understand that when
9   you helped her with her computer skills
10  Mr. Wacker couldn't assess what Ms. Lennon's
11  skills were?
12  A.   He didn't -- he wasn't the one who
13  assessed her.
14  Q.   Who did assess her?
15  A.   Dr. Wu.
16  Q.   When you helped Ms. Lennon with her
17  computer skills, did you understand that
18  Dr. Wu could not assess Ms. Lennon's
19  computer skills?
20  A.   Please read the question again.
21  Q.   Sure.
22          MS. FENDELL-SATINSKY:  Could
23  you read it back, please.
24          THE COURT REPORTER:  Uh-huh.

Page 79

1          MS. FENDELL-SATINSKY:  Thank
2   you.
3              - - -
4          (Whereupon, the court reporter
5   read the last question.)
6              - - -
7          THE WITNESS:  No, I did not.
8   BY MS. FENDELL-SATINSKY:
9   Q.   So if you help somebody with their
10  computer skills, then it's part -- their
11  performance of their computer skills is part
12  you, correct?
13  A.   Yes.
14  Q.   So it's not -- so when you helped
15  Ms. Lennon with her computer skills, that
16  was not adequately displaying her
17  performance, correct?
18  A.   Yes.
19  Q.   And if somebody is not adequately
20  displaying their own personal performance,
21  then they can't be properly assessed, right?
22  A.   Yes.
23  Q.   Any other things that Mr. Wacker
24  asked you to do that you found morally

Page 80

1   objectionable, if not illegal?
2   A.   Expense report, uhm, file.  You know,
3   to submit -- submitting expense reports.
4   Q.   What about submitting expense
5   reports?
6   A.   If it was justified in doing it or if
7   it was maybe illegal to, to do that.
8   Q.   Well, what did he ask you to do with
9   an expense report that you found
10  objectionable or illegal?
11  A.   To, to allocate expenses for, say,
12  travel or conference attendance, something
13  like that, uhm, to an NSF or an NIH grant
14  number, whether or not it was something that
15  was allowed.
16  Q.   Did you know what every NSF or NIH
17  grant number permitted in terms of expenses?
18  A.   Yes.
19  Q.   You knew what every NSF grant --
20  A.   I knew -- well, I knew what you
21  weren't supposed to submit.
22  Q.   So what did Mr. Wacker ask you to
23  submit that you felt you were not supposed
24  to submit?

20  (Pages 77 to 80)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 81

1    A.   Specifically, he just said, "Ruth,
2  don't question it. You've been asked to do
3  it. Just file it. Hit it. Send it. It's
4  not your problem," and I did.
5    Q.   Did Mr. Wacker ask you to submit any
6  expense report that you believed was
7  expensed to -- improperly to an account or a
8  grant?
9    A.   I, I asked. I didn't know the
10  answer. I asked if it was not. So I don't
11  know whether or not it was, but I went to
12  him.
13    Q.   Okay. So my question is a little
14  different.
15    A.   Uh-huh.
16    Q.   Is there anything that Mr. Wacker
17  asked you to submit in an expense report
18  that you believed --
19    A.   Okay, okay.
20    Q.   -- was not properly allocated to a
21  grant or an expense account?
22    A.   No.
23    Q.   When did he ask you to submit an
24  expense report that you found morally

Page 82

1  objectionable, if not illegal?
2    A.   It was my last year there, 2013.
3    Q.   How many times?
4    A.   Once comes to mind.
5    Q.   Any other times?
6    A.   No.
7    Q.   Any other things that Mr. Wacker
8  asked you to do that you found morally
9  objectionable, if not illegal?
10    A.   That I shouldn't -- he asked me to
11  not give Keya Sadeghipour, who was the
12  acting dean, the information he wanted that
13  he had asked me for.
14    Q.   What information did Keya Sadeghipour
15  ask you for?
16    A.   He asked me to do -- he asked me to
17  look at all employees that I -- that
18  reported to me and report their absences.
19    Q.   Who reported to you?
20    A.   The administrative staff.
21    Q.   You were their supervisor?
22    A.   Yes.
23    Q.   Did you do their reviews?
24    A.   I contributed to them. The chair

Page 83

1  always or the dean always did it, too.
2    Q.   Did you have the ability to terminate
3  the administrative staff?
4    A.   Tanya Hunnewell, I did.
5    Q.   You terminated her?
6    A.   She reported directly to me.
7    Q.   And you made the decision to
8  terminate Tanya?
9    A.   No, I did not.
10    Q.   Right. So I'm asking if you
11  personally had the ability to terminate the
12  administrative staff who you say reported to
13  you.
14         MR. MUNSHI: Objection to
15    form. Asked and answered.
16         THE WITNESS: Just Tanya.
17  BY MS. FENDELL-SATINSKY:
18    Q.   But you did. It was not your
19  decision to terminate Tanya?
20    A.   No, it was not mine.
21    Q.   Did you have the ability to
22  discipline --
23    A.   Yes.
24    Q.   -- the administrative staff --

Page 84

1    A.   Yes, I did.
2    Q.   -- who reported to you?
3    A.   Yes.
4    Q.   Without seeking authorization from
5  somebody else?
6    A.   No.
7    Q.   Okay. And who did you have to seek
8  approval from before you could discipline
9  the administrative staff?
10    A.   I didn't need approval. I just -- it
11  went to another level. I could, I could do
12  a disciplinary action if I needed to, but
13  I -- it would go to the next level.
14    Q.   What do you mean it would go to the
15  next level?
16    A.   Well, then it would -- Greg would
17  review it.
18    Q.   So Mr. Wacker would approve any
19  discipline you wanted to give before you
20  gave the discipline?
21    A.   If I did. I never did.
22    Q.   So you never issued discipline to --
23    A.   I never, no.
24    Q.   Let me finish my questions.

ELITE LITIGATION SOLUTIONS, LLC

Page 85

1    A.   Okay, sorry.
2    Q.   You never issued discipline to any of
3   the administrative staff who you say
4   reported to you?
5    A.   No, I did not.
6    Q.   Going back to the information that
7   Mr. Wacker asked you not to give to Keya,
8   did he tell you why he did not want you to
9   give that information to him?
10   A.   Because of the -- he -- when Keya
11  came in as acting dean, he changed some of
12  the policies about, about reporting and --
13   Q.   My question is a little bit
14  different.
15   A.   Okay.
16       MS. FENDELL-SATINSKY: Can you
17   read back my question, please.
18       THE COURT REPORTER: Uh-huh.
19              ---
20       (Whereupon, the court reporter
21   read back the last question.)
22              ---
23       MR. MUNSHI: She just answered
24   that.

Page 86

1        You can answer again if you
2    want.
3   BY MS. FENDELL-SATINSKY:
4    Q.   Can you answer that question?
5    A.   Yeah.  Uhm, I think I understand the
6   question.
7        Keya was there half-time.  He was
8   between two colleges, and when he leaves he
9   just had to know what we're doing here.
10   Q.   Anything else he told you?
11   A.   No.
12   Q.   Did you ultimately give that
13  information to Keya?
14   A.   I did.
15   Q.   And how -- did you tell Mr. Wacker
16  that you were going to give the information
17  to Keya?
18   A.   I did not, no.
19   Q.   So you disregarded Mr. Wacker's
20  request not to give Keya the information,
21  correct?
22   A.   That's correct.
23   Q.   And in doing so, you didn't listen to
24  a direction of your supervisor, right?

Page 87

1    A.   He wasn't my supervisor.
2    Q.   In doing so, you did not listen to a
3   direction of someone superior to you,
4   correct?
5    A.   I did listen.  I listened to my, my
6   supervisor, Keya.
7    Q.   Keya was your supervisor?
8    A.   Yes, he was.  Keya Sadeghipour was my
9   supervisor.
10   Q.   He was the person that you reported
11  to?
12   A.   Reported to, uh-huh.
13   Q.   From when to when?
14   A.   He was at the college for 2002 to
15  2000 -- the end of 2003.  I'm guessing about
16  the time.
17   Q.   So this incident with Keya happened
18  in 2002 or 2003?
19   A.   Right.  During his term as interim
20  dean.
21   Q.   Anything else that Mr. Wacker asked
22  you to do that you found morally
23  objectionable, if not illegal, other than
24  what you've already told me?

Page 88

1    A.   No.
2        MR. MUNSHI: We've been going
3    about an hour.  Can we take five?
4        MS. FENDELL-SATINSKY: I just
5    want to finish this line of
6    questioning.
7        MR. MUNSHI: Okay.  Yeah,
8    whenever you're done with this line
9    of questions.
10  BY MS. FENDELL-SATINSKY:
11   Q.   The incident involving Keya where you
12  say Keya asked you for information and
13  Mr. Wacker told you not to give it to him,
14  when did that occur?
15   A.   Right after his appointment as acting
16  dean.  So, the date is not clear to me.  I'm
17  thinking it's probably July, the summer of
18  2003-'04.
19   Q.   That did not happen in 2013?
20   A.   With Keya?
21   Q.   Yes.
22   A.   No, uh-uh.
23   Q.   What did Mr. Wacker ask you to do in
24  regards to calling Tanya Hunnewell's

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 89

1   doctor's office in 2005?
2   A.   If she -- she was out, had called
3   out, and he wanted her doctor to say that
4   she was sick.
5   Q.   Did you call her doctor's office?
6   A.   No, I did not.
7   Q.   Did he ask you to call her doctor's
8   office?
9   A.   He did.
10   Q.   And in 2005 Mr. Wacker was senior to
11   you, correct?
12   A.   Yes.
13        MR. MUNSHI:  Just objection to
14     form.
15        THE WITNESS:  Yeah, yes.
16   BY MS. FENDELL-SATINSKY:
17   Q.   Do you understand what -- when I say
18   the word "senior," what do you mean?  What
19   did you understand that to mean?
20   A.   It means that his grade level is
21   higher than me and he was also the, you
22   know, the director of finance in the college
23   dean's office.
24   Q.   So Mr. Wacker asked you to call

Page 90

1   Ms. Hunnewell's doctor, and you did not do
2   that, correct?
3   A.   No, I did not.
4   Q.   And by not doing that, you didn't
5   listen to a direction he gave you, correct?
6   A.   That is true, yes.
7   Q.   You said Mr. Wacker told you to do
8   what your superiors tell you to do even if
9   you struggle morally or ethically with it?
10   A.   That -- not then.  Later.
11   Q.   When did he tell you that?
12   A.   With Dr. Wu.  That would have been
13   2000 -- like 2009 to my termination.
14   Q.   Did he tell you that in regard to a
15   specific incident or did he make the
16   statement generally?
17   A.   It was a specific incident, but I
18   can't -- it would have been something I
19   questioned about.
20   Q.   What was the specific incident?
21   A.   It would have been about reporting,
22   you know, the grant numbers and what I could
23   do with them.
24   Q.   You said it would have been.

Page 91

1        Do you know what it was or --
2   A.   It was, I mean, because it was
3   financial in nature.
4   Q.   So it dealt with reporting grant
5   numbers?
6   A.   Reporting expenses.  Allocating
7   expenses, I should say.
8   Q.   And was that what we spoke about?
9   Did that relate to the --
10   A.   Yes.
11   Q.   -- what we spoke about earlier when
12   you told me that Dr. Wacker asked you to
13   submit expense reports to NSF or NHI (sic)
14   grant numbers that you found morally
15   objectionable?
16   A.   Yes.  And it's "Mr. Wacker."
17   Q.   I'm sorry.  I'm giving him an extra
18   title.
19        MR. MUNSHI:  Is now a good
20     time?
21        MS. FENDELL-SATINSKY:  Let's
22   take a break.
23        THE VIDEOGRAPHER:  This
24   concludes video No. 1.

Page 92

1        We're going off the record.
2   The time is 11:23.
3        - - -
4        (Whereupon, a brief recess was
5   taken from 11:23 until 11:35 a.m.)
6        - - -
7        THE VIDEOGRAPHER:  Going back
8   on the record at 11:35.  Here
9   begin's video No. 2.
10        Please proceed.
11   BY MS. FENDELL-SATINSKY:
12   Q.   Ms. Briggs, before the break you told
13   me that you believe you had administrative
14   staff who reported to you?
15   A.   Uh-huh.
16   Q.   Is that a "yes"?
17   A.   Yes, it is.  I'm sorry.
18   Q.   What time period was that?
19   A.   2002 to maybe 6 months.  A very short
20   period of time.
21   Q.   So for about a six-month period you
22   had administrative staff reporting to you?
23   A.   Tanya did.  I was her direct
24   supervisor.

23 (Pages 89 to 92)

ELITE LITIGATION SOLUTIONS, LLC

## Page 93

1  Q.   Did you have anyone else who reported
2  to you during the time you worked at Temple?
3  A.   Not direct report, no.
4  Q.   Do you know how old Mr. Wacker is?
5  A.   No, I do not.
6  Q.   Do you have an estimate of how old he
7  is?
8  A.   55, maybe.
9  Q.   At some point, you asked Mr. Wacker
10 to serve as a reference for you, correct?
11 A.   I did not.
12 Q.   You don't believe you ever asked
13 Mr. Wacker to serve as a reference for you?
14 A.   I don't recall doing that.
15 Q.   You started working at Temple in
16 February 2001 --
17 A.   That is --
18 Q.   -- is that right?
19 A.   Yes.
20 Q.   And you stopped working at Temple on
21 April 1st, 2014?
22 A.   Yes.
23 Q.   At the time your employment at Temple
24 ended, how much did you earn?

## Page 94

1  A.   Fifty-one and, maybe, five-hundred,
2  something like that.
3  Q.   Were you eligible for any type of
4  bonus at the time your employment with
5  Temple ended?
6  A.   No.
7  Q.   At any time during your employment at
8  Temple, were you eligible for a bonus?
9  A.   Yes.
10 Q.   When were you eligible for a bonus?
11 A.   From the time I started, I believe.
12 Let me retract that.  The first year I was a
13 contract employee was TAUP.
14 Q.   T --
15 A.   Or no.  A union; I was union, was my
16 first job there.
17 Q.   So when you started at Temple in
18 2001, you were a union employee?
19 A.   Yes.
20 Q.   And as a union employee, were you
21 entitled to a bonus?
22 A.   I don't know the answer to that
23 question.
24 Q.   Were you eligible for any kind of

## Page 95

1  bonus at any time during your employment at
2  Temple?
3  A.   Yes.
4  Q.   When were you entitled to a bonus?
5  A.   From 2003 until my first disciplinary
6  action, 2012.
7  Q.   What was your understanding of why
8  you were not eligible for a bonus after
9  2012?
10 A.   I was on probation.
11 Q.   And is it your understanding that
12 when an employee is on probation they're not
13 eligible for a bonus?
14 A.   That's my understanding.
15 Q.   Did anyone tell you that?
16 A.   Yes.
17 Q.   Who?
18 A.   Greg.
19 Q.   Wacker?
20 A.   Uh-huh.
21 Q.   Is that a "yes"?
22 A.   Yes.  I'm sorry.
23 Q.   Did he tell you in a written
24 communication?

## Page 96

1  A.   No.
2  Q.   In an oral conversation?
3  A.   Yes.
4  Q.   Did anyone else tell you that you're
5  not eligible for a bonus when you're on
6  probation?
7  A.   No.  Not that I remember, no.
8  Q.   Were you on probation in 2012?
9  A.   Yes.
10 Q.   Were you on probation in 2013?
11 A.   Yes.
12 Q.   Were you on probation in 2014?
13 A.   Yes.
14 Q.   And what did you understand being on
15 probation to mean?
16 A.   There was a time period after a
17 disciplinary action was given, which was a
18 year, and we couldn't bid on jobs and get
19 bonuses.
20 Q.   Did you understand that also meant
21 that if you had another similar infraction
22 that could lead to the next step in the
23 discipline process?
24 A.   Yes.

RUTH V. BRIGGS

Page 97

1    Q.    And in some instances the next step
2  of the discipline process could be
3  termination?
4    A.    Could you repeat that?
5    Q.    Sure.  The next step in the
6  discipline process in some instances could
7  be termination?
8    A.    Yes, I did know that.
9    Q.    What was your first job at Temple?
10   A.    I was the editorial assistant to
11 Kamel Khalili in the Center for
12 Neurovirology and Cancer Biology.
13   Q.    What was your pay in that job?
14   A.    I believe it was 34,000.
15   Q.    Who was your supervisor?
16   A.    Kamel Khalili, K-A-M, as in Mary,
17 E-L.  Last name is K-H-A-L-I-L-I.
18   Q.    Does Mr. Khalili --
19   A.    Doctor.
20   Q.    Dr. Khalili, does Dr. Khalili still
21 work at Temple?
22   A.    Yes, he does.
23   Q.    What did you think of Dr. Khalili as
24 a supervisor?

Page 98

1    A.    He was tough, but I liked him.
2    Q.    Did you think he was fair?
3    A.    Not always, no.
4    Q.    In what ways?
5    A.    The shop steward from the -- did I
6  say "TAUP"?  I meant, I meant, uhm, AFSCME.
7  I'm sorry.  TAUP is the faculty union.  Uhm,
8  the AFSCME shop steward was in my building,
9  and he was always around and telling me,
10 "You don't have to do that.  You don't have
11 to do that," so...
12        It was my first hourly job since high
13 school, so...
14   Q.    You told me your pay was $34,000.
15   A.    Approx -- I'm guess -- I'm not -- I
16 don't know the exact amount.
17   Q.    Were you paid by the hour or were you
18 paid a salary?
19   A.    I was paid -- I was hourly.
20   Q.    And what was your hourly rate?
21   A.    I don't know.  I can't remember.
22   Q.    You said initially that you were a
23 part of TAUP union and --
24   A.    But I re -- okay.  Correcting that, I

Page 99

1  meant AFSCME.
2    Q.    So you were not a part of the TAUP
3  union?
4    A.    No.
5    Q.    You were part of the AFSCME --
6    A.    AFSCME.
7    Q.    -- union.
8    A.    Uh-huh.
9    Q.    And that was in your first job as the
10 editorial assistant?
11   A.    Yes, uh-huh.
12   Q.    Uhm, did -- you told me that you felt
13 Dr. Khalili was not always fair because he
14 was telling the shop steward not to do
15 things?
16   A.    No, no, no.  That's not what I said.
17   Q.    Okay.
18   A.    Can I repeat that?
19   Q.    So why did you not believe
20 Dr. Khalili was not always fair?
21   A.    He, he was inconsistent, I think,
22 about -- I had no written job description
23 that was other than a generic description
24 for Temple.

Page 100

1    Q.    In what way did you find him
2  inconsistent?
3    A.    About assignments there, when they
4  changed or...
5    Q.    Were you the only editorial
6  assistant?
7    A.    Yes, I was.
8    Q.    So no one else had your job, correct?
9    A.    No one else had my job.
10   Q.    Were there any other ways in which
11 you found Dr. Khalili to be not always fair?
12   A.    He was a tough supervisor.  I'm
13 trying to think of instances.
14        One comes to mind.  I went to the
15 bathroom one time, and he came into my
16 office and I wasn't there and reported me as
17 away from my desk without permission.  So,
18 Cindy was the office supervisor.  She came
19 to me.
20   Q.    Did you ask Dr. Khalili if you could
21 go to the restroom on that occasion?
22   A.    No, I did not.
23   Q.    Did you ask Cindy if you could go to
24 the restroom on that occasion?

25 (Pages 97 to 100)

RUTH V. BRIGGS

Page 101

1    A.   No, I did not.
2    Q.   Were you disciplined for that?
3    A.   I, I was -- I don't know if it was a
4    formal discipline, but I definitely was
5    called into his office, yeah.
6    Q.   Were you placed on a probation as a
7    result of that incident?
8    A.   I'm not sure, really.  I know that
9    there was some -- he called me in and showed
10   me something.  I don't know if there was a
11   discipline.  I don't have a copy of it.
12   Q.   Why did you feel that was not
13   always -- that that was not fair?
14   A.   Because it wasn't -- the job
15   description -- I mean the duties changed, so
16   I wasn't aware of them until -- it just sort
17   of fell on me.
18   Q.   Any other ways in which you felt
19   Dr. Khalili was not fair to you?
20   A.   Intrusive about personal things.
21   Like, you know, the bathroom; uhm, if one of
22   my children call -- and I was not on the
23   phone, but if my kids called, he'd want to
24   know the content of the conversation.

Page 102

1    Q.   Any other ways in which you found
2    Dr. Khalili to be not fair?
3    A.   No.
4    Q.   Do you know if Dr. Khalili asked
5    anyone else about the contents of their
6    conversations, their non-work conversations
7    at the office?
8    A.   I'm not aware of that.  I wouldn't
9    be.  I don't know that.
10   Q.   You said that you didn't think it was
11   fair when you went to the restroom and
12   Dr. Khalili reported you as away from your
13   desk?
14   A.   Yes.
15   Q.   Why did you not believe that was
16   fair?
17   A.   Well, I was embarrassed.  Uhm, I
18   thought, bathroom behavior, what I do in the
19   bathroom is pretty much mine.
20   Q.   Did he ask you what you did in the
21   bathroom, or he was just upset that --
22   A.   No.  Ask me --
23   Q.   Let me ask my question.
24   A.   Okay.  I'm sorry.

Page 103

1    Q.   Did he ask you what you did in the
2    bathroom?
3    A.   No.
4    Q.   So he just was upset that you had
5    gone to the bathroom --
6    A.   Right.
7    Q.   -- without his permission?
8    A.   Yes.
9    Q.   And you believe that was unfair
10   because you were embarrassed by that?
11   A.   No.  Because it wasn't something I
12   had to do before.  It just sort of happened
13   that time.  It wasn't a department rule
14   where people had to...
15   Q.   After Dr. Khalili spoke with you, did
16   you understand that you had to request
17   permission before you left your desk?
18   A.   I did.  Yes, I did.
19   Q.   And after he spoke with you, did you
20   request permission to leave your desk when
21   you did leave your desk?
22   A.   He told me to report to Cindy.  And,
23   yes, I did.
24       MR. MUNSHI:  What are we

Page 104

1    calling this?
2        THE COURT REPORTER:  Briggs?
3        MS. FENDELL-SATINSKY:
4    Perfect, Briggs, Briggs 1.
5        MR. MUNSHI:  Can we call them
6    Defendant's 1?  Otherwise, when I
7    mark them, it will be all confusing.
8        MS. FENDELL-SATINSKY:  I think
9    there's a lot of them that are
10   already marked.
11       THE COURT REPORTER:  I can
12   remark them.  That's fine.
13       MS. FENDELL-SATINSKY:  If you
14   want to just put, like, D, dash,
15   Briggs or something like that?
16       THE COURT REPORTER:  Is that
17   okay or do you want just --
18       MR. MUNSHI:  I'm just trying
19   to think down the road if I'm
20   marking things as Plaintiff-1 and
21   then there's Briggs-1 and
22   Plaintiff-1, it's going to get
23   really confusing.
24       THE COURT REPORTER:  So you

ELITE LITIGATION SOLUTIONS, LLC

Page 105

1  want D-1?
2       MR. MUNSHI: I would just
3  propose D-1.
4       THE COURT REPORTER: D-1?
5       MR. MUNSHI: Or Defendant's 1.
6       THE COURT REPORTER: Okay.
7       MR. MUNSHI: But it's up to
8  you.
9       THE COURT REPORTER: That's
10  fine.
11       MS. FENDELL-SATINSKY: I don't
12  care.
13       MR. MUNSHI: Thank you.
14       - - -
15       (Whereupon, Temple Hire Sheet,
16  Bates No. TEMPLE0076-77, was marked
17  as D Exhibit No. 1 for
18  identification.)
19       - - -
20  BY MS. FENDELL-SATINSKY:
21  Q.   Ms. Briggs, the court reporter has
22  given you a document that's been marked as
23  D-1. Take a look at this document, and my
24  first question for you is going to be

Page 106

1  whether you've ever seen this document.
2  A.   It's hard for me to read. Is the
3  first heading -- or second heading "internal
4  compliance"? I can't read the first word.
5  "Internal compliance"?
6  Q.   So the first section I believe says
7  "Temple University Human Resources Action
8  Authorization," and then the next section
9  says "Internal Compliance."
10  A.   Okay. Thank you.
11  Q.   The next section after that says
12  "External Compliance."
13  A.   Thank you.
14       I've never seen this before, I don't
15  recall.
16  Q.   Is this consistent with -- is there
17  anything about this that's inconsistent with
18  your position as an editorial assistant at
19  Temple?
20  A.   Could you repeat the question again.
21  Q.   Sure.
22       MS. FENDELL-SATINSKY: Can you
23  read it back, please.
24       THE COURT REPORTER: Uh-huh.

Page 107

1       - - -
2       (Whereupon, the court reporter
3  read back the last question.)
4       - - -
5       THE WITNESS: Uh, no.
6  BY MS. FENDELL-SATINSKY:
7  Q.   And going back to something you told
8  me earlier, you mentioned an experience when
9  Dr. Khalili asked you about going to the
10  restroom and why you were not at your desk,
11  correct?
12  A.   Where I had been, yes.
13  Q.   Do you know if he asked anyone else
14  why they left their desk and went to the
15  bathroom or where they had been?
16  A.   No, I don't.
17  Q.   After your job as editorial
18  assistant, did you have another job at
19  Temple?
20  A.   Yes.
21  Q.   What was your next job?
22  A.   Executive assistant to the dean in
23  the College of Science and Technology.
24  Q.   When did you obtain that role?

Page 108

1  A.   It was 2002.
2  Q.   Did you apply for that job?
3  A.   Yes, I did.
4  Q.   And you were selected?
5  A.   Yes.
6  Q.   Did you want that job?
7  A.   Yes.
8  Q.   Why did you want that job?
9  A.   Because I was told by the development
10  director that I would be helping him more
11  than anyone. And my background is in
12  development and fundraising; I was excited
13  about that.
14  Q.   Who was the development director?
15  A.   His name was Gregory Murphy, and he
16  was the director of development for the
17  College of Science and Technology.
18  Q.   But when you applied for the role of
19  executive assistant, you understood that you
20  would be reporting to the dean; is that
21  right?
22  A.   Yes. But he was part of the, the
23  group that interviewed me.
24  Q.   But you understood when you applied

ELITE LITIGATION SOLUTIONS, LLC

## Page 109

1  for the job that you would not be reporting
2  to Mr. Murphy, correct?
3  A.  Supervisor.  I understood that, yes.
4          MR. MUNSHI:  You can put that
5  to the side.
6          THE WITNESS:  I don't know
7  what this is.
8          MR. MUNSHI:  You can put it to
9  the side.  It's okay.  She'll tell
10  you if you --
11          THE WITNESS:  Okay.
12  BY MS. FENDELL-SATINSKY:
13  Q.  Did your salary change when you
14  became an executive assistant?
15  A.  Yes, it did.
16  Q.  And what did -- how did your pay
17  change?
18  A.  It went -- I'm thinking around 40,
19  maybe a little less.
20  Q.  Did you have additional
21  responsibilities as executive assistant that
22  you had not had as an editorial assistant?
23  A.  Oh, yes.
24  Q.  And who was the dean of the College

## Page 110

1  of Science and Technology at that time?
2  A.  Allen Nicholson.
3  Q.  Had you worked with Dean Nicholson in
4  your role as an editorial assistant?
5  A.  No.
6  Q.  What did you think of Dean Nicholson?
7          MR. MUNSHI:  Objection to
8  form.
9          THE WITNESS:  Very fine --
10          MR. MUNSHI:  Go ahead.
11          THE WITNESS:  Very -- a fine
12  man, very -- a good man.  I really
13  liked Dr. Nicholson.
14  BY MS. FENDELL-SATINSKY:
15  Q.  Did you like him as a supervisor?
16  A.  Yes.
17  Q.  Did you think he was a fair
18  supervisor?
19  A.  Yes.
20          THE COURT REPORTER:  D-2.
21          MR. MUNSHI:  Thank you.
22          - - -
23          (Whereupon, 2/14/05 Temple HR
24  Affirmative Action Authorization,

## Page 111

1  Bates No. TEMPLE0078-80, was marked
2  as D Exhibit No. 2 for
3  identification.)
4          - - -
5  BY MS. FENDELL-SATINSKY:
6  Q.  The court reporter has given you a
7  document that was marked as D-2.
8  A.  Uh-huh.
9  Q.  Same first question; I'm going to ask
10  whether you've seen this document before.
11  A.  No, I have not.  I don't --
12          MR. MUNSHI:  Take your time.
13          THE WITNESS:  No, I have not.
14  BY MS. FENDELL-SATINSKY:
15  Q.  On the first page, it says the date
16  this was issued was February 14th, 2005.
17          Do you see that?
18  A.  I see that.
19  Q.  Does that refresh your recollection
20  about when you started as the executive
21  assistant to Dean Nicholson?
22  A.  2005, this says?  Is that what --
23  Q.  That's what it says.
24  A.  Yeah, okay.  Yeah, okay.

## Page 112

1  Q.  So I'm asking:  Does that refresh
2  your recollection as to when you --
3  A.  Yes.
4  Q.  -- started working in that role?
5  A.  Yes.
6  Q.  So do you believe you started working
7  for Dean Nicholson in 2005?
8  A.  Yes.
9  Q.  And it says recommended starting
10  salary $45,500.
11          Do you see that?
12  A.  I see that.
13  Q.  Does that refresh your recollection
14  about what your salary was when you were --
15  started as the executive assistant for
16  Dean Nicholson?
17  A.  I don't remember it now, but I see
18  it, yeah.
19  Q.  Do you have any reason to doubt
20  that's what your salary was when you
21  started --
22  A.  I have no reason --
23  Q.  -- reporting to Dean Nicholson?
24  A.  No, I don't doubt it.

RUTH V. BRIGGS

Page 113

1    Q.    Did you like your job working for
2  Dean Nicholson?
3    A.    I did.
4    Q.    What were your responsibilities as
5  Dean Nicholson's executive assistant?
6    A.    To deal with the committees, the
7  deans' committees, the college committees,
8  some university committees; uhm, taking care
9  of doing the faculty side of graduation and
10  commence -- any, any kind of formal event
11  where they would need academic regalia and a
12  platform party.
13    Q.    Did you have responsibilities for
14  Dean Nicholson's schedule?
15    A.    Yes, I did.
16    Q.    Did you have responsibilities to plan
17  events?
18    A.    Yes.
19    Q.    Were you responsible for submitting
20  Dean Nicholson's expense reports?
21    A.    Yes.
22    Q.    Were you responsible for booking
23  travel for Dean Nicholson?
24    A.    No.

Page 114

1    Q.    Who booked Dean Nicholson's travel?
2    A.    I don't know.  He wasn't there -- he
3  was only there for the first two months or
4  three months I was there.
5    Q.    Dean Nicholson was?
6    A.    Yes.
7    Q.    And then what happened to him?
8    A.    He was replaced with Keya Sadeghipour
9  as the acting dean.  I believe it was July
10  1st is the -- yeah.
11    Q.    July 1st of 2005?
12    A.    Yes.
13    Q.    Do you know why Dean Nicholson was
14  replaced by Keya Sadeghipour?
15    A.    No, I do not.
16    Q.    And when Dean Nicholson was replaced
17  by Mr. Sadeghipour -- Dr. Sadeghipour, did
18  you keep your position as executive
19  assistant?
20    A.    Yes.
21    Q.    Had you worked with Mr. Sadeghipour
22  prior to 2005?
23    A.    No.
24    Q.    So you had no interactions with

Page 115

1  Mr. Sadeghipour from 2001 to 2005 --
2    A.    I had met him.
3    Q.    -- is that correct?
4    A.    I met him.
5    Q.    Other than meeting him, had you had
6  any other interactions with Dr. Sadeghipour
7  from 2001 to 2005?
8    A.    No.
9    Q.    When you became Dean Sadeghipour's
10  executive assistant, did you have the same
11  responsibilities you had as Dean Nicholson's
12  executive assistant?
13    A.    Pretty much, yes.  He tweaked them a
14  little bit, but...
15    Q.    In what way?
16    A.    Because he was there half-time, he
17  wanted me to report to him every day what
18  was going on in the office.
19    Q.    And was that not something you did
20  for Dean Nicholson?
21    A.    No.
22    Q.    Other than reporting to him what was
23  going on every day, were there any other
24  changes that Mr. Sadeghipour made to your

Page 116

1  responsibilities?
2    A.    He was -- he took away my -- I asked
3  him to take away my, uhm, supervisory role
4  over Tanya.
5    Q.    And what did he say?
6    A.    He said, yes, he would.
7    Q.    At that time, was Tanya still
8  employed by Temple?
9    A.    Yes.
10    Q.    So Tanya was still employed by Temple
11  when you started to report to Dean
12  Sadeghipour?
13    A.    Sadeghipour, yes, uh-huh.
14    Q.    Any other changes that Dean
15  Sadeghipour made to your responsibilities?
16    A.    More events.
17    Q.    He asked you to plan more events?
18    A.    Events that had to do with finding
19  the new, the new dean, department a new
20  dean.
21    Q.    Anything else?
22    A.    A welcoming party to welcome the new
23  dean; graduation.
24    Q.    You were -- you had worked on

29 (Pages 113 to 116)

RUTH V. BRIGGS

| Page 117 | Page 119 |
|---|---|
| 1   graduation for --<br>2   A.   For Allen.<br>3   Q.   -- Dean Nicholson, correct?<br>4   A.   Uh-huh, uh-huh.<br>5   Q.   Is that a "yes"?<br>6   A.   Yes.  That is true.<br>7   Q.   So working on graduation was not a<br>8   new responsibility for you?<br>9   A.   No, it was not.<br>10   Q.   Any other responsibilities that<br>11   Dean Sadeghipour changed from Dean<br>12   Nicholson?<br>13   A.   No.<br>14   Q.   You mentioned that one of the things<br>15   you asked Dean Sadeghipour for was to not to<br>16   have to -- to take away your supervisor role<br>17   over Tanya.<br>18   A.   Yes.<br>19   Q.   Why?<br>20   A.   Because I felt that it was illegal.<br>21   Q.   You felt what was illegal?<br>22   A.   To call, contact the doctors.  Well,<br>23   I didn't feel.  I knew it was, to do that.<br>24   Q.   And you told me there was only one | 1   Q.   Were there any other reasons that you<br>2   asked Dean Sadeghipour to take away your<br>3   supervisory role over Tanya?<br>4           MR. MUNSHI:  Beyond what she's<br>5       already testified to?<br>6   BY MS. FENDELL-SATINSKY:<br>7   Q.   Beyond -- you've told me that you<br>8   felt -- that you asked Dean Sadeghipour to<br>9   take away your supervisory role over Tanya<br>10   because you felt it was illegal to contact<br>11   her doctor, correct?<br>12   A.   Correct.<br>13           MR. MUNSHI:  Objection to<br>14       form.  She said other things.<br>15   BY MS. FENDELL-SATINSKY:<br>16   Q.   Other than that --<br>17           MS. FENDELL-SATINSKY:  Let me<br>18       finish my question.<br>19   BY MS. FENDELL-SATINSKY:<br>20   Q.   Other than that, were there any other<br>21   reasons that you asked Dean Sadeghipour to<br>22   take away your supervisory role over Tanya?<br>23           MR. MUNSHI:  Objection to<br>24       form. |

| Page 118 | Page 120 |
|---|---|
| 1   occasion on which Mr. Wacker asked you to<br>2   call Tanya's doctor, correct?<br>3   A.   There was one time when he asked me<br>4   to do that, but there were other pressures<br>5   from him to get rid of her.<br>6   Q.   Okay.  So, I want to go back to this.<br>7       I asked you why you asked Dean<br>8   Sadeghipour to take away your supervisory<br>9   role over Tanya, and you said because you<br>10   felt it was illegal to contact her doctor,<br>11   correct?<br>12           MR. MUNSHI:  Objection to<br>13       form.<br>14           THE WITNESS:  Yeah.<br>15   BY MS. FENDELL SATINSKY:<br>16   Q.   And that was on the one occasion that<br>17   we discussed earlier where Mr. Wacker --<br>18   A.   Yes.<br>19   Q.   -- asked you to do that?<br>20   A.   Yes.<br>21   Q.   Were there any other occasions on<br>22   which anyone at Temple asked you to contact<br>23   Tanya's doctor?<br>24   A.   No. | 1           THE WITNESS:  Yeah.<br>2           MR. MUNSHI:  Go ahead.<br>3           THE WITNESS:  Yes, yes.<br>4   BY MS. FENDELL-SATINSKY:<br>5   Q.   Do you understand my question?<br>6   A.   Yes, I do.<br>7   Q.   Okay.<br>8   A.   It was to discipline her, write up,<br>9   formally discipline her.<br>10   Q.   And who asked you to discipline her?<br>11   A.   Greg Wacker.<br>12   Q.   And what did he ask you to discipline<br>13   her for?<br>14   A.   For absenteeism.<br>15   Q.   Was she absent?<br>16   A.   Yes.<br>17   Q.   Why did you not discipline her?<br>18   A.   Because she had intermittent family<br>19   medical leave.<br>20   Q.   Did Mr. Wacker know that?<br>21   A.   He did.<br>22   Q.   Do you know what exactly her<br>23   authorized intermittent FMLA leave was?<br>24   A.   Can you repeat the question? |

30 (Pages 117 to 120)

RUTH V. BRIGGS

Page 121

1    Q.    Sure.
2         Do you know how many days or hours
3    she was permitted to be absent pursuant to
4    her intermittent FMLA leave?
5    A.    It was intermittent.  It could be --
6    paid leave was until she used all of her
7    vacation, and then afterwards she could
8    still take off without pay.
9    Q.    Did you review Tanya's FMLA
10   paperwork?
11   A.    No, I did not.
12   Q.    Did you know how much time her doctor
13   authorized her to be off work?
14   A.    He add -- it was approved as
15   intermittent.  That means that it's not a
16   specified period of time like May 1st to May
17   15, that it, it rolls.
18   Q.    So when -- to you, does it mean that
19   when somebody needs to take leave they're
20   able to take leave?
21   A.    Say that again.
22   Q.    Sure.
23        You understood -- how did you know
24   that Tanya was on intermittent FMLA leave?

Page 122

1    A.    Because I was told when I was hired.
2    Q.    Who told you that?
3    A.    I believe it was Greg.
4    Q.    And did Greg tell you anything else
5    about Tanya's ability to take intermittent
6    FMLA leave other than the fact that she had
7    intermittent FMLA leave?
8    A.    He told me that he didn't believe
9    her.
10   Q.    Anything else?
11   A.    And that he wanted me to find a
12   reason to get rid of her.
13   Q.    Anything else Mr. Wacker told you
14   about Tanya's intermittent FMLA leave other
15   than what you've told me?
16   A.    No.
17   Q.    Have you ever taken intermittent FMLA
18   leave at Temple?
19   A.    I have.
20   Q.    And when you're going to take
21   intermittent leave, what's the process for
22   reporting?
23   A.    You call, call in.  If it's
24   intermittent, you call in in the morning

Page 123

1    you're having an exacerbation or whatever.
2    You just say, "I want" -- "I'm using my FMLA
3    day today."
4    Q.    And when you took intermittent FMLA
5    leave, was it your understanding that --
6    what was your -- let me step back.
7         What was your understanding of how
8    much leave you could take pursuant to your
9    FMLA leave?
10   A.    Paid or unpaid or both?
11   Q.    Both.
12   A.    There was -- I don't know exactly, to
13   be honest with you.
14   Q.    When you went on intermittent FMLA
15   leave, did you have to complete a form from
16   a doctor?
17   A.    Yes.
18   Q.    And did that form specify how much
19   leave you were entitled to?
20   A.    I don't know.
21   Q.    What was -- did you believe that you
22   could take any day off when you were on
23   intermittent FMLA leave?
24   A.    I mean -- any day?  No.  I know I had

Page 124

1    to call in or...
2    Q.    Right.  But other than calling in,
3    did you believe you could take off whenever
4    you wanted when you were on intermittent
5    FMLA leave?
6    A.    I did if -- yes.
7    Q.    And did you believe the same for
8    Tanya, that she could take off whenever she
9    wanted?
10   A.    I be -- yes.
11   Q.    And where did that understanding come
12   from with regard to Tanya?
13   A.    From the employee handbook.
14   Q.    What specifically in --
15   A.    Or maybe, maybe it was pol -- the
16   policy for FMLA.
17   Q.    Did you ask anyone in H.R. about what
18   Tanya was entitled to take under her FMLA
19   leave?
20   A.    I did speak to someone in H.R.
21   Q.    Who?
22   A.    Deirdre Walton.
23   Q.    And what did Ms. Walton tell you
24   about Tanya's FMLA leave?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 125

1    A.   I don't recall.  I think she referred
2   me back to Greg.
3    Q.   And I believe you told me earlier,
4   but correct me if I'm wrong, that Mr. Wacker
5   didn't tell you -- he told you that -- let
6   me ask a cleaner question.
7        I believe you told me earlier, but
8   correct me if I'm wrong, that Mr. Wacker
9   told you that Tanya was on intermittent FMLA
10   leave, but he did not provide you with any
11   other specifics about her leave; is that
12   correct?
13    A.   That's correct.
14    Q.   Since you didn't review Tanya's FMLA
15   paperwork, you don't know exactly what kind
16   of leave she was entitled to, correct?
17        MR. MUNSHI:  Just objection to
18        form.
19        THE WITNESS:  That is
20        incorrect.
21        MS. FENDELL-SATINSKY:  Okay.
22        THE WITNESS:  I knew because I
23        asked Deirdre Walton.
24

Page 126

1   BY MS. FENDELL-SATINSKY:
2    Q.   Well, you told me, Deirdre Walton,
3   you don't remember what Deirdre Walton
4   said
5    A.   Yeah, I --
6    Q.   -- except that she referred you back
7   to Greg.
8    A.   Okay.  But now I'm remembering now.
9   I asked her if -- what was the difference
10   between FMLA and intermittent, and she told
11   me what the policy was.
12    Q.   So what did she tell you?
13    A.   The policy was if the person was sick
14   that morning, whatever -- I don't know what
15   her issue was.  Whatever the issue you're on
16   Family Medical Leave for, that you can -- if
17   something comes up and your intermittent,
18   you call in that morning and say that you
19   need to take an FMLA day.  And that's the
20   only explanation you have to give.
21    Q.   Did Ms. Walton --
22    A.   The medical information is protected,
23   I was told.
24    Q.   Sure.  So she couldn't tell you

Page 127

1   anything about the medical information.
2    A.   I didn't ask.  Yeah.
3    Q.   So you don't know what Tanya's
4   medical information said about when she was
5   entitled to leave, correct?
6    A.   No, I don't.  You're right.
7    Q.   Going back to your work for Dean
8   Sadeghipour, how long did Dean Sadeghipour
9   stay in the role as the dean of College of
10   Science and Technology?
11    A.   About 18 months.  And I'm
12   approximating.
13    Q.   After about 18 months, did someone
14   else become the dean of the College of
15   Science and Technology?
16    A.   Yes.
17    Q.   Who was that?
18    A.   That was Hai-Lung, H-A-I, hyphen,
19   L-U-N-G.  Last name is Dai, D-A-I.
20    Q.   And when Dean Dai became the dean,
21   did you stay in your role as executive
22   assistant?
23    A.   Yes.
24    Q.   Did you have the same

Page 128

1   responsibilities for Dean Dai that you had
2   for Dean Sadeghipour?
3    A.   They, they changed.
4    Q.   How did they change?
5    A.   Uhm, Dean Dai was the permanent dean,
6   so he was really trying to reach out to
7   alumni; get a board of visitors together,
8   because we didn't have a board of visitors.
9   So it was more external, a lot of external,
10   working with external constituents.
11    Q.   Any other way that your
12   responsibilities changed?
13    A.   A lot more travel.
14    Q.   For you or for Dean --
15    A.   For Dr. Dai.
16    Q.   So there was a lot more travel for
17   Dean Dai?
18    A.   Yes.
19    Q.   And were you responsible for booking
20   Dean Dai's travel?
21    A.   Yes, I was.
22    Q.   Were you responsible for booking
23   Dean Sadeghipour's travel?
24    A.   No.

32  (Pages 125 to 128)

RUTH V. BRIGGS

Page 129

1    Q.   Was Dean Dai the first person that
2   you've booked travel for at Temple?
3    A.   Yes.
4    Q.   And when you booked travel for
5   Dean Dai, did that include flight
6   arrangements?
7    A.   He did a lot of his own. He liked it
8   that way. But sometimes, yes, I did.
9    Q.   Do you know why he liked to book his
10   travel on his own?
11    A.   Because he liked to connect at
12   certain places. He had a lot of
13   conferences. So he would give me what he
14   found and ask me to book it for him once he
15   had the flights.
16    Q.   Do you know why he didn't ask you to
17   initially search for flights?
18    A.   Because he said he liked to find the
19   cheapest flight. That's what he told me.
20    Q.   What did you think of Dean
21   Sadeghipour?
22         MR. MUNSHI:  Just objection to
23      form.
24         THE WITNESS:  I really liked

Page 130

1      him.
2   BY MS. FENDELL-SATINSKY:
3    Q.   Did you think he was fair?
4    A.   Uh-huh.
5    Q.   Is that a "yes"?
6    A.   Yes. I'm sorry.
7    Q.   What did you think of Dean Dai?
8         MR. MUNSHI:  Same objection to
9      form.
10         You can answer.
11         THE WITNESS:  I welcomed
12      Dean Dai with open arms. I was so
13      happy to see him. I could see the
14      dean's office was really going to
15      take off instead of just sort of
16      limping along. And I was very
17      excited, and I felt we had a really
18      good relationship initially.
19   BY MS. FENDELL-SATINSKY:
20    Q.   And did that change at some point?
21    A.   Uhm, towards the end, yes.
22    Q.   And why did it change?
23    A.   Because I was, because I was told I
24   was on loan to Dr. Wu in the other

Page 131

1   department. And that was all I knew, just
2   to help him get off. He was a new chair.
3    Q.   Were you upset that Dean Dai had put
4   you on loan to Dr. Wu?
5    A.   No, not at all. It was just that I
6   was forgotten.
7    Q.   By who?
8    A.   The dean's office.
9    Q.   And by Dean Dai?
10    A.   Dean Dai and Vice-Dean George
11   Palladino.
12    Q.   In what way do you believe you were
13   forgotten?
14    A.   Because I was told I was on loan,
15   and, like, you know, a year-and-a-half
16   passed. I'm like, When am I coming back?
17   But then I reported directly to Palladino at
18   that point.
19    Q.   When did you start reporting to
20   Palladino?
21    A.   When Dean Dai was appointed dean, the
22   permanent dean.
23    Q.   When did that happen?
24    A.   Oh, that happened -- once again,

Page 132

1   year, I'm going to say he started January
2   1st of 2006 or '07. That was his official
3   date.
4    Q.   And at that point in time,
5   Vice-Dean Palladino became your supervisor?
6    A.   Well, Vice-Dean was there before
7   Dean Dai. He came in during the transition.
8    Q.   Right. But did you start to report
9   to Vice-Dean Palladino in January 2006 or
10   2007?
11    A.   Before. When Dr. Palladino came
12   over, I'm guessing, the fall before. When
13   he came over, I reported to him because
14   Dean Dai wasn't here -- there.
15    Q.   And you did not report to -- was
16   there a time when there was no dean?
17    A.   There were acting deans.
18    Q.   Right. So, I understand Dean
19   Sadeghipour was an acting dean.
20         And he was there about 18 months, you
21   told me?
22    A.   Yes.
23    Q.   And then you told me after Dean
24   Sadeghipour, Dean Dai became the dean?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 133

1    A.   Yeah.  But Allen Nicholson was the
2    first interim dean.
3    Q.   I understand.
4    A.   Okay, okay.
5    Q.   I'm focused on the time between
6    Dean Sadeghipour and Dean Dai.
7    A.   Right.
8    Q.   Was there any point in time when
9    there was no dean?
10   A.   No.
11   Q.   And did you begin to report to
12   Dean Palladino when Dean Dai became the
13   dean?
14   A.   Dean Dai became the dean, was
15   announced the dean, but he was transitioning
16   from Penn; so Dr. Palladino was on the
17   ground.  He was the boots on the ground for
18   Dr. Wu -- for Dr. Dai, so I reported to him.
19   Q.   So when did you begin reporting to
20   Dr. Palladino?
21   A.   So, October -- I'm thinking
22   September, October of 2006-'07.
23   Q.   And then once Dr. -- once Dean Dai
24   came on, then did you report to Dean Dai or

Page 134

1    did you continue to report to Dr. --
2    A.   I continued --
3    Q.   -- Palladino?
4    A.   -- to report to Palladino.
5    Q.   Let me finish my questions.
6    A.   I'm sorry.
7    Q.   That's okay.
8        What did you think of Dean Palladino
9    as a supervisor?
10   A.   He was a tough guy, but I liked him.
11   Q.   Did you think --
12   A.   He was -- go ahead.
13   Q.   I'm sorry.  Go ahead.  It sounded
14   like you were going to say something else.
15   A.   Yeah, yeah.  I just thought he was a
16   good guy.
17   Q.   Did you think he was fair?
18   A.   He was fair.
19   Q.   When did you -- when were you, what
20   you said, given on loan to Dr. Wu?
21   A.   That would have been the end of
22   August/beginning of September of 2009.
23   Q.   At that point in time, did Dean Wu
24   become your supervisor?

Page 135

1    A.   Yes.
2    Q.   And you said after about a
3    year-and-a-half in that role you wanted to
4    go -- well, let me ask you:  Did there come
5    a point in time when you understood that you
6    were going to be Dr. Wu's executive
7    assistant?
8    A.   Well, temporarily, immediately when
9    he asked.
10   Q.   Okay.  Well, did there come a point
11   in time when you understood that was going
12   to be your permanent position?
13   A.   Not officially, no.
14   Q.   So no one ever told you that your
15   role was to be Dr. Wu's executive assistant;
16   is that your testimony?
17   A.   That is.
18   Q.   So the whole time that you worked for
19   Dr. Wu, you believed that you were on loan
20   to him?
21   A.   For the first 18 months, I did, yeah.
22   Q.   And then what did you believe after
23   the first 18 months?
24   A.   I felt forgotten.

Page 136

1    Q.   Okay.  So did you believe that you
2    were on loan after the first 18 months?
3    A.   No, I did not anymore.
4    Q.   So what did you believe then after
5    the first 18 months?
6    A.   That I was there, I was -- it was
7    permanent.
8    Q.   So that you were going to be Dr. Wu's
9    permanent executive assistant?
10   A.   Right, exactly.
11   Q.   As Dr. Wu's executive assistant, did
12   you have the same kinds of responsibilities
13   you had had for Dean Nicholson --
14   A.   Yes.
15   Q.   -- Dr. Palladino, and Dean --
16   A.   Sadeghipour.
17   Q.   -- Sadeghipour?
18       MR. MUNSHI:  Objection to
19   form.
20       Go ahead and answer.
21       THE WITNESS:  Yes.
22   BY MS. FENDELL-SATINSKY:
23   Q.   So you were responsible for Dr. Wu's
24   travel?

RUTH V. BRIGGS

| Page 137 |
|---|
| 1   A.   Yes. |
| 2   Q.   Were you responsible for Dr. Wu's |
| 3   expense reports? |
| 4   A.   Yes. |
| 5   Q.   And for checking the status of those |
| 6   expense reports? |
| 7   A.   Yes. |
| 8   Q.   Were you responsible for editing |
| 9   papers for Dr. Wu? |
| 10   A.   Yes. |
| 11   Q.   Had you done that for any of the |
| 12   prior individuals you had been an executive |
| 13   assistant for? |
| 14   A.   No. |
| 15   Q.   So editing papers was a new task to |
| 16   you? |
| 17   A.   Yes. |
| 18   Q.   And editing papers, did that require |
| 19   a lot of focus? |
| 20   A.   Yes. |
| 21   Q.   And that's a very detail-oriented -- |
| 22   A.   Yes. |
| 23   Q.   -- responsibility, correct? |
| 24   A.   Yes. |

| Page 139 |
|---|
| 1   distinguished guest from another university |
| 2   come in. |
| 3   Q.   Did that change your responsibilities |
| 4   or did it just make the events themselves |
| 5   different? |
| 6   A.   Just different, just different. |
| 7   Q.   So it did not change your |
| 8   responsibilities in regard to organizing the |
| 9   events? |
| 10   A.   No. |
| 11   Q.   And in your role as executive |
| 12   assistant for Dr. Wu, you didn't have any |
| 13   responsibility for staff supervision -- |
| 14   A.   No. |
| 15   Q.   -- correct? |
| 16   A.   No, I did not. |
| 17   Q.   Were you the only executive assistant |
| 18   for Dr. Wu? |
| 19   A.   Yes. |
| 20   Q.   So Dr. Wu did not have any other |
| 21   executive assistants while you were his |
| 22   executive assistant? |
| 23   A.   That is correct. |
| 24   Q.   Did anyone else report to Dr. Wu |

| Page 138 |
|---|
| 1   Q.   For Dr. Wu, did you continue to |
| 2   organize events? |
| 3   A.   Yes. |
| 4   Q.   And meetings? |
| 5   A.   Yes. |
| 6   Q.   And organizing events and meetings, |
| 7   did that include ordering food? |
| 8   A.   Yes. |
| 9   Q.   Did that include arranging food? |
| 10   A.   Yes. |
| 11   Q.   Did that include making the event |
| 12   look presentable? |
| 13   A.   Yes. |
| 14   Q.   And those tasks you had done for the |
| 15   prior deans of the college, correct? |
| 16   A.   Yes. |
| 17   Q.   So those were not new tasks to you? |
| 18   A.   They were different kinds of events, |
| 19   but yes. |
| 20   Q.   In what way were they different kinds |
| 21   of events? |
| 22   A.   Rather than being collegial, they |
| 23   were more focused on colloquium, maybe |
| 24   having speak -- you know, maybe a |

| Page 140 |
|---|
| 1   while you reported to him? |
| 2   A.   Uh-huh. |
| 3   Q.   Is that a "yes"? |
| 4   A.   Yeah.  I'm sorry. |
| 5   Q.   That's okay. |
| 6   A.   "Yes." |
| 7   Q.   Who else? |
| 8   A.   I don't know all of them, but I can |
| 9   tell you the ones I know. |
| 10   Q.   Sure. |
| 11   A.   Judy Lennon; uhm, Jackie Harriz - and |
| 12   that's H-A-R-R-I-Z, as in zebra - Alexandra |
| 13   Grinshpun, G-R-I-N-S-P-H-U-N (sic); Laurie |
| 14   Shteir; Associate Chair Justin Shi; and |
| 15   Eugene Kwatny.  Both associate chairs, I'm |
| 16   sorry. |
| 17   Q.   The two associate chairs, were they |
| 18   directly below Dr. Wu? |
| 19   A.   Yes. |
| 20   Q.   So they were senior to you? |
| 21   A.   They were senior, uh-huh. |
| 22   Q.   And when I say "senior," I'm talking |
| 23   about the definition you gave me earlier of |
| 24   "senior." |

35  (Pages 137 to 140)

RUTH V. BRIGGS

Page 141

1    A.   Yes.
2    Q.   Laurie Shteir, what was her job?
3    A.   She was an adjunct professor and a
4    coordinator of the lab programs, I believe
5    her title was.
6    Q.   And in that role, she had different
7    responsibilities than you had, correct?
8    A.   Yes, yeah.  Much different.
9    Q.   Who is Alexandra Grinshpun?
10   A.   Grinshpun, she was the business
11   manager for the department for a short
12   period of time.
13   Q.   And she had different
14   responsibilities than you, correct?
15   A.   Yes.
16   Q.   Was she replaced by somebody else?
17   A.   Drew DiMeo.
18   Q.   When did Drew replace her?
19   A.   I'm going to say 2010-ish.
20   Q.   And when Drew DiMeo became the
21   business manager, did he assume Alexandra's
22   responsibilities?
23        MR. MUNSHI:  Just objection to
24        form.

Page 142

1         But go ahead.
2         THE WITNESS:  They were
3         different, because he didn't come
4         into the office.  He stayed in the
5         dean's office.
6    BY MS. FENDELL-SATINSKY:
7    Q.   Otherwise, did his -- in your
8    opinion, did his responsibilities change
9    from Alexandra's?
10   A.   Yes.
11   Q.   In what way?
12   A.   He just was not -- you know, I don't
13   know how to answer that question, to be
14   honest.
15   Q.   So you don't --
16   A.   He just wasn't visible.  He wasn't
17   physically located there, so...
18   Q.   But you don't personally know whether
19   his responsibilities changed from
20   Alexandra's?
21   A.   That is correct.
22   Q.   And Mr. DiMeo's job, in Mr. DiMeo's
23   job was he doing tasks and responsibilities
24   different than yours?

Page 143

1    A.   Yes.
2    Q.   What position did Jackie Harriz --
3    A.   Harriz?
4    Q.   -- have?
5    A.   She worked with the graduate
6    students.  She did like the F-1 visas and
7    J-1s.  That's what she did with the
8    department.
9    Q.   Do you know what her title was?
10   A.   I think it was coordinator of
11   international students in our department.
12   Q.   And earlier you told me Judy Lennon
13   was a secretary, correct?
14   A.   Right, the department secretary.
15   Q.   Of the -- were there any other
16   employees who reported to Dr. Wu during the
17   time you were Dr. Wu's executive assistant?
18   A.   On the hierarchy chart, all the
19   faculty did, so...
20   Q.   Anyone else?  Was there anyone else
21   within the office that was not a faculty
22   member?
23   A.   Well, when Alexandra was there, she
24   reported to him.  I think even the people in

Page 144

1    the labs below us reported to him, but I
2    can't say for sure.
3    Q.   But Judy, Jackie, Alexandra, Laurie,
4    Justin, and Eugene were the people in the
5    office; is that accurate?
6    A.   Eugene Kwatny was on a different
7    floor, but he was associate chair of the
8    department.
9    Q.   But you were all associated together
10   as being --
11   A.   Yes.
12   Q.   -- a part of --
13   A.   That's correct.
14   Q.   -- part of Dr. Wu's office?
15   A.   Yes.
16   Q.   Is that correct?
17   A.   That's correct.
18   Q.   Okay.  So was there anyone else who
19   you considered to be part of Dr. Wu's office
20   during the time you were Dr. Wu's executive
21   assistant?
22   A.   I'm just going through in my head.
23   A.   Sure.
24   A.   I think the student workers.  I can't

36 (Pages 141 to 144)

RUTH V. BRIGGS

Page 145

1    say for sure, but I would think.
2          Uhm, Tom, what is Tom's last name?
3    Well, the, uhm, like, technical people in
4    our department, John Ikoniak, he reported to
5    Dr. Wu.  Tom Stauffer to Dr. Wu.
6    Q.    Was he a technical person, too?
7    A.    Yes.
8    Q.    And were they -- did they work in IT?
9    A.    Yes, uh-huh.
10   Q.    Did you have any IT responsibilities
11   during the time you were Dr. Wu's executive
12   assistant?
13   A.    No.
14   Q.    Anyone else you can think of who was
15   part of Dr. Wu's office during the time you
16   were Dr. Wu's executive assistant?
17   A.    Uhm, yeah.  Hailey King.
18   Q.    What job did Ms. King have?
19   A.    She took Jackie Harriz's position,
20   which was the same thing, coordinating the
21   visas and stuff like that.
22   Q.    Anyone else?
23   A.    The adjuncts, did I say that?  The
24   adjunct professors.

Page 146

1    Q.    Anyone else that you can remember?
2    A.    I'm just going through the staff in
3    my head.
4    Q.    Uh-huh.
5    A.    Oh, Sally Kyvernitis.
6    Q.    What was Sally's job?
7    A.    I'm going to spell her last.  It's
8    K-Y-V-E-R-T-I-N-I-S (sic).  Sally was the
9    coordinator for our undergraduate students
10   to make sure they got their credits and
11   could graduate on time.
12   Q.    Anyone else?
13   A.    I think that's everyone in the
14   department.
15   Q.    Sally's responsibilities were
16   different than yours, correct?
17   A.    Oh, yes, uh-huh.
18   Q.    And Judy Lennon's responsibilities,
19   hers were different than yours too, right?
20   A.    Yes.
21   Q.    In terms of the hierarchy, I
22   understand Dr. Wu was at the top of the
23   hierarchy --
24   A.    Uh-huh.

Page 147

1    Q.    -- correct?
2    A.    Yes.
3    Q.    And then you told me that Justin Shi
4    and Eugene Kwatny were directly below
5    Dr. Wu?
6    A.    Yes.
7    Q.    Who came in the hierarchy after
8    Dr. -- after Justin Shi and Eugene Kwatny?
9    A.    I would say faculty, tenure track,
10   our tenure, our tenure track faculty.
11   Q.    Where did Laurie Shteir fall in the
12   chain of command?
13   A.    She was a quasi faulty staff
14   position; so she reported directly to him, I
15   know that.
16   Q.    Did you re -- did you view Laurie
17   Shteir as senior to you?
18   A.    No, I did not.
19   Q.    Did you view her as a peer?
20   A.    Yes.
21   Q.    And do you know if Laurie Shteir had
22   any -- has any advanced degrees?
23   A.    I believe she has a master's degree.
24   Q.    Do you have a master's degree?

Page 148

1    A.    I'm short of some credits.
2    Q.    So you don't have a master's degree?
3    A.    I don't have my master's degree,
4    uh-uh.
5    Q.    Alexandra Grinshpun, was she senior
6    to you?
7    A.    Yes.
8    Q.    And, again, when I use the word
9    "senior" --
10   A.    Yes, she was.
11   Q.    -- I'm using your definition.
12   A.    Yes, she was.
13   Q.    Do you understand that moving forward
14   if I use the word "senior," unless I tell
15   you otherwise, I'm referring to the
16   definition you gave me earlier?
17   A.    Right, I understand.
18   Q.    So you said Alexandra was senior to
19   you, correct?
20   A.    Yes.
21   Q.    And so Drew was senior to you as
22   well?
23   A.    My grade level was higher than his.
24   I don't know if --

37  (Pages 145 to 148)

RUTH V. BRIGGS

Page 149

1    Q.   What's a grade level?
2    A.   I -- we had a T -- for staff members
3    who were salary, there was a T level who
4    weren't faculty; and I was a T-26, which I
5    believe was the first level of management.
6    And when Drew started, he was like maybe a
7    T-23 or 4, I'm not sure, but he was
8    definitely below me.
9    Q.   You said that T-26 is a first tier of
10   management?
11   A.   I believe so.
12   Q.   But Mr. DiMeo's position was business
13   manager, correct?
14   A.   Assistant.
15   Q.   Is that what Alexandra's position
16   was, assistant business manager?
17   A.   Oh, I thought -- I'm sorry.  I
18   thought you were talking about at the
19   college.  I'm sorry.  He was business
20   manager for us, you are correct.
21   Q.   So Drew DiMeo's position was business
22   manager?
23   A.   For the department, yes.
24   Q.   And you -- did you view Drew DiMeo

Page 150

1    as -- well, did you view yourself as senior
2    to Drew DiMeo?
3    A.   Frankly, I never thought about it.
4    Q.   Thinking about it now, did you
5    view -- do you view yourself as having been
6    senior to Drew DiMeo?
7    A.   I was.
8    Q.   In what way?
9    A.   If I look at the T schedule, you
10   know, T scale.
11   Q.   Could you give Mr. DiMeo assignments?
12   A.   No.
13   Q.   Could you give Alexandra Grinshpun
14   assignments?
15   A.   No.
16   Q.   Could you give Laurie Shteir
17   assignments?
18   A.   No.
19   Q.   Could Laurie Shteir give you
20   assignments?
21   A.   Through Dr. Wu, yes.
22   Q.   Could Alexandra Grinshpun give you
23   assignments?
24   A.   Through Dr. Wu.

Page 151

1    Q.   Could Drew DiMeo give you
2    assignments?
3    A.   Through Dr. Wu.
4    Q.   Could Jackie Harriz give you
5    assignments?
6    A.   We didn't -- no.  We didn't work
7    together.
8    Q.   Jackie Harriz, did you view her as
9    senior to you?
10   A.   I viewed her as a peer.
11   Q.   And Judy Lennon, did you view her as
12   senior to you?
13   A.   No.
14   Q.   Did you view her as a peer?
15   A.   Yes.
16   Q.   Sally --
17   A.   Kyvernitis.
18   Q.   -- Kyvernitis --
19   A.   Uh-huh.
20   Q.   -- did you view her as senior to you?
21   A.   Yes.
22   Q.   And Hailey King, did you view her as
23   senior to you?
24   A.   No, I did not.

Page 152

1    Q.   Did you view her as a peer?
2    A.   Yes.
3    Q.   And when Hailey King started working
4    at Temple, did she assume Jackie Harriz's
5    role?
6    A.   Yes.
7    Q.   And Jackie Harriz's responsibilities?
8    A.   Yes.  With the one caveat I didn't
9    see their -- I mean, I don't -- I'm
10   assuming.  We were introduced to them.  So,
11   I don't have access to files, if that's what
12   you're --
13   Q.   No, I understand.  I'm asking you --
14   A.   Okay.
15   Q.   -- how you view them.
16   A.   Okay.
17   Q.   And you told me how you viewed --
18   A.   Okay.
19   Q.   -- people.
20        MS. FENDELL-SATINSKY:
21   (Indicating):
22        MR. MUNSHI:  Thank you.
23        THE COURT REPORTER:  This is
24   three.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 153

```
 1                    - - -
 2          (Whereupon, 10/20/09 email
 3     regarding Ruth Briggs, Bates No.
 4     TEMPLE0081-86, was marked as D
 5     Exhibit No. 3 for identification.)
 6                    - - -
 7   BY MS. FENDELL-SATINSKY:
 8     Q.   Ms. Briggs, the court reporter has
 9   given you a document that's been marked as
10   D-3, and I want you to take a look at it.
11   It's a couple of pages.  And, again, let me
12   know whether you've ever seen the document
13   before.
14     A.   (Brief pause while reading.)
15          No.  I don't remember seeing it.  I
16   feel surprised.
17     Q.   You said you're surprised?
18     A.   Uh-huh.
19     Q.   What are you surprised by?
20     A.   That I -- it's about me, but I wasn't
21   informed.
22     Q.   Well, read, read the next few pages
23   and let me know if you've seen the next few
24   pages.
```

Page 154

```
 1     A.   Okay.  My job description.
 2     Q.   Okay.  So you haven't seen the cover
 3   email that's marked as TEMPLE0081?
 4     A.   That is correct.
 5     Q.   But you have seen what you called
 6   your "job description" that's been marked as
 7   TEMPLE0082 to TEMPLE0086?
 8     A.   Yes.
 9     Q.   Okay.
10          MR. MUNSHI:  Just wait for a
11       question.  Just wait.
12   BY MS. FENDELL-SATINSKY:
13     Q.   I want you to read this through, and
14   when you're done --
15     A.   Okay.
16     Q.   -- taking a look at it, uhm, let me
17   know.
18     A.   (Brief pause while reading.)
19          Can I use someone's pen to check off
20   the ones I want to talk about?
21     Q.   Well, I --
22          MR. MUNSHI:  Just wait for the
23       question.
24
```

Page 155

```
 1   BY MS. FENDELL-SATINSKY:
 2     Q.   Well, I just want --
 3     A.   Okay.
 4     Q.   I just want you to read it.
 5     A.   Okay.  I read it.
 6     Q.   And when you're done reading it --
 7     A.   Okay.
 8     Q.   -- let me know you're finished
 9   reading it.
10     A.   Yup, yup.
11     Q.   You're finished?
12     A.   Uh-huh.
13     Q.   Is that a "yes"?
14     A.   Yes, it is.
15     Q.   Is there anything in this description
16   that's inaccurate?
17     A.   Screening phone calls.
18     Q.   What page are you on?
19     A.   I'm on, uhm, 0082.
20     Q.   Okay.  So you did not screen phone
21   calls?
22     A.   For his phone only, not for the
23   department.
24     Q.   So you screened Dr. Wu's phone calls,
```

Page 156

```
 1   but not the department's phone calls?
 2     A.   Yes.
 3     Q.   So I want to know everything in here
 4   or anything in here that you feel is
 5   inaccurate.
 6     A.   I did not coordinate student workers'
 7   schedules, which is on 0082 also.
 8     Q.   Okay.
 9     A.   Okay.  This is a generic one.  I
10   didn't have any direct reports, it says on
11   the last, 0085.
12          Once again, it says, coordinate and
13   monitor student worker and rules.  Uhm --
14     Q.   Is that on 00852 (sic)?
15     A.   Yes.  Yes, it is.  It's in that
16   paragraph, the last paragraph.
17     Q.   The paragraph that says "job
18   qualifications"?
19     A.   Yes.
20          Uhm, "Establishes priorities for
21   direct reports," I didn't have any.
22     Q.   Anything else in here other than what
23   you've told me that is inaccurate?
24     A.   Well, that, most of that sentence
```

                              39 (Pages 153 to 156)

RUTH V. BRIGGS

Page 157

1  that we were just talking about,
2  "establishes priorities for direct reports,"
3  that's not true. "Assigning and directing
4  work," I didn't do that. I did not appraise
5  performance; I did not provide training; and
6  I -- "insuring all projects are completed in
7  a timely fashion," within -- I could, you
8  know -- if I were the only -- I took my, my
9  timeline seriously, but --
10 Q.  Sure.
11 A.  -- sometimes it was a group.
12 Q.  So on your own projects, you were
13 insuring for -- you were responsible for
14 insuring that projects were completed
15 timely?
16 A.  I was.
17 Q.  And when you were in a group, your
18 feeling is that you were not responsible for
19 that?
20 A.  Well, no. I was assigned a certain
21 task of the whole project.
22 Q.  And so you would complete the task
23 and then --
24 A.  Whatever my -- you're right.

Page 158

1  Q.  -- let the group move on?
2  A.  That is true.
3  Q.  So you wouldn't follow up with the
4  group to see where they were?
5  A.  Oh, no. That's not -- no. I
6  thought -- we worked in a group. It would
7  be like a group, you know, session, and
8  there would be assigned things and...
9  Q.  So when you worked in a group, did
10 you feel it was your responsibility to
11 complete the project in a timely fashion?
12 A.  My portion of it, yes.
13 Q.  But you didn't feel it was your
14 over -- it was your responsibility to insure
15 the group's overall project was completed
16 timely?
17 A.  No; because I didn't supervise them.
18 Q.  Other than the responsibilities that
19 you've told me were inaccurate, you
20 understood that the other responsibilities
21 in here were part of your job and
22 expectations you needed to meet, correct?
23 A.  Yes.
24 Q.  And this was your job description

Page 159

1  when you reported to Dr. Wu, correct?
2  A.  Well, I -- this is a generic, a
3  generic job description, pretty much. I
4  mean, I asked for it, to be honest with you.
5  Uhm, they did put in "for the department and
6  chair" of that department.
7  Q.  So does this job description
8  summarize the responsibilities that you had
9  as executive assistant to Dr. Wu other than
10 the points that you've told me are not
11 accurate?
12 A.  "Remain abreast of all staff
13 schedules within the office," that was
14 not -- I -- not my responsibility.
15 Q.  Do you need me to ask my question
16 again?
17 A.  I didn't answer it right? Oh.
18 Q.  Why don't --
19    MS. FENDELL-SATINSKY: Can you
20 read back my question?
21    THE COURT REPORTER: Uh-huh.
22    - - -
23    (Whereupon, the court reporter
24 read the following:

Page 160

1     Q  So does this job
2  description summarize the
3  responsibilities that you had as
4  executive assistant to Dr. Wu other
5  than the points that you've told me
6  are not accurate?)
7     - - -
8     THE WITNESS: I told you them
9  all, right? I don't know what
10 the -- understand what --
11 BY MS. FENDELL-SATINSKY:
12 Q.  So my question is: Does this job
13 description accurately summarize the job
14 that you had as Dr. Wu's executive assistant
15 other than what you've told me were not part
16 of your job?
17 A.  Okay. So I told you that screening
18 phone calls, right, was one?
19 Q.  You told me, screening phone calls,
20 you only screen Dr. Wu's phone calls --
21 A.  Right.
22 Q.  -- not the department's phone calls.
23 You told me you did not remain abreast of
24 all staff schedules within the office; you

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 161

1 did not coordinate and monitor student
2 workers' schedules and rules; you did not
3 have any direct reports; you did not monitor
4 student workers; and the last sentence of
5 job qualifications that relates to
6 establishing priorities for direct reports,
7 assigning and directing work, appraising
8 performance, and providing training and
9 feedback did not apply to you.
10 A.  Correct.
11 Q.  Other than those --
12 A.  I'm sorry.
13 Q.  -- those tasks, is this document
14 that's Bates numbered TEMPLE002 (sic) to
15 TEMPLE006 (sic) an accurate description of
16 your job as executive assistant for Dr. Wu?
17 A.  Yes.  With those exceptions, yes.
18 Q.  And so other than the exceptions you
19 gave me, you understood these
20 responsibilities to be part of your job for
21 Dr. Wu?
22 A.  Yes.
23 Q.  And you understood that Dr. Wu
24 expected you to complete them well and to

Page 162

1 the best of your ability?
2 A.  Yes.
3 Q.  If you go to TEMPLE003 (sic).
4 A.  (Witness complies with request.)
5 MR. MUNSHI:  0083?
6 MS. FENDELL-SATINSKY:  0083,
7 sorry.
8 BY MS. FENDELL-SATINSKY:
9 Q.  It says "core competencies."
10 A.  Uh-huh.
11 Q.  Do you see that?
12 A.  Uh-huh.
13 Q.  Is that a "yes"?
14 A.  Yes, it is.  I'm sorry.
15 Q.  And it lists from TEMPLE0083 to 0085
16 various core competencies.
17 Do you see that?
18 A.  Yes, I do.
19 Q.  And those include accountability and
20 dependability upon others -- in addition to
21 others, right?
22 A.  Yes.
23 Q.  Of the core competencies listed,
24 which did you feel was the most important in

Page 163

1 your job as executive assistant for Dr. Wu?
2 MR. MUNSHI:  Just objection to
3 form.
4 You can answer if you
5 understand.
6 THE WITNESS:  Okay.
7 Accountability; clear communication.
8 First off, I think they're all
9 important, but clear communication.
10 Is there anything here about
11 confidentiality?
12 BY MS. FENDELL-SATINSKY:
13 Q.  So, I'm just going to take what I
14 said back earlier.  So I had said that the
15 core competencies list goes on to
16 TEMPLE0085.
17 A.  Uh-huh.
18 Q.  But the core competencies list only
19 goes on to TEMPLE0084, and then it says
20 "Role Competencies."
21 A.  Right.
22 Q.  Do you see that?
23 A.  Uh-huh.
24 Q.  So the core competencies just go from

Page 164

1 TEMPLE0083 to the top of TEMPLE0084.
2 A.  Uh-huh.
3 Q.  So, I understand from the core
4 competencies you've told me so far that you
5 think accountability and clear communication
6 are two of the most important, although I
7 recognize you testified that you think
8 they're all important.
9 Are there any others in addition to
10 accountability and clear communication that
11 you think are the most important?
12 A.  I would say handles complex issues
13 that impact the department, university, and
14 external constituents.
15 Q.  Where is that?
16 A.  That would be on 0083.  It's the
17 second one down.
18 Q.  So, do you see that core competencies
19 starts after that?
20 A.  Yes, I do.
21 Q.  So "handles complex issues that have
22 impact to the department, university" is, if
23 you go back, an essential function, not a
24 core competency?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 165

1    A.   Yes, it would be, yes.
2    Q.   So according to the job description,
3  "handles complex issues" is an essential
4  function of the job, not a core
5  competency --
6    A.   Yes.
7    Q.   -- correct?
8    A.   Yes.
9    Q.   So, again, of the core competencies,
10  which do you feel are the most important in
11  addition to accountability and
12  dependability?
13         MR. MUNSHI:  Just objection to
14    form.
15         Go ahead and answer.
16         THE WITNESS:  Okay, okay.
17    Uhm, "respect and valuing
18    diversity" -- oh, wait a minute.
19    We're still in the core
20    competencies, right?
21         MS. FENDELL-SATINSKY:  Right.
22  BY MS. FENDELL-SATINSKY:
23    Q.   And respect and valuing diversity is
24  a part of, is a core competency on the job

Page 166

1  description.
2    A.   Dependability; clear communication --
3  they're all.  Problem-solving;
4  decision-making; and team work is always
5  important.  Yeah.
6    Q.   As Dr. Wu's executive assistant, you
7  had a lot of responsibility?
8    A.   I did.
9    Q.   Uhm, and a lot of different kinds of
10  responsibilities?
11    A.   Yes.
12    Q.   And you understood that your job was
13  essential to Dr. Wu's job?
14    A.   Yes, I did.
15    Q.   And Dr. Wu, was he a busy person?
16    A.   Very busy.
17    Q.   He had a busy schedule?
18    A.   Very busy.
19    Q.   So it was very important to manage
20  his schedule correctly, right?
21    A.   Yes.
22    Q.   And that was part of your
23  responsibility?
24    A.   That was part, yes.

Page 167

1    Q.   And since Dr. Wu was a busy person,
2  it was also important for you to keep him
3  organized, correct?
4    A.   Yes.
5    Q.   And that was one of your
6  responsibilities, right?
7    A.   Yes.
8    Q.   And if Dr. Wu was more organized, he
9  could be more effective, did you feel?
10    A.   Yes.
11    Q.   And if he was more effective, did you
12  feel that would reflect well on both of you?
13    A.   Yes.
14    Q.   Where did you physically work when
15  you worked for Dr. Wu?
16    A.   Two different places.  Initially, I
17  worked outside of his office on the third
18  floor in Walkman Hall.
19    Q.   Did you work physically somewhere
20  else?
21    A.   Yes.
22    Q.   Where was that?
23    A.   Uhm, it was Thanks -- the night
24  before Thanksgiving of, let me see, 2007, I

Page 168

1  think -- no, that couldn't be right.  2010,
2  it would be.  He moved me to the 10th floor
3  of Walkman Hall, another building.
4    Q.   Did he explain why he moved you?
5    A.   Because I was in the center of all
6  the hubbub, so this was -- I could -- it was
7  quiet.
8    Q.   So that could help you focus?
9    A.   Right, to -- yes.
10    Q.   And did you feel that could help you
11  focus more?
12    A.   It -- yes.
13    Q.   And did it help you focus more?
14    A.   Yes.
15    Q.   So, uh, is it accurate to say that
16  you were pleased with the physical move of
17  your office?
18    A.   It was -- yes.
19    Q.   And was it less noisy on the 10th
20  floor?
21    A.   Yes.
22    Q.   And did that help you focus more?
23    A.   Yes.
24    Q.   How old is Dr. Wu?

42 (Pages 165 to 168)

ELITE LITIGATION SOLUTIONS, LLC

Page 169

1    A.   I'm going to guess.  I think he's 60
2  now, maybe 59.
3    Q.   During the time that you were
4  Dr. Wu's executive assistant, what was your
5  impression of what his job was?
6    A.   He was the -- had all the functions
7  of a department chair.
8    Q.   And what did that entail?
9    A.   Often, it -- creating, you know,
10  relationships with -- he did a lot with
11  international universities, so China was a
12  big thrust for the whole University at the
13  time.  Or for at least our college, I should
14  say.
15        Uhm, having, you know, distinguished
16  people visit us to give colloquium weekly.
17        Okay?  Is that enough?  Okay.
18    Q.   Sure.
19    A.   Okay.
20        MR. MUNSHI:  Rachel, it's
21        12:50.  I just wanted to see if you
22        wanted to go now, in ten minutes,
23        fifteen minutes, whenever.
24        THE WITNESS:  Yeah.

Page 170

1        MS. FENDELL-SATINSKY:  Yup.
2  I'll just ask a couple more
3  questions.
4        MR. MUNSHI:  Sure.
5        MS. FENDELL-SATINSKY:  And
6        then we'll take a break.
7        THE WITNESS:  Yeah.  It
8        doesn't feel finished yet.  Okay.
9  BY MS. FENDELL-SATINSKY:
10    Q.   Are you okay to keep going for a --
11    A.   Yeah.
12    Q.   -- few more minutes?
13    A.   Uh-huh.
14    Q.   Uhm, did you view Dr. Wu as having an
15  important job?
16    A.   Yes.
17    Q.   And did you feel that you were
18  important, your role was important to him?
19    A.   Yes, I did.
20        - - -
21        (Whereupon, 12/31/12 email re
22        Happy New Year, Bates No. TEMPLE
23        UNIVERSITY (R.BRIGGS)-000363-368 AND
24        362, was marked as D Exhibit No. 4

Page 171

1        for identification.)
2        - - -
3  BY MS. FENDELL-SATINSKY:
4    Q.   The court reporter has given you a
5  document that's been marked as D-4.  I'm
6  going to ask you the same first question,
7  which is whether you've ever seen this
8  before.
9    A.   Yes, I have.
10    Q.   And this --
11        MR. MUNSHI:  Hold on.
12  BY MS. FENDELL-SATINSKY:
13    Q.   You have?
14        MR. MUNSHI:  Well, actually
15        look through the whole document.
16        THE WITNESS:  Oh, I'm looking
17        at this.  You know, I just looked at
18        that first email.
19  BY MS. FENDELL-SATINSKY:
20    Q.   So, I want you to tell me --
21    A.   Okay.
22    Q.   -- if you've seen the document
23  before.
24    A.   (Brief pause while reading.)

Page 172

1        Yes, I've seen it.
2    Q.   Okay.  So starting on the first page
3  of the document, is it accurate that this is
4  an email from you to Dr. Wu on December
5  31st, 2012?
6    A.   That is correct.
7    Q.   And tell me what this email -- and
8  you don't have to read it to me, but tell me
9  what this email is about.
10    A.   He had been away for the holidays,
11  and I wanted to say happy holidays to him
12  and he asked me to come in on a practice
13  that -- he played the violin very well, so
14  he asked me to come in while he and
15  John Ikoniak, who was teaching; so I took
16  the pictures and sent it to him.
17    Q.   Did you enjoy sitting in on that
18  practice?
19    A.   Yes, I did.
20    Q.   Uhm, did you sit in on other
21  practices or performances of Dr. Wu?
22    A.   Performances, but not practices.
23    Q.   And did you enjoy attending the
24  practices?

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 173

1    A.   I only went to one.
2    Q.   Okay.
3    A.   Okay.
4    Q.   And did you enjoy attending the
5   performances?
6    A.   Yes.
7    Q.   And about how many performances did
8   you go to?
9    A.   There were two he did for the
10  department.
11   Q.   When were those performances?
12   A.   One was the holiday party, and that
13  would have been the last year I was there.
14  And he I think informally did it back in our
15  lunchroom.  We had like a lunch, common
16  lunch area, and he played.  And it was,
17  like, during lunch.
18   Q.   And so you said that the one concert
19  around the holidays was in the year before
20  you left Temple, which was 2013?
21   A.   That would have been, yes.
22   Q.   And the other concert or performance?
23   A.   You know, I -- you know, I can't
24  remember the day, but it was just at

Page 174

1   lunchtime.  He just happened to have his
2   violin.
3    Q.   And then if you go to the last page
4   of this exhibit.
5    A.   Uh-huh, okay.
6    Q.   There's an email from Dr. Wu to you,
7   correct?
8    A.   Uh-huh.
9    Q.   Is that a "yes"?
10   A.   Yes, it is.
11   Q.   And he says -- he's thanking you for
12  your note, and he wishes you a Happy New
13  Year too; is that right?
14   A.   That is correct.
15   Q.   And were these types of exchanges
16  common with Dr. Wu around the holidays?
17   A.   It was common for me to do it, yes.
18   Q.   And --
19   A.   His, his response, sometimes.  I
20  mean, are you talking specifically holiday?
21   Q.   My question was about holidays, so my
22  question was --
23   A.   This is, this is the only one I can
24  remember, but...

Page 175

1    Q.   So you don't recall exchanging
2   holiday or New Year's wishes with Dr. Wu
3   other than this D-4?
4    A.   I'm not sure.
5            - - -
6        (Whereupon, Temple University
7         Rules of Conduct, Bates No.
8         TEMPLE0148-164, was marked as D
9         Exhibit No. 5 for identification.)
10           - - -
11  BY MS. FENDELL-SATINSKY:
12   Q.   Ms. Briggs, the court reporter has
13  given you a document that's been marked as
14  D-5.  I'm going to have the same first
15  question for you, which is whether you've
16  ever seen this document before.
17   A.   Yes, I have.
18   Q.   And is this Temple University's Rules
19  of Conduct?
20   A.   Yes, it is.
21   Q.   Did you have access to this during
22  your employment at Temple?
23   A.   Yes, I did.
24   Q.   I'd like you to turn to TEMPLE0152.

Page 176

1    A.   (Witness complies with request.)
2        Okay.
3    Q.   So the top of this page says, "Rules
4   of Conduct," and then the second sentence
5   says, "Temple expects its employees to abide
6   by the following Rules of Conduct."
7        Do you see that?
8    A.   Uh-huh.
9    Q.   Is that a "yes"?
10   A.   Yes.  I'm sorry.
11   Q.   That's okay.
12       Did you understand that Temple
13  expected its employees, including you, to
14  abide by the bullet-pointed Rules of Conduct
15  listed on TEMPLE0152?
16   A.   Yes.
17   Q.   If you go down to the bottom, it says
18  "Disciplinary Procedure."
19   A.   Uh-huh.
20   Q.   Do you see that?
21   A.   Yes, I do.
22   Q.   And I'm going to the last para -- the
23  last sentence of this paragraph.  It says,
24  "Repeated violations of work rules within a

RUTH V. BRIGGS

Page 177

1  specific category over a 12-month period
2  will lead to the next step in the
3  progressive discipline process."
4       Do you see that?
5  A.   Yes, I do.
6  Q.   Do you understand that?
7  A.   Yes, I do.
8  Q.   And did you understand that during
9  your -- the time you worked at Temple?
10  A.   I understood that it was a
11  possibility, yes.
12  Q.   Well, did you understand that
13  violations of work rules within a specific
14  category over a 12-month period would lead
15  to the next step in the progressive
16  discipline process?
17  A.   I didn't understand it to be true all
18  the time, to be honest with you.
19  Q.   You told me earlier that you were on
20  probation in 2012 and 2013 and 2014,
21  correct?
22  A.   That is correct.
23  Q.   And why did you believe that you were
24  on probation those years?  I apologize if I

Page 178

1  already asked you that.
2  A.   Uhm, the -- I don't -- what -- why do
3  I understand I was?  Because of a mistake,
4  or one was oversleeping.
5  Q.   So did you understand that if you
6  received a discipline you were on probation
7  for a year following that discipline?
8  A.   I did.  Yes, I did.
9  Q.   And if you turn to the next page,
10  which is TEMPLE0153.
11  A.   Uh-huh.
12  Q.   Did you understand that there were
13  four categories of disciplinary action --
14  disciplinary violations?
15  A.   Yes, I did.
16  Q.   And those are Category A, B, C, and
17  D, right?
18  A.   Yes.
19  Q.   And so did you understand that if you
20  received, for example, a Category B
21  disciplinary action, that if you received
22  another Category B disciplinary action
23  within 12 months it would lead to the next
24  action in the process?

Page 179

1  A.   I did know that it was a policy, yes.
2       - - -
3       (Whereupon, Temple University
4       Polices and Procedures Manual memo,
5       Bates No. BRIGGS 94-96, was marked
6       as D Exhibit No. 6 for
7       identification.)
8       - - -
9       THE WITNESS:  There's nothing
10  more with this (indicating)?
11       MS. FENDELL-SATINSKY:  Not
12  right now.
13       THE WITNESS:  Okay.
14       MS. FENDELL-SATINSKY:  You can
15  put it to the side.
16  BY MS. FENDELL-SATINSKY:
17  Q.   The court reporter has given you a
18  document that's been marked as D-6.
19  A.   Uh-huh.
20  Q.   Is that a "yes"?
21  A.   Yes.  I'm sorry.  "Yes."
22  Q.   That's okay.
23       Same first question to you is whether
24  you've seen this document before.

Page 180

1  A.   Yes, I have.
2  Q.   And if you look down at the Bates
3  numbers in right-hand corner, you see it
4  says "BRIGGS 94" on the first page?
5  A.   Yes, I do.
6  Q.   And I will tell you that means that
7  this is a document that you or your attorney
8  produced to us from you.  Okay?
9  A.   Yes.
10  Q.   Did you have access to this document
11  throughout your employment at Temple?
12  A.   Yes.
13  Q.   And did you understand this document
14  during your employment at Temple?
15  A.   Yes.
16  Q.   And you understand that Temple
17  prohibits discrimination and harassment,
18  correct?
19  A.   Yes.
20       MR. MUNSHI:  Objection to
21  form.
22       Go ahead.
23  BY MS. FENDELL-SATINSKY:
24  Q.   You understood that was Temple's

45 (Pages 177 to 180)

RUTH V. BRIGGS

Page 181

1   policy during your employment, correct?
2   A.   Yes.
3   Q.   I want to go back quickly to earlier
4   we talked about Mr. Wacker.
5   A.   The --
6   Q.   You can put that aside --
7   A.   Oh, okay.
8   Q.   -- for now.
9   A.   Okay, okay.
10   Q.   And when we talked about Dr.
11   Wacker --
12   A.   Mr. Wacker.
13   Q.   Mr. Wacker.  I'm giving everybody
14   additional titles or not enough titles.
15       When we talked about Mr. Wacker, you
16   gave me a list of things that Dr. Wacker
17   asked you to do that you found morally
18   objectionable, if not illegal.
19       Do you remember that?
20   A.   Yes.
21   Q.   Why do you think Dr. -- let me ask it
22   again.
23       Why do you think Mr. Wacker asked you
24   to do those things you identified as morally

Page 182

1   objectionable, if not illegal?
2       MR. MUNSHI:  Objection to
3   form.
4   BY MS. FENDELL-SATINSKY:
5   Q.   Do you understand my question?
6   A.   Yes, I do.
7   Q.   Okay.
8   A.   Uhm, I was surprised that he asked me
9   to do it.  It was against the law.
10   Q.   Why do you --
11   A.   And it --
12   Q.   Why do you think he asked you to do
13   it?
14   A.   Because he told me he did not believe
15   that Tanya was sick.
16   Q.   Why do you believe that he did not
17   believe Tanya was sick?
18   A.   I don't know.
19   Q.   Why do you believe he told you to
20   find something on Tanya to get rid of her?
21   A.   Because he thought she was lying.
22   Q.   Why do you believe he coached you
23   before your meeting with an attorney about
24   Tanya's lawsuit?

Page 183

1   A.   I don't know.
2   Q.   Well, why do you believe he asked you
3   to call Tanya's doctor's office?
4   A.   Because he didn't believe she was
5   sick.
6   Q.   Why do you believe he asked you to do
7   what your superiors tell you to do even if
8   you struggle morally or ethically with it?
9   A.   Can you ask that question again?
10   Q.   Sure.
11       Why do you believe Mr. Wacker told
12   you to do what your superiors tell you to do
13   even if you struggle morally or ethically
14   with it?
15   A.   I don't know the answer to that
16   question.
17   Q.   Why do you believe Mr. Wacker told
18   you to try to find something to get rid of
19   Ms. Lennon and not to help her with her
20   computer?
21   A.   I don't know the answer to that
22   question.
23   Q.   Why do you believe Mr. Wacker told
24   you to submit expense reports that you found

Page 184

1   morally objectionable, if not illegal?
2   A.   Can I clarify something, please?
3   Q.   Sure.
4   A.   I asked -- would go to him if I
5   thought that there might be some, and I'd
6   say, "Is this okay to hit?  Can I submit
7   this?"  So I would -- that's about the
8   expense reports.  There were times I was
9   like, "Is this acceptable or not?"
10   Q.   Okay.  And did you believe that there
11   was a time he asked you to submit an expense
12   report that you found morally objectionable,
13   if not illegal?
14   A.   I did say -- I probably said I felt
15   uncomfortable about it because I didn't
16   understand that, but when he told -- he's
17   the finance person and...
18   Q.   And did you feel uncomfortable with
19   it because you don't have a finance
20   background?
21   A.   No.  I didn't -- whatever this
22   request for just didn't...
23   Q.   So you didn't necessarily understand
24   what the expense reports were for?

46 (Pages 181 to 184)

RUTH V. BRIGGS

Page 185

```
 1    A.   Right; and if it was acceptable as a
 2  reimbursable expense.
 3    Q.   Because you didn't understand
 4  necessarily what the grants or --
 5    A.   What can be --
 6    Q.   -- projects entitled you to bill?
 7    A.   Yes.  That is true.
 8    Q.   Why do you believe that Mr. Wacker
 9  told you not to give Dean Sadeghipour
10  information?
11    A.   He told me he didn't like him.
12    Q.   Among other claims in your Complaint
13  in this action, you allege that Temple
14  discriminated against you because of your
15  age and sex, correct?
16    A.   Uh-huh.
17    Q.   Is that a "yes"?
18    A.   Oh, I'm sorry.
19    Q.   That's okay.  Is that a "yes"?
20    A.   Yes.
21    Q.   Who do you believe discriminated
22  against you because of your age and your
23  sex?
24    A.   Well, Dr. Wu's comments about my age
```

Page 186

```
 1  on different -- three different occasions.
 2    Q.   And I'm just going to --
 3    A.   Why are you looking --
 4    Q.   -- for a second, because Mr. Munshi
 5  is, is nodding his head.
 6         MR. MUNSHI:  Oh, I'm -- I was,
 7    I was rocking.  I didn't, I didn't
 8    mean to --
 9         THE WITNESS:  Oh, okay.
10         MR. MUNSHI:  -- do anything.
11    I was just rocking back and forth.
12    Sorry.  I didn't realize.
13  BY MS. FENDELL-SATINSKY:
14    Q.   So, you've identified Dr. Wu.
15    A.   Now I forgot the question.
16    Q.   Sure.  Let me ask it again.
17         So among other claims in your
18  Complaint, you allege that Temple
19  discriminated against you because of your
20  age --
21    A.   Right.
22    Q.   -- and your sex, correct?
23    A.   Yes.
24    Q.   And I asked you who do you believe
```

Page 187

```
 1  discriminated against you because of your
 2  age and your sex, and you said Dr. Wu.
 3    A.   Specifically, yes.
 4    Q.   Okay.  Anyone else aside from Dr. Wu?
 5    A.   No.
 6    Q.   Your Complaint also alleges that
 7  Temple subjected you to a hostile work
 8  environment --
 9    A.   Yes.
10    Q.   -- correct?
11    A.   Yes.  That is the true.
12    Q.   Who do you believe created a hostile
13  work environment?
14    A.   Greg Wacker; Drew DiMeo; Dr. Wu.
15    Q.   And how do you believe Mr. Wacker
16  created a hostile work environment?
17    A.   By threatening me if I didn't
18  cooperate with him that he would fire me.
19    Q.   When did he do that?
20    A.   It was about Judy, helping Judy out.
21    Q.   Did he ever threaten you on any other
22  occasion?
23    A.   My first day in the dean's office,
24  but that's a long time ago.
```

Page 188

```
 1    Q.   And the first day in the dean's
 2  office, was that when you worked for Dean
 3  Nicholson?
 4    A.   Yes, uh-huh.
 5    Q.   And what did he threaten you with in
 6  regards to that occasion?
 7    A.   He stood over my desk when everyone
 8  was gone and told me that I probably
 9  shouldn't mess with him, because I wouldn't
10  win.  And I said to him, "I won't."
11    Q.   Any other way that you believe
12  Mr. Wacker created a hostile work
13  environment for you?
14    A.   By not responding to my, my requests
15  for help, mediation, something between
16  Dr. Wu and myself.
17    Q.   Did he assign, uhm, Drew DiMeo to
18  that role?
19    A.   It wasn't happen -- yes, he did,
20  but...
21    Q.   So he did respond to your request,
22  just not in a way that you were satisfied
23  with?
24    A.   I didn't request Drew to be in on the
```

Page 189

1    meetings, if that's what you mean.
2    Q.    You requested that somebody be in
3    that meeting?
4    A.    From H.R. or from Sandy Foehl,
5    someone who -- from the H -- Human Resources
6    who would help me.
7    Q.    Did you specifically request someone
8    from Human Resources?
9    A.    Yeah, uh-huh.
10    Q.    Did you do that in an email?
11    A.    Yes.
12    Q.    And when did you do that?
13    A.    Multiple occasions.  Throughout the
14    last, like, last four months that I was
15    there, I, I felt something was coming.
16    Q.    When you say you felt something was
17    coming, what do you mean?
18    A.    Well, I was being written up for
19    things that I felt were -- that I was
20    singled out.  No one else was written up for
21    anything, so I just felt very singled out.
22    Q.    Did you feel singled out by
23    Mr. Wacker?
24    A.    In -- yes.

Page 190

1    Q.    And why do you think Mr. Wacker
2    singled you out?
3    A.    I don't know the answer to that
4    question.
5    Q.    Uhm, any other way in which you
6    believe Mr. Wacker created a hostile work
7    environment for you?
8    A.    By, uhm, reporting -- having Drew,
9    his, his report, sit in our meetings and
10    then report back to him.  He always knew
11    what happened.
12    Q.    Any other way in which you believe
13    Dr. Wacker created a hostile work
14    environment for you?
15    A.    He just -- he would call me and say,
16    "I just want you to just do whatever he
17    says.  I'm tired of him coming over here,"
18    those kind of things.  It just was I felt
19    stressed all the time.
20    Q.    Do whatever who says?
21    A.    Dr. Wu.
22    Q.    Okay.  And anything else that
23    Dr. Wacker did that you believe created a
24    hostile work environment for you?

Page 191

1    A.    By being involved.  I don't know why
2    he was involved in my -- I wasn't in his
3    office.  I don't know what his involvement
4    was.
5         I mean when I was with Dr. Wu.  Prior
6    to that, I was in his office.
7    Q.    Okay.  Anything else?
8    A.    Fear.  I saw what happened, what he
9    wanted me to do to one person, another
10    person, and I was, I was fearful that it
11    would happen to me.
12    Q.    So you were fearful that he would
13    want to do what?
14    A.    To find a reason to get -- you know,
15    to, to discipline me.
16    Q.    Why did you think he wanted to
17    discipline you?
18    A.    I don't know.
19    Q.    Anything else Mr. Wacker did that you
20    thought created a hostile work environment?
21    A.    Yeah.  He and Dr. Wu would meet
22    behind my -- you know, without me.
23    Q.    Okay.  Anything else?
24    A.    Not that I can -- no.

Page 192

1    Q.    You gave me a list of things that you
2    claim Mr. Wacker did to you that you believe
3    created a hostile work environment, correct?
4    A.    Correct.
5    Q.    Why do you believe Dr. -- I did it
6    again.
7    A.    Yeah, I know.
8    Q.    Why do you believe Mr. Wacker did the
9    things you allege he did?
10    A.    I believe it began with the lawsuit
11    from Tanya, Tanya Hunnewell.
12    Q.    So you believed that Dr. Wacker --
13         MR. MUNSHI:  Mister.
14         MS. TRACHTENBERG:  Mister.
15         MS. FENDELL-SATINSKY:  Mister.
16    See.
17         MS. TRACHTENBERG:  Just call
18    him "Wacker."
19         MS. FENDELL-SATINSKY:  That
20    would be easier --
21         THE WITNESS:  Call him "Greg."
22         MS. FENDELL-SATINSKY:  -- for
23    everyone.  I'll call him "Greg."
24

48  (Pages 189 to 192)

RUTH V. BRIGGS

Page 193

BY MS. FENDELL-SATINSKY:
1   BY MS. FENDELL-SATINSKY:
2   Q.   You believe, uhm, that Greg treated
3   you the way he did because of what related
4   to Tanya?
5   A.   I feared that he would.  I didn't
6   know that he would.
7   Q.   Okay.
8   A.   Yeah.
9   Q.   So my question was:  Why do you
10  believe Greg did the things that you
11  identify that you believe created a hostile
12  work environment?
13  A.   Out of fear of retaliation.
14  Q.   Okay.  So you believe that Greg did
15  the things you identified as doing which you
16  believe created a hostile work environment
17  to instill fear in you?
18  A.   Yes.
19  Q.   Any other reason?
20  A.   He told me he could get rid of me in
21  a minute.
22  Q.   Okay.  And why do you believe he told
23  you he could get rid of you any (sic)
24  minute?

Page 194

1   A.   I don't know the answer to that
2   question.
3   Q.   Okay.  You also told me that you
4   believe Drew DiMeo subjected you to a
5   hostile work environment, correct?
6   A.   Yes.
7   Q.   What did Drew DiMeo do that you
8   believe made a hostile work environment?
9   A.   He -- in our morning meetings, it was
10  really he and Dr. Wu.  And this was three
11  days a week they would meet with me and
12  just -- it wasn't about what we're going to
13  do.  It's going to be "what did you do
14  wrong."  And Greg, I never would have, you
15  know, a chance to defend, to say "that's not
16  true" or...
17       Drew, I felt like Drew was my friend
18  for a while, and -- and that changed.
19  Q.   And so when that changed, did you
20  feel at that point that he started to create
21  a hostile work environment for you?
22  A.   The hostile work environment created
23  started when he was asked to sit in on the
24  meetings with Dr. Wu and I in the morning

Page 195

1   but under Greg Well's -- Greg Wacker's
2   supervision.
3   Q.   And other than the mornings meetings
4   with Mr. DiMeo, did Mr. DiMeo do anything
5   else that you believe created a hostile work
6   environment for you?
7   A.   Yes.  His -- he was unwilling to
8   believe me or trust me.
9   Q.   Anything else?
10  A.   No.
11  Q.   Why do you believe that Mr. DiMeo was
12  asked to sit in on your morning meetings
13  with Dr. Wu?
14  A.   I don't know.
15  Q.   Why do you believe Mr. DiMeo was
16  unwilling to believe or trust you?
17  A.   I don't know.
18  Q.   You also said that Dr. Wu created a
19  hostile work environment for you; is that
20  correct?
21  A.   Yes, he did, uh-huh.
22  Q.   Yes?
23  A.   Yes, he did.
24  Q.   Okay.  What did Dr. Wu do that

Page 196

1   created a hostile work environment for you?
2   A.   He would --
3        MR. MUNSHI:  After we answer
4   that, can we either take five or
5   take lunch?  Because we're getting
6   into big, big things now.
7        MS. FENDELL-SATINSKY:  Yup.  I
8   have one question after this.
9        MR. MUNSHI:  We've been going
10  like an hour-and-a-half.
11       THE WITNESS:  Okay.  Now --
12  BY MS. FENDELL-SATINSKY:
13  Q.   Are you okay to continue?
14  A.   I want you tell me what the question
15  was again.
16  Q.   Sure.
17  A.   I'm sorry.
18  Q.   Are you okay to continue or do you --
19  A.   Oh, I am.
20  Q.   -- need a break?
21  A.   Sure, yeah.
22  Q.   Okay.  So my question to you was
23  that:  You told me that Dr. Wu created a
24  hostile work environment for you, correct?

49 (Pages 193 to 196)