RUTH V. BRIGGS

Page 197

1    A.   Correct.
2    Q.   So I want to know what Dr. Wu did
3    that created a hostile work environment for
4    you?
5    A.   He would, he would degrade, yell at
6    me, I mean literally yell at me in public
7    settings - front office, elevator, hallway -
8    in front of external constituents, staff,
9    other faculty.
10   Q.   Would it be accurate to say that
11   Dr. Wu was a yeller?
12   A.   Yes.
13   Q.   And so he yelled at a lot of people,
14   right?
15   A.   Not -- no.
16   Q.   Did you ever see him yell at
17   students?
18   A.   His graduate students I did, yes.
19   Q.   Did you ever see him yell at any
20   other employees?
21   A.   No, I did not.
22   Q.   What else did Dr. Wu do that made you
23   feel that you were subjected to a hostile
24   work environment?

Page 198

1    A.   He thought -- he said.  He would
2    often say, "Are you stupid or something?"
3    You know, it was degrading.
4    He would criticize my, my finances.
5    I mean, just really weird stuff that was...
6    Q.   So I want to know everything that he
7    did that you believe contributed to a
8    hostile work environment for you, and I --
9    you've given me a couple things already, so
10   I want to know if there's anything else.
11   A.   No.  Just generalized fear.
12   Q.   Why do you believe Dr. Wu yelled at
13   you?
14   A.   I don't know.
15   Q.   Well, why do you believe Dr. Wu said
16   you were stupid?
17   A.   I don't know.
18   Q.   Why do you believe Dr. Wu criticized
19   your finances?
20   A.   I don't know.
21   Q.   The final claim in your Complaint is
22   that Temple retaliated against you because
23   of internal reports of discrimination you
24   made, correct?

Page 199

1    A.   Yes.
2    Q.   Who do you believe retaliated against
3    you?
4           MR. MUNSHI:  Rachel, you said
5    you had one more question.
6           MS. FENDELL-SATINSKY:  Well,
7    she answered her question, Rahul.
8    I'm entitled to follow up.
9           MR. MUNSHI:  I know, but you
10   also said earlier if we want to take
11   a break we can take a break.
12          MS. FENDELL-SATINSKY:  And
13   your witness said she's fine to keep
14   going.
15          MR. MUNSHI:  All right.
16   BY MS. FENDELL-SATINSKY:
17   Q.   Ms. Briggs, are you --
18          MR. MUNSHI:  We're asking big
19   questions here.
20   BY MS. FENDELL-SATINSKY:
21   Q.   -- to keep going?  And if you're not,
22   I want you to tell me that, okay?
23   I asked you one question, so since
24   that's pending I'd like you to answer that.

Page 200

1    And after that --
2    A.   So after I finish this one, okay?
3    Q.   Exactly.
4    A.   Oh, okay.
5    Q.   Yup.  So my question to you was:  Who
6    do you believe retaliated against you?
7    A.   Deirdre Walton; Greg Wacker; Dr. Wu.
8    Q.   Anyone else?
9    A.   No.
10          MS. FENDELL-SATINSKY:  So,
11   we're going to take a break for
12   lunch.
13          THE WITNESS:  Okay.
14          MS. FENDELL-SATINSKY:  We have
15   lunch here.
16   I will give you a reminder
17   that your attorney is well aware of.
18   You are entitled to speak with your
19   attorney, and I am entitled to ask
20   you questions about that.  The
21   communications you have with your
22   attorney while you're under oath are
23   not privileged.
24          THE WITNESS:  Okay.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 201

1      MS. FENDELL-SATINSKY:  So I
2  always like to tell witnesses that
3  up front.
4      THE WITNESS:  So I remain
5  under oath.
6      MS. FENDELL-SATINSKY:
7  Exactly.
8      THE WITNESS:  Okay.
9      MS. FENDELL-SATINSKY:  I
10  always like to tell you that up
11  front.
12      THE WITNESS:  Okay.
13      MS. FENDELL-SATINSKY:  Because
14  when we get back from the break, my
15  first question for you is going to
16  be, uhm, what, if anything, you
17  discussed with your attorney during
18  lunch.
19      THE WITNESS:  Okay.
20      MS. FENDELL-SATINSKY:  So I
21  think we'll take about 20 minutes,
22  to come back at 1:35 or so.  If you
23  need more time --
24      THE WITNESS:  So it's 1:10

Page 202

1  then, okay.
2      MS. FENDELL-SATINSKY:  It's
3  1:15 now.
4      THE WITNESS:  1:15, okay.
5      MS. FENDELL-SATINSKY:  So
6  we'll take a break until about 1:35.
7  And if you need more time than that,
8  you can just let us know.
9      MR. MUNSHI:  Sounds good.
10      THE WITNESS:  Are you okay?
11      MR. MUNSHI:  Thank you.
12      THE WITNESS:  Okay.
13      THE VIDEOGRAPHER:  This
14  concludes video No. 2.  We're going
15  off the record at 1:16.
16          - - -
17      (Whereupon, a lunch recess was
18  taken from 1:16 until 1:50 p.m.)
19          - - -
20      THE VIDEOGRAPHER:  Going back
21  on the record.  The time is 1:50.
22  Here begins video No. 3.
23  BY MS. FENDELL-SATINSKY:
24    Q.  Ms. Briggs, we're back from our lunch

Page 203

1  break, and I'll continue with my questions.
2  Again, if you don't understand any of my
3  questions, please let me know.  And the same
4  ground rules we went over this morning
5  apply.  Okay?
6    A.  Thank you.
7    Q.  Before we took a break, you mentioned
8  that Dr. Wu yelled at you in public
9  settings?
10    A.  Uh-huh.
11    Q.  Yes?
12    A.  Yes.  I'm sorry.  Yes.
13    Q.  How -- when did he begin, first begin
14  yelling at you in public settings?
15    A.  When?  Was it when or how?
16    Q.  When.
17    A.  When.  Initially.  Within a month of
18  my being there.
19    Q.  So around October of 2009?
20    A.  Yeah.
21    Q.  How often did he yell at you in
22  public settings?
23    A.  A couple times a month.
24    Q.  What was the process for notifying

Page 204

1  Dr. Wu if you were going to be absent or
2  late?
3    A.  For the department, there was no
4  policy.
5    Q.  So were --
6    A.  Most people sent an email.
7    Q.  An email to Dr. Wu?
8    A.  Uh-huh.
9    Q.  Is that a "yes"?
10    A.  Yes.  My policy was to call.
11    Q.  But you knew other people sent
12  emails?
13    A.  Yes; because I would be cc'd.
14    Q.  And sometimes you did send emails,
15  right?
16    A.  If I wasn't coming in?
17    Q.  Yes.
18    A.  I don't recall.  I might have once or
19  twice, but...
20    Q.  You don't recall any occasion on
21  which you emailed Dr. Wu to tell him that
22  you would be late or absent?
23    A.  I'm -- I don't recall.  I'm not
24  saying that I didn't, but I don't recall.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 205

1    If he wasn't -- if he was away, if he was at
2    a conference or something, that would
3    have... And I would have emailed about
4    other people, too.
5    Q.   I'm going to show you an email.
6    A.   Okay.
7    Q.   I only have one copy of it --
8    A.   Okay.
9    Q.   -- so I'm going to show your
10   attorney --
11   A.   Okay.
12   Q.   -- first before I show it to you.
13       MR. MUNSHI:  Do you want to
14   mark it or just --
15       MS. FENDELL-SATINSKY:  Yeah, I
16   just want to show it to you first.
17       MR. MUNSHI:  Oh, okay.
18       MS. FENDELL-SATINSKY:  Because
19   I only have one copy.
20       - - -
21       (Whereupon, 12/18/12 email
22   regarding family emergency, Bates
23   No. TEMPLE0000392, was marked as D
24   Exhibit No. 7 for identification.)

Page 206

1        - - -
2    BY MS. FENDELL-SATINSKY:
3    Q.   I'm going to give you a document
4    that's been marked by the --
5    A.   Okay.
6    Q.   -- court reporter as D-7.
7        Does this refresh your recollection
8    that there occasions on which you emailed
9    Dr. Wu to tell him that you would be absent
10   or late?
11   A.   Well, it's in writing.  Yes.
12   Q.   So that email refreshes your
13   recollection that you did, in fact,
14   sometimes email Dr. Wu if you were going to
15   be late or absent, correct?
16   A.   Yes.
17   Q.   You can put that aside.
18   A.   Okay.  Here, on top here
19   (indicating)?
20   Q.   That's fine.
21       And in terms of notifying Dr. Wu if
22   you were going late or absent, you said
23   sometimes you called him, correct?
24   A.   Yes.  Or someone in the office if he

Page 207

1    wasn't available.
2    Q.   And did Dr. Wu have a voicemail on
3    his phone?
4    A.   It was always full.
5    Q.   Was that part of your responsibility,
6    to check his voicemails?
7    A.   No, it was not.
8    Q.   Did he ever ask you to do that?
9    A.   No, he did not.
10   Q.   Did you ever offer to do that?
11   A.   No.  He really used his cell phone,
12   so...
13   Q.   Did you have Dr. Wu's cell phone
14   number?
15   A.   His number, yes, uh-huh.
16   Q.   Do you know if his cell phone had a
17   voicemail?
18   A.   I don't know.  I'm assuming.
19   Q.   And there were instances in which you
20   were late, correct?
21   A.   Yes.
22   Q.   And was Dr. Wu generally flexible
23   about that?
24   A.   Until, yeah, until one time he

Page 208

1    wasn't.
2    Q.   And when was that one time?
3    A.   The time I overslept three hours.
4    And I don't -- the date would have been
5    probably 2014.
6    Q.   And what happened on the occasion on
7    which you overslept for three hours?
8    A.   I woke up, had a "Home Alone" moment,
9    called work, and asked for Dr. Wu.  He was
10   in a meeting.  I asked for Judy.  They
11   didn't know where she was, so I told the
12   student worker who was answering the phones.
13   I said, "Please tell Dr. Wu I'm" -- and I
14   live within five minutes of the University.
15   "I'm coming right now.  I overslept."
16   Q.   Did you call Dr. Wu's cell phone that
17   day?
18   A.   No.  She said he was in a meeting.
19   Q.   My question was:  Did you call his
20   cell phone?
21   A.   No, I did not, no.
22   Q.   Did you email him that day?
23   A.   No, I did not.
24   Q.   Did you ever text message with Dr. Wu

52 (Pages 205 to 208)

RUTH V. BRIGGS

Page 209

1   on his personal cell phone?
2   A.   Probably, yeah.
3   Q.   Did you send him a text message on
4   that day?
5   A.   No, I did not.
6   Q.   And do you -- how late were you when
7   you --
8   A.   I was three hours late.
9        MR. MUNSHI:  Just wait until
10       the question is done.
11       THE WITNESS:  Okay.  I'm
12       sorry.
13       MR. MUNSHI:  That's okay.
14   BY MS. FENDELL-SATINSKY:
15   Q.   So you were three hours late --
16   A.   Uh-huh.
17   Q.   -- on that occasion?
18   A.   Yes, I was.
19   Q.   And -- strike that.
20   A.   I'm sorry?
21   Q.   I just said "strike that."
22   A.   Oh, okay.
23   Q.   Yup.  And you didn't call in that
24   lateness until you were three hours late,

Page 210

1   correct?
2   A.   I, I woke up.  Yeah, right.
3   Q.   But by the time you'd woke up, you
4   were three hours late?
5   A.   Yes, yes.
6   Q.   But other than that particular
7   occasion, Dr. Wu was flexible with you being
8   late?
9   A.   Generally, in the department.  I
10   wasn't late that often.
11   Q.   Were -- was there any other time in
12   which you were three hours late --
13   A.   Never.
14   Q.   -- without notifying?
15       Was there any other time when you
16   were more than two hours late without
17   notifying him?
18   A.   No.
19   Q.   Was there any other time in which you
20   were an hour late notifying him?
21   A.   No.
22   Q.   Was there any time in which you were
23   more than 30 minutes late without notifying
24   him?

Page 211

1   A.   No.
2   Q.   Was there ever a time in which you
3   were more than 15 minutes late without
4   notifying him?
5   A.   Not that I recall.
6   Q.   Was there ever a time that you were
7   more than ten minutes late without notifying
8   him?
9   A.   I think maybe I could have been.
10   Q.   Sometimes did you leave during the
11   day to run errands?
12   A.   No.
13   Q.   You never left for errands?
14   A.   For him maybe.
15   Q.   You never left to run a personal
16   errand yourself?
17   A.   At lunchtime.
18   Q.   Did you ever leave anytime other than
19   lunchtime to run a personal errand for
20   yourself?
21   A.   Can you give me -- like a doctor's
22   appointment?  I don't know what you mean.
23   Q.   So I'm asking if you recall any time
24   that you left during the day to run an

Page 212

1   errand during the time you worked for
2   Dr. Wu.
3   A.   Yes.
4   Q.   And was Dr. Wu flexible with that?
5   A.   Well, I didn't -- it was lunchtime,
6   so I didn't tell him.
7   Q.   So you never told him when you were
8   going to leave?
9        MR. MUNSHI:  Just objection to
10       form.
11       THE WITNESS:  (No response.)
12   BY MS. FENDELL-SATINSKY:
13   Q.   What time did you take lunch?
14   A.   Most of the time, I didn't, but
15   whenever it was -- I could whenever there
16   was coverage, because I would often have to
17   come downstairs.
18   Q.   I'm going to show your lawyer another
19   email I only have one copy of, but then
20   we'll mark it as an exhibit.
21       MR. MUNSHI:  This is 8, I
22       guess.
23       - - -
24       (Whereupon, 1/25/13 email

53  (Pages 209 to 212)

RUTH V. BRIGGS

Page 213

1    regarding picking up a prescription,
2    Bates No. TEMPLE0000382, was marked
3    Exhibit No. 8 for identification.)
4         - - -
5         THE WITNESS:  Thank you.
6    BY MS. FENDELL-SATINSKY:
7    Q.   So, the court reporter has given you
8    a document that's been marked as D-8.
9         Have you seen that document before?
10   A.   I don't remember it, but it's mine.
11   Q.   It's an email from you --
12   A.   Yes.
13   Q.   -- to Dr. Wu, correct?
14   A.   Yes.
15   Q.   And in the email you indicate that
16   you're going to run an errand for 15
17   minutes?
18   A.   I'm going to Rite Aid, yes.
19   Q.   And on that occasion do you recall
20   Dr. Wu giving you any problems in wanting to
21   run an errand?
22   A.   No, I do not recall.
23   Q.   I don't have any other questions
24   about that document at this time.

Page 214

1    A.   I'm sorry.  I didn't hear the last
2    thing you said.
3    Q.   I said I don't have any other --
4    A.   Oh, okay.
5    Q.   -- questions --
6    A.   Oh, okay.
7    Q.   -- about that document at this time.
8         - - -
9         (Whereupon, 11/09/11
10        Disciplinary Report, Bates No.
11        BRIGGS 23, was marked as D Exhibit
12        No. 9 for identification.)
13        - - -
14   BY MS. FENDELL-SATINSKY:
15   Q.   Ms. Briggs, the court reporter has
16   given you an exhibit that's marked as D-9.
17   A.   Uh-huh.
18   Q.   Take a look at the exhibit, and my
19   first question to you is going to be whether
20   you've ever seen this before.
21   A.   Yes, I have.
22   Q.   And is this the disciplinary report
23   from Dr. Wu to you on November -- in
24   November 2011?

Page 215

1    A.   That is correct.
2    Q.   And if you look down at the Bates
3    number in the bottom right-hand corner of
4    this document, it says "BRIGGS 23."
5         Do you see that?
6    A.   Yes, I do.
7    Q.   And that means that's a document that
8    your attorney provided to us.
9    A.   Okay.
10   Q.   So you received a copy of this
11   document, correct?
12   A.   Yes.
13   Q.   And it says it's a written warning;
14   is that right?
15   A.   Yes, it does.
16   Q.   And it was for a violation of Rule
17   B.11, unprofessional/inappropriate conduct,
18   correct?
19   A.   That is correct.
20   Q.   What led to this disciplinary report?
21   A.   Uhm, Dr. Wu was standing in front of
22   my desk, and it was -- actually, it was the
23   day after my birthday, and, uhm, he asked me
24   how old I turned.  And I guess I was 58 or

Page 216

1    something.  He said, uh, "You know, in China
2    women are put out to pasture by your age."
3         And he made a similar comment before,
4    and I just said, "Well, with all due
5    respect, we are in America right now."
6         And then the next thing I knew, I got
7    called to the dean's office and I was
8    written up for unprofessional conduct.  And
9    I asked Greg if he knew what Dr. Wu had said
10   to me.  He didn't know.
11   Q.   If you look down at the bottom of the
12   document where it says "print name," is that
13   your signature?
14   A.   That's my signature.
15   Q.   And then below that there's another
16   signature.
17        Do you know whose that is?
18   A.   That's Dr. Wu's.
19   Q.   And was this presented to you by
20   Dr. Wack -- by Mr. Wacker and Dr. Wu?
21   A.   You know, I don't recall who
22   report -- I don't recall if it was just him
23   or Greg was there.  I don't know.
24   Q.   What occurred at the meeting during

54  (Pages 213 to 216)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 217

1  which this was given to you?
2  A.   I do remember.  I went to -- Greg
3  called me to his office and gave it to me
4  for unprofessional conduct, yeah.
5  Q.   So was Dr. Wu not present?
6  A.   No, he wasn't there, no.
7  Q.   And what did Greg tell you when he
8  gave this to you?
9  A.   He said, "Dr. Wu just said that you
10  had been inappropriate in public," he said,
11  "Something that was" -- you know, I
12  shouldn't said.
13      And I said, "Did he tell you what I
14  said?"  And I repeated it back.  I said, "He
15  said something about my age, and I said,
16  'Well, we're not there.  We're in America
17  now.'"
18  Q.   Did Greg tell you anything else about
19  why you received this discipline?
20  A.   No, he did not.
21  Q.   Did you ask him anything else about
22  why you received this discipline?
23  A.   No, I did not.
24  Q.   Did you ask Dr. Wu why you received

Page 218

1  this discipline?
2  A.   No, I did not.
3  Q.   When you told Dr. Wu that, what you
4  said was, "We're in America now" or "We're
5  in America," what was his response?
6  A.   Nothing.  I mean, it didn't seem
7  unusual.  He just walked away.  I mean, it
8  wasn't like he was upset about it or
9  anything.  He just walked away.
10  Q.   And you said he had made that comment
11  previously?
12  A.   Yes.
13  Q.   When did he make that comment
14  previously to you?
15  A.   With, you know, within a period of
16  four or five months, he would make reference
17  to -- it usually had to do with my age and
18  my salary.  I mean, I would talk to him
19  about that.  And then I don't know how it
20  got onto that women being put out to pasture
21  at 55.  I'm like...
22  Q.   So, my question is a little
23  different.
24      When did he -- was there another

Page 219

1  occasion on which he said to you that women
2  are put out to pasture by that age?
3  A.   Well, he didn't use that term, but he
4  did say something about women in China are
5  required to retire earlier.  He didn't use
6  the get out -- you know, "put out to
7  pasture" thing.
8  Q.   Retire earlier than what?
9  A.   At 55, he told me.
10  Q.   So on another occasion Dr. Wu told
11  you women in China retire at 55?
12  A.   Yes.
13  Q.   And when was that?
14  A.   Around the same, you know, very close
15  to the same time.
16  Q.   Where were you when he said that?
17  A.   We were in his office.
18  Q.   Was the door shut?
19  A.   I don't recall.
20  Q.   Did anyone else sit close to Dr. Wu's
21  office?
22  A.   It was pretty open.  Yeah, yeah; the
23  student workers and Judy.
24  Q.   What was the conversation you were

Page 220

1  having with Dr. Wu in which he allegedly
2  told you that women in China retire at 55?
3  A.   It was about my, uhm -- he was
4  telling me that I should, I should go -- I
5  should travel, and I said, "Well, I really
6  don't have the money to travel."
7      And I was like, "Well, you must be a
8  poor money manager.  I know how much money
9  you're making."
10     I was like, "Dr. Wu, I'm a single
11  mother.  I can't go."  And I said, "Plus, I
12  have a job.  I just can't drop my job and
13  go."
14     That was, you know -- it -- I
15  don't -- I can't say that he said that women
16  were -- I should retire, but the implication
17  was "it's time for you to travel and get out
18  of here."
19  Q.   So --
20  A.   And it was -- and then this happened
21  a couple weeks later.
22  Q.   So he didn't actually say women in
23  China retire --
24  A.   No, but he did question me.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 221

1    Q.   No.  My -- just wait until --
2    A.   I'm sorry.
3    Q.   -- I ask my --
4    A.   I'm sorry.
5    Q.   -- question.
6    A.   I'm sorry.
7    Q.   So Dr. Wu did not actually say that
8    women in China retire at 55?
9    A.   He did, but he didn't say "put out to
10   pasture."
11   Q.   Okay.
12   A.   Okay.
13   Q.   So, you just told me he didn't, he
14   didn't actually say --
15   A.   He didn't say "put out to pasture."
16        MR. MUNSHI:  Just wait until
17     the question is done.
18        MS. FENDELL-SATINSKY:  Right.
19        THE WITNESS:  Okay.
20   BY MS. FENDELL-SATINSKY:
21   Q.   So, so --
22   A.   Sorry.
23   Q.   -- I asked you before did he ever say
24   that women were put out to pasture by a

Page 222

1    certain age anytime other than the day on
2    which Mr. Wacker gave you this discipline,
3    and you told me "no."
4    A.   Not that terminology, right.
5    Q.   Right.  And so I asked you -- you
6    told me -- I asked you what else did he say
7    sort of in that vein, and you told me that
8    he told you that women in China retire at 55
9    and that he said that during a conversation
10   in which he was telling you that you should
11   travel.
12   A.   Okay.  Well, let me rephrase that.
13   Okay?
14   Q.   Sure.
15   A.   That I am, that I -- what I took from
16   that was that he was telling me that I
17   needed to travel and I needed to be a better
18   money manager and travel; there's no reason
19   I can't.  "You've been" -- I'm a single
20   mother, "go."  So I, I read into that.
21   Q.   Okay.  So Dr. Wu did not actually
22   tell you that you should retire?
23   A.   No.
24   Q.   Correct?

Page 223

1    A.   He told me -- no, he did not tell me
2    to retire.
3    Q.   You interpreted from what he was
4    saying you felt that he was saying that you
5    should retire?
6    A.   Yes.
7    Q.   Was it in that conversation when he
8    told you women in China retire at 55?
9    A.   No.  That was this day (indicating).
10   No, it wasn't.
11   Q.   Okay.  So the women -- so was that
12   the same comment as "women are put out to
13   pasture" by that age?  I'm just confused.
14   A.   Yeah, I am too now, when which
15   happened and in what order.
16   Q.   So I'm not concerned about the order
17   right now.  I understand your testimony that
18   on the day that you received this
19   disciplinary report, you're saying that
20   Dr. Wu told you that women are put out to
21   pasture by a certain age in China.
22   A.   Right.
23   Q.   I understand that.
24   A.   Okay.

Page 224

1    Q.   So then I asked you if he ever said
2    that again, and you said "no," correct?
3    A.   "Put out to pasture"?
4    Q.   Yes.
5    A.   No.
6    Q.   That was your testimony.
7    A.   No, he didn't.
8    Q.   He never said that again?
9    A.   No, he did not say that.
10   Q.   And then I asked you if he made
11   comments that were similar, and you said
12   that he told you that women in China retire
13   at 55; so I want to know what conversation
14   you had with him during which he told you
15   that women in China retire at 55.
16   A.   With, with absolute certainty, I
17   can't give you the date or the exact
18   wordage, but I know that it happened before
19   this.  That's why I lost it.  Well, not lost
20   it, but I -- I'm not generally one to be
21   confrontive, but I just said, "We're not in
22   China."
23   Q.   In what context did that conversation
24   occur?

56 (Pages 221 to 224)

RUTH V. BRIGGS

Page 225

1         MR. MUNSHI:  I'm sorry.  Which
2    one?
3    BY MS. FENDELL-SATINSKY:
4    Q.   The comment you just gave me.  You
5    said that Dr. Wu told you women in China
6    retire at 55, correct?
7    A.   Yes.
8    Q.   And you told me that occurred before
9    you received this disciplinary report,
10   right?
11   A.   Yes.
12   Q.   So I want to know the conversation in
13   which --
14   A.   I, I -- it was in his, in his office.
15   You know, he counselled me frequently; so I
16   can't tell you the date, to be honest with
17   you.
18   Q.   Okay.  I'm not -- I didn't ask for
19   the date.
20   A.   Okay.
21   Q.   So my question to you was:  In what
22   context and what conversation --
23   A.   In a conversation --
24   Q.   Let me finish my question.

Page 226

1    A.   I'm sorry.
2    Q.   My question for you was:  In what
3    context, what conversation did Dr. Wu
4    allegedly make the comment that women in
5    China retire at 55?
6    A.   It was in a conversation in his
7    office.  I don't know if the door was open
8    or closed, and it was about -- it was that
9    same travel thing, and, you know, I can't
10   say that he -- I'm, I'm confused.
11   Q.   So are you unsure if --
12   A.   I am unsure.
13   Q.   -- Dr. Wu made the comment "women in
14   China retire at 55"?
15   A.   Well, he did make it, but I'm unsure
16   about the context.
17   Q.   So you don't know the context in
18   which Dr. Wu allegedly said, "Women in China
19   retire at 55"?
20   A.   Yes, I don't recall, right.
21   Q.   Is it your testimony you don't
22   remember anything about that conversation?
23   A.   No, I do remember him talking about
24   it.  I don't remember the context.

Page 227

1    Q.   So you don't remember anything else
2    about that conversation with Dr. Wu except
3    that one comment; is that correct?
4    A.   I, I can tell you it was in a
5    conversation and in his office.
6    Q.   Okay.  Other than the fact that it
7    was in a conversation and it was in his
8    office, is it accurate that you don't
9    remember anything else about the
10   conversation in which Dr. Wu allegedly told
11   you women in China retire at 55?
12   A.   I don't know if it was added
13   conversation, you're right.  I don't know.
14   Q.   I think my question was a little bit
15   different.
16        MS. FENDELL-SATINSKY:  Can you
17   read my question back, please.
18        THE WITNESS:  Did he ever
19   before that?
20        MS. FENDELL-SATINSKY:  No.
21        THE WITNESS:  Yes.
22        MS. FENDELL-SATINSKY:  That
23   was not my question.
24        Can you read my question back.

Page 228

1         - - -
2         (Whereupon, the court reporter
3    read back the following question:
4    Q   Other than the fact that it
5    was in a conversation and it was in
6    his office, is it accurate that you
7    don't remember anything else about
8    the conversation in which Dr. Wu
9    allegedly told you women in China
10   retire at 55?)
11        - - -
12        THE WITNESS:  I do believe it
13   was about the -- it was the -- and
14   there's an email about it, about the
15   travel and my, my, my being a poor
16   money manager and...
17        MS. FENDELL-SATINSKY:  Again,
18   that's not my question.
19        THE WITNESS:  That was the
20   conversation.
21        MR. MUNSHI:  You asked what
22   the context was.  She said it three
23   times now.
24        MS. FENDELL-SATINSKY:  Rahul,

57 (Pages 225 to 228)

RUTH V. BRIGGS

Page 229

1     she hasn't answered my question.
2         That's not my question.
3     BY MS. FENDELL-SATINSKY:
4     Q.    So, Ms. Briggs, the comment that
5     Dr. Wu allegedly made that women in China
6     retire at 55, was that in an oral
7     conversation?
8     A.    Oh, yeah.
9     Q.    Okay.  And you told me that that
10    conversation was in Dr. Wu's office,
11    correct?
12    A.    Yes.
13    Q.    And you've told me, but correct me if
14    I'm wrong, but you don't remember what the
15    conversation was about other than that he
16    made that comment; is that right?
17        MR. MUNSHI:  Objection to
18        form.  That's not what she said.
19    BY MS. FENDELL-SATINSKY:
20    Q.    And I told you --
21        MR. MUNSHI:  You can answer it
22        again.
23    BY MS. FENDELL-SATINSKY:
24    Q.    I told you "correct me if I'm wrong,"

Page 230

1     right?
2     A.    Oh, okay.
3     Q.    So I want to know --
4     A.    Okay.
5     Q.    -- if I'm wrong, tell me I'm wrong.
6     Okay?
7         So my question to you is that:  You
8     don't -- from what you've told me, I want to
9     make sure I understand.
10    A.    Okay.
11    Q.    So what I understand is that you
12    don't remember anything about the
13    conversation in which Dr. Wu told you women
14    in China retire at 55 except that comment.
15    If I'm wrong, I want you to tell me I'm
16    wrong and explain that.
17        MR. MUNSHI:  Objection to
18        form.
19        Answer it again.
20        THE WITNESS:  Okay.
21    BY MS. FENDELL-SATINSKY:
22    Q.    Do you understand my question?
23    A.    I do.
24    Q.    Okay.

Page 231

1     A.    Okay.  Do you need the date or
2     just --
3     Q.    Nope.
4     A.    Okay.
5     Q.    My question wasn't about the date.
6     A.    All right.  I -- it was about my, my
7     money situation.  I don't even know why it
8     came up.  That seemed kind of personal.  And
9     he said I should travel, take some time and
10    travel.
11    Q.    And then when did he make the comment
12    about women in China retiring at 55?
13    A.    Well, you know -- at what time did he
14    say it?  I don't -- I -- you know, in -- I'm
15    not real clear about whether it was that --
16    I don't think it's how the conversation
17    started.  I think the conversation started
18    about travel, uhm, and, you know, I said I
19    have obligations, I have to raise -- I have
20    kids to raise and I -- he said, "Well,
21    you know, at 50" -- and I think that's when
22    he said at 50 -- women retire at 55.  And I
23    don't even know if it's true, but at 55 in
24    China.

Page 232

1         Now, I didn't even -- I thought he
2     was just counseling me about, you know, how
3     to get myself together and so I can travel.
4     Q.    Did he say that you should retire?
5     A.    No, he didn't, no.
6     Q.    At any point in time, did Dr. Wu tell
7     you that you should retire?
8     A.    No.  He never told me I should
9     retire, no.
10    Q.    When Dr. Wu told you that women in
11    China retire at 55, what did you say in
12    response?
13    A.    That time?
14    Q.    Yes.
15    A.    Uh-uh, it was a -- no.  I mean, it
16    was just a conversation.  I didn't make much
17    of it, to be honest with you.  I just took
18    it as part of that whole conversation.
19    Q.    Were you offended by it?
20    A.    No; I was not at the time.  I was a
21    little offended about the personal finances,
22    because I felt --
23    Q.    Because you felt?
24    A.    -- my own shame.  My own shame.

58  (Pages 229 to 232)

Page 233

1    Q.   When Dr. Wu told you that in China
2  women are put out to pasture by a certain
3  age on the day you received this
4  disciplinary report, were you offended by
5  that comment?
6    A.   Yes, I was.
7    Q.   And is that why, uhm, is that why you
8  gave him the response that you did?
9    A.   Yes.
10    Q.   Other than what you've told me, did
11  Dr. Wu make any similar comments to you
12  during your employment at Temple about women
13  retiring or women being put out to pasture
14  at a certain age?
15    A.   No.
16    Q.   No?
17    A.   Huh?
18    Q.   I just couldn't hear you.  Was your
19  answer "no"?
20    A.   I'm sorry.
21        MR. MUNSHI:  She said "no."
22        THE WITNESS:  "No."
23  BY MS. FENDELL-SATINSKY:
24    Q.   So after you told Dr. Wu that you

Page 234

1  found his comment offensive, he stopped
2  making that comment; is that accurate?
3    A.   No, I didn't say...
4    Q.   Okay.  So tell me what you told
5  Dr. Wu in response to his comment that in
6  China women are put out to pasture by a
7  certain age.
8    A.   I said, "Well, we're not in China
9  right now.  We're in America."
10        And it was the day after my birthday,
11  so I -- that was a kind of weird "happy
12  birthday" kind of thing, but...
13    Q.   And you said that he had no response
14  to that and walked away?
15    A.   Yes.
16    Q.   Correct?
17    A.   Yes.
18    Q.   And after you responded to him in
19  that way, he never made a similar comment
20  after that, correct?
21    A.   No.
22    Q.   Correct, he never made a similar
23  comment?
24    A.   Correct, he never said that or made

Page 235

1  that comment.
2    Q.   Did Dr. Wu make any other comments
3  about you being a woman after this
4  disciplinary report?
5        MR. MUNSHI:  Just objection to
6    form.
7        You can answer it if you
8    understood.
9        THE WITNESS:  What did you
10    say?
11        MR. MUNSHI:  Objection to
12    form.
13        THE WITNESS:  Uh-huh.
14        MR. MUNSHI:  If you understood
15    the question, you can go ahead and
16    answer it.
17  BY MS. FENDELL-SATINSKY:
18    Q.   So, that goes for everything.
19    A.   Yeah.
20    Q.   If you don't understand my questions,
21  remember --
22    A.   I'm not sure I understand what your
23  question was.
24    Q.   Sure.  So if you don't understand my

Page 236

1  questions --
2    A.   Okay.
3    Q.   -- I want you --
4    A.   Okay.
5    Q.   -- to tell me that.
6    A.   Okay.
7    Q.   Okay?
8    A.   All right.
9    Q.   So my question was:  After this
10  disciplinary report that's at D-9 --
11    A.   Right.
12    Q.   -- did Dr. Wu make any other comments
13  to you about you being a woman?
14        MR. MUNSHI:  Just objection to
15    form.
16        Go ahead and answer it.
17        THE WITNESS:  Well, are we
18    talking about age or women?
19        MS. FENDELL-SATINSKY:  That
20    wasn't my --
21        THE WITNESS:  Both.
22        MS. FENDELL-SATINSKY:  That
23    was not my question.  I want you --
24        THE WITNESS:  I'm not --

ELITE LITIGATION SOLUTIONS, LLC

## Page 237

1    MS. FENDELL-SATINSKY: -- to
2  listen to my question. Okay?
3    THE WITNESS: Okay.
4    MS. FENDELL-SATINSKY: Can you
5  please read back my question.
6    THE WITNESS: I -- okay.
7         - - -
8    (Whereupon, the court reporter
9  read back the following question:
10    Q Did Dr. Wu make any other
11  comments to you about being a
12  woman?)
13         - - -
14    MS. FENDELL-SATINSKY: Yup.
15  BY MS. FENDELL-SATINSKY:
16   Q.   So after this disciplinary report at
17  D-9, did Dr. Wu make any other comments to
18  you about being a woman?
19   A.   No.
20   Q.   After this disciplinary report at
21  D-9, did Dr. Wu make any other comments to
22  you about age?
23   A.   No.
24    MR. MUNSHI: You can put it to

## Page 238

1  the side.
2    THE WITNESS: Okay.
3         - - -
4    (Whereupon, 6/18/12 cmail
5  string, Bates No. TEMPLE UNIVERSITY
6  (R.BRIGGS)-0000318-319 and 399 --
7  401, was marked as D Exhibit No. 10
8  for identification.)
9         - - -
10  BY MS. FENDELL-SATINSKY:
11   Q.   Ms. Briggs, the court reporter has
12  given you a document that's been marked as
13  D-10. It's actually two separate emails,
14  but you'll see they go together. And so
15  take a look at the emails, and let me know
16  if you've seen this before, these e-mails
17  before.
18   A.   (Brief pause while reading.)
19  Okay, I read it.
20   Q.   Okay. So, I'm going to start with
21  the top one on the first page.
22   A.   Uh-huh.
23   Q.   And I want you to look at the email
24  that's from February 13th, 2012 from

## Page 239

1  Drew DiMeo to you.
2    Do you see that?
3   A.   I -- wait a minute. February, okay.
4   Q.   Do you see where I am?
5   A.   Yes, I am.
6   Q.   And this is an email from Drew DiMeo
7  to you in which he asks you to make a
8  conscious effort to review certain
9  expenditures on a monthly basis.
10   A.   That's correct.
11   Q.   And as you told me earlier,
12  reconciling money and reports, expense
13  reports, was part of your job, right?
14   A.   Uh-huh.
15   Q.   Is that a "yes"?
16   A.   It became my job, yes, after
17  Alexandra left.
18   Q.   So you understood that to be part of
19  your job responsibilities?
20   A.   Yes.
21   Q.   And in this email Drew suggests to
22  you that you put a recurring reminder in
23  your calendar.
24    Do you see?

## Page 240

1   A.   In the -- yeah, yes.
2   Q.   And did you do that?
3   A.   Yes, I did.
4   Q.   So did you find that suggestion from
5  him helpful?
6   A.   Yes.
7   Q.   And then the next sentence
8  says/refers to Dr. Wu's PCARD.
9    Do you see that?
10   A.   The same email?
11   Q.   Same email.
12   A.   Uh-huh, okay.
13   Q.   What's a PCARD?
14   A.   Uh, it's a purchasing card. It's a
15  Visa.
16   Q.   And Drew is asking you to speak with
17  Tarah Morris about getting Dr. Wu's
18  purchasing card renewed; is that correct?
19   A.   Yes.
20   Q.   And, again, this email between you
21  and Drew is from February 13th, 2012,
22  correct?
23   A.   Correct.
24   Q.   Okay. So if you go to the next email

ELITE LITIGATION SOLUTIONS, LLC

## Page 241

1   that's attached, so the next set.
2   A.   The top one?  No, okay.
3   Q.   The next set of emails that's part of
4   this exhibit.
5   A.   Okay.
6   Q.   It starts Bates No. 000399.
7   A.   Correct.
8   Q.   Do you see that?
9   A.   Yes.
10   Q.   Okay.  And so this is an email from
11   June 18th, 2012 from Drew DiMeo to you,
12   copying Dr. Wu, correct?
13   A.   Uh-huh, correct.
14   Q.   Okay.  And here Drew is forwarding
15   you an email from Tarah Morris --
16   A.   Morris.
17   Q.   -- and is telling you that it's
18   imperative you reconcile the PCARD on a
19   monthly basis.
20        Do you see that?
21   A.   I do.
22   Q.   And you understood that was
23   important, right?
24   A.   Yes.

## Page 242

1   Q.   And between February and June, had
2   you reconciled Dr. Wu's PCARD on a monthly
3   basis?
4   A.   I had reconciled the receipts that I
5   had gotten, yes.
6   Q.   So you had completely reconciled
7   Dr. Wu's PCARD from February to June of
8   2012?
9   A.   Not every month, no.
10   Q.   So you had not done all of the
11   months; is that correct?
12   A.   No; because I, I needed receipts.
13   Q.   Did you ask Dr. Wu for the receipts?
14   A.   Either Dr. Wu or whoever had used it.
15   A lot of people used the card, so...
16   Q.   And did you follow up with them for
17   the receipts?
18   A.   I did.
19   Q.   And did you tell that to Drew?
20   A.   I did.  I, I can't imagine that I
21   wouldn't have if he was being called for
22   something I was responsible for.
23   Q.   So, I don't want you to guess.
24        Do you remember telling that to Drew?

## Page 243

1   A.   No, I don't remember calling and
2   telling him.
3   Q.   We talked about earlier one of your
4   responsibilities was to book Dr. Wu's
5   travel.
6   A.   Yes.
7   Q.   Correct?
8   A.   Yes.
9   Q.   And we also talked about earlier the
10   importance of booking travel correctly for
11   him, right?
12   A.   Yes.
13        MR. MUNSHI:  You can put the
14   document to the side.
15        THE WITNESS:  Okay.  Is this
16   over?
17        MR. MUNSHI:  Just listen to
18   the question.
19        THE WITNESS:  Okay.
20        MR. MUNSHI:  The questions
21   that she has.
22   BY MS. FENDELL-SATINSKY:
23   Q.   I think I may have just asked this,
24   but I apologize because --

## Page 244

1   A.   Okay.
2   Q.   -- Mr. Munshi's comment threw me off.
3        You told me you understood the
4   importance --
5   A.   Yes.
6   Q.   -- of making correct travel
7   arrangements?
8   A.   I do.
9        - - -
10        (Whereupon, 8/2/12 email
11   string, Bates No. TEMPLE UNIVERSITY
12   (R.BRIGGS)-0000150-155, was marked
13   as D Exhibit No. 11 for
14   identification.)
15        - - -
16   BY MS. FENDELL-SATINSKY:
17   Q.   Ms. Briggs, the court reporter has
18   given you a document that's been marked as
19   D-11.  I'm going to ask you to review this
20   and let me know if you've seen it before.
21   A.   (Witness complies with request.)
22   Okay.
23   Q.   Have you seen this document before?
24   A.   Yes.

RUTH V. BRIGGS

Page 245

1  Q.  Starting on the first page of this
2  document, looking at the second email, it's
3  an email from August 1st, 2012 from Dr. Wu
4  to you.
5  A.  Uh-huh.
6  Q.  Do you see that?
7  A.  I do.
8  Q.  And in the email he asks you to check
9  a direct flight from Philly to Napa or
10  nearby, leaving Monday afternoon and coming
11  back on Thursday morning.
12    Do you see that?
13  A.  Uh-huh.
14  Q.  Is that a "yes"?
15  A.  I see it, yes.  I'm sorry.
16  Q.  That's okay.
17  A.  Uh-huh.
18  Q.  And did you book that flight for
19  Dr. Wu?
20  A.  I'm -- yes.  I, I -- yes.
21  Q.  Did you book the flight on an
22  incorrect date?
23  A.  It says I purchased it on Monday.
24  I'm not going to argue with that, but...

Page 246

1  Q.  So the email that's above the email
2  we just discussed is an email from Dr. Wu to
3  Justin Shi and Drew DiMeo saying that you
4  stated "clearly leaving on Monday," but you,
5  Ruth, changed it to Sunday and purchased it
6  without his knowledge.
7    Do you know what Dr. Wu is referring
8  to?
9  A.  Uhm, I don't recall.
10  Q.  Did you -- was there an occasion, any
11  occasion on which you incorrectly booked
12  flights for Dr. Wu?
13  A.  Not to my knowledge.
14  Q.  So you --
15  A.  Not without being directed, no.
16  Q.  So you don't recall any occasion on
17  which you booked incorrect travel for
18  Dr. Wu?
19  A.  No, I don't.
20    MR. MUNSHI:  You can put that
21  to the side.  Just wait for her
22  question.
23    THE WITNESS:  Oh, I wanted to
24  make sure I know what it's about.

Page 247

1    MR. MUNSHI:  Just listen to
2  the question.
3  BY MS. FENDELL-SATINSKY:
4  Q.  You told me earlier that when you
5  started working for Dr. Wu that Dr. Wu was
6  more focused on events with speakers and
7  visiting speakers.
8  A.  Yes.
9  Q.  Is that correct?
10  A.  He had an emphasis on it, yes,
11  absolutely.
12  Q.  And was Dr. Wu involved with
13  recruiting faculty from -- recruiting
14  faculty?
15  A.  Faculty internally for Temple?
16  Q.  Yes.
17  A.  He was part of it.  Yes, he was part
18  of it.
19  Q.  And did you assist him in helping
20  coordinate --
21  A.  Yes.
22  Q.  -- the logistics --
23  A.  Yes.
24  Q.  Let me finish my question.

Page 248

1  A.  Uh-huh.
2  Q.  Did you assist him in coordinating
3  logistics for faculty when they came to
4  interview at Temple?
5  A.  Candidates, right?
6  Q.  Candidates.
7  A.  Yes.
8  Q.  Yes.
9    So faculty from other universities or
10  schools that came to interview --
11  A.  Right.
12  Q.  -- at Temple, correct?
13  A.  That is correct.
14  Q.  And when you had candidates come
15  visit, it was important to ensure they had
16  the best visit possible, right?
17  A.  Yes.
18  Q.  Because if they were a candidate it
19  was somebody that Temple potentially wanted
20  to hire, right?
21  A.  That is correct.
22  Q.  And were you responsible for, in some
23  occasions, in booking travel for candidates
24  when they came to visit?

ELITE LITIGATION SOLUTIONS, LLC

Page 249

1   A.   The tenured faculty, yes.
2   Q.   And you told me before you understood
3   the importance of booking correct travel,
4   right?
5   A.   Absolutely.
6   Q.   And that would hold true for
7   candidates visiting as well?
8   A.   Yes.
9   Q.   While working under Dr. Wu, was there
10  an instance in which you forgot to book
11  plane reservations for a visiting candidate?
12  A.   Well, I didn't forget, but Clint
13  Whaley, yes, his ticket was not purchased.
14  Q.   And you said you didn't forget.
15  What do you mean?
16  A.   He and I were -- Clint Whaley and I
17  were going back and forth.  I'd get him an
18  itinerary, and he'd say it's not working,
19  try another one, and it just went back and
20  forth and...
21  Q.   Let me show you an email maybe to
22  refresh your recollection.
23  A.   I'm the one who admitted that I
24  didn't.

Page 250

1              - - -
2              (Whereupon, 3/24/13 email
3       string regarding lodging for Whaley,
4       Bates No. TEMPLE0000571-575, was
5       marked as D Exhibit No. 12 for
6       identification.)
7              - - -
8   BY MS. FENDELL-SATINSKY:
9   Q.   So, I want you to take a look at this
10  email and let me know when you're finished
11  reviewing the whole email.
12  A.   (Witness complies with request.)
13          MR. MUNSHI:  You meant the
14  whole thread, right?
15          MS. FENDELL-SATINSKY:  Yup,
16  the whole string of emails.
17          THE WITNESS:  I remember very
18  clearly.
19          MR. MUNSHI:  Read through it.
20          THE WITNESS:  I do, I remember
21  it clearly.
22  BY MS. FENDELL-SATINSKY:
23  Q.   Let me know when you're finished
24  reading the document.

Page 251

1   A.   (Brief pause while reading.)
2       Okay.
3   Q.   So I'm going to start at the back,
4   which is the earliest of the emails, and the
5   first email that starts this chain of emails
6   is on February 20th, 2013 from you to
7   Dr. Whaley, correct?
8   A.   Yes.
9   Q.   And was Dr. Whaley a candidate that
10  was coming in for an interview at Temple?
11  A.   Yes.
12  Q.   And you emailed Dr. Whaley on
13  February 20th, 2013 and informed him that
14  you had confirmed lodging for him, correct?
15  A.   Yes.
16  Q.   And about a month later, on March
17  22nd, 2013, Mr. Whaley emailed you and asked
18  if there was an itinerary for the visit yet
19  and how he's going to -- is he going to take
20  a taxi from the airport to the hotel.
21  A.   Uh-huh.
22  Q.   Do you see that?
23  A.   Uh-huh.
24  Q.   Is that a "yes"?

Page 252

1   A.   Yes.  Sorry.
2   Q.   And he emailed you at 8:54 a.m.
3       Do you see that?
4   A.   Yes.
5   Q.   And did you respond to that email?
6   A.   Well, on that day I can't say that I
7   did, but I did respond to his email.  I sent
8   him several itineraries.
9       And there aren't any emails to me
10  here, are there?
11  Q.   So I'm staying right now on that
12  email.  And you said you believe you sent
13  him itineraries, but you don't --
14  A.   No.
15  Q.   -- know that you responded that day,
16  that day being March 22nd; is that correct?
17  A.   That's correct.
18  Q.   And did you work on Saturdays and
19  Sundays?
20  A.   Yes, I did.
21  Q.   Every Saturday and Sunday?
22  A.   No.
23  Q.   You'll see the next email on the
24  earlier page, which is a March 22nd email

RUTH V. BRIGGS

Page 253

1    from Dr. Whaley to Dr. Kwatny.
2    A.   Kwatny, okay.
3    Q.   Kwatny?
4    A.   Uh-huh.
5    Q.   Do you see that?
6    A.   Yes, I do.
7    Q.   And that email is from 3:47 p.m.,
8    correct?
9    A.   Yes.
10   Q.   And in that email Dr. Whaley is
11   asking Dr. Kwatny that he assumes interview
12   is still scheduled and, if so, if there's
13   somebody who can answer his below questions
14   regarding the itinerary and taking a taxi.
15        Do you see that?
16   A.   Uh-huh.
17   Q.   Is that a "yes"?
18   A.   Yeah. I'm sorry.  Yes.
19        MR. MUNSHI:  Do your best --
20        THE WITNESS:  I'm sorry.
21        MR. MUNSHI:  -- to verbalize.
22        THE WITNESS:  I'm sorry.
23        MR. MUNSHI:  That's okay.
24        MS. FENDELL-SATINSKY:  That's

Page 254

1    okay.
2         THE WITNESS:  I'm just...
3         MS. FENDELL-SATINSKY:  That's
4    okay.
5    BY MS. FENDELL-SATINSKY:
6    Q.   And does that help refresh your
7    memory that you did not respond on March
8    22nd, if Dr. Whaley was following up with
9    Dr. Kwatny?
10   A.   I don't see my emails to him.  That's
11   the whole thing.
12   Q.   Right.  You told me you did not
13   remember responding to Dr. Whaley on March
14   22nd, correct?
15   A.   I don't know that, you're right,
16   correct.
17   Q.   So I was saying, by seeing this email
18   from Dr. Whaley to Dr. Kwatny later in the
19   afternoon on March 22nd, does that refresh
20   your recollection that you did not respond?
21   A.   Yes.
22        MR. MUNSHI:  Objection to
23   form, but go ahead.
24

Page 255

1    BY MS. FENDELL-SATINSKY:
2    Q.   Yes, it does?
3    A.   (Indicating.)
4    Q.   And based on Dr. Whaley's email to
5    Dr. Kwatny on March 22nd, do you believe
6    that you did not respond?
7    A.   Which -- tell me what email again.
8    Q.   Sure.  So, read the email.  The
9    second from the page, there's an email.
10   A.   572?
11   Q.   On 574.
12   A.   Okay, all right.
13   Q.   So on 574 there's two emails at the
14   bottom of the page.
15   A.   Uh-huh.
16   Q.   Do you see them?
17   A.   Uh-huh.
18   Q.   Is that a "yes"?
19   A.   Yes, yes.  I'm sorry.
20   Q.   So one email is from Dr. Kwatny to
21   Dr. Whaley on March 22nd at 6:41 p.m.
22   A.   Okay.
23   Q.   And the other email is from
24   Dr. Whaley to Dr. Kwatny at 3:47 p.m.

Page 256

1         Do you see those?
2    A.   I see those.
3    Q.   So, read those emails.  And those
4    emails -- well, let me step back.
5         Those emails indicate that Dr. Whaley
6    is still looking for information regarding
7    his itinerary and travel from the airport,
8    correct?
9    A.   That is correct.
10   Q.   And so seeing those emails, does that
11   refresh your recollection that you did not
12   respond to Dr. Whaley about his itinerary
13   and transportation from the airport on March
14   22nd?
15   A.   Yes.  It responds -- my memory is I
16   remember this.  But the exact question that
17   I didn't respond, I can't say that that is
18   true, because we talked on the phone on
19   numerous occasions.
20   Q.   If you turn to the next page, which
21   is TEMPLE0000573, the bottom of that email
22   is an email from Dr. Whaley to Dr. Kwatny
23   and you on March 23rd.
24   A.   23rd, uh-huh.

64  (Pages 253 to 256)

RUTH V. BRIGGS

Page 257

1   Q.   Do you see that?
2   A.   Uh-huh.
3   Q.   And in that email Dr. Whaley says
4   looking through his email he doesn't have an
5   actual E-ticket.  He had a proposed flight
6   from Ruth, "but I don't have any email
7   confirming after I approved the flight.  I
8   tried to look up the flight that Ruth sent
9   me, and Delta does not seem to know about
10  it."
11  A.   Uh-huh.
12  Q.   Do you see that?
13  A.   I see that.
14  Q.   And did you, in fact -- did
15  Dr. Whaley, in fact, approve a flight?
16  A.   No, he did not, not -- we -- I left
17  him num -- I, I, I, I -- I'll -- I can check
18  my emails too, because I kept them, but I
19  contacted by email, but he wasn't
20  responding.  It was about a month period
21  that this started.
22      So I would call him.  I'd say,
23  "Dr. Whaley, this is very confusing about
24  when you want to leave and where the

Page 258

1   layover" -- whoop, "the layovers are, so
2   could we talk on the phone?"
3   Q.   So I will tell you I don't have any
4   records of those emails.
5   A.   Well, no.  I --
6   Q.   If you do you have those --
7   A.   Okay.
8   Q.   -- emails, I would ask that you
9   search for them and you provide them --
10  A.   Okay.
11  Q.   -- to your attorney.  Following this
12  deposition, I am going to send your attorney
13  a letter --
14  A.   Okay.
15  Q.   -- that will list other documents
16  you've identified today that you have not
17  produced in this litigation.
18      MR. MUNSHI:  And we'll talk
19  about it.
20      THE WITNESS:  Okay.
21  BY MS. FENDELL-SATINSKY:
22  Q.   And so if you do have documents that
23  relate to Dr. Whaley's visit, I would ask
24  that you --

Page 259

1   A.   Okay.
2   Q.   -- provide those to your attorney.
3   A.   I'll look.  I'll look.
4   Q.   And why would you still have those
5   emails?
6   A.   Because I had -- I feel like I had
7   been discriminated against.  Why would I not
8   save them?  There's, there's, there's no
9   mitigating factor here.
10  Q.   That --
11  A.   You know, they --
12  Q.   Ms. Briggs.
13  A.   I cannot tell you --
14      MR. MUNSHI:  She's answering
15  your question.
16      MS. FENDELL-SATINSKY:  No,
17  she's not, and so I'm going to --
18      MR. MUNSHI:  She is answering.
19      MS. FENDELL-SATINSKY:  --
20  interrupt you and --
21      MR. MUNSHI:  You asked why
22  would she do it.
23      MS. FENDELL-SATINSKY:  --
24  stop --

Page 260

1       MR. MUNSHI:  And she's
2   answering your question.
3       MS. FENDELL-SATINSKY:  -- you.
4   BY MS. FENDELL-SATINSKY:
5   Q.   So do you have access still to your
6   Temple University email account?
7   A.   I don't.
8       MR. MUNSHI:  Were you done
9   answering the previous question?
10      THE WITNESS:  No, I'm not.
11      MS. FENDELL-SATINSKY:  I'm
12  going to cut you off because it's
13  not answering --
14      THE WITNESS:  Okay.
15      MR. MUNSHI:  You asked her --
16      MS. FENDELL-SATINSKY:  -- and
17  responsive to my question.
18      MR. MUNSHI:  -- why did she do
19  something, and she's explaining it.
20  Just because you don't like what
21  she's saying doesn't mean you can
22  stop her.
23      MS. FENDELL-SATINSKY:  Ms.
24  Briggs.

65 (Pages 257 to 260)

RUTH V. BRIGGS

Page 261

1      THE WITNESS:  Yes?
2      MS. FENDELL-SATINSKY:  I'm
3  going to ask you --
4      THE WITNESS:  Okay.
5      MS. FENDELL-SATINSKY:  -- a
6  question again.
7      THE WITNESS:  Okay.
8      MS. FENDELL-SATINSKY:  Okay?
9  And I want you --
10      MR. MUNSHI:  And you're going
11  to withdraw --
12      MS. FENDELL-SATINSKY:  --
13  answer it --
14      MR. MUNSHI:  -- the previous
15  question.
16      MS. FENDELL-SATINSKY:  -- to
17  the best of your ability.
18      THE WITNESS:  Okay.
19      MS. FENDELL-SATINSKY:  Okay?
20      MR. MUNSHI:  So the previous
21  question has to be withdrawn.
22  BY MS. FENDELL-SATINSKY:
23   Q.   So, uhm, so you told me you no longer
24  have access to your Temple University email?

Page 262

1   A.   No, I do not.
2   Q.   Okay.  And when you were at Temple,
3  did you print out copies of emails?
4   A.   No.
5   Q.   How did you save emails from when you
6  were at Temple to still have them today?
7   A.   If they were relevant and I needed a
8  confirmation, I would just print it as a PDF
9  and save it on our, on our shared network
10  drive.
11   Q.   And do you still have access to the
12  shared network drive?
13   A.   No.
14   Q.   Did that cease when your employment
15  with Temple ended?
16   A.   Oh, I don't think so.
17   Q.   Well, I'm sorry.  Did your access to
18  the shared network drive cease when your
19  employment --
20   A.   Yes.
21   Q.   -- with Temple ended?
22   A.   Yeah.
23   Q.   So how did you get emails from the
24  shared network drive that you had saved into

Page 263

1  your own possession?
2   A.   Because I saved them.
3   Q.   Right.  But you told me you saved
4  them to a shared network drive.
5   A.   I know, but I also saved -- printed
6  out a copy for me.
7   Q.   Okay.  Because I asked you before if
8  you printed anything out, and you said "no."
9   A.   Oh, okay.  Oh, okay.  Well, I --
10  well, when I say printed out, I would save
11  it to as a PDF for me too.  I don't -- I'm
12  not a paper -- I printed to PDF, is what I
13  should say.
14   Q.   And how -- I understand when you
15  printed to PDF you saved on the shared
16  drive; is that right?
17   A.   I shared -- but I kept a copy for me
18  for my records.
19   Q.   And how did you do that?
20   A.   I did it on my, my computer.
21   Q.   Where did you save it to?
22   A.   We had -- my desktop or my documents.
23  We didn't have to file everything on there.
24   Q.   I understand, but I'm asking:  Since

Page 264

1  you don't have access to your Temple
2  computer anymore --
3   A.   No, I do not.
4   Q.   But you're telling me you still have
5  emails from Temple, correct?
6   A.   I do.
7   Q.   So I want to know how you still have
8  emails from Temple, and you told me that you
9  saved things to PDF.
10   A.   Right.
11   Q.   Right?  So how did you get the things
12  that you saved from PDF to be in your
13  possession now, given that you no longer
14  have access to your Temple emails?
15   A.   I imported them into my personal
16  email account the day I got fired.
17   Q.   And how did you import them into your
18  personal email account?
19   A.   From gmail to gmail.  I just
20  imported.
21   Q.   Did you just forward them?
22   A.   No.  I -- there's an import function.
23   Q.   And how does that work?
24   A.   Google Mail.  I don't -- I'm not --

66  (Pages 261 to 264)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 265

1   Q.   Well, how did you actually complete
2   the import?
3   A.   I can't -- I don't -- can't -- I'd
4   have to look at the directions.
5        MS. FENDELL-SATINSKY:  Mr.
6   Munshi, I'm going to ask you again
7   to stop nodding your head to the
8   witness.
9        MR. MUNSHI:  Sorry.  I'm just
10  rocking.
11       THE WITNESS:  I didn't even
12  see him.  I'm looking at you.
13       MR. MUNSHI:  Nothing is
14  intended.  I'm just --
15       MS. FENDELL-SATINSKY:  That's
16  fine.  It was just the second time
17  I've spoken to you about it.
18       MR. MUNSHI:  And I apologize.
19  And like I said, the first time it
20  was inadvertent.
21       THE WITNESS:  So does that --
22  is that --
23  BY MS. FENDELL-SATINSKY:
24  Q.   So, so you have copies of your Temple

Page 266

1   emails now in your personal gmail account?
2   A.   Yes.  Yes, I do.
3   Q.   That are accessible to you --
4   A.   Yes, yes.
5   Q.   -- currently?
6   A.   Yes.
7   Q.   And the emails that you imported from
8   Temple into your personal gmail account, did
9   those all relate to your employment at
10  Temple?
11  A.   Yes; or my termination, I guess.
12  Q.   How many emails were there that you
13  imported?
14  A.   I don't know.  Maybe -- any of these
15  documents, any of these emails that were
16  accusing me of something, so that.  So there
17  were, like, 50.
18  Q.   About approximately 50?
19  A.   Approximately 50 in that, yeah.
20  Q.   So you believe you imported
21  approximately 50 emails from your Temple
22  email to your personal email?
23  A.   And that's a vague number.  It's
24  probably less.

Page 267

1   Q.   Did you ask anyone at Temple if you
2   could do that?
3   A.   No, I did not.
4   Q.   And have you looked through those
5   emails in conjunction with finding emails
6   relevant to your litigation?
7   A.   Say that -- ask that --
8   Q.   Sure.
9        Have you looked through those emails
10  in conjunction with this lawsuit that you've
11  filed against Temple?
12  A.   Have I or how do I?
13  Q.   Have you.
14  A.   Yes, I have.
15  Q.   Okay.  And you said you decided to
16  save documents based upon anything that was,
17  did you say, blaming you for something?  Or
18  "accusing" you of something I think was --
19  A.   Right.
20  Q.   -- the word you used.
21  A.   Right.
22  Q.   So you saved any email that was
23  accusing you of something?
24  A.   Yes.  And anything that might

Page 268

1   support, support it, you know.
2   Q.   Support accusations against you?
3   A.   Yeah.  I mean, if there was -- like,
4   there's -- not an -- some things here from me
5   either, so I'm not sure what it is, but...
6   Q.   I understand.  And so you think if
7   there were emails from you to Dr. Whaley --
8   A.   Dr. Whaley.
9   Q.   -- those would be in the emails you
10  imported from your Temple email to your
11  personal email?
12  A.   Yes.
13  Q.   So I'm, again, I'm going to send an
14  email to your attorney after the deposition.
15  A.   Uh-huh.
16  Q.   But for the record, I'm going to
17  make --
18  A.   Okay.
19  Q.   -- the note that we would like you to
20  search for those emails.  I have not seen
21  any of those emails between you and
22  Dr. Whaley other than what I have here as
23  D-12.
24  A.   Uh-huh.

RUTH V. BRIGGS

Page 269

1    Q.    And if you have them, then you can
2  give them in to your attorney and he'll pass
3  them on to us.
4    A.    Can I ask a question then?
5    Q.    Uhm, I --
6    A.    About the voicemail.  Because I -- it
7  was mostly voicemail, talking on the phone.
8  So how do I document that?
9    Q.    So you have voicemails?
10    A.    I don't know --
11    Q.    Oh, you --
12    A.    -- where they belong.  I mean who has
13  them.
14    Q.    Do you have voice -- did you import
15  any voicemails?
16    A.    No.  I don't -- no.
17    Q.    Okay.
18    A.    But that -- I -- so I can't access
19  that.  I mean him, you know, contacting me,
20  leaving me a voicemail.
21    Q.    I understand that.  But you said if
22  there were emails that you would have --
23    A.    I'll check, yes.
24    Q.    -- copies of the emails.

Page 270

1    A.    I'll check, but I'm not sure if there
2  are anymore.  I'll have to check.
3    Q.    Okay.  Did you tell Dr. Wu or anyone
4  else that Mr. Whaley was not getting back to
5  you?
6    A.    I don't recall.
7    Q.    I'm sorry.  That Dr. Whaley was not
8  getting back to you.
9    A.    Back to you, right.  I don't recall,
10  and I have -- I'd like to give you a reason
11  for that.
12    Q.    Sure.
13    A.    Dr. Wu had -- was organizing an NSF
14  conference, and he was using student
15  workers; and like three days before the
16  conference was to happen, he pulled me off.
17  He says, "This is a priority.  Drop
18  everything.  Do this."
19      And I literally, like, had to pull a
20  program together, food, everything, in like
21  three days.  So, I remember coming home from
22  work and sitting on my bed and saying, "A
23  ball is going to drop, and it's going to hit
24  my head."  And it did.

Page 271

1      And as soon as I realized it was
2  Clint Whaley, I went right in and told
3  Dr. Wu.
4    Q.    So Dr. -- is it your testimony that
5  because Dr. Wu asked you to work on another
6  project you did not follow up with
7  Dr. Whaley?
8    A.    Yes.
9    Q.    And I believe you testified to this
10  before, but ultimately you did take
11  responsibility for not booking Dr. Whaley's
12  travel, correct?
13    A.    At the end, yes.  At the end, it
14  falls on me.
15    Q.    You recognized --
16    A.    I dropped the ball.
17    Q.    So you recognized that --
18    A.    Yes.
19    Q.    -- you did not complete something
20  that you were supposed to?
21    A.    Yes, I do.
22    Q.    And you understood that not booking
23  his travel was problematic; is that correct?
24    A.    Oh, absolutely.

Page 272

1    Q.    Did Dr. Whaley ultimately come visit
2  Temple?
3    A.    No, he did not.
4    Q.    And was that because his travel was
5  not booked?  If you know.
6    A.    I don't know.
7    Q.    And was Dr. Whaley hired by Temple?
8    A.    No.
9    Q.    And to become hired by Temple, in
10  your experience, does the person have to
11  interview in-person?
12    A.    This is -- yes.  Several.  You know,
13  there's a process.
14    Q.    And to be hired as a faculty at
15  Temple, in your experience, the person must
16  interview several times in-person?
17    A.    Yes.
18    Q.    So because Dr. Whaley did not
19  actually visit, he could not have been hired
20  for the position?
21    A.    That is correct.
22    Q.    And were you disciplined for this?
23    A.    Three days suspension without pay.
24        - - -

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 273

```
 1          (Whereupon, 3/26/13
 2     Disciplinary Report, Bates No.
 3     BRIGGS 49, was marked as D Exhibit
 4     No. 13 for identification.)
 5              - - -
 6  BY MS. FENDELL-SATINSKY:
 7     Q.   Ms. Briggs, my first question to you
 8  is going to be whether you're seen this
 9  document before.
10     A.   Yes, I have.
11     Q.   And is this the discipline you
12  received as a result of the incident with
13  Dr. Whaley you just testified about?
14     A.   Yes, I -- yes, it is.
15     Q.   And where it says "employee
16  signature," is that your signature?
17     A.   That is mine.
18     Q.   And where it says "Ruth Briggs" in
19  the handwritten text, is that your
20  handwriting?
21     A.   Yes.
22     Q.   And below that it says "Jie Wu."
23          Do you recognize --
24     A.   I do recog --
```

Page 274

```
 1     Q.   -- the signature as Dr. Wu's
 2  signature?
 3     A.   Uh-huh.
 4     Q.   Is that a "yes"?
 5     A.   Yes, it is.  I'm sorry.
 6     Q.   And this, uh, was a three-day
 7  suspension without pay, correct?
 8     A.   Correct.
 9     Q.   And this was issued to you on March
10  26th, 2013, right?
11     A.   Yes.
12     Q.   In "explanation," it says, "C.4 -
13  Neglecting job duties or responsibilities or
14  failing to carry out instructions given by a
15  supervisor (sic)."
16     A.   Correct.
17     Q.   Do you see that?
18     A.   Yes.
19     Q.   And do you understand, uhm, that you
20  had committed a Level C disciplinary
21  infraction?
22     A.   I disagree with the level, but, yes,
23  I do.  I dropped the ball.
24     Q.   So you disagreed with the severity of
```

Page 275

```
 1  the discipline?
 2     A.   Yes.
 3     Q.   But you understood that you were
 4  issued a Level C discipline?
 5     A.   Yes.
 6     Q.   And you understood -- you told me
 7  before that you dropped the ball.
 8          And in "dropping the ball," which
 9  were your words, did you fail to carry out
10  an instruction given by Dr. Wu to book
11  travel for Dr. Whaley?
12     A.   To complete it, yes.
13     Q.   And if you need to pull it back out,
14  that's fine, but the first time that there's
15  a Level C infraction, that leads to a
16  suspension without pay, correct?
17     A.   Right, correct.
18     Q.   And you understood that, correct?
19     A.   I didn't know that then, but I did
20  after, yeah.
21     Q.   But you did have access to the Rules
22  of Conduct throughout your --
23     A.   I did.
24     Q.   -- employment?
```

Page 276

```
 1     A.   Right.
 2     Q.   Okay.  So had you wanted to
 3  understand what type of discipline you might
 4  be given, you could have consulted the Rules
 5  of Conduct?
 6     A.   I'm not sure I understand your
 7  question.
 8     Q.   Okay.  I understand that you said you
 9  didn't understand that a Level C infraction
10  the first time resulted in a three-day
11  suspension without pay, correct?
12     A.   I understood --
13     Q.   Until you received this.
14     A.   Well, I understood what a C did, but
15  I disagree with this being a Level C, is
16  what I said.
17     Q.   Okay, I understand.
18     A.   Okay.
19     Q.   So when you received this
20  disciplinary report, you understood that it
21  was a Level C infraction and because it was
22  a Level C infraction the discipline was a
23  three-day suspension without pay?
24     A.   They told me.  Right.
```

69 (Pages 273 to 276)

ELITE LITIGATION SOLUTIONS, LLC

| Page 277 |
|---|

1    Q.   Okay.  And you said you disagreed
2   with the severity of the discipline?
3    A.   Uh-huh.
4    Q.   Is that a "yes"?
5    A.   Yes, it is.
6    Q.   Why?
7    A.   Because it wasn't willful.  It was a
8   mistake, and there are mitigating factors.
9   I was alone in the office.  There was Judy
10  Lennon was on family medical leave because
11  her mom died.  I mean, there was no one in
12  the office, and I was pulling it, so...
13       I'm not going to make excuses for
14  dropping the ball, but I -- there was a lot
15  of other things.  And I -- Dr. Kwatny says
16  people in our department don't make
17  mistakes.  Well, I did, and I owned up to it
18  and I took my three-day suspension.
19   Q.   The, uh, the instruction to book
20  Dr. Whaley's travel, that was given solely
21  to you, correct?
22   A.   I believe, yes.  That's my knowledge.
23   Q.   So you don't have any knowledge that
24  Ms. Lennon was involved?

| Page 278 |
|---|

1    A.   No, I don't have any.
2    Q.   Or that she was asked to be involved?
3    A.   I don't have any knowledge if she
4   was.
5    Q.   And you did not ask Ms. Lennon to be
6   involved, correct?
7    A.   No, I didn't, no.
8    Q.   No, you did not ask her --
9    A.   I did not --
10   Q.   -- to be involved?
11   A.   -- ask her, no.
12   Q.   Why did you feel -- let me step back.
13       I understand from what you've told me
14  that you disagreed with the severity of the
15  discipline, correct?
16   A.   Correct.
17   Q.   Although you disagreed with it, did
18  you understand why it had been a Level C
19  infraction?
20   A.   Yes, I did.
21   Q.   And although you disagreed with it,
22  did you understand Dr. Wu's position about
23  why it was a Level C infraction?
24   A.   No.

| Page 279 |
|---|

1    Q.   So --
2    A.   Do I understand or do I agree?  What
3   was the...
4    Q.   Sure.
5    A.   I'm sorry.
6        MS. FENDELL-SATINSKY:  Are you
7   able to read it back?
8        THE WITNESS:  Okay.
9        THE COURT REPORTER:  Uh-huh.
10       MS. FENDELL-SATINSKY:  Thank
11  you.
12             - - -
13       (Whereupon, the court reporter
14  read back the following:
15       Q  And although you disagreed
16  with it, did you understand Dr. Wu's
17  position about why it was a Level C
18  infraction?)
19             - - -
20       THE WITNESS:  No, I don't.
21  BY MS. FENDELL-SATINSKY:
22   Q.   So you did not understand why --
23   A.   No, I don't understand why it was a
24  Level C.

| Page 280 |
|---|

1    Q.   Okay.  And why do you think Dr. Wu
2   gave you a Level C infraction?
3    A.   I believe he wanted me out of there.
4    Q.   Why?
5    A.   He didn't like me.  Not that he
6   didn't like me personally.  He didn't want
7   me to -- he wanted a secretary, basically,
8   and he didn't -- what Justin Shi, who is
9   that associate chair, told me is that "Dr.
10  Wu doesn't want you to ask questions.  He
11  doesn't want you to make suggestions.  He
12  just wants you to listen to him and do what
13  he says."
14   Q.   Why do you believe that Dr. Wu,
15  uhm -- you said, you said that Dr. Wu -- you
16  don't believe Dr. Wu didn't like you; is
17  that right?
18   A.   He didn't want me where I was, right.
19   Q.   So why do you believe that?
20   A.   I don't know.  I don't know.  I don't
21  know.  I, I do believe Dr. Wu liked me, and
22  I liked him, you know, when things were
23  good.
24   Q.   So --

RUTH V. BRIGGS

Page 281

1    A.   So I don't think he disliked me.  I
2   just think he...
3    Q.   Do you think he just wanted you to
4   perform different functions in your job?
5    A.   Right.  But without telling me; so I
6   was kind of like working in the dark.
7    Q.   So there were miscommunications
8   about -- you felt there were
9   miscommunications about what he wanted you
10  to do and what you felt he wanted you to do?
11   A.   Yes.
12   Q.   But --
13   A.   I was in a different building.
14   Q.   Right.  But you, you did feel that
15  you liked him personally and he liked you
16  personally?
17   A.   Yes.
18   Q.   There were just misunderstandings
19  about your work assignments?
20   A.   Exactly, and my role.
21   Q.   And your role.
22       And am I correct that you don't know
23  why there were misunderstandings about your
24  role?

Page 282

1    A.   I can tell you what I think --
2    Q.   Sure.
3    A.   -- is the reason.  Well, being in
4   another building doesn't help.  Uhm, getting
5   emails like "do this," "do" -- I mean, it
6   was not clear, and then it would change and
7   then it would be he'd, you know, change it,
8   "Judy, you do it."  It just flipped around
9   all the time.
10       And I was always called off of
11  something I was doing without -- oh, I
12  always went, "I'll do it.  I'll do it."
13   Q.   Did he -- is he somebody who has high
14  demands of people who work for him?
15   A.   Uhm, yes, he does.  His faculty.  Not
16  all staff, but his faculty.
17   Q.   And he -- is it fair to say he
18  expects a lot of his employees?
19   A.   Some, yeah.
20   Q.   Uhm, and you say "some."
21       Does he not expect --
22   A.   He protected some.
23   Q.   -- a lot from other employees?
24   A.   Yeah, yeah.  He protected some

Page 283

1   people.
2    Q.   So who did he protect?
3    A.   He protected Judy from -- and I
4   wanted to -- myself, I didn't want to see
5   Judy lose her job either.
6    Q.   Why do you feel he protected Judy?
7    A.   Because he just -- you know, he
8   allowed her, he -- I kept saying, "Dr. Wu,
9   she needs training.  She needs to go to
10  computer classes."
11   Q.   And in what way did he protect her?
12   A.   He said, "I think the computer" --
13  "the typewriter is cute."
14   Q.   And --
15   A.   "Cute" is the word he used.
16   Q.   Do you know how long Judy worked for
17  Dr. Wu?
18   A.   Well, Dr. Wu -- she's been in that
19  department for, I -- you know, from high
20  school or Temple from high school; so she
21  just recently retired, I guess.  But I don't
22  know.  I mean, the whole -- she was there
23  when he came in.  So when he was recruited
24  by Dr. Dai, who I was part of, you know,

Page 284

1   doing his travel, he, uhm -- she was already
2   there.
3    Q.   So Judy --
4    A.   So he inherited her.
5    Q.   Okay.  So Judy was with Dr. Wu from
6   the start of Dr. Wu's employment --
7    A.   Yes.
8    Q.   -- at Temple?
9    A.   Yes.
10   Q.   And anyone else that you felt Dr. Wu
11  protected other than Judy?
12   A.   When Alexandra Grinshpun was there.
13  It wasn't protection.  It was just not --
14  letting stuff slide, but yelling at me all
15  the time about that.
16   Q.   So your opinion was that he let stuff
17  slide for Judy and Alexandra but not for
18  you?
19   A.   Right.
20   Q.   And how old is Judy?
21   A.   Oh, geeze.  She's older than me.  I
22  would say she's 65, maybe.
23   Q.   And how old was Alexandra?
24   A.   Forty-ish.  She had small children,

71  (Pages 281 to 284)

RUTH V. BRIGGS

Page 285

1  so I'm just guessing.
2  Q.   And let me correct that both Judy and
3  Alexandra are both women?
4  A.   Yes.
5  Q.   Anyone else that you felt Dr. Wu
6  protected?
7  A.   Jackie Harriz; Hailey King; Laurie
8  Shteir.
9  Q.   Anyone else?
10  A.   Tom Stauffer.  I mean, there was some
11  pretty serious mistakes no one ever got in
12  trouble for, and that's why I was surprised.
13  Q.   Are you aware of anyone else who
14  worked in Dr. Wu's office who failed to book
15  travel arrangements for a visiting
16  candidate?
17  A.   No, I am not aware of anyone.
18  Q.   How old is Jackie Harriz?
19  A.   Well, she retired from Temple, so I'm
20  guessing.  I don't know, 60-ish, 65.
21  Q.   How old is Hailey King?
22  A.   In her late 20s, early 30s.
23  Q.   How old was Laurie Shteir?
24  A.   Fifty-ish.

Page 286

1  Q.   How old was Tom Stauffer?
2  A.   Forty-ish.
3  Q.   Anyone else that you felt Dr. Wu
4  tried to protect?
5  A.   Not that comes to mind, no.
6  Q.   You said that, uhm -- Dr. Gi (sic),
7  is that correct, the assistant chair?
8  A.   (No response.)
9  Q.   You said that --
10  MR. MUNSHI:  Shi?
11  THE WITNESS:  Shi?
12  MS. FENDELL-SATINSKY:  Shi.
13  THE WITNESS:  Oh, Dr., yeah,
14  Justin Shi, yeah.
15  MS. FENDELL-SATINSKY:  Thank
16  you.
17  THE WITNESS:  Uh-huh.
18  BY MS. FENDELL-SATINSKY:
19  Q.   You said that Dr. Shi told you that
20  Dr. Wu wanted a secretary?
21  A.   No.  He said, "He just wants you to
22  not give feedback, not make suggestions.
23  Don't ask any questions.  Just do as he
24  says."  So if I ask him to clarify

Page 287

1  something, that was challenging him.
2  Q.   Did you ask Dr. Shi for input or did
3  Dr. --
4  A.   I did.  I did.
5  MR. MUNSHI:  Just wait until
6  she's done --
7  THE WITNESS:  I'm sorry.
8  MR. MUNSHI:  -- asking the
9  question.
10  BY MS. FENDELL-SATINSKY:
11  Q.   So you asked Dr. Shi for input?
12  A.   Yes.
13  Q.   And this is -- what you just
14  testified to is what Dr. Shi told you?
15  A.   Yes.
16  Q.   Do you know why Dr. Wu did not want
17  you to give feedback or make suggestions?
18  A.   I don't.
19  Q.   After receiving the disciplinary
20  report at D-13, did you understand that you
21  were on probation for a year and that any
22  further Level C infraction could lead to the
23  end of your employment at Temple?
24  A.   Yes, I did.

Page 288

1       - - -
2  (Whereupon, 11/20/13 email
3  string, Bates No. TEMPLE0000658-659,
4  was marked as D Exhibit No. 4 for
5  identification.)
6       - - -
7  BY MS. FENDELL-SATINSKY:
8  Q.   Ms. Briggs, the court reporter has
9  given you a document that's been marked as
10  D-14.
11  A.   Okay.
12  Q.   Can you read this document and let me
13  know if you've seen it before.
14  A.   (Witness complies with request.)
15  I do.  Dr. Wu's letter to me, emailed
16  to me, I understand that.
17  Q.   And you've seen that before, correct?
18  A.   Yes.  Yes, I have.
19  Q.   And is this email accurate in that
20  you had had several discussions with Dr. Wu
21  and Drew about not using Dr. Wu's credit
22  card for departmental usage?
23  A.   That is true.
24  Q.   And so then Dr. Wu here in D-14 was

72 (Pages 285 to 288)

Page 289

1  sending you a written --
2      A.  Right.
3      Q.  -- reminder of that; is that correct?
4      A.  That is correct.  But I didn't make
5  these charges.
6      Q.  But it is accurate that you've had
7  several meetings with -- you had had several
8  meetings with Dr. Wu and Drew regarding not
9  using Dr. Wu's credit card for departmental
10  usage?
11     A.  That is correct.  And these were made
12  by someone else, I want you to know.  His
13  card number everyone had.
14     Q.  Did you monitor his credit card bills
15  as part of your job?
16     A.  I did.
17     Q.  And did you tell him when there were
18  charges to his credit card that shouldn't
19  appear?
20     A.  I did.
21     Q.  Following the suspension notice that
22  was D-13 --
23     A.  D -- okay.
24     Q.  -- between then and the end of your

Page 290

1  employment at Temple, did Dr. Wu and
2  Mr. DiMeo address other performance issues
3  with you?
4      A.  Yes; Monday, Wednesday, and Friday
5  mornings.
6      Q.  Was one of the things they spoke with
7  you about your delay in responding to
8  communications?
9      A.  To, to whom?
10     Q.  Sure.  So you told me that Dr. Wu and
11  Mr. DiMeo spoke with you about other
12  performance issues between your suspension
13  notice and the end of your employment at
14  Temple, correct?
15     A.  Yes.
16     Q.  So I asked if one of the things they
17  spoke with you about was your delay in
18  responding to communications.
19     A.  He did.  But I didn't delay.  I don't
20  believe I delayed.  Five minutes I don't
21  think, is his email, is not a delay.
22             - - -
23         (Whereupon, 11/20/13 email
24      regarding another example, Bates No.

Page 291

1  TEMPLE0000666-670, was marked as D
2  Exhibit No. 15 for identification.)
3             - - -
4         THE WITNESS:  Thank you.
5  BY MS. FENDELL-SATINSKY:
6      Q.  So take a look at this document.
7  And, again I'm going to ask you if you've
8  ever seen it before.
9      A.  No, I have not.
10     Q.  Take a look through the whole
11  document, and let me know if you've ever
12  seen it before.
13     A.  (Witness complies with request.)
14         Okay, say your question.
15     Q.  Does this refresh your recollection
16  that there were instances in which you had
17  delayed communications and Dr. Wu spoke with
18  you about it between the time of your
19  suspension and the end of your employment at
20  Temple?
21     A.  Specifically, I don't recall this
22  incident, but I see it here, yes.
23     Q.  And seeing it, does that refresh your
24  recollection at all that --

Page 292

1      A.  It does.
2      Q.  -- there were instances -- let me
3  finish my question.
4         Does seeing this exhibit at D-15
5  refresh your recollection that there were
6  instances in which you were delayed in
7  responding to communications?
8      A.  I don't know where my -- I don't see
9  my emails to Ms. Hecht, or his response to
10  me, "When do you want to go?"
11     Q.  So my question is a little bit
12  different.
13         MS. FENDELL-SATINSKY:  Could
14      you read back my question, please.
15         THE COURT REPORTER:  Uh-huh.
16         MS. FENDELL-SATINSKY:  Thank
17      you.
18             - - -
19         (Whereupon, the court reporter
20      read back the following question:
21         Q  Does seeing this exhibit at
22      D-15 refresh your recollection that
23      there were instances in which you
24      were delayed in responding to

RUTH V. BRIGGS

Page 293

1    communications?)
2             - - -
3         THE WITNESS:  Isn't that like,
4    "When did you stop beating your
5    wife"?  I mean, I'm sorry, but
6    you're asking me if it's true that
7    the communications were delayed or
8    Dr. Wu accused me?  I'm not --
9         MS. FENDELL-SATINSKY:  No.
10   BY MS. FENDELL-SATINSKY:
11   Q.   I'm going to ask the court
12   reporter --
13   A.   I --
14   Q.   I'm going to ask the court reporter
15   to read back my --
16   A.   Okay.
17   Q.   -- question again.
18        MR. MUNSHI:  And if you don't
19   understand the question, just say
20   you don't understand the question.
21        MS. FENDELL-SATINSKY:  And,
22   Ms. Briggs, as I've told you
23   throughout this deposition, if you
24   don't understand a question, I don't

Page 294

1    want me to tell you that.
2         Rahul, I'm going to ask you --
3         THE WITNESS:  Okay.
4         MS. FENDELL-SATINSKY:  -- to
5    stop telling the witness that if she
6    doesn't understand the question she
7    should tell me that.  I've given her
8    that instruction numerous times
9    today, and she's indicated she
10   understands that instruction.
11        MR. MUNSHI:  Fine.  Now you
12   remember.
13            - - -
14        (Whereupon, the court reporter
15   read back the following question:
16        Q  Does seeing this exhibit at
17   D-15 refresh your recollection that
18   there were instances in which you
19   were delayed in responding to
20   communications?)
21            - - -
22        THE WITNESS:  No.
23   BY MS. FENDELL-SATINSKY:
24   Q.   You mentioned earlier that you had

Page 295

1    three-times-a-week meetings with Andrew
2    DiMeo and Dr. Wu; is that correct?
3    A.   That is correct.
4    Q.   And when did those meetings start?
5    A.   I think they started probably the
6    fall of 2013.
7    Q.   Did those meetings start after you
8    spoke with Mr. Wacker about needing somebody
9    or wanting somebody to help "mediate," I
10   think were your words, between you and
11   Dr. Wu?
12   A.   Actually, I didn't ask Greg.  I asked
13   Deirdre.  But I -- these -- the meetings
14   started out more as like let's go over
15   what's going on in the department.  They
16   started out as informative, no problem at
17   all.
18        So, that's not how they started out.
19   It's just the tone of them changed, the door
20   was shut, and, you know, staff are like,
21   "What's going on with Ruth?"  I -- they just
22   changed in tone to be -- to being, you know,
23   confrontive.  It really wasn't about what's
24   going on in the department.  It's like where

Page 296

1    did you do something wrong.
2    Q.   You told me earlier that you -- one
3    of the reasons that you believe Mr. Wacker
4    created a hostile work environment for you
5    was because he did not respond to your
6    requests for help to mediate between
7    yourself and Dr. Wu; is that correct?
8    A.   Okay, all right.  But that was when
9    the -- yes, okay, you're right.
10   Q.   Okay.  So that's correct?
11   A.   That is correct.
12   Q.   And so following that request, did
13   these meetings with Mr. DiMeo and Dr. Wu
14   start?
15   A.   No.  They had started before that.
16   Q.   So the meetings with Mr. DiMeo and
17   Dr. Wu started before you asked for someone
18   to mediate between you and Dr. Wu to
19   Mr. Wacker?
20   A.   Yes.
21   Q.   When did you make that request to
22   Mr. Wacker?
23   A.   I don't know the date.
24   Q.   Was it an oral request or a written

74 (Pages 293 to 296)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 297

1  request?
2      A.  I think it was -- I think I did it in
3  email.  But I'm guessing.  I have to look.
4      Q.  If you did it in an email, would that
5  he one of the emails that you would have
6  imported into your gmail?
7      A.  Yeah, it would have been, probably.
8      Q.  Okay.  And I will tell you that we
9  don't have that email.
10     A.  Okay.
11     Q.  So, again, if you can look for that
12 email.  And if it exists, give it to your
13 attorney, please.
14         You said that, the meetings, the door
15 began to close at meetings; is that correct?
16     A.  Yes.
17     Q.  Where were the meetings held?
18     A.  In his office, Dr. Wu's office.
19     Q.  Were all of the meetings held in
20 Dr. Wu's office?
21     A.  Yes.
22     Q.  And the way the office was set up,
23 could other people see and hear things from
24 Dr. Wu's office if the door was open?

Page 298

1      A.  If the door was open, they could hear
2  and see.  If the door was closed, they could
3  hear.
4      Q.  How could they hear if the door was
5  closed?
6      A.  Yell.
7      Q.  So they could hear if he yelled.
8  But, otherwise, could they hear what was
9  going on in Dr. Wu's office?
10     A.  Yes.  And the only reason I know is
11 that people would come up and tell me they
12 were sorry and they felt bad for me.  I'm
13 like, "I didn't know you could hear that."
14     Q.  Why did people come up and say they
15 were sorry and felt bad for you?
16         MR. MUNSHI:  Just objection to
17 form.
18         You can answer it if you
19 understand.
20         THE WITNESS:  I --
21 BY MS. FENDELL-SATINSKY:
22     Q.  You testified that people came up to
23 you and said they were sorry and felt bad
24 for you, correct?

Page 299

1      A.  Yes.
2      Q.  Why did -- do you know why those
3  people came up to you?
4      A.  Because two of them are faculty,
5  young faculty members.  They said it feels
6  so uncomfortable to hear it.
7      Q.  What did they tell you they were
8  hearing?
9      A.  Him yelling at me.
10     Q.  About what?
11     A.  Anything.  "Get me a coffee" or, you
12 know, maybe something about this
13 (indicating).
14     Q.  Do you know what they heard you
15 yelling about, or are you guessing?
16         I'm sorry.  Do you know what they
17 heard Dr. Wu yelling about --
18     A.  They knew that --
19     Q.  -- or are you guessing?
20     A.  I don't know if they knew the
21 content, but they could tell by the, by the
22 tone that it was, you know, it was harsh.
23     Q.  Did they tell you what they felt what
24 Dr. Wu --

Page 300

1      A.  No.
2      Q.  Let me step back.
3         Did they tell you what they heard
4  Dr. Wu yelling about?
5      A.  They did not say that.
6      Q.  Other than the two faculty, did
7  anyone tell you that they heard any
8  discussions between Dr. -- between you and
9  Dr. Wu in Dr. Wu's office?
10     A.  Some of the PhD candidates.
11     Q.  How many?
12     A.  Ten, maybe.
13     Q.  Did they tell you what they heard
14 between you and Dr. Wu in Dr. Wu's office?
15     A.  Not the -- no.
16     Q.  What did they tell you?
17     A.  "Why does he yell at you all the
18 time?"
19     Q.  And did they express that he too had
20 yelled at them?
21     A.  They weren't his graduate students,
22 so, no, they did not.
23     Q.  So he only yelled at his graduate
24 students?

75 (Pages 297 to 300)

RUTH V. BRIGGS

Page 301

1    A.   Yes.
2          MR. MUNSHI:  Could we take two
3    minutes at a good time?
4          MS. FENDELL-SATINSKY:  I am
5    just in the middle of a question, a
6    series of questions.
7          MR. MUNSHI:  That's why I said
8    "at a good time."
9          MS. FENDELL-SATINSKY:  Okay.
10   Oh, I thought you said --
11         MR. MUNSHI:  At a good -- I'll
12   say:  At a good time, can you let us
13   know?
14         MS. FENDELL-SATINSKY:  Sure.
15         MR. MUNSHI:  We can take two
16   minutes then.
17         MS. FENDELL-SATINSKY:  Sure.
18   BY MS. FENDELL-SATINSKY:
19   Q.   Do you believe it's appropriate to
20   discuss performance issues or errors in an
21   open-door meeting?
22   A.   No.
23   Q.   And do you believe it's more
24   appropriate to discuss those type of issues

Page 302

1    in a closed-door meeting?
2    A.   Closed-door.
3    Q.   And having a closed-door meeting also
4    gives more privacy, correct?
5    A.   For a meeting as you said, yes.
6    Q.   Well, it gives more privacy because
7    people can't see in, right?
8    A.   They can't see, right.
9    Q.   And it's -- I understand your
10   testimony is that Dr. Wu yelled, so people
11   could hear him, but it's harder to hear in a
12   closed-door --
13   A.   Exactly, yes.
14   Q.   -- meeting than an open-door meeting?
15   A.   Uh-huh.  Yes, I agree with you.
16   Q.   Were the meetings partially intended
17   to improve communications?
18         MR. MUNSHI:  Just objection to
19   form.
20         MS. FENDELL-SATINSKY:  Between
21   you and Dr. Wu.
22         MR. MUNSHI:  Objection to
23   form.
24         Go ahead.

Page 303

1    BY MS. FENDELL-SATINSKY:
2    Q.   Did you understand that the meetings
3    were partially intended to help improve
4    communications between --
5    A.   That's what I was told.
6    Q.   -- you and Dr. Wu?
7    A.   Yes.  That's what I was told.
8    Q.   And who told you that?
9    A.   Greg and Drew.
10   Q.   And you said during the meetings Drew
11   and Dr. Wu would discuss performance issues;
12   is that right?
13   A.   Yeah.
14   Q.   And did they identify performance
15   issues during the meetings?
16   A.   Yeah.
17   Q.   And by identifying the performance
18   issues, did you understand those were areas
19   in which they expected improvement from you?
20   A.   Yes.
21         MS. FENDELL-SATINSKY:  We can
22   take a quick break.
23         MR. MUNSHI:  Thank you.
24         THE VIDEOGRAPHER:  This

Page 304

1    concludes video No. 3.  We're going
2    off the record at 3:17.
3          - - -
4          (Whereupon, a brief recess was
5    taken from 3:17 until 3:26 p.m.)
6          - - -
7          THE VIDEOGRAPHER:  The time is
8    3:26.
9          Back on the record.
10   BY MS. FENDELL-SATINSKY:
11   Q.   Ms. Briggs, in January of 2014, did
12   you receive a disciplinary report?
13   A.   January of 2014?
14   Q.   Yes.
15   A.   I know of all of them.  I just don't
16   know the dates.
17   Q.   Okay.
18         - - -
19         (Whereupon, 1/20/14
20   disciplinary report, Bates No.
21   TEMPLE0170, was marked as D Exhibit
22   No. 16 for identification.)
23         - - -
24

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 305

BY MS. FENDELL-SATINSKY:
1. Q. Have you seen this document marked as
2. D-16 before?
3. A. Yes, I have.
4. Q. And is this a disciplinary report
5. from January 20th, 2014 from Dr. Wu to you?
6. A. Correct.
7. Q. If you look down at the bottom where
8. it says "employee signature," is that your
9. name and your signature?
10. A. That is my name, yes.
11. Q. And your signature?
12. A. Uh-huh.
13. Q. Is that a "yes"?
14. A. Yes. I'm sorry.
15. Q. And below you, is that Andrew DiMeo's
16. name and signature?
17. A. That -- uh, it is. I can't justify
18. to whether it's his, but that is what it
19. says.
20. Q. Did Mr. DiMeo meet with you to issue
21. this discipline?
22. A. I don't know, because I can't
23. remember what it was for. This -- there was

Page 306

1. no explanation.
2. Q. Did this discipline relate to the
3. incident you discussed earlier when you
4. overslept?
5. A. Okay. Then he did come to the
6. office. He came up to my office.
7. Q. Mr. DiMeo?
8. A. Yes.
9. Q. And did he come with Mr. Wu?
10. A. No.
11. Q. Just Mr. DiMeo?
12. A. Yes.
13. Q. But this discipline resulted from the
14. incident you discussed earlier when you
15. overslept for three hours, correct?
16. A. Yes.
17. Q. And you understood that this was a
18. violation -- uhm, I'm sorry.
19. You understood that this was a Type B
20. violation, correct?
21. A. Yes.
22. Q. And that this was a written warning?
23. A. Yes.
24. Q. Was there anything about the incident

Page 307

1. in which you overslept and reported to work
2. three hours late that we have not discussed?
3. A. Could you, could you --
4. Q. Sure. So, earlier you testified
5. about an instance in which you reported to
6. work three hours late.
7. A. Right.
8. Q. Because you overslept, correct?
9. A. Correct.
10. Q. And that's what this discipline that
11. was marked as D-16 was for, correct?
12. A. Correct.
13. Q. So I was asking whether there's
14. anything related to the incident that
15. resulted in the discipline at D-16 that we
16. have not talked about.
17. A. Yes.
18. Q. What?
19. A. I was basically called a liar. No
20. one would even contact -- when they talk
21. about there being procedures and protocol,
22. there was no protocol in that department.
23. Q. Did you ever observe anyone in your
24. office reporting to work three hours late

Page 308

1. without informing somebody else in the
2. office?
3. A. I don't know if it was three hours.
4. I know someone who didn't come in for three
5. days.
6. Q. Without reporting that they --
7. A. Without reporting.
8. Q. -- were going to be out?
9. A. Yup.
10. Q. Who was that?
11. A. Hailey King.
12. Q. Do you know of the circumstances why
13. Ms. King did not report to work for three
14. days?
15. A. Well, she didn't call -- no, I don't,
16. no. Dr. Wu was traveling at the time and...
17. Q. Do you know if she had previously
18. spoken with Dr. Wu about that?
19. A. She did not.
20. Q. How do you know that?
21. A. Because Dr. Wu didn't know about it,
22. he said.
23. Q. Do you know if Ms. King was ill?
24. A. I didn't ask her. She was pretty

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 309

1 new. I didn't ask her.
2     Q.   Did you ask -- did you know if
3 Ms. King had an emergency?
4     A.   I don't know.
5     Q.   So you don't know why Ms. King was --
6 did not report to work for three days?
7     A.   No, I don't.
8     Q.   Okay. Was there anyone else who
9 reported to work three hours late and did
10 not report that they were going to be three
11 hours late?
12     A.   Three hours or just --
13     Q.   Yes.
14     A.   -- tardiness?
15          Okay. I don't know of anyone, but
16 I'm not nosey.
17     Q.   And who called you a liar?
18     A.   I can't say that anybody called me a
19 liar. They said I was lying.
20     Q.   About what?
21     A.   About Dr. Wu's accusations.
22     Q.   About what?
23     A.   About all of these emails.
24     Q.   Okay. So, I am focused right now --

Page 310

1     A.   On the, on the, I'm sorry, the
2 disciplines.
3     Q.   So I'm focused right now just on the
4 incident in which you overslept for three
5 hours and reported to work late.
6     A.   Right.
7     Q.   Okay? And you testified about that
8 incident earlier, right?
9     A.   Yes.
10     Q.   So my question to you was: Is there
11 anything else about that incident that you
12 did not already testify about?
13     A.   Uhm, no, I don't think so. I was
14 surprised when Drew gave it to me, actually.
15     Q.   Why were you surprised?
16     A.   Because tardiness was and absenteeism
17 was not an issue for me. And I worked till
18 whenever they needed me so that -- even that
19 night I was there till like 9:00 or 10:00.
20     Q.   Do you have an estimate of how many
21 days you called in late or took off work
22 between January 2014 and April 2014?
23     A.   Well, this one.
24     Q.   Okay. So, one.

Page 311

1     A.   There might have been five or ten
2 minutes, but no.
3     Q.   So you, you don't believe that you
4 called in late or took off anytime between
5 January 2014 and April 2014; is that your
6 testimony?
7     A.   Can we do lateness and absentee?
8     Q.   Sure.
9     A.   Okay.
10     Q.   So, do you believe that you were
11 absent, that you were absent anytime between
12 January 2014 and April 2014?
13     A.   I don't recall.
14     Q.   Do you have an estimate of how many
15 days you called in late between January 2014
16 and April 2014?
17     A.   Maybe three times. And I'm talking
18 five or ten minutes.
19     Q.   Was there an incident in which you
20 made an error in booking hotel reservations
21 for a colloquium speaker?
22     A.   Yes.
23     Q.   Tell me about that.
24     A.   I'm sorry?

Page 312

1     Q.   Tell me about that.
2     A.   I booked the reservations at Club
3 Quarters for the speaker as I was told to.
4 Dr. Wu had the date wrong.
5     Q.   So was it your position that the
6 error was not your fault?
7     A.   That one was not my fault.
8     Q.   Did you ever fail to submit Dr. Wu's
9 expense reports in a timely manner?
10     A.   No, I did not.
11     Q.   Your testimony is that you always
12 submitted Dr. Wu's expense --
13     A.   In a timely manner, yes.
14     Q.   It's your testimony that you always
15 submitted Dr. Wu's expense reports in a
16 timely manner?
17     A.   Right.
18     Q.   Is that "yes"?
19     A.   That is "yes."
20     Q.   Is it your testimony that you always
21 submitted Dr. Wu's expense reports within
22 the time that he requested they be
23 completed?
24     A.   No, I did not.

78 (Pages 309 to 312)

RUTH V. BRIGGS

Page 313

1    Q.   So there were instances in which you
2  did not complete Dr. Wu's expense reports
3  within the time Dr. Wu wanted you to
4  complete them?
5    A.   That is correct.
6    Q.   And we talked about earlier expense
7  reports were a part of your job
8  responsibilities in working for Dr. Wu,
9  right?
10   A.   Yes.  I did them.
11   Q.   Just not on time.
12   A.   Not in three hours, no.
13   Q.   Your employment with Temple ended on
14  April 1st, 2014; is that correct?
15   A.   That is correct.
16   Q.   Do you recall an incident in March of
17  2014 when you were instructed to complete a
18  travel reimbursement expense for Dr. Wu by
19  the end of the day?
20   A.   Not specifically, but there are
21  times, yes, uh-huh.
22   Q.   Do you -- during the meetings you had
23  with Drew and Dr. Wu, did you become
24  argumentative in any of those meetings?

Page 314

1    A.   In the end, I did.  I hadn't -- I
2  felt -- they were lying about me, and no one
3  would listen to me.  H.R. wouldn't listen to
4  me.  No one would listen to me.
5    Q.   What were they lying about?
6    A.   Well, they were saying I didn't call
7  in on that day that I was three hours late,
8  which is not the truth.  I asked them to
9  please investigate it, I'm not lying, and
10  they said they wouldn't.
11   Q.   And on that day when you were three
12  hours late, you didn't call in until you
13  were three hours late, correct?
14   A.   As soon as I got up.  And I came to
15  work immediately.  I mean, I was there to
16  work in ten minutes.
17   Q.   And that was three hours after you
18  were due to report to work, correct?
19   A.   Yes.
20   Q.   And you did not call in until you
21  woke up, which was three hours late?
22   A.   That is correct.
23   Q.   Anything else that you told Drew and
24  Dr. Wu were calling you a liar about?

Page 315

1    A.   Well, one of them is that they
2  wouldn't -- that I had called in.  They kept
3  saying I didn't.  I said, "I did call in."
4    Q.   And --
5    A.   And it was their word against mine.
6    Q.   You said that when you called in you
7  reported it to a student worker, correct?
8    A.   That's the only person who was there.
9    Q.   Anything else that you felt Drew and
10  Dr. Wu were lying about with regard to?
11   A.   I don't believe that it was Drew
12  doing it intentionally to me.  I will say
13  that first.  But looking at these emails, I
14  don't -- I can -- him forwarding an email
15  saying I didn't complete something when he
16  didn't answer my question makes it look out
17  to me -- that is just what -- the general
18  way it went for me.
19   Q.   Why did you believe Dr. Wu was
20  calling you a liar?
21   A.   I really believe he just wanted me to
22  go, disappear.
23   Q.   And is that because you believed that
24  he wanted you to do different tasks than you

Page 316

1  wanted --
2    A.   Not at all.
3    Q.   -- to do, as testified?
4    A.   Oh, no, not at all.
5    Q.   So why do you believe he wanted you
6  gone?
7    A.   I can't answer for him.  I'm sorry.
8    Q.   You don't know why?
9    A.   I don't know why.
10   Q.   And you don't have a belief as to
11  why?
12   A.   I do.
13   Q.   Okay.  So what's your belief?
14   A.   I knew that when I got that first,
15  that three-day suspension, that I could not
16  bid on another job.  And I had tried
17  desperately to get -- I didn't want to be
18  there if he didn't want me there either.
19  You know, I even said to him, "Dr. Wu, if
20  you don't want me here, help me get out.  If
21  you don't want me here, I don't want to be
22  here."
23      But I couldn't bid on jobs when I was
24  on probation.  Deirdre finally lifted it

RUTH V. BRIGGS

| Page 317 | Page 319 |
|---|---|

**Page 317**

1  after about -- after I got that, that other
2  one, then it added another year to it.  So
3  she lifted that so I could apply for jobs,
4  but for a year I couldn't apply for jobs.
5  And that's what Greg was telling me, "Apply
6  for jobs."
7       I'm like, "I can't."
8   Q.   And that's why you believe Dr. Wu
9  wanted you out?
10   A.   Well, if there's enough -- if you
11  have enough disciplinary reports, you
12  just -- that's what the rule book says.
13   Q.   Right.  My question was why do you
14  believe Dr. Wu wanted you out, and you said
15  you couldn't answer that question.
16   A.   I don't know what's in his head.
17   Q.   Okay.  So my question was:  Why do
18  you believe he wanted you out?
19   A.   I don't know.
20   Q.   So you don't have any belief as to
21  why he wanted you out?
22   A.   I do.
23   Q.   Okay.  So, again, for the third time
24  I have asked to you tell me.

**Page 318**

1   A.   Do I have to say?  I mean, it's
2  personal.  Is it really part of the
3  testimony that I believe he didn't like me?
4  I mean, is that important?
5   Q.   It is, actually, Ms. Briggs.  You've
6  brought a lawsuit against --
7   A.   I do believe that he didn't --
8   Q.   -- against --
9   A.   -- like me.
10   Q.   Let me finish.
11       You've brought a lawsuit against
12  Temple University.  It's a serious
13  allegation in federal court.  I'm entitled
14  to ask you questions today unless your
15  attorney directs you not to --
16   A.   Okay.
17   Q.   -- answer the questions --
18   A.   I'm sorry.
19   Q.   -- under limited circumstances.
20   A.   I'm sorry.
21   Q.   So you do have to answer my
22  question --
23   A.   Okay.
24   Q.   -- as asked.

**Page 319**

1       Again, for the third or fourth time,
2  my question is:  Why do you believe that
3  Dr. Wu wanted you out?  And, again, those
4  are your words.
5   A.   I believe he wanted a younger
6  secretary that wasn't as problematic to his
7  budget, and it seemed likely that it be
8  Ruth.  I was the only one who wasn't in a
9  union in the department, and I had no
10  recourse.
11   Q.   So you believe that he wanted a
12  younger secretary?
13   A.   He wanted a secretary, right.
14   Q.   He wanted a secretary.
15   A.   A secretary, yes.
16   Q.   And you were not a secretary,
17  correct?
18   A.   I am not a secretary.
19   Q.   So you believe he wanted somebody in
20  a different role than you?
21   A.   I do.
22   Q.   And somebody who cost less than you
23  cost?
24   A.   Yes.

**Page 320**

1   Q.   Is there any other reasons that you
2  believed that Dr. Wu wanted you out?
3   A.   No.
4   Q.   Ultimately, you resigned from Temple,
5  correct?
6   A.   Under duress.  I was given a chance
7  to be terminated or submit my resignation.
8   Q.   So you were given a choice, correct?
9   A.   Yes.
10   Q.   And you chose resignation, correct?
11   A.   I did.  And the reason is that
12  Deirdre said I could continue to bid on
13  internal jobs at Temple.
14          - - -
15       (Whereupon, 4/3/14 resignation
16  email, Bates No. TEMPLE0088, was
17  marked as D Exhibit No. 17 for
18  identification.)
19          - - -
20       THE COURT REPORTER:
21  Seventeen.
22  BY MS. FENDELL-SATINSKY:
23   Q.   Ms. Briggs, have you seen this
24  document before?

80 (Pages 317 to 320)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 321

1    A.    Yes.
2    Q.    And is this your resignation letter?
3    A.    Yes, it is.
4    Q.    This is dated April 3rd, 2014,
5    correct?
6    A.    That is correct.
7    Q.    And it indicates that your
8    resignation is effective April 1st, 2014,
9    correct?
10   A.    That is correct.
11   Q.    The fact that you resigned from
12   Temple, has that enabled you to tell
13   potential employers that you resigned?
14   A.    I only had two interviews since then,
15   and it came up and I said I resigned. One
16   of them was internal, and one was at the
17   Community College of Philadelphia.
18   Q.    In connection with your resignation,
19   were you told that no challenges would be
20   made to your application for Unemployment
21   Compensation?
22   A.    When I asked a question, yes, Deirdre
23   told me that it fell on Temple. If they say
24   that they are going to agree to it, then

Page 322

1    that's where the appeal thing starts.
2    Q.    And did Deirdre tell you that no
3    challenge would be made to your request?
4    A.    She did tell me that.
5    Q.    And was no challenge, in fact, made?
6    A.    No challenge was made, but they also
7    told me to write down that I resigned.
8    Q.    Did you ultimately receive
9    Unemployment Compensation?
10   A.    Uhm, after appeal.
11   Q.    But you ultimately received
12   Unemployment Compensation; is that correct?
13   A.    Yes; about eight weeks afterwards.
14   Q.    And the Unemployment Compensation you
15   received, was that backdated? So did you
16   receive it going back --
17   A.    It was back --
18   Q.    -- to the time of --
19   A.    Yes, it was.
20   Q.    -- your resignation?
21   A.    Yes, it was.
22                  - - -
23            (Whereupon, 4/1/14 letter,
24        Bates No. TEMPLE0171, was marked as

Page 323

1            D Exhibit No. 18 for
2            identification.)
3                  - - -
4    BY MS. FENDELL-SATINSKY:
5    Q.    Ms. Briggs, I've given you a document
6    that's been marked as D-18. Again, my first
7    question to you is going to be whether
8    you've seen this document before.
9    A.    Yes, I have.
10   Q.    And this is a letter from Mr. Wacker
11   to you, correct?
12   A.    That's correct.
13   Q.    Did Mr. Wacker give you this letter
14   in-person?
15   A.    Yes.
16   Q.    Was there anyone else in the meeting
17   for --
18   A.    Deirdre Walton.
19   Q.    Let me finish my question.
20   A.    I'm sorry.
21   Q.    Was there anyone else in the meeting
22   with Dr. -- with Mr. Wacker when he gave you
23   D-18?
24   A.    Deirdre Walton.

Page 324

1    Q.    Anyone else?
2    A.    No.
3    Q.    Where was the meeting?
4    A.    It was in the third-floor dean's
5    office conference room in Walkman Hall --
6    no. Conwell, I'm sorry, Conwell.
7    Q.    What were -- were you told there was
8    a purpose to the meeting?
9    A.    No. I didn't...
10   Q.    And what occurred during the meeting?
11   A.    I walked in the room. I didn't see
12   Deirdre immediately. I just -- Greg had
13   called me. When I came in, he said, "Look,
14   we have a meeting. Can you come down?"
15            And I was actually meeting with Sandy
16   Foehl that morning, and I didn't want to
17   cancel the meeting. And I told him I
18   couldn't be there till 10:30.
19            He said, "Well, when you get," you
20   know -- "just come to my office when you get
21   back."
22            So, I did. I'm like, "I'm back."
23            And he said, "Let's go in the
24   conference room."

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 325

1    So I just started walking ahead of
2  him, and he was behind me.  And then I heard
3  Deirdre, and I looked.  I went, "This is
4  probably not an April Fools joke," but...
5    Q.   And so --
6    A.   But then they handed me this letter.
7    Q.   Okay.  And what did they tell you?
8    A.   I can't -- you know what, I cannot
9  remember.  I was shocked.  I was in shock.
10   Q.   So do you not remember any discussion
11  that occurred at that meeting?
12   A.   No.
13   Q.   Is it your testimony that the only
14  thing you recall about that meeting is where
15  the meeting occurred, going into the
16  meeting, receiving this letter, and who was
17  at the meeting?
18   A.   Yes.  I remember reading the last
19  line of the letter.
20   Q.   Okay.  Is there anything else about
21  the meeting in which you received D-18 that
22  you recall?
23   A.   No.
24   Q.   And this letter states that you were

Page 326

1  in violation of two Category C work rules,
2  correct?
3    A.   Uh-huh.
4    Q.   Is that a "yes"?
5    A.   That is, I'm sorry, yes.
6    Q.   And those violations were related to
7  incidents, the incidents referenced above in
8  the letter in bullet points, correct?
9    A.   Uh-huh.  That -- yes, uh-huh.  Sorry.
10   Q.   And you told me earlier that when you
11  received the March 2013 suspension you
12  understood that you were on probation for a
13  year, correct?
14   A.   Correct.
15   Q.   And you understood then that any
16  further Level C infraction could lead to the
17  end of your employment at Temple, correct?
18   A.   I did know that.  But, quite
19  honestly, I didn't really know it was a
20  Level C until a week later when I got my
21  stuff from the office.
22   Q.   You didn't know that the March
23  2013 --
24   A.   No.  Because I just -- I was --

Page 327

1    Q.   Let me --
2    A.   -- in shock.
3    Q.   -- finish my question.
4    A.   I'm sorry.
5    Q.   Did you not know that the March 2013
6  discipline was a Level C or you did not know
7  that this April 1st letter reflected Level
8  C?
9    A.   The second, the April 1st.
10   Q.   Okay.
11   A.   Oh, was it April 1st?  No, March
12  20th.
13   Q.   This letter is dated April 1st --
14   A.   Oh, but I'm talking about --
15   Q.   -- correct?
16   A.   -- the incident.  Okay.
17   Q.   Okay.  So when you received this
18  letter on April 1st, 2014, did you
19  understand that you were being disciplined
20  for two Level C violations?
21   A.   At the time, no.
22   Q.   And was that part of what you
23  classified as being shocked?
24   A.   Yes.

Page 328

1    Q.   Subsequently, did you come to
2  understand that?
3    A.   Yes.
4    Q.   And you said, I believe - I apologize
5  for asking again - that you were given a
6  copy of this letter at the meeting?
7    A.   Yes.
8    Q.   What did you do when you left the
9  meeting?
10   A.   It was early.  It was like 10:30 in
11  the morning.  I went -- I was told by Greg I
12  could go back to my office and gather my
13  belongings and just needed to turn my keys
14  back in before he left that day.
15   Q.   And did you do that?
16   A.   I did.
17   Q.   And then did you leave the building?
18   A.   I packed my stuff up.  I was there
19  until about 7:00 or 8:00.  I knew not to go
20  on my computer, because I knew that it
21  could, it could be checked.  But, yeah, I
22  was there, and there was no one else there,
23  you know.  I didn't have my keys once I shut
24  my door, but I locked all my stuff in the

ELITE LITIGATION SOLUTIONS, LLC

Page 329

1  room because I couldn't take it home. I
2  didn't have a car.
3      Q.   So you went back to your office, you
4  turned in your keys --
5      A.   At 5:00 or -- well, before Greg left.
6      Q.   So at the end of the day --
7      A.   Yes.
8      Q.   -- you turned in your keys and you
9  locked the door to your office, correct?
10     A.   No. It was open. I continued to
11  work.
12     Q.   So after your meeting with Greg, you
13  continued to work for the whole day?
14     A.   Yes.
15     Q.   What did you do that day?
16     A.   He just told me to get my belongings
17  together. And I had, you know, pictures
18  and, you know, I had stuff. I used to bring
19  stuff for, like, events from my house, so I
20  was gathering stuff together.
21     Q.   So you spent the day gathering things
22  together?
23     A.   Yes. And he also told me to go -- to
24  apply for Unemployment that day.

Page 330

1      Q.   And did you do that?
2      A.   Yes, I did.
3      Q.   And did you appreciate that
4  Mr. Wacker told you that?
5      A.   I appreciated that I had the
6  opportunity to sit there and do it, but he
7  told me to write down that I resigned due to
8  personal reasons, and that's what I put
9  down.
10     Q.   Did you understand that putting down
11  on Unemployment Compensation papers that you
12  resigned -- or what did you understand that
13  putting your resignation down on
14  Unemployment Compensation paperwork do to
15  the Unemployment Compensation process?
16         MR. MUNSHI: Just objection to
17  form.
18         THE WITNESS: Okay. Uhm,
19  every time you say that, I forget
20  the question.
21         MS. FENDELL-SATINSKY: Sure.
22         THE WITNESS: I'm sorry. I'm
23  sorry.
24

Page 331

1  BY MS. FENDELL-SATINSKY:
2      Q.   Did you have an understanding of why
3  Mr. Wacker told you to put down that you
4  resigned on your Unemployment Compensation
5  form?
6      A.   No, I didn't.
7      Q.   Did you ask him why?
8      A.   Yeah. I wanted to know how you got
9  Unemployment. I didn't know what was
10 eligible and...
11     Q.   My question is a little different.
12         I asked: Did you ask Mr. Wacker why
13 he told you to put down that you resigned on
14 the form?
15     A.   No, I didn't.
16     Q.   During that day, did you -- is that
17 when you imported your Temple emails to your
18 gmail emails?
19     A.   No. I had been doing it.
20     Q.   You had been doing that?
21     A.   Like since January, I guess.
22     Q.   So did you do it as you received
23 emails?
24     A.   If, if it applied to me, yes.

Page 332

1      Q.   So as you received emails, you
2  forwarded them -- or, I'm sorry, as you
3  received emails at Temple that you believed
4  were pertinent, you imported them from your
5  Temple email to your gmail?
6      A.   I didn't import them then. I printed
7  them. I had a file in my documents for me,
8  and I just printed them to PDF.
9      Q.   Right. And then when did you import
10 the emails that you printed as PDF into your
11 personal email?
12     A.   I -- it was after I had already left.
13 I still had access to -- you know, I had my
14 Temple ID and I could still use the computer
15 center, and I just asked one of the guys to
16 show me how to import my email.
17     Q.   And did you understand that after you
18 resigned from Temple you were to turn in
19 your badges and access to Temple?
20     A.   My what?
21     Q.   Sure. You said -- how did you get
22 into the work center?
23     A.   I walked. I walked in.
24     Q.   Did you need an ID?

Page 333

1    A.   Well, everyone needed an ID, but I
2  didn't need it to get in.  Is that what you
3  mean?
4    Q.   Well, was it a work center just for
5  people who worked at Temple?
6    A.   Where I -- in where I worked?
7    Q.   No.
8    A.   I don't --
9    Q.   So, you told me that you imported
10  your emails from your Temple email to your
11  gmail --
12    A.   Yes.
13    Q.   -- after your employment with Temple
14  ended.
15    A.   Right.
16    Q.   Correct?
17    A.   Correct.
18    Q.   And while you still had access to
19  your Temple email, correct?
20    A.   Correct.
21    Q.   And you told me you did that by
22  walking into a work center at Temple; is
23  that correct?
24    A.   To the tech center at Temple, right.

Page 334

1    Q.   The tech center at Temple?
2    A.   Uh-huh, right.
3    Q.   And is the tech center something
4  that's accessible to the public?
5    A.   If, if you have -- you have to sign
6  onto a computer with your Temple passcode.
7    Q.   So you need to be affiliated with
8  Temple to access those computers?
9    A.   Yes.
10    Q.   And you asked somebody who worked in
11  the tech --
12    A.   Center.
13    Q.   -- center to help you import your
14  emails?
15    A.   Yes.
16    Q.   Is that correct?
17    A.   That is correct.
18    Q.   And did you tell that person that you
19  worked at Temple?
20    A.   No.  Well, I mean, I assume he knew
21  it.  I mean...
22    Q.   But at that point you didn't work at
23  Temple, right?
24    A.   But I still had access.  Right,

Page 335

1  you're right.
2    Q.   But you assumed that that person knew
3  or believed that you still worked at Temple?
4    A.   I don't know.  I can't...
5    Q.   Did you tell that person you worked
6  at Temple?
7    A.   I don't know.
8    Q.   You don't remember?
9    A.   I don't remember.
10    Q.   You said you understood that
11  resigning enabled you to apply for other
12  jobs at Temple, correct?
13    A.   That's what I was told, yes.
14    Q.   And you did ultimately apply for
15  other jobs at Temple?
16    A.   I did.
17    Q.   The work center that you mentioned,
18  did you understand that to be only for
19  people currently affiliated with Temple?
20    A.   No, I didn't.  I mean, I was still a
21  student there.
22    Q.   You were still a student?  What do
23  you mean?
24    A.   I was taking a class.

Page 336

1    Q.   At that time, you were taking a
2  class?
3    A.   At Tyler, yes.
4    Q.   At Tyler?
5    A.   Well, Tyler is the art school at
6  Temple.
7    Q.   And what class were you enrolled in
8  at that time?
9    A.   Metalwork, metal workshop, metal
10  fabrication workshop.
11    Q.   And do art students have access to
12  that work center?
13    A.   All students, all students, faculty,
14  and staff.
15    Q.   Some of the emails you imported to
16  your gmail from your Temple email related to
17  Dr. Whaley; is that correct?
18    A.   Yes.
19    Q.   Okay.  And do you understand that
20  it's sensitive when candidates come in to
21  interview they don't necessarily want their
22  current institution to know that they're
23  interviewing?
24    A.   Absolutely, yes.

84  (Pages 333 to 336)

RUTH V. BRIGGS

Page 337

1    Q.   And do you believe that's
2    confidential?
3    A.   Yes.
4    Q.   And do you take that seriously?
5    A.   I take it seriously.
6    Q.   Do you understand that Temple had a
7    policy that prohibited you from gaining
8    unauthorized access into a Temple computer?
9    A.   I didn't know that, but what -- you
10   mean after I was let go?
11   Q.   My question was different.
12   A.   Okay.
13   Q.   Do you understand that Temple had a
14   policy that --
15   A.   No, I didn't.
16   Q.   Let me finish my question.
17         Do you understand that Temple had a
18   policy that prohibited unauthorized access
19   of its computer systems?
20   A.   Yes.  I guess I did, yeah.
21   Q.   And computer systems includes emails,
22   correct?
23   A.   Yes.
24   Q.   You understood -- let me step back.

Page 338

1          We talked about one type of
2    confidential information that you had access
3    to during your employment from Dr. Wu, that
4    being information that candidates were
5    coming to interview for faculty positions --
6    A.   Right.
7    Q.   -- correct?
8    A.   Yes.
9    Q.   Did you have access to other types of
10   confidential information in your role as
11   Dr. Wu's executive assistant?
12   A.   Yes.
13   Q.   What other types of information?
14   A.   Promotion and tenure; uhm, salary
15   increases for faculty members; uhm, merit,
16   merit for faculty members.
17   Q.   And you understood the importance of
18   keeping that information confidential?
19   A.   Absolutely, yes, I do.
20   Q.   And there were communications about
21   those subjects through email, correct?
22   A.   About -- just generally?
23   Q.   Were there communications about those
24   subjects --

Page 339

1    A.   Yes.
2    Q.   --through email?
3          And you understood that emails were
4    part of the type of information that had to
5    be protected if there was confidential
6    information?
7    A.   Right.
8    Q.   And you understand the importance of
9    ensuring that the type of information you
10   described is not released outside of those
11   who are permitted to know it, correct?
12   A.   I do.
13   Q.   Ms. Briggs, did -- were there any
14   other occasions in which you went to the
15   work center after your employment at Temple
16   ended?
17   A.   I met with, uhm -- I'm trying to pull
18   his name out.  He was the president of the
19   Alumni Association.  He agreed to net -- to
20   be one of the people I networked with, and I
21   met him there for just a meeting about
22   suggestions about how to network.
23   Q.   Who was that?
24   A.   I'm trying to think of his name right

Page 340

1    now.  It'll come to me in a second.
2    Q.   Did you reach out to him?
3    A.   Actually, he, he found out that I was
4    gone.  He had come in for a meeting and
5    asked.  He just sent me a -- he says, "I
6    hope you're okay.  I heard you're not here
7    anymore."
8    Q.   How did he contact you?
9    A.   By email probably.  I had -- I don't
10   know.
11   Q.   By which email?
12   A.   Well, it had to have been Temple,
13   because I didn't have "rbriggs" until after
14   I was fired.
15   Q.   Why did you continue to access your
16   Temple email after the end of your
17   employment with Temple?
18   A.   Well, I didn't -- I can honestly say
19   to you that I wasn't accessing my email.  I
20   was just getting email that, that was
21   beneficial to my case.  I knew that I was
22   going to -- I was being pushed out.
23   Q.   You --
24   A.   And I was -- it was defense.

85  (Pages 337 to 340)

ELITE LITIGATION SOLUTIONS, LLC

Page 341

1  Q.  You just told me that the Alumni
2  Association president contacted you by email
3  to suggest --
4  A.  Or he called.  I'm not sure if he
5  called or contacted.  You know, he had my
6  number.
7  Q.  So is it your testimony that
8  following the end of your employment at
9  Temple you never read a single email in your
10  Temple email account?
11  A.  Ones I had gotten, I did.
12  Q.  So you did continue to access your
13  email after --
14  A.  Yes.
15  Q.  -- the end of your employment at
16  Temple?
17  A.  But not anything new.  There was
18  nothing really there anyway.
19  Q.  Well, there was maybe an email from
20  the Alumni Association president; is that
21  correct?
22  A.  I'm thinking we talked on the phone.
23  I can't really remember.  There might be.  I
24  can look.

Page 342

1  Q.  Do you know how he would have gotten
2  your personal phone number?
3  A.  Because we were working on a project
4  together.
5  Q.  So he had your personal phone number?
6  A.  He did.  It wasn't unusual in our
7  department for events.
8  Q.  So is -- I just want to be clear.
9     Is it your testimony that you did not
10  open any email that you received subsequent
11  to the end of your employment from Temple
12  after the end of your employment with
13  Temple?
14  A.  I don't -- no, I didn't.  It might
15  have been from my kid, one of my kids
16  personally, but no.
17  Q.  So other than email from your
18  children that was sent to your Temple
19  email --
20  A.  Right.
21  Q.  -- it is your testimony that you
22  didn't open, delete, or do any other
23  activity on your Temple email after your
24  employment ended with Temple?

Page 343

1  A.  That is true, yeah.  After that
2  import, I never accessed it again.  I, I
3  knew.  I, I knew that it was wrong to do
4  that.
5  Q.  So you knew even accessing the emails
6  was wrong?
7  A.  No.  Other -- anything that I had
8  gotten after my termination, that it wasn't
9  my business.
10  Q.  So you said that you never went into
11  your emails again after that one occasion;
12  is that correct?
13  A.  I, I could have looked in that folder
14  for something.
15  Q.  But at that point you would have had
16  the emails on your personal email, so why --
17  A.  I know.
18  Q.  Right.
19  A.  I know.
20  Q.  So why would you have needed to look
21  at your Temple emails then?
22  A.  But that was -- that happened
23  subsequent -- I mean simultaneously.  I
24  mean, I went up, I met with the Help Desk, I

Page 344

1  said, "How do I import these into mine?"  No
2  one said to me, "Don't do it."  I --
3  Q.  Well, did you tell anyone you were a
4  former employee?
5  A.  No.  But -- I didn't, but I think
6  it's still -- I think even if I were still
7  working there you -- I wouldn't take
8  anybody's email.
9  Q.  So you understood -- and correct me
10  if I'm wrong, but you understood it was
11  wrong to access your Temple emails after
12  your employment with Temple ended; is that
13  correct?
14  A.  Yes.
15  Q.  And you -- let me strike that
16  question.
17  A.  I'm not sure I understand anyway.
18      - - -
19      (Whereupon, 6/23/05 PDP, Bates
20  No. TEMPLE UNIVERSITY
21  (R.BRIGGS)-0000224-234, was marked
22  as D Exhibit No. 19 for
23  identification.)
24      - - -

RUTH V. BRIGGS

Page 345

```
1   BY MS. FENDELL-SATINSKY:
2     Q.   Ms. Briggs, take a look at this
3   document.  My first question for you --
4     A.   Uh-huh.
5     Q.   -- is going to be if you've seen this
6   before.
7     A.   Yes.
8     Q.   And is this your 20 -- 2004 to 2005
9   performance review?
10    A.   Correct.
11    Q.   Created by Allen Nicholson?
12    A.   Correct.
13    Q.   And your final rating on this review
14  was a 2.83, correct?
15    A.   Correct.
16    Q.   It's on the first page.
17    A.   I said "yes."
18    Q.   I didn't hear you.
19    A.   Oh, okay.  I'm sorry.
20    Q.   So "yes"?
21    A.   I'm sorry.  "Yes."
22    Q.   Just so it's clear for the record --
23    A.   Okay, sorry.
24    Q.   -- your final rating on this
```

Page 346

```
1   evaluation was 2.83, correct?
2     A.   Yes.
3          I don't know why Dr. Wu's name is on
4   there, though.
5          MR. MUNSHI:  Just wait for the
6   question.
7          THE WITNESS:  Okay.
8          MS. FENDELL-SATINSKY:  I'll
9   tell you I think that's because they
10  all update with the person's --
11         THE WITNESS:  Oh, okay.
12         MS. FENDELL-SATINSKY:  -- last
13  supervisor.
14              - - -
15         (Whereupon, 11/15/05 PDP,
16  Bates No. TEMPLE UNIVERSITY
17  (R.BRIGGS)-0000235-242, was marked
18  as D Exhibit No. 20 for
19  identification.)
20              - - -
21  BY MS. FENDELL-SATINSKY:
22    Q.   I've given you a document that's been
23  marked as D-20.
24    A.   Uh-huh.
```

Page 347

```
1     Q.   Again, my first question for you is
2   going to be whether you've ever seen this
3   before.
4     A.   Yes, I have.
5     Q.   And is this your 2005 to 2006
6   performance review?
7     A.   That's correct.
8     Q.   And this was from Dean --
9     A.   Sadeghipour.
10    Q.   -- Sadeghipour.
11    A.   Uh-huh.
12    Q.   And it's on the second page here, but
13  your final rating on this review was a 2.28,
14  correct?
15    A.   Yes, correct.
16    Q.   And if you look right below that, the
17  performance category ratings go from 0 to 4,
18  correct?
19    A.   That's correct.
20    Q.   And 4 is the highest rating?
21    A.   That's correct.
22    Q.   And 0 is the lowest rating --
23    A.   That is correct.
24    Q.   -- correct?
```

Page 348

```
1     A.   Yes.
2              - - -
3          (Whereupon, 8/17/06 PDP, Bates
4   No. TEMPLE UNIVERSITY
5   (R.BRIGGS)-0000243-251, was marked
6   as D Exhibit No. 21 for
7   identification.)
8              - - -
9   BY MS. FENDELL-SATINSKY:
10    Q.   Ms. Briggs, the court reporter has
11  given you a --
12    A.   I'm sorry.
13    Q.   -- document that's --
14    A.   I'm sorry.
15    Q.   -- marked as D-21.
16    A.   Uh-huh.
17    Q.   And I have the same question for you,
18  which is if you've ever seen this document
19  before.
20    A.   Yes, I have.
21    Q.   And is this your 2006 to 2007
22  performance review?
23    A.   That is.
24    Q.   And that was created by
```

87 (Pages 345 to 348)

RUTH V. BRIGGS

Page 349

1   George Palladino?
2   A.   That's correct.
3   Q.   And your final rating on this review
4   was a 2.09, correct?
5   A.   That is correct.
6                - - -
7            (Whereupon, 2/25/08 PDP, Bates
8        No. TEMPLE UNIVERSITY
9        (R.BRIGGS)-0000252-258, was marked
10       as D Exhibit No. 22 for
11       identification.)
12               - - -
13   BY MS. FENDELL-SATINSKY:
14   Q.   Ms. Briggs, the court reporter has
15   given you a document that we've marked as
16   D-22.  Again, I'm going to have the same
17   first question, which is whether you've ever
18   seen this document before.
19   A.   Yes, I have.
20   Q.   And this is an evaluation from 2007
21   to 2008, correct?
22   A.   Correct.
23   Q.   Created by George Palladino --
24   A.   Correct.

Page 350

1   Q.   -- correct?
2   A.   Yes.
3   Q.   And if you look on the next page,
4   your final rating on this review was a 2.7,
5   correct?
6   A.   Yes.
7   Q.   Where it says "employee comments,"
8   are those your comments that you drafted on
9   the first page?
10   A.   They're mine, yes.
11   Q.   And if you go back to D-20, which is
12   the 2005 --
13   A.   Okay.
14   Q.   -- to 2006 review.
15   A.   Uh-huh.
16   Q.   Where it says "employee comments,"
17   are those your comments?
18   A.   Yes.
19   Q.   And if you go to D-21, which was the
20   2006 to 2007 review.
21   A.   Uh-huh.
22   Q.   Is that a "yes"?
23   A.   Yes.  I'm sorry.
24   Q.   You'll see that it says "employee

Page 351

1   comment" on some of the pages?  Not on the
2   first page.
3   A.   All right, okay, yes.
4   Q.   But on the second, for example?
5   A.   Yes, I see.
6   Q.   Are those your comments?
7   A.   Yes, they are.
8   Q.   So on the reviews where it says
9   "employee comment," those are your comments
10   that you put in, correct?
11   A.   Yes.
12               - - -
13           (Whereupon, 10/01/08 PDP,
14       Bates No. TEMPLE UNIVERSITY
15       (R.BRIGGS)-0000259-264, was marked
16       as D Exhibit No. 23 for
17       identification.)
18               - - -
19   BY MS. FENDELL-SATINSKY:
20   Q.   Ms. Briggs, the court reporter has
21   given you a document that's been marked as
22   D-23.
23   A.   Uh-huh, yes.
24   Q.   Is that a "yes"?

Page 352

1   A.   Yes.
2   Q.   Is -- have you seen this document
3   before?
4   A.   Yes, I have.
5   Q.   Is this your 2008 to 2009 performance
6   review?
7   A.   Yes.
8   Q.   And was this completed by George
9   Palladino?
10   A.   Yes.
11   Q.   And your final rating on this review
12   was a 2.88, correct?
13   A.   Yes.
14               - - -
15           (Whereupon, 6/14/11 PDP, Bates
16       No. TEMPLE UNIVERSITY
17       (R.BRIGGS)-0000265-270, was marked
18       as D Exhibit No. 24 for
19       identification.)
20               - - -
21   BY MS. FENDELL-SATINSKY:
22   Q.   Ms. Briggs, the court reporter has
23   given you a document marked as D-24.
24       Have you seen this document before?

88  (Pages 349 to 352)

RUTH V. BRIGGS

Page 353

1    A.   Yes.
2    Q.   Is this your 2010 to 2011 performance
3 review?
4    A.   Yes.
5    Q.   And was this created by Dr. Wu?
6    A.   Yes.
7    Q.   And on this review your final rating
8 was a 2.91, correct?
9    A.   Yes.
10   Q.   And that was higher than the rating
11 you received in year 2008 to 2009 review
12 from George Palladino --
13   A.   Yes.
14   Q.   -- correct?
15   A.   Yes.
16              - - -
17         (Whereupon, 6/12/12 PDP, Bates
18    No. TEMPLE0137-142, was marked as D
19    Exhibit No. 25 for identification.)
20              - - -
21 BY MS. FENDELL-SATINSKY:
22   Q.   Ms. Briggs, the court reporter has
23 given you a document that's been marked as
24 D-25.

Page 354

1    A.   Uh-huh, yes.
2    Q.   Have you seen this document before?
3    A.   Yes.
4    Q.   And is this your 2011 to 2012
5 performance review?
6    A.   Yes.
7    Q.   And this review is from Dr. Wu,
8 correct?
9    A.   Yes.
10   Q.   And your final rating on this review
11 is a 2.78, correct?
12   A.   Yes.
13              - - -
14         (Whereupon, 5/28/13 PDP, Bates
15    No. TEMPLE0143-146, was marked as D
16    Exhibit No. 26 for identification.)
17              - - -
18 BY MS. FENDELL-SATINSKY:
19   Q.   Ms. Briggs, the court reporter has
20 given you a document marked as D-26.
21         Have you seen this document before?
22   A.   Yes.
23   Q.   And is this your 2012 to 2013
24 performance review?

Page 355

1    A.   Yes.
2    Q.   And this is your review from Dr. Wu,
3 correct?
4    A.   Yes.
5    Q.   And the format on this review is a
6 little bit different?
7    A.   That's correct.
8    Q.   Your final rating on this review was
9 "partially meets expectations," correct?
10   A.   Yes.
11   Q.   And if you look down at "Performance
12 Rating Categories," the top category is
13 "exceeds expectations," right?
14   A.   Where is that?  What page?
15   Q.   The bottom of the first page.
16   A.   It's cut off of mine.
17   Q.   So performance category ratings, the
18 top category is "significantly exceeds
19 expectations," correct?
20   A.   Oh, I see it, okay.
21   Q.   Is it right that the first/top
22 category is "significantly exceeds
23 expectations"?
24   A.   I'm sorry?  Repeat.

Page 356

1    Q.   Sure.
2         MR. MUNSHI:  Do you want me to
3    just show her?
4 BY MS. FENDELL-SATINSKY:
5    Q.   Am I -- on the bottom of the page --
6    A.   Uh-huh.
7    Q.   -- the first page, it says
8 "Performance Rating Categories."
9         Do you see that?
10   A.   Right, yeah.
11   Q.   Okay.  So under "Performance Rating
12 Categories," it indicates a top ranking is
13 "significantly exceeds expectations,"
14 correct?
15   A.   Yes.
16   Q.   And then "exceeds expectations" is
17 below that, right?
18   A.   Yes.
19   Q.   "Meets expectations" is below that,
20 correct?
21   A.   Yes.
22   Q.   Then if you turn to the next page,
23 "partially meets expectations" is below
24 that, correct?

89 (Pages 353 to 356)

RUTH V. BRIGGS

1    A.   Yes.
2    Q.   And then "does not meet expectations"
3  is below that?
4    A.   Yes.
5    Q.   At any time did you tell Dr. Wu you
6  believed you were being treated differently
7  because of your sex?
8    A.   No.
9    Q.   At any time did you tell Dr. Wu you
10  believed you were being treated differently
11  because of your age?
12    A.   No.
13    Q.   At any time did you tell Dr. Wu that
14  you thought you experienced a hostile work
15  environment from him?
16    A.   Yes.  Yes, I did.
17    Q.   When did you tell him that?
18    A.   I don't have a date.  I mean, it was
19  around when Drew and Dr. Wu and I were
20  meeting.
21    Q.   Did you tell him that you believed
22  you were experiencing a hostile work
23  environment because of your age?
24    A.   No, I did not.

1    Q.   Did you tell him you believed you
2  were experiencing a hostile work environment
3  because of your sex?
4    A.   No.
5    Q.   At any time, did you tell Dr. Wu you
6  believed you were being retaliated against?
7    A.   Yes.
8    Q.   And when did you tell Dr. Wu that?
9    A.   Around that same time.  I can't tell
10  you exactly what date.
11    Q.   Did you tell Dr. Wu why you believed
12  you were being retaliated against?
13    A.   No, I did not.
14    Q.   So you just generally told him you
15  believed he was retaliating against you?
16    A.   Yes.  And I remember asking him if
17  there was something that -- "What was it?"
18  "What could I change?"
19    Q.   And what did he say?
20    A.   To do as I'm told to do, pretty much.
21    Q.   And just so that I'm clear, you did
22  not tell him why you believed he was
23  retaliating against you?
24    A.   No, I did not tell him, uh-uh.

1    Q.   Earlier you identified some employees
2  that you felt Dr. Wu protected.
3    A.   Uh-huh.
4    Q.   Do you recall that?
5    A.   Yes, I do.
6    Q.   And one of those employees you
7  referred to is Hailey King, correct?
8    A.   Yes.
9    Q.   And you told me there was an instance
10  in which Hailey King did not report to work
11  for three days and was not disciplined --
12    A.   Yes.
13    Q.   -- is that correct?
14        How do you know Ms. King was not
15  disciplined?
16    A.   Because her office was right next to
17  mine and she didn't show up.  We were -- we
18  were concerned, where is she.  We called,
19  tried to call her, couldn't get her.
20    Q.   My question was:  How do you know
21  that Ms. King was not disciplined?
22    A.   Because she didn't show up for work.
23    Q.   How do you know she was not
24  disciplined?

1    A.   Because I was told.  It's in one of
2  the emails.  I mean, she -- I can't, I can't
3  remember why, how I know, but I know that
4  she wasn't.
5    Q.   Do you know if Dr. Wu or anyone else
6  had a conversation with her about it?
7    A.   I think that they did speak to her,
8  yes.
9    Q.   And after that incident, was there
10  any other occasion on which Ms. King did not
11  report to work?
12    A.   There was another incident where she
13  didn't report for two days.  I did not know
14  about that.  The timekeeper told me because
15  she was very upset about what was going on,
16  and she actually resigned as a result.
17    Q.   Who was the timekeeper?
18    A.   Antoinette Newton.
19    Q.   Was Ms. King a union employee?
20    A.   I don't know that.
21    Q.   Why did Ms. King have to keep her
22  time if she was not a union employee?
23    A.   Well, Toni kept a time for everyone
24  in the department.  It wasn't like a time

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 361

1    clock.  She just...
2    Q.   Do you know why Ms. King was absent
3    those two days?
4    A.   No, I don't.
5    Q.   Do you know if Ms. King had an
6    emergency?
7    A.   I don't.
8    Q.   Do you know if Ms. King had any FMLA
9    leave?
10   A.   No.
11   Q.   Do you know if Ms. King had any
12   medical accommodation?
13   A.   No, I don't know that.
14   Q.   Do you know if Ms. King was
15   disciplined for the time that she did not
16   report for two days?
17   A.   I don't know that.
18            - - -
19        (Whereupon, 12/14/11 email,
20        Bates No. TEMPLE UNIVERSITY
21        (R.BRIGGS)-0000327-328, was marked
22        as D Exhibit No. 27 for
23        identification.)
24            - - -

Page 362

1    BY MS. FENDELL-SATINSKY:
2    Q.   Before we look at this email, let me
3    ask you one other question about Ms. King.
4         Was there any other way other than
5    what you've already testified to that you
6    believe that Ms. King was treated better
7    than you by Dr. Wu?
8    A.   Well, once I was moved upstairs, uhm,
9    a lot of my responsibilities were given to
10   her.  Things that I had done for years like
11   the awards banquet, some stuff with events
12   was given to her when I had done them
13   successfully for years.
14   Q.   Do you know why they were given to
15   her?
16   A.   No, I don't.
17   Q.   Did you ask why?
18   A.   No, I did not.
19   Q.   When did Ms. King join Temple?
20   A.   I'm, I'm going to guess it's 2012.  I
21   can't say for certain.
22   Q.   Do you know what kind of experience
23   Ms. King had before working at Temple?
24   A.   Her work experience, I don't.  I

Page 363

1    think she came right from graduate school.
2    I'm not sure about her work experience.
3    Q.   Do you know what her graduate degree
4    was in?
5    A.   I think it was in student counseling.
6    I'm not sure, but it was in counseling, the
7    counseling field.
8    Q.   Any other way in which you believe
9    Ms. King was treated better than you by
10   Dr. Wu?
11   A.   She came -- she was pretty much late
12   just about a couple times a week because of
13   the train, and left early.  And that is --
14   no one ever said anything.  And I wouldn't
15   either, except for I was the one who was
16   expected to stay.
17        I'm sorry.  Never mind.  No, I don't
18   know that.
19   Q.   You worked, you said, on the tenth
20   floor, correct?
21   A.   I'm sorry?
22   Q.   You told me you worked on the tenth
23   floor?
24   A.   Yes.

Page 364

1    Q.   And did Ms. King also work on the
2    tenth floor?
3    A.   No.  She remained in the main office.
4    I was moved after she came.
5    Q.   So you did not work in the same
6    physical --
7    A.   No.
8    Q.   -- space as her?
9    A.   We did for a while.  We did for a
10   while, about a year.
11   Q.   Until you were moved?
12   A.   Yes.
13   Q.   And after you were moved, you were
14   not in the same space as Ms. King, correct?
15   A.   No, I was not.
16   Q.   And so you couldn't observe what she
17   was doing on a daily basis, correct?
18   A.   No; except for when she needed stuff
19   from me.  I mean --
20   Q.   Correct.
21   A.   -- we did talk about stuff.
22   Q.   But because you were not in the same
23   physical office as her --
24   A.   That is --

91  (Pages 361 to 364)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 365

1    Q.   -- once you moved to the tenth floor,
2    you could not see if she was coming late or
3    leaving early, correct?
4    A.   No, correct.
5    Q.   And do you know what Ms. King's
6    salary was?
7    A.   No.  I have -- don't.
8    Q.   Do you know if Ms. King was paid more
9    than you or less than you?
10   A.   I don't know.
11   Q.   Do you know what Ms. King's job
12   description was?
13   A.   No, I don't know what her job
14   description was.
15   Q.   Did you ever review Ms. King's job
16   description?
17   A.   No.
18   Q.   Did you -- strike that.
19       Ms. King is also a woman, correct?
20   A.   Yes.
21   Q.   Any other way in which you believe
22   Ms. King was treated better than you by
23   Dr. Wu?
24   A.   No.

Page 366

1    Q.   So, I believe the court reporter gave
2    you a document marked as D-27.
3    A.   Uh-huh.
4    Q.   Have you seen this email before?
5    A.   Uh-huh.
6    Q.   Is that a "yes"?
7    A.   Yes.  I'm sorry.  "Yes."
8    Q.   And is this an email from you to
9    Mr. Wacker and Mr. DiMeo?
10   A.   Yes.
11   Q.   And have you seen this document
12   before?  I think you just said "yes."
13   A.   Yes.
14   Q.   If you go down to the third to last
15   paragraph.
16   A.   Uh-huh.
17   Q.   You write, "I am wondering how it is
18   that I can be disciplined for violations and
19   others in the office come and go as they
20   please, violate policies about student
21   records and Social Security numbers, with no
22   consequences at all."
23   A.   Uh-huh.
24   Q.   Do you see that?

Page 367

1    A.   Yes, I do.
2    Q.   Did you ever violate policies about
3    student records or Social Security numbers?
4    A.   I didn't, no.
5    Q.   Were you disciplined for any
6    violations other than those that we reviewed
7    today?
8    A.   The, the --
9    Q.   So today we reviewed some
10   disciplinary actions, correct?
11   A.   Yes.
12   Q.   Did you receive any disciplinary
13   actions other than the disciplinary actions
14   we reviewed today?
15   A.   No.
16            - - -
17       (Whereupon, Plaintiff's
18       complaint was marked as D Exhibit
19       No. 28 for identification.)
20            - - -
21   BY MS. FENDELL-SATINSKY:
22   Q.   Ms. Briggs, have you seen this
23   document before?
24   A.   Yes, I have.

Page 368

1    Q.   And is this the Complaint that you
2    filed against Temple?
3    A.   Yes.
4    Q.   Did you read this Complaint before it
5    was filed?
6    A.   Yes.
7    Q.   And when you read it, did you believe
8    that all of the facts in it were true?
9    A.   Yes.
10   Q.   I want you to turn to paragraph 35.
11   It's on Page 5.
12   A.   Okay.
13   Q.   And you reference in that paragraph
14   that you continued to be harassed and
15   bullied by Dr. Wu.
16       Do you contend that there's any
17   harassment or bullying that you received
18   from Dr. Wu other than what you've already
19   testified to today?
20   A.   No.
21   Q.   I want you to turn to paragraph 46,
22   please.  It's on Page 6.
23   A.   Okay.
24   Q.   You reference in that paragraph that

92 (Pages 365 to 368)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 369

1  you felt singled out by Dr. Wu and Andrew
2  DiMeo.
3      Do you see that?
4  A.  I see that.
5  Q.  Did you felt -- did you feel singled
6  out by Dr. Wu and Andrew DiMeo in any way
7  other than what we've already -- what -- I'm
8  sorry.  Let me go back so it's clean.
9      Did you feel singled out in any way
10  by Dr. Wu and Andrew DiMeo other than what
11  you've already testified to today?
12  A.  No.
13  Q.  Earlier you mentioned that you took
14  FMLA leave during your employment at Temple?
15  A.  That is correct.
16  Q.  And were there -- did you have any
17  issues related to your Family Medical Leave
18  Act leave?
19      MR. MUNSHI:  Just objection to
20  form.
21      MS. FENDELL-SATINSKY:  Sure.
22      MR. MUNSHI:  On "issues."
23      MS. FENDELL-SATINSKY:  Sure.
24

Page 370

1  BY MS. FENDELL-SATINSKY:
2  Q.  Did you have any -- did Temple
3  approve your request for FMLA leave?
4  A.  Yes.
5  Q.  And did you take absences as part of
6  your FMLA leave?
7  A.  Yes, I did.
8  Q.  And did you have any -- did you
9  receive any discipline or criticism from
10  anyone at Temple for taking your FMLA leave?
11  A.  No.
12      MS. FENDELL-SATINSKY:  I think
13  now is a good time for a quick
14  break.
15      MR. MUNSHI:  Okay.
16      THE VIDEOGRAPHER:  The time is
17  4:29.
18      Off the record.
19      - - -
20      (Whereupon, a brief recess was
21  taken from 4:29 until 4:40 p.m.)
22      - - -
23      THE VIDEOGRAPHER:  The time is
24  4:40.

Page 371

1      Back on the record.
2  BY MS. FENDELL-SATINSKY:
3  Q.  Ms. Briggs, earlier you told me that
4  you believed Deirdre Walton, in addition to
5  other people, retaliated against you; is
6  that correct?
7  A.  Yes.
8  Q.  And you also testified that Deirdre
9  Walton lifted the ban on your applications,
10  internal applications; is that correct?
11  A.  Yes.
12  Q.  And am I correct that when somebody
13  is on probation at Temple, the policy is
14  that person can't post internally for a job
15  until the probation is up?  Is that right?
16  A.  Yes.
17  Q.  And Ms. Walton lifted that ban for
18  you so that you could apply for other
19  positions while you were on probation?
20  A.  Yes.  She said she did, uh-huh.
21  Q.  And did you understand that she did
22  that?
23  A.  I understood she did it.
24  Q.  And that's not something she had to

Page 372

1  do, correct?
2  A.  No, I guess not.  I don't know for
3  sure, but, yeah.
4  Q.  And --
5  A.  I would say "no."
6  Q.  And you appreciated she did that?
7  A.  I appreciated it.
8  Q.  And you still believe that she
9  retaliated against you.
10      In what way did she retaliate against
11  you?
12  A.  I reached out to her on numerous
13  occasions - and I believe you have those
14  emails - to please come and help me, just
15  help me mediate.
16  Q.  And so you believe that Ms. Walton
17  retaliated against you by not mediating?
18  A.  Well, well, by when I would call her
19  and ask her to come, she would say, "Let me
20  talk to Greg."  Or if it had to do with a
21  discipline, when I told her about the
22  three-day discipline for coming in three
23  hours late, she thought it was harsh and she
24  said, "Well, let me call Greg."

Page 373

1    And then when she called back, she
2  said, "Well, you failed to follow protocol."
3  And then it was all of a sudden it changed,
4  so I -- but I continued to reach out to her.
5  I reached out to her first always.
6    Q.   Was that because she was your H.R.
7  contact?
8    A.   Yes.  And she was Labor Relations.
9    Q.   Is there any other way in which you
10 believe that Ms. Walton retaliated against
11 you?
12   A.   By refusing to meet.  She met with me
13 once.
14   Q.   Did she respond to your emails?
15   A.   One time.  That was about that she
16 would lift the ban for me.
17   Q.   So your testimony is that Ms.
18 Walton --
19   A.   Well, no.  I take it back.  She, she
20 did respond to my emails that I said,
21 "You're not responding" in a defensive way.
22   Q.   Any other way in which you believe
23 Ms. Walton retaliated against you?
24   A.   Well, I told her that I wanted to

Page 374

1  meet with Sandy Foehl, the Equal Employment
2  internal officer.  She knew that.
3    Q.   And did you tell her why you wanted
4  to meet with Sandy?
5    A.   No, I didn't.
6    Q.   Any other way in which you believe
7  Ms. Walton retaliated against you?
8    A.   No.
9    Q.   You also testified that you believe
10 Mr. Wacker retaliated against you; is that
11 correct?
12   A.   Yes.
13   Q.   In what way do you believe Mr. Wacker
14 retaliated against you?
15   A.   By putting through all of these
16 things against me without having been there,
17 without even allowing me to give my, my
18 version of what happened.  He said it wasn't
19 necessary.  My boss told him, told him, and
20 that was enough.
21   Q.   Did you understand that nonunion
22 employees do not have an opportunity to
23 respond to discipline?
24   A.   I know that I'm at-will.  Yes, yes, I

Page 375

1  did, I guess.
2    Q.   So you understood that nonunion
3  employees do not have an opportunity to
4  respond to discipline?
5    A.   Oh, to -- I'm sorry.
6    Q.   Let me ask the question --
7    A.   Okay.
8    Q.   -- differently.
9    A.   Okay.
10   Q.   Did you understand that nonunion
11 employees could not give statements with
12 regard to their discipline or as part of
13 their discipline?
14   A.   Really?  No, I didn't.
15   Q.   Anything else that you believe
16 Mr. Wacker did to retaliate against you?
17   A.   No.
18   Q.   Why do you believe that Ms. Walton
19 retaliated against you?
20   A.   I believe she believed Greg.  Greg
21 talked to her.  She said she got, you know,
22 the particulars from Greg, and that's --
23 then wouldn't explain it to me.
24   Q.   Any other reason you believe that

Page 376

1  Ms. Walton retaliated against you?
2    A.   No.
3    Q.   Why do you believe Mr. Wacker
4  retaliated against you?
5    A.   I don't know the answer to that
6  question.
7    Q.   You also --
8    A.   I'm sorry.
9    Q.   I'm sorry.  Did I cut you off?
10   A.   I'm sorry.  I just don't know the
11 answer.
12   Q.   So you don't have a belief as to why
13 he retaliated against you; is that correct?
14   A.   No.
15   Q.   You also testified that you believe
16 Dr. Wu retaliated against you.
17      How do you believe Dr. Wu retaliated
18 against you?
19   A.   For contacting H.R.
20   Q.   For contacting Deirdre?
21   A.   On several occasions.  Contacting
22 Sandy Foehl.
23   Q.   How do you know that Dr. Wu knew you
24 contacted Deirdre?

RUTH V. BRIGGS

Page 377

1    A.   Because Greg told him.
2    Q.   Greg?
3    A.   Deirdre would contact Greg.
4    Q.   And you believe Greg then told
5    Dr. Wu?
6    A.   Greg did tell, I know, yes.
7    Q.   How do you know that Greg told Dr. Wu
8    that you spoke to Deirdre?
9    A.   It's hearsay, but Drew said, "Well,
10   Dr. Wu knows what you're doing.  He knows
11   about this."
12   Q.   He knows about what?
13   A.   About my going to Sandy Foehl, going
14   to Deirdre, trying to work this out.  And I
15   did -- at one time I did say to him, "Dr.
16   Wu, I think we need a mediator.  I think
17   we're speaking different languages."
18   Q.   At any point -- let me ask something
19   else.
20       Do you have any firsthand knowledge
21   that Dr. Wu knew that you spoke with Deirdre
22   or Sandy?
23   A.   Repeat the question, please.
24   Q.   Sure.

Page 378

1       Do you have any firsthand knowledge,
2    personal knowledge, that Dr. Wu knew that
3    you spoke with Deirdre or Sandy?
4    A.   No.  Only through other people.  No.
5    Q.   And the other people you heard that
6    through you said was Drew DiMeo?
7    A.   Uh-huh.
8    Q.   Is that a "yes"?
9    A.   Yes.  I'm sorry.
10   Q.   Anyone else?
11   A.   Greg Wacker.
12   Q.   Greg Wacker told you that Dr. Wu knew
13   you contacted Deirdre and Sandy?
14   A.   Yeah.
15   Q.   In what context did he tell you that?
16   A.   It was probably -- it was he would
17   call me over to his office and tell me.  He
18   would say it, threaten me, you know, "You
19   got" -- "If you want your job, you need to,
20   you need to cut it out."
21   Q.   Did he say what you needed to cut
22   out, or did you imply it?
23   A.   Well, it was about Dr. Wu.  He knew
24   that because he was angry.  He's like, "I'm

Page 379

1    tired of Wu being over here all the time.
2    Just do what he says."
3    Q.   Right.  And you said that Greg Wacker
4    told you to cut it out.
5       I'm asking did he tell you what to
6    "cut it out"?
7    A.   Just do what Dr. -- cut out
8    questioning this.  Like if I would question,
9    like repeat instructions, that was seen as
10   being confrontational.  And I wasn't.  It
11   was like, "I don't understand.  Could you
12   repeat it."
13   Q.   Did Greg Wacker ever tell you that he
14   told Dr. Wu that you spoke with Deirdre or
15   Sandy?
16   A.   No.  It would have been secondhand.
17   No.
18   Q.   Did anyone, did anyone other than
19   Drew DiMeo tell you that they told Dr. Wu
20   that you spoke with Deirdre or Sandy?
21   A.   No.
22   Q.   So the only person who told you that
23   they told Dr. Wu you spoke with Deirdre and
24   Sandy was Drew DiMeo; is that correct?

Page 380

1    A.   Right.
2    Q.   Did you tell Drew DiMeo -- is that
3    correct?
4    A.   Yes, uh-huh.
5    Q.   Did you tell Dr. DiMeo that you spoke
6    with Sandy?
7    A.   I told him.  Yes, I did.
8    Q.   Why did you tell him that?
9    A.   Because of his comments about my
10   gender, my age and gender, and the very
11   different treatment.
12   Q.   Because of whose comments about your
13   age and gender?
14   A.   Dr. Wu.  I'm sorry.
15   Q.   And those are the comments, the two
16   comments you referred to earlier about
17   Dr. Wu telling you that, that in China women
18   were put out to pasture at a certain age --
19   A.   Uh-huh.
20   Q.   -- and that in China women retired at
21   55, correct?
22   A.   Yes.
23   Q.   Did Mr. DiMeo make any comments about
24   your gender?

RUTH V. BRIGGS

## Page 381

1    A.   No.
2    Q.   Did Mr. DiMeo make any comments about
3    your age?
4    A.   No.
5    Q.   Did Mr. Wacker make any comments
6    about your gender?
7    A.   No.
8    Q.   Did Mr. Wacker make any comments
9    about your age?
10   A.   No.
11   Q.   Did Ms. Walton make any comments
12   about your age?
13   A.   No.
14   Q.   Did Ms. Walton make any comments
15   about your gender?
16   A.   No.
17   Q.   Did Ms. Foehl make any comments about
18   your age?
19   A.   No.
20   Q.   Did Ms. Foehl make any comments about
21   your gender?
22   A.   No.
23   Q.   Other than what we've already talked
24   about, is there any way in which -- any

## Page 382

1    other way in which you believe Dr. Wu
2    retaliated against you?
3    A.   No.
4              - - -
5              (Whereupon, 8/2/12 email
6         string regarding scheduling a
7         meeting, Bates No. TEMPLE UNIVERSITY
8         (R.BRIGGS)-0000210-212 and 2098, was
9         marked as D Exhibit No. 29 for
10        identification.)
11             - - -
12   BY MS. FENDELL-SATINSKY:
13   Q.   Ms. Briggs, this document is marked
14   as Exhibit D-29.  The Bates numbers are 210,
15   211, 212, and then 208 --
16   A.   Uh-huh.
17   Q.   -- is the last one.
18        Do you see that?
19   A.   208, yes.
20   Q.   Okay.  Have you seen these emails
21   before?
22   A.   Yes, I have.
23   Q.   So I want to start on 211, please.
24   A.   Okay.

## Page 383

1    Q.   And on the bottom of 211, that's an
2    email from you to Sandy Foehl on July 25th,
3    2012, correct?
4    A.   Yes.
5    Q.   And this email says that you spoke
6    with Rhonda Brown?
7    A.   Yes.
8    Q.   Who is Rhonda Brown?
9    A.   She was the, the director or chair of
10   the -- I think they changed the name of the
11   office.  I think it was called -- I don't
12   know.  It was for Equal Opportunity.  She
13   worked with Sandy for a while.  I don't know
14   what they called it.
15   Q.   And Rhonda suggested that you reach
16   out to Sandy?
17   A.   That's what she said, yes.
18   Q.   And this email on July 25th, 2012, is
19   this the first time that you had spoken with
20   anyone in EEO about -- let me just step
21   back.
22        Is this email from July 25th, 2012
23   the first time you spoke with anyone in EEO
24   during your employment at Temple?

## Page 384

1    A.   She wasn't in EEO.  Is that --
2    Rhonda, you mean?
3    Q.   I'm talking about Sandy.
4    A.   Oh, Sandy.  Uhm, yes, it was.
5    Q.   Okay.
6    A.   Uh-huh.
7    Q.   So July 25th, 2012 was the first time
8    you spoke with anyone in EEO?
9    A.   Yes.
10   Q.   And you emailed Sandy on July 25th.
11   Sandy wrote back to you on July 26th and
12   said when -- what her availability was.
13        Do you see that?
14   A.   I do.
15   Q.   And then on July 29th you wrote back
16   to Sandy and you gave her your availability,
17   correct?
18   A.   Which one?  I'm sorry.  Which one?
19   Q.   Sure.  So if you go to --
20   A.   Which page?
21   Q.   -- the first page, 210.
22   A.   Uh-huh.
23   Q.   On July 29th, you emailed Sandy.
24   A.   Right.

RUTH V. BRIGGS

Page 385

1   Q.   Correct?
2   A.   Yes, I did.
3   Q.   And you said -- you gave her your
4   availability to meet, correct?
5   A.   Yes.
6   Q.   And then Sandy suggested a time on
7   July 30th --
8   A.   Yes.
9   Q.   -- correct?  And then based on your
10  email from August 2nd, 2012, it appears that
11  you and Sandy had a meeting?
12  A.   That is true.
13  Q.   So do you recall on what day you met
14  with Sandy?
15  A.   What day of the week it was?
16  Q.   So, your meeting with Sandy was
17  obviously between July 30th and August 2nd,
18  correct?
19  A.   I would, I would -- I do remember the
20  meeting.
21  Q.   Okay.  So what day was the meeting?
22  A.   What day of the -- I don't know what
23  day the meeting was.
24  Q.   Okay.  But you'll agree with me that

Page 386

1   your meeting with Sandy was sometime between
2   July 30th and August 2nd, 2012?
3   A.   Well, it says that I met with her on
4   July 30th.
5   Q.   Okay.  So your meeting with Sandy was
6   on July 30th, correct?
7   A.   That is correct.  I'm sorry.
8   Q.   Where did you meet with Sandy?
9   A.   In her office.
10  Q.   How long did you meet with her for?
11  A.   Half an hour to forty-five minutes,
12  maybe.
13  Q.   What did you discuss with her during
14  that meeting?
15  A.   About the problems I was having in
16  the department and that I -- the comments
17  Dr. Wu had made about my age and my -- I, I
18  just needed to talk to her, but I decided to
19  withdraw.
20  Q.   And when you say the comments Dr. Wu
21  made about age, are you referring to the
22  comments that you testified to where Dr. Wu
23  said that in China women are put out to
24  pasture around a certain age and that in

Page 387

1   China women retire at 55?
2   A.   That is correct.
3   Q.   And those comments were not about
4   you, correct?
5       MR. MUNSHI:  Just objection to
6   form.
7   BY MS. FENDELL-SATINSKY:
8   Q.   Were those comments about you?
9   A.   About me?
10  Q.   Yes.
11  A.   Oh, I don't know.  I mean, no.  He
12  just said it to me.
13  Q.   Right.
14  A.   Okay.
15  Q.   He said it to you.
16  A.   To me, right, right.
17  Q.   But they weren't about you, correct?
18  A.   Not to my -- no, uh-uh.
19  Q.   You -- "no"?
20  A.   "No."  I'm sorry.
21  Q.   That's okay.
22       Anything else you discussed with
23  Sandy during that meeting?
24  A.   She, you know, she just walked

Page 388

1   through the process with me.  And I asked
2   her to hold off on it, because I have a son
3   with a spinal cord injury.  He was having
4   surgery, and I was concerned about that; so
5   I asked her to just hold on, don't release
6   anything.
7   Q.   So if you turn to the last page,
8   which is 208.
9   A.   (Witness complies with request.)
10  Q.   This is an August 3rd email from
11  Sandy to you, correct?
12  A.   Yes, it is.
13  Q.   And this is in response to the email
14  that you sent Sandy on August 2nd, correct?
15  A.   Yes.  August 3rd?
16  Q.   In response to the email --
17  A.   Oh.
18  Q.   -- you sent on August 2nd.
19  A.   Oh, okay.
20  Q.   Which is the first page.
21  A.   Okay.
22  Q.   Is that right?
23  A.   Yes.
24  Q.   And in your email on August 2nd, you

Page 389

1  had asked to review the letter to Michael
2  Klein.
3      Who is Michael Klein?
4  A.   He's the dean of the College of
5  Science and Technology.
6  Q.   And here in this email on August 3rd,
7  Sandy told you that, "Equal Opportunity
8  Compliance does not have grievants review
9  the complaint notices," but you can inform
10  the notice by sending your own written
11  statement of the issues, correct?
12  A.   Correct.
13  Q.   And she goes on to actually request
14  your statement, right?
15  A.   Correct.
16  Q.   And she said to please set out in
17  writing the treatment that you find
18  discriminatory or harassment, the sources of
19  the dis -- the source of the disparate
20  treatment and/or unwelcome conduct, and the
21  basis for the unfair treatment from your
22  perspective, correct?
23  A.   Correct.
24  Q.   And she says that you can provide as

Page 390

1  much detail as you wish, right?
2  A.   Correct.
3  Q.   And she encourages you to keep a
4  record of pertinent new events going
5  forward.
6      Do you see that?
7  A.   Yes.
8  Q.   Did you do that?
9  A.   Yes.
10  Q.   How did you keep a record of
11  pertinent new events going forward?
12  A.   Email. Sometimes notes, just email
13  notes to myself.
14  Q.   Your record that you kept, would that
15  have been included in the documents you
16  imported to your gmail?
17  A.   That would have -- prob -- yes.
18  Q.   Were there any records you kept that
19  were not imported into your gmail?
20  A.   Ask the question again.
21  Q.   Sure.
22      So Ms. Foehl told you to keep a
23  record of pertinent new events, right?
24  A.   Right.

Page 391

1  Q.   And you told me you did keep a
2  record --
3  A.   Yes.
4  Q.   -- correct?
5      And so now I want to know if there's
6  anything in that record you kept other than
7  the emails that you imported to your gmail?
8  A.   No -- well, wait a minute. The
9  disciplinary, they were scanned, but that
10  wasn't from my email.
11  Q.   Okay. So the record that you kept
12  were -- was the emails that you imported and
13  your written discipline; is that right?
14  A.   Right, yes.
15  Q.   Okay.
16  A.   Uh-huh.
17      - - -
18      (Whereupon, 9/9/12 email
19      string, Bates No. BRIGGS 24-29, was
20      marked as D Exhibit No. 30 for
21      identification.)
22      - - -
23  BY MS. FENDELL-SATINSKY:
24  Q.   Ms. Briggs, this is D-30. Take a

Page 392

1  look at this and let me know if you've seen
2  it before.
3  A.   I have. Yes, I have.
4  Q.   Okay. So starting on the first page,
5  which is BRIGGS 24, there is a September 9th
6  email from you to Sandy Foehl, correct?
7  A.   Yes.
8  Q.   And you respond that you're uncertain
9  about the status of your complaint, correct?
10      MR. MUNSHI: I'm sorry. Are
11      you reading from somewhere? I
12      missed that.
13      MS. FENDELL-SATINSKY: Yup.
14      So the email from September 9th.
15      The first sentence says, "I am
16      uncertain about the status of the
17      complaint."
18  BY MS. FENDELL-SATINSKY:
19  Q.   Do you see that?
20      MR. MUNSHI: Oh.
21  BY MS. FENDELL-SATINSKY:
22  Q.   Ms. Briggs, do you see that?
23  A.   I see that, yes. I'm sorry. I
24  didn't know you were talking to me.

98 (Pages 389 to 392)

RUTH V. BRIGGS

Page 393

1    Q.   And you told me before that you told
2  Sandy not to do anything about your
3  complaint --
4    A.   But --
5    Q.   -- because -- let me finish my
6  question.
7    A.   I'm sorry.
8    Q.   You told me before you told Sandy not
9  to do anything about your complaint because
10  you were going out on FMLA leave to help
11  your son; is that correct?
12    A.   That is correct.  How -- can -- no?
13    Q.   Go ahead.
14    A.   Uhm, this was before I met with her,
15  I think.  Can I check the dates?  I mean,
16  I'm --
17    Q.   Sure.  So if you look back at the
18  prior email, which was D-29, your meeting
19  with Sandy Foehl was on July 30th and this
20  email is from September 9th; so this email
21  that is D-30 is from after your meeting with
22  Ms. Foehl on July 30th.
23    A.   Yes, it is.
24    Q.   In the fourth to last paragraph of

Page 394

1  your email that starts, "The reason for
2  reporting this" --
3    A.   What page?
4    Q.   The first page.  Same email --
5    A.   Okay.
6    Q.   -- from September 9th.
7    A.   Okay.
8    Q.   Do you see it says, "The reason for
9  reporting this to you"?
10    A.   (No response.)
11    Q.   Do you see that paragraph?
12    A.   To Sandy?
13    Q.   Yes.
14    A.   Okay.  I'm, I'm --
15    Q.   On BRIGGS 24, the fourth to last
16  paragraph.
17    A.   Oh, I was up on the top.  And I'm
18  sorry.
19    Q.   The fourth to last paragraph says,
20  "The reason for reporting this to you."
21       Do you see that?
22    A.   Uh-huh.
23    Q.   Is that a "yes"?
24    A.   Yes.  I'm sorry.

Page 395

1    Q.   The last sentence of that paragraph
2  says, "I do know I was paid significantly
3  lower than two male staff members in the
4  dean's office who were my equals."
5       Who were they?
6    A.   I'd rather not give their names.
7    Q.   You have to give their names.
8    A.   I have to, okay.  Uhm, Vinodh
9  Ganesan.  Do you want me to spell that?
10    Q.   We can do it off the record.
11    A.   Okay.
12    Q.   And who was the other person?
13    A.   There's a student worker.  He's no
14  longer -- I don't --
15    Q.   It was a student worker who was paid
16  more than you?
17    A.   No, he wasn't paid more than me.
18    Q.   Okay.
19    A.   But he told me that he knew.
20    Q.   So, so I'm asking:  That last
21  sentence says, I know -- "I do know that I
22  was paid significantly lower than two male
23  staff members in the dean's office who were
24  my equals."  And I want to know who the two

Page 396

1  male staff members were in the dean's office
2  who were your equals who were paid more than
3  you.
4    A.   Vinodh Ganesan, V I N O D H, Ganesan,
5  G-A-N-E-S-A-N.
6    Q.   And who was the other one?
7    A.   I'm sorry.  Roger Catedo (sic).
8    Q.   And what was Roger's position?
9    A.   He was in facili -- I don't know what
10  his title is, facilities.
11    Q.   And what was Vinodh's position?
12    A.   He was the IT per -- head of the IT
13  in the dean's office.
14    Q.   And they were not within Dr. Wu's
15  office, correct?
16    A.   This is before Dr. Wu's.
17    Q.   You told me that you started working
18  for Dr. Wu in 2009.  This is be -- this is
19  in 2012.
20    A.   I know, but these people that this
21  was -- they told me when I was in the dean's
22  office under Keya Sadeghipour.
23    Q.   So that's back from 2006?
24    A.   That would be, yup.

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 397

1    Q.    Around 2006?
2    A.    Around, around, yes.
3    Q.    And did you ask them what their
4    salaries were?
5    A.    No, I didn't.
6    Q.    How did you know what their salaries
7    were?
8    A.    One of them came to me and told me
9    that I needed to stand up for myself and
10   gave me suggestions about how to do it.
11   Q.    And who was that?
12   A.    Vinodh.
13   Q.    And how did you know the other
14   person's salary?
15   A.    That was hearsay from Vinodh.
16   Q.    From who?
17   A.    From Vinodh.
18   Q.    Got it.
19         And did you ever complain about being
20   paid less than them prior to this email on
21   September 9th?
22   A.    Not to my knowledge.
23   Q.    In the last sentence -- the last --
24   second to last sentence of your email says,

Page 398

1    "I am not authorizing any action on my part,
2    because I am waiting to be cleared for FMLA
3    for a short period to care for my son, who
4    has a spinal cord injury."
5         Do you see that?
6    A.    Yes, I do.
7    Q.    And then in the email above this
8    email we just reviewed, it's a September 9th
9    email from you to Rhonda Brown, correct?
10   A.    Correct.
11   Q.    And you say, "I regret having seen
12   Sandy Foehl, because I could not see the
13   original complaint, nor have I heard if it
14   was filed or how it will be addressed,"
15   correct?
16   A.    Correct.
17   Q.    But you told me previously that you
18   told Sandy Foehl not to do anything with
19   your complaint because you were going out on
20   FMLA leave, correct?
21   A.    I didn't understand really what she
22   was going to do.  I didn't know if, the
23   letter, she was waiting to send the letter
24   to Dean Klein after my approval or if I had

Page 399

1    set things in motion.  I didn't know.  I
2    had, I had no idea if I'd set things kind of
3    in motion and once she knew it she had to
4    act on it.
5    Q.    Your testimony was, correct me if I'm
6    wrong, but your testimony was that you told
7    Sandy Foehl in the meeting on July 20th not
8    to do anything with your complaint
9    because --
10   A.    I did.
11   Q.    -- you were taking FMLA leave.
12   A.    I know, but I did --
13   Q.    Correct?
14   A.    Correct.
15   Q.    Okay.
16   A.    Correct, yes.
17   Q.    And so -- and you told Sandy Foehl
18   again on September 9th not to -- you did not
19   authorize any action on September 9th,
20   correct?
21   A.    I did.
22   Q.    You specifically told her that you
23   were not authorizing any action, right?
24   A.    Yes.  That's true.

Page 400

1         - - -
2         (Whereupon, 11/2/12 email
3    regarding job description, Bates No.
4    TEMPLE UNIVERSITY
5    (R.BRIGGS)-0000202, was marked as D
6    Exhibit No. 31 for identification.)
7         - - -
8    BY MS. FENDELL-SATINSKY:
9    Q.    Ms. Briggs, have you seen this
10   exhibit marked as D-31 before?
11   A.    Yes.
12   Q.    Am I correct that you had no
13   communications with Ms. Foehl between
14   September 2012 and this email on November
15   2nd, 2012?
16   A.    Can you ask the question again,
17   please?
18   Q.    Sure.
19         Am I correct that you had no
20   communications with Sandy Foehl between your
21   email on September 9th, 2012, which we just
22   reviewed at D-30, and this email from
23   November 2nd, 2012, which is marked as D-31?
24   A.    No.  Not to my knowledge, no.

100  (Pages 397 to 400)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 401

1    Q.   So there were no communications
2 between you and Ms. Foehl between September
3 9th and November 2nd, correct?
4              MR. MUNSHI:  Objection.  She
5       just answered that question.
6              THE WITNESS:  I'm thinking.
7       I'm thinking.  I'm trying to --
8              MS. FENDELL-SATINSKY:  My
9       question was unclear, because I
10      asked her "correct" and she had said
11      "no," but then she said, "No, not to
12      my knowledge," so I'm just
13      clarifying that there were no
14      commun --
15             THE WITNESS:  There --
16 BY MS. FENDELL-SATINSKY:
17   Q.   "Yes" or "no," were there
18 communications between you and Sandy Foehl
19 between September 9th, 2012 and November
20 2nd, 2012?
21   A.   I don't know the answer to that
22 question.  There were emails, but I don't
23 know what the dates were, to be honest.
24   Q.   So you don't know if there were

Page 402

1 communications between you and Sandy Foehl
2 between September 9th, 2012 and November
3 2nd, 2012?
4   A.   I don't know.
5   Q.   If there were communications, would
6 they be -- would they have been written
7 communications by email?
8   A.   Yeah, they are.  And, actually, I
9 read them yesterday from the Complaint.
10   Q.   So if there were communications
11 between you and Ms. Foehl between September
12 9th, 2012 and November 2nd, 2012 there, we
13 would have documented emails of that, those
14 conversations; is that right?
15   A.   Yes.
16             - - -
17         (Whereupon, 11/5/12 email
18      regarding job description, Bates No.
19      TEMPLE UNIVERSITY
20      (R.BRIGGS)-0000199-200, was marked
21      as D Exhibit No. 32 for
22      identification.)
23             - - -
24

Page 403

1 BY MS. FENDELL-SATINSKY:
2   Q.   Ms. Briggs, this is a document marked
3 as D-32.  And so if you go to the second
4 page of this document, this is the email
5 that we just reviewed from November 12 that
6 was marked as D-31, and here on D-32 is
7 Ms. Foehl's response to you, correct?
8   A.   Correct.
9   Q.   And Ms. Foehl in her email to you
10 from November 5th says that you had written
11 that you were not authorizing any action on
12 her part on Septem -- on your part, excuse
13 me, on September 9th, correct?
14   A.   To file the Complaint, yes.
15   Q.   And so Ms. Foehl says, "If you are
16 now authorizing action, will you please
17 respond to my request of April 30th, 2012
18 for a written statement setting out the
19 particular instances of bullying, threats of
20 dismissal, and expressions of age bias by
21 Dr. Wu and/or Mr. Wacker," correct?
22   A.   Correct.
23   Q.   And she says the email forwarded from
24 Dr. Wu -- "the email from Dr. Wu forwarded

Page 404

1 by you on September 9th, 2012 is not
2 discriminatory on its face," correct?
3   A.   Yes.
4   Q.   And then if you go down, she asks,
5 "Who is paid more than you for the same
6 work?"  In the second paragraph, the last
7 sentence.
8   A.   Are we on 199?
9   Q.   Yup.
10   A.   Okay.
11   Q.   The last sentence of the second
12 paragraph on 199.
13   A.   (No response.)
14   Q.   Do you see that?
15   A.   Uh-huh.
16   Q.   Yes?
17   A.   Yes.
18   Q.   And were those the two males that you
19 replied to or that you told me about earlier
20 who were paid more than you?
21   A.   Yes.
22   Q.   Was there anyone else other than
23 those two males who you believe was paid
24 more than you for the same work?

101 (Pages 401 to 404)

RUTH V. BRIGGS

| Page 405 |
| --- |

1    A.   No.
2    Q.   How old were those two individuals?
3    A.   Thirty to mid-thirties, something.
4    Q.   Both of them?
5    A.   Vin was mid-thirties, mid-thirties at
6    the time.
7    Q.   Okay.
8    A.   Uhm --
9    Q.   And I don't have the attachment to
10   this email, but Ms. Foehl says that she
11   attached direction to the federal, state,
12   and municipal offices in Philadelphia.
13        Do you see that?
14   A.   Yes.
15   Q.   And if you look up at attachments, it
16   shows there was --
17   A.   Right.
18   Q.   -- "agency list_eoc.doc."
19        Do you see that?
20   A.   Yes, uh-huh.
21   Q.   And so Ms. Foehl provided you with
22   information about how you could make a
23   complaint to a government agency, correct?
24   A.   Correct.

| Page 406 |
| --- |

1    Q.   And you did not file any complaint
2    with a government agency at this time,
3    correct?
4    A.   I did not.
5    Q.   You did not at this time, correct?
6    A.   Not at that time, no.
7             - - -
8        (Whereupon, 2/8/13 email
9        string, Bates No. BRIGGS 38, was
10       marked as D Exhibit No. 33 for
11       identification.)
12            - - -
13   BY MS. FENDELL-SATINSKY:
14   Q.   Ms. Briggs, have you seen this
15   document before?
16   A.   Yes, I have.
17   Q.   You say, "Rhonda, I am so bullied and
18   harassed all day."
19        Does the bullying and harassment
20   relate to anything more than what we've
21   talked about already today?
22   A.   No, it does not.
23   Q.   And you say, "Two people in the
24   dean's office tell me that I can find

| Page 407 |
| --- |

1    another job.  That can't be right."
2        Who were the two people in the dean's
3    office who told you that?
4    A.   Greg Wacker and Dean -- and Drew
5    DiMeo.
6    Q.   And they told you that you could find
7    another job?
8    A.   If I didn't like it, I could look for
9    another job.
10   Q.   When did they say that to you?
11   A.   Whenever I complained, basically,
12   "Look for another job."
13   Q.   And did you start to look for another
14   job at that time?
15   A.   I bid on many jobs throughout the
16   time.
17   Q.   Many jobs internally?
18   A.   Internally, uh-huh.
19   Q.   Did you look for any jobs externally?
20   A.   I did not.
21        THE COURT REPORTER:  Didn't we
22   just do 33?
23        MS. FENDELL-SATINSKY:  No; 32.
24   I just checked.

| Page 408 |
| --- |

1        THE COURT REPORTER:  Okay.
2        MR. MUNSHI:  This is -- the
3    new one is 34.
4        MS. FENDELL-SATINSKY:  Is it?
5        THE WITNESS:  This should be
6    34.
7        THE COURT REPORTER:  Okay.
8    That's what I thought.  I messed up.
9    It was 33, the last one.
10       THE WITNESS:  Thirty-three,
11   yes.
12       THE COURT REPORTER:  This one
13   is 34.
14       MS. FENDELL-SATINSKY:  Okay.
15       THE COURT REPORTER:  Okay,
16   sorry.
17       MS. FENDELL-SATINSKY:  That's
18   okay.
19            - - -
20       (Whereupon, 2/8/13 email
21   string "urgent," Bates No. TEMPLE
22   UNIVERSITY (R.BRIGGS)-0000197-198,
23   was marked as D Exhibit No. 34 for
24   identification.)

102  (Pages 405 to 408)

## Page 409

1              - - -
2    BY MS. FENDELL-SATINSKY:
3      Q.    Ms. Briggs, this is a document that's
4    been marked as D-34.
5          Have you seen this document before?
6      A.    Yes, I have.
7      Q.    And the bottom email, the first
8    email, is an email from you to Sandy Foehl
9    on February 8th, 2013.
10     A.    Yes.
11     Q.    Correct?
12     A.    Correct.
13     Q.    And in response to your email,
14   Ms. Foehl told you, "This is an issue for
15   Human Resources first," correct?
16     A.    Correct.
17     Q.    And she said to address the situation
18   with Deirdre Walton in Labor & Employee
19   Relations, correct?
20     A.    Correct.
21     Q.    And did you contact Ms. Walton after
22   receiving this email?
23     A.    Yes.
24     Q.    How quickly after this email did you

## Page 410

1    contact Ms. Walton?
2      A.    I don't remember the dates.
3              - - -
4          (Whereupon, 2/11/13 email
5          string regarding Confidential
6          communication, Bates No.
7          TEMPLE0196-199, was marked as D
8          Exhibit No. 35 for identification.)
9              - - -
10   BY MS. FENDELL-SATINSKY:
11     Q.    Ms. Briggs, have you seen this
12   document before?
13     A.    Yes, I have.
14     Q.    I want you to turn to TEMPLE0198.
15     A.    (Witness complies with request.)
16     Q.    It's the first email in this chain.
17     A.    Okay.
18     Q.    Do you see it?
19     A.    Uh-huh.
20     Q.    Is that a "yes"?
21     A.    Yeah. I'm sorry. Yes.
22     Q.    Is this a February -- this is a
23   February 9th, 2013 email from you to Cameron
24   Etezady.

## Page 411

1      A.    Yes.
2      Q.    Did I pronounce his last name right?
3      A.    I don't know the...
4      Q.    Okay. We'll just say from you to
5    Cameron.
6      A.    Yes.
7      Q.    And you reached out to Cameron to
8    request a confidential in -- a confidential
9    conversation to discuss disparate treatment
10   which you believe is related to your age of
11   58, correct?
12     A.    Correct.
13     Q.    Why did you reach out to Cameron?
14     A.    Because I was always referred back to
15   Sandy -- I mean to Deirdre Walton. And I
16   had met Cameron. I believe he was outside
17   counsel. I can't say that for sure, but
18   he's the one who interviewed me for the
19   Hunnewell thing and I felt really -- he was
20   a very trusting -- I felt trusting. And
21   then I heard he came to Temple, and I
22   contacted him.
23     Q.    And Cameron then responded to you,
24   and he told you about his schedule and

## Page 412

1    recommended that you speak with Sandy Foehl
2    or Tracey Hamilton in EOC, correct?
3      A.    That is correct.
4      Q.    And then you replied to Cameron and
5    you relayed to him various things, including
6    since you provided a statement years ago for
7    a discrimination lawsuit by Tanya Hunnewell
8    in which I did not -- "in which I
9    contradicted the story that I was coached to
10   report, I do not trust she has my best
11   interest at heart."
12         And that was what you were saying
13   about Sandy Foehl, correct?
14     A.    I was saying that about Deirdre
15   Walton, actually.
16     Q.    Okay. And you told me before that it
17   was Greg Wacker who coached you to say
18   something different than what happened with
19   regards to Ms. Hunnewell?
20     A.    It was Greg Wacker, but -- say your
21   question again.
22     Q.    Sure.
23     A.    I'm sorry.
24     Q.    You told me before it was Greg Wacker

ELITE LITIGATION SOLUTIONS, LLC

1 who coached you to report --
2 A. Yes.
3 Q. -- something wrong about -- something
4 that was incorrect about Ms. Hunnewell; is
5 that correct?
6 A. Yes.
7 Q. And here you're saying that you don't
8 trust Deirdre because Greg coached you to
9 report something different; is that correct?
10 A. That is correct.
11 Q. Deirdre did not coach you to report
12 something different?
13 A. No, she did not.
14 Q. In response to this email, Cameron
15 referred you to Fay Trachtenberg in his
16 office, correct?
17 A. Yes.
18 Q. Or he said he could meet with you the
19 following week; is that right?
20 A. That is correct.
21 Q. And you explain in your response to
22 him on February 11th that you're not
23 uncomfortable with Sandy, but Sandy referred
24 you to Deirdre, correct?

1 A. Correct.
2 Q. And you say that you have no history
3 with Fay and should you contact her on your
4 own, correct?
5 A. What page is that?
6 MR. MUNSHI: First page.
7 BY MS. FENDELL-SATINSKY:
8 Q. 196, the first page.
9 A. Okay.
10 Q. The bottom email from you to Cameron.
11 A. Looks familiar, yeah, I guess.
12 Q. And you found --
13 A. Yes.
14 Q. Did you find Cameron helpful and
15 responsive?
16 A. I did.
17 Q. And Cameron responds to you and says
18 that he had given Fay a heads-up and she is
19 on this email, you can call her to set up a
20 time or use her email --
21 A. Yes.
22 Q. -- correct?
23 A. That is correct.
24 - - -

1 (Whereupon, 4/25/13 email
2 string, Bates No. BRIGGS 51-52, was
3 marked as D Exhibit No. 36 for
4 identification.)
5 - - -
6 BY MS. FENDELL-SATINSKY:
7 Q. Ms. Briggs, this is D-36.
8 Have you seen these emails before?
9 A. I have.
10 Q. So, so if we go back to D-34, which
11 was two exhibits before, on February 8th,
12 2013, Ms. Foehl told you to contact Deirdre
13 Walton, correct?
14 A. Correct.
15 Q. And then if you look at D-36, this is
16 an email from April 25th from you to
17 Deirdre Walton, correct?
18 A. That is correct.
19 Q. And you write in the email that you
20 appreciate Deirdre taking the time to meet
21 with you that past Monday, correct?
22 A. Correct.
23 Q. Was that the first meeting you had
24 with Deirdre Walton?

1 A. Yes.
2 Q. So you did not meet with Deirdre
3 Walton between February 8th, 2013 and April
4 25th -- I'm sorry, February 20 -- you did
5 not meet with Ms. Walton between February
6 8th, 2013 and the week of February 21st,
7 20 -- the week of February -- I'm getting
8 myself all confused now.
9 There was no meeting between you and
10 Ms. Walton between February 8th, 2013 and
11 the week of April 21st, 2013, correct?
12 A. 2013?
13 Q. Yes.
14 A. Not that I recall.
15 Q. Okay. And going back to D-36, you
16 say your interactions with Dr. Wu and Drew
17 had been very positive and friendly since
18 you met with Deirdre, and your anxiety has
19 decreased significantly, correct?
20 A. Correct.
21 Q. And so you found the meeting with
22 Deirdre to be helpful; is that right?
23 A. Yes.
24 Q. And Deirdre responded to you on the

Page 417

1   same day and said that you were welcome and
2   she was happy to hear that the meeting, she
3   says, "have approved." I think she meant
4   "improved." And if you need to talk to her,
5   please feel free to reach out, correct?
6   A.   Correct.
7   Q.   And she also said, "Please do look at
8   any other position here at the University
9   that meet your skills and background, and
10  let me know if you see anything," correct?
11  A.   Correct.
12  Q.   During the meeting that you had with
13  Deirdre Walton in April 2013, is that when
14  she lifted the ban on your ability to apply
15  for jobs internally?
16  A.   I don't recall. I really -- it was
17  probably around that time, because I -- I
18  must have been on probation. Yes, so it had
19  to have been, yes. There is an email about
20  that somewhere.
21  Q.   And you did ultimately contact
22  Ms. Walton on a number of occasions about
23  other jobs, correct?
24  A.   Well, I would apply -- she told me to

Page 418

1   bid on the job and let her know that I did.
2   Q.   Right. So you contacted her on
3   occasions about jobs that were available?
4   A.   Right. Or sometimes for advice, do
5   you think it's a good fit or...
6          - - -
7        (Whereupon, various emails
8        regarding available jobs, Bates No.
9        BRIGGS 53-57, was marked as D
10       Exhibit No. 37 for identification.)
11         - - -
12  BY MS. FENDELL-SATINSKY:
13  Q.   Ms. Briggs, have you seen this
14  document before?
15  A.   Yes, I have.
16  Q.   So there's three emails attached to
17  this exhibit that's D-37. Okay?
18  A.   Uh-huh, yes.
19  Q.   So, we'll start with the first one.
20  A.   Okay.
21  Q.   So here you're contacting Ms. Walton
22  about a job posting in the School of Media
23  and Communication, correct?
24  A.   Yes.

Page 419

1   Q.   And you're asking her for her
2   feedback, right?
3   A.   Yes.
4   Q.   In the second paragraph, you say, "I
5   received reports from three faculty members
6   about Dr. Wu making untrue and disparaging
7   remarks about me in the presence of
8   faculty."
9        Who are the three faculty members?
10  A.   Alex Yates, Alexander Yates; Frank
11  Friedman; and Robert Aiken.
12  Q.   Did they speak to you together or
13  individually?
14  A.   They were separate conversations.
15  Q.   Were they oral conversations?
16  A.   Yes.
17  Q.   Where did the conversations occur?
18  A.   Probably in their office or -- I
19  would say in their office.
20  Q.   Did you reach out to them to discuss
21  Dr. Wu?
22  A.   No, I did not.
23  Q.   Is it your testimony that each of
24  them approached you to speak with you about

Page 420

1   Dr. Wu?
2   A.   That's not how it happened either.
3   Q.   Okay. So why don't you tell me --
4   A.   Listen.
5   Q.   -- how it happened.
6   A.   I can't say for sure why I was
7   meeting with them. I might have been
8   working on an event and...
9   Q.   So during meetings with Alexander
10  Yates, Frank Friedman, and Robert Akin, they
11  told you that Dr. Wu was making untrue and
12  disparaging remarks about you?
13  A.   (No response.)
14  Q.   Let me ask you something else.
15       What did they -- what did Alexander
16  Yates tell you that Dr. Wu said about you?
17  A.   When, when I made a mistake, they
18  would be said to faculty.
19  Q.   Anything else?
20  A.   Like a discipline.
21       It was told to one -- well, actually,
22  it might have been at a faculty meeting, I
23  don't know, but that I had, uhm, made a
24  mistake -- not a mistake, but I had not

RUTH V. BRIGGS

Page 421

1  followed through on a promotion and tenure
2  timeline.
3  Q.    Anything else that Alexander Yates
4  told you --
5  A.    Well --
6  Q.    -- that Dr. Wu said about you?
7  A.    No.
8  Q.    And did Alexander Yates say that the
9  statements, those statements that you just
10  testified to, were untrue and disparaging,
11  or did you believe those statements were
12  untrue and disparaging?
13  A.    I believed they were untrue.
14  Q.    What did Frank Friedman tell you that
15  Dr. Wu said about you?
16  A.    Pretty much the same thing.  It was a
17  lot about faculty promotion and tenure and
18  hiring faculty.
19  Q.    Was there only -- was there just one
20  conversation with Alexander Yates about
21  this?
22  A.    It was -- yeah.  It was in passing, I
23  have to tell you.  It wasn't like a meeting.
24  He didn't --

Page 422

1  Q.    Okay.  Before, you told me that it
2  was during meetings in their --
3  A.    Well, I mean, I went in their office
4  for something, and I can't remember what it
5  was.
6  Q.    Okay.  So did Alexander Yates tell
7  you on more than one occasion that Dr. Wu
8  made remarks about you?
9  A.    Just one occasion.
10  Q.    Frank Friedman, you said, relayed
11  similar comments as Alexander Yates,
12  correct?
13  A.    That is true.
14  Q.    And did Frank Friedman relay that to
15  you on one occasion or more than one?
16  A.    About the remarks, no.  One occasion.
17  Q.    And, again, did Frank Friedman say
18  those comments were untrue and disparaging
19  or did you interpret the comments Frank
20  Friedman relayed to you as untrue and
21  disparaging?
22  A.    I interpreted them as untrue and
23  disparaging.
24  Q.    Robert Aiken, what did he tell you

Page 423

1  that Dr. Wu said about you?
2  A.    It was all about, it was all about
3  the same thing, promotion and tenure.
4  Q.    Did Robert Aiken tell you that more
5  than once?
6  A.    No.
7  Q.    Did Robert Aiken say the statements
8  were untrue and disparaging, or did you feel
9  that the statements that Robert Aiken
10  relayed were untrue and disparaging?
11  A.    I believed that they were untrue and
12  disparaging.
13  Q.    The next sentence says, "Two staff
14  members and a student worker reported to me
15  that they overheard Dr. Wu talking about the
16  disciplinary action in the public setting."
17         Who were the two staff members and
18  the student worker?
19  A.    Taylor Lentz was one of them, and
20  Mary Kate Galenski (ph) was another one, and
21  it was after I was on probation for three
22  days.
23  Q.    So Taylor Lentz was a student worker,
24  correct?

Page 424

1  A.    Yes.
2  Q.    And who was Mary Kate Galenski?
3  A.    A student worker.
4  Q.    This sentence says two staff members
5  and "a" student worker.
6  A.    I can't remember now.
7  Q.    So are you now saying that it's --
8  A.    I'm not --
9  Q.    -- two student workers who reported
10  this to you?
11  A.    I can't -- I don't recall.
12  Q.    So do you not recall who said this to
13  you?
14  A.    I recall Taylor and Mary Kate did.
15  Q.    Okay.  And Mary Kate was a student
16  worker, correct?
17  A.    A student worker.
18  Q.    And this sentence in this email says
19  "a" student worker, right?
20  A.    What paragraph was that?
21  Q.    The second paragraph, the last
22  sentence.
23  A.    I, I don't remember who I, I --
24  Q.    Okay.

106 (Pages 421 to 424)

1   A.  I know --
2   Q.  I'm saying: This last sentence
3 refers to "a" student worker, correct?
4   A.  It's two student workers.
5   Q.  So it's an er -- there is a --
6   A.  An error, uh-huh.
7   Q.  -- a mistake in your email?
8   A.  Uh-huh.
9   Q.  So was it two student workers and one
10 staff member or two student workers and you
11 don't remember who else?
12   A.  Well, John Ikoniak knew. He was a
13 staff member. I don't -- I must have -- it
14 must be a typo. So it was Mary Kate, Taylor
15 Lentz, and John Ikoniak.
16   Q.  And you said that they told you this
17 after your three-day suspension, correct?
18   A.  Yes.
19   Q.  Did they tell you together or
20 individually?
21   A.  Oh, individually.
22   Q.  And what did they tell you?
23   A.  They said, "So what happened that you
24 were suspended?"

1     And I -- first of all, I didn't tell
2 them why, but I was humiliated.
3     I asked him, you know, "Dr. Wu,
4 please keep it confidential," and...
5   Q.  Did they tell you anything other than
6 asking you why you were suspended?
7   A.  No, they, they did not.
8     - - -
9     (Whereupon, 8/8/13 email
10     string, Bates No. BRIGGS 64-67, was
11     marked as D Exhibit No. 38 for
12     identification.)
13     - - -
14     THE COURT REPORTER:
15     Thirty-eight.
16 BY MS. FENDELL-SATINSKY:
17   Q.  Ms. Briggs, this is an email that --
18 you know what, before we do that, let's go
19 finish. I apologize. That's my fault. I
20 didn't complete going through D-37, so let's
21 turn back to D-37 for a moment.
22   A.  Uh-huh.
23   Q.  BRIGGS 54, which is the second page
24 of that exhibit.

1   A.  Yes.
2   Q.  This is communication from you to
3 Deirdre Walton regarding two positions, and
4 you're asking her thoughts on them, correct?
5   A.  Uh-huh, yes.
6   Q.  And the last page of this packet is
7 an email from you to Deirdre Walton about
8 another position, correct?
9   A.  Yes.
10   Q.  Did you bid for any of the positions
11 that are referenced in these emails?
12   A.  I think I did. I can't remember
13 which ones. But I did want her feedback,
14 which I didn't get. I might have -- I'm
15 sure there's a record of what I bid on. I
16 don't -- but she didn't get back to me about
17 that.
18   Q.  Okay. Let's turn back to D-38.
19   A.  (Witness complies with request.)
20   Q.  So have you seen this document
21 before?
22   A.  Yes, I have.
23   Q.  And these are a series of emails
24 between you and Cameron, correct?

1   A.  Yes.
2   Q.  And they go back to the emails, uhm,
3 that we previously stock -- that we
4 previously reviewed, I apologize, from
5 February 2013, right?
6   A.  Are we on 38? Is that the name, the
7 number of the document?
8   Q.  Yup. It's on Exhibit 38.
9   A.  Okay.
10   Q.  And if you go to Page 66 and 67 --
11   A.  Okay.
12   Q.  -- these are the emails we previously
13 reviewed between you and Cameron from
14 February 2013, correct?
15   A.  Yes.
16   Q.  And then if you go to BRIGGS 64,
17 which is the first page, that is an email
18 from you to Cameron from August 6th, 2013,
19 right?
20   A.  Yes.
21   Q.  And you say that you're forwarding
22 the email you sent him in February; that you
23 contacted Fay and she referred you to
24 Deirdre Walton; you did reach out to Deirdre

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 429

1   and ask if she would agree to meet with
2   Dr. Wu and Andrew DiMeo to serve in a
3   mediator-like role.
4        Was that the meeting that you had
5   with Deirdre Walton in April of 2013 that we
6   referred to before?
7   A.   No, it wasn't.
8   Q.   Okay.  So what meeting was that that
9   you had with Deirdre in which you asked her
10  if she would agree to meet with Dr. Wu,
11  Drew DiMeo, and you to serve as a
12  mediator-like role?
13  A.   She and I did not meet about that.
14  Q.   Did you send her an email about that?
15  A.   On several occasions.  I don't know
16  if it was this date, though.
17       THE COURT REPORTER:  You don't
18  know if it was?
19       THE WITNESS:  Huh?  Oh, I'm
20  sorry.  I did email her and ask her
21  for her to help me, but I don't know
22  if it's in response to this.
23  BY MS. FENDELL-SATINSKY:
24  Q.   You then write below you did not --

Page 430

1   on the next page, you did not hear from her,
2   Deirdre, after your initial conversation
3   until you made contact with her in April
4   when you returned from a three-day
5   suspension without pay, correct?
6   A.   Correct.
7   Q.   And in response to this email,
8   Cameron told you that because you had worked
9   with Fay in the past, he would direct you to
10  her, as she generally handles employment
11  matters, correct?
12  A.   Correct.
13  Q.   And you told Cameron that Fay can --
14  he can provide Fay with the background and
15  Fay can contact you, correct?
16  A.   Correct.
17            - - -
18       (Whereupon, 2/6/14 email
19  follow-up, Bates No. BRIGGS 69, was
20  marked as D Exhibit No. 39 for
21  identification.)
22            - - -
23       THE COURT REPORTER:
24  Thirty-nine.

Page 431

1        MR. MUNSHI:  Can I grab one?
2        MS. FENDELL-SATINSKY:  Oh,
3   sorry.  I wrote D-39 on that one.
4        MR. MUNSHI:  That's okay.
5   BY MS. FENDELL-SATINSKY:
6   Q.   Ms. Briggs, have you seen this email
7   before?
8   A.   Yes, I have.
9   Q.   And this is an email from February
10  6th, 2013 (sic) from --
11  A.   '14.
12  Q.   2014, I apologize, from you to
13  Deirdre Walton, correct?
14  A.   Correct.
15  Q.   And you say that you're contacting
16  Deirdre about a recent telephone call that
17  you had about another disciplinary action
18  against you dated January 20th, 2014,
19  correct?
20  A.   Correct.
21  Q.   And during that meeting, did Deirdre
22  tell you that she would speak with Greg
23  Wacker about the matter?
24  A.   Correct.

Page 432

1            - - -
2        (Whereupon, 2/22/14 email
3   regarding supporting defense
4   documents, Bates No. EEOC 0062-65,
5   was marked as D Exhibit No. 40 for
6   identification.)
7            - - -
8        THE COURT REPORTER:  Forty.
9   BY MS. FENDELL-SATINSKY:
10  Q.   Ms. Briggs, have you seen this email
11  before?
12  A.   Yes, I have.
13  Q.   And this is from February 22nd, 2014.
14  It's an email from you to Deirdre Walton,
15  correct?
16  A.   Correct.
17  Q.   Uhm, if you look back at the email
18  that was D-39, the prior exhibit.
19  A.   Okay.
20  Q.   So the last exhibit we just looked
21  at.
22  A.   Oh, okay.
23  Q.   Up on the right-hand corner there is
24  a notation that says "6/20/14, 1:38 p.m."

RUTH V. BRIGGS

Page 433

```
 1        Do you see that?
 2   A.    Where are, where are you?  I'm sorry.
 3   Q.    Sure.  On D-39.
 4   A.    Uh-huh.
 5   Q.    In the upper right-hand corner --
 6   A.    Uh-huh.
 7   Q.    -- there's a notation that says
 8   "6/20/14, 1:38 p.m."
 9   A.    Right.
10   Q.    See that?
11   A.    Yes.
12   Q.    And is that the date on which you
13   accessed this email?
14   A.    No.  It was when it was -- I printed
15   it.
16   Q.    So this was printed after the end of
17   your employment at Temple?
18   A.    Yes.
19   Q.    Correct?
20   A.    Correct.  I'm sorry.
21   Q.    And you told me before the only thing
22   that you did on your email after the end of
23   your employment was import the emails,
24   correct?
```

Page 434

```
 1   A.    I need to make a correction.  This
 2   isn't mine, from me.  It was from Temple
 3   University mail.  "Following up on our
 4   conversation" --
 5   Q.    So this --
 6   A.    I don't know what all these --
 7   Q.    Okay.
 8   A.    -- headers and footers are.
 9   Q.    So this is an email from you to
10   Deirdre Walton, correct?
11   A.    Correct.
12   Q.    And the email is dated February 6th,
13   2014, right?
14   A.    Correct.
15   Q.    And this is an email from your Temple
16   email, correct?
17   A.    Correct.
18   Q.    And there is a notation on the upper
19   right-hand corner that says "6/20/14,"
20   correct?
21   A.    Correct.
22   Q.    And June 20, '14 was after the end of
23   your employment at Temple, right?
24   A.    Correct.
```

Page 435

```
 1   Q.    And you told me that was the date on
 2   which you printed this email?
 3   A.    Well, actually, I'm not sure what it
 4   means.  I don't know if it's a header from
 5   when Temple printed it or if it's me.  How
 6   do I tell?
 7   Q.    Well, this is a document that you
 8   produced to us.
 9   A.    Okay.  Then I --
10   Q.    It says BRIGGS 60 --
11   A.    It was when I printed it then.
12   Q.    Okay.  It says BRIGGS 69, so this is
13   a document you gave to your attorney and he
14   produced it to us.
15   A.    Okay.  So then it was printed by me
16   then.
17   Q.    Okay.  So you're saying that you
18   printed this document on June 20th, 2014,
19   correct?
20   A.    That's what it says.
21   Q.    And you --
22   A.    Yes.
23   Q.    That was after the end of your
24   employment at Temple, right?
```

Page 436

```
 1   A.    Correct.
 2   Q.    And in printing this email on June
 3   20th, 2014, you were doing something other
 4   than importing emails from your Temple email
 5   to your gmail following the end of your
 6   employment at Temple, correct?
 7   A.    I'm sorry.  I don't -- I'm sure -- I
 8   don't understand the question.
 9   Q.    Sure.
10         MS. FENDELL-SATINSKY:  Can you
11   read it back, please.
12         - - -
13         (Whereupon, the court reporter
14   read back the last question.)
15         - - -
16         THE WITNESS:  Yes, yes?
17   BY MS. FENDELL-SATINSKY:
18   Q.    So let's turn now to D-40.
19         And this is an email from you to Ms.
20   Walton.
21   A.    Uh-huh.
22   Q.    Correct?
23   A.    Yes.
24   Q.    And from February 22nd, 2014,
```

RUTH V. BRIGGS

Page 437

1    correct?
2    A.    Correct.
3    Q.    And this is in regards to the
4    discipline you received in January of 2014,
5    correct?
6    A.    Correct, uh-huh, yes.
7    Q.    Did you have communications with
8    Ms. Walton between February 6th, 2014 and
9    February 22nd, 2014?
10   A.    I, I don't -- prob -- I, I don't know
11   when, but I don't -- yeah.
12   Q.    I don't want you to guess.
13   A.    Okay.  Then I don't know.
14   Q.    So if you don't remember --
15   A.    I don't know.
16   Q.    -- or you don't know, that's fine.
17       But which is it, you don't know or
18   you don't remember?
19   A.    I don't know.
20   Q.    Okay.  On the upper right-hand corner
21   of this document --
22   A.    Uh-huh.
23   Q.    -- there is a date.  It says 4/21/14.
24       Do you see that?

Page 438

1    A.    I do.
2    Q.    And, again, uhm, I don't have the
3    copy you provided to us.  This is from the
4    EEOC, but this is a document that I'll
5    represent to you that you provided to the
6    EEOC.  Okay?
7    A.    Yes.
8    Q.    And so this 4/21/14 date, does that
9    reflect that you printed this email on that
10   date?
11   A.    I -- it -- I can't say for sure.
12   Somebody printed it.  It probably was me.
13   Q.    And do you have any reason to believe
14   it wasn't you who printed this email on
15   April 21st, 2014 if you provided this email
16   to the EEOC?
17   A.    No, I don't have any reason.
18   Q.    And April 21st, 2014 was after the
19   end of your employment at Temple, correct?
20   A.    Yes.  Yes, it was.
21       - - -
22       (Whereupon, 2/26/14 email,
23       Bates No. EEOC 0066, was marked as D
24       Exhibit No. 41 for identification.)

Page 439

1       - - -
2    BY MS. FENDELL-SATINSKY:
3    Q.    Ms. Walton (sic), have you seen this
4    email before?
5       MR. MUNSHI:  Briggs.
6       THE WITNESS:  Briggs.
7       MS. FENDELL-SATINSKY:  I'm
8    sorry, Ms. Briggs.
9       THE WITNESS:  Yes.
10      MS. FENDELL-SATINSKY:  I'm
11   looking at "Ms. Walton," your note
12   on Ms. Walton.
13      THE WITNESS:  Yes, I have.
14      MS. FENDELL-SATINSKY:  Okay.
15   BY MS. FENDELL-SATINSKY:
16   Q.    And this is an email from you to you,
17   correct?
18   A.    Yes.
19   Q.    And you write -- the handwritten note
20   on here, is that your note?
21   A.    "Note to self," is that you mean?
22   Q.    Yes.
23   A.    Yes, uh-huh.
24   Q.    And the underline on here, is that

Page 440

1    your underline?
2    A.    Yes, it is.
3    Q.    Okay.  And this is from February
4    26th, 2014, correct?
5    A.    Correct.
6    Q.    So this is a few days after you sent
7    the email at D-40 to Ms. Walton, right?
8    A.    I'm sorry.
9    Q.    Sure.
10      So, D-41 is after, comes after D-40,
11   correct?
12   A.    Yes.
13   Q.    And you say here that Deirdre called
14   after speaking with Greg to tell you that
15   Greg told her that you came in at noon, did
16   not call anyone, and claimed not to have an
17   excuse for being late, correct?
18   A.    Yes.
19   Q.    And you write you told her that
20   Dr. Wu asked you why you had not sent an
21   email, and you told him that your computer
22   was powered down and takes long to power up,
23   correct?
24   A.    Right, correct.

110 (Pages 437 to 440)

RUTH V. BRIGGS

Page 441

1           ---
2           (Whereupon, 2/25/14 email,
3     Bates No. TEMPLE0324, was marked as
4     D Exhibit No. 42 for
5     identification.)
6           ---
7  BY MS. FENDELL-SATINSKY:
8     Q.   Ms. Briggs, have you seen D-42
9  before?
10    A.   Yes.
11    Q.   And this is an email from February
12 25th from you to Sandy Foehl in which you
13 say, "I want to schedule an appointment to
14 file a complaint," correct?
15    A.   Correct.
16    Q.   And other than the emails that we've
17 reviewed, did you have any other
18 conversations with Sandy Foehl -- let me ask
19 a different question.
20    A.   Okay.
21    Q.   Other than the emails we've
22 reviewed --
23    A.   Okay.
24    Q.   -- and the communications and

Page 442

1  conversations you had with Sandy reflected
2  in those emails, did you have any other
3  conversations with Sandy before February
4  25th, 2014?
5     A   Yes; in 2012.
6     Q.   Right.  And we went over an email --
7     A.   Oh, besides that.
8     Q.   -- from 2012.
9     A.   Oh, okay.  Yeah, okay.
10    Q.   So my question was:  Other than the
11 emails that we've gone over and the meetings
12 that are relayed or contained --
13    A.   Uh-huh.
14    Q.   -- in those emails, did you have any
15 other conversations with Sandy Foehl before
16 February 25th, 2014?
17    A.   About the case, right?  I mean, I --
18    Q.   Any conversations, period.
19    A.   -- could have seen her in passing.  I
20 don't --
21    Q.   Sure.  So did you have any
22 conversations about yourself with Sandy
23 Foehl before February 25th, 2014 other than
24 the communications that we've reviewed and

Page 443

1  the emails that we reviewed?
2     A.   No, I did not.
3     Q.   And in this email you tell Sandy that
4  you plan to file an EEOC complaint
5  internally and that you've already had a
6  phone intake with the EEOC, correct?
7     A.   Correct.
8     Q.   When did you have your phone intake
9  with the EEOC?
10    A.   I don't know.  I mean, it's around
11 the same time.
12    Q.   At the time you had a phone intake
13 with the EEOC, had you retained an attorney?
14    A.   No.
15    Q.   When did you retain an attorney?
16    A.   I think in June.  June, maybe.
17    Q.   June 2014?
18    A.   Yes.
19    Q.   Did you retain an attorney after the
20 end of your employment at Temple?
21    A.   Yes.
22          ---
23          (Whereupon, 3/14/14 email
24     string, Bates No. BRIGGS 74-76, was

Page 444

1  marked as D Exhibit No. 43 for
2  identification.)
3          ---
4     THE COURT REPORTER:
5     Forty-three.
6  BY MS. FENDELL-SATINSKY:
7     Q.   Ms. Briggs, have you seen these
8  emails before?
9     A.   Yes.
10    Q.   And in the top email, it's an email
11 from Deirdre to you dated March 14th, 2014,
12 correct?
13    A.   Yes.
14    Q.   And she's asking -- you're exchanging
15 questions about poten -- exchanging e-mails
16 about having a meeting.
17    A.   Yes.
18    Q.   Correct?
19    A.   Yes.
20    Q.   Was there any meeting that followed
21 these emails?
22    A.   I don't know the date that we met.  I
23 really don't know.  I can look at the email.
24 There was only one where she came to my

111 (Pages 441 to 444)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 445

1  office.
2  Q.   So you only had one in-person meeting
3  with Ms. Walton?
4  A.   Plus if she was there when I was let
5  go, but...
6  Q.   Okay.
7  A.   Okay.
8  Q.   So other than the one in-person
9  meeting -- other than the time -- other than
10 what -- other than the meeting at the end of
11 your employment with Temple --
12 A.   Uh-huh.
13 Q.   -- did you have any other in-person
14 meeting with Ms. Walton?
15 A.   Yes.
16 Q.   Okay.  And when was that other
17 in-person meeting?  And you can feel free to
18 look back --
19 A.   Oh, okay.
20 Q.   -- at the other --
21 A.   Because I can't remember when I
22 thanked her.
23 Q.   -- exhibits --
24 A.   All right.

Page 446

1  Q.   -- if that helps.
2  A.   Yeah.  Oh, it might be here.  Sorry.
3  Q.   So, take a minute to look.
4  A.   Okay.
5       MS. FENDELL-SATINSKY:  Let's
6  go off the record while you look.
7       THE WITNESS:  All right.
8       MS. FENDELL-SATINSKY:  And
9  then we can come back on the record.
10      THE VIDEOGRAPHER:  The time is
11 5:53.
12      Off the record.
13      - - -
14      (Whereupon, a brief recess was
15 taken from 5:53 until 6:01 p.m.)
16      - - -
17      THE VIDEOGRAPHER:  6:01, back
18 on the record.
19 BY MS. FENDELL-SATINSKY:
20 Q.   So, Ms. Briggs, before we took a
21 break, you were looking through the exhibits
22 to help refresh your memory about when you
23 had an in-person meeting with Ms. Walton.
24 A.   Yes.

Page 447

1  Q.   Correct?
2  A.   Correct.
3  Q.   And have the exhibits refreshed your
4  memory about that?
5  A.   It did.
6  Q.   Okay.  And so when did the in-person
7  meeting with Ms. Walton occur?
8  A.   It happened on April 25th, 2013 at
9  11:22.
10 Q.   What --
11 A.   Well, actually, that's when I wrote
12 the email to her.
13 Q.   What email --
14 A.   It happened then.
15 Q.   What exhibit are you looking at?
16 A.   It is Exhibit 36.  Is that the number
17 here?
18      THE COURT REPORTER:  I think
19 it's 30.  Oh, no, it's 36, you're
20 right.
21      THE WITNESS:  Uh-huh.
22      THE COURT REPORTER:  I don't
23 have my glasses on.
24      THE WITNESS:  I do, and I

Page 448

1  can't tell.
2  BY MS. FENDELL-SATINSKY:
3  Q.   Okay.  So the only in-person meeting
4  you had with Ms. Walton was on the Monday
5  the week of April 25th; is that correct?
6  A.   Other than the last day, right?
7  Q.   Other than your last day.
8  A.   Yes, uh-huh.
9  Q.   And that day --
10 A.   Yes.
11 Q.   -- would have been April 22nd,
12 correct?
13 A.   April 25th.
14 Q.   Well, you sent the email on April
15 25th, and on April 25th you referred to the
16 meeting "this past Monday."
17 A.   Oh, okay.
18 Q.   So I'm asking if the past Monday was
19 April 22nd.
20 A.   Yes, it was.
21 Q.   I believe we already talked about
22 your meeting on April 22nd with Ms. Walton.
23 Where did that meeting occur?
24 A.   In my office.

112 (Pages 445 to 448)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 449

1    Q.    And that was on the tenth floor,
2    right?
3    A.    Tenth floor of Conwell.  I'm sorry.
4    Carnell.
5    Q.    What?
6    A.    I said "Conwell."  I meant "Carnell."
7    Q.    Oh, okay.  Is there anything that
8    occurred in that meeting other than what
9    we've already talked about?
10   A.    It was very posi -- no.  It was very
11   positive.
12   Q.    And you felt positive after that
13   meeting, correct?
14   A.    Yes, I did.
15   Q.    And did Ms. Walton provide you with
16   strategies to use with Dr. Wu and Mr. DiMeo?
17   A.    Yes.  She listened to me and then
18   talked to me about bidding on other jobs,
19   those kinds.  More like advice.
20   Q.    Okay.  So that -- and just so -- I
21   believe you testified to this earlier, but
22   that's the meeting in which you believe she
23   told you that she would pull back your
24   inability to apply for positions because of

Page 450

1    your probation?
2    A.    I don't know if that was the time.
3    Q.    Okay.
4    A.    I don't know.  I know there's another
5    email, and I don't see it here.  But, but
6    it's probably around that time.
7    Q.    Okay.
8    A.    But it was a separate email.
9         - - -
10        (Whereupon, 3/25/14 email
11        string, Bates No. BRIGGS 79-83, was
12        marked as D Exhibit No. 44 for
13        identification.)
14        - - -
15        THE COURT REPORTER:
16   Forty-four.
17        MS. FENDELL-SATINSKY:
18   Forty-four?
19        THE COURT REPORTER:  Yup.
20   BY MS. FENDELL-SATINSKY:
21   Q.    Ms. Briggs, have you seen this email
22   before?
23   A.    Yes, I have.
24   Q.    And these are emails between you and

Page 451

1    Ms. Walton, correct?
2    A.    Yes.
3    Q.    So if we go back to the first email
4    in this chain, it's a March 23rd email from
5    you to Ms. Walton that starts on BRIGGS 81;
6    is that correct?
7    A.    Yes, it is.
8    Q.    And Ms. Walton responded to you the
9    next day, correct?
10   A.    Yes.
11   Q.    And then you responded to Ms. Walton
12   the next day, March 25th, right?
13   A.    Yes.
14   Q.    And Ms. Walton responded to you then
15   in the final email of this exhibit on the
16   same day, right?
17   A.    Yes.
18        - - -
19        (Whereupon, 3/28/14 email
20        string, Bates No. EEOC 0067-71, was
21        marked as D Exhibit No. 45 for
22        identification.)
23        - - -
24        THE COURT REPORTER:

Page 452

1    Forty-five.
2    BY MS. FENDELL-SATINSKY:
3    Q.    Ms. Briggs, you told me earlier that
4    on April 1st you did make a complaint to
5    Sandra Foehl, correct?
6    A.    Yes.
7    Q.    And what was the content of your
8    complaint to Sandra Foehl on April 1st?
9    A.    That I was being discriminated based
10   on my age and my gender, and retaliation.  I
11   think I said retaliation.  I don't -- I'm
12   not sure.  Age and gender.
13   Q.    There are notes on this Exhibit D-45,
14   correct?
15   A.    There are, yes.
16   Q.    And are those your notes?
17   A.    That's my handwriting, yes.
18   Q.    What did you make those notes?
19   A.    April 1st.  I don't know exactly
20   when, but...
21   Q.    Did you meet make them on April
22   1st --
23   A.    I don't know.
24   Q.    -- or?

113 (Pages 449 to 452)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 453

1    A.   I don't really know.
2    Q.   You don't know.
3         You don't know when those notes were
4    made?
5    A.   (No response.)
6    Q.   Am I correct that you don't know
7    when --
8    A.   And I'm just reading what I wrote.
9    Q.   Sure.
10   A.   Okay.  (Brief pause while reading.)
11        I don't know the answer to the
12   question.
13   Q.   Okay.  And your notes say that you
14   met with Ms. Foehl at 10:00 a.m. and you
15   were asked to meet with Mr. Wacker at 10:30
16   a.m.?
17   A.   Correct.
18   Q.   Earlier, you testified that Mr.
19   Wacker called you first thing in the morning
20   and asked to meet with you.  You said that
21   you had a meeting and that you would let him
22   know when you were back.
23   A.   Yes.
24   Q.   So Mr. Wacker did not ask to meet

Page 454

1    with you at 10:30, did he?
2    A.   When I called him, he asked me to
3    come at 10:30.
4    Q.   So you called him when you returned,
5    and he said to come.  And that was at 10:30?
6    A.   No, that's not, not how it happened.
7    Q.   Okay.  So what happened?
8    A.   He called me first thing in the
9    morning --
10   Q.   Right.
11   A.   -- when I got there and said that
12   there was a dean's office meeting.  And I
13   said, "Well, I can't come at that time, but
14   I can be there at 10:30."
15        And he said that would be fine.  So I
16   went right from Sandy's office to his
17   office.
18   Q.   So he did not ask you to meet at
19   10:30, correct?
20   A.   (No response.)
21   Q.   You offered to meet at 10:30.
22   A.   Well, I said I could meet with him at
23   10:30, right.
24   Q.   So he did not ask you to meet at

Page 455

1    10:30, correct?
2    A.   He asked me to meet at 10:00.
3         - - -
4         (Whereupon, 4/21/14 email
5    string, Bates No. TEMPLE0174-175,
6    was marked as D Exhibit No. 46 for
7    identification.)
8         - - -
9         THE COURT REPORTER:
10   Forty-six.
11   BY MS. FENDELL-SATINSKY:
12   Q.   Ms. Briggs, have you seen this
13   document before?
14   A.   Yes, I have.
15   Q.   If you turn to the last page of this
16   document, this is an April 2nd email from
17   Ms. Foehl to you.
18        Do you see that?
19   A.   Yes, I do.
20   Q.   And she says, "Ruth, I appreciate
21   that you are able to send me correspondence
22   you referenced in our meeting yesterday.  I
23   will conduct an investigation of your
24   complaint of age discrimination."

Page 456

1         Do you see that?
2    A.   Yes, I do.
3    Q.   And in your response to her, you did
4    not indicate that she should also be
5    investigating a complaint of gender
6    discrimination or retaliation, correct?
7    A.   I don't...
8    Q.   So Ms. Foehl told you on April 2nd
9    that she was going to conduct an
10   investigation of your complaint of age
11   discrimination.
12   A.   Yes.
13   Q.   Correct?
14   A.   Yes.
15   Q.   Her email does not mention gender
16   discrimination or retaliation, correct?
17   A.   It doesn't mention that.
18   Q.   And you responded to Ms. Foehl,
19   correct?
20   A.   Yes.
21   Q.   And your response does not say
22   anything about the fact that you'd like her
23   to investigate gender discrimination or
24   retaliation, correct?

114 (Pages 453 to 456)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 457

1   A.   No, it doesn't.
2   Q.   Are you certain that you told
3   Ms. Foehl that you felt you were being
4   discriminated against because of your gender
5   and retaliation?
6   A.   Yes, I am.
7   Q.   So if Ms. Foehl said that you only
8   made a complaint about age discrimination,
9   would she be lying?
10          MR. MUNSHI:  Just objection to
11   form.
12          You can answer.
13          THE WITNESS:  I'm sorry?
14          MR. MUNSHI:  Objection to
15   form, but you can answer the
16   question.
17          THE WITNESS:  Okay.  I
18   believed it was both.
19          MS. FENDELL-SATINSKY:  That
20   wasn't my question.
21          THE WITNESS:  Yes, I, I
22   mentioned gender and age.
23          MS. FENDELL-SATINSKY:  Okay.
24

Page 458

1   BY MS. FENDELL-SATINSKY:
2   Q.   So my question was that:  If Ms.
3   Foehl said that you only complained about
4   age discrimination, would she be lying?
5   A.   I would not say she was lying.
6   Q.   So there may have been a
7   misunderstanding?
8   A.   Yes.  I don't think of her as a
9   person who would lie.
10   Q.   So you believe, you believe that you
11   conveyed to Ms. Foehl that you wanted to
12   make a complaint of age and gender
13   discrimination and maybe retaliation,
14   correct?
15   A.   Yes.
16   Q.   And you believe it's possible,
17   however, that Ms. Foehl did not understand
18   that; is that correct?
19   A.   Yes.
20          MR. MUNSHI:  Just objection to
21   form.
22          THE WITNESS:  Yes.
23   BY MS. FENDELL-SATINSKY:
24   Q.   When you got the email on April 2nd

Page 459

1   from Ms. Foehl that said, "I will conduct an
2   investigation of your complaint of age
3   discrimination" --
4   A.   Yes.
5   Q.   -- did you understand that to mean
6   that she did not understand that you had
7   also made a complaint or --
8   A.   If I can be really perfectly
9   honest --
10   Q.   Sure.
11   A.   -- with you, I didn't pick that up.
12   Q.   Okay.
13   A.   It was a bad, bad couple days.
14   Q.   Other than what we've gone through,
15   the emails that we've talked about and the
16   other meetings that we've talked about and
17   the meetings that are conveyed in these
18   emails, did you make any other complaints to
19   anyone in management, H.R., or Legal at
20   Temple about what you viewed as
21   discrimination, retaliation, or harassment?
22   A.   No.
23   Q.   And I know you told me earlier that
24   you never told Dr. Wu that you felt he was

Page 460

1   treating you differently because of your
2   sex, correct?
3   A.   I don't recall that I did.  No, I
4   don't.
5   Q.   Did you ever tell Mr. Wacker that you
6   believed you were being discriminated
7   against because of your sex?
8   A.   I believe I did.
9   Q.   You did or you believe you did?
10   A.   I remem -- that's what I remember.
11   Q.   So --
12   A.   At the same time, the same time I
13   talked about the age thing.
14   Q.   The same time you talked to
15   Mr. Wacker about the age thing?  You had not
16   previously told me that you had relayed
17   anything to Mr. Wacker --
18   A.   Yeah.  Because I was --
19   Q.   -- about an --
20   A.   -- written up.
21   Q.   -- age thing.
22   A.   I don't, I don't --
23   Q.   Are you referring to your write-up
24   from 2011?

115 (Pages 457 to 460)

ELITE LITIGATION SOLUTIONS, LLC

RUTH V. BRIGGS

Page 461

1  A.  No.
2  Q.  Okay.  Which write-up are you
3  referring to?
4  A.  It was --
5  Q.  You told me earlier that the write-up
6  you received in January 2011 --
7  A.  Right.
8  Q.  -- was after Dr. Wu made a comment to
9  you about women being put out to pasture at
10  a certain age in China, correct?
11  A.  Yes.
12      MR. MUNSHI:  Just objection to
13   form on the date.  It wasn't January
14   2011.
15      MS. FENDELL-SATINSKY:  I think
16   it was November 2011.
17      MR. MUNSHI:  Yeah.
18  BY MS. FENDELL-SATINSKY:
19  Q.  So the November 2011 discipline that
20  you received you believed was a result of
21  you telling Dr. Wu -- let me step back.
22      Are you saying that you spoke with
23  Mr. Wacker about the discipline you received
24  in November 2011?

Page 462

1  A.  No.  I think, I think -- the one
2  about where I was written up for
3  insubordination or unprofessional conduct?
4  Q.  So, there are a few disciplines.  So
5  there is a discipline from 2011 that --
6  A.  Yes.
7  Q.  -- from November of 2011 that you
8  testified occurred after Dr. Wu made a
9  comment to you --
10  A.  Okay.
11  Q.  -- that women were put out to pasture
12  at a certain age --
13  A.  Right.
14  Q.  -- in China, correct?
15  A.  That is correct.
16  Q.  And you told me that you went to
17  Dr. -- you went to Mr. Wacker about that
18  discipline, right?
19  A.  I was called to him by him.
20  Q.  By him.
21      And he gave you the discipline; is
22  that right?
23  A.  Yes, he did.
24  Q.  And you asked Mr. Wacker, you

Page 463

1  testified, whether he knew what Dr. Wu had
2  said to you.
3  A.  Correct.
4  Q.  Correct?
5  A.  Yes.
6  Q.  Other than saying that, did you say
7  anything else?  Did you say anything to
8  Dr. -- I did it again.
9  A.  Greg.
10  Q.  Other than that, did you say anything
11  else to Mr. Wacker --
12  A.  I did.
13  Q.  -- about -- let me finish my
14  question.
15  A.  I'm sorry.
16  Q.  Other than that, did you say anything
17  else to Mr. Wacker about age discrimination?
18  A.  About age or gender?
19  Q.  My question was about age.
20  A.  Yes, I did.
21  Q.  What did you say to him?
22  A.  I told him what Dr. Wu had told me,
23  that about the statement in China women are
24  put out to pasture at 55.

Page 464

1  Q.  Right.  Other than that, did you say
2  anything else to him about being treated
3  differently because of your age?
4  A.  I can't say specifically what it was.
5  We had a long conversation.  I don't
6  remember.  It was all about that.  I can't
7  say.
8  Q.  Is there anything you can do to
9  refresh your recollection?
10  A.  No, I -- uhm, right now, I can't.
11  Q.  So there's nothing sitting here today
12  that you can do to refresh your recollection
13  about what else you may have said to
14  Dr. Wacker -- I did it again.
15      There is nothing else sitting here
16  today that you can do to refresh your
17  recollection about what you said to
18  Mr. Wacker in the meeting in which you
19  received discipline in November of 2011,
20  correct?
21  A.  Not -- correct, not that I recall.
22  Q.  And you can't do anything to refresh
23  your recollection sitting here today,
24  correct?

116 (Pages 461 to 464)

RUTH V. BRIGGS

Page 465

1    A.   No.  The -- no.
2    Q.   And when you relayed to Dr. Wacker
3  the comments that Dr. Wu made to you, did
4  you say anything else about the comment
5  other than relaying the comment to him?
6    A.   It is my recollection that we talked
7  about the gender, the age, and the
8  retaliation.
9    Q.   But you don't remember anything
10  specific about that conversation then what
11  else you said to him, correct?
12    A.   No, I don't.
13    Q.   You don't remember anything else.
14    A.   I don't recall, no.
15    Q.   Correct?
16    A.   That's correct, yes.
17    Q.   And you don't remember anything else
18  that Mr. Wacker said to you in that
19  conversation, correct?
20    A.   No, I don't.
21    Q.   So it's just -- is it your guess that
22  you said something else to him about your
23  age, your gender, and retaliation, or do you
24  remember saying something to him about

Page 466

1  your -- let's start with your age.
2        Do you remember saying something else
3  to him about your age?
4    A.   My age, yes.
5    Q.   Okay.  So what else did you say to
6  him about your age?
7    A.   Oh, what else besides the -- no,
8  nothing.
9    Q.   Okay.
10    A.   I thought -- okay.
11    Q.   Do you remember saying anything else
12  to Mr. Wacker in that conversation or -- let
13  me ask the question again.
14        Do you remember saying anything to
15  Dr. Wacker -- there we go.
16        Do you remember saying anything to
17  Greg in that conversation about your gender?
18    A.   I don't remember exactly.
19    Q.   And there is nothing sitting here
20  today that you can do to refresh your
21  recollection, right?
22    A.   No.
23    Q.   Nothing you can do, correct?
24    A.   Nothing I can do.

Page 467

1    Q.   Do you remember saying anything to
2  doc -- to Mr. Wacker in that conversation
3  about retaliation?
4    A.   I can't say for sure, no.
5    Q.   And there's nothing sitting here
6  today that you can do to refresh your
7  recollection?
8    A.   No.  I have no records from that
9  time.
10    Q.   Other than that one conversation you
11  had with Mr. Wacker in which you relayed a
12  conversation in which -- I'm sorry.  Let me
13  start again.
14        Other than that one conversation you
15  had with Mr. Wacker where you relayed
16  Dr. Wu's comment --
17    A.   Yeah.
18    Q.   -- did you have any other
19  conversations with Mr. Wacker about being
20  treated differently because of your age or
21  gender?
22    A.   Not directly.
23    Q.   What do you mean "not directly"?
24    A.   I spoke to Drew.

Page 468

1    Q.   But not to Dr. Wacker?
2    A.   Mister.  No.
3    Q.   Mr. Wacker.
4    A.   Okay.  Uhm, no.
5    Q.   Okay.
6    A.   Drew was like my contact.
7    Q.   So just so the record is clean, other
8  than that one conversation with Mr. Wacker
9  during which you relayed a comment Dr. Wu
10  made to you, you did not have any other
11  conversations with Mr. Wacker himself about
12  treating -- being treated differently
13  because of your age or gender, correct?
14    A.   That's correct.
15    Q.   And you did not have any other
16  conversations with Mr. Wacker where you
17  spoke to him about retaliation, correct?
18    A.   Correct.
19    Q.   You said you spoke with Drew about
20  age and gender discrimination; is that
21  accurate?
22    A.   That is accurate.
23    Q.   Okay.  When did you do that?
24    A.   It was in 2014.  Uhm, I don't have a

117 (Pages 465 to 468)

RUTH V. BRIGGS

Page 469

1  date.
2  Q.   What did you tell him?
3  A.   I told him that I believed that I was
4  being treated differently than other people
5  in the department because of my age and
6  because of my gender, and he was angry at me
7  for saying it.
8  Q.   What did he say to you?
9  A.   He said, "I don't know where that" --
10 you know, I can't remember exactly, but it
11 was very -- it wasn't a very good meeting,
12 so...
13 Q.   Okay.  So, I don't want you to guess
14 what happened at the meeting.  I want you to
15 only tell me what you remember happening at
16 the meeting.
17     So what do you remember Mr. DiMeo
18 saying in response to your comment that you
19 thought you were treated differently because
20 of your age and gender?
21 A.   I, I, I can't recall specifics.  I'm
22 sorry.
23 Q.   Do you remember anything else about
24 your conversation with Drew in which you

Page 470

1  told him you thought you were treated
2  differently because of your age and your
3  gender?
4  A.   I thought I just answered the
5  question.  No.
6  Q.   Do you remember where the
7  conversation --
8  A.   It was --
9  Q.   -- occurred?
10 A.   It was in his office.
11 Q.   Did you go to him to specifically
12 speak about this, or were you there to
13 discuss something else?
14 A.   I was called.  I believe I was called
15 into his office for some -- to be proactive,
16 but I don't, I don't -- it was after our
17 meeting.  It was after a meeting with Dr.
18 Wu, and he wanted me to come back.  I don't
19 know if his intent was to go over something
20 else with me, but...
21 Q.   But you raised this with him; he
22 didn't raise this with you, correct?
23 A.   At -- after I met with Dr. Wu and he
24 asked me to go back.  And he was mad at me.

Page 471

1  He was like, you know, "Just listen to him."
2  And I don't -- I don't recall the exact
3  word.  I was a wreck.
4  Q.   So are you positive that you told him
5  during that meeting that you were treated
6  differently because of your age and gender,
7  or are you -- or did you believe he inferred
8  that based on your -- what you said?
9  A.   I know I told him.  I know I told
10 him.  I don't recall exactly when.
11 Q.   Well, you told me it was in 2014.
12 A.   It was in 2014.  That's when
13 things -- I knew something was coming.  I
14 could feel it.
15 Q.   So was it toward the end of your time
16 at Temple?
17 A.   I actually think I have an email.
18 And I can look for it, but I think it was
19 probably in February.
20 Q.   And you believe you have an email
21 that says what?
22 A.   About -- well, actually, it wouldn't
23 say that.  About going to his -- I don't
24 know what day it was I went to his office.

Page 472

1  So I have a "come to my office" kind of
2  thing.
3  Q.   Well, you said that this
4  conversation --
5  A.   Yeah.
6  Q.   -- occurred when you went to his
7  office.
8  A.   His office, right.  "Come to my
9  office."
10 Q.   Right.
11 A.   His office.
12 Q.   So you said you have -- you think you
13 have an email that --
14 A.   That said, "Come to my office."
15 Q.   -- reflects this.
16 A.   But you're right, I don't have
17 anything that says anything.  I did talk to
18 him privately about it.  I didn't put it in
19 writing.
20 Q.   And you don't have -- the email that
21 you think you have from him just says "come
22 to my office" or words to that effect?
23 A.   Some -- yeah.
24 Q.   And, again, just for the record, we

118 (Pages 469 to 472)