# EXHIBIT 27

# In The Matter Of:

*RUTH V. BRIGGS v.*

*TEMPLE UNIVERSITY*

---

*JIE WU*

*May 31, 2017*

---

*Terry Burke Reporting*

*Registered Professional Reporters*

*terryburkermr@gmail.com*

*(215) 205-9079*

Min-U-Script® with Word Index

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                    -      -      -
 4   RUTH V. BRIGGS,                  :
 5              Plaintiff,            :
                                      :   Civil Action
 6   v.                              :   No. 16-00248
 7   TEMPLE UNIVERSITY,               :
 8              Defendant.            :
 9                    -      -      -
10            Philadelphia, Pennsylvania
              Wednesday, May 31, 2017
11                    -      -      -
12
13            Deposition of JIE WU, taken pursuant
14   to notice, held at Console Mattiacci Law, LLC,
15   1525 Locust Street, Ninth Floor, Philadelphia,
16   Pennsylvania, beginning at 10:00 a.m., on
17   Wednesday, May 31, 2017, before Terry Barbano
18   Burke, RMR-CRR.
19
20
21
22            TERRY BURKE REPORTING
                 (215) 205-9079
23            terryburkermr@gmail.com
24
```

**Page 2**

```
 1   APPEARANCES:
 2        RAHUL MUNSHI, ESQUIRE
          Console Mattiacci Law, LLC
 3        1525 Locust Street, Ninth Floor
          Philadelphia Pennsylvania 19102
 4
          Counsel for the Plaintiff
 5
          RACHEL FENDELL SATINSKY, ESQUIRE
 6        Littler Mendelson, P.C.
          Three Parkway
 7        1601 Cherry Street, Suite 1400
          Philadelphia, Pennsylvania 19102
 8
          Counsel for the Defendant
 9
10                    -      -      -
11                  JIE WU,
12        SERC Center, 035-10, 1925 North 12th
13        Street, Room 362, Philadelphia,
14        Pennsylvania, having been duly sworn, was
15        examined and testified as follows:
16   BY MR. MUNSHI:
17   Q.   Good morning, Dr. Wu.
18   A.   Good morning.  How are you?
19   Q.   My name is Rahul Munshi.  I am an
20   attorney here at Console Mattiacci Law, and I
21   have the privilege of representing Ruth Briggs
22   in this action that has been brought against
23   Temple.
24            You are here for your deposition.
```

**Page 3**

```
 1   Do you understand that?
 2   A.   Yes.
 3   Q.   Have you ever had your deposition taken
 4   before?
 5   A.   No.
 6   Q.   Let me tell you a little bit about how
 7   depositions work generally.
 8   A.   Sure.
 9   Q.   I am going to be asking you a series of
10   questions here today.  You are going to be
11   giving me answers to those questions.  If I ask
12   you a question that you don't understand or you
13   want me to repeat, just go ahead and let me know
14   that.  I will try to ask a better question or I
15   will just say the question again.
16            Okay?
17   A.   Okay.
18   Q.   You will see here that Terry is sitting
19   to your left, and you will see that she is
20   taking everything we are saying down so that a
21   transcript can be created later on.
22            As a result, we have to make sure we
23   do our very best to not talk over each other --
24   A.   Sure, uh-huh.
```

**Page 4**

```
 1   Q.   And that is a good segue into my next
 2   instruction, which is, if you could try to do
 3   your very best to wait until I am done asking my
 4   question before you start answering it, even if
 5   you know where my question is going.  I am going
 6   to try to do my very best to not ask you a
 7   question until you are done answering my
 8   previous one.
 9            Okay?
10   A.   Okay.
11   Q.   Similar instruction is, again, for the
12   purposes of the transcript, we have to make sure
13   we verbalize all of our answers.  So head
14   shakes, head nods, those don't come out on the
15   transcript.  So from time to time I may say "can
16   you please verbalize that."
17   A.   Uh-huh.
18   Q.   And that is what I mean.
19            Do you understand that?
20   A.   Okay.
21   Q.   If you do want to take a break at any
22   point, we will do our very best.
23   A.   Uh-huh, okay.
24   Q.   The last instruction I will give you,
```

Page 5

1  Dr. Wu, is the most important one, and that is
2  that you just took an oath here to tell the
3  truth. Even though you are in our conference
4  room and there is no judge present, there is no
5  jury present, with that oath comes the same
6  responsibility to tell the truth and the same
7  potential penalties of perjury if you do not
8  tell the truth.
9          Do you understand that?
10  A. Yes, I understand.
11  Q. Please verbalize.
12          And that goes for an answer of "I
13  don't recall" when you do recall.
14          Do you understand that?
15  A. Yes, I understood.
16          MR. MUNSHI: Let's mark this
17  document as P-1.
18          (P-1 was marked for identification.)
19  BY MR. MUNSHI:
20  Q. I will represent to you, Dr. Wu, that
21  P-1 is a printout of a portion of a resume that
22  was on Temple's website. My only question for
23  you, and go ahead and review it, is if the
24  information under your employment history and

Page 6

1  education history is all accurate?
2  A. Yes, it is accurate.
3  Q. How about the education history on the
4  second page?
5  A. Yes.
6  Q. Good.
7          MR. MUNSHI: Let's have this
8  document marked as P-2, please.
9          (P-2 was marked for identification.)
10  BY MR. MUNSHI:
11  Q. Dr. Wu, I will represent to you that P-2
12  is another document that was printed from
13  Temple's website. It is a short biography.
14          If you can just review all of this
15  information and tell me if all of this is
16  accurate?
17  A. Yes, it's accurate because I prepared
18  it.
19  Q. Good.
20          Sometimes people prepare things not
21  accurately. But you have had a chance to review
22  it?
23  A. Yeah.
24  Q. What is your current position over at

Page 7

1  Temple?
2  A. I'm a professor computer science --
3  computer and information sciences, and also I'm
4  a center director. The center name is called
5  Center for Networked Computing.
6          And also I have a side job as
7  associate vice provost for international
8  affairs.
9  Q. And that is at Temple University as
10  well?
11  A. Yes, that's at Temple University.
12  Q. Are you the chair of any department
13  currently?
14  A. Not. I resigned last year.
15  Q. What were you the chair of?
16  A. Chair of department of computer and
17  information sciences.
18  Q. And you resigned from that position in
19  the year 2016?
20  A. Yes.
21  Q. Why did you resign?
22  A. It's like my term ends, two terms. I
23  extended one year.
24  Q. Your term ended, is that what you said?

Page 8

1  A. Yeah.
2  Q. Who is the current chair of the
3  department?
4  A. His name is Slobodan Vucetic. It's
5  difficult.
6  Q. We will do our best with the spelling of
7  the names afterwards.
8  A. Slobodan Vucetic. It's a Serbian name.
9  Q. Okay.
10          Do you have any folks reporting
11  directly to you now?
12  A. Yes. So I have two reporting lines.
13  One is to chair of the department. The other
14  one is provost of our university.
15  Q. Those are the people to whom you report;
16  correct?
17  A. Yes.
18  Q. Does anybody report to you currently?
19  A. Oh, it is complicated. Yeah, I have two
20  assistant vice president report to me, both for
21  international affairs. And also we have office,
22  Temple has office in China. So the director of
23  that office report to me.
24  Q. Anyone else report to you currently?

Page 9

1    A.  And at Temple, there is a Confucius
2  Institute in the university.  So there are two
3  directors.  Both directors report to me.
4    Q.  Anybody else report to you directly
5  right now?
6    A.  No.
7    Q.  In the year 2014, 2013/2014 period, were
8  you the chairman of the department back then?
9    A.  Yes.
10    Q.  And you were also a professor back then;
11  correct?
12    A.  Yes.
13    Q.  And back in the years 2013/2014, can you
14  estimate for me the number of people who
15  reported directly to you?
16    A.  It's about 50.
17    Q.  Five zero?
18    A.  Yes, five zero.
19    Q.  What is your date of birth, Dr. Wu?
20    A.  ████████████
21    Q.  Where were you born?
22    A.  Shanghai, China.
23    Q.  When did you move to the United States?
24    A.  January 16, 1987.

Page 10

1    Q.  You remember the exact date?
2    A.  Yes.
3    Q.  So about 30 years ago?
4    A.  Yeah.
5    Q.  Did you live in China the whole time
6  before you moved to the United States?
7    A.  Correct.
8    Q.  Are you aware, Dr. Wu, that in China
9  there is a mandatory retirement law?
10    A.  I think it's yes.  Not just China, but
11  many other country in Asia.
12    Q.  What other countries are you aware of?
13    A.  As far as I'm told, Korea, Japan, Hong
14  Kong, Macau.
15    Q.  As far as you understand, all of those
16  Asian countries have some sort of mandatory
17  retirement law?
18    A.  Yes.
19    Q.  As far as China's law goes, based on
20  your understanding and your history of growing
21  up there --
22    A.  Yeah.
23    Q.  -- are you aware that under China's law
24  most men must retire at the age of 60?

Page 11

1    A.  Yes.
2    Q.  And are you aware that under China's
3  law -- put aside the other countries --
4    A.  Yes.
5    Q.  -- most women and white collar
6  professions must retire at the age of 55?
7    A.  White collar, yes.  White collar.
8    Q.  Different for blue collar, right?
9    A.  Yes.
10    Q.  Under blue collar it is age 50?
11    A.  Yes.
12    Q.  But white collar are professions that
13  are in the office; right?
14    A.  Yes.
15    Q.  So for those women who work in the white
16  collar professions, the mandatory age is 55;
17  correct?
18    A.  Uh-huh, uh-huh.
19    Q.  Please verbalize.
20    A.  Yes.
21    Q.  So you are aware based on your
22  understanding of the law from growing up there
23  that Chinese law treats men and women
24  differently, there is a different age; right?

Page 12

1        MS. SATINSKY: Objection to form.
2  You can answer the question.
3        THE WITNESS: Yes, yes.
4  BY MR. MUNSHI:
5    Q.  Did you ever have a discussion with Ruth
6  Briggs about China's retirement law?
7    A.  We never discussed from the law
8  perspective.  But we discuss after my travel, I
9  usually always have discussion with Ruth, share
10  my experience of the travel.  So I think at one
11  point we discussed about it.  But nothing for
12  retirement.  Just say womens retire early.
13    Q.  What do you recall about those
14  conversations you had with Ruth Briggs?
15    A.  When?
16    Q.  What do you recall about it?
17    A.  Oh, just it's kind of very casual
18  conversation.  We just shared experience of
19  culture.  I just mentioned that, you know, women
20  retire early.
21    Q.  Did you tell her that in China it is
22  actually the age 55 for some women?
23    A.  No, no, no.
24    Q.  So you just said women retire early, but

Page 13

1  you didn't say what age?
2     A. Yes, actually I mentioned --
3        MS. SATINSKY: Just wait until he is
4  finished asking the question.
5        THE WITNESS: Sorry.
6        MS. SATINSKY: That is okay.  It
7  will come out cleaner for the transcript.
8  BY MR. MUNSHI:
9     Q. Did you say anything about the age,
10  specific number of age, or did you just say
11  early?
12     A. I don't remember exactly, but I do
13  mention cases women retire very early, including
14  my sister.
15     Q. When you said "very early," what were
16  you referring to?
17     A. Early could be 40, 50, women last job.
18     Q. Do you remember when you had this
19  conversation with Ruth Briggs?
20     A. It's awhile ago. Maybe five years, six
21  years ago.
22     Q. And was this one conversation or did you
23  have multiple conversations with her regarding
24  the culture in China?

Page 14

1     A. I just remember once.
2     Q. Do you remember where this conversation
3  took place?
4     A. In my office.
5     Q. And what prompted this conversation?
6  Did she ask you about the culture in China or
7  did you just offer it yourself?
8     A. No. I don't remember the content, but
9  we discussed many things.
10     Q. And we are just talking right now about
11  this concept that over in China --
12     A. Yeah.
13     Q. -- there is this mandatory law; right?
14     A. No, no, I never discussed mandatory law.
15  I just said women retired early and there are
16  many cases, certain job -- for certain
17  discipline, they required young women.  Like in
18  the restaurant.  More labor.
19     Q. And now we are talking about China;
20  right?
21     A. Yes, China.
22     Q. And is it your understanding that this
23  is a cultural characteristic of China?
24     A. No, not really, because Chinese, after

Page 15

1  retire, they continue work and go back to the
2  same place and continue work.
3     Q. What do you mean by that, after they
4  retire they continue working?
5     A. Yeah, they continue working.  You can
6  rehire them.
7     Q. So what is the retirement, what are you
8  retiring from?
9     A. So I think the main purpose is that you
10  don't want a person to hold a position for too
11  long, especially like a leadership position.
12     Q. Is it your understanding that the same
13  concepts and the same laws are in the United
14  States?
15     A. I'm not sure of the retirement age.  I
16  know university probably not, but in many
17  company I think that there is discussion, I
18  think maybe even with Ruth, that you don't see
19  many people -- I mean once you reach a certain
20  age, you retire.
21     Q. What is that certain age from your own
22  experiences?
23     A. I don't know.  It varies.  But
24  university can work until 70's.

Page 16

1     Q. And is it your understanding that Temple
2  has a mandatory retirement age?
3     A. I don't think so.
4     Q. Are you aware of any companies in the
5  United States that have mandatory retirement
6  ages?
7     A. I don't remember.  I don't think so.
8     Q. Are you aware of any laws in the United
9  States that do require folks to retire at a
10  certain age?
11     A. No.
12     Q. Are you aware of any laws in the United
13  States that prohibit companies from putting
14  mandatory retirement ages?
15     A. I'm not sure, but I don't see any like
16  law that say we have to retire certain age.
17     Q. You said that the conversation about how
18  it works over in China with certain women
19  retiring, was that one conversation or multiple
20  conversations?
21     A. I think --
22        MS. SATINSKY: Hold on.  Objection
23  to form.  Asked and answered.  You can answer
24  the question.

Page 17

1       THE WITNESS: I recall just maybe
2  once.
3  BY MR. MUNSHI:
4    Q.  And this took place at a time where Ruth
5  Briggs was reporting directly to you; correct?
6    A.  Yes.
7    Q.  And do you recall that Ruth Briggs
8  started reporting directly to you in around
9  2009?
10   A.  Yes.
11   Q.  And she left Temple in 2014?
12   A.  Yes.
13   Q.  So the conversation with Ruth happened
14  sometime between 2009 and 2014; correct?
15       MS. SATINSKY: Objection.  Asked and
16  answered.  You can answer the question.
17       THE WITNESS: Correct.
18  BY MR. MUNSHI:
19   Q.  Did you have an understanding at the
20  time you had this conversation with Ruth that
21  she was in her 50s?
22   A.  I do not know, but she's not the
23  youngest one.  We have many senior staff member.
24   Q.  Not my question.  Just talking about

Page 18

1  Ruth.  Okay?
2    A.  Yeah.
3    Q.  Did you have an understanding when you
4  had this conversation with Ruth that she was In
5  her 50s?
6        MS. SATINSKY: Objection.  Asked and
7  answered.  You can answer the question.
8        THE WITNESS: Yeah, I think so,
9  because she and I probably similar age.
10  BY MR. MUNSHI:
11   Q.  Did you ever say to her words to the
12  effect of most women in China do retire at the
13  age of 55?
14       MS. SATINSKY: Objection.  Asked and
15  answered.
16       You can answer the question.
17       THE WITNESS: I don't think so.  I
18  don't put a number, like 55.  But even we have
19  these conversations, nothing to do with
20  retirement.  Just discussed the culture things.
21  BY MR. MUNSHI:
22   Q.  When you say it had nothing to do with
23  retirement, what do you mean by that?
24   A.  Because we have a long conversation,

Page 19

1  like a one-hour conversation, so we talk about
2  different culture, the habit of eating, the
3  habit of working.  So this is just like a very
4  small piece of conversation.
5    Q.  And do you make it known at your job at
6  Temple that you are from China?
7    A.  Oh, everyone knows by looking.
8    Q.  Everyone knows that you are from China?
9    A.  Yes.
10   Q.  Did you ever say, Dr. Wu, words to the
11  effect that women in China are put out to
12  pasture at age 55?
13   A.  No, I never say that word.  I don't even
14  know that word.
15   Q.  Which word?
16   A.  The word you just said.
17   Q.  Pasture?
18   A.  Pasture, yeah.
19   Q.  Never heard that word before in your
20  life?
21   A.  No.
22       MR. MUNSHI: Let's have this
23  document marked as P-3.
24       (P-3 was marked for identification.)

Page 20

1        MR. MUNSHI: Let's have this one
2  marked as P-4.
3        (P-4 was marked for identification.)
4  BY MR. MUNSHI:
5    Q.  Dr. Wu, in your hands you have two
6  different documents here.  One is marked P-3 and
7  one is marked P-4.
8        P-3 is the complaint that was filed
9  in this lawsuit --
10   A.  Uh-huh.
11   Q.  -- from Ruth Briggs.
12       P-4, that is on the table, this is
13  Temple University's answer to the complaint.
14       Do you see that?
15   A.  Yes.
16   Q.  Looking at P-3, which is in your hand
17  right here, you will see as you flip through it
18  there are numbered paragraphs.
19   A.  Which page?
20   Q.  So let's look at Page 4, and the
21  numbered paragraph of 24.
22       Paragraph 24 states, "By way of
23  example, on or about November 9, 2011, Dr. Wu (a
24  Chinese national) stated to plaintiff, who is

Page 21

1    turning 57 years old the next day, that women in
2    China are 'put out to pasture at the age of
3    55.'"
4          Do you see that?
5    A.  Yes, I see that.
6    Q.  You see that, okay.
7          Did that ever happen?
8          MS. SATINSKY: Objection.  Asked and
9    answered.  You can answer the question one more
10   time.
11         THE WITNESS: Yeah, never have
12   because I don't even know the word pasture.
13   BY MR. MUNSHI:
14   Q.  If you can go to P-4, which is the
15   document on the table.
16         You will see that these are numbered
17   paragraphs as well.  If you can go to numbered
18   Paragraph 24.  And you will see the
19   word "denied"; right?
20   A.  Yes.
21   Q.  This is an accurate statement in this
22   answer that that paragraph is denied; correct?
23   A.  Yes, correct.
24   Q.  Do you see here in the lawsuit, which is

Page 22

1    P-3, that Miss Briggs has asserted in this suit,
2    which is in federal court, that you did in fact
3    make a statement to her about women being put
4    out to pasture at the age of 55?  Do you see
5    that in the lawsuit?
6    A.  Uh-huh.
7    Q.  Please verbalize.
8    A.  Yes.
9    Q.  And do you understand that the assertion
10   that she has made in this complaint in this
11   lawsuit is that you made an age-based comment
12   about her?
13         MS. SATINSKY: Objection to form.
14         THE WITNESS: I understand what she
15   said, but I didn't do that.
16   BY MR. MUNSHI:
17   Q.  And do you understand based on your
18   review of the complaint and the paragraph that
19   you say didn't happen that Ruth Briggs has
20   asserted in this lawsuit in federal court that
21   you made a sex-based or gender-based comment
22   about her?
23         MS. SATINSKY: Objection to form.
24         THE WITNESS: I did not make that

Page 23

1    kind of comments about her.
2    BY MR. MUNSHI:
3    Q.  But you see that she has made those
4    assertions; right?
5    A.  Yes, I see it.
6    Q.  And so I understand clearly, you dispute
7    making an age-based or sex-based comment to her
8    or about her; correct?
9          MS. SATINSKY: Objection to form.
10   Are you referring to Paragraph 24?
11   BY MR. MUNSHI:
12   Q.  Yes.
13   A.  Okay.  I understand.
14   Q.  And do you agree with me that you are
15   disputing that you made an age-based or
16   sex-based comment to her as listed in
17   Paragraph 24?
18   A.  Yes, I agree.
19   Q.  Have you ever made an age-based or
20   sex-based comment to Ruth Briggs?
21   A.  I don't think so.
22   Q.  And if she has asserted in this lawsuit
23   that you did in fact make age-based and/or
24   sex-based comments, you are going to dispute

Page 24

1    that; correct?
2    A.  Correct.
3    Q.  Do you agree with me that a comment such
4    as, words to the effect of, "In China, women in
5    China are put out to pasture at the age of 55,"
6    do you agree with me that that would be an
7    inappropriate thing to say in the workplace?
8          MS. SATINSKY: Objection to form.
9          THE WITNESS: Yes, it's
10   inappropriate.
11   BY MR. MUNSHI:
12   Q.  Do you agree with me that using
13   unprofessional or inappropriate language or
14   stating unprofessional or inappropriate comments
15   in the workplace might be a violation of
16   Temple's policies?
17         MS. SATINSKY: Objection to form.
18         THE WITNESS: Yes, I understand.
19         MR. MUNSHI: Let's have this
20   document marked as P-5, please.
21         (P-5 was marked for identification.)
22   BY MR. MUNSHI:
23   Q.  The document in front of you, Dr. Wu, on
24   the first page is called Temple University Rules

Page 25

1    of Conduct.  Feel free to review it.
2           My question is, are you familiar
3    with this document?
4       A. (Pause.)
5           Yes, I know this document.  When I
6    joined Temple, I was handed this document.
7       Q. And you will see in the lower right-hand
8    corner of this document there are various page
9    numbers, Temple, and then a number.
10          Do you see that?
11      A. Yeah.
12      Q. Can you go to the page that is
13   Temple 159.  This page has a header of "Category
14   C Violations."
15          Do you see that?
16      A. Yes.
17      Q. And there is the third section down is
18   "C3, disruptive or disorderly conduct."
19          Do you see that?
20      A. Uh-huh.
21          MS. SATINSKY: Is that yes?
22          THE WITNESS: Yes.
23   BY MR. MUNSHI:
24      Q. And it is a little faded, so let me know

Page 26

1    if you can't read this, but the third bullet
2    point down under C3 is, "Using any
3    unprofessional, inappropriate, profane, abusive,
4    threatening or obscene language towards a
5    supervisor, other employees, students, patients,
6    clients, visitors or the public."
7           Do you see that?
8       A. Yeah, I see that.
9       Q. Based on your experience as a manager
10   over at Temple University, do you consider a
11   comment to somebody, a staff member, that women
12   in China are put out to pasture at the age of 55
13   to be an unprofessional or inappropriate or
14   threatening comment as listed in this document?
15          MS. SATINSKY: Objection to form.
16          You can answer.
17          THE WITNESS: Yes, it's
18   unprofessional.
19   BY MR. MUNSHI:
20      Q. If you said words to the effect of women
21   are put out to pasture in China at the age of
22   55, do you think it would be appropriate for
23   that person to whom it was said to raise a
24   complaint?

Page 27

1           MS. SATINSKY: Objection to form.
2    You can answer the question.
3           THE WITNESS: Yes.
4    BY MR. MUNSHI:
5       Q. Were you ever disciplined or counseled
6    or reprimanded at any point for making an
7    age-based or sex-based comment to anybody at
8    Temple?
9       A. No, never.
10      Q. And you are almost 60 years old now;
11   right?
12      A. 55.
13      Q. You're 55, okay.
14          And if someone said to you that in
15   China men at age 60 are put out to pasture, how
16   would that make you feel?
17          MS. SATINSKY: Objection to form.
18   You can answer the question.
19          THE WITNESS: Obviously I would get
20   offended.
21   BY MR. MUNSHI:
22      Q. Why would you be offended by that?
23      A. Yeah, because you retire.  You're forced
24   to retire early, right?

Page 28

1       Q. And if somebody said that to you, you
2    may feel that they are telling you we don't want
3    you any more; right?
4       A. Yes.
5       Q. Going back to P-3, which is the lawsuit.
6    And let's go back to Page 4, and I read to you
7    Paragraph 24.  The next paragraph is
8    Paragraph 25.
9           It says, "Plaintiff interpreted
10   Dr. Wu's comment, which was made to her right
11   before her birthday, to mean that plaintiff
12   should no longer be in the workforce as a result
13   of her sex and age."
14          Paragraph 26 states, "Plaintiff was,
15   of course, insulted by Dr. Wu's comment and
16   insinuation.  At the time plaintiff had been
17   employed by Temple for over ten years and
18   intended to work for Temple for at least another
19   ten years."
20          And then Paragraph 27
21   states, "Plaintiff politely replied to Dr. Wu
22   that we are in the United States and not in
23   China."
24          Do you see that?

Page 29

1   A.  Yes.
2   Q.  Did Ruth Briggs ever say words to you to
3   the effect of, "We're in the United States, not
4   in China"?
5   A.  No, I don't recall.
6   Q.  Do you dispute the assertion of
7   Paragraph 27 that is in her lawsuit, which
8   states that Miss Briggs, the plaintiff, said to
9   you, "We're in the United States, not in China"?
10      MS. SATINSKY: In response to?
11      THE WITNESS: I don't recall she say
12  that.
13  BY MR. MUNSHI:
14  Q.  You don't recall one way or another?
15  A.  Yeah.
16  Q.  Is it possible she did say that to you?
17      MS. SATINSKY: In response to this
18  conversation are you referring to, or at any
19  time?
20      MR. MUNSHI: Both.
21  BY MR. MUNSHI:
22  Q.  Did she ever say this to you at any
23  time?
24  A.  I don't recall.

Page 30

1   Q.  And in response to this conversation
2   that you are telling me happened several years
3   ago, do you recall one way or another --
4   A.  Because I remember clearly our
5   conversation was very friendly, casual, like
6   culture exchange.  There's no complaint from her
7   during or after the conversation.
8   Q.  What made you think that it was friendly
9   or casual from her perspective?
10  A.  The reason that we had very good terms,
11  we always have conversation.  We exchange gifts.
12  We talk about different things, music and food
13  and many other things, travels.
14  Q.  Do you believe you had a friendly
15  relationship with Ruth Briggs?
16  A.  Yeah.
17      MS. SATINSKY: If you weren't
18  finished, go ahead.
19      THE WITNESS: During the normal
20  conversation, not work related.  So we always
21  exchange idea, talk different subjects.
22  BY MR. MUNSHI:
23  Q.  Did you feel that you got along well
24  with Ruth Briggs?

Page 31

1   A.  Yes.
2   Q.  Did you like her as a person?
3   A.  Yes.  In fact, we invite her back after
4   she lost the job for a party, a retirement party
5   for another person, another staff member.
6   Q.  Who was that person?
7   A.  Called, her name is Toni Newton.
8   Q.  Antoinette Newton?
9   A.  Yeah.
10  Q.  Did you personally invite Ruth Briggs?
11  A.  Staff member invite her.
12  Q.  So did you personally ever invite Ruth
13  Briggs?
14  A.  I did not.
15  Q.  When you had this conversation with Ruth
16  Briggs, what do you recall her mannerisms to be
17  like, her reaction to be like?
18  A.  She's --
19      MS. SATINSKY: Hold on.  Objection
20  to form.  Which conversation are you talking
21  about?
22      MR. MUNSHI: Sorry.
23  BY MR. MUNSHI:
24  Q.  The conversation where you are talking

Page 32

1   about what happens over in China with folks
2   retiring early or very early?
3   A.  She's very interested and she smiled.
4   We always, when we have conversation, it's very
5   pleasant, always pleasant.
6   Q.  Just to be crystal clear here, I don't
7   want to talk about other conversations.  You
8   said the word "always."  I don't want to talk
9   about other conversations.
10  A.  Yeah.
11  Q.  I just want to focus in on this one
12  conversation where you are talking about in
13  China folks or women retiring at some point.
14      MS. SATINSKY: I just want to be
15  clear for the record, you are pointing to the
16  complaint, but --
17      MR. MUNSHI: Not any more.
18      MS. SATINSKY: I just want to be
19  clear that your question does not refer to the
20  complaint.  It is referring back to a separate
21  conversation.
22  BY MR. MUNSHI:
23  Q.  Just referring to that one conversation.
24      Do you recall her smiling during

Page 33

1  that conversation?
2    A. I don't remember exactly, but I
3  definitely for sure that she not complain, she
4  doesn't feel unhappy, and she looks like very
5  interested to knowing the culture.
6    Q. This was your interpretation of her?
7    A. Yes.
8    Q. Now, around this same time, Dr. Wu, did
9  you issue a discipline to Ruth Briggs?
10   A. I issued several disciplinary stuff, but
11 I don't remember the timing.
12      MR. MUNSHI: Could we have this
13 marked as P-6, please.
14      (P-6 was marked for identification.)
15 BY MR. MUNSHI:
16   Q. Dr. Wu, in front of you is a document
17 that has been marked as P-6. Please take your
18 time and review the document.
19   A. Uh-huh.
20      Yes.
21   Q. And do you see that this is a
22 disciplinary report that was issued to Ruth
23 Briggs?
24   A. Uh-huh.

Page 34

1    Q. Sorry. Please say yes or no.
2    A. Yes.
3    Q. Is that your signature there on the
4  bottom?
5    A. Yes.
6    Q. And do you see the date of this
7  disciplinary report -- well, there are various
8  dates here -- but there is a date next to your
9  signature up at the top, it looks like
10 November 17th, 2011?
11   A. Yes.
12   Q. And then three lines above that there is
13 a typed-in date that says "November 9th, 2011."
14      Do you see that?
15   A. Yes.
16   Q. And then down in the middle of the page,
17 there is a checkmark next to the words "written
18 warning."
19      Do you see that?
20   A. Yes, I see it.
21   Q. And then it says "dates of action,
22 November 9th, 2011."
23      Do you see that?
24   A. Yes.

Page 35

1    Q. Then under explanation (use reverse side
2  if needed) there is one line in there that
3  says "Violation of B.11 unprofessional/
4  inappropriate conduct."
5      Do you see that?
6      MS. SATINSKY: Just to be clear for
7  the record, it is "Violation of 'Rule' B.11."
8      MR. MUNSHI: That's what I meant to
9  say.
10 BY MR. MUNSHI:
11   Q. It says, "Violation of Rule B.11,
12 Unprofessional/Inappropriate Conduct." Do you
13 see that?
14   A. Yes.
15   Q. What was the unprofessional/
16 inappropriate conduct that Ruth did that
17 resulted in this discipline in November of 2011?
18   A. I don't recall exactly. It is just a
19 series of misconduct that result in this kind of
20 disciplinary action. I consult with the dean's
21 office and they helped me to identify the level.
22   Q. Can you tell me sitting here right now
23 what conduct she did that resulted in this
24 discipline in November of 2011?

Page 36

1    A. I don't recall.
2    Q. Was the unprofessional/inappropriate
3  conduct Ruth saying to you, we are in the United
4  States, not in China?
5    A. No, it's nothing. Cannot be.
6    Q. That had nothing to do with it?
7    A. That had nothing to do with it.
8    Q. And you don't even recall if she said
9  those things; right?
10   A. Yes, I don't even recall she said that.
11   Q. Is it possible she did say that to you
12 and that is why you issued this discipline?
13   A. No, definitely not.
14   Q. And you understand that she has asserted
15 in this lawsuit in federal court that she
16 received the discipline for making that comment
17 to you, "we're in the United States, not in
18 China." Do you understand that?
19   A. Yes, I understand.
20   Q. And do you dispute her assertion?
21   A. Yes, definitely. Because whenever I
22 issues these things, it is just a sequence of
23 events. I check with our dean's office and
24 check with my two associate chair.

Page 37

1  Q. With whom did you discuss this specific
2  discipline in the dean's office?
3  A. Usually Greg and Drew.
4  Q. I just want to be super specific here,
5  so I don't want to talk about what usually
6  happens or what typically happens or what
7  generally happens. Just looking specifically at
8  this disciplinary report that is P-6.
9  A. Uh-huh.
10  Q. Do you recall speaking with anybody in
11  the dean's office prior to issuing this
12  discipline to Ruth Briggs?
13  A. I would say yes, because for any
14  unwritten disciplinary things, I consult with
15  the dean's office. They help me to identify or
16  suggest the level of violation.
17  Q. Do you recall having any conversation
18  with Greg Wacker prior to issuing this
19  discipline that is P-6 regarding this
20  discipline?
21  A. I don't remember exact procedure, but I
22  always consult with dean's office.
23  Q. Again, my question is just going to be
24  your specific knowledge. If you don't know, you

Page 38

1  don't know. That is okay. I just want to be
2  clear that we are just talking about this
3  specifically, not generally. Okay?
4  A. Yeah.
5  Q. Do you recall a specific conversation
6  with Drew DiMeo about this disciplinary report
7  before issuing it to Ruth Briggs?
8  A. I don't recall exactly.
9  Q. Do you recall a conversation with
10  anybody else in the dean's office about issuing
11  this discipline to Ruth Briggs?
12  A. I would say only two person, Greg and
13  Drew.
14  Q. But do you have a specific recollection
15  of those conversations or not?
16  A. I don't recall the content of the
17  conversation, but definitely I did have
18  conversation with them.
19  Q. So you know for sure that you had a
20  conversation, but you don't know what the
21  content was?
22  A. Yeah.
23  Q. Did you have any conversations with
24  anybody in human resources about issuing this

Page 39

1  discipline to Ruth Briggs?
2  A. This I don't recall, but I contact HR
3  several times about other things.
4  Q. And again, we will get to all those
5  things.
6  A. Yeah.
7  Q. You have plenty of time to talk about
8  those. I just want to talk about this. Okay?
9  A. Yeah.
10  Q. Whose decision was it to issue Ruth
11  Briggs this discipline at that time?
12  A. It's a collective decision.
13  Q. Between whom?
14  A. Between me and the dean's office.
15  Q. Anybody in particular in the dean's
16  office? Again, specifically about this
17  discipline, not in general.
18  A. Against?
19  Q. Sorry. Again, not in general, and not
20  typically, not usually. I am talking about
21  specifically with this discipline, whose
22  decision was it to issue Ruth this discipline?
23  MS. SATINSKY: Objection. Asked and
24  answered. You can answer the question.

Page 40

1  THE WITNESS: I don't recall who.
2  But I would say Greg and Drew together.
3  BY MR. MUNSHI:
4  Q. Who was the first person to raise the
5  issue of potentially giving Ruth Briggs a
6  discipline at this time?
7  A. Again, I don't recall who's the person
8  who initiate this, but it's just a sequence of
9  this misconduct. Then I contact the dean's
10  office. Then they suggest that we can do --
11  first verbal then written.
12  Q. Verbal what?
13  A. Verbal to inform Ruth. Because we have
14  a weekly meeting.
15  Q. Verbal to inform Ruth about the
16  discipline?
17  A. Yeah.
18  Q. Or about what?
19  A. About whatever the misconduct or her
20  performance.
21  Q. What verbal conversations did you have
22  with Ruth regarding this discipline prior to
23  giving it to her, if any?
24  A. Again, I don't remember the exact

Page 41

1  content, but we usually always give a verbal
2  before the written.
3      Q. And again, I just want to caution you,
4  we are not talking about usually or always. We
5  are just talking specifically about these
6  incidents.
7      MS. SATINSKY: Yes, but he is
8  entitled to testify about his practice.
9      MR. MUNSHI: I know.
10 BY MR. MUNSHI:
11     Q. I just want to be clear. We can get to
12 those things, but right now I am just talking
13 about this discipline.
14     A. Uh-huh.
15     Q. Prior to this discipline you gave to
16 Ruth Briggs, did you ever give her any sort of
17 written warning?
18     A. I don't remember if this is the first
19 one or second written. There are several
20 sequence. And also there are lots of e-mail
21 records.
22     Q. Have you ever seen any e-mail record
23 that specifically discusses why Ruth Briggs was
24 given this specific discipline?

Page 42

1      A. I don't recall.
2      Q. Do you recall seeing any document where
3  it is written down anywhere as to what the
4  unprofessional/inappropriate conduct that
5  resulted in this specific discipline?
6      A. I don't recall.
7      Q. Do you recall any note to human
8  resources or any note to yourself or any other
9  handwritten notes that you had that specify
10 specifically what the
11 unprofessional/inappropriate conduct that
12 resulted in this specific discipline?
13     A. I don't recall.
14     Q. The date here up top is November 9th,
15 2011.
16     A. Uh-huh.
17     Q. What is the significance of that date,
18 why is that date there?
19     A. You say November 11th?
20     Q. Up top it says "department computer and
21 information sciences."
22     A. Yeah.
23     Q. "Date, November 9th, 2011."
24     What is the significance of that

Page 43

1  date?
2      A. I don't know.
3      Q. Did you input that date into this
4  document?
5      A. Yes, I input the date.
6      Q. Do you recall what, if anything,
7  happened on November 9th, 2011?
8      A. I don't recall any significance of this
9  date.
10     Q. Did you know that Ruth Briggs' birthday
11 is November 10th?
12     A. I don't remember.
13     Q. Do you understand that Ruth Briggs has
14 alleged in this lawsuit that you made an age and
15 sex-based comment to her the day before her
16 birthday on November 9th, 2011?
17     MS. SATINSKY: Objection. Asked and
18 answered.
19     THE WITNESS: I don't know.
20     MS. SATINSKY: Objection to form.
21 You can answer.
22     THE WITNESS: Yeah.
23     I don't know.
24 BY MR. MUNSHI:

Page 44

1      Q. Did you write "Violation of Rule B.11,
2  unprofessional/inappropriate conduct" in this
3  box?
4      A. I did not write that.
5      Q. Do you have any understanding as to why
6  there is no information on this page as to what
7  the alleged conduct was that resulted in this
8  discipline?
9      A. I do not know. I think that's a
10 practice. We don't write details.
11     Q. Why is that your practice or why is that
12 Temple's practice?
13     MS. SATINSKY: Objection to form.
14 BY MR. MUNSHI:
15     Q. Is that your practice or is that
16 Temple's practice?
17     A. It's not my practice.
18     Q. So whose practice is it?
19     A. I don't remember. Maybe the dean's
20 office.
21     Q. Sitting here right now, do you have any
22 understanding why the specific conduct that
23 resulted in Ruth Briggs' discipline is not
24 listed on this page?

Page 45

1    A. As I say, I don't remember exact
2  unprofessional/inappropriate conduct, but it's a
3  sequence of violation.  Then I talk to the
4  dean's office, and then they suggest this
5  category.
6    Q. Who suggested this category to you?
7    A. Again, two persons, Greg and Drew.
8    Q. And is that in general, or do you have a
9  specific recollection of Greg and Drew
10  instructing you on the level of the violation?
11    A. I don't recall exactly, but I'm almost
12  certain that's the way.  I would never do that
13  kind of thing myself.
14    Q. What kind of thing?
15    A. I mean to write a violation without
16  consulting with the dean's office.  I would tell
17  them exactly what happened.  Then they will help
18  me to decide what level.
19    Q. And sitting here right now, do you have
20  a specific recollection of what you told Greg or
21  Drew was the misconduct or unprofessional
22  conduct that resulted in this?
23    A. I don't recall the content, but it is
24  definitely not the one Ruth claimed.

Page 46

1      MS. SATINSKY: In the complaint.
2      THE WITNESS: In the complaint.
3  BY MR. MUNSHI:
4    Q. Definitely not?
5    A. Yeah, definitely not.
6    Q. Did you have any conversations with
7  anybody in human resources prior to issuing this
8  discipline?
9    A. I don't recall.  As I say, I have
10  several conversation with human resource about
11  this.
12    Q. Do you have a specific recollection of
13  informing anybody in human resources about the
14  alleged inappropriate or unprofessional conduct
15  that Ruth Briggs allegedly did that resulted in
16  this discipline?
17    A. As I say, I don't recall that.
18    Q. How about after this discipline was
19  issued, did you have any conversations with
20  human resources specifically about what conduct
21  resulted in this discipline?
22    A. I don't recall.
23    Q. Did you issue this discipline to Ruth
24  Briggs yourself?

Page 47

1    A. Again, the procedure is someone typed
2  this form, I think the dean's office.  Then they
3  give me the form.  Then we ask Ruth to sign and
4  I sign.  This is normal procedure.
5    Q. And do you recall having a meeting with
6  Ruth Briggs where this document was handed to
7  her?
8    A. I don't recall exactly the format, but
9  we always informed Ruth about whatever, whenever
10  something happened, we ask and she acknowledge.
11    Q. What do you recall her acknowledging
12  with regard to this specific discipline?
13    A. I don't recall.
14    Q. Do you --
15    A. But she never complained whenever we
16  issue these things to her.
17      MS. SATINSKY: And when you
18  say "these things," you are referring to?
19      THE WITNESS: I'm referring to this
20  disciplinary report.
21  BY MR. MUNSHI:
22    Q. Based on your experience as a manager --
23  and you have been a manager over at Temple
24  University for how long?

Page 48

1    A. Seven years as department chair.
2    Q. And prior to becoming the department
3  chair, did you have people who reported directly
4  to you?
5    A. Yeah.  I work at federal government.
6    Q. And it looks like from your resume that
7  you started at Temple University in 2009; is
8  that right?
9    A. Yes.
10      MS. SATINSKY: I just want to put on
11  the record an objection as to P-1 and P-2.  We
12  will let Dr. Wu testify about this, but Temple's
13  document request in this case asked for all
14  documents that plaintiff intended offering as
15  exhibits at depositions and/or at trial of this
16  matter.  These requests were propounded on
17  May 27, 2016, and we did not receive P-1 or P-2.
18      Again, I will let Dr. Wu testify
19  about these documents and I will permit
20  Mr. Munshi to ask questions about them, but I do
21  want to put an objection on the record as to the
22  use of them.
23  BY MR. MUNSHI:
24    Q. So Dr. Wu, you started working over at

Page 49

1  Temple University in 2009; is that correct?
2      A.  Correct.
3      Q.  And when you started working there, did
4  you hold the position of director of the Center
5  for Networked Computing?
6      A.  This is after a few years.
7      Q.  When you first started working at Temple
8  University, did you have any individuals
9  reporting directly to you?
10     A.  All the staff report to me.  Ruth joined
11  the department maybe a semester later or one
12  year later.
13     Q.  So by the time this discipline was
14  issued, you had already been managing employees
15  at Temple University for two years; is that
16  right?
17     A.  Yes, correct.
18     Q.  And as a manager at Temple University,
19  do you consider giving somebody a written
20  warning an important event?
21     A.  Oh, yeah, very important.
22     Q.  It is not something that you would do
23  lightly; correct?
24     A.  It's probably the first time in my life

Page 50

1  give that kind of warning.
2      Q.  The first time to any employee?
3      A.  To any employee, yes.  So I consult with
4  dean's office, my associates, many, many times
5  before we issue such written.
6      Q.  And when you say "associates," who are
7  you referring to?
8      A.  Associate chair.  Actually, these two
9  persons most important.  They know all the
10  details of our conversation and because we have
11  a weekly meeting.  I spent lots of time to
12  discuss about Ruth.
13     Q.  Who is the associate chair?
14     A.  One is Gene Kwanty, G-E-N-E,
15  K-W-A-N-T-Y.  Another one is Justin Shi, last
16  name S-H-I.
17         These are the two most important
18  persons because they know all the day-to-day
19  business of me and the department and the
20  disruption of Ruth to the department.
21     Q.  Do you have a specific recollection of
22  having any conversation with Dr. Kwanty about
23  the conduct that Ruth Briggs allegedly did that
24  resulted in this discipline?

Page 51

1      A.  Yes, because for all the events relating
2  to Ruth, I would tell my two associates.
3      Q.  What do you specifically recall
4  discussing with Dr. Kwanty about Ruth Briggs'
5  alleged conduct that resulted in this specific
6  discipline?
7      A.  As I say, I don't recall, because she
8  has so many misconducts over the years.
9      Q.  Do you recall ever stating in writing to
10  Dr. Kwanty, I am going to give Ruth Briggs
11  discipline because of something?
12     A.  No, there's no written things.
13  Everything is through conversation.
14     Q.  How about Justin Shi?
15     A.  It's the same.
16     Q.  Same?
17     A.  Yeah.  We have weekly meetings.
18     Q.  And just so the record is clear, my
19  question is, do you have a specific recollection
20  of ever putting in writing to Justin Shi the
21  reasons why this discipline was issued to Ruth
22  Briggs at this time?
23     A.  There is no written.
24         But if there is a need, we can dig

Page 52

1  out all the e-mails surrounding the events
2  before that between me and Ruth.
3      Q.  I think we have.
4      A.  Yeah.
5      Q.  Did you ever learn, Dr. Wu, from Greg
6  Wacker -- sorry.  Let me take a step back.
7      A.  Yeah.
8      Q.  What is Greg Wacker's position at this
9  time?
10         MS. SATINSKY:  At what time?
11  BY MR. MUNSHI:
12     Q.  November of 2011?
13     A.  He's manager, financial manager.  But I
14  think he's also in charge of all the staff,
15  college staff.
16     Q.  Did he report directly to you?
17     A.  No.  He's dean's level -- I mean dean's
18  office.
19     Q.  Did Ruth Briggs have any reporting
20  relationship to Greg Wacker?
21     A.  Not officially.  Greg is like in charge
22  of all the staff.  So indirectly he has this
23  responsibility.
24     Q.  Is Greg Wacker still employed by Temple,

Page 53

1  do you know?
2  A.  Yes.  I think officially he's in charge
3  of all staff member, hiring in the college.
4  Q.  And Ruth Briggs was considered a staff
5  member?
6  A.  Oh, yes.
7  Q.  Did you ever learn from Greg Wacker that
8  Ruth Briggs told him that you made a comment to
9  her about retiring at the age of 55?
10  A.  I don't recall.  This is the first time
11  I see this, discrimination.
12  Q.  This lawsuit, you mean?
13  A.  Yes, lawsuit.
14  Q.  Based on your experience as a manager at
15  Temple for several years, if you gave a written
16  warning to somebody for opposing a sex-based or
17  age-based comment that you made, would you
18  understand that conduct of issuing that
19  discipline to be a violation of Temple's
20  policies?
21      MS. SATINSKY: Objection to form.
22  You can answer.
23      THE WITNESS: Yeah, definitely.
24  BY MR. MUNSHI:

Page 54

1  Q.  At any point when Ruth Briggs was
2  working under you, did you have a conversation
3  with her about your retirement?
4  A.  Never.  I actually encourage her to
5  enjoy life, to travel more, so to be less
6  stressful.
7  Q.  What do you recall, is that one
8  conversation or several?
9  A.  Multiple conversations.  I always
10  suggest her, just be relaxed and then do some
11  vacation.  Then she always say that she has
12  money issue.
13      MR. MUNSHI: Let's have this marked
14  as P-7.
15      (P-7 was marked for identification.)
16  BY MR. MUNSHI:
17  Q.  Dr. Wu, in front of you is an e-mail
18  chain that is several pages long, Bates stamped
19  Briggs 64 to 67, between Ruth Briggs and an
20  individual named Cameron Etezady.
21      Do you know who Cameron Etezady is?
22      MS. SATINSKY: Do you want him to
23  testify about this document?  If you do, I would
24  like him to read it first.

Page 55

1      MR. MUNSHI: I am going to point
2  him.
3      MS. SATINSKY: Dr. Wu, I want you to
4  read the whole thing before you testify about
5  it.
6      THE WITNESS: Okay.  It may take a
7  few minutes to read.
8      (Pause.)
9      It is backward, right?
10  BY MR. MUNSHI:
11  Q.  Right.  The oldest e-mail would be in
12  the back, so if you want to read from back to
13  front, that's fine.
14  A.  (Pause.)
15      Okay.
16  Q.  Do you know who Cameron Etezady is?
17  A.  I don't know.
18  Q.  I am going to direct your attention to
19  the third page of P-7.  And there is an e-mail
20  that starts in the middle of that page, it says,
21  "On February 10, 2013, 10:32 p.m., Ruth Briggs
22  wrote."
23      Do you see that in the middle of the
24  page?

Page 56

1  A.  Yes.
2  Q.  And the third paragraph of her e-mail
3  states, the first sentence is, "On numerous
4  occasions" -- and I am sorry, I may pronounce
5  your name wrong.  Can you pronounce your name
6  for me?
7  A.  Yes.  Jie Wu.
8  Q.  It says, "On numerous occasions, Jie Wu
9  has mentioned the professional lives of women my
10  age (58) in China are over, and I wrote it off
11  to cultural differences."
12      Do you see that?
13  A.  Yes.
14  Q.  Do you dispute what Ruth Briggs wrote in
15  this e-mail to Cameron Etezady that you
16  mentioned on numerous occasions that the
17  professional lives of women are over?
18  A.  I just recall one conversation, which is
19  friendly conversation after my travel.
20  Q.  And in that friendly conversation after
21  your travel, did you mention that the
22  professional lives of women her age (58) in
23  China are over?
24  A.  No, because I don't even know her age.

Page 57

1  How can I say 58?
2     Q.  Take out the age part of it where the
3  specific number is 58.
4         Did you mention to her during that
5  friendly conversation after your travel that the
6  professional lives of women of a certain age are
7  over?
8     A.  Again, I don't recall the exact wording.
9  I would not say professional life.  I just say
10  lots of women retire.  Not just women.  Males
11  are retired.
12     Q.  In that conversation you had with Ruth
13  Briggs, were you also talking about men or were
14  you just talking about woman?
15     A.  I think I focus more on women, but I
16  don't remember exact information.  I would never
17  say about the age, like 58.
18     Q.  You are talking about the specific
19  number?
20     A.  Yeah.  I don't recall this.  I would not
21  say this specific number.
22     Q.  Putting aside the specific number, age,
23  which you may not have known --
24     A.  Uh-huh.

Page 58

1     Q.  -- you are not disputing with me that a
2  conversation about retirement is age-based;
3  right?
4         MS. SATINSKY: Objection to form.
5         THE WITNESS: In China, yes, but it
6  has nothing to do with US.  It is totally out of
7  context.
8  BY MR. MUNSHI:
9     Q.  Just specifically this line that she
10  wrote here to Cameron, that on numerous
11  occasions, Jie Wu mentioned that the
12  professional lives of women (58) in China are
13  over," you are saying that did not happen;
14  correct?
15         MS. SATINSKY: Objection.  Asked and
16  answered.  You can answer it one more time.
17         THE WITNESS: I just said, we had a
18  conversation about it, but it is a casual
19  conversation after my trip about the culture.
20  It's nothing to do with her.
21  BY MR. MUNSHI:
22     Q.  Her next sentence in this e-mail to
23  Cameron is, "It was when he would make a comment
24  that referenced my age and failure to attain the

Page 59

1  financial stability to be able to travel when I
2  felt defensive and offended."
3         Do you see that?
4     A.  Yeah, I saw that.
5     Q.  And earlier, just a few minutes ago, you
6  were telling me that you did have conversations
7  with Ruth Briggs where you encouraged her to
8  travel; correct?
9     A.  Yes.
10     Q.  In those conversations where you
11  encouraged her to travel, you discussed her
12  financial situation; correct?
13     A.  No, we never discussed financial
14  situation.  I just, from my point of view, I
15  just feel sorry for her.  I just say this may
16  change your life if you take some time off, I
17  mean to do some travel, be less stressful.  It's
18  a very friendly environment.
19     Q.  Did she mention anything to you anything
20  about finances when you were having
21  conversations about travel?
22     A.  She mentioned because she says that she
23  still owe money for college.
24     Q.  And in the conversations where you

Page 60

1  encouraged her to travel, did you ever make a
2  comment as she writes here to Cameron, a comment
3  that referenced her age, or do you dispute what
4  she wrote here?
5         MS. SATINSKY: Objection.  Asked and
6  answered numerous times.  You can answer his
7  question one more time.
8         THE WITNESS: This is nothing to do
9  with age.  Just said you need to take a
10  vacation, be more relaxed.  Be too stressful.
11  BY MR. MUNSHI:
12     Q.  I want to be crystal clear here just so
13  the record is clear.
14         When she writes here that you would
15  make a comment that referenced her age in
16  connection with travel, you dispute that;
17  correct?
18     A.  Yes, I dispute it.
19     Q.  When she writes here to Cameron that on
20  numerous occasions you mentioned that
21  professional lives of women her age are over,
22  did you think she was just making that up?
23         MS. SATINSKY: Objection to form.
24         THE WITNESS: It's not making up.  I

Page 61

1  do say that, but it's totally different context.
2  I talk about fact in China womens retire certain
3  age. It is just one conversation. It is
4  nothing to do with what happened in US.
5  BY MR. MUNSHI:
6      Q. And when she writes here that you would
7  make a comment that referenced her age in
8  connection with travel, do you think she's
9  making that up?
10         MS. SATINSKY: Objection to form.
11         THE WITNESS: I would not relate age
12  to travel.
13  BY MR. MUNSHI:
14     Q. But you see that she wrote that?
15     A. Yeah, I know.
16     Q. Do you think she is making it up to
17  Cameron?
18         MS. SATINSKY: Objection to form.
19         THE WITNESS: Or maybe she
20  misunderstood.
21  BY MR. MUNSHI:
22     Q. Do you think she's lying?
23         MS. SATINSKY: Objection to form.
24  Asked and answered. Don't answer that question.

Page 62

1  He just answered it.
2         THE WITNESS: Yeah.
3         MR. MUNSHI: He just said maybe she
4  misunderstood, which is fine. I am asking a
5  more specific question.
6  BY MR. MUNSHI:
7      Q. Do you think she is lying?
8         MS. SATINSKY: Again, asked and
9  answered.
10        THE WITNESS: So I don't need to
11  answer, right?
12        MS. SATINSKY: You can answer the
13  question one more time, but that's it. After
14  this, don't answer again.
15        THE WITNESS: Yeah, because I say
16  that I don't relate age and this travel. I
17  would not say those kind of things.
18  BY MR. MUNSHI:
19     Q. And I understand you have said that
20  several times.
21     A. Yeah, yeah.
22     Q. I understand that. So I am not asking
23  you that question as to whether you did it. I
24  am asking you based on your reading of what she

Page 63

1  wrote to Cameron, do you think she's lying when
2  she wrote it?
3      A. It's just not correct.
4      Q. Do you know who a woman named Sandra
5  Foehl is, F-O-E-H-L?
6      A. Sandra Foehl, I don't recall.
7         MS. SATINSKY: Can we take a break?
8         MR. MUNSHI: Sure. Let's take five.
9         (Recess.)
10  BY MR. MUNSHI:
11     Q. Dr. Wu, I was about to ask you about
12  Sandra Foehl, F-O-E-H-L. Are you familiar with
13  her in any way?
14     A. I don't recall.
15     Q. Are you familiar at Temple with an
16  office called the EEO office?
17     A. I think there is one, yeah. I don't
18  have any contact.
19     Q. Are you familiar with the phrase "equal
20  employment opportunity office" at Temple?
21     A. Oh, yeah.
22     Q. You know the name of that office?
23     A. Yeah.
24     Q. What is that office, as far as you know?

Page 64

1      A. It is just to ensure that equal
2  opportunity, when we hire faculty, we make sure
3  that we go through that office.
4      Q. Did you have any contact with the EEO
5  office regarding Ruth Briggs?
6      A. I don't recall.
7      Q. Did you ever learn that Ruth Briggs told
8  the EEO office anything about you?
9      A. I don't --
10        MS. SATINSKY: Prior to this
11  litigation?
12  BY MR. MUNSHI:
13     Q. Prior to her termination?
14     A. I do not. I do not know.
15     Q. Did you ever learn prior to the
16  termination that Ruth Briggs said anything to
17  the EEO office about age comments that you
18  allegedly made to her?
19        MS. SATINSKY: Objection to form.
20        THE WITNESS: I do not know.
21        MR. MUNSHI: P-8.
22        (P-8 was marked for identification.)
23  BY MR. MUNSHI:
24     Q. In front of you, Dr. Wu, is a document

Page 65

1 that has been marked as P-8.  It is two e-mails
2 here.  Feel free to review it and let me know
3 when you are done.
4    A.  (Pause.)
5        Okay.  I have one question.  So she
6 says that not relevant to following tactic for
7 male.  Threaten me with dismissal for lack of
8 loyalty to him.
9        Who she refer to?
10    Q.  Let me go through my questions here.
11 Okay?
12    A.  Okay.
13    Q.  The bottom e-mail from Ruth Briggs to
14 Sandra Foehl dated September 9th, 2012, do you
15 see that e-mail?
16    A.  Yes.
17    Q.  The third paragraph up from the bottom
18 starts with the phrase, "regarding our
19 discussion related to Dr. Wu's comments about my
20 age."
21        Do you see that?
22    A.  Uh-huh.
23    Q.  Sorry, please just verbalize for the
24 record.

Page 66

1    A.  Yes.
2    Q.  And that reference here from Ruth Briggs
3 in P-8, comments related to her age from you, do
4 you dispute that you ever made comments to her
5 about her age as listed here?
6        MS. SATINSKY: Objection.  Asked and
7 answered.
8        You can answer the question.
9        THE WITNESS: Yeah, I don't recall
10 my comments on age.  It is just, again, out of
11 context, I cannot recall anything.
12 BY MR. MUNSHI:
13    Q.  Do you recall any comments about her age
14 in a different context?
15    A.  No.  I would never have the official
16 occasion to discuss her age.
17    Q.  Do you know a woman named Deidre Walton?
18    A.  Yeah, Deidre I think sound familiar.
19 Maybe HR.
20    Q.  In human resources?
21    A.  Yeah.
22    Q.  Prior to Ruth Briggs' termination, did
23 you have any conversations with Deidre Walton
24 about Ruth Briggs?

Page 67

1    A.  Again, I talked to several people in HR.
2 I think she's one of them.
3    Q.  Do you recall the names of anybody else
4 in human resources who you spoke with about Ruth
5 Briggs?
6    A.  Either Deidre or Sharon, yeah.
7    Q.  Sharon Boyle?
8    A.  Yes.
9    Q.  Anybody else besides Deidre and Sharon
10 Boyle who you recall speaking with in human
11 resources about Ruth Briggs prior to her
12 termination?
13    A.  I don't recall.  I only remember these
14 two names.
15    Q.  Did Deidre Walton ever tell you that
16 Ruth Briggs had conversations with her about
17 you?
18    A.  She didn't tell me.
19    Q.  Did Sharon Boyle ever tell you that
20 Miss Briggs had conversations with her about
21 you?
22    A.  No, she didn't.
23    Q.  Did you ever learn from Greg Wacker that
24 Miss Briggs had gone to human resources or the

Page 68

1 EEO office or legal about you?
2        MS. SATINSKY: Prior to the end of
3 her employment at Temple?
4        MR. MUNSHI: Correct.
5        THE WITNESS: No, I did not know.
6 BY MR. MUNSHI:
7    Q.  Did you ever learn from Drew DiMeo that
8 Ruth Briggs had gone to human resources, EEO or
9 legal prior to her termination about you?
10        MS. SATINSKY: Objection to form.
11 You can answer.
12        THE WITNESS: He did not.
13 BY MR. MUNSHI:
14    Q.  Prior to joining Temple, you had worked
15 at a different university; right?
16    A.  Yes.
17    Q.  Would you say that you have been
18 managing employees in one capacity or another
19 for over 20 years?
20    A.  Employee sounds like research associate,
21 TA's in some programs, and at the National
22 Science Foundation I managed the whole program.
23    Q.  And in the year 2014, within your prior
24 capacity as the chair, you were managing around

Page 69

1   50 people or so?
2       A.  Correct.
3       Q.  And in your capacity as a manager for
4   all these years, are you familiar with Title VII
5   of the Civil Rights Act of 1964?
6           MS. SATINSKY: Objection to form.
7   You can answer the question.
8           THE WITNESS: I have heard that.
9   BY MR. MUNSHI:
10      Q.  What have you heard?
11      A.  The title.
12          MS. SATINSKY: I don't want you to
13  testify about anything you might have learned
14  from an attorney.
15          THE WITNESS: Uh-huh.
16          MS. SATINSKY: But anything that you
17  have learned from someone other than an
18  attorney, you can testify about.
19          THE WITNESS: Uh-huh.
20  BY MR. MUNSHI:
21      Q.  So just to clarify my question, it is
22  within your capacity as a manager, not in your
23  capacity in litigation.
24      A.  Yeah, yeah.

Page 70

1       Q.  What have you heard about Title VII of
2   the Civil Rights Act of 1964?
3       A.  I heard this, but I don't know the
4   detail.
5       Q.  And again, within your capacity as a
6   manager -- not litigation --
7       A.  Uh-huh.
8       Q.  -- are you familiar with the Age
9   Discrimination in Employment Act?
10          MS. SATINSKY: Objection to form.
11  You can answer.
12          THE WITNESS: I know.  I know that
13  we should not have this age discrimination.
14  BY MR. MUNSHI:
15      Q.  Okay.  And within your capacity as a
16  manager in Pennsylvania, are you familiar with
17  the Pennsylvania Human Relations Act?
18          MS. SATINSKY: Objection to form.
19  You can answer.
20          THE WITNESS: I am not very familiar
21  with that, not familiar.
22  BY MR. MUNSHI:
23      Q.  Are you generally familiar within your
24  capacity as a manager that there are federal and

Page 71

1   state laws that protect individuals from certain
2   types of discrimination?
3           MS. SATINSKY: Objection to form.
4           THE WITNESS: Yes, I know that.
5   BY MR. MUNSHI:
6       Q.  Did you ever receive training from
7   Temple University about employment laws?
8       A.  Oh, yeah, I did all kinds of training
9   online, on meetings.
10      Q.  What kinds of meetings?
11      A.  Like when I entered, human resource meet
12  with me.  I don't remember exact content.  But
13  each semester we have to pass certain classes,
14  online classes.  But discrimination definitely
15  is the one we know, we shouldn't do that.
16      Q.  And for the online classes, did they
17  discuss discrimination in the workplace?
18      A.  I'm pretty sure, yes.
19      Q.  And in those online classes, did they
20  discuss retaliation in the workplace?
21      A.  I don't recall exactly.  Obviously you
22  cannot retaliate.  You shouldn't.
23      Q.  And are you familiar within your
24  capacity as a manager at Temple that Temple has

Page 72

1   anti-discrimination and anti-retaliation
2   policies?
3       A.  Yes.
4       Q.  Do you consider these policies of
5   anti-discrimination and anti-retaliation
6   important?
7       A.  Oh, yeah, very important.
8       Q.  Why?
9       A.  The reason that we should not
10  discriminate people based on age, gender.
11      Q.  In your capacity as a manager, is it
12  your understanding that even though we have
13  these federal and state laws and policies, that
14  sometimes there is discrimination in the
15  workplace?
16          MS. SATINSKY: Objection to form.
17          THE WITNESS: Yes, because I heard
18  from different news and other sources.  There
19  are cases of discrimination.
20  BY MR. MUNSHI:
21      Q.  And similarly within your capacity as a
22  manager, even though we have these federal and
23  state laws and policies, do you understand that
24  unlawful retaliation sometimes does take place?

Page 73

1    MS. SATINSKY: Objection to form.
2    THE WITNESS: Yes, I can imagine so.
3   BY MR. MUNSHI:
4    Q. Do you have an understanding as a
5   manager that somebody's age or somebody's sex is
6   considered a protected characteristic?
7    MS. SATINSKY: Objection to form.
8    THE WITNESS: Yeah, I understand.
9   BY MR. MUNSHI:
10    Q. Within your capacity as a manager, what
11   does that mean to you, a protected
12   characteristic?
13    MS. SATINSKY: Objection to form.
14    THE WITNESS: Oh, I just say that we
15   should not discriminate people based on age and
16   gender and other things.
17   BY MR. MUNSHI:
18    Q. Did Ruth Briggs ever complain to you
19   that she didn't feel like you were treating her
20   fairly?
21    A. I don't recall.
22    Q. Has any employee ever complained to you
23   that you are not treating them fairly?
24    A. No, I never receive any complaint from

Page 74

1   faculty or from staff.
2    Q. Do you think that would be something you
3   would remember if Ruth Briggs did in fact
4   complain to you?
5    A. Oh, yeah, yeah. Because I feel very
6   proud after working seven years no one made any
7   complaint to me.
8    Q. Did Ruth Briggs ever complain to you
9   that she felt like you were treating her
10   differently than other staff members?
11    A. She never directly complained to me.
12    MR. MUNSHI: Let's have this
13   document marked as P-9, please.
14    (P-9 was marked for identification.)
15   BY MR. MUNSHI:
16    Q. Dr. Wu, in front of you is a document
17   that has been marked as P-9. Please take time
18   to read it.
19    A. (Pause.)
20    Okay.
21    Q. On the first page of P-9, there is an
22   e-mail from Ruth Briggs to you dated
23   November 9th, 2010.
24    Do you see that?

Page 75

1    A. Correct.
2    Q. And the last sentence in the first
3   paragraph, the big paragraph that Ruth Briggs
4   writes to you, she says, "While I have no
5   defense against anything that comes my way, it
6   would be nice to have fairness and treatment and
7   equal applying standards apply for staff
8   members."
9    Do you see that?
10    A. Which? Oh, yeah, yeah, I see it.
11    Q. Are you with me, the last sentence of
12   the first paragraph?
13    A. Yeah, I see that.
14    Q. Did you ever talk to Ruth Briggs about
15   what she wrote here in that sentence?
16    A. I don't recall exactly the conversation,
17   but I almost talk to her daily on various
18   things.
19    Q. Do you have a recollection of talking
20   with Ruth Briggs about why she felt this way?
21    A. I don't recall.
22    Q. Did you ever disclose to human resources
23   that she wrote to you about fairness and
24   treatment and equal applying standards?

Page 76

1    A. I don't recall.
2    Q. Don't you think that is something that
3   you should have reported to human resources if
4   you have a staff member writing to you about
5   fairness and treatment and equal applying
6   standards?
7    MS. SATINSKY: Objection to form.
8   Mischaracterizes testimony.
9    You can answer the question if you
10   understand it.
11    THE WITNESS: Yeah, because I don't
12   think that's the level that I should report to
13   to HR. Because all I ask is just to prove
14   reasons, and she didn't do the work and then
15   come up with all kinds of excuses.
16   BY MR. MUNSHI:
17    Q. Just focusing in on what she wrote to
18   you, did you feel that it wasn't necessary to
19   inform human resources that you had a staff
20   member, Ruth Briggs, who wrote to you about her
21   treatment from you?
22    MS. SATINSKY: Objection to form.
23   Mischaracterizes testimony.
24    You can answer the question.

Page 77

1      THE WITNESS: Again, I don't think
2   that it reach a level for me to report to HR for
3   this incident.
4   BY MR. MUNSHI:
5    Q. Had any other employee prior to November
6   of 2010 ever written to you or said to you or
7   commented to you anything about fairness and
8   treatment in the workplace?
9    A. I don't recall.
10    Q. Prior to November of 2010, had any other
11   employee reporting to you wrote to you, said to
12   you, or commented to you about equal applying
13   standards apply for all staff members?
14      MS. SATINSKY: Objection to form.
15      THE WITNESS: Again, I don't think
16   so, because there's no other staff has problem
17   like Ruth's.
18   BY MR. MUNSHI:
19    Q. Did you talk with Greg Wacker about Ruth
20   Briggs' e-mail to you that we are looking at,
21   P-9?
22    A. Again, I don't recall.  I have many
23   conversations with Greg about Ruth.
24    Q. Do you recall a conversation with

Page 78

1   Dr. Kwanty about Ruth Briggs' e-mail to you that
2   she writes in here in P-9 about her treatment in
3   the workplace?
4      MS. SATINSKY: Objection to form.
5      THE WITNESS: Again, I don't recall.
6   BY MR. MUNSHI:
7    Q. How about Justin Shi?
8    A. I don't recall.
9    Q. How did it make you feel to receive an
10   e-mail from Ruth Briggs where she talks to you
11   about fairness and treatment and equal applying
12   standards applied for staff members?
13    A. I feel that I gave her simple work.  She
14   didn't complete it.  And she not giving the
15   truth that she complete it.  She told me that
16   she complete it, but never sent the result back
17   to me.  Then she complain all this problem with
18   computer.  That's her practice always, the
19   tactic.
20      Instead of admitting the errors or
21   problems, she comes up with all kinds of
22   excuses.
23    Q. And did you consider her e-mail to you
24   in November of 2010 explaining an excuse?

Page 79

1    A. Yes.  I just feel that it's her opinion
2   about the fairness and the standard.
3    Q. Was that upsetting to you to have a
4   staff member for the first time raising an issue
5   with you about fairness in the workplace?
6    A. No, it's not upsetting.  I'm not really
7   upsetting about her as a person.  Just upsetting
8   her performance.
9    Q. So the fact that she wrote this e-mail
10   to you, her manager, about how she feels she is
11   being treated, that didn't upset you?
12    A. Again, she upset me on many other
13   things.  I don't recall this stand out.
14    Q. Were you surprised to get an e-mail from
15   her where she talks about her treatment in the
16   workplace?
17      MS. SATINSKY: Objection to form.
18      THE WITNESS: Obviously there was
19   some surprise, but not to the extent that I
20   report to HR.
21   BY MR. MUNSHI:
22    Q. Did you think that she had any basis to
23   complain to you about how the standards are
24   being applied to her?

Page 80

1      MS. SATINSKY: Objection to form.
2      THE WITNESS: It's no surprise
3   because she's always complaining different
4   things in her life, her miserable life.  She
5   will tell me about the family.  We all feel
6   sympathetic to her, for her.
7   BY MR. MUNSHI:
8    Q. You called it her opinion.  When she
9   wrote her opinion that we just talked about, the
10   last sentence in Paragraph 1, do you think that
11   that is how she really felt or do you think she
12   is just lying?
13      MS. SATINSKY: Objection to form.
14      THE WITNESS: I think she felt.  I'm
15   not saying she's lying.  It's her interpretation
16   about fairness.
17   BY MR. MUNSHI:
18    Q. So thinking that she's telling you her
19   honest opinion and thoughts about how she is
20   being treated by you in the workplace, did you
21   feel the need to follow up with her or anybody
22   about this?
23    A. Oh, yeah.
24      MS. SATINSKY: Objection to form.

Page 81

1  Mischaracterizes testimony.
2       You can answer.
3       THE WITNESS: Yeah.  We -- as I say,
4  we spend about six year or five year, the whole
5  department, almost every week try to help her.
6  I call HR several times.  Seek help from the
7  dean's office to help her.  And we have numerous
8  conversation and documented.  Instead of firing
9  her, we just tried to help her.
10  BY MR. MUNSHI:
11    Q.  And when you said "numerous
12  conversations," are you talking about with human
13  resources or with Ruth?
14    A.  With all.  With human resources, with
15  dean's office, with Ruth.
16    Q.  So in your conversations with Ruth, did
17  you talk about her feelings that she wrote in
18  P-9?
19    A.  I don't recall exactly the content, but
20  we talk a wide range of things, how we can help
21  her.
22    Q.  And in all your conversations with human
23  resources, over all the years where you are
24  talking about how do we help Ruth Briggs --

Page 82

1    A.  Yeah.
2    Q.  -- did you ever raise this issue with
3  them that she wrote to me about fairness and
4  treatment?
5       MS. SATINSKY: Objection to form.
6       THE WITNESS: I don't recall.
7  BY MR. MUNSHI:
8    Q.  Any reason why you wouldn't raise that?
9       MS. SATINSKY: Objection to form.
10       THE WITNESS: Because we don't feel,
11  I don't feel that there is a mistreatment.
12  BY MR. MUNSHI:
13    Q.  Did you consider what she writes here to
14  be a false accusation?
15       MS. SATINSKY: Objection to form.
16  Asked and answered.
17       You can answer the question one more
18  time, Dr. Wu.
19       THE WITNESS: Okay.
20       So again, it's just her feeling,
21  right, about the fairness, the equal standard.
22  BY MR. MUNSHI:
23    Q.  Do you consider that a false accusation?
24       MS. SATINSKY: Objection to form.

Page 83

1    Asked and answered.
2       THE WITNESS: Yeah, I would not say
3  this is accurate.
4  BY MR. MUNSHI:
5    Q.  Is it upsetting to you as a manager to
6  have a staff member write things to you that are
7  inaccurate about the workplace?
8       MS. SATINSKY: Objection.  Asked and
9  answered.  Rahul, I've given you a lot of leeway
10  on questions that have been asked more than
11  once.
12       MR. MUNSHI: Slightly different.
13       MS. SATINSKY: Doctor, you can
14  answer this question one more time.
15       THE WITNESS: As I say, I don't even
16  recall that.  It cannot be that upsetting to me.
17  BY MR. MUNSHI:
18    Q.  Do you feel like you treat all your
19  direct reports equally regardless of age or
20  gender?
21    A.  Oh, definitely.  Because we have lots of
22  staff member.  A couple of staff much older than
23  her.
24    Q.  Do you feel like you treat all her staff

Page 84

1  members with respect?
2    A.  Oh, yes.
3    Q.  Do you feel like you're a good manager?
4    A.  I would let my staff or faculty to
5  comment about my performance.  I feel confident
6  about myself.
7    Q.  What do you consider your greatest
8  strengths as a manager?
9    A.  Just a manager.  You know that before I
10  joined, the department was in disarray.  Just
11  like at department meeting, people fight each
12  other, quarrel with each other, yell in the
13  corridor.
14       Once I join department, and I just
15  give an example, we have like monthly meeting,
16  we all become very professional.  And department
17  grow significantly, both in terms of number of
18  students and the research grant.
19    Q.  Do you consider yourself to have any
20  weaknesses as a manager?
21    A.  Weakness, I think I'm not tough enough.
22  I'm very sympathetic to Ruth.  Even after her
23  dismissal, I was thinking about her, about her
24  son.  Because she mention about to me many times

Page 85

1 about her son's situation.
2 Q. Did you have graduate students reporting
3 to you as well?
4 A. Oh, yeah, many.
5 Q. Did you ever get the sense that any of
6 your graduate students or staff members were
7 intimidated by you?
8 A. It could be because I'm tough in the
9 sense that I want them to be productive in
10 research for graduate students. So I work hard.
11 I lead by example. So I always come early and
12 leave very late.
13 Q. Have you ever raised your voice with any
14 of your direct reports?
15 A. I raise my voice to my students, but not
16 to staff or faculty.
17 Q. How often do you raise your voice with
18 your students?
19 A. Quite often, because sometimes technical
20 discussion becomes heated discussion and we
21 raise -- I raised voice. But I never do that to
22 my staff and my faculty.
23 Q. Do you ever yell in Chinese in the
24 workplace?

Page 86

1 A. Yes, sometimes with my students, Chinese
2 students.
3 Q. Have you ever been counseled or
4 disciplined or reprimanded for raising your
5 voice in the workplace?
6 A. No, never. I never receive any
7 complaint from a colleague.
8 Q. But regardless of whether you ever
9 received a complaint, do you think it is
10 appropriate to raise your voice in the workplace
11 like that?
12 MS. SATINSKY: Objection to form.
13 THE WITNESS: Again, this is a
14 technical discussion, like a closed door, so.
15 BY MR. MUNSHI:
16 Q. Sorry, can you explain to me any sort of
17 situation or scenario where it would be
18 appropriate for you to be raising your voice to
19 a graduate student who reports to you?
20 MS. SATINSKY: Objection to form.
21 Asked and answered. You can answer the
22 question.
23 THE WITNESS: Again, to raise the
24 voice, again, relative, right. So for some

Page 87

1 people it's -- so I don't think it's anything
2 like a disruption to the workplace.
3 BY MR. MUNSHI:
4 Q. To your knowledge, no one has ever
5 complained that you have done this?
6 A. No, no. Not from my staff. Not from my
7 students. Not from my faculty.
8 MR. MUNSHI: Let's have this marked.
9 (P-10 was marked for
10 identification.)
11 BY MR. MUNSHI:
12 Q. Dr. Wu, you have P-10 in front of you.
13 Please review it.
14 A. Uh-huh.
15 (Pause.)
16 Okay.
17 Q. So P-10 is an e-mail from Ruth Briggs to
18 Greg Wacker dated October 29th, 2010.
19 A. Uh-huh.
20 Q. And she writes here, "Greg, I cannot
21 come in here day in and day out not knowing if
22 I'm going to be applauded or punched. It is
23 stressful to me and everyone around me. If I
24 wanted to change jobs at Temple, it would be

Page 88

1 impossible because of him."
2 The next paragraph says, "Frankly,
3 it borders on harassment. Right now he is in
4 his office yelling in Chinese at one of his
5 students. The he starts complaining to Justin
6 in Chinese about the dean's office. The
7 environment is hostile. Even faculty members
8 have told me that they are uncomfortable about
9 the way he treats me. Ruth."
10 Did you ever learn that Ruth Briggs
11 sent this e-mail to Greg Wacker?
12 A. No, I don't know. I never learned that.
13 Q. Did you ever learn that she said to Greg
14 Wacker in 2010 that the environment was hostile?
15 A. I do not know.
16 Q. Did you ever talk with Greg about
17 yelling at students --
18 A. No.
19 Q. -- in the workplace?
20 A. No. I never talk to Greg about that.
21 Q. And how about anybody at HR, did that
22 ever come up?
23 A. No. Because I never receive any
24 complaint.

Page 89

1    Q. Do you know if Greg Wacker ever talked
2   with human resources about Ruth Briggs'
3   statements in here about you yelling or that the
4   environment is hostile?
5    A. No, Greg didn't tell me.
6        MR. MUNSHI: Let's have this marked
7   as P-11.
8        (P-11 was marked for
9   identification.)
10  BY MR. MUNSHI:
11   Q. Now, Dr. Wu, in front of you is P-11 and
12  this is an e-mail chain.  The bottom e-mail is
13  the one we looked at just now, and then there is
14  a top e-mail from Greg Wacker to Deidre Walton.
15   A. Uh-huh.
16       Okay.
17   Q. Do you see here that Greg Wacker
18  forwarded Ruth Briggs' e-mail to Deidre Walton?
19   A. Uh-huh.
20   Q. Sorry.  Please just verbalize.
21   A. Yes.
22   Q. And Deidre Walton is the person we spoke
23  about earlier who you know is a member of human
24  resources of Temple; correct?

Page 90

1    A. Correct.
2    Q. Did Deidre Walton ever follow up with
3   you or talk to you about how you speak to your
4   students in the workplace?
5    A. No.  I don't recall.
6    Q. Did she ever talk to you about Ruth
7   Briggs' statement in her e-mail to Greg Wacker
8   that the environment is hostile?
9    A. No, she didn't.
10   Q. Did Deidre Walton ever follow up with
11  you and talk to you about Ruth Briggs' statement
12  that she e-mailed to Greg Wacker about
13  harassment?
14   A. No.
15   Q. As far as you know, sitting here right
16  now, based on looking at Ruth Briggs' e-mail of
17  October 29th, 2010, and then Greg Wacker's
18  e-mail to Deidre Walton the same day --
19   A. Uh-huh.
20   Q. -- human resources and Greg Wacker had
21  Ruth Briggs' complaint and no one asked you
22  about it?
23       MS. SATINSKY: Objection to form.
24       THE WITNESS: I don't recall.

Page 91

1   BY MR. MUNSHI:
2    Q. So this e-mail that is in front of you,
3   this e-mail chain is October 29th, 2010, and the
4   e-mail we just looked at before, the one before
5   that, the one that Ruth Briggs sent to you --
6    A. Uh-huh.
7    Q. -- is November --
8        MS. SATINSKY: I need you to refer
9   to the exhibit number because I think we are
10  getting confused.
11  BY MR. MUNSHI:
12   Q. So the documents we just looked at,
13  P-11, are e-mails dated October 29th, 2010.
14   A. Uh-huh.
15   Q. And the e-mail we looked at before, P-9,
16  is dated November 9th, 2010.
17       Do you see those?
18   A. Yes.
19   Q. Do you recall when the first time was
20  that you went to human resources to talk about
21  Ruth Briggs' performance?
22   A. I don't recall the date.
23   Q. Do you recall that she started working
24  for you some time in 2009?

Page 92

1        MS. SATINSKY: Objection.  Asked and
2   answered.
3        You can answer one more time.
4        THE WITNESS: Yeah, I think maybe
5   she work under me later 2009 or early 2010.
6   BY MR. MUNSHI:
7    Q. Okay.
8    A. Can I make a comment of her letter?
9        MS. SATINSKY: There is no question.
10       THE WITNESS: No question, right?
11  Okay.
12  BY MR. MUNSHI:
13   Q. It is not like a normal conversation.  I
14  am sorry.
15       (P-12 was marked for
16  identification.)
17  BY MR. MUNSHI:
18   Q. Now, P-12 in front of you is a
19  three-page document.
20   A. Uh-huh.
21   Q. You can go ahead and review that.
22   A. (Pause.)
23       Okay.
24   Q. Dr. Wu, do you see that the e-mail that

Page 93

1  you sent to Ralph Jenkins, subject line, "A
2  Revised Letter," is dated November 17th, 2010?
3      A. Yes.
4      Q. And do you see that that is
5  approximately eight days after P-9, the e-mail
6  that we looked at before, from Ruth Briggs to
7  you --
8      A. Uh-huh.
9      Q. -- where she mentions fairness and
10 treatment and equal applying standards?
11     A. Uh-huh.
12         MS. SATINSKY: Objection to form.
13         THE WITNESS: Yeah, I saw the time.
14 BY MR. MUNSHI:
15     Q. Did you draft this letter that is
16 attached to this e-mail?
17     A. We wrote together with my two associate
18 chair.
19     Q. And are those Justin Shi and Gene
20 Kwanty?
21     A. Yes.
22     Q. Did you submit this letter to human
23 resources?
24     A. Yes.

Page 94

1      Q. At this point in November of 2010, did
2  you want to terminate Ruth Briggs?
3      A. No. We just want to report the fact and
4  document. Just snapshot of her work just one
5  week. So this happened every week like for five
6  years.
7      Q. What were you hoping would be the result
8  of this letter to human resources?
9      A. We just want to report the fact.
10     Q. At the end of the letter, you write, "I
11 am asking for your assistance in finding a
12 replacement for her position."
13         What did you mean by that?
14     A. Yeah, so that means we seek help from HR
15 for a solution.
16     Q. But what did you mean by replacement?
17     A. Replacement means find another, another
18 job for her.
19     Q. Did human resources ever respond to your
20 letter that you submitted?
21     A. I don't recall if they send me any
22 written comments. I don't know the result.
23 There is no action.
24     Q. How about orally, did you have any

Page 95

1  conversations with human resources as to --
2      A. I had --
3      Q. Wait. Just for the transcript.
4          Did you have any conversations with
5  anybody in human resources as a result of your
6  letter?
7      A. I think so, but I don't remember exactly
8  the timing.
9      Q. And when you said "no action," what did
10 you mean by that?
11     A. No action means that there is no
12 replacement.
13     Q. Did you meet with anybody in human
14 resources as a result of the letter you sent
15 about Ruth Briggs?
16         MS. SATINSKY: Objection to form.
17 Asked and answered.
18         THE WITNESS: I don't recall.
19 BY MR. MUNSHI:
20     Q. Do you recall saying to anybody in human
21 resources that Ruth Briggs had recently sent you
22 an e-mail talking about fairness and treatment
23 and equal applying standards?
24         MS. SATINSKY: Objection to form.

Page 96

1  Asked and answered.
2          THE WITNESS: I don't recall.
3          MS. SATINSKY: You can answer.
4          THE WITNESS: I just send a letter
5  to HR. I mean, again, collectively with two
6  associate chair and the dean's office.
7  BY MR. MUNSHI:
8      Q. In your conversation with human
9  resources, as a result of the letter or any
10 communications you had with human resources, did
11 it ever come up that Ruth Briggs had recently
12 stated to Greg Wacker that the environment was
13 hostile?
14     A. I do not -- no. She sent an e-mail to
15 Greg.
16     Q. My question was a little bit different.
17         MS. SATINSKY: He said he didn't
18 know she sent the e-mail to Greg.
19         THE WITNESS: I didn't know any of
20 these things. First time I see today.
21 BY MR. MUNSHI:
22     Q. My question was a little bit different.
23 Just so I am clear. Did it ever come up --
24 forget about the e-mail -- did it ever come up

Page 97

1 that Ruth Briggs said that the environment was
2 hostile?
3    A. I don't know.  Again, I was surprised
4 she say that the environment's hostile.
5    Q. Why are you surprised?
6    A. Because we are quite friendly in general
7 and she's quite happy organizing events for us.
8 She's good at organizing events.  But if we
9 assign her specific job, then she cannot
10 complete on time.
11    Q. Did you ever see her get upset during
12 meetings with you where she started crying?
13    A. Not much.  But whenever I point out her
14 weakness and she kind of freeze out, try to
15 defend herself in a wrong way.  It could be
16 small things make big things.  Like escalate.
17        MR. MUNSHI: Let's take a look at
18 P-13.
19        (P-13 was marked for
20 identification.)
21 BY MR. MUNSHI:
22    Q. P-13 is an e-mail from Sharon Boyle to
23 you and several other people on December 9th,
24 2010.  I will give you a moment to review that.

Page 98

1    A. (Pause.)
2        Okay.
3    Q. Do you see here in the third line that
4 Sharon Boyle writes to you, she writes, "Based
5 on the discussions and information received in
6 both meetings, there is no basis for
7 disciplining Ruth at this time."
8        Do you see that?
9    A. Yeah, I see.
10    Q. And earlier she talks about meeting with
11 Ruth Briggs; right?
12    A. Uh-huh.
13    Q. Do you see that in that letter?
14    A. Yes.
15    Q. Were you satisfied with human resources'
16 handling of your letter?
17    A. In what way by satisfied?
18    Q. Did you agree that there was no basis
19 for disciplining Ruth at this time?
20    A. It depends on what you mean,
21 "discipline."
22        Because to us, Ruth is a big
23 disruption to the whole department, and we just
24 seek help.

Page 99

1    Q. What would she do that would be a
2 disruption to the department?
3    A. Oh, she just spend all the time talking,
4 not doing the work.
5    Q. Was it a disruption in the workplace
6 that she would be talking with Greg Wacker?
7    A. No.  Greg is now working the office.
8 Ruth just spend time talking to faculty, some
9 visitors, very loud, just in front of my office.
10    Q. Her office was not in front of your
11 office --
12    A. It's in front of my office.
13    Q. Was it moved at some point?
14    A. Yes.
15    Q. When?
16    A. I think maybe 2012.  Because we sought
17 all kinds of solution.  Eventually we think
18 about maybe this is a good way to assign her to
19 upstairs so that she can be more focused.
20    Q. Was it a disruption to the workplace
21 that she was having conversations with people
22 not in the office?
23    A. No.  She just grab people whenever
24 someone passed by and have long conversation.

Page 100

1 Then she was saying that the people like to talk
2 to me.  It is not like I want to talk to them.
3    Q. I am sorry, I don't know what that
4 means?
5    A. It means she doesn't initiate the
6 conversation.  People came to her office to talk
7 to her.  In reality it is not.  She just grab
8 someone who want to talk and start conversation,
9 all kind of conversations.
10    Q. When she writes to you about her
11 treatment in the workplace by you, is that a
12 disruption as well?
13        MS. SATINSKY: Objection to form.
14        THE WITNESS: No, it's not a
15 disruption.  That's why I was kind of surprised
16 he raised these things.
17 BY MR. MUNSHI:
18    Q. Did you talk with Greg Wacker about
19 human resource's conclusion about no basis for
20 disciplining Ruth at this time?
21        MS. SATINSKY: Referring to P-13.
22        THE WITNESS: I don't recall the
23 exact content, but I remember we all know that
24 that's a conclusion at that stage.

Page 101

1 BY MR. MUNSHI:
2 Q. Do you recall any conversation with
3 Deidre Walton, who is on this e-mail, P-13,
4 about HR's statement?
5 A. Yeah, as I say, I have many
6 conversations with Deidre, so this could be one
7 of them.
8 Q. Did you have conversations with Deidre
9 Walton about other employees besides Ruth
10 Briggs?
11 A. No.
12 Q. So in all your conversations with Deidre
13 Walton about Ruth Briggs --
14 A. Yes.
15 Q. -- did you ever disclose to her anything
16 you knew about Ruth Briggs' feelings about the
17 treatment in the office?
18 MS. SATINSKY: Objection to form.
19 THE WITNESS: No. I just say that
20 we are very frustrated and so we need to find a
21 good solution to help Ruth. I was informed that
22 they know the history of Ruth. It's not the
23 problem that she start working with us. So she
24 has a long history of problems.

Page 102

1 BY MR. MUNSHI:
2 Q. You are talking about before you even
3 got to Temple?
4 A. Yeah. Well before.
5 Q. And how do you know about that?
6 A. Because they informed me.
7 Q. Who is "they"?
8 A. The dean's office and HR.
9 Q. Who in the dean's office?
10 A. I don't remember exactly.
11 Q. Who in HR?
12 A. I don't remember exactly.
13 Q. What did they tell you?
14 A. They just say that we understand. We
15 tried to help, but that's not the problem right
16 now. But she has long history of this problem.
17 Q. What did they tell you is the history of
18 the problem?
19 A. They did not go into detail.
20 Q. And you don't recall who said this to
21 you?
22 A. Yeah, I don't recall.
23 Q. When did this person or people say this
24 to you?

Page 103

1 A. I don't remember. Everyone you talk to,
2 everyone knows Ruth, about her problem.
3 Q. Prior to her working underneath you, are
4 you aware if she ever received any sort of
5 written warnings or discipline?
6 A. I don't know.
7 Q. Did you ever see her personnel file and
8 see if there was anything in there?
9 A. No, I never look at her personnel file.
10 Q. Are you aware if she was ever put on any
11 sort of performance improvement plan prior to
12 working underneath you?
13 A. I do not know.
14 Q. Are you aware if she was ever given any
15 sort of workplace suspension before she started
16 working underneath you?
17 A. No.
18 Q. And you are aware that she worked at
19 Temple University for several years before she
20 started working underneath you; correct?
21 MS. SATINSKY: Objection to form.
22 THE WITNESS: Yes, that I know.
23 BY MR. MUNSHI:
24 Q. And when you started talking about

Page 104

1 before, Ralph Jenkins, who is he? Who is Ralph
2 Jenkins?
3 A. Oh, he's a vice dean.
4 Q. Did you report to him?
5 A. Yeah. Technically I report to dean, but
6 he was like executive vice dean. So I have a
7 weekly meeting with him.
8 Q. And Ralph Jenkins is the person who you
9 sent the letter to in P-12; right?
10 A. Yes.
11 Q. You wanted to keep, is it Dr. Jenkins?
12 A. Yes, Dr. Jenkins.
13 Q. You wanted to keep Dr. Jenkins in the
14 loop --
15 A. In the loop.
16 Q. -- in the loop about Ruth Briggs; right?
17 A. Yes. I --
18 Q. You --
19 MS. SATINSKY: Go ahead, finish your
20 answer.
21 THE WITNESS: Because I always keep,
22 whatever the action, I keep the dean's office in
23 the loop.
24 BY MR. MUNSHI:

Page 105

1   Q.  You meant specifically about Ruth
2   Briggs, you wanted to keep Dr. Jenkins in the
3   loop about any sort of issues you had with Ruth
4   Briggs; right?
5   A.  Yes.
6   Q.  You wanted him to know that there were
7   any sort of concerns you had with her
8   performance; right?
9   A.  Yes.
10  Q.  And you had numerous conversations with
11  him about Ruth Briggs in the workplace?
12  A.  Oh, yeah.
13  Q.  Did you ever have a conversation with
14  him telling him that she sent you an e-mail
15  about being treated fairly in the workplace?
16  A.  No.
17      MS. SATINSKY: Objection to form.
18  You can answer.
19      THE WITNESS: I don't recall.
20  BY MR. MUNSHI:
21  Q.  So why would you bring him in the loop
22  and keep him in the loop about Ruth Briggs'
23  performance issues allegedly but not tell him
24  about how she felt?

Page 106

1       MS. SATINSKY: Objection to form.
2       THE WITNESS: Well, because she
3   didn't perform well.
4   BY MR. MUNSHI:
5   Q.  So you didn't feel the need to --
6       MS. SATINSKY: He wasn't finished.
7   You can keep going with your answer.
8       THE WITNESS: Yeah, I don't feel
9   that she was mistreated.  I just recalled him
10  the fact about Ruth's performance and
11  disruptions.
12  BY MR. MUNSHI:
13  Q.  So because you felt she wasn't being
14  mistreated, that is why you didn't feel the need
15  to bring Dr. Jenkins in the loop about her
16  feelings; right?
17      MS. SATINSKY: Objection to form.
18  Mischaracterizes his testimony.  You can answer
19  the question.
20      THE WITNESS: Again, I contact HR
21  many times and also dean's office to seek help
22  to see any way we can help Ruth, either
23  consultation or other means.  That's why we kept
24  her for so many years, five years or four years.

Page 107

1   BY MR. MUNSHI:
2   Q.  And just with regard to Dr. Jenkins, you
3   did not forward Ruth Briggs' e-mail to him that
4   we looked at that is P-9; right?
5   A.  No, I didn't.
6   Q.  And you didn't forward that same e-mail
7   P-9 to Greg Wacker; right?
8   A.  No.
9   Q.  Did Ruth Briggs ever tell you that she
10  felt bullied by you?
11  A.  No.
12  Q.  Did you ever learn from anybody at
13  Temple that Ruth Briggs stated that she felt
14  bullied by you?
15      MS. SATINSKY: Prior to the end of
16  her employment at Temple?
17      MR. MUNSHI: Correct.
18      THE WITNESS: No.
19      Because I always under the
20  assumption I tried to help her.  So not to
21  dismiss her.
22  BY MR. MUNSHI:
23  Q.  What do you men by "dismiss her"?
24  A.  Dismiss means fire her.  The whole

Page 108

1   department try very hard, tried to keep her, to
2   help her to improve her performance.
3   Q.  Does Temple have a performance
4   improvement plan system?
5   A.  I believe so, but I'm not the expert in
6   that.
7   Q.  Was Ruth Briggs ever put on a
8   performance improvement plan?
9   A.  I don't recall, but in my annual
10  evaluation, I would give some discussions about
11  how to improve certain categories.
12  Q.  But are you aware if Miss Briggs was
13  ever put on a formal performance improvement
14  plan?
15      MS. SATINSKY: Objection to form.
16      THE WITNESS: I don't recall.
17  BY MR. MUNSHI:
18  Q.  Did you have the discretion to put her
19  on one of those plans?
20      MS. SATINSKY: Objection to form.
21  What kind of plan?
22  BY MR. MUNSHI:
23  Q.  Did you have the discretion to put her
24  on a performance improvement plan?

Page 109

1    A.  I can give a suggestion, but ultimately
2    it's her decision.
3    Q.  I am sorry, whose decision?
4    A.  Ruth's decision.  To take a class or
5    take some program, yeah.
6    Q.  Did you ever have a discussion with
7    anybody about putting Ruth Briggs on a
8    performance improvement plan?
9    A.  I don't recall.
10        MS. SATINSKY: Objection to form.
11   Wait to let me object.
12        You can answer.
13        THE WITNESS: Yeah, I'm pretty sure
14   that I had numerous conversations with HR and
15   dean's office seeking help and suggest Ruth to
16   do whatever needed to improve her performance,
17   including training.
18   BY MR. MUNSHI:
19   Q.  Did you ever have a conversation with
20   Ruth Briggs specifically about taking classes
21   for training?
22   A.  I don't recall.  Whatever written in my
23   annual evaluation, I would convey the
24   information to her.

Page 110

1    Q.  Did anybody from HR or the EEO office or
2    anybody at Temple ever ask you if you were
3    treating Ruth the same way as other people prior
4    to her termination?
5        MS. SATINSKY: Objection to form.
6    You can answer.
7        THE WITNESS: Again, no one
8    questioned the way I treat Ruth.  I treat
9    everyone just the same.
10   BY MR. MUNSHI:
11   Q.  And did anybody at Temple ever inform
12   you that they were looking into concerns that
13   Ruth raised about you?
14        MS. SATINSKY: Objection to form.
15   Prior to the end of her employment?
16   BY MR. MUNSHI:
17   Q.  Prior to the end of her termination?
18   A.  No.  Actually, I never know that Ruth is
19   complaining about me.
20   Q.  At any point did you learn that Ruth
21   Briggs was submitting job applications
22   internally at Temple?
23   A.  This I know.  I think she tried many
24   places, but was not successful.

Page 111

1    Q.  How did you learn that she had submitted
2    applications internally?
3    A.  I forgot.  From different sources.
4    Q.  Did you learn that from Ruth?
5    A.  Probably not.  She probably would not
6    tell me directly.
7    Q.  Why do you think that?
8    A.  Oh, I don't know.  She just didn't tell
9    me directly.  It's probably awkward, right, talk
10   to your boss before looking for a new job.
11   Q.  From wherever you heard it from,
12   whatever source, you did have an understanding
13   that she was looking for a new job away from
14   you; right?
15        MS. SATINSKY: Objection to form.
16        THE WITNESS: Yeah, the latest
17   stage.
18   BY MR. MUNSHI:
19   Q.  Just to be clear, my question was, did
20   you have an understanding that the job she was
21   looking for were other jobs reporting to you or
22   outside of your reporting?
23   A.  Yeah, I would say yes.  But I don't know
24   the detail which department she applied.

Page 112

1    Q.  Do you have any understanding as to why
2    she wanted to transfer away from you?
3        MS. SATINSKY: Objection to form.
4        THE WITNESS: Oh, it's clear because
5    she understand that she's not suitable for her
6    job as the executive assistant.
7    BY MR. MUNSHI:
8    Q.  Do you know what her job was before she
9    started reporting to you?
10   A.  Yes.
11   Q.  What was that?
12   A.  She's executive assistant to dean.
13   Q.  So she had the same job title before you
14   were even --
15   A.  Oh, yes, yes.
16   Q.  And when she was the executive assistant
17   to the dean, are you aware of any conversations
18   about potentially firing her for bad
19   performance?
20   A.  I do not know.  Actually, when I joined
21   Temple I was very happy that Ruth can work with
22   me because she's very friendly when I interview.
23   She's the one like meet and greet me.  So I feel
24   very happy that she can work with me.

Page 113

1  Q. Did that change at some point that you
2  no longer felt happy working with her?
3  A. Oh, yeah, once you start working with
4  her, you know her performance.
5  Q. At what point did you reach that
6  conclusion?
7  A. Oh, very early. Because she some time
8  make a decision by her own without informing me.
9  Like her office, she make a huge office.
10  Q. What do you mean by that?
11  A. You know, her office like a cubicle. So
12  she just decide to up the size of her office
13  just the first few days of her work.
14  Q. When did you first think about firing
15  her?
16  MS. SATINSKY: Objection to form.
17  THE WITNESS: I don't recall. But
18  this is after at least a year with all the
19  struggles.
20  BY MR. MUNSHI:
21  Q. When was the first time, if ever, you
22  have a discussion with somebody about firing
23  her?
24  MS. SATINSKY: Objection to form.

Page 114

1  THE WITNESS: Again, I don't recall.
2  I usually only seek help from the deans and HR
3  and ask their suggestions.
4  BY MR. MUNSHI:
5  Q. And I am talking specifically about the
6  concept of firing her. Not disciplining her,
7  not reprimanding her. Actually firing her.
8  What is the first conversation you
9  recall where that concept was discussed?
10  MS. SATINSKY: Objection to form.
11  THE WITNESS: I have many
12  conversations, especially associate chair.
13  We always want to protect Ruth not to fire her.
14  The ideal situation we conclude is that find a
15  suitable job for her inside campus. But
16  executive secretary is not her job.
17  BY MR. MUNSHI:
18  Q. What do you mean by "executive
19  secretary"?
20  A. Executive secretary you have lots of
21  responsibilities. She cannot perform the work
22  we assigned her.
23  Q. Did you consider her to be an executive
24  secretary?

Page 115

1  A. No, definitely not. No, I mean her
2  level is not executive secretary level. That's
3  why the whole department struggled.
4  Q. So in all these efforts that you are
5  talking about here, did you ever talk with
6  anybody at Temple about finding her another job?
7  A. Yes, I think so.
8  Q. Who did you have those conversations
9  with?
10  A. I think it was the dean's office and HR.
11  Q. Any understanding as to why she wasn't
12  simply moved?
13  A. Because her performance is so terrible,
14  no one want her.
15  Q. Her performance from when?
16  A. I do not --
17  Q. From all the years before --
18  A. Yeah.
19  Q. -- or under you?
20  A. I do not know which one.
21  MR. MUNSHI: P-14, please.
22  (P-14 was marked for
23  identification.)
24  BY MR. MUNSHI:

Page 116

1  Q. Dr. Wu, in front of you is a document
2  that has been marked as P-14. I will give you a
3  moment to review that.
4  A. (Pause.)
5  Okay.
6  Q. This disciplinary report is dated
7  March 26th, 2013. Do you see that?
8  A. Uh-huh.
9  Q. Just verbalize, please.
10  A. Yes.
11  Q. Do you recall giving or Miss Briggs
12  receiving some discipline in connection with an
13  issue with a man named Clint Whaley?
14  A. Oh, yes. That's one of the candidate
15  and she forgot to book the ticket.
16  Q. Whose decision was it to give her this
17  discipline?
18  A. Again, all this one is a joint
19  discussion. I would never issue this letter
20  before talking to the dean's office.
21  Q. Who did you talk to in the dean's office
22  before giving her this discipline?
23  A. Usually Greg.
24  Q. And again, going back to what we said

Page 117

1  earlier, I don't want to know usually or
2  generally or typically.
3    A.  Yeah, I'm pretty sure it was Greg.
4    Q.  Do you have a specific recollection of
5  talking with Greg about issuing Ruth Briggs this
6  discipline?
7    A.  Yes, because this is everyone in the
8  department knows this incident.
9    Q.  What do you recall discussing with Greg
10  prior to issuing this discipline?
11    A.  I don't recall.  I just report the fact.
12  Then we have a long discussion.  Then we come up
13  the level of disciplinary.
14    Q.  Do you recall having conversations with
15  anybody else besides Greg about issuing this
16  discipline to Ruth Briggs?
17    A.  Oh, yes, I always discuss with two
18  associate chair.
19    Q.  And again, I just want to caution you
20  that I am not talking about usually or always.
21    A.  No, definitely I talked to both
22  associate chairs.
23    Q.  What do you recall discussing with
24  Justin Shi about issuing this discipline?

Page 118

1    A.  I don't recall the exact conversation.
2  Because the whole department is waiting for the
3  candidate to come to conduct interview.  We set
4  up Itinerary, then the same day find out the
5  ticket never issue.
6    Q.  Whose decision was it to give her a
7  three-day suspension instead of a written
8  warning or any other form of discipline?
9    A.  Again, it's a collective decision.
10    Q.  And collective in this instance of who?
11  Not usually in this instance.  Collectively
12  means who?
13    A.  It means me and Greg, maybe Drew.
14    Q.  And Drew, you said?
15    A.  Yeah, and Drew.  Drew's always in the
16  loop.
17    Q.  Do you recall any conversations with
18  Drew DiMeo about issuing Ruth Briggs this
19  specific discipline?
20    A.  I don't recall.
21    Q.  Whose decision was it to classify this
22  as a Level C discipline?
23    A.  I'm not expert in terms of deciding the
24  level.  I always consult with the dean's office.

Page 119

1    Q.  Is it your understanding that it was
2  within your discretion to assign it a Level C or
3  a Level D?
4    A.  Oh, yeah, yeah, because ultimately it's
5  my responsibility.
6    Q.  Was it also within your discretion to
7  not give her any discipline at all?
8    A.  Yeah.
9      MR. MUNSHI: Let's have this as
10  P-15, please.
11      (P-15 was marked for
12  identification.)
13  BY MR. MUNSHI:
14    Q.  You can have a moment to review that.
15    A.  (Pause.)
16      Yes.
17    Q.  These e-mails, or the top e-mail from
18  you is from a Gmail account.  Do you see that?
19    A.  Yeah.
20    Q.  Would you often use a Gmail account?
21    A.  Yes, I always use it.
22    Q.  You always use a Gmail account to
23  conduct Temple business?
24    A.  Yes.

Page 120

1    Q.  Why is that?
2    A.  Oh, because it's convenient.  I have so
3  many different e-mails, so it's all converted to
4  my Gmail.
5    Q.  Did anyone from the university ever tell
6  you not to use Gmail?
7    A.  No.
8    Q.  Did you ever have to discuss
9  confidential matters by e-mail using your Gmail
10  address?
11    A.  I use most of the time the Gmail
12  account.
13    Q.  Did anyone ever tell you to stop using
14  Gmail?
15    A.  No.
16    Q.  Did anyone ever raise with you that that
17  might be a concern?
18    A.  No, no one.
19    Q.  With regard to this issue discussed in
20  P-15, do you recall if Miss Briggs ever admitted
21  to making a mistake with the booking of the
22  travel?
23    A.  Oh, this one I think she admitted.
24    Q.  This one she?

Page 121

1    A. She admitted.
2    Q. What do you recall about that?
3    A. I don't remember exact, but she didn't
4  dispute the fact she forgot to do the work.
5    Q. Do you recall her having a discussion
6  with you about admitting to the fact?
7    A. I don't recall that.
8    Q. Do you recall how you learned that she
9  admitted to it?
10   A. I don't recall.
11   Q. But one way or another you knew she --
12   A. Oh, yeah, yeah. I must have talked to
13  her.
14   Q. Did you --
15      MS. SATINSKY: And I don't want you
16  to guess, so just testify about what you
17  actually remember.
18      THE WITNESS: Yeah, I don't remember
19  exact, the sequence and the format.
20  BY MR. MUNSHI:
21   Q. So putting aside how you learned that
22  she had admitted to it, did you believe her,
23  that she made a mistake?
24   A. Yeah, she made a mistake.

Page 122

1      MR. MUNSHI: Let's look at P-16,
2  please.
3      (P-16 was marked for
4  identification.)
5      MS. SATINSKY: Just for the record,
6  P-16, I don't think this is a complete e-mail.
7  It is cut off.
8  BY MR. MUNSHI:
9    Q. So P-15, which I think is in that stack
10  there, the e-mail that you sent to Gene Kwanty,
11  is March 25th, 2013, at 8:21 a.m.?
12   A. Uh-huh.
13   Q. I am actually pointing to P-15.
14   A. Yeah.
15   Q. I am just orienting you to the time.
16   A. Okay.
17   Q. 8:21 a.m.
18      And then on P-16, do you see at
19  10:51, same date, Ruth Briggs writes to you,
20  Andrew and Kwanty, "When you have time today,
21  may I come talk to you regarding Clint Whaley?"
22      Do you see that?
23      MS. SATINSKY: Objection to form.
24  Mischaracterizes the document. You can answer.

Page 123

1      THE WITNESS: Yes.
2      So what's your question?
3  BY MR. MUNSHI:
4    Q. My question is, the top e-mail is from
5  you to Eugene Kwanty where you wrote, "Gene,
6  call me before you reply. Ruth." And then your
7  name. Do you see that?
8    A. Yes.
9    Q. Do you recall having a conversation with
10  Gene about --
11   A. Oh, I just want to find out what's the
12  problem.
13   Q. Well, you asked him to talk to you
14  before he spoke with Ruth.
15      Why did you do that?
16   A. Because I want to know the fact before I
17  talk to Ruth.
18   Q. Ruth's e-mail is not to you. It is to
19  Dr. Kwanty.
20   A. Uh-huh.
21      MS. SATINSKY: Objection to form.
22  BY MR. MUNSHI:
23   Q. Do you see that?
24   A. Yeah.

Page 124

1    Q. So why did you want to talk to
2  Dr. Kwanty before he spoke to Ruth?
3    A. Yeah, because Dr. Kwanty working with
4  me, under me, and he's a search committee chair.
5  So I want to hear Gene Kwanty's story.
6    Q. You wanted to hear Gene Kwanty's story
7  before he spoke with Ruth?
8    A. No. I just want to know the fact as
9  soon as possible.
10   Q. Okay. But you wrote before you reply to
11  Ruth. Why was it important for you to talk to
12  him before you --
13   A. I don't recall the exact content.
14      So this implies that it's urgency.
15  I want to talk to him first.
16      MR. MUNSHI: P-17.
17      (P-17 was marked for
18  identification.)
19  BY MR. MUNSHI:
20   Q. In front of you is P-17.
21      MS. SATINSKY: I will permit
22  Mr. Munshi to question Dr. Wu about P-17, but I
23  will note for the record this is an incomplete
24  e-mail.

Page 125

1      THE WITNESS: (Pause.)
2      Okay.
3  BY MR. MUNSHI:
4      Q. So the top e-mail from Ruth Briggs, did
5  you see here she writes, "Dear Dr. Kwanty,
6  thanks for meeting with me today." She
7  said, "As I said, I dropped the ball and I am
8  very sorry about failing to confirm Clint
9  Whaley's flight reservation. Please let me know
10 if you change you mind and want me to send an
11 apology to Dr. Whaley."
12     Do you see that?
13     A. Uh-huh. Yes.
14     Q. Did you think Ruth was sincere in her
15 apology that she wrote to Dr. Whaley?
16     MS. SATINSKY: Objection to form.
17 You can answer.
18     THE WITNESS: Yes. Yes, I think so.
19 BY MR. MUNSHI:
20     Q. And do you recall her asking if she
21 could send an apology to Clint Whaley?
22     A. I don't recall, but I see this one.
23     Q. The decision to give Ruth Briggs a
24 three-day suspension was made after she admitted

Page 126

1  to dropping the ball; right?
2      A. Uh-huh, uh-huh.
3      MS. SATINSKY: Objection to form.
4      THE WITNESS: Yes.
5  BY MR. MUNSHI:
6      Q. And this was a three-day unpaid
7  suspension; right?
8      A. Yes.
9      Q. If you wanted to, it was within your
10 discretion to give her a Level B violation
11 instead of a Level C violation; is that right?
12     A. Uh-huh.
13     MS. SATINSKY: Objection. Asked and
14 answered. And again, Rahul, you continue to ask
15 the same questions. I will permit Dr. Wu, and
16 like I said, I have given you a lot of leeway on
17 it, but I am going to start telling Dr. Wu to
18 stop answering questions he has already
19 answered.
20     So Dr. Wu, you can answer this
21 question.
22     THE WITNESS: Yes, again, these
23 decisions are collective. We assess the level
24 of violation of disciplinary. Then we decide

Page 127

1  the level.
2  BY MR. MUNSHI:
3      Q. Have you ever given any -- I'm sorry.
4      A. I mean together with the dean's office.
5      Q. Have you ever given any other staff
6  member a three-day suspension besides Ruth
7  Briggs?
8      A. No.
9      Q. How about since Ruth Briggs'
10 termination?
11     A. No.
12     MS. SATINSKY: Objection to form.
13     THE WITNESS: No.
14 BY MR. MUNSHI:
15     Q. Have you ever given any other staff
16 member a Level C discipline?
17     A. I don't think so.
18     Q. In all your years of managing employees
19 at Temple, has any employee reporting to you
20 ever made a mistake?
21     A. Oh, they made mistake.
22     Q. Has anybody ever made a mistake that
23 they admitted to dropping the ball, but you
24 still disciplined them?

Page 128

1      A. No, no one has that kind of repeated
2  mistake and severeness as Ruth, like this
3  incident.
4      Q. Have you ever given anybody a Level B
5  discipline besides Ruth?
6      A. I don't recall that.
7      Q. How about a Level A discipline?
8      A. No.
9      Q. Is Ruth Briggs the only person who you
10 have given discipline, a disciplinary report to
11 for making a mistake?
12     MS. SATINSKY: Objection to form.
13     THE WITNESS: I think so.
14 BY MR. MUNSHI:
15     Q. Was there an official department policy
16 on how to inform you if the staff member is
17 running late to work?
18     MS. SATINSKY: Objection to form.
19     THE WITNESS: Yes. It's kind of
20 informal rule if someone late or we take
21 vacation, they will e-mail me. And we have
22 another staff to record the fact.
23 BY MR. MUNSHI:
24     Q. And when you say "informal rule," what

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

JIE WU
May 31, 2017

Page 129

1   do you mean by that?
2       A.  I don't recall that we issued like a
3   letter say you need to give me two-day notice or
4   something.
5           Informal means that if you want to
6   take a day off, you need to inform me a day
7   early.  So that's it.
8       Q.  And what was the informal rule if
9   somebody is just late, not taking a day off,
10  just late?
11      A.  This happened because of traffic, so I
12  don't take that seriously.  But if it's repeat,
13  then I will have a verbal warning, a
14  conversation.
15      Q.  And did you ever have that with anybody?
16      A.  I think so.
17      Q.  Sitting here right now, can you tell me
18  the name of anyone --
19      A.  Yes, I think Judy sometimes late.  And
20  there's another one, Hailey, I had a
21  conversation.
22      Q.  Judy Lennon?
23      A.  Yes, Judy Lennon.
24      Q.  Did you ever issue any written

Page 130

1   discipline or written warning to Judy Lennon?
2       A.  I don't recall.  It could be one, but
3   maybe not.  I issued many times verbal warning.
4   I never issued written warning without a verbal
5   warning first.
6       Q.  And Hailey King, did you ever give her a
7   written warning about --
8       A.  No.  But I have a very serious verbal
9   warning with her.  That's during the hurricanes.
10      Q.  Was the very serious --
11          MS. SATINSKY: I don't think he was
12  finished.
13          THE WITNESS: During the hurricane.
14  BY MR. MUNSHI:
15      Q.  During the hurricane?
16      A.  Yes.  She was absent for a couple days.
17      Q.  This very serious verbal warning that
18  you gave to Hailey King, is there any note about
19  it?
20      A.  No.
21      Q.  Did you inform anybody in writing?
22      A.  No.  It's not in writing, but many
23  people knows.  Justin Shi knows.
24      Q.  And what was the issue with Hailey King?

Page 131

1       A.  Oh, she just disappear.  Not disappear.
2   But out of reach, maybe out of power for a
3   couple days and no one knows where she is, she
4   was.  So when she come back, then we have
5   serious conversation with her.
6       Q.  So there were a couple of days where she
7   didn't show up to work?
8       A.  No.
9       Q.  And there were a couple of days where
10  she didn't inform you about whatever her
11  situation was?
12      A.  Yeah, yeah.  But that's during the
13  hurricane.
14      Q.  And during that hurricane for a couple
15  of days she didn't e-mail you?
16      A.  She didn't e-mail me.
17      Q.  And during that hurricane for a couple
18  of days she didn't call you; right?
19      A.  She didn't call me.
20      Q.  She didn't call anybody in the office;
21  right?
22      A.  Yeah, probably not.  That's why we have
23  serious conversation.
24      Q.  But nothing written down?

Page 132

1       A.  Nothing written down.  Because to me it
2   is just one single incident, during the
3   hurricane.  I come in from Florida.  I went
4   through all hurricane season, so I know the
5   life.
6       Q.  But it was one incident that took place
7   over multiple days; right?
8       A.  Yes.  Just one of many.
9       Q.  Prior to January 2014, was there ever an
10  issue with Ruth Briggs showing up late without
11  properly informing you?
12      A.  Oh, this is constant.  She's always late
13  and then she come up with all kinds of excuses.
14      Q.  Did you have verbal conversations with
15  her about being late?
16      A.  Oh, yes.
17      Q.  Prior to giving her a written warning,
18  did you ever write down anywhere that she had
19  problems with being late?
20      A.  No, I did not write down.  Oh, I could
21  have.  I can check my e-mail.  I think I keep
22  notes a certain period.
23      Q.  Notes about what?
24      A.  About Ruth's problem.

Page 133

1    Q. About being late or other things?
2    A. Other things. Again, I have all the
3  e-mails. So sometimes I just wrote myself an
4  e-mail about Ruth.
5    Q. You write yourself notes to --
6    A. Yeah.
7    Q. -- that you didn't send to other people?
8    A. Yeah, I didn't send.
9        MR. MUNSHI: I don't think we have
10  any of those, Rachel.
11        MS. SATINSKY: Rahul, we searched
12  documents. We talked to you about our document
13  searches, and to the extent that they existed
14  and were hit on our document searches, they
15  would have been produced.
16  BY MR. MUNSHI:
17    Q. Are you sure they exist?
18    A. I really don't know. I could send my
19  e-mail, usually I send myself an e-mail and just
20  keep a record. But I think the team search all
21  my e-mail. A team came to my office to get all
22  my e-mail.
23    Q. Gmail and Temple?
24    A. Yeah, yeah.

Page 134

1    Q. If somebody is running late, a staff
2  member is running late, would it be appropriate
3  notice for that person to call the office and
4  ask to speak with you?
5    A. No. Usually they send a note to the
6  staff who managing the time and cc me.
7    Q. That was the informal policy; right?
8    A. Yes, informal policy.
9    Q. But would it be appropriate to forget
10  about writing an e-mail, just calling you up?
11    A. Sometimes, yes. Some people call me.
12    Q. If you weren't available, would it be
13  appropriate for someone to say to Judy Lennon,
14  I'll be there soon?
15    A. Yeah, they always talk to each other to
16  cover each other.
17    Q. And if you are not available and Judy
18  Lennon is not available, would it be appropriate
19  to say whoever picks up the phone, "Tell Dr. Wu
20  I'll be there soon"?
21    A. Yes.
22        MR. MUNSHI: Let's have this
23  document marked as P-18, please.
24        (P-18 was marked for

Page 135

1  identification.)
2        MS. SATINSKY: Can we go off the
3  record.
4        (A discussion was held off the
5  record.)
6  BY MR. MUNSHI:
7    Q. Dr. Wu, in front of you is P-18. I will
8  give you a moment to review that.
9    A. Okay.
10    Q. Do you see that this is a disciplinary
11  report dated January 20th, 2014?
12    A. Uh-huh.
13    A. Sorry.
14    A. Yes, I saw it.
15    Q. And this was a written warning --
16    A. Yeah.
17    Q. -- given to Ruth Briggs.
18        Do you see that?
19    A. Yes.
20    Q. And this was a violation of Work Rule
21  B.10. Do you see that?
22    A. Yes.
23    Q. Whose decision was it to give Ruth
24  Briggs this discipline?

Page 136

1    A. Again, all the decision I collectively
2  talked to the dean's office. They reach a
3  conclusion the level. I talked to the dean's
4  office every week almost about Ruth.
5    Q. This discipline is signed by Andrew
6  DiMeo. Do you see that?
7    A. Okay, yes.
8    Q. Did you talk with Ruth Briggs about this
9  discipline?
10    A. Again, I don't recall, because whenever
11  we issue this written statement, we talk to
12  Ruth, inform Ruth, and she signs.
13    Q. Do you recall Ruth Briggs saying that
14  she told a student-worker she was running late
15  because you weren't available?
16    A. I don't remember this incident.
17    Q. Is there anything you recall about this
18  incident that led to this discipline?
19    A. I don't remember. Because so many
20  violations, so I don't recall specifically which
21  one.
22    Q. Well, I know you didn't sign this
23  document, but do you recall specifically any
24  conversations with Andrew or Greg or anyone

Page 137

1 else --
2    A. I don't know.
3    Q. Sorry.
4    -- before this was issued?
5    A. I don't recall.
6    Q. Do you recall having a conversation with
7 a student-worker where she told you that Ruth
8 Briggs talked to her about coming in late?
9    A. Maybe, but I don't recall the exact
10 incidents for this. As I say, she always late,
11 so it's no surprise.
12    Q. She was always late, but this is the one
13 and only discipline you gave her for being late;
14 right?
15       MS. SATINSKY: Objection to form.
16 Mischaracterizes testimony. You can answer the
17 question.
18       THE WITNESS: Again, I don't recall
19 the nature for this disciplinary. Usually for
20 like a single time late, we would not discipline
21 them. It must be a sequence of things, or
22 lying.
23 BY MR. MUNSHI:
24    Q. Did you think Ruth Briggs was lying?

Page 138

1    A. Not lying. She just -- this is her
2 character, so she try to cover herself with
3 other excuses.
4    Q. Did you ever have a conversation with
5 her about being late or being absent where you
6 thought she was lying to you?
7    A. No. Just say you need to come on time.
8 We all need to work.
9    Q. Did you ever accuse Miss Briggs of
10 purposefully or intentionally missing a meeting
11 with you?
12    A. I don't think so.
13    Q. Did you ever accuse Miss Briggs in your
14 meetings with her one-on-one or with anyone else
15 present, did you ever accuse her of not telling
16 the truth to you?
17    A. No. I think she's an honest person.
18    Q. She's an honest person?
19    A. Yes, she's an honest person. But
20 whenever we point to her weakness, then she try
21 to overly defend herself.
22    Q. Was Miss Briggs required as part of her
23 job to clock in and clock out?
24    A. Yes, I think.

Page 139

1    Q. How about Hailey King, as part of her
2 job, did she have to clock in and clock out?
3    A. Yeah. I think all staff need to clock
4 in and clock out.
5    Q. At any point did some of Ruth Briggs'
6 job duties go to Hailey King?
7    A. I don't recall, but we have kind of
8 informal policy when staff was absent, the other
9 staff need to cover. So they need to cover each
10 other possibly.
11    Q. Besides a temporary covering for each
12 other --
13    A. It is temporary covering usually. Not a
14 permanent coverage.
15    Q. Do you recall at any point permanently
16 any job duties going from Ruth Briggs to Hailey
17 King?
18    A. I don't remember. Could be. Maybe
19 something related to academic or something. Or
20 maybe Ruth's other work. So this could happen.
21 There are lots of jobs that permanent assigned.
22 There are also some ad hoc type job which is
23 assigned based on the need.
24    Q. Who made the decision to terminate Ruth

Page 140

1 Briggs' employment?
2       MS. SATINSKY: Objection to form.
3       THE WITNESS: Again, it's a
4 collective, it's usual. And then I report the
5 fact in the dean's office and I just discuss. I
6 assume the dean's office check with HR. They
7 reach a conclusion that that's the termination.
8 BY MR. MUNSHI:
9    Q. So just talking about the decision
10 itself, when you say "collective," specific to
11 the decision on this termination --
12    A. Uh-huh.
13    Q. -- what does "collective" mean?
14       MS. SATINSKY: Objection to form.
15       THE WITNESS: Collective means that
16 we discuss and we think that's the offense that
17 result in the termination.
18 BY MR. MUNSHI:
19    Q. And who is the "we"?
20    A. I would say Greg. Greg, me and Drew.
21    Q. What is the first time you recall anyone
22 discussing with you the concept of terminating
23 Ruth Briggs' employment?
24    A. I don't recall. Maybe like the second

Page 141

1    year.  Again, it's not termination.  We just say
2    that can we find Ruth a suitable job on campus,
3    like a replacement.
4        Q.  So her last day of employment at Temple
5    was in 2014, April 1, 2014?
6        A.  Yes.
7        Q.  Before April 1, 2014, do you recall any
8    conversations with Greg or Drew or anybody else
9    about terminating her employment?
10       A.  I don't recall.  But the conversation
11   not phrasing terminations.  Just we need to
12   collect all the fact for this violation or we
13   just report.
14       Q.  So regardless of what ended up
15   happening --
16       A.  Yeah.
17       Q.  -- did you ever have a conversation in
18   2014 about terminating her employment?
19       A.  Probably.  I don't recall exactly the
20   format of reaching the conclusion.
21       Q.  So at some point you know that she is no
22   longer working at Temple; right?
23       A.  Oh, yeah, yeah.  This takes awhile.  You
24   know, all these things is ultimately decided by

Page 142

1    HR.
2        Q.  Taking you to the April 2014 time
3    period, was it your understanding that she was
4    terminated or she resigned or she was
5    transferred?  What was your understanding?
6        A.  I understand that she just terminated.
7    But later I heard that it could be maybe, there
8    are several choices, but I do not know the
9    details.  But I really care about her, so I
10   suggest that any way we can help her, covering
11   her son, because her son is close to graduation.
12   If we terminate her, the son will lose the
13   support to continue studying at Temple.  So I
14   discussed with Gene Kwanty and Justin about
15   that.
16       Q.  So I am clear here, how did you learn
17   that she was no longer working at Temple?
18       A.  I think someone informed me and that
19   Ruth just admitted error very calmly, signed a
20   document, whatever the termination.
21       Q.  So prior to her actually leaving Temple,
22   did you know that she was going to no longer be
23   working at Temple?
24       A.  Yeah, I know.

Page 143

1        Q.  How did you learn that she was going to
2    no longer be working at Temple?
3        A.  Oh, because someone told me that she
4    signed a document.
5        Q.  Prior to her signing that document --
6        A.  Oh, I do not know, yeah.
7        Q.  So I'm trying to take you back to the
8    period before she left.  So April 1, 2014, was
9    her last day.
10       A.  Yeah.
11       Q.  So prior to April 1, 2014, did you have
12   an understanding one way or another that she was
13   going to not be working at Temple any more?
14       A.  Oh, yeah, I know that.
15       Q.  So how did you know that?
16       A.  Because we have all the conversations
17   and all these, I report these incidents.  I
18   think the action was very quick, and I think the
19   dean's office approach her.  Then she
20   immediately know that she would be fired.  So
21   she was very calm.  That's what I'm told.
22       Q.  You weren't there for that meeting?
23       A.  No, I was not there.
24       Q.  Going back to any meetings or

Page 144

1    conversations that you had, were you part of any
2    meeting or conversation where it was decided we
3    are going to take action against Ruth and
4    terminate her employment?
5        A.  I don't recall exactly, but I report the
6    fact of all these offenses, discuss with the
7    dean's office.
8        Q.  And the dean's office, again, we are
9    talking about Greg and Drew?
10       A.  Yes, Greg, Drew.  They probably will
11   report again to the HR.
12       Q.  Were you part of any conversations with
13   HR --
14       A.  No.
15       Q.  -- around this concept of terminating
16   her employment?
17       A.  I don't recall that I had conversation
18   with HR for the last step.
19       Q.  What is your understanding of why Ruth
20   Briggs was terminated?
21           MS. SATINSKY: Objection to form.
22           THE WITNESS: Oh, yeah, because all
23   this series of these offenses, that ultimately
24   she dismissed.

Page 145

1   BY MR. MUNSHI:
2     Q. Did anybody else play any sort of role
3   in the termination of Ruth Briggs' employment,
4   as far as you know?
5         MS. SATINSKY: Objection to form
6         THE WITNESS: I don't think so. But
7   we spend more time to discuss how to help her
8   instead of terminating her.
9   BY MR. MUNSHI:
10    Q. Do you recall any conversation with
11  Deidre Walton about terminating her employment
12  in the year 2014?
13    A. I don't recall. Because most of the
14  conversation with HR is just seeking whether we
15  can help Ruth or find other job or any way we
16  can help Ruth to improve the performance.
17    Q. This idea of helping Ruth find another
18  job, did you write any e-mails about what you
19  were trying to do to help her?
20    A. I didn't. I just request a meeting with
21  HR. I request a meeting with dean's office.
22  But there is no -- I mean they also try very
23  hard, but they not find a simple job. There I
24  seek help from HR, see if you can help Ruth.

Page 146

1     Q. What meetings did you request with HR?
2     A. I don't recall. I have multiple meeting
3   with HR about Ruth.
4     Q. In your meetings with HR, communications
5   with HR, did you discuss finding another job for
6   her?
7     A. No. I just ask help. So Ruth is not
8   performing and it's a big disruption to the
9   department. Then what can we do? And they
10  acknowledge that they understand problem with
11  Ruth. They also trying. But ultimately, the
12  decision by the new department head, whoever
13  want to accept Ruth. It seem to me like no one
14  want to accept Ruth.
15    Q. Do you recall having any of these
16  conversations with HR in the year 2014?
17    A. I don't recall.
18    Q. Do you recall these conversations with
19  HR in the year 2013?
20    A. Again, many times. I don't know which
21  years I talked to. But I don't remember any
22  conversation for the time that she got fired.
23    Q. We talked about Deidre Walton and we
24  talked about Sharon Boyle.

Page 147

1     A. Yeah.
2     Q. Is there anybody else in human resources
3   that you recall having these conversations with?
4     A. I don't recall. Probably not.
5         MS. SATINSKY: Objection to form
6         THE WITNESS: Probably not, because
7   I always deal with these two.
8   BY MR. MUNSHI:
9     Q. And did you ever discuss Ruth Briggs
10  with Deidre Walton in person?
11    A. Which one? In person with Deidre?
12    Q. In person, like face to face?
13    A. I don't know which format. Definitely
14  we do phone conversation.
15    Q. And with Deidre Walton, did you ever
16  discuss with her finding another job for Ruth
17  Briggs?
18    A. Yeah, I think so. Because they informed
19  me that HR could help because they know the
20  availabilities.
21    Q. And did Deidre Walton ever inform you
22  that Ruth Briggs was in fact looking for another
23  job internally?
24    A. I don't recall.

Page 148

1     Q. But you did know that from some source?
2     A. Yes, from sources she's looking, but was
3   not successful.
4     Q. And did you ever have a discussion with
5   Deidre Walton or anyone in HR about why
6   Miss Briggs wanted to move away from you?
7         MS. SATINSKY: Objection to form.
8   Asked and answered. He has already answered
9   this question numerous times.
10        MR. MUNSHI: What was the answer?
11        MS. SATINSKY: Rahul, he has
12  answered this question numerous times.
13        MR. MUNSHI: What was the answer?
14        MS. SATINSKY: You can answer one
15  more time. If he asks it again, I am going to
16  tell you not to answer it. So answer it one
17  more time.
18  BY MR. MUNSHI:
19    Q. What was the answer?
20    A. I don't think we discuss about that.
21    Q. Do you recall seeing any documents, any
22  notes, any e-mails, any handwritten notes from
23  you or to you about why Ruth Briggs was being
24  terminated?

Page 149

1      MS. SATINSKY: Objection to form.
2      THE WITNESS: There's no e-mail.
3  BY MR. MUNSHI:
4      Q.  Is there anyone who we haven't discussed
5  yet who you spoke with at Temple about ending
6  Miss Briggs' employment?
7      A.  Other than associate chair, Justin and
8  Gene Kwanty.
9      Q.  Did either Justin or Gene Kwanty play
10  any role in the decision to end the employment?
11      A.  Probably not.  I just informed the fact
12  that the problem with Ruth.
13      MR. MUNSHI: Let's have this marked
14  as P-19.
15      (P-19 was marked for
16  identification.)
17      THE WITNESS: (Pause.)
18      Okay.
19  BY MR. MUNSHI:
20      Q.  So in front of you, P-19, is a letter
21  dated April 1, 2014, signed by Greg Wacker.
22      Do you see that?
23      A.  Yes.
24      Q.  Did you review this document prior to

Page 150

1  April 1, 2014?
2      A.  I don't recall exactly, but I told Greg
3  all the details about these three incidents.
4  And Drew was in the loop, that he knows all of
5  it.
6      Q.  When you say "three incidents," what are
7  you referring to?
8      A.  Two incidents.
9      MS. SATINSKY: He said "these"
10  incidents.
11  BY MR. MUNSHI:
12      Q.  I thought you said three.  "These"
13  incidents is what you said?
14      A.  Yes.
15      Q.  On the second incident with booking a
16  reservation for the wrong dates, do you see
17  that?
18      A.  Yeah.
19      Q.  Did you have a conversation with Ruth
20  Briggs where she said that you gave her the
21  wrong dates?
22      A.  I don't recall.  I don't think I gave
23  her wrong dates.
24      Q.  Is that possible, that you gave her the

Page 151

1  wrong dates?
2      MS. SATINSKY: Objection to form.
3      THE WITNESS: It's always possible,
4  but we can check the record.
5  BY MR. MUNSHI:
6      Q.  And on the first incident with her
7  failure to finish an expense reimbursement --
8      A.  Yeah.
9      Q.  -- do you recall talking with Ruth
10  Briggs about that incident?
11      A.  Oh, yeah.  Because that's the main thing
12  that triggered.
13      Q.  Do you recall her stating that she could
14  not access the information she needed?
15      A.  Yeah, I remember.  But that's not the
16  case.  So somehow she -- I'm saying that she
17  fabricate.  So we caught her something that was
18  not true.  Then she get so upset the next
19  morning.
20      Q.  I'm sorry, did you say you're not saying
21  she fabricated or she did fabricate?
22      A.  I think she fabricated something.
23      Q.  I'm sorry, you are saying that she did
24  fabricate?

Page 152

1      A.  Yes.
2      Q.  So you are saying that she lied?
3      MS. SATINSKY: Objection to form.
4  Mischaracterizes testimony.
5      You can answer the question.
6      THE WITNESS: Yeah, I think so.
7      Again, she just tried to cover
8  herself, and when she did not complete it, then
9  she tried to cover herself, but then she got
10  caught the next morning.
11  BY MR. MUNSHI:
12      Q.  Did she try to cover herself with regard
13  to the Clint Whaley situation or did she admit
14  to it?
15      A.  No, this she didn't admit to.  She just
16  covered herself and just say that document is
17  not available.  Grant number is not there, but
18  in reality it is there.
19      Q.  So in your history with Ruth Briggs,
20  there were instances where she did admit to
21  making a mistake; right?
22      MS. SATINSKY: Objection to form.
23      THE WITNESS: I would say 90 to 95
24  percent of the time she would not admit it.  She

Page 153

1  just tried to find excuses.
2  BY MR. MUNSHI:
3     Q.  But there were times that she did?
4     A.  Just like one instance, the booking she
5  admit.
6     Q.  In the years that she reported to you,
7  is that the only time you recall her admitting?
8     A.  The major incidents.  Most of the time
9  she would just come up with excuses.
10    Q.  Shortly after Miss Briggs' employment
11 ended, did you have a conversation with Sandy
12 Foehl?
13        MS. SATINSKY: In connection with?
14 BY MR. MUNSHI:
15    Q.  With Ruth Briggs?
16    A.  I don't recall, because I may have had
17 several conversations with different agencies,
18 but this is already almost like three years.
19    Q.  After Ruth Briggs is gone, after
20 employment is over, with whom do you recall
21 speaking about Ruth Briggs?
22        MS. SATINSKY: And I don't want you
23 to testify --
24 BY MR. MUNSHI:

Page 154

1     Q.  I am not talking about conversations
2  with lawyers.
3        MS. SATINSKY: You can testify if
4  you spoke with a lawyer, but I don't want you to
5  testify about what you spoke with with the
6  lawyer.  So you can testify to the people that
7  you spoke with.
8        THE WITNESS: Oh, I spoke with my
9  colleagues about that, about Ruth.  I just feel
10 sorry that ultimately she get dismissed.
11 BY MR. MUNSHI:
12    Q.  Who are these people you spoke with
13 after she had already been --
14    A.  All my associate chairs, colleagues.
15    Q.  Do you recall speaking with Sandy Foehl?
16    A.  I don't recall that.
17        MR. MUNSHI: This is P-20, please.
18        THE WITNESS: As I say, I talked to
19 many people.
20        (P-20 was marked for
21 identification.)
22 BY MR. MUNSHI:
23    Q.  You have in front of you P-20.  You can
24 take a moment and review that e-mail chain.

Page 155

1     A.  (Pause.)
2        Okay.
3     Q.  The bottom e-mail is between Sandy Foehl
4  and Deidre Walton, the person in human
5  resources.
6     A.  Uh-huh.
7     Q.  At the end of Sandy Foehl's e-mail, she
8  writes, "I have an appointment with the
9  department chair this afternoon."
10        Do you see she wrote that?
11    A.  Yes.
12    Q.  This is dated April 4th, 2014.
13    A.  Uh-huh.
14    Q.  Do you see that?
15    A.  Yeah, I saw it.
16    Q.  Do you recall having a conversation with
17 Sandy Foehl around this time about Ruth Briggs?
18    A.  As I say, I have lots of conversations
19 with different people, but this one I just did
20 not recall.
21    Q.  After she was let go, did you have a
22 conversation with Greg Wacker about Ruth Briggs?
23    A.  Not officially.  She probably would
24 mention about Ruth and the situation.

Page 156

1     Q.  What do you mean by "not officially"?
2     A.  Officially means have an official
3  conversation how to deal with Ruth's situation
4  because Ruth is gone.  So I don't think we had
5  any more conversation like that.
6     Q.  How about Justin Shi, did you have any
7  conversations with him regarding Ruth Briggs
8  after she was gone?
9     A.  No, we --
10        MS. SATINSKY: Objection to form.
11 You can answer.
12        THE WITNESS: We occasionally talk
13 to -- I mean we mention about Ruth and we want
14 to find out what's her situation.  So one of
15 staff report to me later that Ruth find a job.
16 I feel very happy because Ruth posted on her
17 website or Facebook.
18 BY MR. MUNSHI:
19    Q.  Is that how you found out that she found
20 a job?
21    A.  Yeah.
22    Q.  Did you have any conversations with
23 Deidre Walton after Ruth Briggs' employment
24 ended about Ruth Briggs?

Page 157

1    A. I don't recall.
2    Q. How about anybody in HR?
3    A. I don't recall that.  Because the timing
4 I get confused whether it is before her
5 termination or after her termination.  I have
6 numerous conversations with HR about Ruth, yeah.
7    Q. Before and after the termination?
8    A. I don't recall whether it is before or
9 after.
10    Q. Okay.
11    A. I'm not sure if there is a conversation
12 after Ruth's termination.
13        MR. MUNSHI: This is P-21.
14       (P-21 was marked for
15 identification.)
16 BY MR. MUNSHI:
17    Q. In front of you is an e-mail chain P-21.
18 You can take a moment and review it.
19    A. (Pause.)
20       Okay.
21    Q. The oldest e-mail in this chain on the
22 bottom of the first page, it is from Sandy Foehl
23 to you dated August 8th, 2014.  Do you see that?
24    A. Yeah.

Page 158

1    Q. And she writes to you, "Dear Dr. Wu,
2 there is a particular allegation in Ruth Briggs'
3 complaint, the US Equal Employment Opportunity
4 Commission, that I need to review with you."
5    A. Uh-huh.
6    Q. Did you end up speaking with Sandy
7 Foehl?
8    A. Yeah, now I recall.  I think she kind
9 of -- she came to my office and discussed.
10    Q. What do you recall about that
11 conversation?
12    A. Because she just say that -- I don't
13 remember her role.  She's not a university
14 official, but some kind of a union -- I'm not
15 sure.  And then she just talked to me and then
16 she recorded our conversation.
17    Q. What do you mean she recorded it?
18    A. No, record means wrote down.  But that's
19 the first time we were kind of surprised to know
20 that Ruth mentioned that we have this age
21 discrimination, because it is never in my mind
22 that there is age discrimination.  And we have a
23 couple of staff much older than Ruth and we
24 don't discriminate.

Page 159

1    Q. Was Sandy Foehl taking notes during this
2 conversation with you?
3    A. I think so.
4    Q. Handwritten notes or on a computer?
5    A. I think it's hand notes.  She's more
6 tradition.  Now I remember this.  She's a very
7 nice lady.
8    Q. And do you recall her asking you
9 questions about Ruth Briggs?
10    A. Yeah, she ask questions.
11    Q. What do you recall her asking?
12    A. I don't remember.  I think that time
13 about age-related issue.  I said that's really
14 surprised.  Never in my mind that we
15 discriminate Ruth based on age.
16    Q. Did she say anything to you about
17 complaints that Ruth raised about you?
18    A. I don't know exactly what kind of
19 complaints.  Actually I never know that I'm the
20 main target person by Ruth.  I always think that
21 I'm the one protecting Ruth.
22    Q. Is that what Sandy told you, that you
23 were the main target?
24    A. No, no one told me.  Until today.  This

Page 160

1 looks like this is the one target to me.
2    Q. She writes here in P-21, "There is a
3 particular allegation in Ruth Briggs'
4 complaint."
5       Was there a particular allegation
6 that she asked you about?
7    A. Yeah, I think that's the age stuff.
8    Q. Did she ask you if you ever made any age
9 comments to Ruth?
10    A. I don't recall the details.
11    Q. Did she ask you if you ever made any
12 sex-based or gender-based comments to Ruth?
13    A. No, no.  I mean I would never make those
14 kind of comments to Ruth.
15    Q. Do you recall any questions that she
16 asked you during this meeting?
17    A. I don't recall that.
18    Q. How long was this meeting?
19    A. It's about 15 minutes to a half an hour.
20 It's not long.
21    Q. And we talked about different people who
22 you spoke with after Ruth Briggs had left
23 Temple, and again, we don't want to get into the
24 conversations that you had with any lawyers.

Page 161

1    A. Uh-huh.
2    Q. But did you speak with any lawyers in
3  2014 about Ruth Briggs?
4    A. I don't think so. The lawyers are very,
5  very late. Until these things happen, then I
6  get approached. And everyone got surprised that
7  this thing is still continuing.
8    Q. In the year 2014, did anybody ask you if
9  you ever made comments to Ruth Briggs about the
10  mandatory retirement law in China?
11       MS. SATINSKY: Except to the extent
12  you had any discussions about that with an
13  attorney.
14       THE WITNESS: No. But I do recall
15  that we have some conversation in the faculty,
16  information about age discrimination. So
17  everyone laugh at that.
18  BY MR. MUNSHI:
19    Q. Who had this conversation?
20    A. I think it was Justin and Gene.
21    Q. Who was laughing?
22    A. Laughing means that they find it absurd.
23  Not that they are laughing. They just find it
24  absurd.

Page 162

1    Q. And this is regarding Ruth, or in
2  general?
3    A. Regarding Ruth's allegation.
4    Q. Was this at a faculty meeting or
5  something else?
6    A. No, no. It's just private meeting. We
7  never discuss this.
8    Q. You, Justin and Gene?
9    A. Yes.
10    Q. What did you discuss?
11    A. Just said it looks like there is a
12  lawsuit from Ruth.
13    Q. What else did you say?
14    A. I didn't say in detail.
15    Q. Did you tell him that the allegations
16  were that you discriminated against her?
17    A. I don't recall exactly, but maybe I
18  mentioned that looks like there's age-related
19  discrimination.
20    Q. Do you recall mentioning to them that
21  she has alleged that you retaliated against her?
22    A. No. Retaliated, never. This is the
23  first time I saw this today. But I never do
24  that. Because there is no age discrimination.

Page 163

1  I never -- she never complained to me in person
2  about any of these allegations.
3    Q. And it is your testimony that she never
4  complained to you about you treating her
5  differently than other people in the workplace?
6    A. No.
7    Q. Even though we just saw that e-mail
8  earlier where she talked about fairness in the
9  workplace?
10    A. No. To be honest, that's a long e-mail.
11  I do not even remember. I saw that I sent this.
12  But even I saw that I sent this, I don't think
13  that's sufficient.
14    Q. Did you meet with Sandy Foehl any other
15  time besides the one that we just talked about?
16    A. I don't recall. Maybe we met twice, but
17  definitely once in my office.
18    Q. Did she ever tell you that she
19  personally had conversations with Ruth Briggs
20  about filing a complaint?
21    A. I don't recall. Likely she told me that
22  she had also met Ruth.
23    Q. Sorry, say that again?
24       MS. SATINSKY: Also met Ruth.

Page 164

1       THE WITNESS: She also met Ruth.
2  BY MR. MUNSHI:
3    Q. So she did tell you that?
4       MS. SATINSKY: She said she met
5  Ruth.
6  BY MR. MUNSHI:
7    Q. Sorry. I got lost. Sandy said what?
8    A. Sandy mainly focus on the questions to
9  me. So I just answer some questions. She just
10  have prepared list of questions like you, so I
11  just answered.
12       MR. MUNSHI: Give me two minutes.
13  Let me just review something here.
14       (Pause.)
15       MR. MUNSHI: I have no further
16  questions.
17       I just wanted to circle back that to
18  the extent any of those handwritten notes with
19  Sandy Foehl do exist, I need those, but we can
20  talk about that later.
21       MS. SATINSKY: I will certainly ask
22  about them.
23       I have no questions at this time,
24  and the witness reserves the right to read and

---

Page 165

```
 1   sign.
 2          MR. MUNSHI: Thank you, sir.
 3          (Witness excused.)
 4          -   -   -
 5          (The deposition concluded at
 6   1:01 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 167

```
 1          E X H I B I T S  (cont'd):
 2   JIE WU DEPOSITION EXHIBITS          MARKED
 3   P-16  E-mail string, TEMPLE 0000579   122
 4   P-17  E-mail string, TEMPLE 0000586   124
 5   P-18  Disciplinary Report TEMPLE 0170  135
 6   P-19  Letter dated April 1, 2014, from 149
          Mr. Wacker to Ms. Briggs, TEMPLE 0171
 7
 8   P-20  E-mail string, Temple University  154
          (R. Briggs) - 0000023
 9   P-21  E-mail string, Temple University  157
          (R. Briggs) - 0000286 - 287
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 166

```
 1              I N D E X
 2   DEPONENT:  JIE WU                    PAGE
 3      Examination by Mr. Munshi          2
 4          E X H I B I T S
 5   WU DEPOSITION EXHIBITS             MARKED
 6   P-1   Resume of Jie Wu               5
 7   P-2   Biography                      6
 8   P-3   Complaint                     19
 9   P-4   Defendant Temple University's 20
          Answer with Affirmative Defenses to
10         Plaintiff's Complaint
11   P-5   Temple University Rules of Conduct  24
12   P-6   Disciplinary Report, BRIGGS 23  33
13   P-7   E-mail string, BRIGGS 64 - 67   54
14   P-8   E-mail string, BRIGGS 24        64
15   P-9   E-mail string, Temple University  74
          (R. Briggs) - 0000411 - 412
16
17   P-10  E-mail, Temple University       87
          (R. Briggs) - 0000332
18
19   P-11  E-mail string, Temple University  89
          (R. Briggs) - 0000344
20   P-12  E-mail string, Temple University  92
          (R. Briggs) - 0000329 - 0000331
21
22   P-13  E-mail, Temple University        97
          (R. Briggs) - 0000355
23   P-14  Disciplinary Report, BRIGGS 49  115
24   P-15  E-mail string, TEMPLE 169       119
```

---

Page 168

```
 1          WITNESS SIGNATURE/CERTIFICATION PAGE
 2
 3
 4          I have read the foregoing transcript
 5   of my deposition given on Wednesday, May 31,
 6   2017, and it is true, correct and complete, to
 7   the best of my knowledge, recollection and
 8   belief, except for the list of corrections, if
 9   any, attached on a separate sheet herewith.
10
11
12
13
14
15
16   _____
17   DATE              JIE WU
18
19
20
21
22
23
24
```

---

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

JIE WU
May 31, 2017

Page 169

```
 1
 2
 3
 4              I HEREBY CERTIFY that the
 5  proceedings, evidence and objections are
 6  contained fully and accurately in the
 7  stenographic notes taken by me upon the
 8  foregoing matter on Wednesday, May 31, 2017, and
 9  that this is a true and correct transcript of
10  same.
11
12
13
14
15
16          Terry Barbano Burke, RMR-CRR
17
18
19              (The foregoing certification
20  of this transcript does not apply to any
21  reproduction of the same by any means, unless
22  under the direct control and/or supervision of
23  the certifying reporter.)
24
```

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

JIE WU
May 31, 2017

## A

**able (1)** 59:1
**above (1)** 34:12
**absent (3)** 130:16;
138:5;139:8
**absurd (2)** 161:22,24
**abusive (1)** 26:3
**academic (1)** 139:19
**accept (2)** 146:13,14
**access (1)** 151:14
**account (4)** 119:18,20,
22;120:12
**accurate (6)** 6:1,2,16,
17;21:21;83:3
**accurately (1)** 6:21
**accusation (2)** 82:14,23
**accuse (3)** 138:9,13,15
**acknowledge (2)** 47:10;
146:10
**acknowledging (1)**
47:11
**Act (4)** 69:5;70:2,9,17
**action (8)** 34:21;35:20;
94:23;95:9,11;104:22;
143:18;144:3
**actually (11)** 12:22;
13:2;50:8;54:4;110:18;
112:20;114:7;121:17;
122:13;142:21;159:19
**ad (1)** 139:22
**address (1)** 120:10
**admit (5)** 152:13,15,20,
24;153:5
**admitted (8)** 120:20,23;
121:1,9,22;125:24;
127:23;142:19
**admitting (3)** 78:20;
121:6;153:7
**affairs (2)** 7:8;8:21
**afternoon (1)** 155:9
**afterwards (1)** 8:7
**again (51)** 3:15;4:11;
37:23;39:4,16,19;40:7,
24;41:3;45:7;47:1;
48:18;57:8;62:8,14;
66:10;67:1;70:5;77:1,
15,22;78:5;79:12;
82:20;86:13,23,24;
96:5;97:3;106:20;
110:7;114:1;116:18,
24;117:19;118:9;
126:14,22;133:2;
136:1,10;137:18;
140:3;141:1;144:8,11;
146:20;148:15;152:7;
160:23;163:23
**Against (5)** 39:18;75:5;
144:3;162:16,21
**age (63)** 10:24;11:6,10,
16,24;12:22;13:1,9,10;
15:15,20,21;16:2,10,

16;18:9,13;19:12;21:2;
22:4;24:5;26:12,21;
27:15;28:13;43:14;
53:9;56:10,22,24;57:2,
6,17,22;58:24;60:3,9,
15,21;61:3,7,11;62:16;
64:17;65:20;66:3,5,10,
13,16;70:8,13;72:10;
73:5,15;83:19;158:20,
22;159:15;160:7,8;
161:16;162:24
**age-based (8)** 22:11;
23:7,15,19,23;27:7;
53:17;58:2
**agencies (1)** 153:17
**age-related (2)** 159:13;
162:18
**ages (2)** 16:6,14
**ago (5)** 10:3;13:20,21;
30:3;59:5
**agree (6)** 23:14,18;
24:3,6,12;98:18
**ahead (5)** 3:13;5:23;
30:18;92:21;104:19
**allegation (4)** 158:2;
160:3,5;162:3
**allegations (2)** 162:15;
163:2
**alleged (5)** 43:14;44:7;
46:14;51:5;162:21
**allegedly (4)** 46:15;
50:23;64:18;105:23
**almost (6)** 27:10;45:11;
75:17;81:5;136:4;
153:18
**along (1)** 30:23
**always (31)** 12:9;30:11,
20;32:4,5,8;37:22;
41:1,4;47:9;54:9,11;
78:18;80:3;85:11;
104:21;107:19;114:13;
117:17,20;118:15,24;
119:21,22;132:12;
134:15;137:10,12;
147:7;151:3;159:20
**and/or (2)** 23:23;48:15
**Andrew (3)** 122:20;
136:5,24
**annual (2)** 108:9;
109:23
**answered (26)** 16:23;
17:16;18:7,15;21:9;
39:24;43:18;58:16;
60:6;61:24;62:1,9;
66:7;82:16;83:1,9;
86:21;92:2;95:17;96:1;
126:14,19;148:8,8,12;
164:11
**anti-discrimination (2)**
72:1,5
**anti-retaliation (2)** 72:1,
5
**Antoinette (1)** 31:8

**apology (3)** 125:11,15,
21
**applauded (1)** 87:22
**applications (2)** 110:21;
111:2
**applied (3)** 78:12;
79:24;111:24
**apply (2)** 75:7;77:13
**applying (7)** 75:7,24;
76:5;77:12;78:11;
93:10;95:23
**appointment (1)** 155:8
**approach (1)** 143:19
**approached (1)** 161:6
**appropriate (7)** 26:22;
86:10,18;134:2,9,13,18
**approximately (1)** 93:5
**April (8)** 141:5,7;142:2;
143:8,11;149:21;
150:1;155:12
**Asia (1)** 10:11
**Asian (1)** 10:16
**aside (3)** 11:3;57:22;
121:21
**asserted (4)** 22:1,20;
23:22;36:14
**assertion (2)** 22:9;29:6;
36:20
**assertions (1)** 23:4
**assess (1)** 126:23
**assign (3)** 97:9;99:18;
119:2
**assigned (2)** 114:22;
139:21,23
**assistance (1)** 94:11
**assistant (4)** 8:20;
112:6,12,16
**associate (12)** 7:7;
36:24;50:8,13;68:20;
93:17;96:6;114:12;
117:18,22;149:7;
154:14
**associates (3)** 50:4,6;
51:2
**assume (1)** 140:6
**assumption (1)** 107:20
**attached (1)** 93:16
**attain (1)** 58:24
**attention (1)** 55:18
**attorney (3)** 69:14,18;
161:13
**August (1)** 157:23
**availabilities (1)** 147:20
**available (5)** 134:12,17,
18;136:15;152:17
**aware (14)** 10:8,12,23;
11:2,21;16:4,8,12;
103:4,10,14,18;108:12;
112:17
**away (3)** 111:13;112:2;

148:6
**awhile (2)** 13:20;
141:23
**awkward (1)** 111:9

## B

**B10 (1)** 135:21
**B11 (4)** 35:3,7,11;44:1
**back (17)** 9:8,10,13;
15:1;28:5,6;31:3;
32:20;52:6;55:12,12;
78:16;116:24;131:4;
143:7,24;164:17
**backward (1)** 55:9
**bad (1)** 112:18
**ball (3)** 125:7;126:1;
127:23
**based (13)** 10:19;
11:21;22:17;26:9;
47:22;53:14;62:24;
72:10;73:15;90:16;
98:4;139:23;159:15
**basis (4)** 79:22;98:6,
18;100:19
**Bates (1)** 54:18
**become (1)** 84:16
**becomes (1)** 85:20
**becoming (1)** 48:2
**besides (7)** 67:9;101:9;
117:15;127:6;128:5;
139:11;163:15
**best (5)** 3:23;4:3,6,22;
8:6
**better (1)** 3:14
**big (4)** 75:3;97:16;
98:22;146:8
**biography (1)** 6:13
**birth (1)** 9:19
**birthday (3)** 28:11;
43:10,16
**bit (3)** 3:6;96:16,22
**blue (2)** 11:8,10
**book (1)** 116:15
**booking (3)** 120:21;
150:15;153:4
**borders (1)** 88:3
**born (1)** 9:21
**boss (1)** 111:10
**both (6)** 8:20;9:3;
29:20;84:17;98:6;
117:21
**bottom (6)** 34:4;65:13,
17;89:12;155:3;157:22
**box (1)** 44:3
**Boyle (6)** 67:7,10,19;
97:22;98:4;146:24
**break (2)** 4:21;63:7
**Briggs (130)** 12:6,14;
13:19;17:5,7;20:11;
22:1,19;23:20;29:2,8;
30:15,24;31:10,13,16;
33:9,23;37:12;38:7,11;

39:1,11;40:5;41:16,23;
43:13;46:15,24;47:6;
50:23;51:10,22;52:19;
53:4,8;54:1,19,19;
55:21;56:14;57:13;
59:7;64:5,7,16;65:13;
66:2,24;67:5,11,16,20,
24;68:8;73:18;74:3,8,
22;75:3,14,20;76:20;
78:10;81:24;87:17;
88:10;91:5;93:6;94:2;
95:15,21;96:11;97:1;
98:11;101:10,13;
104:16;105:2,4,11;
107:9,13;108:7,12;
109:7,20;110:21;
116:11;117:5,16;
118:18;120:20;122:19;
125:4,23;127:7;128:9;
132:10;135:17,24;
136:8,13;137:8,24;
138:9,13,22;139:16;
144:20;147:9,17,22;
148:6,23;150:20;
151:10;152:19;153:15,
19,21;155:17,22;156:7,
24;159:9;160:22;
161:3,9;163:19
**Briggs' (26)** 43:10;
44:23;51:4;66:22;
77:20;78:1;89:2,18;
90:7,11,16,21;91:21;
101:16;105:22;107:3;
127:9;139:5;140:1,23;
145:3;149:6;153:10;
156:23;158:2;160:3
**bring (2)** 105:21;
106:15
**bullet (1)** 26:1
**bullied (2)** 107:10,14
**business (2)** 50:19;
119:23

## C

**C3 (2)** 25:18;26:2
**call (7)** 81:6;123:6;
131:18,19,20;134:3,11
**called (5)** 7:4;24:24;
31:7;63:16;80:8
**calling (1)** 134:10
**calm (1)** 143:21
**calmly (1)** 142:19
**came (3)** 100:6;133:21;
158:9
**Cameron (10)** 54:20,
21;55:16;56:15;58:10,
23;60:2,19;61:17;63:1
**campus (2)** 114:15;
141:2
**can (83)** 3:21;4:15;
6:14;9:13;12:2;15:5,
24;16:23;17:16;18:7,

16;21:9,14,17;25:12;
26:16;27:2,18;35:22;
39:24;40:10;41:11;
43:21;51:24;53:22;
56:5;57:1;58:16;60:6;
62:12;63:7;66:8;68:11;
69:7,18;70:11,19;73:2;
76:9,24;81:2,20;82:17;
83:13;86:16,21;92:3,8,
21;96:3;99:19;105:18;
106:7,18,22;109:1,12;
110:6;112:21,24;
119:14;122:24;125:17;
126:20;129:17;132:21;
135:2;137:16;141:2;
142:10;145:15,16,24;
146:9;148:14;151:4;
152:5;154:3,6,23;
156:11;157:18;164:19
**candidate (2)** 116:14;
118:3
**capacity (12)** 68:18,24;
69:3,22,23;70:5,15,24;
71:24;72:11,21;73:10
**care (1)** 142:9
**case (2)** 48:13;151:16
**cases (3)** 13:13;14:16;
72:19
**casual (4)** 12:17;30:5,
9;58:18
**categories (1)** 108:11
**Category (3)** 25:13;
45:5,6
**caught (2)** 151:17;
152:10
**caution (2)** 41:3;117:19
**cc (1)** 134:6
**center (4)** 7:4,4,5;49:4
**certain (14)** 14:16,16;
15:19,21;16:10,16,18;
45:12;57:6;61:2;71:1,
13;108:11;132:22
**certainly (1)** 164:21
**chain (6)** 54:18;89:12;
91:3;154:24;157:17,21
**chair (18)** 7:12,15,16;
8:2,13;36:24;48:1,3;
50:8,13;68:24;93:18;
96:6;114:12;117:18;
124:4;149:7;155:9
**chairman (1)** 9:8
**chairs (2)** 117:22;
154:14
**chance (1)** 6:21
**change (4)** 59:16;
87:24;113:1;125:10
**character (1)** 138:2
**characteristic (3)** 14:23;
73:6,12
**charge (3)** 52:14,21;
53:2
**check (5)** 36:23,24;
132:21;140:6;151:4

**checkmark (1)** 34:17
**China (36)** 8:22;9:22;
10:5,8,10;12:21;13:24;
14:6,11,19,21,23;
16:18;18:12;19:6,8,11;
21:2;24:4,5;26:12,21;
27:15;28:23;29:4,9;
32:1,13;36:4,18;56:10,
23;58:5,12;61:2;
161:10
**China's (4)** 10:19,23;
11:2;12:6
**Chinese (7)** 11:23;
14:24;20:24;85:23;
86:1;88:4,6
**choices (1)** 142:8
**circle (1)** 164:17
**Civil (2)** 69:5;70:2
**claimed (1)** 45:24
**clarify (1)** 69:21
**class (1)** 109:4
**classes (5)** 71:13,14,
16,19;109:20
**classify (1)** 118:21
**cleaner (1)** 13:7
**clear (13)** 32:6,15,19;
35:6;38:2;41:11;51:18;
60:12,13;96:23;
111:19;112:4;142:16
**clearly (2)** 23:6;30:4
**clients (1)** 26:6
**Clint (5)** 116:13;
122:21;125:8,21;
152:13
**clock (6)** 138:23,23;
139:2,2,3,4
**close (1)** 142:11
**closed (1)** 86:14
**collar (7)** 11:5,7,7,8,10,
12,16
**colleague (1)** 86:7
**colleagues (2)** 154:9,14
**collect (1)** 141:12
**collective (8)** 39:12;
118:9,10;126:23;
140:4,10,13,15
**collectively (1)** 96:5;
118:11;136:1
**college (3)** 52:15;53:3;
59:23
**coming (1)** 137:8
**comment (22)** 22:11,
21;23:7,16,20;24:3;
26:11,14;27:7;28:10,
15;36:16;43:15;53:8,
17;58:23;60:2,2,15;
61:7;84:5;92:8
**commented (2)** 77:7,12
**comments (14)** 23:1,24;
24:14;64:17;65:19;
66:3,4,10,13;94:22;
160:9,12,14;161:9
**Commission (1)** 158:4

**committee (1)** 124:4
**communications (2)**
96:10;146:4
**companies (2)** 16:4,13
**company (1)** 15:17
**complain (6)** 33:3;
73:18;74:4,8;78:17;
79:23
**complained (6)** 47:15;
73:22;74:11;87:5;
163:1,4
**complaining (3)** 80:3;
88:5;110:19
**complaint (19)** 20:8,13;
22:10,18;26:24;30:6;
32:16,20;46:1,2;73:24;
74:7;86:7,9;88:24;
90:21;158:3;160:4;
163:20
**complaints (2)** 159:17,
19
**complete (6)** 78:14,15,
16;97:10;122:6;152:8
**complicated (1)** 8:19
**computer (6)** 7:2,3,16;
42:20;78:18;159:4
**Computing (2)** 7:5;49:5
**concept (5)** 14:11;
114:6,9;140:22;144:15
**concepts (1)** 15:13
**concern (1)** 120:17
**concerns (2)** 105:7;
110:12
**conclude (1)** 114:14
**concluded (1)** 165:5
**conclusion (6)** 100:19,
24;113:6;136:3;140:7;
141:20
**Conduct (21)** 25:1,18;
35:4,12,16,23;36:3;
42:4,11;44:2,7,22;45:2,
22;46:14,20;50:23;
51:5;53:18;118:3;
119:23
**conference (1)** 5:3
**confident (1)** 84:5
**confidential (1)** 120:9
**confirm (1)** 125:8
**Confucius (1)** 9:1
**confused (2)** 91:10;
157:4
**connection (4)** 60:16;
61:8;116:12;153:13
**consider (5)** 26:10;
49:19;72:4;78:23;
82:13,23;84:7,19;
114:23
**considered (2)** 53:4;
73:6
**constant (1)** 132:12
**consult (5)** 35:20;
37:14,22;50:3;118:24
**consultation (1)** 106:23

**consulting (1)** 45:16
**contact (5)** 39:2;40:9;
63:18;64:4;106:20
**content (9)** 14:8;38:16,
21;41:1;45:23;71:12;
81:19;100:23;124:13
**context (4)** 58:7;61:1;
66:11,14
**continue (6)** 15:1,2,4,5;
126:14;142:13
**continuing (1)** 161:7
**convenient (1)** 120:2
**conversation (88)**
12:18;13:19,22;14:2,
5;16:17,19;17:13,20;
18:4,24;19:1,4;29:18;
30:1,5,7,11,20;31:15,
20,24;32:4,12,21,23;
33:1;37:17;38:5,9,17,
18,20;46:10;50:10,22;
51:13;54:2,8;56:18,19,
20;57:5,12;58:2,18,19;
61:3;75:16;77:24;81:8;
92:13;96:8;99:24;
100:6,8;101:2;105:13;
109:19;114:8;118:1;
123:9;129:14,21;
131:5,23;137:6;138:4;
141:10,17;144:2,17;
145:10,14;146:22;
147:14;150:19;153:11;
155:16,22;156:3,5;
157:11;158:11,16;
159:2;161:15,19
**conversations (54)**
12:14;13:23;16:20;
18:19;32:7,9;38:15,23;
40:21;46:6,19;54:9;
59:6,10,21,24;66:23;
67:16,20;77:23;81:12,
16,22;95:1,4;99:21;
100:9;101:6,8,12;
105:10;109:14;112:17;
114:12;115:8;117:14;
118:17;132:14;136:24;
141:8;143:16;144:1;
12;146:16,18;147:3;
153:17;154:1;155:18;
156:7,22;157:6;
160:24;163:19
**converted (1)** 120:3
**convey (1)** 109:23
**corner (1)** 25:8
**corridor (1)** 84:13
**counseled (2)** 27:5;
86:3
**countries (3)** 10:12,16;
11:3
**country (1)** 10:11
**couple (8)** 83:22;
130:16;131:3,6,9,14,
17;158:23
**course (1)** 28:15

**court (3)** 22:2,20;36:15
**cover (7)** 134:16;138:2;
139:9,9;152:7,9,12
**coverage (1)** 139:14
**covered (1)** 152:16
**covering (3)** 139:11,13;
142:10
**created (1)** 3:21
**crying (1)** 97:12
**crystal (2)** 32:6;60:12
**cubicle (1)** 113:11
**cultural (2)** 14:23;56:11
**culture (8)** 12:19;13:24;
14:6;18:20;19:2;30:6;
33:5;58:19
**current (2)** 6:24;8:2
**currently (3)** 7:13;8:18,
24
**cut (1)** 122:7

---

## D

**daily (1)** 75:17
**date (15)** 9:19;10:1;
34:6,8,13;42:14,17,18,
23;43:1,3,5,9;91:22;
122:19
**dated (11)** 65:14;
74:22;87:18;91:13,16;
93:2;116:6;135:11;
149:21;155:12;157:23
**dates (6)** 34:8,21;
74:22;87:18;93:2;151:1
**day (11)** 21:1;43:15;
87:21,21;90:18;118:4;
129:6,6,9;141:4;143:9
**days (9)** 93:5;113:13;
130:16;131:3,6,9,15,
18;132:7
**day-to-day (1)** 50:18
**deal (2)** 147:7;156:3
**dean (5)** 104:3,5,6;
112:12,17
**deans (1)** 114:2
**dean's (39)** 35:20;
36:23;37:2,11,15,22;
38:10;39:14,15;40:9;
44:19;45:4,16;47:2;
50:4;52:17,17;81:7,15;
88:6;96:6;102:8,9;
104:22;106:21;109:15;
115:10;116:20,21;
118:24;127:4;136:2,3;
140:5,6;143:19;144:7,
8;145:21
**Dear (2)** 125:5;158:1
**December (1)** 97:23
**decide (3)** 45:18;
113:12;126:24
**decided (2)** 141:24;
144:2
**deciding (1)** 118:23
**decision (19)** 39:10,12,

22;109:2,3,4;113:8;
116:16;118:6,9,21;
125:23;135:23;136:1;
139:24;140:9,11;
146:12;149:10
**decisions (1)** 126:23
**defend (2)** 97:15;
138:21
**defense (1)** 75:5
**defensive (1)** 59:2
**definitely (14)** 33:3;
36:13,21;38:17;45:24;
46:4,5;53:23;71:14;
83:21;115:1;117:21;
147:13;163:17
**Deidre (25)** 66:17,18,
23;67:6,9,15;89:14,18,
22;90:2,10,18;101:3,6,
8,12;145:11;146:23;
147:10,11,15,21;148:5;
155:4;156:23
**denied (2)** 21:19,22
**department (27)** 7:12,
16;8:3,13;9:8;42:20;
48:1,2;49:11;50:19,20;
81:5;84:10,11,14,16;
98:23;99:2;108:1;
111:24;115:3;117:8;
118:2;128:15;146:9,
12;155:9
**depends (1)** 98:20
**deposition (2)** 3:3;
165:5
**depositions (2)** 3:7;
48:15
**detail (4)** 70:4;102:19;
111:24;162:14
**details (5)** 44:10;50:10;
142:9;150:3;160:10
**differences (1)** 56:11
**Different (19)** 11:8,24;
19:2;20:6;30:12,21;
61:1;66:14;68:15;
72:18;80:3;83:12;
96:16,22;111:3;120:3;
153:17;155:19;160:21
**differently (3)** 11:24;
74:10;163:5
**difficult (1)** 8:5
**dig (1)** 51:24
**DiMeo (4)** 38:6;68:7;
118:18;136:6
**direct (3)** 55:18;83:19;
85:14
**directly (8)** 8:11;9:4,
15;17:5,8;48:3;49:9;
52:16;74:11;111:6,9
**director (3)** 7:4;8:22;
49:4
**directors (2)** 9:3,3
**disappear (2)** 131:1,1
**disarray (1)** 84:10
**disciplinary (14)** 33:10,

22;34:7;35:20;37:8,14;
38:6;47:20;116:6;
117:13;126:24;128:10;
135:10;137:19
**discipline (62)** 14:17;
33:9;35:17,24;36:12,
16;37:2,12,19,20;
38:11;39:1,11,17,21,
22;40:6,16,22;41:13,
15,24;42:5,12;44:8,23;
46:8,16,18,21,23;
47:12;49:13;50:24;
51:6,11,21;53:19;
98:21;103:5;116:12,
17,22;117:6,10,16,24;
118:8,19,22;119:7;
127:16;128:5,7,10;
130:1;135:24;136:5,9,
18;137:13,20
**disciplined (3)** 27:5;
86:4;127:24
**disciplining (4)** 98:7,19;
100:20;114:6
**disclose (2)** 75:22;
101:15
**discretion (5)** 108:18,
23;119:2,6;126:10
**discriminate (4)** 72:10;
73:15;158:24;159:15
**discriminated (1)**
162:16
**discrimination (13)**
53:11;70:9,13;71:2,14,
17;72:14,19;158:21,
22;161:16;162:19,24
**discuss (18)** 12:8;37:1;
50:12;66:16;71:17,20;
117:17;120:8;140:5,
16;144:6;145:7;146:5;
147:9,16;148:20;
162:7,10
**discussed (12)** 12:7,11;
14:9,14;18:20;59:11,
13;114:9;120:19;
142:14;149:4;158:9
**discusses (1)** 41:23
**discussing (4)** 51:4;
117:9,23;140:22
**discussion (14)** 12:5,9;
15:17;65:19;85:20,20;
86:14;109:6;113:22;
116:19;117:12;121:5;
135:4;148:4
**discussions (3)** 98:5;
108:10;161:12
**dismiss (3)** 107:21,23,
24
**dismissal (2)** 65:7;
84:23
**dismissed (1)** 144:24;
154:10
**disorderly (1)** 25:18
**dispute (10)** 23:6,24;

29:6;36:20;56:14;60:3,
16,18;66:4;121:4
**disputing (2)** 23:15;
58:1
**disruption (9)** 50:20;
87:2;98:23;99:2,5,20;
100:12,15;146:8
**disruptions (1)** 106:11
**disruptive (1)** 25:18
**Doctor (1)** 83:13
**document (35)** 5:17;
6:8,12;19:23;21:15;
24:20,23;25:3,5,6,8;
26:14;33:16,18;42:2;
43:4;47:6;48:13;54:23;
64:24;74:13,16;92:19;
94:4;116:1;122:24;
133:12,14;134:23;
136:23;142:20;143:4,
5;149:24;152:16
**documented (1)** 81:8
**documents (6)** 20:6;
48:14,19;91:12;
133:12;148:21
**done (4)** 4:3,7;65:3;
87:5
**door (1)** 86:14
**down (10)** 3:20;25:17;
26:2;34:16;42:3;
131:24;132:1,18,20;
158:18
**Dr (52)** 5:1,20;6:11;
9:19;10:8;19:10;20:5,
23;24:23;28:10,15,21;
33:8,16;48:12,18,24;
50:22;51:4,10;52:5;
54:17;55:3;63:11;
64:24;65:19;74:16;
78:1;82:18;87:12;
89:11;92:24;104:11,
12,13;105:2;106:15;
107:2;116:1;123:19;
124:2,3,22;125:5,11,
15;126:15,17,20;
134:19;135:7;158:1
**draft (1)** 93:15
**Drew (17)** 37:3;38:6,
13;40:2;45:7,9,21;
68:7;118:13,14,15,18;
140:20;141:8;144:9,
10;150:4
**Drew's (1)** 118:15
**dropped (1)** 125:7
**dropping (2)** 126:1;
127:23
**during (14)** 30:7,19;
32:24;57:4;97:11;
130:9,13,15;131:12,14,
17;132:2;159:1;160:16
**duties (2)** 139:6,16

**E**

earlier (5) 59:5;89:23;
98:10;117:1;163:8
**early (15)** 12:12,20,24;
13:11,13,15,17;14:15;
27:24;32:2,2;85:11;
92:5;113:7;129:7
**eating (1)** 19:2
**education (2)** 6:1,3
**EEO (7)** 63:16;64:4,8,
17;68:1,8;110:1
**effect (5)** 18:12;19:11;
24:4;26:20;29:3
**efforts (1)** 115:4
**eight (1)** 93:5
**Either (3)** 67:6;106:22;
149:9
**else (13)** 8:24;9:4;
38:10;67:3,9;117:15;
137:1;138:14;141:8;
145:2;147:2;162:5,13
**e-mail (68)** 41:20,22;
54:17;55:11,19;56:2,
15;58:22;65:13,15;
74:22;77:20;78:1,10,
23;79:9,14;87:17;
88:11;89:12,12,14,18;
90:7,16,18;91:2,3,4,15;
92:24;93:5,16;95:22;
96:14,18,24;97:22;
101:3;105:14;107:3,6;
119:17;120:9;122:6,
10;123:4,18;124:24;
125:4;128:21;131:15,
16;132:21;133:4,19,19,
21,22;134:10;149:2;
154:24;155:3,7;
157:17,21;163:7,10
**e-mailed (1)** 90:12
**e-mails (8)** 52:1;65:1;
91:13;119:17;120:3;
133:3;145:18;148:22
**employed (2)** 28:17;
52:24
**employee (7)** 50:2,3;
68:20;73:22;77:5,11;
127:19
**employees (5)** 26:5;
49:14;68:18;101:9;
127:18
**employment (22)** 5:24;
63:20;68:3;70:9;71:7;
107:16;110:15;140:1,
23;141:4,9,18;144:4,
16;145:3,11;149:6,10;
153:10,20;156:23;
158:3
**encourage (1)** 54:4
**encouraged (3)** 59:7,
11;60:1
**end (8)** 68:2;94:10;
107:15;110:15,17;
149:10;155:7;158:6
**ended (4)** 7:24;141:14;

153:11;156:24
**ending (1)** 149:5
**ends (1)** 7:22
**enjoy (1)** 54:5
**enough (1)** 84:21
**ensure (1)** 64:1
**entered (1)** 71:11
**entitled (1)** 41:8
**environment (7)** 59:18;
88:7,14;89:4;90:8;
96:12;97:1
**environment's (1)** 97:4
**equal (6)** 63:19;64:1;
75:7,24;76:5;77:12;
78:11;82:21;93:10;
95:23;158:3
**equally (1)** 83:19
**error (1)** 142:19
**errors (1)** 78:20
**escalate (1)** 97:16
**especially (2)** 15:11;
114:12
**estimate (1)** 9:14
**Etezady (4)** 54:20,21;
55:16;56:15
**Eugene (1)** 123:5
**evaluation (2)** 108:10;
109:23
**even (19)** 4:4;5:3;
15:18;18:18;19:13;
21:12;36:8,10;56:24;
72:12,22;83:15;84:22;
88:7;102:2;112:14;
163:7,11,12
**event (1)** 49:20
**events (5)** 36:23;51:1;
52:1;97:7,8
**Eventually (1)** 99:17
**everyone (9)** 19:7,8;
87:23;103:1,2;110:9;
117:7;161:6,17
**exact (13)** 10:1;37:21;
40:24;45:1;57:8,16;
71:12;100:23;118:1;
121:3,19;124:13;137:9
**exactly (18)** 13:12;
33:2;35:18;38:8;45:11,
17;47:8;71:21;75:16;
81:19;95:7;102:10,12;
141:19;144:5;150:2;
159:18;162:17
**example (10)** 20:23;
84:15;85:11
**Except (1)** 161:11
**exchange (3)** 30:6,11,
21
**excuse (1)** 78:24
**excused (1)** 165:3
**excuses (6)** 76:15;
78:22;132:13;138:3;
153:1,9
**executive (9)** 104:6;
112:6,12,16;114:16,18,

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

JIE WU
May 31, 2017

20,23;115:2
**exhibit (1)** 91:9
**exhibits (1)** 48:15
**exist (2)** 133:17;164:19
**existed (1)** 133:13
**expense (1)** 151:7
**experience (5)** 12:10,
18;26:9;47:22;53:14
**experiences (1)** 15:22
**expert (2)** 108:5;118:23
**explain (1)** 86:16
**explaining (1)** 78:24
**explanation (1)** 35:1
**extended (1)** 7:23
**extent (4)** 79:19;
133:13;161:11;164:18

**F**

**fabricate (3)** 151:17,21,
24
**fabricated (2)** 151:21,
22
**face (2)** 147:12,12
**Facebook (1)** 156:17
**fact (20)** 22:2;23:23;
31:3;61:2;74:3;79:9;
94:3,9;106:10;117:11;
121:4,6;123:16;124:8;
128:22;140:5;141:12;
144:6;147:22;149:11
**faculty (10)** 64:2;74:1;
84:4;85:16,22;87:7;
88:7;99:8;161:15;
162:4
**faded (1)** 25:24
**failing (1)** 125:8
**failure (2)** 58:24;151:7
**fairly (3)** 73:20,23;
105:15
**fairness (13)** 75:6,23;
76:5;77:7;78:11;79:2,
5;80:16;82:3,21;93:9;
95:22;163:8
**false (2)** 82:14,23
**familiar (12)** 25:2;
63:12,15,19;66:18;
69:4;70:8,16,20,21,23;
71:23
**family (1)** 80:5
**far (6)** 10:13,15,19;
32:4;90:15;145:4
**February (1)** 55:21
**federal (7)** 22:2,20;
36:15;48:5;70:24;
72:13,22
**Feel (27)** 25:1;27:16;
28:2;30:23;33:4;59:15;
65:2;73:19;74:5;76:18;
78:9,13;79:1;80:5,21;
82:10,11;83:18,24;
84:3,5;106:5,8,14;
112:23;154:9;156:16

**feeling (1)** 82:20
**feelings (3)** 81:17;
101:16;106:16
**feels (1)** 79:10
**felt (10)** 59:2;74:9;
75:20;80:11,14;
105:24;106:13;107:10,
13;113:2
**few (4)** 49:6;55:7;59:5;
113:13
**fight (1)** 84:11
**file (2)** 103:7,9
**filed (1)** 20:8
**filing (1)** 163:20
**finances (1)** 59:20
**financial (4)** 52:13;
59:1,12,13
**find (14)** 94:17;101:20;
114:14;118:4;123:11;
141:2;145:15,17,23;
153:1;156:14,15;
161:22,23
**finding (4)** 94:11;115:6;
146:5;147:16
**fine (2)** 55:13;62:4
**finish (2)** 104:19;151:7
**finished (4)** 13:4;30:18;
106:6;130:12
**fire (2)** 107:24;114:13
**fired (2)** 143:20;146:22
**firing (6)** 81:8;112:18;
113:14,22;114:6,7
**first (27)** 24:24;40:4,11;
41:18;49:7,24;50:2;
53:10;54:24;56:3;
74:21;75:2,12;79:4;
91:19;96:20;113:13,
14,21;114:8;124:15;
130:5;140:21;151:6;
157:22;158:19;162:23
**Five (7)** 9:17,18;13:20;
63:8;81:4;94:5;106:24
**flight (1)** 125:9
**flip (1)** 20:17
**Florida (1)** 132:3
**focus (3)** 32:11;57:15;
164:8
**focused (1)** 99:19
**focusing (1)** 76:17
**Foehl (13)** 63:5,6,12;
65:14;153:12;154:15;
155:3,17;157:22;
158:7;159:1;163:14;
164:19
**F-O-E-H-L (2)** 63:5,12
**Foehl's (1)** 155:7
**folks (4)** 8:10;16:9;
32:1,13
**follow (3)** 80:21;90:2,
10
**following (1)** 65:6
**food (1)** 30:12
**forced (1)** 27:23

**forget (2)** 96:24;134:9
**forgot (3)** 111:3;
116:15;121:4
**form (85)** 12:1;16:23;
22:13,23;23:9;24:8,17;
26:15;27:1,17;31:20;
43:20;44:13;47:2,3;
53:21;58:4;60:23;
61:10,18,23;64:19;
68:10;69:6;70:10,18;
71:3;72:16;73:1,7,13;
76:7,22;77:14;78:4;
79:17;80:1,13,24;82:5,
9,15,24;86:12,20;
90:23;93:12;95:16,24;
100:13;101:18;103:21;
105:17;106:1,17;
108:15,20;109:10;
110:5,14;111:15;
112:3;113:16,24;
114:10;118:8;122:23;
123:21;125:16;126:3;
127:12;128:12,18;
137:15;140:2,14;
144:21;145:5;147:5;
148:7;149:1;151:2;
152:3,22;156:10
**formal (1)** 108:13
**format (4)** 47:8;121:19;
141:20;147:13
**forward (2)** 107:3,6
**forwarded (1)** 89:18
**found (2)** 156:19,19
**Foundation (1)** 68:22
**four (1)** 106:24
**Frankly (1)** 88:2
**free (2)** 25:1;65:2
**freeze (1)** 97:14
**friendly (9)** 30:5,8,14;
56:19,20;57:5;59:18;
97:6;112:22
**front (19)** 24:23;33:16;
54:17;55:13;64:24;
74:16;87:12;89:11;
91:2;92:18;99:9,10,12;
116:1;124:20;135:7;
149:20;154:23;157:17
**frustrated (1)** 101:20
**further (1)** 164:15

**G**

**gave (8)** 41:15;53:15;
78:13;130:18;137:13;
150:20,22,24
**gender (3)** 72:10;
73:16;83:20
**gender-based (2)**
22:21;160:12
**Gene (12)** 50:14;
93:19;122:10;123:5,
10;124:5,6;142:14;
149:8,9;161:20;162:8

**G-E-N-E (1)** 50:14
**general (5)** 39:17,19;
45:8;97:6;162:2
**generally (5)** 3:7;37:7;
38:3;70:23;117:2
**gifts (1)** 30:11
**given (10)** 41:24;83:9;
103:14;126:16;127:3,
5,15;128:4,10;135:17
**giving (8)** 3:11;40:5,23;
49:19;78:14;116:11,
22;132:17
**Gmail (9)** 119:18,20,
22;120:4,6,9,11,14;
133:23
**goes (2)** 5:12;10:19
**good (8)** 4:1;6:6,19;
30:10;84:3;97:8;99:18;
101:21
**government (1)** 48:5
**grab (2)** 99:23;100:7
**graduate (4)** 85:2,6,10;
86:19
**graduation (1)** 142:11
**grant (2)** 84:18;152:17
**greatest (1)** 84:7
**greet (1)** 112:23
**Greg (52)** 37:3,18;
38:12;40:2;45:7,9,20;
52:5,8,20,21,24;53:7;
67:23;77:19,23;87:18,
20;88:11,13,16,20;
89:1,5,14,17;90:7,12,
17,20;96:12,15,18;
99:6,7;100:18;107:7;
116:23;117:3,5,9,15;
118:13;136:24;140:20,
20;141:8;144:9,10;
149:21;150:2;155:22
**grow (1)** 84:17
**growing (2)** 10:20;
11:22
**guess (1)** 121:16

**H**

**habit (2)** 19:2,3
**Hailey (7)** 129:20;
130:6,18,24;139:1,6,16
**half (1)** 160:19
**hand (2)** 20:16;159:5
**handed (2)** 25:6;47:6
**handling (1)** 98:16
**hands (1)** 20:5
**handwritten (4)** 42:9;
148:22;159:4;164:18
**happen (5)** 21:7;22:19;
58:13;139:20;161:5
**happened (8)** 17:13;
30:2;43:7;45:17;47:10;
61:4;94:5;129:11
**happening (1)** 141:15
**happens (4)** 32:1;37:6,

6,7
**happy (5)** 97:7;112:21,
24;113:2;156:16
**harassment (2)** 88:3;
90:13
**hard (3)** 85:10;108:1;
145:23
**head (3)** 4:13,14;
146:12
**header (1)** 25:13
**hear (2)** 124:5,6
**heard (8)** 19:19;69:8,
10;70:1,3;72:17;
111:11;142:7
**heated (1)** 85:20
**held (1)** 135:4
**help (27)** 37:15;45:17;
81:5,6,7,9,20,24;94:14;
98:24;101:21;102:15;
106:21,22;107:20;
108:2;109:15;114:2;
142:10;145:7,15,16,19,
24,24;146:7;147:19
**helped (1)** 35:21
**helping (1)** 145:17
**herself (7)** 97:15;138:2,
21;152:8,9,12,16
**hire (1)** 64:2
**hiring (1)** 53:3
**history (9)** 5:24;6:1,3;
10:20;101:22,24;
102:16,17;152:19
**hit (1)** 133:14
**hoc (1)** 139:22
**hold (4)** 15:10;16:22;
31:19;49:4
**honest (5)** 80:19;
138:17,18,19;163:10
**Hong (1)** 10:13
**hoping (1)** 94:7
**hostile (7)** 88:7,14;
89:4;90:8;96:13;97:2,4
**hour (1)** 160:19
**HR (35)** 39:2;66:19;
67:1;76:13;77:7;79:20;
81:6;88:21;94:14;96:5;
102:8,11;106:20;
109:14;110:1;114:2;
115:10;140:6;142:1;
144:11,13,18;145:14,
21,24;146:1,3,4,5,16,
19;147:19;148:5;
157:2,6
**HR's (1)** 101:4
**huge (1)** 113:9
**human (36)** 38:24;
42:7;46:7,10,13,20;
66:20;67:4,10,24;68:8;
70:17;71:11;75:22;
76:3,19;81:12,14,22;
89:2,23;90:20;91:20;
93:22;94:8,19;95:1,5,
13,20;96:8,10;98:15;

100:19;147:2;155:4
**hurricane (7)** 130:13,
15;131:13,14,17;132:3,
4
**hurricanes (1)** 130:9

## I

**idea (2)** 30:21;145:17
**ideal (1)** 114:14
**identification (21)** 5:18;
6:9;19:24;20:3;24:21;
33:14;54:15;64:22;
74:14;87:10;89:9;
92:16;97:20;115:23;
119:12;122:4;124:18;
135:1;149:16;154:21;
157:15
**identify (2)** 35:21;37:15
**imagine (1)** 73:2
**immediately (1)** 143:20
**implies (1)** 124:14
**important (8)** 5:1;49:20,
21;50:9,17;72:6,7;
124:11
**impossible (1)** 88:1
**improve (4)** 108:2,11;
109:16;145:16
**improvement (6)**
103:11;108:4,8,13,24;
109:8
**inaccurate (1)** 83:7
**inappropriate (9)** 24:7,
10,13,14;26:3,13;35:4,
16;46:14
**incident (10)** 77:3;
117:8;128:3;132:2,6;
136:16,18;150:15;
151:6,10
**incidents (9)** 41:6;
137:10;143:17;150:3,
6,8,10,13;153:8
**including (2)** 13:13;
109:17
**incomplete (1)** 124:23
**indirectly (1)** 52:22
**individual (1)** 54:20
**individuals (2)** 49:8;
71:1
**inform (10)** 40:13,15;
76:19;110:11;128:16;
129:6;130:21;131:10;
136:12;147:21
**informal (7)** 128:20,24;
129:5,8;134:7,8;139:8
**information (11)** 5:24;
6:15;7:3,17;42:21;
44:6;57:16;98:5;
109:24;151:14;161:16
**informed (6)** 47:9;
101:21;102:6;142:18;
147:18;149:11
**informing (3)** 46:13;

113:8;132:11
**initiate (2)** 40:8;100:5
**input (2)** 43:3,5
**inside (1)** 114:15
**insinuation (1)** 28:16
**instance (3)** 118:10,11;
153:4
**instances (1)** 152:20
**Instead (5)** 78:20;81:8;
118:7;126:11;145:8
**Institute (1)** 9:2
**instructing (1)** 45:10
**instruction (3)** 4:2,11,24
**insulted (1)** 28:15
**intended (2)** 28:18;
48:14
**intentionally (1)** 138:10
**interested (2)** 32:3;33:5
**internally (3)** 110:22;
111:2;147:23
**international (2)** 7:7;
8:21
**interpretation (2)** 33:6;
80:15
**interpreted (1)** 28:9
**interview (2)** 112:22;
118:3
**intimidated (1)** 85:7
**into (5)** 4:1;43:3;
102:19;110:12;160:23
**invite (4)** 31:3,10,11,12
**issue (19)** 33:9;39:10,
22;40:5;46:23;47:16;
50:5;54:12;79:4;82:2;
116:13,19;118:5;
120:19;129:24;130:24;
132:10;136:11;159:13
**issued (10)** 33:10,22;
36:12;46:19;49:14;
51:21;129:2;130:3,4;
137:4
**issues (3)** 36:22;105:3,
23
**issuing (12)** 37:11,18;
38:7,10,24;46:7;53:18;
117:5,10,15,24;118:18
**itinerary (1)** 118:4

## J

**January (3)** 9:24;132:9;
135:11
**Japan (1)** 10:13
**Jenkins (10)** 93:1;
104:1,2,8,11,12,13;
105:2;106:15;107:2
**Jie (3)** 56:7,8;58:11
**job (31)** 7:6;13:17;
14:16;19:5;31:4;94:18;
97:9;110:21;111:10,
13,20;112:6,8,13;
114:15,16;115:6;
138:23;139:2,6,16,22;

141:2;145:15,18,23;
146:5;147:16,23;
156:15,20
**jobs (3)** 87:24;111:21;
139:21
**join (1)** 84:14
**joined (4)** 25:6;49:10;
84:10;112:20
**joining (1)** 68:14
**joint (1)** 116:18
**judge (1)** 5:4
**Judy (6)** 129:19,22,23;
130:1;134:13,17
**July (1)** 9:20
**jury (1)** 5:5
**Justin (14)** 50:15;
51:14,20;78:7;88:5;
93:19;117:24;130:23;
142:14;149:7,9;156:6;
161:20;162:8

## K

**keep (10)** 104:11,13,
21,22;105:2,22;106:7;
108:1;132:21;133:20
**kept (1)** 106:23
**kind (19)** 12:17;23:1;
35:19;45:13,14;50:1;
62:17;97:14;100:9,15;
108:21;128:1,19;
139:7;158:8,14,19;
159:18;160:14
**kinds (6)** 71:8,10;
76:15;78:21;99:17;
132:13
**King (6)** 130:6,18,24;
139:1,6,17
**knew (2)** 101:16;
121:11
**knowing (2)** 33:5;87:21
**knowledge (2)** 37:24;
87:4
**known (2)** 19:5;57:23
**knows (8)** 19:7,8;
103:2;117:8;130:23,
23;131:3;150:4
**Kong (1)** 10:14
**Korea (1)** 10:13
**Kwanty (16)** 50:14,22;
51:4,10;78:1;93:20;
122:10,20;123:5,19;
124:2,3;125:5;142:14;
149:8,9
**K-W-A-N-T-Y (1)** 50:15
**Kwanty's (2)** 124:5,6

## L

**labor (1)** 14:18
**lack (1)** 65:7
**lady (1)** 159:7
**language (2)** 24:13;

26:4
**last (10)** 4:24;7:14;
13:17;50:15;75:2,11;
80:10;141:4;143:9;
144:18
**late (21)** 85:12;128:17,
20;129:9,10,19;132:10,
12,15,19;133:1;134:1,
2;136:14;137:8,10,12,
13,20;138:5;161:5
**later (7)** 3:21;49:11,12;
92:5;142:7;156:15;
164:20
**latest (1)** 111:16
**laugh (1)** 161:17
**laughing (3)** 161:21,22,
23
**law (13)** 10:9,17,19,23;
11:3,22,23;12:6,7;
14:13,14;16:16;161:10
**laws (7)** 15:13;16:8,12;
71:1,7;72:13,23
**lawsuit (13)** 20:9;
21:24;22:5,11,20;
23:22;28:5;29:7;36:15;
43:14;53:12,13;162:12
**lawyer (2)** 154:4,6
**lawyers (4)** 154:2;
160:24;161:2,4
**lead (1)** 85:11
**leadership (1)** 15:11
**learn (14)** 52:5;53:7;
64:7,15;67:23;68:7;
88:10,13;107:12;
110:20;111:1,4;
142:16;143:1
**learned (5)** 69:13,17;
88:12;121:8,21
**least (2)** 28:18;113:18
**leave (1)** 81:9
**leaving (1)** 142:21
**led (1)** 136:18
**leeway (2)** 83:9;126:16
**left (4)** 3:19;17:11;
143:8;160:22
**legal (2)** 68:1,9
**Lennon (5)** 129:22,23;
130:1;134:13,18
**less (2)** 54:5;59:17
**letter (17)** 92:8;93:2,15,
22;94:8,10,20;95:6,14;
96:4,9;98:13,16;149:9;
116:19;129:3;149:20
**level (22)** 35:21;37:16;
45:10,18;52:17;76:12;
77:2;115:2,2;117:13;
118:22,24;119:2,3;
126:10,11,23;127:1,16;
128:4,7;136:3
**lied (1)** 152:2
**life (8)** 19:20;49:24;
54:5;57:9;59:16;80:4,
4;132:5

**lightly (1)** 49:23
**Likely (1)** 163:21
**line (4)** 35:2;58:9;93:1;
98:3
**lines (2)** 8:12;34:12
**list (1)** 164:10
**listed (4)** 23:16;26:14;
44:24;66:5
**litigation (3)** 64:11;
69:23;70:6
**little (4)** 3:6;25:24;
96:16,22
**live (1)** 10:5
**lives (6)** 56:9,17,22;
57:6;58:12;60:21
**long (11)** 15:11;18:24;
47:24;54:18;99:24;
101:24;102:16;117:12;
160:18,20;163:10
**longer (6)** 28:12;113:2;
141:22;142:17,22;
143:2
**look (4)** 20:20;97:17;
103:9;122:1
**looked (6)** 89:13;91:4,
12,15;93:6;107:4
**looking (11)** 19:7;
20:16;37:7;77:20;
90:16;110:12;111:10,
13,21;147:22;148:2
**looks (5)** 33:4;34:9;
48:6;160:1;162:11,18
**loop (10)** 104:14,15,16,
23;105:3,21,22;
106:15;118:16;150:4
**lose (1)** 142:12
**lost (2)** 31:4;164:7
**lot (2)** 83:9;126:16
**lots (7)** 41:20;50:11;
57:10;83:21;114:20;
139:21;155:18
**loud (1)** 99:9
**lower (1)** 25:7
**loyalty (1)** 65:8
**lying (9)** 61:22;62:7;
63:1;80:12,15;137:22,
24;138:1,6

## M

**Macau (1)** 10:14
**main (4)** 15:9;151:11;
159:20,23
**mainly (1)** 164:8
**major (1)** 153:8
**making (10)** 23:7;27:6;
36:16;60:22,24;61:9,
16;120:21;128:11;
152:21
**male (1)** 65:7
**Males (1)** 57:10
**man (1)** 116:13
**managed (1)** 68:22

**managing (23)** 26:9;
47:22,23;49:18;52:13,
13;53:14;69:3,22;70:6,
16,24;71:24;72:11,22;
73:5,10;79:10;83:5;
84:3,8,9,20
**managing (5)** 49:14;
68:18,24;127:18;134:6
**mandatory (9)** 10:9,16;
11:16;14:13,14;16:2,5,
14;161:10
**mannerisms (1)** 31:16
**many (26)** 10:11;14:9,
16;15:16,19;17:23;
30:13;50:4,4;51:8;
77:22;79:12;84:24;
85:4;101:5;106:21,24;
110:23;114:11;120:3;
130:3,22;132:8;
136:19;146:20;154:19
**March (2)** 116:7;122:11
**mark (1)** 5:16
**marked (38)** 5:18;6:8,9;
19:23,24;20:2,3,6,7;
24:20,21;33:13,14,17;
54:13,15;64:22;65:1;
74:13,14,17;87:8,9;
89:6,8;92:15;97:19;
115:22;116:2;119:11;
122:3;124:17;134:23,
24;149:13,15;154:20;
157:14
**matter (1)** 48:16
**matters (1)** 120:9
**may (9)** 4:15;28:2;
48:17;55:6;56:4;57:23;
59:15;122:21;153:16
**Maybe (21)** 13:20;
15:18;17:1;44:19;
49:11;61:19;62:3;
66:19;92:4;99:16,18;
118:13;130:3;131:2;
137:9;139:18,20;
140:24;142:7;162:17;
163:16
**mean (26)** 4:18;15:3,
19;18:23;28:11;45:15;
52:17;53:12;59:17;
73:11;94:13,16;95:10;
96:5;98:20;113:10;
114:18;115:1;127:4;
129:1;140:13;145:22;
156:1,13;158:17;
160:13
**means (14)** 94:14,17;
95:11;100:4,5;106:23;
107:24;118:12,13;
129:5;140:15;156:2;
158:18;161:22
**meant (2)** 35:8;105:1
**meet (4)** 71:11;95:13;
112:23;163:14
**meeting (18)** 40:14;

47:5;50:11;84:11,15;
98:10;104:7;125:6;
138:10;143:22;144:2;
145:20,21;146:2;
160:16,18;162:4,6
**meetings (9)** 51:17;
71:9,10;97:12;98:6;
138:14;143:24;146:1,4
**member (16)** 17:23;
26:11;31:5,11;53:3,5;
76:4,20;79:4;83:6,22;
89:23;127:6,16;
128:16;134:2
**members (7)** 74:10;
75:8;77:13;78:12;84:1;
85:6;88:7
**men (5)** 10:24;11:23;
27:15;57:13;107:23
**mention (7)** 13:13;
56:21;57:4;59:19;
84:24;155:24;156:13
**mentioned (9)** 12:19;
13:2;56:9,16;58:11;
59:22;60:20;158:20;
162:18
**mentioning (1)** 162:20
**mentions (1)** 93:9
**met (5)** 163:16,22,24;
164:1,4
**middle (3)** 34:16;55:20,
23
**might (3)** 24:15;69:13;
120:17
**mind (1)** 125:10;
158:21;159:14
**minutes (4)** 55:7;59:5;
160:19;164:12
**Mischaracterizes (7)**
76:8,23;81:1;106:18;
122:24;137:16;152:4
**misconduct (4)** 35:19;
40:9,19;45:21
**misconducts (1)** 51:8
**miserable (1)** 80:4
**Miss (13)** 22:1;29:8;
67:20,24;108:12;
116:11;120:20;138:9,
13,22;148:6;149:6;
153:10
**missing (1)** 138:10
**mistake (9)** 120:21;
121:23,24;127:20,21,
22;128:2,11;152:21
**mistreated (2)** 106:9,14
**mistreatment (1)** 82:11
**misunderstood (2)**
61:20;62:4
**moment (6)** 97:24;
116:3;119:14;135:8;
154:24;157:18
**money (2)** 54:12;59:23
**monthly (1)** 84:15
**More (22)** 14:18;21:9;

28:3;32:17;54:5;57:15;
58:16;60:7,10;62:5,13;
82:17;83:10,14;92:3;
99:19;143:13;145:7;
148:15,17;156:5;159:5
**morning (2)** 151:19;
152:10
**most (9)** 5:1;10:24;
11:5;18:12;50:9,17;
120:11;145:13;153:8
**move (2)** 9:23;148:6
**moved (3)** 10:6;99:13;
115:12
**much (3)** 83:22;97:13;
158:23
**multiple (5)** 13:23;
16:19;54:9;132:7;
146:2
**MUNSHI (186)** 5:16,19;
6:7,10;12:4;13:8;17:3,
18;18:10,21;19:22;
20:1,4;21:13;22:16;
23:2,11;24:11,19,22;
25:23;26:19;27:4,21;
29:13,20,21;30:22;
31:22,23;32:17,22;
33:12,15;35:8,10;40:3;
41:9,10;43:24;44:14;
46:3;47:21;48:20,23;
52:11;53:24;54:13,16;
55:1,10;58:8,21;60:11;
61:5,13,21;62:3,6,18;
63:8,10;64:12,21,23;
66:12;68:4,6,13;69:9,
20;70:14,22;71:5;
72:20;73:3,9,17;74:12,
15;76:16;77:4,18;78:6;
79:21;80:7,17;81:10;
82:7,12,22;83:4,12,17;
86:15;87:3,8,11;89:6,
10;91:1,11;92:6,12,17;
93:14;95:19;96:7,21;
97:17,21;100:17;
101:1;102:1;103:23;
104:24;105:20;106:4,
12;107:1,17,22;108:17,
22;109:18;110:10,16;
111:18;112:7;113:20;
114:4,17;115:21,24;
119:9,13;121:20;
122:1,8;123:3,22;
124:16,19,22;125:3,19;
126:5;127:2,14;
128:14,23;130:14;
133:9,16;134:22;
135:6;137:23;140:8,
18;145:1,9;147:8;
148:10,13,18;149:3,13,
19;150:11;151:5;
152:11;153:2,14,24;
154:11,17,22;156:18;
157:13,16;161:18;
164:2,6,12,15;165:2

**music (1)** 30:12
**must (4)** 10:24;11:6;
121:12;137:21
**myself (4)** 45:13;84:6;
133:3,19

## N

**name (10)** 7:4;8:4,8;
31:7;50:16;56:5,5;
63:22;123:7;129:18
**named (4)** 54:20;63:4;
66:17;116:13
**names (3)** 8:7;67:3,14
**national (2)** 20:24;
68:21
**nature (1)** 137:19
**necessary (1)** 76:18
**need (19)** 51:24;60:9;
62:10;80:21;91:8;
101:20;106:5,14;
129:3,6;138:7,8;139:3,
9,9,23;141:11;158:4;
164:19
**needed (3)** 35:2;
109:16;151:14
**Networked (2)** 7:5;49:5
**new (3)** 111:10,13;
146:12
**news (1)** 72:18
**Newton (2)** 31:7,8
**next (9)** 4:1;21:1;28:7;
34:8,17;58:22;88:2;
151:18;152:10
**nice (2)** 75:6;159:7
**nods (1)** 4:14
**normal (3)** 30:19;47:4;
92:13
**note (5)** 42:7,8;124:23;
130:18;134:5
**notes (10)** 42:9;132:22,
23;133:5;148:22,22;
159:1,4,5;164:18
**notice (2)** 129:3;134:3
**November (21)** 20:23;
34:10,13,22;35:17,24;
42:14,19,23;43:7,11,
16;52:12;74:23;77:5,
10;78:24;91:7,16;93:2;
94:1
**number (11)** 9:14;
13:10;18:18;25:9;57:3,
19,21,22;84:17;91:9;
152:17
**numbered (4)** 20:18,21;
21:16,17
**numbers (1)** 25:9
**numerous (13)** 56:3,8,
16;58:10;60:6,20;81:7,
11;105:10;109:14;
148:9,12;157:6

## O

**oath (2)** 5:2,5
**object (1)** 109:11
**Objection (96)** 12:1;
16:22;17:15;18:6,14;
21:8;22:13,23;23:9;
24:8,17;26:15;27:1,17;
31:19;39:23;43:17,20;
44:13;48:11,21;53:21;
58:4,15;60:5,23;61:10,
18,23;64:19;66:6;
68:10;69:6;70:10,18;
71:3;72:16;73:1,7,13;
76:7,22;77:14;78:4;
79:17;80:1,13,24;82:5,
9,15,24;83:8;86:12,20;
90:23;92:1;93:12;
95:16,24;100:13;
101:18;103:21;105:17;
106:1,17;108:15,20;
109:10;110:5,14;
111:15;112:3;113:16,
24;114:10;122:23;
123:21;125:16;126:3,
13;127:12;128:12,18;
137:15;140:2,14;
144:21;145:5;147:5;
148:7;149:1;151:2;
152:3,22;156:10
**obscene (1)** 26:4
**Obviously (3)** 27:19;
71:21;79:18
**occasion (1)** 66:16
**occasionally (1)** 156:12
**occasions (5)** 56:4,8,
16;58:11;60:20
**October (4)** 87:18;
90:17;91:3,13
**off (7)** 56:10;59:16;
122:7;129:6,9;135:2,4
**offended (3)** 27:20,22;
59:2
**offense (1)** 140:16
**offenses (2)** 144:6,23
**offer (1)** 14:7
**offering (1)** 48:14
**office (72)** 8:21,22,23;
11:13;14:4;35:21;
36:23;37:2,11,15,22;
38:10;39:14,16;40:10;
44:20;45:4,16;47:2;
50:4;52:18;63:16,16,
20,22,24;64:3,5,8,17;
68:1;81:7,15;88:4,6;
96:6;99:7,9,10,11,12,
22;100:6;101:17;
102:8,9;104:22;
106:21;109:15;110:1;
113:9,9,11,12;115:10;
116:20,21;118:24;
127:4;131:20;133:21;

134:3;136:2,4;140:5,6;
143:19;144:7,8;
145:21;158:9;163:17
**official (4)** 66:15;
128:15;156:2;158:14
**officially (5)** 52:21;53:2;
155:23;156:1,2
**often (3)** 85:17,19;
119:20
**old (2)** 21:1;27:10
**older (2)** 83:22;158:23
**oldest (2)** 55:11;157:21
**once (7)** 14:1;15:19;
17:2;83:11;84:14;
113:3;163:17
**one (79)** 4:8;5:1;7:23;
8:13,14;12:10;13:22;
16:19;17:23;20:1,6,7;
21:9;29:14;30:3;32:11,
23;35:2;41:19;45:24;
49:11;50:14,15;54:7;
56:18;58:16;60:7;61:3;
62:13;63:17;65:5;67:2;
68:18;71:15;74:6;
82:17;83:14;87:4;88:4;
89:13;90:21;91:4,5;
92:3;94:4;101:6;
108:19;110:7;112:23;
115:14,20;116:14,18;
120:18,23,24;121:11;
125:22;128:1;129:20;
130:2;131:3;132:2,6,8;
136:21;137:12;143:12;
146:13;147:11;148:14,
16;153:4;155:19;
156:14;159:21,24;
160:1;163:15
**one-hour (1)** 19:1
**one-on-one (1)** 138:14
**online (4)** 71:9,14,16,
19
**only (7)** 5:22;38:12;
67:13;114:2;128:9;
137:13;153:7
**opinion (4)** 79:1;80:8,9,
19
**opportunity (3)** 63:20;
64:2;158:3
**opposing (1)** 53:16
**orally (1)** 94:24
**organizing (2)** 97:7,8
**orienting (1)** 122:15
**out (26)** 4:14;13:7;
19:11;21:2;22:4;24:5;
26:12,21;27:15;52:1;
57:2;58:6;66:10;79:13;
87:21;97:13,14;118:4;
123:11;131:2,2;
138:23;139:2,4;
156:14,19
**outside (1)** 111:22
**over (20)** 3:23;6:24;
14:11;16:18;26:10;

28:17;32:1;47:23;
48:24;51:8;56:10,17,
23;57:7;58:13;60:21;
68:19;81:23;132:7;
153:20
**overly (1)** 138:21
**owe (1)** 59:23
**own (2)** 15:21;113:8

---

**P**

**P-1 (5)** 5:17,18,21;
48:11,17
**P-10 (3)** 87:9,12,17
**P-11 (4)** 89:7,8,11;
91:13
**P-12 (3)** 92:15,18;
104:9
**P-13 (5)** 97:18,19,22;
100:21;101:3
**P-14 (3)** 115:21,22;
116:2
**P-15 (5)** 119:10,11;
120:20;122:9,13
**P-16 (4)** 122:1,3,6,18
**P-17 (4)** 124:16,17,20,
22
**P-18 (3)** 134:23,24;
135:7
**P-19 (3)** 149:14,15,20
**P-2 (5)** 6:8,9,11;48:11,
17
**P-20 (3)** 154:17,23
**P-21 (4)** 157:13,14,17;
160:2
**P-3 (7)** 19:23,24;20:6,
8,16;22:1;28:5
**P-4 (5)** 20:2,3,7,12;
21:14
**P-5 (2)** 24:20,21
**P-6 (5)** 33:13,14,17;
37:8,19
**P-7 (3)** 54:14,15;55:19
**P-8 (4)** 64:21,22;65:1;
66:3
**P-9 (11)** 74:13,14,17,
21;77:21;78:2;81:15;
91:15;93:5;107:4,7
**page (16)** 6:4;20:19,
20;24:24;25:8,12,13;
28:6;34:16;44:6,24;
55:19,20,24;74:21;
157:22
**pages (1)** 54:18
**paragraph (20)** 20:21,
22;21:18,22;22:18;
23:10,17;28:7,7,8,14,
20;29:7;56:2;65:17;
75:3,3,12;80:10;88:2
**paragraphs (2)** 20:18;
21:17
**part (5)** 57:2;138:22;
139:1;144:1,12

**particular (4)** 39:15;
158:2;160:3,5
**party (2)** 31:4,4
**pass (1)** 71:13
**passed (1)** 99:24
**pasture (10)** 19:12,17,
18;21:2,12;22:4;24:5;
26:12,21;27:15
**patients (1)** 26:5
**Pause (15)** 25:4;55:8,
14;65:4;74:19;87:15;
92:22;98:1;116:4;
119:15;125:1;149:17;
155:1;157:19;164:14
**penalties (1)** 5:7
**Pennsylvania (2)** 70:16,
17
**people (27)** 6:20;8:15;
9:14;15:19;48:3;67:1;
69:1;72:10;73:15;
84:11;87:1;97:23;
99:21,23;100:1,6;
102:23;110:3;130:23;
133:7;134:11;156:4,
12,19;155:19;160:21;
163:5
**percent (1)** 152:24
**perform (2)** 106:3;
114:21
**performance (20)**
40:20;79:8;84:5;
91:21;103:11;105:8,
23;106:10;108:2,3,8,
13,24;109:8,16;
112:19;113:4;115:13,
15;145:16
**performing (1)** 146:8
**period (4)** 9:7;132:22;
142:3;143:8
**perjury (1)** 5:7
**permanent (2)** 139:14,
21
**permanently (1)** 139:15
**permit (3)** 48:19;
124:21;126:15
**person (23)** 15:10;
26:23;31:2,5,6;38:12;
40:4,7;79:7;89:22;
102:23;104:8;128:9;
134:3;138:17,18,19;
147:10,11,12;155:4;
159:20;163:1
**personally (3)** 31:10,
12;163:19
**personnel (2)** 103:7,9
**persons (3)** 45:7;50:9,
18
**perspective (2)** 12:8;
30:9
**phone (2)** 134:19;
147:14
**phrase (2)** 63:19;65:18
**phrasing (1)** 141:11

**picks (1)** 134:19
**piece (1)** 19:4
**place (5)** 14:3;15:2;
17:4;72:24;132:6
**places (1)** 110:24
**plaintiff (8)** 20:24;28:9,
11,14,16,21;29:8;48:14
**plan (7)** 103:11;108:4,
8,14,21,24;109:8
**plans (1)** 108:19
**play (2)** 145:2;149:9
**pleasant (2)** 32:5,5
**please (21)** 4:16;5:11;
6:8;11:19;22:7;24:20;
33:13,17;34:1;65:23;
74:13,17;87:13;89:20;
115:21;116:9;119:10;
122:2;125:9;134:23;
154:17
**plenty (1)** 39:7
**pm (1)** 55:21
**point (18)** 4:22;12:11;
26:2;27:6;32:13;54:1;
55:1;59:14;94:1;97:13;
99:13;110:20;113:1,5;
138:20;139:5,15;
141:21
**pointing (2)** 32:15;
122:13
**policies (6)** 24:16;
53:20;72:2,4,13,23
**policy (4)** 128:15;
134:7,8;139:8
**politely (1)** 28:21
**portion (1)** 5:21
**position (6)** 6:24;7:18;
15:10,11;49:4;52:8;
94:12
**possible (5)** 29:16;
36:11;124:9;150:24;
151:3
**possibly (1)** 139:10
**posted (1)** 156:16
**potential (1)** 5:7
**potentially (2)** 40:5;
112:18
**power (1)** 131:2
**practice (9)** 41:8;44:10,
11,12,15,16,17,18;
78:18
**prepare (1)** 6:20
**prepared (2)** 6:17;
164:10
**present (3)** 5:4,5;
138:15
**president (1)** 8:20
**pretty (3)** 71:18;109:13;
117:3
**previous (1)** 4:8
**printed (1)** 6:12
**printout (1)** 5:21
**prior (30)** 37:11,18;
40:22;41:15;46:7;48:2;

**picks (1)** 134:19
**private (1)** 162:6
**probably (13)** 15:16;
18:9;49:24;111:5,5,9;
131:22;141:19;144:10;
147:4,6;149:11;155:23
**problem (11)** 77:16;
78:17;101:23;102:15,
16,18;103:2;123:12;
132:24;146:10;149:12
**problems (3)** 78:21;
101:24;132:19
**procedure (3)** 37:21;
47:1,4
**produced (1)** 133:15
**productive (1)** 85:9
**profane (1)** 26:3
**professional (8)** 56:9,
17,22;57:6,9;58:12;
60:21;84:16
**professions (3)** 11:6,12,
16
**professor (2)** 7:2;9:10
**program (2)** 68:22;
109:5
**programs (1)** 68:21
**prohibit (1)** 16:13
**prompted (1)** 14:5
**pronounce (2)** 56:4,5
**properly (1)** 132:11
**propounded (1)** 48:16
**protect (2)** 71:1;114:13
**protected (2)** 73:6,11
**protecting (1)** 159:21
**proud (1)** 74:6
**prove (1)** 76:13
**provost (2)** 7:7;8:14
**public (1)** 26:6
**punched (1)** 87:22
**purpose (1)** 15:9
**purposefully (1)** 138:10
**purposes (1)** 4:12
**put (16)** 11:3;18:18;
19:11;21:2;22:3;24:5;
26:12,21;27:15;48:10,
21;103:10;108:7,13,18,
23
**putting (5)** 16:13;51:20;
57:22;109:7;121:21

---

**Q**

**quarrel (1)** 84:12
**quick (1)** 143:18
**Quite (3)** 85:19;97:6,7

## R

**Rachel (1)** 133:10
**Rahul (4)** 83:9;126:14;
133:11;148:11
**raise (10)** 26:23;40:4;
82:2,8;85:15,17,21;
86:10,23;120:16
**raised (5)** 85:13,21;
100:16;110:13;159:17
**raising (3)** 79:4;86:4,18
**Ralph (4)** 93:1;104:1,1,
8
**range (1)** 81:20
**reach (6)** 15:19;77:2;
113:5;131:2;136:2;
140:7
**reaching (1)** 141:20
**reaction (1)** 31:17
**read (8)** 26:1;28:6;
54:24;55:4,7,12;74:18;
164:24
**reading (1)** 62:24
**reality (2)** 100:7;152:18
**really (6)** 14:24;79:6;
80:11;133:18;142:9;
159:13
**reason (3)** 30:10;72:9;
82:8
**reasons (2)** 51:21;
76:14
**recall (169)** 5:13,13;
12:13,16;17:1,7;29:5,
11,14,24;30:3;31:16;
32:24;35:18;36:1,8,10;
37:10,17;38:5,8,9,16;
39:2;40:1,7;42:1,2,6,7,
13;43:6,8;45:11,23;
46:9,17,22;47:5,8,11,
13;51:3,7,9;53:10;
54:7;56:18;57:8,20;
63:6,14;64:6;66:9,11,
13;67:3,10,13;71:21;
73:21;75:16,21;76:1;
77:9,22,24;78:5,8;
79:13;81:19;82:6;
83:16;90:5,24;91:19,
22,23;94:21;95:18,20;
96:2;100:22;101:2;
102:20,22;105:19;
108:9,16;109:9,22;
113:17;114:1,9;
116:11;117:9,11,14,23;
118:1,17,20;120:20;
121:2,5,7,8,10;123:9;
124:13;125:20,22;
128:6;129:2;130:2;
136:10,13,17,20,23;
137:5,6,9,18;139:7,15;
140:21,24;141:7,10,19;
144:5,17;145:10,13;
146:2,15,17,18;147:3,

4,24;148:21;150:2,22;
151:9,13;153:7,16,20;
154:15,16;155:16,20;
157:1,3,8;158:8,10;
159:8,11;160:10,15,17;
161:14;162:17,20;
163:16,21
**recalled (1)** 106:9
**receive (6)** 48:17;71:6;
73:24;78:9;86:6;88:23
**received (4)** 36:16;
86:9;98:5;103:4
**receiving (1)** 116:12
**recently (2)** 95:21;
96:11
**Recess (1)** 63:9
**recollection (6)** 38:14;
45:9;20;46:12;50:21;
51:19;75:19;117:4
**record (16)** 32:15;35:7;
41:22;48:11,21;51:18;
60:13;65:24;122:5;
124:23;128:22;133:20;
135:3,5;151:4;158:18
**recorded (2)** 158:16,17
**records (1)** 41:21
**refer (3)** 32:19;65:9;
91:8
**reference (1)** 66:2
**referenced (4)** 58:24;
60:3,15;61:7
**referring (10)** 13:16;
23:10;29:18;32:20,23;
47:18,19;50:7;100:21;
150:7
**regard (4)** 47:12;107:2;
120:19;152:12
**regarding (9)** 13:23;
37:19;40:22;64:5;
65:18;122:21;156:7;
162:1,3
**regardless (3)** 83:19;
86:8;141:14
**rehire (1)** 15:6
**reimbursement (1)**
151:7
**relate (2)** 61:11;62:16
**related (4)** 30:20;
65:19;66:3;139:19
**relating (1)** 51:1
**Relations (1)** 70:17
**relationship (2)** 30:15;
52:20
**relative (1)** 86:24
**relaxed (2)** 54:10;60:10
**relevant (1)** 65:6
**remember (37)** 10:1;
13:12,18;14:1,2,8;
16:7;30:4;33:2,11;
37:21;40:24;41:18;
43:12;44:19;45:1;
57:16;67:13;71:12;
74:3;95:7;100:23;

102:10,12;103:1;
121:3,17,18;136:16,19;
139:18;146:21;151:15;
158:13;159:6,12;
163:11
**repeat (2)** 3:13;129:12
**repeated (1)** 128:1
**replacement (5)** 94:12,
16,17;95:12;141:3
**replied (1)** 28:21
**reply (2)** 123:6;124:10
**report (31)** 8:15,18,20,
23,24;9:3,4;33:22;
34:7;37:8;38:6;47:20;
49:10;52:16;76:12;
77:2;79:20;94:3,9;
104:4,5;116:6;117:11;
128:10;135:11;140:4;
141:13;143:17;144:5,
11;156:15
**reported (4)** 9:15;48:3;
76:3;153:6
**reporting (12)** 8:10,12;
17:5,8;49:9;52:19;
77:11;85:2;111:21,22;
112:9;127:19
**reports (3)** 83:19;
85:14;86:19
**represent (2)** 5:20;6:11
**reprimanded (2)** 27:6;
86:4
**reprimanding (1)** 114:7
**request (4)** 48:13;
145:20,21;146:1
**requests (1)** 48:16
**require (1)** 16:9
**required (2)** 14:17;
138:22
**research (3)** 68:20;
84:18;85:10
**reservation (2)** 125:9;
150:16
**reserves (1)** 164:24
**resign (1)** 7:21
**resigned (3)** 7:14,18;
142:4
**resource (2)** 46:10;
71:11
**resources (31)** 38:24;
42:8;46:7,13,20;66:20;
67:4,11,24;68:8;75:22;
76:3,19;81:13,14,23;
89:2,24;90:20;91:20;
93:23;94:8,19;95:1,5,
14,21;96:9,10;147:2;
155:5
**resources' (1)** 98:15
**resource's (1)** 100:19
**respect (1)** 84:1
**respond (1)** 94:19
**response (3)** 29:10,17;
30:1
**responsibilities (1)**

114:21
**responsibility (3)** 5:6;
52:23;119:5
**restaurant (1)** 14:18
**result (10)** 3:22;28:12;
35:19;78:16;94:7,22;
95:5,14;96:9;140:17
**resulted (11)** 35:17,23;
42:5,12;44:7,23;45:22;
46:15,21;50:24;51:5
**resume (2)** 5:21;48:6
**retaliate (1)** 71:22
**retaliated (2)** 162:21,22
**retaliation (2)** 71:20;
72:24
**retire (16)** 10:24;11:6;
12:12,20,24;13:13;
15:1,4,20;16:9,16;
18:12;27:23,24;57:10;
61:2
**retired (2)** 14:15;57:11
**retirement (15)** 10:9,17;
12:6,12;15:7,15;16:2,5,
14;18:20,23;31:4;54:3;
58:2;161:10
**retiring (5)** 15:8;16:19;
32:2,13;53:9
**reverse (1)** 35:1
**review (18)** 5:23;6:14,
21;22:18;25:1;33:18;
65:2;87:13;92:21;
97:24;116:3;119:14;
135:8;149:24;154:24;
157:18;158:4;164:13
**Revised (1)** 93:2
**right (54)** 9:5;11:8,13,
24;14:10,13,20;20:17;
21:19;23:4;27:11,24;
28:3,10;35:22;36:9;
41:12;44:21;45:19;
48:8;49:16;55:9,11;
58:3;62:11;68:15;
82:21;86:24;88:3;
90:15;92:10;98:11;
102:15;104:9,16;
105:4,8;106:16;107:4,
7;111:9,14;126:1,7,11;
129:17;131:18,21;
132:7;134:7;137:14;
141:22;152:21;164:24
**right-hand (1)** 25:7
**Rights (2)** 69:5;70:2
**role (3)** 145:2;149:10;
158:13
**room (1)** 5:4
**Rule (6)** 35:11;44:1;
128:20,24;129:8;
135:20
**Rule' (1)** 35:7
**Rules (1)** 24:24
**running (4)** 128:17;
134:1,2;136:14
**Ruth (233)** 12:5,9,14;

13:19;15:18;17:4,7,13,
20;18:1,4;20:11;22:19;
23:20;29:2;30:15,24;
31:10,12,15;33:9,22;
35:16;36:3;37:12;38:7,
11;39:1,10,22;40:5,13,
15,22;41:16,23;43:10,
13;44:23;45:24;46:15,
23;47:3,6,9;49:10;
50:12,20,23;51:2,4,10,
21;52:2,19;53:4,8;
54:1,19;55:21;56:14;
57:12;59:7;64:5,7,16;
65:13;66:2,22,24;67:4,
11,16;68:8;73:18;74:3,
8,22;75:3,14,20;76:20;
77:19,23;78:1,10;
81:13,15,16,24;84:22;
87:17;88:9,10;89:2,18;
90:6,11,16,21;91:5,21;
93:6;94:2;95:15,21;
96:11;97:1;98:7,11,19,
22;99:8;100:20;101:9,
13,16,21,22;103:2;
104:16;105:1,3,11,22;
106:22;107:3,9,13;
108:7;109:7,15,20;
110:3,8,13,18,20;
111:4;112:21;114:13;
117:5,16;118:18;
122:19;123:6,14,17;
124:2,7,11;125:4,14,
23;127:6,9;128:2,5,9;
132:10;133:4;135:17,
23;136:4,8,12,12,13;
137:7,24;139:5,16,24;
140:23;141:2;142:19;
144:3,19;145:3,15,16,
17,24;146:3,7,11,13,
14;147:9,16,22;
148:23;149:12;150:19;
151:9;152:19;153:15,
19,21;154:9;155:17,22,
24;156:4,7,13,15,16,
23,24;157:6;158:2,20,
23;159:9,15,17,20,21;
160:3,9,12,14,22;
161:3,9;162:1,1,2;
163:19,22,24;164:1,5
**Ruth's (9)** 77:17;
106:10;109:4;123:18;
132:24;139:20;156:3;
157:12;162:3

## S

**same (16)** 5:5,6;15:2,
12,13;33:8;51:15,16;
90:18;107:6;110:3,9;
112:13;118:4;122:19;
126:15
**Sandra (4)** 63:4,6,12;
65:14

**Sandy (13)** 153:11;
154:15;155:3,7,17;
157:22;158:6;159:1,
22;163:14;164:7,8,19
**SATINSKY (142)** 12:1;
13:3,6;16:22;17:15;
18:6,14;21:8;22:13,23;
23:9;24:8,17;25:21;
26:15;27:1,17;29:10,
17;30:17;31:19;32:14,
18;35:6;39:23;41:7;
43:17,20;44:13;46:1;
47:17;48:10;52:10;
53:21;54:22;55:3;58:4,
15;60:5,23;61:10,18,
23;62:8,12;63:7;64:10,
19;66:6;68:2,10;69:6,
12,16;70:10,18;71:3;
72:16;73:1,7,13;76:7,
22;77:14;78:4;79:17;
80:1,13,24;82:5,9,15,
24;83:4,13;86:12,20;
90:23;91:8;92:1,9;
93:12;95:16,24;96:3,
17;100:13,21;101:18;
103:21;104:19;105:17;
106:1,6,17;107:15;
108:15,20;109:10;
110:5,14;111:15;
112:3;113:16,24;
114:10;121:15;122:5,
23;123:21;124:21;
125:16;126:3,13;
127:12;128:12,18;
130:11;133:11;135:2;
137:15;140:2,14;
144:21;145:5;147:5;
148:7,11,14;149:1;
150:9;151:2;152:3,22;
153:13,22;154:3;
156:10;161:11;163:24;
164:4,21
**satisfied (2)** 98:15,17
**saw (8)** 59:4;93:13;
135:14;155:15;162:23;
163:7,11,12
**saying (11)** 3:20;36:3;
58:13;80:15;95:20;
100:1;136:13;151:16,
20,23;152:2
**scenario (1)** 86:17
**science (2)** 7:2;68:22
**sciences (3)** 7:3,17;
42:21
**search (2)** 124:4;
133:20
**searched (1)** 133:11
**searches (2)** 133:13,14
**season (1)** 132:4
**second (4)** 6:4;41:19;
140:24;150:15
**secretary (5)** 114:16,19,
20,24;115:2

**section (1)** 25:17
**seeing (2)** 42:2;148:21
**Seek (6)** 81:6;94:14;
98:24;106:21;114:2;
145:24
**seeking (2)** 109:15;
145:14
**seem (1)** 146:13
**segue (1)** 4:1
**semester (2)** 49:11;
71:13
**send (9)** 94:21;96:4;
125:10,21;133:7,8,18,
19;134:5
**senior (1)** 17:23
**sense (2)** 85:5,9
**sent (13)** 78:16;88:11;
91:5;93:1;95:14,21;
96:14,18;104:9;
105:14;122:10;163:11,
12
**sentence (6)** 56:3;
58:22;75:2,11,15;
80:10
**separate (1)** 32:20
**September (1)** 65:14
**sequence (6)** 36:22;
40:8;41:20;45:3;
121:19;137:21
**Serbian (1)** 8:8
**series (3)** 3:9;35:19;
144:23
**serious (5)** 130:8,10,
17;131:5,23
**seriously (1)** 129:12
**set (1)** 118:3
**Seven (2)** 48:1;74:6
**several (15)** 30:2;
33:10;39:3;41:19;
46:10;53:15;54:8,18;
62:20;67:1;81:6;97:23;
103:19;142:8;153:17
**severeness (1)** 128:2
**sex (2)** 28:13;73:5
**sex-based (9)** 22:21;
23:7,16,20,24;27:7;
43:15;53:16;160:12
**shakes (1)** 4:14
**Shanghai (1)** 9:22
**share (1)** 12:9
**shared (1)** 12:18
**Sharon (7)** 67:6,7,9,19;
97:22;98:4;146:24
**Shi (8)** 50:15;51:14,20;
78:7;93:19;117:24;
130:23;156:6
**S-H-I (1)** 50:16
**short (1)** 6:13
**Shortly (1)** 153:10
**show (1)** 131:7
**showing (1)** 132:10
**side (2)** 7:6;35:1
**sign (4)** 47:3,4;136:22;

165:1
**signature (2)** 34:3,9
**signed (4)** 136:5;
142:19;143:4;149:21
**significance (3)** 42:17,
24;43:8
**significantly (1)** 84:17
**signing (1)** 143:5
**signs (1)** 136:12
**Similar (2)** 4:11;18:9
**similarly (1)** 72:21
**simple (2)** 78:13;
145:23
**simply (1)** 115:12
**sincere (1)** 125:14
**single (2)** 132:2;137:20
**sister (1)** 13:14
**sitting (6)** 3:18;35:22;
44:21;45:19;90:15;
129:17
**situation (10)** 59:12,14;
85:1;86:17;114:14;
131:11;152:13;155:24;
156:3,14
**six (2)** 13:20;81:4
**size (1)** 113:12
**Slightly (1)** 83:12
**Slobodan (2)** 8:4,8
**small (2)** 19:4;97:16
**smiled (1)** 32:3
**smiling (1)** 32:24
**snapshot (1)** 94:4
**solution (3)** 94:15;
99:17;101:21
**somebody (7)** 26:11;
28:1;49:19;53:16;
113:22;129:9;134:1
**somebody's (2)** 73:5,5
**somehow (1)** 151:16
**someone (9)** 27:14;
47:1;69:17;99:24;
100:8;128:20;134:13;
142:18;143:3
**sometime (1)** 17:14
**Sometimes (8)** 6:20;
72:14,24;85:19;86:1;
129:19;133:3;134:11
**son (4)** 84:24;142:11,
11,12
**son's (1)** 85:1
**soon (3)** 124:9;134:14,
20
**Sorry (22)** 13:5;31:22;
34:1;39:19;52:6;56:4;
59:15;65:23;86:16;
89:20;92:14;100:3;
109:3;125:8;127:3;
135:13;137:3;151:20,
23;154:10;163:23;
164:7
**sort (9)** 10:16;41:16;
86:16;103:4,11,15;
105:3,7;145:2

**sought (1)** 99:16
**sound (1)** 66:18
**sounds (1)** 68:20
**source (2)** 111:12;
148:1
**sources (3)** 72:18;
111:3;148:2
**speak (3)** 90:3;134:4;
161:2
**speaking (5)** 37:10;
67:10;153:21;154:15;
158:6
**specific (26)** 13:10;
37:1,4,24;38:5,14;
41:24;42:5,12;44:22;
45:9,20;46:12;47:12;
50:21;51:5,19;57:3,18,
21,22;62:5;97:9;117:4;
118:19;140:10
**specifically (15)** 37:7;
38:3;39:16,21;41:5,23;
42:10;46:20;53:5;58:9;
105:1;109:20;114:5;
136:20,23
**specify (1)** 42:9
**spelling (1)** 8:6
**spend (4)** 81:4;99:3,8;
145:7
**spent (1)** 50:11
**spoke (12)** 67:4;89:22;
123:14;124:2,7;149:5;
154:4,5,7,8,12;160:22
**stability (1)** 59:1
**stack (1)** 122:9
**staff (39)** 17:23;26:11;
31:5,11;49:10;52:14,
15,22;53:3,4;74:1,10;
75:7;76:4,19;77:13,16;
78:12;79:4;83:6,22,22,
24;84:4;85:6,16,22;
87:6;127:5,15;128:16,
22;134:1,6;139:3,8,9;
156:15;158:23
**stage (2)** 100:24;
111:17
**stamped (1)** 54:18
**stand (1)** 79:13
**standard (2)** 79:2;82:21
**standards (8)** 75:7,24;
76:6;77:13;78:12;
79:23;93:10;95:23
**start (5)** 4:4;100:8;
101:23;113:3;126:17
**started (11)** 17:8;48:7,
24;49:3,7;91:23;97:12;
103:15,20,24;112:9
**starts (3)** 55:20;65:18;
88:5
**state (3)** 71:1;72:13,23
**stated (3)** 20:24;96:12;
107:13
**statement (6)** 21:21;
22:3;90:7,11;101:4;

136:11
**statements (1)** 89:3
**States (16)** 9:23;10:6;
15:14;16:5,9,13;20:22;
28:14,21,22;29:3,8,9;
36:4,17;56:3
**stating (3)** 24:14;51:9;
151:13
**step (2)** 52:6;144:18
**still (4)** 52:24;59:23;
127:24;161:7
**stop (2)** 120:13;126:18
**story (2)** 124:5,6
**strengths (1)** 84:8
**stressful (4)** 54:6;
59:17;60:10;87:23
**struggled (1)** 115:3
**struggles (1)** 113:19
**student (1)** 86:19
**students (13)** 26:5;
84:18;85:2,6,10,15,18;
86:1,2;87:7;88:5,17;
90:4
**student-worker (2)**
136:14;137:7
**studying (1)** 142:13
**stuff (2)** 33:10;160:7
**subject (1)** 93:1
**subjects (1)** 30:21
**submit (1)** 93:22
**submitted (2)** 94:20;
111:1
**submitting (1)** 110:21
**successful (2)** 110:24;
148:3
**sufficient (1)** 163:13
**suggest (6)** 37:16;
40:10;45:4;54:10;
109:15;142:10
**suggested (1)** 45:6
**suggestion (1)** 109:1
**suggestions (1)** 114:3
**suit (1)** 22:1
**suitable (3)** 112:5;
114:15;141:2
**super (1)** 37:4
**supervisor (1)** 26:5
**support (1)** 142:13
**Sure (16)** 3:8,22,24;
4:12;15:15;16:15;33:3;
38:19;63:8;64:2;71:18;
109:13;117:3;133:17;
157:11;158:15
**surprise (1)** 79:19;80:2;
137:11
**surprised (7)** 79:14;
97:3,5;100:15;158:19;
159:14;161:6
**surrounding (1)** 52:1
**suspension (5)** 103:15;
118:7;125:24;126:7;
127:6
**sympathetic (2)** 80:6;

84:22
**system (1)** 108:4

**T**

**table (2)** 20:12;21:15
**tactic (2)** 65:6;78:19
**talk (42)** 3:23;19:1;
  30:12,21;32:7,8;37:5;
  39:7,8;45:3;61:2;
  75:14,17;77:19;81:17,
  20;88:16,20;90:3,6,11;
  91:20;100:1,2,6,8,18;
  103:1;111:9;115:5;
  116:21;122:21;123:13,
  17;124:1,11,15;
  134:15;136:8,11;
  156:12;164:20
**talked (17)** 67:1;80:9;
  89:1;117:21;121:12;
  133:12;136:2,3;137:8;
  146:21,23,24;154:18;
  158:15;160:21;163:8,
  15
**talking (32)** 14:10,19;
  17:24;31:20,24;32:12;
  38:2;39:20;41:4,5,12;
  57:13,14,18;75:19;
  81:12,24;95:22;99:3,6,
  8;102:2;103:24;114:5;
  115:5;116:20;117:5,
  20;140:9;144:9;151:9;
  154:1
**talks (3)** 78:10;79:15;
  98:10
**target (3)** 159:20,23;
  160:1
**TA's (1)** 68:21
**team (2)** 133:20,21
**technical (2)** 85:19;
  86:14
**Technically (1)** 104:5
**telling (7)** 28:2;30:2;
  59:6;80:18;105:14;
  126:17;138:15
**Temple (57)** 7:1,9,11;
  8:22;9:1;16:1;17:11;
  19:6;20:13;24:24;25:6,
  9,13;26:10;27:8;28:17,
  18;47:23;48:7;49:1,7,
  15,18;52:24;53:15;
  63:15,20;68:3,14;71:7,
  24,24;87:24;89:24;
  102:3;103:19;107:13,
  16;108:3;110:2,11,22;
  112:21;115:6;119:23;
  127:19;133:23;141:4,
  22;142:13,17,21,23;
  143:2,13;149:5;160:23
**Temple's (7)** 5:22;6:13;
  24:16;44:12,16;48:12;
  53:19
**temporary (2)** 139:11,

13
**ten (2)** 28:17,19
**term (2)** 7:22,24
**terminate (4)** 94:2;
  139:24;142:12;144:4
**terminated (4)** 142:4,6;
  144:20;148:24
**terminating (6)** 140:22;
  141:9,18;144:15;
  145:8,11
**termination (18)** 64:13,
  16;66:22;67:12;68:9;
  110:4,17;127:10;
  140:7,11,17;141:1;
  142:20;145:3;157:5,5,
  7,12
**terminations (1)** 141:11
**terms (4)** 7:22;30:10;
  84:17;118:23
**terrible (1)** 115:13
**Terry (1)** 3:18
**testify (12)** 41:8;48:12,
  18;54:23;55:4;69:13,
  18;121:16;153:23;
  154:3,5,6
**testimony (7)** 76:8,23;
  81:1;106:18;137:16;
  152:4;163:3
**thanks (1)** 125:6
**thinking (2)** 80:18;
  84:23
**third (6)** 25:17;26:1;
  55:19;56:2;65:17;98:3
**though (4)** 5:3;72:12,
  22;163:7
**thought (2)** 138:6;
  150:12
**thoughts (1)** 80:19
**Threaten (1)** 65:7
**threatening (2)** 26:4,14
**three (5)** 34:12;150:3,6,
  12;153:18
**three-day (1)** 118:7;
  125:24;126:6;127:6
**three-page (1)** 92:19
**ticket (2)** 116:15;118:5
**times (12)** 39:3;50:4;
  60:6;62:20;81:6;84:24;
  106:21;130:3;146:20;
  148:9,12;153:3
**timing (3)** 33:11;95:8;
  157:3
**Title (4)** 69:4,11;70:1;
  112:13
**today (6)** 3:10;96:20;
  122:20;125:6;159:24;
  162:23
**together (3)** 40:2;
  93:17;127:4
**told (14)** 10:13;45:20;
  53:8;64:7;78:15;88:8;
  136:14;137:7;143:3,
  21;150:2;159:22,24;

163:21
**Toni (1)** 31:7
**took (4)** 5:2;14:3;17:4;
  132:6
**top (7)** 34:9;42:14,20;
  89:14;119:17;123:4;
  125:4
**totally (1)** 58:6;61:1
**tough (2)** 84:21;85:8
**towards (1)** 26:4
**tradition (1)** 159:6
**traffic (1)** 129:11
**training (4)** 71:6,8;
  109:17,21
**transcript (5)** 3:21;4:12,
  15;13:7;95:3
**transfer (1)** 112:2
**transferred (1)** 142:5
**travel (17)** 12:8,10;
  54:5;56:19,21;57:5;
  59:1,8,11,17,21;60:1,
  16;61:8,12;62:16;
  120:22
**travels (1)** 30:13
**treat (4)** 83:18,24;
  110:8,8
**treated (3)** 79:11;
  80:20;105:15
**treating (5)** 73:19,23;
  74:9;110:3;163:4
**treatment (13)** 75:6,24;
  76:5,21;77:8;78:2,11;
  79:15;82:4;93:10;
  95:22;100:11;101:17
**treats (2)** 11:23;88:9
**trial (1)** 48:15
**tried (8)** 81:9;102:15;
  107:20;108:1;110:23;
  152:7,9;153:1
**triggered (1)** 151:12
**trip (1)** 58:19
**true (1)** 151:18
**truth (5)** 5:3,6,8;78:15;
  138:16
**try (10)** 3:14;4:2,6;
  81:5;97:14;108:1;
  138:2,20;145:22;
  152:12
**trying (3)** 143:7;145:19;
  146:11
**turning (1)** 21:1
**twice (1)** 163:16
**two (20)** 7:22;8:12,19;
  9:2;20:5;36:24;38:12;
  45:7;49:15;50:8,17;
  51:2;65:1;67:14;93:17;
  96:5;117:17;147:7;
  150:8;164:12
**two-day (1)** 129:3
**type (1)** 139:22
**typed (1)** 47:1
**typed-in (1)** 34:13
**types (1)** 71:2

**typically (3)** 37:6;39:20;
  117:2

**U**

**ultimately (6)** 109:1;
  119:4;141:24;144:23;
  146:11;154:10
**uncomfortable (1)** 88:8
**under (11)** 5:24;10:23;
  11:2,10;26:2;35:1;
  54:2;92:5;107:19;
  115:19;124:4
**underneath (4)** 103:3,
  12,16,20
**understood (1)** 5:15
**unhappy (1)** 33:4
**union (1)** 158:14
**United (1)** 9:23;10:6;
  15:13;16:5,8,12;28:22;
  29:3,9;36:3,17
**University (19)** 7:9,11;
  8:14;9:2;15:16,24;
  24:24;26:10;47:24;
  48:7;49:1,8,15,18;
  68:15;71:7;103:19;
  120:5;158:13
**University's (1)** 20:13
**unlawful (1)** 72:24
**unpaid (1)** 126:6
**unprofessional (7)**
  24:13,14;26:3,13,18;
  45:21;46:14
**unprofessional/ (2)**
  35:3,15
  Unprofessional/Inappropriate (6)
  35:12;36:2;42:4,11;
  44:2;45:2
**unwritten (1)** 37:14
**up (30)** 10:21;11:22;
  34:9;42:14,20;60:22,
  24;61:9,16;65:17;
  76:15;78:21;80:21;
  88:22;90:2,10;96:11,
  23,24;113:12;117:12;
  118:4;131:7;132:10,
  13;134:10,19;141:14;
  153:9;158:6
**upset (4)** 79:11,12;
  97:11;151:18
**upsetting (6)** 79:3,6,7,7;
  83:5,16
**upstairs (1)** 99:19
**urgency (1)** 124:14
**uso (7)** 35:1;48:22;
  119:20,21,22;120:6,11
**using (4)** 24:12;26:2;
  120:9,13
**usual (1)** 140:4
**usually (15)** 12:9;37:3,
  5;39:20;41:1,4;114:2;
  116:23;117:1,20;
  118:11;133:19;134:5;

137:19;139:13

**V**

**vacation (3)** 54:11;
  60:10;128:21
**varies (1)** 15:23
**various (3)** 25:8;34:7;
  75:17
**verbal (12)** 40:11,12,
  13,15,21;41:1;129:13;
  130:3,4,8,17;132:14
**verbalize (8)** 4:13,16;
  5:11;11:19;22:7;65:23;
  89:20;116:9
**vice (4)** 7:7;8:20;104:3,
  6
**view (1)** 59:14
**VII (2)** 69:4;70:1
**violation (15)** 24:15;
  35:3,7,11;37:16;44:1;
  45:3,10,15;53:19;
  126:10,11,24;135:20;
  141:12
**Violations (2)** 25:14;
  136:20
**visitors (2)** 26:6;99:9
**voice (8)** 85:13,15,17,
  21;86:5,10,18,24
**Vucetic (2)** 8:4,8

**W**

**Wacker (22)** 37:18;
  52:6,20,24;53:7;67:23;
  77:19;87:18;88:11,14;
  89:1,14,17;90:7,12,20;
  96:12;99:6;100:18;
  107:7;149:21;155:22
**Wacker's (2)** 52:8;
  90:17
**wait (4)** 4:3;13:3;95:3;
  109:11
**waiting (1)** 118:2
**Walton (20)** 66:17,23;
  67:15;89:14,18,22;
  90:2,10,18;101:3,9,13;
  145:11;146:23;147:10,
  15,21;148:5;155:4;
  156:23
**warning (16)** 34:18;
  41:17;49:20;50:1;
  53:16;118:8;129:13;
  130:1,3,4,5,7,9,17;
  132:17;135:15
**warnings (1)** 103:5
**way (18)** 20:22;29:14;
  30:3;45:12;63:13;75:5,
  20;88:9;97:15;98:17;
  99:18;106:22;110:3,8;
  121:11;142:10;143:12;
  145:15
**Weakness (3)** 84:21;

97:14;138:20
**weaknesses (1)** 84:20
**website (3)** 5:22;6:13;
156:17
**week (4)** 81:5;94:5,5;
136:4
**weekly (4)** 40:14;
50:11;51:17;104:7
**weren't (4)** 30:17;
134:12;136:15;143:22
**Whaley (6)** 116:13;
122:21;125:11,15,21;
152:13
**Whaley's (1)** 125:9
**what's (3)** 123:2,11;
156:14
**whenever (7)** 36:21;
47:9,15;97:13;99:23;
136:10;138:20
**wherever (1)** 111:11
**white (5)** 11:5,7,7,12,15
**whole (8)** 10:5;55:4;
68:22;81:4;98:23;
107:24;115:3;118:2
**who's (1)** 40:7
**Whose (8)** 39:10,21;
44:18;109:3;116:16;
118:6,21;135:23
**wide (1)** 81:20
**within (11)** 68:23;
69:22;70:5,15,23;
71:23;72:21;73:10;
119:2,6;126:9
**without (4)** 45:15;
113:8;130:4;132:10
**WITNESS (116)** 12:3;
13:5;17:1,17;18:8,17;
21:11;22:14,24;24:9,
18;25:22;26:17;27:3,
19;29:11;30:19;40:1;
43:19,22;46:2;47:19;
53:23;55:6;58:5,17;
60:8,24;61:11,19;62:2,
10,15;64:20;66:9;68:5,
12;69:8,15,19;70:12,
20;71:4;72:17;73:2,8,
14;76:11;77:1,15;78:5;
79:18;80:2,14;81:3;
82:6,10,19;83:2,15;
86:13,23;90:24;92:4,
10;93:13;95:18;96:2,4,
19;100:14,22;101:19;
103:22;104:21;105:19;
106:2,8,20;107:18;
108:16;109:13;110:7;
111:16;112:4;113:17;
114:1,11;121:18;
123:1;125:1,18;126:4,
22;127:13;128:13,19;
130:13;137:18;140:3,
15;144:22;145:6;
147:6;149:2,17;151:3;
152:6,23;154:8,18;

156:12;161:14;164:1,
24;165:3
**woman (3)** 57:14;63:4;
66:17
**women (28)** 11:5,15,
23;12:19,22,24;13:13,
17;14:15,17;16:18;
18:12;19:11;21:1;22:3;
24:4;26:11,20;32:13;
56:9,17,22;57:6,10,10,
15;58:12;60:21
**womens (2)** 12:12;61:2
**word (8)** 19:13,14,15,
16,19;21:12,19;32:8
**wording (1)** 57:8
**words (6)** 18:11;19:10;
24:4;26:20;29:2;34:17
**work (24)** 3:7;11:15;
15:1,2,24;28:18;30:20;
48:5;76:14;78:13;
85:10;92:5;94:4;99:4;
112:21,24;113:13;
114:21;121:4;128:17;
131:7;135:20;138:8;
139:20
**worked (2)** 68:14;
103:18
**workforce (1)** 28:12
**working (23)** 15:4,5;
19:3;48:24;49:3,7;
54:2;74:6;91:23;99:7;
101:23;103:3,12,16,20;
113:2,3;124:3;141:22;
142:17,23;143:2,13
**workplace (25)** 24:7,15;
71:17,20;72:15;77:8;
78:3;79:5,16;80:20;
83:7;85:24;86:5,10;
87:2;88:19;90:4;99:5,
20;100:11;103:15;
105:11,15;163:5,9
**works (1)** 16:18
**write (10)** 44:1,4,10;
45:15;83:6;94:10;
132:18,20;133:5;
145:18
**writes (16)** 60:2,14,19;
61:6;75:4;78:2;82:13;
87:20;98:4,4;100:10;
122:19;125:5;155:8;
158:1;160:2
**writing (6)** 51:9,20;
76:4;130:21,22;134:10
**written (25)** 34:17;
40:11;41:2,17,19;42:3;
49:19;50:5;51:12,23;
53:15;77:6;94:22;
103:5;109:22;118:7;
129:24;130:1,4,7;
131:24;132:1,17;
135:15;136:11
**wrong (6)** 56:5;97:15;
150:16,21,23;151:1

**wrote (24)** 55:22;56:10,
14;58:10;60:4;61:14;
63:1,2;75:15,23;76:17,
20;77:11;79:9;80:9;
81:17;82:3;93:17;
123:5;124:10;125:15;
133:3;155:10;158:18
**Wu (36)** 5:1,20;6:11;
9:19;10:8;19:10;20:5,
23;24:23;28:21;33:8,
16;48:12,18,24;52:5;
54:17;55:3;56:7,8;
58:11;63:11;64:24;
74:16;82:18;87:12;
89:11;92:24;116:1;
124:22;126:15,17,20;
134:19;135:7;158:1
**Wu's (3)** 28:10,15;
65:19

### Y

**year (14)** 7:14,19,23;
9:7;49:12;68:23;81:4,
4;113:18;141:1;
145:12;146:16,19;
161:8
**years (28)** 9:13;10:3;
13:20,21;21:1;27:10;
28:17,19;30:2;48:1;
49:6,15;51:8;53:15;
68:19;69:4;74:6;81:23;
94:6;103:19;106:24,
24,24;115:17;127:18;
146:21;153:6,18
**yell (2)** 84:12;85:23
**yelling (3)** 88:4,17;89:3
**young (1)** 14:17
**youngest (1)** 17:23

### Z

**zero (2)** 9:17,18

### 1

**1 (7)** 80:10;141:5,7;
143:8,11;149:21;150:1
**1:01 pm (1)** 165:6
**10 (1)** 55:21
**10:32 (1)** 55:21
**10:51 (1)** 122:19
**10th (1)** 43:11
**11th (1)** 42:19
**15 (1)** 160:19
**159 (1)** 25:13
**16 (1)** 9:24
**17th (2)** 34:10;93:2
**1964 (2)** 69:5;70:2
**1987 (1)** 9:24

### 2

**20 (1)** 68:19
**2009 (6)** 17:9,14;48:7;
49:1;91:24;92:5
**2010 (14)** 74:23;77:6,
10;78:24;87:18;88:14;
90:17;91:3,13,16;92:5;
93:2;94:1;97:24
**2011 (11)** 20:23;34:10,
13,22;35:17,24;42:15,
23;43:7,16;52:12
**2012 (2)** 65:14;99:16
**2013 (4)** 55:21;116:7;
122:11;146:19
**2013/2014 (2)** 9:7,13
**2014 (21)** 9:7;17:11,
14;68:23;132:9;
135:11;141:5,5,7,18;
142:2;143:8,11;
145:12;146:16;149:21;
150:1;155:12;157:23;
161:3,8
**2016 (2)** 7:19;48:17
**20th (1)** 135:11
**24 (6)** 20:21,22;21:18;
23:10,17;28:7
**25 (1)** 28:8
**25th (1)** 122:11
**26 (1)** 28:14
**26th (1)** 116:7
**27 (3)** 28:20;29:7;
48:17
**29th (4)** 87:18;90:17;
91:3,13

### 3

**30 (1)** 10:3

### 4

**4 (2)** 20:20;28:6
**40 (1)** 13:17
**4th (1)** 155:12

### 5

**50 (4)** 9:16;11:10;
13:17;69:1
**50s (2)** 17:21;18:5
**55 (13)** 11:6,16;12:22;
18:13,18;19:12;22:4;
24:5;26:12,22;27:12,
13;53:9
**55' (1)** 21:3
**57 (1)** 21:1
**58 (6)** 56:10,22;57:1,3,
17;58:12
**5th (1)** 9:20

### 6

**60 (3)** 10:24;27:10,15
**61 (1)** 9:20

**64 (1)** 54:19
**67 (1)** 54:19

### 7

**70's (1)** 15:24

### 8

**8:21 (2)** 122:11,17
**8th (1)** 157:23

### 9

**9 (1)** 20:23
**90 (1)** 152:23
**95 (1)** 152:23
**9th (10)** 34:13,22;
42:14,23;43:7,16;
65:14;74:23;91:16;
97:23