# EXHIBIT 28

# In The Matter Of:

*RUTII V. BRIGGS v.*
*TEMPLE UNIVERSITY*

---

*GREGORY G. WACKER*
*June 29, 2017*

---

*Terry Burke Reporting*
*Registered Professional Reporters*
*terryburkermr@gmail.com*
*(215) 205-9079*

Min-U-Script® with Word Index

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                    -        -        -
 4    RUTH V. BRIGGS,                  :
 5           Plaintiff,               :
 6    v.                              :   Civil Action
                                      :   No. 16-00248
 7    TEMPLE UNIVERSITY,              :
 8           Defendant.               :
 9                    -        -        -
10            Philadelphia, Pennsylvania
              Thursday, June 29, 2017
11                   -        -        -
12
13            Deposition of GREGORY G. WACKER,
14    taken pursuant to notice, held at Littler
15    Mendelson, P.C., Three Parkway, 1601 Cherry
16    Street, Suite 1400, Philadelphia, Pennsylvania,
17    beginning at 10:10 a.m., on Thursday, June 29,
18    2017, before Terry Barbano Burke, RMR-CRR.
19
20
21
22            TERRY BURKE REPORTING
                 (215) 205-9079
23            terryburkermr@gmail.com
24
```

**Page 2**

```
 1   APPEARANCES:
 2       RAHUL MUNSHI, ESQUIRE
         Console Mattiacci Law, LLC
 3       1525 Locust Street, Ninth Floor
         Philadelphia Pennsylvania 19102
 4
         Counsel for the Plaintiff
 5
         RACHEL FENDELL SATINSKY, ESQUIRE
 6       Littler Mendelson, P.C.
         Three Parkway
 7       1601 Cherry Street, Suite 1400
         Philadelphia, Pennsylvania 19102
 8
         Counsel for the Defendant
 9
10                   -        -        -
11            GREGORY G. WACKER,
12    125 Archbishop Drive, Conshohocken,
13    Pennsylvania, 19428, having been duly
14    sworn, was examined and testified as
15    follows:
16   BY MR. MUNSHI:
17       Q.   Good morning, Mr. Wacker.
18       A.   Good morning.
19       Q.   We just met, but my name is Rahul
20    Munshi.   I am an attorney at Console Mattiacci
21    Law, and I have the privilege of representing
22    Ruth Briggs in this action she has brought
23    against Temple University.
24            You are here today for your
```

**Page 3**

```
 1   deposition.  Do you understand that?
 2    A.  Yes.
 3    Q.  Have you ever had your deposition taken
 4   before?
 5    A.  No.
 6    Q.  Let me give you some of the ground rules
 7   and just basically explain how things normally
 8   work.
 9        I am going to be asking you a series
10   of questions and you are going to be giving the
11   answers to those questions.  If I ask you a
12   question you don't understand or you want me to
13   repeat, just let me know, I will try to ask a
14   better question.
15        Okay?
16    A.  Yes.
17    Q.  You have Terry sitting right to your
18   left, and obviously you see her taking down
19   everything so the transcript can be created
20   later.  As a result, we have to make sure you
21   verbalize all of your answers.  Head shakes,
22   head nods, don't come out clean on the
23   transcript, so if you try to do your very best.
24   I may have to remind you a couple of times.
```

**Page 4**

```
 1        Okay?
 2    A.  Yes.
 3    Q.  Similar instructions for the purposes of
 4   the transcript is, we have to make really sure
 5   that we don't talk over each other all that
 6   much.  So if you can try to wait until I am done
 7   asking my question even if you know where I am
 8   going before you start answering it, and I am
 9   going to try to do my best to not ask you my
10   next question until are you done answering my
11   first one.
12        Okay?
13    A.  Yes.
14    Q.  If you do want to take a break at any
15   point today, just let me know.  As long as there
16   isn't a question pending at the time, we will go
17   ahead and take that break.
18        Okay?
19    A.  Yes.
20    Q.  The last instruction I will give you
21   today, Mr. Wacker, is you just took an oath here
22   to tell the truth.  Even though we are in a
23   conference room and there is no judge here,
24   there is no jury here, with that oath comes the
```

Page 5

```
 1   same obligations to tell the truth, same
 2   potential penalties of perjury if you do not
 3   tell the truth.
 4        Do you understand that?
 5   A.  Yes.
 6   Q.  What is your date of birth?
 7   A.  ███████████
 8   Q.  Are you currently employed by Temple?
 9   A.  Yes.
10   Q.  When did you start working at Temple?
11   A.  Approximately 12 years ago.
12   Q.  Ballpark 2005?
13   A.  2003, somewhere around there.  Been
14   there 12, 13 years.
15   Q.  What was your first position at Temple?
16   A.  What was it?  Possibly a business
17   manager.
18   Q.  How long did you hold that role?
19   A.  Three or four years.
20   Q.  When you were hired, in which department
21   were you?
22   A.  Department of biology.
23   Q.  Who did you report to back then?
24   A.  Kamel Khalili.
```

Page 6

```
 1   Q.  I need you to spell that.
 2   A.  K-A-M-E-L, K-H-A-L-I-L-I.
 3   Q.  What was that person's title?
 4   A.  He was a faculty member.  Director of a
 5   center in the biology department.
 6   Q.  What was the next position that you
 7   held?
 8   A.  I then became director of finance and
 9   administration.
10   Q.  Ballpark year on that?
11   A.  I don't know, but I was in that probably
12   about, I'm going to say, nine years.  I held
13   that position for nine years.
14   Q.  What position do you currently hold?
15   A.  Assistant dean finance and
16   administration.
17   Q.  So before you were a director, now you
18   are an assistant dean?
19   A.  Yes.
20   Q.  Both finance and administration, though?
21   A.  Yes, finance and administration.
22   Q.  When did you start having that job
23   title?
24   A.  Probably about two years ago.
```

Page 7

```
 1   Q.  And was that your next job title after
 2   you were the director of finance and
 3   administration?
 4   A.  I left Temple and went to Hahnemann for
 5   a year or so.
 6   Q.  And when was that?
 7   A.  I don't recall the date.
 8   Q.  Ballpark?
 9   A.  It was in between, I guess maybe four
10   years after I was first in Temple.
11   Q.  So you said that you were the director
12   of finance and administration for nine years.
13   A.  Yes.  There might have been -- oh, no,
14   no, no.  There was no break in that.  It was the
15   first position -- what did I say? -- business
16   manager.  The business manager, I took a break
17   between the business manager position and then I
18   came back as the director of finance
19   administration.  Was in that for about nine
20   years.  Then I became the assistant dean for
21   finance and administration.
22   Q.  And that is what you are right now?
23   A.  Yes.
24   Q.  Who do you report to right now?
```

Page 8

```
 1   A.  Michael Klein, the dean.
 2   Q.  Is he dean of anything in particular?
 3   A.  Dean of the College of Science and
 4   Technology.
 5   Q.  Back in 2014, were you the director or
 6   the assistant dean?
 7   A.  2014, would have been director.
 8   Q.  Was it a promotion to assistant dean or
 9   a lateral?
10   A.  Promotion.
11   Q.  Do you know who promoted you?
12   A.  The current dean.
13   Q.  Is that Michael Klein?
14   A.  Michael Klein.
15   Q.  Do you have any direct reports right now
16   reporting to you?
17   A.  Yes.
18   Q.  Approximately how many?
19   A.  Four.
20   Q.  How about back in 2014, did you have any
21   folks reporting directly to you?
22   A.  Yes.
23   Q.  How many?
24   A.  Three or four.  I can't remember the
```

**RUTH V. BRIGGS v.**
**TEMPLE UNIVERSITY**

**GREGORY G. WACKER**
**June 29, 2017**

Page 9

1  exact number.
2    Q.  Can you tell me their names?  This is
3  back in 2014.
4    A.  2014, it would be Drew, Andrew DiMeo.
5  '14?  I'm not sure if Walter Weidenbacher was
6  there.  I don't think he was there.
7        Erin Allen may have been.  I mean
8  they are rotating staff through there.  The
9  exact names, I would have to go back and see.
10    Q.  Back in the 2014 time period, who did
11  you report directly to?
12    A.  I would have reported to the dean, which
13  would have been Michael Klein.
14    Q.  So you have been reporting to Michael
15  Klein for many years now?
16    A.  As long as he has been dean.  He's
17  probably been dean five years.
18    Q.  At any point did you have a reporting
19  relationship to or with Jie Wu?
20    A.  Dr. Wu was the chair of the department,
21  the CIS department.  He did not directly report
22  to me.  He reports to the dean.
23    Q.  You did not report directly to him?
24    A.  I did not report to him, no.

Page 10

1    Q.  Organizational chart wise, were you on
2  the same level?
3    A.  Yes.
4    Q.  And at any point during your tenure at
5  Temple, did you have a reporting relationship to
6  or with Ruth Briggs?
7    A.  As a direct report, no.
8    Q.  How about indirect?
9    A.  Indirect, there may have been when Allen
10  Nicholson was chair, and I believe he brought
11  Ruth over.  More or less if the dean was out and
12  the senior associate dean was out, then I would
13  kind of be left in charge of the office.
14    Q.  When you said Allen Nicholson brought
15  her over, what do you mean?
16    A.  He hired her.  He hired her.
17    Q.  Hired her externally into Temple?
18    A.  Well, she was already in Temple.  He
19  hired her in a position that became vacant in
20  the dean's office.
21    Q.  And at that time, Ruth Briggs was
22  already an employee of Temple?
23    A.  Yes.
24    Q.  Allen Nicholson brings her into this

Page 11

1  department?
2    A.  Into the dean's office, yes.
3    Q.  Ballpark, what year was that?
4    A.  I don't know.
5    Q.  Was she already employed by Temple
6  before you were employed by Temple, do you know?
7    A.  I do not know that.
8    Q.  Did you have any supervision or
9  supervisory authority over Ruth Briggs at any
10  time?
11    A.  No.  Once again, no direct supervision
12  over her.
13    Q.  Indirect supervision over her?
14    A.  Once again, if the dean, nobody was
15  around, and somebody needed a question answered
16  or guidance on something, they would come to me
17  and I would guide them on whatever the topic may
18  be.
19    Q.  Is that a common occurrence or is this a
20  one-off thing randomly?
21        MS. SATINSKY: Objection to form.
22  You can answer the question.
23        THE WITNESS: It happens, you know,
24  quite often in the normal business process, some

Page 12

1  of the associate deans will be out at meetings,
2  whatever, and if a problem comes in and any of
3  the administrative staff need assistance with
4  determining how to handle that situation, they
5  would come to me then for advice and guidance.
6  BY MR. MUNSHI:
7    Q.  Did you ever conduct any of Miss Briggs'
8  performance reviews at any time?
9    A.  No.
10    Q.  Did you ever review any of her
11  performance reviews prior to them being given to
12  her?
13    A.  Not that I recall.
14    Q.  Did anyone ever seek your input as to
15  what her performance evaluation should look
16  like?
17    A.  Not that I recall.
18    Q.  Did you ever consider yourself to be her
19  boss?
20    A.  No.
21    Q.  Beyond what you have already described
22  in the situations where no one else was present,
23  did you have any other role vis-à-vis Ruth
24  Briggs?

Page 13

1     MS. SATINSKY: Objection to form.
2         You can answer the question.
3         THE WITNESS: In my role, I more or
4  less serve as a consultant, guidance, and a
5  resource for anyone in the college that has any
6  type of issue.  Any matter that they need
7  guidance, direction, advice on, whatever, they
8  can come in and talk to me confidentially, and
9  at that point, I would just advise them to what
10 other resources might be available within Temple
11 or where they might want to go to.
12 BY MR. MUNSHI:
13    Q. And did you ever have occasion to advise
14 Miss Briggs on a confidential basis?
15        MS. SATINSKY: Objection to form.
16        THE WITNESS: I don't know that it
17 was confidential.  You know, she would bring
18 issues up in front of others and my response
19 would be go see the appropriate entity that
20 handles that type of a complaint.
21 BY MR. MUNSHI:
22    Q. What do you mean by "others"?
23    A. Other staff members in the office,
24 particularly Drew DiMeo and other administrative

Page 14

1  office.
2     Q. There was the one comment that she
3  allegedly said Dr. Wu made.
4     Q. Which was?
5     A. I don't know.  You know, something about
6  China.  Once again, I don't know the full
7  contents of it.  I can't tell you exactly what
8  it was.  At that point, she felt it had
9  something to do with either her age or her
10 gender, and I suggested that she go to Sandra
11 Foehl's office to file a complaint if indeed
12 that was said.
13        Once again, I don't know what was
14 said, so I had no supporting documentation.
15 There was nothing in writing or indicating
16 exactly what it was.
17    Q. How did you learn that a statement was
18 allegedly made to Ruth Briggs?
19    A. She brought it up in the course of
20 casual conversation with myself and Drew in the
21 office.  Not in an office.  In the outer office
22 where anybody could be walking around or milling
23 around.
24    Q. What do you mean by "outer office"?

Page 15

1     A. This is an office, outside.  If this was
2  my office, it would have been outside.  There is
3  other desks around.  There is other people
4  around.  So it would have been made in that
5  conversation when we were just standing around
6  having conversation.
7     Q. And you were present along with Drew
8  DiMeo?
9     A. Yes.
10    Q. And did she just come right up to you or
11 were you having a meeting?  Explain to me the
12 context.
13        MS. SATINSKY: Objection.
14        Asked and answered.  You can answer
15 the question.
16        THE WITNESS: It wasn't a formal
17 meeting.  Once again, my office is the hub and
18 activity for finance and business-related
19 activities.  People are constantly coming and
20 going in and out of my office for various, you
21 know, business-related activities.  It was not a
22 planned meeting, a scheduled meeting, a "Hey,
23 I'm filing a complaint" type of thing.  It was
24 just in the context of us talking about a bunch

Page 16

1  of other things, it was mentioned.  And once
2  again, my direction was if you feel that adamant
3  about a complaint, this office handles that type
4  of complaint, go seek that.
5  BY MR. MUNSHI:
6     Q. And by "this office," you are talking
7  about Sandy Foehl's office?
8     A. Yes.
9     Q. That is the EEO office; correct?
10    A. Yes.
11    Q. How did you determine that the comment
12 was age or gender based?
13        MS. SATINSKY: Objection to form.
14 Asked and answered.  You can answer the
15 question.
16        THE WITNESS: Once again, I believe
17 that the context of what she was saying had to
18 do something with age and gender and China, as
19 part of a conversation with a lot of
20 conversations going on with multiple people in
21 the office.  Once again, it was not any type of
22 a formal complaint.
23 BY MR. MUNSHI:
24    Q. To you?

Page 17

1    A. To me or to Drew, yes.
2    Q. Just so I'm clear here, did she say this
3  was an age or gender-based comment, or is that
4  something that you interpreted?
5         MS. SATINSKY: Objection.
6         Asked and answered.  You can answer
7  it.
8         THE WITNESS: She said yes.  She
9  seemed to indicate that it was.
10  BY MR. MUNSHI:
11    Q. I am just asking a finer point.  Did she
12  say this an age and gender-based comment or
13  did you interpret it as such?
14         MS. SATINSKY: Objection.  Asked and
15  answered.
16         You can answer it one more time,
17  Greg.
18         THE WITNESS: I believe she
19  interpreted it as that, at which point, then, I
20  threw my comment back to her, the appropriate
21  group is affirmative action.
22  BY MR. MUNSHI:
23    Q. Affirmative action is the EEO office?
24    A. Or Sandy Foehl, Sandy Foehl.

Page 18

1    Q. I am still not understanding, so let me
2  ask one more time.
3         Did she say to you and Drew, this is
4  an age and gender-based comment, or based on
5  what she did relate to you, you understood it to
6  be one?
7         MS. SATINSKY: Objection.  Asked and
8  answered.
9         THE WITNESS: I didn't know what it
10  was, so I directed her to another office.
11  BY MR. MUNSHI:
12    Q. You knew enough to direct her to
13  somebody's office; right?
14    A. Yes.
15    Q. Did you direct her to anybody else's
16  office?
17    A. Sandy Foehl.
18    Q. So who is Sandy Foehl and what does she
19  do there?
20    A. There --
21         MS. SATINSKY: Objection to form.
22         You can answer the question.
23         THE WITNESS: They handle personnel
24  complaints.  So at that point, we had a

Page 19

1  personnel issue.  Send it over to them.
2         I don't do any investigations for
3  the most part that relate to those type of
4  activities.
5  BY MR. MUNSHI:
6    Q. Is the EEO office a part of HR?
7    A. I don't know.  I don't know the
8  structure.
9    Q. Do you know if the EEO office where
10  Sandy Foehl works has any specific job duties or
11  jurisdiction that is special?
12         MS. SATINSKY: Objection to form.
13         THE WITNESS: I'm not sure.
14  BY MR. MUNSHI:
15    Q. Do you know what EEO stands for?
16    A. The Equal Employment Opportunity group.
17    Q. Did you direct Miss Briggs as a result
18  of what she had conveyed to you to any other
19  department in HR?
20         MS. SATINSKY: Objection.  Asked and
21  answered.
22         You can answer it one more time.
23         THE WITNESS: No.
24  BY MR. MUNSHI:

Page 20

1    Q. Why didn't you tell her to talk to HR if
2  it was a personnel issue?
3    A. Don't know.
4    Q. You understood at that time that you
5  advised her to go talk to Sandy Foehl, and Sandy
6  Foehl within her capacity in the EEO office, she
7  deals with age and gender-type issues; right?
8         MS. SATINSKY: Objection.  Asked and
9  answered.
10         You can answer it one more time.
11         THE WITNESS: Yes.
12         MS. SATINSKY: I am just going to
13  put on the record an objection, Rahul.  You did
14  this in the past deposition where you asked the
15  same questions repeatedly.  If it continues to
16  happen in this deposition, I am going to call
17  the judge.
18  BY MR. MUNSHI:
19    Q. During your tenure at Temple, to your
20  knowledge, has any employee ever complained that
21  you harassed them, discriminated against them,
22  or retaliated against them?
23    A. Not that I'm aware of.
24    Q. During your tenure at Temple, to your

Page 21

1  knowledge, has any employee gone to HR to
2  complain about you?
3      A. Not that I'm aware of.
4      Q. And during your tenure at Temple, to
5  your knowledge, has any employee filed an EEOC
6  charge alleging anything about your conduct?
7      A. Not that I'm aware of.
8      Q. Do you work with an employee named Tanya
9  Honeywell?
10     A. Yes.
11     Q. Who is she?
12     A. I don't know her exact title, but she
13  was an administrative assistant, along those
14  lines, that worked in the dean's office.
15     Q. Is she still employed at Temple?
16     A. No -- I do not know.
17     Q. And when you say the "dean's office,"
18  which dean's office?
19     A. College of Technology and Science dean's
20  office.
21     Q. At any point did you have a direct or
22  indirect reporting relationship with her?
23     A. Yes.
24     Q. Year?

Page 22

1          MS. SATINSKY: Is that a question?
2  It is not a question. Don't answer that. If
3  you have a question, you can ask it as a
4  question.
5  BY MR. MUNSHI:
6      Q. Do you know what year it was that you
7  had a direct or indirect relationship with Tanya
8  Honeywell?
9      A. I do not.
10     Q. And was it a direct relationship or
11  indirect?
12     A. Indirect.
13     Q. Did she report to somebody who reported
14  to you?
15     A. No.
16     Q. So describe for me what you mean by
17  indirect?
18     A. She would have reported to the dean's
19  administrative assistant.
20         Now, when that person left or -- if
21  that person were to leave or whatever, once
22  again, I would be helping monitor, but not a
23  direct report to me.
24     Q. And who was that individual who was the

Page 23

1  dean's administrative assistant?
2      A. Right now?
3      Q. No. We are talking about Tanya
4  Honeywell?
5      A. Tanya? It might have been Ruth.
6      Q. Do you recall if Miss Honeywell went on
7  FMLA leave at any point while she was employed
8  at Temple?
9      A. Yes, she did.
10     Q. How do you know that?
11     A. I do remember she was on -- I do
12  remember her being out on intermittent FMLA.
13     Q. Were you in any position to authorize
14  the FMLA leave?
15     A. No.
16     Q. Did you have an understanding if her
17  FMLA leave was related to her own medical
18  condition or somebody else's medical condition?
19     A. No.
20     Q. Did you ever think that she was faking
21  something to get on FMLA?
22     A. No.
23         MS. SATINSKY: Objection to form.
24         You can answer.

Page 24

1          THE WITNESS: No.
2  BY MR. MUNSHI:
3      Q. Did you ever tell anybody that you
4  thought that she was faking it?
5      A. No.
6      Q. Did you ever instruct Ruth Briggs to
7  find out more information about Miss Honeywell's
8  FMLA?
9      A. No.
10     Q. Did you ever instruct Miss Briggs to
11  call the doctor's office and find out more about
12  Miss Honeywell?
13     A. No.
14     Q. At any point, did you instruct or direct
15  Miss Briggs to issue discipline on
16  Miss Honeywell?
17     A. In accordance with work rules, yes.
18     Q. Which work rules are you talking about?
19     A. It would be the Temple University work
20  rules.
21     Q. Which rules specifically are you talking
22  about?
23     A. At this point, I don't know. I would
24  have to see which items would be there.

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

GREGORY G. WACKER
June 29, 2017

Page 25

1     Under FMLA you are allowed out for
2  the FMLA reasons.  If you are out sick and above
3  and beyond that for non-FMLA related, you can
4  follow university work rules for excessive
5  absenteeism and those types of things.
6     There may have been some performance
7  issues with work not getting done, and the only
8  directive would be is that anything that she is
9  out for FMLA, you cannot do anything.  Anything
10  that is just regular sick, discipline can be
11  taken.
12    Q.  Explain to me what you mean by "regular
13  sick"?
14    A.  If I called out today and said, hey, I'm
15  out four hours for FMLA sick, that four hours
16  gets booked sick time.  It cannot be used in my
17  calculation for the work rule violation of
18  excessive absenteeism.
19    If I take just four hours sick,
20  that's it.  If I take 15 days sick that are not
21  FMLA related, I can be written up for excessive
22  absenteeism.
23    Q.  Did you have an understanding that
24  Miss Honeywell was on intermittent FMLA leave?

Page 26

1    A.  Yes.
2    Q.  And was it your understanding that she
3  was excessively absent?
4    A.  Yes.
5    Q.  What was your basis for concluding that?
6    A.  The complaints that came in to me about
7  work not getting done and people asking how to
8  handle that.  At which point, then, that would
9  be pushed back to the supervisor to say, hey,
10  you are supervising the employee, you need to
11  follow work rules.
12    Q.  Were you receiving complaints that work
13  was not being done because Miss Honeywell was
14  absent?
15    A.  I don't know why, but I was receiving
16  complaints that the work was not being done.
17    Q.  Did you ever conclude that she was being
18  absent excessively for non-FMLA reasons?
19    A.  Once again, I would have directed the
20  supervisor to find out what -- supervise the
21  employee and figure out what is going on.
22    Q.  This supervisor you are talking about,
23  was that Ruth Briggs?
24    A.  I believe it was.

Page 27

1    Q.  So did you tell Miss Briggs to actually
2  give her a form of discipline?
3    A.  I told her to find out what the problems
4  were and handle them appropriately according to
5  university work rules.
6    Q.  And then did you have a discussion with
7  Ruth Briggs about what she found out?
8    A.  I don't believe it ever got to that
9  point.
10    Q.  Did you ask Miss Briggs to look into any
11  medical information of Tanya Honeywell?
12    A.  No, because it's confidential.
13    Q.  What did you ask Miss Briggs to look
14  into?
15    MS. SATINSKY: Objection.  Asked and
16  answered.
17    You can answer it one more time.
18    THE WITNESS: Once again, what was
19  going on with the work and the performance and
20  why were things not getting done and handle it
21  in accordance with university work rules.
22  BY MR. MUNSHI:
23    Q.  Was discipline ultimately issued?
24    A.  I don't recall.

Page 28

1    Q.  Are you aware that Miss Honeywell later
2  brought a claim against Temple?
3    A.  I was aware of it through the attorney.
4    MS. SATINSKY: Beyond that, I don't
5  want you to testify about anything else that you
6  learned through an attorney either at Temple or
7  outside of Temple regarding Miss Honeywell.
8  BY MR. MUNSHI:
9    Q.  What is the name of the attorney?
10    A.  It was Temple's attorney.  Temple
11  University's counsel office.
12    Q.  In-house counsel?
13    A.  In house, yes, in-house counsel.
14    Q.  Did you ever meet with in-house counsel?
15    MS. SATINSKY: You can answer that
16  as to whether or not you met.
17    THE WITNESS: Yes.
18  BY MR. MUNSHI:
19    Q.  Do you know if Ruth Briggs ever met with
20  an attorney from Temple about Miss Honeywell?
21    A.  I do not know.
22    Q.  Did you ever have a discussion with Ruth
23  Briggs about Tanya Honeywell's claim?
24    A.  No.

Page 29

1   Q. Did Ruth Briggs ever inform you that she
2  spoke with HR about Tanya Honeywell?
3   A. No.
4   Q. Did you ever speak with HR about Tanya
5  Honeywell?
6   A. I don't recall.
7   Q. Did you ever learn from Ruth Briggs that
8  she informed HR that she believed that you were
9  harassing Miss Honeywell regarding FMLA leave?
10   MS. SATINSKY: Objection.  Asked and
11  answered.
12   THE WITNESS: No.
13  BY MR. MUNSHI:
14   Q. Did you ever instruct or direct Ruth
15  Briggs to give Miss Honeywell a lower
16  performance rating on a performance evaluation?
17   A. No.
18   Q. Did you ever have any discussion with
19  Ruth Briggs about Tanya Honeywell's performance
20  evaluations?
21   A. No.
22   Q. Was Miss Briggs in a position to give
23  performance evaluations of Tanya Honeywell?
24   A. If she was her direct supervisor, yes.

Page 30

1   Q. Any other employee that you are aware of
2  who raised a claim regarding anything to do with
3  your conduct?
4   MS. SATINSKY: Objection.  Asked and
5  answered.  You can answer it one more time.
6   THE WITNESS: No.
7   MR. MUNSHI: He said no before, and
8  now we are talking about Tanya Honeywell.
9  BY MR. MUNSHI:
10   Q. So anybody else?
11   A. No.
12   MS. SATINSKY: Just to be clear, he
13  did not testify Tanya Honeywell ever raised a
14  complaint against him.
15  BY MR. MUNSHI:
16   Q. Did you ever work with a woman named
17  Judy Lennon?
18   A. Yes.
19   Q. Who was she?
20   A. She was an administrative assistant or a
21  secretary in the CIS department.
22   Q. Is she still employed at Temple?
23   A. No.  She's retired.
24   Q. Do you know when she retired?

Page 31

1   A. Last year, approximately.
2   Q. Did you ever have an indirect or direct
3  reporting relationship with her?
4   A. No.  No direct.
5   Q. Same indirect in your capacity you
6  explained earlier?
7   A. Yes.
8   Q. Did you at any point recommend her
9  termination?
10   A. No.
11   Q. Did you ever have a discussion with
12  anybody regarding terminating her employment?
13   A. No.
14   Q. Did you ever have a discussion with Ruth
15  Briggs about Judy Lennon generally?
16   A. Yes.
17   Q. What do you recall?
18   A. Ruth would continually do some of Judy's
19  work and not get Ruth's work done.  And my
20  advice would be you need to do your work first.
21  Judy is capable and competent.
22   I occasionally work with staff to
23  help them improve their skills and do things.
24  Judy would always type out a manual, a form that

Page 32

1  was on the computer that you can type on the
2  computer.  She would print it out and type it.
3   I took two typewriters from her to
4  force her to learn how to use the computer to
5  print the form.  She was fine.  She was able to
6  do it.
7   So it was that type of guidance and
8  coaching that I was working with to help her
9  improve her skill sets to satisfy the faculty
10  needs.
11   Q. Approximately how old was Judy Lennon
12  when she retired?
13   A. I have no idea.
14   Q. Was she of retirement age or was it an
15  early retirement?
16   A. I'm going to assume that she's
17  retirement age.
18   MS. SATINSKY: I don't want you to
19  assume or guess anything.  If you know, you
20  should testify what you know.
21   THE WITNESS: I don't know.
22  BY MR. MUNSHI:
23   Q. Did you ever inform Ruth Briggs or
24  direct her to dig up any information about Judy

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

GREGORY G. WACKER
June 29, 2017

Page 33

1  Lennon?
2       MS. SATINSKY: Objection to form.
3       THE WITNESS: No.
4  BY MR. MUNSHI:
5    Q.  Do you know somebody named Antoinette
6  Newton?
7    A.  Yes.
8    Q.  Who is she?
9    A.  She was in CIS as well.
10   Q.  In what capacity?
11   A.  I don't know.  Administrative assistant,
12  administrative coordinator.  Don't know the
13  exact title.
14   Q.  Any indirect or direct reporting
15  relationship with her?
16   A.  No.
17   Q.  Even an indirect one like with the other
18  folks?
19   A.  Well, everybody in the college is an
20  indirect.  They come to me for advice and
21  guidance.
22   Q.  Did Miss Newton ever come to you for
23  advice or guidance?
24   A.  Not that I'm aware of.

Page 34

1    Q.  Did Judy Lennon ever come to you for
2  advice or guidance?
3    A.  Not that I'm aware of.
4    Q.  Is Miss Newton still working at Temple?
5    A.  No.  I believe she retired as well.
6    Q.  Did you ever have a conversation with
7  Miss Briggs about Miss Newton?
8    A.  No.
9    Q.  Regarding Ruth Briggs, what role, if
10  any, did you play in the decision to terminate
11  her employment?
12       MS. SATINSKY: Objection to form.
13       THE WITNESS: I facilitated the
14  analysis of Dr. Wu's request that she be
15  terminated.
16  BY MR. MUNSHI:
17   Q.  Who made the decision to terminate?
18       MS. SATINSKY: Objection to form.
19       THE WITNESS: Dr. Wu initiates the
20  request.  Drew, who works under me, investigated
21  the details.  Gets the details to me.
22       We then hand those details over to
23  labor relations, which would be Deirdre Walton's
24  group.  And then it is assessed where the issue

Page 35

1  that was brought up falls under the work rules.
2  BY MR. MUNSHI:
3    Q.  And then during that multi-step process,
4  when is the decision made with regard to Ruth
5  Briggs?
6    A.  Once it's reviewed by HR, labor
7  relations, and confirmed that the appropriate
8  work rule has been identified, and then the
9  appropriate discipline is issued.
10   Q.  Did Dr. Wu initiate the request to
11  terminate Miss Briggs to you or Mr. DiMeo or
12  somebody else?
13       MS. SATINSKY: Objection to form.
14       You can answer the question.
15       THE WITNESS: To Drew.
16  BY MR. MUNSHI:
17   Q.  When did that take place?
18   A.  I do not recall.
19   Q.  In what format was that request to
20  terminate Miss Briggs made?
21       MS. SATINSKY: Objection to form.
22  BY MR. MUNSHI:
23   Q.  And by "format," I mean orally, e-mail,
24  memo to the file, phone call?

Page 36

1    A.  To me, it was verbal.
2    Q.  We will get to you in a second, because
3  first you said that Dr. Wu initiated the request
4  to Drew?
5    A.  To Drew, yes.
6    Q.  So just focus on that one for right now.
7    A.  I don't know.
8    Q.  Then did you have a conversation with
9  Drew DiMeo?
10   A.  Drew came to me and had the
11  conversation.
12   Q.  When did that take place?
13   A.  Right after Dr. Wu made the request to
14  Drew.
15   Q.  How do you know that it was right after?
16   A.  That's what I recall.
17   Q.  Did Drew say, "I just spoke with
18  Dr. Wu"?
19   A.  I don't recall the exact language.
20   Q.  What did Drew say to you?
21   A.  The typical conversation we would have
22  is, "There's an issue here, here's the
23  information that we have.  The individual would
24  like to proceed this way.  Can we proceed?"

Page 37

1   Q. Let me just be more specific.  I don't
2  want to talk about typically or in general how
3  things normally work.  Just focusing in on
4  Miss Briggs.  Okay?
5   A. Yes.
6   Q. What did Drew DiMeo say to you regarding
7  Ruth Briggs and Dr. Wu's request to terminate?
8   A. That Dr. Wu would like to terminate Ruth
9  because of this issue.  At which point then I
10  would say gather the appropriate information and
11  documentation.  Then we'll kick it to HR,
12  meaning Deirdre Walton, labor relations, and see
13  where it goes.
14   Q. You said the phrase "this issue."  Did
15  he say the phrase "this issue," or is that what
16  you are saying?
17   A. That's what I'm saying.
18   Q. So what was "this issue," quote/unquote,
19  this issue?
20   A. I would have to look at the information
21  again to be 100 percent confident on that.
22   Q. And sitting here right now, we are just
23  talking about your memory of your recollection
24  of your conversation with Drew DiMeo.

Page 38

1   Do you recall specifically what Drew
2  DiMeo specifically told you was an issue that
3  Dr. Wu wanted to fire Miss Briggs over?
4   MS. SATINSKY: Objection to form.
5   THE WITNESS: I believe the issue
6  may have been about a reimbursement for Dr. Wu.
7  Something Ruth had to put into one of the
8  systems, university systems that she was unable
9  to do for multiple days.
10  BY MR. MUNSHI:
11   Q. Did Drew DiMeo tell you what she did
12  wrong, if anything?
13   A. Once again, from what I recall, it was
14  she put in, Dr. Wu had a reimbursement -- if
15  this is the correct incident that I'm thinking
16  of -- she was supposed to put in a reimbursement
17  for Dr. Wu a week ago and she wasn't able to get
18  it in because she was having -- she said -- she
19  indicated she was having problems.  It was
20  investigated and the problem she said she had
21  was not substantiated and she became
22  argumentative and combative and disruptive.
23   Q. Did Drew DiMeo explain to you why Dr. Wu
24  wanted to actually fire her over this issue --

Page 39

1   MS. SATINSKY: Objection to forth.
2  BY MR. MUNSHI:
3   Q. -- as opposed any other sort of
4  discipline, or no discipline at all?
5   A. I think it's the aggregate of all of her
6  mistakes that she would make, and this may be
7  the straw that broke the camel's back.
8   Q. Did you instruct Drew DiMeo to gather
9  the appropriate documentation?
10   A. Yes.
11   MS. SATINSKY: Objection.  Asked and
12  answered.
13   THE WITNESS: Yes.
14  BY MR. MUNSHI:
15   Q. What documentation, if any, did he
16  gather?
17   A. I don't know.
18   Q. Did you ever review the documentation
19  that he gathered?
20   A. Yes, I would have as part of working
21  with HR.
22   Q. Again, I want to caution you on
23  the "would have," because, again, we are not
24  talking about typically or in general with other

Page 40

1  people.  Just here.  So just with regard to Ruth
2  Briggs.
3   First of all, do you know if he did
4  actually in fact gather information?
5   A. Yes.
6   Q. How do you know that?
7   A. Yes, because he reached out to
8  accounting, the controller's office, to confirm
9  that the information was available for Ruth to
10  use at the time of the incident.
11   Q. Did you actually review any
12  correspondence or memos or e-mails or anything
13  regarding Ruth Briggs and the decision to
14  terminate her?
15   MS. SATINSKY: Objection to form.
16   THE WITNESS: Yes.
17  BY MR. MUNSHI:
18   Q. And what did you review?
19   A. The controller's office confirmed that
20  the FOAPAL she needed was available, where she
21  continually insinuated that it was not, and
22  became argumentative and disruptive.  And that
23  was a four-day period, three- or four-day
24  period.

Page 41

1  Q. What did you review, was there a
2  confirmation e-mail or confirmation memo?
3  A. Yes.
4  A. I believe there was an e-mail from
5  someone in the controller's office indicating
6  thereafter FOAPAL was available for her to
7  access.
8  Q. Any other documentation that you recall
9  reviewing in connection with Ruth Briggs'
10  termination?
11  A. A draft of the termination letter.
12  Q. Anything else?
13  A. Not that I recall.
14  Q. Are you aware of any information or
15  documentation that Drew DiMeo gathered that you
16  did not review?
17  A. No.
18  Q. Did you ever have a discussion with
19  Dr. Wu about terminating Miss Briggs's
20  employment?
21  A. Yes.
22  Q. How many?
23  A. Can you repeat the question?
24  Q. Sure. So I asked you first if you ever
25  had a conversation with Dr. Wu about terminating

Page 42

1  Miss Briggs' employment. You said yes. I said
2  how many conversations?
3  A. Maybe one or two in the context of
4  discipline in Dr. Wu would save up a series of
5  mistakes and errors and problems and come in
6  after the fact and say, "Here's six items that
7  she screwed up over the last four months. Can
8  we do any discipline?"
9       And my answer was always no, because
10  we're not doing stuff after the fact. We're not
11  taking any type of discipline for saved up
12  mistakes. If there's a mistake and there's a
13  work rule violation, we need to address it in a
14  timely manner at the time of the infraction.
15  You can't save up a bunch of mistakes and then
16  expect to get rid of her. Once again, you have
17  to follow university work rules.
18  Q. Now, you used the phrase in the context
19  of discipline.
20       Did you ever have a discussion with
21  him in the context of termination specifically?
22  A. No. It would be discipline, if he has
23  an issue, we follow the work rule discipline.
24  Q. Now, is it your understanding that he,

Page 43

1  Dr. Wu, initiated the request to terminate
2  Miss Briggs to Drew DiMeo?
3  A. Yes.
4  Q. Did he ever initiate the same request to
5  you?
6  A. No.
7  Q. Now, this one or two, or however many
8  conversations you had with Dr. Wu within the
9  context of discipline, when was the last time
10  that you had that type of conversation with him
11  vis-à-vis the termination date?
12       MS. SATINSKY: Objection to form.
13       THE WITNESS: I don't recall.
14  BY MR. MUNSHI:
15  Q. You used the phrase that you
16  "facilitated the analysis" of Dr. Wu's request.
17       What do you mean by facilitate the
18  analysis?
19  A. I will get together with Drew. Have
20  some discussions, you know, about what he would
21  need to do and how he would need to proceed.
22  That information would then get conveyed to
23  labor relations, Deirdre Walton's group.
24       So it would be coordinating Dr. Wu,

Page 44

1  Drew, labor relations, making sure that
2  everybody is following the same work rules and
3  guidance.
4  Q. Did you in fact do any sort of analysis?
5  A. I mean once I get the information, I
6  will look at work rules and concur with an
7  opinion.
8  Q. And again, I don't want to talk about in
9  general or typically. I am talking about
10  specifically here because you said "I would" or
11  "I will."
12       Just specifically here, did you do
13  an analysis as to whether or not Miss Briggs
14  should be terminated?
15  A. Yes.
16  Q. Is there any other information that you
17  had at your disposal beyond what you already
18  told me that you reviewed as part of your
19  analysis?
20       MS. SATINSKY: Objection to form.
21       THE WITNESS: Not that I recall.
22  BY MR. MUNSHI:
23  Q. Any other conversations you had with
24  Drew DiMeo regarding the termination of Ruth

Page 45

1　Briggs beyond what you already told me?
2　　A.　No.
3　　Q.　Any other conversations with Dr. Wu
4　beyond what you already told me regarding
5　terminating Miss Briggs?
6　　A.　No.
7　　Q.　Did you ever reach a conclusion as to
8　whether or not Miss Briggs should be terminated?
9　　A.　Yes.
10　　Q.　Did you express that to anybody?
11　　A.　Labor relations.
12　　Q.　Who in labor relations?
13　　A.　It would be Deirdre Walton.
14　　Q.　Anybody else in labor relations besides
15　Deirdre Walton that you had a conversation --
16　　A.　Not that I recall.
17　　Q.　Anyone else in human relations you ever
18　spoke with besides Deirdre Walton about
19　terminating Miss Briggs's employment?
20　　A.　Not that I recall.
21　　Q.　Did you provide labor relations with any
22　sort of documentation regarding the termination
23　of Ruth Briggs?
24　　A.　Yes.

Page 46

1　　Q.　What did you provide?
2　　A.　Some of the information that Drew would
3　have provided.
4　　Q.　That Drew provided to you?
5　　A.　Yes.
6　　Q.　You told me about the correspondence
7　regarding the accounting department and FOAPAL.
8　　　Any other documentation that you are
9　talking about?
10　　A.　It would be the termination letter.
11　They would have sent me a draft.  We would have
12　made some changes and went back and forth with
13　it.
14　　Q.　Any other documentation that you
15　provided to labor relations?
16　　A.　Not that I recall.
17　　Q.　Do you recall forwarding an e-mail about
18　FOAPAL to labor relations or drafting one
19　yourself?
20　　A.　There was an e-mail to that effect.  I
21　can't remember whether I crafted that or Drew
22　DiMeo crafted that.
23　　Q.　But you are sure you provided it to
24　labor relations?

Page 47

1　　A.　I thought it was provided.
2　　Q.　My question is just about what you did.
3　I will ask the other people what they did.  Just
4　about what you did.
5　　A.　I don't recall.
6　　Q.　Did anybody at any point express to you
7　their request to terminate Ruth Briggs?
8　　A.　I mean Drew saying Dr. Wu wanted to
9　proceed with discipline and termination.  That
10　was what started it.
11　　Q.　I understand Drew is expressing to you
12　what Dr. Wu said to him; correct?
13　　A.　Yes.
14　　Q.　Did Drew offer you any sort of an
15　opinion or was he just relaying to you what
16　Dr. Wu said to him?
17　　A.　I don't know.
18　　Q.　Did you have any discussions with
19　Deirdre Walton or anybody else in labor
20　relations about terminating Ruth Briggs?
21　　　MS. SATINSKY:  Objection.  Asked and
22　answered.
23　　　You can answer.
24　　　THE WITNESS:  It would be Deirdre.

Page 48

1　BY MR. MUNSHI:
2　　Q.　How many conversations do you recall
3　having with her regarding terminating Ruth
4　Briggs?
5　　A.　It would be based on the work rules and
6　the incident at the time, the incident that
7　occurred.
8　　Q.　Sorry.  My question was how many
9　conversations?
10　　A.　I don't recall.
11　　Q.　Do you recall if it was more than one?
12　　A.　There might have been one or two.
13　　Q.　Was this in person or over the phone?
14　　A.　Most of them would have been over the
15　phone.
16　　Q.　Again, I am going to tell you not in
17　general and not typically.  Just specifically.
18　If you don't recall, you can tell me you don't
19　recall.
20　　A.　Yeah, I don't recall.
21　　Q.　Did you express to Deirdre Walton that
22　it was Dr. Wu's request to terminate Ruth
23　Briggs?
24　　A.　I would say yes.

Page 49

1   Q. Do you know if Dr. Wu spoke with
2  Miss Walton about Ruth Briggs and terminating
3  her?
4   A. I do not know.
5   Q. Do you know if Dr. Wu at any point spoke
6  with Miss Walton about Ruth Briggs?
7   A. I do not know.
8   Q. Are you aware, prior to the termination
9  decision in 2014, if Dr. Wu ever spoke with
10  Deirdre Walton about Ruth Briggs's performance?
11       MS. SATINSKY: Objection to form and
12  objection asked and answered.
13       You can answer the question.
14       THE WITNESS: I do not know.
15  BY MR. MUNSHI:
16   Q. Anything else you recall saying to
17  Miss Walton regarding Miss Briggs's termination?
18       MS. SATINSKY: Objection to form.
19       THE WITNESS: No.
20  BY MR. MUNSHI:
21   Q. Are you aware if Drew DiMeo ever spoke
22  with Deirdre Walton about Ruth Briggs'
23  termination?
24   A. No.

Page 50

1   Q. Are you aware if Drew DiMeo ever spoke
2  with Deirdre Walton about Ruth Briggs in
3  general?
4   A. No.
5   Q. Are you aware if Drew DiMeo ever sent
6  Deirdre Walton any documentation or e-mails or
7  correspondence regarding Ruth Briggs?
8   A. I don't recall.
9   Q. Is there anyone else who played any role
10  in the decision to terminate Ruth Briggs beyond
11  the folks you have told me about?
12       MS. SATINSKY: Objection to form.
13       THE WITNESS: Not that I'm aware of.
14  BY MR. MUNSHI:
15   Q. Did you ever have a discussion with
16  Sandy Foehl about Ruth Briggs?
17   A. I don't recall.
18   Q. And my question was broad.  Not just
19  about termination.  About anything.
20       Any recollection of any conversation
21  with Sandy Foehl about Ruth Briggs in general?
22       MS. SATINSKY: Objection.  Asked and
23  answered.
24       THE WITNESS: I've had numerous

Page 51

1  conversations with Sandy Foehl about numerous
2  situations.  I can't recall one specific about
3  Ruth.
4  BY MR. MUNSHI:
5   Q. Just so I am clear, when you say you
6  have had numerous conversations with Sandy
7  Foehl, you are talking about in general about a
8  lot of things or just --
9   A. In general about a lot of things.  Once
10  again, you get all of the labor relations, HR,
11  and any type of complaints that come through the
12  college end up on my desk.
13       I don't recall anything specific
14  about Ruth.
15   Q. Are you aware of any documentation
16  beyond the termination letter which specifies as
17  to why Miss Briggs was terminated?
18       MS. SATINSKY: Objection to form.
19       THE WITNESS: She resigned.
20  BY MR. MUNSHI:
21   Q. What is your understanding of her
22  resignation?
23   A. She resigned.
24   Q. Dr. Wu recommended her termination;

Page 52

1  correct?
2       MS. SATINSKY: Objection.  Asked and
3  answered three times.
4       It is the last time you are going to
5  answer that question, Greg.
6       THE WITNESS: He recommended that we
7  proceed with university work rules.
8  BY MR. MUNSHI:
9   Q. In what format did Ruth Briggs resign?
10  Was it in person to you, was it over the phone,
11  was it by e-mail?
12   A. I believe it was an e-mail to Deirdre
13  Walton or labor relations.
14   Q. Is it your testimony that Ruth Briggs
15  was not fired by Temple?
16   A. Yes, as far as I know.
17       MS. SATINSKY: Before we go into
18  documents, can we take a break?
19       MR. MUNSHI: Yes.
20       (Recess.)
21  BY MR. MUNSHI:
22   Q. Mr. Wacker, was there anybody else over
23  at Temple who you discussed the termination of
24  Ruth Briggs' employment besides the people you

Page 53

1 have already told me about?
2         MS. SATINSKY: Objection.  Asked and
3 answered.
4         THE WITNESS: No.
5 BY MR. MUNSHI:
6   Q.  Did you ever consider putting Ruth
7 Briggs on a performance improvement plan?
8   A.  I believe that is what was being done by
9 interjecting Drew into meeting with her and
10 Dr. Wu.
11   Q.  Is there a formal performance
12 improvement plan system at Temple?
13         MS. SATINSKY: Objection to form.
14         THE WITNESS: Not that I'm aware of.
15 BY MR. MUNSHI:
16   Q.  Is there any sort of documentation that
17 you are aware of that states any goals or
18 objectives that Ruth Briggs had to meet by
19 certain periods of time?
20   A.  There is an annual performance
21 development plan that the supervisor and the
22 employee are supposed to be meeting and going
23 over and discussing those issues.
24         Hence Drew was put into the equation

Page 54

1 to make sure that Ruth and Dr. Wu would meet
2 weekly and discuss what's coming up the next
3 week, what needed to be done in terms of the
4 work for that upcoming week.
5   Q.  And whose decision was it to place Drew
6 DiMeo in that position?
7   A.  Mine, in conjunction with talking to one
8 of the other senior associate deans.
9   Q.  Who is that person?
10   A.  At the time that would have been Ralph
11 Jenkins.  He's deceased.
12   Q.  Approximately when did Drew DiMeo begin
13 that role?
14   A.  I believe when he was hired.  I'm going
15 to say five, six years ago.
16   Q.  This role that Drew DiMeo had where he
17 would be meeting with Dr. Wu and Ruth Briggs,
18 did that take place over months or years?  How
19 long would that go on?
20   A.  I don't know how long the overlap was,
21 but as long as Drew and Ruth were both in their
22 positions, they were -- Drew was interjected to
23 help facilitate between Dr. Wu and Ruth.
24   Q.  Let's take a look at this document that

Page 55

1 was previously marked as P-19.  I will give you
2 a moment to review that.
3   A.  (Pause.)
4         Okay.
5   Q.  This is a letter dated April 1st, 2014,
6 signed by you; correct?
7   A.  Yes.
8   Q.  And the last sentence of the letter
9 states, "Effective the end of the day today,
10 your employment at Temple University is being
11 terminated."
12         Do you see that?
13   A.  Yes.
14   Q.  And did you draft this letter?
15   A.  I drafted it in consultation with labor
16 relations, Deirdre Walton.
17   Q.  Did you write the first draft of this
18 letter?
19   A.  I don't recall.
20   Q.  Did you ever share a draft or the final
21 form of this letter with Dr. Wu?
22   A.  I don't recall.
23   Q.  The first sentence of the letter
24 says, "Over the last week, we have investigated

Page 56

1 two work-related items that were brought to the
2 dean's office attention."
3         When it says "we," who is that
4 referring to?
5   A.  It would be Drew, Drew DiMeo.
6   Q.  Then in the first bullet point there is
7 a paragraph regarding March 20th, 2014.
8         Do you see that?
9   A.  Yes.
10   Q.  It says, "On March 20th, 2014, at 3:56
11 p.m., you were instructed to complete a Concur
12 travel expense reimbursement for Dr. Wu by the
13 end of the workday."
14         Who gave you that information?
15   A.  It would have come from Dr. Wu and Drew.
16   Q.  Do you recall having a conversation with
17 Dr. Wu about this reimbursement issue?
18   A.  I do not recall.
19   Q.  So who did you get this information from
20 that you do recall?
21   A.  It would have been through Drew.
22   Q.  We already talked about FOAPAL,
23 F-O-A-P-A-L?
24   A.  Yes.

Page 57

1    Q. What is that, generally?
2    A. It is a six-digit accounting number that
3  ties into where his expense would be charged to.
4    Q. It says here, "At 5:30 p.m. you --
5  meaning Ruth Briggs -- "contacted Drew and
6  indicated that the FOAPAL was still not
7  available in Concur."
8        What is Concur?
9    A. That's the university electronic
10  reimbursement system for travel.
11    Q. How did you learn that information, that
12  Ruth Briggs had contacted Drew?
13    A. From Drew.
14    Q. Then it says, "Drew confirmed the FOAPAL
15  was available."
16        Did you learn that from Drew as
17  well?
18    A. Yes.
19    Q. It says, "You failed to complete the
20  task as requested.  On Friday, you met with
21  Dr. Wu and Drew as scheduled."
22        Were you present for that meeting?
23    A. I was not.
24    Q. Did Drew tell you on that night of

Page 58

1  March 20th that in fact the information was
2  available?
3        MS. SATINSKY: Objection to form.
4        THE WITNESS: Yes.
5  BY MR. MUNSHI:
6    Q. Did you ever talk to Ruth Briggs about
7  this situation, the FOAPAL?
8    A. Yes.
9    Q. Did you have that conversation with Ruth
10  Briggs prior to April 1, 2014?
11    A. I believe at the time of the incident,
12  the discussion, she became -- once again, we
13  were in the general office with Drew and we were
14  in the office -- I was in the office with Drew,
15  office area with Drew.  Ruth came in and this
16  issue was brought up and she was argumentative
17  and combative in the office at that time.  That
18  the FOAPAL wasn't there.  That, you know, she
19  doesn't have access to it, that we're lying and
20  it's not -- she was argumentative and persistent
21  that the FOAPAL was not available for her to
22  see.
23    Q. Is there anything in this letter dated
24  April 1st, 2014, about her being argumentative

Page 59

1  and combative with you?
2    A. No.
3    Q. Why not?
4    A. At this point, she didn't report to me.
5  It is an issue that had to be taken up with
6  Dr. Wu and work rules.
7    Q. When she said to you that she didn't
8  have access to this information, did you think
9  that she was lying?
10    A. Drew confirmed that it was there.
11    Q. I understand that.
12    A. Drew confirmed that it was there.
13    Q. I understand that.  But she was also
14  saying to you that she didn't have access to it;
15  right?
16    A. She indicated that, yes.
17    Q. So there was a discrepancy between the
18  two, you understood that; right?
19    A. Yes.
20    Q. So did you think that Ruth Briggs was
21  lying?
22    A. No.  There --
23    Q. Is it possible -- sorry.
24        MS. SATINSKY: You can go ahead and

Page 60

1  finish your answer.
2        THE WITNESS: Did she believe that
3  it was not there?  Yes.  Was she correct in that
4  assumption?  No.  Did she not know how to access
5  it?  That was more likely the solution.
6  BY MR. MUNSHI:
7    Q. Is it possible that there was some sort
8  of a tech issue that resulted in her not being
9  able to access it even though Drew confirmed it
10  was available?
11    A. No.
12    Q. Is it possible that she was locked out
13  for one reason or another?
14        MS. SATINSKY: Objection to form.
15        THE WITNESS: Not that I'm aware of.
16  BY MR. MUNSHI:
17    Q. Are you aware if she had ever used the
18  FOAPAL system before?
19    A. Yes.  She uses the FOAPAL system for all
20  of the travel reimbursements that she puts in.
21    Q. And are you aware if she had ever used
22  the Concur system before?
23    A. Yes, she has used the Concur system
24  before.

Page 61

1    Q. And prior to March 20th, 2014, do you
2 recall any instance where Ruth Briggs had said
3 to you, "I can't access the information in these
4 systems"?
5        MS. SATINSKY: Objection to form.
6        THE WITNESS: Not that I recall.
7 BY MR. MUNSHI:
8    Q. Had Temple been using FOAPAL and Concur
9 for years prior to this time?
10    A. I'm not sure of the length. You have to
11 check with the IT group.
12    Q. It says here that during this meeting
13 between Ruth, Dr. Wu, and Drew that she became
14 argumentative and unprofessional."
15        How did you learn that information?
16    A. From Drew.
17    Q. What did he tell you?
18    A. That she was being unprofessional,
19 screaming, yelling, that Dr. Wu and her were
20 liars.
21    Q. Where did the conversation take place?
22    A. I believe in Dr. Wu's office or the main
23 CIS office.
24    Q. Did anybody complain to you that they

Page 62

1 had heard Ruth yelling?
2    A. No.
3    Q. Did you ever hear about that incident
4 beyond from what Drew told you?
5    A. No.
6    Q. Did you ever talk to Dr. Wu about that
7 incident?
8    A. No.
9    Q. The second bullet point here, in this
10 April 1st, 2014, letter that you signed, it is
11 regarding a room reservation for the wrong date.
12        Do you see that?
13    A. Yes.
14    Q. Who gave you that information?
15    A. That would be Drew.
16    Q. Anybody else?
17    A. It would be Drew in consultation with
18 Dr. Wu.
19    Q. Did you ever have a conversation with
20 Dr. Wu about this issue?
21    A. Not that I recall.
22    Q. So did you have a conversation with
23 anybody besides Drew?
24        MS. SATINSKY: Objection to form.

Page 63

1        THE WITNESS: Possibly Deirdre in
2 HR.
3 BY MR. MUNSHI:
4    Q. Do you have a specific recollection of
5 that?
6    A. Yes, I would have.
7    Q. What do you recall talking to Deirdre
8 Walton about?
9    A. About these two incidents and the
10 discipline that should go with it.
11    Q. Did you provide her with any additional
12 information besides the few sentences in the
13 second bullet point?
14        MS. SATINSKY: Objection to form.
15 Asked and answered.
16 BY MR. MUNSHI:
17    Q. Regarding this hotel issue?
18    A. It would have been provided with
19 whatever Drew was able to provide and Dr. Wu.
20    Q. Did you provide Deirdre Walton or
21 anybody in labor relations with any
22 correspondence or documentation regarding the
23 issues set forth in the second bullet point?
24        MS. SATINSKY: Objection. Asked and

Page 64

1 answered. You can answer it one more time,
2 Greg.
3        THE WITNESS: Whatever would have
4 been provided by Drew and Dr. Wu.
5 BY MR. MUNSHI:
6    Q. But sitting here right now, can you tell
7 me what that is?
8    A. I don't recall.
9    Q. Did you at any point ever see any
10 documentation regarding the booking of the wrong
11 dates allegedly by Ruth Briggs as set forth in
12 the second bullet point?
13    A. I don't recall.
14    Q. Did you ever ask Ruth Briggs about what
15 took place there?
16    A. No.
17    Q. Did you ever talk to Dr. Wu about it?
18    A. No.
19    Q. Just learned this from Drew DiMeo?
20    A. Once again, the normal process is that
21 the individual involved with supervising and
22 helping monitor this handles all of the details.
23 I get summary information, determine whether
24 there is sufficient documentation to proceed or

Page 65

1   not, and then that gets passed to HR/labor
2   relations.
3      Q.  I know.  We are talking about normal
4   procedure again.
5         MS. SATINSKY: I understand.  Rahul,
6   he is entitled to testify as to what his
7   practice is, and that is what he is doing.
8   BY MR. MUNSHI:
9      Q.  So I will ask the question again.  Did
10  you talk to anybody else besides Drew DiMeo
11  about the second bullet point?
12     A.  Possibly Deirdre Walton.
13     Q.  Is it possible that Dr. Wu gave Ruth
14  Briggs the wrong dates to book?
15        MS. SATINSKY: Objection.
16        THE WITNESS: I don't know.
17  BY MR. MUNSHI:
18     Q.  Then the letter continues to state that
19  Miss Briggs is in violation of the following
20  work rules.
21        Who made the decision that her
22  conduct warranted a violation of C.4
23  Negligence/Carelessness?
24     A.  In consultation with labor relations,

Page 66

1   that's what was decided.
2      Q.  When you say "in consultation," you mean
3   you in consultation?  Who in consultation with
4   labor relations?
5      A.  Drew, myself, and Deirdre Walton.
6      Q.  Did you ever participate in a
7   conversation, phone or otherwise, with both
8   Deirdre and Drew together?
9      A.  Yes.
10     Q.  Regarding Ruth Briggs?
11     A.  Yes.
12     Q.  How many of those did you have?
13     A.  I don't recall.
14     Q.  Are these the same conversations you
15  mentioned earlier with Deirdre Walton, or are
16  these separate conversations?
17     A.  I don't recall.
18     Q.  Do you recall any conversations, only
19  you and Deirdre, without Drew, regarding Ruth
20  Briggs and the termination?
21     A.  Yes.
22     Q.  Now, separate from that, do you recall
23  any conversations with both Deirdre and Drew and
24  yourself regarding Ruth Briggs and the

Page 67

1   termination?
2      A.  Yes.
3      Q.  Of the three of you, how many of those
4   conversations were there?
5      A.  I don't recall.
6      Q.  What was discussed?
7      A.  The specific incidents that were put up
8   and the work rules that they would have violated
9   and the appropriate disciplinary action to go
10  with this.
11     Q.  Is that any different from what you
12  discussed with Deirdre Walton, just the two of
13  you?
14     A.  No.
15     Q.  Same conversations, just one time with
16  Drew and one time without Drew; is that right?
17     A.  Yes.
18     Q.  "C.3, Disruptive Or Disorderly Conduct."
19        Whose decision was it to determine
20  that she violated that rule?
21     A.  In consultation with Deirdre Walton and
22  HR, it was decided that that was a violation as
23  well.
24     Q.  What conduct did she do that was

Page 68

1   disorderly?
2      A.  The disruptive, argumentative and
3   unprofessional behavior in front of Drew and
4   Dr. Wu.
5      Q.  Do you know if anyone could hear them
6   outside of the office?
7      A.  I was not there.  I do not know.
8      Q.  So what was disruptive?
9      A.  She was argumentative and
10  unprofessional.
11     Q.  From what you heard; right?
12     A.  From what I heard, yes.
13     Q.  At any point prior to Miss Briggs'
14  termination or resignation, I guess, did you
15  learn that she had complained about Dr. Wu?
16     A.  No.
17     Q.  Did you ever have a discussion with
18  Deirdre Walton about Miss Briggs raising
19  concerns with her?
20     A.  No.
21     Q.  At any point prior to Miss Briggs'
22  employment at Temple ending, did you learn that
23  she raised any complaints or concerns with Sandy
24  Foehl?

Page 69

1  A. No.
2  Q. How about anybody in the EEO office?
3  A. Not that I recall.
4  Q. Are you aware of her raising any
5  concerns or complaints about Dr. Wu's treatment
6  of her with anybody in the dean's office?
7      MS. SATINSKY: Prior to the end of
8  her employment at Temple?
9      MR. MUNSHI: Yes.
10     THE WITNESS: Not that I recall.
11  BY MR. MUNSHI:
12  Q. Did she ever complain to you directly
13  about how Dr. Wu was treating her in the
14  workplace?
15  A. She may have once, at which point I
16  would direct her to Sandy Foehl to get Sandy's
17  group involved.
18  Q. Is that one incident, the one you
19  already told me about, with the alleged comment
20  about China?
21  A. I don't recall.
22  Q. Putting aside the situation about the
23  alleged comment regarding China, any other
24  instance that you recall that she complained

Page 70

1  directly to you about Dr. Wu's treatment of her
2  in the workplace?
3  A. I don't recall any specific complaint
4  that she was looking for action from me.
5  Q. How about a general complaint?
6  A. Well, general, she was always
7  complaining, just in general. And as part of my
8  consultation and management with me, you can't
9  be argumentative with your boss. When you're
10  asked to do tasks, do them. And that's why Drew
11  was put in the equation, because Dr. Wu and Ruth
12  would be seeing and hearing things differently.
13  So Drew was in there to help make sure that this
14  is what we're doing by when and what, to clarify
15  any of those issues. And as far as I know,
16  there was no issues that were brought up outside
17  of that.
18  Q. What was the nature of the general
19  complaint she raised to you about Dr. Wu?
20  A. Every once in awhile they would get into
21  a he said/she said. If there was some work that
22  was not performed by the right time, you know,
23  Drew would help decipher. Ruth would come in
24  and say, "Dr. Wu yelled at me because he wanted

Page 71

1  something at ten o'clock today." Well, he sent
2  it from his non-Temple e-mail to Ruth and she
3  wouldn't have gotten it until after five o'clock
4  or whatever.
5      At which point, then, I would go
6  back and tell Dr. Wu, "Dr. Wu, you are wrong.
7  You can't send stuff from your non-Temple e-mail
8  after hours and expect her to have it done in
9  the morning."
10     And once again, Drew was put in to
11  help manage those things, and over time those
12  problems went away because Dr. Wu then started
13  using his Temple e-mail.
14  Q. Did she ever express to you that her
15  working relationship with Dr. Wu caused her
16  stress?
17  A. No.
18  Q. Did she ever express to you that she was
19  feeling harassed by Dr. Wu?
20  A. Not that I'm aware of.
21  Q. Did she ever complain to you that the
22  workplace environment was hostile?
23  A. Not that I'm aware of.
24  Q. Do you recall her complaining to you

Page 72

1  about Dr. Wu raising his voice in the office?
2  A. Not that I'm aware of.
3  Q. This is a document that was previously
4  marked as P-10. I will give you a moment to
5  review that.
6  A. (Pause.)
7      Okay.
8  Q. This is an e-mail dated October 29th,
9  2010, from Ruth Briggs to you.
10     Do you see that?
11  A. Yes.
12  Q. The subject line is, "I need advice."
13     Do you see that?
14  A. Yes.
15  Q. She writes here, "Greg, I cannot come in
16  here day in and day out not knowing if I am
17  going to be applauded or punched. It is
18  stressful to me and everyone around me. If I
19  wanted to change jobs at Temple, it would be
20  impossible because of him. Frankly, it borders
21  on harassment. Right now he is in his office
22  yelling in Chinese at one of his students. The"
23  -- I think it is "then" or "the" -- "he starts
24  complaining to Justin in Chinese about the

Page 73

1 dean's office. The environment is hostile.
2 Even faculty members have told me that they are
3 uncomfortable with the way he treats me. Ruth."
4        Do you see that?
5    A. Yes.
6    Q. When she says "he," did you understand
7 that to be Dr. Wu?
8    A. Yes.
9    Q. Did you understand when you got this
10 e-mail that she is talking to you about how
11 Dr. Wu treats her?
12        MS. SATINSKY: Objection to form.
13        THE WITNESS: I need advice, not
14 action. So she was advised. Once again, this
15 is part of my role. It is advice, and if
16 everybody that didn't get along with their boss
17 came in and was harassed, I'd have a full-time
18 job.
19 BY MR. MUNSHI:
20    Q. Which this is part of; right?
21    A. The advice given would be you need to do
22 as Dr. Wu wants, meet his deadlines. The fact
23 that he is talking in Chinese, we are an
24 international college. There's multi-languages

Page 74

1 being spoken, and there's no edict that the dean
2 is going to say everybody must speaking English.
3        So with that, the advice she was
4 given is to recognize that he is her boss, she
5 needs to report properly to him and get the
6 tasks done that need to get done and focus on
7 the workload, and not worry about Judy and not
8 worry about this and not worry about everything
9 but.
10    Q. Is there anything about Judy in this
11 e-mail?
12    A. No.
13        But faculty members are
14 uncomfortable. And once again, this leads into
15 bigger conversations that are advice, not
16 action. She didn't say, "he's harassing me."
17 And once again, my advice is, see the
18 appropriate group that would handle that. Sandy
19 Foehl's group, HR, would be all part of the
20 general advice that I would give her.
21    Q. Did you understand or did you not
22 understand upon getting this e-mail that
23 Miss Briggs had concerns or complaints about how
24 Dr. Wu was treating her in the workplace?

Page 75

1        MS. SATINSKY: Objection to form.
2        THE WITNESS: Once again, the
3 conversations would have evolved to, "you're not
4 getting the work done and he's upset with you
5 because the work is not done. If you get the
6 work done, he's not upset with you."
7 BY MR. MUNSHI:
8    Q. So is the answer to my question yes or
9 no?
10    A. Can you repeat the question?
11    Q. Sure. Did you or did you not understand
12 that Miss Briggs was raising a concern or
13 complaint to you about the way Dr. Wu treated
14 her in the workplace?
15        MS. SATINSKY: Objection to form.
16        THE WITNESS: It was a concern
17 seeking advice. Not a complaint requiring
18 action.
19 BY MR. MUNSHI:
20    Q. And what is the difference between a
21 concern and a complaint?
22    A. A complaint I have to act. A concern I
23 don't have to act. A concern I need advice.
24        If I come to you for advice, you

Page 76

1 know, I'm not asking you to act and do
2 something. I'm asking you for an opinion
3 advice, how should I handle this, what should I
4 do.
5    Q. And that difference between a concern
6 and a complaint that you just told me, is that
7 Temple's policy or your policy or what?
8        MS. SATINSKY: Objection to form.
9        THE WITNESS: It's not a policy.
10 It's advice.
11 BY MR. MUNSHI:
12    Q. Did you ever see anywhere written down a
13 Temple document that says there is a difference
14 between someone raising a concern and raising a
15 complaint?
16    A. Not that I'm aware of.
17    Q. When somebody raises a complaint, do
18 they have to use any special language or magic
19 language saying, "now I'm raising a complaint"?
20        MS. SATINSKY: Objection to form.
21        THE WITNESS: Can you repeat the
22 question?
23 BY MR. MUNSHI:
24    Q. Yes.

Page 77

1    When an employee goes to you and
2  gives you information, is there any special or
3  magic language they have to use to say,
4  "Mr. Wacker, I am now making a complaint?"
5    A. I will --
6       MS. SATINSKY: Objection to form.
7  Go ahead.
8       THE WITNESS: I will ask them, "Is
9  this a formal complaint that you want me to act
10 on, or no?"
11 BY MR. MUNSHI:
12   Q. Did you ask Miss Briggs that question
13 with regard to this e-mail?
14   A. I don't recall the exact details, but I
15 would encourage her to file a complaint if she
16 felt she was.
17   Q. Again, I am going to ask you about your
18 specific recollection. Not what you would do.
19      Did you talk to Ruth Briggs about
20 this e-mail?
21   A. Yes.
22   Q. What do you recall talking to her about?
23   A. Focus on your work and completing the
24 work for Dr. Wu and stop focusing on all the

Page 78

1  other things that you're focusing on, which
2  would include worrying about his students, Judy
3  Lennon and others. That you need to focus on
4  your workload. You work for Dr. Wu. You need
5  to accommodate his needs and make sure that his
6  work is completed and accurate. Okay?
7    Q. Did you ask her why she felt the
8  environment was hostile?
9    A. She was not completing work and
10 getting -- Dr. Wu would then have a conversation
11 with her about the work not being completed.
12 And I --
13   Q. Could -- go ahead.
14   A. I assume she interpreted that as him
15 yelling at her, which I was not there to hear or
16 see.
17   Q. Is it possible for both those things to
18 happen at the same time, that one, she is not
19 doing her work, and two, the environment is
20 hostile?
21      MS. SATINSKY: Objection to form.
22      THE WITNESS: Is it possible? Yes.
23 BY MR. MUNSHI:
24   Q. Did you ever talk to Dr. Wu about this

Page 79

1  e-mail?
2    A. I don't recall.
3    Q. Any reason why you wouldn't?
4       MS. SATINSKY: Objection to form.
5  It misstates testimony.
6       THE WITNESS: What would be done is
7  Drew would be pulled in as part of the
8  consultation and helping manage Dr. Wu and Ruth.
9  BY MR. MUNSHI:
10   Q. And as of October 29th, 2010, do you
11 recall if Drew DiMeo was in fact playing that
12 role?
13   A. I don't recall.
14   Q. You see he is not cc'd on this e-mail?
15   A. Yeah, yeah. I don't recall.
16   Q. Do you ever tell Dr. Wu that a
17 subordinate of his has now said to you that she
18 thinks the environment is hostile?
19   A. I don't recall.
20   Q. Do you recall talking to Dr. Wu that one
21 of his subordinates writes to you in an e-mail
22 that, quote, it borders on harassment?
23   A. I don't recall.
24   Q. In your normal course and practice,

Page 80

1  would that be something that you would do, tell
2  the manager about whom there are these concerns
3  being raised that they are happening?
4    A. Once again, I believe Drew was involved
5  in managing this situation and I was leaving him
6  manage it. And my advice is if there's a
7  complaint, file a formal complaint, because she
8  would be the only one that can file that.
9    Q. Just looking at this e-mail here, P-10,
10 did you consider this to be a serious issue?
11      MS. SATINSKY: Objection to form.
12      THE WITNESS: Concern that should
13 have continual monitoring, which there was
14 someone there monitoring in terms of Drew DiMeo,
15 I believe.
16 BY MR. MUNSHI:
17   Q. When you said "concern," who is
18 concerned? You are concerned? Who is
19 concerned?
20   A. Well, my concern, yes. If this activity
21 is going on, it is something to be concerned
22 with.
23      However, this was advice on how to
24 do and what to do.

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

GREGORY G. WACKER
June 29, 2017

Page 81

1  Q. Did you inform human resources that you
2 received an e-mail from Miss Briggs talking
3 about bordering on harassment and the
4 environment being hostile?
5  A. I don't recall.
6  Q. Would that be in your normal course and
7 practice to do?
8  A. I don't recall.
9  Q. Now, you have said that employees have
10 the ability to come to you and ask for
11 consultation or advice.
12  A. Yes.
13  Q. Do you raise all the times that someone
14 comes to you with HR?
15  A. Is it required?
16  Q. No. In your normal course and practice
17 as you have been discussing here, do you raise
18 everything with HR that somebody comes to you
19 with?
20  A. No.
21  Q. So you have the discretion to go to HR
22 or not?
23  A. Yes.
24  Q. So when do you go to HR and when do you

Page 82

1 not go to HR in your normal course and practice?
2     MS. SATINSKY: Objection to form.
3     THE WITNESS: Anything that would be
4 an EEOC type of violation. Anything that I know
5 that is a violation of a university work rule.
6     I mean they are the easiest.
7 BY MR. MUNSHI:
8  Q. Did you see an EEOC violation or
9 violation of work rule in what Ruth Briggs
10 e-mailed you about?
11  A. Once again, no. She was asking for
12 advice, not action.
13  Q. And in the normal course and practice in
14 your role, are there any other types of issues
15 that you would go to HR on?
16     MS. SATINSKY: Objection. Asked and
17 answered.
18     You can answer it one more time.
19 BY MR. MUNSHI:
20  Q. Unless you want to stick to your
21 previous answer. I am saying anything else.
22     MS. SATINSKY: His previous answer
23 was, Rahul, that he goes in certain
24 circumstances, among others.

Page 83

1 BY MR. MUNSHI:
2  Q. Anything else beyond what you said? I
3 am giving you the opportunity.
4  A. No.
5  Q. Let's take a look at this document,
6 which is P-11.
7  A. (Pause.)
8     Okay.
9  Q. Do you see here, Mr. Wacker, that P-11
10 on the bottom is the same e-mail I just showed
11 you before?
12  A. Yes.
13     MS. SATINSKY: At what? You said
14 "the same e-mail I just showed you before." To
15 what are you referring?
16     THE WITNESS: The other one, except
17 now it is forwarded.
18     MR. MUNSHI: P-10.
19 BY MR. MUNSHI:
20  Q. At the top of P-11, you are forwarding
21 Miss Briggs' e-mail to you to Deirdre Walton.
22     Do you see that?
23  A. Yes.
24  Q. I guess it is Deirdre Culbreath-Walton.

Page 84

1 But it is the same Deirdre Walton in labor
2 relations we have been talking about; is that
3 right?
4  A. Yes.
5  Q. You write here, "I will call you later
6 to discuss."
7     Do you see that?
8  A. Yes.
9  Q. Why did you forward this e-mail from
10 Ruth Briggs over to HR?
11  A. I don't recall.
12  Q. Is it because what Miss Briggs raised to
13 you had to deal with an EEOC issue?
14     MS. SATINSKY: Objection to form.
15 Asked and answered.
16     THE WITNESS: No.
17 BY MR. MUNSHI:
18  Q. Was it because there was a potential
19 violation of a rule?
20  A. Not necessarily. Because I needed
21 advice.
22  Q. What did you need advice on?
23  A. Deirdre. Is there anything here that we
24 need to be concerned with?

Page 85

1  　　　Just like Ruth reached out to me for
2  advice, I reached out to Deirdre for advice.
3  　　Q.  So what did you discuss with Deirdre?
4  　　A.  I don't recall.
5  　　Q.  Did you tell Dr. Wu that you spoke with
6  Deirdre?
7  　　A.  I do not recall.
8  　　Q.  Is it possible you did?
9  　　　　MS. SATINSKY: Objection to form.
10 　　　　THE WITNESS: Is it possible?  Yes.
11 BY MR. MUNSHI:
12 　　Q.  Did you go back to Ruth after speaking
13 with Deirdre about her e-mail?
14 　　A.  I do not recall.
15 　　Q.  Do you recall if Deirdre did in fact
16 give you any advice?
17 　　A.  I don't recall.
18 　　Q.  From Day 1 of your employment with
19 Temple, were you considered a manager?
20 　　A.  Yes.
21 　　Q.  Besides the e-mail we just looked at
22 where Miss Briggs says the environment is
23 hostile, has any other employee ever said words
24 to that effect to you that the environment is

Page 86

1  hostile or the working environment is hostile?
2  　　A.  Not that I'm aware of.
3  　　Q.  She writes here in the e-mail that it
4  borders on harassment.  Did any other employee
5  during your tenure at Temple ever say to you
6  that conduct borders on harassment or is
7  harassment?
8  　　　　MS. SATINSKY: Objection to form.
9  　　　　THE WITNESS: Not that I'm aware of.
10 BY MR. MUNSHI:
11 　　Q.  In your experience as a manager at
12 Temple for over ten years now, do you think it
13 is a good idea to talk to the manager about whom
14 workplace complaints or concerns are raised?
15 　　　　MS. SATINSKY: Objection to form.
16 　　　　THE WITNESS: Can you repeat the
17 question?
18 BY MR. MUNSHI:
19 　　Q.  Sure.  Based on your experience over ten
20 years as a manager at Temple, do you think it is
21 a good idea to talk to the manager about whom
22 workplace complaints are being raised?
23 　　　　MS. SATINSKY: Objection to form.
24 　　　　THE WITNESS: Yes.

Page 87

1  BY MR. MUNSHI:
2  　　Q.  Is it possible that you did talk to
3  Dr. Wu about this?
4  　　　　MS. SATINSKY: Objection.  Asked and
5  answered.  Misstates testimony.  Rahul, you
6  continue to do this.  He answered the question
7  already and his testimony was, "Is it possible?"
8  "Yes".  You are now asking him the same exact
9  question.
10 BY MR. MUNSHI:
11 　　Q.  Prior my question was is it possible you
12 talked to Dr. Wu about your conversation with
13 Deirdre.
14 　　　　This question is, is it possible you
15 talked to Dr. Wu about the e-mail from Ruth
16 Briggs?
17 　　　　MS. SATINSKY: And that question was
18 already answered as well.
19 BY MR. MUNSHI:
20 　　Q.  Say the answer again.
21 　　A.  I said no.
22 　　Q.  So that one is no.  Now I got lost.
23 　　A.  What was the question?
24 　　　　MS. SATINSKY: You just said it,

Page 88

1  Rahul.  You're confusing him because you're
2  asking a question and then you're changing the
3  question.  Your first question to him was, is it
4  possible that he had a conversation.  Right?
5  And I objected to that question.
6  　　　　Then you asked him did you have a
7  conversation with Dr. Wu about Ruth Briggs'
8  e-mail, and he said no.
9  　　　　MR. MUNSHI: Right.
10 BY MR. MUNSHI:
11 　　Q.  So this question was just "possible."
12 Because now it sounded like you said no.
13 　　　　Let me just ask again and she can
14 object and you can give your answer whatever it
15 is.
16 　　　　Is it possible that you spoke with
17 Dr. Wu about Ruth Briggs' e-mail to you dated
18 October 29th, 2010?
19 　　　　MS. SATINSKY: Objection.  Asked and
20 answered.
21 　　　　You can answer it again, Greg.
22 　　　　THE WITNESS: Is it possible?  Yes.
23 BY MR. MUNSHI:
24 　　Q.  Did you ever have any conversations with

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

GREGORY G. WACKER
June 29, 2017

Page 89

1   human resources about Ruth Briggs' performance?
2          MS. SATINSKY: Objection.  Asked and
3   answered.
4          You can answer it again, Greg.
5          THE WITNESS: Can you repeat the
6   question?
7   BY MR. MUNSHI:
8   Q.  Yes.
9          Did you ever have any conversations
10  with HR about Ruth Briggs' performance,
11  performance deficiencies?
12         MS. SATINSKY: Objection.  Asked and
13  answered.
14         THE WITNESS: The performance, as it
15  relates to her performance development?  No.  As
16  it relates to specific work-related incidents?
17  Yes.
18  BY MR. MUNSHI:
19  Q.  Any workplace-related incident beyond
20  what we already talked about?
21  A.  Not that I recall.
22  Q.  This is a document that was previously
23  marked as P-12.
24  A.  (Pause.)

Page 90

1          Okay.
2   Q.  The first page of P-12 is an e-mail from
3   Dr. Wu to Ralph Jenkins.  That is the gentleman
4   who you mentioned earlier; right?
5   A.  Okay.
6   Q.  And Mr. Jenkins then forwards it over to
7   you.  Do you see that?
8   A.  Yes.
9   Q.  Do you recall reviewing the attachment
10  letter from Dr. Wu back when you received it?
11  A.  I don't recall.
12  Q.  Do you recall any conversations with
13  Ralph Jenkins regarding Dr. Wu's attached
14  letter?
15  A.  There was multiple conversations related
16  to work, Ruth's work activities with various
17  individuals at various levels as incidents
18  occurred.
19  Q.  Do you see here that this e-mail from
20  Dr. Wu to Ralph Jenkins that was forwarded over
21  to you --
22  A.  Yes.
23  Q.  -- is approximately three weeks after
24  the e-mail that we just looked at, P-10?

Page 91

1   A.  Yes.
2   Q.  Did you inform Ralph Jenkins that
3   approximately three weeks earlier you had just
4   gotten an e-mail from Ruth Briggs regarding her
5   feelings of Dr. Wu?
6          MS. SATINSKY: Objection to form.
7          THE WITNESS: I don't recall.
8   BY MR. MUNSHI:
9   Q.  In your normal course and practice
10  within your role, is that something you would
11  have discussed with Mr. Jenkins?
12         MS. SATINSKY: Objection to form.
13         THE WITNESS: Possibly.
14  BY MR. MUNSHI:
15  Q.  Did you ever discuss Dr. Wu's letter,
16  P-12, with human relations or labor relations?
17  A.  I don't recall.
18  Q.  This was previously marked as P-13.
19  A.  (Pause.)
20  Q.  Have you had a chance to review P-13,
21  Mr. Wacker?
22  A.  Yes.
23  Q.  Do you see this is an e-mail from an
24  individual named Sharon Boyle?

Page 92

1   A.  Yes.
2   Q.  Do you know who Sharon Boyle is?
3   A.  Yes.
4   Q.  Who is she?
5   A.  She's in charge of HR right now.
6   Q.  Is she still at Temple?
7   A.  Yes, she is.
8   Q.  Did you ever have a discussion with
9   Sharon Boyle about Ruth Briggs?
10  A.  I don't recall.
11  Q.  You see that on P-13 you are cc'd on
12  this e-mail from Sharon Boyle.  Do you see that?
13  A.  Yes.
14  Q.  And she writes, among other things,
15  that, quote, Based on the discussions and
16  information received in both meetings, there is
17  no basis for disciplining Ruth at this time."
18         Do you see that?
19  A.  Yes.
20  Q.  Did you participate in any meetings
21  regarding Dr. Wu's letter?
22  A.  I don't recall.
23  Q.  Were you satisfied with human relations'
24  handling of this matter?

Page 93

1      MS. SATINSKY: Objection to form.
2      THE WITNESS: Yes.
3  BY MR. MUNSHI:
4     Q. And did you talk to Dr. Wu about HR's
5  conclusion here?
6     A. I don't recall.
7     Q. Did you talk to Ralph Jenkins about it?
8     A. I don't recall.
9     Q. Did you talk to Ruth Briggs about it?
10     A. I don't recall.
11     Q. Do you recall talking to anybody about
12  HR's conclusion as set forth in P-13?
13     A. This is consistent with the series of
14  conversations that I had with labor relations
15  and Dr. Wu on wanting to bring up a series of
16  deficiencies over an extended period of time
17  that were not written up in a timely manner.
18  Okay? So that's consistent with the way I was
19  trying to run the interactions.
20      And once again, HR got involved in
21  this one and made the decision. There was no
22  reason for me to change it.
23     Q. Did you feel that there was anything
24  that warranted discipline of Ruth Briggs at that

Page 94

1  time?
2     A. I mean, you know, most of the items on
3  here would warrant some type of discipline if
4  they were done in a timely manner. And the fact
5  is that if they were not in a timely manner, I
6  would not allow it to go forward. I would shut
7  them down.
8     Q. Was it your understanding that Sharon
9  Boyle's conclusion that there was no basis for
10  disciplining Ruth at this time was based on the
11  fact that it was too late?
12     A. I don't know.
13     Q. Do you recall Ruth Briggs being issued
14  disciplinary reports during her tenure at
15  Temple?
16     A. Yes.
17     Q. This is a document that was previously
18  marked as P-6.
19      Take a moment and review that.
20     A. (Pause.)
21     Q. P-6 is a disciplinary report dated
22  November 9, 2011.
23      Do you see that?
24     A. Yes.

Page 95

1     Q. Did you hand this disciplinary report to
2  Ruth Briggs?
3     A. I don't recall.
4     Q. Whose decision was it to issue this
5  discipline?
6     A. In consultation with labor relations and
7  Dr. Wu, Dr. Wu initiating, following up with
8  labor relations, it was determined this is the
9  appropriate violation of the rule.
10     Q. And just so I am clear, you said Dr. Wu
11  initiating. Initiating with whom?
12     A. He was initiating with whoever the --
13  I'm not sure if it was Drew at the time. I
14  believe it's Drew.
15     Q. Did you play any role in the decision or
16  the issuing of this disciplinary report?
17     A. The usual role that I play in getting
18  the information passed up to me, evaluating
19  whether to pass it through to HR or not is the
20  standard process that I go by.
21     Q. With regard to this specific
22  disciplinary report, do you have a specific
23  recollection of facilitating it or doing
24  anything with it?

Page 96

1     A. I remember facilitating it.
2     Q. Anything beyond that?
3     A. Some of the times I sit with the
4  individual and the supervisor. Sometimes we sit
5  with the individual, the supervisor and HR. I'm
6  not sure which process was followed when this
7  was given to Ruth.
8     Q. Did you discuss giving this discipline
9  to Ruth Briggs with Dr. Wu before it was
10  actually given to Ruth Briggs?
11     A. Can you repeat the question?
12     Q. Yes. Basically, did you talk to Dr. Wu
13  about the underlying actions or incidents before
14  this discipline was given to Ruth Briggs?
15     A. I don't recall.
16     Q. Now, under "Explanation," "Use reverse
17  side if needed," do you see that right in the
18  middle of the page?
19     A. Yes.
20     Q. It says, "Violation of B.11,
21  Unprofessional/Inappropriate Conduct"?
22     A. Yes.
23     Q. Did you put that in there?
24     A. I don't recall.

Page 97

1  Q. The "unprofessional/inappropriate
2  conduct" in P-6, it is not specified here;
3  right?
4  A. It's not specified here, but there
5  should have been some type of appropriate
6  supporting documentation that either Dr. Wu or
7  Drew, if Drew was there, would have had.
8  Q. Do you know if any such documentation
9  exists?
10  A. I don't recall.
11  Q. What was the unprofessional/
12  inappropriate conduct by Ruth Briggs that
13  warranted this discipline?
14  A. I'm not 100 percent sure, but it may
15  have been she got up and walked out of a meeting
16  with Dr. Wu.
17  Q. The conversation that you mentioned
18  earlier with Ruth Briggs and Drew DiMeo where
19  she said that Dr. Wu allegedly made some comment
20  about China, do you understand that that was
21  related to this disciplinary report or was that
22  a separate issue?
23  A. No --
24  MS. SATINSKY: Objection to form.

Page 98

1  Go ahead.
2  THE WITNESS: No, not related at
3  all.
4  BY MR. MUNSHI:
5  Q. Did Ruth Briggs explain to you that
6  Dr. Wu had made a comment to her about women
7  having a retirement age in China?
8  A. The comment that she made earlier was
9  the only comment that I was aware of. And like
10  I said, I wasn't paying full attention to what
11  it was, but it had to do with either women in
12  retirement, or something along those lines.
13  Q. Do you recall Ruth Briggs then saying
14  that she told Dr. Wu words to the effect
15  of, "We're in the United States, not China?"
16  A. I don't recall.
17  Q. Do you see on here that the date of
18  action, the date is November 9th, 2011. Do you
19  see that?
20  A. Yes.
21  Q. Do you know that Ruth Briggs' birthday
22  is November 10th?
23  A. No.
24  Q. Did you personally ever write down

Page 99

1  anywhere what it was that Ruth Briggs did that
2  warranted this conduct?
3  MS. SATINSKY: Objection. Asked and
4  answered.
5  You can answer it again, Greg.
6  THE WITNESS: No.
7  BY MR. MUNSHI:
8  Q. Now, do you have a recollection -- I
9  understand your practice -- but do you have a
10  recollection of speaking with anyone in labor
11  relations about the issuance of this specific
12  disciplinary report?
13  A. Yes.
14  Q. And was that Deirdre Walton?
15  A. It would have been labor relations. I
16  don't recall who it was.
17  Q. And do you recall telling that person
18  what the unprofessional/inappropriate conduct
19  was that Miss Briggs allegedly did?
20  A. I don't recall.
21  Q. Do you recall Miss Briggs ever
22  complaining to you that she got this discipline
23  unfairly?
24  A. I don't recall.

Page 100

1  Q. In all your years over at Temple, has
2  any employee ever complained to you about a
3  formal disciplinary report that they received?
4  MS. SATINSKY: Objection to form.
5  THE WITNESS: I don't recall.
6  BY MR. MUNSHI:
7  Q. Any of the disciplines that Ruth Briggs
8  got over at Temple, do you recall her
9  complaining to you that she shouldn't have
10  gotten them?
11  A. Ruth complained about everything and
12  shouldn't have gotten any discipline for
13  anything, even when it was clearly incompetency.
14  Like I said, numerous occasions I didn't allow
15  things to proceed -- disciplinary action to
16  proceed because it was not documented in a
17  timely manner.
18  Q. Sitting here right now, do you have a
19  specific recollection of any complaints that she
20  did raise to you regarding a disciplinary
21  report?
22  A. Not that I recall.
23  Q. Did she ever complain to you that she
24  felt like she was being singled out?

Page 101

1    A.  Not that I recall.
2         MR. MUNSHI: Let's have this marked
3    as P-22.
4         (P-22 was marked for
5    identification.)
6    BY MR. MUNSHI:
7    Q.  Mr. Wacker, so I have given you P-22.  I
8    will give you a moment to review it.
9    A.  Okay.
10   Q.  Did you already review it?
11   A.  I reviewed it, yes.
12   Q.  So this is an e-mail from Ruth Briggs to
13   you and Drew DiMeo dated December 14th, 2011.
14        Do you see that?
15   A.  Yes.
16   Q.  Third paragraph from the bottom.
17   A.  Okay.
18   Q.  She writes here, "I am wondering how it
19   is that I can be disciplined for violations and
20   others in the office come and go as they please,
21   violate policies about student records and
22   social security numbers with no consequences at
23   all."
24        Do you see that?

Page 102

1    A.  Yes.
2    Q.  And this e-mail is a couple of weeks
3    after the disciplinary report --
4    A.  Yes.
5    Q.  -- that we have looked at, P-6.
6         Do you see that?
7    A.  Yes.
8    Q.  Did you have a conversation with Ruth
9    Briggs about her e-mail here?
10   A.  I don't recall.
11   Q.  Did you understand that she was
12   basically saying to you that she feels singled
13   out?
14        MS. SATINSKY: Objection to form.
15        THE WITNESS: No.  I did notice
16   that -- "I was wondering why neither of you
17   responded until I saw this e-mail.  Did not send
18   and was in my outbox."
19        Which is consistent with the work
20   challenges that she had on a day-to-day basis
21   with Dr. Wu.
22   BY MR. MUNSHI:
23   Q.  So regarding that paragraph that I just
24   read out loud for the record, did you have any

Page 103

1    understanding that she was raising a concern at
2    that point?
3    A.  No.
4    Q.  Did you ask her what she meant by "other
5    people violating policies with no consequences
6    at all"?
7    A.  I don't recall.
8    Q.  Do you recall telling Drew DiMeo to talk
9    to Ruth about this?
10   A.  I don't recall, but it is something that
11   Drew would have handled as part of his
12   day-to-day interactions with Ruth in the CIS
13   department.
14   Q.  Would that be a serious issue if there
15   were people who were violating policies like
16   this?
17        MS. SATINSKY: Objection to form.
18        THE WITNESS: Yes.  But from what I
19   recall, there was no one there in charge of
20   that.  And by default, that would fall under
21   Ruth making sure that the ProShred group comes
22   in and gets their shredding.  And once again,
23   that was right in front of Ruth's area where she
24   sat.

Page 104

1         So the fact that she did tape them
2    up and get them sealed was the correct action
3    that needed to be done and they were supposed to
4    be left next to the ProShred box where the
5    ProShred group was coming in to pick up the
6    shred.
7    BY MR. MUNSHI:
8    Q.  The discipline that we looked at, P-6,
9    was dated November 9th, 2011.
10        Are you aware of any disciplines
11   that Ruth Briggs received from Temple prior to
12   November 9th, 2011?
13   A.  I don't recall.
14   Q.  Do you know if she ever received any
15   discipline prior to working under Dr. Wu?
16   A.  I don't recall.
17   Q.  Now, at any point did you learn that
18   Ruth Briggs was submitting applications
19   internally for job transfers?
20   A.  I was probably aware of that.  It would
21   have been something that I -- I know I
22   encouraged her to do.  I encourage any employee
23   that is unhappy in their job to apply out into
24   other positions.

Page 105

1   Q. Did you consider Miss Briggs to be
2   unhappy in her job?
3   A. She was looking to get out of the
4   department into a new job.
5   Q. Was it your belief or understanding that
6   she was unhappy in her current job?
7   A. It would lead you to believe that, yes.
8   Q. Not me.  Lead you?
9   A. One could interpret it that way.
10  Q. Don't bring me into this.  I am just
11  talking about you.
12  A. Yes.
13  Q. What led you to believe that she was
14  unhappy?
15  A. In just general conversations and
16  consulting with her and her indicating that she
17  was looking at other jobs, I would continue to
18  encourage her to do that.
19  Q. Did you have an understanding that she
20  was unhappy with her relationship with Dr. Wu?
21  A. I don't recall.  I don't recall.
22  Q. Did you have an understanding that she
23  was looking to transfer away from Dr. Wu?
24        MS. SATINSKY: Objection to form.

Page 106

1        THE WITNESS: She was exploring
2   opportunities to get out of the department that
3   she was in, yes.
4   BY MR. MUNSHI:
5   Q. In other words, are you aware of any
6   jobs that she was looking for that would have
7   kept her under Dr. Wu?
8   A. Can you repeat that question?
9   Q. So in other words, Dr. Wu has a lot of
10  people who report to him; correct?
11  A. Yes.
12  Q. Was it your understanding that she was
13  looking for jobs that would take her out of
14  Dr. Wu, meaning not other jobs still under
15  Dr. Wu?
16  A. Yes.
17  Q. As of November 2011, did you have
18  occasion to see Miss Briggs' performance and
19  work product firsthand?
20  A. The only time I would be made aware of
21  it is when there was disciplinary action in the
22  process that was initiated by her supervisor and
23  then would get passed through Drew.
24  Q. So absent a disciplinary or something

Page 107

1   wrong going on with her performance deficiency,
2   you didn't have occasion to actually see her
3   work product?
4   A. No.
5   Q. Did you act as a reference for her?
6   A. I indicated, as I do for all of the
7   employees, that I would be happy to provide a
8   reference for you if need be.
9   Q. That is within your discretion to say
10  yes or no?
11  A. Yes, anybody can say yes or no.  And
12  once again, in the fact that I deal with my
13  current employees, I encourage them to look at
14  what opportunities are out there to grow and
15  expand and I'd be happy to provide a reference.
16        MR. MUNSHI: P-23.
17        (P-23 was marked for
18  identification.)
19  BY MR. MUNSHI:
20  Q. I will give you a moment to review the
21  e-mail chain that is P-23.
22  A. (Pause.)
23        Okay.
24  Q. Did you ever talk to anyone in labor

Page 108

1   relations or human relations about Ruth Briggs
2   wanting a transfer?
3   A. Not that I recall.
4   Q. Did you ever talk with Drew DiMeo about
5   Ruth Briggs wanting to transfer away from
6   Dr. Wu?
7        MS. SATINSKY: Objection to form.
8        THE WITNESS: Not that I recall.
9   BY MR. MUNSHI:
10  Q. Did you in fact serve as a reference for
11  any jobs for Ruth Briggs?
12  A. I don't know if she put me down at all.
13  I don't recall getting any calls for a
14  reference.
15  Q. This is a document that was previously
16  marked as P-18.
17  A. (Pause.)
18        Okay.
19  Q. This is another disciplinary report
20  issued to Ruth Briggs.  This one is dated
21  January 20, 2014.
22        Do you see that?
23  A. Yes.
24  Q. Do you recall the circumstances around

Page 109

1 this discipline?
2 A. I do not.
3 Q. Do you know whose idea it was to give
4 this discipline to Ruth Briggs?
5 A. Dr. Wu would initiate it and go through
6 Drew and then Drew would pass it up to me to see
7 whether it should proceed or not.
8 Q. And do you in fact remember doing that
9 process with regard to this disciplinary report?
10 A. Yes, yes. Any disciplinary report ends
11 up getting funneled through me.
12     Drew would have gathered the
13 information, passed it up, said here's what
14 we're looking at, and then it would have gone to
15 Deirdre in HR.
16 Q. What information do you recall Drew
17 DiMeo passing up to you regarding this
18 disciplinary report?
19 A. I don't recall.
20 Q. Do you recall that the circumstances
21 around this pertained to Miss Briggs being late
22 one day?
23     MS. SATINSKY: Objection to form.
24     THE WITNESS: I don't recall.

Page 110

1 BY MR. MUNSHI:
2 Q. Do you recall meeting with Ruth Briggs
3 where she had an explanation as to why she was
4 late?
5 A. I don't recall.
6 Q. I understand your normal process, but do
7 you have a specific recollection of chatting
8 with Miss Walton or anyone else in labor
9 relations about this disciplinary report?
10     MS. SATINSKY: Objection to form.
11 Asked and answered.
12     THE WITNESS: I don't recall.
13 BY MR. MUNSHI:
14 Q. Did you have an understanding or a
15 recollection that Miss Briggs opposed this
16 specific disciplinary report in any way?
17 A. I don't recall.
18     MR. MUNSHI: Let's take a look at
19 this, P-24.
20     (P-24 was marked for
21 identification.)
22     THE WITNESS: Okay.
23 BY MR. MUNSHI:
24 Q. P-24 is an e-mail from Ruth Briggs to

Page 111

1 Deirdre Walton February 26th, 2014.
2     Do you see that?
3 A. Yes.
4 Q. Does this refresh your recollection at
5 all as to a conversation with Deirdre Walton
6 regarding this issue?
7 A. I do not recall.
8 Q. Do you recall ever telling Deirdre
9 Walton that Ruth Briggs came in late and didn't
10 call anyone to say she is coming in late?
11 A. I don't recall.
12 Q. Do you recall any issue with Ruth Briggs
13 oversleeping and not telling anybody she was
14 going to be late?
15 A. I do recall hearing instances where the
16 front office was not open because no one was
17 there. But that's the extent of what I recall.
18 Q. And did she work in the front office?
19 A. Yes, for CIS.
20 Q. This is a document that was previously
21 marked as D-41. Let's just keep it as D-41. It
22 has the sticker on it already.
23 A. Okay.
24 Q. So this is an e-mail from Ruth to Ruth

Page 112

1 on February 26th, 2014. Her first sentence
2 is, "Deirdre called after speaking to Greg to
3 tell me that Greg told her that I came in at
4 noon, did not call anyone, and claimed to not
5 have an excuse for being late."
6     Did you say that to Deirdre?
7 A. I don't recall. And once again, it
8 would have been provided in documentation from
9 Dr. Wu complaining to Drew about the issue.
10 Q. Have you ever seen that documentation?
11 A. I don't recall.
12 Q. Did Drew DiMeo ever provide you with any
13 documentation regarding this oversleeping issue?
14     MS. SATINSKY: Objection to form.
15     THE WITNESS: I don't recall.
16 BY MR. MUNSHI:
17 Q. At any point did Drew DiMeo provide you
18 with any documentation regarding Ruth Briggs
19 being tardy?
20 A. Something was provided because we took
21 disciplinary action. What, I don't recall.
22 Q. And you don't recall if Dr. Wu gave you
23 any documentation; correct?
24 A. I don't recall.

**Page 113**

1  Q. Have you ever seen anyone disciplined
2  for being late?
3  A. I don't recall.
4  Q. The end of this D-41 document says, "She
5  said she will call a meeting with Greg, Drew,
6  Deirdre and myself about this issue and will get
7  back to me with the date of the meeting."
8  Do you recall if that meeting ever
9  took place?
10  A. I do not recall.
11  MR. MUNSHI: P-25.
12  (P-25 was marked for
13  identification.)
14  BY MR. MUNSHI:
15  Q. So P-25 in front of you is two
16  back-to-back documents Bates stamped Temple
17  University (R. Briggs) 119 and 120.
18  The first page of P-25 is dated
19  April 11, 2014 --
20  A. Okay.
21  Q. -- from Miss Walton to you, and there is
22  an attachment, it appears. It says "Ruth
23  Briggs.docx."
24  Do you see that?

**Page 114**

1  A. Okay.
2  Q. The second page of P-25 is an e-mail
3  from Miss Walton to you dated March 31, 2014.
4  A. Okay.
5  Q. Also an attachment "Ruth Briggs.docx."
6  A. Okay.
7  Q. Do you know what those attachments are?
8  A. Am I 100 percent sure? No. Do I
9  believe they would have been the termination
10  letter that went back and forth between Deirdre
11  and I, because, once again, that's something
12  that HR approves the final product. I usually
13  have them initiate the initial product. I'll
14  make changes, they'll make changes, and then
15  when they are done they say here it is.
16  Q. The top page of P-25 is actually dated
17  April 11th, 2014. Do you see that the
18  termination letter predates that?
19  A. Yeah. The one may have been the
20  termination. The question is, is the other the
21  resignation, because I know at one point I
22  didn't have a resignation letter.
23  Q. We will follow up on that one just to
24  make sure.

**Page 115**

1  A. I believe Ruth sent the resignation
2  letter to Deirdre.
3  Q. After Ruth Briggs was no longer employed
4  at Temple, did you have any conversations with
5  Sandy Foehl about her?
6  A. I don't recall.
7  Q. Did you have an understanding that Sandy
8  Foehl had met with Dr. Wu after Miss Briggs was
9  no longer working there?
10  A. I don't recall.
11  Q. Did you have an understanding that Sandy
12  Foehl had met with Drew DiMeo after Miss Briggs
13  was no longer working there?
14  A. I don't recall.
15  Q. After Miss Briggs was no longer employed
16  at Temple, did you have any more conversations
17  with Deirdre Walton about her?
18  MS. SATINSKY: About Ruth or about
19  Deirdre?
20  BY MR. MUNSHI:
21  Q. About Ruth.
22  A. About Ruth? I don't recall.
23  MR. MUNSHI: Give me two minutes.
24  (Pause.)

**Page 116**

1  BY MR. MUNSHI:
2  Q. Just two more questions here,
3  Mr. Wacker.
4  Did Drew DiMeo ever inform you that
5  he learned that Ruth Briggs had gone to HR about
6  Dr. Wu?
7  A. No.
8  Q. Did you have any conversations with an
9  individual named Tracy Hamilton in labor
10  relations?
11  MS. SATINSKY: About?
12  BY MR. MUNSHI:
13  Q. Ruth Briggs?
14  A. I don't recall.
15  Q. How about an individual named Rhonda
16  Brown, any conversations with her regarding Ruth
17  Briggs?
18  A. I don't recall.
19  MR. MUNSHI: That is all I have.
20  MS. SATINSKY: I don't have any
21  questions. The witness reserves the right to
22  read and sign.
23  (Witness excused.)
24  - - -

Page 117

```
1              (The deposition concluded at
2    12:43 p.m.)
3                -    -    -
4              I N D E X
5    DEPONENT:  GREGORY G. WACKER              PAGE
6        Examination by Mr. Munshi                2
7
8              E X H I B I T S
     WACKER DEPOSITION EXHIBITS                MARKED
9
     P-22  E-mail, TEMPLE UNIVERSITY           101
10        (R. BRIGGS) - 0000327
11   P-23  E-mail string, TEMPLE UNIVERSITY    107
          (R. Briggs) - 0000320 - 0000321
12
     P-24  E-mail, BRIGGS 69                   110
13
     P-25  Two e-mails, TEMPLE UNIVERSITY      113
14        (R. BRIGGS) - 0000119 - 0000120
15
16
17
18
19
20
21
22
23
24
```

Page 118

```
1              WITNESS SIGNATURE/CERTIFICATION PAGE
2
3
4
5         I have read the foregoing transcript
6    of my deposition given on Thursday, June 29,
7    2017, and it is true, correct and complete, to
8    the best of my knowledge, recollection and
9    belief, except for the list of corrections, if
10   any, attached on a separate sheet herewith.
11
12
13
14
15
16
17   _____    _____
18   DATE            GREGORY G. WACKER
19
20
21
22
23
24
```

Page 119

```
1
2
3
4         I HEREBY CERTIFY that the
5    proceedings, evidence and objections are
6    contained fully and accurately in the
7    stenographic notes taken by me upon the
8    foregoing matter on Thursday, June 29, 2017, and
9    that this is a true and correct transcript of
10   same.
11
12
13
14
15
16        Terry Barbano Burke, RMR-CRR
17
18
19             (The foregoing certification
20   of this transcript does not apply to any
21   reproduction of the same by any means, unless
22   under the direct control and/or supervision of
23   the certifying reporter.)
24
```

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

GREGORY G. WACKER
June 29, 2017

## A

**ability (1)** 81:10
**able (4)** 32:5;38:17;
60:9;63:19
**above (1)** 25:2
**absent (4)** 26:3,14,18;
106:24
**absenteeism (3)** 25:5,
18,22
**access (7)** 41:6;58:19;
59:8,14;60:4,9;61:3
**accommodate (1)** 78:5
**accordance (2)** 24:17;
27:21
**according (1)** 27:4
**accounting (3)** 40:8;
46:7;57:2
**accurate (1)** 78:6
**act (5)** 75:22,23;76:1;
77:9;107:5
**action (13)** 17:21,23;
67:9;70:4;73:14;74:16;
75:18;82:12;98:18;
100:15;104:2;106:21;
112:21
**actions (1)** 96:13
**activities (4)** 15:19,21;
19:4;90:16
**activity (2)** 15:18;80:20
**actually (7)** 27:1;38:24;
40:4,11;96:10;107:2;
114:16
**adamant (1)** 16:2
**additional (1)** 63:11
**address (1)** 42:13
**administration (8)** 6:9,
16,20,21;7:3,12,19,21
**administrative (8)** 12:3;
13:24;21:13;22:19;
23:1;30:20;33:11,12
**advice (28)** 12:5;13:7;
31:20;33:20,23;34:2;
72:12;73:13,15,21;
74:3,15,17,20;75:17,
23,24;76:3,10;80:6,23;
81:11;82:12;84:21,22;
85:2,2,16
**advise (2)** 13:9,13
**advised (2)** 20:5;73:14
**affirmative (2)** 17:21,23
**again (41)** 11:11,14;
14:6,13;15:17;16:2,16,
21;22:22;26:19;27:18;
37:21;38:13;39:22,23;
42:16;44:8;48:16;
51:10;58:12;64:20;
65:4,9;71:10;73:14;
74:14,17;75:2;77:17;
80:4;82:11;87:20;
88:13,21;89:4;93:20;
99:5;103:22;107:12;

112:7;114:11
**against (4)** 20:21,22;
28:2;30:14
**age (10)** 14:9;16:12,
18;17:3,12;18:4;20:7;
32:14,17;98:7
**aggregate (1)** 39:5
**ago (4)** 5:11;6:24;
38:17;54:15
**ahead (5)** 4:17;59:24;
77:7;78:13;98:1
**alleged (2)** 69:19,23
**allegedly (5)** 14:3,18;
64:11;97:19;99:19
**alleging (1)** 21:6
**Allen (1)** 9:7;10:9,14,24
**allow (2)** 94:6;100:14
**allowed (1)** 25:1
**along (4)** 15:7;21:13;
73:16;98:12
**always (3)** 31:24;42:9;
70:6
**among (2)** 82:24;92:14
**analysis (6)** 34:14;
43:16,18;44:4,13,19
**Andrew (1)** 9:4
**annual (1)** 53:20
**answered (29)** 11:15;
15:14;16:14;17:6,15;
18:8;19:21;20:9;27:16;
29:11;30:5;39:12;
47:22;49:12;50:23;
52:3;53:3;63:15;64:1;
82:17;84:15;87:5,6,18;
88:20;89:3,13;99:4;
110:11
**Antoinette (1)** 33:5
**appears (1)** 113:22
**applauded (1)** 72:17
**applications (1)** 104:18
**apply (1)** 104:23
**appropriate (10)** 13:19;
17:20;35:7,9;37:10;
39:9;67:9;74:18;95:9;
97:5
**appropriately (1)** 27:4
**approves (1)** 114:12
**Approximately (7)** 5:11;
8:18;31:1;32:11;54:12;
90:23;91:3
**April (6)** 55:5;58:10,24;
62:10;113:19;114:17
**area (2)** 58:15;103:23
**argumentative (9)**
38:22;40:22;58:16,20,
24;61:14;68:2,9;70:9
**around (10)** 5:13;
11:15;14:22,23;15:3,4,
5;72:18;108:24;109:21
**aside (1)** 69:22
**assessed (1)** 34:24
**assistance (1)** 12:3
**Assistant (10)** 6:15,18;

7:20;8:6,8;21:13;
22:19;23:1;30:20;
33:11
**associate (3)** 10:12;
12:1;54:8
**assume (3)** 32:16,19;
78:14
**assumption (1)** 60:4
**attached (1)** 90:13
**attachment (3)** 90:9;
113:22;114:5
**attachments (1)** 114:7
**attention (2)** 56:2;98:10
**attorney (5)** 28:3,6,9,10,
20
**authority (1)** 11:9
**authorize (1)** 23:13
**available (9)** 13:10;
40:9,20;41:5;57:7,15;
58:2,21;60:10
**aware (32)** 20:23;21:3,
7;28:1,3;30:1;33:24;
34:3;41:13;49:8,21;
50:1,5,13;51:15;53:14,
17;60:15,17,21;69:4;
71:20,23;72:2;76:16;
86:2,9;98:9;104:10,20;
106:5,20
**away (3)** 71:12;105:23;
108:5
**awhile (1)** 70:20

## B

**B11 (1)** 96:20
**back (16)** 5:23;7:18;
8:5,20;9:3,9,10;17:20;
26:9;39:7;46:12;71:6;
85:12;90:10;113:7;
114:10
**back-to-back (1)** 113:16
**Ballpark (4)** 5:12;6:10;
7:8;11:3
**based (6)** 16:12;18:4;
48:5;86:19;92:15;
94:10
**basically (3)** 3:7;96:12;
102:12
**basis (5)** 13:14;26:5;
92:17;94:9;102:20
**Bates (1)** 113:16
**became (7)** 6:8;7:20;
10:19;38:21;40:22;
58:12;61:13
**begin (1)** 54:12
**behavior (1)** 68:3
**belief (1)** 105:5
**besides (5)** 45:14,18;
52:24;62:23;63:12;
65:10;85:21
**best (2)** 3:23;4:9
**better (1)** 3:14
**Beyond (12)** 12:21;

25:3;28:4;44:17;45:1,
4;50:10;51:16;62:4;
83:2;89:19;96:2
**bigger (1)** 74:15
**biology (2)** 5:22;6:5
**birth (1)** 5:6
**birthday (1)** 98:21
**book (1)** 65:14
**booked (1)** 25:16
**booking (1)** 64:10
**bordering (1)** 81:3
**borders (4)** 72:20;
79:22;86:4,6
**boss (4)** 12:19;70:9;
73:16;74:4
**Both (6)** 6:20;54:21;
66:7,23;78:17;92:16
**bottom (2)** 83:10;
101:16
**box (1)** 104:4
**Boyle (4)** 91:24;92:2,9,
12
**Boyle's (1)** 94:9
**break (5)** 4:14,17;7:14,
16;52:18
**Briggs (124)** 10:6,21;
11:9;12:24;13:14;
14:18;19:17;24:6,10,
15;26:23;27:1,7,10,13;
28:19,23;29:1,7,15,19,
22;31:15;32:23;34:7,9;
35:5,11,20;37:4,7;
38:3;40:2,13;43:2;
44:13;45:1,5,8,23;47:7,
20;48:4,23;49:2,6;
50:2,7,10,16,21;51:17;
52:9,14;53:7,18;54:17;
57:5,12;58:6,10;59:20;
61:2;64:11,14;65:14,
19;66:10,20,24;68:18;
72:9;74:23;75:12;
77:12,19;81:2;82:9;
84:10,12;85:22;87:16;
91:4;92:9;93:9,24;
94:13;95:2;96:9,10,14;
97:12,18;98:5,13;99:1,
19,21;100:7;101:12;
102:9;104:11,18;
105:1;108:1,5,11,20;
105:1;108:1,5,11,20;
109:4,21;110:2,15,24;
111:9,12;112:18;
113:17;115:3,8,12,15;
116:5,13,17
**Briggs' (14)** 12:7;41:8;
42:1;49:22;52:24;
68:13,21;83:21;88:7,
17;89:1,10;98:21;
106:18
**Briggsdocx (2)** 113:23;
114:5
**Briggs's (4)** 14:18;
45:19;49:10,17
**bring (3)** 13:17;93:15;

105:10
**brings (1)** 10:24
**broad (1)** 50:18
**broke (1)** 39:7
**brought (8)** 10:10,14;
14:19;28:2;35:1;56:1;
58:16;70:16
**Brown (1)** 116:16
**bullet (6)** 56:6;62:9;
63:13,23;64:12;65:11
**bunch (1)** 15:24;42:15
**business (5)** 5:16;7:15,
16,17;11:24
**business-related (2)**
15:18,21

## C

**C3 (1)** 67:18
**C4 (1)** 65:22
**calculation (1)** 25:17
**call (7)** 20:16;24:11;
35:24;84:5;111:10;
112:4;113:5
**called (2)** 25:14;112:2
**calls (1)** 108:13
**came (7)** 7:18;26:6;
36:10;58:15;73:17;
111:9;112:3
**camel's (1)** 39:7
**can (48)** 3:19;4:6;9:2;
11:22;13:2,8;15:14;
16:14;17:6,16;18:22;
19:22;20:10;22:3;
23:24;25:3,10,21;
27:17;28:15;30:5;32:1;
35:14;36:24;41:22;
42:7;47:23;48:18;
49:13;52:18;59:24;
64:1,6;75:10;76:21;
80:8;82:18;86:16;
88:13,14,21;89:4,5;
96:11;99:5;101:19;
106:8;107:11
**capable (1)** 31:21
**capacity (3)** 20:6;31:5;
33:10
**casual (1)** 14:20
**caused (1)** 71:15
**caution (1)** 39:22
**cc'd (2)** 79:14;92:11
**center (1)** 6:5
**certain (2)** 53:19;82:23
**chain (1)** 107:21
**chair (2)** 9:20;10:10
**challenges (1)** 102:20
**chance (1)** 91:20
**change (2)** 72:19;93:22
**changes (3)** 46:12;
114:14,14
**changing (1)** 88:2
**charge (4)** 10:13;21:6;
92:5;103:19

charged (1) 57:3
chart (1) 10:1
chatting (1) 110:7
check (1) 61:11
China (7) 14:6;16:18;
69:20,23;97:20;98:7,
15
Chinese (3) 72:22,24;
73:23
circumstances (3)
82:24;108:24;109:20
CIS (6) 9:21;30:21;
33:9;61:23;103:12;
111:19
claim (3) 28:2,23;30:2
claimed (1) 112:4
clarify (1) 70:14
clean (1) 3:22
clear (4) 17:2;30:12;
51:5;95:10
clearly (1) 100:13
coaching (1) 32:8
College (6) 8:3;13:5;
21:19;33:19;51:12;
73:24
combative (3) 38:22;
58:17;59:1
coming (4) 15:19;54:2;
104:5;111:10
comment (12) 14:2;
16:11;17:3,12,20;18:4;
69:19,23;97:19;98:6,8,
9
common (1) 11:19
competent (1) 31:21
complain (5) 21:2;
61:24;69:12;71:21;
100:23
complained (5) 20:20;
68:15;69:24;100:2,11
complaining (6) 70:7;
71:24;72:24;99:22;
100:9;112:9
complaint (23) 13:20;
14:11;15:23;16:3,4,22;
30:14;70:3,5,19;75:13,
17,21,22;76:6,15,17,
19;77:4,9,15;80:7,7
complaints (11) 18:24;
26:6,12,16;51:11;
68:23;69:5;74:23;
86:14,22;100:19
complete (2) 56:11;
57:19
completed (2) 78:6,11
completing (2) 77:23;
78:9
computer (3) 32:1,2,4
concern (11) 75:12,16,
21,22,23;76:5,14;
80:12,17,20;103:1
concerned (5) 80:18,
18,19,21;84:24

concerns (6) 68:19,23;
69:5;74:23;80:2;86:14
conclude (1) 26:17
concluding (1) 26:5
conclusion (4) 45:7;
93:5,12;94:9
concur (7) 44:6;56:11;
57:7,8;60:22,23;61:8
condition (2) 23:18,18
conduct (12) 12:7;21:6;
30:3;65:22;67:18,24;
86:6;96:21;97:2,12;
99:2,18
conference (1) 4:23
confident (1) 37:21
confidential (3) 13:14,
17;27:12
confidentially (1) 13:8
confirm (1) 40:8
confirmation (2) 41:2,2
confirmed (6) 35:7;
40:19;57:14;59:10,12;
60:9
confusing (1) 88:1
conjunction (1) 54:7
connection (1) 41:8
consequences (2)
101:22;103:5
consider (4) 12:18;
53:6;80:10;105:1
considered (1) 85:19
consistent (3) 93:13,18;
102:19
constantly (1) 15:19
consultant (1) 13:4
consultation (11) 55:15;
62:17;65:24;66:2,3,3;
67:21;70:8;79:8;81:11;
95:6
consulting (1) 105:16
contacted (2) 57:5,12
contents (1) 14:7
context (7) 15:12,24;
16:17;42:3,18,21;43:9
continual (1) 80:13
continually (2) 31:18;
40:21
continue (2) 87:6;
105:17
continues (2) 20:15;
65:18
controller's (3) 40:8,19;
41:4
conversation (26)
14:20;15:5,6;16:19;
34:6;36:8,11,21;37:24;
41:24;43:10;45:15;
50:20;56:16;58:9;
61:21;62:19,22;66:7;
78:10;87:12;88:4,7;
97:17;102:8;111:5
conversations (27)
16:20;42:2;43:8;

44:23;45:3;48:2,9;
51:1,6;66:14,16,18,23;
67:4,15;74:15;75:3;
88:24;89:9;90:12,15;
93:14;105:15;115:4,
16;116:8,16
conveyed (2) 19:18;
43:22
coordinating (1) 43:24
coordinator (1) 33:12
correspondence (4)
40:12;46:6;50:7;63:22
counsel (4) 28:11,12,
13,14
couple (2) 3:24;102:2
course (7) 14:19;79:24;
81:6,16;82:1,13;91:9
crafted (1) 46:21,22
created (1) 3:19
Culbreath-Walton (1)
83:24
current (3) 8:12;105:6;
107:13
currently (2) 5:8;6:14

**D**

D-41 (3) 111:21,21;
113:4
date (7) 5:6;7:7;43:11;
62:11;98:17,18;113:7
dated (11) 55:5;58:23;
72:8;88:17;94:21;
101:13;104:9;108:20;
113:18;114:3,16
dates (2) 64:11;65:14
day (5) 55:9;72:16,16;
85:18;109:22
days (2) 25:20;38:9
day-to-day (2) 102:20;
103:12
deadlines (1) 73:22
deal (2) 84:13;107:12
deals (1) 20:7
dean (17) 6:15,18;
7:20;8:1,2,3,6,8,12;
9:12,16,17,22;10:11,
12;11:14;74:1
deans (2) 12:1;54:8
dean's (11) 10:20;11:2;
21:14,17,18,19;22:18;
23:1;56:2;69:6;73:1
deceased (1) 54:11
December (1) 101:13
decided (2) 66:1;67:22
decipher (1) 70:23
decision (12) 34:10,17;
35:4;40:13;49:9;50:10;
54:5;65:21;67:19;
93:21;95:4,15
default (1) 103:20
deficiencies (2) 89:11;
93:16

deficiency (1) 107:1
Deirdre (49) 34:23;
37:12;43:23;45:13,15,
18;47:19,24;48:21;
49:10,22;50:2,6;52:12;
55:16;63:1,7,20;65:12;
66:5,8,15,19,23;67:12,
21;68:18;83:21,24;
84:1,23;85:2,3,6,13,15;
87:13;99:14;109:15;
111:1,5,8;112:2,6;
113:6;114:10;115:2,
17,19
department (12) 5:20,
22;6:5;9:20,21;11:1;
19:19;30:21;46:7;
103:13;105:4;106:2
deposition (4) 3:1,3;
20:14,16
describe (1) 22:16
described (1) 12:21
desk (1) 51:12
desks (1) 15:3
details (5) 34:21,21,22;
64:22;77:14
determine (3) 16:11;
64:23;67:19
determined (1) 95:8
determining (1) 12:4
development (2) 53:21;
89:15
difference (3) 75:20;
76:5,13
different (1) 67:11
differently (1) 70:12
DiMeo (35) 9:4;13:24;
15:8;35:11;36:9;37:6,
24;38:2,11,23;39:8;
41:14;43:2;44:24;
46:22;49:21;50:1,5;
54:6,12,16;56:5;64:19;
65:10;79:11;80:14;
97:18;101:13;103:8;
108:4;109:17;112:12,
17;115:12;116:4
direct (18) 8:15;10:7;
11:11;18:12,15;19:17;
21:21;22:7,10,23;
24:14;29:14,24;31:2,4;
32:24;33:14;69:16
directed (2) 18:10;
26:19
direction (2) 13:7;16:2
directive (1) 25:8
directly (6) 8:21;9:11,
21,23;69:12;70:1
Director (8) 6:4,8,17;
7:2,11,18;8:5,7
disciplinary (21) 67:9;
94:14,21;95:1,16,22;
97:21;99:12;100:3,15,
20;102:3;106:21,24;

108:19;109:9,10,18;
110:9,16;112:21
discipline (28) 24:15;
25:10;27:2,23;35:9;
39:4,4;42:4,8,11,19,22,
23;43:9;47:9;63:10;
93:24;94:3;95:5;96:8,
14;97:13;99:22;
100:12;104:8,15;
109:1,4
disciplined (2) 101:19;
113:1
disciplines (2) 100:7;
104:10
disciplining (2) 92:17;
94:10
discrepancy (1) 59:17
discretion (2) 81:21;
107:9
discriminated (1) 20:21
discuss (5) 54:2;84:6;
85:3;91:15;96:8
discussed (5) 52:23;
67:6,12;91:11
discussing (2) 53:23;
81:17
discussion (11) 27:6;
28:22;29:18;31:11,14;
41:17;42:20;50:15;
58:12;68:17;92:8
discussions (3) 43:20;
47:18;92:15
Disorderly (2) 67:18;
68:1
disposal (1) 44:17
disruptive (5) 38:22;
40:22;67:18;68:2,8
doctor's (1) 24:11
document (9) 54:24;
72:3;76:13;83:5;89:22;
94:17;108:15;111:20;
113:4
documentation (23)
14:14;37:11;39:9,15,
18;41:7,14;45:22;46:8,
14;50:6;51:15;53:16;
63:22;64:10,24;97:6,8;
112:8,10,13,18,23
documented (1) 100:16
documents (2) 52:18;
113:16
done (20) 4:6,10;25:7;
26:7,13,16;27:20;
31:19;53:8;54:3;71:8;
74:6,6;75:4,5,6;79:6;
94:4;104:3;114:15
down (5) 3:18;76:12;
94:7;98:24;108:12
Dr (116) 9:20;14:3;
34:14,19;15:10;36:3,
13,18;37:7,8;38:3,6,14,
17,23;41:18,24;42:4,4;
43:1,8,16,24;45:3;47:8,

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

GREGORY G. WACKER
June 29, 2017

12,16;48:22;49:1,5,9;
51:24;53:10;54:1,17,
23;55:21;56:12,15,17;
57:21;59:6;61:13,19,
22;62:6,18,20;63:19;
64:4,17;65:13;68:4,15;
69:5,13;70:1,11,19,24;
71:6,6,12,15,19;72:1;
73:7,11,22;74:24;
75:13;77:24;78:4,10,
24;79:8,16,20;85:5;
87:3,12,15;88:7,17;
90:3,10,13,20;91:5,15;
92:21;93:4,15;95:7,7,
10;96:9,12;97:6,16,19;
98:6,14;102:21;
104:15;105:20,23;
106:7,9,14,15;108:6;
109:5;112:9,22;115:8;
116:6
**draft (5)** 41:10;46:11;
55:14,17,20
**drafted (1)** 55:15
**drafting (1)** 46:18
**Drew (104)** 9:4;13:24;
14:20;15:7;17:1;18:3;
34:20;35:15;36:4,5,9,
10,14,17,20;37:6,24;
38:1,11,23;39:8;41:14;
43:2,19;44:1,24;46:2,4,
21;47:8,11,14;49:21;
50:1,5;53:9,24;54:5,12,
16,21,22;56:5,5,15,21;
57:5,12,13,14,16,21,
24;58:13,14,15;59:10,
12;60:9;61:13,16;62:4,
15,17,23;63:19;64:4,
19;65:10;66:5,8,19,23;
67:16,16;68:3;70:10,
13,23;71:10;79:7,11;
80:4,14;95:13,14;97:7,
7,18;101:13;103:8,11;
106:23;108:4;109:6,6,
12,16;112:9,12,17;
113:5;115:12;116:4
**during (8)** 10:4;20:19,
24;21:4;35:3;61:12;
86:5;94:14
**duties (1)** 19:10

## E

**earlier (6)** 31:6;66:15;
90:4;91:3;97:18;98:8
**early (1)** 32:15
**easiest (1)** 82:6
**edict (1)** 74:1
**EEO (7)** 16:9;17:23;
19:6,9,15;20:6;69:22
**EEOC (4)** 21:5;82:4,8;
84:13
**effect (3)** 46:20;85:24;
98:14

**Effective (1)** 55:9
**either (4)** 14:9;28:6;
97:6;98:11
**electronic (1)** 57:9
**else (16)** 12:22;28:5;
30:10;35:12;41:11;
45:14,17;47:19;49:16;
50:9;52:22;62:16;
65:10;82:21;83:2;
110:8
**else's (2)** 18:15;23:18
**e-mail (45)** 35:23;41:2,
3;46:17,20;52:11,12;
71:2,7,13;72:8;73:10;
74:11,22;77:13,20;
79:1,14,21;80:9;81:2;
83:10,14,21;84:9;
85:13,21;86:3;87:15;
88:8,17;90:2,19,24;
91:4,23;92:12;101:12;
102:2,9,17;107:21;
110:24;111:24;114:2
**e-mailed (1)** 82:10
**e-mails (2)** 40:12;50:6
**employed (5)** 5:8;11:5,
6;21:15;23:7;30:22;
115:3,15
**employee (14)** 10:22;
20:20;21:1,5,8;26:10,
21;30:1;53:22;77:1;
85:23;86:4;100:2;
104:22
**employees (3)** 81:9;
107:7,13
**Employment (11)**
19:16;31:12;34:11;
41:19;42:1;45:19;
52:24;55:10;68:22;
69:8;85:18
**encourage (4)** 77:15;
104:22;105:18;107:13
**encouraged (1)** 104:22
**end (5)** 51:12;55:9;
56:13;69:7;113:4
**ending (1)** 68:22
**ends (1)** 109:10
**English (1)** 74:2
**enough (1)** 18:12
**entitled (1)** 65:6
**entity (1)** 13:19
**environment (9)** 71:22;
73:1;78:8,19;79:18;
81:4;85:22,24;86:1
**Equal (1)** 19:16
**equation (2)** 53:24;
70:11
**Erin (1)** 9:7
**errors (1)** 42:5
**evaluating (1)** 95:18
**evaluation (2)** 12:15;
29:16
**evaluations (2)** 29:20,
23

**even (6)** 4:7,22;33:17;
60:9;73:2;100:13
**everybody (4)** 33:19;
44:2;73:16;74:2
**everyone (1)** 72:18
**evolved (1)** 75:3
**exact (7)** 9:1,9;21:12;
33:13;36:19;77:14;
87:8
**exactly (2)** 14:7,16
**except (1)** 83:16
**excessive (3)** 25:4,18,
21
**excessively (2)** 26:3,18
**excuse (1)** 112:5
**excused (1)** 116:23
**exists (1)** 97:9
**expand (1)** 107:15
**expect (2)** 42:16;71:8
**expense (2)** 56:12;57:3
**experience (2)** 86:11,
19
**explain (5)** 3:7;15:11;
25:12;38:23;98:5
**explained (1)** 31:6
**Explanation (2)** 96:16;
110:3
**exploring (1)** 106:1
**express (5)** 45:10;47:6;
48:21;71:14,18
**expressing (1)** 47:11
**extended (1)** 93:16
**extent (1)** 111:17
**externally (1)** 10:17

## F

**facilitate (2)** 43:17;
54:23
**facilitated (2)** 34:13;
43:16
**facilitating (2)** 95:23;
96:1
**fact (14)** 40:4;42:6,10;
44:4;58:1;73:22;79:11;
85:15;94:4,11;104:1;
107:12;108:10;109:8
**faculty (4)** 6:4;32:9;
73:2;74:13
**failed (1)** 57:19
**faking (2)** 23:20;24:4
**fall (1)** 103:20
**falls (1)** 35:1
**far (2)** 52:16;70:15
**February (2)** 111:1;
112:1
**feel (2)** 16:2;93:23
**feeling (1)** 71:19
**feelings (1)** 91:5
**feels (1)** 102:12
**felt (4)** 14:8;77:16;
78:7;100:24
**few (1)** 63:12

**figure (1)** 26:21
**file (5)** 14:11;35:24;
77:15;80:7,8
**filed (1)** 21:5
**filing (1)** 15:23
**final (2)** 55:20;114:12
**finance (9)** 6:8,15,20,
21;7:2,12,18,21;15:18
**find (4)** 24:7,11;26:20;
27:3
**fine (1)** 32:5
**finer (1)** 17:11
**finish (1)** 60:1
**fire (2)** 38:3,24
**fired (1)** 52:15
**first (15)** 4:11;5:15;
7:10,15;31:20;36:3;
40:3;41:23;55:17,23;
56:6;88:3;90:2;112:1;
113:18
**firsthand (1)** 106:19
**five (3)** 9:17;54:15;71:3
**FMLA (13)** 23:7,12,14,
17,21;24:8;25:1,2,9,15,
21,24;29:9
**FOAPAL (13)** 40:20;
41:5;46:7,18;56:22;
57:6,14;58:7,18,21;
60:18,19;61:8
**F-O-A-P-A-L (1)** 56:23
**focus (4)** 36:6;74:6;
77:23;78:3
**focusing (3)** 37:3;
77:24;78:1
**Foehl (16)** 17:24,24;
18:17,18,19;10:20:5,6;
50:16,21;51:1,7;68:24;
69:16;115:5,8,12
**Foehl's (3)** 14:11;16:7;
74:19
**folks (3)** 8:21;33:18;
50:11
**follow (5)** 25:4;26:11;
42:17,23;114:23
**followed (1)** 96:6
**following (3)** 44:2;
65:19;95:7
**force (1)** 32:4
**form (57)** 11:21;13:1,
15;16:13;18:21;19:12;
23:23;27:2;31:24;32:5;
33:2;34:12,18;35:13,
21;38:4;40:15;43:12;
44:20;49:11,18;50:12;
51:18;53:13;55:21;
58:3;60:14;61:5;62:24;
63:14;73:12;75:1,15;
76:8,20;77:6;78:21;
79:4;80:11;82:2;84:14;
85:9;86:8,15,23;91:6,
12;93:1;97:24;100:4;
102:14;103:17;105:24;
108:7;109:23;110:10;
112:14
**formal (6)** 15:16;16:22;
53:11;77:9;80:7;100:3
**format (3)** 35:19,23;
52:9
**forth (6)** 39:1;46:12;
63:23;64:11;93:12;
114:10
**forward (2)** 84:9;94:6
**forwarded (2)** 83:17;
90:20
**forwarding (2)** 46:17;
83:20
**forwards (1)** 90:6
**found (1)** 27:7
**four (8)** 5:19;7:9;8:19,
24;25:15,15,19;42:7
**four-day (2)** 40:23,23
**Frankly (1)** 72:20
**Friday (1)** 57:20
**front (6)** 13:18;68:3;
103:23;111:16,18;
113:15
**full (2)** 14:6;98:10
**full-time (1)** 73:17
**funneled (1)** 109:11

## G

**gather (4)** 37:10;39:8,
16;40:4
**gathered (3)** 39:19;
41:14;109:12
**gave (5)** 56:14;62:14;
65:13;112:22
**gender (3)** 14:10;
16:12,18
**gender-based (1)** 17:3,
12;18:4
**gender-type (1)** 20:7
**general (15)** 37:2;
39:24;44:9;48:17;50:3,
21;51:7,9;58:13;70:5,
6,7,18;74:20;105:15
**generally (2)** 31:15;
57:1
**gentleman (1)** 90:3
**gets (4)** 25:16;34:21;
65:1;103:22
**given (7)** 12:11;73:21;
74:4;96:7,10,14;101:7
**gives (1)** 77:2
**giving (3)** 3:10;83:3;
96:8
**goals (1)** 53:17
**goes (3)** 37:13;77:1;
82:23
**good (2)** 86:13,21
**Greg (10)** 17:17;52:5;
64:2;72:15;88:21;89:4;
99:5;112:2,3;113:5
**ground (1)** 3:6
**group (10)** 17:21;

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

GREGORY G. WACKER
June 29, 2017

19:16;34:24;43:23;
61:11;69:17;74:18,19;
103:21;104:5
**grow** (1) 107:14
**guess** (4) 7:9;32:19;
68:14;83:24
**guidance** (9) 11:16;
12:5;13:4,7;32:7;
33:21,23;34:2;44:3
**guide** (1) 11:17

## H

**Hahnemann** (1) 7:4
**Hamilton** (1) 116:9
**hand** (2) 34:22;95:1
**handle** (7) 12:4;18:23;
26:8;27:4,20;74:18;
76:3
**handled** (1) 103:11
**handles** (3) 13:20;16:3;
64:22
**handling** (1) 92:24
**happen** (2) 20:16;
78:18
**happening** (1) 80:3
**happens** (1) 11:23
**happy** (2) 107:7,15
**harassed** (3) 20:21;
71:19;73:17
**harassing** (2) 29:9;
74:16
**harassment** (6) 72:21;
79:22;81:3;86:4,6,7
**Head** (2) 3:21,22
**hear** (3) 62:3;68:5;
78:15
**heard** (3) 62:1;68:11,
12
**hearing** (2) 70:12;
111:15
**held** (2) 6:7,12
**help** (6) 31:23;32:8;
54:23;70:13,23;71:11
**helping** (3) 22:22;
64:22;79:8
**Hence** (1) 53:24
**here's** (3) 36:22;42:6;
109:13
**Hey** (3) 15:22;25:14;
26:9
**hired** (6) 5:20;10:16,16,
17,19;54:14
**hold** (2) 5:18;6:14
**Honeywell** (19) 21:9;
22:8;23:4,6;24:12,16;
25:24;26:13;27:11;
28:1,7,20;29:2,5,9,15,
23;30:8,13
**Honeywell's** (3) 24:7;
28:23;29:19
**hostile** (9) 71:22;73:1;
78:8,20;79:18;81:4;

85:23;86:1,1
**hotel** (1) 63:17
**hours** (4) 25:15,15,19;
71:8
**house** (1) 28:13
**HR** (29) 19:6,19;20:1;
21:1;29:2,4,8;35:6;
37:11;39:21;51:10;
63:2;67:22,74,19,
81:14,18,21,24;82:1,
15;84:10;89:10;92:5;
93:20;95:19;96:5;
109:15;114:12;116:5
**HR/labor** (1) 65:1
**HR's** (2) 93:4,12
**hub** (1) 15:17
**human** (6) 45:17;81:1;
89:1;91:16;92:23;
108:1

## I

**idea** (4) 32:13;86:13,
21;109:3
**identification** (4) 101:5;
107:18;110:21;113:13
**identified** (1) 35:8
**impossible** (1) 72:20
**improve** (2) 31:23;32:9
**improvement** (2) 53:7,
12
**inappropriate** (1) 97:12
**incident** (9) 38:15;
40:10;48:6,6;58:11;
62:3,7;69:18;89:19
**incidents** (5) 63:9;67:7;
89:16;90:17;96:13
**include** (1) 78:2
**incompetency** (1)
100:13
**indeed** (1) 14:11
**indicate** (1) 17:9
**indicated** (4) 38:19;
57:6;59:16;107:6
**indicating** (3) 14:15;
41:4;105:16
**indirect** (13) 10:8,9;
11:13;21:22;22:7,11,
12,17;31:2,5;33:14,17,
20
**individual** (8) 22:24;
36:23;64:21;91:24;
96:4,5;116:9,15
**individuals** (1) 97:12
**inform** (5) 29:1;32:23;
81:1;91:2;116:4
**information** (28) 24:7;
27:11;32:24;36:23;
37:10,20;40:4,9;41:13;
43:22;44:5,16;46:2;
56:14,19;57:11;58:1;
59:8;61:3,15;62:14;
63:12;64:23;77:2;

92:16;95:18;109:13,16
**informed** (1) 29:8
**infraction** (1) 42:14
**In-house** (3) 28:12,13,
14
**initial** (1) 114:13
**initiate** (4) 35:10;43:4;
109:5;114:13
**initiated** (3) 36:3;43:1;
106:22
**initiates** (1) 34:19
**initiating** (4) 95:7,11,11,
12
**input** (1) 12:14
**insinuated** (1) 40:21
**instance** (2) 61:2;69:24
**instances** (1) 111:15
**instruct** (5) 24:6,10,14;
29:14;39:8
**instructed** (1) 56:11
**instruction** (1) 4:20
**instructions** (1) 4:3
**interactions** (2) 93:19;
103:12
**interjected** (1) 54:22
**interjecting** (1) 53:9
**intermittent** (2) 23:12;
25:24
**internally** (1) 104:19
**international** (1) 73:24
**interpret** (2) 17:13;
105:9
**interpreted** (3) 17:4,19;
78:14
**into** (15) 10:17,24;11:2;
27:10,14;38:7;52:17;
53:9,24;57:3;70:20;
74:14;104:23;105:4,10
**investigated** (3) 34:20;
38:20;55:24
**investigations** (1) 19:2
**involved** (4) 64:21;
69:17;80:4;93:20
**issuance** (1) 99:11
**issue** (31) 13:6;19:1;
20:2;24:15;34:24;
36:22;37:9,14,15,18,
19;38:2,5,24;42:23;
56:17;58:16;59:5;60:8;
62:20;63:17;80:10;
84:13;95:4;97:22;
103:14;111:6,12;
112:9,13;113:6
**issued** (4) 27:23;35:9;
94:13;108:20
**issues** (8) 13:18;20:7;
25:7;53:23;63:23;
70:15,16;82:14
**issuing** (1) 95:16
**items** (4) 24:24;42:6;
56:1;94:2

## J

**January** (1) 108:21
**Jenkins** (8) 54:11;90:3,
6,13,20;91:2,11;93:7
**Jie** (1) 9:19
**job** (9) 6:22;7:1;19:10;
73:18;104:19,23;
105:2,4,6
**jobs** (6) 72:19;105:17;
106:6,13,14;108:11
**judge** (2) 4:23;20:17
**Judy** (10) 30:17;31:15,
21,24;32:11,24;34:1;
74:7,10;78:2
**Judy's** (1) 31:18
**jurisdiction** (1) 19:11
**jury** (1) 4:24
**Justin** (1) 72:24

## K

**Kamel** (1) 5:24
**K-A-M-E-L** (1) 6:2
**keep** (1) 111:21
**kept** (1) 106:7
**Khalili** (1) 5:24
**K-H-A-L-I-L-I** (1) 6:2
**kick** (1) 37:11
**kind** (1) 10:13
**Klein** (5) 8:1,13,14;
9:13,15
**knew** (1) 18:12
**knowing** (1) 72:16
**knowledge** (3) 20:20;
21:1,5

## L

**labor** (29) 34:23;35:6;
37:12;43:23;44:1;
45:11,12,14,21;46:15,
18,24;47:19;51:10;
52:13;55:15;63:21;
65:24;66:4;84:1;91:16;
93:14;95:6,8;99:10,15;
107:24;110:8;116:9
**language** (4) 36:19;
76:18,19;77:3
**last** (7) 4:20;31:1;42:7;
43:9;52:4;55:8,24
**late** (9) 94:11;109:21;
110:4;111:9,10,14;
112:5;113:2
**later** (3) 3:20;28:1;84:5
**lateral** (1) 8:9
**lead** (2) 105:7,8
**leads** (1) 74:14
**learn** (9) 14:17;29:7;
32:4;57:11,16;61:15;
68:15,22;104:17
**learned** (3) 28:6;64:19;

116:5
**leave** (6) 22:21;23:7,
14,17;25:24;29:9
**leaving** (1) 80:5
**led** (1) 105:13
**left** (5) 3:18;7:4;10:13;
22:20;104:4
**length** (1) 61:10
**Lennon** (6) 30:17;
31:15;32:11;33:1;34:1;
78:3
**less** (2) 10:11;13:4
**letter** (20) 41:10;46:10;
51:16;55:5,8,14,18,21,
23;58:23;62:10;65:18;
90:10,14;91:15;92:21;
114:10,18,22;115:2
**level** (1) 10:2
**levels** (1) 90:17
**liars** (1) 61:20
**likely** (1) 60:5
**line** (1) 72:12
**lines** (2) 21:14;98:12
**locked** (1) 60:12
**long** (6) 4:15;5:18;
9:16;54:19,20,21
**longer** (4) 115:3,9,13,
15
**look** (9) 12:15;27:10,
13;37:20;44:6;54:24;
83:5;107:13;110:18
**looked** (5) 85:21;90:24;
102:5;104:8
**looking** (8) 70:4;80:9;
105:3,17,23;106:6,13;
109:14
**lost** (1) 87:22
**lot** (4) 16:19;51:8,9;
106:9
**loud** (1) 102:24
**lower** (1) 29:15
**lying** (2) 58:19;59:9,21

## M

**magic** (2) 76:18;77:3
**main** (1) 61:22
**making** (4) 44:1;77:4;
103:21
**manage** (3) 71:11;
79:8;80:6
**management** (1) 70:8
**manager** (10) 5:17;
7:16,16,17;80:2;85:19;
86:11,13,20,21
**managing** (1) 80:5
**manner** (5) 42:14;
93:17;94:4,5;100:17
**manual** (1) 31:24
**many** (10) 8:18,23;
9:15;41:21;42:2;43:7;
48:2,8;66:12;67:3
**March** (5) 56:7;10;58:1;

61:1;114:3
**marked (12)** 55:1;72:4;
89:23;91:18;94:18;
101:2,4;107:17;
108:16;110:20;111:21;
113:12
**matter (2)** 13:6;92:24
**may (10)** 3:24;9:7;
10:9;11:17;25:6;38:6;
39:6;69:15;97:14;
114:19
**maybe (2)** 7:9;42:3
**mean (13)** 9:7;10:15;
13:22;14:24;22:16;
25:12;35:23;43:17;
44:5;47:8;66:2;82:6;
94:2
**meaning (3)** 37:12;
57:5;106:14
**meant (1)** 103:4
**medical (3)** 23:17,18;
27:11
**meet (4)** 28:14;53:18;
54:1;73:22
**meeting (14)** 15:11,17,
22,22;53:9,22;54:17;
57:22;61:12;97:15;
110:2;113:5,7,8
**meetings (2)** 12:1;
92:16,20
**member (1)** 6:4
**members (3)** 13:23;
73:2;74:13
**memo (2)** 35:24;41:2
**memory (1)** 37:23
**memos (1)** 40:12
**mentioned (4)** 16:1;
66:15;90:4;97:17
**met (5)** 28:16,19;57:20;
115:8,12
**Michael (5)** 8:1,13,14;
9:13,14
**middle (1)** 96:18
**might (5)** 7:13;13:10,
11;23:5;48:12
**milling (1)** 14:22
**Mine (1)** 54:7
**minutes (1)** 115:23
**Miss (63)** 12:7;13:14;
19:17;23:6;24:7,10,12,
15,16;25:24;26:13;
27:1,10,13;28:1,7,20;
29:9,15,22;33:22;34:4,
7,7;35:11,20;37:4;
38:3;41:18;42:1;43:2;
44:13;45:5,8,19;49:2,6,
17,17;51:17;65:19;
68:13,18,21;74:23;
75:12;77:12;81:2;
83:21;84:12;85:22;
99:19,21;105:1;
106:18;109:21;110:8,
15;113:21;114:3;

115:8,12,15
**misstates (2)** 79:5;87:5
**mistake (1)** 42:12
**mistakes (4)** 39:6;42:5,
12,15
**moment (5)** 55:2;72:4;
94:19;101:8;107:20
**monitor (2)** 22:22;64:22
**monitoring (2)** 80.13,14
**months (2)** 42:7;54:18
**More (17)** 10:11;13:3;
17:16;18:2;19:22;
20:10;24:7,11;27:17;
30:5;37:1;48:11;60:5;
64:1;82:18;115:16;
116:2
**morning (1)** 71:9
**most (3)** 19:3;48:14;
94:2
**much (1)** 4:6
**multi-languages (1)**
73:24
**multiple (3)** 16:20;38:9;
90:15
**multi-step (1)** 35:3
**MUNSHI (107)** 12:6;
13:12,21;16:5,23;
17:10,22;18:11;19:5,
14,24;20:18;22:5;24:2;
27:22;28:8,18;29:13;
30:7,9,15;32:22;33:4;
34:16;35:2,16,22;
38:10;39:2,14;40:17;
43:14;44:22;48:1;
49:15,20;50:14;51:4,
20;52:8,19,21;53:5,15;
58:5;60:6,16;61:7;
63:3,16;64:5;65:8,17;
69:9,11;73:19;75:7,19;
76:11,23;77:11;78:23;
79:9;80:16;82:7,19;
83:1,18,19;84:17;
85:11;86:10,18;87:1,
10,19;88:9,10,23;89:7,
18;91:8,14;93:3;98:4;
99:7;100:6;101:2,6;
102:22;104:7;106:4;
107:16,19;108:9;
110:1,13,18,23;112:16;
113:11,14;115:20,23;
116:1,12,19
**must (1)** 74:2
**myself (3)** 14:20;66:5;
113:6

---

## N

**name (1)** 28:9
**named (6)** 21:8;30:16;
33:5;91:24;116:9,15
**names (2)** 9:2,9
**nature (1)** 70:18
**necessarily (1)** 84:20

need (18) 6:1;12:3;
13:6;26:10;31:20;
42:13;43:21,21;72:12;
73:13,21;74:6;75:23;
78:3,4;84:22,24;107:8
**needed (6)** 11:15;
40:20;54:3;84:20;
96:17;104:3
**needs (3)** 32:10;74:5;
78:5
**Negligence/Carelessness (1)**
65:23
**neither (1)** 102:16
**new (1)** 105:4
**Newton (4)** 33:6,22;
34:4,7
**next (5)** 4:10;6:6;7:1;
54:2;104:4
**Nicholson (3)** 10:10,14,
24
**night (1)** 57:24
**nine (4)** 6:12,13;7:12,
19
**nobody (1)** 11:14
**nods (1)** 3:22
**non-FMLA (2)** 25:3;
26:18
**non-Temple (2)** 71:2,7
**noon (1)** 112:4
**normal (10)** 11:24;
64:20;65:3;79:24;81:6,
16;82:1,13;91:9;110:6
**normally (2)** 3:7;37:3
**notice (1)** 102:15
**November (6)** 94:22;
98:18,22;104:9,12;
106:17
**number (2)** 9:1;57:2
**numbers (1)** 101:22
**numerous (4)** 50:24;
51:1,6;100:14

---

## O

**oath (2)** 4:21,24
**object (1)** 88:14
**objected (1)** 88:5
**Objection (78)** 11:21;
13:1,15;15:13;16:13;
17:5,14;18:7,21;19:12,
20;20:8,13;23:23;
27:15;29:10;30:4;33:2;
34:12,18;35:13,21;
38:4;39:1,11;40:15;
43:12;44:20;47:21;
49:11,12,18;50:12,22;
51:18;52:2;53:2,13;
58:3;60:14;61:5;62:24;
63:14,24;65:15;73:12;
75:1,15;76:8,20;77:6;
78:21;79:4;80:11;82:2,
16;84:14;85:9;86:8,15,
23;87:4;88:19;89:2,12;

91:6,12;93:1;97:24;
99:3;100:4;102:14;
103:17;105:24;108:7;
109:23;110:10;112:14
**objectives (1)** 53:18
**obligations (1)** 5:1
**obviously (1)** 3:18
**occasion (3)** 13:13;
106:18;107:2
**occasionally (1)** 31:22
**occasions (1)** 100:14
**occurred (2)** 48:7;90:18
**occurrence (1)** 11:19
**o'clock (2)** 71:1,3
**October (3)** 72:8;79:10;
88:18
**offer (1)** 47:14
**office (52)** 10:13,20;
11:2;13:23;14:1,11,21,
21,21,24;15:1,2,17,20;
16:3,6,7,9,21;17:23;
18:10,13,16;19:6,9;
20:6;21:14,17,18,20;
24:11;28:11;40:8,19;
41:4;56:2;58:13,14,14,
15,17;61:22,23;68:6;
69:2,6;72:1,21;73:1;
101:20;111:16,18
**often (1)** 11:24
**old (1)** 32:11
**Once (32)** 11:11,14;
14:6,13;15:17;16:1,16,
21;22:21;26:19;27:18;
35:6;38:13;42:16;44:5;
51:9;58:12;64:20;
69:15;70:20;71:10;
73:14;74:14,17;75:2;
80:4;82:11;93:20;
103:22;107:12;112:7;
114:11
**one (42)** 4:11;12:22;
14:2;17:16;18:2,6;
19:22;20:10;27:17;
30:5;33:17;36:6;38:7;
42:3;43:7;46:18;48:11,
12;51:2;54:7;60:13;
64:1;67:15,16;69:18,
18;72:22;78:18;79:20;
80:8;82:18;83:16;
87:22;93:21;103:19;
105:9;108:20;109:22;
111:16;114:19,21,23
**one-off (1)** 11:20
**only (5)** 25:7;66:18;
80:8;98:9;106:20
**open (1)** 111:16
**opinion (3)** 44:7;47:15;
76:2
**opportunities (2)** 106:2;
107:14
**Opportunity (2)** 19:16;
83:3
**opposed (2)** 39:3;

110:15
**orally (1)** 35:23
**Organizational (1)** 10:1
**others (5)** 13:18,22;
78:3;82:24;101:20
**otherwise (1)** 66:7
**out (33)** 3:22;10:11,12;
12:1;15:20;23:12;24:7,
11;25:1,2,9,14,15;
26:20,21;27:3,7;31:24;
32:2;40:7;60:12;72:16;
85:1,2;97:15;100:24;
102:13,24;104:23;
105:3;106:2,13;107:14
**outbox (1)** 101:8
**outer (1)** 14:21,24
**outside (5)** 15:1,2;28:7;
68:6;70:16
**over (27)** 4:5;10:11,15;
11:9;12,13;19:1;34:22;
38:3,24;42:7;48:13,14;
52:10,22;53:23;54:18;
55:24;71:11;84:10;
86:12,19;90:6,20;
93:16;100:1,8
**overlap (1)** 54:20
**oversleeping (2)**
111:13;112:13
**own (1)** 23:17

---

## P

**P-10 (4)** 72:4;80:9;
83:18;90:24
**P-11 (3)** 83:6,9,20
**P-12 (3)** 89:23;90:2;
91:16
**P-13 (4)** 91:18,20;
92:11;93:12
**P-18 (1)** 108:16
**P-19 (1)** 55:1
**P-22 (3)** 101:3,4,7
**P-23 (3)** 107:16,17,21
**P-24 (3)** 110:19,20,24
**P-25 (6)** 113:11,12,15,
18;114:2,16
**P-6 (5)** 94:18,21;97:2;
102:5;104:8
**page (5)** 90:2;96:18;
113:18;114:2,16
**paragraph (3)** 56:7;
39:20;44:18;70:7;
73:15,20;74:19;79:7;
103:11
**part (11)** 16:19;19:3,6;
39:20;44:18;70:7;
73:15,20;74:19;79:7;
103:11
**participate (2)** 66:6;
92:20
**particular (1)** 8:2
**particularly (1)** 13:24
**pass (2)** 95:19;109:6
**passed (4)** 65:1;95:18;
106:23;109:13

passing (1) 109:17
past (1) 20:14
Pause (9) 55:3;72:6;
83:7;89:24;91:19;
94:20;107:22;108:17;
115:24
paying (1) 98:10
penalties (1) 5:2
pending (1) 4.16
people (10) 15:3,19;
16:20;26:7;40:1;47:3;
52:24;103:5,15;106:10
percent (3) 37:21;
97:14;114:8
performance (20) 12:8,
11,15;25:6;27:19;
29:16,16,19,23;49:10;
53:7,11,20;89:1,10,11,
14,15;106:18;107:1
performed (1) 70:22
period (4) 9:10;40:23,
24;93:16
periods (1) 53:19
perjury (1) 5:2
persistent (1) 58:20
person (6) 22:20,21;
48:13;52:10;54:9;
99:17
personally (1) 98:24
personnel (3) 18:23;
19:1;20:2
person's (1) 6:3
pertained (1) 109:21
phone (5) 35:24;48:13,
15;52:10;66:7
phrase (4) 37:14,15;
42:18;43:15
pick (1) 104:5
place (7) 35:17;36:12;
54:5,18;61:21;64:15;
113:9
plan (3) 53:7,12,21
planned (1) 15:22
play (3) 34:10;95:15,17
played (1) 50:9
playing (1) 79:11
please (1) 101:20
pm (2) 56:11;57:4
point (34) 4:15;9:18;
10:4;13:9;14:8;17:11,
19;18:24;21:21;23:7;
24:14,23;26:8;27:9;
31:8;37:9;47:6;49:5;
56:6;59:4;62:9;63:13,
23;64:9,12;65:11;
68:13,21;69:15;71:5;
103:2;104:17;112:17;
114:21
policies (1) 101:21;
103:5,15
policy (3) 76:7,7,9
position (10) 5:15;6:6,
13,14;7:15,17;10:19;

23:13;29:22;54:6
positions (2) 54:22;
104:24
possible (16) 59:23;
60:7,12;65:13;78:17,
22;85:8,10;87:2,7,11,
14;88:4,11,16,22
Possibly (4) 5:16;63:1;
65:12;91:13
potential (2) 5:2;84:18
practice (8) 65:7;79:24;
81:7,16;82:1,13;91:9;
99:9
predates (1) 114:18
present (3) 12:22;15:7;
57:22
previous (2) 82:21,22
previously (7) 55:1;
72:3;89:22;91:18;
94:17;108:15;111:20
print (2) 32:2,5
prior (11) 12:11;49:8;
58:10;61:1,9;68:13,21;
69:7;87:11;104:11,15
probably (4) 6:11,24;
9:17;104:20
problem (2) 12:2;38:20
problems (4) 27:3;
38:19;42:5;71:12
procedure (1) 65:4
proceed (9) 36:24,24;
43:21;47:9;52:7;64:24;
100:15,16;109:7
process (8) 11:24;35:3;
64:20;95:20;96:6;
106:22;109:9;110:6
product (4) 106:19;
107:3;114:12,13
promoted (1) 8:11
promotion (2) 8:8,10
properly (1) 74:5
ProShred (3) 103:21;
104:4,5
provide (9) 45:21;46:1;
63:11,19,20;107:7,15;
112:12,17
provided (9) 46:3,4,15,
23;47:1;63:18;64:4;
112:8,20
pulled (1) 79:7
punched (1) 72:17
purposes (1) 4:3
pushed (1) 26:9
put (10) 20:13;38:7,14,
16;53:24;67:7;70:11;
71:10;96:23;108:12
puts (1) 60:20
putting (2) 53:6;69:22

### Q

quite (1) 11:24
quote (2) 79:22;92:15

quote/unquote (1)
37:18

### R

Rahul (5) 20:13;65:5;
82:23;87:5;88:1
raise (3) 81:13,17;
100:20
raised (8) 30:2,13;
68:23;70:19;80:3;
84:12;86:14,22
raises (1) 76:17
raising (8) 68:18;69:4;
72:1;75:12;76:14,14,
19;103:1
Ralph (6) 54:10;90:3,
13,20;91:2;93:7
randomly (1) 11:20
rating (1) 29:16
reach (1) 45:7
reached (3) 40:7;85:1,2
read (2) 102:24;116:22
really (1) 4:4
reason (3) 60:13;79:3;
93:22
reasons (2) 25:2;26:18
recall (141) 7:7;12:13,
17;23:6;27:24;29:6;
31:17;35:18;36:16,19;
38:1,13;41:7,12;43:13;
44:21;45:16,20;46:16,
17;47:5;48:2,10,11,18,
19,20;49:16;50:8,17;
51:2,13;55:19,22;
56:16,18,20;61:2,6;
62:21;63:7;64:8,13;
66:13,17,18,22;67:5;
69:3,10,21,24;70:3;
71:24;77:14,22;79:2,
11,13,15,19,20,23;
81:5,8;84:11;85:4,7,14,
15,17;89:21;90:9,11,
12;91:7,17;92:10,22;
93:6,8,10,11;94:13;
95:3;96:15,24;97:10;
98:13,16;99:16,17,20,
21,24;100:5,8,22;
101:1;102:10;103:7,8,
10,19;104:13,16;
105:21,21;108:3,8,13,
24;109:16,19,20,24;
110:2,5,12,17;111:7,8,
11,12,15,17;112:7,11,
15,21,22,24;113:3,8,
10;115:6,10,14,22;
116:14,18
received (6) 81:2;
90:10;92:16;100:3;
104:11,14
receiving (2) 26:12,15
Recess (1) 52:20
recognize (1) 74:4

recollection (11) 37:23;
50:20;63:4;77:18;
95:23;99:8,10;100:19;
110:7,15;111:4
recommend (1) 31:8
recommended (2)
51:24;52:6
record (2) 20:13;
102:24
records (1) 101:21
reference (5) 107:5,8,
15;108:10,14
referring (2) 56:4;83:15
refresh (1) 111:4
regard (5) 35:4;40:1;
77:13;95:21;109:9
regarding (33) 28:7;
29:9;30:2;31:12;34:9;
37:6;40:13;44:24;45:4,
22;46:7;48:3;49:17;
50:7;56:7;62:11;63:17,
22;64:10;66:10,19,24;
69:23;90:13;91:4;
92:21;100:20;102:23;
109:17;111:6;112:13,
18;116:16
regular (2) 25:10,12
reimbursement (6)
38:6,14,16;56:12,17;
57:10
reimbursements (1)
60:20
relate (2) 18:5;19:3
related (6) 23:17;25:3,
21;90:15;97:21;98:2
relates (2) 89:15,16
relations (33) 34:23;
35:7;37:12;43:23;44:1;
45:11,12,14,17,21;
46:15,18,24;47:20;
51:10;52:13;55:16;
63:21;65:2,24;66:4;
84:2;91:16,16;93:14;
95:6,8;99:11,15;108:1,
1;110:9;116:10
relations' (1) 92:23
relationship (9) 9:19;
10:5;21:22;22:7,10;
31:3;33:15;71:15;
105:20
relaying (1) 47:15
remember (8) 8:24;
23:11,12;46:21;96:1;
109:8
remind (1) 3:24
repeat (8) 3:13;41:22;
75:10;76:21;86:16;
89:5;96:11;106:8
repeatedly (1) 20:15
report (27) 5:23;7:24;
9:11,21,23,24;10:7;
22:13,23;59:4;74:5;
94:21;95:1,16,22;

97:21;99:12;100:3,21;
102:3;106:10;108:19;
109:9,10,18;110:9,16
reported (3) 9:12;
22:13,18
reporting (8) 8:16,21;
9:14,18;10:5;21:22;
31:3;33:14
reports (3) 8:15;9:22;
94:14
request (12) 34:14,20;
35:10,19;36:3,13;37:7;
43:1,4,16;47:7;48:22
requested (1) 57:20
required (1) 81:15
requiring (1) 75:17
reservation (1) 62:11
reserves (1) 116:21
resign (1) 52:9
resignation (5) 51:22;
68:14;114:21,22;115:1
resigned (2) 51:19,23
resource (1) 13:5
resources (3) 13:10;
81:1;89:1
responded (1) 102:17
response (1) 13:18
result (2) 3:20;19:17
resulted (1) 60:8
retaliated (1) 20:22
retired (4) 30:23,24;
32:12;34:5
retirement (5) 32:14,15,
17;98:7,12
reverse (1) 96:16
review (13) 12:10;
39:18;40:11,18;41:1,
15;55:2;72:5;91:20;
94:19;101:8,10;107:20
reviewed (3) 35:6;
44:18;101:11
reviewing (2) 41:8;90:9
reviews (2) 12:8,11
Rhonda (1) 116:15
rid (1) 42:16
right (30) 3:17;7:22,24;
8:15;15:10;18:13;20:7;
23:2;36:6,13,15;37:22;
59:15,18;64:6;67:16;
68:11;70:22;72:21;
73:20;84:3;88:4,9;
90:4;92:5;96:17;97:3;
100:18;103:23;116:21
role (5) 5:18;12:23;
13:3;34:9;50:9;54:13,
16;73:15;79:12;82:14;
91:10;95:15,17
room (2) 4:23;62:11
rotating (1) 9:8
rule (9) 25:17;35:8;
42:13,23;67:20;82:5,9;
84:19;95:9
rules (18) 3:6;24:17,18,

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

GREGORY G. WACKER
June 29, 2017

20,21;25:4;26:11;27:5,
21;35:1;42:17;44:2,6;
48:5;52:7;59:6;65:20;
67:8
**run (1)** 93:19
**Ruth (134)** 10:6,11,21;
11:9;12:23;14:18;23:5;
24:6;26:23;27:7;28:19,
22,29:1,7,14,19,31:14,
18;32:23;34:9;35:4;
37:7,8;38:7;40:1,9,13;
41:8;44:24;45:23;47:7,
20;48:3,22;49:2,6,10,
22;50:2,7,10,16,21;
51:3,14;52:9,14,24;
53:6,18;54:1,17,21,23;
57:5,12;58:6,9,15;
59:20;61:2,13;62:1;
64:11,14;65:13;66:10,
19,24;70:11,23;71:2;
72:9;73:3;77:19;79:8;
82:9;84:10;85:1,12;
87:15;88:7,17;89:1,10;
91:4;92:9,17;93:9,24;
94:10,13;95:2;96:7,9,
10,14;97:12,18;98:5,
13,21;99:1;100:7,11;
101:12;102:8;103:9,
12,21;104:11,18;108:1,
5,11,20;109:4;110:2,
24;111:9,12,24,24;
112:18;113:22;114:5;
115:1,3,18,21,22;
116:5,13,16
**Ruth's (3)** 31:19;90:16;
103:23

## S

**said/she (1)** 70:21
**same (14)** 5:1,1;10:2;
20:15;31:5;43:4;44:2;
66:14;67:15;78:18;
83:10,14;84:1;87:8
**Sandra (1)** 14:10
**Sandy (18)** 16:7;17:24,
24;18:17,18;19:10;
20:5,5;50:16,21;51:1,
6;68:23;69:16;74:18;
75:5,7,11
**Sandy's (1)** 69:16
**sat (1)** 103:24
**SATINSKY (93)** 11:21;
13:1,15;15:13;16:13;
17:5,14;18:7,21;19:12,
20;20:8,12;22:1;23:23;
27:15;28:4,15;29:10;
30:4,12;32:18;33:2;
34:12,18;35:13,21;
38:4;39:1,11;40:15;
43:12;44:20;47:21;
49:11,18;50:12,22;
51:18;52:2,17;53:2,13;

58:3;59:24;60:14;61:5;
62:24;63:14,24;65:5,
15;69:7;73:12;75:1,15;
76:8,20;77:6;78:21;
79:4;80:11;82:2,16,22;
83:13;84:14;85:9;86:8,
15,23;87:4,17,24;
88:19;89:2,12;91:6,12;
93:1;97:24;99:3;100:4;
102:14;103:17;105:24;
108:7;109:23;110:10;
112:14;115:18;116:11,
20
**satisfied (1)** 92:23
**satisfy (1)** 32:9
**save (2)** 42:4,15
**saved (1)** 42:11
**saw (1)** 102:17
**saying (10)** 16:17;
37:16,17;47:8;49:16;
59:14;76:19;82:21;
98:13;102:12
**scheduled (2)** 15:22;
57:21
**Science (2)** 8:3;21:19
**screaming (1)** 61:19
**screwed (1)** 42:7
**sealed (1)** 104:2
**second (7)** 36:2;62:9;
63:13,23;64:12;65:11;
114:2
**secretary (1)** 30:21
**security (1)** 101:22
**seeing (1)** 70:12
**seek (2)** 12:14;16:4
**seeking (1)** 75:17
**seemed (1)** 17:9
**Send (3)** 19:1;71:7;
102:17
**senior (2)** 10:12;54:8
**sent (4)** 46:11;50:5;
71:1;115:1
**sentence (3)** 55:8,23;
112:1
**sentences (1)** 63:12
**separate (3)** 66:16,22;
97:22
**series (4)** 3:9;42:4;
93:13,15
**serious (2)** 80:10;
103:14
**serve (2)** 13:4;108:10
**set (3)** 63:23;64:11;
93:12
**sets (1)** 32:9
**shakes (1)** 3:21
**share (1)** 55:20
**Sharon (5)** 91:24;92:2,
9,12;94:8
**showed (2)** 83:10,14
**shred (1)** 104:6
**shredding (1)** 103:22
**shut (1)** 94:6

**sick (7)** 25:2,10,13,15,
16,19,20
**side (1)** 96:17
**sign (1)** 116:22
**signed (2)** 55:6;62:10
**Similar (1)** 4:3
**singled (2)** 100:24;
102:12
**sit (2)** 96:3,4
**sitting (4)** 3:17;37:22;
64:6;100:18
**situation (4)** 12:4;58:7;
69:22;80:5
**situations (2)** 12:22;
51:2
**six (2)** 42:6;54:15
**six-digit (1)** 57:2
**skill (1)** 32:9
**skills (1)** 31:23
**social (1)** 101:22
**solution (1)** 60:5
**somebody (7)** 11:15;
22:13;23:18;33:5;
35:12;76:17;81:18
**somebody's (1)** 18:13
**someone (4)** 41:4;
76:14;80:14;81:13
**Sometimes (1)** 96:4
**somewhere (1)** 5:13
**Sorry (2)** 48:8;59:23
**sort (6)** 39:3;44:4;
45:22;47:14;53:16;
60:7
**sounded (1)** 88:12
**speak (1)** 29:4
**speaking (4)** 74:2;
85:12;99:10;112:2
**special (3)** 19:11;
76:18;77:2
**specific (5)** 19:10;
37:1;51:2,13;63:4;
67:7;70:3;77:18;89:16;
95:21,22;99:11;
100:19;110:7,16
**specifically (7)** 24:21;
38:1,2;42:21;44:10,12;
48:17
**specified (2)** 97:2,4
**specifies (1)** 51:16
**spell (1)** 6:1
**spoke (10)** 29:2;36:17;
45:18;49:1,5,9,21;
50:1;85:5;88:16
**spoken (1)** 74:1
**staff (4)** 9:8;12:3;13:23;
31:22
**stamped (1)** 113:16
**standard (1)** 95:20
**standing (1)** 15:5
**stands (1)** 19:15
**start (3)** 4:8;5:10;6:22
**started (2)** 47:10;71:12
**starts (1)** 72:23

**state (1)** 65:18
**statement (1)** 14:17
**states (3)** 53:17;55:9;
98:15
**stick (1)** 82:20
**sticker (1)** 111:22
**still (7)** 18:1;21:15;
30:22;34:4;57:6;92:6;
106:14
**stop (1)** 77:24
**straw (1)** 39:7
**stress (1)** 71:16
**stressful (1)** 72:18
**structure (1)** 19:8
**student (1)** 101:21
**students (2)** 72:22;78:2
**stuff (2)** 42:10;71:7
**subject (1)** 72:12
**submitting (1)** 104:18
**subordinate (1)** 79:17
**subordinates (1)** 79:21
**substantiated (1)** 38:21
**sufficient (1)** 64:24
**suggested (1)** 14:10
**summary (1)** 64:23
**supervise (1)** 26:20
**supervising (2)** 26:10;
64:21
**supervision (3)** 11:8,11,
13
**supervisor (8)** 26:9,20,
22;29:24;53:21;96:4,5;
106:22
**supervisory (1)** 11:9
**supporting (2)** 14:14;
97:6
**supposed (3)** 38:16;
53:22;104:3
**sure (19)** 3:20;4:4;9:5;
19:13;41:23;44:1;
46:23;54:1;61:10;
70:13;75:11;78:5;
86:19;95:13;96:6;
97:14;103:21;114:8,24
**system (6)** 53:12;
57:10;60:18,19,22,23
**systems (3)** 38:8,8;61:4

## T

**talk (22)** 4:5;13:8;20:1,
5;37:2;44:8;58:6;62:6;
64:17;65:10;77:19;
78:24;86:13,21;87:2;
93:4,7,9;96:12;103:8;
107:24;108:4
**talked (4)** 56:22;87:12,
15;89:20
**talking (23)** 15:24;16:6;
23:3;24:18,21;26:22;
30:8;37:23;39:24;44:9;
46:9;51:7;54:7;63:7;
65:3;73:10,23;77:22;

79:20;81:2;84:2;93:11;
105:11
**Tanya (12)** 21:8;22:7;
23:3,5;27:11;28:23;
29:2,4,19,23;30:8,13
**tape (1)** 104:1
**tardy (1)** 112:19
**task (1)** 57:20
**tasks (2)** 70:10;74:6
**tech (1)** 60:8
**Technology (2)** 8:4;
21:19
**telling (4)** 99:17;103:8;
111:8,13
**Temple (47)** 5:8,10,15;
7:4,10;10:5,17,18,22;
11:5,6;13:10;20:19,24;
21:4,15;23:8;24:19;
28:2,6,7,10,20;30:22;
34:4;52:15,23;53:12;
55:10;61:8;68:22;69:8;
71:13;72:19;76:13;
85:19;86:5,12,20;92:6;
94:15;100:1,8;104:11;
113:16;115:4,16
**Temple's (2)** 28:10;
76:7
**ten (3)** 71:1;86:12,19
**tenure (6)** 10:9,19,
24;21:4;86:5;94:14
**terminate (14)** 34:10,
17;35:11,20;37:7,8;
40:14;43:1;47:7;48:22;
50:10
**terminated (5)** 34:15;
44:14;45:8;51:17;
55:11
**terminating (8)** 31:12;
41:18,24;45:5,19;
47:20;48:3;49:2
**termination (22)** 31:9;
41:9,10;42:21;43:11;
44:24;45:22;46:10;
47:9;49:8,17,23;50:19;
51:16,24;52:23;66:20;
67:1;68:14;114:9,18,
20
**terms (2)** 54:3;80:14
**Terry (1)** 3:17
**testify (2)** 28:5;30:13;
32:20;65:6
**testimony (4)** 52:14;
79:5;87:5,7
**thereafter (1)** 41:5
**thinking (1)** 38:15
**Third (1)** 101:16
**though (4)** 4:22;6:20;
60:9
**thought (2)** 24:4;47:1
**Three (6)** 5:19;8:24;
52:3;67:3;90:23;91:3
**three- (1)** 40:23
**threw (1)** 17:20

**TERRY BURKE REPORTING**

**ties (1)** 57:3
**timely (5)** 42:14;93:17;
  94:4,5;100:17
**times (4)** 3:24;52:3;
  81:13;96:3
**title (5)** 6:3,23;7:1;
  21:12;33:13
**today (5)** 4:15,21;
  25.14,55.9,71.1
**together (2)** 43:19;66:8
**told (14)** 27:3;38:2;
  44:18;45:1,4;46:6;
  50:11;53:1;62:4;69:19;
  73:2;76:6;98:14;112:3
**took (6)** 4:21;7:16;
  32:3;64:15;112:20;
  113:9
**top (2)** 83:20;114:16
**topic (1)** 11:17
**Tracy (1)** 116:9
**transcript (3)** 3:19,23;
  4:4
**transfer (3)** 105:23;
  108:2,5
**transfers (1)** 104:19
**travel (3)** 56:12;57:10;
  60:20
**treated (1)** 75:13
**treating (2)** 69:13;74:24
**treatment (2)** 69:5;70:1
**treats (2)** 73:3,11
**truth (3)** 4:22;5:1,3
**try (4)** 3:13,23;4:6,9
**trying (1)** 93:19
**two (13)** 6:24;32:3;
  42:3;43:7;48:12;56:1;
  59:18;63:9;67:12;
  78:19;113:15;115:23;
  116:2
**type (16)** 13:6,20;
  15:23;16:3,21;19:3;
  31:24;32:1,2,7;42:11;
  43:10;51:11;82:4;94:3;
  97:5
**types (2)** 25:5;82:14
**typewriters (1)** 32:3
**typical (1)** 36:21
**typically (4)** 37:2;39:24;
  44:9;48:17

**U**

**ultimately (1)** 27:23
**unable (1)** 38:8
**uncomfortable (2)** 73:3;
  74:14
**Under (8)** 25:1;34:20;
  35:1;96:16;103:20;
  104:15;106:7,14
**underlying (1)** 96:13
**understood (3)** 18:5;
  20:4;59:18
**unfairly (1)** 99:23

**unhappy (5)** 104:23;
  105:2,6,14,20
**United (1)** 98:15
**University (11)** 24:19;
  25:4;27:5,21;38:8;
  42:17;52:7;55:10;57:9;
  82:5;113:17
**University's (1)** 28:11
**Unless (1)** 82:20
**unprofessional (4)**
  61:14,18;68:3,10
**unprofessional/ (1)**
  97:11
Unprofessional/Inappropriate (3)
  96:21;97:1;99:18
**up (28)** 13:18;14:19;
  15:10;25:21;32:24;
  35:1;42:4,7,11,15;
  51:12;54:2;58:16;59:5;
  67:7;70:16;93:15,17;
  95:7,18;97:15;104:2,5;
  109:6,11,13,17;114:23
**upcoming (1)** 54:4
**upon (1)** 74:22
**upset (2)** 75:4,6
**use (5)** 32:4;40:10;
  76:18;77:3;96:16
**used (6)** 25:16;42:18;
  43:15;60:17,21,23
**uses (1)** 60:19
**using (2)** 61:8;71:13
**usual (1)** 95:17
**usually (1)** 114:12

**V**

**vacant (1)** 10:19
**various (3)** 15:20;
  90:16,17
**verbal (1)** 36:1
**verbalize (1)** 3:21
**violate (1)** 101:21
**violated (2)** 67:8,20
**violating (2)** 103:5,15
**violation (12)** 25:17;
  42:13;65:19,22;67:22;
  82:4,5,8,9;84:19;95:9;
  96:20
**violations (1)** 101:19
**vis-à-vis (2)** 12:23;
  43:11
**voice (1)** 72:1

**W**

**Wacker (7)** 4:21;52:22;
  77:4;83:9;91:21;101:7;
  116:3
**wait (1)** 4:6
**walked (1)** 97:15
**walking (1)** 14:22
**Walter (1)** 9:5
**Walton (33)** 37:12;

45:13,15,18;47:19;
  48:21;49:2,6,10,17,22;
  50:2,6;52:13;55:16;
  63:8,20;65:12;66:5,15;
  67:12,21;68:18;83:21;
  84:1;99:14;110:8;
  111:1,5,9;113:21;
  114:3;115:17
**Walton's (2)** 34:23;
  43:23
**wants (1)** 73:22
**warrant (1)** 94:3
**warranted (4)** 65:22;
  93:24;97:13;99:2
**way (6)** 36:24;73:3;
  75:13;93:18;105:9;
  110:16
**week (4)** 38:17;54:3,4;
  55:24
**weekly (1)** 54:2
**weeks (3)** 90:23;91:3;
  102:2
**Weidenbacher (1)** 9:5
**what's (1)** 54:2
**whose (4)** 54:5;67:19;
  95:4;109:3
**wise (1)** 10:1
**within (5)** 13:10;20:6;
  43:8;91:10;109:7
**without (2)** 66:19;67:16
**WITNESS (79)** 11:23;
  13:3,16;15:16;16:16;
  17:8,18;18:9,23;19:13,
  23;20:11;24:1;27:18;
  28:17;29:12;30:6;
  32:21;33:3;34:13,19;
  35:15;38:5;39:13;
  40:16;43:13;44:21;
  47:24;49:14,19;50:13,
  24;51:19;52:6;53:4,14;
  58:4;60:2,15;61:6;
  63:1;64:3;65:16;69:10;
  73:13;75:2,16;76:9,21;
  77:8;78:22;79:6;80:12;
  82:3;83:16;84:16;
  85:10;86:9,16,24;
  88:22;89:5,14;97:13;
  93:2;98:2;99:6;100:5;
  102:15;103:18;106:1;
  108:8;109:24;110:12,
  22;112:15;116:21,23
**woman (1)** 30:16
**women (2)** 98:6,11
**wondering (2)** 101:18;
  102:16
**words (4)** 85:23;98:14;
  106:5,9
**work (53)** 3:8;21:8;
  24:17,18,19;25:4,7,17;
  26:7,11,12,16;27:5,19,
  21;30:16;31:19,19,20,
  22;35:1,8;37:3;42:13,
  17,23;44:2,6;48:5;

52:7;54:4;59:6;65:20;
  67:8;70:21;75:4,5,6;
  77:23,24;78:4,6,9,11,
  19;82:5,9;90:16,16;
  102:19;106:19;107:3;
  111:18
**workday (1)** 56:13
**worked (1)** 21:14
**working (9)** 5:10;32:8;
  34:4;39:20;71:15;86:1;
  104:15;115:9,13
**workload (2)** 74:7;78:4
**workplace (7)** 69:14;
  70:2;71:22;74:24;
  75:14;86:14,22
**workplace-related (1)**
  89:19
**work-related (2)** 56:1;
  89:16
**works (2)** 19:10;34:20
**worry (3)** 74:7,8,8
**worrying (1)** 78:2
**write (3)** 55:17;84:5;
  98:24
**writes (5)** 72:15;79:21;
  86:3;92:14;101:18
**writing (1)** 14:15
**written (3)** 25:21;76:12;
  93:17
**wrong (6)** 38:12;62:11;
  64:10;65:14;71:6;
  107:1
**Wu (107)** 9:19,20;14:3;
  34:19;35:10;36:3,13,
  18;37:8;38:3,6,14,17,
  23;41:18,24;42:4;43:1,
  8,24;45:3;47:8,12,16;
  49:1,5,9;51:24;53:10;
  54:1,17,23;55:21;
  56:12,15,17;57:21;
  59:6;61:13,19;62:6,18,
  20;63:19;64:4,17;
  65:13;68:4,15;69:13;
  70:11,19,24;71:6,6,12,
  15,19;72:1;73:7,11,22;
  74:24;75:13;77:24;
  78:4,10,24;79:8,16,20;
  85:5;87:3,12,15;88:7,
  17;90:3,10,20;91:5;
  93:4,15;95:7,7,10;96:9,
  12;97:6,16,19;98:6,14;
  102:21;104:15;105:20,
  23;106:7,9,14,15;
  108:6;109:5;112:9,22;
  115:8;116:6
**Wu's (10)** 34:14;37:7;
  43:16;48:22;61:22;
  69:5;70:1;90:13;91:15;
  92:21

**Y**

**year (6)** 6:10;7:5;11:3;

21:24;22:6;31:1
**years (17)** 5:11,14,19;
  6:12,13,24;7:10,12,20;
  9:15,17;54:15,18;61:9;
  86:12,20;100:1
**yelled (1)** 70:24
**yelling (4)** 61:19;62:1;
  72:22;78:15

---

**1**

**1 (2)** 58:10;85:18
**100 (3)** 37:21;97:14;
  114:8
**10th (1)** 98:22
**11 (1)** 113:19
**11-13-1962 (1)** 5:7
**119 (1)** 113:17
**11th (1)** 114:17
**12 (2)** 5:11,14
**120 (1)** 113:17
**13 (1)** 5:14
**14 (1)** 9:5
**14th (1)** 101:13
**15 (1)** 25:20
**1st (3)** 55:5;58:24;
  62:10

---

**2**

**20 (1)** 108:21
**2003 (1)** 5:13
**2005 (1)** 5:12
**2010 (3)** 72:9;79:10;
  88:18
**2011 (6)** 94:22;98:18;
  101:13;104:9,12;
  106:17
**2014 (20)** 8:5,7,20;9:3,
  4,10;49:9;55:5;56:7,
  10;58:10,24;61:1;
  62:10;108:21;111:1;
  112:1;113:19;114:3,17
**20th (4)** 56:7,10;58:1;
  61:1
**26th (2)** 111:1;112:1
**29th (3)** 72:8;79:10;
  88:18

---

**3**

**3:56 (1)** 56:10
**31 (1)** 114:3

---

**5**

**5:30 (1)** 57:4

---

**9**

**9 (1)** 94:22
**9th (3)** 98:18;104:9,12

# EXHIBIT 29

# In The Matter Of:

*RUTH V. BRIGGS v.*

*TEMPLE UNIVERSITY*

---

*DEIRDRE CULBREATH-WALTON*

*June 30, 2017*

---

*Terry Burke Reporting*

*Registered Professional Reporters*

*terryburkermr@gmail.com*

*(215) 205-9079*

Min-U-Script® with Word Index

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                   -      -      -
 4   RUTH V. BRIGGS,                :
 5           Plaintiff,             :
                                    :    Civil Action
 6   v.                             :    No. 16-00248
 7   TEMPLE UNIVERSITY,             :
 8           Defendant.             :
 9                   -      -      -
10               Philadelphia, Pennsylvania
                   Friday, June 30, 2017
11                   -      -      -
12
13               Deposition of DEIRDRE
14   CULBREATH-WALTON, taken pursuant to notice, held
15   at Console Mattiacci Law, LLC, 1525 Locust
16   Street, Ninth Floor, Philadelphia, Pennsylvania,
17   beginning at 10:15 a.m., on Friday, June 30,
18   2017, before Terry Barbano Burke, RMR-CRR.
19
20
21
22               TERRY BURKE REPORTING
                     (215) 205-9079
23               terryburkermr@gmail.com
24
```

Page 2

```
 1   APPEARANCES:
 2         RAHUL MUNSHI, ESQUIRE
           Console Mattiacci Law, LLC
 3           1525 Locust Street, Ninth Floor
             Philadelphia Pennsylvania 19102
 4
             Counsel for the Plaintiff
 5
     RACHEL FENDELL SATINSKY, ESQUIRE
 6   Littler Mendelson, P.C.
     Three Parkway
 7     1601 Cherry Street, Suite 1400
       Philadelphia, Pennsylvania 19102
 8
             Counsel for the Defendant
 9
10                   -      -      -
11         DEIRDRE CULBREATH-WALTON,
12     493 East Harmon Road, Philadelphia,
13     Pennsylvania, 19128, having been duly
14     sworn, was examined and testified as
15     follows:
16   BY MR. MUNSHI:
17     Q.   Good morning, Miss Walton.
18     A.   Good morning.
19     Q.   My name is Rahul Munshi.  I am an
20   attorney here at Console Mattiacci Law, and I
21   have the privilege of representing Ruth Briggs
22   in this action that has been brought against
23   Temple.
24         You are here today for your
```

Page 3

```
 1   deposition.  Do you understand that?
 2     A.   Yes.
 3     Q.   Have you ever had your deposition taken
 4   before?
 5     A.   Yes, I have.
 6     Q.   How many times?
 7     A.   Six.  Five or six.
 8     Q.   Have you ever had your deposition taken
 9   with regard to your capacity as a Temple
10   employee?
11     A.   Yes.
12     Q.   When was the last time that happened?
13     A.   I'm trying to think here.  Probably
14   about four or five years ago.
15     Q.   And was that an employment-related
16   claim?
17     A.   Yes, it was.
18     Q.   Do you remember the name of the
19   plaintiff?
20     A.   I'm blanking on the plaintiff.
21         Oh, yes.  It was Juvencio -- I
22   forget his last name.
23     Q.   Was it an employment discrimination
24   claim?
```

Page 4

```
 1     A.   Yes.
 2     Q.   Did that case go to trial?
 3     A.   No.  Gonzalez.  Juvencio Gonzalez.  It's
 4   coming back.
 5     Q.   Actually, let me just give you some
 6   instructions here just to remind you.  It has
 7   been a long time.
 8         I am going to be asking you some
 9   questions.  If I ask you a question you don't
10   understand or you want me to repeat, just let me
11   know and I will try to ask a better question.
12         Okay?
13     A.   Sure.
14     Q.   You obviously see Terry is writing
15   everything we are say down so a transcript can
16   be created.
17     A.   Okay.
18     Q.   As a result, we have to make sure we
19   don't talk over each other, otherwise the
20   transcript is not going to come out clean.  So
21   if you try to do your best to wait until I am
22   done asking my question before you start
23   answering, I will try and do my best to wait
24   until you are done answering before I start my
```

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

DEIRDRE CULBREATH-WALTON
June 30, 2017

Page 5

1 next question.
2          Okay?
3     A. Sure.
4     Q. Similar instruction for the purpose of
5 the transcript. We have to make sure we
6 verbalize all of our answers. Okay?
7     A. Yes.
8     Q. Prior to the Juvencio claim, what was
9 the deposition you had before that?
10    A. I can't remember.
11    Q. Have you ever been deposed within your
12 capacity as a Temple employee in an employment
13 discrimination claim where the individual
14 plaintiff raised a claim of age discrimination?
15    A. Yes. I think Juvencio's was an age.
16    Q. That was an age case?
17    A. It was age and race.
18    Q. Any other depositions you have had where
19 the underlying claim was age discrimination?
20    A. Not that I recall.
21    Q. How about any depositions where the
22 underlying claim was related to gender or sex
23 discrimination?
24    A. I'm not sure.

Page 6

1     Q. Have you ever been deposed in an action
2 where the underlying claim included an
3 allegation of retaliation?
4     A. Not that I recall.
5     Q. You are an HR professional; correct?
6     A. Yes.
7     Q. When did you first start working in HR
8 in any capacity for any company?
9     A. At Temple or for my career?
10    Q. For any company.
11    A. I have been working in HR since 1987.
12    Q. You are currently employed by Temple;
13 correct?
14    A. Yes, I am.
15    Q. What is your current job title?
16    A. I'm the director for labor employee
17 relations.
18    Q. Is that within any specific department?
19    A. It's within HR.
20    Q. Do you also have any capacity within the
21 EEO office?
22    A. No, I don't work with the EEO office. I
23 mean I don't work in their office.
24    Q. At Temple is the EEO office separate and

Page 7

1 apart from HR?
2     A. Yes, it is.
3     Q. When did you first start working at
4 Temple?
5     A. In February of 1999.
6     Q. And what position did you have when you
7 first started working at Temple?
8     A. I was employee relations specialist.
9     Q. And that was an HR position; correct?
10    A. Yes.
11    Q. How long did you hold that position?
12    A. About two years.
13    Q. What was next for you?
14    A. I was then promoted to employee
15 relations manager.
16    Q. And how long did you hold that title?
17    A. And I was in that position maybe another
18 two to three years.
19    Q. What about after that?
20    A. And I was the assistant director for
21 employee relations.
22    Q. For how long?
23    A. Two years.
24    Q. And that was another promotion?

Page 8

1     A. Uh-huh.
2     Q. Just verbalize. I knew you were going
3 to do it.
4     A. What?
5          MS. SATINSKY: Is that a yes?
6 BY MR. MUNSHI:
7     Q. Verbalize.
8     A. Yes, that was.
9     Q. And what about after that?
10    A. I was then finally promoted to my
11 current position, which is director for labor
12 employee relations.
13    Q. What year was that that you got promoted
14 to that position?
15    A. I would have to say 2008.
16    Q. Is it fair to say you have been working
17 as an HR professional for about 30 years?
18    A. Yes.
19    Q. Are you a member of any HR societies or
20 organizations?
21    A. Yes. I'm a member of SHRM.
22    Q. Anything else?
23    A. Greater Valley Forge Human Resource
24 Association.

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

DEIRDRE CULBREATH-WALTON
June 30, 2017

Page 9

1   Q. Anything else?
2   A. That's it.
3   Q. Do you have any certifications or
4   licenses in HR?
5   A. I have the SHRM, the SPHR certification.
6   Q. From SHRM?
7   A. Yes.
8   Q. Anything else?
9   A. Well, they split off, so there is a
10  separate one under HRCl.  It is a certification
11  as well.
12  Q. What is HRCI?
13  A. SHRM, initially when were you certified
14  under them, it was certified under HRCl.  I
15  forget what the acronym means, but they were the
16  agency that certified you.
17        They, two, three years ago, split
18  off.  SHRM has their own certification, but you
19  continue with HRCl, so I have certification
20  under both of them.
21  Q. Have you had any training throughout
22  your career as an HR professional for about 30
23  years in how to recognize discrimination in the
24  workplace?

Page 10

1   A. Yes.
2   Q. What kind of training have you gone
3   through on that?
4   A. Throughout my years, it's been with
5   seminars, employment, working with employment
6   attorneys that have gone to many trainings and
7   employment seminars that were held by law
8   offices in the city.
9   Q. And have you had training throughout
10  your career on how to recognize retaliation in
11  the workplace?
12  A. Yes.
13  Q. Similar seminars that you attended?
14  A. Yes.
15  Q. Did you ever take any classes or
16  seminars on civil rights laws, like Title VII,
17  Age Discrimination in Employment Act, those
18  types of things?
19  A. Yes, I have.
20  Q. Back in the 2014 time period --
21  A. Yes.
22  Q. -- we can even look at the first half of
23  2014, can you describe for me what your
24  reporting structure was over at Temple?

Page 11

1   A. 2014?  It was probably the same as it is
2   today.  I report to Sharon Boyle, who is our
3   associate vice president for human resources,
4   and Sharon reports to Ken Kaiser, who is our
5   CFO.
6   Q. Back in that 2014 time period, did
7   anybody report directly to you?
8   A. Yes.  I had two direct reports.  I had
9   an administrative assistant, administrative
10  specialist, as well as employee relations
11  manager.
12  Q. And who were those direct reports, what
13  are their names?
14  A. Felisha Brown was my administrative
15  specialist.  Ebony Jones was the employee
16  relations manager.
17  Q. I may have missed it.  Were there only
18  two or were there four in total direct reports?
19  A. Two.
20  Q. Okay.
21        Ebony Jones was an HR professional
22  as well?
23  A. Yes.
24  Q. Back in that 2014 time period, describe

Page 12

1   for me what your general job duties and
2   responsibilities were?
3   A. In my capacity, I'm responsible for all
4   employee relation issues at the university that
5   deal with conflict issues for supervisors,
6   discipline, performance management.
7        I'm responsible for all the
8   processing.  It gets done under my supervision,
9   all processing and terminations.  Unemployment.
10  ADA, the American with Disability Act, all those
11  claims come through my office.  Coaching and
12  counseling supervisors.
13  Q. Did you have any job duties or
14  responsibilities pertaining to EEO policies?
15  A. In my role and as a person who is
16  responsible for holding the university work
17  rules, as well as the university policies that
18  include EEOC, yes.  So departments would contact
19  me with any issues.  Employees contact me with
20  any concerns or issues regarding EEOC.  But I
21  work very closely with the EOC department when
22  we do get those claims.
23  Q. The internal EEO office at Temple, you
24  mean?

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

DEIRDRE CULBREATH-WALTON
June 30, 2017

Page 13

1 A. Uh-huh, yes. Yes.
2 Q. Just describe for me what is that
3 relationship between HR and EEO, what does the
4 EEO department do that HR does not do?
5 A. The EOC department at Temple
6 investigates all discrimination complaints and
7 sexual harassment complaints that are brought to
8 their attention on every level from students to
9 employees. So when employees may come to them
10 and it crosses over, they work closely with my
11 office just to kind of determine where the
12 issues may lie.
13 Q. So back in this 2014 time period, was it
14 part of your job duties and responsibilities to
15 conduct any workplace investigations into claims
16 of discrimination or retaliation?
17 A. I would not investigate discrimination.
18 I do investigate employment practices, wrongful,
19 you know, or hostile work environment, those
20 types of complaints. If an employee comes to me
21 and feels they have been treated unfairly in any
22 way, I investigate those when it runs or it
23 crosses the line to EOC and discrimination-type
24 cases, I would then forward it on to them.

Page 14

1 Q. Have you ever, during your tenure at
2 Temple, conducted a workplace investigation into
3 discrimination or retaliation?
4 A. I've worked with EOC on an
5 investigation, yes.
6 Q. And how does that relationship work?
7 A. With a partner.
8 Q. Partners?
9 A. Uh-huh.
10 Q. How about with regard to retaliation,
11 did you ever participate in an investigation
12 regarding a claim of retaliation at Temple?
13 A. Yes.
14 Q. Approximately how many regarding
15 discrimination that you participated in?
16 A. It's hard to tell. I'm sure it's been
17 over ten. I mean I've been there 18 years, so
18 it's probably been over ten claims.
19 Q. And how about claims of retaliation,
20 approximately how many have you participated in?
21 A. Maybe four or five.
22 Q. And you mentioned hostile work
23 environment claims as well. Have you ever
24 participated in an investigation into a claim of

Page 15

1 hostile work environment at Temple?
2 A. Yes, I have, but the number I couldn't
3 tell you.
4 Q. And in all these investigations that you
5 have participated in regarding discrimination or
6 retaliation or hostile work environment, would
7 it be part of your job duties or the group's job
8 duties to actually reach a conclusion as to
9 whether or not discrimination actually did take
10 place?
11 MS. SATINSKY: Objection to form.
12 You can answer the question.
13 THE WITNESS: Yes.
14 BY MR. MUNSHI:
15 Q. Same thing with retaliation and hostile
16 work environment claims, does the decision get
17 made as to whether or not it did take place or
18 did not take place?
19 A. Yes.
20 Q. And in the investigations that you have
21 participated in throughout your tenure at
22 Temple, has there ever been a determination that
23 yes, the allegations made by the employee
24 regarding discrimination, retaliation or hostile

Page 16

1 work environment, it is true, it happened?
2 MS. SATINSKY: Objection to form.
3 THE WITNESS: I don't recall. I'm
4 not sure. I don't think so. But I'm going to
5 be honest, I can't recall.
6 BY MR. MUNSHI:
7 Q. Have you ever heard of any investigation
8 that was conducted by somebody else at Temple
9 where a conclusion was reached that the
10 individual's allegations were confirmed?
11 MS. SATINSKY: Objection to form and
12 objection attorney-client privilege. I don't
13 want you to testify about anything you might
14 have learned through an attorney either at
15 Temple or outside of Temple, but beyond that,
16 you can testify to that question.
17 THE WITNESS: To be honest, I can't
18 really speak specific to that.
19 BY MR. MUNSHI:
20 Q. Throughout your tenure at Temple and
21 within your capacity as an HR professional, have
22 you ever personally received a complaint of
23 discrimination at Temple?
24 A. Yes.

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

DEIRDRE CULBREATH-WALTON
June 30, 2017

Page 17

1   Q.  Approximately how many times throughout
2   your tenure at Temple?
3   A.  It's been over ten, I can say.
4   Q.  Again, within your capacity as an HR
5   professional at Temple, did you ever personally
6   receive any complaints of retaliation?
7   A.  Yes, I have.
8   Q.  Approximately how many?
9   A.  From my memory, maybe four or five.
10  Q.  And how about regarding hostile work
11  environment, did you ever personally receive any
12  complaints of hostile work environment?
13  A.  Yes, I have.
14  Q.  Ballpark, how many?
15  A.  I'm really generalizing here.  Probably,
16  that's a number that's probably over ten too.
17  Q.  And regarding specifically the
18  complaints that you received personally, do you
19  recall any instance where any of those
20  allegations were in fact corroborated?
21      MS. SATINSKY: Objection to form and
22  objection to privilege.  To the extent you have
23  learned something outside from counsel, you may
24  testify to it.

Page 18

1      THE WITNESS: So your question is?
2   BY MR. MUNSHI:
3   Q.  Regarding only the complaints that you
4   personally received regarding discrimination,
5   retaliation or hostile work environment, are you
6   aware if any of those claims that you personally
7   received were in fact corroborated or confirmed?
8   Putting aside anything you learned from counsel.
9   A.  Yes.
10  Q.  The answer is yes?
11  A.  Uh-huh, yes.
12  Q.  How many times did that happen?
13  A.  About six times.
14  Q.  When was the last time that that
15  happened?
16  A.  It's probably about five years ago.
17  Q.  What were the circumstances that you
18  recall where the allegation was confirmed?
19  A.  I had an employee that was working for a
20  supervisor where the atmosphere was very
21  hostile.  The supervisor was overly demanding,
22  abusive, and so many times embarrassed the
23  person in front of people.
24  Q.  What did you learn that you found to be

Page 19

1   abusive?
2   A.  Requiring the person to -- well,
3   demeaning the person in front of other people.
4   So if there is a mistake that happened, they got
5   yelled at to the point that, you know, they were
6   actually cursed at and it was in front of other
7   employees.
8   Q.  Within your job duties and
9   responsibilities at Temple, are you assigned to
10  any particular departments at Temple, or is it
11  just Temple University in general?
12  A.  It's Temple University in general.
13  Q.  Have you ever received any sort of
14  complaints about discrimination, retaliation or
15  hostile work environment stemming from the CIS
16  department?
17  A.  Have I ever received complaints from the
18  CIS department?  No.
19  Q.  Did you ever receive any complaint or
20  learn about any complaint outside of what you
21  learned from counsel, any complaints about Greg
22  Wacker?
23  A.  Yes.
24  Q.  How many do you recall?

Page 20

1   A.  I guess about three.
2   Q.  Can you tell me the names of those
3   individuals who raised those complaints?
4   A.  I forget this young lady's last name.
5   Her name was Tanya.  I don't remember Tanya's
6   last name.
7   Q.  Honeywell?
8   A.  Huh?
9   Q.  Honeywell?
10  A.  Yeah.
11      Ruth complained.
12      When you say complaints, I want to
13  be clear.  The complaint is?
14  Q.  Anything regarding discrimination,
15  retaliation, hostile work environment.
16  A.  Okay.  Just recently -- forgive me.  I
17  forget the lady's name.  She was, I believe,
18  assistant dean.  Her name escapes me right now.
19  She was assistant dean.
20  Q.  And what did this assistant dean
21  complain about?
22  A.  Well, it wasn't Greg specifically, but
23  Greg was, I guess, clumped together with the
24  dean and the vice dean.  This person felt that

**Page 21**

1 she was being treated unfairly by them.
2   Q. Forgive me, I don't know all the deans
3 names over at Temple. Who is the dean and who
4 is the vice dean in that situation?
5   A. The dean is Mike Klein.
6   Q. That's Michael Klein?
7   A. Uh-huh.
8       And the vice dean, I forget his
9 name. It is going to come to me. His name is
10 going to pop up later. I can't remember his
11 name. Sorry.
12   Q. If it does pop up, just let me know.
13 That kind of goes for all the questions, if
14 later on you want to come back to something,
15 just let me know.
16   A. Okay.
17   Q. This individual, the assistant dean
18 complained about being treated unfairly in the
19 workplace?
20   A. Yes.
21   Q. What did she say happened?
22   A. Let me take that back.
23       A letter was sent anonymously to our
24 office. It was sent to a couple offices. So we

**Page 22**

1 looked into it. But it was about those three
2 people were named in that complaint.
3   Q. Did you personally participate into the
4 looking into it?
5   A. Yes.
6   Q. When you look into an allegation or a
7 concern like that, what do you do?
8       MS. SATINSKY: Objection to form.
9 You can answer the question.
10       THE WITNESS: Well, in this case,
11 because of some -- because they said that the
12 actions affected women, so it seemed like it was
13 a sex discrimination case, but at the same time
14 it had to deal with some employment actions, I
15 partnered with EOC and we together investigated
16 the claim.
17 BY MR. MUNSHI:
18   Q. And when you investigated that claim,
19 what did you do?
20   A. We met with -- we met with everyone that
21 was mentioned in the letter. That included the
22 dean, the vice dean, Greg Wacker.
23       We met, this claim mentioned several
24 women that they felt were affected. We met with

**Page 23**

1 those women. And then we met with some others
2 in the dean's office.
3   Q. Was Dean Michael Klein's name
4 specifically mentioned in this?
5   A. Yes, it was.
6   Q. And did you personally meet with Michael
7 Klein?
8   A. Yes, I did.
9   Q. And did you inform Michael Klein in this
10 situation that his name was mentioned in the
11 letter?
12   A. He was aware. He got a copy of it.
13   Q. Is that investigation still ongoing or
14 is it over?
15   A. No. It ended.
16   Q. Was any sort of conclusion reached?
17   A. That we didn't find for any
18 discrimination.
19   Q. Is Michael Klein the dean of CIS?
20   A. He's the dean of college and technology.
21 CIS is a department.
22   Q. What do you recall Tanya Honeywell
23 complaining about regarding Greg Wacker?
24   A. That was awhile ago, but from memory,

**Page 24**

1 she also complained of being treated unfairly,
2 and I think her complaint was a discrimination
3 complaint as well. I believe it was sex. We
4 ended up -- I reached that conclusion only
5 because where we ended up with it. But I
6 believe that's what it was.
7   Q. In connection with Tanya Honeywell's
8 complaint, did you conduct an investigation or
9 look into her concerns?
10       MS. SATINSKY: Objection to form.
11       THE WITNESS: I don't think so.
12 BY MR. MUNSHI:
13   Q. Did you ever meet or speak with Greg
14 Wacker regarding Tanya Honeywell's claims?
15   A. No.
16   Q. Do you know if anybody within human
17 resources did?
18   A. No.
19   Q. Did you ever speak with Ruth Briggs
20 regarding Tanya Honeywell?
21   A. No.
22   Q. Did you have an understanding that Ruth
23 Briggs had a reporting relationship with Tanya
24 Honeywell?

Page 25

1     A. Not from my memory.
2     Q. Do you recall if Miss Honeywell raised
3   any allegations regarding retaliation by Greg
4   Wacker?
5         MS. SATINSKY: To her?
6   BY MR. MUNSHI:
7     Q. If you ever learned outside of what you
8   may have learned from counsel.
9     A. No.
10    Q. And this latest claim that you are aware
11  of from the assistant dean, was there any
12  allegation about retaliation there?
13    A. Sorry. Can you rephrase that?
14    Q. Yes. Going back to the assistant dean
15  that you were telling me about, were there any
16  allegations in connection with that concern
17  about retaliation?
18    A. No.
19    Q. Within your capacity as an HR
20  professional for about 30 years, do you agree
21  with me that certain managers may take actions
22  against individuals who do complain about
23  discrimination?
24        MS. SATINSKY: Objection to form.

Page 26

1         THE WITNESS: Do I agree that
2   managers will take action against employees
3   who --
4   BY MR. MUNSHI:
5     Q. "Could" take action.
6         MS. SATINSKY: Objection to form.
7   You can answer if you understand it.
8         THE WITNESS: When you say "could,"
9   you mean under -- with the blessings of HR? I'm
10  not really clear.
11  BY MR. MUNSHI:
12    Q. I will ask a more simple question.
13        Within your experience as an HR
14  professional for 30 years, do you believe that
15  retaliation may exist in the workplace?
16    A. Yes.
17    Q. And same within your capacity as an HR
18  professional for approximately 30 years, do you
19  believe that discrimination may exist in the
20  workplace?
21    A. Yes.
22    Q. And do you believe that a hostile work
23  environment may be created in the workplace?
24    A. Yes.

Page 27

1     Q. Coming back to Ruth Briggs here, at any
2   point prior to Miss Briggs' termination of
3   employment at Temple, did you learn that she had
4   complained about Dr. Wu?
5     A. Yes.
6     Q. Do you recall when the first time you
7   learned about that was?
8     A. Do you want the exact date?
9     Q. If you can give me the year.
10    A. Just my memory, when did Tanya leave?
11    Q. You mean Ruth?
12    A. When did Ruth leave?
13    Q. Ruth left in April of 2014.
14    A. Okay. So Ruth may have contacted me to
15  complain about her work situation maybe a year,
16  it might have been two years, maybe a year and a
17  half before.
18    Q. And the first time that she contacted
19  you regarding Dr. Wu, can you describe for me
20  what the circumstances were?
21    A. She just called to tell me that she felt
22  that Dr. Wu was demanding and that she and he
23  many times didn't see eye to eye on things.
24    Q. Anything else you recall about the

Page 28

1   circumstances around Miss Briggs' first
2   complaint to you regarding Dr. Wu?
3     A. I think that was it. It was just really
4   being like oil and water.
5     Q. Did you understand at that time when she
6   raised a complaint about Dr. Wu that she was
7   complaining about how he was treating her in the
8   workplace?
9     A. Yes.
10    Q. Approximately how many times do you
11  recall having learned of any complaints by
12  Miss Briggs regarding Dr. Wu?
13        MS. SATINSKY: Outside of what you
14  might have learned from an in-house or external
15  lawyer for Temple.
16  BY MR. MUNSHI:
17    Q. Yes. And that is going to apply for
18  this whole, I am not going to ask you about any
19  complaints you had with any attorney.
20    A. Okay. So any complaint?
21    Q. From Miss Briggs regarding Dr. Wu?
22    A. Regarding Dr. Wu?
23    Q. Yes.
24        MS. SATINSKY: That you did not

Page 29

1  learn through counsel.
2  THE WITNESS: Well over 10 or 11
3  times. It may have been more.
4  BY MR. MUNSHI:
5  Q. Did Miss Briggs ever complain to you
6  that she felt the relationship was abusive, or
7  words to that effect?
8  MS. SATINSKY: Objection to form.
9  THE WITNESS: I don't think she ever
10 used abusive, but she felt it was harsh, you
11 know, or demanding.
12 BY MR. MUNSHI:
13 Q. Did she describe any instances or
14 occurrences between her and Dr. Wu where she
15 felt demeaned?
16 A. Not that I recall.
17 Can I go back on that question?
18 Q. Sure.
19 A. She would talk about the interaction
20 between herself, Dr. Wu, and Drew, and she felt
21 that situation was demeaning.
22 Q. Did she describe what aspect of that
23 relationship was demeaning?
24 A. She didn't like the fact that Drew

Page 30

1  participated in a meeting with her and Dr. Wu to
2  go over her work. She thought that was
3  demeaning.
4  Q. Anything else you recall her describing
5  as demeaning?
6  A. Just that situation. Just that I think
7  it was maybe a weekly meeting and she wasn't
8  happy with that circumstance.
9  Q. Did you have an understanding that
10 Mr. DiMeo reported to Greg Wacker?
11 A. Yes.
12 Q. Did you ever speak with Mr. DiMeo about
13 his relationship with Miss Briggs?
14 A. Yes.
15 Q. Approximately how many times did you do
16 that?
17 A. Again, that's well over ten, 11, 12.
18 Numerous times.
19 Q. Did you express to Mr. DiMeo that
20 Miss Briggs expressed to you that she felt there
21 was something demeaning about the relationship?
22 A. Yes.
23 Q. How did he respond?
24 A. Many times he expressed -- she expressed

Page 31

1  it to him too. So many times that was our
2  conversation, where he said to me, you know, she
3  doesn't like these meetings. She complains
4  about them. But they would be there for her, to
5  help her, to assist her.
6  Q. When Miss Briggs would come to you and
7  describe anything about the relationship with
8  Dr. Wu and Drew DiMeo in those meetings, would
9  you then follow up with Drew DiMeo and say, hey,
10 this is what Miss Briggs just told me, is this
11 what happened?
12 A. Yes.
13 Q. And would you do the same with Dr. Wu?
14 A. I have to admit, I talked to Dr. Wu a
15 handful of times. The majority of my
16 conversations were with Greg Wacker and Drew.
17 Q. So do you recall after Miss Briggs
18 coming to you and describing anything that she
19 felt was demeaning regarding her meetings with
20 Dr. Wu and Drew DiMeo going to Dr. Wu and
21 saying, what is up, what is happening here?
22 A. I never went directly to Dr. Wu. All my
23 conversations were with Greg Wacker and Drew.
24 There were these times where Dr. Wu

Page 32

1  reached out to me. That's the handful of times
2  that I referred to.
3  Q. At any point during Miss Briggs' tenure
4  at Temple, did you go to Dr. Wu and ask him
5  about anything regarding Miss Briggs?
6  A. No.
7  Q. How come?
8  A. Mainly because of my role and the way
9  that I basically functioned or the way I
10 functioned with the College of Science and
11 Technology, I worked through Greg Wacker and
12 Drew DiMeo. If they had personnel issues, they
13 contacted me. If I had issues, I contacted
14 them. And I worked through them. They were the
15 people in that office that were responsible for
16 handling those issues. So I always worked
17 through them.
18 Q. Did you ever go to Dr. Wu and ask him --
19 this is while Miss Briggs is still working
20 there -- to confirm or deny if anything
21 specifically happened?
22 A. I never -- quite honest, from my memory,
23 I never directly went to Dr. Wu.
24 Q. But you would affirmatively go to Greg

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

DEIRDRE CULBREATH-WALTON
June 30, 2017

Page 33

1  Wacker and Drew DiMeo?
2     A. Yes.
3     Q. Approximately how many discussions do
4  you recall with Greg Wacker about Miss Briggs
5  raising concerns about Dr. Wu?
6     A. About five or six.
7     Q. Did Greg Wacker ever come to you for
8  advice on how to handle a workplace relationship
9  between Dr. Wu and Ruth Briggs?
10    A. Yes.
11    Q. Approximately how many times did that
12  happen?
13    A. About five or six times.
14    Q. And did Greg Wacker ever tell you that
15  Miss Briggs had expressed to him that she felt
16  the working relationship between her and Dr. Wu
17  was causing her stress?
18    A. Just to clarify, you are asking me did
19  Greg ever tell me that Ruth Briggs came to him
20  to complain?
21    Q. Correct.
22    A. He may have, but I don't recall
23  specifically.
24    Q. Do you recall him ever coming to you and

Page 34

1  expressing to you that Miss Briggs said to him
2  that she felt harassed by Dr. Wu?
3     A. I don't recall.
4     Q. Do you recall him telling you that
5  Miss Briggs had said to him, Greg Wacker, that
6  Dr. Wu was yelling in the office?
7     A. She may have.
8     Q. And do you recall ever finding out if
9  that was true, if Dr. Wu did yell in the office?
10    A. What I recall is that Greg and Drew
11  looked into if that was the case. And from my
12  understanding, he sometimes maybe yelled at
13  students that he was working with.
14    Q. Did you ever discuss that with Dr. Wu as
15  to whether he should or should not do that?
16    A. I didn't. I'm sure that Greg and Drew
17  did. To be specific, I know Drew talked with
18  him about how he conducted his self.
19    Q. And by "him," you mean Dr. Wu?
20    A. Yes.
21    Q. Do you recall Greg Wacker ever informing
22  you that Ruth Briggs told him that she felt the
23  environment was hostile?
24    A. I don't recall specifically. She may

Page 35

1  have, but I don't recall specifically.
2     Q. Do you recall Ruth Briggs ever
3  complaining directly to you that she felt that
4  the environment was hostile?
5     A. Yes.
6     Q. Approximately how many times did she do
7  that with you?
8     A. Maybe five or six times.
9     Q. Do you recall the circumstances around
10  the first time that she raised hostile work
11  environment with you?
12       MS. SATINSKY: Objection to form.
13       THE WITNESS: I don't recall the
14  first time. I had a lot of conversations with
15  Ruth Briggs, or she sent me e-mails. So what
16  stands out for me is whenever she was
17  disciplined for something, she would consider
18  that to be hostile.
19  BY MR. MUNSHI:
20    Q. Do you remember any of the circumstances
21  around her allegations to you about hostile work
22  environment?
23       MS. SATINSKY: Objection to form.
24       THE WITNESS: Just whenever she was

Page 36

1  disciplined or if she was talked to about errors
2  that she made where, you know, Dr. Wu, you know,
3  talked to her about those errors or complained
4  to her about things that weren't getting done,
5  that's when she called me and said, you know,
6  Dr. Wu's complaining about I didn't do this or
7  she didn't do something correctly. Usually
8  those were the circumstances that she considered
9  to be hostile.
10  BY MR. MUNSHI:
11    Q. And then would you do anything as a
12  result of her complaining about hostile work
13  environment?
14       MS. SATINSKY: Objection to form.
15       You can answer the question.
16       THE WITNESS: Yes, I would talk with
17  Greg and Drew.
18  BY MR. MUNSHI:
19    Q. Greg and Drew didn't work within the
20  same department as Ruth and Dr. Wu; correct?
21    A. No, they didn't.
22    Q. Were either one of them physically
23  located in the same building as Dr. Wu?
24    A. I believe they were in the same

1 building.
2    Q.  What department did Greg and Drew work
3 in?
4    A.  They worked in the dean's office.
5    Q.  And again, by "dean's office," Michael
6 Klein's office?
7    A.  Yes.
8    Q.  Is it your understanding that Greg and
9 Drew weren't physically present for every
10 interaction that Ruth Briggs and Dr. Wu had?
11    A.  Yes.
12    Q.  After Ruth Briggs would raise an issue
13 with you about the environment being hostile,
14 would you give Greg or Drew any sort of
15 instructions or directions as to what to do
16 next?
17    A.  So when Ruth would call me -- honestly,
18 I wasn't -- well, you are specifically asking
19 about hostile, but she called me about other
20 things.  When she called me to complain about
21 something, I contacted Drew and Greg.  We talked
22 about it.  We talked about what was going on in
23 the office, what the issues were.  They told me
24 they would look into it.  They would call me

1 back.  And then I would, you know, give them
2 advice on, you know, how they should handle it.
3    Q.  And what was the nature of them looking
4 into it?
5    A.  They would go down and talk with Dr. Wu.
6 They also would talk to Ruth.
7    Q.  Did you ever have occasion to speak with
8 Dr. Wu and Ruth together?
9    A.  I don't think I ever did.
10    Q.  So would the typical sequence of events
11 be Ruth would talk with you, you would then talk
12 with Greg and/or Drew, Greg and/or Drew would
13 speak with Dr. Wu and/or Ruth, and then they
14 would report back to you?
15       MS. SATINSKY: Objection to form.
16       THE WITNESS: Just so I'm clear,
17 Ruth would talk to me.  I would talk to Greg and
18 Drew.  They would talk to them and get back to
19 me, yes.
20 BY MR. MUNSHI:
21    Q.  Wouldn't it be easier for you just to
22 talk to Dr. Wu yourself?
23       MS. SATINSKY: Objection to form.
24       THE WITNESS: No, it wouldn't have.

1 BY MR. MUNSHI:
2    Q.  Why is that?
3    A.  I found it difficult -- there were
4 conversations I had with Dr. Wu.  I found it
5 difficult from my perspective to communicate
6 with him.  That is not the reason why I didn't
7 communicate with him, but, you know, he was very
8 busy.  I wasn't in their area, their space.  And
9 again, as I explained earlier, when we handled
10 personnel issues, I usually worked with Greg and
11 Drew.  They were the people that handled
12 personnel issues.
13       That doesn't mean I couldn't have
14 contacted Dr. Wu.  I just didn't.  I worked with
15 Greg.
16       And they were pretty much on top of
17 the situation.  Greg, by having Drew sit in on
18 those meetings and kind of mediate the issues
19 between Drew and -- I mean between Dr. Wu and
20 Ruth, they usually had firsthand knowledge.
21    Q.  Do you recall any conversations with
22 Greg Wacker about Ruth Briggs' complaints about
23 the environment being hostile?
24    A.  Okay, I'm sorry, repeat that again?

1    Q.  Sure.  Do you recall any conversations
2 between you and Greg Wacker specifically about
3 Ruth's complaints about the environment being
4 hostile?
5    A.  Yes.
6    Q.  And how many times would that happen?
7       MS. SATINSKY: Objection to form.
8 BY MR. MUNSHI:
9    Q.  Sorry.  How many times did that happen?
10    A.  Probably well over six times or more.
11    Q.  And was it your understanding that after
12 you and Greg would talk, that Greg would then
13 look into the situation?
14    A.  Not always.  Greg would sometimes have
15 an issue.  He would know.  So if I called him
16 and said, listen, Ruth called, said this, he
17 would have had that information.  He'd say,
18 listen, this is what happened.
19       So many times it was in response to
20 something that Ruth did not do or something Ruth
21 did do and didn't do correctly and maybe it was
22 surrounding a discipline.  So many times when I
23 called Greg was already on top of it and was
24 already handling it.

Page 41

1    Q.  Sure.  How about situations where Greg
2  may not have already had firsthand knowledge,
3  was it your understanding that he would look
4  into it if there was a claim of hostile work
5  environment?
6       MS. SATINSKY: Objection to form.
7       THE WITNESS: Are you talking
8  specifically of Ruth or just in general?
9  BY MR. MUNSHI:
10    Q.  Yes, we are only talking about Ruth
11  right now.
12    A.  Only talking about Ruth?
13       If there was an issue or complaint,
14  he looked into it, yeah, he would look into it.
15    Q.  Do you recall any conversations with
16  Greg Wacker about Ruth Briggs complaining that
17  she felt harassed?
18    A.  Did I recall a conversation with Greg?
19    Q.  Correct.
20    A.  That she felt harassed?
21       Not that I recall.
22    Q.  Let's take a look at this document that
23  was previously marked as P-11.  Miss Walton,
24  take your time.

Page 42

1       I apologize.  I just called you
2  Miss Walton.  But I see there is a fuller name
3  there.  What do you prefer?
4    A.  Walton is fine.
5       Okay.
6    Q.  So the bottom e-mail on P-11 is from
7  Ruth Briggs to Greg Wacker dated October 29th,
8  2010.
9       Do you see that?
10    A.  Uh-huh.
11    Q.  Just verbalize, please.
12    A.  I'm sorry.  Yes.
13    Q.  That is okay.  Everyone does it.
14       The second paragraph from
15  Miss Briggs starts with, "Frankly, it borders on
16  harassment.  Right now he is in his office
17  yelling in Chinese at one of his students.  The
18  he starts complaining to Justin in Chinese about
19  the dean's office.  The environment is hostile."
20       Do you see that?
21    A.  Yes.
22    Q.  And do you have an understanding
23  that "he" is referring to Dr. Wu?
24    A.  Yes.

Page 43

1    Q.  And then up on top of P-11, Greg Wacker
2  then forwards this e-mail to you.  Do you see
3  that?
4    A.  Yes.
5    Q.  And then Greg says, "I'll call you later
6  to discuss."
7       Do you see that?
8    A.  Yes.
9    Q.  And do you recall having a conversation
10  with Greg Wacker about this e-mail that's P-11?
11    A.  I don't recall specifically this
12  discussion with him.
13    Q.  Do you recall having a discussion with
14  Ruth Briggs about the e-mail that was forwarded
15  to you?
16    A.  Okay, so not the e-mail specifically,
17  but she's complained, like I mentioned earlier,
18  him yelling at students in Chinese.
19    Q.  And how about what she writes here about
20  frankly it borders on harassment, do you recall
21  any conversations with Ruth Briggs where she
22  used that word, "harassment" or "harass"?
23    A.  I don't specifically recall, but she may
24  have, but I don't specifically recall.

Page 44

1       She has talked about, you know, the
2  environment being hostile and him yelling at
3  students in Chinese.
4    Q.  And do you recall having a conversation
5  with Greg Wacker about having him look into an
6  allegation from Miss Briggs about harassment?
7       MS. SATINSKY: Objection to form.
8  Asked and answered.  You can answer the
9  question.
10       THE WITNESS: I don't recall.
11  BY MR. MUNSHI:
12    Q.  As an HR professional getting an e-mail
13  like this forwarded to you, does that raise a
14  concern with you?
15       MS. SATINSKY: Objection to form.
16       THE WITNESS: Yes, it does, it
17  raises an issue -- did you say objection?  What
18  was your question, does it raise an objection to
19  me?
20  BY MR. MUNSHI:
21    Q.  A concern?
22    A.  A concern, yes.
23    Q.  Why?
24    A.  Okay, so at the university I would be

Page 45

1 concerned about students being yelled at and
2 someone complaining that their environment is
3 hostile.
4    Q. Do you recall ever asking Miss Briggs
5 why she felt the environment was hostile?
6        MS. SATINSKY: Objection to form.
7 Asked and answered.
8        You can answer the question.
9        THE WITNESS: Yes.
10 BY MR. MUNSHI:
11    Q. And did you understand that her feelings
12 of the environment being hostile stemmed from
13 her relationship with Dr. Wu?
14    A. Yes.
15    Q. Did you also understand that she thought
16 the environment was hostile because of Greg
17 Wacker?
18    A. No.
19    Q. So just Dr. Wu or anybody else?
20    A. Just Dr. Wu.
21    Q. In those handful of conversations that
22 you had with Dr. Wu, were any of them about Ruth
23 Briggs?
24        MS. SATINSKY: Objection to form.

Page 46

1 Asked and answered.
2        You can answer the question again.
3 BY MR. MUNSHI:
4    Q. My question is really, I just want to
5 understand if you were telling me about
6 conversations that you may have had with Dr. Wu
7 that had nothing to do with Ruth Briggs?
8        MS. SATINSKY: Objection to form.
9 Asked and answered. You can answer the
10 question.
11        THE WITNESS: Every time I talked to
12 Dr. Wu about Ruth Briggs.
13 BY MR. MUNSHI:
14    Q. That is all I was going for.
15        Do you recall Dr. Wu issuing to
16 Miss Briggs discipline, disciplinary reports?
17    A. Did I recall Dr. Wu issuing them?
18    Q. Yes.
19    A. From my memory, they were issued along
20 with, I believe Drew was always there.
21    Q. Do you know when Drew started working at
22 Temple?
23    A. No, I don't know.
24    Q. Do you know when he started having that

Page 47

1 role vis-à-vis Ruth and Dr. Wu?
2        MS. SATINSKY: Objection to form.
3        THE WITNESS: From my memory, I
4 think it was at least two years before she left
5 or a year and a half before she left.
6 BY MR. MUNSHI:
7    Q. Take a look at this document that was
8 previously marked as P-6.
9    A. (Pause.)
10        Okay.
11    Q. So in front of you is P-6. This is a
12 disciplinary report to the Ruth Briggs dated
13 November 9th, 2011.
14    A. Uh-huh.
15    Q. Under the explanation tab it says,
16 "Violation of Rule B.11,
17 unprofessional/inappropriate conduct."
18        Do you see that?
19    A. Uh-huh.
20    Q. Sorry. Just verbalize.
21    A. I'm sorry. Yes. I think I said that
22 twice. I apologize.
23    Q. That is okay. Everyone does it.
24        In connection with this disciplinary

Page 48

1 report that was given to Ruth Briggs, did you
2 participate in it or facilitate it in any way?
3    A. They may have contacted me for guidance,
4 but I don't recall specifically.
5    Q. Had you ever met with or spoke with Ruth
6 Briggs prior to her working under Dr. Wu?
7    A. Yes.
8    Q. You had an understanding that she had
9 been working at Temple prior to her working in
10 this department; correct?
11    A. Yes.
12    Q. Prior to November 9th, 2011, do you
13 recall her ever getting any sort of disciplinary
14 report like this?
15    A. I don't recall. She may have, but I
16 don't recall specifically.
17    Q. Do you recall any conversations with
18 Greg Wacker or Dr. Wu or anybody about the idea
19 of issuing Ruth Briggs a discipline in
20 November 2011?
21        MS. SATINSKY: Objection to form.
22 Asked and answered.
23        You can answer it again.
24        THE WITNESS: I don't recall.

Page 49

BY MR. MUNSHI:

1   BY MR. MUNSHI:
2      Q.  Do you know whose decision it was to
3   issue this discipline?
4      A.  I'm sure Dr. Wu made the decision with
5   guidance and counsel.  I just don't recall who
6   gave him that guidance.
7          It could have been -- it probably
8   was Greg, but I just don't recall.
9      Q.  And you see here under explanation that
10  there is a reference to unprofessional/
11  inappropriate conduct.
12     A.  Uh-huh.
13     Q.  Do you see it is not specified as to
14  what that is; right?
15     A.  Uh-huh, yes.
16     Q.  Do you have any recollection or
17  knowledge as to what that inappropriate or
18  unprofessional conduct of Ruth Briggs was that
19  resulted in this discipline?
20     A.  Because it is unprofessional or
21  inappropriate conduct, I know there was
22  interaction between her and Dr. Wu where she
23  blew up.  The dates are throwing me, so forgive
24  me.  So this may have been that incident.

Page 50

1   Specifically I'm not sure.
2      Q.  Do you know of any e-mails or memos to
3   the file or notes regarding what the conduct was
4   that Miss Briggs allegedly did that resulted in
5   this discipline?
6      A.  I don't recall offhand.
7      Q.  Do you recall ever discussing this
8   discipline with Ruth Briggs?
9      A.  I just don't remember.
10     Q.  Do you recall ever having a conversation
11  with Ruth Briggs where she expressed that Dr. Wu
12  made a comment to her about the retirement age
13  in China?
14     A.  I recall her relaying to me that Dr. Wu
15  was having a conversation where he mentioned
16  that, yes.
17     Q.  Do you recall what she mentioned to you?
18     A.  She said that he had just -- that he was
19  generally speaking in the office and talking to
20  others and talking about the retirement age in
21  the country that he came from.
22     Q.  China?
23     A.  China.
24     Q.  Was this over the phone or in person

Page 51

1   where she expressed this to you?
2      A.  It was over the phone, definitely.
3      Q.  And do you recall her expressing or your
4   perception that she was offended by it?
5          MS. SATINSKY: Objection to form.
6          THE WITNESS: She was complaining
7   about it, yeah.
8   BY MR. MUNSHI:
9      Q.  Do you recall her saying to you that he
10  said words to the effect of women in China must
11  retire at the age of 55?
12         MS. SATINSKY: Objection to form.
13  Asked and answered.
14         You can answer the question.
15         THE WITNESS: I don't recall her
16  specifically saying that.  Just that he was
17  talking about the retirement age in China.
18  BY MR. MUNSHI:
19     Q.  And do you recall her saying it was
20  specifically about women?
21     A.  She mentioned women, yes.  But she also
22  mentioned that he was talking generally as well,
23  but she mentioned, she did mention women.
24     Q.  In your capacity as an HR professional

Page 52

1   for approximately 30 years, do you believe that
2   a comment made in the workplace about retirement
3   of women in China could be an inappropriate
4   thing to say in the workplace?
5          MS. SATINSKY: Objection to form.
6          THE WITNESS: It would depend on the
7   context.
8   BY MR. MUNSHI:
9      Q.  Did you think it was appropriate for
10  Ruth Briggs to come to you and complain that
11  Dr. Wu had made that comment to her?
12         MS. SATINSKY: Objection to form.
13         THE WITNESS: Do I think it was
14  appropriate for her to come to me and complain?
15         Because of her perception, it was
16  her perception, I can't judge her perception, so
17  yes.
18  BY MR. MUNSHI:
19     Q.  Did you look into that complaint that
20  she raised with you?
21         MS. SATINSKY: Objection to form.
22         THE WITNESS: I talked with --
23  again, I talked with Greg and Drew and I asked
24  them to talk with Dr. Wu and find out if this

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

DEIRDRE CULBREATH-WALTON
June 30, 2017

Page 53

1  occurred in the way that Ruth presented it.
2  BY MR. MUNSHI:
3      Q. And do you recall if you said that to
4  them in person or over the phone?
5      A. It was over the phone.
6      Q. Did they ever get back to you?
7      A. Yes.
8      Q. Both of them or one of them?  Who got
9  back to you?
10     A. It could have been either one of them.
11  One of them got back to me.
12     Q. What did they tell you?
13     A. That again, they said that -- not again.
14  But they said that Dr. Wu did not present it in
15  the way that Ruth brought it to me.  That he was
16  speaking, and he wasn't -- their defense was
17  that the doctor was not speaking specifically to
18  her, that he was talking generally.
19     Q. Was it your understanding that there
20  were other people in the room when he made the
21  comment?
22     A. Yes.
23     Q. Did you speak to anybody else besides
24  Greg or Drew about Ruth Briggs' complaint about

Page 55

1  confirm Ruth's reply back.  They may have told
2  me. I don't recall.  But they got back to me
3  generally of what took place.
4      Q. And when Ruth is telling you about this,
5  did she also explain that this comment from
6  Dr. Wu was right before her birthday?
7      A. No.
8      Q. Have you ever met Ruth Briggs in person
9  before?
10     A. Yes.
11     Q. Did you understand that back in the 2014
12  period she was in her 50s?
13     A. Yes.
14     Q. P-6 in front of you, it is dated
15  November 9th, 2011.
16         Do you see that?
17     A. Yes.
18     Q. Did you know that Ruth Briggs' birthday
19  was November 10th?
20     A. No.
21         MR. MUNSHI: Do you need a comfort
22  break?
23         MS. SATINSKY: Sure.
24         (Recess.)

Page 54

1  this comment?
2          MS. SATINSKY: Objection to form.
3          THE WITNESS: No, I didn't.
4  BY MR. MUNSHI:
5      Q. Did you ever learn that Ruth responded
6  to Dr. Wu's comment by saying words to the
7  effect of, "We're in the United States, not
8  China?"
9          MS. SATINSKY: Objection to form.
10         THE WITNESS: I think she may have
11  said that to me.
12  BY MR. MUNSHI:
13     Q. Same conversation that you had with her?
14     A. Yes.
15     Q. Did you ask Greg and Drew to look into
16  that aspect as well?
17     A. I asked them to look into the whole
18  conversation.
19     Q. And did they ever, one or both of them,
20  ever get back to you regarding that specific
21  comment that Ruth made?
22     A. They looked into it, into the situation
23  and the conversation.  They got back to me and
24  told me what took place.  I didn't ask them to

Page 56

1  BY MR. MUNSHI:
2      Q. Miss Walton, we were talking about
3  discipline that Ruth Briggs received in November
4  of 2011.
5          Do you recall her also receiving
6  discipline in March of 2013?
7      A. Yes.
8      Q. And what do you recall about the
9  circumstances around that discipline?
10     A. From my memory, I think that's the one
11  where she was supposed to schedule a faculty
12  member to -- I'm sorry.  She was responsible for
13  scheduling the travel arrangements for a
14  visiting prospect for a faculty position.
15     Q. Do you recall her receiving a three-day
16  suspension without pay in connection with that
17  issue?
18     A. Yes.
19     Q. And did you play any role in connection
20  with issuing that discipline?
21     A. Yes.  I counseled them.  The dean's
22  office, Greg, called me and said this is -- it
23  may have been in conjunction with Drew.  They
24  contacted me and they told me the circumstances

Page 57

1  of what took place and asked for my advice.
2  Q.  Did you ever discuss the discipline with
3  Ruth Briggs?
4  A.  Yes.
5  Q.  And do you recall her expressing to you
6  that she felt the discipline was too severe?
7  A.  Yes.
8  Q.  In your time over at Temple, had you
9  ever seen an employee within that department of
10  CIS receive a discipline with three days of no
11  pay?
12  A.  I'm not in on every discipline that's
13  taken place at CIS, so I don't know.
14  Q.  Just what you have seen?
15  A.  Just what I have seen?  No, I haven't
16  handled any.
17  Q.  Who made the decision that she should
18  receive three days without pay as the
19  discipline?
20  A.  Greg and I talked about it.  We looked
21  at our results of conduct and we chose, based on
22  the severity of what took place, what the
23  violation should be.
24  Q.  Was it your decision or Greg's decision?

Page 58

1  A.  Ultimately it's the department's
2  decision.  I basically give them my advice based
3  on our rules of conduct.
4  Q.  Did you ever discuss this particular
5  discipline with Dr. Wu?
6  A.  I don't know if I talked to Dr. Wu.
7  MR. MUNSHI:  Let's have this
8  document marked as P-26.
9  (P-26 was marked for
10  identification.)
11  BY MR. MUNSHI:
12  Q.  Take your time and review P-26.
13  A.  (Pause.)
14  Q.  In reviewing P-26, do you recall
15  Miss Briggs objecting to the severity of this
16  discipline to you?
17  A.  Yes.
18  Q.  Did you ever have a discussion with Greg
19  Wacker about Ruth Briggs' objection to the
20  severity?
21  A.  I'm sure we discussed it.
22  Q.  Did you have an understanding from Ruth
23  Briggs that she felt that she was being treated
24  unfairly with regard to this punishment?

Page 59

1  A.  Yes.
2  Q.  Did you talk with Ruth about that?
3  A.  Yes, I did.
4  Q.  Did you tell Greg Wacker -- he's not on
5  this e-mail -- did you tell Greg Wacker that
6  Miss Briggs felt she was being treated unfairly
7  with this punishment?
8  A.  Greg and I discussed this situation.  He
9  was already aware that she felt this way, so we
10  had discussion.  I told him that she had
11  e-mailed me.  He told me that he was aware.  I
12  guess she may have talked to Drew or even Greg
13  directly about her concerns.  So yeah, I had a
14  conversation with him about it.
15  Q.  And did Ruth Briggs express to you that
16  she felt like she was being singled out with
17  regard to this punishment?
18  A.  Well, I think in the letter she states
19  that.
20  Q.  She writes here, quote, There are
21  different standards for performance and
22  productivity which are not justified."
23  Did she express to you that she felt
24  basically she was held to a double standard by

Page 60

1  Dr. Wu?
2  MS. SATINSKY:  Objection to form.
3  THE WITNESS:  Not a double standard,
4  but she felt that, you know, in her mind, others
5  make mistakes and they are not dealt with, but
6  she makes mistakes and she is.
7  BY MR. MUNSHI:
8  Q.  Did you similarly ask Greg or Drew to
9  look into Miss Briggs' concerns about how she
10  was being punished here?
11  MS. SATINSKY:  Objection to form.
12  THE WITNESS:  I talked with them
13  about it.  We talked about her accusations of
14  other people in the office.  They assured me
15  that everyone was treated equally and that there
16  weren't -- there was no one in the office making
17  the mistakes that she was making.
18  BY MR. MUNSHI:
19  Q.  And did you ask Greg or Drew to follow
20  up with Dr. Wu and say, "This is what Ruth is
21  saying about how she is being treated"?
22  MS. SATINSKY:  Objection to form.
23  THE WITNESS:  Just to be clear, you
24  are asking did I ask them to follow up with

Page 61

1    Dr. Wu?
2    BY MR. MUNSHI:
3       Q.  Right.  Because I understand you didn't
4    talk to Dr. Wu.
5       A.  Right.
6            Yes.
7       Q.  And did they get back to you?
8       A.  Yes.  They got back to me, but they were
9    an integral part of what was going on in that
10   department.  So when I say "they," more
11   specifically Drew.  So, you know, they knew that
12   things were going on.  You know, Dr. Wu worked
13   with them consistently if he had issues with
14   anyone in his office.  So they were aware of any
15   issues or concerns.
16      Q.  At any point prior to the termination of
17   employment of Ruth Briggs, did you learn that
18   she complained about comments regarding her age
19   from Dr. Wu?
20           MS. SATINSKY: Objection to form.
21   BY MR. MUNSHI:
22      Q.  Besides the comment we already talked
23   about.
24      A.  No.

Page 62

1       Q.  Did you ever talk with Sandy Foehl, and
2    I may be mispronouncing that name.  Is it Foehl?
3       A.  It's "Foehl."
4       Q.  Did you ever speak with Sandy Foehl
5    about Ruth Briggs?
6       A.  Yes.
7       Q.  And did Sandy Foehl ever express to you
8    that Ruth Briggs had said to Sandy that there
9    were comments being made about my age by Dr. Wu?
10           MS. SATINSKY: Objection to form.
11           THE WITNESS: She may have.  I don't
12   recall specifically.  I don't recall
13   specifically.
14   BY MR. MUNSHI:
15      Q.  Is that something as an HR professional
16   of almost 30 years or so that would raise a
17   concern with you, if there is a manager in the
18   workplace making comments regarding age to an
19   employee?
20           MS. SATINSKY: Objection to form.
21           THE WITNESS: It would be a concern
22   to me if it was in the context of their age and
23   their employment.
24   BY MR. MUNSHI:

Page 63

1       Q.  If it was within that context, would you
2    want to find out more information?
3            MS. SATINSKY: Objection to form.
4            THE WITNESS: Yes.
5    BY MR. MUNSHI:
6       Q.  Would you want to look into those
7    allegations as an HR professional?
8            MS. SATINSKY: Objection to form.
9            THE WITNESS: Yes.
10   BY MR. MUNSHI:
11      Q.  Do you know who Cameron Etezady is?
12      A.  Yes.
13      Q.  Did you ever speak with him at any time?
14      A.  No.
15           MS. SATINSKY: I just want it to be
16   clear, you can testify if you have ever spoken
17   with Cameron.  I don't want you to testify at
18   this point as to anything you discussed, have
19   discussed with Cameron or may have discussed.
20           THE WITNESS: Sure.
21   BY MR. MUNSHI:
22      Q.  So the answer was yes that you have
23   spoken with him?
24           MS. SATINSKY: I think it was no.

Page 64

1            THE WITNESS: It was no.
2    BY MR. MUNSHI:
3       Q.  Sorry.  I mixed that up.
4       A.  Generally or in regards to Ruth Briggs?
5       Q.  Just talking about Ruth Briggs.
6       A.  No.
7       Q.  Do you know who Fay Trachtenberg is?
8       A.  Yes.
9       Q.  Same question, not getting into the
10   communications, did you speak with her about
11   Ruth Briggs?
12           MS. SATINSKY: Prior to the end of
13   Ruth's employment at Temple?
14           MR. MUNSHI: Yes.
15           THE WITNESS: No.
16   BY MR. MUNSHI:
17      Q.  Were you aware that Ruth Briggs was
18   having communications with Cameron Etezady?
19      A.  No.
20      Q.  Were you aware that Ruth Briggs was
21   having communications with Fay Trachtenberg?
22      A.  No.
23      Q.  Were you aware that Ruth Briggs was
24   having communications with Sandy Foehl?

Page 65

1    MS. SATINSKY: Objection to form.
2  Asked and answered.
3    THE WITNESS: I may have.
4  BY MR. MUNSHI:
5    Q. Anything you can recall right now about
6  your conversations with Sandy Foehl and any
7  complaints that Ruth Briggs raised with her?
8    MS. SATINSKY: Objection to form.
9    THE WITNESS: I don't recall
10  specifically, but I know Sandy did call to say
11  Ruth complained to her about her working
12  relationship, her working situation.
13  BY MR. MUNSHI:
14    Q. Approximately when did that happen?
15    A. I couldn't tell you.
16    Q. Do you recall if it was in the year of
17  2014 when she was terminated or some time
18  earlier than that?
19    MS. SATINSKY: Objection to form.
20    THE WITNESS: It could have been
21  earlier. I mean it could have been in '14 and
22  earlier.
23  BY MR. MUNSHI:
24    Q. Are you aware if Sandy Foehl ever spoke

Page 66

1  with Dr. Wu about Ruth Briggs?
2    A. No, I'm not aware of that.
3    Q. Are you aware if Sandy Foehl ever spoke
4  with Greg Wacker about Ruth Briggs?
5    MS. SATINSKY: Other than what you
6  may have learned from an attorney.
7    THE WITNESS: No.
8  BY MR. MUNSHI:
9    Q. How about with Drew DiMeo, are you aware
10  of any conversations between Sandy Foehl and
11  Drew DiMeo regarding Ruth Briggs?
12    MS. SATINSKY: Again, other than
13  what you may have learned from an attorney.
14  BY MR. MUNSHI:
15    Q. It is going to be the same instruction
16  the whole day. I think you get it.
17    MS. SATINSKY: I am going to put my
18  objection on the record.
19  BY MR. MUNSHI:
20    Q. I have faith in your ability to
21  understand.
22    A. To be honest, I'm not sure.
23    Q. Did you have any conversations with Drew
24  DiMeo, just the two of you, regarding Ruth

Page 67

1  Briggs beyond what we have already talked about
2  today?
3    A. Beyond what we talked about? Yeah. I
4  mean he would call me many times. I shouldn't
5  say many times. He would call me a number of
6  times after meeting with Ruth and Dr. Wu.
7    Q. And did Drew ever express to you that
8  Dr. Wu was frustrated with Ruth Briggs?
9    A. They both had become frustrated.
10    Q. And did Ruth ever express to you that
11  she felt intimidated by Dr. Wu?
12    A. I don't think she was ever intimidated.
13  She never came off intimidated to me because she
14  many times gave back to Dr. Wu. I mean she
15  pushed back herself.
16    Q. Did she ever express to you that she was
17  afraid of being retaliated against?
18    A. No.
19    Q. There was a third discipline that was
20  issued to Ruth Briggs in January 2014.
21    Do you recall that?
22    A. In January?
23    Q. Of 2014.
24    A. Off the top of my head, I recall a

Page 68

1  discipline, but I don't remember specifics of
2  it.
3    Q. Let's take a look at P-18.
4    A. (Pause.)
5    Q. Do you recall this disciplinary report
6  that Miss Briggs received in January 2014?
7    A. I recall seeing this, yes.
8    Q. Did you play any role in issuing or
9  facilitating this disciplinary report?
10    A. I don't recall specifically, but I'm
11  sure Drew called me.
12    Q. Do you recall talking with Ruth Briggs
13  about this discipline?
14    A. I'm not sure. I'm sure she called me.
15    Q. Do you recall her telling you, this was
16  an issue about her being late to work one day?
17    A. Uh-huh.
18    MS. SATINSKY: Objection to form.
19  BY MR. MUNSHI:
20    Q. Do you recall her telling you that she
21  had called a student-worker to say she was going
22  to be late?
23    A. Yes.
24    Q. Did you ever speak with that

Page 69

1  student-worker?
2  A. No, I didn't.
3  Q. Do you know if Greg Wacker ever did or
4  Drew DiMeo ever did?
5  A. It's my understanding that they did.
6  Q. And did they report back to you what
7  this person said?
8  A. Yes, I'm sure -- yes, they did.
9  Q. Any recollection of what they told you?
10  A. From my memory of the situation, Ruth
11  did not report to work timely.  When she called
12  in, she didn't call her supervisor or anyone in
13  a leadership role.  She called a student and the
14  student confirmed that.
15  Q. Do you recall Ruth saying that Dr. Wu
16  wasn't available at the time that she called?
17  A. Yes.
18  Q. And do you know Judy Lennon?
19  A. I've heard of her.  I don't know her.
20  Q. Do you recall her being an
21  administrative assistant in that department?
22  MS. SATINSKY: Objection to form.
23  THE WITNESS: No.
24  BY MR. MUNSHI:

Page 70

1  Q. Do you recall Ruth Briggs telling you
2  she also tried contacting Judy Lennon but she
3  was not available?
4  A. Yes.  Not Judy specifically.  I don't
5  remember her name.  But she did say she tried to
6  contact someone else in the office.
7  Q. Did you give any sort of a
8  recommendation with regard to this discipline
9  that is P-18?
10  A. Yes, I'm sure they contacted me.
11  Q. And the discipline that is given here is
12  a written warning.  Do you see that?
13  A. Yes.
14  Q. And prior to January 20th, 2014, did
15  Ruth Briggs have any ongoing issues with being
16  tardy or not showing up to work?
17  A. I don't know.
18  Q. What did Ruth Briggs do wrong to warrant
19  a written warning?
20  MS. SATINSKY: Objection to form.
21  THE WITNESS: Well, she didn't, she
22  didn't arrive to work at her report time, and
23  she didn't call out.  And then when she did
24  call, which was way after her shift had started,

Page 71

1  she did not contact the proper people to report
2  that she was not going to be at work.  And
3  contacting a student wasn't sufficient.  My
4  understanding, from my memory, I don't believe
5  the student had passed that message on.
6  So what she did wrong was that she
7  did not report, nor did she show up.
8  BY MR. MUNSHI:
9  Q. You understood from her that she said
10  that she did call Dr. Wu but he wasn't
11  available; right?
12  A. Yes.
13  Q. Did you look into that if that was true?
14  A. I believed her that she did, that she
15  attempted to call Dr. Wu.  In speaking with her
16  specifically, I said to her that there were a
17  number of other avenues.  She could have called
18  the dean's office.  She could have called Greg
19  Wacker.  She could have called Drew DiMeo.  She
20  could have sent an e-mail.  There were many
21  other ways she could have communicated if she
22  was not reaching Dr. Wu other than report to a
23  student.
24  Q. Well, was it your understanding that she

Page 72

1  specifically called that student-worker or that
2  that was the person who answered the phone?
3  A. Well, obviously it was, yes, it was the
4  person who answered the phone.
5  Q. So you understood that she had called
6  the office and it just so happens that a
7  student-worker is the one who answers the phone?
8  MS. SATINSKY: Objection to form.
9  THE WITNESS: I understand that it
10  was a student-worker that she said that she told
11  that she was not going to be -- that she was
12  coming into work late that day.
13  BY MR. MUNSHI:
14  Q. And had she ever gotten any other
15  warnings for tardiness or no call/no shows that
16  you are aware of?
17  MS. SATINSKY: Objection to form.
18  Asked and answered.  You can answer.
19  THE WITNESS: Not that I recall.
20  Not that I know of.
21  BY MR. MUNSHI:
22  Q. Are you aware of any other employee at
23  Temple receiving a disciplinary report or
24  written warning for a one-time situation of

Page 73

1  being late like this?
2  A. Yes.
3  MS. SATINSKY: Objection to form.
4  BY MR. MUNSHI:
5  Q. Did you speak with Greg Wacker after
6  Miss Briggs objected to this?
7  MS. SATINSKY: Objection to form.
8  BY MR. MUNSHI:
9  Q. Did you understand that Ruth Briggs
10  objected to the discipline that she received?
11  A. Yes.
12  Q. Did you speak with Greg Wacker after she
13  objected to it?
14  A. Yes.
15  Q. What do you recall speaking with Greg
16  about?
17  A. I told Greg she was upset about it, that
18  she disagreed with it.
19  And I just relayed to him my
20  conversation with her.
21  Q. As you saw here, this is January of
22  2014, and we have looked at e-mails starting in
23  2010 about Miss Briggs raising concerns about
24  how she was being treated in the workplace;

Page 74

1  right?
2  A. Yes.
3  MS. SATINSKY: Objection to form.
4  BY MR. MUNSHI:
5  Q. Did that raise any --
6  MS. SATINSKY: Let me put my
7  objection on the record before you start
8  talking.
9  MR. MUNSHI: Was it on, Terry?
10  COURT REPORTER: Yes.
11  BY MR. MUNSHI:
12  Q. Did it raise any concern with you that
13  Ruth Briggs was now coming to you again saying
14  that she felt she was being singled out or
15  treated differently?
16  MS. SATINSKY: Objection to form.
17  THE WITNESS: Just to clarify, did
18  it raise any concerns, that's your question?
19  BY MR. MUNSHI:
20  Q. Yes.
21  A. No.
22  Q. How come?
23  A. Because of my past experiences with her,
24  which has spanned over a number of years since

Page 75

1  the early 2000's. Her performance has not
2  always been good. So there's been concerns or
3  issues, and I dealt with the in the past, so it
4  wasn't a concern for me, no.
5  Q. At any point while Miss Briggs was
6  employed at Temple, did you ever reach a
7  conclusion that there was merit or no merit to
8  her complaints of the environment being hostile?
9  MS. SATINSKY: Objection to form.
10  THE WITNESS: I never reached a
11  conclusion. I thought there were mitigating
12  circumstances, and sometimes she contributed
13  towards the work environment.
14  BY MR. MUNSHI:
15  Q. What do you mean by "mitigating
16  circumstances"?
17  A. So what I mean is that mitigating,
18  meaning that there were things that Ruth also
19  contributed to the work environment. You know,
20  she also became -- she talked about Dr. Wu being
21  hostile. She also at times raised her voice and
22  became hostile as well.
23  So it was a combination of things
24  that went on. So I didn't think that this was a

Page 76

1  hostile work environment. I felt that this was
2  two people that didn't see eye to eye and
3  sometimes did not get along.
4  Q. Do you know if she was reaching out to
5  anyone else in human resources besides you?
6  A. Not that I know of.
7  Q. Do you know someone named Rhonda Brown?
8  A. Yes.
9  Q. Who was she?
10  A. Rhonda Brown was the, I think she was
11  associate vice president for IDEAL. She doesn't
12  work in HR.
13  I know you are going to ask me what
14  IDEAL is, but I don't remember what the acronym
15  stands for, but it is the office that deals with
16  diversity for the university.
17  Q. Is it part of EEO?
18  A. EEO? The EOC department used to come
19  under Rhonda. At the time it was no longer
20  under Rhonda.
21  Q. Did you ever have any conversations with
22  Rhonda Brown about Ruth Briggs?
23  A. No.
24  Q. Did anyone ever inform you that Ruth

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

DEIRDRE CULBREATH-WALTON
June 30, 2017

Page 77

1  Briggs had conversations with her?
2  A.  No.
3       MR. MUNSHI: Let's have this marked
4  P-27.
5       (P-27 was marked for
6  identification.)
7       THE WITNESS: (Pause.)
8  BY MR. MUNSHI:
9  Q.  In P-27, the third paragraph starts
10  with, quote, There were a number of times that
11  Dr. Wu canceled or postponed our regularly
12  scheduled meetings (8:45 a.m. on Mondays,
13  Wednesdays and Fridays) with very little notice
14  and Drew did not attend two meetings and was
15  late today."
16      Do you see that?
17  A.  Yes.
18  Q.  Did you ever follow up with Drew or
19  Dr. Wu or anybody as to whether or not that was
20  true?
21  A.  Yes, I did.
22  Q.  Who did you follow up with?
23  A.  With Drew.
24  Q.  What did he say?

Page 78

1  A.  That it was true.
2  Q.  And then in the last paragraph on the
3  first page she writes to you, "I want you to
4  understand how distressing it is when I have no
5  one in the department and no one in human
6  resources who will listen to me.  I am honest
7  and operate with integrity in every arena of my
8  life and five days out of the week I am battered
9  emotionally, insulted, ignored --
10      MS. SATINSKY: Sorry to interrupt
11  you.  It does not say "I am." It says "I a."
12  BY MR. MUNSHI:
13  Q.  The sentence says, "I am honest and
14  operate with integrity in every arena of my life
15  and five days out of the week I 'a' battered
16  emotionally, insulted, ignored, yelled at in
17  front of peers and the department scapegoat."
18      Did you ever talk to Ruth Briggs
19  about what she wrote here?
20  A.  I probably did.  I don't recall
21  specifically, but I'm sure I talked to her.
22  Q.  This is dated February 22nd, 2014.
23      This e-mail isn't the first time
24  that she expressed to you that she felt insulted

Page 79

1  in the workplace; right?
2       MS. SATINSKY: Objection to form.
3       THE WITNESS: I don't recall if she
4  had complained prior to this e-mail.
5  BY MR  MIJNSHI:
6  Q.  And prior to this e-mail, do you recall
7  ever hearing from her that she was yelled at in
8  front of peers?
9  A.  I don't recall.
10  Q.  Being yelled at in front of peers is
11  something we talked about earlier.
12  A.  Uh-huh.
13  Q.  Would you consider that to potentially
14  be abusive treatment?
15  A.  Yes.
16      MS. SATINSKY: Objection to form.
17  BY MR. MUNSHI:
18  Q.  And did you go to Greg or Drew or
19  anybody to look into this concern?
20  A.  Yes.
21  Q.  And do you have a specific recollection
22  of doing so?
23  A.  In regards to this e-mail?  Yes.
24  Q.  What do you recall saying to them?

Page 80

1  A.  I recall saying that Ruth has contacted
2  me.  She had specifically complained of this
3  behavior, and they both told me, you know, they
4  gave me their understanding of what took place
5  and what was going on with Ruth and Dr. Wu.
6  Q.  And was it your understanding that Greg
7  and/or Drew discussed this with Dr. Wu as well?
8  A.  Yes.
9  Q.  And did they relate to you what his
10  thoughts were?
11  A.  Dr. Wu -- what they came back to me and
12  they said Dr. Wu basically denies that he yelled
13  at her in front of other staff.
14  Q.  Was it your understanding that Dr. Wu
15  denied making any comments to Ruth Briggs at all
16  that were insulting?
17      MS. SATINSKY: Objection to form.
18      THE WITNESS: Yes, he denied it.
19  BY MR. MUNSHI:
20  Q.  The last sentence in Ruth's e-mail to
21  you says -- it is on the next page -- it
22  says, "I am appealing to you to assign someone
23  who is fair and unbiased to conduct an
24  investigation for the truth about these two

Page 81

1  incidents without prejudice in a timely manner."
2      Do you see that?
3  A. Uh-huh.
4      MS. SATINSKY: You have to answer.
5      THE WITNESS: Sorry   Yes
6  BY MR. MUNSHI:
7  Q. That is okay.
8      Did you have a conversation with
9  Ruth about her request here?
10  A. I don't remember, but I'm sure I talked
11  with her.
12  Q. How about with Greg and/or Drew, do you
13  recall having a conversation with them about
14  having someone do an investigation?
15  A. I don't think I talked to them about an
16  investigation. I talked to them about her
17  issues and her concerns, but not in regards to
18  investigation.
19      I asked, as I always did when she
20  contacted me, I asked them to look into the
21  situation that was going on between Dr. Wu and
22  Ruth.
23      The main reason that Drew was down
24  there was to mediate the relationship between

Page 82

1  Dr. Wu and Ruth and to address any of those
2  issues.
3      So with Drew down there, she had
4  every opportunity to address these issues.
5  Q. And now coming back to the handful of
6  conversations you did have with Dr. Wu --
7  A. Uh-huh.
8  Q. -- can you give me an estimate as to
9  what handful is? Is it two, four, five, ten?
10  A. It was probably two or three times that
11  I recall.
12  Q. And what is the first one that you
13  recall?
14  A. So I think Dr. Wu called me when he
15  couldn't get in contact with Greg or Drew and he
16  would say, you know -- I can't be real -- I'm
17  being very general. I know that he called in
18  regards to something that Ruth did that caused
19  the problem or error. And I think he called in
20  regards to a lateness. I can't specifically
21  say, but they were surrounding her performance.
22  And he would call me and I would tell him, well,
23  you know, that I would talk with Greg and Drew
24  about the situation. But for the most part, he

Page 83

1  worked through Greg and Drew.
2  Q. The handful of conversations you had
3  with Dr. Wu, would you say that all of them were
4  brief?
5  A. Yes.
6  Q. How brief would you say?
7  A. I didn't stay on the phone with him more
8  than five minutes. It might have been two
9  minutes.
10  Q. The first time he reached out to you.
11  So as we know, Miss Briggs ended her employment
12  in April of 2014. The first time that you had a
13  direct conversation with Dr. Wu, could you tell
14  me if it was in the year 2014 or some time
15  earlier than that?
16  A. From my memory, I think the only time I
17  talked to him was in 2014.
18  Q. So at the time that you spoke with
19  Dr. Wu personally, you had already known
20  directly from Ruth that she had complained about
21  hostile work environment from Dr. Wu; right?
22      MS. SATINSKY: Objection to form.
23      THE WITNESS: Yes.
24  BY MR. MUNSHI:

Page 84

1  Q. And you had already known that she made
2  an allegation about a comment regarding
3  retirement age in China for women that Dr. Wu
4  said?
5      MS. SATINSKY: Objection to form.
6      THE WITNESS: Yes.
7  BY MR. MUNSHI:
8  Q. And you had already had several
9  conversations with Greg Wacker about Ruth
10  Briggs' concerns with Dr. Wu; right?
11  A. Yes.
12  Q. You had already had several
13  conversations with Drew DiMeo about Ruth Briggs'
14  concerns with Dr. Wu; right?
15  A. Yes.
16  Q. Did you ever tell Dr. Wu when you were
17  speaking with him, "I've already been in touch
18  with Ruth Briggs about concerns"?
19  A. No.
20  Q. And you had an understanding that Greg
21  Wacker had conversations with Dr. Wu regarding
22  Ruth Briggs' concerns; right?
23  A. Yes.
24  Q. And you already had an understanding

Page 85

1  that Drew DiMeo had conversations with Dr. Wu
2  about Ruth Briggs' concerns; correct?
3      A. Yes.
4      Q. At any point prior to Miss Briggs'
5  termination of employment, did you learn that
6  she had gone to the EEOC or planned to go to the
7  EEOC? And I don't mean internally EEOC. I mean
8  the government EEOC.
9          MS. SATINSKY: Objection to form.
10         THE WITNESS: I don't recall her
11 telling me that.
12 BY MR. MUNSHI:
13     Q. Do you recall learning that from
14 anybody? And this is prior to Miss Briggs'
15 termination.
16         MS. SATINSKY: Objection to form.
17         THE WITNESS: I just don't recall.
18         MR. MUNSHI: Let's have this marked
19 as P-28, please.
20         (P-28 was marked for
21 identification.)
22 BY MR. MUNSHI:
23     Q. So P-28 starts with an e-mail from Ruth
24 Briggs to Sandy Foehl. Subject line, "I want to

Page 86

1  schedule an appointment to file a complaint."
2  The last sentence in the first paragraph of her
3  e-mail to Sandy is, "I plan to file an EEOC
4  complaint internally and have already had a
5  phone intake with the EEOC."
6          Do you see that?
7      A. Yes, I do.
8      Q. Then Sandy forwarded this e-mail to you
9  on February 26th, 2014. Do you see that?
10     A. Yes.
11     Q. And she asks you, "Have you talked with
12 her recently to know what her issues are?"
13         Did you subsequently have a
14 conversation with Sandy about this?
15     A. Yes.
16     Q. What do you recall about your
17 conversation with Sandy?
18     A. I can't recall specifically, but I'm
19 sure I gave Sandy an update. So as always, when
20 she reaches out to me, I'm sure I called her and
21 told her what the circumstances were and what
22 was going on with Ruth.
23     Q. When you received this e-mail from
24 Sandy, was that the first time that the concept

Page 87

1  of filing an EEOC complaint was raised by Ruth
2  Briggs to you?
3          MS. SATINSKY: Objection to form.
4  Go ahead.
5          THE WITNESS: That I recall, yes.
6  BY MR. MUNSHI:
7      Q. And what was your reaction to reading
8  Ruth Briggs' e-mail where she makes a reference
9  to filing a complaint with the EEOC?
10         MS. SATINSKY: Objection to form.
11 Mischaracterized the document.
12 BY MR. MUNSHI:
13     Q. What was your reaction to reading Ruth
14 Briggs' e-mail regarding planning to file an
15 EEOC complaint internally and that she had
16 already had a phone intake with the EEOC?
17     A. I wasn't too concerned. You know, in my
18 business and my line of work, I find that
19 employees will threaten to do that and it's
20 their right. So I don't necessarily get too
21 concerned when they say that they're going to do
22 that.
23     Q. With regard to Ruth Briggs specifically,
24 were you surprised at all to read her e-mail?

Page 88

1      A. No, I wasn't.
2      Q. Then you did have a conversation with
3  Sandy Foehl and you said you gave her an update.
4          What did you say to her?
5      A. Specifically I can't tell you, or I
6  don't want to make up anything, but I'm sure
7  that I just gave her, as I always do when she
8  calls me in these situations, I gave her an
9  update of what was going on with Ruth at that
10 time.
11     Q. And do you remember what was going on at
12 that time? This is February 26th, 2014.
13     A. This is February.
14         I'm sure the discipline had taken
15 place. She was having meetings on an ongoing
16 basis with Drew and Dr. Wu. And she was not
17 happy about that. So I'm sure that's what her
18 issues were, and I gave Sandy an update of what
19 has been going on with her.
20         So whatever was going on, one, the
21 meetings, the discipline, I went over that with
22 Sandy.
23     Q. Did you inform Greg Wacker about the
24 e-mail that you received from Sandy Foehl, P-28?

Page 89

1   A. I don't recall. I --
2   Q. How about -- sorry, go ahead.
3   A. It's -- I mean I always tell managers
4 that -- because it's her right to do this, and
5 she may have contacted her confidentially, so
6 sometimes I may not tell a manager that this is
7 going on. So I don't recall if I did or not.
8   Q. Same thing with Drew DiMeo, do you
9 recall speaking with him about it?
10   A. I don't recall.
11   Q. Is it possible that you did?
12       MS. SATINSKY: Objection to form.
13       THE WITNESS: I'm not sure.
14 BY MR. MUNSHI:
15   Q. Did you have any conversations with
16 Tracy Hamilton about Miss Briggs' e-mail that we
17 are looking at?
18   A. This specific e-mail?
19   Q. Start with this specific e-mail.
20   A. Tracy Hamilton? I don't recall Tracy
21 Hamilton being involved.
22   Q. With Ruth Briggs?
23   A. Yes.
24   Q. Over the course of several years, would

Page 90

1 you agree with me that Miss Briggs on numerous
2 occasions came to you to discuss her workplace
3 concerns with Dr. Wu?
4   A. On numerous occasions over how many
5 years?
6   Q. From 2010 to 2014.
7   A. She contacted me. We're not in the same
8 physical location, so it wasn't always easy for
9 her to come to me personally.
10   Q. Were there any complaints or concerns
11 that she raised with you about Dr. Wu that you
12 did not look into or direct somebody to look
13 into?
14   A. No.
15       MR. MUNSHI: This is P-29.
16       (P-29 was marked for
17 identification.)
18 BY MR. MUNSHI:
19   Q. This is a bit lengthier, so go ahead and
20 read this e-mail chain. As with most e-mail
21 chains, it starts at the end and was forwarded,
22 if it is easier for you to read it that way.
23   A. (Pause.)
24       Okay.

Page 91

1   Q. P-29 is a lengthy e-mail chain between
2 you and Ruth Briggs, but if you can turn to the
3 second to the last page, which has the No. 72 in
4 the bottom right-hand corner.
5       Miss Briggs writes here, "My work
6 situation with Drew DiMeo and Dr. Wu is
7 escalating and I need your help. This issue is
8 not something that affects my work week, but is
9 causing anxiety and depression throughout my
10 weekends. To mask this from my grown children
11 and grandchildren, I report that I have the flu
12 so that they stay away."
13       At any point, had Miss Briggs
14 expressed to you that the situation at work was
15 causing her anxiety?
16   A. In this e-mail.
17   Q. Prior to this e-mail, did she ever
18 express that to you?
19   A. She may have. I don't recall
20 specifically.
21   Q. Prior to this e-mail, had she ever
22 expressed to you that she was feeling depressed?
23   A. No.
24   Q. Were you surprised to read that?

Page 92

1   A. Yes.
2   Q. On the second page of P-29, with No. 70
3 in the lower right-hand corner, in the middle of
4 that first paragraph, she says, "All I want is
5 to continue to work without being harassed."
6       Do you see that?
7   A. Yes.
8   Q. And is that a concern that you looked
9 into?
10   A. Yes.
11   Q. And how did you look into that concern?
12   A. Again, I talked with Greg and Drew.
13   Q. And then did you also ask them or
14 instruct them to speak with Dr. Wu?
15   A. Yes.
16   Q. So on the first page of P-29, you start
17 your e-mail March 25th, 2014, with, "Good
18 morning, Ruth." You write here, "Every time you
19 have reached out to me I have talked with you
20 and looked into your complaints and concerns."
21   A. Uh-huh.
22   Q. That is an accurate statement; right?
23   A. Yes.
24   Q. And the process you have already

Page 93

1  described for us is what you meant by "looked
2  into"?
3    A.  Yes.
4    Q.  And the complaints and concerns that you
5  looked into included claims of harassment and
6  hostile work environment; correct?
7        MS. SATINSKY: Objection to form.
8        THE WITNESS: It included the
9  complaints that she would have in regards to how
10  she was being treated by Dr. Wu where she felt
11  she was being singled out.  So I would ask Greg
12  and Drew to look into those things.  I would
13  usually call them and ask them about, you know,
14  how things were being run in the computer
15  information department, or CIS.
16  BY MR. MUNSHI:
17    Q.  And Dr. Wu was the chair of CIS at the
18  time?
19    A.  That's my understanding, yes.
20        MR. MUNSHI: Can we have this marked
21  as P-30, please.
22        (P-30 was marked for
23  identification.)
24  BY MR. MUNSHI:

Page 94

1    Q.  Now, P-30 is a portion of the same
2  e-mail chain that we just looked at, P-29, with
3  a different top e-mail.  So you can read through
4  the whole thing again, but I believe it is the
5  same several pages that we just looked at.
6    A.  (Pause.)
7        The top e-mail is part of this one
8  already?
9    Q.  Right.  So the top e-mail is basically,
10  the one I am looking at, is March 25th, 2014,
11  where you are forwarding to Sandy the e-mail
12  chain.
13    A.  Okay.
14    Q.  That was just a long way of getting you
15  to say, do you recall your conversation with
16  Sandy about the e-mail chain that Ruth Briggs
17  and you had?
18    A.  What jogs in my memory is the fact that
19  Ruth had complained and nobody was responding to
20  her, and Sandy being one of those people.  And I
21  contacted Sandy in regards to it, and I
22  forwarded this to Sandy for her to see that Ruth
23  was stating that no one was responding to her,
24  including her.

Page 95

1    Q.  And this was a few weeks after the
2  e-mail we just looked at where Ruth Briggs
3  mentioned the EEOC complaint; right?
4        MS. SATINSKY: Objection to form.
5        THE WITNESS: So that was in
6  February, so yes.
7  BY MR. MUNSHI:
8    Q.  Did you inform Sandy the same thing that
9  you informed Ruth, which was that every time
10  Ruth reached out to you talked with Ruth and
11  looked into her concerns and complaints?
12    A.  Yes.
13    Q.  And did you explain to Sandy that
14  looking into the concerns and complaints meant
15  that you would talk with Greg and Drew?
16    A.  Yes.
17    Q.  And did you explain to Sandy that
18  looking into the concerns and complaints
19  involved Greg or Drew, and/or Drew speaking with
20  Dr. Wu?
21    A.  Yes.
22    Q.  And did Sandy have any sort of reaction
23  to your conversation?
24    A.  No.

Page 96

1    Q.  This e-mail chain, the top one is
2  March 25th, 2014.
3        Do you recall that Ruth Briggs'
4  employment was terminated within a week of that
5  date?
6        MS. SATINSKY: Objection to form.
7        THE WITNESS: I just know she was
8  terminated in April.
9  BY MR. MUNSHI:
10    Q.  Of 2014?
11    A.  Yes.
12        I'm sorry, she wasn't terminated.
13    Q.  What do you mean by that?
14    A.  She resigned.
15    Q.  Was it your understanding that she was
16  given a termination letter?
17    A.  She was given the option.  She was given
18  a termination letter and given the option to
19  resign.
20    Q.  So which one happened first, that she
21  sent in her letter of resignation or she was
22  given the termination letter?
23    A.  She was given the termination letter.
24    Q.  This is P-19.

Page 97

1      MS. SATINSKY: There is no sticker
2   on it.
3      MR. MUNSHI: I am sorry.
4   BY MR. MUNSHI:
5   Q. This has previously been marked as P-19.
6      MS. SATINSKY: I just want to make
7   sure it is marked correctly for this deposition.
8      MR. MUNSHI: We can put another P-19
9   sticker on it if that would do it. This one had
10  been previously marked as P-19.
11     THE WITNESS: (Pause.)
12     Go ahead.
13  BY MR. MUNSHI:
14  Q. Have you ever seen this document before?
15  A. Yes.
16  Q. Do you know if this letter was given to
17  Ruth Briggs?
18  A. Yes, it was.
19  Q. Were you present when it was given to
20  Ruth Briggs?
21  A. Yes, I was.
22  Q. Who else was there?
23  A. Greg Wacker.
24  Q. Anyone else?

Page 98

1   A. Not that I recall.
2   Q. Did Greg Wacker say anything during this
3   meeting between the three of you?
4   A. He talked with Ruth. He explained the
5   reason that we were there, which is to give her
6   this termination letter.
7      In that same meeting, you know, he
8   talked about the gist of this letter and at the
9   same time gave her the option to resign.
10  Q. Did you say anything during this
11  meeting?
12  A. I said to her, you know, the things that
13  she would need. What I usually do is talk
14  about, you know, if she had any questions
15  regarding the termination, any questions in
16  regards to the difference between doing the term
17  or resigning. Talked to her about next steps.
18  If she needed any information in regards to
19  benefits, things like that, and I told her she
20  could contact me with any questions.
21  Q. How did Ruth Briggs appear during this
22  meeting?
23  A. She was surprised and a little taken
24  back.

Page 99

1   Q. Did Greg Wacker go into detail with her
2   about the reasons why she was getting this
3   termination letter?
4   A. I believe, yes, based on what he wrote
5   here.
6   Q. Did you ever discuss with Dr. Wu the
7   circumstances set forth in the first bullet
8   point in P-19?
9   A. I didn't talk specifically with Dr. Wu.
10  I talked with Drew.
11  Q. How about the second bullet point, did
12  you have a conversation with Dr. Wu about the
13  contents therein?
14  A. No.
15  Q. Did Ruth Briggs appear upset during this
16  meeting?
17  A. She was upset, yes.
18  Q. Based on your experience as an HR
19  professional of 30 years, do you agree with me
20  that if Miss Briggs was terminated for
21  complaining about hostile work environment, that
22  could potentially be a violation of Temple's
23  policies?
24     MS. SATINSKY: Objection to form.

Page 100

1      THE WITNESS: Can you ask that
2   again?
3   BY MR. MUNSHI:
4   Q. Sure. Based on your experience as an HR
5   professional of about 30 years, do you agree
6   with me that if Ruth Briggs was terminated for
7   raising complaints of hostile work environment,
8   that could potentially be a violation of
9   Temple's policies?
10     MS. SATINSKY: Objection to form.
11     THE WITNESS: Yes.
12  BY MR. MUNSHI:
13  Q. Whose decision was it to give
14  Miss Briggs a termination letter?
15  A. In consultation with my office,
16  specifically me, Greg made the decision. And
17  again, I'm sure he also collaborated with
18  Dr. Wu.
19  Q. But do you know that for a fact that he
20  collaborated with Dr. Wu on the decision to give
21  the termination letter?
22  A. I know that he talked to Dr. Wu
23  concerning the situation. I'm sure Dr. Wu was
24  on board with the termination. So I think the

**Page 101**

1  decision, yeah, he talked with Dr. Wu, I know.
2    Q. Did you ever talk with Dr. Wu about the
3  decision to terminate?
4    A. No.
5    Q. Do you know if anybody else played any
6  role in the decision to terminate?
7       MS. SATINSKY: Objection to form.
8       THE WITNESS: I'm positive that Greg
9  ran this by his -- at the time, I don't know if
10  he was the vice dean, but he was the associate
11  dean, which would have been -- I forget his
12  name.  Forgive me.
13       Ralph, his name was Ralph Jenkins.
14  BY MR. MUNSHI:
15    Q. Did you have any conversations with
16  Ralph Jenkins about Ruth Briggs?
17    A. I don't think so.
18    Q. When was the first time you heard about
19  the concept of giving Ruth Briggs a termination
20  letter?
21    A. I don't know specifically, but it was
22  close to this date.
23    Q. Prior to some time close to this date,
24  were you ever part of any conversations where

**Page 102**

1  the concept of terminating Miss Briggs came up?
2    A. I'm sure that it may have come up
3  because of the continued errors that she was
4  making.  I just don't recall when.
5    Q. Do you recall making any notes or any
6  e-mails or any memos to the file about
7  discussing Ruth Briggs and termination?
8    A. I may have made notes.  I don't recall
9  off the top of my head.
10    Q. After April 1, 2014, did you have any
11  conversations with Dr. Wu about Ruth Briggs?
12    A. No.
13    Q. How about Greg Wacker, after April 1,
14  any conversations with Greg Wacker about Ruth
15  Briggs?
16    A. I believe so.  I think we were awaiting
17  her decision to resign, so I'm sure I talked
18  with him.
19    Q. And you had conversations with Ruth
20  regarding Unemployment Compensation; correct?
21    A. Yes.
22    Q. As far as you know, ultimately she did
23  receive unemployment compensation; correct?
24    A. Yes.

**Page 103**

1    Q. Do you know what she had to write on her
2  Unemployment Compensation form in order to get
3  it regarding resignation or termination?
4    A. I don't recall.
5    Q. In your experience as an HR
6  professional, do employees typically get
7  Unemployment Compensation if they resign?
8    A. No, they don't.
9    Q. Any conversations after April 1st, 2014,
10  with Sandy Foehl regarding Ruth Briggs?
11    A. Any conversations with Sandra Foehl
12  after April 1st?  Yes.
13    Q. Approximately how many?  And
14  specifically about Ruth Briggs.  Not about
15  anybody else.
16    A. Probably three times I might have talked
17  to her.
18    Q. What do you recall in the first
19  conversation?
20    A. I think I contacted, I may have
21  contacted Sandy after the termination to just
22  update her to give her, you know -- because I
23  think Sandy reached out to me because Ruth had
24  reached out to her, so I just explained to Sandy

**Page 104**

1  what took place, in regards to her termination,
2  why she was terminated and the circumstances.
3    Q. This was after the termination had
4  already happened; right?
5    A. Yes.
6    Q. Did it appear to you that this was the
7  first time that Sandy was learning that she had
8  been terminated, or did it appear to you that
9  Sandy already knew?
10    A. I may have been the person who told her.
11    Q. How did Sandy react?
12    A. She might have been surprised.
13    Q. Did Sandy ever inform you that she
14  herself at this time was looking into
15  Miss Briggs' complaints or concerns?
16    A. After the termination?
17    Q. Yes.
18    A. She may have.  I don't recall.  I mean
19  it was all coming together.  I think that
20  Ruth -- when Ruth came into our meeting, she
21  said that -- well, she told me after Greg left
22  the meeting that she had been to see Sandy.  So
23  I don't recall Sandy specifically saying she was
24  looking into it.  I just know that she called

Page 105

1   me.  I may have updated her or she called me and
2   I updated her.  So I might have called her, she
3   may have called me.  I don't recall.  But we did
4   talk.
5       Q.  What did she say or do that leads you to
6   believe that she was surprised?
7       A.  Surprised because she just didn't know.
8   She didn't know that Ruth no longer was working
9   here or that this action was taken.  So she
10  wasn't like surprised in the fact that she
11  didn't think that Ruth could be terminated.  She
12  just was surprised because she didn't know that
13  she had been terminated.
14      Q.  Did you talk with anybody else in the
15  EEO office about Ruth Briggs' termination?
16      A.  Not that I recall.
17      Q.  After the termination of Ruth Briggs,
18  are you aware if Sandy Foehl spoke with Dr. Wu?
19          MS. SATINSKY: Objection to form.
20          THE WITNESS: I don't know.  I'm
21  sure she did.
22  BY MR. MUNSHI:
23      Q.  What makes you say that?
24      A.  Because I know how Sandy does her

Page 106

1   investigation, so she speaks to everybody
2   involved.
3       Q.  Did you understand that she was
4   conducting an investigation after the
5   termination?
6           MS. SATINSKY: Objection to form.
7           THE WITNESS: I'm not sure if she
8   did an investigation, but I'm sure she called
9   over just to see, just to check into Ruth's
10  issues.
11          MR. MUNSHI: I have no more
12  questions for you, Miss Walton.
13          MS. SATINSKY: I don't have any
14  questions.
15          The witness reserves the right to
16  read and sign.
17          (Witness excused.)
18              -   -   -
19          (The deposition concluded at
20  12:45 p.m.)
21
22
23
24

Page 107

1               I N D E X
2   DEPONENT:  DEIRDRE CULBREATH-WALTON
3       Examination by Mr. Munshi            2
4
5             E X H I B I T S
6   CULBREATH-WALTON DEPOSITION EXHIBITS    MARKED
7   P-26  E-mail string, Bates stamped        58
        TEMPLE UNIVERSITY (R. BRIGGS) -
        0000108
8
9   P-27  E-mail and attachment,              77
        TEMPLE UNIVERSITY (R. BRIGGS) -
        0000040 - 0000043
10
11  P-28  E-mail string, TEMPLE UNIVERSITY    85
        (R. BRIGGS) - 0000039
12
13  P-29  E-mail string, TEMPLE UNIVERSITY    90
        (R. BRIGGS) - 0000069 - 0000073
14
15  P-30  E-mail string, TEMPLE UNIVERSITY    93
        (R. BRIGGS) - 0000079 - 0000082
16
    PREVIOUSLY MARKED EXHIBITS
17
    P-19      Page 97
18
19
20
21
22
23
24

Page 108

1           WITNESS SIGNATURE/CERTIFICATION PAGE
2
3
4
5       I have read the foregoing transcript
6   of my deposition given on Friday, June 30, 2017,
7   and it is true, correct and complete, to the
8   best of my knowledge, recollection and belief,
9   except for the list of corrections, if any,
10  attached on a separate sheet herewith.
11
12
13
14
15
16
17  _____      _____
18  DATE               DEIRDRE CULBREATH-WALTON
19
20
21
22
23
24

Page 109

```
 1
 2
 3
 4              I HEREBY CERTIFY that the
 5   proceedings, evidence and objections are
 6   contained fully and accurately in the
 7   stenographic notes taken by me upon the
 8   foregoing matter on Friday, June 30, 2017, and
 9   that this is a true and correct transcript of
10   same.
11
12
13
14
15
16              Terry Barbano Burke, RMR-CRR
17
18
19              (The foregoing certification
20   of this transcript does not apply to any
21   reproduction of the same by any means, unless
22   under the direct control and/or supervision of
23   the certifying reporter.)
24
```

## A

**a' (1)** 78:15
**ability (1)** 66:20
**abusive (5)** 18:22;19:1;
29:6,10;79:14
**accurate (1)** 92:22
**accusations (1)** 60:13
**acronym (2)** 9:15;76:14
**Act (2)** 10:17;12:10
**action (4)** 6:1;26:2,5;
105:9
**actions (3)** 22:12,14;
25:21
**Actually (4)** 4:5;15:8,9;
19:6
**ADA (1)** 12:10
**address (2)** 82:1,4
**administrative (4)** 11:9,
9,14;69:21
**admit (1)** 31:14
**advice (4)** 33:8;38:2;
57:1;58:2
**affected (2)** 22:12,24
**affects (1)** 91:8
**affirmatively (1)** 32:24
**afraid (1)** 67:17
**Again (16)** 17:4;30:17;
37:5;39:9,24;46:2;
48:23;52:23;53:13,13;
66:12;74:13;92:12;
94:4;100:2,17
**against (3)** 25:22;26:2;
67:17
**age (15)** 5:14,15,16,17,
19;10:17;50:12,20;
51:11,17;61:18;62:9,
18,22;84:3
**agency (1)** 9:16
**ago (4)** 3:14;9:17;
18:16;23:24
**agree (5)** 25:20;26:1;
90:1;99:19;100:5
**ahead (4)** 87:4;89:2;
90:19;97:12
**allegation (6)** 6:3;
18:18;22:6;25:12;44:6;
84:2
**allegations (7)** 15:23;
16:10;17:20;25:3,16;
35:21;63:7
**allegedly (1)** 50:4
**almost (1)** 62:16
**along (2)** 46:19;76:3
**always (9)** 32:16;
40:14;46:20;75:2;
81:19;86:19;88:7;89:3;
90:8
**American (1)** 12:10
**and/or (6)** 38:12,12,13;
80:7;81:12;95:19
**anonymously (1)** 21:23

**answered (10)** 44:8;
45:7;46:1,9;48:22;
51:13;65:2;72:2,4,18
**anxiety (2)** 91:9,15
**apart (1)** 7:1
**apologize (2)** 42:1;
47:22
**appealing (1)** 80:22
**appear (4)** 98:21;
99:15;104:6,8
**apply (1)** 28:17
**appointment (1)** 86:1
**appropriate (2)** 52:9,14
**Approximately (13)**
14:14,20;17:1,8;
26:18;28:10;30:15;
33:3,11;35:6;52:1;
65:14;103:13
**April (7)** 27:13;83:12;
96:8;102:10,13;103:9,
12
**area (1)** 39:8
**arena (1)** 78:7,14
**around (4)** 28:1;35:9,
21;56:9
**arrangements (1)** 56:13
**arrive (1)** 70:22
**aside (1)** 18:8
**aspect (2)** 29:22;54:16
**assign (1)** 80:22
**assigned (1)** 19:9
**assist (1)** 31:5
**assistant (9)** 7:20;11:9;
20:18,19,20;21:17;
25:11,14;69:21
**associate (3)** 11:3;
76:11;101:10
**Association (1)** 8:24
**assured (1)** 60:14
**atmosphere (1)** 18:20
**attempted (1)** 71:15
**attend (1)** 77:14
**attended (1)** 10:13
**attention (1)** 13:8
**attorney (4)** 16:14;
28:19;66:6,13
**attorney-client (1)** 16:12
**attorneys (1)** 10:6
**available (3)** 69:16;
70:3;71:11
**avenues (1)** 71:17
**awaiting (1)** 102:16
**aware (16)** 18:6;23:12;
25:10;59:9,11;61:14;
64:17,20,23;65:24;
66:2,3,9;72:16,22;
105:18
**away (1)** 91:12
**awhile (1)** 23:24

## B

**B11 (1)** 47:16

**back (29)** 4:4;10:20;
11:6,24;13:13;21:14,
22;25:14;27:1;29:17;
38:1,14,18;53:6,9,11;
54:20,23;55:1,2,11;
61:7,8;67:14,15;69:6;
80:11;82:5;98:24
**Ballpark (1)** 17:14
**basad (5)** 57:21;58:2;
99:4,18;100:4
**basically (5)** 32:9;58:2;
59:24;80:12;94:9
**basis (1)** 88:16
**battered (2)** 78:8,15
**became (2)** 75:20,22
**become (1)** 67:9
**behavior (1)** 80:3
**benefits (1)** 98:19
**besides (3)** 53:23;
61:22;76:5
**best (2)** 4:21,23
**better (1)** 4:11
**beyond (3)** 16:15;67:1,
3
**birthday (2)** 55:6,18
**bit (1)** 90:19
**blanking (1)** 3:20
**blessings (1)** 26:9
**blew (1)** 49:23
**board (1)** 100:24
**borders (2)** 42:15;
43:20
**both (5)** 9:20;53:8;
54:19;67:9;80:3
**Boyle (1)** 11:2
**bottom (2)** 42:6;91:4
**break (1)** 55:22
**brief (2)** 83:4,6
**Briggs (109)** 24:19,23;
27:1;28:12,21;29:5;
30:13,20;31:6,10,17;
32:5,19;33:4,9,15,19;
34:1,5,22;35:2,15;
37:10,12;41:16;42:7,
15;43:14,21;44:6;45:4,
23;46:7,12,16;47:12;
48:1,6,19;49:18;50:4,8,
11;52:10;55:8;56:3;
57:3;58:15,23;59:6,15;
61:17;62:5,8;64:4,5,11,
17,20,23;65:7;66:1,4,
11;67:1,8,20;68:6,12;
70:1,15,18;73:6,9,23;
74:13;75:5;76:22;77:1;
78:18;80:15;83:11;
84:18;85:24;87:2,23;
89:22;90:1;91:2,5,13;
94:16;95:2;97:17,20;
98:21;99:15,20;100:6,
14;101:16,19;102:1,7,
11,15;103:10,14;
105:17
**Briggs' (20)** 27:2;28:1;

32:3;39:22;53:24;
55:18;58:19;60:9;
84:10,13,22;85:2,4,14;
87:8,14;89:16;96:3;
104:15;105:15
**brought (2)** 13:7;53:15
**Brown (4)** 11:14;76:7,
10,22
**building (2)** 36:23;37:1
**bullet (2)** 99:7,11
**business (1)** 87:18
**busy (1)** 39:8

## C

**call (13)** 37:17,24;43:5;
65:10;67:4,5;69:12;
70:23,24;71:10,15;
82:22;93:13
**call/no (1)** 72:15
**called (29)** 27:21;36:5;
37:19,20;40:15,16,23;
42:1;56:22;68:11,14,
21;69:11,13,16;71:17,
18,19;72:1,5;82:14,17,
19;86:20;104:24;
105:1,2,3;106:8
**calls (1)** 88:8
**came (3)** 33:19;50:21;
67:13;80:11;90:2;
102:1;104:20
**Cameron (4)** 63:11,17,
19;64:18
**can (29)** 4:15;10:22,23;
15:12;16:16;17:3;20:2;
22:9;25:13;26:7;27:9,
19;29:17;36:15;44:8;
45:8;46:2,9;48:23;
51:14;63:16;65:5;
72:18;82:8;91:2;93:20;
94:3;97:8;100:1
**canceled (1)** 77:11
**capacity (10)** 3:9;5:12;
6:8,20;12:3;16:21;
17:4;25:19;26:17;
51:24
**career (3)** 6:9;9:22;
10:10
**case (5)** 4:2;5:16;
22:10,13;34:11
**cases (1)** 13:24
**caused (1)** 82:18
**causing (3)** 33:17;91:9,
15
**certain (1)** 25:21
**certification (4)** 9:5,10,
18,19
**certifications (1)** 9:3
**certified (3)** 9:13,14,16
**CFO (1)** 11:5
**chain (5)** 90:20;91:1;
94:2,12,16;96:1
**chains (1)** 90:21

**chair (1)** 93:17
**check (1)** 106:9
**children (1)** 91:10
**China (8)** 50:13,22,23;
51:10,17;52:3;54:8;
84:3
**Chinese (4)** 42:17,18;
43:18;44:3
**chose (1)** 57:21
**circumstance (1)** 30:8
**circumstances (13)**
18:17;27:20;28:1;
35:9,20;36:8;56:9,24;
75:12,16;86:21;99:7;
104:2
**CIS (8)** 19:15,18;23:19,
21;57:10,13;93:15,17
**city (1)** 10:8
**civil (1)** 10:16
**claim (15)** 3:16,24;5:8,
13,14,19,22;6:2;14:12,
24;22:16,18,23;25:10;
41:4
**claims (10)** 12:11,22;
13:15;14:18,19,23;
15:16;18:6;24:14;93:5
**clarify (3)** 33:18;74:17
**classes (1)** 10:15
**clean (1)** 4:20
**clear (5)** 20:13;26:10;
38:16;60:23;63:16
**close (2)** 101:22,23
**closely (2)** 12:21;13:10
**clumped (1)** 20:23
**Coaching (1)** 12:11
**collaborated (2)**
100:17,20
**college (2)** 23:20;32:10
**combination (1)** 75:23
**comfort (1)** 55:21
**coming (8)** 4:4;27:1;
31:18;33:24;72:12;
74:13;82:5;104:19
**comment (5)** 50:12;
52:2,11;53:21;54:1,6,
21;55:5;61:22;84:2
**comments (4)** 61:18;
62:9,18;80:15
**communicate (2)** 39:5,7
**communicated (1)**
71:21
**communications (4)**
64:10,18,21,24
**company (2)** 6:8,10
**Compensation (4)**
102:20,23;103:2,7
**complain (8)** 20:21;
25:22;27:15;29:5;
33:20;37:20;52:10,14
**complained (12)** 20:11;
21:18;24:1;27:4;36:3;
43:17;61:18;65:11;
79:4;80:2;83:20;94:19

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

DEIRDRE CULBREATH-WALTON
June 30, 2017

**complaining (10)** 23:23;28:7;35:3;36:6,12;41:16;42:18;45:2;51:6;99:21

**complains (1)** 31:3

**complaint (20)** 16:22;19:19,20;20:13;22:7;24:2,3,8;28:2,6,20;41:13;52:19;53:24;86:1,4;87:1,9,15;95:3

**complaints (27)** 13:6,7,20;17:6,12,18;18:3;19:14,17,21;20:3,12;28:11,19;39:22;40:3;65:7;75:8;90:10;92:20;93:4,9;95:11,14,18;100:7;104:15

**computer (1)** 93:14

**concept (3)** 86:24;101:19;102:1

**concern (12)** 22:7;25:16;44:14,21,22;62:17,21;74:12;75:4;79:19;92:8,11

**concerned (3)** 45:1;87:17,21

**concerning (1)** 100:23

**concerns (23)** 12:20;24:9;33:5;59:13;60:9;61:15;73:23;74:18;75:2;81:17;84:10,14,18,22;85:2;90:3,10;92:20;93:4;95:11,14,18;104:15

**concluded (1)** 106:19

**conclusion (6)** 15:8;16:9;23:16;24:4;75:7,11

**conduct (10)** 13:15;24:8;47:17;49:11,18,21;50:3;57:21;58:3;80:23

**conducted (3)** 14:2;16:8;34:18

**conducting (1)** 106:4

**confidentially (1)** 89:5

**confirm (2)** 32:20;55:11

**confirmed (4)** 16:10;18:7,18;69:14

**conflict (1)** 12:5

**conjunction (1)** 56:23

**connection (5)** 24:7;25:16;47:24;56:16,19

**consider (2)** 35:17;79:13

**considered (1)** 36:8

**consistently (1)** 61:13

**consultation (1)** 100:15

**contact (6)** 12:18,19;70:6;71:1;82:15;98:20

**contacted (16)** 27:14,18;32:13,13;37:21;39:14;48:3;56:24;

70:10;80:1;81:20;89:5;90:7;94:21;103:20,21

**contacting (2)** 70:2;71:3

**contents (1)** 99:13

**context (3)** 52:7;62:22;63:1

**continue (2)** 9:19;92:5

**continued (1)** 102:3

**contributed (2)** 75:12,19

**conversation (21)** 31:2;41:18;43:9;44:4;50:10,15;54:13,18,23;59:14;73:20;81:8,13;83:13;86:14,17;88:2;94:15;95:23;99:12;103:19

**conversations (30)** 31:16,23;35:14;39:4,21;40:1;41:15;43:21;45:21;46:6;48:17;65:6;66:10,23;76:21;77:1;82:6;83:2;84:9,13,21;85:1;89:15;101:15,24;102:11,14,19;103:9,11

**copy (1)** 23:12

**corner (2)** 91:4;92:3

**correctly (3)** 36:7;40:21;97:7

**corroborated (2)** 17:20;18:7

**counsel (6)** 17:23;18:8;19:21;25:8;29:1;49:5

**counseled (1)** 56:21

**counseling (1)** 12:12

**country (1)** 50:21

**couple (1)** 21:24

**course (1)** 89:24

**COURT (1)** 74:10

**created (2)** 4:16;26:23

**crosses (2)** 13:10,23

**current (2)** 6:15;8:11

**currently (1)** 6:12

**cursed (1)** 19:6

### D

**date (4)** 27:8;96:5;101:22,23

**dated (4)** 42:7;47:12;55:14;78:22

**dates (1)** 49:23

**day (3)** 66:16;68:16;72:12

**days (4)** 57:10,18;78:8,15

**deal (2)** 12:5;22:14

**deals (1)** 76:15

**dealt (2)** 60:5;75:3

**dean (19)** 20:18,19,20,24,24;21:3,4,5,8,17;22:22,22;23:3,19,20;25:11,14;101:10,11

**deans (1)** 21:2

**dean's (6)** 23:2;37:4,5;42:19;56:21;71:18

**decision (14)** 15:16;49:2,4;57:17,24,24;58:2;100:13,16,20;101:1,3,6;102:17

**defense (1)** 53:16

**definitely (1)** 51:2

**demanding (3)** 18:21;27:22;29:11

**demeaned (1)** 29:15

**demeaning (7)** 19:3;29:21,23;30:3,5,21;31:19

**denied (2)** 80:15,18

**denies (1)** 80:12

**deny (1)** 32:20

**department (17)** 6:18;12:21;13:4,5;19:16,18;23:21;36:20;37:2;48:10;57:9;61:10;69:21;76:18;78:5,17;93:15

**departments (2)** 12:18;19:10

**department's (1)** 58:1

**depend (1)** 52:6

**deposed (2)** 5:11;6:1

**deposition (6)** 3:1,3,8;5:9;97:7;106:19

**depositions (2)** 5:18,21

**depressed (1)** 91:22

**depression (1)** 91:9

**describe (7)** 10:23;11:24;13:2;27:19;29:13,22;31:7

**described (1)** 93:1

**describing (2)** 30:4;31:18

**detail (1)** 99:1

**determination (1)** 15:22

**determine (1)** 13:11

**difference (1)** 98:16

**different (2)** 59:21;94:3

**differently (1)** 74:15

**difficult (2)** 39:3,5

**DiMeo (17)** 30:10,12,19;31:8,9,20;32:12;33:1;66:9,11,24;69:4;71:19;84:13;85:1;89:8;91:6

**direct (5)** 11:8,12,18;83:13;90:12

**directions (1)** 37:15

**directly (6)** 11:7;31:22;32:23;35:3;59:13;83:20

**director (2)** 6:16;7:20;8:11

**Disability (1)** 12:10

**disagreed (1)** 73:13

**disciplinary (7)** 46:16;

47:12,24;48:13;68:5,9;72:23

**discipline (27)** 12:6;40:22;46:16;48:19;49:3,19;50:5,8;56:3,6,9,20;57:2,6,10,12,19;58:5,16;67:19;68:1,13;70:8,11;73:10;88:14,21

**disciplined (2)** 35:17;36:1

**discrimination (24)** 3:23;5:13,14,19,23;9:23;10:17;13:6,16,17;14:3,15;15:5,9,24;16:23;18:4;19:14;20:14,22;13:23;18;24:2;25:23;26:19

**discrimination-type (1)** 13:23

**discuss (6)** 34:14;43:6;57:2;58:4;90:2;99:6

**discussed (6)** 58:21;59:8;63:18,19;89:8;90:7

**discussing (2)** 50:7;102:7

**discussion (4)** 43:12,13;58:18;59:10

**discussions (1)** 33:3

**distressing (1)** 78:4

**diversity (1)** 76:16

**doctor (1)** 53:17

**document (5)** 41:22;47:7;58:8;87:11;97:14

**done (4)** 4:22,24;12:8;36:4

**double (2)** 59:24;60:3

**down (4)** 4:15;38:5;81:23;82:3

**Dr (121)** 27:4,19,22;28:2,6,12,21,22;29:14,20;30:1;31:8,13,14,20,20,22,24;32:4,18,23;33:5,9,16;34:2,6,9,14,19;36:2,6,20,23;37:10;38:5,8,13,22;39:4,14,19;42:2,3,5;43:19,20,22;46:6,12,15,17;47:1;48:6,18;49:4,22;50:11,14;52:11,24;53:14;54:6;55:6;58:5,6;60:1,20;61:1,4,12,19;62:9;66:1;67:6,8,11,14;69:15;71:10,15,22;75:20;77:11,19;80:5,7,11,12,14;81:21;82:1,6,14;83:3,13,19,21;84:3,10,14,16,21;85:1;88:16;90:3,11;91:6;92:14;93:10,17;95:20;99:6,9,12;100:18,20,22,23;101:1,2;102:11;105:18

**Drew (63)** 29:20,24;31:8,9,16,20,23;32:12;33:1;34:10,16,17;36:17,19;37:2,9,14,21;38:12,12,18;39:11,17,19;46:20,21;52:23;53:24;54:15;56:23;59:12;60:8,19;61:11;66:9,11,23;67:7;68:11;69:4;71:19;77:14,18,23;79:18;80:7;81:12,23;82:3,15,23;83:1;84:13;85:1;88:16;89:8;91:6;92:12;93:12;95:15,19;99:19;100:10

**during (6)** 14:1;32:3;98:2,10,21;99:5

**duties (6)** 12:1,13;13:14;15:7,8;19:8

### E

**earlier (7)** 39:9;43:17;65:18,21,22;79:11;83:15

**early (1)** 75:1

**easier (2)** 38:21;90:22

**easy (1)** 90:8

**Ebony (2)** 11:15,21

**EEO (10)** 6:21,22,24;12:14,23;13:3,4;76:17,18;105:15

**EEOC (13)** 12:18,20;85:6,7,8;86:3,5;87:1,9,15,16;95:3

**effect (3)** 29:7;51:10;54:7

**either (3)** 16:14;36:22;53:10

**else (15)** 8:22;9:1,8;16:8;27:24;30:4;45:19;53:23;70:6;76:5;97:22,24;101:5;103:15;105:14

**e-mail (39)** 42:6;43:2,10,14,16;44:12;59:5;71:20;78:23;79:4,6,23;80:20;85:23;86:3,8,23;87:8,14,24;88:24;89:16,18,19;90:20,20;91:1,16,17,21;92:17;94:2,3,7,9,11,16;95:2;96:1

**e-mailed (1)** 59:11

**e-mails (4)** 35:15;50:2;73:22;102:6

**embarrassed (1)** 18:22

**emotionally (2)** 78:9,16

**employed (2)** 6:12;75:6

**employee (16)** 3:10;5:12;6:16;7:8,14,21;8:12;11:10,15;12:4;13:20;15:23;18:19;

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

DEIRDRE CULBREATH-WALTON
June 30, 2017

57:9;62:19;72:22
**Employees (7)** 12:19;
13:9,9;19:7;26:2;
87:19;103:6
**employment (15)** 3:23;
5:12;10:5,5,7,17;
13:18;22:14;27:3;
61:17;62:23;64:13;
83:11;85:5;96:4
**employment-related (1)**
3:15
**end (2)** 64:12;90:21
**ended (4)** 23:15;24:4,
5;83:11
**environment (35)**
13:19;14:23;15:1,6,
16;16:1;17:11,12;18:5;
19:15;20:15;26:23;
34:23;35:4,11,22;
36:13;37:13;39:23;
40:3;41:5;42:19;44:2;
45:2,5,12,16;75:8,13,
19;76:1;83:21;93:6;
99:21;100:7
**EOC (6)** 12:21;13:5,23;
14:4;22:15;76:18
**equally (1)** 60:15
**error (1)** 82:19
**errors (3)** 36:1,3;102:3
**escalating (1)** 91:7
**escapes (1)** 20:18
**estimate (1)** 82:8
**Etezady (2)** 63:11;
64:18
**even (2)** 10:22;59:12
**events (1)** 38:10
**everybody (1)** 106:1
**everyone (2)** 22:20;
42:13;47:23;60:15
**exact (1)** 27:8
**excused (1)** 106:17
**exist (2)** 26:15,19
**experience (4)** 26:13;
99:18;100:4;103:5
**experiences (1)** 74:23
**explain (3)** 55:5;95:13,
17
**explained (3)** 39:9;
98:4;103:24
**explanation (2)** 47:15;
49:9
**express (8)** 30:19;
59:15,23;62:7;67:7,10,
16;91:18
**expressed (9)** 30:20,24,
24;33:15;50:11;51:1;
78:24;91:14,22
**expressing (3)** 34:1;
51:3;57:5
**extent (1)** 17:22
**external (1)** 28:14
**eye (4)** 27:23,23;76:2,2

## F

**facilitate (1)** 48:2
**facilitating (1)** 68:9
**fact (6)** 17:20;18:7;
29:24;94:18;100:19;
105:10
**faculty (1)** 56:11,14
**fair (2)** 8:16;80:23
**faith (1)** 66:20
**far (1)** 102:22
**Fay (2)** 64:7,21
**February (6)** 7:5;78:22;
86:9;88:12,13;95:6
**feeling (1)** 91:22
**feelings (1)** 45:11
**feels (1)** 13:21
**Felisha (1)** 11:14
**felt (28)** 20:24;22:24;
27:21;29:6,10,15,20;
30:20;31:19;33:15;
34:2,22;35:3;41:17,20;
45:5;57:6;58:23;59:6,
9,16,23;60:4;67:11;
74:14;76:1;78:24;
93:10
**few (1)** 95:1
**file (5)** 50:3;86:1,3;
87:14;102:6
**filing (2)** 87:1,9
**finally (1)** 8:10
**find (4)** 23:17;52:24;
63:2;87:18
**finding (1)** 34:8
**fine (1)** 42:4
**first (23)** 6:7;7:3,7;
10:22;27:6,18;28:1;
35:10,14;78:3,23;
82:12;83:10,12;86:2,
24;92:4,16;96:20;99:7;
101:18;103:18;104:7
**firsthand (2)** 39:20;41:2
**Five (12)** 3:7,14;14:21;
17:9;18:16;33:6,13;
35:8;78:8,15;82:9;83:8
**flu (1)** 91:11
**Foehl (16)** 62:1,2,3,4,7;
64:24;65:6,24;66:3,10;
85:24;88:3,24;103:10,
11;105:18
**follow (5)** 31:9;60:19,
24;77:18,22
**Forge (1)** 8:23
**forget (6)** 3:22;9:15;
20:4,17;21:8;101:11
**forgive (4)** 20:16;21:2;
49:23;101:12
**form (70)** 15:11;16:2,
11;17:21;22:8;24:10;
25:24;26:6;29:8;35:12,
23;36:14;38:15,23;
40:7;41:6;44:7,15;

45:6,24;46:8;47:2;
48:21;51:5,12;52:5,12,
21;54:2,9;60:2,11,22;
61:20;62:10,20;63:3,8;
65:1,8,19;68:18;69:22;
70:20;72:8,17;73:3,7;
74:3,16;75:9;79:2,16;
80:17;83:22;84:5;85:9,
16;87:3,10;89:12;93:7;
95:4;96:6;99:24;
100:10;101:7;103:2;
105:19;106:6
**forth (1)** 99:7
**forward (1)** 13:24
**forwarded (5)** 43:14;
44:13;86:8;90:21;
94:22
**forwarding (1)** 94:11
**forwards (1)** 43:2
**found (3)** 18:24;39:3,4
**four (5)** 3:14;11:18;
14:21;17:9;82:9
**Frankly (2)** 42:15;43:20
**Fridays (1)** 77:13
**front (9)** 18:23;19:3,6;
47:11;55:14;78:17;
79:8,10;80:13
**frustrated (2)** 67:8,9
**fuller (1)** 42:2
**functioned (2)** 32:9,10

## G

**gave (9)** 49:6;67:14;
80:4;86:19;88:3,7,8,
18;98:9
**gender (1)** 5:22
**general (5)** 12:1;19:11,
12;41:8;82:17
**generalizing (1)** 17:15
**generally (5)** 50:19;
51:22;53:18;55:3;64:4
**gets (1)** 12:8
**gist (1)** 98:8
**given (10)** 48:1;70:11;
96:16,17,17,18,22,23;
97:16,19
**giving (1)** 101:19
**goes (1)** 21:13
**Gonzalez (2)** 4:3,3
**good (2)** 75:2;92:17
**government (1)** 85:8
**grandchildren (1)** 91:11
**Greater (1)** 8:23
**Greg (89)** 19:21;20:22,
23;22:22;23:23;24:13;
25:3;30:10;31:16,23;
32:11,24;33:4,7,14,19;
34:5,10,16,21;36:17,
19;37:2,8,14,21;38:12,
12,17;39:10,15,17,22;
40:2,12,12,14,23;41:1,
16,18;42:7;43:1,5,10;

44:5;45:16;48:18;49:8;
52:23;53:24;54:15;
56:22;57:20;58:18;
59:4,5,8,12;60:8,19;
66:4;69:3;71:18;73:5,
12,15,17;79:18;80:6;
81:12;82:15,23;83:1;
84:9,20;88:23;92:12;
93:11;95:15,19;97:23;
98:2;99:1;100:16;
101:8;102:13,14;
104:21
**Greg's (1)** 57:24
**group's (1)** 15:7
**grown (1)** 91:10
**guess (3)** 20:1,23;
59:12
**guidance (3)** 48:3;49:5,
6

## H

**half (3)** 10:22;27:17;
47:5
**Hamilton (3)** 89:16,20,
21
**handful (6)** 31:15;32:1;
45:21;82:5,9;83:2
**handle (2)** 33:8;38:2
**handled (3)** 39:9,11;
57:16
**handling (2)** 32:16;
40:24
**happen (5)** 18:12;
33:12;40:6,9,9;65:14
**happened (10)** 3:12;
16:1;18:15;19:4;21:21;
31:11;32:21;40:18;
96:20;104:4
**happening (1)** 31:21
**happens (1)** 72:6
**happy (2)** 30:8;88:17
**harass (1)** 43:22
**harassed (4)** 34:2;
41:17,20;92:5
**harassment (6)** 13:7;
42:16;43:20,22;44:6;
93:5
**hard (1)** 14:16
**harsh (1)** 29:10
**head (2)** 67:24;102:9
**heard (3)** 16:7;69:19;
101:18
**hearing (1)** 79:7
**held (2)** 10:7;59:24
**help (2)** 31:5;91:7
**herself (2)** 29:20;67:15;
104:14
**hey (1)** 31:9
**hold (2)** 7:11,16
**holding (1)** 12:16
**honest (6)** 16:5,17;
32:22;66:22;78:6,13

**honestly (1)** 37:17
**Honeywell (6)** 20:7,9;
23:22;24:20,24;25:2
**Honeywell's (2)** 24:7,14
**hostile (39)** 13:19;
14:22;15:1,6,15,24;
17:10,12;18:5,21;
19:15;20:15;26:22;
34:23;35:4,10,18,21;
36:9,12;37:13,19;
39:23;40:4;41:4;42:19;
44:2;45:3,5,12,16;75:8,
21,22;76:1;83:21;93:6;
99:21;100:7
**HR (27)** 6:5,7,11,19;
7:1,9;8:17,19;9:4,22;
11:21;13:3,4;16:21;
17:4;25:19;26:9,13,17;
44:12;51:24;62:15;
63:7;76:12;99:18;
100:4;103:5
**HRCI (4)** 9:10,12,14,19
**Huh (1)** 20:8
**Human (5)** 8:23;11:3;
24:16;76:5;78:5

## I

**idea (1)** 48:18
**IDEAL (2)** 76:11,14
**identification (5)** 58:10;
77:6;85:21;90:17;
93:23
**ignored (2)** 78:9,16
**inappropriate (4)** 49:11,
17,21;52:3
**incident (1)** 49:24
**incidents (1)** 81:1
**include (1)** 12:18
**included (6)** 6:2;22:21;
93:5,8
**including (1)** 94:24
**individual (2)** 5:13;
21:17
**individuals (2)** 20:3;
25:22
**individual's (1)** 16:10
**inform (5)** 23:9;76:24;
88:23;95:8;104:13
**information (4)** 40:17;
63:2;93:15;98:18
**informed (1)** 95:9
**informing (1)** 34:21
**in-house (1)** 28:14
**initially (1)** 9:13
**instance (1)** 17:19
**instances (1)** 29:13
**instruct (1)** 92:14
**instruction (2)** 5:4;
66:15
**instructions (2)** 4:6;
37:15
**insulted (3)** 78:9,16,24

insulting (1) 80:16
intake (2) 86:5;87:16
integral (1) 61:9
integrity (2) 78:7,14
interaction (3) 29:19;
37:10;49:22
internal (1) 12:23
internally (3) 85:7;86:4;
87:15
interrupt (1) 78:10
intimidated (3) 67:11,
12,13
into (44) 13:15;14:2,24;
22:1,3,4,6;24:9;34:11;
37:24;38:4;40:13;41:4,
14,14;44:5;52:19;
54:15,17,22,22;60:9;
63:6;64:9;71:13;72:12;
79:19;81:20;90:12,13;
92:9,11,20;93:2,5,12;
95:11,14,18;99:1;
104:14,20,24;106:9
investigate (3) 13:17,
18,22
investigated (2) 22:15,
18
investigates (1) 13:6
investigation (14) 14:2,
5,11,24;16:7;23:13;
24:8;80:24;81:14,16,
18;106:1,4,8
investigations (3)
13:15;15:4,20
involved (3) 89:21;
95:19;106:2
issue (8) 37:12;40:15;
41:13;44:17;49:3;
56:17;68:16;91:7
issued (2) 46:19;67:20
issues (22) 12:4,5,19,
20;13:12;32:12,13,16;
37:23;39:10,12,18;
61:13,15;70:15;75:3;
81:17;82:2,4;86:12;
88:18;106:10
issuing (5) 46:15,17;
48:19;56:20;68:8

## J

January (5) 67:20,22;
68:6;70:14;73:21
Jenkins (2) 101:13,16
job (7) 6:15;12:1,13;
13:14;15:7,7;19:8
jogs (1) 94:18
Jones (2) 11:15,21
judge (1) 52:16
Judy (3) 69:18;70:2,4
justified (1) 59:22
Justin (1) 42:18
Juvencio (3) 3:21;4:3;
5:8

Juvencio's (1) 5:15

## K

Kaiser (1) 11:4
Ken (1) 11:4
kind (4) 10:2;13:11;
21:13;39:18
Klein (5) 21:5,6;23:7,9,
19
Klein's (2) 23:3;37:6
knew (3) 8:2;61:11;
104:9
knowledge (3) 39:20;
41:2;49:17
known (2) 83:19;84:1

## L

labor (2) 6:16;8:11
lady's (2) 20:4,17
last (9) 3:12,22;18:14;
20:4,6;78:2;80:20;
86:2;91:3
late (5) 68:16,22;72:12;
73:1;77:15
lateness (1) 82:20
later (3) 21:10,14;43:5
latest (1) 25:10
law (1) 10:7
laws (1) 10:16
lawyer (1) 28:15
leadership (1) 69:13
leads (1) 105:5
learn (7) 18:24;19:20;
27:3;29:1;54:5;61:17;
85:5
learned (11) 16:14;
17:23;18:8;19:21;25:7,
8;27:7;28:11,14;66:6,
13
learning (2) 85:13;
104:7
least (1) 47:4
leave (2) 27:10,12
left (4) 27:13;47:4,5;
104:21
lengthier (1) 90:19
lengthy (1) 91:1
Lennon (2) 69:18;70:2
letter (16) 21:23;22:21;
23:11;59:18;96:16,18,
21,22,23;97:16;98:6,8;
99:3;100:14,21;101:20
level (1) 13:8
licenses (1) 9:4
lie (1) 13:12
life (2) 78:8,14
line (3) 13:23;85:24;
87:18
listen (3) 40:16,18;78:6
little (2) 77:13;98:23
located (1) 36:23

location (1) 90:8
long (5) 4:7;7:11,16,22;
94:14
longer (2) 76:19;105:8
look (23) 10:22;22:6;
24:9;37:24;40:13;41:3,
14,22;44:5;47:7;52:19;
54:15,17;60:9;63:6;
68:3;71:13;79:19;
81:20;90:12,12;92:11;
93:12
looked (14) 22:1;34:11;
41:14;54:22;57:20;
73:22;92:8,20;93:1,5;
94:2,5;95:2,11
looking (8) 22:4;38:3;
89:17;94:10;95:14,18;
104:14,24
lot (1) 35:14
lower (1) 92:3

## M

main (1) 81:23
Mainly (1) 32:8
majority (1) 31:15
makes (3) 60:6;87:8;
105:23
making (6) 60:16,17;
62:18;80:15;102:4,5
management (1) 12:6
manager (5) 7:15;
11:11,16;62:17;89:6
managers (3) 25:21;
26:2;89:3
manner (1) 81:1
many (28) 3:6;10:6;
14:14,20;17:1,8,14;
18:12,22;19:24;27:23;
28:10;30:15,24;31:1;
33:3,11;35:6;40:6,9,19,
22;67:4,5,14;71:20;
90:4;103:13
March (4) 56:6;92:17;
94:10;96:2
marked (14) 41:23;
47:8;58:8,9;77:3,5;
85:18,20;90:16;93:20,
22;97:5,7,10
mask (1) 91:10
may (40) 11:17;13:9,
12;17:23;25:8,21;
26:15,19,23;27:14;
29:3;33:22;34:7,24;
41:2;43:23;46:6;48:3,
15;49:24;54:10;55:1;
56:23;59:12,22,21;
63:19;65:3;66:6,13;
89:5,6;91:19;102:2,8;
103:20;104:10,18;
105:1,3
maybe (9) 7:17;14:21;
17:9;27:15,16;30:7;

34:12;35:8;40:21
mean (18) 6:23;12:24;
14:17;26:9;27:11;
34:19;39:13,19;65:21;
67:4,14;75:15,17;85:7,
7;89:3;96:13;104:18
meaning (1) 75:18
means (1) 9:15
meant (2) 93:1;95:14
mediate (2) 39:18;
81:24
meet (2) 23:6;24:13
meeting (10) 30:1,7;
67:6;98:3,7,11,22;
99:16;104:20,22
meetings (8) 31:3,8,19;
39:18;77:12,14;88:15,
21
member (8) 8:19,21;
56:12
memory (12) 17:9;
23:24;25:1;27:10;
32:22;46:19;47:3;
56:10;60:10;71:4;
83:16;94:18
memos (2) 50:2;102:6
mention (1) 51:23
mentioned (12) 14:22;
22:21,23;23:4,10;
43:17;50:15,17;51:21,
22,23;95:3
merit (2) 75:7,7
message (1) 71:5
met (7) 22:20,20,23,24;
23:1;48:5;55:8
Michael (6) 21:6;23:3,
6,9,19;37:5
middle (1) 92:3
might (7) 16:13;27:16;
28:14;83:8;103:16;
104:12;105:2
Mike (1) 21:5
mind (1) 60:4
minutes (2) 83:8,9
Mischaracterized (1)
87:11
mispronouncing (1)
62:2
Miss (45) 25:2;27:2;
28:1,12,21;29:5;30:13,
20;31:6,10,17;32:3,5,
19;33:4,15;34:1,5;
41:23;42:2,15;44:6;
45:4;46:16;50:4;56:2;
58:15;59:6;60:9;68:6;
73:6,23;75:5;83:11;
85:4,14;89:16;90:1;
91:5,13;99:20;100:14;
102:1;104:15;106:12
missed (1) 11:17
mistake (1) 19:4
mistakes (3) 60:5,6,17
mitigating (3) 75:11,15,

17
mixed (1) 64:3
Mondays (1) 77:12
more (7) 26:12;29:3;
40:10;61:10;63:2;83:7;
106:11
morning (1) 92:18
most (2) 82:24;90:20
much (1) 39:16
MUNSHI (99) 8:6;
15:14;16:6,19;18:2;
22:17;24:12;25:6;26:4,
11;28:16;29:4,12;
35:19;36:10,18;38:20;
39:1;40:8;41:9;44:11,
20;45:10;46:3,13;47:6;
49:1;51:8,18;52:8,18;
53:2;54:4,12;55:21;
56:1;58:7,11;60:7,18;
61:2,21;62:14,24;63:5,
10,21;64:2,14,16;65:4,
13,23;66:8,14,19;
68:19;69:24;71:8;
72:13,21;73:4,8;74:4,9,
11,19;75:14;77:3,8;
78:12;79:5,17;80:19;
81:6;83:24;84:7;85:12,
18,22;87:6,12;89:14;
90:15,18;93:16,20,24;
95:7;96:9;97:3,4,8,13;
100:3,12;101:14;
105:22;106:11
must (1) 51:10

## N

name (17) 3:18,22;
20:4,5,6,17,18;21:9,9,
11;23:3,10;42:2;62:2;
70:5;101:12,13
named (2) 22:2;76:7
names (3) 11:13;20:2;
21:3
nature (1) 38:3
necessarily (1) 87:20
need (3) 55:21;91:7;
98:13
needed (1) 98:18
next (5) 5:1;7:13;
37:16;80:21;98:17
nobody (1) 94:19
nor (1) 71:7
notes (3) 50:3;102:5,8
notice (1) 77:13
November (6) 47:13;
48:12,20;55:15,19;
56:3
number (6) 15:2;17:16;
67:5;71:17;74:24;
77:10
Numerous (3) 30:18;
90:1,4

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

DEIRDRE CULBREATH-WALTON
June 30, 2017

## O

**objected (3)** 73:6,10,13
**objecting (1)** 58:15
**Objection (76)** 15:11;
16:2,11,12;17:21,22;
22:8;24:10;25:24;26:6;
29:8;35:12,23;36:14;
38:15,23;40:7;41:6;
44:7,15,17,18;45:6,24;
46:8;47:2;48:21;51:5,
12;52:5,12,21;54:2,9;
58:19;60:2,11,22;
61:20;62:10,20;63:3,8;
65:1,8,19;66:18;68:18;
69:22;70:20;72:8,17;
73:3,7;74:3,7,16;75:9;
79:2,16;80:17;83:22;
84:5;85:9,16;87:3,10;
89:12;93:7;95:4;96:6;
99:24;100:10;101:7;
105:19;106:6
**obviously (2)** 4:14;72:3
**occasion (1)** 38:7
**occasions (2)** 90:2,4
**occurred (1)** 53:1
**occurrences (1)** 29:14
**October (1)** 42:7
**off (5)** 9:9,18;67:13,24;
102:9
**offended (1)** 51:4
**offhand (1)** 50:6
**office (29)** 6:21,22,23,
24;12:11,23;13:11;
21:24;23:2;32:15;34:6,
9;37:4,5,6,23;42:16,19;
50:19;56:22;60:14,16;
61:14;70:6;71:18;72:6;
76:15;100:15;105:15
**offices (2)** 10:8;21:24
**oil (1)** 28:4
**one (22)** 9:10;36:22;
42:17;53:8,10,11;
54:19;56:10;60:16;
68:16;72:7;78:5,5;
82:12;88:20;94:7,10,
20,23;96:1,20;97:9
**one-time (1)** 72:24
**ongoing (3)** 23:13;
70:15;88:15
**only (6)** 11:17;18:3;
24:4;41:10,12;83:16
**operate (2)** 78:7,14
**opportunity (1)** 82:4
**option (3)** 96:17,18;
98:9
**order (1)** 103:2
**organizations (1)** 8:20
**others (3)** 23:1;50:20;
60:4
**otherwise (1)** 4:19
**out (19)** 4:20;32:1;

34:8;35:16;52:24;
59:16;63:2;70:23;
74:14;76:4;78:8,15;
83:10;86:20;92:19;
93:11;95:10;103:23,24
**outside (5)** 16:15;
17:23;19:20;25:7;
28:13
**over (23)** 4:19;10:24;
13:10;14:17,18;17:3,
16;21:3;23:14;29:2;
30:2,17;40:10;50:24;
51:2;53:4,5;57:8;
74:24;88:21;89:24;
90:4;106:9
**overly (1)** 18:21
**own (1)** 9:18

## P

**P-11 (4)** 41:23;42:6;
43:1,10
**P-18 (2)** 68:3;70:9
**P-19 (5)** 96:24;97:5,8,
10;99:8
**P-26 (4)** 58:8,9,12,14
**P-27 (3)** 77:4,5,9
**P-28 (4)** 85:19,20,23;
88:24
**P-29 (6)** 90:15,16;91:1;
92:2,16;94:2
**P-30 (3)** 93:21,22;94:1
**P-6 (3)** 47:8,11;55:14
**page (5)** 78:3;80:21;
91:3;92:2,16
**pages (1)** 94:5
**paragraph (5)** 42:14;
77:9;78:2;86:2;92:4
**part (7)** 13:14;15:7;
61:9;76:17;82:24;94:7;
101:24
**participate (3)** 14:11;
22:3;48:2
**participated (6)** 14:15,
20,24;15:5,21;30:1
**particular (2)** 19:10;
58:4
**partner (1)** 14:7
**partnered (1)** 22:15
**Partners (1)** 14:8
**passed (1)** 71:5
**past (2)** 74:23;75:3
**Pause (7)** 47:9;58:13;
68:4;77:7;90:23;94:6;
97:11
**pay (3)** 56:16;57:11,18
**peers (3)** 78:17;79:8,10
**people (10)** 18:23;
19:3;22:2;32:15;39:11;
53:20;60:14;71:1;76:2;
94:20
**perception (4)** 51:4;
52:15,16,16

**performance (4)** 12:6;
59:21;75:1;82:21
**period (5)** 10:20;11:6,
24;13:13;55:12
**person (12)** 12:15;
18:23;19:2,3;20:24;
50:24;53:4;55:8;69:7;
72:2,4;104:10
**personally (10)** 16:22;
17:5,11,18;18:4,6;
22:3;23:6;83:19;90:9
**personnel (3)** 32:12;
39:10,12
**perspective (1)** 39:5
**pertaining (1)** 12:14
**phone (10)** 50:24;51:2;
53:4,5;72:2,4,7;83:7;
86:5;87:16
**physical (1)** 90:8
**physically (2)** 36:22;
37:9
**place (18)** 15:10,17,18;
54:24;55:3;57:1,13,22;
80:4;88:15;104:1
**plaintiff (3)** 3:19,20;
5:14
**plan (1)** 86:3
**planned (1)** 85:6
**planning (1)** 87:14
**play (2)** 56:19;68:8
**played (1)** 101:5
**please (3)** 42:11;85:19;
93:21
**point (10)** 19:5;27:2;
32:3;61:16;63:18;75:5;
85:4;91:13;99:8,9
**policies (4)** 12:14,17;
99:23;100:9
**pop (2)** 21:10,12
**portion (1)** 94:1
**position (7)** 7:6,9,11,17;
8:11,14;56:14
**positive (1)** 101:8
**possible (1)** 89:11
**postponed (1)** 77:11
**potentially (3)** 79:13;
99:22;100:8
**practices (1)** 13:18
**prefer (1)** 42:3
**prejudice (1)** 81:1
**present (3)** 37:9;53:14;
97:19
**presented (1)** 53:1
**president (2)** 11:3;
76:11
**pretty (1)** 39:16
**previously (4)** 41:23;
47:8;97:5,10
**Prior (15)** 5:8;27:2;
48:6,9,12;61:16;64:12;
70:14;79:4,6;85:4,14;
91:17,21;101:23
**privilege (2)** 16:12;

17:22
**Probably (11)** 3:13;
11:1;14:18;17:15,16;
18:16;40:10;49:7;
78:20;82:10;103:16
**problem (1)** 82:19
**process (1)** 92:24
**processing (2)** 12:8,9
**productivity (1)** 59:22
**professional (16)** 6:5;
8:17;9:22;11:1;16:21;
17:5;25:20;26:14,18;
44:12;51:24;62:15;
63:7;99:19;100:5;
103:6
**promoted (3)** 7:14;8:10,
13
**promotion (1)** 7:24
**proper (1)** 71:1
**prospect (1)** 56:14
**punished (1)** 60:10
**punishment (3)** 58:24;
59:7,17
**purpose (1)** 5:4
**pushed (1)** 67:15
**put (3)** 66:17;74:6;97:8
**Putting (1)** 18:8

## Q

**quite (1)** 32:22
**quote (2)** 59:20;77:10

## R

**race (1)** 5:17
**raise (7)** 37:12;44:13,
18;62:16;74:5,12,18
**raised (10)** 5:14;20:3;
25:2;28:6;35:10;52:20;
65:7;75:21;87:1;90:11
**raises (1)** 44:17
**raising (3)** 33:5;73:23;
100:7
**Ralph (3)** 101:13,13,16
**ran (1)** 101:9
**reach (2)** 15:8;75:6
**reached (10)** 16:9;
23:16;24:4;32:1;75:10;
83:10;92:19;95:10;
103:23,24
**reaches (1)** 86:20
**reaching (2)** 71:22;76:4
**react (1)** 104:11
**reaction (3)** 87:7,13;
95:22
**read (6)** 87:24;90:20,
22;91:24;94:3;106:16
**reading (2)** 87:7,13
**real (1)** 82:16
**really (5)** 16:18;17:15;
26:10;28:3;46:4
**reason (3)** 39:6;81:23;

98:5
**reasons (1)** 99:2
**recall (119)** 5:20;6:4;
16:3,5;17:19;18:18;
19:24;23:22;25:2;27:6,
24;28:11;29:16;30:4;
31:17;33:4,22,24;34:3,
4,8,10,21,24;35:1,2,9,
13;39:21;40:1;41:15,
18,21;43:9,11,13,20,
23,24;44:4,10;45:4;
46:15,17;48:4,13,15,
16,17,24;49:5;50:6,7,
10,14,17;51:3,9,15,19;
53:3;55:2;56:9,8,15;
57:5;58:14;62:12,12;
65:5,9,16;67:21,24;
68:5,7,10,12,15,20;
69:15,20;70:1;72:19;
73:15;78:20;79:3,6,9,
24;80:1;81:13;82:11,
13;85:10,13,17;86:16,
18;87:5;89:1,7,9,10,20;
91:19;94:15;96:3;98:1;
102:4,5,8;103:4,18;
104:18,23;105:3,16
**receive (6)** 17:6,11;
19:19;57:10,18;102:23
**received (11)** 16:22;
17:18;18:4,7;19:13,17;
56:3;68:6;73:10;86:23;
88:24
**receiving (3)** 56:5,15;
72:23
**recently (2)** 20:16;
86:12
**Recess (1)** 55:24
**recognize (2)** 9:23;
10:10
**recollection (3)** 49:16;
69:9;79:21
**recommendation (1)**
70:8
**record (2)** 66:18;74:7
**reference (2)** 49:10;
87:8
**referred (1)** 32:2
**referring (1)** 42:23
**regard (6)** 3:9;14:10;
58:24;59:17;70:8;
87:23
**regarding (34)** 12:20;
14:12,14;15:5,24;
17:10,17;18:3,4;20:14;
23:23;24:14,20;25:3;
27:19;28:2,12,21,22;
31:19;32:5;50:3;54:20;
61:18;62:18;66:11,24;
84:2,21;87:14;98:15;
102:20;103:3,10
**regards (10)** 64:4;
79:23;81:17;82:18,20;
93:9;94:21;98:16,18;

104:1
**regularly (1)** 77:11
**relate (1)** 80:9
**related (1)** 5:22
**relation (1)** 12:4
**relations (7)** 6:17;7:8,
15,21;8:12;11:10,16
**relationship (13)** 13:3;
14:6;24:23;29:6,23;
30:13,21;31:7;33:8,16;
45:13;65:12;81:24
**relayed (1)** 73:19
**relaying (1)** 50:14
**remember (11)** 3:18;
5:10;20:5;21:10;35:20;
50:9;68:1;70:5;76:14;
81:10;88:11
**remind (1)** 4:6
**repeat (2)** 4:10;39:24
**rephrase (1)** 25:13
**reply (1)** 55:1
**report (16)** 11:2,7;
38:14;47:12;48:1,14;
68:5,9;69:6,11;70:22;
71:1,7,22;72:23;91:11
**reported (1)** 30:10
**REPORTER (1)** 74:10
**reporting (2)** 10:24;
24:23
**reports (5)** 11:4,8,12,
18;46:16
**request (1)** 81:9
**Requiring (1)** 19:2
**reserves (1)** 106:15
**resign (4)** 96:19;98:9;
102:17;103:7
**resignation (2)** 96:21;
103:3
**resigned (1)** 96:14
**resigning (1)** 98:17
**Resource (1)** 8:23
**resources (4)** 11:3;
24:17;76:5;78:6
**respond (1)** 30:23
**responded (1)** 54:5
**responding (2)** 94:19,
23
**response (1)** 40:19
**responsibilities (4)**
12:2,14;13:14;19:9
**responsible (5)** 12:3,7,
16;32:15;56:12
**result (2)** 4:18;36:12
**resulted (2)** 49:19;50:4
**results (1)** 57:21
**retaliated (1)** 67:17
**retaliation (18)** 6:3;
10:10;13:16;14:3,10,
12,19;15:6,15,24;17:6;
18:5;19:14;20:15;25:3,
12,17;26:15
**retire (1)** 51:11
**retirement (5)** 50:12,20;

51:17;52:2;84:3
**review (1)** 58:12
**reviewing (1)** 58:12
**Rhonda (5)** 76:7,10,19,
20,22
**right (22)** 20:18;41:11;
42:16;49:14;55:6;61:3,
5;65:5;71:11;74:1;
79:1;83:21;84:10,14,
22;87:20;89:4;92:22;
94:9;95:3;104:4;
106:15
**right-hand (2)** 91:4;
92:3
**rights (1)** 10:16
**role (7)** 12:15;32:8;
47:1;56:19;68:8;69:13;
101:6
**room (1)** 53:20
**Rule (1)** 47:16
**rules (2)** 12:17;58:3
**run (1)** 93:14
**runs (1)** 13:22
**Ruth (144)** 20:11;
24:19,22;27:1,11,12,
13,14;33:9,19;34:22;
35:2,15;36:20;37:10,
12,17;38:6,8,11,13,17;
39:20,22;40:16,20,20;
41:8,10,12,16;42:7;
43:14,21;45:22;46:7,
12;47:1,12;48:1,5,19;
49:18;50:8,11;52:10;
53:1,15,24;54:5,21;
55:4,8,18;56:3;57:3;
58:19,22;59:2,5;
60:20;61:17;62:5,8;
64:4,5,11,17,20,23;
65:7,11;66:1,4,11,24;
67:6,8,10,20;68:12;
69:10,15;70:1,15,18;
73:9;74:13;75:18;
76:22,24;78:18;80:1,5,
15;81:9,22;82:1,18;
83:20;84:9,13,18,22;
85:2,23;86:22;87:1,8,
13,23;88:9;89:22;91:2;
92:18;94:16,19,22;
95:2,9,10,10;96:3;
97:17,20;98:4,21;
99:15;100:6;101:16,
19;102:7,11,14,19;
103:10,14,23;104:20,
20;105:8,11,15,17
**Ruth's (5)** 40:3;55:1;
64:13;80:20;106:9

## S

**same (18)** 11:1;15:15;
22:13;26:17;31:13;
36:20,23,24;54:13;
64:9;66:15;89:8;90:7;

94:1,5;95:8;98:7,9
**Sandra (1)** 103:11
**Sandy (42)** 62:1,4,7,8;
64:24;65:6,10,24;66:3,
10;85:24;86:3,8,14,17,
19,24;88:3,18,22,24;
94:11,16,20,21,22;
95:8,13,17,22;103:10,
21,23,24;104:7,9,11,
13,22,23;105:18,24
**SATINSKY (86)** 8:5;
15:11;16:2,11;17:21;
22:8;24:10;25:5,24;
26:6;28:13,24;29:8;
35:12,23;36:14;38:15,
23;40:7;41:6;44:7,15;
45:6,24;46:8;47:2;
48:21;51:5,12;52:5,12,
21;54:2,9;55:23;60:2,
11,22;61:20;62:10,20;
63:3,8,15,24;64:12;
65:1,8,19;66:5,12,17;
68:18;69:22;70:20;
72:8,17;73:3,7;74:3,6,
16;75:9;78:10;79:2,16;
80:17;81:4;83:22;84:5;
85:9,16;87:3,10;89:12;
93:7;95:4;96:6;97:1,6;
99:24;100:10;101:7;
105:19;106:6,13
**saw (1)** 73:21
**saying (11)** 31:21;51:9,
16,19;54:6;60:21;
69:15;74:13;79:24;
80:1;104:23
**scapegoat (1)** 78:17
**schedule (2)** 56:11;
86:1
**scheduled (1)** 77:12
**scheduling (1)** 56:13
**Science (1)** 32:10
**second (4)** 42:14;91:3;
92:2;99:11
**seeing (1)** 68:7
**seemed (1)** 22:12
**self (1)** 34:18
**seminars (4)** 10:5,7,13,
16
**sent (5)** 21:23,24;
35:15;71:20;96:21
**sentence (3)** 78:13;
80:20;86:2
**separate (2)** 6:24;9:10
**sequence (1)** 38:10
**set (1)** 99:7
**several (5)** 22:23;84:8,
12;89:24;94:5
**severe (1)** 57:6
**severity (3)** 57:22;
58:15,20
**sex (3)** 5:22;22:13;24:3
**sexual (1)** 13:7
**Sharon (2)** 11:2,4

**shift (1)** 70:24
**show (1)** 71:7
**showing (1)** 70:16
**shows (1)** 72:15
**SHRM (5)** 8:21;9:5,6,
13,18
**sign (1)** 106:16
**Similar (2)** 5:4;10:13
**similarly (1)** 60:8
**simple (1)** 26:12
**singled (3)** 59:16;
74:14;93:11
**sit (1)** 39:17
**situation (17)** 21:4;
23:10;27:15;29:21;
30:6;39:17;40:13;
54:22;59:8;65:12;
69:10;72:24;81:21;
82:24;91:6,14;100:23
**situations (2)** 41:1;88:8
**six (7)** 3:7,7;18:13;
33:6,13;35:8;40:10
**societies (1)** 8:19
**somebody (2)** 16:8;
90:12
**someone (5)** 45:2;70:6;
76:7;80:22;81:14
**sometimes (5)** 34:12;
40:14;75:12;76:3;89:6
**Sorry (14)** 21:11;25:13;
39:24;40:9;42:12;
47:20,21;56:12;64:3;
78:10;81:5;89:2;96:12;
97:3
**sort (6)** 19:13;23:16;
37:14;48:13;70:7;
95:22
**space (1)** 39:8
**spanned (1)** 74:24
**speak (14)** 16:18;
24:13,19;30:12;38:7,
13;53:23;62:4;63:13;
64:10;68:24;73:5,12;
92:14
**speaking (8)** 50:19;
53:16,17;71:15;73:15;
84:17;89:9;95:19
**speaks (1)** 106:1
**specialist (3)** 7:8;11:10,
15
**specific (7)** 6:18;16:18;
34:17;54:20;79:21;
89:18,19
**specifically (40)** 17:17;
20:22;23:4;32:21;
33:23;34:24;35:1;
37:18;40:2;41:8;43:11,
16,23,24;48:4,16;50:1;
51:16,20;53:17;61:11;
62:12,13;65:10;68:10;
70:4;71:16;72:1;78:21;
80:2;82:20;86:18;
87:23;88:5;91:20;99:9;

100:16;101:21;103:14;
104:23
**specifics (1)** 68:1
**specified (1)** 49:13
**SPHR (1)** 9:5
**split (2)** 9:9,17
**spoke (5)** 48:5;65:24;
66:3;83:18;105:18
**spoken (2)** 63:16,23
**staff (1)** 80:13
**standard (2)** 59:24;60:3
**standards (1)** 59:21
**stands (2)** 35:16;76:15
**start (7)** 4:22,24;6:7;
7:3;74:7;89:19;92:16
**started (4)** 7:7;46:21,
24;70:24
**starting (1)** 73:22
**starts (5)** 42:15,18;
77:9;85:23;90:21
**statement (1)** 92:22
**States (2)** 54:7;59:18
**stating (1)** 94:23
**stay (2)** 83:7;91:12
**stemmed (1)** 45:12
**stemming (1)** 19:15
**steps (1)** 98:17
**sticker (2)** 97:1,9
**still (2)** 23:13;32:19
**stress (1)** 33:17
**structure (1)** 10:24
**student (5)** 69:13,14;
71:3,5,23
**students (6)** 13:8;
34:13;42:17;43:18;
44:3;45:1
**student-worker (5)**
68:21;69:1;72:1,7,10
**Subject (1)** 85:24
**subsequently (1)** 86:13
**sufficient (1)** 71:3
**supervision (1)** 12:8
**supervisor (3)** 18:20,
21;69:12
**supervisors (2)** 12:5,12
**supposed (1)** 56:11
**Sure (39)** 4:13,18;5:3,
5,24;14:16;16:4;29:18;
34:16;40:1;41:1;49:4;
50:1;55:23;58:21;
63:20;66:22;68:11,14,
14;69:8;70:10;78:21;
81:10;86:19,20;88:6,
14,17;89:13;97:7;
100:4,17,23;102:2,17;
105:21;106:7,8
**surprised (8)** 87:24;
91:24;98:23;104:12;
105:6,7,10,12
**surrounding (2)** 40:22;
82:21
**suspension (1)** 56:16

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

DEIRDRE CULBREATH-WALTON
June 30, 2017

## T

**tab (1)** 47:15
**talk (24)** 4:19;29:19;
36:16;38:5,6,11,11,17,
17,18,22;40:12;52:24;
59:2;61:4;62:1;78:18;
82:23;95:15;98:13;
99:9;101:2;105:4,14
**talked (37)** 31:14;
34:17;36:1,3;37:21,22;
44:1;46:11;52:22,23;
57:20;58:6;59:12;
60:12,13;61:22;67:1,3;
75:20;78:21;79:11;
81:10,15,16;83:17;
86:11;92:12,19;95:10;
98:4,8,17;99:10;
100:22;101:1;102:17;
103:16
**talking (12)** 41:7,10,12;
50:19,20;51:17,22;
53:18;56:2;64:5;68:12;
74:8
**Tanya (7)** 20:5;23:22;
24:7,14,20,23;27:10
**Tanya's (1)** 20:5
**tardiness (1)** 72:15
**tardy (1)** 70:16
**technology (2)** 23:20;
32:11
**telling (8)** 25:15;34:4;
46:5;55:4;68:15,20;
70:1;85:11
**Temple (35)** 3:9;5:12;
6:9,12,24;7:4,7;10:24;
12:23;13:5;14:2,12;
15:1,22;16:8,15,15,20,
23;17:2,5;19:9,10,11,
12;21:3;27:3;28:15;
32:4;46:22;48:9;57:8;
64:13;72:23;75:6
**Temple's (2)** 99:22;
100:9
**ten (6)** 14:17,18;17:3,
16;30:17;82:9
**tenure (5)** 14:1;15:21;
16:20;17:2;32:3
**term (1)** 98:16
**terminate (2)** 101:3,6
**terminated (10)** 65:17;
96:4,8,12;99:20;100:6;
104:2,8;105:11,13
**terminating (1)** 102:1
**termination (24)** 27:2;
61:16;85:5,15;96:16,
18,22,23;98:6,15;99:3;
100:14,21,24;101:19;
102:7;103:3,21;104:1,
3,16;105:15,17;106:5
**terminations (1)** 12:9
**Terry (2)** 4:14;74:9

**testify (5)** 16:13,16;
17:24;63:16,17
**therein (1)** 99:13
**third (2)** 67:19;77:9
**thought (3)** 30:2;45:15;
75:11
**thoughts (1)** 80:10
**threaten (1)** 87:19
**three (9)** 7:18;9:17;
20:1;22:1;57:10,18;
82:10;98:3;103:16
**three-day (1)** 56:15
**throughout (7)** 9:21;
10:4,9;15:21;16:20;
17:1;91:9
**throwing (1)** 49:23
**timely (2)** 69:11;81:1
**times (32)** 3:6;17:1;
18:12,13,22;27:23;
28:10;29:3;30:15,18,
24;31:1,15,24;32:1;
33:11,13;35:6,8;40:6,9,
10,19,22;67:4,5,6,14;
75:21;77:10;82:10;
103:16
**title (3)** 6:15;7:16;10:16
**today (3)** 11:2;67:2;
77:15
**together (4)** 20:23;
22:15;38:8;104:19
**told (16)** 31:10;34:22;
37:23;54:24;55:1;
56:24;59:10,11;69:9;
72:10;73:17;80:3;
86:21;98:19;104:10,21
**took (6)** 54:24;55:3;
57:1,22;80:4;104:1
**top (9)** 39:16;40:23;
43:1;67:24;94:3,7,9;
96:1;102:9
**total (1)** 11:18
**touch (1)** 84:17
**towards (1)** 75:13
**Trachtenberg (2)** 64:7,
21
**Tracy (3)** 89:16,20,20
**training (3)** 9:21;10:2,9
**trainings (1)** 10:6
**transcript (3)** 4:15,20;
5:5
**travel (1)** 56:13
**treated (11)** 13:21;21:1,
18;24:1;58:23;59:6;
60:15,21;73:24;74:15;
93:10
**treating (1)** 28:7
**treatment (1)** 79:14
**trial (1)** 4:2
**tried (2)** 70:2,5
**true (5)** 16:1;34:9;
71:13;77:20;78:1
**truth (1)** 80:24
**try (3)** 4:11,21,23

**trying (1)** 3:13
**turn (1)** 91:2
**twice (1)** 47:22
**two (16)** 7:12,18,23;
9:17;11:8,18,19;27:16;
47:4;66:24;76:2;77:14;
80:24;82:9,10;83:8
**types (2)** 10:18;13:20
**typical (1)** 38:10
**typically (1)** 103:6

## U

**Ultimately (2)** 58:1;
102:22
**unbiased (1)** 80:23
**under (11)** 9:10,14,14,
20;12:8;26:9;47:15;
48:6;49:9;76:19,20
**underlying (3)** 5:19,22;
6:2
**understood (2)** 71:9;
72:5
**Unemployment (5)**
12:9;102:20,23;103:2,
7
**unfairly (6)** 13:21;21:1,
18;24:1;58:24;59:6
**United (1)** 54:7
**university (7)** 12:4,16,
17;19:11,12;44:24;
76:16
**unprofessional (2)**
49:18,20
**unprofessional/ (1)**
49:10
**unprofessional/inappropriate (1)**
47:17
**up (18)** 21:10,12;24:4,
5;31:9,21;43:1;49:23;
60:20,24;64:3;70:16;
71:7;77:18,22;88:6;
102:1,2
**update (5)** 86:19;88:3,
9,18;103:22
**updated (2)** 105:1,2
**upset (5)** 73:17;99:15,
17
**used (3)** 29:10;43:22;
76:18
**Usually (5)** 36:7;39:10,
20;93:13;98:13

## V

**Valley (1)** 8:23
**verbalize (5)** 5:6;8:2,7;
42:11;47:20
**vice (7)** 11:3;20:24;
21:4,8;22:22;76:11;
101:10
**VII (1)** 10:16
**Violation (4)** 47:16;

57:23;99:22;100:8
**vis-à-vis (1)** 47:1
**visiting (1)** 56:14
**voice (1)** 75:21

## W

**Wacker (40)** 19:22;
22:22;23:23;24:14;
25:4;30:10;31:16,23;
32:11;33:1,4,7,14;34:5,
21;39:22;40:2;41:16;
42:7;43:1,10;44:5;
45:17;48:18;58:19;
59:4,5;66:4;69:3;
71:19;73:5,12;84:9,21;
88:23;97:23;98:2;99:1;
102:13,14
**wait (2)** 4:21,23
**Walton (5)** 41:23;42:2,
4;56:2;106:12
**warning (3)** 70:12,19;
72:24
**warnings (1)** 72:15
**warrant (1)** 70:18
**water (1)** 28:4
**way (10)** 13:22;32:8,9;
48:2;53:1,15;59:9;
70:24;90:22;94:14
**ways (1)** 71:21
**Wednesdays (1)** 77:13
**week (4)** 78:8,15;91:8;
96:4
**weekends (1)** 91:10
**weekly (1)** 30:7
**weeks (1)** 95:1
**weren't (1)** 36:4;37:9;
60:16
**whenever (2)** 35:16,24
**whole (4)** 28:18;54:17;
66:16;94:4
**whose (2)** 49:2;100:13
**within (15)** 5:11;6:18,
19,20;16:21;17:4;19:8;
24:16;25:19;26:13,17;
36:19;57:9;63:1;96:4
**without (4)** 56:16;
57:18;81:1;92:5
**WITNESS (70)** 15:13;
16:3,17;18:1;22:10;
24:11;26:1,8;29:2,9;
35:13,24;36:16;38:16,
24;41:7;44:10,16;45:9;
46:11;47:3;48:24;51:6,
15;52:6,13,22;54:3,10;
60:3,12,23;62:11,21;
63:4,9,20;64:1,15;65:3,
9,20;66:7;69:23;70:21;
72:9,19;74:17;75:10;
77:7;79:3;80:18;81:5;
83:23;84:6;85:10,17;
87:5;89:13;93:8;95:5;
96:7;97:11;100:1,11;

101:8;105:20;106:7,
15,17
**women (12)** 22:12,24;
23:1;51:10,20,21,23;
52:3;84:3
**word (1)** 43:22
**words (3)** 29:7;51:10;
54:6
**work (45)** 6:22,23;
12:16,21;13:10,19;
14:6,22;15:1,6,16;
16:1;17:10,12;18:5;
19:15;20:15;26:22;
27:15;30:2;35:10,21;
36:12,19;37:2;41:4;
68:16;69:11;70:16,22;
71:2;72:12;75:13,19;
76:1,12;83:22;87:18;
91:5,8,14;92:5;93:6;
99:21;100:7
**worked (9)** 14:4;32:11,
14,16;37:4;39:10,14;
61:12;83:1
**working (17)** 6:7,11;
7:3,7,8;16:12;18:18,19;
32:19;33:16;34:13;
46:21;48:6,9,9;65:11,
12;105:8
**workplace (16)** 9:24;
10:11;13:15;14:2;
21:19;26:15,20,23;
28:8;33:8;52:2,4;
62:18;73:24;79:1;90:2
**write (2)** 92:18;103:1
**writes (4)** 43:19;59:20;
78:3;91:5
**writing (1)** 4:14
**written (3)** 70:12,19;
72:24
**wrong (2)** 70:18;71:6
**wrongful (1)** 13:18
**wrote (2)** 78:19;99:4
**Wu (119)** 27:4,19,22;
28:2,6,12,21,22;29:14,
20;30:1;31:8,13,14,20,
20,22,24;32:4,18,23;
33:5,9,16;34:2,6,9,14,
19;36:2,20,23;37:10;
38:5,8,13,22;39:4,14,
19;42:23;45:13,19,20,
22;46:6,12,15,17;47:1;
48:6,18;49:4,22;50:11,
14;52:11,24;53:14;
55:6;58:5,6;60:1,20;
61:1,4,12,19;62:9;
66:1;67:6,8,11,14;
69:15;71:10,15,22;
75:20;77:11,19;80:5,7,
11,12,14;81:21;82:1,6,
14;83:3,13,19,21;84:3,
10,14,16,21;85:1;
88:16;90:3,11;91:6;
92:14;93:10,17;95:20;

99:6,9,12;100:18,20,
22,23;101:1,2;102:11;
105:18
**Wu's (2)** 36:6;54:6

**Y**

**year (7)** 8:13;27:9,15,
16;47:5;65:16;83:14
**years (22)** 3:14;7:12,
18,23;8:17;9:17,23;
10:4;14:17;18:16;
25:20;26:14,18;27:16;
47:4;52:1;62:16;74:24;
89:24;90:5;99:19;
100:5
**yell (1)** 34:9
**yelled (7)** 19:5;34:12;
45:1;78:16;79:7,10;
80:12
**yelling (4)** 34:6;42:17;
43:18;44:2
**young (1)** 20:4

**1**

**1 (2)** 102:10,13
**10 (1)** 29:2
**10th (1)** 55:19
**11 (2)** 29:2;30:17
**12 (1)** 30:17
**12:45 pm (1)** 106:20
**14 (1)** 65:21
**18 (1)** 14:17
**1987 (1)** 6:11
**1999 (1)** 7:5
**1st (2)** 103:9,12

**2**

**2000's (1)** 75:1
**2008 (1)** 8:15
**2010 (3)** 42:8;73:23;
90:6
**2011 (5)** 47:13;48:12,
20;55:15;56:4
**2013 (1)** 56:6
**2014 (27)** 10:20,23;
11:1,6,24;13:13;27:13;
55:11;65:17;67:20,23;
68:6;70:14;73:22;
78:22;83:12,14,17;
86:9;88:12;90:6;92:17;
94:10;96:2,10;102:10;
103:9
**20th (1)** 70:14
**22nd (1)** 78:22
**25th (3)** 92:17;94:10;
96:2
**26th (2)** 86:9;88:12
**29th (1)** 42:7

**3**

**30 (9)** 8:17;9:22;25:20;
26:14,18;52:1;62:16;
99:19;100:5

**5**

**50s (1)** 55:12
**55 (1)** 51:11

**7**

**70 (1)** 92:2
**72 (1)** 91:3

**8**

**8:45 (1)** 77:12

**9**

**9th (3)** 47:13;48:12;
55:15