# EXHIBIT 30

# In The Matter Of:

*RUTH V. BRIGGS v.*

*TEMPLE UNIVERSITY*

---

*SANDRA A. FOEHL*

*June 30, 2017*

---

*Terry Burke Reporting*

*Registered Professional Reporters*

*terryburkermr@gmail.com*

*(215) 205-9079*

Min-U-Script® with Word Index

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3              -      -      -
 4   RUTH V. BRIGGS,                    :
 5            Plaintiff,               :
                                       :   Civil Action
 6   v.                                :   No. 16-00248
 7   TEMPLE UNIVERSITY,                :
 8            Defendant.               :
 9              -      -      -
10              Philadelphia, Pennsylvania
                   Friday, June 30, 2017
11              -      -      -
12
13              Deposition of SANDRA A. FOEHL, taken
14   pursuant to notice, held at Console Mattiacci
15   Law, LLC, 1525 Locust Street, Ninth Floor,
16   Philadelphia, Pennsylvania, beginning at
17   1:40 p.m., on Friday, June 30, 2017, before
18   Terry Barbano Burke, RMR-CRR.
19
20
21
22              TERRY BURKE REPORTING
                     (215) 205-9079
23              terryburkermr@gmail.com
24
```

Page 2

```
 1   APPEARANCES:
 2        RAHUL MUNSHI, ESQUIRE
          Console Mattiacci Law, LLC
 3           1525 Locust Street, Ninth Floor
             Philadelphia Pennsylvania 19102
 4
             Counsel for the Plaintiff
 5
          RACHEL FENDELL SATINSKY, ESQUIRE
 6        Littler Mendelson, P.C.
          Three Parkway
 7           1601 Cherry Street, Suite 1400
             Philadelphia, Pennsylvania 19102
 8
             Counsel for the Defendant
 9
10              -      -      -
11              SANDRA A. FOEHL,
12        3443 West Penn Street, Philadelphia,
13        Pennsylvania, having been duly sworn,
14        was examined and testified as follows:
15   BY MR. MUNSHI:
16        Q.  Good afternoon, Miss Foehl.
17        A.  Hello.
18        Q.  We just met, but my name is Rahul
19   Munshi.  I'm an attorney here at Console
20   Mattiacci Law, and I have the privilege of
21   representing Ruth Briggs in this action against
22   Temple University.  You are here today for your
23   deposition.
24              Do you understand that?
```

Page 3

```
 1        A.  Yes.
 2        Q.  Have you ever had your deposition taken
 3   before?
 4        A.  Yes.
 5        Q.  Approximately how many times?
 6        A.  Probably four or five.
 7        Q.  Any of those in your capacity as an
 8   employee of Temple?
 9        A.  All of them.
10        Q.  Were all of those employment-related
11   matters?
12        A.  Yes.
13        Q.  When was the last time you had your
14   deposition taken?
15        A.  I don't remember.  Some years ago.
16        Q.  Was it within the last five years?
17        A.  Probably longer.
18        Q.  Let me go over some of the general
19   ground rules here you probably remember.  I am
20   going to be asking you some questions, and if I
21   ask you a question you don't understand, just
22   let me know you don't understand the question
23   and I will try and ask you a better one.
24              Okay?
```

Page 4

```
 1        A.  Okay.
 2        Q.  You see, obviously, Terry is sitting
 3   here today.  She is taking down everything we
 4   say for a transcript.  We have to make sure we
 5   verbalize all of our answers.  Otherwise, the
 6   head shakes don't come out.
 7        A.  Right.
 8        Q.  Everyone does it.  We will let you know.
 9              Similar instruction, we have to do
10   the best we can to not talk over each other.
11   Otherwise, the transcript is not going to come
12   out.
13              Okay?
14        A.  Understood.
15        Q.  If you do want to take a break at any
16   point, just let us know, we can go ahead and do
17   that.
18              Okay?
19        A.  Okay.
20        Q.  The last instruction I will give you is
21   the most important one, and that is even though
22   there is no judge or jury here, you just took an
23   oath to tell the truth.  With that oath comes
24   the same responsibilities as if there was a
```

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 5

1 judge sitting here.
2        Do you understand that?
3    A. I do.
4    Q. Miss Foehl, you are currently employed
5 by Temple; is that correct?
6    A. Yes.
7    Q. What is your current title?
8    A. Director Office of Equal Opportunity
9 Compliance.
10    Q. Is that commonly referred to as the EEO
11 office?
12    A. EOC.
13    Q. The EEOC office?
14    A. EOC.
15    Q. EOC office, okay.
16        How long have you held that
17 position?
18    A. Since 2005, I think.
19    Q. Is that a position within human
20 resources?
21    A. No.
22    Q. Do you consider yourself a human
23 resources professional?
24    A. No, I don't.

Page 6

1    Q. Have you ever worked in human resources
2 before?
3    A. No.
4    Q. When did you start working at Temple?
5    A. 1973.
6    Q. What position did you hold back then?
7    A. I think it was titled affirmative action
8 specialist in the office of affirmative action
9 plans and programs.
10    Q. Are you an attorney?
11    A. No.
12    Q. Have you taken any courses on the law?
13    A. Does sitting in a course count?  I don't
14 think so.  No.
15    Q. Do you have any legal education
16 background, I should ask?
17    A. No.
18    Q. What are your general job duties and
19 responsibilities as the director of EOC?
20    A. As the name of the office suggests, EOC
21 is responsible for university compliance with
22 federal, state, and municipal civil rights laws.
23 So we do report filing for the university.
24 We're responsible for the university's

Page 7

1 affirmative action program plan.  And we do
2 complaint investigations for the university.
3 That is unlawful discrimination complaint
4 investigations.
5    Q. Employment discrimination or all types
6 of discrimination?
7    A. All types.  That is, we respond to
8 student complaints, staff, faculty, and visitors
9 to the university.
10    Q. The civil rights laws that you
11 mentioned, do they include Title VII of the
12 Civil Rights Act?
13    A. Yes.
14    Q. And the Age Discrimination in Employment
15 Act?
16    A. Yes.
17    Q. You said investigating discrimination
18 claims.  Do you also investigate retaliation
19 claims?
20    A. Yes.
21    Q. Do you also investigate claims of
22 hostile work environment?
23    A. If they allege a violation of the civil
24 rights laws.

Page 8

1    Q. Did you ever receive a complaint of
2 discrimination from Ruth Briggs?
3    A. Yes.
4    Q. How many times did that happen?
5    A. Once.
6    Q. And when did that happen?
7    A. In the spring of 2014, I think.
8    Q. If it helps, Miss Briggs ended her
9 employment at Temple in April of 2014?
10    A. That was the time she filed a complaint.
11    Q. What do you mean by "filed a complaint"?
12    A. Said that she wanted an investigation of
13 her concerns done.  We refer to it as filing
14 formal complaint.
15    Q. And is there a difference between the
16 filing of a formal complaint and the making of
17 an informal complaint?
18    A. Yes.  Our -- yes.
19    Q. Did Miss Briggs ever lodge an informal
20 complaint with you?
21    A. She came and discussed informally a
22 number of concerns.
23    Q. And how do you make the distinction
24 between discussing informally and more than

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 9

1  that?
2  　　A.  A grievance procedure that guides -- the
3  equal opportunity compliance office provides
4  informal grievance resolution and formal
5  investigations.  It's not uncommon for
6  individuals to come and talk briefly or at
7  length about an issue that concerns them.  And
8  in the course of the conversation we may
9  discover it is not at all a matter for equal
10  opportunity compliance.  More appropriately an
11  issue for human resources, and we'll give that
12  direction to the individual.
13  　　　　In some cases, individuals simply
14  want to talk through an issue, and that's all
15  they are asking for, to talk through an issue.
16  　　　　Sometimes individuals will say, I
17  have this concern and I want you to conduct an
18  investigation.  That's a formal complaint.
19  　　Q.  And would you ever conduct an
20  investigation without the individual
21  specifically asking you?
22  　　A.  Sometimes, but rarely.
23  　　Q.  For example, if somebody comes to you
24  and says that they are being sexually harassed

Page 10

1  in school --
2  　　　　MS. SATINSKY: Objection to form.
3  　　　　MR. MUNSHI: I didn't ask the
4  question yet.
5  BY MR. MUNSHI:
6  　　Q.  -- you don't need that person to
7  specifically say, Miss Foehl, can you
8  investigate this, it is within your discretion
9  to look into it if you want?
10  　　　　MS. SATINSKY: Objection to form.
11  You can answer.
12  　　　　THE WITNESS: I'm sorry?
13  　　　　MS. SATINSKY: You can answer.
14  　　　　THE WITNESS: Okay.
15  　　　　The office may act.  If we hear an
16  issue that raises a concern for us of harm to an
17  individual, that we would probably move on,
18  whether or not an individual asked for a formal
19  complaint.
20  BY MR. MUNSHI:
21  　　Q.  How do you define "harm" in that
22  situation?
23  　　A.  Sexual assault might be one issue.
24  Someone saying I'm suicidal might be another.

Page 11

1  　　Q.  How about if somebody expresses to you
2  not physical harm, but emotional harm, could
3  that be enough harm for you to investigate
4  without someone asking you?
5  　　　　MS. SATINSKY: Objection to form.
6  　　　　THE WITNESS: Not necessarily,
7  because I would have other resources to call on
8  or to direct an individual to.  Our counseling
9  center, for example.
10  BY MR. MUNSHI:
11  　　Q.  What is the counseling center, is that
12  an HR function?
13  　　A.  No.
14  　　Q.  Like therapeutic counseling?
15  　　A.  Therapeutic counseling.
16  　　Q.  Did Miss Briggs ever complain to you
17  informally or formally about hostile work
18  environment at Temple?
19  　　　　MS. SATINSKY: Objection to form.
20  　　　　THE WITNESS: I don't recall her
21  saying specifically I'm working in a hostile
22  environment.  When she came initially, she
23  raised concerns about her salary, that she felt
24  she wasn't being compensated as she should be.

Page 12

1  BY MR. MUNSHI:
2  　　Q.  Did she ever raise any complaints with
3  you about comments that she heard in the
4  workplace that she found to be related to her
5  age or sex?
6  　　A.  I remember one, and I think only the
7  one, about a supervisor.
8  　　Q.  That supervisor was Dr. Wu; is that
9  right?
10  　　A.  Correct.
11  　　Q.  What was the one comment that you recall
12  her telling you?
13  　　A.  He remarked, as Miss Briggs said, that
14  in his native country, China, as I recall, women
15  who reach the age of 55 are done in the
16  workforce.
17  　　Q.  When she was telling you about this
18  comment, did you consider that to be a
19  complaint?
20  　　A.  No.
21  　　Q.  Did you consider it to be an informal
22  complaint?
23  　　A.  No.
24  　　Q.  Why not?

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 13

1    A. The way I recall Miss Briggs saying it,
2  she said this was conversation.  He had remarked
3  about cultural differences within her hearing.
4          She did not, at the time she related
5  this remark, say that or give me an indication
6  that he had specifically directed it to her and
7  to her work situation.
8    Q. Did she tell you if anybody else was
9  present for this comment?
10   A. I don't remember her telling me that
11  anyone else was present.
12   Q. So explain to me what you meant by not
13  directed?
14   A. Remarking about a cultural difference, I
15  think is different, I think, than someone saying
16  directly to me, or to Miss Briggs, "You're over
17  the hill at 55.  You should consider getting out
18  of the workplace."  I would consider that
19  possibly discrimination.
20   Q. So explain to me the difference between
21  the example that you just gave me and what Ruth
22  said to you that Dr. Wu said?
23   A. I didn't hear in Miss Briggs' telling of
24  Dr. Wu's remark that he was saying to

Page 14

1  Miss Briggs you're 55, you should get out of the
2  workplace, as is the case in my culture.
3    Q. So he didn't say the word "you"?
4        MS. SATINSKY: Objection to form.
5  Misstates testimony.
6  BY MR. MUNSHI:
7    Q. Is there any other difference?
8    A. Well, as he set the context, he was
9  talking about women in his country, China, and I
10  think, as I recall Miss Briggs saying to me, she
11  set that up as or she introduced his remark as
12  an instance of his remarking about cultural
13  difference.
14   Q. Do you have knowledge that Dr. Wu is a
15  native of China?
16       MS. SATINSKY: Objection to form.
17       THE WITNESS: I recall that he is a
18  foreign national, or was.  That was my
19  understanding.  And Asian.  I think from China.
20  I'm not sure.  From an Asian country.
21  BY MR. MUNSHI:
22   Q. Prior to 2012, did you have any
23  interaction with Ruth Briggs?
24   A. I met Ruth somewhere before 2012 in my

Page 15

1  capacity as administrator in, I guess it was
2  equal opportunity compliance, or one of our
3  earlier names at the time.  I was investigating
4  a complaint.  She was someone I interviewed
5  regarding that complaint.
6    Q. And whose complaint was that?
7    A. Tanya Honeywell.
8    Q. Did you meet with Miss Briggs in person?
9    A. I think so.  That was my general
10  practice.
11   Q. Outside of any meetings or
12  communications you had with Miss Briggs
13  regarding Tanya Honeywell, had you had any
14  meetings or conversations with her prior to
15  2012?
16   A. Not that I recall.
17   Q. Regarding Tanya Honeywell, was it your
18  understanding that Ruth Briggs had a reporting
19  relationship with her?
20   A. I don't remember the reporting
21  relationship.
22   Q. Did Miss Briggs say anything to you
23  about an individual named Greg Wacker when you
24  were talking with her regarding Tanya Honeywell?

Page 16

1    A. Greg Wacker was part of the
2  conversation.
3    Q. What do you recall her telling you about
4  Greg Wacker?
5    A. My best recollection is that
6  Mr. Wacker's role in the dean's office was
7  supervisory, but he had some supervisory
8  responsibilities for Tanya Honeywell.  And that
9  the issue that I was investigating was a
10  disagreement as to whether or not his
11  supervision had been fair toward Miss Honeywell.
12   Q. Do you recall Miss Briggs giving you
13  information or her opinion that his supervision
14  was not fair?
15   A. I recall that Miss Briggs was disposed
16  to support Miss Honeywell in the disagreement.
17  That's about the extent of my recollection.
18   Q. And what do you mean by "disposed"?
19   A. Took Miss Honeywell's side in whatever
20  the dispute was.
21   Q. Miss Briggs took Miss Honeywell's side
22  over Greg Wacker's side; is that right?
23   A. Over the position of the dean's office.
24   Q. And in connection with your

Page 17

1  investigation regarding Tanya Honeywell, did you
2  also speak with Greg Wacker?
3    A. I think so.
4    Q. Did you ever inform Greg Wacker what
5  Ruth Briggs said to you?
6    A. No.
7    Q. In connection with Miss Honeywell, did
8  you complete any sort of investigation summary
9  or document?
10   A. I don't recall, because my best
11 recollection is Miss Honeywell's complaint was
12 an agency complaint with EEOC. So I may have
13 been investigating for counsel's office at the
14 time.
15   Q. Did you, in connection with your
16 investigation into Miss Honeywell's claim, did
17 you actually reach a conclusion?
18   A. I must have, but I don't remember what
19 it was.
20   Q. Do you recall sharing with Greg Wacker
21 what your conclusion was?
22   A. I would not have shared it with Greg
23 Wacker.
24   Q. Do you recall the nature of Tanya

Page 18

1  Honeywell's claim?
2    A. My best recollection was it turned on a
3  matter of disability accommodation, but that's
4  about the extent of my recollection.
5    Q. Was there also an FMLA issue with regard
6  to Tanya Honeywell?
7    A. I don't know, but that probably would
8  not have come to my attention.
9    Q. After the Tanya Honeywell conversation
10 that you had with Ruth Briggs, when do you
11 recall the next time communicating with her?
12   A. When she came to relate her concerns
13 over salary.
14       MR. MUNSHI: Let's have this
15 document marked as P-31.
16       (P-31 was marked for
17 identification.)
18 BY MR. MUNSHI:
19   Q. Miss Foehl, in front of you is a
20 document that is marked as P-31. Go ahead and
21 review that.
22   A. (Pause.)
23   Q. The first e-mail in this chain is dated
24 July 25th, 2012, as in the oldest one.

Page 19

1       Do you see that?
2    A. Yes.
3    Q. Do you recall meeting with Ruth Briggs
4  on July 30th, 2012?
5    A. I know we had a meeting. I have to -- I
6  don't have any independent recollection that it
7  was other than July 30th, as Ruth says.
8    Q. You see in the first e-mail that she
9  sends to you, she says, "I spoke to Rhonda Brown
10 regarding personal employment issues." And
11 Rhonda Brown is also cc'd on this e-mail.
12   A. Uh-huh.
13   Q. Did you speak with Rhonda Brown about
14 Ruth Briggs at any point?
15   A. Not that I recall.
16   Q. What do you recall discussing with Ruth
17 Briggs at this meeting?
18   A. I remember that she had a concern about
19 her salary. I think this is also in that
20 conversation when she spoke to me about working
21 with Dr. Wu and being concerned that some of
22 what she regarded as her responsibilities had
23 been given to other staff in the office and that
24 concerned her.

Page 20

1       And I think this would have been the
2  conversation where she had repeated Dr. Wu's
3  remark about women in China are done at the age
4  of 55 in the workforce.
5    Q. When she told you the comment that
6  Dr. Wu said about the workforce and women in
7  China, how did you react to it?
8       MS. SATINSKY: Objection to form.
9  Asked and answered. You can answer the
10 question.
11      THE WITNESS: Most of these meetings
12 I listen.
13 BY MR. MUNSHI:
14   Q. Did you have any sort of concern that he
15 said this to her or that she was complaining
16 about it?
17      MS. SATINSKY: Objection to form.
18 Asked and answered.
19      THE WITNESS: My response to an
20 initial telling of the situation is to the
21 speakers' concerns. Ruth was concerned. I
22 listen.
23 BY MR. MUNSHI:
24   Q. Did she discuss with you during this

Page 21

1  meeting the filing of a complaint?
2      A. I don't specifically recall, but it's
3  usual for me when an individual comes with
4  concerns to talk about the resources, my office,
5  other university offices, and to explain what my
6  office does by way of investigation.  So I
7  likely did not.
8      Q. Did she express to you during this
9  meeting any sort of fear of retaliation for
10  speaking with you?
11      A. I don't remember that.
12      Q. Do you recall her expressing any fear of
13  retaliation if she did file a complaint?
14      A. The hesitation I remember in moving
15  forward was -- concerned her need to take time
16  for a personal matter, and she wanted that to
17  occur first, her being approved for time, leave
18  time, before she did anything further.
19      Q. Did you understand if she had any sort
20  of concern that she could be retaliated against
21  by not being approved of the time?
22      A. Would you repeat the question, please.
23      Q. Sure.  Did you have any understanding if
24  she was concerned about retaliation in the

Page 22

1  manner of not being approved of the time?
2          MS. SATINSKY: Objection to form.
3          THE WITNESS: I can't say beyond
4  what Ruth said to me, that she wanted to wait
5  until her leave was squared away.
6  BY MR. MUNSHI:
7      Q. In the e-mail that she sends to you that
8  is P-31, second sentence, it says, "If it is
9  possible to review the letter to Michael Klein
10  before sending, please let me know."
11          Do you see that?
12      A. Yes.
13      Q. Michael Klein was the dean at the time;
14  right?
15      A. He was.
16      Q. What letter?
17      A. I don't know.  I was surprised when I
18  read that initially.  I didn't know then what
19  letter Ruth was referring to.
20      Q. And then she writes, "If not, I would
21  appreciate a synopsis of the content presented
22  in the complaint so that I will be prepared for
23  my return to work after my son's surgery."
24          Do you see that?

Page 23

1      A. Uh-huh.
2      Q. Did you discuss presenting a complaint?
3      A. Not my presenting a complaint.
4      Q. Sorry, I didn't understand.
5      A. I convey an individual complainant's
6  concerns, so I have to have something to
7  present.
8      Q. So did you understand what she was
9  talking about when she says "synopsis of the
10  content presented in the complaint"?
11      A. No.
12      Q. She writes here, "I am not having
13  buyer's remorse, but I am nervous about the
14  manner with which I will be treated when I
15  return after my son's surgery."
16          Do you see that?
17      A. Uh-huh.
18      Q. So did you have a discussion about any
19  concerns she had upon her return?
20      A. Not that I recall.
21      Q. Did you follow up with her and
22  say, "What are you talking about here?"
23      A. There was further communication, but I
24  don't know how quickly it came after this memo.

Page 24

1      Q. Did you tell anybody that you had met
2  with Ruth Briggs on this date?
3      A. I met on July 30th.  At some point, I
4  asked Deirdre Culbreath-Walton in human
5  resources whether or not she had been talking
6  with Ruth about the salary issues, but I don't
7  know exactly when that came in relationship to
8  the July 30th meeting.
9      Q. Did you inform Miss Walton that you had
10  met with Ruth Briggs?
11      A. I'm not sure whether I would have said I
12  met with Ruth.  I may have simply said, "Ruth
13  has raised a concern about salary with the EOC,
14  has she related that concern to human
15  resources?"
16      Q. Do you recall informing anybody else
17  that you met with Ruth Briggs?
18      A. I don't think I did.
19      Q. At any point prior to the end of
20  Miss Briggs' employment with Temple, did you
21  have a conversation with Greg Wacker about Ruth
22  Briggs?
23      A. Please repeat the question.
24      Q. Sure.  Just looking at the time period

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 25

1  before Miss Briggs' employment ended,
2  April 2014, did you have any conversations with
3  Greg Wacker about Ruth Briggs?
4      A.  No.
5      Q.  Prior to the end of Miss Briggs'
6  employment at Temple, did you have any
7  conversations with Drew DiMeo about Ruth Briggs?
8      A.  No.
9      Q.  Same question with Dr. Wu, did you have
10 any conversations with him prior to the end of
11 Ruth Briggs' employment regarding Ruth Briggs?
12     A.  No.
13     Q.  Anybody in human resources?
14         MS. SATINSKY: Other than what she
15 has already testified to?
16 BY MR. MUNSHI:
17     Q.  Beyond what you have already said, which
18 we will flesh out.
19     A.  I had a conversation with Eric Brunner
20 in learning and development in human resources I
21 think about the same time I talked with Deirdre
22 Walton, but I'm not sure of the date.
23     Q.  Just the one conversation with Eric or
24 multiple?

Page 26

1      A.  Just one, as I recall.
2      Q.  Anybody else in human resources who you
3  spoke with about Ruth Briggs?
4      A.  No.
5      Q.  Did you ever speak with Tracy Hamilton
6  about Ruth Briggs?
7      A.  Could have.  We worked together and the
8  usual procedure for us to confer about who is
9  doing what in case one of us is absent and needs
10 to pick up a matter.
11     Q.  Anybody else in the EOC office who you
12 spoke with regarding Miss Briggs?
13     A.  We're talking about 2014?
14     Q.  Any time before April 2014.
15     A.  No, because we no longer, Tracy and I no
16 longer reported to Rhonda Brown, hadn't since
17 2009.  So no.
18     Q.  Who did you report directly to in 2014?
19     A.  University counsel.
20     Q.  Anyone within the counsel's office or
21 just a department or the specific general
22 counsel?
23     A.  I believe Fay Trachtenberg was assigned
24 as our liaison, but we would go to George Moore

Page 27

1  or any one of associate counsel if we saw the
2  need.
3      Q.  Without getting into the content of your
4  communications with counsel, did you ever speak
5  with Fay Trachtenberg regarding Ruth Briggs?
6      A.  I don't remember doing that.  I would
7  say I don't think so.
8      Q.  How about Cameron Etezady, again,
9  without going into the content, did you ever
10 speak with him regarding Ruth Briggs?
11         MS. SATINSKY: Prior to the end of
12 Miss Briggs' employment at Temple.
13         THE WITNESS: Prior to the end of
14 Miss Briggs' employment.
15         My best recollection is that if I
16 talked to Cameron Etezady, it would have been
17 about --
18         MS. SATINSKY: I don't want you to
19 testify about what it would have been about.
20         THE WITNESS: Okay.
21         MS. SATINSKY: That is protected by
22 the attorney-client privilege.
23         THE WITNESS: I don't remember
24 talking to Cameron Etezady about Ruth Briggs'

Page 28

1  complaints.
2          MR. MUNSHI: Let's have this marked
3  as P-32, please.
4          (P-32 was marked for
5  identification.)
6  BY MR. MUNSHI:
7      Q.  Miss Foehl, in front of you is a
8  three-page document.  The top of the first page
9  says "7-30-2012," and then the top of the second
10 page says "two," and then the top of the third
11 page says "8-3-2012."
12         Do you see that?
13     A.  Uh-huh.
14     Q.  Just verbalize for the transcript,
15 please.
16     A.  Yes.  I see that.
17     Q.  Everyone does it.  That is okay.
18         Are these your notes?
19     A.  Yes, they are.
20     Q.  These are your handwritten notes?
21     A.  Yes.
22     Q.  Did you take them while you were meeting
23 with Ruth Briggs?
24         MS. SATINSKY: The first two pages

Page 29

1 are you focused on?
2        MR. MUNSHI: Yes.  The 7-30-2012.
3        THE WITNESS: I usually work up my
4 notes immediately following a conversation.
5 BY MR. MUNSHI:
6    Q.  Did you then type up these notes?
7    A.  I don't type them up.
8    Q.  Did you share your notes with anybody
9 around this time?
10   A.  No.
11   Q.  Approximately how long was your meeting
12 with Ruth Briggs on 7-30-2012?
13   A.  I don't really remember.
14   Q.  On the first page under "problems," it
15 says here, "Dr. Wu yells and says demeaning
16 things, e.g., 'Are you stupid?'"
17       Do you see that?
18   A.  Yes, I see that.
19   Q.  That is information that Ruth Briggs
20 gave to you?
21   A.  That's Ruth's report to me about Dr. Wu.
22   Q.  Did she give you any other examples of
23 demeaning things?
24   A.  No.

Page 30

1    Q.  In your experience at Temple, is this a
2 common thing that an employee would come and
3 say, "My boss is saying demeaning things
4 like 'Are you stupid'"?
5        MS. SATINSKY: Objection to form.
6        THE WITNESS: It is commonplace in
7 my line of work.
8 BY MR. MUNSHI:
9    Q.  It goes on to say, "In China, women your
10 age are done."  That is the statement that you
11 testified to earlier; correct?
12   A.  Yes.
13   Q.  This comment, "In China, women your age
14 are done," did you discuss that comment with
15 anybody besides Ruth Briggs, putting aside
16 counsel?
17   A.  I did when Miss Briggs said please
18 investigate my complaint.  So after our meeting
19 April 2014, I did.
20   Q.  So after she was no longer employed
21 there?
22   A.  That's hard to answer yes or no.  I
23 think she met with me before she received notice
24 of her termination.

Page 31

1    Q.  Who did you discuss this comment with?
2        MS. SATINSKY: Can we go off the
3 record for a second?
4        MR. MUNSHI: Yes.
5        (A discussion was held off the
6 record.)
7 BY MR. MUNSHI:
8    Q.  Prior to May 6th, 2014, did you ever ask
9 anybody or talk to anybody besides Ruth Briggs
10 about the comment that she relayed to you that
11 Dr. Wu said?
12   A.  I think the first person I talked with
13 after Miss Briggs said investigate was Dr. Wu,
14 and I asked him about Ruth's allegations.
15   Q.  Which allegations?
16   A.  His remarks that she found -- this
17 remark.  I don't recall any other -- this
18 remark.  And her job duties being shifted away.
19 And there was one instance, as I recall, that
20 she believed she had been unfairly disciplined
21 when a newer employee had not been for what Ruth
22 thought was the same offense.
23   Q.  Any other allegations you recall
24 discussing with Dr. Wu at that time?

Page 32

1    A.  This is the initial meeting, so if I
2 noted something new, and that may be where the
3 issue of discipline was, that would have been in
4 the April notes.  So I would have drawn on the
5 April notes for my conversation with Dr. Wu.
6    Q.  Do you recall how he responded to you
7 when you asked him about the remark that
8 Miss Briggs relayed to you?
9    A.  Not without reference to my notes, I
10 don't.
11   Q.  Do you recall if he denied saying it?
12   A.  My best recollection is that he said he
13 regularly discussed cultural differences and
14 language differences with the staff,
15 Miss Briggs, other members of the office staff.
16 And that that was a general conversation.
17   Q.  And at this meeting that you are talking
18 about with Dr. Wu, did you also explain to him
19 that you are conducting an investigation?
20   A.  That would have been the way I
21 introduced myself.
22   Q.  And did you inform him that you are
23 conducting an investigation because Ruth Briggs
24 raised complaints?

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 33

1    A. Yes, I would have identified the
2  complainant as Ruth Briggs.
3    Q. Did you explain, because it looks like
4  the timeline is very close, did you explain that
5  she had raised the complaints with you even
6  before she was let go from Temple?
7        MS. SATINSKY: Objection to form.
8        THE WITNESS: I don't know whether
9  or not I remarked one way or the other to Dr. Wu
10  about when she brought the complaints.
11  BY MR. MUNSHI:
12    Q. Did you say anything to Dr. Wu at this
13  meeting about any allegations from Ruth Briggs
14  that she felt that she was harassed by him?
15        MS. SATINSKY: What meeting are you
16  referring to?
17        MR. MUNSHI: The same one that we
18  are talking about I guess in early April of
19  2014.
20        THE WITNESS: I don't remember using
21  the word "harassed." I would have just asked
22  him about the specific examples, the concerns
23  that Ruth related to me. For example, being
24  moved to the ninth or tenth floor and away from

Page 34

1  the department office. Not being asked to do
2  some of the functions that she believed were
3  within her job description. Being disciplined
4  for arriving late or not coming to work without
5  notice when she said another employee had done
6  the same thing and not been disciplined. I
7  would have asked him about examples Ruth had
8  given me.
9  BY MR. MUNSHI:
10    Q. Did Ruth ever express to you that she
11  felt bullied by Dr. Wu?
12    A. She may have used the word. I'm not
13  sure.
14    Q. Did she ever express to you that she
15  felt that she was being threatened?
16    A. I don't think so. If she used the word,
17  what she related to me, I didn't see that he had
18  put -- it is usually a concern about employment.
19  I didn't see that he had put her employment in
20  jeopardy, that he had related that to her. I
21  didn't hear that from what she conveyed to me.
22    Q. Did she ever express to you that she was
23  afraid of or intimidated by Dr. Wu?
24    A. I don't think so. In fact, Ruth made it

Page 35

1  a point to tell me that she responded right back
2  to Dr. Wu's remark about women in China are done
3  at age 55.
4    Q. And what did she tell you she said in
5  response?
6    A. That we're in the United States and it's
7  different in the United States.
8    Q. Were you aware that Miss Briggs received
9  a disciplinary report in November of 2011 for
10  unprofessional conduct?
11    A. Except for the discipline when she
12  compared herself to a new employee, Ruth never
13  related before her termination her disciplinary
14  record.
15    Q. If you can turn to the second page of
16  P-32, please. The fourth line in, it says
17  here, "File age discrimination complaint?" The
18  next line says, "I'm scared."
19    A. Uh-huh.
20    Q. Explain to me what those notes mean that
21  you write here?
22    A. My best recollection was I was asking
23  Ruth if it was her intention to file an age
24  discrimination complaint.

Page 36

1        She answered, as I noted here, "I'm
2  scared." And she continued, "I'd like to get
3  away from Greg Wacker."
4    Q. So these are her words, "I'd like to get
5  away from Greg Wacker. I feel he is retaliating
6  because of what happened with Tanya Honeywell
7  complaint and my testimony as if Greg is
8  thinking, 'they messed with the wrong person and
9  I'll find a way to take them down'"?
10    A. Yes.
11    Q. Those are her words?
12    A. That is what Ruth was relating to me.
13    Q. Did you respond at all to her stating to
14  you that she is scared?
15    A. I think I may have asked her why she
16  felt scared, which elicited the further
17  response.
18    Q. Temple has an anti-retaliation policy,
19  isn't that right?
20    A. Yes.
21    Q. Did you explain that to her?
22    A. I usually say as a practice, I say to
23  individuals who come with a complaint, here is
24  the jurisdiction of EOC, unlawful discrimination

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 37

1  on the basis of.  Individuals are entitled to
2  raise a concern without fear of retaliation.  If
3  after EOC launches an investigation, if that's
4  what the individual asks us to do, if you feel
5  that you are being subjected to retaliation,
6  please let us know that.  That is also subject
7  to investigation.
8      Q.  In your years at Temple, approximately
9  how many investigations had you conducted into
10  complaints of discrimination?
11     A.  Over a thousand.
12     Q.  How about just employment
13  discrimination, still over a thousand?
14     A.  Probably.
15     Q.  Have you ever conducted an investigation
16  concluding that there was discrimination that
17  took place?
18         MS. SATINSKY: Objection to form.
19         THE WITNESS: My writeups are
20  usually apt to say that, either that I found no
21  violation of university policy, or I have reason
22  to believe that university policy was not
23  followed.
24  BY MR. MUNSHI:

Page 38

1      Q.  So have there been any investigations
2  where you have concluded that Temple policies
3  were not followed?
4      A.  Yes.
5      Q.  What percentage would you say?
6      A.  That's hard to say.
7         It is really hard for me to estimate
8  because, as I pointed out earlier, we can do
9  informal complaint resolution.  We can do formal
10  investigations, and we have the capability of
11  resolving matters before I need to get to a
12  conclusion.
13         So when I have been concerned about
14  university policy not being followed as it
15  should, it is possible for me to have someone
16  rectify that before and resolve the matter.
17     Q.  And with regard to Ruth Briggs, did you
18  ever attempt to resolve the matter?
19     A.  One of the reasons for talking to
20  Deirdre Walton was to have human resources
21  address her concerns about salary, and if there
22  was some reason for those concerns to rectify
23  the issue.
24     Q.  How about her relationship in general

Page 39

1  with Dr. Wu, prior to the end of her employment,
2  did you seek to try to resolve any issues there?
3      A.  Well, it's hard for me to remember.  I
4  think Ruth was the one who first told me that
5  Drew DiMeo was meeting regularly in her meetings
6  with Dr. Wu, and I thought that was a positive
7  step.  I hat it was the school's own effort to
8  minimize conflict, resolve conflict, prevent
9  conflict between Dr. Wu and Ruth.
10     Q.  From what you learned and heard, was
11  that a successful endeavor?
12     A.  Drew DiMeo and Ruth disagreed with that.
13     Q.  When did you learn that there was a
14  disagreement between Ruth and Drew DiMeo?
15     A.  When I met with Drew in April of 2014.
16     Q.  This, again, was after Miss Briggs was
17  no longer employed at Temple?
18     A.  Yes.
19     Q.  How many times did you meet with or
20  speak with Drew about Ruth Briggs in April of
21  2014?
22     A.  Just once, I think.
23     Q.  In person or over the phone?
24     A.  In person.

Page 40

1      Q.  Approximately how long was that, do you
2  know?
3      A.  At least a half an hour.  Maybe as long
4  as an hour.
5      Q.  And did you inform Mr. DiMeo that you
6  were doing an investigation?
7      A.  Yes.
8      Q.  Had you ever interacted with Drew DiMeo
9  prior to that date?
10     A.  No, that was my first occasion to meet
11  Drew.
12     Q.  And did you explain to him that you
13  worked in the EOC office?
14     A.  Yes.
15     Q.  Did you inform Drew that Ruth Briggs had
16  raised a complaint about Dr. Wu?
17     A.  Yes.
18     Q.  Did he express to you that he was
19  already aware that Ruth Briggs had raised a
20  complaint about Dr. Wu?
21     A.  I don't recall that.
22         MR. MUNSHI: This is P-33.
23         (P-33 was marked for
24  identification.)

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 41

BY MR. MUNSHI:

1  BY MR. MUNSHI:
2   Q.  So P-33 in front of you is an e-mail
3  sent to Miss Walton and Mr. Brunner within a
4  couple of days after you met with her; right?
5        MS. SATINSKY: Objection to form.
6        THE WITNESS: As I recall, the
7  meeting was on July 30th, so we asked -- my
8  communication would have been within a few days
9  after that meeting.
10  BY MR. MUNSHI:
11   Q.  Your subject line in your e-mail
12  is "Employee Complaint."  Do you see that?
13   A.  Uh-huh.
14   Q.  Just verbalize, please.
15   A.  Yes, I see that.
16   Q.  So did you understand leaving the
17  meeting on July 30th at 2012 that Miss Briggs
18  was raising a complaint with you?
19        MS. SATINSKY: Objection to form.
20        THE WITNESS: That's a pretty
21  typical heading for me.  Student complaint,
22  employee complaint, sometimes I use the
23  word "concern."
24        Ruth had come and done some

Page 42

1  complaining about her salary and her work
2  situation.  I asked if HR had a history as well
3  on these concerns.
4  BY MR. MUNSHI:
5   Q.  Which concerns?
6   A.  Salary, principally.
7   Q.  There is nothing about salary in this
8  e-mail, is there?
9   A.  No.
10   Q.  Is there another e-mail that you sent to
11  them where you specifically asked about
12  information on salary?
13   A.  No.  It was simply an overture to talk
14  with me.  I asked Deirdre about salary.  I
15  asked, I believe I asked Eric about her
16  performance evaluations.
17   Q.  Performance evaluations is another thing
18  you discussed with Ruth Briggs on July 30th,
19  2012; correct?
20   A.  I'm not perfectly clear.  I think at
21  some point, and it was probably the July 30th
22  meeting, Ruth referred to her performance
23  evaluations -- I don't remember what she said
24  specifically, but about her performance

Page 43

1  evaluations.  But that would have been why I
2  called or reached out to Eric Brunner.
3   Q.  And your subsequent conversation with
4  Miss Walton, did you talk about anything else
5  besides salary?
6   A.  I don't think so.  Salary is what I
7  remember discussing, that would be true.
8   Q.  Did you ask her about the comments that
9  Dr. Wu said about China and women?
10   A.  I don't think so.  That would have been
11  an issue for my office if that was -- if it was
12  a matter for investigating, it would have been
13  my office, not human resources.
14   Q.  Did you have an understanding as to
15  whether or not Miss Walton already knew about
16  that allegation?
17   A.  No recollection that she did.
18   Q.  Did you ever discuss that allegation
19  with Miss Walton?
20   A.  I don't remember doing that.
21   Q.  Why didn't you ask Dr. Wu at that time
22  if he said that comment?
23   A.  I'm sorry.
24   Q.  At that time that you learned about the

Page 44

1  comment from Ruth Briggs, why didn't you reach
2  out to Dr. Wu and say, "Did you say this?"
3        MS. SATINSKY: Objection to form.
4        THE WITNESS: If I'm keeping the
5  timeline straight in my own head, she sent this
6  July 30th, but she did not say, "I want you to
7  investigate."
8  BY MR. MUNSHI:
9   Q.  This is a document that had been
10  previously marked as P-8.  It doesn't have a
11  sticker on it, so the same thing we did before,
12  if we could just throw a P-8 on there.
13        Before we get there, in your
14  conversation with Miss Walton, did she inform
15  you that she had been in contact with Ruth
16  Briggs about any workplace issues?
17   A.  My best recollection is Ruth had
18  discussed her concern about salary with Deirdre.
19  That's all I recall hearing they discussed.
20   Q.  Ruth, when she was having her
21  conversation with you about salary, was she
22  blaming that on Dr. Wu specifically or anybody
23  in particular?
24   A.  I don't remember that she was laying it

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 45

1  at any particular individual's door.
2      Q.  But certainly within your meeting on
3  July 30th, putting aside allegations about
4  salary, you did understand that Miss Briggs was
5  raising a concern or a complaint with you
6  specifically about Dr. Wu; right?
7      A.  Yes.
8      Q.  And then did you ever ask Miss Walton if
9  she also had communications with Ruth Briggs
10  about Dr. Wu specifically?
11      A.  I don't recall doing that.
12      Q.  Do you recall asking Miss Walton if she
13  had any communications with Greg Wacker about
14  the relationship between Miss Briggs and Dr. Wu?
15      A.  You're asking about Deirdre's
16  conversation with Greg?
17      Q.  Current.
18      A.  Did they have any?
19          I don't remember asking.
20      Q.  Well, did you have an understanding that
21  those conversations were happening?
22      A.  I don't remember Deirdre saying yes, I
23  have been talking to Greg Wacker.  I don't
24  remember if she did that.

Page 46

1      Q.  As part of your early investigation in
2  April of 2014, did you ever speak with Greg
3  Wacker?
4          MS. SATINSKY: Prior to May 6th?
5          MR. MUNSHI: I specifically said
6  April 2014.
7          THE WITNESS: April 2014, the orders
8  I recall was Dr. Wu first, then Drew DiMeo and
9  then Greg Wacker all in a fairly short period of
10  time.  I'm thinking it was before May 6th.
11  BY MR. MUNSHI:
12      Q.  What do you recall discussing with Greg
13  Wacker in April or before May 6th?
14          MS. SATINSKY: Can we go off the
15  record?
16          MR. MUNSHI: Yes.
17          (A discussion was held off the
18  record.)
19  BY MR. MUNSHI:
20      Q.  In front of you is a document that has
21  been marked as P-8.
22          Did you get a chance to review that
23  one?
24      A.  Yes.

Page 47

1      Q.  The e-mail on the bottom is dated
2  September 9th, 2012, from Ruth Briggs to you.
3          Do you see that?
4      A.  Yes.
5      Q.  The third to last paragraph in her
6  e-mail to you states, it starts with, "Regarding
7  our discussion related to Dr. Wu's comments
8  about my age."
9          Do you see that?
10      A.  Yes.
11      Q.  Are there any other comments that Ruth
12  Briggs made to you regarding her age?
13      A.  No.
14      Q.  When Ruth Briggs relayed that comment
15  that Dr. Wu said, did you understand from her
16  that she thought it was age related?
17          MS. SATINSKY: Objection to form.
18          THE WITNESS: It was age related.
19  What I didn't know when Ruth was relating it to
20  me was how it related to her age.  I didn't know
21  how old Ruth was.
22  BY MR. MUNSHI:
23      Q.  She says here comments about "my age."
24          Do you see that she wrote that?

Page 48

1      A.  Yes.
2      Q.  So as of this date, September 9th, 2012,
3  did you understand that she interpreted Dr. Wu's
4  comment to be about her age?
5          MS. SATINSKY: Objection to form.
6          THE WITNESS: At this time I knew
7  her report of the original comment, women in
8  China.  So, no, I don't think I drew a
9  conclusion that he was commenting about her age.
10  I didn't know Dr. Wu's age at the time.
11  BY MR. MUNSHI:
12      Q.  Why is Dr. Wu's age relevant?
13      A.  Context, I think, is always important to
14  a complaint investigation, although I hadn't
15  launched one at this time.
16      Q.  As of this period we are looking at,
17  which is still 2012, did Ruth Briggs express to
18  you that Dr. Wu did anything to exhibit age bias
19  towards her?
20      A.  Please repeat the question.
21      Q.  Sure.  During this period in 2012, did
22  Ruth Briggs express to you that Dr. Wu had
23  exhibited age bias towards her?
24      A.  No.

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 49

1    MR. MUNSHI: This is P-34.
2    (P-34 was marked for
3 identification.)
4 BY MR. MUNSHI:
5    Q. I will give you a moment to review.
6    A. (Pause.)
7    Okay.
8    Q. So the e-mail here from you to
9 Miss Briggs dated November 5th, 2012, directing
10 your attention to the middle of the first
11 paragraph, you write here, "If you are now
12 authorizing action, will you please respond to
13 my request of August 30, 2012, for a written
14 statement setting out the particular instances
15 of bullying, threats of dismissal, and
16 expressions of age bias by Dr. Wu and/or
17 Mr. Wacker."
18    Do you see that?
19    A. Yes.
20    Q. The phrase in your own e-mail is
21 "expressions of age bias by Dr. Wu and/or
22 Mr. Wacker."
23    Why did you write that?
24    A. Are you asking about expressions of age

Page 50

1 bias plural or are you asking about the whole
2 sentence?
3    Q. I will ask you a better question.
4    What information and what did you
5 know at that time that led you to now ask Ruth
6 Briggs for particular instances of expressions
7 of age bias?
8    A. When I wrote this, I had only Ruth
9 Briggs' concerns, reports, complaints to me, and
10 they were divergent, varying, kind of all over
11 the place. And I was asking Ruth if she was now
12 wanting me to investigate her concerns, to
13 please be specific.
14    Q. But at the very least, we know from your
15 July 30th, 2012, meeting, that the concept of
16 filing an age discrimination complaint was
17 discussed with her; correct?
18    MS. SATINSKY: Objection to form.
19    THE WITNESS: As I recall from my
20 earlier notes, which we reviewed today, I asked
21 Ruth was she complaining of age bias.
22    Again, it was difficult to -- Ruth
23 tended not to be specific. She related one
24 concern and then another concern without being

Page 51

1 very specific. So I finally said, "Please,
2 Ruth, be specific."
3 BY MR. MUNSHI:
4    Q. When you did have the discussion about
5 filing an age discrimination complaint, she
6 responded that she was scared; right?
7    MS. SATINSKY: Objection to form.
8 Misstates testimony.
9    THE WITNESS: I think we've gone
10 over my notes. She said she was scared. I said
11 -- I would likely have said, why, which
12 related -- she related further.
13    And I think in that, in my notes,
14 she responded -- let me check -- she responded
15 mostly about Greg Wacker, which was then
16 puzzling in November of 2012 because she wasn't
17 being supervised by Greg Wacker.
18 BY MR. MUNSHI:
19    Q. Did you have an understanding back then
20 as to what Greg Wacker's relationship to Ruth
21 Briggs was?
22    A. Their relationship when?
23    Q. November 2012. Workplace relationship.
24    A. Her direct supervisor was Dr. Wu.

Page 52

1    Ruth wouldn't have been supervised
2 by Greg Wacker in 2012 when she was reporting to
3 the department chair, Dr. Wu.
4    Q. Did you ever find out if they had an
5 indirect working relationship back then?
6    A. Indirect how? What kind of indirect
7 work relationship?
8    Q. That he had any sort of supervisory
9 duties over her as a staff member within that
10 department?
11    A. I don't recall learning that he had
12 such. I don't think he did. I didn't hear of
13 it.
14    Q. You also write here, "particular
15 instances of bullying."
16    So was that a phrase that she had
17 used with you about bullying?
18    A. My recollection is that she called Greg
19 a bully. And she didn't -- it was in reference
20 not to herself so much, but to Judy Lennon,
21 secretary in the office, who was supposedly
22 bullied by Greg Wacker.
23    Q. You conclude in this e-mail here
24 advising her that complaints of unlawful

Page 53

1   discrimination may be made to government
2   compliance agencies, as well as to this office,
3   meaning the EOC office; right?
4   A. Yes.
5   Q. And then you attached her information
6   regarding the agency?
7   A. Yes.
8   Q. So at this point, November of 2012, you
9   had an understanding at the very least that it
10  is a possibility that she is going to file an
11  age discrimination complaint; right?
12      MS. SATINSKY: Objection to form.
13      THE WITNESS: I don't think I would
14  have necessarily drawn that conclusion.  It's
15  been my experience that I have had individuals
16  come and complain and complain and complain over
17  and over again, and they never do file a formal
18  complaint with EOC.
19      Is it a possibility?  It's a
20  possibility.
21  BY MR. MUNSHI:
22  Q. Did she ask for this information that
23  you sent to her, or did you send it on your own?
24  A. It's a practice of my office to send it.

Page 54

1   Q. When?
2   A. I'm sorry?
3   Q. It is a practice when, upon what
4   happening would you do that?
5   A. When an individual first comes to talk
6   with me, I may hand over the list.  Sometimes
7   it's a follow-up e-mail.
8       Every -- we try to remember to
9   provide it to every individual who comes to EOC
10  so that they know they have recourse beyond the
11  university.
12      MR. MUNSHI: Let's have this marked
13  as P-35, please.
14      (P-35 was marked for
15  identification.)
16      THE WITNESS: Okay.
17  BY MR. MUNSHI:
18  Q. So this e-mail chain is in February of
19  2013.  Do you see that?
20  A. Yes.
21  Q. So it is approximately six months after
22  you met with her in July of 2012; right?
23  A. Yes.
24  Q. So Ruth reaches out to you on

Page 55

1   February 8th with an e-mail, "Subject:  Urgent."
2   She starts by saying, "Sandy, I am so bullied
3   and harassed all day."
4       Do you see that?
5   A. Yes.
6   Q. She goes on to the next page, the last
7   sentence of the paragraph on the second page
8   says, "No other staff member is required to meet
9   daily for a dose of public humiliation and my
10  request to move the meetings to a private
11  location was flat out denied.  When I asked for
12  clarification on an assignment, it is reported
13  to the dean's office as a challenge to his
14  authority.  If he can have someone there to
15  protect his interests, there is more than an
16  element of unfairness.  It is beginning to feel
17  like psychological abuse."  And then she goes
18  on.
19      You then respond to this e-mail;
20  right?
21  A. Yes, I did.
22  Q. And you tell Ruth that this is an issue
23  for human resources first; right?
24  A. Yes.

Page 56

1   Q. And by "human resources first," what did
2   you mean?
3   A. Address it to Deirdre Walton in labor
4   and employee relations.
5   Q. And then you write to Deirdre up top on
6   P-35, you say, "Deirdre, I don't see a claim of
7   unlawful discrimination/harassment in Ruth
8   Briggs' message."
9       Do you see that?
10  A. Yes.
11  Q. The first line of Ruth's e-mail to you
12  is, "I am so bullied and harassed all day."
13      Do you see that?
14  A. I do.
15  Q. And approximately six months earlier she
16  had a conversation, she had a meeting with you
17  where there was a discussion about filing an age
18  discrimination complaint; correct?
19      MS. SATINSKY: Objection to form.
20      THE WITNESS: I asked Ruth was she
21  talking about age discrimination.  She never did
22  get around to supplying particulars and telling
23  me yes, it's age discrimination, I want you to
24  investigate.

Page 57

BY MR. MUNSHI:
1   Q. I understand that she didn't say those
2  specific words, but we already saw the e-mail
3  where she makes another reference to remarks by
4  Dr. Wu about my age.
5   A. The one remark that I remember.
6   Q. So at this point, you already have met
7  with Ruth Briggs, there has already been a
8  discussion where she relayed a comment to you
9  about women in China.  She has already sent you
10  an e-mail again referencing a comment about age.
11  And now she's coming back to you saying she's
12  bullied and harassed all day.  Again, she's
13  referencing my direct supervisor, who you
14  understood to be Dr. Wu; right?
15      MS. SATINSKY: Objection to form.
16      THE WITNESS: Dr. Wu was her direct
17  supervisor.
18  BY MR. MUNSHI:
19   Q. So what led you to conclude that you
20  don't see a claim of unlawful
21  discrimination/harassment in light of all these
22  events that have taken place within the previous
23  six months?

Page 58

1      MS. SATINSKY: Objection to form.
2      THE WITNESS: Ruth, except when she
3  compared herself with the young employee who was
4  not disciplined as Ruth claimed for similar
5  practice, never said to me, I'm being treated
6  differently because of my age or my gender or my
7  national origin or my religion.  Nor did she
8  point to anyone else and say, see, he or she is
9  doing precisely what I'm doing and is just
10  getting along swimmingly.  Ruth never made that
11  case to me.
12      And what she's doing here in her
13  memo or e-mail of February 8th is laying out for
14  me a very recognizable issue of clashing
15  supervisor and employee, and that goes first to
16  human resources to try and resolve.
17  BY MR. MUNSHI:
18   Q. This idea of comparing herself to
19  somebody else who is not of her protected
20  characteristic, in your experience in doing the
21  work that you do at Temple, is that a
22  requirement in order for you to do anything?
23   A. I wouldn't call it a requirement, but it
24  is usually the first thing that a complainant

Page 59

1  does.  Says, "I did this and I was lambasted for
2  it and so and so did exactly the same thing and
3  they are not.  In my category, they just
4  skated."
5   Q. That's a series of facts that happens
6  sometimes but not all the time?
7   A. Regularly they happen that way.
8   Q. Notwithstanding, she even writes in here
9  like I just read, "No other staff member is
10  required to meet daily for a dose of public
11  humiliation."  So she is talking about how she
12  is being treated differently than other people?
13      MS. SATINSKY: Objection to form.
14      THE WITNESS: That's what Ruth said.
15  Is that what was happening?  Or were there at
16  least two other sides of the circumstance?  Was
17  this hyperbole on Ruth's part?  Ruth hadn't told
18  me to investigate.
19      But she had access to someone in
20  human resources who could address issues of
21  conflict between employee and supervisor.
22  BY MR. MUNSHI:
23   Q. This two sides of the story that you
24  just said, did you ever look into whether there

Page 60

1  was another side to the story in February of
2  2013?
3   A. Not in February 2013.  In April of 2014
4  when Ruth said investigate, I did.
5   Q. So at this point, you only had Ruth's
6  side of the story; right?
7      MS. SATINSKY: Objection to form.
8      THE WITNESS: I had Ruth's several
9  sides of what was going on with Ruth since her
10  story moved in several different directions over
11  time.  Which is why I asked her to please put a
12  statement in writing to me, which she never did.
13  BY MR. MUNSHI:
14   Q. Her story that Dr. Wu, her direct
15  supervisor, had made a comment to her about age
16  and women in China, did that ever change?
17      MS. SATINSKY: Objection to form.
18      THE WITNESS: Basically, no.
19  BY MR. MUNSHI:
20   Q. Did she ever come to you and say,
21  "Actually, Sandy, I made it up"?
22      MS. SATINSKY: Objection to form.
23      THE WITNESS: Ruth never withdrew
24  that remark that she attributed to Dr. Wu.

Page 61

1  BY MR. MUNSHI:
2      Q.  You end your e-mail to Deirdre by
3  saying, "Please let me or Tracy know if a
4  complaint for EOC is raised with you."
5          Do you see that?
6      A.  Yes.
7      Q.  Didn't Ruth Briggs already raise a
8  complaint for EOC with you?
9          MS. SATINSKY:  Objection to form.
10  Asked and answered.
11          You can answer the question.
12          THE WITNESS:  She raised a number of
13  concerns by example, but she did not say "I'm
14  being discriminated against because of my age,
15  please conduct a formal investigation."
16  BY MR. MUNSHI:
17      Q.  Subsequent to 2013, did you have a
18  conversation with her about filing a complaint
19  with the EEOC?
20      A.  I remember two things about Ruth's
21  filing a complaint with the EEOC.  One that I,
22  as is practice of my office, let her know that
23  she could.  And two, in some communication she
24  said she had reached out to EEOC.

Page 62

1      Q.  This was a document that was previously
2  marked as P-28, but we're going to have to put
3  another sticker on it.
4      A.  (Pause.)
5          Okay.
6      Q.  The e-mail from Ruth to you is dated
7  February 25th, 2014.  The subject line, "I want
8  to schedule an appointment to file a complaint."
9          Do you see that e-mail?
10      A.  Yes.
11      Q.  The last sentence of her first paragraph
12  to you is, "I plan to file an EEOC complaint
13  internally and have already had a phone intake
14  with the EEOC."
15          Do you see that?
16      A.  Yes.
17      Q.  And did you understand that to mean the
18  EEOC outside of Temple, meaning the government?
19      A.  Yes.
20      Q.  You then forward this e-mail over to
21  Deirdre and Tracy Hamilton; right?
22      A.  Yes.
23      Q.  Did you talk to anybody or communicate
24  to anybody besides Deirdre and Tracy Hamilton

Page 63

1  about Ruth Briggs having a phone intake with the
2  EEOC?
3      A.  I did not.
4      Q.  Did you talk to Deirdre about any recent
5  issues that may have existed?
6      A.  I don't remember.
7      Q.  Do you recall any discussions with
8  Deirdre in this February/March 2014 time period
9  about Ruth Briggs?
10      A.  I don't remember any conversations.
11      Q.  This is P-30, which we marked this
12  morning.  Here is P-30.
13      A.  (Pause.)
14          Okay.
15          Okay.
16      Q.  So the top e-mail in P-30 is Deirdre
17  forwarding to you an e-mail chain; right?
18      A.  Yes.
19      Q.  And the front page of P-30, there is an
20  e-mail from Ruth to Deirdre dated March 25th,
21  2014.  Middle of the first paragraph, she
22  writes, "All I want is to continue to work
23  without being harassed."
24          Do you see that?

Page 64

1      A.  Yes.
2      Q.  And then Deirdre sends this to you and
3  says, "FYI and for discussion."
4          Did you have a discussion with
5  Deirdre about this?
6      A.  I don't remember discussing these with
7  Deirdre.
8      Q.  At any point did Deirdre inform you that
9  she was looking into Ruth's complaints?
10      A.  The only conversation I remember with
11  Deirdre about Ruth's complaints was a salary
12  issue and how she would go about raising that.
13  So that's the only one I remember having a
14  conversation.
15      Q.  And that was back in 2012, the salary
16  issue?
17      A.  Yes, I think so.
18      Q.  Did Deirdre ever inform you that she was
19  having Greg Wacker or Drew DiMeo look into any
20  concerns or complaints by Ruth Briggs?
21      A.  I don't remember that she did.
22      Q.  Did she ever inform you that she was
23  speaking with Dr. Wu about Ruth Briggs'
24  complaints or concerns?

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 65

1    A.  No.
2    Q.  Did she ever inform you that Greg Wacker
3  and Drew DiMeo were speaking with Dr. Wu and
4  then reporting back to her about Ruth's
5  complaints?
6    A.  No.
7    Q.  And then you met with Ruth Briggs in
8  April of 2014; correct?
9    A.  Yes.
10         MR. MUNSHI: Let's have this marked
11  as P-36.
12         (P-36 was marked for
13  identification.)
14         THE WITNESS: (Pause.)
15         Okay.
16  BY MR. MUNSHI:
17    Q.  P-36, are these your handwritten notes?
18    A.  They are.
19    Q.  Are these your notes from your meeting
20  with Ruth Briggs on April 1st, 2014?
21    A.  Yes.
22    Q.  Under the heading which says "Mtg with
23  Ruth Briggs," it appears the word right
24  underneath it is "age."

Page 66

1         Do you see that?
2    A.  Yes.
3    Q.  Why did you write that?
4    A.  This is the meeting at which Ruth said
5  investigate my complaint, and I would have made
6  sure I knew the grounds for the complaint, and
7  she said age.
8    Q.  Did you discuss an intake questionnaire
9  that she filed with the EEOC and that point?
10    A.  Never reviewed the intake questionnaire
11  with Ruth that I recall.
12    Q.  Did you discuss her going to the EEOC
13  during this meeting?
14    A.  I don't remember whether she brought it
15  up.  I didn't.
16    Q.  This meeting took place, obviously,
17  before her employment was terminated; correct?
18         MS. SATINSKY: Objection to form.
19         THE WITNESS: I didn't know about, I
20  don't think Ruth knew about her termination when
21  we met.  That came afterward, and I don't even
22  remember exactly when I learned.  Maybe she told
23  me that she had been terminated that day.
24  BY MR. MUNSHI:

Page 67

1    Q.  You did understand that she was
2  terminated later that day?
3    A.  I don't remember.  I remember Ruth told
4  me she had been terminated.  I think that was
5  how I learned that she had been terminated.
6    Q.  But that wasn't during this meeting?
7    A.  No.
8    Q.  During this meeting, was there any
9  discussion from her about whether she thought
10  her termination was imminent?
11    A.  I don't recall that she expressed a
12  concern that she was imminent -- that her job
13  was in jeopardy at that point in time.
14    Q.  And at this point in time, April 1st,
15  2014, had you had any conversations with anybody
16  about the potential for Ruth Briggs being
17  terminated?
18    A.  No.
19    Q.  During this period of early 2014, let's
20  say January 1 to April 1, 2014, did you have a
21  conversation with anybody about Ruth Briggs
22  besides Deirdre Walton?
23    A.  I don't recall talking with anyone but
24  Deirdre.

Page 68

1    Q.  During this meeting, did Miss Briggs
2  expressly ask you to investigate her complaint?
3    A.  That's my recollection, yes.
4    Q.  And did she give you any more
5  information as to the basis of her complaint
6  that she wanted you to investigate?
7         MS. SATINSKY: Objection.  Asked and
8  answered.
9         You can answer the question.
10         THE WITNESS: We were, our
11  conversation, there was agreement it was an age
12  discrimination complaint.  If there was anything
13  new, it might have been some of the specific --
14  this was probably the first time she had
15  introduced Hailey King as a comparator.  The
16  only comparator she ever gave me.
17         MR. MUNSHI: Let's have this marked
18  as P-37, please.
19         (P-37 was marked for
20  identification.)
21         THE WITNESS: (Pause.)
22         Okay.
23  BY MR. MUNSHI:
24    Q.  Are these your notes from April 4th,

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 69

1  2014, from your meeting with Dr. Wu?
2  A. Yes.
3  Q. Was it during this meeting where you had
4  a conversation with him about whether he made a
5  comment regarding women in China?
6  A. I think so.
7  Q. Is there anything in your notes about
8  that?
9  A. No.
10  Q. Did you ask Dr. Wu if he had ever
11  exhibited any sort of age bias towards Ruth
12  Briggs during this meeting?
13  A. Even though it's not noted here, I did
14  ask him about the comment because what he said
15  to me -- oh, I can't answer that.
16  Q. Well, if it took place during this
17  meeting, then you can tell me what Dr. Wu said
18  to you.
19  A. Yes.
20      MS. SATINSKY: If it took place
21  during this meeting and it didn't concern Dr. Wu
22  relaying information he told you he learned
23  through counsel, then you can testify about it.
24      THE WITNESS: Okay.

Page 70

1      What he said to me about the remark
2  was that he had regular discussions with staff,
3  not Ruth only, but with staff, about cultural
4  difference, China, the United States.
5  Difficulties or differences in languages that
6  created some difficulties.
7      He said his observation about women
8  working in China, not beyond age 55, was an
9  observation made to Ruth and/or others. And
10  that it was not meant to be upsetting to Ruth
11  Briggs.
12  BY MR. MUNSHI:
13  Q. Did you ask him if he ever did bully or
14  threaten Ruth Briggs?
15  A. I believe he answered that question. In
16  my notes it said he never had any intention to
17  terminate her employment, and my recollection in
18  going over the materials today is that when she
19  talked to me, the bullying was a charge that she
20  made -- she laid at Greg Wacker's door. The
21  clearest example that she gave with regard to
22  Greg Wacker was what she called bullying of the
23  department secretary, not of herself.
24  Q. When you met with Ruth Briggs on

Page 71

1  April 1st, 2014, and she asked you to
2  investigate a complaint, did she ask you to
3  investigate Dr. Wu, Greg Wacker, both?
4  A. We agreed that I would investigate her
5  age discrimination complaint.
6      Was I investigating -- I was
7  investigating then whatever Ruth had said to me
8  about largely Dr. Wu. Greg did not appear to be
9  directly involved with her supervision at the
10  time. But what Ruth told me was what I worked
11  from in investigating her complaint.
12  Q. But you didn't meet with Greg Wacker in
13  April of 2014; correct?
14  A. I met with him some time after I met
15  with Dr. Wu.
16  Q. On the second page of your notes here in
17  P-37, the third paragraph in, you write, "She
18  never raised a concern about her treatment to
19  Dr. Wu, he said, and there was no intention on
20  his part to dismiss her."
21      So Dr. Wu says to you Miss Briggs
22  never raised a concern about what?
23  A. She never said to Dr. Wu, you're
24  mistreating me or never said you're

Page 72

1  discriminating against me, or never said I don't
2  like having duties removed. He said she never
3  raised the concern to him.
4  Q. Did you ask Dr. Wu if Ruth Briggs did
5  respond to his comment about women in China with
6  words to the effect of, "We're in the United
7  States, not China"?
8  A. I don't remember. He did say to me we
9  were discussing -- I raised and we discussed
10  cultural differences.
11  Q. Did you ask Dr. Wu to provide you any
12  sort of documentation?
13  A. I would have asked him in the course of
14  our conversation if he kept notes, kept
15  correspondence. And having done so, I would
16  have asked for copies.
17      I did ask him if he did the annual
18  evaluations, the PDP's. He said yes. I did
19  look at those.
20  Q. Prior to May 26th, 2014, did you see any
21  e-mails from Ruth Briggs to Dr. Wu where she
22  claimed to be treated unfairly?
23  A. From Ruth to Dr. Wu?  I don't remember
24  seeing e-mails like that.

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

Page 73

1  Q. Prior to May 2014, did you see any
2  e-mails from Ruth to Greg Wacker stating that
3  Dr. Wu was not treating her fairly?
4  A. I don't remember e-mails from Ruth to
5  Greg Wacker.
6  Q. Prior to May 2014, did you see any
7  e-mails from Ruth Briggs to Deirdre Walton where
8  she says she is being treated unfairly by
9  Dr. Wu?
10  A. You showed me and I received from
11  Deirdre on March 25th, 2014, Ruth's
12  communications to Deirdre.
13  Q. Prior to May 2014, did you go to Deirdre
14  and ask her for additional documentation as part
15  of your investigation?
16  A. No.
17  Q. Why not?
18  A. I'm trying to think whether I ever asked
19  Deirdre for correspondence. Usually not. We
20  work independently. Deirdre would have been
21  addressing any performance issues in conflict
22  between supervisor and employee. I would have
23  been responsible for complaints of unlawful
24  discrimination. Deirdre hadn't referred any

Page 74

1  complaints from Ruth about discrimination to me.
2  So my firsthand resources would have
3  been Dr. Wu, Mr. DiMeo and Greg Wacker, not
4  Deirdre.
5  Q. Did Deirdre ever inform you that Ruth
6  Briggs had complained about a hostile work
7  environment to her?
8  MS. SATINSKY: Objection to form.
9  THE WITNESS: Please repeat the
10  question.
11  BY MR. MUNSHI:
12  Q. A very simple question.
13  Did Deirdre Walton ever inform you
14  that Ruth Briggs had raised any complaints of
15  hostile work environment to her?
16  MS. SATINSKY: Objection to form.
17  BY MR. MUNSHI:
18  Q. Do you understand my question?
19  A. I think so.
20  I don't think Deirdre ever used that
21  expression to me in conversation about Ruth.
22  Q. Is that something you would want to know
23  if you are doing an investigation?
24  MS. SATINSKY: Objection to form.

Page 75

1  THE WITNESS: Yes, but Deirdre would
2  not have been the one who created the hostile
3  work environment. I would have gone to the
4  source, Dr. Wu, Drew DiMeo, Greg Wacker.
5  BY MR. MUNSHI:
6  Q. Did you ever ask Dr. Wu during that
7  meeting on April 2014 if he did in fact raise
8  his voice and yell at Ruth Briggs?
9  A. What I remember is learning that Dr. Wu
10  was said to have raised his voice with others,
11  including his doctoral students. Ruth might
12  have been the source of that information.
13  That's the information I remember, that he
14  raised his voice with others.
15  Q. Do you also recall her saying that she
16  felt publicly demeaned by him?
17  A. She did not say that to me when we were
18  conversing. I saw it in the e-mail
19  communication.
20  Q. I am sorry. It looked like you were
21  still thinking.
22  A. I am done.
23  Q. Did you ever ask Dr. Wu if he did in
24  fact publicly humiliate Ruth Briggs?

Page 76

1  A. If she hadn't said that to me directly,
2  probably not.
3  Q. Well, we can look at P-32, which is your
4  notes, the first set of notes that we looked at.
5  A. First set of notes? The handwritten
6  notes?
7  Q. It is right in your right hand on the
8  bottom there.
9  A. Okay.
10  Q. The first thing you wrote under
11  "Problems" was, "Dr. Wu yells and says demeaning
12  things, e.g., 'Are you stupid?'"
13  So did you ask Dr. Wu if he said
14  demeaning things to Ruth Briggs?
15  A. I don't remember whether I did or not,
16  but again, I remember being told maybe by Ruth
17  also that he -- this was behavior that was not
18  directed solely at Ruth, which is one more
19  reason why human resources was the first line of
20  defense, because human resources helps manage
21  managers.
22  MR. MUNSHI: I have no further
23  questions, Miss Foehl. Thank you for being
24  here.

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

---

Page 77

```
 1            MS. SATINSKY: I don't have any
 2   questions.  The witness reserves the right to
 3   read and sign.
 4            (Witness excused.)
 5               -  -  -
 6            (The deposition concluded at
 7   3:41 p.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 78

```
 1            I N D E X
 2   DEPONENT:  SANDRA A. FOEHL            PAGE
 3      Examination by Mr. Munshi          2
 4            E X H I B I T S
 5   FOEHL DEPOSITION EXHIBITS          MARKED
 6   P-31  E-mail string, TEMPLE UNIVERSITY   18
            (R. BRIGGS) - 0000210 - 0000211
 7
     P-32  Handwritten notes, "Meeting        28
 8         requested by Ruth Briggs,
           7/30/2012," three pages
 9
     P-33  E-mail, TEMPLE UNIVERSITY          40
10         (R. BRIGGS) - 0000052
11   P-34  E-mail string, TEMPLE UNIVERSITY   49
           (R. BRIGGS) - 0000199
12
     P-35  E-mail string, TEMPLE UNIVERSITY   54
13         (R. BRIGGS) - 0000116 - 0000117
14   P-36  Handwritten notes, "Meeting with   65
           Ruth Briggs, 4/1/2014," one page
15
     P-37  Discrimination Case Worksheet,     68
16         two pages
17   PREVIOUSLY MARKED DEPOSITION EXHIBITS
18   P-8   Page 44
19   P-28  Page 62
20
21
22
23
24
```

---

Page 79

```
 1
 2       WITNESS SIGNATURE/CERTIFICATION PAGE
 3
 4            I have read the foregoing transcript
 5   of my deposition given on Friday, June 30, 2017,
 6   and it is true, correct and complete, to the
 7   best of my knowledge, recollection and belief,
 8   except for the list of corrections, if any,
 9   attached on a separate sheet herewith.
10
11
12
13
14
15
16   _____        _____
17   DATE            SANDRA A. FOEHL
18
19
20
21
22
23
24
```

---

Page 80

```
 1
 2
 3
 4            I HEREBY CERTIFY that the
 5   proceedings, evidence and objections are
 6   contained fully and accurately in the
 7   stenographic notes taken by me upon the
 8   foregoing matter on Friday, June 30, 2017, and
 9   that this is a true and correct transcript of
10   same.
11
12
13
14
15
16       Terry Barbano Burke, RMR-CRR
17
18
19            (The foregoing certification
20   of this transcript does not apply to any
21   reproduction of the same by any means, unless
22   under the direct control and/or supervision of
23   the certifying reporter.)
24
```

---

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

# A

**absent** (1) 26:9
**abuse** (1) 55:17
**access** (1) 59:19
**accommodation** (1) 18:3
**Act** (3) 7:12,15;10:15
**action** (4) 6:7,8;7:1; 49:12
**actually** (2) 17:17; 60:21
**additional** (1) 73:21
**address** (3) 38:21;56:3; 59:20
**addressing** (1) 73:21
**administrator** (1) 15:1
**advising** (1) 52:24
**affirmative** (3) 6:7,8;7:1
**afraid** (1) 34:23
**afterward** (1) 66:21
**again** (7) 27:8;39:16; 50:22;53:17;57:11,13; 76:16
**against** (3) 21:20; 61:14;72:1
**Age** (43) 7:14;12:5,15; 20:3;30:10,13;35:3,17, 23;47:8,12,16,18,20, 23;48:4,9,10,12,18,23; 49:16,21,24;50:7,16, 21;51:5;53:11;56:17, 21,23;57:5,11;58:6; 60:15;61:14;65:24; 66:7;68:11;69:11;70:8; 71:5
**agencies** (1) 53:2
**agency** (2) 17:12;53:6
**ago** (1) 3:15
**agreed** (1) 71:4
**agreement** (1) 68:11
**ahead** (2) 4:16;18:20
**allegation** (2) 43:16,18
**allegations** (5) 31:14, 15,23;33:13;45:3
**allege** (1) 7:23
**along** (1) 58:10
**although** (1) 48:14
**always** (1) 48:13
**and/or** (3) 49:16,21; 70:9
**annual** (1) 72:17
**answered** (6) 20:9,18; 36:1;61:10;68:8;70:15
**anti-retaliation** (1) 36:18
**appear** (1) 71:8
**appears** (1) 65:23
**appointment** (1) 62:8
**appreciate** (1) 22:21
**appropriately** (1) 9:10
**approved** (3) 21:17,21;

22:1
**Approximately** (6) 3:5; 29:11;37:8;40:1;54:21; 56:15
**April** (22) 8:9;25:2; 26:14;30:19;32:4,5; 33:18;39:15,20;46:2,6, 7,13;60:3;65:8,20; 67:14,20;68:24;71:1, 13;75:7
**apt** (1) 37:20
**around** (2) 29:9;56:22
**arriving** (1) 34:4
**Asian** (2) 14:19,20
**aside** (2) 30:15;45:3
**assault** (1) 10:23
**assigned** (1) 26:23
**assignment** (1) 55:12
**associate** (1) 27:1
**attached** (1) 53:5
**attempt** (1) 38:18
**attention** (2) 18:8;49:10
**attorney** (1) 6:10
**attorney-client** (1) 27:22
**attributed** (1) 60:24
**August** (1) 49:13
**authority** (1) 55:14
**authorizing** (1) 49:12
**aware** (2) 35:8;40:19
**away** (5) 22:5;31:18; 33:24;36:3,5

# B

**back** (7) 6:6;35:1; 51:19;52:5;57:12; 64:15;65:4
**background** (1) 6:16
**Basically** (1) 60:18
**basis** (2) 37:1;68:5
**beginning** (1) 55:16
**behavior** (1) 76:17
**besides** (5) 30:15;31:9; 43:5;62:24;67:22
**best** (8) 4:10;16:5; 17:10;18:2;27:15; 32:12;35:22;44:17
**better** (1) 3:23;50:3
**beyond** (4) 22:3;25:17; 54:10;70:8
**bias** (8) 48:18,23; 49:16,21;50:1,7,21; 69:11
**blaming** (1) 44:22
**boss** (1) 30:3
**both** (1) 71:3
**bottom** (2) 47:1;76:8
**break** (1) 4:15
**briefly** (1) 9:6
**Briggs** (91) 8:2,8,19; 11:16;12:13;13:1,16; 14:1,10,23;15:8,12,18, 22;16:12,15,21;17:5;

18:10;19:3,14,17;24:2, 10,17,22;25:3,7,11; 26:3,6,12;27:5,10; 28:23;29:12,19;30:15, 17;31:9,13;32:8,15,23; 33:2,13;35:8;38:17; 39:16,20;40:15,19; 41:17;42:18;44:1,16; 45:4,9,14;47:2,12,14; 48:17,22;49:9;50:6; 51:21;57:8;61:7;63:1, 9;64:20;65:7,20,23; 67:16,21;68:1;69:12; 70:11,14,24;71:21; 72:4,21;73:7;74:6,14; 75:8,24;76:14
**Briggs'** (11) 13:23; 24:20;25:1,5,11;27:12, 14,24;50:9;56:8;64:23
**brought** (2) 33:10; 66:14
**Brown** (4) 19:9,11,13; 26:16
**Brunner** (3) 25:19;41:3; 43:2
**bullied** (5) 34:11;52:22; 55:2;56:12;57:13
**bully** (2) 52:19;70:13
**bullying** (5) 49:15; 52:15,17;70:19,22
**buyer's** (1) 23:13

# C

**call** (2) 11:7;58:23
**called** (3) 43:2;52:18; 70:22
**came** (6) 8:21;11:22; 18:12;23:24;24:7; 66:21
**Cameron** (3) 27:8,16, 24
**can** (17) 4:10,16;10:7, 11,13;20:9;31:2;35:15; 38:8,9;46:14;55:14; 61:11;68:9;69:17,23; 76:3
**capability** (1) 38:10
**capacity** (2) 3:7;15:1
**case** (3) 14:2;26:9; 58:11
**cases** (1) 9:13
**category** (1) 59:3
**cc'd** (1) 19:11
**center** (2) 11:9,11
**certainly** (1) 45:2
**chain** (3) 18:23;54:18; 63:17
**chair** (1) 52:3
**challenge** (1) 55:13
**chance** (1) 46:22
**change** (1) 60:16
**characteristic** (1) 58:20

**charge** (1) 70:19
**check** (1) 51:14
**China** (18) 12:14;14:9, 15,19;20:3,7;30:9,13; 35:2;43:9;48:8;57:10; 60:16;69:5;70:4,8; 72:5,7
**circumstance** (1) 59:16
**civil** (4) 6:22;7:10,12,23
**claim** (3) 17:16;18:1; 56:6;57:21
**claimed** (2) 58:4;72:22
**claims** (3) 7:18,19,21
**clarification** (1) 55:12
**clashing** (1) 58:14
**clear** (1) 42:20
**clearest** (1) 70:21
**close** (1) 33:4
**coming** (2) 34:4;57:12
**comment** (19) 12:11, 18;13:9;20:5;30:13,14; 31:1,10;43:22;44:1; 47:14;48:4,7;57:9,11; 60:15;69:5,14;72:5
**commenting** (1) 48:9
**comments** (5) 12:3; 43:8;47:7,11,23
**common** (1) 30:2
**commonly** (1) 5:10
**commonplace** (1) 30:6
**communicate** (1) 62:23
**communicating** (1) 18:11
**communication** (4) 23:23;41:8;61:23; 75:19
**communications** (5) 15:12;27:4;45:9,13; 73:12
**comparator** (2) 68:15, 16
**compared** (2) 35:12; 58:3
**comparing** (1) 58:18
**compensated** (1) 11:24
**complain** (4) 11:16; 53:16,16,16
**complainant** (2) 33:2; 58:24
**complainant's** (1) 23:5
**complained** (1) 74:6
**complaining** (3) 20:15; 42:1;50:21
**complaint** (57) 7:2,3; 8:1,10,11,14,16,17,20; 9:18;10:19;12:19,22; 15:4,5,6;17:11,12;21:1, 13;22:22;23:2,3,10; 30:18;35:17,24;36:7, 23;38:9;40:16,20; 41:12,18,21,22;45:5; 48:14;50:16;51:5; 53:11,18;56:18;61:4,8,

18,21;62:8,12;66:5,6; 68:2,5,12;71:2,5,11
**complaints** (17) 7:8; 12:2;28:1;32:24;33:5, 10;37:10;50:9;52:24; 64:9,11,20,24;65:5; 73:23;74:1,14
**complete** (1) 17:8
**Complianco** (6) 5:9; 6:21;9:3,10;15:2;53:2
**concept** (1) 50:15
**concern** (19) 9:17; 10:16;19:18;20:14; 21:20;24:13,14;34:18; 37:2;41:23;44:18;45:5; 50:24,24;67:12;69:21; 71:18,22;72:3
**concerned** (6) 19:21, 24;20:21;21:15,24; 38:13
**concerns** (19) 8:13,22; 9:7;11:23;18:12;20:21; 21:4;23:6,19;33:22; 38:21,22;42:3,5;50:9, 12;61:13;64:20,24
**conclude** (2) 52:23; 57:20
**concluded** (2) 38:2; 77:6
**concluding** (1) 37:16
**conclusion** (5) 17:17, 21;38:12;48:9;53:14
**conduct** (4) 9:17,19; 35:10;61:15
**conducted** (2) 37:9,15
**conducting** (2) 32:19,23
**confer** (1) 26:8
**conflict** (5) 39:8,8,9; 59:21;73:21
**connection** (3) 16:24; 17:7,15
**consider** (5) 5:22; 12:18,21;13:17,18
**contact** (1) 44:15
**content** (4) 22:21; 23:10;27:3,9
**context** (2) 14:8;48:13
**continue** (1) 63:22
**continued** (1) 36:2
**conversation** (9) 9:8; 13:2;16:2;18:9;19:20; 20:2;24:21;25:19,23; 29:4;32:5,16;43:3; 44:14,21;45:16;56:16; 61:18;64:10,14;67:21; 68:11;69:4;72:14; 74:21
**conversations** (7) 15:14;25:2,7,10; 45:21;63:10;67:15
**conversing** (1) 75:18
**convey** (1) 23:5
**conveyed** (1) 34:21

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

**copies (1)** 72:16
**correspondence (2)** 72:15;73:19
**counsel (6)** 26:19,22; 27:1,4;30:16;69:23
**counseling (4)** 11:8,11, 14,15
**counsel's (2)** 17:13; 26:20
**count (1)** 6:13
**country (3)** 12:14;14:9, 20
**couple (1)** 41:4
**course (3)** 6:13;9:8; 72:13
**courses (1)** 6:12
**created (2)** 70:6;75:2
**Culbreath-Walton (1)** 24:4
**cultural (6)** 13:3,14; 14:12;32:13;70:3; 72:10
**culture (1)** 14:2
**current (2)** 5:7;45:17
**currently (1)** 5:4

**D**

**daily (2)** 55:9;59:10
**date (4)** 24:2;25:22; 40:9;48:2
**dated (5)** 18:23;47:1; 49:9;62:6;63:20
**day (5)** 55:3;56:12; 57:13;66:23;67:2
**days (2)** 41:4,8
**dean (1)** 22:13
**dean's (3)** 16:6,23; 55:13
**defense (1)** 76:20
**define (1)** 10:21
**Deirdre (36)** 24:4; 25:21;38:20;42:14; 44:18;45:22;56:3,5,6; 61:2;62:21,24;63:4,8, 16,20;64:2,5,7,8,11,18; 67:22,24;73:7,11,12, 13,19,20,24;74:4,5,13, 20;75:1
**Deirdre's (1)** 45:15
**demeaned (1)** 75:16
**demeaning (5)** 29:15, 23;30:3;76:11,14
**denied (2)** 32:11;55:11
**department (5)** 26:21; 34:1;52:3,10;70:23
**deposition (3)** 3:2,14; 77:6
**description (1)** 34:3
**development (1)** 25:20
**difference (6)** 8:15; 13:14,20;14:7,13;70:4
**differences (5)** 13:3;

32:13,14;70:5;72:10
**different (3)** 13:15;35:7; 60:10
**differently (2)** 58:6; 59:12
**difficult (1)** 50:22
**Difficulties (2)** 70:5,6
**DiMeo (11)** 25:7;39:5, 12,14;40:5,8;46:8; 64:19;65:3;74:3;75:4
**direct (5)** 11:8;51:24; 57:14,17;60:14
**directed (3)** 13:6,13; 76:18
**directing (1)** 49:9
**direction (1)** 9:12
**directions (1)** 60:10
**directly (4)** 13:16; 26:18;71:9;76:1
**Director (2)** 5:8;6:19
**disability (1)** 18:3
**disagreed (1)** 39:12
**disagreement (3)** 16:10,16;39:14
**disciplinary (2)** 35:9,13
**discipline (2)** 32:3; 35:11
**disciplined (4)** 31:20; 34:3,6;58:4
**discover (1)** 9:9
**discretion (1)** 10:8
**discriminated (1)** 61:14
**discriminating (1)** 72:1
**discrimination (24)** 7:3, 5,6,14,17;8:2;13:19; 35:17,24;36:24;37:10, 13,16;50:16;51:5;53:1, 11;56:18,21,23;68:12; 71:5;73:24;74:1
**discrimination/harassment (2)** 56:7;57:22
**discuss (7)** 20:24;23:2; 30:14;31:1;43:18;66:8, 12
**discussed (7)** 8:21; 32:13;42:18;44:18,19; 50:17;72:9
**discussing (7)** 8:24; 19:16;31:24;43:7; 46:12;64:6;72:9
**discussion (10)** 23:18; 31:5;46:17;47:7;51:4; 56:17;57:9;64:3,4;67:9
**discussions (2)** 63:7; 70:2
**dismiss (1)** 71:20
**dismissal (1)** 49:15
**disposed (2)** 16:15,18
**dispute (1)** 16:20
**distinction (1)** 8:23
**divergent (1)** 50:10
**doctoral (1)** 75:11
**document (7)** 17:9;

18:15,20;28:8;44:9; 46:20;62:1
**documentation (2)** 72:12;73:14
**done (10)** 8:13;12:15; 20:3;30:10,14;34:5; 35:2;41:24;72:15; 75:22
**door (2)** 45:1;70:20
**dose (2)** 55:9;59:10
**down (1)** 4:3
**down' (1)** 36:9
**Dr (74)** 12:8;13:22,24; 14:14;19:21;20:2,6; 25:9;29:15,21;31:11, 13,24;32:5,18;33:9,12; 34:11,23;35:2;39:1,6, 9;40:16,20;43:9,21; 44:2,22;45:6,10,14; 46:8;47:7,15;48:3,10, 12,18,22;49:16,21; 51:24;52:3;77:5,15,17; 60:14,24;64:23;65:3; 69:1,10,17,21;71:3,8, 15,19,21,23;72:4,11, 21,23;73:3,9;74:7, 75:4,6,9,23;76:11,13
**drawn (2)** 32:4;53:14
**Drew (14)** 25:7;39:5, 12,14,15,20;40:8,11, 15;46:8;48:8;64:19; 65:3;75:4
**during (13)** 20:24;21:8; 48:21;66:13;67:6,8,19; 68:1;69:3,12,16,21; 75:6
**duties (4)** 6:18;31:18; 52:9;72:2

**E**

**earlier (5)** 15:3;30:11; 38:8;50:20;56:15
**early (3)** 33:18;46:1; 67:19
**education (1)** 6:15
**EEO (1)** 5:10
**EEOC (11)** 5:13;17:12; 61:19,21,24;62:12,14, 18;63:2;66:9,12
**effect (1)** 72:6
**effort (1)** 39:7
**eg (2)** 29:16;76:12
**either (1)** 37:20
**element (1)** 55:16
**elicited (1)** 36:19
**else (8)** 13:8,11;24:16; 26:2,11;43:4;58:8,19
**e-mail (29)** 18:23;19:8, 11;22:7;41:2,11;42:8, 10;47:1,6;49:8,20; 52:23;54:7,18;55:1,19; 56:11;57:3,11;58:13;

61:2;62:6,9,20;63:16, 17,20;75:18
**e-mails (5)** 72:21,24; 73:2,4,7
**emotional (1)** 11:2
**employed (3)** 5:4; 30:20;39:17
**employee (7)** 3:8; 30:2;31:21;34:5;35:12; 41:12,22;56:4;58:3,15; 59:21;73:22
**Employment (16)** 7:5, 14;8:9;19:10;24:20; 25:1,6,11;27:12,14; 34:18,19;37:12;39:1; 66:17;70:17
**employment-related (1)** 3:10
**end (7)** 24:19;25:5,10; 27:11,13;39:1;61:2
**endeavor (1)** 39:11
**ended (2)** 8:8;25:1
**enough (1)** 11:3
**entitled (1)** 37:1
**environment (6)** 7:22; 11:18,22;74:7,15;75:3
**EOC (15)** 5:12,14,15; 6:19,20;24:13;26:11; 36:24;37:3;40:13;53:3, 18;54:9;61:4,8
**Equal (4)** 5:8;9:3,9; 15:2
**Eric (4)** 25:19,23; 42:15;43:2
**estimate (1)** 38:7
**Etezady (3)** 27:8,16,24
**evaluations (5)** 42:16, 17,23;43:1;72:18
**even (5)** 4:21;33:5; 59:8;66:21;69:13
**events (1)** 57:23
**Everyone (2)** 4:8;28:17
**exactly (3)** 24:7;59:2; 66:22
**example (6)** 9:23;11:9; 13:21;33:23;61:13; 70:21
**examples (3)** 29:22; 33:22;34:7
**Except (2)** 35:11;58:2
**excused (1)** 77:4
**exhibit (1)** 48:18
**exhibited (3)** 48:23; 69:11
**existed (1)** 63:5
**experience (3)** 30:1; 53:15;58:20
**explain (9)** 13:12,20; 21:5;32:18;33:3,4; 35:20;36:21;40:12
**express (7)** 21:8;34:10, 14,22;40:18;48:17,22
**expressed (1)** 67:11

**expresses (1)** 11:1
**expressing (1)** 21:12
**expression (1)** 74:21
**expressions (4)** 49:16, 21,24;50:6
**expressly (1)** 68:2
**extent (2)** 16:17;18:4

**F**

**fact (3)** 34:24;75:7,24
**facts (1)** 59:5
**faculty (1)** 7:8
**fair (2)** 16:11,14
**fairly (4)** 34:9;46;73:3
**Fay (2)** 26:23;27:5
**fear (3)** 21:7;12;37:2
**February (6)** 54:18; 55:1;58:13;60:1,3;62:7
**February/March (1)** 63:8
**federal (1)** 6:22
**feel (3)** 36:5;37:4; 55:16
**felt (6)** 11:23;33:14; 34:11,15;36:16;75:16
**few (1)** 41:8
**file (7)** 21:13;35:17,23; 53:10,17;62:8,12
**filed (3)** 8:10,11;66:9
**filing (6)** 6:23;8:13,16; 21:1;50:16;51:5;56:17; 61:18,21
**finally (1)** 51:1
**find (2)** 36:9;52:4
**firsthand (1)** 74:2
**five (2)** 3:6,16
**flat (1)** 55:11
**flesh (1)** 25:18
**floor (1)** 33:24
**FMLA (1)** 18:5
**focused (1)** 29:1
**Foehl (5)** 5:4;10:7; 18:19;28:7;76:23
**follow (1)** 23:21
**followed (3)** 37:23; 38:3,14
**following (1)** 29:4
**follow-up (1)** 54:7
**foreign (1)** 14:18
**form (32)** 10:2;10;11:5, 19;14:4,16;20:8,17; 22:2;30:5;33:7;37:18; 41:5,19;44:3;47:17; 48:5;50:18;51:7;53:12; 56:19;57:16;58:1;

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

59:13;60:7,17,22;61:9;
66:18;74:8,16,24
**formal (8)** 8:14,16;9:4,
18;10:18;38:9;53:17;
61:15
**formally (1)** 11:17
**forward (2)** 21:15;62:20
**forwarding (1)** 63:17
**found (3)** 12:4;31:16;
37:20
**four (1)** 3:6
**fourth (1)** 35:16
**front (5)** 18:19;28:7;
41:2;46:20;63:19
**function (1)** 11:12
**functions (1)** 34:2
**further (5)** 21:18;23:23;
36:16;51:12;76:22
**FYI (1)** 64:3

### G

**gave (4)** 13:21;29:20;
68:16;70:21
**gender (1)** 58:6
**general (6)** 3:18;6:18;
15:9;26:21;32:16;
38:24
**George (1)** 26:24
**given (2)** 19:23;34:8
**giving (1)** 16:12
**goes (4)** 30:9;55:6,17;
58:15
**government (2)** 53:1;
62:18
**Greg (36)** 15:23;16:1,4,
22;17:2,4,20,22;24:21;
25:3;36:3,5,7;45:13,16,
23;46:2,9,12;51:15,17,
20;52:2,18,22;64:19;
65:2;70:20,22;71:3,8,
12;73:2,5;74:3;75:4
**grievance (2)** 9:2,4
**ground (1)** 3:19
**grounds (1)** 66:6
**guess (2)** 15:1;33:18
**guides (1)** 9:2

### H

**Hailey (1)** 68:15
**half (1)** 40:3
**Hamilton (3)** 26:5;
62:21,24
**hand (2)** 54:6;76:7
**handwritten (3)** 28:20;
65:17;76:5
**happen (3)** 8:4,6;59:7
**happened (1)** 36:6
**happening (3)** 45:21;
54:4;59:15
**happens (1)** 59:5
**harassed (7)** 9:24;

33:14,21;55:3;56:12;
57:13;63:23
**hard (4)** 30:22;38:6,7;
39:3
**harm (5)** 10:16,21;11:2,
2,3
**head (2)** 4:6;44:5
**heading (2)** 41:21;
65:22
**hear (4)** 10:15;13:23;
34:21;52:12
**heard (2)** 12:3;39:10
**hearing (3)** 13:3;44:19
**held (3)** 5:16;31:5;
46:17
**helps (2)** 8:8;76:20
**herself (5)** 35:12;52:20;
58:3,18;70:23
**hesitation (1)** 21:14
**hill (1)** 13:17
**history (1)** 42:2
**hold (1)** 6:6
**Honeywell (12)** 15:7,
13,17,24;16:8,11,16;
17:1,7;18:6,9;36:6
**Honeywell's (5)** 16:19,
21;17:11,16;18:1
**hostile (6)** 7:22;11:17,
21;74:6,15;75:2
**hour (2)** 40:3,4
**HR (2)** 11:12;42:2
**human (17)** 5:19,22;
6:1;9:11;24:4,14;
25:13,20;26:2;38:20;
43:13;55:23;56:1;
58:16;59:20;76:19,20
**humiliate (1)** 75:24
**humiliation (2)** 55:9;
59:11
**hyperbole (1)** 59:17

### I

**idea (1)** 58:18
**identification (7)** 18:17;
28:5;40:24;49:3;54:15;
65:13;68:20
**identified (1)** 33:1
**immediately (1)** 29:4
**imminent (2)** 67:10,12
**important (2)** 4:21;
48:13
**include (1)** 7:11
**including (1)** 75:11
**independent (1)** 19:6
**independently (1)**
73:20
**indication (1)** 13:5
**indirect (3)** 52:5,6,6
**individual (11)** 9:12,20;
10:17,18;11:18;15:23;
21:3;23:5;37:4;54:5,9
**individuals (6)** 9:6,13,

16;36:23;37:1;53:15
**individual's (1)** 45:1
**inform (12)** 17:4;24:9;
32:22;40:5,15;44:14;
64:8,18,22;65:2;74:5,
13
**informal (5)** 8:17,19;
9:4;12:21;38:9
**informally (3)** 8:21,24;
11:17
**information (10)** 16:13;
29:19;42:12;50:4;53:5,
22;68:5;69:22;75:12,
13
**informing (1)** 24:16
**initial (2)** 20:20;32:1
**initially (1)** 11:22;22:18
**instance (2)** 14:12;
31:19
**instances (3)** 49:14;
50:6;52:15
**instruction (2)** 4:9,20
**intake (4)** 62:13;63:1;
66:8,10
**intention (3)** 35:23;
70:16;71:19
**interacted (1)** 40:8
**interaction (1)** 14:23
**interests (1)** 55:15
**internally (1)** 62:13
**interpreted (1)** 48:3
**interviewed (1)** 15:4
**intimidated (1)** 34:23
**into (8)** 10:9;17:16;
27:3,9;37:9;59:24;
64:9,19
**introduced (3)** 14:11;
32:21;68:15
**investigate (7)** 7:18,
21;10:8;11:3;30:18;
31:13;44:7;50:12;
56:24;59:18;60:4;66:5;
68:2,6;71:2,3,4
**investigating (8)** 7:17;
15:3;16:9;17:13;43:12;
71:6,7,11
**investigation (18)** 8:12;
9:18,20;17:1,8,16;
21:6;32:19,23;37:3,7,
15;40:6;46:1;48:14;
61:15;73:15;74:23
**investigations (6)** 7:2,4;
9:5;37:9;38:1,10
**involved (1)** 71:9
**issue (15)** 9:7,11,14,15;
10:16,23;16:9;18:5;
32:3;38:23;43:11;
55:22;58:14;64:12,16
**issues (7)** 19:10;24:6;
39:2;44:16;59:20;63:5;
73:21

16;36:23;37:1;53:15

### J

**January (1)** 67:20
**jeopardy (2)** 34:20;
67:13
**job (4)** 6:18;31:18;
34:3;67:12
**judge (2)** 4:22;5:1
**Judy (1)** 52:20
**July (13)** 18:24;19:4,7;
24:3,8;41:7,17;42:18,
21;44:6;45:3;50:15;
54:22
**jurisdiction (1)** 36:24
**jury (1)** 4:22

### K

**keeping (1)** 44:4
**kept (2)** 72:14,14
**kind (2)** 50:10;52:6
**King (1)** 68:15
**Klein (2)** 22:9,13
**knew (4)** 43:15;48:6;
66:6,20
**knowledge (1)** 14:14

### L

**labor (1)** 56:3
**laid (1)** 70:20
**lambasted (1)** 59:1
**language (1)** 32:14
**languages (1)** 70:5
**largely (1)** 71:8
**last (6)** 3:13,16;4:20;
47:5;55:6;62:11
**late (1)** 34:4
**later (1)** 67:2
**launched (1)** 48:15
**launches (1)** 37:3
**law (1)** 6:12
**laws (3)** 6:22;7:10,24
**laying (1)** 44:24;58:13
**learn (1)** 39:13
**learned (5)** 39:10;
43:24;66:22;67:5;
69:22
**learning (3)** 35:20;
52:11;75:9
**least (4)** 40:3;50:14;
53:9;59:16
**leave (2)** 21:17;22:5
**leaving (1)** 41:16
**led (2)** 50:5;57:20
**legal (1)** 6:15
**length (1)** 9:7
**Lennon (1)** 52:20
**letter (3)** 22:9,16,19
**liaison (1)** 26:24
**light (1)** 57:22
**likely (2)** 21:7;51:11

### M

**makes (1)** 57:4
**making (1)** 8:16
**manage (1)** 76:20
**managers (1)** 76:21
**manner (2)** 22:1;23:14
**many (4)** 3:5;8:4;37:9;
39:19
**March (2)** 63:20;73:11
**marked (17)** 18:15,16,
20;28:2,4;40:23;44:10;
46:21;49:2;54:12,14;
62:2;63:11;65:10,12;
68:17,19
**materials (1)** 70:18
**matter (7)** 9:9;18:3;
21:16;26:10;38:16,18;
43:12
**matters (2)** 3:11;38:11
**may (18)** 9:8;10:15;
17:12;24:12;31:8;32:2;
34:12;36:15;46:4,10,
13;53:1;54:6;63:5;
72:20;73:1,6,13
**Maybe (3)** 40:3;66:22;
76:16
**mean (5)** 8:11;16:18;
35:20;56:2;62:17
**meaning (2)** 53:3;62:18
**meant (2)** 13:12;70:10
**meet (6)** 15:8;39:19;
40:10;55:8;59:10;
71:12
**meeting (34)** 19:3,5,17;
21:1,9;24:8;28:22;
29:11;30:18;32:1,17;
33:13,15;39:5;41:7,9,
17;42:22;45:2;50:15;
56:16;65:19;66:4,13,
16;67:6,8;68:1;69:1,3,
12,17,21;75:7
**meetings (5)** 15:11,14;
20:11;39:5;55:10
**member (3)** 52:9;55:8;

### J

### K

### L

### M

59:9
**members (1)** 32:15
**memo (2)** 23:24;58:13
**mentioned (1)** 7:11
**message (1)** 56:8
**messed (1)** 36:8
**met (16)** 14:24;24:1,3,
  10,12,17;30:23;39:15;
  41:4;54:22;57:7;65:7;
  66:21;70:24;71:14,14
**Michael (2)** 22:9,13
**middle (2)** 49:10;63:21
**might (4)** 10:23,24;
  68:13;75:11
**minimize (1)** 39:8
**Miss (53)** 5:4;8:8,19;
  10:7;11:16;12:13;13:1,
  16,23;14:1,10;15:8,12,
  22;16:11,12,15,16,19,
  21,21;17:7,11,16;
  18:19;24:9,20;25:1,5;
  26:12;27:12,14;28:7;
  30:17;31:13;32:8,15;
  35:8;39:16;41:3,17;
  43:4,15,19;44:14;45:4,
  8,12,14;49:9;68:1;
  71:21;76:23
**Misstates (2)** 14:5;51:8
**mistreating (1)** 71:24
**moment (1)** 49:5
**months (3)** 54:21;
  56:15;57:24
**Moore (1)** 26:24
**more (5)** 8:24;9:10;
  55:15;68:4;76:18
**morning (1)** 63:12
**most (2)** 4:21;20:11
**mostly (1)** 51:15
**move (2)** 10:17;55:10
**moved (2)** 33:24;60:10
**moving (1)** 21:14
**Mtg (1)** 65:22
**much (1)** 52:20
**multiple (1)** 25:24
**municipal (1)** 6:22
**MUNSHI (60)** 10:3,5,
  20;11:10;12:1;14:6,21;
  18:14,18;20:13,23;
  22:6;25:16;28:2,6;
  29:2,5;30:8;31:4,7;
  33:11,17;34:9;37:24;
  40:22;41:1,10;42:4;
  44:8;46:5,11,16,19;
  47:22;48:11;49:1,4;
  51:3,18;53:21;54:12,
  17;57:1,19;58:17;
  59:22;60:13,19;61:1,
  16;65:10,16;66:24;
  68:17,23;70:12;74:11,
  17;75:5;76:22
**must (1)** 17:18
**myself (1)** 32:21

**N**

**name (1)** 6:20
**named (1)** 15:23
**names (1)** 15:3
**national (2)** 14:18;58:7
**native (2)** 12:14;14:15
**nature (1)** 17:24
**necessarily (2)** 11:6;
  53:14
**need (4)** 10:6;21:15;
  27:2;38:11
**needs (1)** 26:9
**nervous (1)** 23:13
**new (3)** 32:2;35:12;
  68:13
**newer (1)** 31:21
**next (3)** 18:11;35:18;
  55:6
**ninth (1)** 33:24
**Nor (1)** 58:7
**noted (3)** 32:2;36:1;
  69:13
**notes (23)** 28:18,20;
  29:4,6,8;32:4,5,9;
  35:20;50:20;51:10,13;
  65:17,19;68:24;69:7;
  70:16;71:16;72:14;
  76:4,4,5,6
**notice (2)** 30:23;34:5
**Notwithstanding (1)**
  59:8
**November (5)** 35:9;
  49:9;51:16,23;53:8
**number (2)** 8:22;61:12

**O**

**oath (2)** 4:23,23
**Objection (33)** 10:2,10;
  11:5,19;14:4,16;20:8,
  17;22:2;30:5;33:7;
  37:18;41:5,19;44:3;
  47:17;48:5;50:18;51:7;
  53:12;56:19;57:16;
  58:1;59:13;60:7,17,22;
  61:9;66:18;68:7;74:8,
  16,24
**observation (2)** 70:7,9
**obviously (2)** 4:2;66:16
**occasion (1)** 40:10
**occur (1)** 21:17
**off (4)** 31:2,5;46:14,17
**offense (1)** 31:22
**Office (27)** 5:8,11,13,
  15;6:8,20;9:3;10:15;
  16:6,23;17:13;19:23;
  21:4,6;26:11,20;32:15;
  34:1;40:13;43:11,13;
  52:21;53:2,3,24;55:13;
  61:22
**offices (1)** 21:5

**old (1)** 47:21
**oldest (1)** 18:24
**Once (2)** 8:5;39:22
**one (25)** 3:23;4:21;
  10:23;12:6,7,11;15:2;
  18:24;25:23;26:1,9;
  27:1;31:19;33:9,17;
  38:19;39:4;46:23;
  48:15;50:23;57:6;
  61:21;64:13;75:2;
  76:18
**only (1)** 12:6;50:8;
  60:5;64:10,13;68:16;
  70:3
**opinion (1)** 16:13
**Opportunity (4)** 5:8;9:3,
  10;15:2
**order (1)** 58:22
**orders (1)** 46:7
**origin (1)** 58:7
**original (1)** 48:7
**others (3)** 70:9;75:10,
  14
**Otherwise (2)** 4:5,11
**out (14)** 4:6,12;13:17;
  14:1;25:18;38:8;43:2;
  44:2;49:14;52:4;54:24;
  55:11;58:13;61:24
**Outside (2)** 15:11;
  62:18
**over (18)** 3:18;4:10;
  13:16;16:22,23;18:13;
  37:11,13;39:23;50:10;
  51:10;52:9;53:16,17;
  54:6;60:10;62:20;
  70:18
**overture (1)** 42:13
**own (4)** 39:7;44:5;
  49:20;53:23

**P**

**P-28 (1)** 62:2
**P-30 (4)** 63:11,12,16,19
**P-31 (4)** 18:15,16,20;
  22:8
**P-32 (4)** 28:3,4;35:16;
  76:3
**P-33 (3)** 40:22,23;41:2
**P-34 (2)** 49:1,2
**P-35 (3)** 54:13,14;56:6
**P-36 (3)** 65:11,12,17
**P-37 (3)** 68:18,19;
  71:17
**P-8 (3)** 44:10,12;46:21
**page (9)** 28:8,10,11;
  29:14;35:15;55:6,7;
  63:19;71:16
**pages (1)** 28:24
**paragraph (6)** 47:5;
  49:11;55:7;62:11;
  63:21;71:17
**part (5)** 16:1;46:1;

59:17;71:20;73:14
**particular (5)** 44:23;
  45:1;49:14;50:6;52:14
**particulars (1)** 56:22
**Pause (6)** 18:22;49:6;
  62:4;63:13;65:14;
  68:21
**PDP's (1)** 72:18
**people (1)** 59:12
**percentage (1)** 38:5
**perfectly (1)** 42:20
**performance (5)** 42:16,
  17,22,24;73:21
**period (6)** 24:24;46:9;
  48:16,21;63:8;67:19
**person (6)** 10:6;15:8;
  31:12;36:8;39:23,24
**personal (2)** 19:10;
  21:16
**phone (3)** 39:23;62:13;
  63:1
**phrase (2)** 49:20;52:16
**physical (1)** 11:2
**pick (1)** 26:10
**place (6)** 37:17;50:11;
  57:23;66:16;69:16,20
**plan (2)** 7:1;62:12
**plans (1)** 6:9
**please (19)** 21:22;
  22:10;24:23;28:3,15;
  30:17;35:16;37:6;
  41:14;48:20;49:12;
  50:13;51:1;54:13;
  60:11;61:3,15;68:18;
  74:9
**plural (1)** 50:1
**point (14)** 4:16;19:14;
  24:3,19;35:1;42:21;
  53:8;57:7;58:8;60:5;
  64:8;66:9;67:13,14
**pointed (1)** 38:8
**policies (1)** 38:2
**policy (4)** 36:18;37:21,
  22;38:14
**position (4)** 5:17,19;
  6:6;16:23
**positive (1)** 39:6
**possibility (3)** 53:10,19,
  20
**possible (2)** 22:9;38:15
**possibly (1)** 13:19
**potential (1)** 67:16
**practice (6)** 15:10;
  36:22;53:24;54:3;58:5;
  61:22
**precisely (1)** 58:9
**prepared (1)** 22:22
**present (3)** 13:9,11;
  23:7
**presented (2)** 22:21;
  23:10
**presenting (2)** 23:2,3
**pretty (1)** 41:20

**prevent (1)** 39:8
**previous (1)** 57:23
**previously (2)** 44:10;
  62:1
**principally (1)** 42:6
**Prior (15)** 14:22;15:14;
  24:19;25:5,10;27:11,
  13;31:8;39:1;40:9;
  46:4;72:20;73:1,6,13
**private (1)** 55:10
**privilege (1)** 27:22
**Probably (9)** 3:6,17,19;
  10:17;18:7;37:14;
  42:21;68:14;76:2
**problems (2)** 29:14;
  76:11
**procedure (2)** 9:2;26:8
**professional (1)** 5:23
**program (1)** 7:1
**programs (1)** 6:9
**protect (1)** 55:15
**protected (2)** 27:21;
  58:19
**provide (2)** 54:9;72:11
**provides (1)** 9:3
**psychological (1)** 55:17
**public (1)** 55:9;59:10
**publicly (2)** 75:16,24
**put (4)** 34:18,19;60:11;
  62:2
**putting (2)** 30:15;45:3
**puzzling (1)** 51:16

**Q**

**questionnaire (2)** 66:8,
  10
**quickly (1)** 23:24

**R**

**raise (4)** 12:2;37:2;
  61:7;75:7
**raised (15)** 11:23;
  24:13;32:24;33:5;
  40:16,19;61:4,12;
  71:18,22;72:3,9;74:14;
  75:10,14
**raises (1)** 10:16
**raising (3)** 41:18;45:5;
  64:12
**rarely (1)** 9:22
**reach (3)** 12:15;17:17;
  44:1
**reached (1)** 43:2;61:24
**reaches (1)** 54:24
**react (1)** 20:7
**read (3)** 22:18;59:9;
  77:3
**really (1)** 29:13;38:7
**reason (3)** 37:21;
  38:22;76:19
**reasons (1)** 38:19

RUTH V. BRIGGS v.
TEMPLE UNIVERSITY

SANDRA A. FOEHL
June 30, 2017

**recall (41)** 11:20;12:11,
14;13:1;14:10,17;
15:16;16:3,12,15;
17:10,20,24;18:11;
19:3,15,16;21:2,12;
23:20;24:16;26:1;
31:17,19,23;32:6,11;
40:21;41:6;44:19;
45:11,12;46:8,12;
50:19;52:11;63:7;
66:11;67:11,23;75:15
**receive (1)** 8:1
**received (3)** 30:23;
35:8;73:10
**recent (1)** 63:4
**recognizable (1)** 58:14
**recollection (14)** 16:5,
17;17:11;18:2,4;19:6;
27:15;32:12;35:22;
43:17;44:17;52:18;
68:3;70:17
**record (5)** 31:3,6;
35:14;46:15,18
**recourse (1)** 54:10
**rectify (2)** 38:16,22
**refer (1)** 8:13
**reference (3)** 32:9;
52:19;57:4
**referencing (2)** 57:11,
14
**referred (3)** 5:10;42:22;
73:24
**referring (2)** 22:19;
33:16
**regard (3)** 18:5;38:17;
70:21
**regarded (1)** 19:22
**regarding (14)** 15:5,13,
17,24;17:1;19:10;
25:11;26:12;27:5,10;
47:6,12;53:6;69:5
**regular (1)** 70:2
**regularly (3)** 32:13;
39:5;59:7
**relate (1)** 18:12
**related (14)** 12:4;13:4;
24:14;33:23;34:17,20;
35:13;47:7,16,18,20;
50:23;51:12,12
**relating (2)** 36:12;47:19
**relations (1)** 56:4
**relationship (10)** 15:19,
21;24:7;38:24;45:14;
51:20,22,23;52:5,7
**relayed (4)** 31:10;32:8;
47:14;57:9
**relaying (1)** 69:22
**relevant (1)** 48:12
**religion (1)** 58:7
**remark (11)** 13:5,24;
14:11;20:3;31:17,18;
32:7;35:2;57:6;60:24;
70:1

**remarked (3)** 12:13;
13:2;33:9
**Remarking (2)** 13:14;
14:12
**remarks (2)** 31:16;57:4
**remember (41)** 3:15,19;
12:6;13:10;15:20;
17:18;19:18;21:11,14;
27:6,23;29:13;33:20;
39:3;42:23;43:7,20;
44:24;45:19,22,24;
54:8;57:6;61:20;63:6,
10;64:6,10,13,21;
66:14,22;67:3,3;72:8,
23;73:4;75:9,13;76:15,
16
**remorse (1)** 23:13
**removed (1)** 72:2
**repeat (4)** 21:22;24:23;
48:20;74:9
**repeated (1)** 20:2
**report (5)** 6:23;26:18;
29:21;35:9;48:7
**reported (2)** 26:16;
55:12
**reporting (4)** 15:18,20;
52:2;65:4
**reports (1)** 50:9
**request (2)** 49:13;55:10
**required (2)** 55:8;59:10
**requirement (2)** 58:22,
23
**reserves (1)** 77:2
**resolution (2)** 9:4;38:9
**resolve (5)** 38:16,18;
39:2,8;58:16
**resolving (1)** 38:11
**resources (20)** 5:20,23;
6:1;9:11;11:7;21:4;
24:5,15;25:13,20;26:2;
38:20;43:13;55:23;
56:1;58:16;59:20;74:2;
76:19,20
**respond (5)** 7:7;36:13;
49:12;55:19;72:5
**responded (5)** 32:6;
35:1;51:6,14,14
**response (3)** 20:19;
35:5;36:17
**responsibilities (4)**
4:24;6:19;16:8;19:22
**responsible (3)** 6:21,
24;73:23
**retaliated (1)** 21:20
**retaliating (1)** 36:5
**retaliation (6)** 7:18;
21:9,13,24;37:2,5
**return (3)** 22:23;23:15,
19
**review (4)** 18:21;22:9;
46:22;49:5
**reviewed (2)** 50:20;
66:10

**Rhonda (4)** 19:9,11,13;
26:16
**Right (22)** 4:7;12:9;
16:22;22:14;35:1;
36:19;41:4;45:6;51:6;
53:3,11;54:22;55:20,
23;57:15;60:6;62:21;
63:17;65:23;76:7,7;
77:2
**rights (4)** 6:22;7:10,12,
24
**role (1)** 56:6
**rules (1)** 3:19
**Ruth (130)** 8:2;13:21;
14:23,24;15:18;17:5;
18:10;19:3,7,14,16;
20:21;22:4,19;24:2,6,
10,12,12,17,21;25:3,7,
11,11;26:3,6;27:5,10,
24;28:23;29:12,19;
30:15;31:9,21;32:23;
33:2,13,23;34:7,10,24;
35:12,23;36:12;38:17;
39:4,9,12,14,20;40:15,
19;41:24;42:18,22;
44:1,15,17,20;45:9;
47:2,11,14,19,21;
48:17,22;50:5,8,11,21,
22;51:2,20;52:1;54:24;
55:22;56:7,20;57:8;
58:2,4,10;59:14,17;
60:4,9,23;61:7;62:6;
63:1,9,20;64:20,23;
65:7,20,23;66:4,11,20;
67:3,16,21;69:11;70:3,
9,10,14,24;71:7,10;
72:4,21,23;73:2,4,7;
74:1,5,14,21;75:8,11,
24;76:14,16,18
**Ruth's (19)** 29:21;
31:14;56:11;59:17;
60:5,8;61:20;64:9,11;
65:4;73:11

**S**

**salary (18)** 11:23;
18:13;19:19;24:6,13;
38:21;42:1,6,7,12,14;
43:5,6;44:18,21;45:4;
64:11,15
**same (8)** 4:24;25:9,21;
31:22;33:17;34:6;
44:11;59:2
**Sandy (2)** 55:2;60:21
**SATINSKY (45)** 10:2,
10,13;11:5,19;14:4,16;
20:8,17;22:2;25:14;
27:11,18,21;28:24;
30:5;31:2;33:7,15;
37:18;41:5,19;44:3;
46:4,14;47:17;48:5;
50:18;51:7;53:12;

56:19;57:16;58:1;
59:13;60:7,17,22;61:9;
66:18;68:7;69:20;74:8,
16,24;77:1
**saw (3)** 27:1;57:3;
75:18
**saying (13)** 10:24;
11:21;13:1,15,24;
14:10;30:3;32:11;
45:22;55:2;57:12;61:3;
75:15
**scared (6)** 35:18;36:2,
14,16;51:6,10
**schedule (1)** 62:8
**school (1)** 10:1
**school's (1)** 39:7
**second (6)** 22:8;28:9;
31:3;35:15;55:7;71:16
**secretary (2)** 52:21;
70:23
**seeing (1)** 72:24
**seek (1)** 39:2
**send (2)** 53:23,24
**sending (1)** 22:10
**sends (3)** 19:9;22:7;
64:2
**sent (5)** 41:3;42:10;
44:5;53:23;57:10
**sentence (2)** 22:8;50:2;
55:7;62:11
**September (2)** 47:2;
48:2
**series (1)** 59:5
**set (4)** 14:8,11;76:4,5
**setting (1)** 49:14
**several (2)** 60:8,10
**sex (1)** 12:5
**Sexual (1)** 10:23
**sexually (1)** 9:24
**shakes (1)** 4:6
**share (1)** 29:8
**shared (1)** 17:22
**sharing (1)** 17:20
**shifted (1)** 31:18
**short (1)** 46:9
**showed (1)** 73:10
**side (5)** 16:19,21,22;
60:1,6
**sides (3)** 59:16,23;60:9
**sign (1)** 77:3
**Similar (2)** 4:9;58:4
**simple (1)** 74:12
**simply (3)** 9:13;24:12;
42:13
**sitting (3)** 4:2;5:1;6:13
**situation (4)** 10:22;
13:7;20:20;42:2
**six (3)** 54:21;56:15;
57:24
**skated (1)** 59:4
**solely (1)** 76:18
**somebody (9)** 9:23;
11:1;58:19

**Someone (7)** 10:24;
11:4;13:15;15:4;38:15;
55:14;59:19
**Sometimes (5)** 9:16,22;
41:22;54:6;59:6
**somewhere (1)** 14:24
**son's (2)** 22:23;23:15
**sorry (5)** 10:12;23:4;
43:23;54:2;75:20
**sort (7)** 17:8;20:14;
21:9;19;52:8;69:11;
72:12
**source (2)** 75:4,12
**speak (7)** 17:2;19:13;
26:5;27:4,10;39:20;
46:2
**speakers' (1)** 20:21
**speaking (2)** 21:10;
64:23;65:3
**specialist (1)** 6:8
**specific (8)** 26:21;
33:22;50:13,23;51:1,2;
57:3;68:13
**specifically (11)** 9:21;
10:7;11:21;13:6;21:2;
42:11,24;44:22;45:6,
10;46:5
**spoke (4)** 19:9,20;26:3,
12
**spring (1)** 8:7
**squared (1)** 22:5
**staff (9)** 7:8;19:23;
32:14,15;52:9;55:8;
59:9;70:2,3
**start (1)** 6:4
**starts (2)** 47:6;55:2
**state (1)** 6:22
**statement (3)** 30:10;
49:14;60:12
**States (5)** 35:6,7;47:6;
70:4;72:7
**stating (2)** 36:13;73:2
**step (1)** 39:7
**sticker (2)** 44:11;62:3
**still (3)** 37:13;48:17;
75:21
**story (5)** 59:23;60:1,6,
10,14
**straight (1)** 44:5
**student (2)** 7:8;41:21
**students (1)** 75:11
**stupid' (3)** 29:16;30:4;
76:12
**subject (4)** 37:6;41:11;
55:1;62:7
**subjected (1)** 37:5
**subsequent (2)** 43:3;
61:17
**successful (1)** 39:11
**suggests (1)** 6:20
**suicidal (1)** 10:24
**summary (1)** 17:8
**supervised (2)** 51:17;

52:1
**supervision (3)** 16:11,
13;71:9
**supervisor (9)** 12:7,8;
51:24;57:14,18;58:15;
59:21;60:15;73:22
**supervisory (3)** 16:7,7;
52:8
**supplying (1)** 56:22
**support (1)** 16:16
**supposedly (1)** 52:21
**sure (5)** 4:4;14:20;
21:23;24:11,24;25:22;
34:13;48:21;66:6
**surgery (2)** 22:23;23:15
**surprised (1)** 22:17
**swimmingly (1)** 58:10
**synopsis (2)** 22:21;23:9

**T**

**talk (11)** 4:10;9:6,14,
15;21:4;31:9;42:13;
43:4;54:5;62:23;63:4
**talked (4)** 25:21;27:16;
31:12;70:19
**talking (14)** 14:9;15:24;
23:9,22;24:5;26:13;
27:24;32:17;33:18;
38:19;45:23;56:21;
59:11;67:23
**Tanya (10)** 15:7,13,17,
24;16:8;17:1,24;18:6,
9;36:6
**telling (7)** 12:12,17;
13:10,23;16:3;20:20;
56:22
**Temple (16)** 3:8;5:5;
6:4;8:9;11:18;24:20;
25:6;27:12;30:1;33:6;
36:18;37:8;38:2;39:17;
58:21;62:18
**tended (1)** 50:23
**tenth (1)** 33:24
**terminate (1)** 70:17
**terminated (6)** 66:17,
23;67:2,4,5,17
**termination (4)** 30:24;
35:13;66:20;67:10
**Terry (1)** 4:2
**testified (2)** 25:15;
30:11
**testify (2)** 27:19;69:23
**testimony (3)** 14:5;
36:7;51:8
**therapeutic (2)** 11:14,
15
**thinking (3)** 36:8;46:10;
75:21
**third (3)** 28:10;47:5;
71:17
**though (2)** 4:21;69:13
**thought (4)** 31:22;39:6;

47:16;67:9
**thousand (2)** 37:11,13
**threaten (1)** 70:14
**threatened (1)** 34:15
**threats (1)** 49:15
**three-page (1)** 28:8
**throw (1)** 44:12
**timeline (2)** 33:4;44:5
**times (3)** 3:5;8:4;39:19
**title (2)** 5:7;7:11
**titled (1)** 6:7
**today (3)** 4:3;50:20;
70:18
**together (1)** 26:7
**told (8)** 20:5;39:4;
59:17;66:22;67:3;
69:22;71:10;76:16
**took (7)** 4:22;16:19,21;
37:17;66:16;69:16,20
**top (5)** 28:8,9,10;56:5;
63:16
**toward (1)** 16:11
**towards (3)** 48:19,23;
69:11
**Trachtenberg (2)**
26:23;27:5
**Tracy (5)** 26:5,15;61:3;
62:21,24
**transcript (3)** 4:4,11;
28:14
**treated (5)** 23:14;58:5;
59:12;72:22;73:8
**treating (1)** 73:3
**treatment (1)** 71:18
**true (1)** 43:7
**truth (1)** 4:23
**try (4)** 3:23;39:2;54:8;
58:16
**trying (1)** 73:18
**turn (1)** 35:15
**turned (1)** 18:2
**two (6)** 28:10,24;59:16,
23;61:20,23
**type (2)** 29:6,7
**types (2)** 7:5,7
**typical (1)** 41:21

**U**

**uncommon (1)** 9:5
**under (3)** 29:14;65:22;
76:10
**underneath (1)** 65:24
**Understood (2)** 4:14;
57:15
**unfairly (1)** 31:20;
72:22;73:8
**unfairness (1)** 55:16
**United (4)** 35:6,7;70:4;
72:6
**university (10)** 6:21,23;
7:2,9;21:5;26:19;
37:21,22;38:14;54:11

**university's (1)** 6:24
**unlawful (6)** 7:3;36:24;
52:24;56:7;57:21;
73:23
**unprofessional (1)**
35:10
**up (9)** 14:11;23:21;
26:10;29:3,6,7;56:5;
60:21;66:15
**upon (2)** 23:19;54:3
**upsetting (1)** 70:10
**Urgent (1)** 55:1
**use (1)** 41:22
**used (4)** 34:12,16;
52:17;74:20
**using (1)** 33:20
**usual (2)** 21:3;26:8
**usually (6)** 29:3;34:18;
36:22;37:20;58:24;
73:19

**V**

**varying (1)** 50:10
**verbalize (3)** 4:5;28:14;
41:14
**VII (1)** 7:11
**violation (2)** 7:23;37:21
**visitors (1)** 7:8
**voice (3)** 75:8,10,14

**W**

**Wacker (31)** 15:23;
16:1,4;17:2,4,20,23;
24:21;25:3;36:3,5;
45:13,23;46:3,9,13;
49:17,22;51:15,17;
52:2,22;64:19;65:2;
70:22;71:3,12;73:2,5;
74:3;75:4
**Wacker's (8)** 16:6,22;
51:20;70:20
**wait (1)** 22:4
**Walton (14)** 24:9;
25:22;38:20;41:3;43:4,
15,19;44:14;45:8,12;
56:3;67:22;73:7;74:13
**way (6)** 13:1;21:6;
32:20;33:9;36:9;59:7
**whole (1)** 50:1
**whose (1)** 15:6
**withdrew (1)** 60:23
**within (11)** 3:16;5:19;
10:8;13:3;26:20;34:3;
41:3,8;45:2;52:9;57:23
**without (9)** 9:20;11:4;
27:3,9;32:9;34:4;37:2;
50:24;63:23
**WITNESS (43)** 10:12,
14;11:6,20;14:17;
20:11,19;22:3;27:13,
20,23;29:3;30:6;33:8,

20;37:19;41:6,20;44:4;
46:7;47:18;48:6;50:19;
51:9;53:13;54:16;
56:20;57:17;58:2;
59:14;60:8,18,23;
61:12;65:14;66:19;
68:10,21;69:24;74:9;
75:1;77:2,4
**women (14)** 12:14;
14:9;20:3,6;30:9,13;
35:2;43:9;48:7;57:10;
60:16;69:5;70:7;72:5
**word (6)** 14:3;33:21;
34:12,16;41:23;65:23
**words (4)** 36:4,11;57:3;
72:6
**work (15)** 7:22;11:17;
13:7;22:23;29:3;30:7;
34:4;42:1;52:7;58:21;
63:22;73:20;74:6,15;
75:3
**worked (4)** 6:1;26:7;
40:13;71:10
**workforce (3)** 12:16;
20:4,6
**working (5)** 6:4;11:21;
19:20;52:5;70:8
**workplace (5)** 12:4;
13:18;14:2;44:16;
51:23
**write (7)** 35:21;49:11,
23;52:14;56:5;66:3;
71:17
**writes (4)** 22:20;23:12;
59:8;63:22
**writeups (1)** 37:19
**writing (1)** 60:12
**written (1)** 49:13
**wrong (1)** 36:8
**wrote (3)** 47:24;50:8;
76:10
**Wu (67)** 12:8;13:22;
14:14;19:21;20:6;25:9;
29:15,21;31:11,13,24;
32:5,18;33:9,12;34:11,
23;39:1,6,9;40:16,20;
43:9,21;44:2,22;45:6,
10,14;46:8;47:15;
48:18,22;49:16,21;
51:24;52:3;57:5,15,17;
60:14,24;64:23;65:3;
69:1,10,17,21;71:3,8,
15,19,21,23;72:4,11,
21,23;73:3,9;74:3;
75:4,6,9,23;76:11,13
**Wu's (7)** 13:24;20:2;
35:2;47:7;48:3,10,12

**Y**

**years (3)** 3:15,16;37:8
**yell (1)** 75:8
**yells (2)** 29:15;76:11

**young (1)** 58:3

**1**

**1 (2)** 67:20,20
**1973 (1)** 6:5
**1st (3)** 65:20;67:14;
71:1

**2**

**2005 (1)** 5:18
**2009 (1)** 26:17
**2011 (1)** 35:9
**2012 (20)** 14:22,24;
15:15;18:24;19:4;
41:17;42:19;47:2;48:2,
17,21;49:9,13;50:15;
51:16,23;52:2;53:8;
54:22;64:15
**2013 (4)** 54:19;60:2,3;
61:17
**2014 (32)** 8:7,9;25:2;
26:13,14,18;30:19;
31:8;33:19;39:15,21;
46:2,6,7;60:3;62:7;
63:8;21;65:8,20;67:15,
19,20;69:1;71:1,13;
72:20;73:1,6,11,13;
75:7
**25th (4)** 18:24;62:7;
63:20;73:11
**26th (1)** 72:20

**3**

**3:41 pm (1)** 77:7
**30 (1)** 49:13
**30th (11)** 19:4,7;24:3,8;
41:7;17;42:18,21;44:6;
45:3;50:15

**4**

**4th (1)** 68:24

**5**

**55 (6)** 12:15;13:17;
14:1;20:4;35:3;70:8
**5th (1)** 49:9

**6**

**6th (4)** 31:8;46:4,10,13

**7**

**7-30-2012 (3)** 28:9;
29:2,12

**8**

**8-3-2012 (1)** 28:11
**8th (2)** 55:1;58:13

**9**

**9th (2)** 47:2;48:2