## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| RUTH V. BRIGGS, | : | |
| Plaintiff, | : | Case No. 16-0248 |
| v. | : | |
| TEMPLE UNIVERSITY, | : | |
| Defendant. | : | |

## DEFENDANT'S TRIAL MEMORANDUM

Defendant Temple University respectfully submits the following Trial Memorandum for this Honorable Court's consideration.

## I.    NATURE OF ACTION

Plaintiff Ruth Briggs is a former employee of Defendant Temple University who ultimately resigned in April 2014 after her repeated behavioral problems and performance deficiencies. Refusing to accept responsibility for her poor performance, Ms. Briggs claims that Temple retaliated and discriminated against her because of her age and gender.

Distilled to their essence, Ms. Briggs' allegations are based on nothing more than her disagreement with Temple's decisions about her employment. Simply put, Ms. Briggs wants a jury to second-guess and overrule Temple's business decisions. It is well settled that Ms. Briggs' own subjective belief as to whether Temple's decisions were fair, wise, or even correct, is immaterial, and neither Ms. Briggs, the Court, nor a jury may function as a super-personnel department weighing the prudence of Temple's personnel decisions.

## II.     STATEMENT OF FACTS[1]

### A.     About Temple University

Temple University is a deeply rooted, integral part of the Philadelphia (higher education) community.   Temple's history begins in 1884, when a young working man asked Russell Conwell if he could tutor him at night.   A well-known Philadelphia minister, Conwell quickly said yes.

In 1888, Conwell received a charter of incorporation for "The Temple College."   His founding vision for the school was to provide superior educational opportunities for academically talented and highly motivated students, regardless of their backgrounds or means.

Today, Temple's more than 35,000 students continue to follow the university's official motto—*Perseverantia Vincit*, or "Perseverance Conquers"—with their supreme dedication to excellence in academics, research, athletics, the arts, and more.

### B.     Ms. Briggs' Employment and Job Duties

Temple hired Ms. Briggs, who was born in 1954, as an Editorial Assistant in the Center for Neurovirology and Cancer Biology in 2001.   In February 2005, Ms. Briggs applied and was selected for the position of Executive Assistant to the Dean of the College of Science and Technology.   Over the following four years, Ms. Briggs' supervisors changed, and included Dean Allen Nicholson, Acting Dean Keya Sadeghipour, Dean Hai-Lung Dai, and Vice Dean George Palladino.   Around August or September 2009, Ms. Briggs learned that she would be on loan to (*i.e.* working temporarily for) the new Chair of the Department of Computer and Information Sciences, Dr. Jie Wu, who then became her supervisor.   After about eighteen

---

[1] Temple does not include citations for these facts or supporting exhibits as it has extensively briefed the facts, as well as the record evidence supporting them, in connection with its Motion for Summary Judgment (Docket No. 28.).

months, Ms. Briggs became Dr. Wu's permanent (and only) Executive Assistant.  Dr. Wu was born in China in 1961, and he immigrated to the United States in 1987.

Ms. Briggs viewed Dr. Wu as having an important job, and she felt that her role was important to him.  Ms. Briggs' job responsibilities included keeping Dr. Wu organized, managing his schedule, and booking travel.  Ms. Briggs understood that her job was essential to Dr. Wu's position, and she felt he could be more effective if he was organized, which would reflect well on both of them.

### C.     Temple Prohibits Discrimination and Harassment

Temple maintains an electronic Policies and Procedures Manual, which includes policies that explicitly prohibit discrimination and harassment.  Ms. Briggs had access to the Policies and Procedures Manual during her employment, and she understood that Temple prohibits discrimination and harassment.

### D.     Ms. Briggs' Performance and Behavioral Issues Result in Counseling and Disciplinary Actions

#### 1.     Temple Informally Counsels Ms. Briggs

Although Dr. Wu initially was pleased that Ms. Briggs would be working with him because she was very friendly when he interviewed at Temple, that changed shortly after they started working together.  Almost from the outset of her employment, Ms. Briggs made repeated errors that affected Dr. Wu's ability to perform his job, blamed others for her errors and lack of timeliness, and refused to take ownership of her mistakes.

#### 2.     Mr. Wacker Asks Mr. DiMeo to Participate in Ms. Briggs' Meetings with Dr. Wu

Dr. Wu and Andrew DiMeo, who was, at that time, the Assistant Director of Finance in the Dean's Office of the College of Science and Technology, began meeting with Ms. Briggs three times per week to address her performance issues.  Greg Wacker, who was, at that time, the

Director of Finance in the Dean's Office of the College of Science and Technology, asked Mr. DiMeo to attend the meetings, hoping Mr. DiMeo could help Ms. Briggs better understand the expectations of her job.  During the meetings, Dr. Wu and Mr. DiMeo identified Ms. Briggs' performance issues, which Ms. Briggs understood were areas they expected her to improve.

Ms. Briggs initially valued Mr. DiMeo's input and insight.  But, she ceased valuing his input when he started agreeing with Dr. Wu about a month after he began attending the meetings. Ms. Briggs also felt that her relationship with Mr. DiMeo "got a little confrontive."

Ms. Briggs often contacted Deirdre Walton who was, at the time, Temple's Director of Labor/Employee Relations,[2] about Dr. Wu, Mr. DiMeo, and Mr. Wacker.  Ms. Briggs told Ms. Walton it was demeaning to have Mr. DiMeo participate in her meetings with Dr. Wu and relayed that her work environment was hostile.  To her, Ms. Briggs' environment was "hostile" whenever she received discipline, others acknowledged her errors, and when Dr. Wu yelled at students in Chinese.  Ms. Walton knew Ms. Briggs also sometimes raised her voice and became hostile, and she believed, as Ms. Briggs did, that Ms. Briggs' and Dr. Wu's relationship was simply a matter of "two people that didn't see eye to eye and sometimes did not get along."

### 3.      Temple Formally Disciplines Ms. Briggs

#### a.      Temple's Disciplinary Procedure

Temple maintains Rules of Conduct, which Ms. Briggs understood she was expected to follow.  Temple's Rules of Conduct state under the heading "Disciplinary Procedure" that:

> Any employee who violates a Rule of Conduct is subject to the appropriate corrective disciplinary action, which is based on the category of the work rule violation (A, B, C or D) and the number or frequency of previous violations within the preceding 12-month period.    Repeated violations of work rules within a specific

---

[2] Ms. Walton's responsibilities include employee relations issues involving conflicts with supervisors, performance management, and discipline.

category over a 12-month period will lead to the next step in the disciplinary process.

Ms. Briggs understood this procedure.

When Ms. Briggs failed to meet expectations, Dr. Wu or Mr. DiMeo reported the facts to Mr. Wacker, and Mr. Wacker helped Dr. Wu identify the appropriate course of action with the assistance of Ms. Walton.

Each time she received a formal disciplinary action because of her behavior or her performance deficiencies, Ms. Briggs refused to take responsibility for her failings. Instead, she made excuses and complained about the "unfairness" of being disciplined.

### b.       November 2011 Discipline

On November 11, 2011, Mr. Wacker issued Ms. Briggs a written warning for violating Rule B.11, unprofessional/inappropriate conduct. During their meeting, Mr. Wacker allegedly told Ms. Briggs that Dr. Wu reported to him she behaved inappropriately by saying something she should not have said. According to Ms. Briggs, she received this disciplinary action because she responded to Dr. Wu's alleged comment that women in China "are put out to pasture by [her] age" by telling him that "we are in America right now."[3] Ms. Briggs claims that Dr. Wu told her a short time earlier that women in China retire at 55, and that is "why [she] lost it. Well, not lost it, but . . . [she is] generally not one to be confrontive, but [she] just said, "'We're not in China.'"

### c.       March 2013 Discipline

One essential component of Dr. Wu's job was to recruit faculty for Temple, and Ms. Briggs assisted him by coordinating logistics for faculty candidates when they visited Temple to interview, including booking travel for certain candidates when they visited. In February/March 2013, Ms. Briggs was supposed to book travel for a candidate named Clint Whaley, but she

---

[3] Dr. Wu denies making this comment.

failed to do so.  Dr. Whaley ultimately did not visit, and therefore, was not hired by Temple.  Ms. Briggs understood that it was her responsibility to book his travel and that it was problematic that she failed to do so.

Because of the incident, on March 26, 2013, Ms. Briggs received a three-day suspension without pay for violating Rule C.4, neglecting job duties or responsibilities, or failing to carry out instructions given by a supervisor.  Ms. Briggs acknowledges she "dropped the ball" by failing to carry out Dr. Wu's instruction and she understood why her discipline was a categorized as a Level C.  She also understood that, after she received the disciplinary action, she was on probation for a year and an additional Level C infraction could lead to the end of her employment with Temple.  Ms. Briggs is not aware of anyone else who worked in Dr. Wu's office who failed to book travel arrangements for a visiting candidate.

On April 8, 2013, Ms. Briggs emailed Ms. Walton complaining about the level of discipline she received, and claiming that "[n]egligence, carelessness and poor job performance [was] not uncommon" in the department, but there were "different standards for performance and productivity."  Ms. Walton relayed Ms. Briggs' concerns to Mr. Wacker, who already knew of the situation.  Messrs. Wacker and DiMeo assured Ms. Walton that everyone was treated equally and that no other employee made as many mistakes as Ms. Briggs.

### d.    January 2014 Discipline

On January 20, 2014, Ms. Briggs was three hours late for work, for which she believes she received a written warning for violating Work Rule B.10, failing to meet expected standards of performance, productivity or efficiency.[4]  Although she claims she called the office when she woke up and told a student worker who answered the phone she overslept and would be there in

---

[4] Ms. Briggs acknowledges she was late on previous occasions, and Dr. Wu was flexible, until she was three hours late and did not call in.  There was no other occasion on which she was more than thirty minutes late without notifying Dr. Wu.

ten minutes, she admits that she did not call Dr. Wu on his cell phone, nor did she send him an email or text message to let him know she would be late.  When she was given the disciplinary action, Ms. Briggs became argumentative because she felt Dr. Wu and Mr. DiMeo were "lying" about her because they said she had not called in and refused her request they investigate the incident.[5]

On February 22, 2014, Ms. Briggs contacted Ms. Walton about her January 20, 2014 discipline.  Ms. Briggs forwarded to Ms. Walton calendars for January and February "to defend [herself] from Drew DiMeo's and Greg Wacker's unsubstantiated accusations, for which [she] received a second serious discipline."  Ms. Briggs further stated that she "truly overslept and missed the meeting" on one day, and then closed by stating that she was "appealing to [Ms. Walton] to assign someone who is fair and unbiased to conduct an investigation for the truth about these two incidences without prejudice in a timely manner."  As she always did when Ms. Briggs contacted her, Ms. Walton contacted Mr. Wacker and/or Mr. DiMeo and asked them to look into the situation.

On March 13, 2014, Ms. Briggs complained to Ms. Walton that she believed Mr. Wacker's assertion she failed to the notify the department she overslept, was false, and stating that she "want[ed] to settle this matter internally with the HR department regarding [her] request to rescind this discipline simply because Greg Wacker lied in his statement to [Ms. Walton] about [Ms. Briggs]."  She further complained that she was not given the opportunity to defend herself and complained about the "authoritarian leadership" of "staff members in managerial positions."  She also stated that, "[i]n the eyes of the law, this could be viewed as unfair labor

---

[5] Ms. Briggs was disciplined because she was late and did not come in until mid-day; she did not call in until mid-day, and then spoke with a student rather than her supervisor (Dr. Wu), an administrator, or a regular employee; and she did not send an email to Dr. Wu once she knew that he was not available by phone.

practices and discrimination, both of which violate federal and state laws." Ms. Walton responded to the email later that same day, offering to meet with Ms. Briggs to discuss her concerns.

### e.        April 2014

As part of her job duties, Ms. Briggs submitted Dr. Wu's expense reports, and admits that sometimes she failed to submit the reports timely. In one such incident, on March 20, 2014, Dr. Wu instructed Ms. Briggs to complete a travel expense reimbursement for him by the end of the day, and she failed to do so. Although she claimed she could not do so because of technical issues, Mr. DiMeo confirmed no technical issues existed. On March 21, 2014, when Dr. Wu and Mr. DiMeo approached Ms. Briggs about her deficiency, Ms. Briggs was argumentative and unprofessional, insisting that Dr. Wu and Mr. DiMeo were calling her a liar. Not long before that, Ms. Briggs was instructed to book a hotel reservation for a colloquium speaker for his upcoming visit to Temple on March 13th and 14th, and she booked the room for the wrong dates. Dr. Wu reported these two incidents to the Dean's Office, and Mr. DiMeo investigated the facts; Mr. Wacker then turned the information over to and discussed the situation with Ms. Walton, and together with Dr. Wu, Mr. Wacker, and Mr. DiMeo, they decided termination was the appropriate level of discipline.

Early on the morning of April 1, 2014, Mr. Wacker called Ms. Briggs and asked to meet with her at 10:00 AM. Ms. Briggs responded that she had another meeting, but could meet at 10:30 AM, to which he agreed. When Ms. Briggs went to the Dean's Office to meet with Mr. Wacker, Ms. Walton was also present. Of their meeting, Ms. Briggs only remembers that Mr. Wacker gave her a letter. The letter advised Ms. Briggs that Temple investigated the two work-related items (discussed above) brought to the attention of the Dean's Office, which constituted violations of two Level C work rules: C.4 (negligence/carelessness) and C.3 (disruptive or

8

disorderly conduct), that the disciplinary action for a second Level C violation is termination, and therefore, her employment was being terminated that day.  During that meeting, Mr. Wacker also offered Ms. Briggs the option of resigning, which Ms. Briggs ultimately accepted.[6]  On April 3, 2014, Ms. Briggs submitted a resignation email, in which she stated, in part, that she had "great admiration" for "our amazing faculty."

### E.     Ms. Briggs Complains to Temple About Her Treatment

#### 1.     Ms. Briggs Communicates with Temple's Legal Office

On February 9, 2013, Ms. Briggs emailed Associate University Counsel Cameron Etezady requesting a confidential conversation "to discuss disparate treatment" she believed was related to her age.  Mr. Etezady suggested that Ms. Briggs contact Sandy Foehl or Tracey Hamilton in EOC,[7] which was an unsatisfactory response to Ms. Briggs.  Mr. Etezady then offered to refer Ms. Briggs to Fay Trachtenberg in the legal office.  Ms. Briggs responded that she "would feel most comfortable meeting with" Ms. Trachtenberg, and Mr. Etezady provided instructions for arranging a call or meeting.  Ms. Briggs found Mr. Etezady responsive and helpful.

On August 6, 2013, Ms. Briggs forwarded to Mr. Etezady a portion of their email communications from February 2013, stated that she contacted Fay (Trachtenberg), who referred her to Deirdre Walton, and that she (Ms. Briggs) asked Ms. Walton to serve as a mediator in meetings with Dr. Wu and Mr. DiMeo.  Mr. Etezady again suggested that Ms. Briggs speak with Ms. Trachtenberg.

---

[6] Additionally, Ms. Walton told Ms. Briggs that Temple would not challenge her claim for unemployment compensation benefits, and she was able to collect unemployment from the time of her resignation.

[7] Temple's Equal Opportunity Compliance ("EOC") Department investigates all discrimination and harassment complaints that are brought to their attention from students, faculty, and employees.  The EOC is separate from Human Resources.

### 2.  Ms. Briggs Communicates with Sandy Foehl (Equal Opportunity Compliance)

Ms. Briggs' first contact with EOC was a July 25, 2012 email to Sandy Foehl, Temple's EOC Director, in which Ms. Briggs requested a meeting.  Ms. Briggs met with Ms. Foehl on July 30, 2012.  During the meeting, Ms. Briggs told Ms. Foehl about the problems she was having in the department and "the comments Dr. Wu had made about [her] age," in particular his alleged comment that women in China are "put out to pasture" around a certain age or retire at 55.  Ms. Briggs also reported that Dr. Wu yelled[8] and made demeaning comments like, "Are you stupid?"  Ms. Briggs told Ms. Foehl she gave Dr. Wu the "benefit of the doubt" for his remarks, "allowing for cultural differences and [his] difficulty with English."  Ms. Foehl "walked through the [EOC] process" with Ms. Briggs, but Ms. Briggs "asked [Ms. Foehl] to hold off" on doing anything because her son was about to undergo spinal surgery.

On August 2, 2012, Ms. Briggs asked Ms. Foehl if she could review EOC's letter on her behalf before it was sent, and if not, said she "would appreciate a synopsis of the content presented in the 'complaint.'"  Ms. Foehl advised Ms. Briggs that EOC "doesn't have grievants review the complaint notices [they] send."  Ms. Foehl also explicitly asked Ms. Briggs to provide a written statement including "the present treatment [she found] discriminatory and/or harassing, the source of the disparate treatment and/or unwelcome conduct, and the basis for the unfair treatment from [her] perspective."

On September 9, 2012, Ms. Briggs forwarded Ms. Foehl an email chain regarding a grant proposal Dr. Wu assigned to a student worker, and complaining that it was "yet another of [her] job functions assigned to" the student, which she found "shaming and embarrassing[;]"  Ms. Briggs also complained that she was paid less than "two male staff members in the dean's office

---

[8] Ms. Briggs acknowledged that Dr. Wu also yelled at his students, both male and female.

who were [her] equals."   The complaint about Ms. Briggs' compensation related to compensation purportedly paid to two male staff members around 2006; Ms. Briggs never previously complained about this issue.[9]   Ms. Briggs also, again, reiterated that she was not authorizing any action by Ms. Foehl.

On November 2, 2012, Ms. Briggs inquired about the status of her complaint with Ms. Foehl.  Ms. Foehl responded by referring Ms. Briggs to Ms. Briggs' prior statement that she was not authorizing any action, and Ms. Foehl repeated her request for a written statement if Ms. Briggs was authorizing action.  Ms. Foehl also asked Ms. Briggs to provide specifics about the compensation issue.   Finally, Ms. Foehl advised Ms. Briggs that complaints of unlawful discrimination also could be made to governmental compliance agencies, and provided Ms. Briggs with information about how Ms. Briggs could make such a complaint.  Ms. Briggs did not file a complaint at that time.

Ms. Briggs' sent her apparent response approximately three months later—on February 8, 2013, when she emailed Ms. Foehl, stating that she was "so bullied and harassed all day," she had to meet with Dr. Wu and Mr. DiMeo every morning "to discuss [her] failure to comply with a directive that prohibit[ed] any work activity that ha[d] not been approved by [her] supervisor[;]" she further complained that "[n]o other staff member [was] required to meet daily for a dose of public humiliation," and when she requested clarification on an assignment, it was "reported to the dean's office as a challenge to [her supervisor's] authority."   Ms. Foehl responded, advising Ms. Briggs that the issue was one for Human Resources, and instructed her to address her concerns with Ms. Walton.

---

[9] Ms. Briggs' concern about her compensation is the only issue Ms. Briggs raised with Ms. Foehl that Ms. Foehl discussed with Ms. Walton.  Ms. Foehl did not discuss with Ms. Walton the issue Ms. Briggs raised concerning Dr. Wu's supposed comment about women in China, because Ms. Foehl's office – rather than Human Resources – was responsible for investigating that issue.

More than a year later, on February 25, 2014, Ms. Briggs asked Ms. Foehl for an appointment to file a complaint. This was Ms. Briggs' first communication with Ms. Foehl since their February 2013 email exchange. Ms. Briggs stated that she already had a phone intake with the Equal Employment Opportunity Commission ("EEOC") and she planned to file a complaint internally.

Ms. Briggs met with Ms. Foehl at 10:00 AM on April 1, 2014. (Briggs Dep. 452:3-6.) During the meeting, Ms. Briggs complained she was being discriminated against because of her age and her gender.[10] Ms. Briggs relayed that she wished to file a complaint of age discrimination, mentioned her January 20 disciplinary action, and compared her treatment to that of Hailey King.[11] Ms. Briggs never provided a written statement of her allegations, as Ms. Foehl requested during, and subsequent to, their meeting.

On April 4, 2014, Ms. Foehl met with Dr. Wu to discuss Ms. Briggs' allegations. Dr. Wu reported that Ms. Briggs resigned the prior day. When Ms. Foehl asked Dr. Wu about his comment concerning women retiring in China, he explained that he regularly discussed cultural differences between China and the United States with all of his staff (not just Ms. Briggs), and the comment was simply an observation he made in one such discussion, which was not meant to be upsetting to Ms. Briggs.

---

[10] Although Ms. Briggs believes she conveyed to Ms. Foehl that she wanted to make a complaint of age and gender discrimination, and maybe retaliation, she believes it is possible that Ms. Foehl did not understand that.

[11] Ms. Briggs contends that Ms. King was once absent for three days without reporting she would be out and she was not disciplined for the incident; she acknowledges, however, that Dr. Wu or someone spoke with Ms. King about the incident. According to Ms. Briggs, another employee told her there was another occasion on which Ms. King did not report to work for two days. Ms. Briggs admits that she does not know the circumstances surrounding Ms. King's absences. Ms. King was absent for two days and did not call in or email Dr. Wu because of the hurricane. When Ms. King returned to work, Dr. Wu gave her a "very serious verbal warning."

### III.    KEY LEGAL ISSUES

Ms. Briggs cannot prove, by a preponderance of the evidence, that Temple discriminated against or harassed her because of her age or gender.   Ms. Briggs also cannot prove, by a preponderance of the evidence that Temple University discriminated against her because of any protected activity.

The evidence demonstrates that Temple University terminated Ms. Briggs for a legitimate, non-discriminatory reason—namely, her admittedly repeated behavioral and job performance issues, which violated Temple's Rules of Conduct.  Ms. Briggs cannot show that the termination decision or the previous disciplinary decisions were pretext for discriminatory animus.  Indeed, many of Ms. Briggs' alleged comparators are other women around Ms. Briggs' age.  Further, she cannot point to anyone who Temple treated more favorably who was (1) disciplined for the same infractions or (2) on probation when a new alleged infraction occurred.

Further, with regard to Ms. Briggs' retaliation claim, the termination decision was made before Dr. Wu, Mr. DiMeo, or Mr. Wacker knew Ms. Briggs complained to Temple University. The evidence demonstrates that Ms. Briggs was not harassed, and that any stray comments allegedly made by Dr. Wu do not rise to the level of harassment, as a matter of law.

### A.    Whether Ms. Briggs Can Prove, By A Preponderance Of The Evidence, That Temple University Intentionally Discriminated Against Her Because Of Her Age In Violation Of The ADEA Or Her Gender In Violation Of Title VII

Ms. Briggs does not have any direct evidence of age or gender discrimination.  Absent direct evidence, discrimination claims are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[12]  *See, e.g., Willis v.*

---

[12] Gender and age discrimination claims asserted under the PHRA are analyzed using the same framework as claims asserted under Title VII and the ADEA.  *See, e.g., Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 n.5 (3d Cir. 2006) (gender); *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998) (age).

*UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015).   Under this framework, if Ms. Briggs establishes a *prima facie* case, the burden shifts to Temple to articulate a legitimate, non-discriminatory reason for the challenged employment decisions.  *Id.*  Then, the burden shifts back to Ms. Briggs, who bears the ultimate burden of establishing that the proffered reason was pretext for discrimination.  *Id.*  To establish a disparate treatment claim under the ADEA, Ms. Briggs must prove that age was the "but-for" cause of her termination.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

### 1.    Whether Ms. Briggs Can Establish A *Prima Facie* Case Of Disparate Treatment

To establish a *prima facie* case of disparate treatment, Ms. Briggs must show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances of the adverse action give rise to an inference of discrimination.  *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015).  Temple does not dispute that Ms. Briggs is a member of a protected class and that she experienced an adverse employment action (her discharge).   However, Ms. Briggs cannot establish a *prima facie* case because she cannot show that she was qualified for her position, and she has no evidence giving rise to an inference of discrimination.

### 2.    Whether Ms. Briggs Can Show That Temple's Legitimate, Non-Discriminatory Reason For Its Actions Was A Pretext For Discrimination

Even if Ms. Briggs could establish a *prima facie* case of disparate treatment (and she cannot), Temple rebuts the inference of discrimination by "provid[ing] evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons."  *Willis*, 808 F.3d at 644.  Temple need not *disprove* an improper motive; rather, it merely must *identify* a legitimate motive for the challenged employment decision.  *See, e.g., Dean v. Specialized Sec.*

14

*Response*, Civil Action No. 09-515, 2011 U.S. Dist. LEXIS 94722, at *38 (W.D. Pa. Aug. 24, 2011).  The inquiry focuses on the perception of the decision-maker; thus, the employer need only have "an honest belief that the incident occurred."  *Id.* at *39.  Temple had a legitimate, non-discriminatory reason for disciplining and discharging Ms. Briggs:  her repeated behavioral and job performance issues, which violated Temple's Rules of Conduct.

Given Temple's legitimate non-discriminatory reason for Ms. Briggs' termination, to prevail on her discrimination claims, Ms. Briggs must adduce evidence from which a factfinder could reasonably either (1) disbelieve Temple's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Temple's action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  She cannot do either.

The first method of establishing pretext focuses on whether the plaintiff has adduced evidence from which a fact-finder could reasonably disbelieve the defendant's articulated legitimate reasons for the challenged actions.  As the Third Circuit has explained, to discredit the employer's reason, a plaintiff must:

> demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence" and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

*Fuentes*, 32 F.3d at 765 (alteration in original) (citation and internal quotation marks omitted).

At this stage of the analysis, the question is "not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [an unlawful motive]." *Keller v. ORIX Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (internal quotation marks omitted).  As the Third Circuit explained, the plaintiff "has the burden of casting doubt on an employer's articulated reasons for an employment decision.  Without some evidence to cast this

doubt, this court will not intervene in an otherwise valid management decision.  To require less would be to expose to litigation every management decision impacting on a protected party." *Billet v. CIGNA Corp.*, 940 F.2d 812, 828 (3d Cir. 1991); *see also Ezold*, 983 F.2d at 533.

To show pretext under the second method identified in *Fuentes*, a plaintiff must demonstrate, through admissible record evidence, that discrimination "was more likely than not a motivating or determinative cause of the adverse employment action."  *Fuentes*, 32 F.3d at 762. A plaintiff cannot rely on her own subjective beliefs or feelings to establish that discrimination was the reason for her termination decision.  *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 413 (E.D. Pa. 2000) ("Pretext cannot be established based on speculation and mere conclusory allegations.").  Rather, she must proffer *actual evidence* to support her claim of pretext.  *Harris v. Mercy Health Corp.*, Civil Action No. 97-7802, 2000 U.S. Dist. LEXIS 11228, at *29 (E.D. Pa. Aug. 10, 2000) (finding plaintiff's unsupported allegations insufficient to avoid summary judgment where he "offer[ed] no evidence suggesting that defendant's asserted reasons for its actions . . . were either objectively false or merely pretextual").

Ms. Briggs has no evidence to (1) cast doubt on the reasons given by Temple for disciplining and discharging her, or (2) support a finding that the decisions to discipline and discharge her were motivated by discriminatory intent.  Ms. Briggs, therefore, cannot prove by a preponderance of the evidence that Temple's legitimate non-discriminatory reason for its actions was a pretext.

### B.      Whether Ms. Briggs Can Prove, By A Preponderance Of The Evidence, Gender – Or Age – Based Harassment

To prevail on a claim of gender or age discrimination under a theory of a hostile or abusive work environment, Ms. Briggs must establish the following elements by a preponderance of the evidence: (1) she suffered intentional discrimination because of her age or

gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and (5) there is a basis for holding Temple liable. *See, e.g., Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006). Even assuming Ms. Briggs's allegations are true, she does not meet this standard.

### C.     Whether Ms. Briggs Can Prove Retaliation By A Preponderance Of The Evidence

The *McDonnell Douglas* burden-shifting analysis also applies to claims of retaliation. *See, e.g., Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 259, 257 (3d Cir. 2017). To establish a *prima facie* case of retaliation Ms. Briggs must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. *Id.* Similar to an age discrimination claim, a plaintiff alleging retaliation must show that her protected activity was the "but-for" cause of the challenged employment action. *Id.* Ms. Briggs cannot make this showing as she has no evidence that her alleged protected activity was *a factor in* – let alone the *but-for cause of* – her discipline or discharge.

### IV.    DEFENDANT'S WITNESS LIST

1. Jie Wu, Ph.D.
   c/o Littler Mendelson, P.C.
   Three Parkway
   1601 Cherry Street, Suite 1400
   Philadelphia, PA 19102

2. Andrew DiMeo
   c/o Littler Mendelson, P.C.
   Three Parkway
   1601 Cherry Street, Suite 1400
   Philadelphia, PA 19102

3. Gregory Wacker
   c/o Littler Mendelson, P.C.

Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102

4. Sandra Foehl
c/o Littler Mendelson, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102

5. Deirdre Walton
c/o Littler Mendelson, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102

6. Ruth V. Briggs
c/o Console Mattiacci Law, LLC
1525 Locust Street, 9th Floor
Philadelphia, PA 19102

Temple reserves the right to call those witnesses identified by Ms. Briggs in her Rule 26

Initial Disclosures, as well as rebuttal witnesses.

## V.    ITEMIZED STATEMENT OF DAMAGES

Temple is not seeking monetary damages from Ms. Briggs at this time, but will seek

costs, fees, and all other available relief if successful at trial.

## VI.   DEFENDANT'S TRIAL EXHIBITS[13]

1. Complaint re: Briggs v. Temple University, No. 2:16-cv-00248

2. Defendant Temple University's Answer with Affirmative Defenses to Plaintiff Ruth
   Briggs's Complaint

3. Plaintiff Ruth Briggs's Responses to Defendant Temple University's First Set of
   Interrogatories

4. October 19-20, 2009 emails between Gregory Wacker, Lisa Stepp, and Sharlita Brown
   (TEMPLE0081-86)

---

[13] Temple University is not aware of any contested exhibits at this time.

5. Temple University Rules of Conduct (TEMPLE 0148-164)

6. Temple University Policies and Procedures Manual (BRIGGS 94-96)

7. November 9, 2011 Disciplinary Report (BRIGGS 23)

8. March 26, 2013 Disciplinary Report (BRIGGS 49)

9. January 20, 2014 Disciplinary Report (TEMPLE0170)

10. Employee Performance Development Plan June 2005 (TEMPLE UNIVERSITY (R. BRIGGS) – 0000224-234)

11. Employee Performance Development Plan June 2006 (TEMPLE UNIVERSITY (R. BRIGGS) – 0000235-242)

12. Employee Performance Development Plan June 2007 (TEMPLE UNIVERSITY (R. BRIGGS) – 0000243-251)

13. Employee Performance Development Plan June 2008 (TEMPLE UNIVERSITY (R. BRIGGS) – 0000252-258)

14. Employee Performance Development Plan June 2009 (TEMPLE UNIVERSITY (R. BRIGGS) – 0000259-264)

15. Employee Performance Development Plan June 2011 (TEMPLE UNIVERSITY (R. BRIGGS) – 0000265-270)

16. Employee Performance Development Plan June 2012 (TEMPLE UNIVERSITY (R. BRIGGS) – 0000271-276)

17. Employee Performance Development Plan June 2013 (TEMPLE UNIVERSITY (R. BRIGGS) – 0000277-280)

18. December 31, 2012 emails between Ruth Briggs and Jie Wu (TEMPLE UNIVERSITY (R. BRIGGS) – 0000362-368)

19. December 18, 2012 email from Ruth Briggs to Jie Wu, cc: Judy C. Lennon, et al., (TEMPLE0000392)

20. August 2, 2012 email from Jie Wu to Justin Yuan Shi, cc: Andrew DiMeo (TEMPLE UNIVERSITY (R. BRIGGS) – 0000150-155)

21. February 20, 2013 – March 24, 2013 email string between Ruth Briggs, Clint Whaley, Jie Wu, and Eugene Kwanty (TEMPLE0000571-575)

22. November 20, 2013 email from Jie Wu to Ruth Briggs, cc: Andrew DiMeo (TEMPLE0000658-659)

23. April 3, 2014 email from Ruth Briggs to Deirdre Walton (TEMPLE0088)

24. April 1, 2014 letter from Gregory Wacker to Ruth Briggs (BRIGGS 90)

25. December 14, 2011 email from Ruth Briggs to Gregory Wacker, et al. (TEMPLE UNIVERSITY (R. BRIGGS) – 0000327-328)

26. July 25, 2012 – August 3, 2012 emails between Ruth Briggs and Sandra Foehl (TEMPLE UNIVERSITY (R. BRIGGS) – 0000208, 210-211)

27. November 2, 2012 – November 5, 2012 emails between Sandra Foehl and Ruth Briggs (TEMPLE UNIVERSITY (R. BRIGGS) – 0000199-201)

28. April 25, 2013 emails between Deirdre Walton and Ruth Briggs (BRIGGS 51-52)

29. February 6, 2014 email from Ruth Briggs to Deirdre Walton (BRIGGS 69)

30. March 13, 2014 – March 14, 2014 emails between Deirdre Walton and Ruth Briggs (BRIGGS 74-76)

31. April 2, 2014 and April 21, 2014 emails between Sandra Foehl and Ruth Briggs (TEMPLE0174-175)

32. Ruth Briggs's LinkedIn Profile (BRIGGS 377-382)

33. April 24, 2015 – May 23, 2017 Facebook messages between Alexis Cogan and Ruth Briggs (BRIGGS 385-402)

34. September 9, 2008 – July 14, 2016 Facebook messages between Abbe Forman and Ruth Briggs (BRIGGS 403-423)

35. December 30, 2008 – March 3, 2016 Facebook messages between Christine Kim and Ruth Briggs (BRIGGS 428-441)

36. April 8, 2011 – July 8, 2016 Facebook messages between Lan Nguyen and Ruth Briggs (BRIGGS 444-458)

37. April 30, 2014 – June 25, 2016 Facebook messages between Jennie Shanker and Ruth Briggs (BRIGGS 460-464)

38. December 28, 2010 – April 23, 2014 Facebook messages between Avi Sil and Ruth Briggs (BRIGGS 465-475)

39. December 3, 2009 – May 24, 2017 Facebook messages between Karen Woods Wilson and Ruth Briggs (BRIGGS 484-509)

40. December 15, 2014 emails between Nemanja Djuric and Ruth Briggs (BRIGGS 512)

41. November 9, 2010 emails between Jie Wu and Ruth Briggs (TEMPLE UNIVERSITY (R. BRIGGS) – 0000411-412)

42. October 29, 2010 email from Gregory Wacker to Deirdre Walton (TEMPLE UNIVERSITY (R. BRIGGS) – 0000344)

43. December 9, 2010 email from Sharon Boyle to Jie Wu, et al. (TEMPLE UNIVERSITY (R. BRIGGS) – 0000355)

44. March 25, 2013 emails between Eugene Kwatny, Jie Wu, and Andrew DiMeo (TEMPLE0169)

45. March 25, 2013 email from Ruth Briggs to Eugene Kwatny (TEMPLE0000586)

46. April 4, 2014 emails between Sandra Foehl and Deirdre Walton (TEMPLE UNIVERSITY (R. BRIGGS) – 0000023)

47. January 12, 2012 emails between Gregory Wacker and Ruth Briggs  (TEMPLE UNIVERSITY (R. BRIGGS) – 0000320-322)

48. April 2, 2014 emails between Ruth Briggs and Deidre Walton (TEMPLE UNIVERSITY (R. BRIGGS) – 0000121)

49. April 8, 2013 email from Ruth Briggs to Deirdre Walton (TEMPLE UNIVERSITY (R. BRIGGS) – 0000108)

50. February 26, 2014 email from Sandra Foehl to Deirdre Walton (TEMPLE UNIVERSITY (R. BRIGGS) – 0000039)

51. March 28, 2014 email from Deirdre Walton to Sharlita Brown, forwarding emails between Ms. Walton and Ms. Briggs (TEMPLE UNIVERSITY (R. BRIGGS) – 0000069-73)

52. August 3, 2012 email from Sandra Foehl to Deirdre Walton and Eric Brunner (TEMPLE UNIVERSITY (R. BRIGGS) – 0000052)

53. February 8, 2013 email from Sandra Foehl to Deirdre Walton (TEMPLE UNIVERSITY (R. BRIGGS) – 0000116-117)

54. Sandra Foehl Notes (TEMPLE UNIVERSITY (R. BRIGGS) – 0000476-481)

55. Ruth Briggs' Medical Records (MIDDLEMAN 1-45)

56. March 2014 emails between Sandra Foehl and Ruth Briggs (TEMPLE0000310-313)

57. November 9, 2010 Emails between Dr. Wu and Ruth Briggs (TEMPLE UNIVERSITY (R.BRIGGS) - 0000411)

58. November 29, 2012 emails between Dr. Wu and Drew DiMeo (BRIGGS 32-37)

59. November 19, 2013 emails between Ruth Briggs, Drew DiMeo and Dr. Wu (TEMPLE0000641-643)

60. January 21, 2013 – February 3, 2013 emails (TEMPLE0000359-360)

61. March 24, 2013 emails between Eugene Kwatny and Dr. Wu (TEMPLE0000561-0000564)

62. February 4, 2013 email between Dr. Wu, Drew DiMeo, and Ruth Briggs (TEMPLE0000343)

63. December 18, 2012 emails (TEMPLE0000393)

64. April 8, 2013 email from Ruth Briggs to Deirdre Walton (BRIGGS 50)

65. November 20, 2013 email from Dr. Wu to Ralph Jenkins (TEMPLE0000663-665)

66. April 12, 2010 email from Dr. Wu to Ruth Briggs (TEMPLE UNIVERSITY (R. BRIGGS)-0000356)

67. March 26, 2013 email from Dr. Wu to Ruth Briggs and Drew DiMeo (TEMPLE UNIVERSITY (R. BRIGGS)-0000359)

68. March 26, 2013 email from Drew DiMeo to Ruth Briggs and Dr. Wu (TEMPLE UNIVERSITY (R. BRIGGS)-0000361)

69. June 18, 2012 emails from Drew DiMeo to Ruth Briggs (TEMPLE UNIVERSITY (R. BRIGGS)-0000399-401)

70. September 9, 2012 Email from Ruth Briggs to Sandra Foehl (TEMPLE UNIVERSITY (R. BRIGGS)-0000203-207)

71. March 20, 2014 Email between Ruth Briggs and Drew DiMeo (TEMPLE0250-0252)

## VII.   TEMPLE UNIVERSITY'S PROPOSED VOIR DIRE

Temple University's proposed *voir dire* is attached hereto as Exhibit A.

## VIII.   TEMPLE UNIVERSITY'S PROPOSED JURY INSTRUCTIONS

Temple University's proposed *voir dire* is attached hereto as Exhibit A.

Respectfully submitted,


/s/ Richard R. Harris
Richard R. Harris (PA #84897)
Rachel Fendell Satinsky (PA #308751)
Jonathan L. Shaw (PA #316882)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3000 (telephone)
267.402.3131 (facsimile)
rharris@littler.com
rsatinsky@littler.com
jlshaw@littler.com

Attorneys for Defendant
Temple University

Date: July 16, 2018

## CERTIFICATE OF SERVICE

I, Richard R. Harris, hereby certify that, on this 16th day of July, 2018, the foregoing document was filed using the Eastern District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon all counsel of record.

*/s/ Richard R. Harris*
Richard R. Harris

# EXHIBIT A
## (PROPOSED VOIR DIRE)

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RUTH V. BRIGGS,                          :
                                         :
            Plaintiff,                   :        Case No. 16-0248
                                         :
      v.                                 :
                                         :
TEMPLE UNIVERSITY,                       :
                                         :
            Defendant.                   :
                                         :
                                         :

### DEFENDANT'S PROPOSED VOIR DIRE

Defendant Temple University respectfully requests that the Court use the following *voir dire* during the jury selection process:

## I.   INTRODUCTION OF CASE TO JURY PANEL

This case involves two parties – the Plaintiff, Ruth Briggs, and the Defendant, Temple University.  Ms. Briggs is a former employee of Temple University.  Ms. Briggs has brought claims against Temple University for age and gender discrimination, harassment, and retaliation.

Ms. Briggs is represented by Steve Console and Rahul Munshi of Console Mattiacci Law, LLC.  Temple University is represented by Richard R. Harris and Rachel Fendell Satinsky of Littler Mendelson, P.C.

This is the stage of the trial where the jurors are selected to hear the case.  I will be asking certain questions so that I can learn a little about you.  Some of these questions may seem to pry.  I apologize for that, but it is extremely important for the attorneys and me to know if there is anything that would cause you unintentionally to be unfair to either side.

Now, I have these questions for you.

## II.    SPECIFIC VOIR DIRE

1.    Do you know any facts about this case other than what the Judge has told you?

2.    Have you had any education, training, or work experience in any of the following:

    (a)    Human resources or Employee relations?

    (b)    Law?

    (c)    Psychology/counseling?

    (d)    Work as an administrative assistant or secretary?

    If so, what is your experience or training?

3.    Have you or anyone close to you ever made a complaint about your treatment at work, either internally or with the government?

4.    Have any of you or your spouse, close family member or friend ever felt that you/they were treated unfairly at work?

    (a)    When?

    (b)    What happened?

    (c)    Did you/they complain?

    (d)    Were you/they satisfied with the response to your/their complaint?

    (e)    Would you tend to believe allegations of unfair treatment if raised by an employee against his/her employer or former employer?

5.    Have any of you or a spouse, close family member or friend ever felt that you/they were the victim of discrimination in the workplace?

    (a)    When?

    (b)    What happened?

    (c)    Did you/they complain?

    (d)    Were you/they satisfied with the response to your/their complaint?

    (e)    Given this experience, would you tend to believe allegations of discrimination in the workplace?

6.    Have any of you or your spouse, close family member or friend ever felt that you/they were being retaliated against in the workplace?

    (a)    When?

    (b)    What happened?

    (c)    Did you/they complain?

    (d)    Were you/they satisfied with the response to your/their complaint?

    (e)    Would you tend to believe allegations of retaliation in the workplace?

7.    Have any of you or your spouse, close family member or friend ever worked somewhere that you considered a hostile workplace?

    (a)    When?

    (b)    Where?

    (c)    What happened?

    (d)    Did you/they feel the hostility was based on age, gender, or race?

    (e)    Did you/they complain?

    (f)    Were you/they satisfied with the response to your/their complaint?

    (g)    Based on this personal experience would you tend to believe allegations of a hostile work environment against an employer?

8.    Have any of you or your spouse, close family member or friend ever lost a job?

9.    Have any of you ever observed what you believed was discrimination in your workplace?

    (a)    When?

    (b)    Where?

    (c)    What was involved?

    (d)    Who engaged in the discrimination?

    (e)    Did you/they take any action?

    (f)    Would you tend to believe an employee who raises allegations of discrimination?

10.     Have you or your spouse, close family member or friend ever felt you were pushed out of a job or replaced by a younger employee?

     (a)     When?

     (b)     Where?

     (c)     What was involved?

     (d)     Would you tend to believe similar allegations if raised in a lawsuit against an employer?

11.     Have any of you ever had a dispute with a supervisor?

     (a)     When?

     (b)     What was involved?

     (c)     Was it resolved?  If so, how was it resolved?

     (d)     In this case, plaintiff was in disputes with her employer.  Would you tend to favor the plaintiff based on your similar experience?

12.     Have you, or anyone close to you, ever been put on disciplinary probation by an employer

     (a)     Who?  When?

     (b)     Was the probation justified?  Why/why not?

     (c)     Was the probation successfully completed?

13.     Do any of you believe that employers, managers, or supervisors generally discriminate against their employees based upon their sex?  If so, why do you feel this way?

14.     Do any of you believe that employers, managers, or supervisors generally discriminate against their employees based upon their age?  If so, why do you feel this way?

15.     Would you tend to believe allegations of gender discrimination against a supervisor from China?

16.     Would you tend to believe allegations of age discrimination against a supervisor from China?

17.     Do you consider yourself an activist, whether through your work, writing, groups, or other activities, for any issues that are important to you?  If so, what issues?

18.     Do any of you believe that an employer should not be permitted to end the employment of an employee for poor performance?  If so, why do you feel this way?

19.   Will you have any difficulty refraining from discussing this case with anyone until it is submitted to you for decision, and then only discuss the case with the jurors in the jury room?

20.   Will you have any difficulty keeping an open mind until you have heard all of the evidence and all of the argument of both counsel, and the court has given you all the instructions?

21.   Each attorney has the right to excuse prospective jurors without giving a reason. Would you dislike the attorney or the party he or she represents if he or she excused a prospective juror without giving a reason?

22.   What newspapers and magazines do you read regularly?

23.   What was the last book you read?

24.   If you watch television, what shows do you watch regularly?

25.   Do you have any bumper stickers on your car? If so, what do they say or depict?

26.   If you belong to any civic, social, fraternal, or professional organizations, please state which ones.

27.   Under our system of justice, a very important principle is that large organizations like Temple University are to be treated no better and no worse than individuals. If you have a problem accepting that, then you owe it to everyone in the courtroom to say so now. Does anyone have any problem accepting that?

28.   Have you ever testified in any court proceeding?

    (a)   When?

    (b)   Explain the circumstances.

29.   Just because Temple University was sued does not mean that it did anything wrong. If the evidence is such that Ms. Briggs does not prove her case, would you have any difficulty returning a verdict for Temple University with no compensation to Ms. Briggs?

30.   Would your verdict in this case be influenced in any way by factors other than the evidence in the courtroom, such as friendships, political affiliation, personal philosophies, family relationships or the type of work you do or any other factor other than the facts and the law?

31.   Ms. Briggs is not entitled to any money simply because she filed suit against Temple University. Will you have any difficulty accepting this principle?

32.  Do you think you might have a tendency to favor the employee in a lawsuit?  If so, why do you feel this way?

33.  Have any of you ever had a negative experience with Temple University?

    (a)  Explain the circumstances.

    (b)  When?

    (c)  Who else was involved?

34.  Do any of you have a close relative or friend who has ever had a negative experience with Temple University?

    (a)  Who?

    (b)  What relation does the person have to you?

    (c)  Explain the circumstances.

    (d)  When?

    (e)  Who else was involved?

35.  Do any of you work for, or have any of you ever worked for, Temple University?

    (a)  When?

    (b)  For how long?

    (c)  In what capacity?

    (d)  Was your experience positive or negative?  Explain.

    (e)  For what reason did you leave the employ of Temple University?

36.  Do any of you have a close relative or friend who works for, or who previously worked for, Temple University?

    (a)  Who?

    (b)  What relation does the person have to you?

    (c)  In what capacity?

    (d)  For how long?

    (e)  Was this person's experience positive or negative?  Explain.

(f)     For what reason did this person leave the employ of Temple University?

37.   Have you ever been a student at Temple University?

(a)     Explain the circumstances.

(b)     Was your experience positive or negative?  Explain.

38.   Do any of you have a close relative or friend who is currently, or who was previously, a student at Temple University?

(a)     Who?

(b)     What relation does the person have to you?

(c)     Explain the circumstances.

(d)     Was this person's experience positive or negative?  Explain.

39.   Have you ever heard anything unfavorable about Temple University?

40.   Do you have any negative opinions about Temple University?   If so, what is your opinion?

41.   Do you, or a close relative or friend, currently work, or have in the past worked, in higher education?

(a)     Who?

(b)     What relation does this person have to you?

(c)     Where did you/they work?

(d)     In what capacity did you/they work in higher education?

(e)     For how long?

(f)     For what reason did you/they leave that job?

42.   Do you know the plaintiff, Ruth Briggs?

43.   Do you know any of the attorneys in this case (Steve Console, Laura Mattiacci, Rahul Munshi, Richard Harris and Rachel Fendell Satinsky)?

44.   Do you know anyone who works at Littler Mendelson, P.C. or Console Mattiacci Law, LLC?

45.   Have you ever heard of the law firm Console Mattiacci Law, LLC?  In what context?

46. A number of people may testify in this case. Do you know any of these individuals?

    (a)    Dr. Jie Wu

    (b)    Andrew DiMeo

    (c)    Gregory Wacker

    (d)    Sandra ("Sandy") Foehl

    (e)    Deirdre Walton

47. Is there any reason the subject matter in this case would make it difficult for you to render a fair and impartial verdict?

48. Have you ever been a party to a lawsuit?

    (a)    Plaintiff or Defendant?

    (b)    What type of case?

    (c)    Which Court?

49. Have you ever served as a juror before in any state or federal court?

    (a)    When?

    (b)    Where?

    (c)    Civil or criminal?

    (d)    What was the outcome?

    (e)    What did you think of the jury system as you experienced it?

50. Have you ever been involved in any way in an employment discrimination case?

    (a)    When?

    (b)    How were you involved?

    (c)    Which Court?

51. This trial is expected to last approximately 3-4 days. Is there anyone who would face a significant hardship by serving as a juror on this case?

52. Does anyone have any difficulty hearing, seeing or paying close attention to detail for a long time?

53.     Does anyone have any other physical or mental condition that would make it difficult for you to pay attention to the evidence?

54.     Is there anything else that any of you believe might make it difficult for you to be fair and impartial, whether I have covered the subject or not?


Respectfully submitted,


*/s/ Richard R. Harris*
Richard R. Harris (PA #84897)
Rachel Fendell Satinsky (PA #308751)
Jonathan L. Shaw (PA #316882)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3000 (telephone)
267.402.3131 (facsimile)
rharris@littler.com
rsatinsky@littler.com
jlshaw@littler.com

Attorneys for Defendant
Temple University

Date: July 10, 2018

## CERTIFICATE OF SERVICE

I, Rachel Fendell Satinsky, hereby certify that, on this 10th day of July, 2018, the foregoing document was filed using the Eastern District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon all counsel of record.

/s/ Rachel Fendell Satinsky
Rachel Fendell Satinsky

# EXHIBIT B
# (PROPOSED JURY INSTRUCTIONS)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RUTH V. BRIGGS,                          :
                                         :
        Plaintiff,                 :    Case No. 16-0248
                                         :
        v.                         :
                                         :
TEMPLE UNIVERSITY,                       :
                                         :
        Defendant.                 :
                                         :
                                         :

## DEFENDANT'S AMENDED PROPOSED JURY INSTRUCTIONS

Pursuant to Federal Rule of Civil Procedure 51 and this Court's June 18, 2018 Order (Docket No. 40), Defendant Temple University respectfully submits the following amended proposed Jury Instructions and requests that they be used in the trial of the above-captioned matter. Temple University also requests that this Court allow it to supplement or modify these proposed Jury Instructions as necessary or appropriate after the submission of all evidence or during conference with the Court.

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 1

**Preliminary Instructions – Introduction; Role of Jury**

Now that you have been sworn, I have the following preliminary instructions for your guidance as jurors in this case.

You will hear the evidence, decide what the facts are, and then apply those facts to the law that I will give to you.

You and only you will be the judges of the facts. You will have to decide what happened. I play no part in judging the facts. You should not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be. My role is to be the judge of the law. I make whatever legal decisions have to be made during the course of the trial, and I will explain to you the legal principles that must guide you in your decisions. You must follow that law whether you agree with it or not.

Third Circuit Court of Appeals, Model Jury Instruction 1.1.

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 2

**Preliminary Instructions – Conduct of the Jury**

Now, a few words about your conduct as jurors.

First, I instruct you that during the trial and until you have heard all of the evidence and retired to the jury room to deliberate, you are not to discuss the case with anyone, not even among yourselves. If anyone should try to talk to you about the case, including a fellow juror, bring it to my attention promptly. There are good reasons for this ban on discussions, the most important being the need for you to keep an open mind throughout the presentation of evidence. I know that many of you use cell phones, smart phones like Blackberries and iPhones, and other portable electronic devices; laptops, netbooks, and other computers both portable and fixed to access the internet and to communicate with others. You also must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case. This includes your family and friends. You may not communicate orally with anyone about the case on your cell phone, smart phone, or portable or fixed computer or device of any kind; or use these devices to communicate electronically by messages or postings of any kind including e-mail, instant messages, text messages, text or instant messaging services such as Twitter, or through any blog, website, internet chat room, or by way of any other social networking websites or services like Facebook, MySpace, LinkedIn, and YouTube.

If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, remember it is because they are not supposed to talk or visit with you, either. That is why you are asked to wear your juror tags. It shows that you are someone who is not to be approached in any way.

Second, do not read or listen to anything related to this case that is not admitted into evidence. By that I mean, if there is a newspaper article or radio or television report relating to this case, do not read the article or watch or listen to the report. In addition, do not try to do any independent research or investigation on your own on matters relating to the case or this type of case. Do not do any research on the internet, for example. You are to decide the case upon the evidence presented at trial. In other words, you should not consult dictionaries or reference materials, search the internet, websites, blogs, or use any other electronic tools to obtain information about this case or to help you decide the case. Please do not try to find out information from any source outside the confines of this courtroom.

Again, do not reach any conclusion on the claims or defenses until all of the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

Finally, if any member of the jury has a friend or family member who is in attendance at this public trial, that visitor must first register with my Clerk because special rules will govern their attendance. You may not discuss any aspect of this trial with the visitor, nor may you permit the visitor to discuss it with you.

Third Circuit Court of Appeals Model Jury Instruction 1.3.

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 3

**Preliminary Instructions – Corporate Party Involved**

Your decision must be based only on the evidence presented here.   You must not be influenced in any way by either sympathy for or prejudice against anyone.

You must follow the law as I explain it – even if you do not agree with the law –you must follow all of my instructions as a whole.   You must not single out or disregard any of the instructions on the law.

The fact that a corporation is involved as a party must not affect your decision in any way.  A corporation and all other persons stand equal before the law and must be dealt with as equals in a court of justice.  A company or university is entitled to the same fair trial as a private individual.   When a corporation is involved, of course, it may act only through people as its employees; and, in general, a corporation is responsible under the law for any of the acts and statements of its employees that are made within the scope of their duties as employees of the company.

Eleventh Circuit Court of Appeals Model Civil Jury Instruction 3.2.2 (modified).

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 4

### Preliminary Instructions – Bench Conferences

During the trial it may be necessary for me to talk with the lawyers out of your hearing by having a bench conference. If that happens, please be patient.

We are not trying to keep important information from you. These conferences are necessary for me to fulfill my responsibility, which is to be sure that evidence is presented to you correctly under the law.

We will, of course, do what we can to keep the number and length of these conferences to a minimum. While we meet, I will invite you to stand up and stretch and take a short break or perhaps even call a recess if it is a lengthy issue, and permit you to go downstairs for a break.

I may not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

Third Circuit Court of Appeals Model Jury Instruction 1.4.

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 5

**Preliminary Instructions – Evidence**

The evidence from which you are to find the facts consists of the following:

1.     The testimony of the witnesses;

2.     Documents and other things received as exhibits;

3.     Any facts that are stipulated – that is, formally agreed to by the parties; and

4.     Any facts that are judicially noticed – that is, facts I say you must accept as true even without other evidence.

The following things are not evidence:

1.     Statements, arguments, and questions of the lawyers for the parties in this case;

2.     Objections by lawyers;

3.     Any testimony I tell you to disregard; and

4.     Anything you may see or hear about this case outside the courtroom.

You must make your decision based only on the evidence that you see and hear in court. Do not let rumors, suspicions, or anything else that you may see or hear outside of court influence your decision in any way.

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

There are rules that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. This simply means that the lawyer is requesting that I make a decision on a particular rule of evidence. You should not be influenced by the fact that an objection is made. Objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe that evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it. If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Also, certain testimony or other evidence may be ordered struck from the record and you will be instructed to disregard this evidence.  Do not consider any testimony or other evidence that gets struck or excluded.  Do not speculate about what a witness might have said or what an exhibit might have shown.

Third Circuit Court of Appeals Model Jury Instruction 1.5.

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 6

**Preliminary Instructions – Direct and Circumstantial Evidence**

There are two types of evidence that you may use in reaching your verdict. One type of evidence is called "direct evidence." An example of "direct evidence" is when a witness testifies about something that the witness knows through his own senses – something the witness has seen, felt, touched or heard or did. If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining. Another form of direct evidence is an exhibit where the fact to be proved is its existence or current condition.

The other type of evidence is circumstantial evidence. "Circumstantial evidence" is proof of one or more facts from which you could find another fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

You should consider both kinds of evidence that are presented to you. The law makes no distinction in the weight to be given to either direct or circumstantial evidence. You are to decide how much weight to give any evidence.

Third Circuit Court of Appeals Model Jury Instruction 1.6 (Option 2).

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 7

**Preliminary Instructions – Credibility of Witnesses**

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses. "Credibility" means whether a witness is worthy of belief. You may believe everything a witness says or only part of it or none of it. In deciding what to believe, you may consider a number of factors, including the following:

(1)  the opportunity and ability of the witness to see or hear or know the things the witness testifies to;

(2)  the quality of the witness's understanding and memory;

(3)  the witness's manner while testifying;

(4)  whether the witness has an interest in the outcome of the case or any motive, bias or prejudice;

(5)  whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence;

(6)  how reasonable the witness's testimony is when considered in the light of other evidence that you believe; and

(7)  any other factors that bear on believability.

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.

Third Circuit Court of Appeals Model Jury Instruction 1.7.

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 8**

**Preliminary Instructions – Preponderance of the Evidence**

This is a civil case. Ms. Briggs is the party who brought this lawsuit. Temple University is the party against which the lawsuit was filed. Ms. Briggs has the burden of proving her case by what is called the preponderance of the evidence. That means Ms. Briggs has to prove to you, in light of all the evidence, that what she claims is more likely so than not so. To say it differently: if you were to put the evidence favorable to Ms. Briggs and the evidence favorable to Temple University on opposite sides of the scales, Ms. Briggs would have to make the scales tip somewhat on her side. If Ms. Briggs fails to meet this burden, the verdict must be for Temple University. If you find after considering all the evidence that a claim or fact is more likely so than not so, then the claim or fact has been proved by a preponderance of the evidence.

In determining whether any fact has been proved by a preponderance of evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

On certain issues, called affirmative defenses, Temple University has the burden of proving the elements of the defense by a preponderance of the evidence. I will instruct you on the facts that will be necessary for you to find on this affirmative defense. An affirmative defense is proven if you find, after considering all evidence in the case, that Temple University has succeeded in proving that the required facts are more likely so than not so.

You may have heard of the term "proof beyond a reasonable doubt." That is a stricter standard of proof and it applies only to criminal cases. It does not apply in civil cases such as this. So you should put it out of your mind.

Third Circuit Court of Appeals Model Jury Instruction 1.10.

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 9**

**Preliminary Instructions – Business Judgment**

Ms. Briggs's inability to think of any reasons for the end of her employment other than age and sex discrimination and retaliation is not sufficient to support her claim.  To prevail on her claim for age and sex discrimination and retaliation, Ms. Briggs must do more than express her own disagreement with Temple University's reasons for its actions; she must demonstrate that those reasons are a pretext for discrimination – that is, that they are a cover-up for age discrimination, sex discrimination, and retaliation.

Just as Ms. Briggs's own opinion is not sufficient to support her claims of age discrimination, sex discrimination, and retaliation neither is the opinion of a co-worker or any other individual not involved in the actual decisions about which Ms. Briggs complains.

Sources: *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991), *overruled on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1223 (7th Cir. 1991); *Ali v. Maryland Dep't of Env't.*, No. 94-1683, 1995 U.S. App. LEXIS 4316, at *8 (4th Cir. 1995); *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988); *Elliott v. Group Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983), *cert. denied*, 467 U.S. 1215 (1984); *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464-65 (7th Cir. 1986); *Confer v. SKF Indus.*, 40 Fair Empl. Prac. Cas. (BNA) 1721, No. 84–344, 1986 WL 8600, at *4 (W.D. Pa. 1986); *Sorba v. Pennsylvania Drilling Co.*, 648 F. Supp. 292, 295 (W.D. Pa. 1986), *rev'd on other grounds*, 821 F.2d 200 (3d Cir. 1987), *cert. denied*, 484 U.S. 1018 (1988).

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 10**

**Preliminary Instructions – Description of Trial Proceedings**

The trial will proceed in the following manner:

First, attorneys for Ms. Briggs will make an opening statement to you.  Next, attorneys for Temple University [may] <u>will</u> make an opening statement.  What is said in the opening statements is not evidence, but is simply an outline to help you understand what each party expects the evidence to show.  [A party is not required to make an opening statement.]

[After [[Before]] the attorneys have made their opening statements, [I will instruct you on the applicable law] then each party is given an opportunity to present its evidence.]

Ms. Briggs goes first because she has the burden of proof.  Ms. Briggs will present witnesses whom counsel for Temple University may cross-examine, and Ms. Briggs may also present evidence.  Following Ms. Briggs's case, Temple University may present evidence. Counsel for Ms. Briggs may cross-examine witnesses for the defense.  After the parties' main case is presented, they may be permitted to present what is called rebuttal evidence.

After all the evidence has been presented, I will instruct you on the law and then the attorneys will present to you closing arguments to summarize and interpret the evidence in a way that is helpful to their clients' positions.  As with opening statements, closing arguments are not evidence.  Once the closing arguments are completed, I will then instruct you on the law.  After that you will retire to the jury room to deliberate on your verdict in this case.

[At this point the court may wish to inform the jury of the scheduling and length of the trial, and other logistical information.]

Third Circuit Court of Appeals Model Jury Instruction 1.12 (modified).

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 11

**General Instructions For Use During Trial – Recess Admonition**

We are about to take [our first] [a] recess [and I remind you of the instruction I gave you earlier]. During this recess and any other recess, you must not discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else. If anyone tries to talk to you about the case, do not tell your fellow jurors but tell me about it immediately. [Do not read, watch or listen to any news reports of the trial, or conduct any research or investigation, including on the Internet. Remember that I told you not to use any electronic tools to communicate with anyone about the case or to do research relating to the case.] Finally, remember to keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors.

If you need to speak with me about anything, simply give a signed note to [identify court personnel] to give to me.

I will not repeat these admonitions each time we recess or adjourn, but you will be reminded of them on occasion.

Third Circuit Court of Appeals Model Jury Instruction 2.14.

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 12**

**At End of Trial – Deliberations**

When you retire to the jury room to deliberate, you may take with you these instructions [your notes] and the exhibits that the Court has admitted into evidence. You should select one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if, under the appropriate burden of proof, the parties have established their claims. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

As jurors, you have a duty to consult with each other and to deliberate with the intention of reaching a verdict. Each of you must decide the case for yourself, but only after a full and impartial consideration of all of the evidence with your fellow jurors. Listen to each other carefully. In the course of your deliberations, you should feel free to re-examine your own views and to change your opinion based upon the evidence. But you should not give up your honest convictions about the evidence just because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of obtaining enough votes for a verdict.

When you start deliberating, do not talk to the jury officer, to me or to anyone but each other about the case. During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a cell phone, smart phone like Blackberries or iPhones, or computer of any kind; the internet, any internet service, or any text or instant messaging service like Twitter; or any internet chat room, blog, website, or social networking service such as Facebook, MySpace, LinkedIn, or YouTube, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate. Information that you might see on the internet or on social media has not been admitted into evidence and the parties have not had a chance to discuss it with you.

You should not seek or obtain such information and it must not influence your decision in this case.

If you have any questions or messages for me, you must write them down on a piece of paper, have the foreperson sign them, and give them to the jury officer.  The officer will give them to me, and I will respond as soon as I can.  I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.

One more thing about messages.  Never write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that a certain number is voting one way or another.  Your votes should stay secret until you are finished.

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, each juror must agree to the verdict.  Your verdict must be unanimous.

A form of verdict has been prepared for you.  It has a series of questions for you to answer.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will fill it in, and have your foreperson date and sign the form.  You will then return to the courtroom and your foreperson will give your verdict.  Unless I direct you otherwise, do not reveal your answers until you are discharged.  After you have reached a verdict, you are not required to talk with anyone about the case unless I order you to do so.

Once again, I want to remind you that nothing about my instructions and nothing about the form of verdict is intended to suggest or convey in any way or manner what I think your verdict should be.  It is your sole and exclusive duty and responsibility to determine the verdict.

Third Circuit Court of Appeals Model Jury Instruction 3.1.

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 13**

**General Instructions For Use At End of Trial – Number of Witnesses**

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify.  What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.

Third Circuit Court of Appeals Model Jury Instruction 3.2.

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 14

### General Instructions For Use At End of Trial – Deadlock

It is your duty as jurors to consult with one another and to deliberate with a view toward reaching an agreement, if you can do so consistent with your individual judgments. Each of you must decide the case for yourself, but you should do so only after a consideration of the case with your fellow jurors, and you must be open to their opinions. You should not be influenced to vote a certain way, however, by the single fact that a majority of the jurors, or any of them, will vote in a certain way. In other words, you should not surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict, or solely because of the opinions of the other jurors.

In the course of your deliberations you should not hesitate to reexamine your own views, and to change your opinion if you are convinced that those views are wrong. To reach a unanimous result you must examine the questions submitted to you openly and frankly, with proper regard for the opinions of others and with a willingness to reexamine your own views.

Remember that you are not partisans; you are judges – judges of the facts. Your only interest is to seek the truth from the evidence. You are the judges of the credibility of the witnesses and the weight of the evidence.

If you should fail to agree on a verdict, the case is left open and must be resolved at a later time. There is no reason to think that another trial would be conducted in a better way or that a different jury would decide it any better. Any future jury must be selected in the same manner and from the same source as you.

We try cases to dispose of them and to reach a common conclusion if it is consistent with the conscience of each member of the jury. I suggest that, in deliberating, you each recognize that you are not infallible, that you listen to the opinions of the other jurors and that you do so carefully with a view to reaching a common conclusion, if you can. You may take all the time that you feel is necessary.

I remind you that in your deliberations you are to consider the instructions I have given you as a whole. You should not single out any part of any instruction, including this one, and ignore others. They are all equally important.

You may now retire and continue your deliberations.

Third Circuit Court of Appeals Model Jury Instruction 3.4.

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 15**

**ADEA Introductory Instruction**

In this case the Plaintiff Ms. Briggs has made a claim under the Federal Civil Rights statute that prohibits age discrimination against an employee, if that person is 40 years of age or older. This statute is known as the Age Discrimination in Employment Act or "ADEA."

Specifically, Ms. Briggs claims that ~~[he/she] was [denied employment] [describe the employment action at issue] by the defendant~~_____ the Defendant, Temple University, terminated her employment because of her age.

Temple University denies that it terminated Ms. Briggs's employment and that it discriminated against Ms. Briggs because of her age. Further, Temple University asserts that Ms. Briggs failed to mitigate her damages by seeking other employment after she stopped working for Temple University.

I will now instruct you more fully on the issues you must address in this case.

Third Circuit Court of Appeals Model Jury Instruction 8.0 (modified).

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 16**

**Elements of an ADEA Claim – Disparate Treatment**

      In this case Ms. Briggs is alleging that Temple University terminated her employment because of her age.  In order for Ms. Briggs to recover on this discrimination claim against Temple University, Ms. Briggs must prove that Temple University <u>terminated her employment</u> and intentionally discriminated against her.  This means that Ms. Briggs must prove that her age was ~~a determinative factor[1] in [defendant's] decision to [describe action] [plaintiff]~~ <u>the reason Temple University terminated her employment.</u>

      To prevail on this claim, Ms. Briggs must prove both of the following by a preponderance of the evidence:

      First:  <u>Temple University terminated Ms. Briggs' employment</u>; and

      Second:  ~~[Plaintiff's] age was a determinative factor in [Defendant's] decision.~~  <u>Temple University terminated Ms. Briggs's employment because of her age – in other words, Ms. Briggs's age was the reason that Temple University terminated her employment.</u>

      Although Ms. Briggs must prove that Temple University acted with the intent to discriminate, Ms. Briggs is not required to prove that Temple University acted with the particular intent to violate Ms. Briggs's federal civil rights.  Moreover, Ms. Briggs is not required to produce direct evidence of intent, such as statements admitting discrimination.  Intentional discrimination may be inferred from the existence of other facts.

      You should weigh all the evidence received in the case in deciding whether Temple University intentionally discriminated against Ms. Briggs because of her age.  [For example, you have been shown statistics in this case. Statistics are one form of evidence that you may consider when deciding whether a defendant intentionally discriminated against a plaintiff. You should evaluate statistical evidence along with all the other evidence.]

      <u>If you find that Temple University terminated Ms. Briggs' employment,</u> Temple University has given a nondiscriminatory reason for its decision to terminate Ms. Briggs's employment——<u>despite numerous opportunities to improve, Ms. Briggs continually failed to perform her job, had poor judgment, and a bad attitude.</u>  If you believe Temple University's stated reason and if you find that Temple University's decision terminate Ms. Briggs's employment would have occurred because of Temple University's stated reason regardless of Ms. Briggs's age, then you must find for Temple University.  If you disbelieve Temple University's stated reason for its conduct, then you may, but need not, find that Ms. Briggs has proved intentional discrimination.  In determining whether Temple University's stated reason for its actions was a pretext, or excuse, for discrimination, you may not question Temple

---

[1] Temple University has modified this instruction pursuant to *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (2009).  Courts have applied *Gross* to age claims under the PHRA.  *See, e.g., Carfagno v. SCP Distribs., LLC d/b/a Poolcorp*, No. 14-4856, 2016 WL 521196 (E.D. Pa. Feb. 10, 2016) (Tucker, C.J.).

University's business judgment.  You cannot find intentional discrimination simply because you disagree with the business judgment of Temple University or believe it is harsh or unreasonable. You are not to consider Temple University's wisdom.  However, you may consider whether Ms. Briggs has proven that Temple University's reason is merely a cover-up for discrimination.

**Concluding Instruction:**

Ultimately, you must decide whether Ms. Briggs has proven that her age ~~was a determinative factor~~ was the reason for Temple University's decision to terminate her employment.  ~~"Determinative factor" means that if not for the plaintiff's age, the [adverse employment action] would not have occurred.~~

~~In deciding whether age was a determinative factor, you must be careful to distinguish age from other factors that are not dependent on age. For example, if Temple University's action was based on Ms. Briggs's seniority, this is not an age-dependent decision. A person's seniority is based on time with the employer, and this is not the same factor as the person's age. Thus, an employer does not violate the ADEA just by interfering with an older employee's benefits that would have vested by virtue of the employee's years of service.~~

Third Circuit Court of Appeals Model Jury Instruction 8.1.1 (modified).

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 17

**Elements of an ADEA Claim — Harassment — Hostile Work Environment — No Tangible Employment Action**

Ms. Briggs claims that she was subjected to harassment by [names [to be determined prior to closing arguments]] and that this harassment was motivated by Ms. Briggs's age.

Temple University is liable for the actions of [names [to be determined prior to closing arguments]] in Ms. Briggs's claim of discriminatory harassment if Ms. Briggs proves all of the following elements by a preponderance of the evidence:

First: Ms. Briggs was subjected to [describe alleged conduct or conditions giving rise to plaintiff's claim [to be determined prior to closing arguments]] by [names [to be determined prior to closing arguments]].

Second: [Names [to be determined prior to closing arguments]] conduct was not welcomed by Ms. Briggs.

Third: [Names [to be determined prior to closing arguments]] conduct was motivated by the fact that Ms. Briggs was 59 years of age.

Fourth: The conduct was so severe or pervasive that a reasonable person in Ms. Briggs's position would find Ms. Briggs's work environment to be hostile or abusive. This element requires you to look at the evidence from the point of view of a reasonable person of 59 years of age and how he or she would have ~~reaction~~ reacted to Ms. Briggs's work environment.

Fifth: Ms. Briggs believed her work environment to be hostile or abusive as a result of [names [to be determined prior to closing arguments]] conduct.

[Depending on Ms. Briggs's testimony. To be determined prior to closing arguments:

Sixth: Management level employees knew, or should have known, of the abusive conduct. You can find that management level employees should have known of the abusive conduct if 1) an employee provided management level personnel with enough information to raise a probability of age harassment in the mind of a reasonable employer, or if 2) the harassment was so pervasive and open that a reasonable employer would have had to be aware of it.]

If any of the above elements has not been proved by a preponderance of the evidence, your verdict must be for Temple University and you need not proceed further in considering this claim. If you find that the elements have been proved, then you must consider Temple University's affirmative defense. I will instruct you now on the elements of that affirmative defense.

You must find for Temple University if you find that Temple University has proved both of the following elements by a preponderance of the evidence:

First: That Temple University exercised reasonable care to prevent harassment in the workplace on the basis of age, and also exercised reasonable care to promptly correct any harassing behavior that does occur.

Second: That Ms. Briggs unreasonably failed to take advantage of any preventive or corrective opportunities provided by Temple University.

Proof of the following facts will be enough to establish the first element that I just referred to, concerning prevention and correction of harassment:

1. Temple University had established an explicit policy against harassment in the workplace on the basis of age.

2. That policy was fully communicated to its employees.

3. That policy provided a reasonable way for Ms. Briggs to make a claim of harassment to higher management.

4. Reasonable steps were taken to correct the problem, if raised by Ms. Briggs.

On the other hand, proof that Ms. Briggs did not follow a reasonable complaint procedure provided by Temple University will ordinarily be enough to establish that Ms. Briggs unreasonably failed to take advantage of a corrective opportunity.


Third Circuit Court of Appeals Model Jury Instruction 8.1.3 (modified).

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 18**

**ADEA Definitions — Hostile or Abusive Work Environment**

In determining whether a work environment is "hostile" you must look at all of the circumstances, which may include:

- The total physical environment of Ms. Briggs's work area.

- The degree and type of language and insult that filled the environment before and after Ms. Briggs arrived.

- The reasonable expectations of Ms. Briggs upon entering the environment.

- The frequency of the offensive conduct.

- The severity of the conduct.

- The effect of the working environment on Ms. Briggs's mental and emotional well-being.

- Whether the conduct was unwelcome, that is, conduct Ms. Briggs regarded as unwanted or unpleasant.

- Whether the conduct was pervasive.

- Whether the conduct was directed toward Ms. Briggs.

- Whether the conduct was physically threatening or humiliating.

- Whether the conduct was merely a tasteless remark.

- Whether the conduct unreasonably interfered with Ms. Briggs's work performance.

Conduct that amounts only to ordinary socializing in the workplace, such as occasional horseplay, occasional use of abusive language, tasteless jokes, and occasional teasing, does not constitute an abusive or hostile work environment. A hostile work environment can be found only if there is extreme conduct amounting to a material change in the terms and conditions of employment. Moreover, isolated incidents, unless extremely serious, will not amount to a hostile work environment.

It is not enough that the work environment was generally harsh, unfriendly, unpleasant, crude or vulgar to all employees. In order to find a hostile work environment, you must find that Ms. Briggs was harassed because of her age. The harassing conduct may, but need not be age-based in nature. Rather, its defining characteristic is that the harassment complained of was linked to Ms. Briggs's age. The key question is whether Ms. Briggs, as a person of 59 years of age was subjected to harsh employment conditions to which substantially younger employees were not.

It is important to understand that, in determining whether a hostile work environment existed at Temple University's workplace you must consider the evidence from the perspective of a reasonable person of Ms. Briggs's age in the same position.  That is, you must determine whether a reasonable person of Ms. Briggs's age would have been offended or harmed by the conduct in question.   You must evaluate the total circumstances and determine whether the alleged harassing behavior could be objectively classified as the kind of behavior that would seriously affect the psychological or emotional well-being of a reasonable person of Ms. Briggs's age.   The reasonable person of Ms. Briggs's age is simply one of normal sensitivity and emotional make-up.

Third Circuit Court of Appeals Model Jury Instruction 8.2.1.

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 19**

**Elements of an ADEA Claim — Retaliation**

Ms. Briggs claims that Temple University retaliated against her because of her complaints of age discrimination.

To prevail on this claim, Ms. Briggs must prove all of the following by a preponderance of the evidence:

First: Ms. Briggs complained about age discrimination.

Second: Ms. Briggs was <u>terminated</u> at the time, or after, the protected conduct took place.

Third: There was a causal connection between <u>the termination of Ms. Briggs' employment</u> and Ms. Briggs's complaint of age discrimination.

Concerning the first element, Ms. Briggs need not prove the merits of her complaint of age discrimination, but only that she was acting under a reasonable,[2] good faith belief that her rights under the Age Discrimination in Employment Act were violated.

Concerning the second element, the term "materially adverse" means that Ms. Briggs must show Temple University <u>terminated her employment and</u> the termination of her employment was serious enough that it well might have discouraged a reasonable worker from complaining of age discrimination. [The activity need not be related to the workplace or to Ms. Briggs's employment.]

Concerning the third element, that of causal connection, that connection may be shown in many ways. For example, you may or may not find that there is a sufficient connection through timing, that is Temple University's action followed shortly after Temple University became aware of Ms. Briggs's complaint of age discrimination. Causation is, however, not necessarily ruled out by a more extended passage of time. Causation may or may not be proven by antagonism shown toward Ms. Briggs or a change in demeanor toward Ms. Briggs.

<u>If you find that Temple University terminated Ms. Briggs' employment, Temple University has given a nondiscriminatory reason for ending Ms. Briggs's employment—despite numerous opportunities to improve, Ms. Briggs continually failed to perform her job, had poor judgment, and a bad attitude. If you believe Temple University's stated reason and if you find that Temple University's decision terminate Ms. Briggs's employment would have occurred because of Temple University's stated reason regardless of Ms. Briggs's complaint of age discrimination, then you must find for Temple University. If you disbelieve Temple University's stated reason for its conduct, then you may, but need not, find that Ms. Briggs has proved retaliation. In determining whether Temple University's stated reason for its actions was a pretext, or excuse, for retaliation, you may not question Temple University's business judgment. You cannot find retaliation simply because you disagree with the business judgment of Temple</u>

---

[2] See the Comment for a discussion of the allocation of responsibility for determining the reasonableness of the plaintiff's belief.

University or believe it is harsh or unreasonable.   You are not to consider Temple University's wisdom.  However, you may consider whether Ms. Briggs has proven that Temple University's reason is merely a cover-up for retaliation.[3]

Ultimately, you must decide whether Ms. Briggs's complaint of age discrimination was the reason Temple University terminated her employment.   ~~had a determinative effect "Determinative effect" means that if not for Ms. Briggs's complaint of age discrimination, her termination would not have occurred.~~

Third Circuit Court of Appeals Model Jury Instruction 8.1.5 (modified).

---

[3] "As with other types of discrimination or retaliation claims, the defendant may proffer a non-retaliatory reason for its employment decision, and the plaintiff may seek to rebut that reason by showing that it was really a cover-up for retaliation." Third Circuit Court of Appeals Model Jury Instruction 8.1.5, cmt. Non-retaliatory Reason; Pretext (citing *Daniels v. School District of Philadelphia*, 776 F.3d 181, 198 (3d Cir. 2015) (upholding grant of summary judgment against plaintiff on retaliation claims under, inter alia, the ADEA, because the defendant had "proffered legitimate reasons for [its] adverse actions, which Daniels has failed to rebut")).

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 20**

**ADEA Damages – General Compensatory Damages**

      I am now going to instruct you on damages available under the ADEA.  Just because I am instructing you on how to award damages does not mean that I have any opinion on whether or not Temple University should be held liable.

      General compensatory damages, such as for pain and suffering, are not recoverable in ADEA actions.  Therefore, you should not award any compensatory damages under the ADEA—for Ms. Briggs's claims of age-related discrimination or retaliation—regardless of what you decide in this case.

Third Circuit Court of Appeals Model Jury Instruction 8.4.1, comment (modified).

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 21

**ADEA Damages – Back Pay**

If you find that Temple University terminated Ms. Briggs' employment and intentionally discriminated against Ms. Briggs because of her age, then you must determine the amount of damages that Temple University's actions have caused Ms. Briggs. Ms. Briggs has the burden of proving damages by a preponderance of the evidence.

You must award as actual damages an amount that reasonably compensates Ms. Briggs for any lost wages and benefits, taking into consideration any increases in salary and benefits, including pension, that Ms. Briggs would have received from Temple University had Ms. Briggs not been the subject of Temple University's intentional discrimination.

Back pay damages, if any, apply from the time Ms. Briggs's employment ended until the date of your verdict.

You must reduce any award by the amount of the expenses that Ms. Briggs would have incurred in making those earnings.

If you award back pay, you are instructed to deduct from the back pay figure whatever wages Ms. Briggs has obtained from other employment during this period. However, please note that you should not deduct social security benefits, unemployment compensation and pension benefits from an award of back pay.

You are further instructed that Ms. Briggs has a duty to mitigate her damages – that is Ms. Briggs is required to make reasonable efforts under the circumstances to reduce her damages. It is Temple University's burden to prove that Ms. Briggs has failed to mitigate. So if Temple University persuades you, by a preponderance of the evidence, that Ms. Briggs failed to obtain substantially equivalent job opportunities that were reasonably available to her, you must reduce the award of damages by the amount of the wages that Ms. Briggs reasonably would have earned if she had obtained those opportunities.

In assessing ADEA damages, you must not consider attorney fees or the costs of litigating this case. Attorney fees and costs under the ADEA, if relevant at all, are for the court and not the jury to determine. Therefore, attorney fees and costs should play no part in your calculation of any damages.

Third Circuit Court of Appeals Model Jury Instruction 8.4.2 (modified).

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 22**

**ADEA Damages – Liquidated Damages**

If you find that Temple University terminated Ms. Briggs' employment and intentionally discriminated against Ms. Briggs because of her age, [If] and you find that Ms. Briggs is entitled to recover damages for lost wages or benefits because Temple University intentionally discriminated against Ms. Briggs based on her age in violation of the ADEA, then I will also ask you to decide a further question: whether Temple University's conduct was willful.   For purposes of your answer to that question, Ms. Briggs has the burden of proving willfulness by a preponderance of the evidence.

You must find Temple University's violation of the ADEA to be willful if Temple University knew or showed reckless disregard for whether terminating Ms. Briggs's employment was prohibited by the law.   To establish willfulness it is not enough to show that Temple University acted negligently.   If you find that Temple University did not know, or knew only that the law was potentially applicable, and did not act in reckless disregard as to whether its conduct was prohibited by the law, then Temple University's conduct was not willful.

Third Circuit Court of Appeals Model Jury Instruction 8.4.3 (modified).

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 23**

**ADEA Damages – Front Pay**

If you find that Temple University terminated Ms. Briggs' employment and intentionally discriminated against Ms. Briggs because of her age, you may determine and award separately a monetary amount equal to the present value of any future wages and benefits that Ms. Briggs would reasonably have earned from Temple University had Temple University not terminated Ms. Briggs' employment from the date of your verdict through a reasonable period of time in the future. From this figure you must subtract the amount of earnings and benefits Ms. Briggs will receive from other employment during that time. Ms. Briggs has the burden of proving these damages by a preponderance of the evidence.

If you find that Ms. Briggs is entitled to recovery of future earnings from Temple University, then you must reduce any award by the amount of the expenses that Ms. Briggs would have incurred in making those earnings.

You are further instructed that Ms. Briggs has a duty to mitigate her damages – that is Ms. Briggs is required to make reasonable efforts under the circumstances to reduce her damages. It is Temple University's burden to prove that Ms. Briggs has failed to mitigate. So if Temple University persuades you, by a preponderance of the evidence, that Ms. Briggs has stopped searching for substantially equivalent job opportunities that are reasonably available to her, you must reduce the award of damages by the amount of the wages that Ms. Briggs reasonably could have earned if she obtained those opportunities.

You must also reduce any award to its present value by considering the interest that Ms. Briggs could earn on the amount of the award if she made a relatively risk-free investment. The reason you must make this reduction is because an award of an amount representing future loss of earnings is more valuable to Ms. Briggs if she receives it today than if it were received at the time in the future when it would have been earned. It is more valuable because Ms. Briggs can earn interest on it for the period of time between the date of the award and the date she would have earned the money. So you should decrease the amount of any award for loss of future earnings by the amount of interest that Ms. Briggs can earn on that amount in the future.

Third Circuit Court of Appeals Model Jury Instruction 8.4.4 (modified).

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 24**

**ADEA Damages – Nominal Damages**

     If you return a verdict for Ms. Briggs, but Ms. Briggs has failed to prove actual injury and therefore is not entitled to damages, then you must award nominal damages of $1.00.

     A person whose federal rights were violated is entitled to a recognition of that violation, even if she suffered no compensable injury.  Nominal damages (of $1.00) are designed to acknowledge the deprivation of a federal right, even where no compensable injury occurred.

     However, if you find compensable injury, you must award damages for lost wages or benefits (as I instructed you), rather than nominal damages.

Third Circuit Court of Appeals Model Jury Instruction 8.4.5.

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 25**

**Title VII Introductory Instruction**

In this case the Plaintiff Ms. Briggs <u>also</u> makes a claim under a Federal Civil Rights statute that prohibits employers from discriminating against an employee in the terms and conditions of employment because of the employee's ~~race, color, religion,~~ sex~~, or national origin~~.

More specifically, Ms. Briggs claims that ~~[he/she] was [describe the employment action at issue] by the defendant _____ because of [plaintiff's] [protected status]~~ <u>the Defendant, Temple University, terminated her employment</u> because of her sex.

Temple University denies that ~~plaintiff was discriminated against in any way~~ <u>it terminated Ms. Briggs's employment</u> and that <u>it discriminated against Ms. Briggs because of her sex</u>.  Further, Temple University asserts that Ms. Briggs failed to mitigate her damages.  I will now instruct you more fully on the issues you must address in this case.

Third Circuit Court of Appeals Model Jury Instruction 5.0 (modified).

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 26

**Elements of a Title VII Claim – Disparate Treatment – Pretext**

In this case Ms. Briggs is alleging that Temple University terminated her employment because of her sex.  In order for Ms. Briggs to recover on this discrimination claim against Temple University, Ms. Briggs must prove that Temple University intentionally discriminated against Ms. Briggs.  This means that Ms. Briggs must prove that <u>Temple University terminated her employment and</u> her sex was a determinative factor in Temple University's decision.

To prevail on this claim, Ms. Briggs must prove all of the following by a preponderance of the evidence:

First:  Temple terminated Ms. Briggs' employment; and

Second:  Ms. Briggs's sex was a determinative factor in Temple University's decision.

Although Ms. Briggs must prove that Temple University acted with the intent to discriminate, Ms. Briggs is not required to prove that Temple University acted with the particular intent to violate Ms. Briggs's federal civil rights.  Moreover, Ms. Briggs is not required to produce direct evidence of intent, such as statements admitting discrimination.  Intentional discrimination may be inferred from the existence of other facts.

You should weigh all the evidence received in the case in deciding whether Temple University intentionally discriminated against Ms. Briggs. [For example, you have been shown statistics in this case. Statistics are one form of evidence that you may consider when deciding whether a defendant intentionally discriminated against a plaintiff. You should evaluate statistical evidence along with all the other evidence.]

<u>If you find that Temple University terminated Ms. Briggs' employment</u>, Temple University has given a nondiscriminatory reason for its decision<u>—despite numerous opportunities to improve, Ms. Briggs continually failed to perform her job, had poor judgment, and a bad attitude.</u>  If you believe Temple University's stated reason and if you find that Temple University's decision to terminate Ms. Briggs's employment would have occurred because of Temple University's stated reason regardless of Ms. Briggs's sex, then you must find for Temple University.  If you disbelieve Temple University's stated reason for its conduct, then you may, but need not, find that Ms. Briggs has proved intentional discrimination.  In determining whether Temple University's stated reason for its actions was a pretext, or excuse, for discrimination, you may not question Temple University's business judgment.   You cannot find intentional discrimination simply because you disagree with the business judgment of Temple University or believe it is harsh or unreasonable.   You are not to consider Temple University's wisdom.  However, you may consider whether Ms. Briggs's has proven that Temple University's reason is merely a cover-up for discrimination.

Ultimately, you must decide whether Ms. Briggs has proven that her sex was a determinative factor in Temple University's decision to terminate her employment. "Determinative factor" means that if not for Ms. Briggs's sex, Ms. Briggs's termination would not have occurred.

Third Circuit Court of Appeals Model Jury Instruction 5.1.2 (modified).

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 27**

**Elements of a Title VII Action – Harassment – Hostile Work Environment – No Tangible Employment Action**

Ms. Briggs claims that she was subjected to harassment by [names [to be determined prior to closing arguments]] and that this harassment was motivated by Ms. Briggs's sex.

Temple University is liable for the actions of [names [to be determined prior to closing arguments]] in Ms. Briggs's claim of harassment if Ms. Briggs proves all of the following elements by a preponderance of the evidence:

First: Ms. Briggs was subjected to [describe alleged conduct or conditions giving rise to plaintiff's claim [to be determined prior to closing arguments]] by [names [to be determined prior to closing arguments]].

Second: [Names [to be determined prior to closing arguments]] conduct was not welcomed by Ms. Briggs.

Third: [Names [to be determined prior to closing arguments]] conduct was motivated by the fact that Ms. Briggs is a female.

Fourth: The conduct was so severe or pervasive that a reasonable person in Ms. Briggs's position would find Ms. Briggs's work environment to be hostile or abusive. This element requires you to look at the evidence from the point of view of a reasonable female's reaction to Ms. Briggs's work environment.

Fifth: Ms. Briggs believed her work environment to be hostile or abusive as a result of [names [to be determined prior to closing arguments]] conduct.

[Depending on Ms. Briggs's testimony.  To be determined prior to closing arguments:

Sixth: Management level employees knew, or should have known, of the abusive conduct. Management level employees should have known of the abusive conduct if 1) an employee provided management level personnel with enough information to raise a probability of sex harassment in the mind of a reasonable employer, or if 2) the harassment was so pervasive and open that a reasonable employer would have had to be aware of it.]

If any of the above elements has not been proved by a preponderance of the evidence, your verdict must be for Temple University and you need not proceed further in considering this claim.  If you find that the elements have been proved, then you must consider Temple University's affirmative defense.  I will instruct you now on the elements of that affirmative defense.

You must find for Temple University if you find that Temple University has proved both of the following elements by a preponderance of the evidence:

First: Temple University exercised reasonable care to prevent harassment in the workplace on the basis of sex, and also exercised reasonable care to promptly correct any harassing behavior that does occur.

Second: Ms. Briggs unreasonably failed to take advantage of any preventive or corrective opportunities provided by Temple University.

Proof of the four following facts will be enough to establish the first element that I just referred to, concerning prevention and correction of harassment:

1. Temple University had established an explicit policy against harassment in the workplace on the basis of sex.

2. That policy was fully communicated to its employees.

3. That policy provided a reasonable way for Ms. Briggs to make a claim of harassment to higher management.

4. Reasonable steps were taken to correct the problem, if raised by Ms. Briggs.

On the other hand, proof that Ms. Briggs did not follow a reasonable complaint procedure provided by Temple University will ordinarily be enough to establish that Ms. Briggs unreasonably failed to take advantage of a corrective opportunity.

Third Circuit Court of Appeals Model Jury Instruction 5.1.5.

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 28

**Title VII Definitions — Hostile or Abusive Work Environment**

In determining whether a work environment is "hostile" you must look at all of the circumstances, which may include:

- The total physical environment of Ms. Briggs's work area.

- The degree and type of language and insult that filled the environment before and after Ms. Briggs arrived.

- The reasonable expectations of Ms. Briggs upon entering the environment.

- The frequency of the offensive conduct.

- The severity of the conduct.

- The effect of the working environment on Ms. Briggs's mental and emotional well-being.

- Whether the conduct was unwelcome, that is, conduct Ms. Briggs regarded as unwanted or unpleasant.

- Whether the conduct was pervasive.

- Whether the conduct was directed toward Ms. Briggs.

- Whether the conduct was physically threatening or humiliating.

- Whether the conduct was merely a tasteless remark.

- Whether the conduct unreasonably interfered with Ms. Briggs's work performance.

Conduct that amounts only to ordinary socializing in the workplace, such as occasional horseplay, occasional use of abusive language, tasteless jokes, and occasional teasing, does not constitute an abusive or hostile work environment. A hostile work environment can be found only if there is extreme conduct amounting to a material change in the terms and conditions of employment. Moreover, isolated incidents, unless extremely serious, will not amount to a hostile work environment.

It is not enough that the work environment was generally harsh, unfriendly, unpleasant, crude or vulgar to all employees. In order to find a hostile work environment, you must find that Ms. Briggs was harassed because of her sex. The harassing conduct may, but need not be sexual in nature. Rather, its defining characteristic is that the harassment complained of is linked to the victim's sex. The key question is whether Ms. Briggs, as a female, was subjected to harsh employment conditions to which males were not.

It is important to understand that, in determining whether a hostile work environment existed at the Temple University workplace you must consider the evidence from the perspective of a reasonable female in the same position.  That is, you must determine whether a reasonable female would have been offended or harmed by the conduct in question.  You must evaluate the total circumstances and determine whether the alleged harassing behavior could be objectively classified as the kind of behavior that would seriously affect the psychological or emotional well-being of a reasonable female.  The reasonable female is simply one of normal sensitivity and emotional make-up.

Third Circuit Court of Appeals Model Jury Instruction 5.2.1.

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 29**

**Elements of a Title VII Claim — Retaliation**

Ms. Briggs claims that Temple University discriminated against her because of her complaints of sex discrimination.

To prevail on this claim, Ms. Briggs must prove all of the following by a preponderance of the evidence:

First: Ms. Briggs complained about sex discrimination.

Second: Ms. Briggs was <u>terminated</u> at the time, or after, the protected conduct took place.

Third: There was a causal connection between the termination of Ms. Briggs's employment and Ms. Briggs's complaints of sex discrimination.

Concerning the first element, Ms. Briggs need not prove the merits of her complaints of sex discrimination, but only that she was acting under a reasonable, good faith belief that her right to be free from discrimination on the basis of her sex was violated.

Concerning the second element, the term "materially adverse" means that Ms. Briggs must show Temple University <u>terminated her employment</u> and the termination of her employment was serious enough that it well might have discouraged a reasonable worker from complaining of sex discrimination.  [The activity need not be related to the workplace or to Ms. Briggs's employment.]

Concerning the third element, that of causal connection, that connection may be shown in many ways.  For example, you may or may not find that there is a sufficient connection through timing, that is Temple University's action followed shortly after Temple University became aware of Ms. Briggs's complaints of sex discrimination.  Causation is, however, not necessarily ruled out by a more extended passage of time.  Causation may or may not be proven by antagonism shown toward Ms. Briggs or a change in demeanor toward Ms. Briggs.

<u>        If you find that Temple University terminated Ms. Briggs' employment, Temple University has given a nondiscriminatory reason for terminating her employment—despite numerous opportunities to improve, Ms. Briggs continually failed to perform her job, had poor judgment, and a bad attitude.  If you believe Temple University's stated reason and if you find that Temple University's decision to terminate Ms. Briggs's employment would have occurred because of Temple University's stated reason regardless of Ms. Briggs's complaint of age discrimination, then you must find for Temple University.  If you disbelieve Temple University's stated reason for its conduct, then you may, but need not, find that Ms. Briggs has proved retaliation.  In determining whether Temple University's stated reason for its actions was a pretext, or excuse, for retaliation, you may not question Temple University's business judgment.  You cannot find retaliation simply because you disagree with the business judgment of Temple University or believe it is harsh or unreasonable.  You are not to consider Temple University's</u>

wisdom.  However, you may consider whether Ms. Briggs has proven that Temple University's
reason is merely a cover-up for retaliation.[4]

Ultimately, you must decide whether Ms. Briggs's complaints of sex discrimination had a
determinative effect on Temple University's decision to terminate Ms. Briggs's employment.
"Determinative effect" means that if not for Ms. Briggs's complaints of sex discrimination, her
termination would not have occurred.

Third Circuit Court of Appeals Model Jury Instruction 5.1.7 (modified).

---

[4] "As with other types of discrimination or retaliation claims, the defendant may proffer a non-retaliatory reason for its employment decision, and the plaintiff may seek to rebut that reason by showing that it was really a cover-up for retaliation." Third Circuit Court of Appeals Model Jury Instruction 8.1.5, cmt. Non-retaliatory Reason; Pretext (citing *Daniels v. School District of Philadelphia*, 776 F.3d 181, 198 (3d Cir. 2015) (upholding grant of summary judgment against plaintiff on retaliation claims under, inter alia, the ADEA, because the defendant had "proffered legitimate reasons for [its] adverse actions, which Daniels has failed to rebut")).

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 30**

**Title VII Damages — Compensatory Damages — General Instruction**

I am now going to instruct you on damages.  Just because I am instructing you on how to award damages does not mean that I have any opinion on whether or not Temple University should be held liable.

If you find by a preponderance of the evidence that Temple University terminated Ms. Briggs's employment and intentionally discriminated against Ms. Briggs by terminating her employment because of her sex, then you must consider the issue of compensatory damages.  As I instructed you earlier, Ms. Briggs is not entitled to compensatory damages for her age discrimination claim.  Under Title VII of the Civil Rights Act of 1964, however, you must award Ms. Briggs an amount that will fairly compensate her for any injury she actually sustained as a result of Temple University's conduct towards Ms. Briggs due to her sex.  The damages that you award must be fair compensation, no more and no less.  The award of compensatory damages is meant to put Ms. Briggs in the position she would have occupied if the discrimination had not occurred.  Ms. Briggs has the burden of proving damages by a preponderance of the evidence.

Ms. Briggs must show that the injury would not have occurred without Temple University's act [or omission].  Ms. Briggs must also show that Temple University's act [or omission] played a substantial part in bringing about the injury, and that the injury was either a direct result or a reasonably probable consequence of Temple University's act [or omission].  This test — a substantial part in bringing about the injury — is to be distinguished from the test you must employ in determining whether Temple University's actions [or omissions] were motivated by discrimination.  In other words, even assuming that Temple University's actions [or omissions] were motivated by discrimination, Ms. Briggs is not entitled to damages for an injury unless Temple University's discriminatory actions [or omissions] actually played a substantial part in bringing about that injury.

There can be more than one cause of an injury.  To find that Temple University's act [or omission] caused Ms. Briggs's injury, you need not find that Temple University's act [or omission] was the nearest cause, either in time or space.  However, if Ms. Briggs's injury was caused by a later, independent event that intervened between Temple University's act [or omission] and Ms. Briggs's injury, Temple University is not liable unless the injury was reasonably foreseeable by Temple University.

In determining the amount of any damages that you decide to award, you should be guided by common sense.  You must use sound judgment in fixing an award of damages, drawing reasonable inferences from the facts in evidence.  You may not award damages based on sympathy, speculation, or guesswork.

You may award damages for any pain, suffering, inconvenience, mental anguish, or loss of enjoyment of life that Ms. Briggs experienced as a consequence of Temple University's allegedly unlawful act or omission.  No evidence of the monetary value of such intangible things as pain and suffering has been, or need be, introduced into evidence.  There is no exact standard

for fixing the compensation to be awarded for these elements of damage. Any award you make should be fair in light of the evidence presented at the trial.

I instruct you that in awarding compensatory damages, you are not to award damages for the amount of wages that Ms. Briggs would have earned, either in the past or in the future, if she had continued in employment with Temple University. These elements of recovery of wages that Ms. Briggs would have received from Temple University are called "back pay" and "front pay". [Under the applicable law, the determination of "back pay" and "front pay" is for the court.] ["Back pay" and "front pay" are to be awarded separately under instructions that I will soon give you, and any amounts for "back pay" and "front pay" are to be entered separately on the verdict form.]

You may award damages for monetary losses that Ms. Briggs may suffer in the future as a result of Temple University's allegedly unlawful act or omission. [For example, you may award damages for loss of earnings resulting from any harm to Ms. Briggs's reputation that was suffered as a result of Temple University's [allegedly unlawful act or omission]. Where a victim of discrimination has been terminated by an employer, and has sued that employer for discrimination, she may find it more difficult to be employed in the future, or may have to take a job that pays less than if the discrimination had not occurred. That element of damages is distinct from the amount of wages Ms. Briggs would have earned in the future from Temple University if she had retained the job.]

As I instructed you previously, Ms. Briggs has the burden of proving damages by a preponderance of the evidence. But the law does not require that Ms. Briggs prove the amount of her losses with mathematical precision; it requires only as much definiteness and accuracy as circumstances permit.

You are instructed that Ms. Briggs has a duty under the law to "mitigate" her damages-- that means that Ms. Briggs must take advantage of any reasonable opportunity that may have existed under the circumstances to reduce or minimize the loss or damage caused by Temple University. It is Temple University's burden to prove that Ms. Briggs has failed to mitigate. So if Temple University persuades you by a preponderance of the evidence that Ms. Briggs failed to take advantage of an opportunity that was reasonably available to her, then you must reduce the amount of Ms. Briggs's damages by the amount that could have been reasonably obtained if she had taken advantage of such an opportunity.

In assessing damages, you must not consider attorney fees or the costs of litigating this case. Attorney fees and costs, if relevant at all, are for the court and not the jury to determine. Therefore, attorney fees and costs should play no part in your calculation of any damages.

Third Circuit Court of Appeals Model Jury Instruction 5.4.1 (modified).

**<u>DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 31</u>**

**Title VII Damages – Nominal Damages**

If you return a verdict for Ms. Briggs <u>on her sex discrimination or sex retaliation claim</u>, but Ms. Briggs has failed to prove actual injury and therefore is not entitled to compensatory damages, then you must award nominal damages of $1.00.

A person whose federal rights were violated is entitled to a recognition of that violation, even if she suffered no actual injury.  Nominal damages (of $1.00) are designed to acknowledge the deprivation of a federal right, even where no actual injury occurred.

However, if you find actual injury, you must award compensatory damages (as I instructed you), rather than nominal damages.

Third Circuit Court of Appeals Model Jury Instruction 5.4.5.