# EXHIBIT 05
## Trial Tr. 07 17 18 AM

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

RUTH V. BRIGGS,                 .
                               . Case No. 1:15-cv-00902-LS
              Plaintiff        .
                               .
         vs.                   . 601 Market Street
                               . Philadelphia, Pennsylvania 19106
                               . July 17, 2018
                               .
TEMPLE UNIVERSITY,             .
                               .
              Defendants. .
. . . . . . . . . . . . . ..

TRANSCRIPT OF TRIAL
DAY 2 - A.M. SESSION
BEFORE THE HONORABLE ROBERT F. KELLY
UNITED STATES DISTRICT JUDGE
AND A JURY

APPEARANCES:

For the Plaintiff:          Laura Carlin Mattiacci, Esq.
                            Stephen G. Console, Esq.
                            Rahul Munshi, Esq.
                            CONSOLE MATTIACCI LAW, LLC
                            1525 Locust Street
                            Philadelphia, Pennsylvania 19102


For the Defendant:          Richard R. Harris, Esq.
                            Rachel Fendell Satinsky, Esq.
                            LITTLER MENDELSON, PC
                            1601 Cherry Street, Suite 1400
                            Philadelphia, Pennsylvania 19102



Audio Operator:             Electronically Recorded
                            by Court Personnel

Transcription Company:      JDR Acquisition, LLC./
                            Advanced Transcription
                            1880 John F. Kennedy Boulevard
                            6th Floor
                            Philadelphia, Pennsylvania 19103
                            (855)204-8184
Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1  sensed that after these writeups started coming that, as a

2  non -- I was a salaried employee, which meant I wasn't a -- I

3  wasn't in a union.  And in Temple, just about everyone,

4  they're in a union, including faculty.  So I was one of the

5  few who weren't.  And in my department, I believe I was the

6  only non-union employee.

7      And I -- so I was expected to pick up where the hourly

8  rate people were not.  So if they left, then I could pick it

9  up.  So I -- I did -- I picked up a lot of extra tasks,

10  projects when I was -- I always volunteered for them.  And I

11  kept trying to make it work.  I kept -- I was trying to make

12  it -- make my -- make myself -- I knew that the -- that the

13  department needed me because when I wasn't there, they would

14  call me to say, Ruth, help me with this, help me with that.

15  But I -- it just didn't seem to -- Dr. Wu loved me when he

16  did, and he -- when he was not on my side, he was brutal.  He

17  was brutal to me.

18  Q    Did he ever raise his voice?

19  A    He did raise his voice frequently.  And quite -- in the

20  beginning when I started there, I did approach him privately

21  and ask him if he would -- if I could keep his door closed

22  while he met with his -- his Ph.D. candidates because it was

23  so disturbing to me to hear him yelling at them.  So I -- he

24  did.  We were allowed to do that.  But I could still hear it.

25      There were times when he would come out and yell at me

1   in the front office.  I -- on two separate occasions, I

2   remember him looking at me and saying, what are you, stupid.

3   And then another time when he said, can't you speak English.

4   And I was -- you know, I just don't know how to respond to

5   those kinds of comments.  I just --

6   Q    How does that make you feel to be yelled at?

7   A    I was -- I was mortified.  I was so embarrassed because

8   it would be in front of -- you know, it was a -- it was a

9   front office.  So there could be students there.  There could

10  be outside constituents visiting.  There could be alums.

11  There could be parents.  And there could be, you know, staff

12  members and faculty.  So it wasn't like ever a private place.

13  It was -- it was always a public humiliation.

14  Q    Did you ever hear him raise his voice with any other

15  employee?

16  A    I never heard him.  No, I did not.

17          MR. MUNSHI:  Your Honor, before we go further, can

18  I just put up the organizational chart that's right up there

19  so the jury can see it?

20          THE COURT:  Yep.

21          MR. MUNSHI:  Thank you.

22  BY MR. MUNSHI:

23  Q    Okay, Ruth.  So let me now take you to 2011.

24  A    Uh-huh.

25  Q    Okay?  And let's talk about November of 2011.

1       First of all, you mentioned the year that you were born.

2   But tell us the date of your birthday.

3   A    November 10th, 1954.

4   Q    Okay.  Tell us what happened in November of 2011 on

5   November 9th.

6   A    I was in the front office.  I was at -- at my desk.  And

7   Dr. Wu came and stood in front of my doorway.  And he said,

8   so you're having a birthday, how old are you going to be.

9   And I didn't even know he knew my birthday.  But I just

10  assumed that someone must have passed him a birthday card or

11  something.  And I told him I was going to be 57.  And he

12  said, well, you -- because, you know, in China, we put women

13  out to pasture at 55.  And I -- like, my jaw dropped because

14  I knew the office was filled with people.  And -- and I

15  replied to him, Dr. Wu, with all -- with all due respect,

16  we're in America and not in China.

17  Q    How did that make you feel when Dr. Wu said words to the

18  effect of women are put out to pasture?

19  A    Well, I was embarrassed.  I was also insulted because I

20  -- I would still be working.  I have no plan -- had no plans

21  to retire.  I was going to work until I -- I like working.  I

22  like being part of -- of a community.  I like doing the work.

23  I like meeting people.  And I love Temple.  I -- I just can't

24  imagine that I would -- if I could still be there, I would

25  be.  Not in that department, but I would be at Temple.

1  A    Yes.

2  Q    -- sent this email?

3  A    Yes, I did.

4  Q    Okay.  Was this in person?

5  A    Yes.

6  Q    Okay.  And tell us what you told Sandra Foehl, the

7  Director of Equal Employment Compliance, in your face-to-face

8  meeting with her.

9  A    Well, I -- I told her about the age comment and I told

10 her about my -- the retaliation -- my fear of retaliation.

11 And I asked her if there was some kind of way that she could

12 mediate for Dr. Wu and I.  I didn't understand what her role

13 was, if she was just there to file a formal complaint or not.

14 And since I agreed -- I said to her I was afraid to do it,

15 that I didn't know that she -- you know, I just didn't know

16 what her role was.

17 Q    Had you ever gone to her with a complaint before?

18 A    I -- not for me.  I had met her for another thing.  But,

19 no, I -- never for me.

20 Q    And looking at this same email chain, Plaintiff's Trial

21 Exhibit 5 --

22 A    Uh-huh.

23 Q    -- can we go to the first page, please?

24 A    Sure.

25         MR. MUNSHI:  And if we can just blow up the top

45

```
1              to fire me.  I" -- "I do know that I was paid

2              significantly lower than my two" -- "two male staff

3              members in the Dean's office who were my equals."

4       Keep going?

5   Q   Keep going.

6   A   Okay.

7              "Regarding our discussion related to Dr. Wu's

8              comments about my age, I am forwarding an email

9              that was sent to a student worker in our office

10             about" -- "about yet another job" -- "another one"

11             -- "job functions assigned to her.  I was copied on

12             the email as to" -- "as you can see in the email

13             header, as was" -- "as was last week.  I was

14             informed in front of Mary Kate, who is a student

15             worker, that she would be handling all his travel

16             arrangements, too.  I am not authorizing any action

17             on my part because I am waiting to be cleared for

18             FMLA for a short period to care for my son who has

19             a spinal-cord injury."

20  Q   And let's just go to the top email on that same email

21  chain.  It's an email up top to Rhonda Brown.

22  A   Okay.

23  Q   And Rhonda Brown of Office of Institutional Diversity.

24  Read that email for us, please.

25  A          "Dear Rhonda, I regret having seen Sandy Foehl
```

49

1          MR. MUNSHI:  And we'll move Plaintiff's Trial

2     Exhibit 11 into evidence.

3          MR. HARRIS:  No objection.

4          THE COURT:  It's admitted.

5     (P-11 received in evidence)

6     BY MR. MUNSHI:

7     Q    And, Ruth, if we can take a look at your email of

8     February 8th, 2013 to Sandy Foehl on the bottom.

9     A    Uh-huh.

10    Q    And if we can blow that one up for the jury?

11         Read for us your email to Sandy Foehl of February 8,

12    2013, please.

13    A    Okay.  "Sandy" --

14    Q    And if you want to read it on the screen if that's

15    easier, that's fine.

16    A         "Sandy, I am so bullied and harassed every day all

17              day.  Every morning I must meet with my direct

18              supervisor and Greg Wacker's assistant Drew DiMeo

19              for a staff meeting to discuss my failure to comply

20              with the directive that prohibits any work activity

21              that has not been approved by my supervisor, all of

22              which are related to performing daily functions in

23              the office, such as answering" -- "such as

24              answering questions from students or visitors to

25              our building.  The threat of discipline for

50

```
1              assisting a visitor and responding to a request
2              from another office does not seem to have any
3              actions of wrongdoing; rather, fulfilling the
4              customer service expectation of the University.  No
5              other staff member is required to meet daily for" -
6              - "for a closed" -- "again, it's a public
7              humiliation.  And my request to move the meetings
8              to a private location was flat-out denied.  When I
9              asked for clarification on an assignment, I" -- "it
10             was reported to the Dean's office that I was
11             challenging his authority.  If he can have someone
12             there to protect his interests, there is no more
13             that I can" -- "there is more than an element of
14             bias.  It is beginning to feel like psychological
15             abuse.  If my only resource to address this problem
16             is through HR, this is unacceptable.  Can I" -- "I
17             can't" --
18        Keep going?
19   Q    Yeah.  It's --
20   A    "Can I contact --"
21   Q    -- "Can I contact --"
22   A    "-- a mediator?"
23   Q    Now, going to the first page of Plaintiff's Trial
24   Exhibit 11, read for us Sandy Foehl's response to the email
25   that you just read out loud to us.
```

1    A    I do.

2    Q    Okay.  And was that the second written discipline that

3    you had received during your tenure at Temple at that point?

4    A    Yes.  It was.

5    Q    All right.  Tell us, Ruth, what happened that led to you

6    getting the three-day unpaid suspension at that time?

7    A    It was -- I was working with one of the Assistant

8    Chairs, Eugene Kwatny, who headed up the hiring committee for

9    -- the faculty hiring committee for the department.  And I

10   was -- I arranged for faculty candidates to come in, their --

11   you know, their itinerary, their lodging, their food and

12   their -- their -- I hosted them while they were here.

13        So Dr. Whaley was one of I believe nine or 10 that

14   semester.  Dr. Whaley and I went back and forth.  I sent him

15   an itinerary.  He sent it back.  It wouldn't work.  So there

16   were like three or four itineraries.  And I talked to Dr.

17   Kwatny about it and said, we're having a hard time nailing

18   this down.  And he said, well, just tell him if he would feel

19   better, go ahead and buy his own ticket and we'll reimburse

20   him.  He had to submit it for reimbursement.  So that's -- so

21   what happened was I -- I took responsibility for not

22   following up on that.  I was off campus at a conference with

23   Dr. Wu, and over the weekend, it occur -- you know, I checked

24   my email and Dr. Kwatny contacted me.  He's like, did you get

25   an itinerary.  And I think I -- you know, as I recall, I

1      position and she would contact the HR generalist to

2      lift the hold.  Since April, I've sent three

3      requests to my" -- "by email to bid on positions

4      that I found, but she has not responded.  I have a

5      very strong personal belief regarding"

6      (indiscernible) "litigious society and I feel a

7      moral obligation to find solutions to a problem in

8      a manner that is not adversarial.  But no one will

9      respond to me and my professional life is on the

10     line.  My situation I believe now is compounded

11     because of my age, my gender, and perhaps

12     ethnicity.  I'm begging for someone within Temple

13     to help me mediate this problem.  My confidence has

14     never been so low and at 58 years old, I have" --

15     "I have no" -- "not options to change the course of

16     my plummeting professional career because I'm

17     relegated to making coffee and secretarial

18     functions, even though I've never been a secretary.

19     Young female students workers occupy the front

20     office areas where they carry out my job functions

21     while I was relocated to the third floor" --

22     actually, from the third floor of Walkman"

23     (phonetic) "to the tenth floor of Cornell.  Even

24     though the two-verus-one meetings continue every

25     morning, the main office and I" -- "the main" --

1   you've had in 13 years at Temple?

2   A    Yes.

3   Q    Okay.  So tell us, what happened here that resulted in

4   you getting this written warning?

5   A    I had overslept three hours.  And, you know, not -- I

6   was already scared anyways that they were after me, trying to

7   get rid of me.  And I live very close to campus.  We had no

8   written -- there was no -- the department didn't have any

9   procedures for doing this if you're late, call -- you know,

10  what were you supposed to do.

11       So I called the front office and a student worker

12  answered the phone.  And I asked for Judy Lennon, who's the

13  department secretary.  She said they -- they couldn't find

14  her.  And I said, tell -- is Dr. Wu there.  And she said, Dr.

15  Wu's in a meeting and the door is closed.  So I said, tell

16  Dr. Wu that I am going to be there in five minutes.  I lived

17  that close to campus.

18       And I went in and went to my office.

19  Q    And did you call Dr. Wu yourself personally, on his cell

20  phone, for example?

21  A    No.  Because I was told he was in a meeting with the

22  doors closed.

23  Q    Had you ever been this late, a couple of hours late

24  before?

25  A    No.

1          MR. HARRIS:  Objection.  She said three hours, Your

2    Honor.

3          MR. MUNSHI:  Oh, I'm sorry.  Three --

4    BY MR. MUNSHI:

5    Q    Have you ever been three hours late before at Temple in

6    13 years?

7    A    No.  In fact, I was -- generally there early, and I

8    worked late.  I worked Saturdays.  I worked Sundays.  I was

9    not late.  That is not a problem for me, and I was surprised

10   by the -- I was actually surprised to get written up, to be

11   honest with you.  When it was handed to me, Dr. Andrew DiMeo

12   handed it to me and I was like, are you kidding.  And he

13   went, Ruth, this is serious.  I said, I'm not taking -- you

14   know, I'm not denying the fact that I was late, but this is -

15   - you're writing me up for this?  I said, what am I -- I'm

16   trying to get off probation so I can, you know, get another

17   job.  And he -- he was angry that he didn't think I took it

18   seriously.  I did take it seriously.  I felt horrible about

19   it.  But I stayed on to work the rest of the day until well

20   into the evening, probably until 9 or 10.  But that wasn't

21   unusual for any day for me.

22   Q    Do you recall Dr. Wu testifying yesterday that you were

23   late multiple times a week?  Is that true?

24   A    Nothing could be further from the truth.  I'm not saying

25   that I'd never been five minutes late when I commuted from

80

1    the suburbs because of, you know, transport -- you know --

2    you know, traffic, or I was late probably once that -- maybe

3    around that time, that snowy time we had because I was

4    walking to work.  Five minutes.  But three or four times a

5    week I believe he said.  That is -- I feel that that's

6    another way to just make me -- assassinate my character with

7    -- there's no documentation, either.

8    Q    That you received?

9    A    And I -- from them, no.  And I -- you know, I -- and you

10   can see that I document my -- you know, my things and, you

11   know, frequently.

12   Q    And let's just get a better understanding of what your

13   workday was like.

14        Were you a -- an hourly worker who punched in or out, or

15   were you salary?

16   A    No.  I -- I was a salary employee at Temple.  And I

17   believe I was the only administrative staff person in the

18   department who wasn't a union employee.  So their work rules

19   said you come in at your time and you leave at your time.  If

20   you punch in late or punch out late, you can be written up

21   for it.  So they had to leave when they did, you know.  And

22   when they did, often, I was still there.  And whatever

23   someone needed -- was doing, Dr. Wu needed it, I stayed and

24   finished it up for them.

25   Q    Did you ever work past 5 p.m.?

81

1    A    It was frequently.  A couple times a week I did.

2    Q    How about on weekends?  Ever work weekends?

3    A    I did events, any event that came up I handled.  I --

4    there were -- that -- actually, the day after I got written

5    up for this, Dr. Wu called me.  It was a snow day and the

6    University was closed.  And he told me that I had to come in.

7    And I'd just been disciplined.  I wasn't going to argue with

8    him.  I came in and I worked that day, even though the

9    University was closed.

10   Q    Did you feel that this writeup was retaliatory?

11   A    I did.  It was -- it is.  I believe in my heart that it

12   was retaliatory.

13   Q    Were you aware of any other staff members who worked in

14   the office who were late or didn't show up for work?

15   A    I am.  And it's not my intention to rat anyone out.

16   That isn't my intention.  My intention is to point out there

17   was a -- there was a different set of standards from me to

18   other people.  We had a young woman start in our department,

19   Hailey King.  And she had only been in -- maybe there for

20   like three months.  And she didn't come in for three days

21   straight.  Didn't call in.  Didn't -- we didn't know what

22   happened to her.  I was only made aware of it because the

23   timekeeper of the department was on another floor and she

24   called and she said, have you guys seen Hailey.  And, no.

25   And she called every day.  She called -- she kept trying to

82

1   call her, and she didn't -- nobody could get in touch with

2   her.  She never called in.  Then she showed up --

3   Q    Is that the Hailey King that's on the organizational

4   chart over there with us?

5   A    Yes.  Yes, it is.

6   Q    Around how old was Hailey when you worked --

7   A    Like 28.  I mean, yeah.  I'm going to -- not older than

8   30, for sure.

9   Q    Do you know if Hailey King received a written discipline

10  for not coming to work?

11  A    I am not -- you know, I don't -- I don't want anybody to

12  know my business, so I didn't ask.  But I was -- I learned

13  later that she hadn't been disciplined.  She received a --

14  you know, a talk, a verbal warning, but it didn't make -- a

15  verbal warning is still supposed to go in your HR file.

16  Q    Did you feel that Dr. Wu treated Hailey better than you?

17  A    Absolutely.  And she was on probation, too, because she

18  had not been there a year yet.  So that could have been

19  grounds for dismissal.

20  Q    Now, Ruth, if you can turn to the document that's behind

21  Tab 33, please, in your binder?

22  A    Okay.

23  Q    And --

24  A    I see it.

25  Q    -- tell us what this document is?

91

1       Ruth, did you ever learn that Dr. -- did you ever learn

2    from anybody about Dr. Wu knowing about your complaints?

3    A    Yes.  From Andrew DiMeo and from Greg Wacker.

4    Q    Tell us what you learned from Mr. DiMeo.

5    A    I -- I remember meeting with him first in his office and

6    told him and -- and he told me, he says, like, Dr. Wu knows

7    what's going on, and I'm -- you know, and it's got to stop.

8    And then Greg Wacker is in the same office.  He told me that

9    Dr. Wu knows what you're doing and if you want your job, you

10   better cut it out.

11   Q    Did you ever tell Drew DiMeo that you were speaking with

12   Sandy Foehl from Equal Employment?

13   A    Yes.

14   Q    So let's go back to April 1st, 2014.

15       What happens after you leave Sandy Foehl's office?

16   A    Well, Greg -- actually, Greg called me when I arrived in

17   the morning and said, we have a meeting in the Dean's office

18   at 10 o'clock in the morning.  And I was meeting with Sandy

19   at 10.  So I told him that I -- I needed to make it a little

20   later.  And he said 10:30 would be fine.

21       So I met with Sandy.  I didn't even go back to my

22   office.  I just went directly to the Dean's office to Greg's

23   -- where Greg is.  And Deirdre Walton was there.  And they

24   took me into a conference room and handed me a letter that

25   said that I was being terminated by the end of the day.

93

1    THE WITNESS:  Yes

2    BY MR. MUNSHI:

3    Q    There are two bullet points that describe two different

4    situations that they say in this letter led to your

5    termination.  Let's talk about those two, okay?

6    A    Yes.

7    Q    The second bullet point says you were directed to book a

8    room reservation.  Do you see that?

9    A    Yes, I do.

10   Q    Okay.  What happened here?  Tell us what happened with

11   Dr. Ness Shroff.

12   A    I -- there was one overlap in the day.  I had -- I think

13   that when -- my -- I maybe booked it the -- his stay on

14   campus in Cumberland from like the 12th to the 13th rather

15   than the 13th to the 14th.

16   Q    How did you learn that the dates were supposed to be --

17   how did you learn what the dates were supposed to be?

18   A    Well, Dr. Wu told -- asked me to book them.

19   Q    Did the dates ever change from what you were originally

20   told?

21   A    I -- it was a verbal request.  I -- you know, I recall

22   that there was some changing in that.  But I don't have it,

23   you know ...

24   Q    And as a result of any change that may have happened,

25   did you in fact book a hotel?

101

1  couldn't allocate them.  And Drew -- Drew told me that I was

2  not telling the truth, that I, in fact, did have access to

3  that.  And I asked them if they would go -- you know, go with

4  me, and let -- let them show me what I saw because I'm -- I'm

5  pulling up the screen for me.  And I wanted that -- and

6  didn't -- and they said they didn't -- no, they wouldn't --

7  didn't need to do that, that I was lying.

8        And I -- I was -- I was called a liar, and I was angry.

9  And I -- and I said, I -- you know, I had -- I had to walk

10 out.  I -- I thought I was going to cry.

11 Q    So these two issues, the Concur issue that we're talking

12 about right now and the hotel booking issue, those are the

13 two that are on the --

14 A    For -- yeah.

15 Q    -- bullet points of your termination letter?

16 A    Yes.  C-level violations.

17 Q    Ruth, tell us what it was like to receive a termination

18 letter from Temple after 13 years there?

19 A    It was just confirming what I thought to be the case for

20 me.  I knew that they were after me, I knew I was being

21 discriminated against because of my age and my gender.  And I

22 -- my -- you know, after awhile, it was clear that there was

23 retaliation because I was reaching out to so many different

24 people in a way I thought -- I wasn't trying to be a nudge, I

25 wasn't trying -- I was really asking for help.  I wanted

116

1    A    These are email confirmations, you know, ones I

2    submitted my application and letters, and whatever documents

3    they requested online.

4              MR. MUNSHI:  Your Honor, we move Plaintiff's

5    Exhibit 66 into evidence.

6              MR. HARRIS:  No objection.

7    BY MR. MUNSHI:

8    Q    And Ruth, just --

9              THE COURT:  It will be admitted.

10        (P-66 received in evidence)

11   BY MR. MUNSHI:

12   Q    Without going through every single email there, just

13   talk to us about the various places that you applied to, your

14   efforts to find another job.

15   A    I -- I really wanted to stay in higher ed.  I -- I -- I

16   really loved it.  I -- I -- I didn't get very many

17   interviews, to be honest with you.  But one interview I got

18   was with CCP -- I'm sorry -- Community College of

19   Philadelphia, and it was pretty much doing the same thing I

20   was doing in the Dean's Office.  It had to do with faculty

21   recruitment.

22        And I had an interview with two women, and I was -- came

23   right up front and told them that I was -- that I resigned

24   from -- from Temple because I, in fact, was asked to resign,

25   after I was fired.

118

1    cashier.

2    Q    How did that make you feel?

3    A    I -- I thought this was the end -- I really -- you know,

4    I really did.  I thought that I was going to -- I was so

5    distraught.  I was going to let my children down.  I had no

6    money, and I couldn't even get a minimum-wage-hour job.  I

7    was not well.  I had asthma, and I had been hospitalized.  I

8    had crushed my finger, you know, right before I left.  I

9    mean, I had so many things going on, and I --

10   Q    Were you also --

11   A    I'm pretty much bankrupt.  I mean, I didn't file

12   bankruptcy.  But you know what?  Because I don't have

13   anything.  But I lost everything.  I finally -- you know

14   what?  I finally looked into senior housing, subsidized

15   housing in Philadelphia, through the Philadelphia Commission

16   on Aging.  And the ones I looked at were like you could smell

17   urine in the hallways, and it was -- it was so -- you know, I

18   knew I was going to have to make this move because I couldn't

19   afford my apartment.  But I thought that that was one step

20   before I stepped into my grave, if I moved into there.  And I

21   was just about ready to give up, and I was able to find

22   another source for subsidized housing, for people in

23   situations like mine, that wasn't in a senior home.

24   Q    Ruth, were you ultimately able to find a job?

25   A    I -- I did.  I found a job as -- as a home health aide

119

```
 1   to a disabled woman, that -- she's totally disabled, through

 2   Liberty Home Resources, is what it's called.  It's a staff --

 3   Q    And when did you start with her?

 4   A    It was August of two years ago, so it was 2014.  Yeah.

 5   No, 2016.  So I've been with her almost two years.

 6   Q    So, from April 1st, 2014, when you left Temple, you were

 7   terminated by Temple, until August of 2016, did you have any

 8   jobs?

 9   A    No, I did not.

10   Q    And how much do you make as a home healthcare nurse?

11   A    I -- I make ten seven -- $10.70 an hour now; I started

12   out at 10.50.

13   Q    And while you were working at Temple, what was your

14   annual salary?

15   A    From 50,000, with benefits.

16   Q    And Ruth, if you can turn to 62, the Tab 62 in your

17   binder.

18   A    Okay.

19   Q    And on the eleventh page of that document, do you see a

20   description of the different health insurance benefits --

21   A    Yes, I do.

22   Q    -- and other benefits that you received at Temple?

23   A    Yes, I do.

24   Q    During those two years, Ruth, where you didn't have a

25   job, what did you do for health insurance?
```

123

1   A      I had -- you know, to be perfectly honest with you, I

2   had never even considered retirement.  I -- maybe I just

3   didn't -- it wasn't on my radar at all.  So I didn't like

4   have a target date, it never even occurred to me.  I had

5   planned to leave that money for my kids, to take care of

6   their brother, when I'm gone.  I know it's not much, but it

7   would have helped them take care of their brother, who's

8   disabled.

9   Q      And lastly, Ruth, you had mentioned your family a few

10  times.  And tell us about how this experience -- how it's

11  affected any relationships you've had with any of your

12  family?

13  A      My three grand -- I think the proudest role I've ever

14  been called is -- I have been called is Mimi, and that's

15  grandmother to my grandkids.  And that first Christmas, when

16  I didn't have anything, I didn't have -- I couldn't even put

17  up a tree for them, I didn't have gifts for them.  And it's

18  so hard to tell children, little ones, that you don't have

19  it.  And it -- and I still haven't been able to afford that.

20  I am the -- I'm making it now, with the subsidized rent, but

21  I don't have extra money.  There's no extra money.

22              THE COURT:  Any other questions?

23              MR. MUNSHI:  That's all we have, Your Honor.

24  Thank you.

25              THE COURT:  Are you ready -- it's a little -- it's