# EXHIBIT 06
## Trial Tr. 07 17 18 PM

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

RUTH V. BRIGGS,                     .
                                    . Case No. 1:15-cv-00902-LS
            Plaintiff,              .
                                    .
        vs.                         . 601 Market Street
                                    . Philadelphia, Pennsylvania 19106
                                    . July 17, 2018
                                    .
TEMPLE UNIVERSITY,                  .
                                    .
            Defendants.             .
. . . . . . . . . . . . . . . .
                TRANSCRIPT OF TRIAL
              DAY 2 - P.M. SESSION
     BEFORE THE HONORABLE ROBERT F. KELLY
          UNITED STATES DISTRICT JUDGE
                  AND A JURY
APPEARANCES:
For the Plaintiff:          Laura Carlin Mattiacci, Esq.
                            Stephen G. Console, Esq.
                            Rahul Munshi, Esq.
                            CONSOLE MATTIACCI LAW, LLC
                            1525 Locust Street
                            Philadelphia, Pennsylvania 19102

For the Defendant:          Richard R. Harris, Esq.
                            Rachel Fendell Satinsky, Esq.
                            LITTLER MENDELSON, PC
                            1601 Cherry Street, Suite 1400
                            Philadelphia, Pennsylvania 19102

Audio Operator:             Electronically Recorded
                            by Court Personnel

Transcription Company:      JDR Acquisition, LLC./
                            Advanced Transcription
                            1880 John F. Kennedy Boulevard
                            6th Floor
                            Philadelphia, Pennsylvania 19103
                            (855)204-8184

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

5

1    experience, specifically, how you felt when you were moved to

2    the tenth floor?

3    A    Do I recall what I said or can I --

4    Q    Yes.  Do you remember what you said then?

5    A    Not exactly, word for word, but I could probably -- I

6    remember saying that it was -- I was embarrassed, first, by

7    the move, but then relieved to be away from the -- the

8    tension and the stress.

9    Q    Do you remember what you said this morning, when asked

10   by counsel how you felt about that experience when you got

11   moved to the tenth floor?  Do you remember what you said this

12   morning?

13   A    I said I was embarrassed.

14   Q    Do you remember saying the word "banished."

15   A    And banished.

16   Q    Banished?

17   A    I -- yeah, and I'll -- I'll stand by that.  Yes, I did

18   feel banished.

19          MR. HARRIS:  Okay.  May the witness be shown the

20   clip on Page 168 of her deposition transcript, starting -- or

21   beginning at Line 4.

22          THE WITNESS:  Am I --

23          MR. HARRIS:  It's going to go up on the screen

24   shortly.

25          THE WITNESS:  Oh.

7

1    BY MR. HARRIS:

2    Q    You didn't say banished, did you?

3    A    No, I didn't.  The --

4    Q    Okay.  But you said you stand by the fact that you felt

5    banished.

6    A    I think they both can be true.

7    Q    Well, do you recall just saying -- you just saw that

8    clip, correct?

9    A    Yes, I did.

10   Q    And in that clip, you specifically said that you

11   actually welcomed that you were being moved.

12   A    I welcomed being able to work up there, yes, I did say

13   that.

14   Q    And --

15   A    It was less -- less traffic, less hub --

16   Q    Noisy?

17   A    Noisy.

18   Q    And it was helpful to you.

19   A    It was helpful to my performing my job, yes.

20   Q    Okay.

21   A    That is true.

22   Q    All right.  Do you also -- okay.  Thank you.  Do you

23   also being asked [sic] by Ms. Satinsky about the discipline

24   you received regarding Professor Whaley coming to Temple

25   University?

9

1    A     Yes.

2    Q     Okay.  And specifically, you believe that, unless -- if

3    I understand it correctly, that mister -- or Professor Whaley

4    was supposed to give you some information, and he failed to

5    do so.

6    A     There was a back-and-forth of, yes, he -- there was

7    several itineraries that I sent him, and they weren't right -

8    -

9    Q     Okay.

10   A     -- for him, so I asked Dr. Kwatney -- as I recall, Dr.

11   Kwatney and I talked about, and he said, just ask him if it

12   would be better if he booked his own flight, and we got

13   reimbursed for it.

14   Q     And you told Professor Whaley this?

15   A     No, I did not.  No -- I mean, yes, I did.  I told him

16   that that -- I relayed that to him, but I didn't follow up on

17   it, is what I didn't do.

18   Q     Okay.  Is it your testimony that you relayed to

19   Professor Whaley that he should book his own flight?

20   A     That -- not should, that he could, that he could book --

21   book his own flight.

22   Q     How did you communicate that?

23   A     I believe it was on the phone.

24   Q     Not an email.

25   A     It might have been an email, too.

1   Q    Did you speak to him?

2   A    Did I speak to Clint Whaley on the phone, is that what

3   the question is?

4   Q    Yeah.

5   A    What is the question?  I'm sorry.

6   Q    You said that you called him, correct?

7   A    I did call him.

8   Q    And you said that you spoke to him, correct?

9   A    I spoke to him.

10  Q    Okay.  Did you tell him, during the phone conversation,

11  that he could or should book his flight --

12  A    I --

13  Q    -- and get reimbursed by the University?

14  A    I believe it was could, and I didn't get the -- the

15  answer.

16  Q    So he never responded.

17  A    No.

18  Q    What did he say during the call?

19  A    I don't recall.  And actually, you know what?  I -- it

20  might have been an email, so I'm -- I'm not -- I'm not sure.

21  I can't answer with certainty.

22  Q    Okay.  Was it an email or a phone call?

23  A    I'm not -- I can't answer with certainty.  It could have

24  been both.  I can't answer with certainty.

25  Q    You said you had a phone conversation with Professor

11

1    Whaley.

2    A    Yes.

3    Q    Did you not?

4         MR. MUNSHI:  Objection, Your Honor.  He's gone over

5    this three times.  She says she doesn't recall specifically.

6         THE COURT:  Overruled.

7         THE WITNESS:  I -- I -- I can't make something up,

8    I don't --

9         MR. HARRIS:  Well --

10         THE WITNESS:  I don't -- I don't -- I mean, I --

11   there were numerous times, this went -- went over -- over a

12   month.  So there were emails, there were phone calls.  And

13   I don't know the -- you know, the exact wording of any of

14   them.  And I don't -- I can't recall.

15   BY MR. HARRIS:

16   Q    Okay.  Do you remember testifying earlier this morning

17   that Professor Whaley was supposed to give you information

18   that you didn't receive?

19   A    He was.

20   Q    Okay.

21   A    But that doesn't make -- that doesn't make me less -- I

22   mean, I was -- should have followed up with him, and that's

23   what I'm -- that is what I'm saying.  I took responsibility

24   for that, I should have followed up with him.

25   Q    But you failed to do so.

12

1  A    I failed to do so.

2  Q    You were expecting him to provide you what information?

3  A    That he was coming.  I gave him -- that he -- you know,

4  he -- he had reservations at our Conwell Inn on campus.

5  Q    Right.  You made the reservations.

6  A    I made the reservations for him.

7  Q    You booked the hotel.

8  A    Yes, I did.

9  Q    And so you knew that he was coming, and that's why you

10  booked the hotel.

11  A    Yes.

12  Q    Yes?  Okay.  So you knew he was coming.

13  A    I did know he was coming.  Yes, I did.

14  Q    Okay.  So when you just said, a few seconds ago, that

15  you weren't sure whether or not he was coming, that's

16  inaccurate.

17  A    Did I -- I wasn't sure what -- how he -- no, it's not

18  inaccurate.  I knew he was coming, of course I knew he was

19  coming.  It was my job to -- it was --

20  Q    Right.  He booked a flight, so he was --

21  A    No, I don't know --

22  Q    -- (indiscernible) --

23  A    -- that he booked a flight.

24  Q    -- responsibility for booking --

25  A    I don't know if he booked a flight.  I didn't book the

13

1    flight for him.

2    Q     But you were supposed to.

3    A     I was supposed to arrange travel for him, yes.

4    Q     Which includes booking the flight.

5    A     It includes booking the flight.

6    Q     And you failed to do so.

7    A     I failed to do so.

8    Q     Okay.  Did you also talk to Professor Whaley about why

9    you failed to book the flight?

10   A     I did not because I asked Dr. Wu, if I could call Dr.

11   Whaley and apologize, and I was told I wasn't allowed to.

12   Q     So you weren't actually waiting for doctor -- or

13   Professor Whaley to give you the information then.

14   A     I was away -- I was off campus.  I'm -- I'm sorry.  I

15   was totally off campus for a conference, and I didn't -- I

16   dropped the ball.  I don't know how else to say that.  I

17   dropped that ball.

18   Q     Okay.  Do you recall testifying that you thought that

19   that discipline was unfair?

20   A     I do believe it was unfair.

21   Q     You dropped the ball.

22   A     I dropped the ball.

23   Q     You just testified that you dropped the ball.

24   A     Right.  I dropped the ball.

25   Q     You don't believe that you should get discipline for

14

1    dropping the ball?

2    A    No, I -- I didn't -- it was the severity of the -- of

3    the punishment.

4    Q    This wasn't your first discipline, was it?

5    A    It was second, third.  I don't know.

6    Q    Okay.

7    A    Second.  There were four.

8    Q    This was in March of 2013.

9    A    So that was the second.

10   Q    So it -- the discipline, as you understood it, it's

11   based on matrix, correct?

12   A    Yes.

13   Q    All right.  And so, based on the level of your prior

14   discipline will impact the preceding or following discipline,

15   correct?

16   A    I'm not aware if that's how it works.  I -- I can't tell

17   you if that's how it works.

18   Q    You spoke to HR a litany of times throughout your

19   employment at Temple University.

20   A    I sure did.

21   Q    Did you also talk to them about your discipline that you

22   received?

23   A    Yes, I did.

24   Q    And you explained to them that you thought some of these

25   disciplines were unfair.

15

1  A    I thought that was unfair, yes.  Three days -- yes.

2  Q    And they also explained to you the policy.  Do you --

3  A    I don't remember anyone explaining the policy to me.

4  Q    Did you ask?

5  A    Probably.

6  Q    And what did they reply?

7  A    HR often did not get back to me, I have to tell you.

8  Those emails went out into a black, so I don't -- I can't

9  really say.  I did think it was harsh.

10  Q    Okay.  You recognized that the level of discipline you

11  received was based on the prior discipline.

12  A    It was based on the prior discipline, or what -- the

13  action that I was disciplined for?

14  Q    The action that you were disciplined for.  Yes?

15  A    I understand that.

16  Q    All right.

17  A    But I -- the prior one, I don't know -- I don't know

18  what you're saying about that.

19  Q    I'll get back to that in a moment.

20  A    Okay.

21  Q    Ma'am, as I understand it, your responsibility as the

22  Executive Assistant for Dr. Wu involved being responsible for

23  his calendar, correct?

24  A    That is correct.

25  Q    As well as making sure that individuals that he was

30

1    A    Now, that does surprised me.

2    Q    What does it say, ma'am?

3    A    2.28.

4    Q    On the performance-rating categories, where does that

5    fall?

6    A    Between performance meets minimum expectations and

7    standards.

8    Q    Okay.  And can you go down to where it says -- so,

9    that's below average, yes?

10   A    Yes, it is.

11   Q    Ms. Briggs, I couldn't hear you.  I'm sorry?

12   A    I said yes.

13   Q    Under "goals and projects," could you read the first

14   goal for you under Phase I under Project Number 1?

15   A    Sure.

16            "Make your own materials, leaving the dean's office

17            has met all standards, policies to make sure the

18            process is smooth and flawless.  This includes

19            materials related to promotion and tenure, at

20            leaves, and retirements."

21   Q    What was your rating for that?

22   A    2.0.

23   Q    Again, that meet minimum expectations and standards,

24   correct?

25   A    Yes, it is.

46

1   Q    All right.  So, that's the most important -- I'm asking

2   you those questions, ma'am.

3   A    Okay.

4   Q    So, did you ever receive a 3.0 prior to Dr. Wu?

5   A    I don't know.  Oh, is this the one right before Dr. Wu?

6   Yes, then, you are correct.  I don't know what Dr. Wu gave

7   me.

8   Q    I have shown you one where you received a 3.0 so far?

9   A    No, you have not.

10  Q    And in the following year, I think you were evaluated by

11  Dr. Wu, correct?

12  A    It would be Dr. Wu.

13  Q    And from the year of -- let me see -- it would be 2009

14  through 2010 -- I'm sorry, 2010 through 2011.

15  A    Where's 2009 to '10?

16  Q    Good question.  I hope to find that one.

17          MR. HARRIS:  One moment, please.  With the Court's

18  indulgence?

19          THE COURT:  All right.

20      (Pause in proceedings)

21  BY MR. HARRIS:

22  Q    Ma'am, I'm -- I apologize, I don't have one for that

23  year.  Do you know whether or not you were evaluated from

24  2009 to 2010 by Dr. Wu?

25  A    I'm sorry, what was the question?

47

1   Q    I said I don't have a document that shows 2009 through

2   2010 for Dr. Wu.

3   A    It would be --

4   Q    Do you recall actually being evaluated by Dr. Wu?

5   A    Yes, Dr. Wu did evaluate me, but I went there in 2009,

6   so ...

7   Q    So, you may not have had an evaluation in that first

8   year?

9   A    I had -- did get an evaluation.

10  Q    In that year, are you sure?  Because I sure don't have

11  it.  Are you sure about that?

12  A    I'm sure.

13  Q    Okay.

14          MR. HARRIS:  May the witness be shown D-15?

15  BY MR. HARRIS:

16  Q    The evaluation period that you were just referring to,

17  Ms. Briggs, was that a full academic year or a partial year?

18  A    Was -- that would have been a full year --

19  Q    Now --

20  A    -- it started in 2009.

21  Q    It would have been a full year, okay.

22      So, ma'am, you testified that the previous deans were

23  people who you had a tremendous amount of respect for and

24  that were fair, yes?

25  A    They were, yes.

48

1  Q    And none of those deans actually gave you a performance

2  evaluation of a 3.0 or higher, correct?

3  A    Correct.

4  Q    And, in fact, George Palladino, I think had the highest

5  score of a 2.8, yes?

6  A    Yes.

7  Q    Correct?

8  A    Yes.

9  Q    All right.  So, Dr. Wu was the person that you've been

10 testified to who bullied you, correct?

11 A    Yes.

12 Q    Who harassed you, yes?

13 A    Yes.

14 Q    Who was absolutely unfair to you, correct?

15 A    Yes.

16 Q    And can you tell me what his final score rating for you

17 was for 2010 to 2011.

18       MR. HARRIS:  And may this be published to the jury,

19 Your Honor?

20       THE WITNESS:  2.91.

21       THE COURT:  Yes, it can.

22 BY MR. HARRIS:

23 Q    2.91, is that what it says?

24 A    Yes, it is.

25 Q    So, the bully and the harasser gave you the highest

61

1          MR. MUNSHI:  No objection.

2       (D-23 received in evidence)

3  BY MR. HARRIS:

4  Q    An April 2nd, twenty -- April 3rd -- excuse me -- 2014,

5  did you -- this email -- is this the email you sent to Ms.

6  Walton?

7  A    Yes, it is.

8  Q    Could you please read that to the jury?

9  A    Sure.

10          "Dear Deirdre.  It is with great sadness that I

11          resign from my position as Executive Assistance in

12          the Department of Computer and Information

13          Sciences, in the College of Science" -- "Science

14          and Technology, effective April 1st, 2014."

15      More?

16  Q    Yes, please.

17  A       "I have great admiration for our students, both

18          undergraduate and graduate, and their amazing

19          faculty.  I miss my family and my community."

20  Q    That's the email that you sent, indicating that you were

21  resigning from your role.  Yes?

22  A    I was told that I should -- could resign.

23  Q    Right.

24  A    Right.

25  Q    That was offered to you, correct?  By Ms. Walton, who

1   Q    Your request?

2   A    My request.

3   Q    Because you wanted help?

4   A    I wanted to see if I had Alzheimer's like my father.

5   Q    But you did not have that?

6   A    I did not have that.

7   Q    Ms. Briggs, are you currently employed?

8   A    Yes, I am.

9   Q    Your current employment, I believe you're a health --

10  home healthcare assistant?

11  A    Aide, right.  Uh-huh.  Yes.

12  Q    And as I also understand your testimony, you have not

13  looked for a position since you've been in that current role?

14  A    No.

15  Q    Okay.  And it's -- your salary currently is

16  approximately half of what you made when you were working at

17  Temple University?

18  A    Or less.  Yeah.

19  Q    And the position that you currently have is full-time?

20  A    Yes, it is.

21  Q    Okay.  And as I understand your testimony, you have a

22  degree, correct?

23  A    Yes, I do.

24  Q    That you actually received with honors?

25  A    Yes, I did.

102

1    hearing you.  Sorry.

2    Q    You will agree with me that the areas that counsel went

3    over with you were the areas that you scored well, correct?

4    A    Yes.

5    Q    But you also will agree with me, in those performance

6    evaluations, the vast majority of those categories, you

7    scored below a 2.0, correct?  Or excuse me, below a 3.0.

8    A    Yes.

9    Q    And so your final rating was less than a 3.0, correct?

10   A    Yes.

11   Q    On every single one, prior to you actually being

12   supervised by Dr. Wu.

13   A    Yes.

14   Q    Okay.  And so 3.0 reads, "Performance meets job's

15   expectations."  So you never met the job expectation before

16   you actually were reviewed by Dr. Wu, correct?

17   A    For -- you mean the final score, you're talking about.

18   Q    Correct.

19   A    Right.

20   Q    The final score.

21   A    Yes.

22           MR. HARRIS:  Okay.  Thank you.  I have no further

23   questions.

24           MR. MUNSHI:  I'm sorry.  I just have one question,

25   in light of that last one.

108

1    our Equal Opportunity Compliance Office.

2    Q    Okay.  So, you don't actually investigate those claims;

3    the EOC Office would?

4    A    Yes.

5    Q    So, since you don't investigate claims of

6    discrimination, it would not be possible for you to determine

7    whether somebody's claims of discrimination had merit,

8    correct?

9    A    That's true.

10   Q    I'd like you to take a look at a document.  There's some

11   binders in front of you that have a lot of documents.  The

12   one document says -- or binder says "Plaintiff's Exhibits."

13   If you could find that one.

14   A    Okay.

15   Q    Now, you would agree with me that in 2013 and in 2014,

16   Ms. Briggs brought claims of discrimination to your

17   attention, correct?

18   A    No, she did not.

19   Q    So, since she did not bring claims of discrimination to

20   your attention, then it would follow that you did not do an

21   investigation into her claims of discrimination, correct?

22   A    Correct.

23   Q    And you wouldn't have done the investigation anyway, to

24   determine if there was merit, because you don't do the

25   investigations, correct?

116

1   disciplinary report that was issued to Ruth brings.  The date

2   at the top is 11/09/2011.  Do you see that?

3   A    Yes, I do.

4   Q    And it was issued by her supervisor, Dr. Wu.

5        Do you have any idea why this disciplinary action was

6   issued to Ms. Briggs?

7   A    Yes, I do.

8   Q    And what is that reason?

9   A    From my memory and understanding, Ms. Briggs was

10  disciplined for unprofessional, inappropriate behavior.

11  There was a blowout between her and Dr. Wu, where she became

12  loud and inappropriate with her supervisor.

13  Q    Is it Temple's policy that if disciplinary action is

14  issued, that there should be supporting documentation to

15  support the reason why the discipline was issued?

16  A    Usually what happens is there should be a statement

17  that's made, but it's not necessarily a part of the

18  disciplinary report.

19  Q    A -- okay.  Go ahead.

20  A    But, usually, when a Department is running a discipline

21  by me, they give me the details of the event and what took

22  place and we determine what that discipline is going to be,

23  but we don't actually put the specifics of the details in the

24  disciplinary report.

25  Q    Why not?

117

1    A    We just don't find it's necessary to put all the details

2    into it.  We ask that the supervisor or the manager keep

3    documents for themselves on the situation.

4    Q    Doesn't -- does HR retain any of the documents?

5    A    At times, yes, or the manager or the business manager,

6    like Greg Wacker, who assisted Dr. Wu, would have kept those

7    documents.

8    Q    Is there a uniform policy at Temple that says that when

9    discipline is issued, the supporting documentation is kept at

10   HR or kept at the manager's office or is it at the discretion

11   of HR and the manager?

12   A    It depends.  There's not always supporting documents.

13   In this situation where Ms. Briggs and Dr. Wu had this

14   inappropriate interaction where she yelled at him, it was Dr.

15   Wu's statement that he made to Greg; he sent him an email.

16   So, there's no policy that says that you have to keep

17   something in the file.  We keep the discipline in the file.

18   Q    Did you say that Greg Wacker sent an email to Dr. Wu

19   about the discipline?

20   A    No, what I'm saying is that Dr. Wu -- and I'm

21   speculating here, because I don't know for sure -- I know

22   that Dr. Wu discussed the situation with Greg Wacker.  He may

23   have done it by email, but I know that he discussed it with

24   Greg Wacker and they discussed the situation and they

25   determined, based on that situation, to issue a discipline.

119

1    her side of the story?

2    A    No, I did not.

3    Q    Why not?

4    A    Because that -- well the -- I'm sorry -- well, that

5    would have been the responsibility of Greg Wacker.

6    Q    Did Greg Wacker speak with her?

7    A    That's my understanding.

8    Q    Did you create any documentation of these conversations

9    that you had with Mr. Wacker?

10   A    I don't think so.

11   Q    You didn't create a note to the file or email to

12   memorialize it?

13   A    I'm -- I don't think so.  I think he called me.  We had

14   a conversation.  I may have made notes to remind myself, but

15   I don't think I made any documentation or anything that I

16   would put into a file.

17   Q    How about Mr. Wacker, did you ask him to send you an

18   email or to document what his purpose was in issuing this

19   write-up?

20   A    No, I didn't.

21   Q    Did he tell you that the circumstances around this

22   write-up were when Dr. Wu relayed to her that in China, they

23   put women out to pasture at 55?

24   A    No, I don't recall that.

25   Q    And do you recall being told that in response, Ms.

120

1   Briggs said, Well, with all due respect, we are not in China;

2   we are in America.

3   A     I recall that specific story, because it was relayed to

4   me by Ruth Briggs, but I don't recall that this write-up was

5   for that interaction.

6   Q     But, yet, we don't have any email, document, note to the

7   file, nothing, to support what you're saying right now, that

8   it had to do with a time in which Ms. Briggs got loud and

9   blew up at Dr. Wu?

10  A     I, per se, don't have anything in my file.  I just have

11  the conversation that I had with Greg Wacker.

12  Q     Then you said that afterwards, you did speak with Ms.

13  Briggs about this write-up, correct?

14  A     Yes.

15  Q     And she told you that she felt that this was

16  retaliatory, correct?

17  A     I don't recall that.  Many times after Ms. Briggs

18  received a discipline, she would call my office to complain

19  about it and she would tell me that, you know, that it wasn't

20  her fault, that, you know, she didn't do anything wrong.

21  With this specific discipline, I don't recall what her

22  argument with Dr. Wu was, but after off of her disciplines,

23  she called me.

24  Q     How many disciplines did Ms. Briggs get?

25  A     From my memory, I think it was about four.

133

1  Q    And did they -- is any of this documented in any emails,

2  notes to the file or anything?

3  A    It may be.  It may be or may -- you know, many times,

4  our conversations were over the phone or I may have sent them

5  an email and they may have replied back to my email, so there

6  might be documentation, yes.

7  Q    Was there any disciplinary action issued against Dr. Wu

8  for his yelling at the students?

9  A    No, not that I know of.

10 Q    Why not?

11 A    I don't know.

12 Q    But you're saying that Mr. Wacker did speak to Dr. Wu

13 about the complaints about him screaming at his students?

14 A    My understanding is that Greg Wacker and Drew had a

15 conversation.  This complaint was relayed to me.  When they

16 came back to me, my understanding was that they looked into

17 it and they talked to Dr. Wu about it.

18     I don't know if any -- you know, they may have talked to

19 the vice-dean at the time that Dr. Wu reported into, but from

20 my memory, I don't recall what took place with Dr. Wu.

21 Q    Okay.  Now, after the November write-up that we went

22 over in which there's no documentation as to why it was

23 issued, there was another disciplinary action issued a year

24 and four months later, do you recall that, in March of 2013?

25 A    A discipline to Ruth Briggs?

137

1    took place, that it was her responsibility to arrange for the

2    travel for this visiting candidate.  And she may have

3    contacted him early on, but there was no contact on the day

4    of travel, there was no arrangements made for him, he did not

5    know.  And we lost that candidate, he never came.

6    Q    Ms. Walton, do -- are you the HR person that approved

7    this three-day suspension without pay?

8    A    Yes, I am.

9    Q    Was it possible to give her a one-day suspension?

10   A    Not in regards to our rules of conduct.  So the rules of

11   conduct at the University, a C violation calls for a three-

12   day suspension.

13   Q    So this couldn't have been a B violation or an A

14   violation?

15   A    Well, an A violation, in our rules of conduct, is only

16   for attendance.  And a B violation that I think could have

17   been -- you know, that -- if we had chose to do a B

18   violation, it would have been for inefficiency, and I don't

19   think it rose to the level of inefficiency.  It was neglect

20   and carelessness because this person never came, and we lost

21   that candidate.

22   Q    So you're saying that one C violation is a mandatory

23   three-day suspension.

24   A    Yes.

25   Q    I hate to do this, but I got to show you the rules of

146

1    A    I believe that Ms. Briggs was well meaning and wanted to

2    do well in the Department.  But she continued to make many

3    errors, and -- and this was one of them.  You know?  Where

4    she just neglected her job responsibility.

5    Q    Okay.  The mistake that she made with booking the

6    flight, that's one.  What other -- what are all these other

7    errors?  Because there's only two other writeups after this.

8    A    So there was a history that's not documented with Ms.

9    Briggs, where she made many errors in the Department, in the

10   CIS Department, but also when she worked in the Dean's

11   Office.  So the Department, you know, they liked Ms. Briggs,

12   she was a very nice lady.  They didn't want to see her lose

13   her job.  And so, many times, they didn't document many of

14   the errors that she was making, and they tried to find work

15   for her that would suit her skills.

16   Q    So her -- these errors are so severe that led to her

17   termination, but they're not documented.

18   A    They didn't lead to her termination, but they -- but

19   they did get the management to the point where they had to

20   start documenting, and that's what they did.

21   Q    Okay.  So the undocumented errors that you're talking

22   about did not lead to her termination.

23   A    They didn't lead to her termination, but they did lead

24   to where there was frustration in the Department, there was

25   frustration with Dr. Wu.  And you know, Dr. Wu complained to