1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
RUTH V. BRIGGS,                  .
                                 . Case No. 1:16-cv-248
              Plaintiff,         .
                                 .
          vs.                    . 601 Market Street
                                 . Philadelphia, Pennsylvania 19106
                                 . July 16, 2018
                                 .
TEMPLE UNIVERSITY,               .
                                 .
              Defendants.        .
. . . . . . . . . . . . . . .
```

TRANSCRIPT OF TRIAL
DAY 1 - A.M. SESSION
BEFORE THE HONORABLE ROBERT F. KELLY
UNITED STATES DISTRICT JUDGE
AND A JURY

APPEARANCES:

For the Plaintiff:          Laura Carlin Mattiacci, Esq.
                            Stephen G. Console, Esq.
                            Rahul Munshi, Esq.
                            CONSOLE MATTIACCI LAW, LLC
                            1525 Locust Street
                            Philadelphia, Pennsylvania 19102

For the Defendant:          Richard R. Harris, Esq.
                            Rachel Fendell Satinsky, Esq.
                            LITTLER MENDELSON, PC
                            1601 Cherry Street, Suite 1400
                            Philadelphia, Pennsylvania 19102

Audio Operator:             Electronically Recorded
                            by Court Personnel

Transcription Company:      JDR Acquisition, LLC./
                            Advanced Transcription
                            1880 John F. Kennedy Boulevard
                            6th Floor
                            Philadelphia, Pennsylvania 19103
                            (855)204-8184

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

INDEX

                                                      Page

MOTIONS IN LIMINE                                       3

JURY SELECTION                                         13

COURT DECISION:  MOTION IN LIMINE RE:  HUNNEWELL       16

PRELIMINARY JURY INSTRUCTIONS                          19

OPENING STATEMENT BY MUNSHI                            20

OPENING STATEMENT BY MR. HARRIS                        34


WITNESS                      DIRECT  CROSS  REDIRECT  RECROSS

FOR THE PLAINTIFF

GREGORY WACKER                  39



EXHIBIT                                      IDENT.  EVID.

P-3      11/11/11 Disciplinary Notice                  52

3

```
 1                    (Proceedings commence at 9:11 a.m.)

 2              THE COURT:  You may be seated.

 3              We should deal first with the motions in limine.

 4  Yes.

 5              MR. MUNSHI:  Good morning, Your Honor.

 6              THE COURT:  Good morning.

 7              MR. MUNSHI:  My name is Rahul Munshi, I'm here on

 8  behalf of the Plaintiff Ruth Briggs.

 9              Your Honor, we have filed on motion in limine in

10  this matter.  And just by way of very, very brief background,

11  as Your Honor know, this is an employment discrimination and

12  retaliation case against the Defendant Temple University.

13              The plaintiff in this case, Ruth Briggs, she was

14  employed by Temple University for about 13 years before she

15  was terminated in 2014.  The subject of our motion in limine

16  is to preclude various private, personal communications that

17  she had with some of her former colleagues over at Temple.

18  These were her friends.  These were people who she had

19  private communications with on Facebook, online, via

20  Messenger, with no intention of anybody from Temple ever

21  seeing them.  None of her supervisors at Temple, no one who

22  played any role whatsoever in any decision to terminate her

23  employment had ever seen these messages.  And therefore,

24  whatever the content is there is entirely irrelevant to this

25  matter.  And for those reasons, under Rule 401, we wish to
```

4

1    preclude those messages.

2           THE COURT:  And these were all after her employment

3    had ended with Temple?

4           MR. MUNSHI:  Some were before; some were after.  In

5    the immediate aftermath of her termination on April 1st,

6    2014, she had various communications where she expressed that

7    she was no longer there.  And these were all to her friends,

8    these were not posted publicly, these were simply private

9    communications.  And none of these communications were with

10   anybody who played any role in the decision to terminate her

11   employment.

12          THE COURT:  All right.

13          MR. HARRIS:  If I may, Your Honor.

14          THE COURT:  Yes.

15          MR. HARRIS:  Richard Harris on behalf of the

16   defendant.

17          Your Honor, the Court asked an important question:

18   Were these communications -- did they occur before or after

19   her employment?  Well, the germane -- the most important

20   communications that we're talking about and that we're moving

21   for admission, as you can see through our brief, are those

22   communications that were communicated before, that

23   specifically deal with her communications about the decision-

24   makers.  So some of the messages that we're referring to, the

25   Facebook messages, are actually email, communication between

5

1    Ms. Briggs and others about her employer.  So certainly --

2    and that's certainly relevant.

3         I would certainly submit that, even though they're

4    relevant, it goes to credibility, as well as the subjective

5    component of their claim.  She has a hostile work environment

6    claim, as this Court is fully aware.  There's an objective

7    component and a subjective component.  And certainly, the

8    subjective component --

9         THE COURT:  Well, specifically, what do you think

10   they'd be relevant to show?

11        MR. HARRIS:  I think they go to -- they

12   specifically go to show her ability -- or her desire -- and I

13   will say the perception because I don't want to go into the

14   specific communications because we do have an open courtroom.

15   But the specific communications, she's actually talking about

16   the decision-makers in the case.  She's talking about Mr.

17   Wacker, she's talking about mister -- Dr. Wu.

18        So she's describing her -- whether or not -- A,

19   what she thinks about them, how she describes their

20   character, what she specifically says about how they treated

21   her.  Those things are certainly relevant for the jury to

22   determine, to assess her credibility.  And certainly it goes

23   to the subjective component, whether or not she believed that

24   she was in a hostile work environment.  And I submit that

25   those communications are certainly relevant to that point.

6

1          THE COURT:  How does it show -- how would it show

2     that she was in a hostile work environment or not in one;

3     how?

4          MR. HARRIS:  Well, I think some of the

5     communications, she describes her environment, one of which

6     she doesn't describe it as being hostile, after the fact.  So

7     she's describing that she left the organization, and she does

8     not say, in any of those communications, that she was treated

9     differently based on her gender.  But she describes that the

10    individuals who made the decision for her to be terminated

11    lacked courage, lacked credibility.  And so all those things

12    are important, I think, for the jury to assess her

13    credibility, and certainly the question of her being in --

14          THE COURT:  I'll take --

15          MR. HARRIS:  -- a hostile work environment.

16          THE COURT:  I'll take that under advisement.  But

17    neither side should make reference to these communications,

18    until I rule on it.  Okay?

19          MR. HARRIS:  And the one thing that I would ask

20    this Court to  look at is the Harris v. Forklift case, which

21    I submit is germane to this issue.  And I think that's cited

22    in our brief, as well.

23          THE COURT:  And that is your only --

24          MR. MUNSHI:  Your Honor, that's our only motion in

25    limine.

1          THE COURT:  Yes.  Defense?

2          MS. SATINSKY:  Good morning, Your Honor.  Rachel

3     Fendell Satinsky on behalf of the defendant.

4          Your Honor, we have filed two motions in limine in

5     this case.  The first motion in limine relates to a motion to

6     exclude testimony regarding -- testimony or documents

7     regarding a lawsuit involving a woman named Tanya Hunnewell

8     (phonetic).  It's a lawsuit that was brought in 2008, that

9     Ms. Briggs was -- had some involvement in, and allegedly some

10    of the other players in this case, some of the witnesses, had

11    involvement in.

12         Your Honor, to be precluded under Rule 402 and 401

13    and 403, it's completely irrelevant to this matter.  Ms.

14    Briggs' involvement in that case is irrelevant to this

15    matter.  In fact, if Your Honor admitted that, we would have

16    to go into a whole sideshow of the -- whether there was

17    legitimacy to those allegations in that case.  It's actually

18    a matter that was handled by plaintiff's counsel's firm.  And

19    in addition to that, the matter ultimately settled.  There

20    was no finding of liability on either side.  And so it just

21    will confuse a jury, will require us to go into a whole

22    series of unnecessary and irrelevant questions about another

23    litigation that has nothing to do with this litigation.

24         In addition, Your Honor, the claims in that

25    litigation involved disability discrimination and

8

1    discrimination under the Family and Medical Leave Act.  It

2    doesn't involve any of the discrimination claims that are at

3    issue in this case.

4           THE COURT:  Okay.

5           MR. MUNSHI:  Your Honor, again, by way of very

6    brief background, the individual who we're talking about

7    here, here name is Tanya Hunnewell.  She was a former

8    employee of Temple, and during her employment there, she

9    reported to the Plaintiff Ruth Briggs; also reported to Greg

10   Wacker.  Greg Wacker is an individual who will be testifying

11   at trial in this case.

12           In defendant's own motion, they go through the

13   litany of exactly why Tanya -- evidence of Tanya Hunnewell is

14   particularly relevant to this case.  In their own motion,

15   they describe what transpired and the testimony that

16   plaintiff stated during her deposition, about what took place

17   when Tanya Hunnewell was employed by Temple and ultimately

18   fired by Temple; that, while she was employed there, she had

19   gone on FMLA leave.  And during that time, while Plaintiff

20   Ms. Briggs and Mr. Wacker were her supervisors, Mr. Wacker

21   stated to her, find something on Tanya, I want to get rid of

22   her, discipline her.

23           And after a claim was raised, there was an

24   investigation done, and Ms. Briggs' testimony, already in the

25   deposition, was that she was being coached by Mr. Wacker, who

1  is an individual who's relevant to this case, he's an

2  individual who Temple has stated played a role in the

3  decision to terminate Ms. Briggs' employment; he's the one

4  who signed the termination letter.  Ms. Briggs testified that

5  Mr. Wacker coached her to lie about what took place there.

6  So this issue about Tanya Hunnewell goes directly to the

7  credibility of Mr. Wacker.

8          Also, this evidence is relevant because it goes

9  directly to why Ms. Briggs, over and again, kept telling

10  everybody at Temple, I am afraid of retaliation, I'm scared.

11  These are her words in writing, "I'm scared."  And she ties

12  one of the reasons why she's scared of complaining, and why

13  she's afraid of retaliation, is that I've been down this road

14  with Greg Wacker, and I know what he's going to do, he's

15  going to find something against me.

16          So this issue of Tanya Hunnewell, we have no

17  intention of trying the Tanya Hunnewell case here, but it is

18  very relevant for both Mr. Wacker's credibility and to

19  explain Ms. Briggs' reasonable belief why she was so scared

20  of being retaliated against, which is, ultimately, what

21  happened.

22          THE COURT:  Okay.

23          MS. SATINSKY:  Your Honor, if I might.  Just to

24  note, there was no adverse action taken against Ms. Briggs in

25  connection with this alleged Tanya Hunnewell incident.  As

1   Your Honor is likely well aware, there's many -- much case

2   law on the fact that claims of discrimination that are not

3   the same types of discrimination claims at issue in a case

4   are typically not relevant -- are typically not relevant and

5   not admissible.

6           Again, the claims that were brought in that

7   litigation relate to disability discrimination and

8   discrimination under the Family Medical Leave Act.  The

9   complaint in that case -- again, the matter was settled.

10  There was no finding of liability.  We're going to have to

11  explain to the jury that that matter was settled, what that

12  means, that they can't draw any inferences from that.  We

13  will be going into a full description of the Tanya Hunnewell

14  matter, which has no relevance on this case whatsoever.

15          THE COURT:  Okay.  I'll take it under advisement.

16  During the jury voir dire, don't make any reference to it,

17  either side.

18          MR. MUNSHI:  Understood.

19          MS. SATINSKY:  Thank you, Your Honor.

20          And just one other point, if I may.  As of this

21  morning, we hadn't received any oppositions to our motion in

22  limine filed with the Court.  That may have changed.  But as

23  of this moment, I haven't seen oppositions to either of our

24  motions in limine.

25          THE COURT:  All right.

11

1          MS. SATINSKY:  The second motion in limine we

2   filed, Your Honor, when we --

3          THE COURT:  Do you want to sit down or stand up?

4          MR. MUNSHI:  I was just going to say we don't

5   oppose the second motion, so we can --

6          THE COURT:  All right.

7          MR. MUNSHI:  -- perhaps, save time there.

8          THE COURT:  Okay.  Anything further, before we have

9   the jury come in?

10          MR. HARRIS:  No, Your Honor.

11          THE COURT:  In looking over the voir dire questions

12   -- and normally, in civil cases, I don't stay on the bench

13   while the voir dire is taking place, but I will in this case.

14   But I -- these questions are rather extensive.  I'm afraid

15   they might have the effect of prolonging jury selection.  Say

16   something.

17          MR. HARRIS:  (Not identified) Judge, I --

18          THE COURT:  I'm giving encouragement.

19          MR. HARRIS:  I'm going to encourage this Court that

20   it will not last too long, Judge.  We're -- I certainly

21   understand --

22          THE COURT:  I mean --

23          MR. HARRIS:  -- the Court's reticence --

24          THE COURT:  -- there are a lot --

25          MR. HARRIS:  -- based on what --

1          THE COURT:  -- of questions here.

2          MR. HARRIS:  -- we have provided.  There are a lot

3  of questions.  And in an abundance of caution, we provided

4  more questions than we're actually going to ask, so we

5  understand.

6          THE COURT:  Okay.  You'll understand if I have you

7  come to sidebar?

8          MR. HARRIS:  Yes, I understand that.

9          THE COURT:  And -- okay.

10         MR. HARRIS:  I would be surprised if this Court

11  didn't ask me to come to sidebar.

12         THE COURT:  No, I just mean during the voir dire,

13  to maybe request that it be shortened up some.

14         MR. HARRIS:  Sure.

15         THE COURT:  But anything further, before we get the

16  panel in?

17         MR. HARRIS:  No, Your Honor.

18         MS. MATTIACCI: (Not identified) Your Honor, could

19  we just get a short explanation from you, and your preference

20  for how to conduct this?  Would you prefer for us to ask

21  these questions, and plaintiff go first, and then have

22  defendant ask their questions?

23         THE COURT:  Yes, I -- normally, plaintiff asks your

24  questions.

25         MS. MATTIACCI:  Okay.

13

1        THE COURT:  And then defense would follow up.

2        MS. MATTIACCI:  Okay.

3        THE COURT:  Yeah.

4        MS. MATTIACCI:  Thank you.

5        THE COURT:  All right.  I'll go off the bench until

6   the panel is ready --

7        MR. HARRIS:  Thank you.

8        THE COURT:  -- which I believe will be by 9:30.

9        THE COURT OFFICER:  All rise.

10      (Recess taken at 9:23 a.m.)

11      (Proceedings resume at 10:10 a.m.)

12      (Call to order of the Court)

13      (Jury panel present)

14       THE COURT:  All right.  Good morning, and you all

15   may be seated, except for the jury panel.  I'm going to have

16   the jury panel take an oath at this time.

17       THE COURT OFFICER:  Please raise your right hand.

18      (Jury panel sworn)

19       THE COURT:  You may be seated.  Thank you.

20       Members of the panel, you have been brought here,

21   so that we could select, from among your number, a jury of

22   eight, to hear this case that has been called.  The case is

23   Ruth V. Briggs v. Temple University.  The case involves the

24   plaintiff and the University, Temple.  Ms. Briggs is a former

25   employee of Temple, and she has brought claims against Temple

14

1    University for age and gender discrimination, harassment,

2    retaliation, sex discrimination.

3           This part of the trial is what we call the "voir

4    dire."  And the purpose of the voir dire is to assist counsel

5    in determining if any juror should be excused for cause or

6    any -- and to assist them in exercising their peremptory

7    challenges.

8           The attorneys representing the plaintiff, would you

9    stand and this time, and introduce yourselves, please.

10          MS. MATTIACCI:  Good morning.  My name is Laura

11   Mattiacci, and I'm a partner at the law firm of Console

12   Mattiacci Law.  It's -- we have main offices in Philadelphia,

13   and also offices in New Jersey.  And we have the privilege of

14   representing Ruth Briggs, who is the plaintiff in the case.

15          MR. CONSOLE:  Good morning.  I'm Steve Console, a

16   partner at Console Mattiacci.

17          MR. MUNSHI:  Good morning, everyone.  My name is

18   Rahul Munshi, also at Console Mattiacci law.  I have the

19   privilege of representing Ruth Briggs in this matter.

20          THE COURT:  Thank you.  You may be seated.

21          Defense counsel, please introduce yourselves to the

22   panel.

23          MR. HARRIS:  Thank you, Your Honor.

24          Good morning, my name is Richard Harris, and I'm

25   here at counsel table with Jill Huntley Taylor, Rachel

15

1    Satinsky, Mr. Wacker, as well as Fay Trachtenberg, and we

2    have the honor of representing Temple University.

3              THE COURT:  Okay.  Thank you.  Thank you very much.

4              At this time, plaintiff's counsel may conduct -- or

5    may question the panel.

6              MS. MATTIACCI:  Thank you, Your Honor.

7         (Jury selection conducted 10:14 a.m. to 10:54 a.m.)

8              THE COURT:  Swear the jury.

9              THE COURT OFFICER:  Members of the jury, please

10   rise.

11        (Jury sworn)

12             THE COURT:  At this time, we'll take a ten-minute

13   recess; the jury can go to the jury room.

14             THE COURT OFFICER:  All rise.

15             THE COURT:  You may follow Mark out, please.

16        (Jury excused for recess at 10:55 a.m.)

17             THE COURT:  All right.  The remaining members of

18   the jury panel may return to the jury room on the second

19   floor, at this time.

20             THE COURT OFFICER:  You can leave your numbers or

21   throw them in the trash; you're done with them.

22        (Jury panel excused)

23             THE COURT:  We'll take a ten-minute recess.

24             MR. MUNSHI:  Your Honor, prior to opening

25   statements, we do just have to confirm our technology, just

1    get everything all set.

2            THE COURT:  All right.

3            MR. MUNSHI:  Should we do that now or should we do

4    that --

5            THE COURT:  Do it now.

6            MR. MUNSHI:  Okay.  Thank you.

7        (Recess taken at 10:56 a.m.)

8        (Proceedings resume at 11:09 a.m.)

9        (Jury not present)

10            THE COURT:  I am -- with regard to the motion in

11   limine, with the evidence relating to Tanya Hunnewell, or

12   that prior lawsuit, I am sustaining the motion in limine, and

13   so no reference to that should be made.

14            With regard to the testimony of the prior emails of

15   plaintiff -- I don't have that exact one with me here -- but

16   I am reserving ruling on that, until after I hear the

17   plaintiff testify.

18            MR. HARRIS:  Very well.

19            THE COURT:  All right.

20            MS. MATTIACCI:  Thank you, Your Honor.

21            Your Honor, before we begin, I just wanted to make

22   a motion for sequestration of the witnesses.  I understand

23   that there's one corporate designee for the defendant,

24   Gregory Wacker, but --

25            THE COURT:  All right.

17

1          MS. MATTIACCI:  -- the other witnesses.

2          THE COURT:  Each side is to determine -- see to it

3    that any witnesses they plan to call remain outside of the

4    courtroom, unless there's some special reason that you need

5    them at counsel table.

6          MR. HARRIS:  Yes, Your Honor, and that has been

7    done.

8          THE COURT:  All right.  Thank you.

9          MS. MATTIACCI:  Thank you.

10          THE COURT:  All right.  Bring the jury in, Mark.

11          MR. HARRIS:  Your Honor, we just have one other

12    point that I would like to raise to the Court, just briefly.

13          Your Honor, as the prospective juror made a

14    particularly loud statement regarding his displeasure with

15    Temple University, I would request that this Court give an

16    instruction to the jury that, obviously, evidence in this

17    case will be determined by the witnesses, and that anything

18    that was said by a prospective juror, I would ask them to set

19    that aside.

20          THE COURT:  I will do so.

21          MR. MUNSHI:  Your Honor, may we have just two more

22    minutes to confirm that everything is all set over here?

23          THE COURT:  All right.

24          MR. MUNSHI:  That way, we don't take up any more of

25    the Court's time.

18

1          THE COURT:  All right.

2      (Pause in proceedings)

3          MS. MATTIACCI:  May we ask, Your Honor?  What's the

4  earliest we're allowed in the courtroom in the morning?

5          THE COURT:  I'm here at 7.

6      (Laughter)

7          THE COURT:  Mark can get here at --

8          THE COURT OFFICER:  I would say I get here 7:45

9  ish, so --

10          MS. MATTIACCI:  Okay.

11          THE COURT OFFICER:  -- if you catch me, 7:45.

12          MS. MATTIACCI:  We will be sure to come very early.

13          THE COURT OFFICER:  I'll o pen the courtroom as

14  soon as I get here, which will be around 7:45.

15          MS. MATTIACCI:  Okay.  Excellent.  Then we should

16  have no technology problems going forward, Your Honor,

17  because we'll have everything set.

18          THE COURT:  Okay.  And I think -- and the courtroom

19  will be locked, so you can leave your things here.

20          MS. MATTIACCI:  Thank you.

21      (Participants confer)

22          THE COURT:  Are we all right?

23          MR. MUNSHI:  I think we are all set, Your Honor.

24  Thank you very much.

25          THE COURT:  I guess we can turn the lights down in

19

1    the courtroom, if it helps.

2              MR. HARRIS:  Thank you, Your Honor.  I think that

3    would help.

4              THE COURT:  All right.  Okay.

5         (Participants confer)

6         (Pause in proceedings)

7              THE COURT OFFICER:  All rise.

8         (Jury present)

9              THE COURT:  You may be seated.

10             Members of the jury, before we start, at the --

11   near the end of the voir dire, one of the jurors -- one of

12   the panel members stood up and made a statement about Temple

13   University Hospital, and a problem that he had with them.

14   And I instruct you that that -- to disregard whatever his

15   problem was.  And the only evidence that you should consider

16   in this case is evidence that you hear in this courtroom that

17   is under oath and subject to cross-examination.

18             And with that, we will get underway.  And the way

19   we will proceed is, first, opening statements by plaintiff's

20   counsel, then the defense has the opportunity to make an

21   opening statement.  It's not an argument; it's just a

22   statement as to what their case is about and how they intend

23   to prove it.

24             When those are made, then plaintiff has the

25   opportunity to call witnesses to prove her case.  After the

20

1    witness is presented on direct examination, the witness -- or

2    the defense or the opposing side has the opportunity to

3    cross-examine that witness.  When the plaintiff has finished

4    all the witnesses, then the defense has the opportunity to

5    call witnesses on their behalf.

6            When all of that is finished, each side has the

7    opportunity to make a closing argument to you.  And at that

8    point -- and after that, I give you the instruction on the

9    law that applies to this case.  And at that point, you will

10   then decide -- retire to decide the case.

11           Everything that you know about this case should

12   come to you in this courtroom; the testimony and other

13   evidence that is under oath and subject to cross-examination.

14   And all the law that you know about or find out about that

15   applies to this case should come to you from me.

16           And that is -- at this time, plaintiff may make the

17   opening statement.

18           MR. MUNSHI:  Thank you, Your Honor.

19           May I proceed, Your Honor?

20           THE COURT:  Yes, please.

21           MR. MUNSHI:  Good morning, everyone.  Thank you all

22   for taking the time out of your busy lives to serve on this

23   jury.  I know there's some people out there who, when they

24   get that jury slip in the mail, their first thought is, Oh,

25   how do I get out of this thing?  It's okay.  We know.  But

1    we're glad you're here.

2         And we're going to be asking you to do some tough

3    things over the next couple of days.  We're going to be

4    asking a lot of you.  We're going to be asking you some tough

5    questions.  You're going to be hearing competing stories and

6    it's going to be up to you and you alone to decide who's

7    telling the truth and who's more believable.  We're going to

8    be showing you documents.  You're going to be hearing

9    testimony from witnesses and ultimately, we're going to ask

10   you to use your common sense and your judgment to render a

11   verdict in this case.

12        Unfortunately, trials like this one, they're not

13   wrapped up in an hour like you see on TV and you're not going

14   to see that DNA forensic evidence that you see on CSI and

15   you're not going have that moment that you see in the movies

16   where the person takes the witness stand and they break down

17   and they confess to being a liar and they admit to

18   everything.  That would be a lot of fun, but that's not how

19   it works in real life.

20        And why is that?  Because in the year 2018, you're

21   not going have an employer or an individual come in and take

22   the stand and say, You know what?  You're right.  I got rid

23   of this person because she's too old or I got rid of this

24   person because she's a woman or, You got me, she complained

25   and I retaliated against her.  You're not going to get that

1    from a person.

2         But that doesn't mean that that stuff doesn't

3    happen in real life.  The law, you're going to hear from

4    Judge Kelly, provides that the jury look at all the

5    circumstances.  Look at what went on here.

6         This is called circumstantial evidence, when we're

7    going to be looking at documents and we're going to hear

8    testimony and it's all going to fit together like a puzzle.

9    Ultimately, what we're going to be doing after a couple of

10   days of testimony is put the case in your hands.  You're

11   going to go back to that jury room and you're going to

12   deliberate and you're going to talk about all the things that

13   you've seen and heard over the next couple of days.

14        What we're going to be asking you to do is weigh

15   the evidence.  It's going it be a little bit more complicated

16   than this, but ultimately, what we're going to ask you is if

17   we, the plaintiff, have proven by, what's called a

18   preponderance of the evidence, if we've proven that it's more

19   likely than not that the defendant, Temple University,

20   discriminated against Ruth Briggs because of her age,

21   discriminated against Ruth Briggs because of her gender or

22   retaliated against her for raising complaints of unlawful

23   conduct.  That's what this case is all about.

24        And I mentioned preponderance of the evidence.

25   You've heard a little bit about that before.  That's a fancy

1    word.  That's a legal word.  All that means is more likely

2    than not, right?  So, you've got the scales of justice and if

3    one side tilts every so lightly -- 51 percent -- in one

4    direction, that's the preponderance of the evidence; it's

5    just more likely than not.  It's not beyond a reasonable

6    doubt, which is a phrase you may have heard before.

7            So, let's talk a little bit about what we're doing

8    here, what this is all about.  You've heard a little bit from

9    Judge Kelly, but I'm going to spend the next few minutes and

10   preview a little bit about what you're going to see an hear

11   in this trial.  This is an employment discrimination and

12   retaliation case.

13           At the core of this case is a fundamental bedrock

14   principle of our American society.  Here in the United

15   States, an employer cannot treat somebody differently or

16   discriminate against somebody because of their age.  You

17   cannot discriminate against somebody or treat somebody

18   different because of their gender.  You cannot retaliate

19   against an employee who does complain of the discrimination

20   and retaliation.  These are fundamental aspects of our

21   American society and that's at issue in this case.

22           We all know this, that you can't treat someone

23   differently because of their skin color, their disability,

24   their religion.  Here, we're going to be talking about age

25   and gender and these laws that we're going to be talking

1    about, they go back 50 years, Congress decided that we need

2    to have laws on the books that ensure that employees, when

3    they go to work in the United States, they are not going to

4    be treated differently because of their age or their gender

5    and they cannot be retaliated against.

6              What matters is your ability.  What matters is your

7    merit.  Not what you look like.

8              Now, before we go any further, I want to introduce

9    you to our client, Ruth Briggs.  Ruth is here and you're

10   going to see and hear all about Ruth over the next couple of

11   days.

12             Thanks, you can sit down.

13             Ruth here is 63 years old and she is a former

14   employee of Temple University, as you know.  I'll stand over

15   here.  Ruth was born and raised in Maryland.  She has four

16   children, four grown children in total and three

17   grandchildren, as well.  She was the first person in her

18   family to go to college and she ultimately moved up to the

19   Philadelphia area a couple of decades ago.

20             In the 1990s, she and her husband got divorced and

21   she raised her four kids as a single mother outside of

22   Philadelphia.  She's going to tell us a little bit about the

23   jobs she had; she worked it this entire time.  She'll tell us

24   about the jobs that she had at Temple and for Temple and

25   you're going to hear from her, describe that she worked not

1   just because she needed to provide for her family, but,

2   ultimately, she's a person who really wants to do good in

3   this world.

4          She's going to tell you about the job she had in

5   the early '90s where she was working with at-risk teens and

6   incarcerated women who were pregnant and individuals who

7   needed help learning parental skills.  That's what she did;

8   she was a child health care educator and she's going to tell

9   us all about that work.

10          She's going to tell us that before this whole

11  situation with Temple, she's never been fired from a job

12  before.  She's going to tell us she's never filed a lawsuit

13  before.  She'll tell us she's never sued her employer before.

14  But she's going to tell us why she filed this lawsuit and

15  she's going to tell you what took place at Temple, over her

16  13 years in total when she was working there and how the

17  termination that took place before her 60th birthday, how it

18  devastated her financially and emotionally.

19          Now, Ruth started working over at Temple in

20  February of 2001.  Her first job there was that she was an

21  Editorial Assistant within the College of Science and

22  Technology.  Basically, what she was doing is she was helping

23  a publication to come out, a journal in science.  And she's

24  going to tell us that she had that job for a couple of years

25  and then she started working as an executive assistant to the

26

1    Dean of the College of Science and Technology; that's one of

2    the colleges over at Temple University.  And she held that

3    job for about five years.

4          She'll tell us that her supervisor, she reported to

5    the Dean, her supervisor changed a few times over those

6    years.  There were a couple of interim deans before they

7    found a permanent dean.  So, ultimately, she had a couple of

8    different people who she reported to over the years.

9          She'll tell us that in late 2009, after eight years

10   of working over at Temple, she then changed positions and

11   became the Executive Assistant to the Chair within the

12   Department of Computer and Information Sciences.  And you're

13   going to learn all about these names and you're going to

14   learn all about these times.

15         But the important thing that you're going to hear

16   and I want you to listen for is that Ruth Briggs is going to

17   el us that when she first started at Temple University in

18   February of 2001, until she moved over in 2009, for those

19   eight years, not one writeup.  Not one written discipline.

20   You're not going to see anything.  You're not going see any

21   suspensions.  You're not going to see any performance-

22   improvement plans.  Nothing for eight-plus years, until 2009

23   when she started working for a man named Dr. Wu.

24         Enter Dr. Wu.  Dr. Wu is the Chair of the Computer

25   and Information Sciences Department and you're going to see

1    him take the stand in this case, so you're going to be able

2    to judge his credibility for yourself.  Ruth is going to tell

3    us what it was like working under Dr. Wu.  She's going to

4    tell us how he screamed at her, said to her, "Are you stupid

5    or something?" Barked orders at her.  And he ruled his

6    department like, with an iron fist.

7            Through it all, even up until the very end, Ruth

8    tried to make it work.  She's going to tell us all about

9    that, but you're going to see that Dr. Wu had other plans.

10   Ruth has brought this action because she was discriminated

11   against because of her age, discriminated against because of

12   her gender, and retaliated against because she complained of

13   unlawful conduct at Temple.

14           You're going to see and hear in this trial why

15   exactly Ruth feels that way.  You're going to hear about what

16   happened in November of 2011.  Ruth is going to tell us that

17   on November 9th, 2011, the day before her fifty-seventh

18   birthday, she's sitting in her office and Dr. Wu, her

19   supervisor, comes by.  He asks her, I know it's your

20   birthday, how old are you turning.  She's going to tell us

21   that she responded, 57.  Then she's going to tell us that Dr.

22   Wu appeared surprise.  He said to her, you know, in China,

23   women your age, women who are 55 are put out to pasture.

24           Dr. Wu was born and raised in China and he knows

25   that there is a mandatory retirement law in China that does

1    require women of Ruth's age to forcibly retire.  Ruth is

2    going to tell us that Dr. Wu, her supervisor, says this to

3    her, she responds, with all due respect, we're in the United

4    States, not China.

5           An hour later, Ruth is brought down to speak with

6    Greg Wacker, who's the Director of Administration over at

7    Temple.  Mr. Wacker tells her, you're getting demoted from

8    professional conduct.  Ruth says, let me tell you what

9    happened here, I'm in my office, it's the day before my

10   birthday, Dr. Wu comes in, asks me how old I am, I told him

11   57, and he looks at me and says, women your age in China are

12   put out to pasture.

13          You're going to see that discipline that she

14   received in November of 2011 after working at Temple for

15   10-plus years with no prior written discipline.

16          THE COURT:  You're arguing your case now.

17          MR. MUNSHI:  Well, I apologize, Your Honor.

18          THE COURT:  Well, don't do it.  You tell the jury

19   what you expect and I don't expect it's going to take a whole

20   lot longer.  It's merely an outline --

21          MR. MUNSHI:  I'm just going to go through, Your

22   Honor --

23          THE COURT:  Let me finish.  It's merely an outline

24   of what you intend to prove.

25          MR. MUNSHI:  Yes, Your Honor.  You're going to see

1    over the next several days that after this situation, what

2    Ruth did at Temple University.  And I'm just going to show

3    you an organizational chart over here so you can keep track

4    of some of the names that you are going to hear about over

5    the next several days.

6            Dr. Wu is the individual who Ruth Briggs reported

7    directly to.  Greg Wacker is the individual who gave her the

8    written discipline in November of 2011, who she told all

9    about the comment.  You're going to see and hear that Ruth

10   Briggs, during her employment at Temple, she spoke with

11   Sandra Foehl, the Director of Equal Employment Compliance, at

12   Temple.  She speak with Deirdre Walton, the Director of Labor

13   Relations at Temple.  She spoke with Rhonda Brown, Office of

14   Institutional Diversity.  You're even going to see and hear

15   that Ruth Briggs spoke with in-house counsel at Temple all

16   about Dr. Wu and you're going to see in Ruth's own words --

17   we have it in writing -- you're going to see emails from Ruth

18   where she talks specifically about the conduct that she's

19   facing at Temple.

20           And very quickly, what I want to show you is just a

21   brief time line just to put it all together that starts in

22   November of 2011 with the comment that I just described

23   regarding Dr. Wu.  Ruth Briggs goes to Rhonda Brown, who,

24   remember, is in the Office of Institutional Diversity, and

25   she is the person who Ruth goes to and says, I've got an

30

1    issue.

2           You're going to see that Rhonda Brown tells her, go

3    meet with Sandy Foehl, Sandy Foehl, Director of Equal

4    Employment at Temple.

5           Sandy Foehl, you know, meets with Ruth because we

6    have her notes and Sandra Foehl's own notes, she talks about

7    what Ruth said to her and you're going to see that and you're

8    going to hear from Sandy Foehl what took place and Ruth

9    talked about with regard to the age discrimination.

10          You're going to see that after Sandy Foehl meets

11   with Ruth, nothing happens.  Ruth reached out to Rhonda Brown

12   and Sandy Foehl again.  You're going to see a few months

13   later, nothing happens.  A couple of months later, you're

14   going to see an email.  Ruth Briggs goes back to Rhonda

15   Brown, what's going on here, help.

16          Rhonda Brown's response?  Go to Sandy, the same

17   Sandy Foehl that we just talked about that Ruth had just

18   seen.  So, Ruth goes to Sandy.  She writes to Sandy

19   (indiscernible) getting harassed (indiscernible) no other

20   staff member is required to (indiscernible) a daily dose of

21   public humiliation.  It's beginning to feel like

22   psychological abuse.  This is her email.  You're going to see

23   it.

24          Sandy Foehl's response?  Ruth, address this issue

25   with Human Resources first, address the situation with

31

1   Deirdre Walton in Human Relations.  And you're going to see

2   and hear all about what Ruth did with HR, as well.

3           Ultimately, the next day, Ruth goes to in-house

4   counsel at Temple, Cameron Etezady.  She writes in an email,

5   you're going to see, I believe this it is related to my age

6   with the disparate treatment of me, I'm concerned about

7   retaliation.  Ruth Briggs, you're going to see, is going to

8   try to make this work, because she's going to everybody to

9   talk about these issues and you're going to see all these

10  emails.

11          Cameron says to her, go talk to Sandy.  Ruth

12  responds to Cameron and says, I've already talked to Rhonda,

13  I've already talked to Sandy.  And you're going to see these

14  emails where Ruth talks, again, about Dr. Wu and the comment

15  that he made and the way that he's treating her.

16          Cameron's response?  Go talk to Fay Trachtenberg,

17  another lawyer in my office, she handles employment stuff,

18  talk to her.  Ruth is going to tell us she did talk to Fay.

19  Fay said talk to Deirdre Walton in HR, and it goes on and on

20  and on.  You're going to see every email.  You're going to

21  see every step that Ruth took to talk about what was going on

22  and how she goes and gets through (indiscernible) ultimately,

23  she goes back to Cameron, in-house counsel.

24          And you're going to see the full emails.  My

25  situation is now being combatted because of my age.  And

1    she's going to tell us why exactly she felt it that way and

2    why she was trying to just get help.

3            She goes back to Deirdre in Human Resources, how

4    distressing this is.  These are her words.  These are her

5    emails.  She's going to tell you about these, I'm battered

6    emotionally.

7            She goes back to Sandy Foehl, I want to go to the

8    EEOC just for help.

9            She goes back to Deirdre Walton and in her own

10   words she talking about how I'm drowning here, I'm being

11   bullied, I'm being harassed.  She's going to talk to us about

12   why she felt this way and the wringer that she's put through.

13           Ultimately, she meets with Sandy Foehl on April

14   1st, 2014, and at that meeting Ruth talks with Ms. Foehl,

15   who, remember, is the director of equal employment at Temple

16   and talks specifically about filing an age-discrimination

17   complaint with her and just the same things that for two and

18   a half years you're going see, she's been talking about.

19           Like I said, you're going to see all of these

20   emails and you'll see that all these individuals, this

21   fundamental idea of somebody there trying to help her you'll

22   see if they did it or if they failed her.

23           Let me end where I began.  Later that day, after

24   she meets with Sandy Foehl, you're going to see that Ruth is

25   brought in and terminated, handed a termination letter.  And

1   she's going to tell us all about what's in that letter and

2   the real story.  At the end of this trial, it's going to be

3   up to you and you alone as the jurors in this case to weigh

4   the evidence in this case and decide who's telling the truth,

5   in light of everything you've seen and everything you've

6   heard.

7           And at the end of this trial, you're going to come

8   back in front of you and we're going to ask you did, in fact,

9   it happen.  Did they let Dr. Wu do what he said happens in

10  China, that women of Ruth's age are put out to pasture?  Did

11  we prove that it's more likely than not that Ruth Briggs was

12  discriminated against because of her age, discriminated

13  against because of her gender and retaliated against for

14  engaging in all of this activity.

15          If the defendant employer is found to be in

16  violation of the law, that employer is required to pay

17  damages to compensate the individual for their financial and

18  emotional harm.  And Ruth is going to talk to us about how

19  this whole situation has impacted her.  How she had to move

20  into subsidized housing.  How PECO shut off her utilities.

21  How she had to file for food stamps for the first time in her

22  life at the age of 60, looking for a job and the interviews

23  that she was just hoping for.

24          And of this trial, I'll come back in front of you

25  again and we'll ask you to consider all of these things and

34

1    ask you to render a verdict in favor of Ruth Briggs.  Thank

2    you.

3           THE COURT:  Counsel, would you like to open for the

4    defense at this point?

5           MR. HARRIS:  I do, Your Honor, if I may?

6           Good morning.  Temple University, it's been called

7    the beacon of North Philadelphia.  It is -- it stands on

8    Broad Street, 35,000 students strong.  It prides itself on

9    having diversity of racial and ethnic diversity, but as well

10   as gender and diversity of thought.

11          You'll find individuals within the university,

12   within the College of Science and Technology of all ages,

13   stripes, males, females, ages, you name it.

14          When the university was founded, it was found on

15   the core principle that perseverance conquers.  If my Latin

16   were better, I would be able to provide it to you in Latin,

17   but that's at the core of the university.

18          It's been said that no good deed goes unpunished.

19   You'll hear evidence from witnesses who will testify that the

20   quality of Ms. Briggs' performance in her responsibilities

21   were marginal at best from the time that she was hired at

22   Temple University.  So, the question is, why would she

23   continue to stay around if, in fact, her performance was

24   deficient?

25          My first statement was that perseverance conquers.

1    That's a core cultural value of the organization.  In

2    variably, individuals -- and you'll hear from witnesses who

3    will testify -- that it is an extreme difficulty, it is out

4    of university's character to terminate people immediately, so

5    we give them chances after chances after chances to succeed.

6    And you'll hear evidence from the witnesses who will testify

7    to that fact here, as it relates to Ms. Briggs.

8            There's a best-selling book on The New York Times

9    list called, Principles, by Ray Dalio.  And in Ray Dalio's

10   book, he was a large hedge fund operator and in fact, he

11   decided to develop principles by which that organization and

12   other organizations could follow, as cultural values to

13   increase the quality of their decision-making and the quality

14   of their performance.

15           The premise is based on the notion of a radical

16   transparency so that if everyone in the organization is

17   accountable for their actions, if they own their mistakes and

18   they make themselves vulnerable and they accept criticism and

19   feedback and critique, then we'll have a better-performing

20   organization.  That's one of the hallmarks of Ray Dalio's

21   principles.  The notion is if you have that radical

22   transparency, you'll create a work environment that

23   individuals will love to come to work and individual will

24   perform better than they otherwise would.

25           The notion of providing a meaningful workforce,

1    it's something that organizations strive for.  And you'll

2    hear from the individuals within the College of Science and

3    Technology, that will tell you that they enjoyed working with

4    Ms. Briggs.  She was a joy to be around, that she was

5    pleasant.  People certainly engaged with her on a regular

6    basis, but the problem wasn't whether or not she was affable

7    or friendly or social with the individuals within the

8    organization.

9            The problem was she couldn't accept feedback.  So,

10   you'll hear witnesses testify to that over and over again.

11   And the notion is, if we increase the transparency in our

12   organization and if we accept responsibility, Ray Dalio

13   posits that that will create a more inclusive environment, an

14   environment that is based on increasing the quality of the

15   decision-making.  And Bridgewater, the organization that he

16   founded, has outperformed the market on every single

17   financial entity.

18           Temple University, although it's not a for-profit

19   company, also has cultural values and those cultural values

20   are actually organized and memorialized in what is called

21   core competencies that every organization has and every

22   single individual within the organization receives these core

23   competencies and Ms. Briggs was provided those core

24   competencies, as it relates to her position as executive

25   assistant to the chair of the department, Dr. Jie Wu.

1          One of the core competencies, very similar to Ray

2     Dalio's principles, is that individuals such as Ms. Briggs,

3     they need to be accountable for their actions, so they own

4     their mistakes.  And the reason why owning someone's mistake

5     is important is because that allows you to accept

6     responsibility for your actions.  And if you do, that then

7     you're less likely to make that same mistake over and over

8     again, if you recognize it.

9          Evaluate Ms. Briggs when she testifies to determine

10    whether or not she owned her mistakes.  Whether or not that

11    was part of her core competency, whether or not she exhibited

12    that throughout the course of her employment; that's for you

13    to determine.

14         Counsel argues that Ms. Briggs was a stellar

15    performer throughout the life of her employment.  I would ask

16    that you judge that for yourself.  You'll hear there was the

17    evidence of write-ups that she received throughout the life

18    of her employment and certainly while she was in the College

19    of Science and Technology.

20         I'm asking you to confront any bias that you may

21    have.  You heard from your fellow prospective jurors that

22    they couldn't be fair and that's why they were dismissed from

23    this case, as Your Honor just instructed you previously.  The

24    only evidence that's of any import to any of you and to all

25    of you will be on the witness stand.

1          So, you said that you would be fair.  You took and

2     oath and said that you could do so.  We had approximately 25

3     people sitting in the back of this courtroom and all of them

4     didn't say that they could be fair or impartial.  They

5     couldn't be just passing; in fact, they had their minds made

6     up before they came into this courtroom.

7          Not you.  Not you.  Each and every one of you said

8     that you could be fair and that you would make your decision

9     based on the information you received, and I submit to you,

10    based on the quality of information you receive, not the

11    quantity, but the quality.

12         So, on behalf of Temple University, I want to thank

13    you.  I want to thank you for taking this important oath in

14    making sure that you're going to be fair.  My name is Richard

15    Harris, along with Rachel Satinsky, Fay Trachtenberg; we

16    represent Temple University and we all thank you.

17         THE COURT:  The plaintiff may call the first

18    witness.

19         MS. MATTIACCI:  Your Honor, would it be possible to

20    have five minutes to set up the iPad so the jury can see the

21    documents on the screen?

22         THE COURT:  I guess it'll have to be.

23         MS. MATTIACCI:  Let's see.  Can we do it in one

24    minute?  Maybe we can just plug it in.

25         (Pause in proceedings)

39

1      MS. MATTIACCI:  Your Honor, the plaintiff calls

2  Gregory Wacker to the stand as on cross.

3      THE COURT OFFICER:  The chair does not lean back.

4    (Participants confer)

5      THE COURT OFFICER:  Please raise your right hand,

6  place your left hand on the Bible.

7  GREGORY WACKER, WITNESS FOR THE PLAINTIFF, SWORN.

8      THE COURT OFFICER:  Please state your full name for

9  the record, spell your last name.

10      THE WITNESS:  Gregory Wacker, W-a-c-k-e-r.

11      MS. MATTIACCI:  Your Honor, may I approach the

12  witness to give him a binder of exhibits?

13      THE COURT:  Yes.

14      MS. MATTIACCI:  Thank you.

15    (Pause in proceedings)

16      MS. MATTIACCI:  May I proceed, Your Honor?

17      THE COURT:  Please.

18          DIRECT EXAMINATION

19  BY MS. MATTIACCI:

20  Q    Okay.  Good morning, Mr. Wacker.

21  A    Good morning.

22  Q    You are currently employed by Temple University.  Is

23  that correct?

24  A    Yes.

25  Q    And you are the corporate designee for Temple, for this

40

1   trial, correct?

2   A    Yes.

3   Q    Okay.  So you have been sitting at counsel table for

4   Temple, even though that opening statement time period,

5   correct?

6   A    Yes.

7   Q    Your current position is Assistant Dean for Finance and

8   Administration?

9   A    Yes.

10  Q    All right.  And you have four reports?

11  A    I believe, currently, there's three now.

12  Q    Okay.  Did you --

13  A    Three --

14  Q    -- four at --

15  A    Three or four.

16  Q    -- at one point?

17  A    Yes, up until about a year ago, when an individual took

18  a job elsewhere, a promotion within the University.

19  Q    Okay.  So just so we can orient the jury as to where you

20  fall in the organization, this is you, here.  Is that

21  correct?

22          MR. HARRIS:  Excuse me, Your Honor.  I apologize.

23  I would just ask counsel if she could move that to the side

24  because -- so I can see the jury.

25          THE COURT:  Yeah, sure.  Well, try to --

41

1          MS. MATTIACCI:  Let me go -- I can go this way.

2     Okay.  Is the jury okay?

3     BY MS. MATTIACCI:

4     Q    All right.  So this is you here, Director of Finance and

5     Administration, correct?

6     A    Yes.

7     Q    And you report up to the Dean (indiscernible)

8     A    Yes, I --

9     Q    Okay.  And Dr. Wu, that we heard about in the openings,

10    he is the Chair of the Department of Computer and Information

11    Sciences?

12    A    Yeah.  He was, yes.

13    Q    Okay.  He held that position in 2014, at the time when

14    Ms. Briggs was terminated, correct?

15    A    Yes.

16    Q    And now he's no longer in that position?

17    A    No, he is not.

18    Q    So he -- his position is still in this department, but

19    it's not the Chair, correct?

20    A    Yes.  He is a faculty member in the department.

21    Q    Now his removal as Chair was not related to this case,

22    correct?

23    A    No.  Chairs frequently change every three to five years.

24    Q    Okay.  So it's just a rotating position that the

25    different faculty members take?

42

1   A     Yes.

2   Q     All right.  Now, in 2014, Ruth Briggs reported up to Dr.

3   Wu, correct?

4   A     Yes.

5   Q     And in 2014, Wu reported up to the Dean, as well,

6   correct?

7   A     Yes.

8   Q     Okay.  Now, in 2014, how many reports did you have?

9   People reporting up to you.

10  A     It would have been in the neighborhood of four.

11  Q     Now, in two -- I want to focus in on 2014.  You recall

12  that Ms. Briggs was terminated on April 1st, 2014, correct?

13  A     Around there, yes.

14  Q     Okay.  And as of that time, you were not in charge of

15  investigating claims of discrimination, correct?

16  A     No.

17  Q     And in fact, if somebody came to you with a claim of

18  discrimination or retaliation, you would direct them to

19  another department who would handle that.  Isn't that

20  correct?

21  A     Yes.

22  Q     So, if somebody came to you with a claim of

23  discrimination, you could not determine whether or not that

24  claim had merit because you did not do the investigation,

25  correct?

43

1    A    I would not.  I would pass it forward to the appropriate

2    entity within the organization.

3    Q    Now you made the decision to terminate Ms. Briggs.  Is

4    that correct?

5    A    I did not, no.  It was a joint --

6              THE COURT:  You did not know?

7              THE WITNESS:  I did not.  No, I did not make the

8    decision.

9              MS. MATTIACCI:  Okay.

10             THE WITNESS:  It was a joint decision with the

11   supervisor, Human Resources.

12             THE COURT:  Listen.

13             MS. MATTIACCI:  Yes?

14             THE COURT:  I don't want to have to sit here

15   watching you take notes on that board.

16             MS. MATTIACCI:  Okay.  I'm so sorry.  I was just

17   wanting --

18             THE COURT:  It would be --

19             MS. MATTIACCI:  -- to clarify.

20             THE COURT:  -- all right if you would fill it in

21   afterwards, but ...

22             MS. MATTIACCI:  Okay.

23             THE COURT:  You know.

24             MS. MATTIACCI:  I'll keep it moving, Your Honor.  I

25   promise.

44

```
1   BY MS. MATTIACCI:

2   Q    Mr. Wacker, so you did not make a decision.  You're

3   saying that it was a joint decision.

4   A    Yes.

5   Q    And the joint decision was with who?

6   A    It would be with the supervisor, Dr. Wu.

7   Q    Okay.

8   A    And in conjunction with H -- Human Resources and Deirdre

9   Walton's group reviewing the information that was provided to

10  them.

11  Q    Okay.  Anybody else make the decision?

12  A    No, that would be it.

13  Q    Okay.  So it was just these two people, Wu and Walton.

14  A    Yes.

15  Q    Okay.  All right.  Even though you did not make the

16  decision to terminate, and instead, it was Wu and Walton who

17  made the decision to terminate Ms. Briggs, are you aware of

18  the reasons why Ms. Briggs was terminated?

19  A    Yes, some of them.

20  Q    Some of them?  Okay.

21       And what are some of the reasons that she was

22  terminated?

23  A    There were several disciplines, frequently discipline

24  being done.  And as the discipline elevates, levels elevate,

25  and the seriousness of those offenses elevate, the university
```

1   rules and regulations determine what disciplinary action gets

2   taken during that time.  And as she would elevate, the

3   reasons, various reasons -- I believe the one that was --

4   that we intended to discipline on her was that she could not

5   complete a travel reimbursement in an electronic system for

6   Dr. Wu.  And then she became argutive [sic], disruptive

7   towards staff and -- and others.  And it just disrupted the

8   flow of the offices.

9   Q    Okay.  Are you aware that people complained that Dr. Wu

10  would often scream in his office?

11  A    No.

12  Q    Had you ever heard anybody say that Dr. Wu screamed in

13  Chinese at his Chinese students?

14  A    Other than Ruth, no.

15  Q    Okay.  Other than Ruth, did you hear that Dr. Wu would

16  scream into Ms. Briggs' face, are you stupid or something?

17  A    No.

18  Q    Okay.  So it's your testimony that, in -- you have never

19  seen Dr. Wu screaming in the building, correct?

20  A    That is correct.

21  Q    Okay.  But you don't work in the same building as him,

22  correct?

23  A    Not now, no.  And I guess I didn't -- technically, I

24  didn't, either.  I was in an adjacent building --

25  Q    Right.

46

1    A    -- back then.

2    Q    You were in a different building.  Okay.

3    A    Yes.

4    Q    Did you ever hear -- so you did hear the concept that

5    Dr. Wu would scream in Chinese at his students, correct?

6    A    Only from Ruth.

7    Q    Okay.  And when you heard that from Ruth, did that

8    concern you?

9    A    No.

10   Q    So it's acceptable for Dr. Wu to be screaming at his

11   students in Chinese in the office.

12   A    No.  But -- but Ruth did not know what he was saying.

13   So how can she determine that it was screaming?

14   Q    But you did not go down to find out what he was saying,

15   correct?

16   A    No.

17   Q    Or interview anybody to see if he was actually

18   screaming, no matter what he was saying; that he was raising

19   his voice.

20   A    There was no information given to me, to that effect.

21   Q    And you did not need to look into it.

22   A    If information was given to me that indicated that, I

23   would have looked into it.

24   Q    Well, information was given to you by Ms. Briggs,

25   correct?

47

1    A    And it was in the context of her being corrected for

2    failing to complete a task or something that she probably

3    should have had done for Dr. Wu, that was not done in a

4    timely manner.

5    Q    So you just dismissed her statement without doing any

6    investigation into it.

7    A    I don't believe there was anything to investigate.

8    Q    Or you're saying that Ms. Briggs was terminated because

9    she expressed upset at this travel reimbursement disciplinary

10   action she received, correct?

11   A    She was doing it in front of others, frequently, not

12   only in my office, but it her office, and other offices that

13   were under me.

14   Q    So, if Dr. Wu was screaming in front of others, should

15   he be disciplined?

16   A    If it was brought to my attention, we would have a

17   discussion about it, and it would be handed to the

18   appropriate group to handle it, which is managed by Faculty

19   Affairs, which is a separate area.

20   Q    And you never referred it to Faculty Affairs, correct?

21   A    No.

22   Q    And as far as you know, mister -- Dr. Wu was never

23   disciplined in the time that you were supervising him,

24   correct?

25   A    I was not supervising him.

48

1  Q    I'm sorry.  In the time that you were overseeing the

2  department.

3  A    Not that I'm aware of.

4  Q    What other disciplinary actions were lodged against Ms.

5  Briggs that led to her termination?

6  A    Well, the -- once -- once again, the one that led to the

7  termination was the failing to put the travel reimbursement

8  into the appropriate university system, and the fact that she

9  was argumentative and disruptive for approximately about

10 three or four days.  She just would not relent on that, and

11 was continually disruptive during that three or four days,

12 where it was confirmed that she had access to the system and

13 knew how to do it.

14 Q    Okay.  But my question was:  What other disciplinary

15 actions were lodged against Ms. Briggs that led to her

16 termination?

17 A    There was various things where she would not complete or

18 correct travel reservations for high-level guests that were

19 coming in for Dr. Wu.

20 Q    She would not -- did you say she would not confirm?

21 A    She --

22 Q    How --

23 A    She would not complete them properly, or would have

24 errors in the dates.  She would book the wrong -- the hotel

25 for the wrong date, or an airline for a wrong date.

49

1   Q    Okay.  So let me break it down because I want to be

2   clear.  How many times did she book the wrong date?

3   A    The -- I know that -- I believe that there's one that

4   was written up, and there may have been others that we would

5   not write up because they were not reported in a timely

6   manner.

7   Q    So there's one wrong date, in which she was written up,

8   but you're saying there's others in which there's no

9   documentation about.

10   A    Yes.

11   Q    Okay.  And the one wrong date that you are referring to,

12   was that for a hotel?

13   A    It was either a hotel or an airline ticket.  I --

14   Q    Do you know, sitting here today?

15   A    I believe it was the hotel reservation.

16   Q    Is there any other disciplinary actions lodged against

17   Ms. Briggs that led to her termination?

18   A    I believe there was an incident where she walked out of

19   a meeting, just simply got up and walked out of the meeting.

20   Q    When did that happen?

21   A    I don't recall the exact dates, but Human Resources

22   should have the appropriate disciplinary action for her.

23   Q    Any other disciplinary actions lodged against Ms. Briggs

24   that led to her termination?

25   A    Not that I'm aware of.

50

1   Q    Now, in regards to the date that was booked wrong in the

2   hotel, isn't it true that Ms. Briggs, when she was told that

3   the date was wrong, booked -- still booked the hotel date for

4   the time the professor was coming in, and there was no

5   problem because the professor was able to stay at the hotel?

6   A    The professor did stay at a hotel, yes.

7   Q    Okay.  He didn't miss the meeting.

8   A    No.  But that upset Dr. Wu because the -- it's -- the

9   individuals that he brings in are well-known researchers and

10  those types of individuals, and it doesn't leave a strong

11  opinion of Temple and the administrative services, if they

12  can't get his room booked right.

13  Q    In regards to the hotel room, it was booked for the

14  correct night, correct?

15  A    No, I don't believe it was.

16  Q    It was originally booked for a night, and then it --

17  that was changed before the time in which the professor came

18  to stay.  Isn't that correct?

19  A    I do not know that.

20  Q    And let's talk about Number 3 there.  You are aware that

21  Ms. Briggs had a meeting with Dr. Wu, in which he asked her

22  how old she was.  When she responded 57, he told her, well,

23  in China, we put woman out to pasture when they're 55.  Do

24  you recall that?

25  A    She mentioned something along those lines, in a general

51

1    office, with a bunch of other individuals around.

2    Q    Including you, correct?

3    A    Yes.

4    Q    And she also relayed that, in response to that, she

5    said, with all due respect, Dr. Wu, we are not in China, we

6    are in the United States.

7    A    I don't recall her conveying that to me in that

8    conversation.

9    Q    Now you're aware that Ms. Briggs' birthday is November

10   10th?

11   A    I am -- I was not; I am now.

12   Q    And you're aware that Ms. Briggs relayed this to you on

13   November 9th, correct?

14   A    I don't recall.  If that's the date in the

15   documentation, then it would be.

16   Q    Okay.

17        (Participants confer)

18   Q    I'm going to ask to you, Mr. Wacker, to turn to that --

19   to the binder in your -- a page in your binder, which is --

20   P-3 -- is P-3.  So the tab that's Number 3, can you turn to

21   that?

22   A    Okay.

23   Q    Now you recognized this as a disciplinary action that

24   was given to Ms. Briggs, dated November 11th, 2011, correct?

25   A    Yes.

```
1    Q    And your -- excuse me -- your signature is at the

2    bottom.  Is that correct?

3    A    It is not.

4    Q    Okay.  Whose signature is that?

5    A    It is Dr. Wu's signature.

6    Q    Did you review this before it was given to her?

7    A    It would have been -- yes.  It would have been reviewed

8    with myself and Labor Relations, Deirdre Walton's group.  And

9    Drew DiMeo may have been involved in this, as well, in terms

10   of gathering the information, making sure that that

11   information got conveyed to Labor Relations.  And only at

12   that point does it come back to me, as a facilitator, to help

13   process this.

14          MS. MATTIACCI:  Okay.  Your Honor, I'd move for the

15   admission of P-3.

16          THE COURT:  Any objection?

17          MR. HARRIS:  No objection.

18          THE COURT:  It's admitted.

19      (P-3 received in evidence)

20          MS. MATTIACCI:  Your Honor, may I have permission

21   to publish?

22          THE COURT:  All right.  Yes.

23          MR. HARRIS:  And Your Honor, we have a stipulation

24   by and between counsel.  We have no objection to any of these

25   exhibits that have been previously identified as plaintiff's
```

53

1   exhibits.

2           THE COURT:  All right.  Thank you.

3       (Pause in proceedings)

4   BY MS. MATTIACCI:

5   Q    Okay.  So we can see, on this disciplinary writeup for

6   Ms. Briggs, that it says the date of the incident is November

7   9th, 2011.

8       (Participants confer)

9           MR. HARRIS:  Objection.

10  Q    And it says the --

11          MR. HARRIS:  Your Honor, objection.  It doesn't say

12  date of incident, it says the date, period.

13          THE COURT:  Is that correct?

14          MS. MATTIACCI:  It is.  It says the date.

15          THE COURT:  The date.

16  BY MS. MATTIACCI:

17  Q    So the date on there is November 9th, 2011, correct?  At

18  the top, next to "Department"?  Do you see that?

19  A    The date says -- yes.

20  Q    Okay.  And would that be the date of the incident for

21  which the person is being written up?

22  A    No, that's the date -- I believe that's the date that

23  they were written up.

24  Q    The date that they were written up.  Okay.

25  A    Yes.

54

1   Q    So it may -- it does not indicate the day in which the

2   incident took place, for which they are being written up?

3   A    I do not believe that it did.

4   Q    Okay.  Where on the document does it indicate the date

5   on which the incident occurred for which the employee was

6   being written up?

7   A    I don't see one.  That may be in the notes that would

8   have been conveyed to Labor Relations.

9   Q    Okay.  So let's scroll down.  Do you see there in the

10  middle, it says, "Written Warning," with a checkmark?

11  A    Yes.

12  Q    And then it says, "Dates of Action, 11/9/2011"?

13  A    Yes.

14  Q    Okay.  So is that indicating the date in which the

15  incident took place for which the person is being written up?

16  A    No.  It would be the date that we intended to take the

17  action.  We might have sent this over to Labor Relations on

18  the 9th.  And then, as you can see, it didn't get signed

19  until the 11th.

20  Q    Okay.  So scrolling down further -- yeah -- the middle

21  says:

22           "Explanation, violation of Rule B-11,

23           unprofessional/inappropriate conduct."

24       Is that why she was written up, for that reason?

25  A    Yes.

1    Q    Okay.  And then scroll further to the bottom of the

2    document.  And that's the employee's signature, hers, Ruth

3    Briggs', correct?

4    A    Yes.

5    Q    Signed on November 11th?

6    A    Yes.

7    Q    And then Dr. Wu's signature, November 11th, correct?

8    A    Yes.

9    Q    Nowhere on this document does it explain what happened

10   to cause her to be written up for inappropriate --

11   unprofessional, inappropriate conduct, correct?

12   A    Correct.

13   Q    Why was she written up, at this time?

14   A    I believe the -- any supporting documentation or

15   interaction with HR, that they would have -- I believe it

16   would be it was because she walked out of a meeting in Dr.

17   Wu's office.

18   Q    Do you believe there's supporting documentation to that

19   effect?

20   A    Yes.

21   Q    Have you reviewed supporting documentation to that

22   effect?

23   A    No.  Drew DiMeo or Deirdre Walton would have that.

24   Q    But -- so you haven't seen any documentation of that,

25   correct?

1   A    I have not.

2   Q    And your belief that it had to do with walking out of a

3   meeting, is based upon you -- you weren't there, correct?

4   A    No.  It would have been through informal conversations

5   with Drew DiMeo.  And once again, I'm a facilitator in any of

6   these actions.  The biggest thing that I do is make sure

7   that, hey, if something did happen, what rules apply to it.

8   And then it's given to Human Resources and Labor Relations to

9   say, yes, this is a violation, yes, this is a viable action

10  to take.  And then, when that comes back, in some cases, I

11  will present this to the employee because the supervisor, you

12  know, may not want to or want to avoid a confrontation.

13  Q    Isn't it true that this writeup was given to Ms. Briggs

14  because of what she said to Dr. Wu at that meeting, with all

15  due respect, we're not in China, we're in the United States?

16  A    No.

17  Q    You're certain of that, without having any supporting

18  documentation of it?

19  A    Yes, I would be.

20  Q    And even though the date of the writeup is November 9th,

21  2011, which is the day before her birthday, in which the

22  conversation took place, correct?

23  A    That's correct.

24  Q    And there's nothing on this document that says she was

25  written up for walking out of the meeting.

57

1    A    No.

2    Q    Any emails you know of, to describe what happened to

3    lead to this disciplinary action being lodged against Ms.

4    Briggs?

5    A    I don't recall any to me.

6    Q    Do you recall reviewing any to anybody about this

7    writeup?

8    A    I do not recall.

9    Q    I'm going to ask you to turn to Tab 62 in the binder,

10   please.

11   A    (Witness reviews exhibits)

12

13   Q    Do you see Tab 62, Mr. Wacker?

14   A    Yes.

15   Q    I'd like you to turn to Page 7 of that document.

16   A    (Witness reviews exhibit)

17        MR. HARRIS:  Excuse me, Counsel.  Can you provide

18   the Bates Stamp?

19        (Participants confer)

20        MS. MATTIACCI:  It's the interrogatory responses.

21        MR. HARRIS:  Okay.  Very well.  Thank you.

22   BY MS. MATTIACCI:

23   Q    I'm sorry.  Page 3 of the document.

24   A    Okay.

25   Q    Now these are the interrogatory responses by the

58

1   Defendant Temple to questions -- so the interrogatories are

2   questions.  Do you understand that?

3   A    Yes.

4   Q    Okay.  So, in the course of this case, we, Ms. Briggs'

5   side, sent questions over to Temple for them to answer under

6   oath.  Do you understand that?

7   A    Yes.

8   Q    And then, in response, Temple submitted written

9   questions --

10            THE COURT:  Written answers.

11   Q    -- and verified them under --

12            THE COURT:  Written answers.

13   Q    Written answers.  I'm sorry.  Written answers, and swore

14   that they were true and correct.  Do you understand that?

15   A    Yes.

16   Q    Okay.  So, in looking at P-62, which are the answers to

17   -- that Temple provided.

18       (Participants confer)

19            MR. HARRIS:  Excuse me, Your Honor.  We just need

20   to find that document.

21            THE COURT:  All right.

22            MR. HARRIS:  The Court's indulgence?

23       (Participants confer)

24            MS. MATTIACCI:  Are you okay to proceed, Mr.

25   Harris?

59

1          MR. HARRIS:  I don't have it yet.

2          MS. MATTIACCI:  Okay.  It's ...

3      (Participants confer)

4          MR. HARRIS:  Your Honor, may we see you at sidebar?

5          THE COURT:  Yes.

6      (Sidebar)

7          MR. HARRIS:  (indiscernible) I'm sorry.  In

8  plaintiff's exhibits that were provided to us, we only h ave

9  the first page, so we don't have the entire list of

10  interrogatory responses.

11          MS. MATTIACCI:  It's their interrogatory responses.

12          MR. HARRIS:  I understand.  But that -- in their

13  exhibits that they've identified as plaintiff's exhibits,

14  they only identified the first page.  So, if they're like us

15  to look through the entire exhibit, I'm happy to do so, but I

16  have to go get it.

17          THE COURT:  Where is it?

18          MR. HARRIS:  I'm sure it's in my -- one of my

19  boxes.

20          MS. MATTIACCI:  I can give you a copy.

21          MR. MUNSHI:  We have a copy.

22          MR. HARRIS:  That's fine.

23      (Participants confer)

24          THE COURT:  You'll give him a copy?

25          MR. HARRIS:  Yes.

60

1          MR. MUNSHI:  Yeah.

2          MR. HARRIS:  That's fine.  Okay.  Thank you.

3          THE COURT:  Thanks.

4      (Sidebar concluded)

5          MR. HARRIS:  We're ready to proceed, Your Honor.

6  Thank you.

7          MS. MATTIACCI:  Okay.

8          THE COURT:  All right.  Thanks.

9  BY MS. MATTIACCI:

10  Q    Okay.  Mr. Wacker, in looking at the answers by Temple,

11  Question Number 1 to Temple was:

12          "Set forth each and every legitimate,

13          nondiscriminatory reason as to why plaintiff was

14          terminated on or about April 1st, 2014, and

15          describe the factual basis for this decision."

16      Do you see that?

17  A    Yes.

18  Q    Temple's answer was, first:

19          "Objection to the extent it's over-broad and unduly

20          burdensome, seeks information neither relevant, nor

21          reasonably calculated to lead to discovery of

22          admissible evidence.  Temple further objects

23          because Briggs was not terminated, but rather

24          resigned effective April 1st of 2014, in lieu of

25          termination.  Subject to and without waiver of or

61

1          limitation of the foregoing objections and

2          conditions, Temple University responds as follows."

3     Now, first of all, Ms. Briggs did not voluntarily

4  resign.  Isn't that correct?

5  A    As far as I understand, no.  She handed in a resignation

6  letter to Human Resources.

7  Q    She didn't have a choice, though.  Her position -- she -

8  - her job at Temple was being terminated, correct?  Due to

9  the reasons that you stated earlier, correct?

10  A    She was being given disciplinary action that would have

11  included termination, yes.

12  Q    Okay.  So she didn't have a choice in the matter.  She

13  was being -- she was forced out, correct?

14  A    She chose to resign, not be fired.

15  Q    Okay.

16  A    So that is a choice that she made.

17  Q    So, if she didn't choose the word "resignation," she

18  would have been terminated, involuntarily, correct?  She

19  didn't have a choice --

20  A    Correct.

21  Q    -- to stay there.

22  A    Correct.

23  Q    Correct?  Okay.

24     And the reason that there was given the ability to use

25  the word "resignation" was so that she did not get

62

1   unemployment compensation?

2   A   I have no idea.

3   Q   Okay.  Now the very first thing that Temple says is the

4   reason why Ms. Briggs was terminated is because she had

5   "performance issues throughout her tenure at Temple."

6   Sentence 1.  Do you see that?

7   A   Yes.

8   Q   Okay.  Now, as of the time of her termination, Ms.

9   Briggs had been at Temple for 13 years, correct?

10   A   I guess so.  I don't know the exact years.

11   Q   Okay.  Isn't it true that Ms. Briggs did not -- this

12   statement by Temple is a false statement in the -- in their

13   interrogatory responses?  Isn't that correct?

14   A   I do -- no, I do not believe so.

15   Q   So you believe that this statement is true, that Ms.

16   Briggs had performance issues throughout her tenure at

17   Temple.

18   A   Yes.  There was always performance issues throughout,

19   and a lot of the times, they weren't written up.

20   Q   Okay.  So, going back to the list of reasons why Ms.

21   Briggs was terminated, you did not say that she had

22   performance issues throughout her employment.  Do you want to

23   add that reason to this list now?

24   A   Sure.

25   Q   Okay.

63

```
 1       (Pause in proceedings)

 2   A   Those first three reasons are performance issues, as

 3   well.

 4   Q   Mr. Wacker, there wasn't a question posed; you have to

 5   wait for a question.

 6       So, when you were first questioned, you did not say that

 7   there were performance issues throughout her employment at

 8   Temple that led to her termination, correct?

 9   A   I did not properly phrase it that way, yes.

10   Q   I would ask you to turn to P-1.

11   A   (Witness reviews exhibits)

12   Q   It's going to be the very first document in that binder.

13   A   What is it?

14   Q   1.

15   A   Where is it?

16   Q   1, 1.

17   A   Oh.

18   (Witness reviews exhibits)

19   Q   Now this is a document, a Temple University document, HR

20   Affirmative Action Authorization.  Do you see that?

21   A   Yes.

22   Q   And the date on here is February 14th, 2014, at the top

23   -- I mean, sorry, 2005.

24   A   Okay.

25   Q   Okay?  Now, at this point in time, Ms. Briggs had been
```

64

1    employed by Temple for four years, correct?

2    A    I don't recall.

3    Q    Do you believe that she had just started at Temple?

4    A    This would have been a document, I believe -- this would

5    have been the document that brought her into the Dean's

6    Office, and her position into the Dean's Office.

7    Q    Right.  So this is a document that is showing that her -

8    - she was transferred from one department to the other.

9    A    Yes.

10   Q    So she had been working for Temple for several years as

11   of the time of this.

12   A    Yes.

13   Q    And her new position was going to be Executive Assistant

14   Senior Coordinator in the College of Science and Technology,

15   correct?

16   A    Yes.

17   Q    I'd like to go to the second page of this document.

18        (Pause in proceedings)

19   Q    Okay.  The second page gives an explanation for why Ms.

20   Briggs was selected for this position, correct?

21   A    Yes.

22   Q    Okay.  I'm going to blow it up for the jury.

23        Okay.  It says:

24             "After careful review of all credentials and

25             qualifications, the most qualified candidate was

1              selected for the following imperative reasons.  The

2              candidate was selected based on her outstanding

3              communication skills, both verbal and written.  Her

4              previous work experience in developing and writing

5              grant applications, providing editorial assistance,

6              customer service skills, prior university

7              experience, and education make her the best

8              qualified candidate."

9       Do you see that?

10   A    Yes.

11   Q    And that was in regards to Ms. Briggs, correct?

12   A    Yes.

13   Q    And then, if you look at the third page of that document

14   -- oh, by the way, at the bottom of the second page, that's

15   your signature there, right?

16   A    Yes.

17   Q    As Director?

18   A    Yes.

19   Q    And on the third page of this document, it gives the

20   candidate summary of all the candidates that were considered

21   for this position that Ms. Briggs was awarded, correct?

22   A    Yes.

23   Q    So she beat out 18 other candidates for this position in

24   2005, correct?

25   A    This document appears to indicate that only seven of

1    those were interviewed, but yes.  The answer would be yes.

2    Q    Only seven were interviewed?

3    A    Were interviewed.

4    Q    But there were 19 potential candidates, and she was

5    selected.

6    A    Yes.

7    Q    Okay.  So going back to P-62.

8    A    (Witness reviews exhibits)

9    Q    When Temple says, as their very first reason, in the

10   first sentence, as to the reason that Ms. Briggs was

11   terminated, that she had performance issues throughout her

12   tenure at Temple, that is a false statement, isn't it?

13   A    From the time she was in the Dean's Office forward, she

14   did have performance issues.  Prior or that, I don't know.

15   Q    She started at the Dean's Office when?

16   A    What was the date on the document we just--

17   Q    That was 2005.

18   A    2005.  It would be around 2005.

19          THE COURT:  Okay.  And would this be a good time to

20   recess for lunch?

21          MS. MATTIACCI:  Sure, Your Honor.  We can do that.

22          THE COURT:  Okay.  It's -- despite what that clock

23   says, it's about 12:30.  We recess one hour for lunch.

24   Again, don't discuss the case, even among yourselves.  If you

25   can't -- if you shouldn't discuss the case among yourselves,

67

1   then certainly you should not discuss it with anyone outside

2   of the jury, nor allow anyone to discuss it with you or in

3   your presence.

4           And I realize that can be a problem going down on

5   the elevator, sometimes.  But I'm telling counsel to caution

6   their witnesses who may be around to stay clear of the jury.

7           Recess for lunch until 1:30.  The jury is excused.

8           THE COURT OFFICER:  All rise.

9           THE COURT:  You may step down.

10      (Luncheon recess taken at 12:30 p.m.)

11      (Afternoon Session Continues in Separate Transcript)

12

13

14

15

16                          *****

17

18

19

20

21

22

23

24

25

68

CERTIFICATION

1

2          We certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of our

5   knowledge and ability.

6

7   Transcriptionists:  William J. Garling and Coleen Rand

8

9

10

11

12                                          July 16, 2018

13   Coleen Rand, AAERT Cert. No. 341

14   Certified Court Transcriptionist

15   For Advanced Transcription

16

17

18

19

20

21

22

23

24

25

**A**

**a.m** 1:9 3:1
  13:10,11 15:7
  15:7,16 16:7,8
**AAERT** 68:13
**ability** 5:12 24:6
  61:24 68:5
**able** 27:1 34:16
  50:5
**above-entitled**
  68:4
**abundance** 12:3
**abuse** 30:22
**accept** 35:18
  36:9,12 37:5
**acceptable**
  46:10
**access** 48:12
**accountable**
  35:17 37:3
**Acquisition** 1:21
**Act** 8:1 10:8
**action** 9:24
  27:10 45:1
  47:10 49:22
  51:23 54:12,17
  56:9 57:3
  61:10 63:20
**actions** 35:17
  37:3,6 48:4,15
  49:16,23 56:6
**activity** 33:14
**add** 62:23
**addition** 7:19,24
**address** 30:24
  30:25
**adjacent** 45:24
**Administration**
  28:6 40:8 41:5
**administrative**
  50:11
**admissible** 10:5
  60:22
**admission** 4:21
  52:15
**admit** 21:17
**admitted** 7:15

52:18
**Advanced** 1:21
  68:15
**adverse** 9:24
**advisement** 6:16
  10:15
**affable** 36:6
**Affairs** 47:19,20
**Affirmative**
  63:20
**afraid** 9:10,13
  11:14
**aftermath** 4:5
**Afternoon** 67:11
**age** 14:1 22:20
  23:16,24 24:4
  27:11,23 28:1
  28:11 30:9
  31:5,25 33:10
  33:12,22
**age-discrimin...**
  32:16
**ages** 34:12,13
**ago** 24:19 40:17
**airline** 48:25
  49:13
**allegations** 7:17
**alleged** 9:25
**allegedly** 7:9
**allow** 67:2
**allowed** 18:4
**allows** 37:5
**American** 23:14
  23:21
**answer** 58:5
  60:18 66:1
**answers** 58:10
  58:12,13,16
  60:10
**anybody** 3:20
  4:10 44:11
  45:12 46:17
  57:6
**apologize** 28:17
  40:22
**APPEARAN...**
  1:11
**appeared** 27:22

**appears** 65:25
**applications**
  65:5
**applies** 20:9,15
**apply** 56:7
**approach** 39:11
**appropriate**
  43:1 47:18
  48:8 49:22
**approximately**
  38:2 48:9
**April** 4:5 32:13
  42:12 60:14,24
**area** 24:19 47:19
**argues** 37:14
**arguing** 28:16
**argument** 19:21
  20:7
**argumentative**
  48:9
**argutive** 45:6
**aside** 17:19
**asked** 4:17
  50:21
**asking** 21:2,4,4
  22:14 37:20
**asks** 12:23 27:19
  28:10
**aspects** 23:20
**assess** 5:22 6:12
**assist** 14:4,6
**assistance** 65:5
**assistant** 25:21
  25:25 26:11
  36:25 40:7
  64:13
**at-risk** 25:5
**attention** 47:16
**attorneys** 14:8
**Audio** 1:19
**Authorization**
  63:20
**ave** 59:8
**avoid** 56:12
**awarded** 65:21
**aware** 5:6 10:1
  44:17 45:9
  48:3 49:25

50:20 51:9,12

**B**

**B-11** 54:22
**back** 22:11 24:1
  30:14 31:23
  32:3,7,9 33:8
  33:24 38:3
  39:3 46:1
  52:12 56:10
  62:20 66:7
**background**
  3:10 8:6
**Barked** 27:5
**based** 6:9 11:25
  35:15 36:14
  38:9,10 56:3
  65:2
**Basically** 25:22
**basis** 36:6 60:15
**Bates** 57:18
**battered** 32:5
**beacon** 34:7
**beat** 65:23
**bedrock** 23:13
**began** 32:23
**beginning** 30:21
**behalf** 3:8 4:15
  7:3 20:5 38:12
**belief** 9:19 56:2
**believable** 21:7
**believe** 13:8
  31:5 40:11
  45:3 47:7 49:3
  49:15,18 50:15
  53:22 54:3
  55:14,15,18
  62:14,15 64:3
  64:4
**believed** 5:23
**bench** 11:12
  13:5
**best** 34:21 65:7
  68:4
**best-selling** 35:8
**better** 34:16
  35:24
**better-perfor...**

35:19
**beyond** 23:5
**bias** 37:20
**Bible** 39:6
**biggest** 56:6
**binder** 39:12
  51:19,19 57:9
  63:12
**birthday** 25:17
  27:18,20 28:10
  51:9 56:21
**bit** 22:15,25
  23:7,8,10
  24:22
**blow** 64:22
**board** 43:15
**book** 35:8,10
  48:24 49:2
**booked** 50:1,3,3
  50:12,13,16
**books** 24:2
**born** 24:15
  27:24
**bottom** 52:2
  55:1 65:14
**Boulevard** 1:22
**boxes** 59:19
**break** 21:16
  49:1
**Bridgewater**
  36:15
**brief** 3:10 4:21
  6:22 8:6 29:21
**briefly** 17:12
**Briggs** 1:2 3:8
  3:13 5:1 7:9
  8:9,20 9:4,9,24
  13:23,24 14:14
  14:19 22:20,21
  24:9 26:16
  29:6,10,15,23
  30:14 31:7
  33:11 34:1
  35:7 36:4,23
  37:2,9,14
  41:14 42:2,12
  43:3 44:17,18
  46:24 47:8

48:5,15 49:17
49:23 50:2,21
51:12,24 53:6
56:13 57:4
60:23 61:3
62:4,9,11,16
62:21 63:25
64:20 65:11,21
66:10
**Briggs'** 7:14
8:24 9:3,19
34:20 45:16
51:9 55:3 58:4
**Bring** 17:10
**brings** 50:9
**Broad** 34:8
**brought** 7:8
10:6 13:20,25
27:10 28:5
32:25 47:16
64:5
**Brown** 29:13,23
30:2,11,15
**Brown's** 30:16
**building** 45:19
45:21,24 46:2
**bullied** 32:11
**bunch** 51:1
**burdensome**
60:20
**busy** 20:22

_____

**C**
**calculated** 60:21
**call** 13:12 14:3
17:3 19:25
20:5 38:17
**called** 13:22
22:6,17 34:6
35:9 36:20
**calls** 39:1
**Cameron** 31:4
31:11,12,23
**Cameron's**
31:16
**candidate** 64:25
65:2,8,20
**candidates**

65:20,23 66:4
**care** 25:8
**careful** 64:24
**Carlin** 1:12
**case** 1:3 3:12,13
5:16 6:20 7:5
7:10,14,17 8:3
8:11,14 9:1,17
10:1,3,9,14
11:13 13:22,22
13:23 14:14
17:17 19:16,22
19:25 20:9,10
20:11,15 21:11
22:10,23 23:12
23:13,21 27:1
28:16 33:3,4
37:23 41:21
58:4 66:24,25
**cases** 11:12
56:10
**catch** 18:11
**cause** 14:5 55:10
**caution** 12:3
67:5
**Cert** 68:13
**certain** 56:17
**certainly** 5:1,2,3
5:7,21,22,25
6:13 11:20
36:5 37:18
67:1
**CERTIFICA...**
68:1
**Certified** 68:14
**certify** 68:2
**chair** 26:11,24
36:25 39:3
41:10,19,21
**Chairs** 41:23
**challenges** 14:7
**chances** 35:5,5,5
**change** 41:23
**changed** 10:22
26:5,10 50:17
**character** 5:20
35:4
**charge** 42:14

**chart** 29:3
**checkmark**
54:10
**Cherry** 1:17
**child** 25:8
**children** 24:16
24:16
**China** 27:22,24
27:25 28:4,11
33:10 50:23
51:5 56:15
**Chinese** 45:13
45:13 46:5,11
**choice** 61:7,12
61:16,19
**choose** 61:17
**chose** 61:14
**circumstances**
22:5
**circumstantial**
22:6
**cited** 6:21
**civil** 11:12
**claim** 5:5,6 8:23
42:17,22,24
**claims** 7:24 8:2
10:2,3,6 13:25
42:15
**clarify** 43:19
**clear** 49:2 67:6
**client** 24:9
**clock** 66:22
**closing** 20:7
**coached** 8:25
9:5
**Coleen** 68:7,13
**colleagues** 3:17
**college** 24:18
25:21 26:1
34:12 36:2
37:18 64:14
**colleges** 26:2
**color** 23:23
**combatted**
31:25
**come** 11:9 12:7
12:11 18:12
20:12,15 21:21

25:23 33:7,24
35:23 52:12
**comes** 27:19
28:10 56:10
**coming** 48:19
50:4
**commence** 3:1
**comment** 29:9
29:22 31:14
**common** 21:10
**communicated**
4:22
**communication**
4:25 65:3
**communicatio...**
3:16,19 4:6,9,9
4:18,20,22,23
5:14,15,25 6:5
6:8,17
**company** 1:21
36:19
**compensate**
33:17
**compensation**
62:1
**competencies**
36:21,23,24
37:1
**competency**
37:11
**competing** 21:5
**complain** 23:19
**complained**
21:24 27:12
45:9
**complaining**
9:12
**complaint** 10:9
32:17
**complaints**
22:22
**complete** 45:5
47:2 48:17,23
**completely** 7:13
**Compliance**
29:11
**complicated**
22:15

**component** 5:5
5:7,7,8,23
**Computer** 26:12
26:24 41:10
**concept** 46:4
**concern** 46:8
**concerned** 31:6
**concluded** 60:4
**conditions** 61:2
**conduct** 12:20
15:4 22:23
27:13 28:8
29:18 54:23
55:11
**conducted** 15:7
**confer** 18:21
19:5 39:4
51:17 53:8
57:19 58:18,23
59:3,23
**confess** 21:17
**confirm** 15:25
17:22 48:20
**confirmed** 48:12
**confront** 37:20
**confrontation**
56:12
**confuse** 7:21
**Congress** 24:1
**conjunction**
44:8
**connection** 9:25
**conquers** 34:15
34:25
**consider** 19:15
33:25
**considered**
65:20
**Console** 1:12,13
14:11,15,15,16
14:18
**content** 3:24
**context** 47:1
**continually**
48:11
**continue** 34:23
**Continues** 67:11
**conversation**

51:8 56:22
**conversations**
56:4
**conveyed** 52:11
54:8
**conveying** 51:7
**Coordinator**
64:14
**copy** 59:20,21
59:24
**core** 23:13 34:15
34:17 35:1
36:21,22,23
37:1,11
**corporate** 16:23
39:25
**correct** 39:23
40:1,5,21 41:5
41:14,19,22
42:3,6,12,15
42:20,25 43:4
45:19,20,22
46:5,15,25
47:10,20,24
48:18 50:14,14
50:18 51:2,13
51:24 52:2
53:13,17 55:3
55:7,11,12,25
56:3,22,23
58:14 61:4,8,9
61:13,18,20,22
61:23 62:9,13
63:8 64:1,15
64:20 65:11,21
65:24 68:2
**corrected** 47:1
**counsel** 14:4,21
14:25 15:4
17:5 19:20
29:15 31:4,23
34:3 37:14
40:3,23 52:24
57:17 67:5
**counsel's** 7:18
**couple** 21:3 22:9
22:13 24:10,19
25:24 26:6,7

30:13
**courage** 6:11
**course** 37:12
58:4
**Court** 1:1,20 2:5
3:2,6 4:2,12,14
4:17 5:6,9 6:1
6:14,16,20,23
7:1 8:4 9:22
10:15,22,25
11:3,6,8,11,18
11:19,22,24
12:1,6,9,10,12
12:15,23 13:1
13:3,5,8,9,12
13:14,17,19
14:20 15:3,8,9
15:12,14,15,17
15:20,23 16:2
16:5,10,19,25
17:2,8,10,12
17:15,20,23
18:1,5,7,8,11
18:13,18,22,25
19:4,7,9 20:20
28:16,18,23
34:3 38:17,22
39:3,5,8,13,17
40:25 43:6,12
43:14,18,20,23
52:16,18,22
53:2,13,15
58:10,12,21
59:5,17,24
60:3,8 66:19
66:22 67:8,9
68:14
**Court's** 11:23
17:25 58:22
**courtroom** 5:14
17:4 18:4,13
18:18 19:1,16
20:12 38:3,6
**create** 35:22
36:13
**credentials**
64:24
**credibility** 5:4

5:22 6:11,13
9:7,18 27:2
**criticism** 35:18
**critique** 35:19
**cross** 2:11 39:2
**cross-examina...**
19:17 20:13
**cross-examine**
20:3
**CSI** 21:14
**cultural** 35:1,12
36:19,19
**current** 40:7
**currently** 39:22
40:11
**customer** 65:6

### D

**daily** 30:20
**Dalio** 35:9 36:12
**Dalio's** 35:9,20
37:2
**damages** 33:17
**date** 48:25,25
49:2,7,11 50:1
50:3,3 51:14
53:6,12,12,14
53:15,17,19,20
53:22,22,24
54:4,14,16
56:20 63:22
66:16
**dated** 51:24
**dates** 48:24
49:21 54:12
**day** 1:9 27:17
28:9 31:3
32:23 54:1
56:21
**days** 21:3 22:10
22:13 24:11
29:1,5 48:10
48:11
**deal** 3:3 4:23
**dean** 26:1,5,7
40:7 41:7 42:5
**Dean's** 64:5,6
66:13,15

**deans** 26:6
**decades** 24:19
**decide** 20:10,10
21:6 33:4
**decided** 24:1
35:11
**decision** 2:5
3:22 4:10 6:10
9:3 38:8 43:3,8
43:10 44:2,3,5
44:11,16,17
60:15
**decision-** 4:23
**decision-make...**
5:16
**decision-maki...**
35:13 36:15
**deed** 34:18
**defendant** 1:15
3:12 4:16 7:3
12:22 16:23
22:19 33:15
58:1
**defendant's**
8:12
**Defendants** 1:7
**defense** 7:1 13:1
14:21 19:20
20:2,4 34:4
**deficient** 34:24
**Deirdre** 29:12
31:1,19 32:3,9
44:8 52:8
55:23
**deliberate** 22:12
**demoted** 28:7
**department**
26:12,25 27:6
36:25 41:10,18
41:20 42:19
48:2 53:18
64:8
**deposition** 8:16
8:25
**describe** 6:6
8:15 24:25
57:2 60:15
**described** 29:22

**describes** 5:19
6:5,9
**describing** 5:18
6:7
**description**
10:13
**designee** 16:23
39:25
**desire** 5:12
**despite** 66:22
**determine** 5:22
17:2 37:9,13
42:23 45:1
46:13
**determined**
17:17
**determining**
14:5
**devastated**
25:18
**develop** 35:11
**developing** 65:4
**different** 23:18
26:8 41:25
46:2
**differently** 6:9
23:15,23 24:4
**difficulty** 35:3
**DiMeo** 52:9
55:23 56:5
**dire** 10:16 11:11
11:13 12:12
14:4,4 19:11
**direct** 2:11 20:1
39:18 42:18
**direction** 23:4
**directly** 9:6,9
29:7
**director** 28:6
29:11,12 30:3
32:15 41:4
65:17
**disability** 7:25
10:7 23:23
**disciplinary**
2:18 45:1 47:9
48:4,14 49:16
49:22,23 51:23

61:10
**discipline** 8:22
26:19 28:13,15
29:8 44:23,24
45:4
**disciplined**
47:15,23
**disciplines**
44:23
**discovery** 60:21
**discriminate**
23:16,17
**discriminated**
22:20,21 27:10
27:11 33:12,12
**discrimination**
3:11 7:25 8:1,2
10:2,3,7,8 14:1
14:2 23:11,19
30:9 42:15,18
42:23
**discuss** 66:24,25
67:1,2
**discussion** 47:17
**dismissed** 37:22
47:5
**disparate** 31:6
**displeasure**
17:14
**disregard** 19:14
**disrupted** 45:7
**disruptive** 45:6
48:9,11
**distressing** 32:4
**DISTRICT** 1:1
1:1,10
**diversity** 29:14
29:24 34:9,9
34:10
**divorced** 24:20
**DNA** 21:14
**document** 54:4
55:2,9 56:24
57:15,23 58:20
63:12,19,19
64:4,5,7,17
65:13,19,25
66:16

**documentation**
49:9 51:15
55:14,18,21,24
56:18
**documents** 7:6
21:8 22:7
38:21
**doing** 22:9 23:7
25:22 47:5,11
**dose** 30:20
**doubt** 23:6
**Dr** 5:17 26:23
26:24,24 27:3
27:9,18,21,24
28:2,10 29:6
29:16,23 31:14
33:9 36:25
41:9 42:2 44:6
45:6,9,12,15
45:19 46:5,10
47:3,14,22
48:19 50:8,21
51:5 52:5 55:7
55:16 56:14
**draw** 10:12
**Drew** 52:9 55:23
56:5
**drowning** 32:10
**due** 28:3 51:5
56:15 61:8

      **E**
**earlier** 61:9
**earliest** 18:4
**early** 18:12 25:5
**EASTERN** 1:1
**editorial** 25:21
65:5
**education** 65:7
**educator** 25:8
**EEOC** 32:8
**effect** 11:15
46:20 55:19,22
**effective** 60:24
**eight** 13:22 26:9
26:19
**eight-plus** 26:22
**either** 7:20

10:17,23 45:24
49:13
**el** 26:17
**electronic** 1:24
45:5 68:3
**Electronically**
1:19
**elevate** 44:24,25
45:2
**elevates** 44:24
**elevator** 67:5
**email** 4:25 30:14
30:22 31:4,20
**emails** 16:14
29:17 31:10,14
31:24 32:5,20
57:2
**emotional** 33:18
**emotionally**
25:18 32:6
**employed** 3:14
8:17,18 39:22
64:1
**employee** 8:8
13:25 23:19
24:14 54:5
56:11
**employee's** 55:2
**employees** 24:2
**employer** 5:1
21:21 23:15
25:13 33:15,16
**employment**
3:11,23 4:2,11
4:19 8:8 9:3
23:11 29:10,11
30:4 31:17
32:15 37:12,15
37:18 62:22
63:7
**encourage** 11:19
**encouragement**
11:18
**ended** 4:3
**engaged** 36:5
**engaging** 33:14
**enjoyed** 36:3
**ensure** 24:2

**Enter** 26:24
**entire** 24:23
59:9,15
**entirely** 3:24
**entity** 36:17
43:2
**environment**
5:5,24 6:2,5,15
35:22 36:13,14
**equal** 29:11 30:3
32:15
**errors** 48:24
**Esq** 1:12,12,13
1:15,16
**Etezady** 31:4
**ethnic** 34:9
**Evaluate** 37:9
**everybody** 9:10
31:8
**EVID** 2:16
**evidence** 8:13
9:8 16:11
17:16 19:15,16
20:13 21:14
22:6,15,18,24
23:4 33:4
34:19 35:6
37:17,24 52:19
60:22
**exact** 16:15
49:21 62:10
**exactly** 8:13
27:15 32:1
**examination**
20:1 39:18
**Excellent** 18:15
**exclude** 7:6
**excuse** 40:22
52:1 57:17
58:19
**excused** 14:5
15:16,22 67:7
**executive** 25:25
26:11 36:24
64:13
**exercising** 14:6
**exhibit** 2:16
57:16 59:15

**exhibited** 37:11
**exhibits** 39:12
52:25 53:1
57:11 59:8,13
59:13 63:11,18
66:8
**expect** 28:19,19
**experience** 65:4
65:7
**explain** 9:19
10:11 55:9
**explanation**
12:19 54:22
64:19
**expressed** 4:6
47:9
**extensive** 11:14
**extent** 60:19
**extreme** 35:3

      **F**
**F** 1:10,22
**face** 45:16
**Facebook** 3:19
4:25
**facilitator** 52:12
56:5
**facing** 29:19
**fact** 6:6 7:15
10:2 33:8
34:23 35:7,10
38:5 42:17
48:8
**factual** 60:15
**faculty** 41:20,25
47:18,20
**failed** 32:22
**failing** 47:2 48:7
**fair** 37:22 38:1,4
38:8,14
**fall** 40:20
**false** 62:12
66:12
**family** 8:1 10:8
24:18 25:1
**fancy** 22:25
**far** 47:22 61:5
**favor** 34:1

**Fay** 15:1 31:16
  31:18,19 38:15
**February** 25:20
  26:18 63:22
**feedback** 35:19
  36:9
**feel** 30:21
**feels** 27:15
**fellow** 37:21
**felt** 32:1,12
**females** 34:13
**Fendell** 1:16 7:3
**fifty-seventh**
  27:17
**file** 33:21
**filed** 3:9 7:4
  10:22 11:2
  25:12,14
**filing** 32:16
**fill** 43:20
**Finance** 40:7
  41:4
**financial** 33:17
  36:17
**financially**
  25:18
**find** 8:21 9:15
  20:14 34:11
  46:14 58:20
**finding** 7:20
  10:10
**fine** 59:22 60:2
**finish** 28:23
**finished** 20:3,6
**fired** 8:18 25:11
  61:14
**firm** 7:18 14:11
**first** 3:3 7:5
  12:21 19:19
  20:24 24:17
  25:20 26:17
  30:25 33:21
  34:25 38:17
  59:9,14 60:18
  61:3 62:3 63:2
  63:6,12 66:9
  66:10
**fist** 27:6

**fit** 22:8
**five** 26:3 38:20
  41:23
**floor** 1:22 15:19
**flow** 45:8
**FMLA** 8:19
**focus** 42:11
**Foehl** 29:11 30:3
  30:3,5,8,10,12
  30:17 32:7,13
  32:14,24
**Foehl's** 30:6,24
**follow** 13:1
  15:15 35:12
**following** 65:1
**follows** 61:2
**food** 33:21
**for-profit** 36:18
**forced** 61:13
**forcibly** 28:1
**foregoing** 61:1
  68:2
**forensic** 21:14
**Forklift** 6:20
**former** 3:17 8:7
  13:24 24:13
**forth** 60:12
**forward** 18:16
  43:1 66:13
**found** 26:7
  33:15 34:14
**founded** 34:14
  36:16
**four** 24:15,16,21
  40:10,14,15
  42:10 48:10,11
  64:1
**frequently**
  41:23 44:23
  47:11
**friendly** 36:7
**friends** 3:18 4:7
**front** 33:8,24
  47:11,14
**full** 10:13 31:24
  39:8
**fully** 5:6
**fun** 21:18

**fund** 35:10
**fundamental**
  23:13,20 32:21
**further** 11:8
  12:15 24:8
  54:20 55:1
  60:22

**G**

**G** 1:12
**Garling** 68:7
**gathering** 52:10
**gender** 6:9 14:1
  22:21 23:18,25
  24:4 27:12
  33:13 34:10
**general** 50:25
**germane** 4:19
  6:21
**getting** 28:7
  30:19
**give** 17:15 20:8
  35:5 39:12
  59:20,24
**given** 46:20,22
  46:24 51:24
  52:6 56:8,13
  61:10,24
**gives** 64:19
  65:19
**giving** 11:18
**glad** 21:1
**go** 5:11,12,13
  7:16,21 8:12
  12:21 13:5
  15:13 22:11
  24:1,3,8,18
  28:21 30:2,16
  31:11,16 32:7
  41:1,1 46:14
  59:16 64:17
**goes** 5:4,22 9:6,8
  29:23,25 30:14
  30:18 31:3,19
  31:22,23 32:3
  32:7,9 34:18
**going** 9:14,15
  10:10,13 11:4

11:19 12:4
13:15 18:16
21:2,3,4,5,6,7
21:8,9,13,15
21:21,25 22:3
22:7,7,8,9,11
22:11,12,14,15
22:16 23:9,10
23:24,25 24:3
24:10,22,25
25:4,8,10,12
25:14,15,24
26:13,13,15,16
26:20,20,21,25
27:1,2,3,8,9,14
27:15,16,20,21
28:2,13,19,21
28:25 29:2,4,9
29:14,16,17
30:2,7,8,10,12
30:14,15,22
31:1,5,7,7,8,9
31:13,18,20,20
31:21,24 32:1
32:5,11,18,19
32:24 33:1,2,7
33:8,18 38:14
51:18 57:9
62:20 63:12
64:13,22 66:7
67:4
**good** 3:5,6 7:2
  13:14 14:10,15
  14:17,24 20:21
  25:2 34:6,18
  39:20,21 66:19
**grandchildren**
  24:17
**grant** 65:5
**Greg** 8:9,10
  9:14 28:6 29:7
**Gregory** 2:13
  16:24 39:2,7
  39:10
**group** 44:9
  47:18 52:8
**grown** 24:16
**guess** 18:25

38:22 45:23
62:10
**guests** 48:18

**H**

**h** 44:8 59:8
**half** 32:18
**hallmarks** 35:20
**hand** 13:17 39:5
  39:6
**handed** 32:25
  47:17 61:5
**handle** 42:19
  47:18
**handled** 7:18
**handles** 31:17
**hands** 22:10
**happen** 22:3
  33:9 49:20
  56:7
**happened** 9:21
  27:16 28:9
  55:9 57:2
**happens** 30:11
  30:13 33:9
**happy** 59:15
**harassed** 30:19
  32:11
**harassment**
  14:1
**harm** 33:18
**Harris** 1:15 2:8
  4:13,15,15
  5:11 6:4,15,19
  6:20 11:10,17
  11:19,23,25
  12:2,8,10,14
  12:17 13:7
  14:23,24 16:18
  17:6,11 19:2
  34:5 38:15
  40:22 52:17,23
  53:9,11 57:17
  57:21 58:19,22
  58:25 59:1,4,7
  59:12,18,22,25
  60:2,5
**health** 25:8

hear 13:22
  16:16 19:16
  22:3,7 23:10
  24:10,25 26:15
  27:14,15 29:4
  29:9,14 30:8
  31:2 34:19
  35:2,6 36:2,10
  37:16 45:15
  46:4,4
heard 22:13,25
  23:6,8 33:6
  37:21 41:9
  45:12 46:7
hearing 21:5,8
hedge 35:10
held 26:2 41:13
help 19:3 25:7
  30:15 32:2,8
  32:21 52:12
helping 25:22
helps 19:1
hey 56:7
high-level 48:18
hired 34:21
honor 3:5,9,11
  4:13,17 6:24
  7:2,4,12,15,24
  8:5 9:23 10:1
  10:19 11:2,10
  12:17,18 14:23
  15:2,6,24
  16:20,21 17:6
  17:11,13,21
  18:3,16,23
  19:2 20:18,19
  28:17,22,25
  34:5 37:23
  38:19 39:1,11
  39:16 40:22
  43:24 52:14,20
  52:23 53:11
  58:19 59:4
  60:5 66:21
HONORABLE
  1:10
hoping 33:23
Hospital 19:13

hostile 5:5,24
  6:2,6,15
hotel 48:24
  49:12,13,15
  50:2,3,5,6,13
hour 21:13 28:5
  66:23
housing 33:20
HR 31:2,19
  55:15 63:19
Human 30:25
  31:1 32:3
  43:11 44:8
  49:21 56:8
  61:6
humiliation
  30:21
Hunnewell 2:5
  7:7 8:7,13,17
  9:6,16,17,25
  10:13 16:11
Huntley 14:25
husband 24:20

                    I
idea 32:21 62:2
IDENT 2:16
identified 11:17
  12:18 52:25
  59:13,14
immediate 4:5
immediately
  35:4
impacted 33:19
impartial 38:4
imperative 65:1
import 37:24
important 4:17
  4:19 6:12
  26:15 37:5
  38:13
improvement
  26:22
in-house 29:15
  31:3,23
inappropriate
  55:10,11
incarcerated

  25:6
incident 9:25
  49:18 53:6,12
  53:20 54:2,5
  54:15
included 61:11
Including 51:2
inclusive 36:13
increase 35:13
  36:11
increasing 36:14
INDEX 2:1
indicate 54:1,4
  65:25
indicated 46:22
indicating 54:14
indiscernible
  30:19,19,20
  31:22 41:7
  59:7
individual 8:6
  8:10 9:1,2
  21:21 29:6,7
  33:17 35:23
  36:22 40:17
individuals 6:10
  25:6 32:20
  34:11 35:2,23
  36:2,7 37:2
  50:9,10 51:1
indulgence
  58:22
inferences 10:12
informal 56:4
information
  26:12,25 38:9
  38:10 41:10
  44:9 46:20,22
  46:24 52:10,11
  60:20
Institutional
  29:14,24
instruct 19:14
instructed 37:23
instruction
  17:16 20:8
INSTRUCTI...
  2:6

intend 19:22
  28:24
intended 45:4
  54:16
intention 3:20
  9:17
interaction
  55:15
interim 26:6
interrogatories
  58:1
interrogatory
  57:20,25 59:10
  59:11 62:13
interview 46:17
interviewed
  66:1,2,3
interviews 33:22
introduce 14:9
  14:21 24:8
investigate 47:7
investigating
  42:15
investigation
  8:24 42:24
  47:6
involuntarily
  61:18
involve 8:2
involved 7:25
  52:9
involvement 7:9
  7:11,14
involves 13:23
involving 7:7
iPad 38:20
iron 27:6
irrelevant 3:24
  7:13,14,22
ish 18:9
issue 6:21 8:3
  9:6,16 10:3
  23:21 30:1,24
issues 31:9 62:5
  62:16,18,22
  63:2,7 66:11
  66:14
it'll 38:22

intend 19:22
J 68:7
JDR 1:21
Jersey 14:13
Jie 36:25
Jill 14:25
job 25:4,11,20
  25:24 26:3
  33:22 40:18
  61:8
jobs 24:23,24
John 1:22
joint 43:5,10
  44:3,5
journal 25:23
joy 36:4
judge 1:10 11:17
  11:20 22:4
  23:9 27:2
  37:16
judgment 21:10
July 1:5 68:12
juror 14:5 17:13
  17:18
jurors 19:11
  33:3 37:21
jury 1:11 2:4,6
  5:21 6:12 7:21
  10:11,16 11:9
  11:15 13:13,15
  13:16,18,21
  15:7,8,9,11,13
  15:13,16,18,18
  15:22 16:9
  17:10,16 19:8
  19:10 20:23,24
  22:4,11 28:18
  38:20 40:19,24
  41:2 64:22
  67:2,6,7
just-- 66:16
justice 23:2

                    K
keep 29:3 43:24
Kelly 1:10 22:4
  23:9
Kennedy 1:22

                    J
J 68:7

kept 9:9
kids 24:21
knew 48:13
know 3:11 9:14
  20:11,14,23,25
  21:22 23:22
  24:14 27:19,22
  30:5 43:6,23
  46:12 47:22
  49:3,14 50:19
  56:12 57:2
  62:10 66:14
knowledge 68:5
knows 27:24

**L**

Labor 29:12
  52:8,11 54:8
  54:17 56:8
lacked 6:11,11
large 35:10
late 26:9
Latin 34:15,16
Laughter 18:6
Laura 1:12
  14:10
law 1:13 10:2
  14:11,12,18
  20:9,14 22:3
  27:25 33:16
laws 23:25 24:2
lawsuit 7:7,8
  16:12 25:12,14
lawyer 31:17
lead 57:3 60:21
lean 39:3
learn 26:13,14
learning 25:7
leave 8:1,19
  10:8 15:20
  18:19 50:10
led 48:5,6,15
  49:17,24 63:8
left 6:7 39:6
legal 23:1
legitimacy 7:17
legitimate 60:12
let's 23:7 38:23

50:20 54:9
letter 9:4 32:25
  33:1 61:6
levels 44:24
liability 7:20
  10:10
liar 21:17
lie 9:5
lieu 60:24
life 21:19 22:3
  33:22 37:15,17
light 33:5
lightly 23:3
lights 18:25
limine 2:3,5 3:3
  3:9,15 6:25 7:4
  7:5 10:22,24
  11:1 16:11,12
limitation 61:1
line 29:21
lines 50:25
list 35:9 59:9
  62:20,23
listen 26:16
  43:12
litany 8:13
litigation 7:23
  7:23,25 10:7
little 22:15,25
  23:7,8,10
  24:22
LITTLER 1:16
lives 20:22
LLC 1:13
LLC./ 1:21
locked 18:19
Locust 1:14
lodged 48:4,15
  49:16,23 57:3
long 11:20
longer 4:7 28:20
  41:16
look 6:20 22:4,5
  24:7 46:21
  59:15 65:13
looked 46:23
looking 11:11
  22:7 33:22

58:16 60:10
looks 28:11
lot 11:24 12:2
  21:4,18 28:20
  62:19
loud 17:14
love 35:23
lunch 66:20,23
  67:7
Luncheon 67:10

**M**

mail 20:24
main 14:12
makers 4:24
making 38:14
  52:10
males 34:13
man 26:23
managed 47:18
mandatory
  27:25
manner 47:4
  49:6
marginal 34:21
Mark 15:15
  17:10 18:7
market 1:4
  36:16
Maryland 24:15
matter 3:10,25
  7:13,15,18,19
  10:9,11,14
  14:19 46:18
  61:12 68:4
matters 24:6,6
Mattiacci 1:12
  1:13 12:18,25
  13:2,4 14:10
  14:11,12,16,18
  15:6 16:20
  17:1,9 18:3,10
  18:12,15,20
  38:19,23 39:1
  39:11,14,16,19
  41:1,3 43:9,13
  43:16,19,22,24
  44:1 52:14,20

53:4,14,16
  57:20,22 58:24
  59:2,11,20
  60:7,9 66:21
mean 11:22
  12:12 22:2
  63:23
meaningful
  35:25
means 10:12
  23:1
Medical 8:1
  10:8
meet 30:3
meeting 32:14
  49:19,19 50:7
  50:21 55:16
  56:3,14,25
meets 30:5,10
  32:13,24
member 30:20
  41:20
members 13:20
  15:9,17 19:10
  19:12 41:25
memorialized
  36:20
MENDELSON
  1:16
mentioned
  22:24 50:25
merely 28:20,23
merit 24:7 42:24
messages 3:23
  4:1,24,25
Messenger 3:20
middle 54:10,20
minds 38:5
minute 38:24
minutes 17:22
  23:9 38:20
mistake 37:4,7
mistakes 35:17
  37:4,10
mister 5:17
  47:22
moment 10:23
  21:15

months 30:12,13
morning 3:5,6
  7:2 10:21
  13:14 14:10,15
  14:17,24 18:4
  20:21 34:6
  39:20,21
mother 24:21
motion 2:5 3:9
  3:15 6:24 7:5,5
  8:12,14 10:21
  11:1,5 16:10
  16:12,22
motions 2:3 3:3
  7:4 10:24
move 33:19
  40:23 52:14
moved 24:18
  26:18
movies 21:15
moving 4:20
  43:24
Munshi 1:13 2:7
  3:5,7,7 4:4
  6:24 8:5 10:18
  11:4,7 14:17
  14:18 15:24
  16:3,6 17:21
  17:24 18:23
  20:18,21 28:17
  28:21,25 59:21
  60:1

**N**

name 3:7 8:7
  14:10,17,24
  34:13 38:14
  39:8,9
named 7:7 26:23
names 26:13
  29:4
near 19:11
need 17:4 24:1
  37:3 46:21
  58:19
needed 25:1,7
neighborhood
  42:10

**neither** 6:17
60:20
**never** 25:11,12
25:13 45:18
47:20,22
**new** 14:13 35:8
64:13
**night** 50:14,16
**nondiscrimin...**
60:13
**normally** 11:12
12:23
**North** 34:7
**note** 9:24
**notes** 30:6,6
43:15 54:7
**Notice** 2:18
**notion** 35:15,21
35:25 36:11
**November**
27:16,17 28:14
29:8,22 51:9
51:13,24 53:6
53:17 55:5,7
56:20
**number** 13:21
50:20 51:20
60:11
**numbers** 15:20

─────────
**O**
─────────
**o** 18:13
**oath** 13:16 19:17
20:13 38:2,13
58:6
**objection** 52:16
52:17,24 53:9
53:11 60:19
**objections** 61:1
**objective** 5:6
**objects** 60:22
**obviously** 17:16
**occur** 4:18
**occurred** 54:5
**offenses** 44:25
**office** 27:18 28:9
29:13,24 31:17
45:10 46:11

47:12,12 51:1
55:17 64:6,6
66:13,15
**OFFICER** 13:9
13:17 15:9,14
15:20 18:8,11
18:13 19:7
39:3,5,8 67:8
**offices** 14:12,13
45:8 47:12
**oh** 20:24 63:17
65:14
**okay** 6:18 8:4
9:22 10:15
11:8 12:6,9,25
13:2 15:3 16:6
18:10,15,18
19:4 20:25
39:20 40:3,12
40:19 41:2,2,9
41:13,24 42:8
42:14 43:9,16
43:22 44:7,11
44:13,15,20
45:9,15,18,21
46:2,7 48:14
49:1,11 50:7
51:16,22 52:4
52:14 53:5,20
53:24 54:4,9
54:14,20 55:1
57:21,24 58:4
58:16,24 59:2
60:2,7,10
61:12,15,23
62:3,8,11,20
62:25 63:24,25
64:19,22,23
66:7,19,22
**old** 21:23 24:13
27:20 28:10
50:22
**once** 48:6,6 56:5
**online** 3:19
**open** 5:14 34:3
**opening** 2:7,8
15:24 19:19,21
20:17 40:4

**openings** 41:9
**operator** 1:19
35:10
**opinion** 50:11
**opportunity**
19:20,25 20:2
20:4,7
**oppose** 11:5
**opposing** 20:2
**oppositions**
10:21,23
**order** 13:12
**orders** 27:5
**organization** 6:7
35:1,11,16,20
36:8,12,15,21
36:22 40:20
43:2
**organizational**
29:3
**organizations**
35:12 36:1
**organized** 36:20
**orient** 40:19
**originally** 50:16
**outline** 28:20,23
**outperformed**
36:16
**outside** 17:3
24:21 67:1
**outstanding**
65:2
**over-broad**
60:19
**overseeing** 48:1
**owned** 37:10
**owning** 37:4

─────────
**P**
─────────
**P-1** 63:10
**P-3** 2:18 51:20
51:20 52:15,19
**P-62** 58:16 66:7
**p.m** 67:10
**page** 2:2 51:19
57:15,23 59:9
59:14 64:17,19
65:13,14,19

**panel** 12:16 13:6
13:13,15,16,18
13:20 14:22
15:5,18,22
19:12
**parental** 25:7
**part** 14:3 37:11
**Participants**
18:21 19:5
39:4 51:17
53:8 57:19
58:18,23 59:3
59:23
**particularly**
8:14 17:14
**partner** 14:11
14:16
**pass** 43:1
**passing** 38:5
**pasture** 27:23
28:12 33:10
50:23
**Pause** 18:2 19:6
38:25 39:15
53:3 63:1
64:18
**pay** 33:16
**PC** 1:16
**PECO** 33:20
**pen** 18:13
**Pennsylvania**
1:1,5,14,17,23
**people** 3:18
20:23 26:8
35:4 36:5 38:3
42:9 44:13
45:9
**percent** 23:3
**perception** 5:13
**peremptory**
14:6
**perform** 35:24
**performance**
34:20,23 35:14
62:5,16,18,22
63:2,7 66:11
66:14
**performance-**

26:21
**performer**
37:15
**period** 40:4
53:12
**permanent** 26:7
**permission**
52:20
**perseverance**
34:15,25
**person** 21:16,23
21:24 22:1
24:17 25:2
29:25 53:21
54:15
**personal** 3:16
**Personnel** 1:20
**Philadelphia** 1:5
1:14,17,23
14:12 24:19,22
34:7
**phonetic** 7:8
**phrase** 23:6 63:9
**place** 8:16 9:5
11:13 25:15,17
30:8 39:6 54:2
54:15 56:22
**plaintiff** 1:3,12
2:12 3:8,13 8:9
8:16,19 12:21
12:23 13:24
14:8,14 16:15
16:17 19:24
20:3,16 22:17
38:17 39:1,7
60:13
**plaintiff's** 7:18
15:4 19:19
52:25 59:8,13
**plan** 17:3
**plans** 26:22 27:9
**played** 3:22 4:10
9:2
**players** 7:10
**pleasant** 36:5
**please** 13:17
14:9,21 15:9
15:15 20:20

39:5,8,17
57:10
plug 38:24
point 5:25 10:20
17:12 20:8,9
34:4 40:16
52:12 63:25
posed 63:4
position 36:24
40:7 41:13,16
41:18,24 61:7
64:6,13,20
65:21,23
positions 26:10
posits 36:13
possible 38:19
posted 4:8
potential 66:4
preclude 3:16
4:1
precluded 7:12
prefer 12:20
preference
12:19
pregnant 25:6
PRELIMINA...
2:6
premise 35:15
preponderance
22:18,24 23:4
presence 67:3
present 13:13
16:9 19:8
56:11
presented 20:1
preview 23:10
previous 65:4
previously
37:23 52:25
prides 34:8
principle 23:14
34:15
principles 35:9
35:11,21 37:2
prior 15:24
16:12,14 28:15
65:6 66:14
private 3:16,19

4:8
privilege 14:13
14:19
probably 47:2
problem 19:13
19:15 36:6,9
50:5 67:4
problems 18:16
proceed 19:19
20:19 39:16
58:24 60:5
proceedings
1:24 3:1 13:11
16:8 18:2 19:6
38:25 39:15
53:3 63:1
64:18 68:4
process 52:13
produced 1:25
professional
28:8
professor 50:4,5
50:6,17
prolonging
11:15
promise 43:25
promotion
40:18
properly 48:23
63:9
prospective
17:13,18 37:21
prove 19:23,25
28:24 33:11
proven 22:17,18
provide 25:1
34:16 57:17
provided 12:2,3
36:23 44:9
58:17 59:8
provides 22:4
providing 35:25
65:5
psychological
30:22
public 30:21
publication
25:23

publicly 4:8
publish 52:21
purpose 14:4
put 22:10 27:23
28:12 29:21
32:12 33:10
48:7 50:23
puzzle 22:8

## Q

qualifications
64:25
qualified 64:25
65:8
quality 34:20
35:13,13 36:14
38:10,11
quantity 38:11
question 4:17
6:13 15:5
34:22 48:14
60:11 63:4,5
questioned 63:6
questions 7:22
11:11,14 12:1
12:3,4,21,22
12:24 21:5
58:1,2,5,9
quickly 29:20

## R

R 1:15
Rachel 1:16 7:2
14:25 38:15
racial 34:9
radical 35:15,21
Rahul 1:13 3:7
14:18
raise 13:17
17:12 39:5
raised 8:23
24:15,21 27:24
raising 22:22
46:18
Rand 68:7,13
Ray 35:9,9,20
36:12 37:1
reached 30:11

ready 13:6 60:5
real 21:19 22:3
33:2
realize 67:4
really 25:2
reason 17:4 37:4
54:24 60:13
61:24 62:4,23
66:9,10
reasonable 9:19
23:5
reasonably
60:21
reasons 3:25
9:12 44:18,21
45:3,3 61:9
62:20 63:2
65:1
recall 42:11
49:21 50:24
51:7,14 57:5,6
57:8 64:2
receive 38:10
received 10:21
28:14 37:17
38:9 47:10
52:19
receives 36:22
recess 13:10
15:13,16,23
16:7 66:20,23
67:7,10
recognize 37:8
recognized
51:23
record 39:9
recorded 1:19
1:24
recording 1:24
68:3
RECROSS 2:11
REDIRECT
2:11
reference 6:17
10:16 16:13
referred 47:20
referring 4:24
49:11

regard 16:10,14
30:9
regarding 7:6,7
17:14 29:23
regards 50:1,13
65:11
regular 36:5
regulations 45:1
reimbursement
45:5 47:9 48:7
relate 10:7
related 31:5
41:21
relates 7:5 35:7
36:24
relating 16:11
Relations 29:13
31:1 52:8,11
54:8,17 56:8
relayed 51:4,12
relent 48:10
relevance 10:14
relevant 5:2,4
5:10,21,25
8:14 9:1,8,18
10:4,4 60:20
religion 23:24
remain 17:3
remaining 15:17
remember
29:24 32:15
removal 41:21
render 21:10
34:1
report 41:7
reported 8:9,9
26:4,8 29:6
42:2,5 49:5
reporting 42:9
reports 40:10
42:8
represent 38:16
representing
14:8,14,19
15:2
request 12:13
17:15
require 7:21

28:1
**required** 30:20
  33:16
**researchers**
  50:9
**reservation**
  49:15
**reservations**
  48:18
**reserving** 16:16
**resign** 61:4,14
**resignation** 61:5
  61:17,25
**resigned** 60:24
**Resources** 30:25
  32:3 43:11
  44:8 49:21
  56:8 61:6
**respect** 28:3
  51:5 56:15
**responded**
  27:21 50:22
**responds** 28:3
  31:12 61:2
**response** 30:16
  30:24 31:16
  51:4 58:8
**responses** 57:20
  57:25 59:10,11
  62:13
**responsibilities**
  34:20
**responsibility**
  36:12 37:6
**resume** 13:11
  16:8
**retaliate** 23:18
**retaliated** 9:20
  21:25 22:22
  24:5 27:12
  33:13
**retaliation** 3:12
  9:10,13 14:2
  23:12,20 31:7
  42:18
**reticence** 11:23
**retire** 20:10 28:1
**retirement**

27:25
**return** 15:18
**review** 52:6
  64:24
**reviewed** 52:7
  55:21
**reviewing** 44:9
  57:6
**reviews** 57:11
  57:16 63:11,18
  66:8
**Rhonda** 29:13
  29:23 30:2,11
  30:14,16 31:12
**Richard** 1:15
  4:15 14:24
  38:14
**rid** 8:21 21:22
  21:23
**right** 4:12 10:25
  11:6 13:5,14
  13:17 15:17
  16:2,19,25
  17:8,10,23
  18:1,22 19:4
  21:22 23:2
  39:5 40:10
  41:4 42:2
  43:20 44:15
  45:25 50:12
  52:22 53:2
  58:21 60:8
  64:7 65:15
**rise** 13:9 15:10
  15:14 19:7
  67:8
**road** 9:13
**ROBERT** 1:10
**role** 3:22 4:10
  9:2
**room** 15:13,18
  22:11 50:12,13
**rotating** 41:24
**rule** 3:25 6:18
  7:12 54:22
**ruled** 27:5
**rules** 45:1 56:7
**ruling** 16:16

**Ruth** 1:2 3:8,13
  8:9 13:23
  14:14,19 22:20
  22:21 24:9,9
  24:10,13,15
  25:19 26:16
  27:2,7,10,15
  27:16 28:1,5,8
  29:2,6,9,15,17
  29:23,25 30:5
  30:7,8,11,11
  30:14,17,18,24
  31:2,3,7,11,14
  31:18,21 32:14
  32:24 33:11,18
  34:1 42:2
  45:14,15 46:6
  46:7,12 55:2
**Ruth's** 28:1
  29:16 33:10

———————————
**S**
**Sandra** 29:11
  30:6
**Sandy** 30:3,3,5,8
  30:10,12,16,17
  30:18,18,24
  31:11,13 32:7
  32:13,24
**Satinsky** 1:16
  7:2,3 9:23
  10:19 11:1
  15:1 38:15
**save** 11:7
**saying** 44:3
  46:12,14,18
  47:8 49:8
**says** 5:20 28:2,8
  28:11 29:25
  31:11,12 53:6
  53:10,12,14,19
  54:10,12,21
  56:24 62:3
  64:23 66:9,23
**scales** 23:2
**scared** 9:10,11
  9:12,19
**science** 25:21,23

26:1 34:12
  36:2 37:19
  64:14
**Sciences** 26:12
  26:25 41:11
**scream** 45:10,16
  46:5
**screamed** 27:4
  45:12
**screaming** 45:19
  46:10,13,18
  47:14
**screen** 38:21
**scroll** 54:9 55:1
**scrolling** 54:20
**seated** 3:2 13:15
  13:19 14:20
  19:9
**second** 11:1,5
  15:18 64:17,19
  65:14
**see** 4:21 17:2
  21:13,14,14,15
  23:10 24:10
  26:20,20,21,25
  27:9,14 28:13
  28:25 29:9,14
  29:16,17 30:2
  30:7,10,12,14
  30:22 31:1,5,7
  31:9,13,20,21
  31:24 32:18,19
  32:20,22,24
  38:20,23 40:24
  46:17 53:5,18
  54:7,9,18
  57:13 59:4
  60:16 62:6
  63:20 65:9
**seeing** 3:21
**seeks** 60:20
**seen** 3:23 10:23
  22:13 30:18
  33:5 45:19
  55:24
**select** 13:21
**selected** 64:20
  65:1,2 66:5

**selection** 2:4
  11:15 15:7
**Senior** 64:14
**sense** 21:10
**sent** 54:17 58:5
**sentence** 62:6
  66:10
**separate** 47:19
  67:11
**sequestration**
  16:22
**series** 7:22
**seriousness**
  44:25
**serve** 20:22
**service** 1:25
  65:6
**services** 50:11
**Session** 1:9
  67:11
**set** 16:1 17:18
  17:22 18:17,23
  38:20 60:12
**settled** 7:19 10:9
  10:11
**seven** 65:25 66:2
**sex** 14:2
**She'll** 24:23
  25:13 26:4,9
**short** 12:19
**shortened** 12:13
**show** 5:10,12
  6:1,1 29:2,20
**showing** 21:8
  64:7
**shut** 33:20
**sic** 45:6
**side** 6:17 7:20
  10:17 17:2
  20:2,6 23:3
  40:23 58:5
**sidebar** 12:7,11
  59:4,6 60:4
**sideshow** 7:16
**signature** 52:1,4
  52:5 55:2,7
  65:15
**signed** 9:4 54:18

55:5
similar 37:1
simply 4:8 49:19
single 24:21
  36:16,22
sit 11:3 24:12
  43:14
sitting 27:18
  38:3 40:3
  49:14
situation 25:11
  29:1 30:25
  31:25 33:19
skills 25:7 65:3
  65:6
skin 23:23
slip 20:24
social 36:7
society 23:14,21
somebody 23:15
  23:16,17,17
  32:21 42:17,22
someone's 37:4
soon 18:14
sorry 43:16 48:1
  57:23 58:13
  59:7 63:23
sound 1:24 68:3
speak 28:5
  29:12
special 17:4
specific 5:14,15
specifically 4:23
  5:9,12,20
  29:18 32:16
spell 39:9
spend 23:9
spoke 29:10,13
  29:15
staff 30:20 45:7
Stamp 57:18
stamps 33:21
stand 11:3 14:9
  21:16,22 24:14
  27:1 37:25
  39:2
stands 34:7
start 19:10

started 25:19,25
  26:17,23 64:3
  66:15
starts 29:21
state 39:8
stated 8:16,21
  9:2 61:9
statement 2:7,8
  17:14 19:12,21
  19:22 20:17
  34:25 40:4
  47:5 62:12,12
  62:15 66:12
statements
  15:25 19:19
States 1:1,10
  23:15 24:3
  28:4 51:6
  56:15
stay 11:12 34:23
  50:5,6,18
  61:21 67:6
stellar 37:14
step 31:21 67:9
Stephen 1:12
Steve 14:15
stipulation
  52:23
stood 19:12
stories 21:5
story 33:2
Street 1:4,14,17
  34:8
stripes 34:13
strive 36:1
strong 34:8
  50:10
students 34:8
  45:13 46:5,11
stuff 22:2 31:17
stupid 27:4
  45:16
subject 3:15
  19:17 20:13
  60:25
subjective 5:4,7
  5:8,23
submit 5:3,24

6:21 38:9
submitted 58:8
subsidized
  33:20
succeed 35:5
sued 25:13
Suite 1:17
summary 65:20
supervising
  47:23,25
supervisor 26:4
  26:5 27:19
  28:2 43:11
  44:6 56:11
supervisors 3:21
  8:20
supporting
  55:14,18,21
  56:17
sure 12:14 18:12
  38:14 40:25
  52:10 56:6
  59:18 62:24
  66:21
surprise 27:22
surprised 12:10
suspensions
  26:21
sustaining 16:12
Swear 15:8
swore 58:13
sworn 13:18
  15:11 39:7
system 45:5 48:8
  48:12

———— T ————
tab 51:20 57:9
  57:13
table 14:25 17:5
  40:3
take 6:14,16
  10:15 13:16
  15:12,23 17:24
  21:21 27:1
  28:19 41:25
  43:15 54:16
  56:10

taken 9:24 13:10
  16:7 45:2
  67:10
takes 21:16
talk 22:12 23:7
  31:9,11,16,18
  31:18,19,21
  32:11 33:18
  50:20
talked 30:9,17
  31:12,13
talking 4:20
  5:15,16,17 8:6
  23:24,25 32:10
  32:18
talks 29:18 30:6
  31:14 32:14,16
Tanya 7:7 8:7
  8:13,13,17,21
  9:6,16,17,25
  10:13 16:11
task 47:2
Taylor 14:25
technically
  45:23
technology
  15:25 18:16
  25:22 26:1
  34:12 36:3
  37:19 64:14
teens 25:5
tell 24:22,23
  25:4,8,10,12
  25:13,14,15,24
  26:4,9 27:2,4,8
  27:16,20,21
  28:2,8,18
  31:18 32:1,5
  33:1 36:3
telling 9:9 21:7
  33:4 67:5
tells 28:7 30:2
Temple 1:6 3:12
  3:14,17,20,21
  4:3 8:8,17,18
  9:2,10 13:23
  13:24,25,25
  15:2 17:15

19:12 22:19
  24:14,24,24
  25:11,15,19
  26:2,10,17
  27:13 28:7,14
  29:2,10,12,13
  29:15,19 30:4
  31:4 32:15
  34:6,22 36:18
  38:12,16 39:22
  39:25 40:4
  50:11 58:1,5,8
  58:17 60:10,11
  60:22 61:2,8
  62:3,5,9,12,17
  63:8,19 64:1,3
  64:10 66:9,12
Temple's 60:18
ten-minute
  15:12,23
tenure 62:5,16
  66:12
terminate 3:22
  4:10 9:3 35:4
  43:3 44:16,17
terminated 3:15
  6:10 32:25
  41:14 42:12
  44:18,22 47:8
  60:14,23 61:8
  61:18 62:4,21
  66:11
termination 4:5
  9:4 25:17
  32:25 48:5,7
  48:16 49:17,24
  60:25 61:11
  62:8 63:8
terms 52:9
testified 9:4
testifies 37:9
testify 16:17
  34:19 35:3,6
  36:10
testifying 8:10
testimony 7:6,6
  8:15,24 16:14
  20:12 21:9

22:8,10 45:18
**thank** 10:19
13:4,7,19
14:20,23 15:3
15:3,6 16:6,20
17:8,9 18:20
18:24 19:2
20:18,21 34:1
38:12,13,16
39:14 53:2
57:21 60:2,6
**Thanks** 24:12
60:3,8
**they'd** 5:10
**thing** 6:19 20:25
26:15 56:6
62:3
**things** 5:21 6:11
18:19 21:3
22:12 32:17
33:25 48:17
**think** 5:9,11 6:4
6:12,21 18:18
18:23 19:2
**thinks** 5:19
**third** 65:13,19
**thought** 20:24
34:10
**three** 24:16
40:11,13,15
41:23 48:10,11
63:2
**throw** 15:21
**ticket** 49:13
**ties** 9:11
**tilts** 23:3
**time** 8:19 11:7
13:16 14:9
15:4,12,19
17:25 20:16,22
24:23 29:21
33:21 34:21
40:4 41:13
42:14 45:2
47:23 48:1
50:4,17 55:13
62:8 63:25
64:11 66:13,19

**timely** 47:4 49:5
**times** 26:5,14
35:8 49:2
62:19
**today** 49:14
**told** 28:10 29:8
50:2,22
**top** 53:18 63:22
**total** 24:16
25:16
**tough** 21:2,4
**Trachtenberg**
15:1 31:16
38:15
**track** 29:3
**transcript** 1:9
1:25 67:11
68:3
**transcription**
1:21,21,25
68:15
**Transcription...**
68:14
**Transcription...**
68:7
**transferred** 64:8
**transparency**
35:16,22 36:11
**transpired** 8:15
**trash** 15:21
**travel** 45:5 47:9
48:7,18
**treat** 23:15,17
23:22
**treated** 5:20 6:8
24:4
**treating** 31:15
**treatment** 31:6
**trial** 1:9 8:11
14:3 23:11
27:14 33:2,7
33:24 40:1
**trials** 21:12
**tried** 27:8
**true** 50:2 56:13
58:14 62:11,15
**truth** 21:7 33:4
**try** 31:8 40:25

**trying** 9:17 32:2
32:21
**turn** 18:25 51:18
51:20 57:9,15
63:10
**turning** 27:20
**TV** 21:13
**two** 7:4 17:21
32:17 42:11
44:13
**types** 10:3 50:10
**typically** 10:4,4

——————
### U
**ultimately** 7:19
8:17 9:20 21:9
22:9,16 24:18
25:2 26:7 31:3
31:22 32:13
**understand**
11:21 12:5,6,8
16:22 58:2,6
58:14 59:12
61:5
**Understood**
10:18
**underway** 19:18
**unduly** 60:19
**unemployment**
62:1
**Unfortunately**
21:12
**United** 1:1,10
23:14 24:3
28:3 51:6
56:15
**university** 1:6
3:12,14 13:23
13:24 14:1
15:2 17:15
19:13 22:19
24:14 26:2,17
29:2 34:6,11
34:14,17,22
36:18 38:12,16
39:22 40:18
44:25 48:8
61:2 63:19

65:6
**university's**
35:4
**unlawful** 22:22
27:13
**unnecessary**
7:22
**unprofessional**
55:11
**unprofessiona...**
54:23
**unpunished**
34:18
**upset** 47:9 50:8
**use** 21:10 61:24
**utilities** 33:20

——————
### V
**v** 1:2 6:20 13:23
13:23
**value** 35:1
**values** 35:12
36:19,19
**variably** 35:2
**various** 3:16 4:6
45:3 48:17
**verbal** 65:3
**verdict** 21:11
34:1
**verified** 58:11
**viable** 56:9
**violation** 33:16
54:22 56:9
**voice** 46:19
**voir** 10:16 11:11
11:13 12:12
14:3,4 19:11
**voluntarily** 61:3
**vs** 1:4
**vulnerable**
35:18

——————
### W
**W-a-c-k-e-r**
39:10
**Wacker** 2:13
5:17 8:10,10
8:20,20,25 9:5

9:7,14 15:1
16:24 28:6,7
29:7 39:2,7,10
39:20 44:2
51:18 57:13
60:10 63:4
**Wacker's** 9:18
**wait** 63:5
**waiver** 60:25
**walked** 49:18,19
55:16
**walking** 56:2,25
**Walton** 29:12
31:1,19 32:9
44:13,16 55:23
**Walton's** 44:9
52:8
**want** 5:13 8:21
11:3 24:8
26:16 29:20
32:7 38:12,13
42:11 43:14
49:1 56:12,12
62:22
**wanted** 16:21
**wanting** 43:17
**wants** 25:2
**Warning** 54:10
**wasn't** 36:6 63:4
**watching** 43:15
**way** 3:10 8:5
17:24 19:18
27:15 31:15
32:1,12 41:1
63:9 65:14
**we'll** 15:12,23
18:17 33:25
35:19
**we're** 4:20,20,24
8:6 10:10
11:20 12:4
18:4 21:1,2,3,4
21:7,9 22:6,7,9
22:14,16 23:7
23:24,25 28:3
33:8 56:15,15
60:5
**we've** 22:18

weigh 22:14
  33:3
well-known
  50:9
went 22:5
weren't 56:3
  62:19
whatsoever 3:22
  10:14
William 68:7
wish 3:25
witness 2:11
  20:1,1,3 21:16
  37:25 38:18
  39:7,10,12
  43:7,10 57:11
  57:16 63:11,18
  66:8
witnesses 7:10
  16:22 17:1,3
  17:17 19:25
  20:4,5 21:9
  34:19 35:2,6
  36:10 67:6
woman 7:7
  21:24 50:23
women 25:6
  27:23,23 28:1
  28:11 33:10
word 23:1,1
  61:17,25
words 9:11
  29:16 32:4,10
work 5:5,24 6:2
  6:15 24:3 25:9
  27:8 31:8
  35:22,23 45:21
  65:4
worked 24:23
  24:25
workforce 35:25
working 25:5,16
  25:19,25 26:10
  26:23 27:3
  28:14 36:3
  64:10
works 21:19
world 25:3

wrapped 21:13
wringer 32:12
write 49:5
write-ups 37:17
writes 30:18
  31:4
writeup 26:19
  53:5 56:13,20
  57:7
writing 9:11
  29:17 65:4
written 26:19
  28:15 29:8
  49:4,7 53:21
  53:23,24 54:2
  54:6,10,15,24
  55:10,13 56:25
  58:8,10,12,13
  58:13 62:19
  65:3
wrong 48:24,25
  48:25 49:2,7
  49:11 50:1,3
Wu 5:17 26:23
  26:24,24 27:3
  27:9,18,22,24
  28:2,10 29:6
  29:16,23 31:14
  33:9 36:25
  41:9 42:3,5
  44:6,13,16
  45:6,9,12,15
  45:19 46:5,10
  47:3,14,22
  48:19 50:8,21
  51:5 56:14
Wu's 52:5 55:7
  55:17

X

Y

yeah 13:3 40:25
  41:12 54:20
  60:1
year 21:20 40:17
years 3:14 24:1
  24:13 25:16,24

26:3,6,8,9,19
26:22 28:15
32:18 41:23
62:9,10 64:1
64:10
York 35:8

Z

0

1

1 1:9 60:11 62:6
  63:14,16,16
1:16-cv-248 1:3
1:30 67:7
10-plus 28:15
10:10 13:11
10:14 15:7
10:54 15:7
10:55 15:16
10:56 16:7
10th 51:10
11/11/11 2:18
11/9/2011 54:12
11:09 16:8
11th 51:24 54:19
  55:5,7
12:30 66:23
  67:10
13 2:4 3:14
  25:16 62:9
1400 1:17
14th 63:22
1525 1:14
16 1:5 2:5 68:12
1601 1:17
18 65:23
1880 1:22
19 2:6 66:4
19102 1:14,17
19103 1:23
19106 1:5
1990s 24:20
1st 4:5 32:14
  42:12 60:14,24

2

20 2:7
2001 25:20
  26:18
2005 63:23
  65:24 66:17,18
  66:18
2008 7:8
2009 26:9,18,22
2011 27:16,17
  28:14 29:8,22
  51:24 53:7,17
  56:21
2014 3:15 4:6
  32:14 41:13
  42:2,5,8,11,12
  60:14,24 63:22
2018 1:5 21:20
  68:12
25 38:2

3

3 2:3 50:20
  51:20 57:23
34 2:8
341 68:13
35,000 34:8
39 2:13

4

401 3:25 7:12
402 7:12
403 7:13

5

50 24:1
51 23:3
52 2:18
55 27:23 50:23
57 27:21 28:11
  50:22

6

60 33:22
601 1:4
60th 25:17
62 57:9,13
63 24:13
6th 1:22

7

7 18:5 57:15
7:45 18:8,11,14

8

855)204-8184
  1:23

9

9:11 3:1
9:23 13:10
9:30 13:8
90s 25:5
9th 27:17 51:13
  53:7,17 54:18
  56:20