1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

RUTH V. BRIGGS,                .
                              . Case No. 1:16-cv-248
            Plaintiff,        .
                              .
      vs.                     . 601 Market Street
                              . Philadelphia, Pennsylvania 19106
                              . July 16, 2018
                              .
TEMPLE UNIVERSITY,            .
                              .
            Defendants.       .
. . . . . . . . . . . . . . .
              TRANSCRIPT OF TRIAL
            DAY 1 - P.M. SESSION
    BEFORE THE HONORABLE ROBERT F. KELLY
        UNITED STATES DISTRICT JUDGE
                AND A JURY

APPEARANCES:

For the Plaintiff:          Laura Carlin Mattiacci, Esq.
                            Stephen G. Console, Esq.
                            Rahul Munshi, Esq.
                            CONSOLE MATTIACCI LAW, LLC
                            1525 Locust Street
                            Philadelphia, Pennsylvania 19102


For the Defendant:          Richard R. Harris, Esq.
                            Rachel Fendell Satinsky, Esq.
                            LITTLER MENDELSON, PC
                            1601 Cherry Street, Suite 1400
                            Philadelphia, Pennsylvania 19102




Audio Operator:             Electronically Recorded
                            by Court Personnel
Transcription Company:      JDR Acquisition, LLC./
                            Advanced Transcription
                            1880 John F. Kennedy Boulevard
                            6th Floor
                            Philadelphia, Pennsylvania 19103
                            (855)204-8184


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

```
 1                    INDEX


 2
                                              PAGE

 3
     STIPULATION RE:  BIFURCATION                 3

 4


 5
 6   WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

 7
 8   FOR THE PLAINTIFF

 9
10   GREGORY WACKER         6     20      40

11
12   JIE WU                50    101    115      119

13
14
15
16
17
18
19   EXHIBIT                           IDENT.  EVID.

20
21   D-4       Transfer from Dean's Office         26

22   D-8       3/26/13 Disciplinary Notice         31

23   D-9       1/20/14 Disciplinary Notice         32

24   D-72      11/17/10 Email, Wu to Human Resources  103

25
```

3

```
 1                     AFTERNOON SESSION

 2          (Proceedings resume after Luncheon Recess at 1:33 p.m.)

 3          (Call to order of the Court)

 4          (Jury not present)

 5              THE COURT:  All right.  Be seated.

 6              Bring the jury in.

 7              MS. MATTIACCI:  Your Honor?

 8              THE COURT:  Yes.

 9              MS. MATTIACCI:  We just wanted to put a stipulation

10     on the record, real quick.

11              THE COURT:  All right.

12              MS. MATTIACCI:  Is that okay?

13              We -- the parties have agreed that we're going to

14     bifurcate the trial in terms of punitive damages.  So, we

15     just wanted to state that because this would be the witness

16     in which we would elicit testimony concerning the financial

17     net worth of Temple University, but we were agreeing to

18     stipulate to bifurcate that information.

19              MR. HARRIS:  So stipulated, Your Honor.  So

20     stipulated.

21              THE COURT:  How are you going to bifurcate it?  I

22     don't understand.

23              MS. MATTIACCI:  Well, normally, there would be a

24     question that goes to the jury on the original jury form that

25     would be the liability question on punitive damages and if
```

4

1   they say yes to liability, there would be a second phase, a

2   short second phase, in which just the financial data is

3   entered and usually just brief closing arguments on why

4   punitive damages should be assessed at a certain amount and

5   then the jury deliberates to assess the amount of punitive

6   damages.

7           If, on the original verdict sheet, they say no as

8   to the liability question on punitives, then we don't get to

9   the second phase in terms of the amount.

10          THE COURT:  That's fair.

11          MR. HARRIS:  So stipulated.

12          THE COURT:  So, what do we do?

13          MS. MATTIACCI:  So, what would happen is if the

14  jury does come back with yes on punitive damages, then we

15  would call back Mr. Wacker to the stand just for purposes of

16  doing -- stipulating to the net worth of Temple, unless

17  Temple can just agree to a number, then we just give the jury

18  the number and we don't need a witness.

19          MR. HARRIS:  As this Court probably anticipated, I

20  will be moving at the conclusion of the Plaintiff's case to

21  remove that question from the jury.

22          THE COURT:  That's a different matter.  All right.

23          MS. MATTIACCI:  Okay.

24          UNIDENTIFIED:  Can we please move this easel for

25  the jury?

1          MS. MATTIACCI:  Oh, yes.

2          THE COURT:  And I don't want you -- we're not going

3     to watch you taking notes on that anymore.  If you have -- if

4     it's that important to you, have an associate take the notes.

5          MS. MATTIACCI:  Okay.  If -- we can do that.  That

6     would be great, Your Honor.  If there are things we just

7     think are important that later on is -- are going to be

8     important when other witnesses come in, so ...

9          THE COURT:  Yeah, but you can always fill that in

10    and out in accordance with what the testimony was.

11         MS. MATTIACCI:  Okay.

12         THE COURT:  I just don't want to sit here and watch

13    you take notes and nothing's happening.

14         MS. MATTIACCI:  Okay.  Thank you.

15         THE COURT:  One of the jurors is not there.

16         MS. MATTIACCI:  Your Honor, could my co-counsel

17    write on it while I'm asking questions?

18         THE COURT:  Sure, yes.

19      (Pause in proceedings)

20         THE COURT OFFICER:  The juror is on the 11th floor

21    now, Judge.  She should be here at any minute.

22         THE COURT:  Okay.

23      (Pause in proceedings)

24         THE COURT OFFICER:  All rise.

25      (Jury present)

6

1          THE COURT:  You may be seated.

2          All right.  You may continue.

3    GREGORY WACKER, WITNESS FOR THE PLAINTIFF, PREVIOUSLY SWORN,

4    RESUMES STAND.

5                   CONTINUED DIRECT EXAMINATION

6    BY MS. MATTIACCI:

7    Q    Mr. Wacker, now, there's no dispute that Ms. Briggs

8    never received a single performed deficiency write-up, prior

9    to the one that she received, that is dated November 9, 2011,

10   correct?

11   A    I do not know that.

12   Q    Do you know of any before that time?

13   A    Not that I'm aware of.

14   Q    When Ms. Briggs came to talk to you about Dr. Wu saying

15   to her, We put women out to pasture at age 55 in China, you

16   understood that she was relating to you a complaint of sex

17   and age discrimination, correct?

18   A    No, because it was in the context of a whole group of

19   people there.  She was blurting out a statement that might

20   have been said, but, yes, if it was in a different context,

21   it could be construed as that, yes.

22   Q    Isn't it true that when an employee relays to you a

23   complaint of sex or age discrimination or race

24   discrimination, that you refer that employee, then, to Sandy

25   Foehl, who is the equal employment office employee?

1   A    Yes.

2   Q    Okay.  And isn't it true that when Ms. Briggs relayed to

3   you what Mr. -- what Dr. Wu said to her about putting women

4   out to pasture in China, that you then referred her to go

5   speak with Sandy Foehl in the EEOC office -- EEO office?

6   A    I may have.

7   Q    And you did that because you believed that she was

8   relaying to you a complaint of sex and age discrimination,

9   otherwise, you wouldn't have sent it to Sandy Foehl, correct?

10  A    She did not convey it as a complaint.  It was a comment

11  that she had made and if she made it as that, I would advise

12  her to go to Sandy Foehl.

13  Q    If Dr. Wu, in fact, said, We put women out to pasture

14  when they turn 55 in China, would that be an appropriate

15  thing for him to say?

16  A    I don't know the context in what that was said as, if it

17  was said as a part of cultural differences, which we have a

18  lot of diversity within Temple with cultural differences.  If

19  it was said in that context, it would not be.

20  Q    But you did not know?

21  A    I did not know, yes.

22  Q    And you didn't do anything to investigate it, correct?

23  A    If I did anything, it would have been tell Ruth to see

24  Sandy Foehl.

25  Q    Who's in charge of handling complaints of sex and age

1    discrimination, correct?

2    A    Yes.

3    Q    Isn't it true that after Ms. Briggs appraised Dr. Wu in

4    that conversation in which she said, With all due respect,

5    we're not in China; we're in the United States, that Dr. Wu

6    didn't want to work with Ms. Briggs anymore?

7    A    Not that I'm aware of.

8    Q    Isn't it true that within two months of that comment,

9    you encouraged Ms. Briggs to apply for jobs outside of that

10   department?

11   A    Ruth would continually talk to me for advice on

12   different things and if she was unhappy in her position, she

13   would be encouraged to apply for opportunities elsewhere

14   within the university, as I do to my own employees who report

15   to me, of which many have stepped up to higher-level

16   positions and been promoted.

17   Q    My question was just that within two months of this

18   conversation, you encouraged Ms. Briggs to apply for

19   positions outside of Dr. Wu's office, correct?

20   A    I don't know what the time frame on that was, but it's

21   consistent with what I would tell her if she was unhappy with

22   her position.

23            THE COURT:  But do you have a specific recollection

24   of that to her?

25            THE WITNESS:  I do have a specific recollection of

1    telling her to apply for opportunities outside, you know, of

2    our department.

3    BY MS. MATTIACCI:

4    Q    And that was within two months of the conversation about

5    when Dr. Wu said, We put women out to pasture at 55, correct?

6    A    I don't recall the exact timing of that.

7    Q    Okay.  I'd like you to take a look at defendant's

8    document D-47.  Just look at the first page of that document

9    and read to yourself that, you know -- let me know if that

10   refreshes your recollection that within two months of the

11   conversation in which Dr. Wu told her, We put women out to

12   pasture at 55, you encouraged her to apply for positions

13   outside of Dr. Wu's department?

14   A    Yes, this was within that time frame.

15   Q    And isn't it true, also, in January of 2012, that you

16   told Ms. Briggs that you would be happy to provide a

17   reference to her?

18   A    Yes.

19   Q    So, as of 2012, she must not have had such horrible

20   performance issues because you were happy to provide a

21   reference for her so she could get a job outside of Dr. Wu's

22   department, correct?

23   A    No, it was just a thing that I would do to help people

24   find another job.

25   Q    You would do that even if she had such significant

10

1    performance issues that you would put your name on a letter

2    of reference for her?

3    A    It would depend what the position would be and where it

4    would be and what it would be dealing with.

5    Q    Well, how about specifically with Ms. Briggs situation,

6    you'd agree with me that as of 2012, she did not have

7    significant performance issues to the point where you would

8    not sign off on a reference letter, correct?

9    A    No, she did have significant performance issues.

10   Q    So, even though she has significant performance issues

11   as of 2012, you said that you would be happy to provide a

12   reference to her?

13   A    Yes.

14   Q    And pass her off to another department at Temple?

15   A    Yes now.

16   Q    Now, besides the disciplinary write-up that occurred an

17   November 9th, 2011, two months before that on the same day of

18   the "putting out to pasture" comment, are there any -- was

19   there any other documentation of poor performance as of that

20   time?

21   A    I'm not sure what was in documentation form.

22   Q    Let me just ask you if this statement is true or false:

23   Wu requested Ruth be terminated.  Is that true or false?

24   A    False.

25              MS. MATTIACCI:  Can you put false up there, please.

11

1           UNIDENTIFIED:  Uh-huh.

2           MS. MATTIACCI:  Your Honor, may I approach the

3    witness with his deposition?

4           THE COURT:  Yes, please.

5    BY MS. MATTIACCI:

6    Q    I would like you to turn to Page 48 of your deposition.

7    Are you there?

8    A    I believe so.

9    Q    Okay.  Now, before we get to the specific content, what

10   I just handed you was the transcript of the deposition that

11   was taken of you on June 29th, 2017, correct?

12   A    Yes.

13   Q    And that was just about a year ago -- a little over a

14   year ago?

15   A    Yes.

16   Q    And in that deposition you were asked questions and you

17   gave answers, correct?

18   A    Yes.

19   Q    And those answers that you gave at that time, they were

20   under oath, correct?

21   A    Yes.

22   Q    An oath to tell the truth?

23   A    Yes.

24   Q    And the same oath that you took before you testified

25   today?

12

1   A    Yes.

2   Q    Now, turn to Page 48.  Here we go.  Okay.  Can you -- go

3   down to Line 21.  The question was asked of you at your

4   deposition:

5        "Did you express to Deirdre Walton" --

6        That's the HR person, correct?

7   A    Yes.

8   Q    "-- that it was Dr. Wu's request to terminate Ruth

9   Briggs?"

10       Do you see that?

11  A    Yes.

12  Q    And last year when your deposition was taken, you said,

13  Yes, correct?

14  A    "I would say yes."

15  Q    "I would say yes," correct?

16  A    Yes.

17  Q    But today you want to change your testimony and today

18  you deny it?

19  A    No, Dr. Wu requested that I take the appropriate

20  disciplinary action at Ruth for her work inefficiencies and

21  those work inefficiencies led to the classification of the

22  termination under Temple University work rules.  So, Dr. Wu

23  did not say, Terminate her.  He said, Here are the

24  violations, what are the work rules?

25       And the work rules led to termination, at which point

13

1    Dr. Wu would have then most likely been asked by Drew, Have

2    you -- are you okay with this?

3    Q    But the question was simple:  Did you express to Deirdre

4    Walton that it was Dr. Wu's request to terminate Briggs --

5    Ruth Briggs, and you're saying that it was not Dr. Wu's

6    request to terminate Ruth Briggs now?

7    A    Through the process of the disciplinary action that was

8    being handed up to HR, the discipline out of that is

9    termination and Dr. Wu was okay with the termination.

10   Q    But you're saying he didn't request for her to be

11   terminated?

12   A    He requested for the appropriate disciplinary action to

13   be taken, which may include up to termination.

14   Q    So, what you testified to in your deposition is not

15   true?

16   A    No, it is true.

17   Q    I don't think it can be both, Mr. Wacker?

18        MR. HARRIS:  Objection; argumentative.

19        THE COURT:  Sustained.

20   BY MS. MATTIACCI:

21   Q    Now, is it your position that Ms. Walton, who is the HR

22   person, never relayed to you that Ms. Briggs was complaining

23   about a hostile work environment?

24   A    I don't recall.

25   Q    So, she may have relayed to you Ms. Briggs' complaint of

14

1  hostile work environment?

2  A    I -- I don't recall.

3  Q    Is it your position that Ms. Walton never relayed to you

4  Ms. Briggs' complaints of sex and age discrimination?

5  A    I don't recall her conveying them to me.

6  Q    Is it your position that Ms. Walton never relayed to you

7  Ms. Briggs' complaints of retaliation?

8  A    I don't recall.

9  Q    Isn't it true that you helped to draft the termination

10  letter of Ms. Briggs?

11  A    Yes.

12  Q    Okay.  And this termination letter that you drafted was

13  April 1st, 2014, correct?

14  A    Yes.

15  Q    That says, Over the last week, we have investigated two

16  work-related items that were brought to the dean's attention

17  -- dean's office -- dean's office attention, specifically.

18  And then it talks about the first one is the expense not

19  being put in correctly?

20  A    Yes.

21  Q    And then the second one was booking a room for the

22  professor, but the professor did ultimately sleep in a hotel

23  room that night in Philadelphia, correct?

24  A    Yes.

25  Q    Okay.  And then for those two issues, she was issued

15

1    C-4, negligence, careless, and C-3, disruptive or disorderly

2    conduct, correct?

3    A    Correct.

4    Q    And under Temple's policies, you're aware that

5    discipline or infractions of their discipline policy come in

6    either level A, B, C, or D.  Isn't that correct?

7    A    That is correct.

8    Q    And in order for termination to happen, you have to have

9    two Level-C violations within a 12-month period.  Isn't that

10   correct?

11   A    I believe so.

12   Q    So, in order to terminate her, these were the two

13   reasons that were stated that led to her termination?

14   A    I believe so.

15   Q    Now, when deciding to terminate Ms. Briggs, you did not

16   take into account her complaints of sex discrimination, age

17   discrimination, retaliation, and hostile work environment,

18   correct?

19   A    Can you repeat that question?

20            THE COURT:  Did not take into consideration those

21   things?

22            MS. MATTIACCI:  Yes.  Let me restate it.

23            THE COURT:  Well, why --

24   BY MS. MATTIACCI:

25   Q    Did the facts -- when you made this decision to

16

1  terminate Ms. Briggs, did you do anything to ensure that the

2  decision was not being made in retaliation for complaints

3  made by Ms. Briggs?

4  MR. HARRIS:  Objection, Your Honor.  I believe Mr.

5  Wacker has already stated on numerous occasions that he did

6  not make the termination decision.

7  THE WITNESS:  Yeah.

8  THE COURT:  Sustained.

9  BY MS. MATTIACCI:

10  Q   Okay.  So -- but you helped to draft this termination

11  letter, correct?

12  A   Yes.

13  Q   And you signed the termination letter, correct?

14  A   Yes.

15  Q   So, when you drafted the termination letter and signed

16  the termination letter, before you did that, did you do

17  anything to ensure that this decision to terminate was not

18  effected by a biased retaliation?

19  A   It would have been gone back to Labor Relations for a

20  review and confirmation that, indeed, we should proceed.

21  Q   Did you do anything, is my question?

22  A   No.

23  Q   And did you do anything before you signed this letter

24  and drafted this letter to ensure that the decision to

25  terminate was not effected by bias for an older female worker

17

1    or against an older female worker?

2    A    I had no knowledge of any of that being in the equation

3    at all.

4    Q    So, you did not know at the time that you signed this

5    that she had made any complaints of age or sex

6    discrimination?

7    A    Not that I'm aware of.

8    Q    Now, have there been any other claims of sex

9    discrimination brought against the department where you work

10   in, specifically concerning you?

11   A    Not that I'm aware of.

12           MR. HARRIS:  Your Honor, may I see you at sidebar?

13           THE COURT:  Yeah.

14       (Sidebar)

15           MR. HARRIS:  Your Honor, I'd object to this line of

16   inquiry.  It seems --

17           THE COURT:  This was asked --

18           MR. HARRIS:  It's the implication --

19           MS. MATTIACCI:  It's not.  There's a -- this was

20   testified to in Walton's --

21           THE COURT:  Now, wait a minute.  Your question was

22   as to by him?

23           MS. MATTIACCI:  Yeah.  Yep.  Is there a claim of

24   sex discrimination against him.  It's a difference and so --

25           MR. HARRIS:  I don't believe you said -- I don't --

1    if you said "him," I didn't hear that.

2              MS. MATTIACCI:  Against him.

3              THE COURT:  That's what she said.

4              MR. HARRIS:  Oh, she said, "Against him"?

5              THE COURT:  I was surprised --

6              MS. MATTIACCI:  He was in the -- Deirdre Walton

7    will testify to it and she testified to it in her deposition.

8              THE COURT:  All right.

9              MR. HARRIS:  I don't have any objection to that.

10        (Sidebar concluded)

11             THE COURT:  Repeat your question, please.

12   BY MS. MATTIACCI:

13   Q    Mr. Wacker, are you aware of any claims of sex

14   discrimination that were brought against, specifically,

15   meaning you?

16   A    Not that I'm aware of.

17   Q    Now, as the finance administrator of Temple, you would

18   be aware, then, of the amount of grant money that Dr. Wu is

19   responsible for bringing into the university, correct?

20   A    Yes.

21   Q    How much money does Dr. Wu responsible for bringing in?

22   A    I don't recall the exact number -- a million dollars.

23   Q    A million dollars?

24   A    Approximately.

25   Q    And if Dr. Wu was fired, that grant money that he brings

1  in would not be brought into Temple if it's the grant on his

2  name, correct?

3  A     Not necessarily.  Under the grant rules, Temple

4  University has the ability to retain those grants if they can

5  show that they have somebody that is as qualified as Dr. Wu

6  to retain those grants and complete the work.

7  Q     In terms of his stature at -- in Temple, he was at that

8  time, the chair of the Computer and Information Science

9  Department in 2014, correct?

10  A     Yes.

11  Q     And he often traveled to China in part of his research

12  and the papers that he wrote, correct?

13  A     Yes.

14  Q     And he often, when he was in China, would handpick

15  Chinese students to bring back to China -- I mean bring back

16  to the United States as his graduate students.  Isn't that

17  correct?

18  A     I'm not aware of that.

19  Q     Okay.  And you would agree with me that if Dr. Wu were

20  terminated, any future grant money that he may have brought

21  in would be a loss to Temple, correct?

22  A     That would be correct, yes.

23         THE COURT:  Is that it, then, with this witness?

24         MS. MATTIACCI:  Yes, Your Honor.  No further

25  questions.

20

1          THE COURT:  Do you have any questions at this time?

2          MS. SATINSKY:  I do, Your Honor.

3          MR. MUNSHI:  Your Honor, may I step away to see if

4  the next witness is outside --

5          THE COURT:  Sure.

6          MR. MUNSHI:  -- while counsel is conducting the

7  examination?

8                    CROSS-EXAMINATION

9  BY MS. SATINSKY:

10  Q    Good afternoon, Mr. Wacker.

11  A    Good afternoon.

12  Q    Counsel asked you about this document earlier -- these

13  were defendant's interrogatory responses -- have you ever

14  seen this document before today?

15  A    No.

16  Q    Do you know who prepared this document?

17  A    No.

18          THE COURT:  You're just showing him one small

19  segment.

20  BY MS. SATINSKY:

21  Q    Mr. Wacker, if you would, take a look through this

22  document.  I believe it's Plaintiff's Exhibit 62 in the

23  binder and it should also come up for you on the screen.  So,

24  take a look through this and let me know if you've ever seen

25  this before today.

21

1   A    Which one is it in, the Plaintiff's?

2   Q    Yes.

3   A    Okay, 62.

4   Q    It should also be on the screen in front of you.

5   A    Okay.  I don't believe I've seen this document or know

6   who generated this document.

7   Q    Thank you.

8        MS. SATINSKY:  Can you please pull up 51.

9   BY MS. SATINSKY:

10  Q    Mr. Wacker, did you testify about this document earlier?

11  A    Yes.

12  Q    What is the date on this document?

13       MS. MATTIACCI:  Objection, Your Honor; asked and

14  answered.

15       THE COURT:  I don't know if --

16       MS. SATINSKY:  Your Honor, I simply asked him what

17  the date is.  I'm going to ask him one or two other questions

18  about this document.

19       THE COURT:  Okay.  Overruled.

20       THE WITNESS:  It issued February 14th, 2005.

21  BY MS. SATINSKY:

22  Q    What position was this for?

23  A    An executive assistant senior coordinator for the

24  department -- that would have been coming into the dean's

25  office.

22

1   Q    Was this the position under Dr. Wu that Ms. Briggs had?

2   A    This was not, no.

3   Q    Mr. Wacker, can you please provide us with your

4   educational background.

5   A    A Bachelor's in Business Administration.

6   Q    What position do you currently have at Temple?

7   A    Assistant dean, finance and administration.

8   Q    Can you tell us a little bit about your job.

9   A    I basically handle all of the finances for the college,

10  the operating budget, the grant budgets; administratively,

11  I'll handle the purchasing, payroll information, hiring,

12  compliance with university policies and procedures and other

13  administrative responsibilities.

14  Q    How long have you worked in the Department of Business

15  and Finance?

16  A    I've been with Temple for approximately 15 years.

17  Q    Do you know the plaintiff, Ruth Briggs?

18  A    Yes.

19  Q    How do you know her?

20  A    She started working in the Neurovirology Department,

21  which falls under College of Science and Technology and she,

22  at some point, she, based on this position that was

23  previously identified, she applied for and was selected to go

24  into that position to work in the dean's office.

25  Q    Did you work in the dean's office at that time?

23

1  A    Yes.

2  Q    What was your experience working with Ms. Briggs when

3  she worked in the dean's office?

4  A    At times it would be challenging.  It's a high -- you

5  know, it's a high, fast-paced environment and the ability to

6  make decisions and multitask is great and at times, she had

7  challenges with those, with doing all those items.

8  Q    How was her attitude?

9  A    The attitude was good.  She's a likable person, but as

10  for the output and the work, there was often challenges with

11  the work in getting it done in a timely manner.  It's because

12  she would get distracted easily.

13  Q    Did you speak with her about her performance or

14  attitude?

15  A    Quite often, you know, Ruth would talk and seek advice.

16  Situations would arise and I would try to tell her to stay

17  focused, prioritize, you know, and communicate with your

18  boss, as necessary.

19  Q    When she worked in the dean's office, were you her

20  supervisor?

21  A    No.

22  Q    Do you know Dr. Wu?

23  A    Yes.

24  Q    When did you first meet Dr. Wu?

25  A    When he came in as chair for the Department of Computer

24

1    Information Sciences.

2    Q    How's your experience been working with Dr. Wu?

3    A    Can you repeat that?

4    Q    Sure.  How was your experience working with Dr. Wu?

5    A    My experience has always been very good, very cordial.

6    He's busy with a lot of activity and items going on and he

7    does reach out to you when he needs help with items and if he

8    needed anything from the dean's office, he would reach out

9    and ask and we'd be happy to help him.

10   Q    Have you ever witnessed Dr. Wu yelling?

11   A    I have not.

12   Q    Have you ever heard Dr. Wu make any comments you found

13   objectionable?

14   A    I have not.

15   Q    How did Ms. Briggs come to work for Dr. Wu?

16   A    While working in the dean's office, I guess there was

17   several performance issues that kept coming up, repetitive

18   performance issues that kept coming up and Dr. Wu had

19   indicated that he needed a high-level administrative person

20   to help him with his manuscripts and doing his travel and

21   communication with external people.

22        And the dean at the time, you know, suggested that we

23   see if we could get Ruth to go over into that position, as

24   opposed to firing her or taking some other type of action.

25   Q    Do you know why the dean made that decision?

25

1  A    Because I believe he also had challenges with the work,

2  with Ruth not meeting deadlines and getting travel items

3  correctly.

4  Q    Do you know why the dean didn't terminate Ms. Briggs'

5  employment at that time?

6  A    Off of the top, I do not know.

7  Q    Was Ms. Briggs well-liked when she worked in the dean's

8  office?

9  A    Yes.  Yeah, she -- she was very nice, cordial, people

10  liked her.  At times, you'd find her sitting on the floor

11  potting plants to make the office look a little nicer, but

12  people generally enjoyed interacting with her from that

13  perspective.

14  Q    How was she like as a worker?

15  A    As a worker, like I said, when she had to multitask or

16  have deadlines, she would not stay focused on those deadlines

17  and get the task at hand that needed to be handled.  She

18  would get distracted and worry about other people's

19  responsibilities or other items that weren't under her

20  purview.

21        MS. SATINSKY:  Could you please pull up Exhibit

22  D-4.

23  BY MS. SATINSKY:

24  Q    Mr. Wacker, what is this document?

25  A    This is a reassignment of Ruth to the Computer

26

1    Information Science Department that went through the Human

2    Resources Department.  At that time when we wanted to do

3    that, we kicked up -- sent them a full job description

4    saying, Here's what we want, and we just want to transfer

5    Ruth from the dean's office to the Computer Information

6    Science Department and this is Human Resources approving it.

7              MS. SATINSKY:  Your Honor, I'd like to move for the

8    admission of Exhibit D-4.

9              MS. MATTIACCI:  There's no objection, Your Honor.

10             THE COURT:  It may be admitted.

11        (D-4 received in evidence)

12   BY MS. SATINSKY:

13   Q    As a result of the transfer you mentioned, did Ms.

14   Briggs pay change?

15   A    No, despite the job being a level down, her salary was

16   not adjusted downward; it was left where it was.

17             MS. SATINSKY:  Could you please turn to Page 2 of

18   this document.

19   BY MS. SATINSKY:

20   Q    And Mr. Wacker, what were some of Ms. Briggs' job

21   responsibilities working for Dr. Wu?

22   A    It would be to provide administrative support, helping

23   with his manuscripts, letters, also answering phones, helping

24   grant applications, and various other administrative

25   functions -- booking travel, hotels, airlines.

27

1    Q    Initially, when Ms. Briggs went to work for Dr. Wu, how

2    was her performance?

3    A    Initially, it was okay and then after a couple months,

4    there started to be some challenges with things not getting

5    completed in a timely manner and done on time.

6    Q    Did Dr. Wu breeze [sic] those issues with you?

7    A    Occasionally he would mention it and at that point what

8    I would do is I had an individual who worked for me that I

9    put in to mediate and follow up with Ruth and Dr. Wu to make

10   sure they were able to work together and solve any problems

11   that might arise.

12   Q    Who would be that person?

13   A    That would be Drew DiMeo.

14   Q    Why did you choose Mr. DiMeo?

15   A    He worked directly for me and was capable, competent.

16   He's an assistant director to me, at which point he was able

17   to understand and interact with HR and the Department and

18   Ruth and Dr. Wu and kind of mediate whenever there was a he

19   said/she said type of situation.

20   Q    How frequently did you address issues between Dr. Wu and

21   Ms. Briggs?

22   A    When she first started, they were frequently and once I

23   put Drew in place, he was the one that was mediating a lot

24   and I think he was regularly meeting.  I believe they even,

25   at one point, set up weekly meetings to go over what work was

28

1   necessary, what needed to be done, what time frame, and help

2   make sure that both, Ruth knew and Dr. Wu knew when something

3   was going to be completed.

4   Q    Did you ever personally address Ms. Briggs' deficiencies

5   with her?

6   A    Occasionally she would talk and, again, she would get

7   frustrated that Dr. Wu, you know, might have been upset that

8   she didn't complete something in a timely manner and she

9   would come in and I would say, Ruth, you've got to stay

10  focused.  You've got to stop worrying about other people and

11  other people's responsibilities and focus and prioritize.

12  Q    Other than Ms. Briggs' comments to you about Dr. Wu, did

13  anyone else at Temple come to you about Dr. Wu?

14  A    No.

15  Q    Has anyone else at Temple come to you about Dr. Wu?

16  A    No.

17  Q    Are you typically involved in discipline within the

18  college?

19  A    In my general role, I'm a facilitator.  I usually don't

20  get involved until it's escalating up to the discipline

21  level, at which point, it's all I really want to do is make

22  sure that the appropriate university work rules are being

23  followed and if it is a violation, it's which violation it is

24  and all of that then gets handed off to Human Resources to

25  the Labor Relations Group for them to hash out with Drew and

29

1  the supervisor and HR to determine, once again, what the

2  infraction is.  And at that point, he usually comes back to

3  me just to confirm that, okay, we're okay to go with this.

4          MS. SATINSKY:  Could you please pull up Exhibit

5  D-7.

6          Counsel, I believe this was already admitted as

7  P-3.

8  BY MS. SATINSKY:

9  Q    Mr. Wacker, what is this document?

10 A    It's a Temple University disciplinary report.

11 Q    How did this situation come to your attention?

12 A    It would have been brought to me through, you know, Dr.

13 Wu, indicating that an incident happened or if Drew was

14 involved at the time, it would have filtered through him.

15 Q    Did you have a role in issuing this discipline?

16 A    It would be the same role that I've always had in all

17 the discipline.  I make sure that the information is

18 gathered, sent up to Labor Relations, that Labor Relations

19 agrees with, you know, the infraction and the appropriate

20 coding of that violation and then, you know, it just runs by

21 me to say, Okay, everybody's onboard then, okay.

22 Q    Mr. Wacker, earlier you testified that there were

23 occasions in which Ms. Briggs had deficiencies that she

24 wasn't disciplined for.

25 A    Yes.

30

1    Q    Why wasn't she disciplined for those?

2    A    Some of the times they were brought in, you know, well

3    after the fact, you know, several months after the fact and

4    so, three or four or five items that would come in and, you

5    know, my answer, along with checking with Labor Relations is

6    that this is too far after the fact.  You can't have a work-

7    rule violation and then try to take discipline three, four

8    months after the fact.  It has to be ideally within the same

9    week, but sometimes it might take a little bit longer than

10   that, depending upon the communication going back and forth

11   between Labor Relations and Drew and/or the supervisor.

12   Q    Any other reasons?

13   A    Any other reasons?

14   Q    I'm sorry.  Any other reasons that you had testified

15   earlier that Ms. Briggs wasn't disciplined for certain

16   incidents, any other reasons why, other than what you've

17   testified to?

18   A    Yeah, I know when she was in the dean's office, there

19   was -- were items that weren't disciplined.  I was just the

20   supervisor.  I wasn't aware of those issues until well after

21   the fact and at that point, there was nothing that could be

22   done.

23        MS. SATINSKY:  Could you please turn to Exhibit

24   D-8.

25   BY MS. SATINSKY:

31

1    Q     Mr. Wacker what is this document?

2    A     Temple University disciplinary report for Ruth.

3           MS. SATINSKY:  Your Honor, I'd like to move for the

4    admission of this Exhibit D-8.

5           THE COURT:  Any objections?

6           MS. MATTIACCI:  No objection, Your Honor.

7           THE COURT:  It's admitted.

8     (D-8 received in evidence)

9    BY MR. HARRIS:

10   Q     Mr. Wacker, how did this situation come to your

11   attention?

12   A     It would come to me through either Dr. Wu or Drew or a

13   combination of the two, as has been the process that I've

14   been using.

15   Q     What is the date on this document?

16   A     This is March 26th, 2013.

17   Q     What type of discipline was this?

18   A     It was a Category C:  Neglecting job duties,

19   responsibilities, or failing to carry out instructions given

20   by a supervisor.

21   Q     What did this situation relate to?

22   A     I think this related to the booking of the hotel and not

23   having the right dates, but Drew and HR should have the

24   supporting documentation that would support that.

25   Q     Were you involved in issuing this discipline?

32

1    A     In the same role as facilitating all the other

2    discipline throughout the college, I would just make sure

3    that the information was gathered, sent to Labor Relations,

4    verified, and once it came back, I would be involved in that

5    process.

6    Q    Did you designate the category for this violation?

7    A    When we send these out, we might suggest the category,

8    but Labor Relations defines the ultimate category.

9    Q    At any time during Ms. Briggs' employment, did you

10   become aware that her errors or deficiencies had stopped?

11   A     No.

12         MS. SATINSKY:  Could you please turn to Exhibit

13   D-9.

14   BY MS. SATINSKY:

15   Q    Mr. Wacker, what is this document?

16   A    Temple University disciplinary report for Ruth.

17         MS. SATINSKY:  Your Honor, I would like to move

18   this exhibit, D-9.

19         MS. MATTIACCI:  No objection.

20         THE COURT:  It's admitted.

21       (D-9 received in evidence)

22   BY MS. SATINSKY:

23   Q    What is the date on this?

24   A    January 20th, 2014.

25   Q    What type of discipline was this?

33

```
 1   A    It was a violation of a work rule, an inefficiency

 2   failing to meet expected standards of performance.

 3   Q    What type of disciplinary action was it?

 4   A    It was just a written warning.

 5   Q    How did this situation come to your attention?

 6   A    It would have been brought to me through Drew or Dr. Wu.

 7   Q    Based upon your interactions with Ms. Briggs, what was

 8   your opinion of her work situation?

 9   A    In general, that she was unhappy with where she was and

10   didn't want to be there and when she wouldn't get tasks done

11   in a timely manner, she would be somewhat disorderly and

12   argumentative about, you know, just general work.

13   Q    Was that disruptive?

14   A    Yes.

15   Q    In what way?

16   A    In that she would come into the office -- even my office

17   when there were other people around and just, in general, be

18   dissatisfied that she didn't get something right and Dr. Wu

19   was asking her why this wasn't done today and she just didn't

20   like that it wasn't done and was getting corrected by Dr. Wu

21   for something that he was expecting to be done.

22   Q    How was Ms. Briggs attitude working for Dr. Wu?

23   A    At first, it started out good and then it became one of

24   argumentative and questioning everything that he wanted to

25   do.
```

34

1   Q    Dismiss Ms. Briggs' employment at Temple end?

2   A    Yes.

3   Q    How?

4   A    I was informed that she handed in her resignation.

5   Q    Did you meet with Ms. Briggs regarding the ending of her

6   employment?

7   A    Yes.

8   Q    What happened when you met with her?

9   A    We were in the process of taking disciplinary action

10  under the university work rules and met with HR and Labor

11  Relations was in the meeting with us.  That was given --

12  information was given to Ruth and I believe she was given an

13  option or she was allowed to decide if she wanted to resign

14  or not.

15  Q    Who was the person in HR at the meeting with you?

16  A    That would have been Deirdre Walton.

17  Q    Have you been aware of any other employees who've been

18  given the option to resign?

19  A    Not within the College of Science and Technology or the

20  university, for all that matter.

21       MS. SATINSKY:  Can you please pull up Exhibit D-24.

22  BY MS. SATINSKY:

23  Q    Mr. Wacker, what is this document?

24  A    This is the discipline form for the last action that we

25  were planning to take, which is the two violations of failing

35

1    to get the work done as directed by Dr. Wu and additional

2    information, pulling wrong dates for a booking for an

3    important visitor to the college, which led to the rules of

4    conduct violation that would cause termination.

5    Q    Did you draft this letter?

6    A    In conjunction with Human Resources and Deirdre Walton's

7    group, yes.

8    Q    Could you go to the first bullet point.

9    A    Yes.

10   Q    Take a look at that.  There's a reference to football.

11   Do you see that?

12   A    Yes.

13   Q    What's that refer to?

14   A    There's an account number.  When you put an expense in,

15   it's kind of whether you use Checking Account A or B or C.

16   So, it ties into an account number and an automated system

17   that Ruth was aware of and had access to.

18   Q    Was this part of Ms. Briggs' responsibility for Dr. Wu?

19   A    Yes.

20   Q    Did you agree with this termination letter?

21   A    Yes.

22   Q    Why's that?

23   A    Because the behavior and the work rule violations that

24   were being violated were -- were correct.

25   Q    Mr. Wacker, turning back to this first bullet point

1    that's up on your screen, can you tell us what's significant

2    about this?

3    A    It's -- in addition to denying that she has access to

4    it, which we apparently confirmed that she had access to it

5    prior to her getting the thing processed, she continued to be

6    disruptive and argumentative, accusing that Dr. Wu and that

7    Drew and I were liars, which continued to be the disruptive

8    actions that she exhibits whenever she was challenged on

9    something that she had done wrong.

10            MS. SATINSKY:  Can you please focus in on the

11    second bullet point.

12    BY MS. SATINSKY:

13    Q    Mr. Wacker, was this part of the letter that was given

14    to Ms. Briggs?

15    A    Yes.

16    Q    Can you explain this to us.

17    A    This would have been for failing to get a hotel

18    reservation for a very important, high-profile visitor that

19    Dr. Wu had into town and he wanted it at the Conwell Inn,

20    which is on-site at Temple, so that the visitor could see the

21    Temple campus and be on campus for his whole stay.  And what

22    happened is it got booked for the wrong dates.  She couldn't

23    get into the Conwell Inn during those days, so the individual

24    had to stay in Center City, which meant they had to get the

25    subway or a cab or something to Temple for, you know, the two

37

1    or three days that they were here.

2    Q    Why was that significant?

3    A    That's a big impression on the outside community.  This

4    is a high-scientific individual that Dr. Wu collaborates or

5    has a relationship with and it's important to put our best

6    foot forward and show that, you know, we are a top-notch

7    research institution and can handle those types of things.

8    And this, you know, presents a negative image, then, of the

9    Department and Dr. Wu.

10   Q    Mr. Wacker, do you know whether Ms. Briggs spoke with

11   Sandy Foehl before the end of her employment?

12   A    I do not.

13   Q    Do you know what she might have spoken with Sandy Foehl

14   about?

15   A    I do not.

16   Q    Do you know whether Ms. Briggs complained of

17   discrimination while she worked at Temple?

18   A    I do not.

19   Q    Do you know whether Ms. Briggs complained of retaliation

20   while she worked at Temple?

21   A    I do not.

22   Q    Do you know whether Ms. Briggs complained about age-

23   based harassment while she worked at Temple?

24   A    I do not.

25   Q    Do you know whether Ms. Briggs complained of sex or

38

1   gender-related harassment while she worked at Temple?

2   A    I do not.

3   Q    Do you know what Ms. Briggs' age is?

4   A    I do not.

5   Q    Do you know when her birthday is?

6   A    I do not.

7   Q    How old are you?

8   A    I'll be 56.

9   Q    Did Ms. Briggs' age have anything to do with the end of

10  her employment?

11  A    No.

12  Q    Did Ms. Briggs' sex have anything to do with the end of

13  her employment?

14  A    No.

15  Q    At any time, were you concerned that Ms. Briggs was

16  being treated differently at Temple because of her sex?

17  A    No.

18  Q    At any time, were you concerned that Ms. Briggs was

19  being harassed?

20  A    No.

21  Q    Do you know who replaced Ms. Briggs?

22  A    Yes.

23  Q    Who was that?

24  A    It -- it was a Marilyn Grandshaw.

25  Q    Is Marilyn a woman?

39

1    A    Yes.

2    Q    Do you know Marilyn's age?

3    A    I do not.

4    Q    Why do you believe that Ms. Briggs worked at Temple for

5    the time she did?

6              THE COURT:  I'm sorry?

7    Q    Why do you believe Ms. Briggs worked at Temple for the

8    time she did?

9              MS. MATTIACCI:  Objection.

10             THE COURT:  I -- yeah.

11             MS. SATINSKY:  I can rephrase the question, Your

12   Honor, if you'd like.

13             THE COURT:  Pardon?

14             MR. HARRIS:  I can rephrase the question, if you'd

15   like.

16             THE COURT:  Yeah, give it a try.

17             MS. SATINSKY:  Sure.

18   BY MS. SATINSKY:

19   Q    Why do you believe that Ms. Briggs worked at Temple from

20   2001 until 2014?

21             MS. MATTIACCI:  Objection.  Lack of foundation,

22   relevance.

23             THE COURT:  Sustained.

24        (Participants confer)

25   BY MS. SATINSKY:

40

1    Q    Mr. Wacker, why was Ms. Briggs permitted to work at

2    Temple from 2001 to 2014?

3    A    I -- from the time she came into the Dean's Office until

4    the time she terminated, it was because individuals didn't

5    want to, basically, fire her.  They liked her, personally,

6    and they just didn't want to -- because of all of the errors

7    and mistakes, they just didn't want to -- they didn't want to

8    fire her.

9    Q    So why, at the end, was her termination recommended?

10   A    I -- because the mistakes started to impact the image of

11   Temple, and they were becoming repetitive, the same ones over

12   and over again.

13            MS. SATINSKY:  I have no further questions at this

14   time, Mr. Wacker.

15            THE COURT:  Yes?

16            MS. MATTIACCI:  Yes, Your Honor.

17                REDIRECT EXAMINATION

18   BY MS. MATTIACCI:

19   Q    Mr. Wacker, you testified that there were individuals

20   that didn't want to fire Ms. Briggs in 2011 and 2014.

21   A    Yeah.

22   Q    Which individuals did not want to fire Ms. Briggs?

23            MS. SATINSKY:  Your Honor, I said 2001 to 2014.

24            MS. MATTIACCI:  I'm sorry.

25   BY MS. MATTIACCI:

41

1  Q    2001 to 2014.  Which individuals did not want to fire

2  Ms. Briggs?

3  A    It would have been --

4       (Off the record, back off the record 2:32 p.m.)

5  Q    Anybody else?

6  A    I mean, Dr. Wu wouldn't want to fire them either, unless

7  performance issues were the issue.

8  Q    So Dr. Wu did not want to fire Ms. Briggs, all the way

9  up to 2014, until the time she was terminated?

10 A    I don't believe so.  He wanted corrective action taken

11 on her work performance.

12 Q    And did -- were there any other individuals besides Dr.

13 Wu and the Dean, who did not want to see Ms. Briggs

14 terminated, all the way up until April 1st, 2014?

15 A    I don't know.

16 Q    Were there individuals who did want her terminated, up

17 until April 1st, 2014?

18 A    Not that I'm aware of.

19 Q    Now, in 2014, you spoke with Ms. Briggs in person,

20 correct?  Multiple times.

21 A    I would speak to Ruth Briggs multiple times, all

22 throughout any given year.

23 Q    You would agree with me that you understood that Ms.

24 Briggs was at least 50 years old in 2014, correct?

25 A    I -- I don't know because age never came up into the

42

```
 1   equation.

 2   Q    Did you think that she was 40 years old?

 3   A    I didn't know how Ruth is.  I don't know how old a lot

 4   of -- I don't know how old -- other than myself, I don't know

 5   how old anybody else in the college is --

 6   Q    So you --

 7   A    -- because I don't look at that information.

 8   Q    Okay.  Well, in speaking with her and looking at her, is

 9   it your testimony that, in 2014, that you thought it was

10   possible that Ms. Briggs was 40 years old?

11   A    Late forties, maybe.

12   Q    Late forties?

13        You testified on direct that this issue concerning the

14   expense report, and this -- there was -- there's a

15   discrepancy about whether Ms. Briggs had access to the

16   system, to process the expense report, correct?

17   A    Yes.

18   Q    Ms. Briggs said, when she went into the system, she

19   didn't have access to it, correct?

20   A    Yes.

21   Q    And you said it was apparently confirmed that there was

22   proof she had access to it, correct?

23   A    Yes.

24   Q    Have you ever seen documentation of that proof?

25   A    I vaguely remember it.  It -- I can't remember whether
```

43

1    it was in writing or whether it was a verbal confirmation

2    from our central computer services guys.

3    Q    So there might have been something in writing about it

4    that you reviewed?

5    A    I -- I don't recall whether it was in writing or

6    verbally, from the central computer services crew.

7    Q    But thus far, in this trial, we haven't seen this

8    written proof, correct?

9    A    Correct.

10   Q    Now going to the termination letter, P-45.  And I'm

11   going to bring it up on the screen, for ease of looking at

12   it.

13   A    Okay.

14   Q    This is the termination letter of April 1st, 2014 --

15   A    Yes.

16   Q    -- that you drafted and signed, or helped to draft and

17   sign.

18        And do you see, at the bottom there, it says:

19            "Effective, the end of today, your employment at

20            Temple University is being terminated."

21        Do you see that?

22   A    Yes.

23   Q    And this is the letter that you presented to Ms. Briggs

24   on April 1st, 2014, when she was terminated, correct?

25   A    Yes.

44

1    Q    And then it was after that period of time that she said

2    that she would submit the resignation in lieu of the

3    termination, correct?

4    A    Yes.

5    Q    You testified on direct that there were many, many

6    multiple occasions in which Ms. Briggs was argumentative in

7    the workplace.  Is that correct?

8    A    Yes.

9    Q    Caused disruption in the workplace?

10    A    Yes.

11    Q    On direct examination, counsel took you through several

12    writeups that were given to Ms. Briggs.  Were any of those

13    writeups for being argumentative?

14    A    I -- I don't recall if that was part of it or not.

15    Q    Let's turn to P-9.  I'm sorry.  D-9, in the defendant's

16    binder, that black binder.

17    A    (Witness reviews exhibits)

18        Okay.

19            THE COURT:  We've got to pick up the pace here.

20            MS. MATTIACCI:  I'm sorry.  I can -- you know, let

21    me put it right up on the screen, Your Honor.  This will help

22    --

23            THE COURT:  Yeah, well --

24            MS. MATTIACCI:  --  move it along.

25    BY MS. MATTIACCI:

45

1   Q     This is the writeup from January 20th, 2014.  Do you see

2   that?  I put it up on the screen for you, Mr. Wacker.

3   A     Which one was it?

4   Q     This is D-9.

5   A     Oh, 8.  Okay.  D-9.  Okay.

6   Q     Can you see it on the screen, or is that too far away?

7   A     No, I -- I can see it.  Okay.

8   Q     Okay.  So there it is, January 20th, 2014.  This is

9   about three months before she was terminated, correct?

10  A     Yes.

11  Q     And this is a violation of work rule B-10.  Do you see

12  that, right there?

13  A     Yes.

14  Q     Okay.  And what did she do to deserve this B-10 writeup?

15  A     I -- I don't recall.  It would have gone through, you

16  know, Drew and -- and Labor Relations.

17  Q     Isn't it true that -- or maybe -- do you recollect that

18  she was written up for sleep -- oversleeping in the morning?

19  A     I do -- now that you mention it, I do recall there was

20  some lateness involved.

21  Q     And that she called Dr. Wu in the morning, and said she

22  had overslept and she'd be right in, correct?

23  A     I don't recall the details.  That would have been a Drew

24  and Labor Relations detail issue.

25  Q     Okay.  And you recall that Ms. Briggs lives -- or at

46

1  that time, lived within walking distance of Temple, correct?

2  A    I do recall that, yes.

3  Q    So she was able to come in that day, correct?

4  A    I believe so.

5  Q    Okay.  Let's turn to the work rules, which are D-5.  And

6  let's turn to Violation B-10.  Well, actually, let's go up to

7  the top page, "Category B Violations."  I'm going to put it

8  on the screen, so you can see it.

9     Category B Violations are unauthorized absence, which

10  she not absent, correct?  She wasn't absent that day; she

11  came in.

12  A    She came in, yes.

13          MS. SATINSKY:  Objection, Your Honor.  The witness

14  testified he didn't recall.

15          THE COURT:  Pardon?

16          MS. SATINSKY:  Objection, Your Honor.  The witness

17  testified he didn't recall the circumstances.

18          MS. MATTIACCI:  Well, I just asked him if she was -

19  - he said he recalls, now that I brought it up to him.

20          MS. SATINSKY:  Your Honor, this is --

21          MS. MATTIACCI:  That's what --

22          MS. SATINSKY:  -- also beyond the scope of direct.

23          THE COURT:  Well, do you recall this or not?

24          THE WITNESS:  I recall instances.  I don't know if

25  this was the exact incident or not --

47

1          THE COURT:  Okay.

2          THE WITNESS:  -- and that's part of the Drew and HR

3    going back and forth --

4          THE COURT:  Okay.

5          MS. MATTIACCI:  Okay.

6          THE COURT:  And --

7          THE WITNESS:  -- like I said.

8          THE COURT:  You know, let's --

9          MS. MATTIACCI:  In regards -- let me just --

10          MS. SATINSKY:  Your Honor?

11          THE COURT:  We've got to get through this witness

12    now.

13          MS. MATTIACCI:  Yes, Your Honor.

14          THE COURT:  You know, it's not --

15          MS. MATTIACCI:  No, I don't mean to.

16          THE COURT:  We have to --

17          MS. MATTIACCI:  I'm just -- I just want to make

18    sure that I get all of the relevant testimony in for the

19    jury, Your Honor.  And I'm --

20          THE COURT:  Well, you haven't missed much.  Yeah,

21    go ahead.

22          MS. SATINSKY:  Your Honor?

23          MS. MATTIACCI:  I'm sorry.  I'm so close.

24          MS. SATINSKY:  Your Honor?

25          MS. MATTIACCI:  I'm so close.

48

```
 1              MS. SATINSKY:  If I may just put an objection on

 2    the record?  I object to the admission of this exhibit and

 3    the line of questioning about this exhibit as beyond the

 4    scope of my direct.

 5              THE COURT:  Overruled.

 6    BY MS. MATTIACCI:

 7    Q    You testified on direct examination that Dr. Wu was

 8    deficient in bringing to you and Human Resources this

 9    disciplinary issue that he wanted to write up Ms. Briggs on,

10    correct?

11    A    Yes.

12    Q    Okay.  And so mister -- Dr. Wu, then, he was in

13    violation of policy himself because he was not following

14    policy in doing the disciplinary writeups, correct?

15    A    Faculty have a whole different set of rules that they go

16    by.  They're in a union, and the union rules dictate faculty

17    performance and items as such.

18    Q    Okay.  So do you have any information or governance over

19    any of those rules?  So, if a faculty member violates a work

20    rule, or if a faculty member does that something that

21    violates the rules of the workplace, do you have no input in

22    that?

23    A    I have no input on that.  That's Faculty Affairs.

24    There's faculty oversight committees, and the whole TAUP

25    contract dictates how faculty get dealt with.
```

49

1   Q    So, if you learn that Dr. Wu is violating policy, who

2   handles the discipline on that policy violation?

3   A    It would be Faculty Affairs.

4   Q    Okay.  And did you then refer that issue to Faculty

5   Affairs because --

6   A    I'm not aware of Dr. Wu violating policy.

7   Q    I thought you said that there was a problem that he was

8   not bringing the issues to the forefront in a timely manner.

9   A    And that was an effort to help Ruth out; that, if Dr. Wu

10  waited on bringing those disciplinary actions, that I could

11  not take action against Ruth.

12  Q    Okay.  So you were fine with what he was doing then.

13  A    There's no violation of a rule for him bringing them in

14  too late.

15  Q    Okay.

16  A    It's not a violation of a work rule, it's --

17  Q    In regards to D-7, this is the November 9th writeup.

18  You said, on direct examination, there was information

19  gathered and sent to Labor Relations in regards to this

20  writeup.  Have you ever seen any documentation of the

21  information that was gathered and sent to Human Relations

22  [sic]?

23  A    I don't recall.

24          MS. MATTIACCI:  I don't have any further questions,

25  Your Honor.

50

1            THE COURT:  You may step down.  Thank you.

2            THE WITNESS:  Okay.  Thank you.

3       (Witness excused)

4            THE COURT:  Call your next witness.

5            MS. MATTIACCI:  Your Honor, the plaintiff calls Dr.

6    Wu to the stand, as on cross.

7            THE WITNESS:  This book fell apart.

8            MS. MATTIACCI:  That's okay.  I can look at it.

9            Your Honor, may I have a minute to fix the binder?

10           THE COURT:  Go ahead.

11      (Pause in proceedings)

12           THE COURT OFFICER:  Please raise your right hand,

13   place your left hand on the Bible, behind you.

14   JIE WU, WITNESS FOR THE PLAINTIFF, SWORN.

15           THE COURT OFFICER:  Please state your full name for

16   the record, spell your last name.

17           THE WITNESS:  Last name Wu.  Wu.  First name is

18   Jie.

19           THE COURT:  You may sit down.

20           THE WITNESS:  Thank you, Your Honor.

21           MS. MATTIACCI:  May I proceed, Your Honor?

22               DIRECT EXAMINATION

23   BY MS. MATTIACCI:

24   Q    Good afternoon, Dr. Wu.  Is it true that you are

25   currently the Director of the Center for Network Computing,

51

1    and a Professor at Temple University?

2    A    Yes, it's true.

3    Q    And you're also the Director of International Affairs at

4    the College of Science and Technology, correct?

5    A    Correct.

6    Q    You served as the Chair of the Department of Computer

7    and Information Sciences from 2009 until 2016.  Is that

8    correct?

9    A    Correct.

10   Q    Is it also true that you were born in China?

11   A    Yes.

12   Q    And you were raised in China, until you -- until

13   college, correct?

14   A    Yeah, until two thousand eighty-seven.

15   Q    Okay.

16   A    Sorry eighteen eighty -- 1987.

17   Q    Okay.  And also, is it true that you came to the United

18   States and obtained your Ph.D., here at an American

19   university?

20   A    Correct.

21   Q    And then, from that point on, you stayed in the United -

22   -

23          THE COURT:  Can Number 1 Juror see the witness?

24        (Participants confer)

25          THE COURT:  Can you see him?

52

1          THE WITNESS:  Yeah, I can see him.

2      (Participants confer)

3          THE COURT OFFICER:  Can they move the computers,

4   Your Honor?

5          THE WITNESS:  Yeah.

6          THE COURT:  Yeah, move it, so the jury can see the

7   witness.

8          THE WITNESS:  Yeah.

9          THE COURT:  I didn't notice that that was blocking

10  the way.  That's -- these monitors get in the way.

11         THE WITNESS:  Yeah.  I apologize.  I just had eye

12  surgery, so my -- my eyes is like blurry --

13         THE COURT:  Yeah.

14         THE WITNESS:  -- and bruised, so ten --

15         THE COURT:  Yeah, yeah.

16         THE WITNESS:  Ten days ago.

17         THE COURT:  All right.  Okay.

18         MS. MATTIACCI:  Okay.  Thank you.

19  BY MS. MATTIACCI:

20  Q    And then, since the time that you earned your Ph.D., you

21  stayed in the United States since that time, correct?

22  A    Correct.

23  Q    Now I got this off of your CV, so I'm just going to read

24  it, just to make sure we're correct to give some background

25  on you.

53

1     Is it true that your current research includes mobile

2  computing and wireless networks, routing protocol, cloud and

3  green computing, and network trust and security in social

4  network applications?

5  A    Correct.

6  Q    Okay.  And you have published many, many papers.  Is

7  that correct?

8  A    Yes, correct.

9  Q    And you've collaborated with other researchers on these

10  papers?

11  A    Yes, all over the world.

12  Q    All over the world?

13  A    Yeah.

14  Q    And that includes China, as well, correct?

15  A    Correct.

16  Q    And isn't it true that you often go back and visit

17  China, and handpick students from China, to come back and be

18  your graduate students?

19  A    Correct.

20  Q    And is it true that most of your graduate students are

21  from China?

22  A    Yes.  In fact, most of the students in our departments,

23  I think are from China or India.

24  Q    Thank you.

25      And in -- I read that, in two thousand and -- in 2011,

54

1    you were awarded a very prestigious award in China, called a

2    "China Computer Federation Overseas Outstanding Achievement

3    Award."  Is that correct?

4    A    Correct.

5    Q    And that award is awarded in China, for somebody from --

6    who is from China, that comes to a foreign country, you know,

7    the United States or somewhere else, and does good work in

8    the other country, correct?

9    A    Correct.

10   Q    And Temple actually has an office in China, correct?

11   A    Correct.

12   Q    Is that in Shanghai?

13   A    In Beijing.

14   Q    Beijing.

15       And the Director of the Office of the Temple -- of

16   Temple's Campus in China reports to you, correct?

17   A    Yes.  When I was Associate Vice Provost.

18   Q    Okay.

19   A    Yeah.

20   Q    So is it fair to say that you are familiar with the laws

21   concerning discrimination in China?

22   A    Yes.

23   Q    And isn't it true that, in China, there are mandatory

24   retirement ages for all workers, correct?

25   A    Correct.

55

1  Q     And that would include that, in blue-collar jobs, men

2  must retire by the age of 50, correct?

3  A     I'm not sure it's 50.  I think it's 55.

4  Q     Okay.

5  A     And white-collar is sixties.

6  Q     So white-collar men retire at 60?

7  A     Yes.

8  Q     And in blue-collar, they retire at 55?

9  A     Yeah.

10  Q     Okay.  And how about women; what is the law --

11  A     Women --

12  Q     -- there?

13  A     Women, I think is 50.

14  Q     They have to retire at 50?

15  A     Fifty, blue -- I think blue-collar, yeah.

16  Q     Okay.  And what about white-collar --

17  A     White-collar --

18  Q     -- job women?

19  A     -- I think, are 55.

20  Q     Fifty-five.

21  A     Yeah.

22  Q     Okay.

23  A     I just want to comment, it's not in China, but also in

24  most of the Asian county, like Japan, Hong Kong, many other

25  countries --

1   Q    Okay.

2   A    -- in Asia.

3   Q    Thank you.

4        And you -- because of this law of mandatory retirement,

5   many women in China retire very early, correct?

6   A    Correct.

7   Q    In fact, it's very common for women in China to retire

8   even at 40, correct?  Or in their forties.

9   A    There are some cases, but I would not say the majority

10  of cases.

11  Q    Okay.

12  A    Yeah.

13  Q    Not the majority, but --

14  A    Yeah.

15  Q    -- it does happen.

16  A    Yeah, there are some cases.

17  Q    And in fact, your own sister retired very early,

18  correct?

19  A    Yeah.  Yeah.  I think my sister retired in the thirties.

20  Q    In her thirties.

21  A    Yeah.

22  Q    Okay.  And you believe that there are certain jobs that

23  require younger women, correct?

24       MR. HARRIS:  Objection.  She has to set a

25  foundation for that question, Judge, so I would object.

57

1          THE COURT:  Yeah, sustained.

2          THE WITNESS:  So should I answer or ...

3          THE COURT:  No.  No, no, no.

4          THE WITNESS:  Okay.

5          MS. MATTIACCI:  Your Honor, may I be heard on that?

6   I --

7          THE COURT:  No.  Let's go on to something else.

8          MS. MATTIACCI:  Okay.

9   BY MS. MATTIACCI:

10  Q    Okay.  Do you believe that a person should retire

11  earlier, so they're not in a certain position for a long

12  period of time?

13  A    I don't believe that.  I just know the fact, in China,

14  in some other country, yes.

15  Q    Okay.  All right.  Let's talk about 2014.  Okay?

16  A    Uh-huh.

17  Q    At that point in time, Ruth Briggs was assigned to you

18  as an Executive Assistant, correct?

19  A    Correct.

20  Q    Now you -- she had already been hired by Temple

21  University, correct?

22  A    Yeah.  She has been my Executive Assistant since 2009.

23  Q    Okay.  And in fact --

24          THE COURT:  Hold on.

25  Q    -- Ruth Briggs.

58

1          THE COURT:  Just one moment.  Wait.

2       (Off the record.  Back on the record at 2:53 p.m.)

3          THE COURT:  They're not picking up your voice.

4          THE LAW CLERK:  Yeah, they said you're off mic.

5          MS. MATTIACCI:  Wow.

6          THE LAW CLERK:  So they're not picking up to

7   transcribe.

8          MS. MATTIACCI:  Okay.  Do I need to --

9          THE COURT:  Well, maybe you can sit down and be

10  closer to the mic.

11         MS. MATTIACCI:  Okay.  That would be fine.  How's -

12  - that should do it.  That should do it.

13         THE COURT:  Thanks.

14         THE LAW CLERK:  Yep.

15         THE COURT:  That's one of my law clerks, so ...

16      (Participants confer)

17         MS. MATTIACCI:  Okay.  Thank you.  May I proceed,

18  Your Honor?

19         THE COURT:  Yes, go ahead.

20  BY MS. MATTIACCI:

21  Q    So, in 2014, at that point in time -- let me back up for

22  a second.

23      When you started at Temple, Ruth Briggs was already at

24  Temple, correct?  She had been hired already.

25  A    Yeah.  But she works at the Dean's Office.

59

1   Q     That's right.

2   A     Yeah.

3   Q     And then she was assigned, when you came onboard, to be

4   your Executive Assistant, correct?

5   A     Correct.

6   Q     And you recall that there was a meeting in November of

7   2011, in which at least you and Ms. Briggs, and maybe others,

8   were present, in which you said to her, how -- I hear it's

9   your birthday, how old are you.  Is that correct?

10  A     No.

11  Q     Did you ever ask her her age?

12  A     I don't ask her age.  I only know that she's a similar

13  age as my -- my age, but I don't know her age.

14  Q     So you're saying that you never asked her how old she

15  was?

16  A     No.  It's rude to ask age.

17  Q     Did you know that it was her birthday on November 10thm,

18  2011?

19  A     I do not know.

20  Q     Was it routine for -- when it was somebody's birthday in

21  the office, that people would sign cards for each other

22  because it was their birthday?

23  A     Yeah, I think we signed cards to many staff member, but

24  I may not remember all of them.  So they may remind me, say,

25  okay, it's -- today is somebody's birthday, so we sign card.

60

1    Q    Okay.  And that would include Ruth Briggs --

2    A    Correct.

3    Q    -- correct?  If it was her birthday.

4    A    Yes.

5    Q    And you knew, in 2014, that she was not in her thirties,

6    correct?

7    A    Oh, yes.

8    Q    And you --

9    A    Correct.

10   Q    -- believed that she was around your age, which was in

11   the fifties, correct?

12   A    Correct.

13   Q    And in that time of November of 2011, there was a

14   conversation in which you said to her, in China, we put women

15   out to pasture when they're 55, correct?

16   A    No, it's not correct because I don't even know the words

17   at that time, the "pasture."  When my lawyer ask me this, I

18   don't even know this word, so I never say this word.

19   Q    Which word?

20   A    The "pasture."

21   Q    "Pasture"?

22   A    Yeah.

23   Q    You never had heard that word?

24   A    No.

25   Q    In 2014, how long had you been in the United States for?

61

1    A    Maybe 26.

2    Q    Twenty-six years?

3    A    Yeah.

4    Q    And in 26 years, you had not heard the word "pasture"?

5    A    No.

6    Q    Did you say words to the effect that, in China, at your

7    age, women stop working, or are not allowed to work?

8    A    No.  I say the general, men and womens retire early.

9    Q    Okay.  So state for us, specifically, as close as you

10   can remember, what you said to Ms. Briggs at that time?

11   A    No, we had the very friendly conversation because Ruth

12   and I always had some kind of conversation.  And especially

13   after I return from a trip, so we exchange some experience.

14   I tell her my travel experience, food.  I think, in one

15   conversation, we brought up this retirement age, including my

16   sister's retirement, because when you are doing well in

17   China, you can retire early.  My sister retired 30 years old.

18   And some jobs, other nations are like 60 years old for men to

19   retire.  But those men can be rehired.

20   Q    Okay.

21   A    Yeah.

22   Q    So you did have a conversation with her --

23   A    Yes.  Yeah.

24   Q    -- in which you were discussing that older women are

25   retired in China by the time they're close to her age,

62

1   correct?

2   A    No, no, not old women.  I just mentioned a general fact,

3   the women retire early, and men also retire early.

4   Q    Okay.

5   A    It's a very friendly conversation.

6   Q    Okay.  And then she said in response to you, well, with

7   all due respect, we are in the United States.

8   A    No, I don't recall if she is saying that.

9   Q    What was her response when you said that then?

10  A    I don't recall.  I only remember it's a very friendly

11  conversation; it's not like offensive comments anything.

12  Q    Were you upset when she --

13  A    No.

14  Q    In that conversation at all?

15  A    No, I'm not upset.  I don't even know that she's upset.

16  Q    Okay.  So then let's take a look at -- this is going to

17  be Trial Exhibit P-3.

18          THE COURT:  Why don't we stop, at this point, and

19  take a ten-minute recess.  The jury may go out.   Ten-minute

20  recess.

21          THE COURT OFFICER:  All rise.

22          THE WITNESS:  Okay.

23          THE COURT:  You may step down.

24          THE WITNESS:  Oh, okay.  Yeah.

25      (Recess taken at 2:59 p.m.)

63

1      (Proceedings resume at 3:13 p.m.)

2      (Call to order of the Court)

3      (Jury present)

4      (Witness resumes stand)

5          THE COURT:  All right.  You may be seated.

6          MS. MATTIACCI:  May I proceed, Your Honor?

7          THE COURT:  Please, yes.

8    BY MS. MATTIACCI:

9    Q    So, Dr. Wu, when we broke, we were just talking about

10   that you said that the conversation that you had with Ms.

11   Briggs about retirement, mandatory retirement for women at a

12   certain age, that that was a friendly conversation.

13   A    Correct.

14   Q    I would like you to turn to P-3, which is -- there

15   should be a white binder in front of you.  That's the black.

16       (Participants confer)

17   A    What --

18   Q    I'm going to put it up on the screen, so we can save

19   some time.  Are you able to see that on the screen, Dr. Wu,

20   if I blow it up?

21   A    Yes, I can see it.

22   Q    Okay.  Great.

23       So this is a disciplinary writeup that was issued to Ms.

24   Briggs on -- the date at the top says 11/9/2011.  Do you see

25   that?

64

1  A    Correct.

2  Q    And does that indicate to you that that is the date in

3  which the incident took place, for which she is being written

4  up?

5  A    I don't think so.  Usually incidents is a few days

6  before that.

7  Q    Okay.

8  A    Yeah.

9  Q    So it would be before that.

10  A    Yeah, before that.

11  Q    Is there anywhere on this document that indicates then

12  when the event took place that compelled this disciplinary

13  action?

14  A    No.

15  Q    Why is it not on the form?

16  A    I believe that I discussed the incidents with the Dean's

17  Office, and Dean -- of his -- and together, I reach a

18  conclusion.  So they prepare the document.  Then we ask Ruth

19  to sign.

20  Q    Who in the Dean's Office did you speak with?

21  A    I would say Greg.

22  Q    Greg Wacker?

23  A    Yes.

24  Q    Okay.  So you discussed this.  What did you discuss.

25  Tell me what was said?

1  A    I don't know the detail because this is many years ago.

2  There are so many incidents, so -- but each time there's an

3  issue, I discuss it with Greg, and to see any actions are

4  needed.

5  Q    So you can't tell us, today, why this disciplinary

6  action was issued to Ms. Briggs --

7  A    I --

8  Q    -- dated 11/9/2011.

9  A    Yeah.  I cannot recall it.

10 Q    Was there any supporting documentation ever created to

11 support this disciplinary action?

12 A    I believe so.  We can check all the email records.

13 Q    Do you recall reviewing any email about that?

14 A    I didn't.

15 Q    Okay.  But there -- is it normal for an email or other

16 supporting documentation to be created to support a

17 disciplinary action?

18 A    We have a verbal conversations with Dean's Office and

19 with two of my associate -- Associate Chairs.  They can

20 support all the --

21 Q    Is it --

22 A    -- the facts.

23 Q    Is it common for that verbal conversation to be reduced

24 to writing, so there's some sort of written support for the

25 discipline?

66

1    A    Yeah, we have some written document, but probably not

2    for this incident.  There are many other cases.

3    Q    Why not for this incident?

4    A    I don't -- I cannot recall.  But we definitely had

5    conversations, and we can provide the document, if needed.

6    Q    You can provide a document to support this writeup?

7    A    I -- I can go back to the emails or -- I do not know.  I

8    mean, the --

9    Q    And --

10   A    We have so many incidents like this, so ...

11   Q    Okay.  Is it true that, during the discovery phase of

12   this case, you were asked to produce any and all emails that

13   would be relevant to the --

14   A    Yes.  Actually, someone came to my office and got all

15   the emails.

16   Q    Okay.

17   A    Yeah.

18   Q    So, if one existed, it would have been produced,

19   correct?

20   A    I do not know that because they did get all the emails

21   related to Ruth.

22   Q    Okay.

23   A    Yeah.

24   Q    So is it true that people really liked working with Ruth

25   in the office?

1   A     In what sense?  She is a nice person, and like day-to-

2   day conversation.  Actually, I saw that we get along well, so

3   that's why I had always had conversation and culture

4   exchange.  And whenever I came back from a trip, I give her

5   gifts, and we sometimes exchange gifts.  For example, we both

6   like music, so we talk about some classic music.  I remember

7   she gave me a book about Jacqueline Du Pre, the cellist.  And

8   so, in that sense, it's yes.

9   Q     And you were her direct boss, correct?

10  A     Correct.

11  Q     And she got along well with other people in the office,

12  correct?

13  A     Again, it's -- it depend on how -- what you meet by

14  getting along well.  Conversation wise is yes, but in terms

15  of have a job done, not.

16  Q     Okay.  So, prior to this writeup -- let me ask -- the

17  one that we're looking at right now, November 9th, 2011.  Is

18  there any prior written writeup of a performance deficiency

19  of Ms. Briggs?

20  A     I cannot recall, but we -- we wrote up a couple of

21  times, several times.

22  Q     Okay.

23  A     And I also make phone call to HR and ask for help.

24  Q     Okay.  Well, I'm talking about prior to November 9th,

25  2011.  Are you aware of any writeups about her performance?

1   A    I do not aware.

2   Q    Okay.  Now who made the decision to terminate Ms.

3   Briggs?

4   A    It's one -- it's one of the major incidents, and I

5   report to Dean's Office.  So then we -- we discuss.  I think

6   HR is also involve.  So, eventually, we reach a conclusion.

7   Q    Okay.  So my question --

8   A    But -- yeah.

9   Q    -- is I want to know who made the decision to terminate

10  her employment.

11  A    I think it's a collective decision, maybe me and HR.

12  But the Dean's Office gave us some guidance because I do not

13  -- I'm not very familiar with the rules.

14  Q    Okay.

15  A    Yeah.

16  Q    So are you one of the people that made the decision?

17  A    I would say yes.

18  Q    Okay.  And was Greg Wacker one of the people that made

19  the decision?

20  A    Greg provide some informations.  So I don't know the

21  details, whether Greg is involved, probably not.  I mean, he

22  gave me the -- some kind of guidance.

23  Q    Okay.

24  A    Yeah.

25  Q    And can you give me the name of anybody else who was --

1   who made the decision to terminate Ms. Briggs?

2   A    I would say Drew is fully aware of the incident.

3   Q    Who is that?

4   A    Drew, Drew DeMino [sic]?  I forgot the last name.

5   Q    Drew?

6   A    Drew, yeah.  Drew.

7   Q    Okay.  Drew DiMeo?

8   A    Yeah, DiMeo.  Yeah.

9   Q    And Mr. DiMeo was several layers -- or levels below Ms.

10  Briggs.  Isn't that correct?

11  A    Oh, I do not know.  The reason is that Drew work with me

12  directly.  He also work in the Dean's Office, a financial

13  aspect.

14  Q    Right.  So he reported to Mr. Wacker, correct?

15  A    Correct.

16  Q    And he was about in his early thirties, correct?

17  A    Correct.

18  Q    But he didn't have any supervisory responsibility over

19  Ms. Briggs, correct?

20  A    Probably not.  But I ask lots of staff member to help me

21  on the Ruth case.

22  Q    Okay.  Well, my question -- I just want -- I want it to

23  be clear here --

24  A    Yeah.

25  Q    -- who are the people that made the decision to

70

1    terminate Ms. Briggs.  So you're saying Mr. DiMeo was also

2    one of the people that decided to terminate her?

3    A    No, no.  The -- Drew is involved because he knows all

4    the details, the incidents.

5    Q    Okay.

6    A    Yeah, but --

7    Q    I don't need to know right now who was involved.  I want

8    to know who made the decision.

9    A    Oh, decision, I would say me and HR, and with input from

10   the Dean's Office.

11   Q    Okay.  Who in HR?

12   A    I do not remember.  There is a couple of people in HR.

13   Q    But you don't remember their names?

14   A    Yeah.  There is the one Sharon we usually deal with.

15   Another one is Deirdre.

16   Q    Are you saying Sharon?

17   A    Yeah, Sharon.

18   Q    Do you know Sharon's last name?

19   A    Sharon -- Sharon -- I forgot the last time.

20   Q    Okay.  Could --

21   A    I think she's the Director.

22   Q    Okay.  Do you mean Sandy?

23   A    No, it's not Sandy.

24   Q    Not Sandy.

25   A    Yeah.

71

1  Q    Okay.  And then Deirdre.  Is that right?  Deirdre?

2  A    Yes, I think that's --

3  Q    Okay.

4  A    That -- that sounds familiar.

5  Q    Okay.

6  A    Because this is a while ago.  I don't remember exactly

7  the name.

8  Q    Okay.  Prior to your testimony today, you did have a

9  meeting with counsel for Temple, correct?

10  A    Correct.

11  Q    And did you meet, or at least speak several times before

12  testifying today?

13  A    I think once or twice, but not many.

14  Q    Okay.  Have you told me all of the people that made the

15  decision to terminate Ms. Brigs?

16  A    Yeah, I think so.

17  Q    Now I want to ask you why Ms. Briggs was terminated.

18  Can you give me the reasons why she was terminated?

19  A    It's just not one thing or incident because there are so

20  many over the five years.  And it's just she did not do the

21  job was asked to.  I don't remember exactly the -- the

22  termination detail.  It should be in the record.  It's just

23  like I think one, the reimbursement.  And she claim that the

24  documents is not in the system, but somehow, we find out it's

25  in the system or something.  I don't remember detail.

72

1    Q    Okay.  So one of the reasons that she was terminated was

2    because of a travel reimbursement issue.

3    A    Yeah.

4    Q    Can you recall any other reasons why Ms. Briggs was

5    terminated?

6    A    Oh, there are so many things.  Just to give you example,

7    like one -- we have one -- we interview lots of faculty

8    candidates.  So one of the important candidates, senior

9    candidates, is supposed to for -- arrive today, but Ruth

10   forgot to purchase the ticket.  And when the person went to

11   the airport, they notice that the ticket is not available.

12   So this kind of things.  And sometimes like making

13   reservations and forgot, and was made the wrong date and --

14   Q    Okay.

15   A    Yeah.  Those kinds of incidents, there is many.

16   Q    How many times did she book the wrong date or --

17   A    I would say that, on the average, once or twice a week.

18   Q    Once or twice a week --

19   A    Yeah.

20   Q    -- she booked the wrong date?

21   A    No, not the wrong date.  All kinds of mistakes.  We have

22   one week, we spend one week, and to document all things.

23   It's like more than ten times.

24   Q    Well --

25   A    It's just so many small things just add together.

73

1    Q    And you documented these small things?

2    A    Yeah, yeah.  We have one document -- one -- one

3    particular week, we documented.

4    Q    Oh, so one particular week --

5    A    Yeah.

6    Q    -- you documented what she did wrong.

7    A    Yeah, with two Associate Professor.

8    Q    Okay.

9    A    I mean Associate Chairs, we -- we document together.

10   Q    What week did you do this?

11   A    Oh, I don't remember.

12   Q    What did you do with the document?

13   A    The document, just want to see what kind of mistake Ruth

14   made.  We just want to document.

15   Q    Why did you only do it for a week?

16   A    Because we don't have time to do that.  See, I'm

17   supervise over 50 faculty member and staff, so -- but that

18   week, we really spent lots of time, and to document.

19   Q    And did you -- how long before her termination was this

20   document created?

21   A    Oh, this is a while ago, maybe like three years or four

22   years before the termination.

23   Q    Okay.

24   A    So she has kind of travel stuff on beginning, and we

25   always try to help.  And you know, I have a weekly meeting

1  with two Associate Chairs, usually one -- one hour.  But

2  usually, we spend about 15 minutes to talk about Ruth's

3  issues.

4  Q    Okay.  So three years ago -- or three years prior to her

5  termination, you're saying there was a week in which you

6  documented performance issues.

7  A    Yes.

8  Q    But you never did that again for a week or a period of

9  time --

10  A    Because too --

11  Q    -- after that?

12  A    Because it's too time consuming.  I have, again, 50

13  staff and faculty --

14  Q    I --

15  A     -- over 500 students.

16  Q    Dr. Wu, I'm -- just because there's somebody that's

17  recording what we're saying, we got to take turns, back and

18  forth.  So just --

19  A    Okay.

20  Q    I'll wait until your finished answering your question,

21  and then I'll ask my next one, but -- and let's just go step

22  by step.

23       So, other than this one week three years prior to her

24  termination, in which you say that you made some

25  documentation of errors, did you, after that, ever do any --

75

1    a week or a period of time with documentation of supposed

2    errors?

3    A    Not a whole week.  But for the major incidents, I keep a

4    record of all the emails exchanges and --

5    Q    Okay.

6    A    Yeah.

7    Q    So I'm going to go through the only records that we

8    have, in terms of documented performance issues.

9    A    Uh-huh.

10   Q    And then, you know, you -- let's just go through those

11   A    Okay.

12   Q    We have this November 9th, 2011 one --

13   A    Yeah.

14   Q    -- in which you said that you can't recall or have any

15   idea why she got this, correct?

16   A    No, there must be some major incident, but I don't

17   recall the exact.

18   Q    It must be pretty major, right?

19   A    Yes, major.

20   Q    Because she was written up.

21   A    No, it's a major one.

22   Q    Okay.

23   A    Because usually, I give warnings, many times, before we

24   do that document.

25   Q    Okay.

76

1    A    I --

2    Q    Because it's a serious thing to give somebody a written

3    documentation that's going to go in their file, correct?

4    A    Yes.  Yes.

5    Q    And that could potentially harm their ability to get a

6    job outside of your department.

7    A    Correct.  So that's why I don't give many.  There are

8    many staff member in the Department.  I think she's the only

9    one, maybe there is one exception.  Yeah.

10   Q    Okay.  So it's very rare.

11   A    Uh-huh.

12   Q    Now let's go to -- there was -- the next documented

13   performance issue that we have is not until two thousand and

14   -- let's see.

15        (Participants confer)

16   Q    It's not until March 26th of 2013.

17   A    Yes.

18           MS. MATTIACCI:  And I'm showing, Your Honor, P-16.

19   Q    So the one we had just looked at --

20   A    Uh-huh.

21   Q    -- was from November of 2011.

22   A    Uh-huh.

23   Q    And the next documented performance issue we have is

24   March of 2013.

25   A    Correct.

77

1   Q    Okay.  And what did she do to deserve this disciplinary

2   writeup?

3   A    If I remember correctly, this is the case where she

4   forgot to purchase the ticket for -- for the visitor, for the

5   candidate.

6   Q    Right.

7   A    Yeah.

8   Q    And isn't it true that she owned up to that mistake, and

9   she came to you and said, I'm really sorry, I made a mistake.

10  A    Correct.

11  Q    And she apologized and said it would never happen again,

12  correct?

13  A    I think so.

14  Q    And she had never failed to book a plane ticket prior to

15  this March 2013 writeup, correct?

16  A    Correct.  But she made many other mistakes, similar

17  mistakes.

18  Q    Okay.  But there's no documentation of any other

19  mistakes, where she had received a writeup, before -- in

20  between November of 2011 and this --

21  A    Yeah.  The reason is we --

22  Q    -- plane ticket.

23  A    -- we don't do document.  We know that, after a certain

24  number of documentation, she may be fired.  We tried to save

25  her.

78

1   Q    You tried to save her.

2   A    Yeah.  Oh, yeah.

3   Q    Okay.

4   A    So that's why we spent every 15 minutes, try different

5   solution to help her.

6   Q    Well, in this writeup, where she admitted to making a

7   mistake, she was given the penalty of three days of

8   suspension without pay --

9   A    Uh-huh.

10  Q    -- correct?

11  A    Yes.

12  Q    Over a mistake.  Is that right?

13  A    Yes.  But it's a very serious mistake.  It's a very

14  important faculty -- senior faculty candidate.  The whole

15  department is waiting for the visit.

16  Q    Isn't it true that other people in the Department were

17  made aware that the ticket was not booked two days before the

18  professor was supposed to arrive, correct?

19  A    Well, I don't remember the detail.  It's just when the

20  professor tried to go to the airport, and find out the ticket

21  is not there, we were shock and --

22  Q    But that's not what happened, was it, Dr. Wu?  He didn't

23  go to the airport and find out the ticket wasn't there.

24  A    But she has -- she emailed -- he emailed me, or maybe

25  just before he ready to go to airport, they find out there's

1    -- the ticket is not there.

2    Q    Isn't it true that he was scheduled to come in on

3    Monday, and he didn't -- he emailed about not having the

4    ticket on Saturday, correct?

5    A    I don't know the detail.  I'm pretty sure it's the --

6    when just before he's ready to go to airport, he find out the

7    ticket is not there.  But you know, when we interview people,

8    the person should arrive the day before.

9    Q    Okay.

10   A    For -- suppose Monday is the one.  We schedule Sundays

11   is usually the dinner with the faculty, so ...

12   Q    So have you ever issued anyone three days of unpaid

13   suspension?

14   A    No.

15   Q    And so, for those three days, she wasn't allowed to come

16   into the office, correct?

17   A    Well, I don't know the rules.  She's just not paid.  I

18   think she still work, but not pay.  I do not know -- remember

19   the --

20   Q    So you think she came in, had to work, and not get paid

21   for three days?

22   A    No, no.  I don't -- again, I don't remember the -- these

23   three day, probably, she say home, on vacation or something.

24   Q    So she stays home for the three days, she doesn't get

25   paid.  And meanwhile, the work that she has at the office is

80

1   piling up, right?

2   A    Yeah, but we -- the other staff will cover her work.

3   Q    Now, at this point in time, you were not terminating

4   her, correct?

5   A    No, not terminating her.

6   Q    And then the next disciplinary writeup is not until nine

7   months later.

8   A    Uh-huh.

9   Q    This is January of 2014.

10  A    Okay.

11  Q    Do you see that?

12  A    Yeah.  Yes.

13  Q    And what was that disciplinary writeup for?

14  A    I -- I don't remember.  It's the -- again, we can look

15  at the record.

16  Q    Do you recall if there's any supporting documentation

17  for this?

18  A    I would say so because we -- we would not write those

19  kind of things without support.

20  Q    Does it trigger your memory that she was written up

21  because she overslept in the morning, and was late coming

22  into work?

23  A    That happened regularly, almost every week.

24  Q    Every week, she was late?

25  A    Yeah.

81

1    Q    Is there documentation of her being late, every week?

2    A    Oh, you can ask any staff member, faculty member in the

3    Department.

4    Q    Well, okay.  Maybe we will have --

5    A    Yeah.

6    Q    -- they're bring others in to testify as to that.

7    A    Sure.  Yeah.

8    Q    But I'm going to ask --

9    A    That really help, yeah.

10   Q    Dr. Wu, I'm asking you if there is documentation that

11   Ms. Briggs was late every week.

12   A    Yeah, almost every week.

13   Q    Where is the documentation of that?

14   A    There is no documentation.

15   Q    No documentation.

16   A    Well, all faculty member, staff member knows this.

17   Q    There -- but there's no documentation.

18   A    There is no documentation.

19   Q    And the violation that she was cited for was B-10.  Do

20   you see that?

21   A    Yes.

22   Q    Okay.  If you go to -- let's -- we're going to take a

23   look at the work rules.

24        Let me ask you this, as we're working for the work

25   rules.

82

1   A    Uh-huh.

2   Q    65.

3        Do you know who Hailey King is?

4   A    Yes.

5   Q    And Hailey King worked in your department?

6   A    Yes.

7   Q    Hailey King was hired, just in 2013.  Isn't that

8   correct?

9   A    Correct.

10  Q    In the Fall of 2013.

11  A    Correct.

12  Q    And she went missing for three days, meaning she didn't

13  show up for work --

14  A    Uh-huh.

15  Q    -- didn't call in --

16  A    Uh-huh.

17  Q    -- didn't tell anybody where she was.  Isn't that

18  correct?

19  A    It's a different situation.  That's during the hurricane

20  --

21  Q    Dr. Wu.

22  A    -- so --

23  Q    Dr. Wu, with all due respect, I'm just going to try to

24  ask a question.  Answer the question, and then we'll go to

25  the next question.  Okay?

83

1    A    Yes.

2    Q    So my question was:  Isn't it true that Ms. King did not

3    show up for three days, and never called in, and never told

4    anybody where she was, and then showed back up on the fourth

5    day?

6    A    Yeah, it's correct.

7    Q    Okay.

8    A    But it's during the hurricane, there's no electricity.

9    Q    And --

10   A    So she gave me this explanation.

11   Q    In the Fall of 2013, what hurricane hit the east coast?

12   A    I don't recall the name.  You can look at the record,

13   there is a hurricane.

14   Q    Okay.

15   A    And whole of Philadelphia, many places lost power.  So I

16   gave her the benefit of doubt.  But I still criticize her and

17   to tell her seriously, and should not do this in the future.

18   Q    You did not issue her a written warning, correct?

19   A    Yeah, because this is a first offense.

20   Q    Okay.  My question was:  You did not issue her a written

21   warning.

22   A    No.

23   Q    And there was no three-day suspension.

24   A    No.

25   Q    And this hurricane, did it also affect Temple

84

1    University?

2    A     I think so, probably like a one day or --

3    Q     You think?

4    A     But she disappear for more than one day, like three

5    days.

6    Q     Three days --

7    A     Yeah.

8    Q     -- right?

9    A     Yes.

10   Q     And you can't recall the name of the hurricane?

11   A     I could not recall.  But we can all look at Google and

12   to find out.

13   Q     We could all look.

14   A     Yeah.

15   Q     And you know, if you think of the name of the hurricane,

16   you can -- or you know, after you look at it, you can let us

17   know.

18   A     Yeah.

19   Q     What -- Ms. King, she's much younger than Ms. Briggs,

20   correct?

21   A     Correct.

22         But I want to add, there is several staff member much

23   older than Ruth in the Department.

24   Q     Dr. Wu --

25             MS. MATTIACCI:  I move to strike the witness'

85

1    answer as non-responsive.  There was not even a question

2    pending.

3         THE COURT:  All right.  That's struck.  And let's

4    pick up the pace.

5         MS. MATTIACCI:  Okay.  And then -- sorry, Your

6    Honor.  I was going to the disciplinary policy, which is P-

7    65, and I'm going to put it up on the screen.

8    BY MS. MATTIACCI:

9    Q    Now you understand that the disciplinary policy at

10   Temple has four categories, correct?

11   A    Correct.

12   Q    A is the least serious category of violation.

13   A    Uh-huh.

14   Q    B is the next level of seriousness.

15   A    Uh-huh.

16   Q    C is the higher level seriousness, and then there's D.

17   A    Uh-huh.

18   Q    That is the most serious, correct?

19   A    Uh-huh.

20   Q    Okay.  And in terms of this policy here, B-1 says,

21   "Unauthorized Absence."  B-2 is chronic sick day abuse.  B-3

22   is chronic lateness.  Do you see that?

23   A    Yes.

24   Q    I -- are you aware of any documentation disciplinary

25   action against Ms. Briggs for violating B-3 of chronic

86

1   lateness?

2   A    We have a verbal warning.

3   Q    Okay.  But my question was:  Do you have any -- well, do

4   you have any documentation of the verbal warning?

5   A    No.

6   Q    And there's no documentation that -- of an official

7   written warning to her for violating B-3, correct?

8   A    Correct.

9   Q    And when she -- when Ms. Briggs overslept that morning,

10  she was cited for a violation of B-10, which says:

11            "Inefficiency, failing to meet expected standards

12            of performance, productivity, or efficiency."

13       Do you see that?

14  A    Yeah, I saw it.

15  Q    And you're aware that, that day, she stayed at work

16  until nine o'clock at night, to make sure all the work was

17  done, correct?

18  A    She did that several times.  But I ask her not to do

19  that, just work during the regular office hour.

20  Q    She often stayed after hours to try to get all of her

21  work done, correct?

22  A    I'm not -- she stayed late, but it doesn't mean that she

23  had work done.

24  Q    She -- you -- she stayed late, but you're not sure that

25  she --

1   A    Yeah.

2   Q    -- she got work done?

3   A    Yeah.  But we never ask her to do work -- work in the

4   late, yeah.

5   Q    Okay.  But you agree with me she stayed late often,

6   correct?

7   A    Correct.  But still, work not done.

8   Q    And you agree with me that there were times in which

9   Temple was closed, due to snow, and Ms. Briggs would still

10  come into work, to do work during the snow days.

11  A    That could happen, yeah.

12  Q    You recall it happening --

13  A    Yeah.

14  Q    -- correct?

15  A    Yeah.

16  Q    Isn't it true, mister -- Dr. Wu, that you would lose

17  your temper with students in your department and scream at

18  them?

19  A    No, we have technical discussions.  So it, sometime, can

20  be spirited discussion, but doesn't mean it's a yell because

21  I'm very serious, like a technical correctness.

22  Q    So you're saying that you never yelled in the office?

23  A    I would not say we never yell, but we have a heated

24  debate.

25  Q    You have a heated debate.

1   A     Yeah.

2   Q     And would you conduct those debates in Chinese?

3   A     Yeah, sometimes, because they are Chinese.  Their --

4   their English is not that perfect.

5   Q     Now you say that you were trying to help Ms. Briggs.

6   Did you ever reach out to anybody to try to get her another

7   job at Temple?

8   A     Oh, yes.  For the five years, I make a phone call to

9   everywhere, HR, and even encourage Ruth to see if -- if there

10  are suitable job.  I just feel that she's not good -- she's a

11  good person, that's why we get along well, but she's not good

12  in doing this executive like -- Executive Assistant job.

13  Q     You --

14  A     There is a deadline that she's not good at.

15  Q     You know that she was doing the Executive Assistant job

16  for years, before she started working for you, correct?

17  A     Correct.

18  Q     And she got good performance reviews in the years before

19  working for you, correct?

20  A     I'm not sure of that.

21  Q     Her first --

22  A     You can -- you can check Temple record.

23  Q     Her --

24  A     I thought the opposite.

25  Q     Okay.  Her first performance deficiency notice that she

89

1    received was only after working for you, correct?

2    A    Can you repeat the question?

3    Q    The first deficiency notice that she received during

4    working at Temple was after she started working for you,

5    correct?

6    A    I do not know that.

7    Q    Did you ever -- my question, though, was:  Did you ever

8    reach out to anybody, not HR, but to your connections amongst

9    the University, to try to get Ruth a job there that she could

10   do?

11            MR. HARRIS:  Objection.  Asked and answered.

12            THE COURT:  I thought he already answered that,

13   that he had.

14            THE WITNESS:  Yeah.

15   BY MS. MATTIACCI:

16   Q    Okay.  So you had.

17   A    Yeah.

18   Q    Who did you reach out?

19   A    Oh, faculty member and our two Associate Chairs.  That's

20   what main topic of our meetings, how to help Ruth.  And

21   sometimes, she is just keep on talking to the persons, it's -

22   - it's very loud.  And then she says that someone disturbing

23   her work.  So we, eventually, assign her to another office,

24   separate office, so she can concentrate on work.  So we -- we

25   tried all kinds of things for Ruth.

90

1    Q    My question, though, was very specific.  I want to know

2    if you picked up the phone and spoke to somebody outside your

3    department, and said, I have a good employee here, I'd like

4    to get her a job.

5              MR. HARRIS:  Objection.

6    Q    Did you ever do that?

7              MR. HARRIS:  Objection, Your Honor, for the third

8    time.

9              THE COURT:  Overruled.

10   BY MS. MATTIACCI:

11   Q    You can answer.

12   A    Yeah.  It's kind of awkward for me to -- to call someone

13   and say that I going to recommend my personal assistant.

14   Q    So you didn't.

15   A    My -- yeah, I did not do it.  But I ask HR to see, or

16   Dean's Office to see if there is suitable job for her.

17   Q    Okay.

18   A    Yeah.  And I know they -- they tried, as well.

19   Q    You know that they tried to find a job for her.

20   A    Yeah, HR did.

21   Q    Did you ever write a letter of recommendation for her?

22   A    I don't recall that.  If Ruth asked me, I would write.

23   Q    And there -- well, you -- shortly after this writeup

24   that she gets for oversleeping --

25   A    Yeah.

91

1   Q     -- within three months after that, she's terminated,

2   correct?

3   A     Yes.

4   Q     And you knew that she was going to be terminated,

5   correct?

6   A     No.

7   Q     You didn't know she was going to be terminated?

8   A     No, I do not know.

9          THE COURT:  When?  When?

10         THE WITNESS:  No, I do not know what particular

11   date where it's a termination.  It's just some incidents

12   happened, then we recall, then you reach a point --

13         MS. MATTIACCI:  Okay.

14         THE WITNESS:  -- and it's a --

15   BY MS. MATTIACCI:

16   Q   So when --

17         MR. HARRIS:  Excuse me, Your Honor.  May the

18   witness be permitted to finish his answer?

19         MS. MATTIACCI:  Sorry.  I thought he was done.

20         THE COURT:  He may.  Finish.

21         THE WITNESS:  Yeah.

22   BY MS. MATTIACCI:

23   Q   So, at the time in which the termination speaks of --

24   well, let's look at the termination letter.  The termination

25   letter speaks of Ms. Briggs booking a room at the Double Tree

92

1    in Center City, instead of the hotel on Temple's campus.  Do

2    you recall that?

3    A    Oh, I don't recall that.

4    Q    You don't recall that?

5    A    You said in the -- in the hotel?

6    Q    Yes.

7    A    No, I don't recall.

8    Q    You don't recall that.

9         Do you recall what then caused the termination to

10   happen?

11   A    Oh, you mean the reimbursement.

12   Q    Okay.  There was --

13   A    Yeah.

14   Q    Yes.

15   A    Yeah, there was a reimbursement issue.

16   Q    Okay.

17   A    Yeah.

18   Q    So the hotel issue, that did not play a role in her --

19   in the decision to terminate her.

20   A    No, no.  I think yes because she somehow made -- made up

21   some story, and said the document was not there, or whatever

22   information is not there.  But in reality, it -- it's there.

23   Q    Okay.

24   A    Yeah.

25   Q    So, as of the time in which -- the termination letter

93

1   was drafted on April 1st, 2014.

2   A    Yeah.

3   Q    You knew of the expense report and the hotel booking

4   prior to April 1st, correct?

5   A    Yes.

6   Q    So, at the time -- which happened first?

7   A    So what's your question?

8   Q    Which happened first, the hotel room or the expense

9   report?

10  A    I think the whole thing relates to expense report.

11  Q    What's that?

12  A    Expense report.

13  Q    Happened first.

14  A    No, no.  The whole things are triggered by expense

15  report.

16  Q    The whole --

17  A    So she --

18  Q    Go ahead.

19  A    She just made up something, and it -- in fact, it's kind

20  of small thing, but she made up some story, and -- and then

21  the -- got caught.

22  Q    The expense report, she said that she didn't have

23  access.

24  A    Yes (indiscernible)

25  Q    And when she tried to put in the grant number, it

94

1    wouldn't let her process the expense report, correct?

2    A    Yes.  Yeah, I think that's the one.  But in reality, the

3    information is there.

4    Q    Okay.

5    A    Yeah.

6    Q    And there -- you obtained proof?

7    A    It's not me.  I think Drew find out.

8    Q    Drew found out?

9    A    Yeah.

10   Q    Okay.  And Drew got proof --

11   A    Yeah.

12   Q    -- that the --

13   A    Oh, yeah.  Yes.  And drew send out the -- the document,

14   and then the --

15   Q    Okay.  So there's documented proof --

16   A    Yeah.

17   Q    -- that Ms. Briggs had access to this expense account --

18   A    Yes.

19   Q    -- at that time.

20   A    Yeah, yeah.

21   Q    Have you seen this proof?

22   A    I saw -- I remember I saw this when Drew sent it out.

23   And then Ruth admit and --

24   Q    I mean, you are the Chair of the Computer and

25   Information Sciences Department --

1  A    Yes.

2  Q    -- at Temple University.

3  A    Correct.

4  Q    So, if there was proof that she had access to this

5  account --

6  A    Yeah.

7  Q    -- you could have just shown here, he's the proof that

8  you had access to this account.  But that did not happen,

9  correct?

10  A    No, because I'm not very familiar with the -- the

11  financial system.  So Drew is expert, right.

12  Q    Okay.

13  A    Right.  Like it's --

14  Q    So the answer --

15  A    -- just to --

16  Q    -- is no to my

17  A    -- accounting information.  Drew is expert in accessing

18  those information.

19  Q    Okay.  So the answer to my question is no.

20  A    Yeah.  I don't have direct information.

21  Q    Okay.  So, when that expense account issue happened, did

22  you want to terminate Ms. Briggs?

23  A    No.  We -- I don't remember exactly the procedures.  We

24  -- we talked to the Dean's Office, so include Drew and Greg.

25  And then we also involve HR.  Then we reach a collective

1   decision to -- the bar has reached.

2   Q    I -- my question was:  When the expense report issue

3   happened, did you want to terminate Ms. Briggs?

4   A    I -- yes.  When this one day -- they told me that this

5   is like a serious offense, right?  It's a collective

6   decision.  Then we just reach a decision.

7   Q    So is a serious --

8   A    It's not premeditated, like I want to terminate Ruth a

9   particular day, no.

10  Q    But you said that this issue with her putting the

11  expense into the grant number was such a serious issue, she

12  had to be terminated.

13  A    No.  She has so many serious issue.  This is not just

14  one.  I would say like hundreds of issue.

15  Q    Hundreds.

16  A    Yeah, I would say hundred.  Small thing, just accumulate

17  every week.

18  Q    Okay.  Is there any documentation --

19  A    No, we --

20  Q    -- of these --

21  A    As I say --

22  Q    And wait.  Can I just -- let me just finish, Dr. Wu --

23  A    Yeah.

24  Q    -- and then I'll let you go.  Is there any documentation

25  of these hundreds of issues that you're now saying that led

1    to the termination of Ms. Briggs?

2    A    No.  I mean, hundreds of small things accumulates, and

3    there are some larger things.  But as I say, I responsible

4    for so many staff and faculty and student, I cannot spend my

5    time, all the times, on Ruth.

6    Q    Okay.  I -- that's -- my question is:  Is there any

7    documentation of what you're saying are these hundreds of

8    things that Ruth was deficient in, that led to her

9    termination?

10   A    No, there are no document.  Again, you can talk to some

11   staff member and faculty member.

12   Q    Okay.

13   A    They will recall how much time we spend on Ruth, every

14   week.

15   Q    Are you responsible for bringing -- are part of your job

16   duties bringing in grant money to the university?

17   A    What's the question?

18   Q    Do you bring grant money into the University?

19   A    Correct.  Correct.

20   Q    Do you?

21   A    Yes.

22   Q    Okay.  Approximately, what is the value of the grant

23   money that you bring to the University?

24   A    Several million.

25   Q    Several million.

98

```
 1   A    Yes.

 2   Q    Okay.  Is it more than ten?

 3   A    I would say -- I would say maybe like in the range of 5

 4   million.

 5   Q    All right.

 6   A    Over the past seven or eight years.

 7   Q    Did Ms. Walker [sic] in HR relay to you that Ms. Briggs

 8   was complaining of a hostile work environment involving you?

 9   A    No.

10   Q    Did Ms. Walker relay to you that Ms. Briggs was

11   complaining of retaliation by you?

12   A    No.

13   Q    So you're unaware of that.

14   A    I'm unaware.  That's why I'm kind of surprised when I

15   see this document this year.  I thought that Ruth and I in

16   good term.  I'm the one really try to help her, to protect

17   her.

18   Q    Did Ms. Walker ever relay to you that Ms. Briggs was

19   bringing claims of sex and age discrimination pertaining to

20   you?

21   A    No.

22        MR. HARRIS:  Your Honor, I think she's referring to

23   Ms. Walton.

24        MS. MATTIACCI:  I mean Walton.  Was I saying

25   "Walker"?
```

99

1          MR. HARRIS:  Yes.

2          THE WITNESS:  Walker, yeah.

3          MS. MATTIACCI:  Thank you.  I'm sorry.  Let me

4     correct that.  Walton.

5     BY MS. MATTIACCI:

6     Q    So I think you knew who I was talking about.  Let me go

7     back.

8          Deirdre Walton in HR, did she ever relay to you that Ms.

9     Briggs was complaining of a hostile work environment

10    concerning you?

11    A    I don't recall.  I only have -- I remember this one

12    case, she talked to me, but I don't remember it's related to

13    Ruth or other thing, but not something serious.  She just

14    wanted to check with me on something.

15    Q    She wanted to check with you on something.

16    A    Yeah, maybe related to Ruth about -- but I don't recall

17    if Ruth's name is mentioned.

18    Q    Okay.

19    A    Just general, like environment, a friendly environment

20    or some -- hostile environment or whatever, but --

21    Q    Is this --

22    A    -- I don't --

23    Q    -- prior to Ruth's termination or after?

24    A    I don't remember, to be honest.  Maybe after or before,

25    it's -- but during that period, '13 or '15.

100

1   Q    Okay.  Did Ms. Walton, Deirdre Walton, every relay to

2   you that Ms. Briggs was complaining of sex and age

3   discrimination?

4   A    No.  Because I would take this very seriously.

5   Q    Did Ms. Walton ever relay to you that Ms. Briggs was

6   complaining of retaliation by you?

7   A    No.

8   Q    How about Mr. Greg Wacker --

9   A    No.

10  Q    -- did he -- let me just finish, for the record.

11       Did he ever relay to you that Ms. Briggs was complaining

12  about hostile work environment, retaliation, and age and sex

13  discrimination?

14  A    No.

15  Q    So, when you -- at some point after she was terminated,

16  you were advised of this, correct?

17  A    No.  Only this year.

18  Q    Just until this year?

19  A    Yeah, this year.  That's why I was in shock, like how

20  can Ruth say this against me.

21  Q    Wow, okay.

22  A    Or this year, last year, so it's -- that's --

23           THE COURT:  Are we finished with this?  Are we

24  finished?

25           MS. MATTIACCI:  I just want to -- one moment, Your

1    Honor.

2              THE COURT:  Yeah, let's --

3              MS. MATTIACCI:  That's all I have, Your Honor.

4              THE COURT:  Thank you.

5              MR. HARRIS:  May I, Your Honor?

6              THE COURT:  Yes.

7                   CROSS-EXAMINATION

8    BY MR. HARRIS:

9    Q    Dr. Wu, you testified previously that you would

10   recommend Ms. Briggs to another department.  Do you recall

11   testifying to that?

12   A    Yes, but I don't know the detail, which department.

13   Q    Well, when you -- you testified that you would give her

14   a recommendation if she asked you.

15   A    Yes, yes.

16   Q    Do you recall testifying to that?

17   A    Yes, yes.

18   Q    Why would you possibly give her a recommendation if her

19   performance was so deficient?

20   A    No, because I truly think that Ruth is a nice person.

21   She can do some job, like organizing event, she's very good

22   at that.

23   Q    When you say "organizing event" --

24   A    Yeah, organizing for a party or some big events to --

25   yeah, just events.

102

1    Q    Did she do that for the Department?

2    A    Yeah, she did that.  For example, future competing --

3    competitions, and we have some kind of department dinner

4    events, she's very good at that.

5    Q    Okay.  So, if it were an event planning position, you

6    would recommend her.

7    A    Yes.

8    Q    You testified that you had recorded or memorialized Ruth

9    Briggs' performance deficiency as early or before 2011.  Do

10   you remember testifying to that?

11   A    Yes, I would.

12           MR. HARRIS:  Okay.  May the witness be shown -- and

13   may I approach, Your Honor?

14           THE COURT:  All right.

15           MS. MATTIACCI:  What is the document?

16           MR. HARRIS:  D-72.

17           MS. MATTIACCI:  Okay.

18   BY MR. HARRIS:

19   Q    Showing you what's been marked as D-72.  Dr. Wu, after

20   you finish looking at that document, please let me know, and

21   I'll ask you a few questions.

22   A    (Witness reviews exhibit)

23   Q    And it's also on the screen, Dr. Wu.

24   A    Yeah.

25   Q    Do you recognize that --

103

```
 1   A     Yes.

 2   Q     -- document?

 3   A     Yes.

 4   Q     Did you prepare that email to the Human Resources

 5   Department?

 6   A     Yes.  I mean, again, together with -- I think with two

 7   Associate Chairs.

 8           MR. HARRIS:  Your Honor, may I -- I'd like to admit

 9   D-72 into evidence.  And may that be published to the jury?

10           THE COURT:  Any objection?

11           MS. MATTIACCI:  No objection, Your Honor.

12           THE COURT:  It's admitted.

13      (D-72 received in evidence)

14   BY MR. HARRIS:

15   Q    Dr. Wu, did you create this email to Mr. Jenkins

16   (phonetic)?

17   A     Correct, yes.

18   Q     And was that on November 17th, 2010?

19   A     Yes.

20   Q     And now turn to the second page, please.  Is this email

21   -- strike that.

22       Is this document the email that you sent to Human

23   Resources?

24   A     Yes.

25   Q    Is this the example that you were talking about when you
```

104

1    testified regarding the one week in which you monitored Ms.

2    Briggs' performance?

3    A    Yes, that's the one.

4    Q    Is this the document you were referring to?

5    A    Yeah, that's the document.

6    Q    Okay.  The third paragraph says:

7              "For the last two years, we have been frustrated

8              working with Ruth."

9         Does it say that?

10   A    Yes.

11   Q    And so you're talking about the two years preceding you

12   creating this email?

13   A    Yes.

14   Q    So she began working with you in what year?

15   A    2009.

16   Q    Okay.  So are you referring to --

17   A    Including this year, including 2010.

18   Q    Okay.

19   A    Yeah.

20   Q    So 2009 and 2010.

21   A    And 2010, yeah.

22   Q    Is that a yes?

23   A    Yes.

24   Q    All right.  The fourth paragraph says, "Ruth is a well,

25   meaning person."  Did I read that accurately?

105

1    A    Yes.

2    Q    And then what else did you say?  What's the next

3    sentence you provide?

4    A    Oh, which paragraph?  I --

5    Q    The fourth paragraph.

6    A    Again, my vision has some problem.

7              THE COURT:  You read it.

8              THE WITNESS:  Yeah.

9              MR. HARRIS:  If I may?

10             THE COURT:  Yes.

11             THE WITNESS:  Yeah.

12   BY MR. HARRIS:

13   Q    All right.  "She has a strong sense of doing jobs well."

14   Would you -- is that accurate?

15   A    Correct.

16   Q    Did I read that correctly?

17   A    Yes, that's why she's a good person.

18   Q    It says:

19             "However, she has insisted on interpreting

20             instructions her own way, without asking for

21             clarification before execution."

22        Did I read that accurately?

23   A    Uh-huh.

24   Q    You have to say yes or no.

25   A    Yes.

106

1    Q    Okay.  Now were there issues regrading her interpreting

2    what she was supposed to, as opposed to what you asked her to

3    do?

4    A    Yes.

5    Q    And did you provide her feedback?

6    A    We -- we always had a meeting with Ruth, and tell Ruth

7    how to correct.  So we have a weekly meeting -- actually,

8    every day meeting with Ruth, through the later stage.

9    Q    Okay.  The next sentence says:

10            "She also has her own sense of priority, rather

11            than what we specify."

12        What did you mean by that?

13   A    So she does not know what's the priority.  Sometimes,

14   she just thinks certain things -- more things are important

15   priority.

16   Q    Okay.  The next sentence is you go on to talk about the

17   different people that have been frustrated.  You identify

18   yourself.

19   A    Uh-huh.

20   Q    The ISC -- IST Director.

21   A    Yes.

22   Q    And then other faculty members.

23   A    Correct.

24   Q    All right.  And then the next paragraph:

25            "Here are some examples during the last week of our

107

1        Ruth problems."

2     You say "Ruth problems."  What do you mean by "Ruth

3  problems"?

4  A    No, Ruth's problems just make it simple, just said we --

5  we spent time, two Associate Chair and me, document all the

6  things Ruth -- that particular week, the incidents.  So this

7  is just one single week.

8  Q    Is this the week that you were referring to?

9  A    Yes.

10  Q    All right.  So there's -- I believe that there are five

11  incidents listed, correct?

12  A    Yes.

13  Q    All right.  And for -- those are the five incidents in

14  one particular week.

15  A    Yeah, one particular week.

16  Q    All right.

17  A    And both our two Associate Chair aware of that.

18  Q    And who are the Associate Chairs at the time --

19  A    One is --

20  Q    -- (indiscernible)

21  A    One is Gene Kwatny; another one is Justin Shi.

22  Q    I apologize.  Dr. Wu, it was the sixth incident on the

23  third page.  Do you see that?

24  A    The third page, yes.

25  Q    Do you see that incident, as well?

108

1    A    Which incident?

2    Q    F.

3              THE COURT:   F.

4    A    F, yeah.   I've asked Ruth to help proofread our new

5    department brochure.   Last week before leaving for trip, I

6    requested Ruth to give this with her highest priority and for

7    two days, not to work on anything else.   Only a small portion

8    of the work is completed and still is mum mistakes.

9    Q    Is there a following paragraph -- and am I reading this

10   accurately?

11             "There are many similar incidents that demonstrate

12             her inability to follow instructions and work with

13             efficiency and accuracy."

14   A    Correct.

15   Q    That's the information you provided HR?

16   A    Yes.

17   Q    I'll go to the last sentence in that paragraph:

18             "I am very concerned about the long-term impact of

19             this situation."

20        Is that what you said?

21   A    Yeah, because I was hired by the university to reshape

22   the department, the grow the department.   So, but Ruth is not

23   helping us.

24   Q    The next paragraph says:

25             "I'm asking for your assistance in finding her

109

1           replacement for her position."

2      Did you say that?

3  A    Yes.

4  Q    And that was back in 2010?

5  A    Yes.

6  Q    Did you receive assistance from the HR Department in

7  terms of finding a replacement?

8  A    Not in a direct way, but I think that behind the doors,

9  they tried.

10  Q    When you say "behind the doors, they tried"?

11  A    No, I mean tried that -- I contacted them later.  They

12  said they're also looking for that, but somehow know other

13  department wanted Ruth or something.

14  Q    So, the document that you provided, this was in 2010?

15  A    Yes.

16  Q    Did you go over these incidents specifically with Ms.

17  Briggs that were identified in this email?

18  A    I don't recall exactly -- should be -- but I don't

19  recall the exact format.

20  Q    Okay.  When you said "the exact format"?

21  A    Yeah, is that like a conversation or -- so I don't

22  remember exactly.

23  Q    What was your custom with Ms. Briggs?

24  A    Usually, I talked to her every day.

25  Q    Dr. Wu, you heard testimony or counsel asked you a

110

1    question specifically regarding a conversation that you had

2    with Ms. Briggs regarding the retirement age and women in

3    China retiring, as well as men in China retiring.

4    A    Yeah.

5    Q    Can you provide the jury the context of that

6    conversation.

7    A    Now, as I said, I thought I had a good relation with

8    Ruth.  We always had some friendly conversation, so that's

9    probably one of the conversations -- it's just one small

10   subject -- so, we mentioned about the age, the cultural

11   difference, it's just like to see the difference in Asia, in

12   the U.S.  So, the people in Asia retire early, not just for

13   men -- for women, but also for men.

14   Q    Is it also custom for the individuals that retire to go

15   back into the workforce?

16   A    Yes.  Actually, many people do.

17   Q    Counsel asked you a question regarding the incident

18   report of November the 9th, 2011.  Do you recall testimony

19   regarding that incident report?

20   A    Yes.

21   Q    Now, is it -- did you typically or did you typically

22   travel during the school year or during the semester?

23   A    No, I travel for -- by the way, I travel all over the

24   world; I've been to all the countries in Europe, for example

25   -- and then I traveled to China in summer, but I don't travel

1    during the regular semester, like in November.

2    Q    So, November would have been during the semester?

3    A    Yeah, during the semester.

4    Q    So, it would have been unlikely for you to have a

5    conversation with Ms. Briggs during the fall semester in

6    which counsel asked you that question?

7    A    No, if it were right after my trip, it should be in

8    December.

9    Q    Do you recall whether or not Ms. Briggs was written up

10   for walking out of a meeting?

11   A    Walking out of what?

12   Q    Walking out of a meeting that she had with you?

13   A    Yes, sometimes she lost temper or upset or something.

14   Q    When you say she would lost temper or upset --

15   A    Got upset, so sometimes she's frustrated.

16   Q    And what would she do?

17   A    Sometimes she would walk out and she -- but I don't

18   recall the particular date or the particular incident.

19   Q    Understood.  On the instances in which she would walk

20   out or got frustrated, did you contact the dean's office?

21   A    Yeah, I always contacted the dean's office about those

22   kinds of incidents and to ask a suggestion what to do.  I

23   would never make my own personal decision.  And, also, I

24   always check with my two associate chairs.

25   Q    And who were your associate chairs again?

1   A    One is Dr. Gene Kwatny, another is Dr. Justin Shi.

2   Q    Do you recall the incident in which Ms. Briggs received

3   a three-day suspension I believe it was for her coming to

4   work late?  Do you recall that?

5   A    Yes.

6   Q    Do you recall how many hours late she was on that date

7   when she came in?

8   A    I don't recall that.  She's frequently late, like one

9   hour, two hour.  But, again, it's not a single incident; it's

10  like a sequence of incidents and make things worse, instead

11  of admit, she would come up all kinds of excuses and reasons.

12  Q    Do you recall -- if I told you that she was

13  approximately three hours late, would that refresh your

14  recollection as to how many hours she was late?

15  A    That's not surprising, but usually like one hour, two

16  hour late.

17  Q    Did she ever call you on the date that she was late in

18  which she received the write-up?

19  A    I'm pretty sure she didn't call.  If she called, then we

20  just -- we forgive her.

21  Q    So, she did not call?

22  A    Yeah.

23  Q    Did she send you an email?

24  A    Sometimes when she's late, she sends email.  Sometimes,

25  don't.  Many times, don't.

113

1  Q    This particular incident, do you recall whether or not

2  she sent you an email advising you that she was going to be

3  three hours late?

4  A    No, otherwise, I would not wrote her up.

5  Q    Did she send you a text message?

6  A    No.

7  Q    Had you communicated prior to the date she received this

8  incident report, had she sent you -- had she previously sent

9  you text messages?

10 A    I think sometimes she send it, but sometimes she don't.

11 Q    You say sometimes she sent you text messages?

12 A    Yeah, sometimes.

13 Q    To advise you that she would be late?

14 A    Yeah, yeah.

15 Q    Can you describe the age distribution of the individuals

16 in your department at the time that you were the chair?

17 A    So, we have a couple of junior -- I think only one

18 junior one -- Hailey King that she mentioned at consummation

19 [sic], and all the other ones I would say is at 50 or 60 and

20 70.

21 Q    And these are staff members?

22 A    They're all staff members.

23 Q    Administrative assistants?

24 A    Yeah, administrative.  I think all of them are female,

25 except two -- or one is a technician.

114

1    Q    And they -- when you say "all of them are female" --

2    A    Female, yeah.  All of them are female.

3    Q    And --

4    A    Except one is male, is a computer expert.

5    Q    And you said the ages are 50, 60, and 70, absent Ms.

6    King, that counsel referred to?

7    A    Yes.

8    Q    Had you previously been accused of discriminating

9    against based on age or gender by any other staff member at

10   Temple University?

11   A    No, never in my life.  Actually, I was -- after Chair, I

12   was promoted to be Associate Vice Provost.  That job is to

13   recruit more students from different parts of the country, so

14   as to increase diversity.  And because of that, Temple

15   received a special award last year for campus diversity.

16   Q    Whom did you receive the award from?

17   A    Temple University.

18   Q    Where did the award come from?

19   A    From an international organization; again, it's a record

20   that you can find for international affairs.

21          MR. HARRIS:  With the Court's indulgence?

22        (Pause in proceedings)

23          MR. HARRIS:  Your Honor, I have no further

24   questions for this witness.  Thank you.

25          MS. MATTIACCI:  I have a few, Your Honor.

115

REDIRECT EXAMINATION

BY MS. MATTIACCI:

Q    Dr. Wu, counsel just showed you that email back from
2010 in which it said that you'd had these issues -- oops --
isn't it true that you didn't start working with Ms. Wu --
Ms. Briggs until 2009?

A    Yeah, 2009.

Q    Okay.

A    The summer.

Q    Summer of 2009 --

A    Yeah.

Q    -- and that email you're talking about was November
2010, so it wasn't even close to two years that you were
working with her?

A    Yeah, but I talking about a two-year span, right.  A
university's academic year from summer to the next year's
summer, then to fall is another academic year.

Q    Okay.  Well, it would have just been you came in the
summer of 2009, so it would have been first, fall semester
and spring semester of 2009 and then part of fall semester of
2010, correct?

A    Yeah.

Q    And when you said "for the last two years" you didn't
mean two years; you meant --

A    Yeah, just the two years, the two academic years.

116

1  Q    Okay.  So, that wasn't a very long time that you were

2  with her, correct?

3  A    It's over one year, right.

4  Q    And you knew that she was in her fifties when she was

5  assigned to you, correct?

6  A    Yeah, again, I don't -- I never ask a person's age.  I

7  only know that by looking is about 50, I would say.

8  Q    Right.  Okay.

9       And then I would like you to turn to Defendant D-43 in

10  the binder there.

11            MR. HARRIS:  Your Honor, may I approach with the

12  correct binder?

13            THE COURT:  That would help him.

14            THE WITNESS:  Yeah, I don't know how to find that

15  binder.

16            MS. MATTIACCI:  And you know what?  I forgot that

17  he had a screen, Your Honor.  I can just pull it up on the

18  screen.

19  BY MS. MATTIACCI:

20  Q    Okay.  So, here is an email --

21  A    Yeah, Sharon.

22  Q    Sharon is in HR, correct?

23  A    Yes.

24  Q    And that's sent to you and that's November -- I mean

25  December 10th, 2010.  So, this is in response to that email

117

1    that you sent to her with your Ruth problems, correct?

2    A    Yes.

3    Q    Okay.  And she writes to you and saying:

4             "I'm writing to follow up on our meeting regarding

5             the performance with Ruth Briggs.  Following our

6             meeting, I met with Ruth Briggs.  Based on the

7             discussion and information received in both

8             meetings, there's no basis for disciplining Ruth at

9             this time.  My recommendation is to continue to

10            assign tasks to Ruth through email with CC to Alex

11            and alert Alex to any problems as soon as they

12            become evident.  As stated, Monica Washington,

13            Deirdre Walton, we talked about in HR, and I are

14            always available for consultations, as issues

15            arise.  Sharon Boyle."

16        Do you see that?

17   A    Yes.

18   Q    And then from that point, there were no other emails or

19   records of any disciplinary action until the one, the

20   following November, November of 2011, in which you can't

21   recall why that write-up was done, the one that was during --

22   right around her birthday, correct?

23   A    Uh-huh, correct.

24   Q    And other than that email that counsel showed you from

25   2010, there's no other email or documentation that you sent

1    to HR in similar vein, correct?

2    A    Correct.  The reason is that we already frustrated

3    because we spent so much time, but still we didn't get the

4    result, but we still tried to help Ruth every week.

5    Q    And you said that in regards to the issue in which she

6    overslept and came to work a little late, that if she would

7    have called, you would have forgiven her and she would not

8    have gotten a write-up, correct?

9    A    Correct.

10    Q    Isn't it true that she did call, but you were in a

11    meeting at that time?

12    A    I don't recall that one.

13    Q    You recall that she spoke to a student worker who was

14    there to relay that she was going to be late and to relay the

15    message to you?

16    A    That may be another day, but I don't know if it's

17    exactly the same day.

18    Q    Do you recall that being a fact?

19    A    Yeah, as I said, sometimes she called in, sometimes she

20    doesn't.

21    Q    And in terms of this issue concerning her walking out of

22    a meeting, is there any documentation of her ever doing that?

23    A    No document.

24          MS. MATTIACCI:  No further questions, Your Honor.

25          MR. HARRIS:  May I, Your Honor, just briefly on the

119

1   limited inquiry that counsel raised?

2           THE COURT:  Very briefly.

3                       RECROSS-EXAMINATION

4   BY MR. HARRIS:

5   Q    Doctor, we're showing you what's been marked as D-43,

6   the email that was just shown to you --

7   A    Yes.

8   Q    -- from Sharon Boyle to you, Dr. Wu.  Do you see that?

9   A    Yes.  Is it on the screen?

10  Q    It's on the screen, but I think it may be on your screen

11  closer to you.

12  A    It's not on the screen here.

13  Q    It's not on the small screen?

14  A    Yeah.  See, I have a vision problem now.  I cannot see

15  clearly.

16          MS. MATTIACCI:  I believe it's D-43 in the binder,

17  if you want to ...

18          THE WITNESS:  Yes, I see it.

19  BY MR. HARRIS:

20  Q    Dr. Wu, Sharon Boyle is in the HR Department at Temple

21  University, correct?

22          MS. MATTIACCI:  Objection; leading, Your Honor.

23          MR. HARRIS:  Withdrawn.

24  BY MR. HARRIS:

25  Q    Do you recognize the name Sharon Boyle?

120

```
1    A    Yes.

2    Q    What department is she in?

3    A    HR.

4    Q    Okay.  Dr. Wu, do I understand this correctly, that

5    prior to you receiving this email, you had reached out to HR

6    in --

7              MS. MATTIACCI:  Objection; leading, Your Honor.

8              MR. HARRIS:  It's a yes-or-no question, Your Honor.

9              THE COURT:  Well, that's usually leading.

10             MS. MATTIACCI:  Exactly.

11             THE COURT:  Ask it -- rephrase your question.

12             MR. HARRIS:  Sure.

13   BY MR. HARRIS:

14   Q    Did you speak to HR, prior to you receiving this email?

15   A    Yes.  That's -- the mail is emailed to HR, asking her

16   for help.

17   Q    Okay.  Now, this email is dated December the 9th, 2010.

18   A    Yes, it's after my letter.

19   Q    Okay.  Thank you.

20             MR. HARRIS:  I have no further questions.

21             THE COURT:  You may step down, Doctor.  Thank you.

22             MS. MATTIACCI:  Thank you.

23             THE COURT:  You may step down.

24             THE WITNESS:  Okay.

25             (Witness excused)
```

121

1          THE COURT:  It's about 16 minutes after 4 now.

2     Rather than start with a new witness, we will recess until

3     tomorrow morning.  I would like to start promptly at 9:30.

4          When you go home, the first question they ask you

5     is:  What case are you sitting on?  Just tell them you're not

6     allowed to talk about it until it's over and when it's over,

7     you can bore everybody with it, your stories about it, but

8     until then, do not have any conversation with anybody at

9     home, even amongst yourselves or with anyone that you see

10    here in the courtroom.

11         And as a matter of fact, with anybody who was in

12    the courtroom, you should not have any conversations on any

13    subject with them.  So, until 9:30 tomorrow morning, the jury

14    is excused.

15         THE COURT OFFICER:  All rise.

16      (Jury excused)

17         THE COURT:  If counsel has something they want to

18    take up with me before tomorrow morning, then you should come

19    at nine o'clock.  Tell opposing counsel that you have

20    something so opposing counsel is here.

21         The idea is that I'd like to start at 9:30 promptly

22    when we told the jury we were going to start at 9:30.

23         MR. MUNSHI:  Yes, Your Honor.

24         COUNSEL:  Thank you, Your Honor.  Thank you, Your

25    Honor.

122

1          (Proceedings adjourned to 7/17/18)

2          (Concluded at 4:19 p.m.)

3                    *****

4

5                 CERTIFICATION

6          We certify that the foregoing is a correct

7    transcript from the electronic sound recording of the

8    proceedings in the above-entitled matter to the best of our

9    knowledge and ability.

10

11   Transcriptionists:  William J. Garling and Coleen Rand

12

13

14

15

16                                   July 16, 2018

17   Coleen Rand, AAERT Cert. No. 341

18   Certified Court Transcriptionist

19   For JDR Acquisition, LLC./

20   Advanced Transcription

21

22

23

24

25

**A**

**AAERT** 122:17
**ability** 19:4 23:5
   76:5 122:9
**able** 27:10,16
   46:3 63:19
**above-entitled**
   122:8
**absence** 46:9
   85:21
**absent** 46:10,10
   114:5
**abuse** 85:21
**academic**
   115:16,17,25
**access** 35:17
   36:3,4 42:15
   42:19,22 93:23
   94:17 95:4,8
**accessing** 95:17
**account** 15:16
   35:14,15,16
   94:17 95:5,8
   95:21
**accounting**
   95:17
**accumulate**
   96:16
**accumulates**
   97:2
**accuracy** 108:13
**accurate** 105:14
**accurately**
   104:25 105:22
   108:10
**accused** 114:8
**accusing** 36:6
**Achievement**
   54:2
**Acquisition** 1:21
   122:19
**action** 12:20
   13:7,12 24:24
   33:3 34:9,24
   41:10 49:11
   64:13 65:6,11
   65:17 85:25

117:19
**actions** 36:8
   49:10 65:3
**activity** 24:6
**add** 72:25 84:22
**addition** 36:3
**additional** 35:1
**address** 27:20
   28:4
**adjourned**
   122:1
**adjusted** 26:16
**administration**
   22:5,7
**administrative**
   22:13 24:19
   26:22,24
   113:23,24
**administrativ...**
   22:10
**administrator**
   18:17
**admission** 26:8
   31:4 48:2
**admit** 94:23
   103:8 112:11
**admitted** 26:10
   29:6 31:7
   32:20 78:6
   103:12
**Advanced** 1:21
   122:20
**advice** 8:11
   23:15
**advise** 7:11
   113:13
**advised** 100:16
**advising** 113:2
**affairs** 48:23
   49:3,5 51:3
   114:20
**affect** 83:25
**afternoon** 3:1
   20:10,11 50:24
**age** 6:15,17,23
   7:8,25 14:4
   15:16 17:5
   38:3,9 39:2

41:25 55:2
   59:11,12,13,13
   59:13,16 60:10
   61:7,15,25
   63:12 98:19
   100:2,12 110:2
   110:10 113:15
   114:9 116:6
**age-** 37:22
**ages** 54:24 114:5
**ago** 11:13,14
   52:16 65:1
   71:6 73:21
   74:4
**agree** 4:17 10:6
   19:19 35:20
   41:23 87:5,8
**agreed** 3:13
**agreeing** 3:17
**agrees** 29:19
**ahead** 47:21
   50:10 58:19
   93:18
**airlines** 26:25
**airport** 72:11
   78:20,23,25
   79:6
**alert** 117:11
**Alex** 117:10,11
**allowed** 34:13
   61:7 79:15
**American** 51:18
**amount** 4:4,5,9
   18:18
**and/or** 30:11
**answer** 30:5
   57:2 82:24
   85:1 90:11
   91:18 95:14,19
**answered** 21:14
   89:11,12
**answering** 26:23
   74:20
**answers** 11:17
   11:19
**anticipated** 4:19
**anybody** 41:5

42:5 68:25
   82:17 83:4
   88:6 89:8
   121:8,11
**anymore** 5:3 8:6
**apart** 50:7
**apologize** 52:11
   107:22
**apologized**
   77:11
**apparently** 36:4
   42:21
**APPEARAN...**
   1:11
**applications**
   26:24 53:4
**applied** 22:23
**apply** 8:9,13,18
   9:1,12
**appraised** 8:3
**approach** 11:2
   102:13 116:11
**appropriate**
   7:14 12:19
   13:12 28:22
   29:19
**approving** 26:6
**approximately**
   18:24 22:16
   97:22 112:13
**April** 14:13
   41:14,17 43:14
   43:24 93:1,4
**argumentative**
   13:18 33:12,24
   36:6 44:6,13
**arguments** 4:3
**arrive** 72:9
   78:18 79:8
**Asia** 56:2 110:11
   110:12
**Asian** 55:24
**asked** 11:16
   12:3 13:1
   17:17 20:12
   21:13,16 46:18
   59:14 66:12
   71:21 89:11

90:22 101:14
   106:2 108:4
   109:25 110:17
   111:6
**asking** 5:17
   33:19 81:10
   105:20 108:25
   120:15
**aspect** 69:13
**assess** 4:5
**assessed** 4:4
**assign** 89:23
   117:10
**assigned** 57:17
   59:3 116:5
**assistance**
   108:25 109:6
**assistant** 21:23
   22:7 27:16
   57:18,22 59:4
   88:12,15 90:13
**assistants**
   113:23
**associate** 5:4
   54:17 65:19,19
   73:7,9 74:1
   89:19 103:7
   107:5,17,18
   111:24,25
   114:12
**attention** 14:16
   14:17 29:11
   31:11 33:5
**attitude** 23:8,9
   23:14 33:22
**Audio** 1:20
**automated**
   35:16
**available** 72:11
   117:14
**average** 72:17
**award** 54:1,3,5
   114:15,16,18
**awarded** 54:1,5
**aware** 6:13 8:7
   15:4 17:7,11
   18:13,16,18
   19:18 30:20

32:10 34:17
35:17 41:18
49:6 67:25
68:1 69:2
78:17 85:24
86:15 107:17
**awkward** 90:12

**B**

**B** 15:6 35:15
46:7,9 85:14
**B-1** 85:20
**B-10** 45:11,14
46:6 81:19
86:10
**B-2** 85:21
**B-3** 85:21,25
86:7
**Bachelor's** 22:5
**back** 4:14,15
16:19 19:15,15
29:2 30:10
32:4 35:25
41:4 47:3
53:16,17 58:2
58:21 66:7
67:4 74:17
83:4 99:7
109:4 110:15
115:3
**background**
22:4 52:24
**bar** 96:1
**based** 22:22
33:7 37:23
114:9 117:6
**basically** 22:9
40:5
**basis** 117:8
**becoming** 40:11
**began** 104:14
**beginning** 73:24
**behavior** 35:23
**Beijing** 54:13,14
**believe** 11:8
15:11,14 16:4
17:25 20:22
21:5 25:1

27:24 29:6
34:12 39:4,7
39:19 41:10
46:4 56:22
57:10,13 64:16
65:12 107:10
112:3 119:16
**believed** 7:7
60:10
**benefit** 83:16
**best** 37:5 122:8
**beyond** 46:22
48:3
**bias** 16:25
**biased** 16:18
**Bible** 50:13
**bifurcate** 3:14
3:18,21
**BIFURCATI...**
2:3
**big** 37:3 101:24
**binder** 20:23
44:16,16 50:9
63:15 116:10
116:12,15
119:16
**birthday** 38:5
59:9,17,20,22
59:25 60:3
117:22
**bit** 22:8 30:9
**black** 44:16
63:15
**blocking** 52:9
**blow** 63:20
**blue** 55:15
**blue-collar** 55:1
55:8,15
**blurry** 52:12
**blurting** 6:19
**book** 50:7 67:7
72:16 77:14
**booked** 36:22
72:20 78:17
**booking** 14:21
26:25 31:22
35:2 91:25
93:3

**bore** 121:7
**born** 51:10
**boss** 23:18 67:9
**bottom** 43:18
**Boulevard** 1:22
**Boyle** 117:15
119:8,20,25
**breeze** 27:6
**brief** 4:3
**briefly** 118:25
119:2
**Briggs** 1:2 6:7
6:14 7:2 8:3,6
8:9,18 9:16
10:5 12:9 13:4
13:5,6,22
14:10 15:15
16:1,3 22:1,17
23:2 24:15
25:7 26:14
27:1,21 29:23
30:15 33:7,22
34:5 36:14
37:10,16,19,22
37:25 38:15,18
38:21 39:4,7
39:19 40:1,20
40:22 41:2,8
41:13,19,21,24
42:10,15,18
43:23 44:6,12
45:25 48:9
57:17,25 58:23
59:7 60:1
61:10 63:11,24
65:6 67:19
68:3 69:1,10
69:19 70:1
71:17 72:4
81:11 84:19
85:25 86:9
87:9 88:5
91:25 94:17
95:22 96:3
97:1 98:7,10
98:18 99:9
100:2,5,11
101:10 109:17

109:23 110:2
111:5,9 112:2
115:6 117:5,6
**Briggs'** 13:25
14:4,7 25:4
26:20 28:4,12
32:9 34:1
35:18 38:3,9
38:12 102:9
104:2
**Brigs** 71:15
**bring** 3:6 19:15
19:15 43:11
81:6 97:18,23
**bringing** 18:19
18:21 48:8
49:8,10,13
97:15,16 98:19
**brings** 18:25
**brochure** 108:5
**broke** 63:9
**brought** 14:16
17:9 18:14
19:1,20 29:12
30:2 33:6
46:19 61:15
**bruised** 52:14
**budget** 22:10
**budgets** 22:10
**bullet** 35:8,25
36:11
**Business** 22:5,14
**busy** 24:6

**C**

**C** 15:6 31:18
35:15 85:16
**C-3** 15:1
**C-4** 15:1
**cab** 36:25
**call** 3:3 4:15
50:4 63:2
67:23 82:15
88:8 90:12
112:17,19,21
118:10
**called** 45:21
54:1 83:3

112:19 118:7
118:19
**calls** 50:5
**campus** 36:21
36:21 54:16
92:1 114:15
**candidate** 77:5
78:14
**candidates** 72:8
72:8,9
**capable** 27:15
**card** 59:25
**cards** 59:21,23
**careless** 15:1
**Carlin** 1:12
**carry** 31:19
**case** 1:3 4:20
66:12 69:21
77:3 99:12
121:5
**cases** 56:9,10,16
66:2
**categories** 85:10
**category** 31:18
32:6,7,8 46:7,9
85:12
**caught** 93:21
**cause** 35:4
**caused** 44:9 92:9
**CC** 117:10
**cellist** 67:7
**Center** 36:24
50:25 92:1
**central** 43:2,6
**Cert** 122:17
**certain** 4:4
30:15 56:22
57:11 63:12
77:23 106:14
**CERTIFICA...**
122:5
**Certified** 122:18
**certify** 122:6
**chair** 19:8 23:25
51:6 94:24
107:5,17
113:16 114:11
**chairs** 65:19

73:9 74:1
89:19 103:7
107:18 111:24
111:25
**challenged** 36:8
**challenges** 23:7
23:10 25:1
27:4
**challenging** 23:4
**change** 12:17
26:14
**charge** 7:25
**check** 65:12
88:22 99:14,15
111:24
**checking** 30:5
35:15
**Cherry** 1:17
**China** 6:15 7:4
7:14 8:5 19:11
19:14,15 51:10
51:12 53:14,17
53:17,21,23
54:1,2,5,6,10
54:16,21,23
55:23 56:5,7
57:13 60:14
61:6,17,25
110:3,3,25
**Chinese** 19:15
88:2,3
**choose** 27:14
**chronic** 85:21
85:22,25
**circumstances**
46:17
**cited** 81:19
86:10
**City** 36:24 92:1
**claim** 17:23
71:23
**claims** 17:8
18:13 98:19
**clarification**
105:21
**classic** 67:6
**classification**
12:21

**clear** 69:23
**clearly** 119:15
**CLERK** 58:4,6
58:14
**clerks** 58:15
**close** 47:23,25
61:9,25 115:13
**closed** 87:9
**closer** 58:10
119:11
**closing** 4:3
**cloud** 53:2
**co-counsel** 5:16
**coast** 83:11
**coding** 29:20
**Coleen** 122:11
122:17
**collaborated**
53:9
**collaborates**
37:4
**collective** 68:11
95:25 96:5
**college** 22:9,21
28:18 32:2
34:19 35:3
42:5 51:4,13
**combination**
31:13
**come** 4:14 5:8
15:5 20:23
24:15 28:9,13
28:15 29:11
30:4 31:10,12
33:5,16 46:3
53:17 79:2,15
87:10 112:11
114:18 121:18
**comes** 29:2 54:6
**coming** 21:24
24:17,18 80:21
112:3
**comment** 7:10
8:8 10:18
55:23
**comments** 24:12
28:12 62:11
**committees**

48:24
**common** 56:7
65:23
**communicate**
23:17
**communicated**
113:7
**communication**
24:21 30:10
**community** 37:3
**Company** 1:21
**compelled** 64:12
**competent**
27:15
**competing**
102:2
**competitions**
102:3
**complained**
37:16,19,22,25
**complaining**
13:22 98:8,11
99:9 100:2,6
100:11
**complaint** 6:16
6:23 7:8,10
13:25
**complaints** 7:25
14:4,7 15:16
16:2 17:5
**complete** 19:6
28:8
**completed** 27:5
28:3 108:8
**compliance**
22:12
**computer** 19:8
23:25 25:25
26:5 43:2,6
51:6 54:2
94:24 114:4
**computers** 52:3
**computing**
50:25 53:2,3
**concentrate**
89:24
**concerned** 38:15
38:18 108:18

**concerning** 3:16
17:10 42:13
54:21 99:10
118:21
**concluded** 18:10
122:2
**conclusion** 4:20
64:18 68:6
**conduct** 15:2
35:4 88:2
**conducting** 20:6
**confer** 39:24
51:24 52:2
58:16 63:16
76:15
**confirm** 29:3
**confirmation**
16:20 43:1
**confirmed** 36:4
42:21
**conjunction**
35:6
**connections**
89:8
**consideration**
15:20
**consistent** 8:21
**Console** 1:12,13
**construed** 6:21
**consultations**
117:14
**consuming**
74:12
**consummation**
113:18
**contact** 111:20
**contacted**
109:11 111:21
**content** 11:9
**context** 6:18,20
7:16,19 110:5
**continually** 8:11
**continue** 6:2
117:9
**continued** 6:5
36:5,7
**contract** 48:25
**conversation**

8:4,18 9:4,11
60:14 61:11,12
61:15,22 62:5
62:11,14 63:10
63:12 65:23
67:2,3,14
109:21 110:1,6
110:8 111:5
121:8
**conversations**
65:18 66:5
110:9 121:12
**convey** 7:10
**conveying** 14:5
**Conwell** 36:19
36:23
**coordinator**
21:23
**cordial** 24:5
25:9
**correct** 6:10,17
7:9,22 8:1,19
9:5,22 10:8
11:11,17,20
12:6,13,15
14:13,23 15:2
15:3,6,7,10,18
16:11,13 18:19
19:2,9,12,17
19:21,22 35:24
41:20,24 42:16
42:19,22 43:8
43:9,24 44:3,7
45:9,22 46:1,3
46:10 48:10,14
51:4,5,8,9,13
51:20 52:21,22
52:24 53:5,7,8
53:14,15,19
54:3,4,8,9,10
54:11,16,24,25
55:2 56:5,6,8
56:18,23 57:18
57:19,21 58:24
59:4,5,9 60:2,3
60:6,9,11,12
60:15,16 62:1
63:13 64:1

66:19 67:9,10
67:12 69:10,14
69:15,16,17,19
71:9,10 75:15
76:3,7,25
77:10,12,15,16
78:10,18 79:4
79:16 80:4
82:8,9,11,18
83:6,18 84:20
84:21 85:10,11
85:18 86:7,8
86:17,21 87:6
87:7,14 88:16
88:17,19 89:1
89:5 91:2,5
93:4 94:1 95:3
95:9 97:19,19
99:4 100:16
103:17 105:15
106:7,23
107:11 108:14
115:21 116:2,5
116:12,22
117:1,22,23
118:1,2,8,9
119:21 122:6
**corrected** 33:20
**corrective** 41:10
**correctly** 14:19
25:3 77:3
105:16 120:4
**correctness**
87:21
**counsel** 20:6,12
29:6 44:11
71:9 109:25
110:17 111:6
114:6 115:3
117:24 119:1
121:17,19,20
121:24
**countries** 55:25
110:24
**country** 54:6,8
57:14 114:13
**county** 55:24
**couple** 27:3

67:20 70:12
113:17
**Court** 1:1,20 3:3
3:5,8,11,21
4:10,12,19,22
5:2,9,12,15,18
5:20,22,24 6:1
8:23 11:4
13:19 15:20,23
16:8 17:13,17
17:21 18:3,5,8
18:11 19:23
20:1,5,18
21:15,19 26:10
31:5,7 32:20
39:6,10,13,16
39:23 40:15
44:19,23 46:15
46:23 47:1,4,6
47:8,11,14,16
47:20 48:5
50:1,4,10,12
50:15,19 51:23
51:25 52:3,6,9
52:13,15,17
57:1,3,7,24
58:1,3,9,13,15
58:19 62:18,21
62:23 63:2,5,7
85:3 89:12
90:9 91:9,20
100:23 101:2,4
101:6 102:14
103:10,12
105:7,10 108:3
116:13 119:2
120:9,11,21,23
121:1,15,17
122:18
**Court's** 114:21
**courtroom**
121:10,12
**cover** 80:2
**create** 103:15
**created** 65:10,16
73:20
**creating** 104:12
**crew** 43:6

**criticize** 83:16
**cross** 2:6 50:6
**CROSS-EXA...**
20:8 101:7
**cultural** 7:17,18
110:10
**culture** 67:3
**current** 53:1
**currently** 22:6
50:25
**custom** 109:23
110:14
**CV** 52:23

_____

**D**

**D** 15:6 85:16
**D-24** 34:21
**D-4** 2:21 25:22
26:8,11
**D-43** 116:9
119:5,16
**D-47** 9:8
**D-5** 46:5
**D-7** 29:5 49:17
**D-72** 2:24
102:16,19
103:9,13
**D-8** 2:22 30:24
31:4,8
**D-9** 2:23 32:13
32:18,21 44:15
45:4,5
**damages** 3:14
3:25 4:4,6,14
**data** 4:2
**date** 21:12,17
31:15 32:23
63:24 64:2
72:13,16,20,21
91:11 111:18
112:6,17 113:7
**dated** 6:9 65:8
120:17
**dates** 31:23 35:2
36:22
**day** 1:9 10:17
46:3,10 67:2
79:8,23 83:5

84:2,4 85:21
86:15 96:4,9
106:8 109:24
118:16,17
**day-to-** 67:1
**days** 36:23 37:1
52:16 64:5
78:7,17 79:12
79:15,21,24
82:12 83:3
84:5,6 87:10
108:7
**deadline** 88:14
**deadlines** 25:2
25:16,16
**deal** 70:14
**dealing** 10:4
**dealt** 48:25
**dean** 22:7 24:22
24:25 25:4
41:13 64:17
**dean's** 2:21
14:16,17,17
21:24 22:24,25
23:3,19 24:8
24:16 25:7
26:5 30:18
40:3 58:25
64:16,20 65:18
68:5,12 69:12
70:10 90:16
95:24 111:20
111:21
**debate** 87:24,25
**debates** 88:2
**December** 111:8
116:25 120:17
**decide** 34:13
**decided** 70:2
**deciding** 15:15
**decision** 15:25
16:2,6,17,24
24:25 68:2,9
68:11,16,19
69:1,25 70:8,9
71:15 92:19
96:1,6,6
111:23

**decisions** 23:6
**Defendant** 1:15
116:9
**defendant's** 9:7
20:13 44:15
**Defendants** 1:8
**deficiencies** 28:4
29:23 32:10
**deficiency** 6:8
67:18 88:25
89:3 102:9
**deficient** 48:8
97:8 101:19
**defines** 32:8
**definitely** 66:4
**Deirdre** 12:5
13:3 18:6
34:16 35:6
70:15 71:1,1
99:8 100:1
117:13
**deliberates** 4:5
**DeMino** 69:4
**demonstrate**
108:11
**deny** 12:18
**denying** 36:3
**department**
8:10 9:2,13,22
10:14 17:9
19:9 21:24
22:14,20 23:25
26:1,2,6 27:17
37:9 51:6 76:6
76:8 78:15,16
81:3 82:5
84:23 87:17
90:3 94:25
101:10,12
102:1,3 103:5
108:5,22,22
109:6,13
113:16 119:20
120:2
**departments**
53:22
**depend** 10:3
67:13

depending
  30:10
deposition 11:3
  11:6,10,16
  12:4,12 13:14
  18:7
describe 113:15
description 26:3
deserve 45:14
  77:1
designate 32:6
despite 26:15
detail 45:24 65:1
  71:22,25 78:19
  79:5 101:12
details 45:23
  68:21 70:4
determine 29:1
dictate 48:16
dictates 48:25
difference 17:24
  110:11,11
differences 7:17
  7:18
different 4:22
  6:20 8:12
  48:15 78:4
  82:19 106:17
  114:13
differently
  38:16
DiMeo 27:13,14
  69:7,8,9 70:1
dinner 79:11
  102:3
direct 2:6 6:5
  42:13 44:5,11
  46:22 48:4,7
  49:18 50:22
  67:9 95:20
  109:8
directed 35:1
directly 27:15
  69:12
director 27:16
  50:25 51:3
  54:15 70:21
  106:20

disappear 84:4
disciplinary
  2:22,23 10:16
  12:20 13:7,12
  29:10 31:2
  32:16 33:3
  34:9 48:9,14
  49:10 63:23
  64:12 65:5,11
  65:17 77:1
  80:6,13 85:6,9
  85:24 117:19
discipline 13:8
  15:5,5 28:17
  28:20 29:15,17
  30:7 31:17,25
  32:2,25 34:24
  49:2 65:25
disciplined
  29:24 30:1,15
  30:19
disciplining
  117:8
discovery 66:11
discrepancy
  42:15
discriminating
  114:8
discrimination
  6:17,23,24 7:8
  8:1 14:4 15:16
  15:17 17:6,9
  17:24 18:14
  37:17 54:21
  98:19 100:3,13
discuss 64:24
  65:3 68:5
discussed 64:16
  64:24
discussing 61:24
discussion 87:20
  117:7
discussions
  87:19
Dismiss 34:1
disorderly 15:1
  33:11
dispute 6:7

disruption 44:9
disruptive 15:1
  33:13 36:6,7
dissatisfied
  33:18
distance 46:1
distracted 23:12
  25:18
distribution
  113:15
DISTRICT 1:1
  1:1,10
disturbing
  89:22
diversity 7:18
  114:14,15
Doctor 119:5
  120:21
document 9:8,8
  20:12,14,16,22
  21:5,6,10,12
  21:18 25:24
  26:18 29:9
  31:1,15 32:15
  34:23 64:11,18
  66:1,5,6 72:22
  73:2,9,12,13
  73:14,18,20
  75:24 77:23
  92:21 94:13
  97:10 98:15
  102:15,20
  103:2,22 104:4
  104:5 107:5
  109:14 118:23
documentation
  10:19,21 31:24
  42:24 49:20
  65:10,16 74:25
  75:1 76:3
  77:18,24 80:16
  81:1,10,13,14
  81:15,17,18
  85:24 86:4,6
  96:18,24 97:7
  117:25 118:22
documented
  73:1,3,6 74:6

75:8 76:12,23
  94:15
documents
  71:24
doing 4:16 23:7
  24:20 48:14
  49:12 61:16
  88:12,15
  105:13 118:22
dollars 18:22,23
doors 109:8,10
Double 91:25
doubt 83:16
downward
  26:16
Dr 6:14 7:3,13
  8:3,5,19 9:5,11
  9:13,21 12:8
  12:19,22 13:1
  13:4,5,9 18:18
  18:21,25 19:5
  19:19 22:1
  23:22,24 24:2
  24:4,10,12,15
  24:18 26:21
  27:1,6,9,18,20
  28:2,7,12,13
  28:15 29:12
  31:12 33:6,18
  33:20,22 35:1
  35:18 36:6,19
  37:4,9 41:6,8
  41:12 45:21
  48:7,12 49:1,6
  49:9 50:5,24
  63:9,19 74:16
  78:22 81:10
  82:21,23 84:24
  87:16 96:22
  101:9 102:19
  102:23 103:15
  107:22 109:25
  112:1,1 115:3
  119:8,20 120:4
draft 14:9 16:10
  35:5 43:16
drafted 14:12
  16:15,24 43:16

93:1
drew 13:1 27:13
  27:23 28:25
  29:13 30:11
  31:12,23 33:6
  36:7 45:16,23
  47:2 69:2,4,4,5
  69:6,6,7,11
  70:3 94:7,8,10
  94:13,22 95:11
  95:17,24
Du 67:7
due 8:4 62:7
  82:23 87:9
duties 31:18
  97:16

**E**

earlier 20:12
  21:10 29:22
  30:15 57:11
early 56:5,17
  61:8,17 62:3,3
  69:16 102:9
  110:12
earned 52:20
ease 43:11
easel 4:24
easily 23:12
east 83:11
EASTERN 1:1
educational
  22:4
EEO 7:5
EEOC 7:5
effect 61:6
effected 16:18
  16:25
Effective 43:19
efficiency 86:12
  108:13
effort 49:9
eight 98:6
eighteen 51:16
eighty 51:16
eighty-seven
  51:14
either 15:6

31:12 41:6
electricity 83:8
electronic 1:24
  122:7
Electronically
  1:20
elicit 3:16
email 2:24 65:12
  65:13,15 103:4
  103:15,20,22
  104:12 109:17
  112:23,24
  113:2 115:3,12
  116:20,25
  117:10,24,25
  119:6 120:5,14
  120:17
emailed 78:24
  78:24 79:3
  120:15
emails 66:7,12
  66:15,20 75:4
  117:18
employee 6:22
  6:24,25 90:3
employees 8:14
  34:17
employment
  6:25 25:5 32:9
  34:1,6 37:11
  38:10,13 43:19
  68:10
encourage 88:9
encouraged 8:9
  8:13,18 9:12
English 88:4
enjoyed 25:12
ensure 16:1,17
  16:24
entered 4:3
environment
  13:23 14:1
  15:17 23:5
  98:8 99:9,19
  99:19,20
  100:12
equal 6:25
equation 17:2

42:1
errors 32:10
  40:6 74:25
  75:2
escalating 28:20
especially 61:12
Esq 1:12,12,13
  1:15,16
Europe 110:24
event 64:12
  101:21,23
  102:5
events 101:24,25
  102:4
eventually 68:6
  89:23
everybody
  121:7
everybody's
  29:21
EVID 2:19
evidence 26:11
  31:8 32:21
  103:9,13
evident 117:12
exact 9:6 18:22
  46:25 75:17
  109:19,20
exactly 71:6,21
  95:23 109:18
  109:22 118:17
  120:10
examination 6:5
  20:7 40:17
  44:11 48:7
  49:18 50:22
  115:1
example 67:5
  72:6 102:2
  103:25 110:24
examples
  106:25
exception 76:9
exchange 61:13
  67:4,5
exchanges 75:4
Excuse 91:17
excused 50:3

120:25 121:14
  121:16
excuses 112:11
execution
  105:21
executive 21:23
  57:18,22 59:4
  88:12,12,15
exhibit 2:19
  20:22 25:21
  26:8 29:4
  30:23 31:4
  32:12,18 34:21
  48:2,3 62:17
  102:22
exhibits 36:8
  44:17
existed 66:18
expected 33:2
  86:11
expecting 33:21
expense 14:18
  35:14 42:14,16
  93:3,8,10,12
  93:14,22 94:1
  94:17 95:21
  96:2,11
experience 23:2
  24:2,4,5 61:13
  61:14
expert 95:11,17
  114:4
explain 36:16
explanation
  83:10
express 12:5
  13:3
external 24:21
eye 52:11
eyes 52:12

———— F ————
F 1:10,22 108:2
  108:3,4
facilitating 32:1
facilitator 28:19
fact 7:13 30:3,3
  30:6,8,21

53:22 56:7,17
  57:13,23 62:2
  93:19 118:18
  121:11
facts 15:25
  65:22
faculty 48:15,16
  48:19,20,23,24
  48:25 49:3,4
  72:7 73:17
  74:13 78:14,14
  79:11 81:2,16
  89:19 97:4,11
  106:22
failed 77:14
failing 31:19
  33:2 34:25
  36:17 86:11
fair 4:10 54:20
fall 82:10 83:11
  111:5 115:17
  115:19,20
falls 22:21
false 10:22,23
  10:24,25
familiar 54:20
  68:13 71:4
  95:10
far 30:6 43:7
  45:6
fast-paced 23:5
February 21:20
Federation 54:2
feedback 106:5
feel 88:10
fell 50:7
female 16:25
  17:1 113:24
  114:1,2,2
Fendell 1:16
fifties 60:11
  116:4
Fifty 55:15
Fifty-five 55:20
file 76:3
fill 5:9
filtered 29:14
finance 18:17

22:7,15
finances 22:9
financial 3:16
  4:2 69:12
  95:11
find 9:24 25:10
  71:24 78:20,23
  78:25 79:6
  84:12 90:19
  94:7 114:20
  116:14
finding 108:25
  109:7
fine 49:12 58:11
finish 91:18,20
  96:22 100:10
  102:20
finished 74:20
  100:23,24
fire 40:5,8,20,22
  41:1,6,8
fired 18:25
  77:24
firing 24:24
first 9:8 14:18
  23:24 27:22
  33:23 35:8,25
  50:17 83:19
  88:21,25 89:3
  93:6,8,13
  115:19 121:4
five 30:4 71:20
  88:8 107:10,13
fix 50:9
floor 1:22 5:20
  25:10
focus 28:11
  36:10
focused 23:17
  25:16 28:10
Foehl 6:25 7:5,9
  7:12,24 37:11
  37:13
follow 27:9
  108:12 117:4
followed 28:23
following 48:13
  108:9 117:5,20

**food** 61:14
**foot** 37:6
**football** 35:10
**forefront** 49:8
**foregoing** 122:6
**foreign** 54:6
**forgive** 112:20
**forgiven** 118:7
**forgot** 69:4
   70:19 72:10,13
   77:4 116:16
**form** 3:24 10:21
   34:24 64:15
**format** 109:19
   109:20
**forth** 30:10 47:3
   74:18
**forties** 42:11,12
   56:8
**forward** 37:6
**found** 24:12
   94:8
**foundation**
   39:21 56:25
**four** 30:4,7
   73:21 85:10
**fourth** 83:4
   104:24 105:5
**frame** 8:20 9:14
   28:1
**frequently**
   27:20,22 112:8
**friendly** 61:11
   62:5,10 63:12
   99:19 110:8
**front** 21:4 63:15
**frustrated** 28:7
   104:7 106:17
   111:15,20
   118:2
**full** 26:3 50:15
**fully** 69:2
**functions** 26:25
**further** 19:24
   40:13 49:24
   114:23 118:24
   120:20
**future** 19:20

83:17 102:2
_____
**G**
**G** 1:12
**Garling** 122:11
**gathered** 29:18
   32:3 49:19,21
**gender** 114:9
**gender-related**
   38:1
**Gene** 107:21
   112:1
**general** 28:19
   33:9,12,17
   61:8 62:2
   99:19
**generally** 25:12
**generated** 21:6
**getting** 23:11
   25:2 27:4
   33:20 36:5
   67:14
**gifts** 67:5,5
**give** 4:17 39:16
   52:24 67:4
   68:25 71:18
   72:6 75:23
   76:2,7 101:13
   101:18 108:6
**given** 31:19
   34:11,12,12,18
   36:13 41:22
   44:12 78:7
**go** 7:4,12 12:2,2
   22:23 24:23
   27:25 29:3
   35:8 46:6
   47:21 48:15
   50:10 53:16
   57:7 58:19
   62:19 66:7
   74:21 75:7,10
   76:3,12 78:20
   78:23,25 79:6
   81:22 82:24
   93:18 96:24
   99:6 106:16
   108:17 109:16

110:14 121:4
**goes** 3:24
**going** 3:13,21
   5:2,7 21:17
   24:6 28:3
   30:10 43:10,11
   46:7 47:3
   52:23 62:16
   63:18 75:7
   76:3 81:8,22
   82:23 85:6,7
   90:13 91:4,7
   113:2 118:14
   121:22
**good** 20:10,11
   23:9 24:5
   33:23 50:24
   54:7 88:10,11
   88:11,14,18
   90:3 98:16
   101:21 102:4
   105:17 110:7
**Google** 84:11
**gotten** 118:8
**governance**
   48:18
**graduate** 19:16
   53:18,20
**Grandshaw**
   38:24
**grant** 18:18,25
   19:1,3,20
   22:10 26:24
   93:25 96:11
   97:16,18,22
**grants** 19:4,6
**great** 5:6 23:6
   63:22
**green** 53:3
**Greg** 64:21,22
   65:3 68:18,20
   68:21 95:24
   100:8
**GREGORY**
   2:10 6:3
**group** 6:18
   28:25 35:7
**grow** 108:22

**guess** 24:16
**guidance** 68:12
   68:22
**guys** 43:2
_____
**H**
**Hailey** 82:3,5,7
   113:18
**hand** 25:17
   50:12,13
**handed** 11:10
   13:8 28:24
   34:4
**handle** 22:9,11
   37:7
**handled** 25:17
**handles** 49:2
**handling** 7:25
**handpick** 19:14
   53:17
**happen** 4:13
   15:8 56:15
   77:11 87:11
   92:10 95:8
**happened** 29:13
   34:8 36:22
   78:22 80:23
   91:12 93:6,8
   93:13 95:21
   96:3
**happening** 5:13
   87:12
**happy** 9:16,20
   10:11 24:9
**harassed** 38:19
**harassment**
   37:23 38:1
**harm** 76:5
**Harris** 1:15 3:19
   4:11,19 13:18
   16:4 17:12,15
   17:18,25 18:4
   18:9 31:9
   39:14 56:24
   89:11 90:5,7
   91:17 98:22
   99:1 101:5,8
   102:12,16,18

103:8,14 105:9
   105:12 114:21
   114:23 116:11
   118:25 119:4
   119:19,23,24
   120:8,12,13,20
**hash** 28:25
**hear** 18:1 59:8
**heard** 24:12
   57:5 60:23
   61:4 109:25
**heated** 87:23,25
**help** 9:23 24:7,9
   24:20 28:1
   44:21 49:9
   67:23 69:20
   73:25 78:5
   81:9 88:5
   89:20 98:16
   108:4 116:13
   118:4 120:16
**helped** 14:9
   16:10 43:16
**helping** 26:22,23
   108:23
**high** 23:4,5
**high-level** 24:19
**high-profile**
   36:18
**high-scientific**
   37:4
**higher** 85:16
**higher-level**
   8:15
**highest** 108:6
**hired** 57:20
   58:24 82:7
   108:21
**hiring** 22:11
**hit** 83:11
**Hold** 57:24
**home** 79:23,24
   121:4,9
**honest** 99:24
**Hong** 55:24
**Honor** 3:7,19
   5:6,16 11:2
   16:4 17:12,15

19:24 20:2,3
21:13,16 26:7
26:9 31:3,6
32:17 39:12
40:16,23 44:21
46:13,16,20
47:10,13,19,22
47:24 49:25
50:5,9,20,21
52:4 57:5
58:18 63:6
76:18 85:6
90:7 91:17
98:22 101:1,3
101:5 102:13
103:8,11
114:23,25
116:11,17
118:24,25
119:22 120:7,8
121:23,24,25
**HONORABLE**
1:10
**horrible** 9:19
**hostile** 13:23
14:1 15:17
98:8 99:9,20
100:12
**hotel** 14:22
31:22 36:17
92:1,5,18 93:3
93:8
**hotels** 26:25
**hour** 74:1 86:19
112:9,9,15,16
**hours** 86:20
112:6,13,14
113:3
**How's** 24:2
58:11
**HR** 12:6 13:8,21
27:17 29:1
31:23 34:10,15
47:2 67:23
68:6,11 70:9
70:11,12 88:9
89:8 90:15,20
95:25 98:7

99:8 108:15
109:6 116:22
117:13 118:1
119:20 120:3,5
120:14,15
**Human** 2:24
26:1,6 28:24
35:6 48:8
49:21 103:4,22
**hundred** 96:16
**hundreds** 96:14
96:15,25 97:2
97:7
**hurricane** 82:19
83:8,11,13,25
84:10,15

**I**

**idea** 75:15
121:21
**ideally** 30:8
**IDENT** 2:19
**identified** 22:23
109:17
**identify** 106:17
**image** 37:8
40:10
**impact** 40:10
108:18
**implication**
17:18
**important** 5:4,7
5:8 35:3 36:18
37:5 72:8
78:14 106:14
**impression** 37:3
**inability** 108:12
**incident** 29:13
46:25 64:3
66:2,3 69:2
71:19 75:16
107:22,25
108:1 110:17
110:19 111:18
112:2,9 113:1
113:8
**incidents** 30:16
64:5,16 65:2

66:10 68:4
70:4 72:15
75:3 91:11
107:6,11,13
108:11 109:16
111:22 112:10
**include** 13:13
55:1 60:1
95:24
**includes** 53:1,14
**including** 61:15
104:17,17
**increase** 114:14
**INDEX** 2:1
**India** 53:23
**indicate** 64:2
**indicated** 24:19
**indicates** 64:11
**indicating** 29:13
**indiscernible**
93:24 107:20
**individual** 27:8
36:23 37:4
**individuals** 40:4
40:19,22 41:1
41:12,16
110:14 113:15
**indulgence**
114:21
**inefficiencies**
12:20,21
**inefficiency** 33:1
86:11
**information**
3:18 19:8
22:11 24:1
26:1,5 29:17
32:3 34:12
35:2 42:7
48:18 49:18,21
51:7 92:22
94:3,25 95:17
95:18,20
108:15 117:7
**informations**
68:20
**informed** 34:4
**infraction** 29:2

29:19
**infractions** 15:5
**Initially** 27:1,3
**Inn** 36:19,23
**input** 48:21,23
70:9
**inquiry** 17:16
119:1
**insisted** 105:19
**instances** 46:24
111:19
**institution** 37:7
**instructions**
31:19 105:20
108:12
**interact** 27:17
**interacting**
25:12
**interactions**
33:7
**international**
51:3 114:19,20
**interpreting**
105:19 106:1
**interrogatory**
20:13
**interview** 72:7
79:7
**investigate** 7:22
**investigated**
14:15
**involve** 68:6
95:25
**involved** 28:17
28:20 29:14
31:25 32:4
45:20 68:21
70:3,7
**involving** 98:8
**ISC** 106:20
**issue** 41:7 42:13
45:24 48:9
49:4 65:3 72:2
76:13,23 83:18
83:20 92:15,18
95:21 96:2,10
96:11,13,14
118:5,21

**issued** 14:25
21:20 63:23
65:6 79:12
**issues** 9:20 10:1
10:7,9,10
14:25 24:17,18
27:6,20 30:20
41:7 49:8 74:3
74:6 75:8
96:25 106:1
115:4 117:14
**issuing** 29:15
31:25
**IST** 106:20
**items** 14:16 23:7
24:6,7 25:2,19
30:4,19 48:17

**J**

**J** 122:11
**Jacqueline** 67:7
**January** 9:15
32:24 45:1,8
80:9
**Japan** 55:24
**JDR** 1:21
122:19
**Jenkins** 103:15
**Jie** 2:12 50:14
50:18
**job** 9:21,24 22:8
26:3,15,20
31:18 55:18
67:15 71:21
76:6 88:7,10
88:12,15 89:9
90:4,16,19
97:15 101:21
114:12
**jobs** 8:9 55:1
56:22 61:18
105:13
**John** 1:22
**Judge** 1:10 5:21
56:25
**July** 1:5 122:16
**June** 11:11
**junior** 113:17,18

juror 5:20 51:23
jurors 5:15
jury 1:11 3:4,6
  3:24,24 4:5,14
  4:17,21,25
  5:25 47:19
  52:6 62:19
  63:3 103:9
  110:5 121:13
  121:16,22
Justin 107:21
  112:1

**K**

keep 75:3 89:21
KELLY 1:10
Kennedy 1:22
kept 24:17,18
kicked 26:3
kind 27:18
  35:15 61:12
  68:22 72:12
  73:13,24 80:19
  90:12 93:19
  98:14 102:3
kinds 72:15,21
  89:25 111:22
  112:11
King 82:3,5,7
  83:2 84:19
  113:18 114:6
knew 28:2,2
  60:5 91:4 93:3
  99:6 116:4
know 6:11,12
  7:16,20,21
  8:20 9:1,9,9
  17:4 20:16,24
  21:5,15 22:17
  22:19 23:5,15
  23:17,22 24:22
  24:25 25:4,6
  28:7 29:12,19
  29:20 30:2,3,5
  30:18 33:12
  36:25 37:6,8
  37:10,13,16,19
  37:22,25 38:3

38:5,21 39:2
41:15,25 42:3
42:3,4,4 44:20
45:16 46:24
47:8,14 54:6
57:13 59:12,13
59:17,19 60:16
60:18 62:15
65:1 66:7,20
68:9,20 69:11
70:7,8,18
73:25 75:10
77:23 79:5,7
79:17,18 82:3
84:15,16,17
88:15 89:6
90:1,18,19
91:7,8,10
101:12 102:20
106:13 109:12
116:7,14,16
118:16
knowledge 17:2
  122:9
knows 70:3
  81:16
Kong 55:24
Kwatny 107:21
  112:1

**L**

Labor 16:19
  28:25 29:18,18
  30:5,11 32:3,8
  34:10 45:16,24
  49:19
Lack 39:21
larger 97:3
late 42:11,12
  49:14 80:21,24
  81:1,11 86:22
  86:24 87:4,5
  112:4,6,8,13
  112:14,16,17
  112:24 113:3
  113:13 118:6
  118:14
lateness 45:20

85:22 86:1
Laura 1:12
law 1:13 55:10
  56:4 58:4,6,14
  58:15
laws 54:20
lawyer 60:17
layers 69:9
leading 119:22
  120:7,9
learn 49:1
leaving 108:5
led 12:21,25
  15:13 35:3
  96:25 97:8
left 26:16 50:13
let's 44:15 46:5
  46:6,6 47:8
  57:7,15 62:16
  74:21 75:10
  76:12,14 81:22
  85:3 91:24
  101:2
letter 10:1,8
  14:10,12 16:11
  16:13,15,16,23
  16:24 35:5,20
  36:13 43:10,14
  43:23 90:21
  91:24,25 92:25
  120:18
letters 26:23
level 15:6 26:15
  28:21 85:14,16
Level-C 15:9
levels 69:9
liability 3:25 4:1
  4:8
liars 36:7
lieu 44:2
life 114:11
likable 23:9
liked 25:10 40:5
  66:24
limited 119:1
line 12:3 17:15
  48:3
listed 107:11

little 11:13 22:8
  25:11 30:9
  118:6
LITTLER 1:16
lived 46:1
lives 45:25
LLC 1:13
LLC./ 1:21
  122:19
Locust 1:14
long 22:14 57:11
  60:25 73:19
  116:1
long-term
  108:18
longer 30:9
look 9:7,8 20:21
  20:24 25:11
  35:10 42:7
  50:8 62:16
  80:14 81:23
  83:12 84:11,13
  84:16 91:24
looked 76:19
looking 42:8
  43:11 67:17
  102:20 109:12
  116:7
lose 87:16
loss 19:21
lost 83:15
  111:13,14
lot 7:18 24:6
  27:23 42:3
lots 69:20 72:7
  73:18
loud 89:22
Luncheon 3:2

**M**

mail 120:15
main 89:20
major 68:4 75:3
  75:16,18,19,21
majority 56:9
  56:13
making 72:12
  78:6

male 114:4
mandatory
  54:23 56:4
  63:11
manner 23:11
  27:5 28:8
  33:11 49:8
manuscripts
  24:20 26:23
March 31:16
  76:16,24 77:15
Marilyn 38:24
  38:25
Marilyn's 39:2
marked 102:19
  119:5
Market 1:4
matter 4:22
  34:20 121:11
  122:8
Mattiacci 1:12
  1:13 3:7,9,12
  3:23 4:13,23
  5:1,5,11,14,16
  6:6 9:3 10:25
  11:2,5 13:20
  15:22,24 16:9
  17:19,23 18:2
  18:6,12 19:24
  21:13 26:9
  31:6 32:19
  39:9,21 40:16
  40:18,24,25
  44:20,24,25
  46:18,21 47:5
  47:9,13,15,17
  47:23,25 48:6
  49:24 50:5,8
  50:21,23 52:18
  52:19 57:5,8,9
  58:5,8,11,17
  58:20 63:6,8
  76:18 84:25
  85:5,8 89:15
  90:10 91:13,15
  91:19,22 98:24
  99:3,5 100:25
  101:3 102:15

102:17 103:11
114:25 115:2
116:16,19
118:24 119:16
119:22 120:7
120:10,22
**mean** 19:15 41:6
47:15 66:8
68:21 70:22
73:9 86:22
87:20 92:11
94:24 97:2
98:24 103:6
106:12 107:2
109:11 115:24
116:24
**meaning** 18:15
82:12 104:25
**meant** 36:24
115:24
**mediate** 27:9,18
**mediating** 27:23
**meet** 23:24 33:2
34:5 67:13
71:11 86:11
**meeting** 25:2
27:24 34:11,15
59:6 71:9
73:25 106:6,7
106:8 111:10
111:12 117:4,6
118:11,22
**meetings** 27:25
89:20 117:8
**member** 48:19
48:20 59:23
69:20 73:17
76:8 81:2,2,16
81:16 84:22
89:19 97:11,11
114:9
**members**
106:22 113:21
113:22
**memorialized**
102:8
**memory** 80:20
**men** 55:1,6 61:8

61:18,19 62:3
110:3,13,13
**MENDELSON**
1:16
**mention** 27:7
45:19
**mentioned**
26:13 62:2
99:17 110:10
113:18
**message** 113:5
118:15
**messages** 113:9
113:11
**met** 34:8,10
117:6
**mic** 58:4,10
**million** 18:22,23
97:24,25 98:4
**minute** 5:21
17:21 50:9
**minutes** 74:2
78:4 121:1
**missed** 47:20
**missing** 82:12
**mistake** 73:13
77:8,9 78:7,12
78:13
**mistakes** 40:7
40:10 72:21
77:16,17,19
108:8
**mister** 48:12
87:16
**mobile** 53:1
**moment** 58:1
100:25
**Monday** 79:3,10
**money** 18:18,21
18:25 19:20
97:16,18,23
**Monica** 117:12
**monitored**
104:1
**monitors** 52:10
**months** 8:8,17
9:4,10 10:17
27:3 30:3,8

45:9 80:7 91:1
**morning** 45:18
45:21 80:21
86:9 121:3,13
121:18
**move** 4:24 26:7
31:3 32:17
44:24 52:3,6
84:25
**moving** 4:20
**multiple** 41:20
41:21 44:6
**multitask** 23:6
25:15
**mum** 108:8
**Munshi** 1:13
20:3,6 121:23
**music** 67:6,6

_____
**N**
**name** 10:1 19:2
50:15,16,17,17
68:25 69:4
70:18 71:7
83:12 84:10,15
99:17 119:25
**names** 70:13
**nations** 61:18
**necessarily** 19:3
**necessary** 23:18
28:1
**need** 4:18 58:8
70:7
**needed** 24:8,19
25:17 28:1
65:4 66:5
**needs** 24:7
**negative** 37:8
**Neglecting**
31:18
**negligence** 15:1
**net** 3:17 4:16
**network** 50:25
53:3,4
**networks** 53:2
**Neurovirology**
22:20
**never** 6:8 13:22

14:3,6 41:25
59:14 60:18,23
74:8 77:11,14
83:3,3 87:3,22
87:23 111:23
114:11 116:6
**new** 108:4 121:2
**nice** 25:9 67:1
101:20
**nicer** 25:11
**night** 14:23
86:16
**nine** 80:6 86:16
121:19
**non-responsive**
85:1
**normal** 65:15
**normally** 3:23
**notes** 5:3,4,13
**nothing's** 5:13
**notice** 2:22,23
52:9 72:11
88:25 89:3
**November** 6:9
10:17 49:17
59:6,17 60:13
67:17,24 75:12
76:21 77:20
103:18 110:18
111:1,2 115:12
116:24 117:20
117:20
**number** 4:17,18
18:22 35:14,16
51:23 77:24
93:25 96:11
**numerous** 16:5

_____
**O**
**o'clock** 86:16
121:19
**oath** 11:20,22,24
**object** 17:15
48:2 56:25
**objection** 13:18
16:4 18:9
21:13 26:9
31:6 32:19

39:9,21 46:13
46:16 48:1
56:24 89:11
90:5,7 103:10
103:11 119:22
120:7
**objectionable**
24:13
**objections** 31:5
**obtained** 51:18
94:6
**Occasionally**
27:7 28:6
**occasions** 16:5
29:23 44:6
**occurred** 10:16
**offense** 83:19
96:5
**offensive** 62:11
**office** 2:21 6:25
7:5,5 8:19
14:17,17 21:25
22:24,25 23:3
23:19 24:8,16
25:8,11 26:5
30:18 33:16,16
40:3 54:10,15
58:25 59:21
64:17,20 65:18
66:14,25 67:11
68:5,12 69:12
70:10 79:16,25
86:19 87:22
89:23,24 90:16
95:24 111:20
111:21
**OFFICER** 5:20
5:24 50:12,15
52:3 62:21
121:15
**official** 86:6
**Oh** 5:1 18:4 45:5
60:7 62:24
69:11 70:9
72:6 73:4,11
73:21 78:2
81:2 88:8
89:19 92:3,11

94:13 105:4
**okay** 3:12 4:23
5:5,11,14,22
7:2 9:7 11:9
12:2 13:2,9
14:12,25 16:10
19:19 21:3,5
21:19 27:3
29:3,3,21,21
42:8 43:13
44:18 45:5,5,7
45:8,14,25
46:5 47:1,4,5
48:12,18 49:4
49:12,15 50:2
50:8 51:15,17
52:17,18 53:6
54:18 55:4,10
55:16,22 56:1
56:11,22 57:4
57:8,10,15,15
57:23 58:8,11
58:17 59:25
60:1 61:9,20
62:4,6,16,22
62:24 63:22
64:7,24 65:15
66:11,16,22
67:16,22,24
68:2,7,14,18
68:23 69:7,22
70:5,11,20,22
71:1,3,5,8,14
72:1,14 73:8
73:23 74:4,19
75:5,11,22,25
76:10 77:1,18
78:3 79:9
80:10 81:4,22
82:25 83:7,14
83:20 85:5,20
86:3 87:5
88:25 89:16
90:17 91:13
92:12,16,23
94:4,10,15
95:12,19,21
96:18 97:6,12

97:22 98:2
99:18 100:1,21
102:5,12,17
104:6,16,18
106:1,9,16
109:20 115:8
115:18 116:1,8
116:20 117:3
120:4,17,19,24
**old** 38:7 41:24
42:2,3,4,5,10
59:9,14 61:17
61:18 62:2
**older** 16:25 17:1
61:24 84:23
**on-site** 36:20
**onboard** 29:21
59:3
**once** 27:22 29:1
32:4 71:13
72:17,18
**ones** 40:11
113:19
**oops** 115:4
**operating** 22:10
**Operator** 1:20
**opinion** 33:8
**opportunities**
8:13 9:1
**opposed** 24:24
106:2
**opposing** 121:19
121:20
**opposite** 88:24
**option** 34:13,18
**order** 3:3 15:8
15:12 63:2
**organization**
114:19
**organizing**
101:21,23,24
**original** 3:24 4:7
**output** 23:10
**outside** 8:9,19
9:1,13,21 20:4
37:3 76:6 90:2
**Outstanding**
54:2

**Overruled**
21:19 48:5
90:9
**Overseas** 54:2
**oversight** 48:24
**oversleeping**
45:18 90:24
**overslept** 45:22
80:21 86:9
118:6
**owned** 77:8

_____
**P**
**P-** 85:6
**P-16** 76:18
**P-3** 29:7 62:17
63:14
**P-45** 43:10
**P-9** 44:15
**p.m** 1:9 3:2 41:4
58:2 62:25
63:1 122:2
**pace** 44:19 85:4
**page** 2:2 9:8
11:6 12:2
26:17 46:7
103:20 107:23
107:24
**paid** 79:17,20,25
**papers** 19:12
53:6,10
**paragraph**
104:6,24 105:4
105:5 106:24
108:9,17,24
**Pardon** 39:13
46:15
**part** 7:17 19:11
35:18 36:13
44:14 47:2
97:15 115:20
**Participants**
39:24 51:24
52:2 58:16
63:16 76:15
**particular** 73:3
73:4 91:10
96:9 107:6,14

107:15 111:18
111:18 113:1
**parties** 3:13
**parts** 114:13
**party** 101:24
**pass** 10:14
**pasture** 6:15 7:4
7:13 9:5,12
10:18 60:15,17
60:20,21 61:4
**Pause** 5:19,23
50:11 114:22
**pay** 26:14 78:8
79:18
**payroll** 22:11
**PC** 1:16
**penalty** 78:7
**pending** 85:2
**Pennsylvania**
1:1,5,14,17,23
**people** 6:19 9:23
24:21 25:9,12
28:10 33:17
59:21 66:24
67:11 68:16,18
69:25 70:2,12
71:14 78:16
79:7 106:17
110:12,16
**people's** 25:18
28:11
**perfect** 88:4
**performance**
9:20 10:1,7,9
10:10,19 23:13
24:17,18 27:2
33:2 41:7,11
48:17 67:18,25
74:6 75:8
76:13,23 86:12
88:18,25
101:19 102:9
104:2 117:5
**performed** 6:8
**period** 15:9 44:1
57:12 74:8
75:1 99:25
**permitted** 40:1

91:18
**person** 12:6
13:22 23:9
24:19 27:12
34:15 41:19
57:10 67:1
72:10 79:8
88:11 101:20
104:25 105:17
**person's** 116:6
**personal** 90:13
111:23
**personally** 28:4
40:5
**Personnel** 1:20
**persons** 89:21
**perspective**
25:13
**pertaining**
98:19
**Ph.D** 51:18
52:20
**phase** 4:1,2,9
66:11
**Philadelphia** 1:5
1:14,17,23
14:23 83:15
**phone** 67:23
88:8 90:2
**phones** 26:23
**phonetic** 103:16
**pick** 44:19 85:4
**picked** 90:2
**picking** 58:3,6
**piling** 80:1
**place** 27:23
50:13 64:3,12
**places** 83:15
**plaintiff** 1:3,12
2:8 6:3 22:17
50:5,14
**Plaintiff's** 4:20
20:22 21:1
**plane** 77:14,22
**planning** 34:25
102:5
**plants** 25:11
**play** 92:18

please 4:24
10:25 11:4
18:11 21:8
22:3 25:21
26:17 29:4
30:23 32:12
34:21 36:10
50:12,15 63:7
102:20 103:20
point 10:7 12:25
22:22 27:7,16
27:25 28:21
29:2 30:21
35:8,25 36:11
51:21 57:17
58:21 62:18
80:3 91:12
100:15 117:18
policies 15:4
22:12
policy 15:5
48:13,14 49:1
49:2,6 85:6,9
85:20
poor 10:19
portion 108:7
position 8:12,22
10:3 13:21
14:3,6 21:22
22:1,6,22,24
24:23 57:11
102:5 109:1
positions 8:16
8:19 9:12
possible 42:10
possibly 101:18
potentially 76:5
potting 25:11
power 83:15
Pre 67:7
preceding
104:11
premeditated
96:8
prepare 64:18
103:4
prepared 20:16
present 3:4 5:25

59:8 63:3
presented 43:23
presents 37:8
prestigious 54:1
pretty 75:18
79:5 112:19
previously 6:3
22:23 101:9
113:8 114:8
prior 6:8 36:5
67:16,18,24
71:8 74:4,23
77:14 93:4
99:23 113:7
120:5,14
prioritize 23:17
28:11
priority 106:10
106:13,15
108:6
probably 4:19
66:1 68:21
69:20 79:23
84:2 110:9
problem 49:7
105:6 119:14
problems 27:10
107:1,2,3,4
117:1,11
procedures
22:12 95:23
proceed 16:20
50:21 58:17
63:6
proceedings
1:24 3:2 5:19
5:23 50:11
63:1 114:22
122:1,8
process 13:7
31:13 32:5
34:9 42:16
94:1
processed 36:5
produce 66:12
produced 1:25
66:18
productivity

86:12
professor 14:22
14:22 51:1
73:7 78:18,20
promoted 8:16
114:12
promptly 121:3
121:21
proof 42:22,24
43:8 94:6,10
94:15,21 95:4
95:7
proofread 108:4
protect 98:16
protocol 53:2
provide 9:16,20
10:11 22:3
26:22 66:5,6
68:20 105:3
106:5 110:5
provided 108:15
109:14
Provost 54:17
114:12
published 53:6
103:9
pull 21:8 25:21
29:4 34:21
116:17
pulling 35:2
punitive 3:14,25
4:4,5,14
punitives 4:8
purchase 72:10
77:4
purchasing
22:11
purposes 4:15
purview 25:20
put 3:9 6:15
7:13 9:5,11
10:1,25 14:19
27:9,23 35:14
37:5 44:21
45:2 46:7 48:1
60:14 63:18
85:7 93:25
putting 7:3

10:18 96:10
_____
Q
qualified 19:5
question 3:24,25
4:8,21 8:17
12:3 13:3
15:19 16:21
17:21 18:11
39:11,14 56:25
68:7 69:22
74:20 82:24,24
82:25 83:2,20
85:1 86:3 89:2
89:7 90:1 93:7
95:19 96:2
97:6,17 110:1
110:17 111:6
120:8,11 121:4
questioning
33:24 48:3
questions 5:17
11:16 19:25
20:1 21:17
40:13 49:24
102:21 114:24
118:24 120:20
quick 3:10
Quite 23:15

_____
R
R 1:15
race 6:23
Rachel 1:16
Rahul 1:13
raise 50:12
raised 51:12
119:1
Rand 122:11,17
range 98:3
rare 76:10
reach 24:7,8
64:17 68:6
88:6 89:8,18
91:12 95:25
96:6
reached 96:1
120:5

read 9:9 52:23
53:25 104:25
105:7,16,22
reading 108:9
ready 78:25
79:6
real 3:10
reality 92:22
94:2
really 28:21
66:24 73:18
77:9 81:9
98:16
reason 69:11
77:21 118:2
reasons 15:13
30:12,13,14,16
71:18 72:1,4
112:11
reassignment
25:25
recall 9:6 13:24
14:2,5,8 18:22
43:5 44:14
45:15,19,23,25
46:2,14,17,23
46:24 49:23
59:6 62:8,10
65:9,13 66:4
67:20 72:4
75:14,17 80:16
83:12 84:10,11
87:12 90:22
91:12 92:2,3,4
92:7,8,9 97:13
99:11,16
101:10,16
109:18,19
110:18 111:9
111:18 112:2,4
112:6,8,12
113:1 117:21
118:12,13,18
recalls 46:19
receive 109:6
114:16
received 6:8,9
26:11 31:8

32:21 77:19
89:1,3 103:13
112:2,18 113:7
114:15 117:7
**receiving** 120:5
120:14
**recess** 3:2 62:19
62:20,25 121:2
**recognize**
102:25 119:25
**recollect** 45:17
**recollection**
8:23,25 9:10
112:14
**recommend**
90:13 101:10
102:6
**recommendat...**
90:21 101:14
101:18 117:9
**recommended**
40:9
**record** 3:10 41:4
41:4 48:2
50:16 58:2,2
71:22 75:4
80:15 83:12
88:22 100:10
114:19
**recorded** 1:20
1:24 102:8
**recording** 1:24
74:17 122:7
**records** 65:12
75:7 117:19
**RECROSS** 2:6
**RECROSS-E...**
119:3
**recruit** 114:13
**REDIRECT** 2:6
40:17 115:1
**reduced** 65:23
**refer** 6:24 35:13
49:4
**reference** 9:17
9:21 10:2,8,12
35:10
**referred** 7:4

114:6
**referring** 98:22
104:4,16 107:8
**refresh** 112:13
**refreshes** 9:10
**regarding** 34:5
104:1 110:1,2
110:17,19
117:4
**regards** 47:9
49:17,19 118:5
**regrading** 106:1
**regular** 86:19
111:1
**regularly** 27:24
80:23
**rehired** 61:19
**reimbursement**
71:23 72:2
92:11,15
**relate** 31:21
**related** 31:22
66:21 99:12,16
**relates** 93:10
**relating** 6:16
**relation** 110:7
**Relations** 16:19
28:25 29:18,18
30:5,11 32:3,8
34:11 45:16,24
49:19,21
**relationship**
37:5
**relay** 98:7,10,18
99:8 100:1,5
100:11 118:14
118:14
**relayed** 7:2
13:22,25 14:3
14:6
**relaying** 7:8
**relays** 6:22
**relevance** 39:22
**relevant** 47:18
66:13
**remember**
42:25,25 59:24
61:10 62:10

67:6 70:12,13
71:6,21,25
73:11 77:3
78:19 79:18,22
80:14 94:22
95:23 99:11,12
99:24 102:10
109:22
**remind** 59:24
**remove** 4:21
**repeat** 15:19
18:11 24:3
89:2
**repetitive** 24:17
40:11
**rephrase** 39:11
39:14 120:11
**replaced** 38:21
**replacement**
109:1,7
**report** 8:14
29:10 31:2
32:16 42:14,16
68:5 93:3,9,10
93:12,15,22
94:1 96:2
110:18,19
113:8
**reported** 69:14
**reports** 54:16
**request** 12:8
13:4,6,10
**requested** 10:23
12:19 13:12
108:6
**require** 56:23
**research** 19:11
37:7 53:1
**researchers**
53:9
**reservation**
36:18
**reservations**
72:13
**reshape** 108:21
**resign** 34:13,18
**resignation** 34:4
44:2

**Resources** 2:24
26:2,6 28:24
35:6 48:8
103:4,23
**respect** 8:4 62:7
82:23
**response** 62:6,9
116:25
**responses** 20:13
**responsibilities**
22:13 25:19
26:21 28:11
31:19
**responsibility**
35:18 69:18
**responsible**
18:19,21 97:3
97:15
**restate** 15:22
**result** 26:13
118:4
**resume** 3:2 63:1
**resumes** 6:4
63:4
**retain** 19:4,6
**retaliation** 14:7
15:17 16:2,18
37:19 98:11
100:6,12
**retire** 55:2,6,8
55:14 56:5,7
57:10 61:8,17
61:19 62:3,3
110:12,14
**retired** 56:17,19
61:17,25
**retirement**
54:24 56:4
61:15,16 63:11
63:11 110:2
**retiring** 110:3,3
**return** 61:13
**review** 16:20
**reviewed** 43:4
**reviewing** 65:13
**reviews** 44:17
88:18 102:22
**Richard** 1:15

**right** 3:5,11 4:22
6:2 18:8 31:23
33:18 44:21
45:12,22 50:12
52:17 57:15
59:1 63:5
67:17 69:14
70:7 71:1
75:18 77:6
78:12 80:1
84:8 85:3
95:11,13 96:5
98:5 102:14
104:24 105:13
106:24 107:10
107:13,16
111:7 115:15
116:3,8 117:22
**rise** 5:24 62:21
121:15
**ROBERT** 1:10
**role** 28:19 29:15
29:16 32:1
92:18
**room** 14:21,23
91:25 93:8
**routine** 59:20
**routing** 53:2
**rude** 59:16
**rule** 30:7 33:1
35:23 45:11
48:20 49:13,16
**rules** 12:22,24
12:25 19:3
28:22 34:10
35:3 46:5
48:15,16,19,21
68:13 79:17
81:23,25
**runs** 29:20
**Ruth** 1:2 7:23
8:11 10:23
12:8,20 13:5,6
22:17 23:15
24:23 25:2,25
26:5 27:9,18
28:2,9 31:2
32:16 34:12

35:17 41:21
42:3 49:9,11
57:17,25 58:23
60:1 61:11
64:18 66:21,24
69:21 72:9
73:13 84:23
88:9 89:9,20
89:25 90:22
94:23 96:8
97:5,8,13
98:15 99:13,16
100:20 101:20
102:8 104:8,24
106:6,6,8
107:1,2,2,6
108:4,6,22
109:13 110:8
117:1,5,6,8,10
118:4
**Ruth's** 74:2
99:17,23 107:4

**S**

**said/she** 27:19
**salary** 26:15
**Sandy** 6:24 7:5
7:9,12,24
37:11,13 70:22
70:23,24
**Satinsky** 1:16
20:2,9,20 21:8
21:9,16,21
25:21,23 26:7
26:12,17,19
29:4,8 30:23
30:25 31:3
32:12,14,17,22
34:21,22 36:10
36:12 39:11,17
39:18,25 40:13
40:23 46:13,16
46:20,22 47:10
47:22,24 48:1
**Saturday** 79:4
**save** 63:18 77:24
78:1
**saw** 67:2 86:14

94:22,22
**saying** 6:14 13:5
13:10 26:4
59:14 62:8
70:1,16 74:5
74:17 87:22
96:25 97:7
98:24 117:3
**says** 14:15 43:18
63:24 85:20
86:10 89:22
104:6,24
105:18 106:9
108:24
**schedule** 79:10
**scheduled** 79:2
**school** 110:22
**Science** 19:8
22:21 26:1,6
34:19 51:4
**Sciences** 24:1
51:7 94:25
**scope** 46:22 48:4
**scream** 87:17
**screen** 20:23
21:4 36:1
43:11 44:21
45:2,6 46:8
63:18,19 85:7
102:23 116:17
116:18 119:9
119:10,10,12
119:13
**seated** 3:5 6:1
63:5
**second** 4:1,2,9
14:21 36:11
58:22 103:20
**security** 53:3
**see** 7:23 12:10
17:12 20:3
24:23 35:11
36:20 41:13
43:18,21 45:1
45:6,7,11 46:8
51:23,25 52:1
52:6 63:19,21
63:24 65:3

73:13,16 76:14
80:11 81:20
85:22 86:13
88:9 90:15,16
98:15 107:23
107:25 110:11
117:16 119:8
119:14,14,18
121:9
**seek** 23:15
**seen** 20:14,24
21:5 42:24
43:7 49:20
94:21
**segment** 20:19
**selected** 22:23
**semester** 110:22
111:1,2,3,5
115:19,20,20
**send** 32:7 94:13
112:23 113:5
113:10
**sends** 112:24
**senior** 21:23
72:8 78:14
**sense** 67:1,8
105:13 106:10
**sent** 7:9 26:3
29:18 32:3
49:19,21 94:22
103:22 113:2,8
113:8,11
116:24 117:1
117:25
**sentence** 105:3
106:9,16
108:17
**separate** 89:24
**sequence** 112:10
**serious** 76:2
78:13 85:12,18
87:21 96:5,7
96:11,13 99:13
**seriously** 83:17
100:4
**seriousness**
85:14,16
**served** 51:6

**service** 1:25
**services** 43:2,6
**SESSION** 1:9
3:1
**set** 27:25 48:15
56:24
**seven** 98:6
**sex** 6:16,23 7:8
7:25 14:4
15:16 17:5,8
17:24 18:13
37:25 38:12,16
98:19 100:2,12
**Shanghai** 54:12
**Sharon** 70:14,16
70:17,19,19
116:21,22
117:15 119:8
119:20,25
**Sharon's** 70:18
**she'd** 45:22
**sheet** 4:7
**Shi** 107:21 112:1
**shock** 78:21
100:19
**short** 4:2
**shortly** 90:23
**show** 19:5 37:6
82:13 83:3
**showed** 83:4
115:3 117:24
**showing** 20:18
76:18 102:19
119:5
**shown** 95:7
102:12 119:6
**sic** 27:6 49:22
69:4 98:7
113:19
**sick** 85:21
**sidebar** 17:12,14
18:10
**sign** 10:8 43:17
59:21,25 64:19
**signed** 16:13,15
16:23 17:4
43:16 59:23
**significant** 9:25

10:7,9,10 36:1
37:2
**similar** 59:12
77:16 108:11
118:1
**simple** 13:3
107:4
**simply** 21:16
**single** 6:8 107:7
112:9
**sister** 56:17,19
61:17
**sister's** 61:16
**sit** 5:12 50:19
58:9
**sitting** 25:10
121:5
**situation** 10:5
27:19 29:11
31:10,21 33:5
33:8 82:19
108:19
**Situations** 23:16
**sixth** 107:22
**sixties** 55:5
**sleep** 14:22
45:18
**small** 20:18
72:25 73:1
93:20 96:16
97:2 108:7
110:9 119:13
**snow** 87:9,10
**social** 53:3
**solution** 78:5
**solve** 27:10
**somebody** 19:5
54:5 74:16
76:2 90:2
**somebody's**
59:20,25
**somewhat** 33:11
**soon** 117:11
**sorry** 30:14 39:6
40:24 44:15,20
47:23 51:16
77:9 85:5
91:19 99:3

sort 65:24
sound 1:24
   122:7
sounds 71:4
span 115:15
speak 7:5 23:13
   41:21 64:20
   71:11 120:14
speaking 42:8
speaks 91:23,25
special 114:15
specific 8:23,25
   11:9 90:1
specifically 10:5
   14:17 17:10
   18:14 61:9
   109:16 110:1
specify 106:11
spell 50:16
spend 72:22
   74:2 97:4,13
spent 73:18 78:4
   107:5 118:3
spirited 87:20
spoke 37:10
   41:19 90:2
   118:13
spoken 37:13
spring 115:20
staff 59:23 69:20
   73:17 74:13
   76:8 80:2 81:2
   81:16 84:22
   97:4,11 113:21
   113:22 114:9
stage 106:8
stand 4:15 6:4
   50:6 63:4
standards 33:2
   86:11
start 115:5
   121:2,3,21,22
started 22:20
   27:4,22 33:23
   40:10 58:23
   88:16 89:4
state 3:15 50:15
   61:9

stated 15:13
   16:5 117:12
statement 6:19
   10:22
States 1:1,10 8:5
   19:16 51:18
   52:21 54:7
   60:25 62:7
stature 19:7
stay 23:16 25:16
   28:9 36:21,24
stayed 51:21
   52:21 86:15,20
   86:22,24 87:5
stays 79:24
step 20:3 50:1
   62:23 74:21,22
   120:21,23
Stephen 1:12
stepped 8:15
stipulate 3:18
stipulated 3:19
   3:20 4:11
stipulating 4:16
stipulation 2:3
   3:9
stop 28:10 61:7
   62:18
stopped 32:10
stories 121:7
story 92:21
   93:20
Street 1:4,14,17
strike 84:25
   103:21
strong 105:13
struck 85:3
student 97:4
   118:13
students 19:15
   19:16 53:17,18
   53:20,22 74:15
   87:17 114:13
stuff 73:24
subject 110:10
   121:13
submit 44:2
subway 36:25

suggest 32:7
suggested 24:22
suggestion
   111:22
suitable 88:10
   90:16
Suite 1:17
summer 110:25
   115:9,10,16,17
   115:19
Sundays 79:10
supervise 73:17
supervisor
   23:20 29:1
   30:11,20 31:20
supervisory
   69:18
support 26:22
   31:24 65:11,16
   65:20,24 66:6
   80:19
supporting
   31:24 65:10,16
   80:16
suppose 79:10
supposed 72:9
   75:1 78:18
   106:2
sure 5:18 10:21
   20:5 24:4
   27:10 28:2,22
   29:17 32:2
   39:17 47:18
   52:24 55:3
   79:5 81:7
   86:16,24 88:20
   112:19 120:12
surgery 52:12
surprised 18:5
   98:14
surprising
   112:15
suspension 78:8
   79:13 83:23
   112:3
sustained 13:19
   16:8 39:23
   57:1

SWORN 6:3
   50:14
system 35:16
   42:16,18 71:24
   71:25 95:11

———————
     T
take 5:4,13 9:7
   12:19 15:16,20
   20:21,24 30:7
   30:9 34:25
   35:10 49:11
   62:16,19 74:21
   81:22 100:4
   121:18
taken 11:11
   12:12 13:13
   41:10 62:25
talk 6:14 8:11
   23:15 28:6
   57:15 67:6
   74:2 97:10
   106:16 121:6
talked 95:24
   99:12 109:24
   117:13
talking 63:9
   67:24 89:21
   99:6 103:25
   104:11 115:12
   115:15
talks 14:18
task 25:17
tasks 33:10
   117:10
TAUP 48:24
technical 87:19
   87:21
technician
   113:25
Technology
   22:21 34:19
   51:4
tell 7:23 8:21
   11:22 22:8
   23:16 36:1
   61:14 64:25
   65:5 82:17

83:17 106:6
   121:5,19
telling 9:1
temper 87:17
   111:13,14
Temple 1:7 3:17
   4:16,17 7:18
   10:14 12:22
   18:17 19:1,3,7
   19:21 22:6,16
   28:13,15 29:10
   31:2 32:16
   34:1 36:20,21
   36:25 37:17,20
   37:23 38:1,16
   39:4,7,19 40:2
   40:11 43:20
   46:1 51:1
   54:10,15 57:20
   58:23,24 71:9
   83:25 85:10
   87:9 88:7,22
   89:4 95:2
   114:10,14,17
   119:20
Temple's 15:4
   54:16 92:1
ten 52:14,16
   72:23 98:2
ten-minute
   62:19,19
term 98:16
terminate 12:8
   12:23 13:4,6
   15:12,15 16:1
   16:17,25 25:4
   68:2,9 69:1
   70:1,2 71:15
   92:19 95:22
   96:3,8
terminated
   10:23 13:11
   19:20 40:4
   41:9,14,16
   43:20,24 45:9
   71:17,18 72:1
   72:5 91:1,4,7
   96:12 100:15

terminating
80:3,5
termination
12:22,25 13:9
13:9,13 14:9
14:12 15:8,13
16:6,10,13,15
16:16 35:4,20
40:9 43:10,14
44:3 71:22
73:19,22 74:5
74:24 91:11,23
91:24,24 92:9
92:25 97:1,9
99:23
terms 3:14 4:9
19:7 67:14
75:8 85:20
109:7 118:21
testified 11:24
13:14 17:20
18:7 29:22
30:14,17 40:19
42:13 44:5
46:14,17 48:7
101:9,13 102:8
104:1
testify 18:7
21:10 81:6
testifying 71:12
101:11,16
102:10
testimony 3:16
5:10 12:17
42:9 47:18
71:8 109:25
110:18
text 113:5,9,11
Thank 5:14 21:7
50:1,2,20
52:18 53:24
56:3 58:17
99:3 101:4
114:24 120:19
120:21,22
121:24,24
Thanks 58:13
thing 7:15 9:23

36:5 71:19
76:2 93:10,20
96:16 99:13
things 5:6 8:12
15:21 27:4
37:7 72:6,12
72:22,25 73:1
80:19 89:25
93:14 97:2,3,8
106:14,14
107:6 112:10
think 5:7 13:17
27:24 31:22
42:2 53:23
55:3,13,15,19
56:19 59:23
61:14 64:5
68:5,11 70:21
71:2,13,16,23
76:8 77:13
79:18,20 84:2
84:3,15 92:20
93:10 94:2,7
98:22 99:6
101:20 103:6
109:8 113:10
113:17,24
119:10
thinks 106:14
third 90:7 104:6
107:23,24
thirties 56:19,20
60:5 69:16
thought 42:9
49:7 88:24
89:12 91:19
98:15 110:7
thousand 51:14
53:25 76:13
three 30:4,7
37:1 45:9
73:21 74:4,4
74:23 78:7
79:12,15,21,23
79:24 82:12
83:3 84:4,6
91:1 112:13
113:3

three-day 83:23
112:3
ticket 72:10,11
77:4,14,22
78:17,20,23
79:1,4,7
ties 35:16
time 6:12 8:20
9:14 10:20
11:19 17:4
19:8 20:1
22:25 24:22
25:5 26:2 27:5
28:1 29:14
32:9 38:15,18
39:5,8 40:3,4
40:14 41:9
44:1 46:1
52:20,21 57:12
57:17 58:21
60:13,17 61:10
61:25 63:19
65:2 70:19
73:16,18 74:9
74:12 75:1
80:3 90:8
91:23 92:25
93:6 94:19
97:5,13 107:5
107:18 113:16
116:1 117:9
118:3,11
timely 23:11
27:5 28:8
33:11 49:8
times 23:4,6
25:10 30:2
41:20,21 67:21
67:21 71:11
72:16,23 75:23
86:18 87:8
97:5 112:25
timing 9:6
today 11:25
12:17,17 20:14
20:25 33:19
43:19 59:25
65:5 71:8,12

72:9
told 9:11,16
71:14 83:3
96:4 112:12
121:22
tomorrow 121:3
121:13,18
top 25:6 46:7
63:24
top-notch 37:6
topic 89:20
town 36:19
transcribe 58:7
transcript 1:9
1:25 11:10
122:7
transcription
1:21,21,25
122:20
Transcription...
122:18
Transcription...
122:11
transfer 2:21
26:4,13
travel 24:20
25:2 26:25
61:14 72:2
73:24 110:22
110:23,23,25
traveled 19:11
110:25
treated 38:16
Tree 91:25
trial 1:9 3:14
43:7 62:17
tried 77:24 78:1
78:20 89:25
90:18,19 93:25
109:9,10,11
118:4
trigger 80:20
triggered 93:14
trip 61:13 67:4
108:5 111:7
true 6:22 7:2 8:3
8:8 9:15 10:22
10:23 13:15,16

14:9 45:17
50:24 51:2,10
51:17 53:1,16
53:20 54:23
66:11,24 77:8
78:16 79:2
83:2 87:16
115:5 118:10
truly 101:20
trust 53:3
truth 11:22
try 23:16 30:7
39:16 73:25
78:4 82:23
86:20 88:6
89:9 98:16
trying 88:5
turn 7:14 11:6
12:2 26:17
30:23 32:12
44:15 46:5,6
63:14 103:20
116:9
turning 35:25
turns 74:17
Twenty-six 61:2
twice 71:13
72:17,18
two 8:8,17 9:4
9:10 10:17
14:15,25 15:9
15:12 21:17
31:13 34:25
36:25 51:14
53:25 65:19
73:7 74:1
76:13 78:17
89:19 103:6
104:7,11 107:5
107:17 108:7
111:24 112:9
112:15 113:25
115:13,23,24
115:25,25
two-year 115:15
type 24:24 27:19
31:17 32:25
33:3

**types** 37:7
**typically** 28:17
110:21,21
_____
U
**U.S** 110:12
**Uh-huh** 11:1
57:16 75:9
76:11,20,22
78:9 80:8 82:1
82:14,16 85:13
85:15,17,19
105:23 106:19
117:23
**ultimate** 32:8
**ultimately** 14:22
**unauthorized**
46:9 85:21
**unaware** 98:13
98:14
**understand** 3:22
27:17 85:9
120:4
**understood** 6:16
41:23 111:19
**unhappy** 8:12
8:21 33:9
**UNIDENTIFI...**
4:24 11:1
**union** 48:16,16
**United** 1:1,10
8:5 19:16
51:17,21 52:21
54:7 60:25
62:7
**university** 1:7
3:17 8:14
12:22 18:19
19:4 22:12
28:22 29:10
31:2 32:16
34:10,20 43:20
51:1,19 57:21
84:1 89:9 95:2
97:16,18,23
108:21 114:10
114:17 119:21
**university's**

115:16
**unpaid** 79:12
**upset** 28:7 62:12
62:15,15
111:13,14,15
**use** 35:15
**usually** 4:3
28:19 29:2
64:5 70:14
74:1,2 75:23
79:11 109:24
112:15 120:9
_____
V
**V** 1:2
**vacation** 79:23
**vaguely** 42:25
**value** 97:22
**various** 26:24
**vein** 118:1
**verbal** 43:1
65:18,23 86:2
86:4
**verbally** 43:6
**verdict** 4:7
**verified** 32:4
**Vice** 54:17
114:12
**violated** 35:24
**violates** 48:19
48:21
**violating** 49:1,6
85:25 86:7
**violation** 28:23
28:23 29:20
30:7 32:6 33:1
35:4 45:11
46:6 48:13
49:2,13,16
81:19 85:12
86:10
**violations** 12:24
15:9 34:25
35:23 46:7,9
**vision** 105:6
119:14
**visit** 53:16 78:15
**visitor** 35:3

36:18,20 77:4
**voice** 58:3
**vs** 1:4
_____
W
**Wacker** 2:10
4:15 6:3,7
13:17 16:5
18:13 20:10,21
21:10 22:3
25:24 26:20
29:9,22 31:1
31:10 32:15
34:23 35:25
36:13 37:10
40:1,14,19
45:2 64:22
68:18 69:14
100:8
**wait** 17:21 58:1
74:20 96:22
**waited** 49:10
**waiting** 78:15
**walk** 111:17,19
**Walker** 98:7,10
98:18,25 99:2
**walking** 46:1
111:10,11,12
118:21
**Walton** 12:5
13:4,21 14:3,6
18:6 34:16
98:23,24 99:4
99:8 100:1,1,5
117:13
**Walton's** 17:20
35:6
**want** 5:2,12 8:6
12:17 26:4,4
28:21 33:10
40:5,6,7,7,20
40:22 41:1,6,8
41:13,16 47:17
55:23 68:9
69:22,22 70:7
71:17 73:13,14
84:22 90:1
95:22 96:3,8

100:25 119:17
121:17
**wanted** 3:9,15
26:2 33:24
34:13 36:19
41:10 48:9
99:14,15
109:13
**warning** 33:4
83:18,21 86:2
86:4,7
**warnings** 75:23
**Washington**
117:12
**wasn't** 29:24
30:1,15,20
33:19,20 46:10
78:23 79:15
115:13 116:1
**watch** 5:3,12
**way** 33:15 41:8
41:14 52:10,10
105:20 109:8
110:23
**we'll** 82:24
**we're** 3:13 5:2
8:5,5 29:3
52:24 67:17
74:17 81:22,24
119:5
**We've** 44:19
47:11
**week** 14:15 30:9
72:17,18,22,22
73:3,4,10,15
73:18 74:5,8
74:23 75:1,3
80:23,24 81:1
81:11,12 96:17
97:14 104:1
106:25 107:6,7
107:8,14,15
108:5 118:4
**weekly** 27:25
73:25 106:7
**well-liked** 25:7
**went** 26:1 27:1
42:18 72:10

82:12
**weren't** 25:19
30:19
**white** 63:15
**white-collar**
55:5,6,16,17
**who've** 34:17
**Why's** 35:22
**William** 122:11
**wireless** 53:2
**wise** 67:14
**Withdrawn**
119:23
**witness** 2:6 3:15
4:18 6:3 8:25
11:3 16:7
19:23 20:4
21:20 44:17
46:13,16,24
47:2,7,11 50:2
50:3,4,7,14,17
50:20 51:23
52:1,5,7,8,11
52:14,16 57:2
57:4 62:22,24
63:4 89:14
91:10,14,18,21
99:2 102:12,22
105:8,11
114:24 116:14
119:18 120:24
120:25 121:2
**witness'** 84:25
**witnessed** 24:10
**witnesses** 5:8
**woman** 38:25
**women** 6:15 7:3
7:13 9:5,11
55:10,11,13,18
56:5,7,23
60:14 61:7,24
62:2,3 63:11
110:2,13
**womens** 61:8
**word** 60:18,18
60:19,23 61:4
**words** 60:16
61:6

**work** 8:6 12:20
  12:21,22,24,25
  13:23 14:1
  15:17 17:9
  19:6 22:24,25
  23:10,11 24:15
  25:1 27:1,10
  27:25 28:22
  33:1,8,12
  34:10 35:1,23
  40:1 41:11
  45:11 46:5
  48:19 49:16
  54:7 61:7
  69:11,12 79:18
  79:20,25 80:2
  80:22 81:23,24
  82:13 86:15,16
  86:19,21,23
  87:2,3,3,7,10
  87:10 89:23,24
  98:8 99:9
  100:12 108:7,8
  108:12 112:4
  118:6
**work-** 30:6
**work-related**
  14:16
**worked** 22:14
  23:3,19 25:7
  27:8,15 37:17
  37:20,23 38:1
  39:4,7,19 82:5
**worker** 16:25
  17:1 25:14,15
  118:13
**workers** 54:24
**workforce**
  110:15
**working** 22:20
  23:2 24:2,4,16
  26:21 33:22
  61:7 66:24
  81:24 88:16,19
  89:1,4,4 104:8
  104:14 115:5
  115:14
**workplace** 44:7

  44:9 48:21
**works** 58:25
**world** 53:11,12
  110:24
**worry** 25:18
**worrying** 28:10
**worse** 112:10
**worth** 3:17 4:16
**wouldn't** 7:9
  33:10 41:6
  94:1
**Wow** 58:5
  100:21
**write** 5:17 48:9
  80:18 90:21,22
**write-up** 6:8
  10:16 112:18
  117:21 118:8
**writes** 117:3
**writeup** 45:1,14
  49:17,20 63:23
  66:6 67:16,18
  77:2,15,19
  78:6 80:6,13
  90:23
**writeups** 44:12
  44:13 48:14
  67:25
**writing** 43:1,3,5
  65:24 117:4
**written** 33:4
  43:8 45:18
  64:3 65:24
  66:1 67:18
  75:20 76:2
  80:20 83:18,20
  86:7 111:9
**wrong** 35:2 36:9
  36:22 72:13,16
  72:20,21 73:6
**wrote** 19:12
  67:20 113:4
**Wu** 2:12,24 6:14
  7:3,13 8:3,5
  9:5,11 10:23
  12:19,22 13:1
  13:9 18:18,21
  18:25 19:5,19

  22:1 23:22,24
  24:2,4,10,12
  24:15,18 26:21
  27:1,6,9,18,20
  28:2,7,12,13
  28:15 29:13
  31:12 33:6,18
  33:20,22 35:1
  35:18 36:6,19
  37:4,9 41:6,8
  41:13 45:21
  48:7,12 49:1,6
  49:9 50:6,14
  50:17,17,24
  63:9,19 74:16
  78:22 81:10
  82:21,23 84:24
  87:16 96:22
  101:9 102:19
  102:23 103:15
  107:22 109:25
  115:3,5 119:8
  119:20 120:4
**Wu's** 8:19 9:13
  9:21 12:8 13:4
  13:5

**X**

**Y**

**yeah** 5:9 16:7
  17:13,23 25:9
  30:18 39:10,16
  40:21 44:23
  47:20 51:14
  52:1,5,6,8,11
  52:13,15,15
  53:13 54:19
  55:9,15,21
  56:12,14,16,19
  56:19,21 57:1
  57:22 58:4,25
  59:2,23 60:22
  61:3,21,23
  62:24 64:8,10
  65:9 66:1,17
  66:23 68:8,15
  68:24 69:6,8,8

  69:24 70:6,14
  70:17,25 71:16
  72:3,15,19
  73:2,2,5,7 75:6
  75:13 76:9
  77:7,21 78:2,2
  80:2,12,25
  81:5,7,9,12
  83:6,19 84:7
  84:14,18 86:14
  87:1,3,4,11,13
  87:15 88:1,3
  89:14,17 90:12
  90:15,18,20,25
  91:21 92:13,15
  92:17,24 93:2
  94:2,5,9,11,13
  94:16,20,20
  95:6,20 96:16
  96:23 99:2,16
  100:19 101:2
  101:24,25
  102:2,24 104:5
  104:19,21
  105:8,11
  107:15 108:4
  108:21 109:21
  110:4 111:3,21
  112:22 113:12
  113:14,14,24
  114:2 115:7,11
  115:15,22,25
  116:6,14,21
  118:19 119:14
**year** 11:13,14
  12:12 41:22
  98:15 100:17
  100:18,19,22
  100:22 104:14
  104:17 110:22
  114:15 115:16
  115:17 116:3
**year's** 115:16
**years** 22:16
  41:24 42:2,10
  61:2,4,17,18
  65:1 71:20
  73:21,22 74:4

  74:4,23 88:8
  88:16,18 98:6
  104:7,11
  115:13,23,24
  115:25,25
**yell** 87:20,23
**yelled** 87:22
**yelling** 24:10
**Yep** 17:23 58:14
**yes-or-no** 120:8
**younger** 56:23
  84:19

**Z**

**0**

**1**

**1** 1:9 51:23
**1/20/14** 2:23
**1:16-cv-248** 1:3
**1:33** 3:2
**101** 2:12
**103** 2:24
**10th** 116:25
**10thm** 59:17
**11/17/10** 2:24
**11/9/2011** 63:24
  65:8
**115** 2:12
**119** 2:12
**11th** 5:20
**12-month** 15:9
**13** 99:25
**1400** 1:17
**14th** 21:20
**15** 22:16 74:2
  78:4 99:25
**1525** 1:14
**16** 1:5 121:1
  122:16
**1601** 1:17
**17th** 103:18
**1880** 1:22
**19102** 1:14,17
**19103** 1:23
**19106** 1:5
**1987** 51:16

**1st** 14:13 41:14
41:17 43:14,24
93:1,4

---
**2**

**2** 26:17
**2:32** 41:4
**2:53** 58:2
**2:59** 62:25
**20** 2:10
**2001** 39:20 40:2
40:23 41:1
**2005** 21:20
**2009** 51:7 57:22
104:15,20
115:6,7,10,19
115:20
**2010** 103:18
104:17,20,21
109:4,14 115:4
115:13,21
116:25 117:25
120:17
**2011** 6:9 10:17
40:20 53:25
59:7,18 60:13
67:17,25 75:12
76:21 77:20
102:9 110:18
117:20
**2012** 9:15,19
10:6,11
**2013** 31:16
76:16,24 77:15
82:7,10 83:11
**2014** 14:13 19:9
32:24 39:20
40:2,20,23
41:1,9,14,17
41:19,24 42:9
43:14,24 45:1
45:8 57:15
58:21 60:5,25
80:9 93:1
**2016** 51:7
**2017** 11:11
**2018** 1:5 122:16
**20th** 32:24 45:1

45:8
**21** 12:3
**26** 2:21 61:1,4
**26th** 31:16 76:16
**29th** 11:11

---
**3**

**3** 2:3
**3/26/13** 2:22
**3:13** 63:1
**30** 61:17
**31** 2:22
**32** 2:23
**341** 122:17

---
**4**

**4** 121:1
**4:19** 122:2
**40** 2:10 42:2,10
56:8
**48** 11:6 12:2

---
**5**

**5** 98:3
**50** 2:12 41:24
55:2,3,13,14
73:17 74:12
113:19 114:5
116:7
**500** 74:15
**51** 21:8
**55** 6:15 7:14 9:5
9:12 55:3,8,19
60:15
**56** 38:8

---
**6**

**6** 2:10
**60** 55:6 61:18
113:19 114:5
**601** 1:4
**62** 20:22 21:3
**65** 82:2 85:7
**6th** 1:22

---
**7**

**7/17/18** 122:1
**70** 113:20 114:5

---
**8**

**8** 45:5
**855)204-8184**
1:23

---
**9**

**9** 6:9
**9:30** 121:3,13,21
121:22
**9th** 10:17 49:17
67:17,24 75:12
110:18 120:17