1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
RUTH V. BRIGGS,              .
                            . Case No. 1:16-cv-248
          Plaintiff,        .
                            .
      vs.                   . 601 Market Street
                            . Philadelphia, Pennsylvania 19106
                            . July 17, 2018
                            .
TEMPLE UNIVERSITY,          .
                            .
          Defendants.       .
. . . . . . . . . . . . . . .
```

TRANSCRIPT OF TRIAL
DAY 2 - P.M. SESSION
BEFORE THE HONORABLE ROBERT F. KELLY
UNITED STATES DISTRICT JUDGE
AND A JURY

APPEARANCES:

For the Plaintiff:          Laura Carlin Mattiacci, Esq.
                            Stephen G. Console, Esq.
                            Rahul Munshi, Esq.
                            CONSOLE MATTIACCI LAW, LLC
                            1525 Locust Street
                            Philadelphia, Pennsylvania 19102

For the Defendant:          Richard R. Harris, Esq.
                            Rachel Fendell Satinsky, Esq.
                            LITTLER MENDELSON, PC
                            1601 Cherry Street, Suite 1400
                            Philadelphia, Pennsylvania 19102

Audio Operator:             Electronically Recorded
                            by Court Personnel

Transcription Company:      JDR Acquisition, LLC./
                            Advanced Transcription
                            1880 John F. Kennedy Boulevard
                            6th Floor
                            Philadelphia, Pennsylvania 19103
                            (855)204-8184

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

```
1                    INDEX

2

3

4   WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

5

6   FOR THE PLAINTIFF

7

8   RUTH BRIGGS                   3    88,103    101

9

10  DEIRDRE WALTON          104

11

12

13

14

15  EXHIBIT                            IDENT.   EVID.

16

17  P-6      8/2/12 Walton/Foehl/Brown Email(s)        139

18

19  D-10     2004/2005 Performance Evaluation          24

20  D-11     2005/2006 Performance Evaluation          28

21  D-12     2006/2007 Performance Evaluation          34

22  D-18     12/31/12 Briggs/Wu Email(s)               57

23  D-23     4/3/14 Briggs/Walton Email(s)             61

24  D-33     Facebook Messages                         77

25  D-34     Facebook Messages                         79
```

3

1               AFTERNOON SESSION

2       (Proceedings resume after Luncheon Recess at 1:06 p.m.)

3       (Call to order of the Court)

4       (Jury present)

5           THE COURT:  You may be seated.  You may be seated.

6           All right.  You may proceed.

7           MR. HARRIS:  Thank you, Your Honor.

8   RUTH BRIGGS, PLAINTIFF, PREVIOUSLY SWORN, RESUMES STAND

9                   CROSS-EXAMINATION

10   BY MR. HARRIS:

11   Q   Ms. Briggs, do you recall testifying at a deposition in

12   this case on May the 5th -- May 25th -- excuse me -- of 2017,

13   which was a year ago?

14   A   Yes, I do.

15   Q   Okay.  And do you recall being asked by counsel seated

16   next to me, Ms. Satinsky, a series of questions, specifically

17   dealing with the discipline you received while you were an

18   employee at Temple University?

19   A   I'm not sure exactly which one you're talking about, but

20   can you tell me specifically?

21   Q   Well, just generally.

22   A   Generally, yes.

23   Q   Do you recall her asking you:

24           "It's my understanding, we've listened to testimony

25   from several witnesses who said and provided evidence that

4

1   you received discipline on four separate occasions while you

2   were under the leadership of Dr. Wu."

3   A    That is correct.

4   Q    That's correct.

5   A    Yes.

6   Q    And you recall being asked by counsel, Ms, Satinsky,

7   several questions regarding each individual discipline.

8   A    Yes.

9   Q    You do recall that.

10  A    I -- well, I'm not sure exactly what you're talking

11  about, but I know that she asked me questions about them,

12  yes.

13  Q    And you were under oath.

14  A    Yes, I was.

15  Q    And this was actually a videotaped deposition, was it

16  not?

17  A    Yes, it was.

18  Q    And do you recall where it was?

19  A    It was in their -- her office.

20  Q    Okay.  And you were seated there, at the deposition,

21  with your counsel, correct?

22  A    Yes, I was.

23  Q    Mr. Munshi.

24  A    Yes, sir.

25  Q    Okay.  And do you recall being asked about your

1  experience, specifically, how you felt when you were moved to

2  the tenth floor?

3  A    Do I recall what I said or can I --

4  Q    Yes.  Do you remember what you said then?

5  A    Not exactly, word for word, but I could probably -- I

6  remember saying that it was -- I was embarrassed, first, by

7  the move, but then relieved to be away from the -- the

8  tension and the stress.

9  Q    Do you remember what you said this morning, when asked

10  by counsel how you felt about that experience when you got

11  moved to the tenth floor?  Do you remember what you said this

12  morning?

13  A    I said I was embarrassed.

14  Q    Do you remember saying the word "banished."

15  A    And banished.

16  Q    Banished?

17  A    I -- yeah, and I'll -- I'll stand by that.  Yes, I did

18  feel banished.

19        MR. HARRIS:  Okay.  May the witness be shown the

20  clip on Page 168 of her deposition transcript, starting -- or

21  beginning at Line 4.

22        THE WITNESS:  Am I --

23        MR. HARRIS:  It's going to go up on the screen

24  shortly.

25        THE WITNESS:  Oh.

6

1          MS. MATTIACCI:  Your Honor, may we just have a

2    minute to find it?

3          MR. HARRIS:  Sure.

4       (Participants confer)

5          MR. HARRIS:  No objection to that, Judge.  Take

6    your time.

7          MS. MATTIACCI:  What line?

8          MR. HARRIS:  Line 4.  Page 168.

9          THE WITNESS:  Is this it?

10         MR. HARRIS:  It's going to come up in a second.

11   Your counsel is actually waiting --

12         THE WITNESS:  Oh, okay.

13         MR. HARRIS:  -- to find the clip.

14         MR. MUNSHI:  Your Honor, we -- if counsel is trying

15   to impeach the witness, we just read the testimony, and I

16   think he's trying to go forward.  There is no impeachment

17   here.  There is nothing that she said there that's

18   inconsistent with what she said --

19         THE COURT:  Well, the jury will decide that/

20         MR. MUNSHI:  Okay.

21         MR. HARRIS:  Thank you.

22         THE COURT:  Proceed, please.

23         MR. HARRIS:  Thank you.  Could you please show the

24   clip.

25       (Video recording played 11:11:20 to 1:11:55)

1   BY MR. HARRIS:

2   Q      You didn't say banished, did you?

3   A      No, I didn't.  The --

4   Q      Okay.  But you said you stand by the fact that you felt

5   banished.

6   A      I think they both can be true.

7   Q      Well, do you recall just saying -- you just saw that

8   clip, correct?

9   A      Yes, I did.

10  Q      And in that clip, you specifically said that you

11  actually welcomed that you were being moved.

12  A      I welcomed being able to work up there, yes, I did say

13  that.

14  Q      And --

15  A      It was less -- less traffic, less hub --

16  Q      Noisy?

17  A      Noisy.

18  Q      And it was helpful to you.

19  A      It was helpful to my performing my job, yes.

20  Q      Okay.

21  A      That is true.

22  Q      All right.  Do you also -- okay.  Thank you.  Do you

23  also being asked [sic] by Ms. Satinsky about the discipline

24  you received regarding Professor Whaley coming to Temple

25  University?

8

1   A     Yes.  Yes.

2   Q     And I believe that was in Exhibit -- let me look at this

3   one.

4           MR. HARRIS:  With the Court's indulgence.

5           THE COURT:  Yes.

6       (Pause in proceedings)

7           MR. HARRIS:  D-7.  And I believe D-7 has already

8   been introduced into evidence.  May the witness be shown D-7?

9           THE COURT:  All right.

10          THE WITNESS:  I see it.

11      (Participants confer)

12          MR. HARRIS:  I'm mistaken.  D-8.

13          THE WITNESS:  I'm sorry.

14  BY MR. HARRIS:

15  Q     Do you recognize this document, ma'am?

16  A     Yes, I do.

17  Q     And this is the suspension -- or the discipline you

18  received -- excuse me -- for failing to book Mr. Whaley's

19  flight arrangement.  Yes?

20  A     That is correct.

21  Q     Okay.  And do you recall testifying earlier this morning

22  that you believe how you were treated, as it related to that,

23  was somehow unfair?

24  A     Was -- I'm sorry?  I didn't hear you.

25  Q     Was unfair.

1   A     Yes.

2   Q     Okay.  And specifically, you believe that, unless -- if

3   I understand it correctly, that mister -- or Professor Whaley

4   was supposed to give you some information, and he failed to

5   do so.

6   A     There was a back-and-forth of, yes, he -- there was

7   several itineraries that I sent him, and they weren't right -

8   -

9   Q     Okay.

10  A     -- for him, so I asked Dr. Kwatney -- as I recall, Dr.

11  Kwatney and I talked about, and he said, just ask him if it

12  would be better if he booked his own flight, and we got

13  reimbursed for it.

14  Q     And you told Professor Whaley this?

15  A     No, I did not.  No -- I mean, yes, I did.  I told him

16  that that -- I relayed that to him, but I didn't follow up on

17  it, is what I didn't do.

18  Q     Okay.  Is it your testimony that you relayed to

19  Professor Whaley that he should book his own flight?

20  A     That -- not should, that he could, that he could book --

21  book his own flight.

22  Q     How did you communicate that?

23  A     I believe it was on the phone.

24  Q     Not an email.

25  A     It might have been an email, too.

10

1    Q    Did you speak to him?

2    A    Did I speak to Clint Whaley on the phone, is that what

3    the question is?

4    Q    Yeah.

5    A    What is the question?  I'm sorry.

6    Q    You said that you called him, correct?

7    A    I did call him.

8    Q    And you said that you spoke to him, correct?

9    A    I spoke to him.

10   Q    Okay.  Did you tell him, during the phone conversation,

11   that he could or should book his flight --

12   A    I --

13   Q    -- and get reimbursed by the University?

14   A    I believe it was could, and I didn't get the -- the

15   answer.

16   Q    So he never responded.

17   A    No.

18   Q    What did he say during the call?

19   A    I don't recall.  And actually, you know what?  I -- it

20   might have been an email, so I'm -- I'm not -- I'm not sure.

21   I can't answer with certainty.

22   Q    Okay.  Was it an email or a phone call?

23   A    I'm not -- I can't answer with certainty.  It could have

24   been both.  I can't answer with certainty.

25   Q    You said you had a phone conversation with Professor

1   Whaley.

2   A    Yes.

3   Q    Did you not?

4          MR. MUNSHI:  Objection, Your Honor.  He's gone over

5   this three times.  She says she doesn't recall specifically.

6          THE COURT:  Overruled.

7          THE WITNESS:  I -- I -- I can't make something up,

8   I don't --

9          MR. HARRIS:  Well --

10         THE WITNESS:  I don't -- I don't -- I mean, I --

11  there were numerous times, this went -- went over -- over a

12  month.  So there were emails, there were phone calls.  And

13  I don't know the -- you know, the exact wording of any of

14  them.  And I don't -- I can't recall.

15  BY MR. HARRIS:

16  Q    Okay.  Do you remember testifying earlier this morning

17  that Professor Whaley was supposed to give you information

18  that you didn't receive?

19  A    He was.

20  Q    Okay.

21  A    But that doesn't make -- that doesn't make me less -- I

22  mean, I was -- should have followed up with him, and that's

23  what I'm -- that is what I'm saying.  I took responsibility

24  for that, I should have followed up with him.

25  Q    But you failed to do so.

12

1  A   I failed to do so.

2  Q   You were expecting him to provide you what information?

3  A   That he was coming.  I gave him -- that he -- you know,

4  he -- he had reservations at our Conwell Inn on campus.

5  Q   Right.  You made the reservations.

6  A   I made the reservations for him.

7  Q   You booked the hotel.

8  A   Yes, I did.

9  Q   And so you knew that he was coming, and that's why you

10  booked the hotel.

11  A   Yes.

12  Q   Yes?  Okay.  So you knew he was coming.

13  A   I did know he was coming.  Yes, I did.

14  Q   Okay.  So when you just said, a few seconds ago, that

15  you weren't sure whether or not he was coming, that's

16  inaccurate.

17  A   Did I -- I wasn't sure what -- how he -- no, it's not

18  inaccurate.  I knew he was coming, of course I knew he was

19  coming.  It was my job to -- it was --

20  Q   Right.  He booked a flight, so he was --

21  A   No, I don't know --

22  Q   -- (indiscernible) --

23  A   -- that he booked a flight.

24  Q   -- responsibility for booking --

25  A   I don't know if he booked a flight.  I didn't book the

13

1    flight for him.

2    Q    But you were supposed to.

3    A    I was supposed to arrange travel for him, yes.

4    Q    Which includes booking the flight.

5    A    It includes booking the flight.

6    Q    And you failed to do so.

7    A    I failed to do so.

8    Q    Okay.  Did you also talk to Professor Whaley about why

9    you failed to book the flight?

10   A    I did not because I asked Dr. Wu, if I could call Dr.

11   Whaley and apologize, and I was told I wasn't allowed to.

12   Q    So you weren't actually waiting for doctor -- or

13   Professor Whaley to give you the information then.

14   A    I was away -- I was off campus.  I'm -- I'm sorry.  I

15   was totally off campus for a conference, and I didn't -- I

16   dropped the ball.  I don't know how else to say that.  I

17   dropped that ball.

18   Q    Okay.  Do you recall testifying that you thought that

19   that discipline was unfair?

20   A    I do believe it was unfair.

21   Q    You dropped the ball.

22   A    I dropped the ball.

23   Q    You just testified that you dropped the ball.

24   A    Right.  I dropped the ball.

25   Q    You don't believe that you should get discipline for

14

1  dropping the ball?

2  A    No, I -- I didn't -- it was the severity of the -- of

3  the punishment.

4  Q    This wasn't your first discipline, was it?

5  A    It was second, third.  I don't know.

6  Q    Okay.

7  A    Second.  There were four.

8  Q    This was in March of 2013.

9  A    So that was the second.

10 Q    So it -- the discipline, as you understood it, it's

11 based on matrix, correct?

12 A    Yes.

13 Q    All right.  And so, based on the level of your prior

14 discipline will impact the preceding or following discipline,

15 correct?

16 A    I'm not aware if that's how it works.  I -- I can't tell

17 you if that's how it works.

18 Q    You spoke to HR a litany of times throughout your

19 employment at Temple University.

20 A    I sure did.

21 Q    Did you also talk to them about your discipline that you

22 received?

23 A    Yes, I did.

24 Q    And you explained to them that you thought some of these

25 disciplines were unfair.

1  A    I thought that was unfair, yes.  Three days -- yes.

2  Q    And they also explained to you the policy.  Do you --

3  A    I don't remember anyone explaining the policy to me.

4  Q    Did you ask?

5  A    Probably.

6  Q    And what did they reply?

7  A    HR often did not get back to me, I have to tell you.

8  Those emails went out into a black, so I don't -- I can't

9  really say.  I did think it was harsh.

10  Q    Okay.  You recognized that the level of discipline you

11  received was based on the prior discipline.

12  A    It was based on the prior discipline, or what -- the

13  action that I was disciplined for?

14  Q    The action that you were disciplined for.  Yes?

15  A    I understand that.

16  Q    All right.

17  A    But I -- the prior one, I don't know -- I don't know

18  what you're saying about that.

19  Q    I'll get back to that in a moment.

20  A    Okay.

21  Q    Ma'am, as I understand it, your responsibility as the

22  Executive Assistant for Dr. Wu involved being responsible for

23  his calendar, correct?

24  A    That is correct.

25  Q    As well as making sure that individuals that he was

16

1    recruiting to come to the University were going to be booked

2    through travel, et cetera.

3    A    That is correct.

4    Q    All right.  And you were also responsible for event

5    planning, as well as other duties, being responsible as his

6    Executive Assistant.

7    A    That is correct.

8    Q    Were you also responsible for monitoring his emails, as

9    well?

10   A    For monitoring his emails?

11   Q    Emails, yes.  Email traffic.

12   A    I couldn't access his emails.  What do you mean?  His --

13   his email account?  I'm not sure I understand the question.

14   Q    Yes.  The emails that he received, were you responsible

15   --

16   A    Oh, from -- from him --

17   Q    Yeah.

18   A    -- to me?  Oh, yes, I was, of course.

19   Q    Okay.  And then his calendar, you were responsible for

20   holding it and maintaining his calendar.

21   A    Yes.

22   Q    Setting up appointments for him?

23   A    Yes.

24   Q    Evaluating and reviewing materials that would go out

25   from the Department of College [sic] of Science and

17

1    Technology?

2    A    From the Department of Computer and Information

3    Sciences, yes.

4    Q    Department of Computer and Information Sciences.

5    A    Yes.

6    Q    Okay.  Prior to that, as I understand your testimony,

7    you worked in the same College of Science and Technology, but

8    you worked for the Dean.

9    A    That is correct.

10   Q    Assistant Deans, as well as the Dean, Dean Klein.

11   A    Not -- not Dean Klein.  I never worked for Dean Klein.

12   Q    Okay.  The prior deans --

13   A    Dean Dye, yes, I did.

14   Q    Okay.

15   A    Yes.

16   Q    Dr. Dye, Palladino.  Yes?

17   A    Yes.

18   Q    Okay.  And you were at Grade Level 26, T-26, I believe.

19   Yes?

20   A    That is correct.  Yes.

21   Q    And that meant -- what's the significance of being a T-

22   26?

23   A    I believe it's the first level of -- of management.

24   Q    Management.

25   A    Yes.

18

1  Q    Okay.  And so, as a manager in an administrative role,

2  you were actually the highest ranking administrator in the

3  actual College of Science and Technology during your tenure.

4  A    I'm not aware -- I don't know that I was, but --

5  Q    Do you recall testifying that you were the only person

6  who was in that department that held an administrative role,

7  that was not part of a union?

8  A    You --

9  Q    Do you remember testifying to that?

10  A    But you asked me about the College; you didn't ask me

11  about the Department.

12  Q    Okay.  Go to the Department then.

13  A    Okay.

14  Q    Were you the highest-ranking administrative assistant --

15  A    I was -- okay.  I don't --

16  Q    -- in the --

17  A    -- if I was --

18  Q    -- Department?

19  A    -- the highest level, but I was the only -- I was not a

20  union, I was a salaried employee.

21  Q    Okay.  As a salaried employee --

22  A    Yes.

23  Q    -- I think you testified previously that, in fact, you

24  were ranked at a higher or at least the same level as Drew

25  DiMeo.

19

1    A    I know, when Drew first came in, it wasn't at my level,

2    but I don't know what -- if his -- if his changed.

3    Q    Okay.  Dr. Wu was responsible for approximately 50 staff

4    members, including faculty and staff?

5    A    I would say about that, yeah.

6    Q    He testified to that yesterday.  You don't refute that,

7    do you?

8    A    Well, I can't remember exactly how many there were, but

9    it sounds right.

10   Q    And he had a multi-million-dollar budget that he was

11   responsible for?

12   A    I -- I don't know if he had a multi -- I mean, I know he

13   had the grants, but I don't know if he was responsible for --

14   Q    The grants.

15   A    -- the grants.  So repeat the question again?  I'm

16   sorry.

17   Q    Yes.  He was responsible for overseeing multi-million-

18   dollar grants.

19   A    Yes.

20   Q    What percentage of Dr. Wu's time was allocated to

21   recruiting faculty members?

22   A    Dr. Wu?

23   Q    Yes, Dr. Wu.

24   A    I -- you know, I don't know.  I know -- I -- I couldn't

25   -- I'm not even going to try to guess because I don't know.

20

1    Q    Okay.  What percentage of his time was allocated towards

2    overseeing staff?

3    A    I don't know.

4    Q    How about research?

5    A    Probably -- I would say over 50 percent of his time.

6    Q    Was spent doing research.

7    A    Or -- or supervising his post -- his -- his Ph.D.

8    candidates who were conducting a lot of the research.

9    Q    Did he have a teaching assignment?

10   A    Did he have?  I'm sorry.

11   Q    Did he have a teaching assignment?

12   A    He -- I think he taught every other semester, yes.

13   Q    Okay.  So yes.  So, between --

14   A    Yes.

15   Q    -- teaching --

16   A    Uh-huh.

17   Q    -- overseeing faculty, research, and also overseeing

18   graduate students, that was the bulk of his time.

19   A    That was the bulk of?

20   Q    Of his time spent.

21   A    Yes.

22   Q    Okay.  I recall you testifying previously that one of

23   the deans said that he wanted you to be the eyes and ears for

24   him, yes?

25   A    That was not him, though.

21

1    Q    I understand.

2    A    Yes.

3    Q    One of the --

4    A    Uh-huh.

5    Q    -- other deans.  Yes?

6    A    Yes, that is true.

7    Q    Okay.  Do you recall what dean that was?

8    A    Keya Sadeghipour.

9    Q    And do you recall how your performance was under Dean

10   Sadeghipour's leadership?

11   A    It wasn't stellar, but it was average, I would say.

12   Q    Average.

13   A    Uh-huh.

14   Q    The Dean after Dean Singapore was whom?

15   A    Well, it was the Vice Dean, actually, Palladino.

16   Q    And what was your performance under Vice Dean Palladino?

17   A    About the same.

18   Q    Average.

19   A    Average.

20   Q    Do you know why you were moved from Dean Palladino to

21   the next dean, which was -- who was after that?

22   A    I was --

23   Q    Dr. Dye?

24   A    Doctor -- no, Dr. Dye and Dr. Palladino came together.

25   But yeah, okay, Dr. Dye.  Okay.

22

1    Q    What was your performance under Dr. Dye?

2    A    I -- really, Dr. Palladino was the one who did my

3    performance evaluations, so --

4    Q    Average?

5    A    Average.

6    Q    Okay.  Do you remember receiving performance

7    evaluations?

8    A    Perform -- you mean the -- my evaluations at the end of

9    the year?  Yes, I do remember getting them.

10   Q    Okay.  And you received performance evaluations for

11   every single leader in that department or college, from the

12   time of 2009, up until 2014 -- actually, predating that,

13   2006.

14   A    Yeah, okay.

15   Q    You do?  Yes?

16   A    Yes, I did.

17   Q    Okay.  Do you recall when you actually first started in

18   the College of Science and Technology?

19   A    Two --

20   Q    I believe it was somewhere around 2004?

21   A    Two -- it was March 2004 -- '5 -- '4 -- '5, no it was

22   2005.  I'm sorry.

23   Q    Under Allen Nicholson's --

24   A    Allen Nicholson, yes.

25   Q    And what was Mr. Nicholson's role?

23

1    A    He was Interim Dean.

2    Q    Do you recall what your performance was between 2004 and

3    2005, under his leadership?

4    A    Do I recall?  I'm sorry.  I'm having a hard time hearing

5    you.  I'm sorry.

6    Q    Okay.  I'll use the microphone.

7    A    Okay.

8    Q    I apologize.

9    A    Thank you.

10   Q    Do you recall what your performance was between 2004 and

11   2005, under Dean Nicholson's leadership?

12   A    No, I don't -- I don't really call.  I didn't recall

13   doing mine because he was there such a short -- I was there

14   such a short time.  But no, I -- I don't recall.

15            MR. HARRIS:  Okay.  May the witness be shown

16   Exhibit D-10?

17            THE COURT:  All right.

18            MR. MUNSHI:  No objection.

19            THE WITNESS:  Is it going to -- are you pulling it

20   up?

21            MR. HARRIS:  Yeah.  You can look at the screen

22   right it front of you, it should be right there.

23            THE WITNESS:  Oh, okay.  I see it.  Okay.

24   BY MR. HARRIS:

25   Q    Showing you what's been marked as D-10.  Do you

24

1    recognize this, ma'am?

2    A    I do now.  Yes, I do.

3    Q    You do recognize this document?

4    A    Yes, I do.  I do now.

5    Q    This is the performance evaluation you received from --

6    A    (indiscernible)

7    Q    -- Dean Nicholson between the ate -- between the date of

8    2004 through 2005.  Yes?

9    A    That is correct.

10            MR. HARRIS:  I'd like to have this published to the

11   jury.

12            THE COURT:  All right.

13            THE WITNESS:  But I was only there from two

14   thousand -- I wasn't there from 7/2004.  I started in March -

15   -

16            MR. HARRIS:  I understand

17            THE WITNESS:  -- of 2005.

18            MR. HARRIS:  May this be published to the jurors,

19   Your Honor?

20            THE COURT:  Yes.

21       (D-10 received in evidence)

22   BY MR. HARRIS:

23   Q    Now, Ms. Briggs, the University uses a calendar year, or

24   does it work around a fiscal year?

25   A    It works around a fiscal year.

25

1   Q    And so the fiscal year ends on June the 30th, correct?

2   A    Yes.

3   Q    From July 1 to June 30th.

4   A    Yes.

5   Q    All right.  So, the fiscal year that this evaluation

6   period would cover would be July 2004 through June 2005?

7   A    That's what it says, yes.

8   Q    Okay.  And can you tell me what it says -- and as I

9   understand this correctly, it says Executive Assistant Senior

10  Coordinator.  Is that right?

11  A    Yes.

12  Q    And then it also says that the evaluation period is from

13  July 2004 through June 2005, yes?

14  A    It does say that, but I wasn't there that whole time.

15  Q    Okay.  Well, this would have been the relevant period

16  where Dean Nicholson would have overseen your

17  responsibilities?

18  A    Yeah, that is true.  That is true.

19  Q    Okay.  So, it says:

20          "Ruth is meeting the challenge effectively in her

21          new appointment."

22      Does it say that?

23  A    Yes, it does.

24  Q    Okay.  What does it say for your actual final rating?

25  A    2.83.

1   Q   As I understand it, it has the performance-rated

2   categories below that.  Do you see that?

3   A   I'm sorry?

4   Q   Do you see where it says, "performance-rated categories"

5   below?

6   A   Yes, I do see that.

7   Q   Can you read for me --

8   A   Yes, I can.

9   Q   -- where it says, "The performance consistently far

10   exceeds expectations."  Is that a 4.0?

11   A   Yes, it is.

12   Q   You can continue reading.  3.5?

13   A   3.0 performance meets job expectations.  Good solid -- I

14   can't read that --

15   Q   It says "good, solid" does it not?

16   A   Good, solid, right.

17   Q   But you received a 2.83?

18   A   Yes.

19   Q   So, that's less than meeting the expectations of the

20   job?

21   A   Yes, that is true.

22   Q   And this it was Professor Nicholson, whom you said you

23   had a good relationship with?

24   A   I did have a good relationship with him, yes.

25   Q   But he evaluated your performance as being less than --

27

```
 1   A    He did.

 2   Q    -- meeting less than expectations?

 3   A    He did.

 4   Q    Now, Dean Sadeghipour was the second dean that you were

 5   responsible for, correct?

 6   A    That's true.

 7   Q    And the evaluation period for Dean Sadeghipour would

 8   have been July 2005 through June 2006?

 9   A    That's correct.

10   Q    Did he also provide you an evaluation?

11   A    Yes.

12   Q    Do you recall what your performance was during --

13   A    I would say average.

14   Q    Pardon?

15   A    I don't remember the score, no, I don't, but I would

16   tell you it was average.

17   Q    It was average?

18   A    Yes.

19        MR. HARRIS:  Can the witness be shown D-11?

20   BY MR. HARRIS:

21   Q    I'm showing you what's been marked as D-11.  Do you

22   recognize this document, ma'am?

23   A    Yes, I do.

24   Q    Is this the evaluation you received under the leadership

25   of Dean Sadeghipour?
```

28

1   A    Yes, it is.

2            MR. HARRIS:  I'd like to have this moved into

3   evidence.

4            MR. MUNSHI:  No objection.

5            MR. HARRIS:  May it be published to the jury?

6            THE COURT:  Yes.

7        (D-11 received in evidence)

8            THE WITNESS:  I can't --

9            THE COURT:  Is there a question?

10  BY MR. HARRIS:

11  Q    I want to make sure she's looking at this.

12  A    I am looking at it.

13  Q    Okay.  Do you see where it says, "Employee comments."

14  A    Yes.  Well, I don't see it; it's cut off.  Okay.  Now I

15  see it.

16  Q    Would you mind reading what it says under "employee

17  comments."

18  A            "It has been a pleasure to serve Dr. Sadeghipour

19           over the last year.  It's my hope that his

20           leadership will continue, for I enjoy the

21           challenges that he offers me, even though the

22           admonishment about my routine tasks left by the

23           wayside can sting."

24  Q            "-- even though his admonishment about the routine

25           tasks left by the wayside can sting."

29

1   A    Yes.

2   Q    Is that what you wrote?

3   A    Yes.

4   Q    So, he could admonish you regarding tasks that you

5   failed to complete?

6   A    When they weren't completed, yes.

7   Q    When they were not completed?

8   A    For when there were issues, yes, he did speak to me.

9   Q    You said something stronger than speaking to you.  You

10  said admonished.  What did you mean by that?

11  A    That's cherry-picking.  It's a word I used.  It was

12  never admonished -- like yelled at by him.  I was talked to

13  by him.

14  Q    You said "admonished."

15  A    Admonished, meaning that he corrected me.

16  Q    So, you didn't like the way that felt?

17  A    I said it could sting, yes.  I was just being honest.

18  Q    Okay.  I understand that.  Yes, you were being honest.

19  A    Uh-huh.

20  Q    And so, also, you said when Dean Sadeghipour -- but you

21  thought that he was fair, correct?

22  A    I do.

23  Q    Okay.  Do you recall what he has listed for your rating?

24  A    I do not.

25  Q    Turn to the next page.

30

1   A    Now, that does surprised me.

2   Q    What does it say, ma'am?

3   A    2.28.

4   Q    On the performance-rating categories, where does that

5   fall?

6   A    Between performance meets minimum expectations and

7   standards.

8   Q    Okay.  And can you go down to where it says -- so,

9   that's below average, yes?

10  A    Yes, it is.

11  Q    Ms. Briggs, I couldn't hear you.  I'm sorry?

12  A    I said yes.

13  Q    Under "goals and projects," could you read the first

14  goal for you under Phase I under Project Number 1?

15  A    Sure.

16          "Make your own materials, leaving the dean's office

17           has met all standards, policies to make sure the

18           process is smooth and flawless.  This includes

19           materials related to promotion and tenure, at

20           leaves, and retirements."

21  Q    What was your rating for that?

22  A    2.0.

23  Q    Again, that meet minimum expectations and standards,

24  correct?

25  A    Yes, it is.

31

1    Q    What does the reviewer's comments say.

2    A    The reviewer is me.

3    Q    No, the reviewer would have been the dean, correct?

4    A    Oh, the dean, okay.

5         Most of this is still done by the associate -- other

6    associate deans.  I would like her to take the lead.

7    Q    Did you subsequently take the lead for your assignments?

8    A    I did when I was aware of them.

9    Q    Pardon me?

10   A    I did when I was aware of them.

11   Q    Let's go on to Project Number 2 or Goal/Project 2.

12   Could you read that.

13   A    Uh-huh.

14           "Set priorities and plan for direct reports and

15           make sure all expectations are communicated

16           properly and a good plan is in place for their

17           development."

18   Q    Okay.  Who was your rating for that category?

19   A    2.

20   Q    And what did the dean say, as it related to your

21   performance in that category?

22   A           "It's beginning to happen, but not yet established

23           by her authority.  Unfortunately, if this

24           continues, the responsibilities will pass to

25           someone else."

32

1    Q     Okay.  The next category, under Goal 3, you received a

2    4.0, correct?

3    A     Uh-huh.

4    Q     Yes?

5    A     Yes, I did.

6    Q     So, that was excellent, yes?

7    A     Yes.

8    Q     The next category, Project 4, do you see that?

9    A     Yes, I do.

10   Q     And you received a 2.0, correct?

11   A     Yes.

12   Q     And so, the area in which you excelled was an area in

13   which you demonstrated professionalism in the workplace under

14   the Dean Sadeghipour's leadership.

15   A     I'm sorry, I don't under the question.

16   Q     Yes.  The area in which you excelled was under

17   Goal/Project Number 3, right?

18   A     Okay.  Yes.

19   Q     Dealing with professionalism, as it relates to students

20   and faculty during that academic evaluation period, correct?

21   Correct?

22   A     What am I agreeing -- I'm sorry?

23   Q     You did well under that category?

24   A     Yes.

25   Q     But your overall rating was less than average, correct?

33

1   A   Correct.

2   Q   And this was 2006, well before you had been under the

3   leadership of Dr. Wu, correct?

4   A   Yes.

5   Q   It wasn't -- you didn't actually get -- managed or

6   supervised by Dr. Wu until 2009, correct?

7   A   That is true.

8   Q   So, three years before you even had any contact with Dr.

9   Wu?

10  A   Yes.

11  Q   Okay.  Do you recall being supervised under vice or

12  Assistant Dean George Palladino?

13  A   Vice -- vice-dean.

14  Q   Vice-dean?

15  A   Yes.

16  Q   And that was from 2006 through 2007, yes?

17  A   That is correct.  I don't see the thing up there.

18  Q   I haven't put it up there?

19  A   Okay.

20          MR. HARRIS:  May the witness be shown D-12?

21  BY MR. HARRIS:

22  Q   Okay.  Ms. Briggs, do you recognize this document?

23  A   I do.

24  Q   Is this the evaluation that you received from George

25  Palladino for the evaluation from June 2007 -- strike that --

34

1    from July 2006 through June 2007?

2    A    Correct.

3    Q    It is?

4    A    Correct.

5            MR. HARRIS:  Okay.  I'd like to have this marked

6    and moved into evidence.

7            THE COURT:  Okay.

8            MR. HARRIS:  May it be published to the jury?

9            THE COURT:  Any objection?

10           MR. MUNSHI:  No objection.

11           THE COURT:  It may be.

12       (D-12 received in evidence)

13   BY MR. HARRIS:

14   Q    Ms. Briggs, what was your evaluation --

15   A    I don't know.

16   Q    -- in 2007?

17   A    I don't know -- 2.9.

18   Q    2.0.

19   A    2.09, I'm sorry.

20   Q    Again, is that average or below average?

21   A    That's below average.

22   Q    And George Palladino, as I recall you testifying, he was

23   fair to you, correct?

24   A    He was fair -- tough, but fair, yes.

25   Q    Tough but fair?

1    A    Uh-huh.

2    Q    But he gave you a less-than-average performance

3    evaluation?

4    A    Right.

5    Q    Let's go to the next one, D-13, please.  Do you

6    recognize this performance evaluation, Ms. Briggs?

7    A    Yes.

8    Q    Is this the evaluation period that was reviewed by

9    George Palladino for the time period between July 2007

10   through June of 2008?

11   A    Yes.

12   Q    Could you please go down to your comments, please.  Do

13   you see where it says "employee comments"?

14   A    Yes.

15   Q    Could you please read for the jury what you actually

16   provide in this evaluation.

17   A         "Although I have raised my concerns, it remains an

18             honor to serve with two strong, capable leaders

19             being guided by Dean Palladino.  I stand in awe as

20             I watch them transform or college into" -- "in less

21             than two years.  Bravo.  Please see my comments to

22             the individual areas on which I was evaluated."

23             MR. HARRIS:  I apologize, Your Honor.  May I have

24   this published to the jury?

25             THE COURT:  Yes.

36

1    BY MR. HARRIS:

2    Q    May I -- Ms. Briggs, may I direct you to the -- you in

3    that paragraph where it says "employee's comments" to the

4    line that beginning with, "Most of which ..." Do you see

5    that?

6    A    I'm not sure.  Where again?  Where do you want me to

7    read again?

8    Q    I think it's highlighted on your screen, ma'am.

9    A    Oh, I'm sorry looking at it:

10             "Most of which do not reflect the responsibilities

11             and functions for which I volunteered in the summer

12             of 2006 when two administrative staff members are

13             not present."

14   Q    You can continue reading.

15   A    Continue?

16   Q    Please.

17   A    Yes.

18             "One had resigned and the other went on FMLA for

19             approximately two months.  I performed the

20             essential functions required for my position, as

21             well as the other two members" -- "staff members.

22             My attempts to discuss this issue are not taken as

23             credible, although I strive to improve my

24             improvement."

25   Q    So, you had complained to --

37

1   A    I didn't --

2   Q    Pardon me?

3   A    -- complain.

4   Q    Did you complain to George Palladino?

5   A    No, I didn't complain.  I spoke to him.  We talked a

6   lot.

7   Q    Did you offer any concerns about your treatment in that

8   department?

9   A    Well, I did because I was not -- people who did my

10  evaluations, a lot of times wasn't even a full year, so

11  you're looking at that full year and then a new dean would

12  come on.  So there was this change in leadership.  So, there

13  was an adjustment period throughout that time and I was

14  getting to know what my role was.  There was no school for

15  what I did.  I didn't have training for what I did.  I mean,

16  I didn't -- there was no -- what to expect in the dean's

17  office, I was learning on the fly:  What does a dean's office

18  do?  And each dean that came on had ideas about what I was

19  supposed to do.

20  Q    Do you recall --

21  A    Now, I'm not making excuses.  I'm just telling you that

22  there was -- some of these were just for an evaluation for a

23  short period of time.

24  Q    Do you recall me showing the prior example was D-12,

25  which was the prior evaluation period by the same person.

38

1    A    Yes, that was --

2    Q    How --

3    A    But that was -- this was a full year -- this was my

4    first full year with him.

5    Q    Was 2007 through 2008?

6    A    This one, 2007 to 2008; that was the first full year

7    that I had been with him.

8    Q    But you had been with him at least a fair portion of

9    2006 and 2007, correct?

10   A    Right.

11   Q    Okay.  So, the transition that you previously talked

12   about with the prior deans, that didn't happen with George

13   Palladino?

14   A    No, no, it wasn't -- well, it did, because I was

15   confused about what my role -- like, when one was there, I

16   was supposed to be doing this and then without knowing,

17   another one would come on, so I wasn't aware.  So, I was

18   telling him, I was handling these things because I had

19   offered to do them when I was asked when there was no staff

20   to do them.

21       It's not an excuse.  It's just a mitigating factor.  I

22   think that -- I know that I wasn't -- they weren't clear

23   about what it was that I was supposed to do, nor was I, so

24   when I was continuing to do as I did with the previous dean,

25   I wasn't corrected until the end of the year.

39

1   Q    Okay.  And so that led to your performance -- poor

2   performance evaluation by George Palladino?

3   A    Can you -- can you go back to the score?

4   Q    Sure.

5         MR. HARRIS:  Can you put the score up?

6         THE WITNESS:  4, I mean, average.

7   BY MR. HARRIS:

8   Q    A little less than average.

9   A    2.7.

10  Q    Yes.

11  A    It's a 4.0 scale.

12  Q    You consider that average?

13  A    Yeah, I do on a 4.0 scale.

14  Q    It certainly wasn't above average?

15  A    No, it wasn't above average.

16  Q    Let's go to the evaluation period of the one that was

17  previously in front of you, D-13, for 2007/2008.  Again, that

18  was the short year that you previously had that was just

19  shown to you, correct?

20  A    Correct.

21  Q    And this year, this was a full academic year?

22  A    This -- I don't know.

23  Q    On D-13.

24  A    The one that you showed me.

25  Q    Yes.

40

1    A    Yes.

2    Q    The one that's in front of you?

3    A    Yes.

4    Q    And you received a 2.7 here, correct?

5    A    Yes.

6    Q    So, it says 2.0.  It says, "Performance meets minimal

7    expectations and standards" -- minimal.

8    A    It does.

9    Q    3.0 says, "Performance meets job expectations."  So that

10   would be average.  "Good, solid performance" --

11   A    Uh-huh.

12   Q    -- that's under 3.0?

13   A    Correct.

14   Q    You're below that, yes?

15   A    Yes.

16   Q    What was the reason why you're below that, then, if you

17   had a full academic year?

18   A    (No verbal response)

19   Q    Do you not understand my question?

20   A    I do understand your question.

21   Q    Okay.  So, can you tell us why you were below a 3.0 if

22   you now had a full academic year?

23   A    Well, you know, I don't -- the way we were supposed to

24   do the PDPs, and, actually, I was the one who informed the

25   vice-dean how we're supposed to do it.  I took this course

41

1    from HR that no grade inflation, be honest about the grade.

2    No one is always perfect.

3         And so, you know, I talked to them about that.  I don't

4    know what other people got, but I didn't have access to their

5    evaluations, but I assumed that they just weren't inflating

6    the grades and that there was room for improvement and I knew

7    that.

8    Q    Well, Ms. Briggs, you were talking about other

9    employees.  We're talking about why you received --

10   A    No, I wasn't.  I'm talking about mine.  I'm just talking

11   about what I know about the grade.  Did I think this grade

12   was low?  I thought it was -- what Dr. Palladino was supposed

13   to do, is not inflate the grade.

14   Q    You thought he was fair.

15   A    And --

16   Q    -- you said, "tough but fair."

17   A    Tough, but fair.

18   Q    He gave you less than a 3.0, which is meets

19   expectations?

20   A    Yes, he did.

21   Q    Okay.  You said that the reason you received a low score

22   previously is because that particular dean did not evaluate

23   you for a long enough period, yes?

24   A    I don't know which one you're talking about.  Dr.

25   Sadeghipour?

42

1   Q     Yes.

2   A     Yes, it was just a very short time.

3   Q     Correct.  But now George Palladino had you for a year

4   and at least a half of a year, correct?

5   A     Yes.

6   Q     Okay.  By the time that you received the evaluation of a

7   2.7, my question to you is, why did you receive a 2.7 if he

8   now has you for a full academic year?

9   A     Because I don't know that that was -- I don't see that

10  as poor performance, to be honest with you.  It shows room

11  for improvement, but based on what I -- when I took the

12  supervisory course, that was -- you shouldn't be -- have

13  people that are over 3 and above, unless they're

14  extraordinary and then why are they there is basically what

15  they told us.

16  Q     I agree with you when it talks about 3 or --

17  A     So, I'm just telling you what I learned -- what I know

18  about what I learned and my grade.  I don't know about other

19  people's grades.  So, I -- I looked at it as being that's

20  what he -- he was following Temple's HR guidelines:  Do not

21  inflate the grades.  Give -- make sure there's room for

22  improvement.

23  Q     Okay.

24  A     And I figured he was just following that guideline.

25  Q     Did you ever explain to Dean Palladino that you thought

43

1    that your rating was too low?

2    A    I did.  It was -- and I don't remember which one it was,

3    but I did.

4    Q    Did you ever receive a 3.0 evaluation before --

5    A    Yes.

6    Q    -- Dr. Wu evaluated you?

7    A    I can't -- I don't -- I don't know.

8    Q    You said, Yes?

9    A    Well, I think I did.  I mean, I'm not really sure.

10   Q    When?

11   A    I don't know.  I mean, can you show them to me?

12   Q    Absolutely.  I'm asking you, based on your recollection

13   and based on you being an employee of Temple University, when

14   did you receive an evaluation above a 3.0?

15   A    I can't say.

16   Q    You said, Yes, though.  You remember, you said, Yes?

17         MR. MUNSHI:  Your Honor, she just said she doesn't

18   remember.  This is just attacking her.  It's for no reason.

19         MR. HARRIS:  I'll withdraw the question.

20         THE WITNESS:  I'm sorry that I don't -- that I

21   can't say for certain and I'm not going to perjure myself.  I

22   can't say for certain.  So, if you show it to me, I'll tell

23   you whether or not I know it.

24   BY MR. HARRIS:

25   Q    Okay.  All right.

44

1    A    It's hard to be up here.

2    Q    You were previously shown D-14.

3    A    Okay.

4    Q    Do you see that, ma'am?

5    A    I do see it.

6    Q    This is for the academic period of 2008 through 2009,

7    correct?

8    A    That is correct.

9    Q    This same reviewer, George Palladino, correct?

10   A    It's not the same review.  It's following him.

11   Q    The same reviewer.

12   A    Oh, yes.

13   Q    So, now you've had George Palladino for two full years

14   and one-half of a year, correct?

15   A    That is correct.

16   Q    All right.  What was your rating in this academic

17   period?

18   A    I don't -- I don't know.

19   Q    Is it in front of you, ma'am?

20   A    Well, it just is now, okay -- it wasn't before -- 2.88.

21   Q    Okay.  Is that less than a 3.0?

22   A    It is less than a 3.0.

23   Q    So, you never received a 3.0 before Dr. Wu became your

24   supervisor?

25   A    I don't know.  Can you tell me -- I mean, if you show

45

1   me, I'll tell you whether or not -- I don't know my grades.

2   I'm just telling you I don't know what they are.

3   Q   Ma'am, you just saw from 2006 through 2009.

4   A   2006 to 2009.

5   Q   Correct.

6   A   All right.

7   Q   And I believe -- what was the first one that I showed

8   you -- 2004.  So, from 2004 through 2009, you have not

9   received a 3.0 yet, have you?

10  A   I think there's one missing, isn't there?

11          MR. HARRIS:  I'm sorry, may I have this published

12  to the jury?

13          THE COURT:  Yes.

14          THE WITNESS:  How can we're just showing the grade?

15  We're not showing the -- why would we do that?

16  BY MR. HARRIS:

17  Q   Well, the final grade is what your overall assessment

18  was, correct?

19  A   Right.  But why not look at the evaluation as a whole?

20  Q   Well, the reviewer provided you a grade based on your

21  overall performance, correct?

22  A   Yes.

23  Q   All right.  So the final score is what the reviewer

24  thought you should receive in terms of all of the categories?

25  A   Yes.

46

1    Q    All right.  So, that's the most important -- I'm asking

2    you those questions, ma'am.

3    A    Okay.

4    Q    So, did you ever receive a 3.0 prior to Dr. Wu?

5    A    I don't know.  Oh, is this the one right before Dr. Wu?

6    Yes, then, you are correct.  I don't know what Dr. Wu gave

7    me.

8    Q    I have shown you one where you received a 3.0 so far?

9    A    No, you have not.

10   Q    And in the following year, I think you were evaluated by

11   Dr. Wu, correct?

12   A    It would be Dr. Wu.

13   Q    And from the year of -- let me see -- it would be 2009

14   through 2010 -- I'm sorry, 2010 through 2011.

15   A    Where's 2009 to '10?

16   Q    Good question.  I hope to find that one.

17          MR. HARRIS:  One moment, please.  With the Court's

18   indulgence?

19          THE COURT:  All right.

20     (Pause in proceedings)

21   BY MR. HARRIS:

22   Q    Ma'am, I'm -- I apologize, I don't have one for that

23   year.  Do you know whether or not you were evaluated from

24   2009 to 2010 by Dr. Wu?

25   A    I'm sorry, what was the question?

47

1   Q    I said I don't have a document that shows 2009 through

2   2010 for Dr. Wu.

3   A    It would be --

4   Q    Do you recall actually being evaluated by Dr. Wu?

5   A    Yes, Dr. Wu did evaluate me, but I went there in 2009,

6   so ...

7   Q    So, you may not have had an evaluation in that first

8   year?

9   A    I had -- did get an evaluation.

10  Q    In that year, are you sure?  Because I sure don't have

11  it.  Are you sure about that?

12  A    I'm sure.

13  Q    Okay.

14           MR. HARRIS:  May the witness be shown D-15?

15  BY MR. HARRIS:

16  Q    The evaluation period that you were just referring to,

17  Ms. Briggs, was that a full academic year or a partial year?

18  A    Was -- that would have been a full year --

19  Q    Now --

20  A    -- it started in 2009.

21  Q    It would have been a full year, okay.

22       So, ma'am, you testified that the previous deans were

23  people who you had a tremendous amount of respect for and

24  that were fair, yes?

25  A    They were, yes.

48

1   Q    And none of those deans actually gave you a performance

2   evaluation of a 3.0 or higher, correct?

3   A    Correct.

4   Q    And, in fact, George Palladino, I think had the highest

5   score of a 2.8, yes?

6   A    Yes.

7   Q    Correct?

8   A    Yes.

9   Q    All right.  So, Dr. Wu was the person that you've been

10  testified to who bullied you, correct?

11  A    Yes.

12  Q    Who harassed you, yes?

13  A    Yes.

14  Q    Who was absolutely unfair to you, correct?

15  A    Yes.

16  Q    And can you tell me what his final score rating for you

17  was for 2010 to 2011.

18          MR. HARRIS:  And may this be published to the jury,

19  Your Honor?

20          THE WITNESS:  2.91.

21          THE COURT:  Yes, it can.

22  BY MR. HARRIS:

23  Q    2.91, is that what it says?

24  A    Yes, it is.

25  Q    So, the bully and the harasser gave you the highest

49

1   score, correct?

2   A    This was my first year there.

3   Q    You just said 2009/2010 was your first year.

4   A    Two -- well, then, where's that evaluation?

5   Q    That's what I asked you.  I don't have it.

6        But you said you received one in 2010 -- 2009 through

7   2010.

8   A    I'm assuming I did.

9   Q    Okay.  So, this wouldn't be your first year; this would

10  be your second year, correct?

11  A    Yes.  Yes.

12  Q    So, if your second year of being bullied, you received a

13  2.91?

14  A    Yes.

15  Q    The highest score that we've seen so far?

16  A    Yes.

17  Q    Okay.  Now, ma'am, as I understand your testimony, you

18  said that -- well, strike that.

19      Do you recall Dr. Wu saying that he was particularly

20  friendly with you?

21  A    Yes, I do.

22  Q    Okay.  And, in fact, he said that the two of you would

23  exchange gifts?

24  A    We -- not gifts.  I would let him borrow a book or a CD.

25  We would exchange CDs or books about our favorite composers.

50

1    Dr. Wu would bring gifts back from going overseas for

2    everyone in the department, but that comment he made about

3    books and stuff, I ...

4    Q    Did Dr. Wu provide you gifts when he would go abroad?

5    A    When he would -- yes, he did.

6    Q    Okay.  How many occasions did he provide you a gift?

7    A    I'm going to guess five-ish.

8    Q    And how many gifts did you provide him?

9    A    From myself, personally?

10   Q    Yes.

11   A    I don't know that I ever really gave him a gift.  I did

12   share books with him and CDs.

13   Q    Did you ever give him a card?

14   A    Did I give him?

15   Q    A card?

16   A    A card?

17   Q    A greeting card, yeah.

18   A    A greeting card -- probably.

19   Q    On how many occasions did you do that?

20   A    I don't recall.

21   Q    More than two?

22   A    I don't recall.

23   Q    More than three?

24   A    I don't know.

25        From just me?

51

1    Q    Yes, from just you.

2    A    I don't recall.

3    Q    Well, you don't recall the number, but you know that it

4    was more than one?

5    A    I do -- I do recall sending him a card or an email or

6    something about Christmas or something, yeah, I do.

7    Q    Okay.  Do you remember taking photographs of him while

8    he was playing the violin?

9    A    Yes, I do.  He asked me to do it.

10   Q    He asked you to do it?

11   A    Yes.

12   Q    When?

13   A    When they -- at the -- when it happened -- while he and

14   John were practicing.  There was another staff member there.

15   Q    Do you recall Dr. Wu going to Spain in October of 2011

16   for a conference?

17   A    I don't -- I can't say for sure that's what conference

18   it was, but he traveled frequently.

19   Q    Okay.  Do you recall him going to Spain in October of

20   2011?

21   A    No, not really, but -- I don't remember if that was in

22   Spain, but I know that he traveled.

23   Q    Okay.  But, you were responsible for his calendar, as

24   one of the functions that you were responsible for, correct?

25   A    That is true.

52

1    Q    Would you have been the person who would have been

2    responsible for booking his conferences, as well?

3    A    Booking -- I'm sorry -- the conference?

4    Q    Yes, the conference.

5    A    Like conference fees?  Conference fees, you mean for

6    him?  I don't know what you mean.

7    Q    Okay.

8    A    For his -- for travel or for the conference fee, itself?

9    Q    I'll separate them out.

10   A    Okay.

11   Q    You would book his travel for conferences, correct?

12   A    When asked, yes, I did.

13   Q    Okay.  But you also registered him to conferences?

14   A    I have.  Yes, I have.

15   Q    Okay.  That would be -- those two things would be your

16   responsibility --

17   A    They were --

18   Q    -- as his executive assistant?

19   A    -- they were my responsibility, but sometimes I missed

20   out on them, so I can't say that I did it every time.

21   Q    Okay.  I understand.

22        But you have no inspect recollection that Dr. Wu would

23   have been in Spain or Madrid, Spain, specifically, in October

24   of 2011?

25   A    Specifically, I do not recall, but it is -- he traveled

53

1   a lot, as I said.

2   Q    Do you recall him traveling to China in October of 2011?

3   A    In 2000 what?

4   Q    '11.

5   A    He went to China every year, so --

6   Q    In October?

7   A    (No verbal response)

8   Q    Dr. Wu testified that he did not travel to China during

9   the academic year?

10  A    He did travel to China.  Well, he said he didn't travel

11  during the academic year.  He did travel during the academic

12  year.

13  Q    Did he travel to China during the academic year?

14  A    I don't know if he did.  He usually went in the summer,

15  to be honest with you.  He usually did.

16  Q    As he testified?

17  A    Yes.

18  Q    Okay.

19          MR. HARRIS:  The Court's indulgence?

20      (Pause in proceedings)

21          MR. HARRIS:  May the witness be shown P-5.

22          And, specifically, it's already been moved into

23  evidence, so may I have this published to the jury?

24          THE COURT:  Yes.

25  BY MR. HARRIS:

54

1    Q    Page 2 of this document, specifically, Ms. Briggs, do

2    you recall testifying earlier this morning when counsel asked

3    you questions about your contact with Ms. Rhonda Brown?

4    A    Yes, I recall.

5    Q    And do you see the bottom of that email on July 25th,

6    2012?

7    A    Yes.

8    Q    This was you reaching out to Ms. Brown, correct?

9    A    To Sandy.

10   Q    I'm sorry?  To Sandy, in reference to you having a

11   conversation with Ms. Brown?

12   A    Yes.

13   Q    And you went to Ms. Brown for what reason, again?

14   A    To talk to her as a friend.

15   Q    Okay.

16   A    I did not in an official role.

17   Q    Not in an official role.

18   A    No, she was my friend.

19   Q    But as I understand it, you complained to Ms. Brown --

20   A    Yes.

21   Q    -- about the harassing and bullying that you were

22   experiencing under the leadership of Dr. Wu?

23   A    Yes, I did.

24   Q    And how offended you were, based on the comments that he

25   had made --

1    A    Yes.

2    Q    -- and about him treating you unfairly --

3    A    Yes.

4    Q    -- creating a hostile work environment --

5    A    Yes.

6    Q    -- correct?

7    A    Yes.

8    Q    And this was in August of 2012?

9    A    Yes.

10   Q    Okay.

11         MR. HARRIS:  May the witness be shown P-7, please?

12   I believe it's already been moved into evidence.  May I have

13   this published to the jury, please?

14         THE COURT:  Any objection?

15         MR. MUNSHI:  No, Your Honor.

16         THE COURT:  It's admitted.

17   BY MR. HARRIS:

18   Q    Ms. Briggs, I'm showing you what's been marked as P-7.

19   A    Yes.

20   Q    Do you recall testifying to this document earlier today?

21   A    Yes, I do.  Yes.

22   Q    May I have you direct your attention to the bottom of

23   that page, the next-to-last paragraph.

24   A    Can you highlight it?

25   Q    This, this email, this is where you're complaining about

1   the comments that Dr. Wu had said, yes?

2   A    Yes.

3   Q    About the age comments that you were referring to,

4   correct?

5   A    Yes.

6   Q    And, again, the mistreatment that you had been

7   experiencing, yes?

8   A    That's true.

9   Q    Intolerable, in fact, yes?

10   A    Yes.

11          MR. HARRIS:  May the witness be shown D-75.

12          MR. MUNSHI:  There is no D-75.

13          MR. HARRIS:  There should be.  It's an email.

14   It's also marked as -- it should be marked D-18.

15          MR. MUNSHI:  If there's a D-75, we don't have it,

16   just so you know.

17          MR. HARRIS:  I'll make sure you get it.

18          MR. MUNSHI:  Okay.

19          MR. HARRIS:  D-18.

20          MR. MUNSHI:  D-18, okay.

21   BY MR. HARRIS:

22   Q    I'm showing you what has been marked as D-18.  Do you

23   recognize this email exchange?

24   A    Yes, I do.

25   Q    And this is the email exchange from -- between you and

57

1    Dr. Wu on December 31st --

2    A     That's correct.

3    Q     -- on New Year's Eve on 2012, correct?

4    A     Correct.

5              MR. HARRIS:  May this be published to the jury,

6    Your Honor?

7              MR. MUNSHI:  No objection, Your Honor.

8              THE COURT:  It may.

9         (D-18 received in evidence)

10   BY MR. HARRIS:

11   Q     Ms. Briggs, could you read the email that you sent to

12   Dr. Wu on New Year's Eve, please.

13   A     Sure.

14              "Dr. Wu, I did not see you before the holiday break

15              and missed a chance to wish you a great holiday and

16              time with your family, so I sent my holiday card to

17              your home.  As I said in my message, I appreciate

18              all of what you did for me, your commitment to the

19              department, your discipline, and your energy."

20   Q     Let me stop you there.

21   A     Uh-huh.

22   Q     In an email on New Year's Eve, you said, "I appreciate

23   all that you do for me"?

24   A     Uh-huh.

25   Q     Yes?

58

1    A    Yes, I did.

2    Q    Okay.

3              "And your commitment to the department, your

4              discipline, and your energy."

5    A    Yes.

6    Q    This is the harasser and bullier, correct?

7    A    Yes.

8    Q    The same person?  Okay.

9         I'm sorry, can you read the next paragraph, please.

10   A         "I hope that on this last day of 2012 that your

11             last days of the holiday break are spent relaxing

12             with your family, except I bet that you're writing

13             a couple proposals and submitting papers.  The

14             break flew by and I will be back at Temple in a

15             very short time.  There are some pictures attached

16             of master violin teacher Wu and" (indiscernible)

17             "that I took just before break.  You should ask Dr.

18             Kwatny to post one of them on your website.  Be

19             safe and relax and have fun."

20   Q    Is there another document behind that?

21   A    Is it where?

22   Q    Did he respond to your email?

23   A    I don't know.

24   Q    I believe at the top, ma'am.

25   A    Okay.

1   Q    What was his response?

2   A    He says:

3            "Ruth, thanks for the note.  I went to NYC a couple

4            of days ago to watch Aida and enjoy an opera and

5            watch.  I enjoyed it very much.  Happy new year."

6   Q    And that was his response to you?

7   A    Yes, it was.

8   Q    Were the -- attached to that email, did you have

9   photographs?

10  A    I did.

11  Q    That's Professor Jie Wu?

12  A    Yes, it is.  That's him and that's he and John.

13  Q    And those are the photographs that you took?

14  A    Of he and John, yes, I did.  At his request.  It was at

15  his request that I came down to that practice, that lesson

16  for John.

17  Q    Okay.  And you took the time to send him such a nice

18  note?

19  A    I was desperate.  I was desperate.  And as I look at

20  this, I see my desperation.  I was trying to make it work.

21  I'm not a confrontive person.  I don't want to work in a

22  hostile work environment and I was trying my best to make it

23  work.

24            MR. HARRIS:  Your Honor, may we have a quick break?

25            THE COURT:  We'll take a ten-minute recess.

60

1           The jury may go out for 10 minutes.

2           MR. HARRIS:  Thank you.

3           THE COURT OFFICER:  All rise.

4      (Recess taken at 2:10 p.m.)

5      (Proceedings resume at 2:22 p.m.)

6      (Call to order of the Court)

7      (Jury present)

8      (Witness resumes stand)

9           THE COURT:  All right.  You may be seated.

10          Counsel, you may continue.

11          MR. HARRIS:  Thank you.

12  BY MR. HARRIS:

13  Q    Ms. Briggs, do you recall sending an email communication

14  to Ms. Walton in April of 2014?

15  A    Yes, I do.

16  Q    You do?

17  A    Yes.

18  Q    Okay.

19  A    I said yes.  I'm sorry.

20          MR. HARRIS:  May the witness be shown D, I believe

21  it's 23.

22          THE COURT:  Any objection?

23          MR. MUNSHI:  No objection, Your Honor.

24          MR. HARRIS:  And may this be published to the jury?

25          THE COURT:  It's admitted.

61

1          MR. MUNSHI:  No objection.

2      (D-23 received in evidence)

3  BY MR. HARRIS:

4  Q    An April 2nd, twenty -- April 3rd -- excuse me -- 2014,

5  did you -- this email -- is this the email you sent to Ms.

6  Walton?

7  A    Yes, it is.

8  Q    Could you please read that to the jury?

9  A    Sure.

10          "Dear Deirdre.  It is with great sadness that I

11          resign from my position as Executive Assistance in

12          the Department of Computer and Information

13          Sciences, in the College of Science" -- "Science

14          and Technology, effective April 1st, 2014."

15      More?

16  Q    Yes, please.

17  A       "I have great admiration for our students, both

18          undergraduate and graduate, and their amazing

19          faculty.  I miss my family and my community."

20  Q    That's the email that you sent, indicating that you were

21  resigning from your role.  Yes?

22  A    I was told that I should -- could resign.

23  Q    Right.

24  A    Right.

25  Q    That was offered to you, correct?  By Ms. Walton, who

62

1    was the head of --

2    A    By miss --

3    Q    -- HR?

4    A    Right.  And Greg Wacker, yes.

5    Q    Okay.  Greg Wacker?

6    A    And Greg Wacker.

7    Q    As well as Dr. Wu, correct?

8    A    Dr. Wu was not there.

9    Q    He wasn't in the meeting, but he was the one who would

10   have approved this sort of request.

11   A    No.  I don't know.

12   Q    Okay.

13   A    I can't say -- I don't think --

14   Q    Understood.

15        Did you talk to Ms. Walton after you received this

16   email?

17   A    I did.

18   Q    Okay.  And the information that you said, as I

19   understand it, in this email, it was that you resigned.

20   A    I'm sorry?

21   Q    That you resigned.

22   A    That I resigned.

23   Q    Okay.

24   A    It was under duress.  I -- I want to tell you, it was

25   under duress.

63

1    Q    I understood your testimony this morning that you were -

2    - and as you indicated, you were under duress.  But

3    certainly, the emotion impact of the events surrounding your

4    separation from the organization, correct?

5    A    I'm really having a hard time hearing you.  I'm sorry.

6    Q    As I understood your testimony, you indicated that

7    you've had a significant amount of emotional distress around

8    the events that led to your separation from the organization.

9    A    Yes.

10   Q    But as I also understand, Ms. Briggs, prior to you

11   leaving the organization, you had been seeking the treatment

12   of a mental health professional.  Yeah?

13   A    That is true.

14   Q    Okay.  And Dr. Middleman is her name?

15   A    That is her name.

16   Q    And as I also understand it, Dr. Middleman had made a

17   neurological psych evaluation to a Dr. Esposito.  Is that

18   accurate?

19   A    That is correct.

20   Q    And Dr. Esposito prepared a report, did she not?

21   A    Yes, she did.

22   Q    And the report was prepared at the direction and request

23   of your treating physician, which would have been Dr.

24   Middleman.

25   A    Correct.

64

1          MR. HARRIS:  All right.  May the witness be shown -

2   - I believe it is -- I think I have it there -- Dr.

3   Esposito's evaluation report.

4      (Participants confer)

5          THE COURT:  Any objection?

6          MR. HARRIS:  D-55.

7          MR. MUNSHI:  No objection, Your Honor.

8          THE COURT:  It may be admitted.

9          MR. HARRIS:  Excuse me, Your Honor.  The Court's

10  indulgence?  I do have it here somewhere.  It's actually D-38

11  -- or it's Middleman -- it's actually listed under Middleman

12  38, Bates-stamped.  So it's listed under ...

13      (Participants confer)

14          MR. HARRIS:  Okay.  This is an extension of D-55.

15      (Participants confer)

16          MR. HARRIS:  Your Honor, before we go into this,

17  can we just have a very brief sidebar on this document?

18          THE COURT:  All right.

19          MR. HARRIS:  Thank you, Your Honor.

20      (Pause in proceedings)

21      (Sidebar)

22          THE COURT:  Yes.  What is it?

23          MS. MATTIACCI:  Your Honor, we object to the

24  admission of this document.  It's a medical record.  The

25  doctor is not here to testify to it.  It's an out-of-court

65

1    statement, it's hearsay, it's not relevant, as it's dated

2    August 2011.

3              MR. HARRIS:  It's absolutely relevant.  Your Honor,

4    in --

5              THE COURT:  How does it get admitted?

6              MR. HARRIS:  It gets admitted because it impeaches

7    what she had previously said.  She testified that she was --

8    that she had been performing her functions of her job

9    adequately, that she was -- that she didn't make mistakes to

10   such a degree that she should have been disciplined for.

11             In the evaluation, she specifically says part of

12   how she missed the sirens [sic] because she couldn't

13   remember.  She specifically also says that sometimes she

14   would actually stay late to compensate for what she couldn't

15   do during the work hours, all of which is in dispute in this

16   case.

17             MS. MATTIACCI:  (indiscernible)

18             THE COURT:  I don't understand.  How do you happen

19   to have this?

20             MR. HARRIS:  It was provided to be by counsel.

21             THE COURT:  (indiscernible)

22             MS. MATTIACCI:  They requested all the

23   psychological records, and we provided them in discovery.

24   But this is 2011, so it's three years --

25             THE COURT:  (indiscernible) keep up your voice.

66

1          MS. MATTIACCI:  Okay.  This is three and a half

2    years before her termination.  She had a psychological.

3    Actually, the doctor's conclusion was she was fine, she was

4    just having a little anxiety.  And her -- his cognitive

5    testing of her was that she was very acute and very alert.

6    So there's a whole bunch of interpretations that would have

7    to go on here, in order to properly understand it.

8          THE COURT:  (indiscernible) what she told the

9    doctor about --

10         MR. HARRIS:  Exactly.

11         THE COURT:  -- (indiscernible) than what the doctor

12   told her.

13         MS. MATTIACCI:  But then it's only fair that the

14   evaluation -- the conclusion of the evaluation comes in,

15   which is that she has very high mental acuity, that he

16   doesn't think that she has any problems with memory,

17   cognitive function; that everything that she is going through

18   is fine.  You know --

19         MR. HARRIS:  Well, she says, I have trouble

20   multitasking at work, I am forgetful; she forgets things,

21   that she did things, and things must be done.  She misplaces

22   objects, forgets people's names, forgets tasks.  All of those

23   things have been called into issue.  If she tells an

24   evaluator in 2011, specific to the time that she was

25   supposedly under the leadership of Dr. Wu, it certainly

1    impeaches her testimony.

2              MS. MATTIACCI:  No.  His entire investigative

3    summary --

4              THE COURT:  And my --

5              MS. MATTIACCI:  -- has nothing to do with that.

6              THE COURT:  What I'm wrestling with is:  How does

7    it get admitted?

8              MS. MATTIACCI:  Yeah.

9              MR. MUNSHI:  Exactly.

10             MR. HARRIS:  It gets admitted through

11   (indiscernible) I don't have to admit the document,

12   necessarily.  I can certainly -- the document itself comes in

13   for the purposes of prior inconsistency.  She's testifying

14   now that she was a good performer.  She tested -- she

15   provided a statement to a medical health professional that

16   contradicts what she's currently testifying.

17             MS. MATTIACCI:  No.

18             MR. HARRIS:  It comes in as a prior inconsistent

19   statement.

20             MS. MATTIACCI:  She's not contradicting --

21             THE COURT:  You can ask her questions, but if she

22   denies that, I don't know -- you're not going to be able to

23   contradict her with that.

24             MR. HARRIS:  If she denies what, specifically.

25             THE COURT:  What she said in that report, or what

68

1   that report says.

2            MR. HARRIS:  Okay.  If she says she (indiscernible)

3            THE COURT:  Then you're stuck with it.

4            MR. HARRIS:  I'm stuck with what she said.

5            MR. MUNSHI:  Yes, you're stuck with what she says

6   here.

7            MR. HARRIS:  Okay.  I have no problem.

8        (Sidebar concluded)

9            MR. HARRIS:  Your Honor, may I be seen sidebar,

10  just so that I know how to handle that with --

11           THE COURT:  No.  No.

12           MR. HARRIS:  No?

13           THE COURT:  What?

14           MR. HARRIS:  So -- just so I know how to handle the

15  document before it gets published to the jury.

16           MS. MATTIACCI:  Well, which document?

17           THE COURT:  You don't use the document at all.  You

18  just ask some questions, if you want to.

19           MR. HARRIS:  Very well.

20           THE COURT:  And --

21           MR. HARRIS:  If I may?

22           THE COURT:  And don't use the document.

23           MR. HARRIS:  Okay.  Very well.

24           THE COURT:  Actually --

25           THE WITNESS:  Can you highlight it for me?

69

```
 1            THE COURT:  -- you're using --
 2            THE WITNESS:  I'm just having --
 3            THE COURT:  You're using --
 4            THE WITNESS:  -- a hard time seeing it.
 5            THE COURT:  -- the document.
 6            MR. HARRIS:  Pardon me?
 7            THE COURT:  By sitting there, appearing to read
 8   from it, you are using it.
 9            MR. HARRIS:  Your Honor, I don't understand this
10   Court's ruling.  If I may see you at sidebar then.
11            THE COURT:  No, the ruling was you can ask those
12   questions.  Remember?
13            MR. HARRIS:  Okay.
14            THE COURT:  You can ask the questions.  But I don't
15   want you holding a document, asking as if they're coming from
16   that document.
17            MR. HARRIS:  Okay.  Understood.
18   BY MR. HARRIS:
19   Q    Ms. Briggs, do you remember actually being evaluated by
20   a  neuropsychologist?
21   A    Yes, I do.
22   Q    Okay.  And the neuropsychologist was Dr. Esposito.
23   A    That is correct.
24   Q    Do you remember telling Dr. Esposito about your
25   cognitive functions prior to 2012?
```

1  A    I can't -- was that the date?  I'm going to -- I'm not

2  sure, but I -- yes, I did talk to her about it.

3  Q    Okay.  Did you explain to Dr. Esposito that you had

4  problems -- or you had been often been distracted --

5          MR. MUNSHI:  Your Honor, this is just an end around

6  of what we just talked about.

7          THE COURT:  No, I told him he could ask questions.

8          MR. MUNSHI:  Okay.

9          THE COURT:  But, you know --

10          MR. MUNSHI:  We all --

11          THE COURT:  But don't -- don't use any documents.

12  Okay?  Don't create the impression that you're...

13  BY MR. HARRIS:

14  Q    Ms. Briggs, do you remember telling Dr. Esposito that

15  you were often distracted at work?

16  A    Yes.

17  Q    That you would miss assignments at work?

18  A    Yes.

19  Q    That you'd have to stay after work late because of your

20  being easily distracted and compensating for the time period

21  that you couldn't complete your tasks during the work day?

22  A    Yes.

23  Q    Did you struggle with organization and planning?

24  A    I don't recall that, but...

25  Q    That you felt overwhelmed at work?

1    A    I did feel overwhelmed at work.

2    Q    Because of the amount of work that you receive?

3    A    And because of the -- the -- the pressure that they were

4    -- I was pressured.  No mistakes, you know, get it on time,

5    so I did, I did put extra time in to make sure to

6    overcompensate for that.  I --

7    Q    Okay.  And you would forget things?

8    A    I'm sorry?

9    Q    And that you would forget things?

10   A    I can't hear you?

11   Q    Yes.  That you would forget things at work that you were

12   required to --

13   A    I don't recall saying --

14   Q    -- remember?

15   A    -- that.  No, I don't.  If I might say that I was --

16              THE COURT:  There's no question pending.

17              THE WITNESS:  All right.

18   BY MR. HARRIS:

19   Q    And this evaluation that you had with Dr. Esposito was

20   in 2011, three years before you were actually -- were

21   separated from your organization?

22   A    That is correct.  I think.

23   Q    And again, that was at the direction of your treating

24   healthcare professional?

25   A    No, it was at my request.

72

1    Q    Your request?

2    A    My request.

3    Q    Because you wanted help?

4    A    I wanted to see if I had Alzheimer's like my father.

5    Q    But you did not have that?

6    A    I did not have that.

7    Q    Ms. Briggs, are you currently employed?

8    A    Yes, I am.

9    Q    Your current employment, I believe you're a health --

10   home healthcare assistant?

11   A    Aide, right.  Uh-huh.  Yes.

12   Q    And as I also understand your testimony, you have not

13   looked for a position since you've been in that current role?

14   A    No.

15   Q    Okay.  And it's -- your salary currently is

16   approximately half of what you made when you were working at

17   Temple University?

18   A    Or less.  Yeah.

19   Q    And the position that you currently have is full-time?

20   A    Yes, it is.

21   Q    Okay.  And as I understand your testimony, you have a

22   degree, correct?

23   A    Yes, I do.

24   Q    That you actually received with honors?

25   A    Yes, I did.

73

1          MR. HARRIS:  Your Honor, may I see you with

2     Counsel?

3          THE COURT:  Yes.

4          MR. HARRIS:  At sidebar?

5       (Sidebar)

6          MR. HARRIS:  I neglected to go over the Facebook

7     page, the Facebook messages.

8          THE COURT:  Yes.

9          MR. HARRIS:  So I think that this would be an

10    appropriate time, this would be the only area of inquiry that

11    I haven't gone in to that I would like to go in to.

12         THE COURT:  Ma'am?

13         MS. MATTIACCI:  They're completely irrelevant.

14    They're completely irrelevant.  I -- they haven't even

15    identified which statements.  There's just like a little --

16    there's a stack --

17         MS. SATINSKY:  She indicated them in her

18    deposition, Your Honor.

19         MS. MATTIACCI:  It's not an authentication issue,

20    it's an admissibility issue.

21         MR. HARRIS:  No absolutely.  No, I -- I'm not

22    suggesting -- I mean, I think there's no question that they

23    were authenticated.  The question is admissibility and

24    certainly what was called into question is whether or not Ms.

25    Briggs subjectively believes that she was offended by the

74

1    comments, specifically the comment of being told that when

2    you go out to pasture by Dr. Wu.

3             MS. MATTIACCI:   Where is the statement in her

4    Facebook page that contradicts that, at all?   I don't see a

5    single --

6             MR. HARRIS:   (Indiscernible) for the purpose of

7    contradiction.

8             MS. MATTIACCI:   -- statement.

9             MR. HARRIS:   Using it for her subjective belief

10   that she was in a hostile work environment.   The hostility of

11   what she said she experienced, she testified again on direct

12   and cross, that she believes she was in a hostile work

13   environment.   Specifically, that the linchpin in that is the

14   comment that was made by Dr. Wu.   The Facebook messages where

15   she's actually using lewd and vulgar language referring to

16   Dr. Wu and Ms. Walton, certainly calls into question whether

17   or not someone would believe that they were subjectively

18   offended by that comment.

19            MS. MATTIACCI:   That is apples and --

20            MR. HARRIS:   That's a --

21            MS. MATTIACCI:   -- oranges.

22            MR. HARRIS:   That's exactly what the cases -- that

23   specifically address.

24            THE COURT:   I'll allow you to use it for that

25   purpose.

75

1          MR. HARRIS:  Thank you.

2          MS. MATTIACCI:  Your Honor (indiscernible)?

3          THE COURT:  No, you'll have to go back.

4          MS. MATTIACCI:  Okay.  Can I just state I need to

5   put something on the record for, you know?

6          THE COURT:  Well --

7          MS. MATTIACCI:  I just -- Your Honor, just for --

8   it's a -- this is a -- this is a very, very, very, critical

9   issue and I just for appellate purposes, I have to put my

10  record -- I have to put my argument on the record.

11         THE COURT:  No, you don't.

12         MS. MATTIACCI:  I think this is -- I don't?

13         THE COURT:  You know, you've already -- you opposed

14  it.

15         MS. MATTIACCI:  Okay.  But --

16         THE COURT:  What would you like to do --

17         MS. MATTIACCI:  Well, now that we've heard all the

18  testimony, there's absolutely no reason why it would be

19  relevant to the -- to the issue that -- it's not -- it's her

20  state of mind and whether (indiscernible) discriminatory

21  conduct directed towards her would be upsetting to her --

22         THE COURT:  No, it's --

23         MS. MATTIACCI:  -- not whether --

24         THE COURT:  -- it's whether she was actually

25  offended or put in fear or upset.  And --

76

```
 1            MS. MATTIACCI:  And the relevance --

 2            THE COURT:  Okay.

 3            MS. MATTIACCI:  -- would be --

 4            THE COURT:  I've ruled.

 5            MS. MATTIACCI:  Okay.  Thank you, Your Honor.

 6        (Sidebar concluded)

 7  BY MR. HARRIS:

 8  Q    Ms. Briggs, you have a Facebook account, correct?

 9  A    I do have Facebook.  Yes, I do.

10            MR. HARRIS:  May the witness be shown Exhibit D-33?

11            THE COURT:  All right.

12            THE WITNESS:  I see it.  Yes.

13  BY MR. HARRIS:

14  Q    Do you recall sending a Facebook message through

15  Messenger to Alexis Cogan (phonetic)?

16  A    Yes.

17  Q    Show you what's been marked as D-33.  Does that reflect

18  the email exchange between you and Ms. Cogan?

19  A    Is it --

20  Q    Alexis Cogan.

21  A    I'm sorry.  What -- what is the highlighted portion?

22            MR. MUNSHI:  Your Honor, just objection.  He said

23  email.  This is a private Facebook message.  It's not an

24  email.

25            MR. HARRIS:  I stand corrected.
```

77

1    BY MR. HARRIS:

2    Q     The private Facebook message between you and Ms. Cogan?

3    A     That is true.

4    Q     Okay.  On April the 24th, 2015 at 4:35 p.m.?

5    A     Yes.

6    Q     Okay.

7          MR. HARRIS:  I'd like have this marked and moved

8    into evidence and published to the jury.

9          MR. MUNSHI:  Your Honor, we stand by previous

10   objection that these are irrelevant and personal, private

11   messages, have nothing to do with anything.

12         THE COURT:  Admitted for the limited purpose that

13   it reflects on the Plaintiff's claim that she was subjected

14   to a hostile work environment.  All right.

15      (D-33 received in evidence)

16         MR. MUNSHI:  And Your Honor, further objection that

17   this message is after she was already out of Temple, so she

18   was not at, at that time.

19         THE COURT:  All right.  That's fine.  Overruled.

20   BY MR. HARRIS:

21   Q     Showing you what's been marked as Exhibit D-33.

22         MR. HARRIS:  May I have this published to the jury,

23   Your Honor?

24         THE COURT:  All right.  Yes.

25   BY MR. HARRIS:

78

1    Q    Ms. Briggs, do you see this message?

2    A    I do see it.

3    Q    And where it says, "Alexis," that's Ms. Cogan?

4    A    Yes.

5    Q    And where it says, "Ruth," that would be you?

6    A    That would be me.

7    Q    Can I go down to where it says and highlight under where

8    it says, "Ruth?"  Where it says:

9              "I fantasize about him getting publicly disgraced.

10             There's nothing more dangerous than a-s-s-h-o-l-e

11             with too much power."

12        Did you say that?

13   A    I did.

14   Q    And what did you say -- what's the response?

15   A    And what?

16   Q    What is your response after that?

17   A    "I think Greg is a misogynist."

18   Q    And who were you talking about?

19   A    Excuse me?

20   Q    Who were you referring to when you said Greg?

21   A    Wacker.

22   Q    Okay.  Continue.  Ms. Briggs, I gave you the wrong

23   message.  I'm sorry.

24             MR. HARRIS:  May the witness be shown D-34?  It's

25   another Facebook message.

79

```
1    BY MR. HARRIS:

2    Q    Ms. Briggs, were you Facebook friends with Abbey Foreman

3    (phonetic)?

4    A    Yes, I am.

5    Q    Okay.

6              MR. MUNSHI:  And, Your Honor, just for the record

7    being clear before it goes up there, we stand by our previous

8    objections as we've previously stated.

9              THE COURT:  Correct and overruled.

10   BY MR. HARRIS:

11   Q    Show you what's been marked as Defense Exhibit 34.  Do

12   you recognize this email message?

13   A    Yes.

14   Q    Between you and Ms. Foreman?

15   A    Yes.

16             MR. HARRIS:  I'd like to have this marked and moved

17   into evidence and published to the jury.

18             THE COURT:  All right.

19       (D-34 received in evidence)

20             MR. HARRIS:  May the witness be shown Page 406,

21   Briggs at the bottom Bates stamp 406.

22   BY MR. HARRIS:

23   Q    At the top where it says -- can you direct at the very

24   top of the page -- where it says, "Abbey," and then "he is."

25   Do you see that, the very top?
```

80

1    A    Yes, I see it.

2    Q    Okay.  Could you read what Abbey said to you in this

3    exchange?

4    A    I don't know whose is whose and whose is mine, to be

5    honest with you.

6    Q    So when she says, "He is a J-hole," do you know who

7    she's referring to?

8    A    Do I know to whom she's referring or --

9    Q    Yes.

10   A    Yes, I did.

11   Q    Who was she referring to?

12   A    Dr. Wu.

13   Q    Okay.  And then your response is?

14   A    Is that the highlighted part?

15   Q    It is.  Would you read that, please?

16   A    Sure.  The highlighted part, right?

17   Q    Yes.

18   A    "Abbey," -- I don't remember this.  Abbey Foreman

19   answered the before you die to do list, check off what you

20   have done.  It gets better as you read on.  With how to

21   (indiscernible) and five others.

22   Q    You can continue.

23   A         "You know that there is a weenie in the office,

24             right?  If you consider the amount of endurance and

25             restraint it takes to refrain from committing acts

81

```
 1              of postiality" [sic] "you will understand that I am
 2              hesitant to discuss teeny tiny Weenie Wu in my
 3              Facebook status.  It would be suggested by someone
 4              in the Dean's Office to contact HR."
 5    Q    When you say, "Weenie Wu," that --
 6    A    I --
 7    Q    -- that's Dr. Wu you're referring to?
 8    A    Yes.
 9    Q    Okay.  You can continue reading.
10    A         "I would consider the suggestion if I knew of a
11              person in HR in whom I had trust.  Oh well, I
12              don't.  I hope another Weenie Wu victim would take
13              action so that my cowardice ass remains gainfully"
14              --
15         Employed I think is what I meant.
16    Q    And this was in 2011, correct?
17    A    Yes.
18    Q    All right.
19              MR. HARRIS:  Can the witness be shown Briggs-407 --
20    I think I'm going to need that -- I'm sorry.  Can you
21    highlight where it says "Ruth?"  10/1/2011, 3:15 in the
22    morning.  Can you highlight that?
23              THE WITNESS:  Abbey --
24    BY MR. HARRIS:
25    Q    This is what you said, Ms. Briggs?
```

82

1   A   Yes.

2   Q   Okay.  Can you read that, please?

3   A   Uh-huh.

4           "Abbey, I think I heard a lot of Chinese words,

5           your name, then a lot of Chinese.  What happened

6           when you talked to Weewee Wu or why am I not

7           allowed to write comments for your pictures?  Did I

8           say something inappropriate again?"

9   Q   When you say "Weewee Wu" who are you referring to?

10  A   Dr. Wu.

11  Q   That was the name you called him?

12  A   I said that.  Yes, I did.

13  Q   You called him a Weewee?

14  A   Weewee Wu, yes, I did.

15  Q   All right.  Did you call him any other disparaging

16  names, ma'am?

17  A   I don't recall.

18  Q   In your Facebook messages to Ms. -- to Abbey?

19  A   To Abbey?

20  Q   Correct.

21  A   Yeah, I don't recall.  I recall that it was a pretty

22  long exchange when I turned it over to my attorney, but I did

23  not read it all.

24  Q   You hadn't read this message --

25  A   I didn't re-read it, no.

83

1   Q    Okay.  But you do recall reading it before today?  Yes?

2   A    Reading it before today or writing it before today?

3   Q    Both.

4   A    I wrote it, but I don't recall the content and it was a

5   very long exchange and no, I --

6   Q    Okay.

7             MR. HARRIS:  May the witness be shown --

8             THE WITNESS:  I recall being angry, but I don't

9   recall the -- the words exactly like that.

10            MR. HARRIS:  Okay.  May the witness be shown Page

11  416, Briggs-416?

12  BY MR. HARRIS:

13  Q    Can you read the section where it says, "Ruth, and it

14  says, Well," that paragraph?

15  A    I can't -- okay.

16  Q    Could you read for the jury what you said?

17  A    Yes.

18            "Well, the spineless weenie of a man got me today.

19            He had Greg Wacker fire me."

20            THE COURT:  You can use initials or something.

21            MR. HARRIS:  Yes, please.

22            THE WITNESS:  What's that?

23  BY MR. HARRIS:

24  Q    You can use initials.  You don't have to say the word.

25  You can spell it out.

84

1          THE COURT:  The jury can read it, can't they?

2          MR. HARRIS:  I hope they can see it.  So Your

3   Honor, she doesn't have to read it as long as the jury can

4   see it.

5          THE COURT:  I would think so.  All right.  Continue

6   on.

7          MR. HARRIS:  Thank you.  May the witness be shown

8   Page 418?

9   BY MR. HARRIS:

10  Q    Under Section -- the second paragraph where it says,

11  "Ruth."

12  A    Can you highlight it for me, please?  I --

13  Q    Sure.

14  A    -- can't read it.  Okay.

15  Q    You can read this.

16  A          "I've heard you speak poorly about our former

17             department chair.  If it is true, do you have to

18             apologize?  If I point out to him that he is." --

19  Q    Again, you can spell it.

20  A          "-- he is" -- an expletive face -- "is that just

21             considered an FYI?"

22  Q    And who are you referring to here?

23  A    Dr. Wu.

24  Q    Dr. Wu?

25  A    Uh-huh.

85

1  Q   Okay.  Can you go down to the last paragraph on this --

2  the next to the last paragraph on this page?

3  A   Could you highlight it for me, please?

4  Q   Sure.

5  A       "In the last 60 seconds I've had 20 to 25 hateful

6          thoughts about him and his gangster pencil pushers

7          in the dean's office.  Burning in hell is

8          preferable to forgiving them."

9  Q   And then you're referring to Dr. --

10 A   No, I was referring Greg Wacker.

11 Q   Okay.  And those are the Facebook messages you sent or

12 exchanged between you and Abbey Foreman?

13 A   That is correct.

14 Q   Do you have any other messages that -- that you sent

15 regarding or addressing your feelings about Dr. Wu, Ms.

16 Walton or Greg Wacker?

17 A   I don't -- I don't remember.  I know it was a long

18 exchange.  I don't -- I'm not going to say no.  If you show

19 me, I'll tell you whether I said it or not.

20 Q   Do you have any other Facebook pages with other people?

21 A   I'm sorry?

22 Q   Facebook messages with other people other than Abbey

23 Foreman and the other young lady that I showed you earlier?

24 A   I don't -- do I have other Facebook messages?

25 Q   Where you're talking about Dr. Wu, Greg Wacker or

86

1    Deirdre Walton, Ms. Briggs?

2    A    Not at -- no.  Those are two people I worked with.

3            MR. HARRIS:  May the witness be shown Briggs423?

4    The second paragraph where it says, "Ruth."  Would you

5    highlight that, please?

6    BY MR. HARRIS:

7    Q    Again, you don't have to read this one.

8            THE COURT:  Yeah, this is somebody writing

9    something to her?

10           MR. HARRIS:  No, she's writing it.

11           THE COURT:  It is?  All right.  All right.  Okay.

12           MR. HARRIS:  Ms. Briggs is writing.

13   BY MR. HARRIS:

14   Q    Correct, Ms. Briggs?  This is what you wrote to Abbey

15   Foreman, correct?

16   A    It is.

17   Q    All right.

18   A    Can I see the date, please?

19   Q    Sure.

20   A    Okay.  Thank you.

21   Q    Do you see the date?

22   A    Yes.  Thank you.

23   Q    July 14th, 2016?

24   A    Thank you.

25   Q    Okay.  So the individual that you were referring to, who

1    are they?

2    A    Abbey was a pre -- Abbey Foreman was -- she wasn't there

3    then, but she worked -- she was a non-tenure track professor

4    in the department of computer information sciences.

5    Q    Okay.  She was a former colleague in the department?

6    A    She was a -- she was a non-tenure track professor in the

7    department of computer information sciences with whom I -- I

8    became friends.

9    Q    Okay.  In the email -- Facebook exchange message that

10   you had with Ms. Foreman, in the previous text that we just

11   went over, that you did not read aloud, who were you

12   referring to when you were talking about the individuals, the

13   employees, that you use the profanity in reference to?

14   A    Can you show it to me again?

15   Q    Sure.  We'll highlight that.  The employees that you're

16   referring to, who are you referring to?

17   A    I don't know.  Greg.

18   Q    Just Greg?

19   A    That's all I can think of now.  It's had a -- it's a

20   long time ago.

21              THE COURT:  Okay.  You can take that down.

22              MR. HARRIS:  Thank you.

23              THE WITNESS:  The language is embarrassing.

24              THE COURT:  Anything further?

25              MR. HARRIS:  Briefly, Your Honor.  I think I'm

88

1    almost finished.

2              THE COURT:  You're finished?

3              MR. HARRIS:  I think I'm almost finished.  Let me

4    confer with Counsel.

5         (Participants confer)

6              MR. HARRIS:  I have no further questions.

7              MR. MUNSHI:  Your Honor, I just have a few

8    questions, if I may proceed?

9                        REDIRECT EXAMINATION

10   BY MR. MUNSHI:

11   Q    Ruth, let's just get clear on these Facebook messages,

12   okay?  You were just shown messages between you and Abbey

13   Foreman.  Is Abbey Foreman a friend of yours?

14   A    She's a friend of mine.

15   Q    Were these messages that you just saw, were they on

16   Messenger, private Messenger, or were they social posts for

17   the --

18   A    They were --

19   Q    -- whole world to see?

20   A    They were -- no, they were private posts.  Private

21   messages through Messenger.

22   Q    Between you and Abbey Foreman only?

23   A    Between Abbey and Fore -- Abbey Foreman and I.

24   Q    Did you ever send these messages to Dr. Wu?

25   A    No.

89

1    Q    Did you ever send these messages to Ms. Walton or Greg

2    Wacker or anybody else at Temple?

3    A    No.

4    Q    Did you ever intend for anybody else to see these

5    messages?

6    A    No.

7    Q    Okay.  You were shown a series of your performance

8    evaluations, Ruth, and you were shown the grades that you

9    received, but let's actually look at the full evaluations.

10   Okay?

11   A    Okay.

12   Q    So let's look at Defendant's Exhibit 10 if we can, and

13   we'll put it up on the screen.

14   A    Okay.

15   Q    For you.  And Defendant's Exhibit 10 is one that you

16   were shown before, it's an evaluation from the year of 2004

17   to 2005.  Do you see that?

18   A    That is correct.

19   Q    Okay.  And can you tell us who the reviewer is on this

20   page at least?

21   A    Allen Nicholson.

22   Q    Allen.  And Allen Nicholson was an interim dean for a

23   period?

24   A    Right.  Right when I first started, yes.

25   Q    And the final rating you were shown before is a 2.83.  Do

1    you see that?

2    A    I see that.

3    Q    All right.  So let's just be crystal clear about what a

4    2.83 is according to Temple's form.  A 3.0, do you see that

5    on the bottom?

6    A    Yes.

7    Q    Can you read for us what a 3.0 score is?

8    A    Performance meets job expectations, good solid.

9    Q    And there's the next page says performance, right?  And

10   what is a 2.0 score?

11   A    A what?

12   Q    A 2.0.

13   A    Performance meets minimal expectations and standards.

14   Q    Okay.  So the 2.83 that you received is between a 2 and

15   a 3 --

16   A    That's correct.

17   Q    -- correct?

18   A    That's correct.

19   Q    Is it closer to a 2 or closer to a 3?

20   A    Closer to a 3.

21   Q    Okay.  On that second page, and this is Defendant's

22   Exhibit 10, which is from 2004 to 2005, do you see it says

23   "goals/project 2?"  Number 2?

24   A    Yes.

25   Q    And can you read what "goals/project 2" is according to

1    Temple's evaluation?

2    A    I'm sorry, what was the question?

3    Q    Can you read what the goal is, it says assist and

4    support?

5    A    Assist and support the dean during university activities

6    such as commencement, award activity -- award ceremonies, et

7    cetera.

8    Q    And tell us what rating you received for that?

9    A    A 4.0.  4.0.

10   Q    And earlier it said what a 4.0 was on Temple's --

11   A    Yes.

12   Q    -- rating scale and can we go see how they describe what

13   a 4.0 is on the first page?  On the first page.  Can you read

14   what a 4.0 is?

15   A    Performance consistently far exceeds expectations.

16   Q    Can we go to page -- that's fine.  Can we go to page 5

17   of this evaluation, please?

18   A    Uh-huh.

19   Q    And show you -- let's go to core competency number 7 on

20   the very bottom of the page.

21   A    Uh-huh.

22   Q    And can you read for us what the core competency number

23   7 according to Temple is?

24   A    Interpersonal skills, ability to work effectively with

25   others using empathy and self-regulation to manage

92

1   interactions with others.

2   Q    And can you tell us what rating you received for that

3   core competency?

4   A    A 4.0.

5   Q    Let's go to your next evaluation, which is Defendant's

6   Trial Exhibit 11.  And can you tell us what your Defendant's

7   Exhibit 11 is for?

8   A    Can you highlight it for me?

9   Q    Yep.

10   A    From 7/2005 to 6/2006.

11   Q    And were you working in the dean's office at that time?

12   A    Yes, I was.

13   Q    Okay.  And can you tell us who the reviewer is on the

14   first page?

15   A    Keya -- Keya Sadeghipour.

16   Q    Is it Dean Sadeghipour who you mentioned earlier?

17   A    Yes.

18   Q    Let's go to the third page of your evaluation, please.

19   And let's go to Goals/Project Number 3.

20           MR. MUNSHI:  And if we can highlight that.

21   Q    Can you read what Goals/Project Number 3 is --

22   A    Uh-huh.

23   Q    According to Temple's evaluation?

24   A    Okay.

25           "Bring" -- "bring the Dean's Office to a

93

1           professional status, making sure students, faculty,

2           staff are all treated professionally and with

3           respect.  This includes, but is not limited to

4           physical appearance of the office."

5   Q    And can you read what Dean Sadeghipour's reviewer

6   comments was?

7   A    4.0.

8   Q    And how about his comments?

9   A    "She is doing a very good job."

10  Q    Let's go to the next year.  Let's go to Defendant's

11  Trial Exhibit 12, please.  And the reviewer is George

12  Palladino.

13  A    That's --

14  Q    Is that right?

15  A    Yes.

16  Q    Let's go to the third page of this evaluation and see

17  what the evaluation says.  Part 3, Competency, Competency

18  Number 1.  Competency --

19  A    Can you highlight it for me, please?

20  Q    Yep.

21  A    Okay.  Thank you.

22  Q    We got it.  Can you read for us what Competency Number 1

23  is, according to Temple?

24  A           "Client, customer service orientation, focuses

25           one's efforts on exceeding the customer's needs,

94

1           takes personal responsibility for dealing with

2           and/or correcting customer issues and concerns."

3    Q    "Takes personal responsibility for dealing with," right?

4    A    Right.

5    Q    What score did you get?

6    A    A 3.5.

7    Q    Let's go to Page 6 of this same evaluation, please?  And

8    let's take at Core Competency Number 10, and core -- first,

9    let's look at Number 10, then we'll look at Number 11.

10   A    Okay.

11   Q    Core Competency Number 10, Ruth.  Please read for us

12   what Temple's form says and the rating that you received.

13   A        "Ethics, demonstrates the ability to adhere to" --

14           "to adhere to an appropriate and effective set of

15           core values and beliefs, and acts in line with

16           those values."

17   Q    What score did you get?

18   A    A 4.0.

19   Q    Let's look at Competency Number 11, right underneath.

20   A    Uh-huh.

21           "Interpersonal skills, ability to work effectively

22           with others, using empathy and self-regulation to

23           manage interactions with others."

24   Q    What score did you get for that?

25   A    A 3.5.

1  Q    Let's go to the next page, core competency, according to

2  Temple, Competency Number 13, please.  And if you can read

3  that one out loud, and tell us what score you received for

4  that category.

5  A    Yes.  Yes.

6           "Respect and valuing diversity, demonstrates the

7           ability to recognize, understand, and accept and

8           appreciate the value of workplace diversity.

9           Respects the practices, value" -- "expect" --

10      I'm sorry.

11           "Respects the practices, values, and points of view

12           of others, individual" -- "other individuals and

13           groups."

14  Q    Let's go to your next evaluation.  Let's look at

15  Defendant's Trial Exhibit 13, please.  And tell us the year.

16           MR. MUNSHI:  If we can highlight the year for this

17  evaluation.

18           THE WITNESS:  2007 to 2008.

19  BY MR. MUNSHI:

20  Q    And can we say who the reviewer is for this evaluation?

21  A    Can -- I think it's -- it's cut off.  I think it's Dr.

22  Palladino.

23  Q    Yeah, we can show you that.

24  A    Uh-huh.

25  Q    Reviewer, George Palladino.

96

1    A    Okay.  Yes.  Uh-huh.

2    Q    And let's just look at your employee comments --

3    A    Uh-huh.

4    Q    -- for this evaluation.

5    A    Yes.

6    Q    And read our employee comments, if you will, please.

7    A         "Although I have raised my concerns, it remains an

8              honor to serve the" -- "to service with two strong

9              and capable leaders, Dean Dighe and Vice Dean

10             Palladino.  I stand in awe as I watch them

11             transform our college in less than two years.

12             Bravo.  Please see my comments in the individual

13             areas on which I was evaluated, most of which do

14             not reflect the responsibilities and functions for

15             which I volunteered during the Summer of 2006, and

16             with who administrators and staff members were not

17             present.  One had" -- "one had resigned, and the

18             other had went out on FMLA.  For approximately two

19             months, I performed the essential functions

20             required for my position, as well as the other two

21             staff members.  My attempts to discuss this issue

22             are not taken credible, although I strive to

23             improve my" -- "my improvement."

24   Q    And then, for this year, your final score is a 2.7.

25   A    That --

97

1

2    Q    Do you see

3    A    That is correct.

4    Q    Okay.  Now, Ruth, let's just also be crystal-clear about

5    this.  All of these evaluations that we're looking at are

6    prior to you working under Dr. Wu, correct?

7    A    They're -- correct, yes.

8    Q    At any point, did you go to Human Resources to complain

9    about Vice Dean Palladino?

10   A    No, I did not.

11   Q    Did you ever go to Human Resources to complain about --

12   A    No, I did not.

13   Q    -- Dean Dighe, Dean Sadeghipour, Dean Nicholson?

14   A    No, I did not.

15   Q    Did you ever go to Sandy Foehl or anybody in the EEO

16   Office --

17   A    No.

18   Q    -- to complain about Dean Sadeghipour, Dean Nicholson,

19   Dean Dighe, Vice Dean Palladino?

20   A    No, I did not.

21   Q    Let's look at Page 3 of -- I'm sorry.  Let's look at the

22   next -- let's look at Page 6 of this same evaluation.  And

23   again, we're talking about core competencies.  Let's look at

24   the third Core Competency, "Clients/Customer Service

25   Orientation," and see what kind of score you got for that.

98

1    Please read that out loud?

2    A        "Focuses on" -- "efforts on exceeding the

3             customer's needs, take personal responsibility for

4             dealing with and/or correcting customer service

5             issues and concerns."

6    Q    And your score?

7    A    4.0.

8    Q    Okay.  And let's look at your last evaluation,

9    Defendant's Trial Exhibit 14.  And if you can tell us the

10   year for this evaluation?

11   A    2008 -- oh, I'm -- yeah, 2008 to 2009.

12   Q    And the score that you received this year was --

13   A    I don't -- can't see it.  I'm sorry.

14       (Participants confer)

15   A    2.88.

16   Q    Okay.  And again, this is between a 2.0 and a 3.0,

17   correct?

18   A    Correct.

19   Q    Closer to 2 or closer to 3?

20   A    To 3.

21   Q    Let's go to Page 4 of this evaluation.

22       (Pause in proceedings)

23   Q    Actually, I meant to say Page 2.  Sorry.  And

24   "Goals/Project Number 1."  Can you tell us what Vice Dean

25   Palladino's score and comments were?

99

1    A    Yeah.  Schedule required meetings well in advance for

2    each term, 3.0, "Much improved this year."

3    Q    And 3.0, we already talked about, is good

4    (indiscernible) correct?

5    A    Right.

6    Q    Okay.  And Goal/Project Number 2, according to Vice Deal

7    Palladino?

8    A    "Become proficient in NSF Fast Lane submissions," 3.0.

9    "Has learned the basics."

10   Q    Let's go to Page 4 of this evaluation from Vice Dean

11   Palladino, please.  And let's look at Core Competency Number

12   4, please.  And please read out load what --

13   A    Okay.

14   Q    -- George Palladino said.

15   A         "Affects, demonstrates the ability to adhere to

16             appropriate and effective set of core values and

17             beliefs, and acts in line with all the" -- "with

18             those values."

19   Q    And the score you received?

20   A    3.5.

21   Q    And that's between a 3.0 and a 4.0, correct?

22   A    Correct.

23   Q    Okay.  And Core Competency Number 6 on that page?

24   A         "Respect and valuing diversity.  Demonstrates the

25             ability to recognize, understand, and accept and

100

1    appreciate the value of workplace diversity.

2    Respects the practices, values, and points of

3    other" -- "other individuals and groups."

4  Q    Score?

5  A    3.5.

6  Q    Okay.  And let's just go to the previous page.  On the

7  bottom of the previous page, it says, "Competency Number 3."

8  And can you read that for us, please?

9  A    "Client, customer service orientation, focuses

10    one's efforts on exceeding the customer's needs.

11    Takes personal responsibility for dealing with

12    and/or correcting customer service issues and

13    concerns."

14  Q    And your score?

15  A    A 3.0.

16  Q    A good, solid performance, according to Temple, correct?

17  A    Correct.

18  Q    Let's go to what George Palladino says in his comments

19  on the next page, regarding that particular competency that

20  we just read about, personal responsibility.  Can you read

21  that for us?

22  A    "Ms. Briggs takes the time to make all welcome and

23    important, regardless of" --

24    I don't know what that date -- oh -- oh, it's -- oh, I

25  see.

1          "-- regardless of position.  An admirable trait."

2    Q    Okay.  All right.  Ruth, you were shown, on your cross-

3    examination, an email that you sent to Deirdre Walton in

4    April of 2014, where you tendered your resignation, correct?

5    A    Yes.

6    Q    Did that happen before you were handed a termination

7    letter by Greg Wacker or after?

8    A    No, it was two days after, I believe.

9    Q    Your resignation letter was after.

10   A    It was an email, yeah.  Yeah, a resignation email.

11   Q    And that's the same termination letter that we've

12   already seen a few times, correct?

13   A    Right.

14          MR. MUNSHI:  Okay.  That's all I have, Your Honor.

15   Thank you.

16          THE COURT:  Anything further?

17          MR. HARRIS:  Limited, Your Honor.

18          THE COURT:  Pardon?

19          MR. HARRIS:  Yes.  If I may?

20              RECROSS-EXAMINATION

21   BY MR. HARRIS:

22   Q    Ms. Briggs, as I understand your performance evaluation

23   -- and they've been identified as D-10 through, I believe, D-

24   17 -- you would agree with me that, certainly, the areas --

25   A    Can you -- I'm just, once again, having a hard time

1    hearing you.  Sorry.

2    Q    You will agree with me that the areas that counsel went

3    over with you were the areas that you scored well, correct?

4    A    Yes.

5    Q    But you also will agree with me, in those performance

6    evaluations, the vast majority of those categories, you

7    scored below a 2.0, correct?  Or excuse me, below a 3.0.

8    A    Yes.

9    Q    And so your final rating was less than a 3.0, correct?

10   A    Yes.

11   Q    On every single one, prior to you actually being

12   supervised by Dr. Wu.

13   A    Yes.

14   Q    Okay.  And so 3.0 reads, "Performance meets job's

15   expectations."  So you never met the job expectation before

16   you actually were reviewed by Dr. Wu, correct?

17   A    For -- you mean the final score, you're talking about.

18   Q    Correct.

19   A    Right.

20   Q    The final score.

21   A    Yes.

22         MR. HARRIS:  Okay.  Thank you.  I have no further

23   questions.

24         MR. MUNSHI:  I'm sorry.  I just have one question,

25   in light of that last one.

103

1           FURTHER REDIRECT EXAMINATION

2  BY MR. MUNSHI:

3  Q    The 3.0 score, Ruth, that Mr. Harris just said is

4  performance meets job expectations.  2.0 means performance

5  meets minimal expectations and standards.  That was what you

6  saw on the evaluations, correct?

7  A    Yes.

8  Q    And did you ever get an evaluation where you were under

9  2.0 --

10 A    No.

11 Q    -- at any point in your career at Temple?

12 A    No.

13         MR. MUNSHI:  Okay.  I have no further questions.

14 Thank you.

15         THE COURT:  The witness may step down.

16         THE WITNESS:  Thank you, sir.

17     (Witness excused)

18         THE COURT:  Call your next, please.

19         MS. MATTIACCI:  Your Honor, the plaintiff calls

20 Deirdre Walton.

21         MS. SATINSKY:  Your Honor, may I step outside to

22 alert the witness?

23         THE COURT:  Yes.

24     (Pause in proceedings)

25         MR. MUNSHI:  Your Honor, may I just retrieve Ms.

104

1    Briggs' glasses?

2              MS. BRIGGS:  I think my glasses -- oh, wait a

3    minute.  I found them.  I'm sorry.  I'm sorry.

4         (Pause in proceedings)

5              THE COURT OFFICER:  Please raise your raise your

6    right hand, place your left hand on the Bible.

7    DEIRDRE WALTON, WITNESS FOR THE PLAINTIFF, SWORN.

8              THE CLERK:  Please state your full name for the

9    record.

10             THE WITNESS:  Deirdre L. Culbreath Walton.

11             MS. MATTIACCI:  May I proceed, Your Honor?

12             THE COURT:  Yes.

13                        DIRECT EXAMINATION

14   BY MS. MATTIACCI:

15   Q    Good afternoon, Ms. Walton.

16   A    Good afternoon.

17   Q    I just have some questions for you today in regards to

18   Ms. Briggs' claims.  You're familiar with them, correct?

19   A    Yes, I am.

20   Q    And you are currently employed by Temple?

21   A    Yes, I am.

22   Q    You were hired in 1999.  Is that correct?

23   A    That's true.

24   Q    You're currently the director of Labor Relations?

25   A    Labor and Employee Relations.

105

1   Q    Is this a position that you have held since 2008?

2   A    Around there, yes.

3   Q    And this is considered a Human Resources position?

4   A    Yes, it is.

5   Q    Is it true that part of your job is to ensure that the

6   workplace is free of harassment for employees?

7   A    Well, that, and to make sure that our employment -- that

8   proper employment practices are upheld, as well.

9   Q    Would you also agree that your job is to ensure that the

10  workplace is free of retaliation?

11  A    Absolutely, yes.

12  Q    And in your capacity as an HR executive, you are

13  familiar with the laws that govern discrimination, correct?

14  A    Yes, I am.

15  Q    And you're also familiar with the laws that govern

16  retaliation, correct?

17  A    Yes, I am.

18  Q    And the laws that govern hostile work environment?

19  A    Yes.

20  Q    You have taken classes on Title 7, correct?

21  A    Yes, I have.

22  Q    And you understand that Title 7 is the federal law that

23  guards against sex discrimination, correct?

24  A    Yes.

25  Q    Or prohibits against sex discrimination, I should say.

106

1    And, in addition, you are familiar with the Age

2    Discrimination and Employment Act, correct?

3    A    Yes, I am.

4    Q    Known as the "ADEA"?

5    A    Yes.

6    Q    And you know that that is the federal law that prohibits

7    age discrimination, correct?

8    A    Yes.

9    Q    And you are -- you also know that under both of these

10   laws that one cannot retaliate or the employer cannot

11   retaliate against an employee if they bring complaints of age

12   or sex discrimination?

13   A    Yes.

14   Q    Do you still report to Sharon Boyle, the associate vice

15   president for Human Resources?

16   A    Yes, I do.

17   Q    And was that the case in 2014; did you report to Sharon

18   Boyle?

19   A    Yes, I did.

20   Q    And Ms. Boyle, reports to Mr. Ken Kaiser, the CFO,

21   correct?

22   A    Yes.

23   Q    And Mr. Kaiser, he reports to the president of the

24   university?

25   A    Yes, he does.

107

1  Q    So, you are just four levels or three levels below the

2  president of the university?

3  A    I guess you could say that, yes.

4  Q    One of the things you are in charge of -- am I right --

5  is the EEO policies of Temple?

6  A    The Human Resources Department is responsible for making

7  sure that we appear -- uphold the practices -- the employment

8  practices to protect the EEO, yes.

9  Q    Okay.  And if an employee comes to you -- and when we

10  say "EEO" that means equal employment opportunity, correct?

11  A    Yes.

12  Q    And that can include claims of sex or age

13  discrimination, correct?

14  A    Yes.

15  Q    And can include claims of retaliation, correct?

16  A    Yes.

17  Q    And hostile work environment, yes?

18  A    Yes.

19  Q    So, if an employee comes to you with a claim or

20  complaint concerning one of those topics, you would make sure

21  that they are -- that those claims are investigated, correct?

22  A    Yes, I would.

23  Q    Now, do you investigate those claims of discrimination?

24  A    I don't, myself, investigate claims of discrimination.

25  We have an office at the university that does that and that's

108

1    our Equal Opportunity Compliance Office.

2    Q    Okay.  So, you don't actually investigate those claims;

3    the EOC Office would?

4    A    Yes.

5    Q    So, since you don't investigate claims of

6    discrimination, it would not be possible for you to determine

7    whether somebody's claims of discrimination had merit,

8    correct?

9    A    That's true.

10   Q    I'd like you to take a look at a document.  There's some

11   binders in front of you that have a lot of documents.  The

12   one document says -- or binder says "Plaintiff's Exhibits."

13   If you could find that one.

14   A    Okay.

15   Q    Now, you would agree with me that in 2013 and in 2014,

16   Ms. Briggs brought claims of discrimination to your

17   attention, correct?

18   A    No, she did not.

19   Q    So, since she did not bring claims of discrimination to

20   your attention, then it would follow that you did not do an

21   investigation into her claims of discrimination, correct?

22   A    Correct.

23   Q    And you wouldn't have done the investigation anyway, to

24   determine if there was merit, because you don't do the

25   investigations, correct?

109

1   A     Correct.

2   Q     Okay.  If you can take a look at Document P-62.  It's

3   going to be Number P-26 in your tabbed booklet there.

4          MS. MATTIACCI:  Your Honor, I believe this is

5   already in evidence.  Can I have permission to publish?

6          MR. HARRIS:  No objection, Your Honor.

7          THE COURT:  Yes.

8   BY MS. MATTIACCI:

9   Q     Okay.  Now, do you recognize this as Defendant Temple

10  University's -- it's:

11          "Defendant Temple University and the Commonwealth

12           System of Higher Education, Objections and

13           Responses to Plaintiff's Interrogatories, Set 1."

14  Do you see that?

15  A     Yes, I do.

16  Q     And you know -- am I correct -- that interrogatories are

17  questions that one party poses to the other in the course of

18  litigation and then those answers are given to those

19  questions by the other party, correct?

20  A     Yes.

21  Q     And you've been involved in answering these

22  interrogatories in this case and other cases, correct?

23  A     Yes, I've been involved, but that's handled by our

24  counsel's office.

25  Q     Okay.  Well, these interrogatories that are in this

110

1    particular case that were sent to Temple to answer and one of

2    the questions -- I'll get to the question -- it's on Page 7.

3    If I could direct your attention to Number 5.  Do you see

4    that?

5    A    Yes.

6    Q    And we ask Temple to describe in detail all steps taken

7    by defendant to investigate Plaintiff's claims of

8    discrimination, including who was interviewed, any notes,

9    including handwritten notes, created as part of the

10   investigation, any conclusions reached, and disciplinary

11   actions taken as part of the investigation.

12       And the answer that Temple gave was that Temple

13   University objects to Interrogatory Number 5, to the extent

14   that it seeks information and documents protected from

15   disclosure by the attorney-client privilege and/or

16   attorney-client work product.  Subject to and without waiver

17   or limitation of the foregoing objections and conditions,

18   Temple University responds as follows.

19       And I want to direct your attention -- they start

20   answering some information about other folks like Sandra

21   Foehl.  And their first answer there is:

22            "Temple University investigated Briggs' claims of

23            discrimination and found them to be meritless."

24       Do you see that?

25   A    Yes.

111

1    Q    Okay.  And then if you scroll down to the next page --

2    or I'm scrolling -- you're just turning -- to the next page,

3    at the top where it says, 2013.  It says:

4              "In 2013 and 2014, Briggs raised her claims of

5              discrimination with Deirdre Walton, Temple

6              University, Department of Labor and Employee

7              Relations."

8         Do you see that?

9    A    Yes, I do.

10   Q    But a few moments ago, when I asked you if in 2013 and

11   2014 if Briggs raised her claims of discrimination with you,

12   you said that was not true.

13   A    Yes, that was not true.

14   Q    So, the answer that is given in the interrogatory is

15   actually false, correct?

16   A    Yeah, I wouldn't say it was false, mainly because she

17   brought to my attention, the employment practices and the

18   work environment in the office that she worked in, but not

19   discrimination complaints.

20   Q    Okay.  And then in Temple's answers when they go on to

21   say that Ms. Walton found no merit in Ms. Briggs' claims,

22   that statement in Temple's interrogatory response is also

23   false, correct?

24   A    In regards to the claims of her employment situation, I

25   found them to be meritless, but she didn't specifically say

112

1    that she was being discriminated against.

2    Q    Well, in Temple's own answers to their interrogatory

3    requests -- to our interrogatory requests, they say Briggs

4    raised her claims of discrimination with Ms. Walton.  So,

5    we've already established that that is not true.

6         Ms. Walton -- the statement, "Ms. Walton found no merit

7    to Ms. Briggs' claims," that refers to the claims of

8    discrimination.

9         That would be a fair reading of those two sentences,

10   would you agree?

11   A    I would, yes.

12   Q    And would you agree that that's a false statement to say

13   that you found no merit in Ms. Briggs' claims of

14   discrimination because you didn't make a decision one way or

15   the other, correct?

16   A    That's true.

17   Q    Okay.  Now, if you scroll down to the end of this

18   document, you know -- or do you know that these answers are

19   not just answers that Temple gives without any verification.

20   These are answers by Temple under oath, where they're

21   certifying that these answers are true under oath.  Do you

22   realize that?

23   A    Yes.

24   Q    And the certification that Temple attached to these

25   interrogatories was your certification, which I'm showing

113

1    here -- sorry -- verification:

2             "I, Deirdre Culbreath-Walton, hold the position of

3             director of employee relations with Temple

4             University of the Commonwealth System of Higher

5             Education, Temple University, and as such, I duly

6             authorize to execute this verification on behalf of

7             Temple University."

8        And then it says:

9             "I have reviewed Plaintiff's interrogatories and

10            have determined that no one individual at Temple

11            University has personal knowledge of all matters

12            covered by the interrogatories; consequently,

13            Temple University has gathered facts and

14            information from individuals with actual knowledge

15            relevant to this case sufficient for an authorized

16            employee of Temple University to respond to

17            Plaintiff's interrogatories.  I certify that the

18            foregoing factual answers to Plaintiff's

19            interrogatories are true and correct to the best of

20            my knowledge, based upon the information presently

21            available to me.  Subject to the terms of this

22            verification, I declare, under penalty of perjury,

23            that the foregoing factual responses are true and

24            correct to the best of my knowledge for information

25            and belief."

114

1       And that is your signature?

2  A    That is.

3  Q    Now, you're familiar with the idea of doing

4  investigations into claims of discrimination, correct?

5  A    Yes, I am.

6  Q    You would agree with me that in order to do an

7  appropriate investigation into claims of discrimination, it

8  should be thorough and it should be fair, correct?

9  A    Yes, it should.

10 Q    The person investigating the claims of discrimination

11 should be neutral, correct?

12 A    Yes.

13 Q    That person should not have a bias for or against the

14 person that is making the complaint or the person that's

15 being investigated, correct?

16 A    Yes.

17 Q    And in terms of doing a full and complete investigation,

18 do you agree with me that it would be important for all

19 witnesses that are relevant to the situation to be

20 interviewed, correct?

21 A    Yes.

22 Q    And that during those interviews, some sort of notes

23 should be taken of the interviews that occur, correct?

24 A    Yes.

25 Q    And you would agree with me, as well, that in order to

115

1    do a fair and thorough investigation, all relevant

2    documentation should be gathered and reviewed as part of the

3    investigation, correct?

4    A    Yes.

5    Q    At the end of the investigation, as part of a fair and

6    thorough investigation, there should be a summary of the

7    investigation that is pulled together, correct?

8    A    Yes.

9    Q    And the summary should be reduced to writing, correct?

10   A    Yes.

11   Q    And it should be reviewed for accuracy, correct?

12   A    Yes, it should.

13   Q    It should also be reviewed to make sure there is no

14   bias, correct?

15   A    Yes.

16   Q    And the person who had brought the claim or the original

17   complaint should be advised of the results of that

18   investigation, correct?

19   A    Yes.

20   Q    And if there's any disciplinary action to be taken as a

21   result of the investigation, that should be assessed,

22   correct?

23   A    Yes, it should be assessed.

24   Q    I'd like to turn your attention to P-3 of -- in that

25   same binder, Tab Number 3, please.  Ms. Walton, this is a

116

1    disciplinary report that was issued to Ruth brings.  The date

2    at the top is 11/09/2011.  Do you see that?

3    A    Yes, I do.

4    Q    And it was issued by her supervisor, Dr. Wu.

5         Do you have any idea why this disciplinary action was

6    issued to Ms. Briggs?

7    A    Yes, I do.

8    Q    And what is that reason?

9    A    From my memory and understanding, Ms. Briggs was

10   disciplined for unprofessional, inappropriate behavior.

11   There was a blowout between her and Dr. Wu, where she became

12   loud and inappropriate with her supervisor.

13   Q    Is it Temple's policy that if disciplinary action is

14   issued, that there should be supporting documentation to

15   support the reason why the discipline was issued?

16   A    Usually what happens is there should be a statement

17   that's made, but it's not necessarily a part of the

18   disciplinary report.

19   Q    A -- okay.  Go ahead.

20   A    But, usually, when a Department is running a discipline

21   by me, they give me the details of the event and what took

22   place and we determine what that discipline is going to be,

23   but we don't actually put the specifics of the details in the

24   disciplinary report.

25   Q    Why not?

117

1   A    We just don't find it's necessary to put all the details

2   into it.  We ask that the supervisor or the manager keep

3   documents for themselves on the situation.

4   Q    Doesn't -- does HR retain any of the documents?

5   A    At times, yes, or the manager or the business manager,

6   like Greg Wacker, who assisted Dr. Wu, would have kept those

7   documents.

8   Q    Is there a uniform policy at Temple that says that when

9   discipline is issued, the supporting documentation is kept at

10  HR or kept at the manager's office or is it at the discretion

11  of HR and the manager?

12  A    It depends.  There's not always supporting documents.

13  In this situation where Ms. Briggs and Dr. Wu had this

14  inappropriate interaction where she yelled at him, it was Dr.

15  Wu's statement that he made to Greg; he sent him an email.

16  So, there's no policy that says that you have to keep

17  something in the file.  We keep the discipline in the file.

18  Q    Did you say that Greg Wacker sent an email to Dr. Wu

19  about the discipline?

20  A    No, what I'm saying is that Dr. Wu -- and I'm

21  speculating here, because I don't know for sure -- I know

22  that Dr. Wu discussed the situation with Greg Wacker.  He may

23  have done it by email, but I know that he discussed it with

24  Greg Wacker and they discussed the situation and they

25  determined, based on that situation, to issue a discipline.

118

1    Q    Were you the HR person that approved this write-up?

2    A    I'm the HR person that they talked to and I counseled

3    them on this write-up, so I advised them, yes.

4    Q    Is that the policy of Temple that an HR person should

5    review any write-up before it is issued to an employee?

6    A    We don't have a specific policy that says that every

7    write-up should be reviewed by HR, but it's a practice.

8    Q    Okay.  So, when you're saying that -- who contacted you,

9    Dr. Wu or Mr. Wacker?

10   A    Mr. Wacker did.

11   Q    And when Mr. Wacker relayed to you that Ms. Briggs had

12   blown up, you said, at Dr. Wu --

13   A    Yes.

14   Q    -- did you then do an investigation into that?

15   A    No, I didn't do an investigation.  Greg told me he went

16   down and he talked with Dr. Wu.  There may have been

17   witnesses and he came back to me and he said this is what

18   took place.  This is what I want to do.  What do you think

19   about that?  And I gave him my advice.

20        So, no, I don't investigate every time a manager,

21   supervisor calls me and tells me of a circumstance.

22   Q    Did you ever speak to Ms. Briggs about this?

23   A    I believe Ms. Briggs gave me a call afterwards, yes.

24   Q    Okay.  But beforehand, before issuing her a disciplinary

25   action for her conduct, did you call her or visit her to get

119

1  her side of the story?

2  A    No, I did not.

3  Q    Why not?

4  A    Because that -- well the -- I'm sorry -- well, that

5  would have been the responsibility of Greg Wacker.

6  Q    Did Greg Wacker speak with her?

7  A    That's my understanding.

8  Q    Did you create any documentation of these conversations

9  that you had with Mr. Wacker?

10  A    I don't think so.

11  Q    You didn't create a note to the file or email to

12  memorialize it?

13  A    I'm -- I don't think so.  I think he called me.  We had

14  a conversation.  I may have made notes to remind myself, but

15  I don't think I made any documentation or anything that I

16  would put into a file.

17  Q    How about Mr. Wacker, did you ask him to send you an

18  email or to document what his purpose was in issuing this

19  write-up?

20  A    No, I didn't.

21  Q    Did he tell you that the circumstances around this

22  write-up were when Dr. Wu relayed to her that in China, they

23  put women out to pasture at 55?

24  A    No, I don't recall that.

25  Q    And do you recall being told that in response, Ms.

1   Briggs said, Well, with all due respect, we are not in China;

2   we are in America.

3   A    I recall that specific story, because it was relayed to

4   me by Ruth Briggs, but I don't recall that this write-up was

5   for that interaction.

6   Q    But, yet, we don't have any email, document, note to the

7   file, nothing, to support what you're saying right now, that

8   it had to do with a time in which Ms. Briggs got loud and

9   blew up at Dr. Wu?

10  A    I, per se, don't have anything in my file.  I just have

11  the conversation that I had with Greg Wacker.

12  Q    Then you said that afterwards, you did speak with Ms.

13  Briggs about this write-up, correct?

14  A    Yes.

15  Q    And she told you that she felt that this was

16  retaliatory, correct?

17  A    I don't recall that.  Many times after Ms. Briggs

18  received a discipline, she would call my office to complain

19  about it and she would tell me that, you know, that it wasn't

20  her fault, that, you know, she didn't do anything wrong.

21  With this specific discipline, I don't recall what her

22  argument with Dr. Wu was, but after off of her disciplines,

23  she called me.

24  Q    How many disciplines did Ms. Briggs get?

25  A    From my memory, I think it was about four.

121

1   Q    Okay.  And this particular one was the very first one,

2   correct?

3   A    From my memory, yes.

4   Q    At this point in time, she had been at Temple for 10

5   years?

6   A    I'm not sure of her start time, but she had been here a

7   while.

8   Q    So, when this employee who has been there for 10 years

9   gets their first disciplinary write-up --

10            MS. MATTIACCI:  I'll move on, Your Honor.

11  BY MS. MATTIACCI:

12  Q    You did become aware -- oh, I'm sorry, let me take that

13  off -- you did become aware of the -- of what we were just

14  talking about, that Ms. Briggs was upset that Dr. Wu said

15  that women in China are put out to pasture at her age,

16  correct?

17  A    There was a time, yes, when Ms. Briggs contacted me and

18  relayed that story to me.

19  Q    Okay.  And you understood that to be a sexist and ageist

20  comment, correct?

21  A    When she initially called me, I wasn't -- she basically

22  relayed the story to me.  I told her I would look into it.

23  When I talked with -- just to back up a little bit -- she

24  also explained to me that there's an office full of people

25  and that he was relaying that conversation to the group of

1  people.  She said that she was offended by it.

2      I looked into that situation, into that story.  I gave

3  Greg Wacker a call, as I always do when there's an issue, and

4  Greg looked into it.  He found out that he was relaying a

5  story about how things are handled with women in his

6  homeland.

7  Q    Okay.  So, you did recognize it as a comment, because

8  she expressed that she was offended by the comment?

9  A    I recognized that Ruth Briggs had a problem with the

10  comment, yes.

11  Q    And you also understood that in response, Ruth Briggs

12  opposed the comment to Dr. Wu and said, With all due respect,

13  we're not in China, correct?

14  A    I believe, from my memory, I'm not sure, but I know that

15  she did not like the comment.

16  Q    Okay.  So, then, you relayed that information to Mr.

17  Wacker, correct?

18  A    Yes, I did.

19  Q    Now, why would it -- now, at this point, she is relaying

20  to you a complaint of age and sex discrimination to you as a

21  Human Resources executive or personnel, correct?

22  A    Well, I'm -- I didn't take it as a discrimination

23  complaint.  I took it as something that she was unhappy with.

24  She did not like the statement herself.  No one else in the

25  office had a problem with it.  There were others in the

123

1    office at the time when Dr. Wu made that statement.  So, I

2    didn't look at it as a discriminatory complaint.

3        But because she was upset, I did call Greg Wacker and

4    asked him about it and asked him to look into it.

5    Q    You knew at the time that Ms. Briggs was 55 -- or 57

6    years old or in her mid- to late-50s, correct?

7    A    No, because I didn't know Ms. Briggs' age.

8    Q    And did you ever, physically see her?

9    A    Yes, I've seen her many times, yes.

10   Q    So, we can agree that you didn't believe that she was

11   45, correct?

12   A    Honestly, I didn't know what her age was.

13   Q    So, you've had physical -- you've seen her physically,

14   you've had interactions with her, and you're telling us that

15   you thought that it was possible that she could be 45?

16   A    No, I'm not telling you it's possible.  I'm just telling

17   you I did not -- I didn't know what her age was.

18   Q    I know.  So, I'm not asking you what her age was.

19   I'm asking you whether you believe she could have been 45?

20   A    Yes, I did.  I mean, I don't -- and, again, I don't look

21   at people and ascertain what their ages are.  So, I never

22   knew what Ms. Briggs' age was.  I knew she wasn't 20, but I

23   didn't know if she was 40 or 50 or 60.

24   Q    Okay.  Wouldn't it be important to know what her age was

25   when she's coming to you to complain about a statement that

124

1   has to do with the age of women in China who are put out to

2   pasture?

3   A    Possibly.

4   Q    Okay.  So, but you didn't think to ask her what her age

5   was?

6   A    I didn't ask her, no.

7   Q    Isn't it true -- let's go to your deposition for a

8   minute.

9           MR. MUNSHI:  May I approach, Your Honor, with that

10   exhibit?

11          THE COURT:  You may.

12          THE WITNESS:  Thank you.

13  BY MS. MATTIACCI:

14  Q    Okay.  Ironically, we're going to Page 55.

15          MS. SATINSKY:  Counsel, can you tell me what page

16   you're at before it's published.

17          MS. MATTIACCI:  55.

18  BY MS. MATTIACCI:

19  Q    Okay.  I would like to direct your attention to Page 55.

20   Now, when you -- do you recall having your deposition taken?

21  A    Yes, I do.

22  Q    And you understood that the deposition is when questions

23   are asked of you under oath and then you give your responses

24   under oath, the same oath that you took here today -- correct

25   -- an oath to tell the truth?

125

1   A    Yes.

2   Q    And when you gave that deposition, you were asked:

3        "Did you understand that back in 2014, period, she was

4   in her 50s?"

5        Meaning Ruth Briggs?

6   A    Yes.

7   Q    And your answer in the deposition was, "Yes."

8   Do you see that?

9   A    Yes.

10  Q    Okay.  So, then, you did know that she was in her 50s in

11  2014.

12  A    I didn't know for sure, but I must have -- or made the

13  opinion that she was 50 --

14  Q    Okay.

15  A    -- when I did the deposition.

16  Q    All right.  So, now, you know that she's in her 50s.

17  She's relays to you that she's offended by a comment that Dr.

18  Wu makes in regards to putting women out to pasture this

19  their 50s, but you do not, you're saying, recognize that as a

20  complaint of age or sex discrimination?

21  A    She didn't come to me with an age or sex discrimination.

22  She was offended.  She told me she was upset about the

23  comment.  I told her that I would look into it and I talked

24  to Greg Wacker regarding it.

25  Q    Why wouldn't you go and talk to Dr. Wu about it?

126

1  A    I didn't go talk to Dr. Wu because I wasn't in the

2  position to talk to Dr. Wu.  In the position that I was in, I

3  always directed personnel issues through Greg Wacker.  And he

4  had relationships within the school that he looked into those

5  things.  He took care of and his responsibility was to take

6  care of personnel issues.

7  Q    Well, he was the director of finance and administration

8  for Temple University, correct?

9  A    No, for the College of Science and Technology.

10  Q    I mean the College of Science and Technology.  So, he's

11  in charge of all the financial issues?

12  A    Yes, he is.

13  Q    He's not a Human Resources professional, correct?

14  A    He's not a Human Resources professional, but he does

15  take care of many personnel issues, as to many of our, what

16  we call "business managers" in all of the schools at the

17  university.

18  Q    You would never have him do an investigation into a

19  claim of discrimination, correct?

20  A    Not into a claim of discrimination, no, not at all.  I

21  would have him look into a complaint or an issue that someone

22  brought to my attention, as Ruth did.  But once an official

23  claim of discrimination is made, that investigation is done

24  by our Equal Opportunity Compliance Department.

25  Q    But when you have somebody look into something, that's

127

1   very different than doing a fair and thorough investigation,

2   isn't it?

3   A    Well, we've trained our managers and our employees that

4   handle these issues at the university to look into -- and

5   what I mean by "look into" is to investigate.  So, it may not

6   be the investigation that our EOC Department does, but he did

7   do an investigation.  He can -- and so, that's what I mean by

8   "look into" was go and investigate her complaint.

9   Q    So, Greg Wacker was supposed to do a full and thorough

10  investigation into Ms. Briggs' complaints of discrimination?

11  A    He was supposed to do an investigation into the comment

12  that Ruth Briggs said that Dr. Wu said.

13  Q    Okay.  Did you ever get an investigative summary back

14  from him in regards to that investigation?

15  A    I don't recall getting a summary.  What I do recall is

16  that he called me and he told me that he did talk to people

17  in the office who were there when Dr. Wu made the comment.

18  He did talk to Dr. Wu.

19      Most -- I shouldn't say "most" -- what he said was that

20  the comment was made generally to an office of people where

21  he was relaying how things are done in his country.  And so,

22  you know, he did talk to Dr. Wu that -- and he explained to

23  him that this may come across as offensive to some people and

24  he just made him aware that Ruth was upset by the comment.

25  Q    So, Mr. Wacker talked to Dr. Wu about Ms. Briggs being

128

1   upset about him making the comment about putting women out to

2   pasture at 55?

3   A   He didn't say that -- he didn't specifically talk about

4   Ms. Briggs being upset.  What he talked -- what he asked him

5   was, what was the comment?  What was made -- I mean, what was

6   said?  What were the circumstances?  And Dr. Wu answered him

7   back.

8       And he -- and my understanding from Greg -- and this is

9   from my memory -- is he just explained to him that it may

10   come off as offensive.

11   Q   But Dr. Wu would have known that the person that he made

12   that comment to was Ms. Briggs, correct?

13   A   Yes.

14   Q   And now he's having Mr. Wacker come back and question

15   him about this comment, correct?

16   A   Yes.

17   Q   So, then, he would have known that there was some

18   complaint made by Ms. Briggs about the comments, correct?

19   A   Yes.

20   Q   Okay.  So, this knowledge that is in Mr. -- in Dr. Wu's

21   brain that Ms. Briggs is upset with him with the comment,

22   correct?

23   A   Yes.

24   Q   Isn't it true that the reason you didn't go down and

25   talk to Dr. Wu is because you feel uncomfortable around Dr.

129

1  Wu?

2  A    No, that's not true.  Honestly, I've never -- from my

3  memory, I've never met Dr. Wu face to face.

4  Q    Isn't it true that you didn't go and speak to him about

5  this, because you found it difficult to communicate with him?

6  A    That's not true.

7  Q    Okay.  Let's look at your deposition again.  And please

8  turn to Page 39.  Okay.  Do you see Page 39 -- I'm sorry --

9  38?  All right.  Do you see that?  Otherwise, I can go up on

10 the screen.  So much is highlighted already.

11      Okay.  The question to you on Page 38 -- sorry, I'm

12 trying to go down -- sorry about that -- 38 is -- the

13 question posed to you, and this is in the context of talking

14 about the investigation into the offending comment:

15          "Wouldn't it be easier for you to just talk to Dr.

16 Wu yourself?"

17      And you wrote [sic]:

18          "No, it wouldn't have."

19      And the question to you was:

20          "Why is that?"

21      And you said:

22          "I found it difficult.  There were conversations I

23 had with Dr. Wu.  I found it difficult from my perspective to

24 communicate with him."

25          Do you see that?

130

1   A     Yes, I do.

2   Q     So, you had had discussions with Dr. Wu, but you found

3   it difficult to communicate with him?

4   A     But that didn't keep me from -- that's not the reason

5   why I didn't go and talk to Dr. Wu regarding Ruth.  It was

6   just easier -- I shouldn't say "easier."  It was the practice

7   for Greg Wacker to do those investigations.

8          And correct me if I'm wrong, but I think it states in

9   here that I didn't have a problem talking with him, but it

10  was -- I mean it was difficult to communicate with him.

11  There was a communication barrier, but that wouldn't have

12  kept me from going to talk to him.  And I had talked to Dr.

13  Wu several times regarding Ms. Briggs.

14              THE COURT:  Okay.  Are you saying you had

15  difficulty communicating.  Are you speaking of language

16  problems?

17              THE WITNESS:  Yes.

18              THE COURT:  Okay.

19              THE WITNESS:  It was in regards to language.

20              THE COURT:  Not a personality problem?

21              THE WITNESS:  No, there were no personality issues.

22  It was in regards to language.  But that did not deter me

23  from meeting with Dr. Wu.  It just wasn't my practice.

24              The university is very large.  We have many

25  schools.  I work in the central HR department.  We have

131

1    people in the schools that look into personnel issues.  So,

2    it wouldn't have been my practice in any school to go meet

3    with that person unless it was, you know, necessary or if

4    Greg Wacker couldn't do it and he asked me to do it, then,

5    yes, I would have met with Dr. Wu.

6    BY MS. MATTIACCI:

7    Q    Okay.  But, again, Mr. Wacker, he is the same level as

8    Dr. Wu, correct?

9    A    I wouldn't -- I mean, Greg Wacker, I believe, is the

10   vice-dean for CST, so --

11   Q    Well, he is now, but at that time, he was the same level

12   as Dr. Wacker [sic], reporting in to Michael Klein, correct,

13   the dean?

14   A    They both reported to Michael Klein, yes.

15   Q    And he was not in the Human Resources Department,

16   correct?

17   A    He was not.

18   Q    And he was not in the Equal Opportunity Compliance

19   Department, correct?

20   A    He was not.

21   Q    And his function there, he was not supervising Ms.

22   Briggs, correct?

23   A    He was not supervising Ms. Briggs.

24   Q    And you don't know if he had interviewed all of the

25   relevant witnesses to that complaint, correct?

132

1    A    I don't know specifically.  I know that when he got back

2    to me, he said he went to the department.  He talked to the

3    individuals that were there and he talked to Dr. Wu.

4    Q    But you didn't get anything in writing summarizing any

5    of this, correct?

6    A    From my memory, no.  He may have sent me an email, but I

7    don't remember.  He and I usually communicated by phone.

8    When he would call me about specific situations, I would ask

9    him to look into it and he would call me back and let me

10   know, this is what I found, this is what happened.  And, you

11   know, usually, he either called me -- he could me or he

12   emailed me.  In this case, I believe he emailed me -- I mean,

13   he called me, I'm sorry.

14   Q    You had heard that Dr. Wu had yelled at graduate

15   students often in Chinese, correct?

16   A    I believe so, yes.

17   Q    But you never went to investigate his conduct in the

18   office, correct?

19   A    No, I did not.

20   Q    And is it true that you asked Greg and Drew to talk to

21   Dr. Wu about the way that he conducted himself in the office

22   and yelling?

23   A    I asked Greg and Drew to look into the complaints.

24   Q    Okay.  And did they do that?

25   A    Yes, they did.

133

1    Q    And did they -- is any of this documented in any emails,

2    notes to the file or anything?

3    A    It may be.  It may be or may -- you know, many times,

4    our conversations were over the phone or I may have sent them

5    an email and they may have replied back to my email, so there

6    might be documentation, yes.

7    Q    Was there any disciplinary action issued against Dr. Wu

8    for his yelling at the students?

9    A    No, not that I know of.

10   Q    Why not?

11   A    I don't know.

12   Q    But you're saying that Mr. Wacker did speak to Dr. Wu

13   about the complaints about him screaming at his students?

14   A    My understanding is that Greg Wacker and Drew had a

15   conversation.  This complaint was relayed to me.  When they

16   came back to me, my understanding was that they looked into

17   it and they talked to Dr. Wu about it.

18        I don't know if any -- you know, they may have talked to

19   the vice-dean at the time that Dr. Wu reported into, but from

20   my memory, I don't recall what took place with Dr. Wu.

21   Q    Okay.  Now, after the November write-up that we went

22   over in which there's no documentation as to why it was

23   issued, there was another disciplinary action issued a year

24   and four months later, do you recall that, in March of 2013?

25   A    A discipline to Ruth Briggs?

134

1    Q    Yes.

2    A    What was the date again?

3    Q    Well, the first one was November of 2011.

4    A    Okay.

5    Q    All of 2012 went by and there were no disciplinary

6    write-ups.  Do you recall that?

7    A    Okay.

8    Q    And then in March of 2013, there was a disciplinary

9    write-up of Ms. Briggs.  Do you recall that?

10   A    Yes, I do.

11   Q    And what were the circumstances of that?

12   A    From memory, I don't -- unless I have it in front of me

13   -- I think there was a write-up before the March write-up.

14   Q    Let's take a look.  P-16 -- it's the trial binder --

15   it's 16, there.

16        MS. MATTIACCI:  Okay.  May we publish that?

17   BY MS. MATTIACCI:

18   Q    Okay.  Do you see this March 25th, 2013, in which Ruth

19   Briggs received three days of suspension without pay?

20   A    Yes, I do.

21   Q    And it said neglecting job duties or responsibilities or

22   failing to carry out instructions given by a supervisor?

23   A    Yes.

24   Q    And do you know why she got this?

25   A    My understanding is she was issued this discipline

135

1  because she neglected to arrange for travel for a visiting

2  candidate for a faculty position.

3  Q    Okay.  Now you said that you believed that there was one

4  before this, in between the November 2011 and 2013, over, you

5  know, that whole year-and-five-month period of time.  Do you

6  -- can you recall what that is?  Because I don't -- we don't

7  have any disciplinary actions for that time.

8  A    I thought there was a discipline earlier in this year,

9  where -- from my memory, Ms. Briggs failed to report to work.

10 It was an attendance issue.

11 Q    Okay.  That was in January of 2014.

12 A    Okay.

13 Q    I can just --

14 A    My --

15 Q    -- let you know.

16

17 A    Then it was my mistake, yeah.

18 Q    Okay.  So then there is no other disciplinary action

19 between November of 2011 and March of 2013.

20 A    Yes.  Correct.

21 Q    Looking at this three-day suspension with pay -- without

22 pay -- I'm sorry -- without pay, can you recall any other

23 employee being disciplined for three days of suspension

24 without pay?

25 A    Yes.

136

1  Q    For what kind of infraction?

2  A    For C infractions, neglect -- for the same thing,

3  neglecting job duties and responsibilities.  We have

4  suspended employees without pay for that violation.

5  Q    You understand that this was a mistake that she made,

6  that she owed up to the same day?

7  A    I'm not sure if she owned up the same day, but yeah, she

8  did own up to it.  But she felt that it was a simple mistake,

9  you know, that it -- that it wasn't serious, and it was a

10 serious error on her part.

11 Q    So, at Temple, if you make an error, and you say that

12 you made the error, you get a three-day suspension without

13 pay.  That's the policy?

14 A    No, it depends on the error, and if the error was a

15 pretty drastic one.  In  light of the fact that this was --

16 the candidate that was visiting was waiting to travel to

17 Philadelphia to interview for this position.  He was very --

18 a candidate that the University was looking to have come

19 here, he was very prestigious.  And he decided not to come

20 because travel arrangements were never made for him.  He

21 never received any communication from Ms. Briggs.

22 Q    So you did -- he never received any communications from

23 Ms. Briggs?  Did you learn this during your investigation?

24 A    What I learned -- and again, Greg Wacker is the one that

25 came to me, after Dr. Wu went to him with the facts of what

137

1   took place, that it was her responsibility to arrange for the

2   travel for this visiting candidate.  And she may have

3   contacted him early on, but there was no contact on the day

4   of travel, there was no arrangements made for him, he did not

5   know.  And we lost that candidate, he never came.

6   Q    Ms. Walton, do -- are you the HR person that approved

7   this three-day suspension without pay?

8   A    Yes, I am.

9   Q    Was it possible to give her a one-day suspension?

10   A    Not in regards to our rules of conduct.  So the rules of

11   conduct at the University, a C violation calls for a three-

12   day suspension.

13   Q    So this couldn't have been a B violation or an A

14   violation?

15   A    Well, an A violation, in our rules of conduct, is only

16   for attendance.  And a B violation that I think could have

17   been -- you know, that -- if we had chose to do a B

18   violation, it would have been for inefficiency, and I don't

19   think it rose to the level of inefficiency.  It was neglect

20   and carelessness because this person never came, and we lost

21   that candidate.

22   Q    So you're saying that one C violation is a mandatory

23   three-day suspension.

24   A    Yes.

25   Q    I hate to do this, but I got to show you the rules of

138

1  conduct.  And that's D-5, in the other binder.

2        MS. SATINSKY:  Counsel, this hasn't been admitted

3  yet.

4      (Participants confer)

5  BY MS. MATTIACCI:

6  Q   Oh, I'm sorry.  We can look at P-65, which has already

7  been admitted.  If not, I can go through the -- if you can

8  look at P-65 --

9        THE COURT:  Well, just get to it as fast as you

10  can.

11        MS. MATTIACCI:  Okay.

12        THE COURT:  We have to move it along here.

13        MS. MATTIACCI:  All right.  No, I can -- I can just

14  address this in closing, Your Honor.

15        THE COURT:  You can do what?

16        MS. MATTIACCI:  I can address the discrepancy in

17  closing.  I can move on from this topic.

18        THE COURT:  All right.

19  BY MS. MATTIACCI:

20  Q   All right.  Let me get to some emails here.  P-6.  So

21  we're going to go to the plaintiff's binder, P-6.

22      Now, at some point in time, you -- Ms. Briggs spoke to

23  Sandy Foehl about her claims of discrimination and

24  retaliation, correct?

25  A   That's my understanding, yes.

139

1  Q   And after Ms. Foehl received that complaint, she reached

2  out to you, to get information on Ms. Briggs.  Isn't that

3  correct?

4  A   Yes, she did.

5  Q   Okay.  And I'm showing you an email that has been marked

6  as P-6.  It's dated August 3rd, 2012.  Do you see that?

7  A   Yes, I do.

8  Q   And she says -- this is from Sandy Foehl?  Sorry.  I'm

9  trying to get this out.

10    (Participants confer)

11       MS. MATTIACCI:  Oh, Your Honor, may I move for the

12  admission of P-6.

13       THE COURT:  You may.

14       MS. MATTIACCI:  I thought they already stipulated.

15       MS. SATINSKY:  No objection, Your Honor.

16       THE COURT:  It's admitted.

17       MS. MATTIACCI:  Okay.  May I publish, Your Honor?

18       THE COURT:  It is admitted.

19       MS. MATTIACCI:  Yep.

20    (P-6 received in evidence)

21  BY MS. MATTIACCI:

22  Q   Okay.  This email says from Sandy to you and Eric.  Who

23  is Eric?

24  A   Eric Brunner is our Assistant Vice President for

25  Organizational Development --

1   Q     Okay.

2   A     -- and Training.

3   Q     So she asks you:

4              "Do you have" -- "do either of you have some

5              history with Ruth Briggs in the College of Science

6              and Technology, especially since her assignment to

7              the Department of Computer Information Sciences.

8              If so, will you share?"

9   So she was looking for information about Ruth Briggs,

10  after she brought the claim of discrimination, correct?

11  A     And to be honest with you, I don't know what the claim

12  was to Sandra Foehl.

13  Q     Okay.  Did you respond to this?

14  A     I'm sure I did.

15  Q     Did you respond by email?

16  A     From memory, I don't know.  Usually, when Sandy reaches

17  out to -- Sandra Foehl reaches out to me for information

18  regarding employees, I, many times, will pick up the phone

19  and call her, and give her what my experience has been with

20  the employee, or I will reply by email.  I don't remember

21  what I did here.

22  Q     Okay.  One question I forgot to ask you in the

23  beginning.  There was some testimony this morning about

24  performance reviews.  Does Human Resources retain a copy of

25  the performance reviews?

1   A    Yes, we do.

2   Q    And when litigation commences, and there's a request for

3   documents, do you gather those documents to give them to the

4   attorneys for production?

5   A    I don't gather them.  They usually will contact Eric

6   Brunner to get those documents.

7   Q    Okay.  The 2010 performance review of Ms. Briggs is

8   missing.  Do you know if it's in the Human Resources Offices

9   of Temple?

10  A    I don't.

11  Q    Okay.  I'm sorry.

12       All right.  Let's take a look at P-9.

13          MS. MATTIACCI:  Your Honor, this is --

14       (Participants confer)

15          MS. MATTIACCI:  P-9 is already in evidence.  I'm

16  going to blow it up for the jury.  This is the one in which

17  Ruth Briggs sends to Sandy on February 8th, 2013:

18             "I'm so bullied and harassed every day.  Every

19             morning, I must meet with my direct supervisor and

20             Greg Wacker's assistant, Drew DiMeo, for a staff

21             meeting, to discuss my failure to comply with the

22             directive that prohibits any work activity that has

23             not been approved by my supervisor, all of which

24             are related to performing daily functions in the

25             office, such as answering questions from students

142

1           or visitors in the building, and threat of

2           discipline for assisting a visitor."

3      (Participants confer)

4           MS. MATTIACCI:  Sorry.

5  BY MS. MATTIACCI:

6  Q    And then you respond back to her email ...

7      (Participants confer)

8  Q    I'm sorry.  Sandy responds back to the email:

9           "Ruth, this is an issue for Human Resources first.

10          Address the situation and your concerns to Deirdre

11          Walton in Labor and Employee Relations.  Sandy."

12     And then Sandy sends this email to you and says:

13          "Deirdre, I don't see a claim of unlawful

14          discrimination/harassment in Ruth Briggs' message.

15          It appears to be a matter of performance

16          development/correction for Human Resources review.

17          Please let me or Tracy know if a complaint for EEOC

18          is raised with you.  Sandy."

19     Do you see that?

20  A    Yes, I do.

21  Q    So it was passed to you on an evaluation that Ms. Foehl

22  did, without any investigation into the email, correct?

23  A    In regards to Ms. Foehl?

24  Q    Ms. Foehl is evaluating Ms. Briggs' email, and

25  determining, based upon the email alone, that she doesn't see

143

1    a claim for unlawful discrimination and harassment, correct?

2    A    Yes.

3    Q    She didn't interview Ms. Briggs to get information about

4    the email, correct?

5    A    From my understanding, I don't -- I'm not sure if she

6    interviewed her or not.  I -- if you're going from the email,

7    I think she's looking at what Ms. Briggs wrote, and

8    ascertaining that it wasn't for their office to handle.

9    Q    This is after Ms. Briggs has already brought claims of

10   discrimination for age and sex discrimination, correct?

11   A    I don't know if she did or not.

12   Q    Well, we already talked about the offending comment made

13   to her by Dr. Wu, in which you received that complaint, you

14   passed it to Mr. Wacker.  So this is postdating that,

15   correct?

16   A    Again, I'm not sure of the -- as we discussed earlier,

17   I'm not sure of the date that Ms. Briggs relayed that

18   conversation to me with Dr. Wu.  So I'm not sure of that

19   date.  I -- I do know that she relayed that conversation.  I

20   do know I talked to Greg Wacker about it.  I'm not sure of

21   the date.  So I can't say that it was before this date that

22   Sandra Foehl sent this email to me.

23   Q    The information contained in this email, you did -- you

24   then relayed it to Mr. Wacker?

25   A    I think I -- I spoke to Mr. Wacker about it, but what I

144

1   believe was going on here, when --

2   Q    My question was simply:  Did you relay it to Mr. Wacker?

3   A    I don't remember if I did or not.  I may not have.

4   Q    Okay.  So you may not have done anything with it.

5   A    I don't remember.  I don't remember if I did or not.

6   Q    Okay.  Let's go to P-16.  And this is just a month

7   later, after she sent that email, saying that she was feeling

8   harassed and hostile -- harassed every day, or all day.  This

9   is a writeup that she was given on 3/26/2013.  Can you see

10  that?

11  A    Yes, I do.

12  Q    And this was the three days without pay, suspension,

13  right after she had sent the email saying that she feels

14  harassed all day, correct?

15  A    Yes.

16  Q    Okay.  Let's go to P-17.  This is an email that was sent

17  to you by Ruth Briggs, dated April 8th, 2013, correct?

18  A    Yes.

19  Q    Okay.  And is this the email that you were referring to

20  before, in which she reached out to you, complaining about

21  the severity of the three-day-without-pay suspension?

22  A    Yes.

23  Q    She says, "I was surprised by the severity of the

24  discipline," right?

25  A    (No verbal response)

1  Q    And she says that the complaint that Dr. Kwatny does not

2  mention the other -- she said that she took ownership of the

3  error, for which she expected a verbal discipline.  Do you

4  see that?

5  A    Yes.

6  Q    Okay.  And at the end, at the bottom, she says, "The

7  punishment does not fit the crime."  Oh, sorry.

8          "The punishment does not fit the crime, and I will

9          leave a terrible legacy on my service on the

10          University at the age of 58.  I am defending my

11          honor."

12      Do you see that?

13  A    Yes, I do.

14  Q    Okay.  Did you do anything in response to that email?

15  A    Yeah, I'm -- yes, I did.  I talked -- one, I did -- I

16  picked up the phone, and I did talk to Ms. Briggs about this

17  situation, why, you know, the severity was issued, why it was

18  issued at a C level, and why it was so severe because of the

19  situation.

20  Q    Uh-huh.

21  A    And I talked to her about it.  But in regards to

22  reaching out to anyone else, I just talked to Ms. Briggs

23  about why we decided to do that discipline.

24  Q    And did you think that she was -- she was trying to make

25  it work?

146

1   A    I believe that Ms. Briggs was well meaning and wanted to

2   do well in the Department.  But she continued to make many

3   errors, and -- and this was one of them.  You know?  Where

4   she just neglected her job responsibility.

5   Q    Okay.  The mistake that she made with booking the

6   flight, that's one.  What other -- what are all these other

7   errors?  Because there's only two other writeups after this.

8   A    So there was a history that's not documented with Ms.

9   Briggs, where she made many errors in the Department, in the

10  CIS Department, but also when she worked in the Dean's

11  Office.  So the Department, you know, they liked Ms. Briggs,

12  she was a very nice lady.  They didn't want to see her lose

13  her job.  And so, many times, they didn't document many of

14  the errors that she was making, and they tried to find work

15  for her that would suit her skills.

16  Q    So her -- these errors are so severe that led to her

17  termination, but they're not documented.

18  A    They didn't lead to her termination, but they -- but

19  they did get the management to the point where they had to

20  start documenting, and that's what they did.

21  Q    Okay.  So the undocumented errors that you're talking

22  about did not lead to her termination.

23  A    They didn't lead to her termination, but they did lead

24  to where there was frustration in the Department, there was

25  frustration with Dr. Wu.  And you know, Dr. Wu complained to

147

1    the Dean's Office frequently and -- about the errors.  And

2    so, because of those errors that aren't documented, they felt

3    like we had to start documenting when she made errors.

4    Q    I -- and I want to know:  What are those errors that led

5    to her termination?  Because we only have four, and they're

6    very minimal.  So what other --

7    A    Well, the --

8    Q    -- errors?

9            MR. HARRIS:  Your Honor, I'm just going to object

10   to that term of being minimal.  I think that's up to the jury

11   to determine.

12           THE COURT:  Objection --

13           MS. MATTIACCI:  I'll rephrase, Your Honor --

14           THE COURT:  Objection -- pardon?

15           MS. MATTIACCI:  I'm sorry.  I'll rephrase that

16   question.

17           THE COURT:  Yep.  Yeah.

18           MS. MATTIACCI:  I'm just trying to cut to the

19   chase.

20           THE COURT:  Oh, we're in favor of that.

21           MS. MATTIACCI:  I know.

22       (Laughter)

23           THE COURT:  But it's about 20 after 4 now --

24           MS. MATTIACCI:  Okay.

25           THE COURT:  -- and I'm going to let the jury go

148

1  until 9:30 tomorrow morning.  I'm going to talk to counsel a

2  little bit after you leave.  Again, don't discuss it with

3  anybody at home.  The danger always is that they'll know

4  something about the law on the subject.  And as I said, it's

5  important that everything you know about this, you find out

6  in this courtroom.  So the jury is excused until 9:30

7  tomorrow morning.

8         THE COURT OFFICER:  All rise.

9         THE COURT:  You may step down.

10        THE WITNESS:  Okay.

11     (Jury excused at 4:18 p.m.)

12        THE COURT:  Okay.  You may be seated.

13        I just wanted to know:  Where do we stand?

14        MS. MATTIACCI:  We -- Your Honor, we only have one

15  other witness.

16        THE COURT:  All right.

17        MS. MATTIACCI:  And then we will close our case.

18        THE COURT:  Who is the other?

19        MS. MATTIACCI:  It's Sandy Foehl, who is the other

20  EEOC person.

21        THE COURT:  Okay.  And how many witnesses do you

22  have?

23        MR. HARRIS:  Your Honor, as of right now, we're

24  going to be calling Drew DiMeo.  We'll probably call Greg

25  Wacker for a limited purpose, and possible Dr. We, again, for

149

1   the limited purpose --

2           THE COURT:  Okay.

3           MR. HARRIS:  -- that we discussed earlier.

4           THE COURT:  All right.  I just wanted to get an

5   idea.  We might finish this week?

6           MS. MATTIACCI:  I think, absolutely, Your Honor.

7   This went a little slower this afternoon than I anticipated.

8   I'll be very prepared tomorrow morning --

9           THE COURT:  Yeah, I'd really --

10          MS. MATTIACCI:  -- to try to get through it.

11          THE COURT:  I would like to get -- you know, I

12  don't want to hurry anybody, but -- if it's going to mean not

13  doing your job.  But it would be important to get to finish

14  Friday, if we can.

15          MS. MATTIACCI:  Yeah, I think that's absolutely

16  within the realm.

17          MR. HARRIS:  We're going to be short; the defense

18  witnesses are going to be really short.

19          THE COURT:  Okay.

20          MR. HARRIS:  So I don't anticipate that being a

21  problem.

22          THE COURT:  All right.  Tomorrow morning at 9:30.

23          MS. MATTIACCI:  Okay.

24          MR. HARRIS:  Judge, may I?  I just have one issue

25  that we discussed previously that I want to raise to the

150

1   Court before we present our case.  There was discussion about

2   Dr. Briggs' [sic] evaluation with the neuropsychologist.

3   Under Rule 803, in our case-in-chief, I wish to move that in

4   as a business record exception for -- just for the limited

5   purposes that I mentioned before, but -- so it's not going to

6   be used for impeachment purposes, but based on the business

7   record exception.

8           THE COURT:  All right.  I'll think about --

9           MR. HARRIS:  Thank you.

10          THE COURT:  -- if it qualifies.

11          MR. HARRIS:  Thank you.

12          THE COURT:  You can think about it, too.

13          MS. MATTIACCI:  Thank you.

14          THE COURT:  All right.  All right.  Tomorrow

15  morning at 9:30.

16          MS. SATINSKY:  Thank you, Your Honor.

17          THE COURT OFFICER:  All rise.

18      (Proceedings adjourned to 7/18/18)

19      (Concluded at 4:20 p.m.)

20                  *****

21

22

23

24

25

151

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

Transcriptionists:  William J. Garling and Coleen Rand

July 16, 2018

Coleen Rand, AAERT Cert. No. 341

Certified Court Transcriptionist

For Advanced Transcription

**A**

a-s-s-h-o-l-e
78:10
AAERT 151:14
Abbey 79:2,24
80:2,18,18
81:23 82:4,18
82:19 85:12,22
86:14 87:2,2
88:12,13,22,23
88:23
ability 91:24
94:13,21 95:7
99:15,25 151:6
able 7:12 67:22
above-entitled
151:5
abroad 50:4
absolutely 43:12
48:14 65:3
73:21 75:18
105:11 149:6
149:15
academic 32:20
39:21 40:17,22
42:8 44:6,16
47:17 53:9,11
53:11,13
accept 95:7
99:25
access 16:12
41:4
account 16:13
76:8
accuracy 115:11
accurate 63:18
Acquisition 1:19
Act 106:2
action 15:13,14
81:13 115:20
116:5,13
118:25 133:7
133:23 135:18
actions 110:11
135:7
activities 91:5
activity 91:6

141:22
acts 80:25 94:15
99:17
actual 18:3
25:24 113:14
acuity 66:15
acute 66:5
addition 106:1
address 74:23
138:14,16
142:10
addressing
85:15
ADEA 106:4
adequately 65:9
adhere 94:13,14
99:15
adjourned
150:18
adjustment
37:13
administration
126:7
administrative
18:1,6,14
36:12
administrator
18:2
administrators
96:16
admirable 101:1
admiration
61:17
admissibility
73:20,23
admission 64:24
139:12
admit 67:11
admitted 55:16
60:25 64:8
65:5,6 67:7,10
77:12 138:2,7
139:16,18
admonish 29:4
admonished
29:10,12,14,15
admonishment
28:22,24

advance 99:1
Advanced 1:20
151:16
advice 118:19
advised 115:17
118:3
afternoon 3:1
104:15,16
149:7
age 56:3 106:1,7
106:11 107:12
121:15 122:20
123:7,12,17,18
123:22,24
124:1,4 125:20
125:21 143:10
145:10
ageist 121:19
ages 123:21
ago 3:13 12:14
59:4 87:20
111:10
agree 42:16
101:24 102:2,5
105:9 108:15
112:10,12
114:6,18,25
123:10
agreeing 32:22
ahead 116:19
Aida 59:4
Aide 72:11
alert 66:5
103:22
Alexis 76:15,20
78:3
Allen 22:23,24
89:21,22,22
allocated 19:20
20:1
allow 74:24
allowed 13:11
82:7
aloud 87:11
Alzheimer's
72:4
amazing 61:18
America 120:2

amount 47:23
63:7 71:2
80:24
and/or 94:2 98:4
100:12 110:15
angry 83:8
answer 10:15,21
10:23,24 110:1
110:12,21
111:14 125:7
answered 80:19
128:6
answering
109:21 110:20
141:25
answers 109:18
111:20 112:2
112:18,19,20
112:21 113:18
anticipate
149:20
anticipated
149:7
anxiety 66:4
anybody 89:2,4
97:15 148:3
149:12
anyway 108:23
apologize 13:11
23:8 35:23
46:22 84:18
appear 107:7
appearance
93:4
APPEARAN...
1:11
appearing 69:7
appears 142:15
appellate 75:9
apples 74:19
appointment
25:21
appointments
16:22
appreciate
57:17,22 95:8
100:1
approach 124:9

appropriate
73:10 94:14
99:16 114:7
approved 62:10
118:1 137:6
141:23
approximately
19:3 36:19
72:16 96:18
April 60:14 61:4
61:4,14 77:4
101:4 144:17
area 32:12,12,16
73:10
areas 35:22
96:13 101:24
102:2,3
argument 75:10
120:22
arrange 13:3
135:1 137:1
arrangement
8:19
arrangements
136:20 137:4
ascertain 123:21
ascertaining
143:8
asked 3:15 4:6
4:11,25 5:9
7:23 9:10
13:10 18:10
38:19 49:5
51:9,10 52:12
54:2 111:10
123:4,4 124:23
125:2 128:4
131:4 132:20
132:23
asking 3:23
43:12 46:1
69:15 123:18
123:19
asks 140:3
ass 81:13
assessed 115:21
115:23
assessment

45:17
**assignment** 20:9
20:11 140:6
**assignments**
31:7 70:17
**assist** 91:3,5
**Assistance**
61:11
**assistant** 15:22
16:6 17:10
18:14 25:9
33:12 52:18
72:10 139:24
141:20
**assisted** 117:6
**assisting** 142:2
**associate** 31:5,6
106:14
**assumed** 41:5
**assuming** 49:8
**ate** 24:7
**attached** 58:15
59:8 112:24
**attacking** 43:18
**attempts** 36:22
96:21
**attendance**
135:10 137:16
**attention** 55:22
108:17,20
110:3,19
111:17 115:24
124:19 126:22
**attorney** 82:22
**attorney-client**
110:15,16
**attorneys** 141:4
**Audio** 1:18
**August** 55:8
65:2 139:6
**authenticated**
73:23
**authentication**
73:19
**authority** 31:23
**authorize** 113:6
**authorized**
113:15

**available** 113:21
**average** 21:11
21:12,18,19
22:4,5 27:13
27:16,17 30:9
32:25 34:20,20
34:21 39:6,8
39:12,14,15
40:10
**award** 91:6,6
**aware** 14:16
18:4 31:8,10
38:17 121:12
121:13 127:24
**awe** 35:19 96:10

———————
**B**
**B** 137:13,16,17
**back** 15:7,19
39:3 50:1
58:14 75:3
118:17 121:23
125:3 127:13
128:7,14 132:1
132:9 133:5,16
142:6,8
**back-and-forth**
9:6
**ball** 13:16,17,21
13:22,23,24
14:1
**banished** 5:14
5:15,16,18 7:2
7:5
**barrier** 130:11
**based** 14:11,13
15:11,12 42:11
43:12,13 45:20
54:24 113:20
117:25 142:25
150:6
**basically** 42:14
121:21
**basics** 99:9
**Bates** 79:21
**Bates-stamped**
64:12
**beginning** 5:21

31:22 36:4
140:23
**behalf** 113:6
**behavior** 116:10
**belief** 74:9
113:25
**beliefs** 94:15
99:17
**believe** 8:2,7,22
9:2,23 10:14
13:20,25 17:18
17:23 22:20
45:7 55:12
58:24 60:20
64:2 72:9
74:17 101:8,23
109:4 118:23
122:14 123:10
123:19 131:9
132:12,16
144:1 146:1
**believed** 135:3
**believes** 73:25
74:12
**best** 59:22
113:19,24
151:5
**bet** 58:12
**better** 9:12
80:20
**bias** 114:13
115:14
**Bible** 104:6
**binder** 108:12
115:25 134:14
138:1,21
**binders** 108:11
**bit** 121:23 148:2
**black** 15:8
**blew** 120:9
**blow** 141:16
**blown** 118:12
**blowout** 116:11
**book** 8:18 9:19
9:20,21 10:11
12:25 13:9
49:24 52:11
**booked** 9:12

12:7,10,20,23
12:25 16:1
**booking** 12:24
13:4,5 52:2,3
146:5
**booklet** 109:3
**books** 49:25
50:3,12
**borrow** 49:24
**bottom** 54:5
55:22 79:21
90:5 91:20
100:7 145:6
**Boulevard** 1:20
**Boyle** 106:14,18
106:20
**brain** 128:21
**Bravo** 35:21
96:12
**break** 57:14
58:11,14,17
59:24
**brief** 64:17
**Briefly** 87:25
**Briggs** 1:2 2:8
3:8,11 24:23
30:11 33:22
34:14 35:6
36:2 41:8
47:17 54:1
55:18 57:11
60:13 63:10
69:19 70:14
72:7 73:25
76:8 78:1,22
79:2,21 81:25
86:1,12,14
100:22 101:22
104:2 108:16
111:4,11 112:3
116:6,9 117:13
118:11,22,23
120:1,4,8,13
120:17,24
121:14,17
122:9,11 123:5
125:5 127:12
127:25 128:4

128:12,18,21
130:13 131:22
131:23 133:25
134:9,19 135:9
136:21,23
138:22 139:2
140:5,9 141:7
141:17 143:3,7
143:9,17
144:17 145:16
145:22 146:1,9
146:11
**Briggs'** 104:1,18
110:22 111:21
112:7,13 123:7
123:22 127:10
142:14,24
150:2
**Briggs-407**
81:19
**Briggs-416**
83:11
**Briggs/Walton**
2:23
**Briggs/Wu** 2:22
**Briggs423** 86:3
**bring** 50:1 92:25
92:25 106:11
108:19
**brings** 116:1
**brought** 108:16
111:17 115:16
126:22 140:10
143:9
**Brown** 54:3,8,11
54:13,19
**Brunner** 139:24
141:6
**budget** 19:10
**building** 142:1
**bulk** 20:18,19
**bullied** 48:10
49:12 141:18
**bullier** 58:6
**bully** 48:25
**bullying** 54:21
**bunch** 66:6
**Burning** 85:7

126:16 150:4,6

**C**

**C** 136:2 137:11
137:22 145:18
**calendar** 15:23
16:19,20 24:23
51:23
**call** 3:3 10:7,18
10:22 13:10
23:12 60:6
82:15 103:18
118:23,25
120:18 122:3
123:3 126:16
132:8,9 140:19
148:24
**called** 10:6
66:23 73:24
82:11,13
119:13 120:23
121:21 127:16
132:11,13
**calling** 148:24
**calls** 11:12 74:16
103:19 118:21
137:11
**campus** 12:4
13:14,15
**candidate** 135:2
136:16,18
137:2,5,21
**candidates** 20:8
**capable** 35:18
96:9
**capacity** 105:12
**card** 50:13,15
50:16,17,18
51:5 57:16
**care** 126:5,6,15
**career** 103:11
**carelessness**
137:20
**Carlin** 1:11
**carry** 134:22
**case** 1:3 3:12
65:16 106:17
109:22 110:1

113:15 132:12
148:17 150:1
**case-in-chief**
150:3
**cases** 74:22
109:22
**categories** 26:2
26:4 30:4
45:24 102:6
**category** 31:18
31:21 32:1,8
32:23 95:4
**CD** 49:24
**CDs** 49:25 50:12
**central** 130:25
**ceremonies** 91:6
**Cert** 151:14
**certain** 43:21,22
**certainly** 39:14
63:3 66:25
67:12 73:24
74:16 101:24
**certainty** 10:21
10:23,24
**certification**
112:24,25
151:2
**Certified** 151:15
**certify** 113:17
151:3
**certifying**
112:21
**cetera** 16:2 91:7
**CFO** 106:20
**chair** 84:17
**challenge** 25:20
**challenges** 28:21
**chance** 57:15
**change** 37:12
**changed** 19:2
**charge** 107:4
126:11
**chase** 147:19
**check** 80:19
**Cherry** 1:16
**cherry-picking**
29:11
**China** 53:2,5,8

53:10,13
119:22 120:1
121:15 122:13
124:1
**Chinese** 82:4,5
132:15
**chose** 137:17
**Christmas** 51:6
**circumstance**
118:21
**circumstances**
119:21 128:6
134:11
**CIS** 146:10
**claim** 77:13
107:19 115:16
126:19,20,23
140:10,11
142:13 143:1
**claims** 104:18
107:12,15,21
107:23,24
108:2,5,7,16
108:19,21
110:7,22 111:4
111:11,21,24
112:4,7,7,13
114:4,7,10
138:23 143:9
**classes** 105:20
**clear** 38:22 79:7
88:11 90:3
**CLERK** 104:8
**Client** 93:24
100:9
**Clients/Custo...**
97:24
**Clint** 10:2
**clip** 5:20 6:13,24
7:8,10
**close** 148:17
**closer** 90:19,19
90:20 98:19,19
**closing** 138:14
138:17
**Cogan** 76:15,18
76:20 77:2
78:3

**cognitive** 66:4
66:17 69:25
**Coleen** 151:8,14
**colleague** 87:5
**college** 16:25
17:7 18:3,10
22:11,18 35:20
61:13 96:11
126:9,10 140:5
**come** 6:10 16:1
37:12 38:17
125:21 127:23
128:10,14
136:18,19
**comes** 66:14
67:12,18 107:9
107:19
**coming** 7:24
12:3,9,12,13
12:15,18,19
69:15 123:25
**commencement**
91:6
**commences**
141:2
**comment** 50:2
74:1,14,18
121:20 122:7,8
122:10,12,15
125:17,23
127:11,17,20
127:24 128:1,5
128:12,15,21
129:14 143:12
**comments** 28:13
28:17 31:1
35:12,13,21
36:3 54:24
56:1,3 74:1
82:7 93:6,8
96:2,6,12
98:25 100:18
128:18
**commitment**
57:18 58:3
**committing**
80:25
**Commonwealth**

109:11 113:4
**communicate**
9:22 129:5,24
130:3,10
**communicated**
31:15 132:7
**communicating**
130:15
**communication**
60:13 130:11
136:21
**communicatio...**
136:22
**community**
61:19
**Company** 1:19
**compensate**
65:14
**compensating**
70:20
**competencies**
97:23
**competency**
91:19,22 92:3
93:17,17,18,22
94:8,11,19
95:1,2 97:24
99:11,23 100:7
100:19
**complain** 37:3,4
37:5 97:8,11
97:18 120:18
123:25
**complained**
36:25 54:19
146:25
**complaining**
55:25 144:20
**complaint**
107:20 114:14
115:17 122:20
122:23 123:2
125:20 126:21
127:8 128:18
131:25 133:15
139:1 142:17
143:13 145:1
**complaints**

106:11 111:19
127:10 132:23
133:13
**complete** 29:5
70:21 114:17
**completed** 29:6
29:7
**completely**
73:13,14
**Compliance**
108:1 126:24
131:18
**comply** 141:21
**composers**
49:25
**computer** 17:2,4
61:12 87:4,7
140:7
**concerning**
107:20
**concerns** 35:17
37:7 94:2 96:7
98:5 100:13
142:10
**concluded** 68:8
76:6 150:19
**conclusion** 66:3
66:14
**conclusions**
110:10
**conditions**
110:17
**conduct** 75:21
118:25 132:17
137:10,11,15
138:1
**conducted**
132:21
**conducting** 20:8
**confer** 6:4 8:11
64:4,13,15
88:4,5 98:14
138:4 139:10
141:14 142:3,7
**conference**
13:15 51:16,17
52:3,4,5,5,8
**conferences**

52:2,11,13
**confrontive**
59:21
**confused** 38:15
**consequently**
113:12
**consider** 39:12
80:24 81:10
**considered**
84:21 105:3
**consistently**
26:9 91:15
**Console** 1:12,13
**contact** 33:8
54:3 81:4
137:3 141:5
**contacted** 118:8
121:17 137:3
**contained**
143:23
**content** 83:4
**context** 129:13
**continue** 26:12
28:20 36:14,15
60:10 78:22
80:22 81:9
84:5
**continued** 146:2
**continues** 31:24
**continuing**
38:24
**contradict** 67:23
**contradicting**
67:20
**contradiction**
74:7
**contradicts**
67:16 74:4
**conversation**
10:10,25 54:11
119:14 120:11
121:25 133:15
143:18,19
**conversations**
119:8 129:22
133:4
**Conwell** 12:4
**Coordinator**

25:10
**copy** 140:24
**core** 91:19,22
92:3 94:8,8,11
94:15 95:1
97:23,24 99:11
99:16,23
**correct** 4:3,4,21
7:8 8:20 10:6,8
14:11,15 15:23
15:24 16:3,7
17:9,20 24:9
25:1 27:5,9
29:21 30:24
31:3 32:2,10
32:20,21,25
33:1,3,6,17
34:2,4,23 38:9
39:19,20 40:4
40:13 42:3,4
44:7,8,9,14,15
45:5,18,21
46:6,11 48:2,3
48:7,10,14
49:1,10 51:24
52:11 54:8
55:6 56:4 57:2
57:3,4 58:6
61:25 62:7
63:4,19,25
69:23 71:22
72:22 76:8
79:9 81:16
82:20 85:13
86:14,15 89:18
90:16,17,18
97:3,6,7 98:17
98:18 99:4,21
99:22 100:16
100:17 101:4
101:12 102:3,7
102:9,16,18
103:6 104:18
104:22 105:13
105:16,20,23
106:2,7,21
107:10,13,15
107:21 108:8

108:17,21,22
108:25 109:1
109:16,19,22
111:15,23
112:15 113:19
113:24 114:4,8
114:11,15,20
114:23 115:3,7
115:9,11,14,18
115:22 120:13
120:16 121:2
121:16,20
122:13,17,21
123:6,11
124:24 126:8
126:13,19
128:12,15,18
128:22 130:8
131:8,12,16,19
131:22,25
132:5,15,18
135:20 138:24
139:3 140:10
142:22 143:1,4
143:10,15
144:14,17
151:3
**corrected** 29:15
38:25 76:25
**correcting** 94:2
98:4 100:12
**correctly** 9:3
25:9
**counsel** 3:15 4:6
4:21 5:10 6:11
6:14 54:2
60:10 65:20
73:2 88:4
102:2 124:15
138:2 148:1
**counsel's** 109:24
**counseled** 118:2
**country** 127:21
**couple** 58:13
59:3
**course** 12:18
16:18 40:25
42:12 109:17

**Court** 1:1,18 3:3
3:5 6:19,22 8:5
8:9 11:6 23:17
24:12,20 28:6
28:9 34:7,9,11
35:25 45:13
46:19 48:21
53:24 55:14,16
57:8 59:25
60:3,6,9,22,25
64:5,8,18,22
65:5,18,21,25
66:8,11 67:4,6
67:21,25 68:3
68:11,13,17,20
68:22,24 69:1
69:3,5,7,11,14
70:7,9,11
71:16 73:3,8
73:12 74:24
75:3,6,11,13
75:16,22,24
76:2,4,11
77:12,19,24
79:9,18 83:20
84:1,5 86:8,11
87:21,24 88:2
101:16,18
103:15,18,23
104:5,12 109:7
124:11 130:14
130:18,20
138:9,12,15,18
139:13,16,18
147:12,14,17
147:20,23,25
148:8,9,12,16
148:18,21
149:2,4,9,11
149:19,22
150:1,8,10,12
150:14,17
151:15
**Court's** 8:4
46:17 53:19
64:9 69:10
**courtroom**
148:6

cover 25:6
covered 113:12
cowardice 81:13
create 70:12
  119:8,11
created 110:9
creating 55:4
credible 36:23
  96:22
crime 145:7,8
critical 75:8
cross 2:4 74:12
cross- 101:2
CROSS-EXA...
  3:9
crystal 90:3
crystal-clear
  97:4
CST 131:10
Culbreath
  104:10
Culbreath-W...
  113:2
current 72:9,13
currently 67:16
  72:7,15,19
  104:20,24
customer 93:24
  94:2 98:4
  100:9,12
customer's
  93:25 98:3
  100:10
cut 28:14 95:21
  147:18

D
D 60:20
D- 101:23
D-10 2:19 23:16
  23:25 24:21
  101:23
D-11 2:20 27:19
  27:21 28:7
D-12 2:21 33:20
  34:12 37:24
D-13 35:5 39:17
  39:23

D-14 44:2
D-15 47:14
D-18 2:22 56:14
  56:19,20,22
  57:9
D-23 2:23 61:2
D-33 2:24 76:10
  76:17 77:15,21
D-34 2:25 78:24
  79:19
D-38 64:10
D-5 138:1
D-55 64:6,14
D-7 8:7,7,8
D-75 56:11,12
  56:15
D-8 8:12
daily 141:24
danger 148:3
dangerous
  78:10
date 24:7 70:1
  86:18,21
  100:24 116:1
  134:2 143:17
  143:19,21,21
dated 65:1 139:6
  144:17
day 1:9 58:10
  70:21 136:6,7
  137:3,12
  141:18 144:8,8
  144:14
days 15:1 58:11
  59:4 101:8
  134:19 135:23
  144:12
Deal 99:6
dealing 3:17
  32:19 94:1,3
  98:4 100:11
dean 17:8,10,10
  17:11,11,13
  21:7,9,14,14
  21:15,16,20,21
  23:1,11 24:7
  25:16 27:4,4,7
  27:25 29:20

31:3,4,20
32:14 33:12
35:19 37:11,18
38:24 41:22
42:25 89:22
91:5 92:16
93:5 96:9,9
97:9,13,13,13
97:18,18,19,19
98:24 99:10
131:13
dean's 30:16
  37:16,17 81:4
  85:7 92:11,25
  146:10 147:1
deans 17:10,12
  20:23 21:5
  31:6 38:12
  47:22 48:1
Dear 61:10
December 57:1
decide 6:19
decided 136:19
  145:23
decision 112:14
declare 113:22
defendant 1:15
  109:9,11 110:7
Defendant's
  89:12,15 90:21
  92:5,6 93:10
  95:15 98:9
Defendants 1:7
defending
  145:10
defense 79:11
  149:17
degree 65:10
  72:22
Deirdre 2:10
  61:10 86:1
  101:3 103:20
  104:7,10 111:5
  113:2 142:10
  142:13
demonstrated
  32:13
demonstrates

94:13 95:6
99:15,24
denies 67:22,24
department
  16:25 17:2,4
  18:6,11,12,18
  22:11 37:8
  50:2 57:19
  58:3 61:12
  84:17 87:4,5,7
  107:6 111:6
  116:20 126:24
  127:6 130:25
  131:15,19
  132:2 140:7
  146:2,9,10,11
  146:24
depends 117:12
  136:14
deposition 3:11
  4:15,20 5:20
  73:18 124:7,20
  124:22 125:2,7
  125:15 129:7
describe 91:12
  110:6
desperate 59:19
  59:19
desperation
  59:20
detail 110:6
details 116:21
  116:23 117:1
deter 130:22
determine 108:6
  108:24 116:22
  147:11
determined
  113:10 117:25
determining
  142:25
development
  31:17 139:25
development/...
  142:16
die 80:19
different 127:1
difficult 129:5

129:22,23
130:3,10
difficulty 130:15
Dighe 96:9
  97:13,19
DiMeo 18:25
  141:20 148:24
direct 2:4 31:14
  36:2 55:22
  74:11 79:23
  104:13 110:3
  110:19 124:19
  141:19
directed 75:21
  126:3
direction 63:22
  71:23
directive 141:22
director 104:24
  113:3 126:7
disciplinary
  110:10 115:20
  116:1,5,13,18
  116:24 118:24
  121:9 133:7,23
  134:5,8 135:7
  135:18
discipline 3:17
  4:1,7 7:23 8:17
  13:19,25 14:4
  14:10,14,14,21
  15:10,11,12
  57:19 58:4
  116:15,20,22
  117:9,17,19,25
  120:18,21
  133:25 134:25
  135:8 142:2
  144:24 145:3
  145:23
disciplined
  15:13,14 65:10
  116:10 135:23
disciplines
  14:25 120:22
  120:24
disclosure
  110:15

**discovery** 65:23
**discrepancy**
  138:16
**discretion**
  117:10
**discriminated**
  112:1
**discrimination**
  105:13,23,25
  106:2,7,12
  107:13,23,24
  108:6,7,16,19
  108:21 110:8
  110:23 111:5
  111:11,19
  112:4,8,14
  114:4,7,10
  122:20,22
  125:20,21
  126:19,20,23
  127:10 138:23
  140:10 143:1
  143:10,10
**discriminatio...**
  142:14
**discriminatory**
  75:20 123:2
**discuss** 36:22
  81:2 96:21
  141:21 148:2
**discussed**
  117:22,23,24
  143:16 149:3
  149:25
**discussion** 150:1
**discussions**
  130:2
**disgraced** 78:9
**disparaging**
  82:15
**dispute** 65:15
**distracted** 70:4
  70:15,20
**distress** 63:7
**DISTRICT** 1:1
  1:1,10
**diversity** 95:6,8
  99:24 100:1

**doctor** 13:12
  21:24 64:25
  66:9,11
**doctor's** 66:3
**document** 8:15
  24:3 27:22
  33:22 47:1
  54:1 55:20
  58:20 64:17,24
  67:11,12 68:15
  68:16,17,22
  69:5,15,16
  108:10,12
  109:2 112:18
  119:18 120:6
  146:13
**documentation**
  115:2 116:14
  117:9 119:8,15
  133:6,22
**documented**
  133:1 146:8,17
  147:2
**documenting**
  146:20 147:3
**documents**
  70:11 108:11
  110:14 117:3,4
  117:7,12 141:3
  141:3,6
**doing** 20:6 23:13
  38:16 93:9
  114:3,17 127:1
  149:13
**dollar** 19:18
**Dr** 4:2 9:10,10
  13:10,10 15:22
  17:16 19:3,20
  19:22,23 21:23
  21:24,24,25
  22:1,2 28:18
  33:3,6,8 41:12
  41:24 43:6
  44:23 46:4,5,6
  46:11,12,24
  47:2,4,5 48:9
  49:19 50:1,4
  51:15 52:22

53:8 54:22
  56:1 57:1,12
  57:14 58:17
  62:7,8 63:14
  63:16,17,20,23
  64:2 66:25
  69:22,24 70:3
  70:14 71:19
  74:2,14,16
  80:12 81:7
  82:10 84:23,24
  85:9,15,25
  88:24 95:21
  97:6 102:12,16
  116:4,11 117:6
  117:13,14,18
  117:20,22
  118:9,12,16
  119:22 120:9
  120:22 121:14
  122:12 123:1
  125:17,25
  126:1,2 127:12
  127:17,18,22
  127:25 128:6
  128:11,20,25
  128:25 129:3
  129:15,23
  130:2,5,12,23
  131:5,8,12
  132:3,14,21
  133:7,12,17,19
  133:20 136:25
  143:13,18
  145:1 146:25
  146:25 148:25
  150:2
**drastic** 136:15
**Drew** 18:24 19:1
  132:20,23
  133:14 141:20
  148:24
**dropped** 13:16
  13:17,21,22,23
  13:24
**dropping** 14:1
**due** 120:1
  122:12

**duly** 113:5
**duress** 62:24,25
  63:2
**duties** 16:5
  134:21 136:3
**Dye** 17:13,16
  21:23,24,25
  22:1

_____

**E**

**earlier** 8:21
  11:16 54:2
  55:20 85:23
  91:10 92:16
  135:8 143:16
  149:3
**early** 137:3
**ears** 20:23
**easier** 129:15
  130:6,6
**easily** 70:20
**EASTERN** 1:1
**Education**
  109:12 113:5
**EEO** 97:15
  107:5,8,10
**EEOC** 142:17
  148:20
**effective** 61:14
  94:14 99:16
**effectively** 25:20
  91:24 94:21
**efforts** 93:25
  98:2 100:10
**either** 132:11
  140:4
**electronic** 1:23
  151:4
**Electronically**
  1:18
**email** 9:24,25
  10:20,22 16:11
  16:13 51:5
  54:5 55:25
  56:13,23,25
  57:11,22 58:22
  59:8 60:13
  61:5,5,20

62:16,19 76:18
  76:23,24 79:12
  87:9 101:3,10
  101:10 117:15
  117:18,23
  119:11,18
  120:6 132:6
  133:5,5 139:5
  139:22 140:15
  140:20 142:6,8
  142:12,22,24
  142:25 143:4,6
  143:22,23
  144:7,13,16,19
  145:14
**Email(s)** 2:17,22
  2:23
**emailed** 132:12
  132:12
**emails** 11:12
  15:8 16:8,10
  16:11,12,14
  133:1 138:20
**embarrassed**
  5:6,13
**embarrassing**
  87:23
**emotion** 63:3
**emotional** 63:7
**empathy** 91:25
  94:22
**employed** 72:7
  81:15 104:20
**employee** 3:18
  18:20,21 28:13
  28:16 35:13
  43:13 96:2,6
  104:25 106:11
  107:9,19 111:6
  113:3,16 118:5
  121:8 135:23
  140:20 142:11
**employee's** 36:3
**employees** 41:9
  87:13,15 105:6
  127:3 136:4
  140:18
**employer**

106:10
employment
14:19 72:9
105:7,8 106:2
107:7,10
111:17,24
ends 25:1
endurance
80:24
energy 57:19
58:4
enjoy 28:20 59:4
enjoyed 59:5
ensure 105:5,9
entire 67:2
environment
55:4 59:22
74:10,13 77:14
105:18 107:17
111:18
EOC 108:3
127:6
equal 107:10
108:1 126:24
131:18
Eric 139:22,23
139:24 141:5
error 136:10,11
136:12,14,14
145:3
errors 146:3,7,9
146:14,16,21
147:1,2,3,4,8
especially 140:6
Esposito 63:17
63:20 69:22,24
70:3,14 71:19
Esposito's 64:3
Esq 1:11,12,12
1:15,15
essential 36:20
96:19
established
31:22 112:5
et 16:2 91:6
Ethics 94:13
evaluate 41:22
47:5

evaluated 26:25
35:22 43:6
46:10,23 47:4
69:19 96:13
evaluating
16:24 142:24
evaluation 2:19
2:20,21 24:5
25:5,12 27:7
27:10,24 32:20
33:24,25 34:14
35:3,6,8,16
37:22,25 39:2
39:16 42:6
43:4,14 45:19
47:7,9,16 48:2
49:4 63:17
64:3 65:11
66:14,14 71:19
89:16 91:1,17
92:5,18,23
93:16,17 94:7
95:14,17,20
96:4 97:22
98:8,10,21
99:10 101:22
103:8 142:21
150:2
evaluations 22:3
22:7,8,10
37:10 41:5
89:8,9 97:5
102:6 103:6
evaluator 66:24
Eve 57:3,12,22
event 16:4
116:21
events 63:3,8
EVID 2:15
evidence 3:25
8:8 24:21 28:3
28:7 34:6,12
53:23 55:12
57:9 61:2 77:8
77:15 79:17,19
109:5 139:20
141:15
exact 11:13

exactly 3:19
4:10 5:5 19:8
66:10 67:9
74:22 83:9
examination
88:9 101:3
103:1 104:13
example 37:24
exceeding 93:25
98:2 100:10
exceeds 26:10
91:15
excelled 32:12
32:16
excellent 32:6
exception 150:4
150:7
exchange 49:23
49:25 56:23,25
76:18 80:3
82:22 83:5
85:18 87:9
exchanged
85:12
excuse 3:12 8:18
38:21 61:4
64:9 78:19
102:7
excused 103:17
148:6,11
excuses 37:21
execute 113:6
executive 15:22
16:6 25:9
52:18 61:11
105:12 122:21
exhibit 2:15 8:2
23:16 76:10
77:21 79:11
89:12,15 90:22
92:6,7 93:11
95:15 98:9
124:10
Exhibits 108:12
expect 37:16
95:9
expectation
102:15

expectations
26:10,13,19
27:2 30:6,23
31:15 40:7,9
41:19 90:8,13
91:15 102:15
103:4,5
expected 145:3
expecting 12:2
experience 5:1
5:10 140:19
experienced
74:11
experiencing
54:22 56:7
explain 42:25
70:3
explained 14:24
15:2 121:24
127:22 128:9
explaining 15:3
expletive 84:20
expressed 122:8
extension 64:14
extent 110:13
extra 71:5
extraordinary
42:14
eyes 20:23

_____
F
F 1:9,20
face 84:20 129:3
129:3
Facebook 2:24
2:25 73:6,7
74:4,14 76:8,9
76:14,23 77:2
78:25 79:2
81:3 82:18
85:11,20,22,24
87:9 88:11
fact 7:4 18:23
48:4 49:22
56:9 136:15
factor 38:21
facts 113:13
136:25

factual 113:18
113:23
faculty 19:4,21
20:17 32:20
61:19 93:1
135:2
failed 9:4 11:25
12:1 13:6,7,9
29:5 135:9
failing 8:18
134:22
failure 141:21
fair 29:21 34:23
34:24,24,25
38:8 41:14,16
41:17 47:24
66:13 112:9
114:8 115:1,5
127:1
fall 30:5
false 111:15,16
111:23 112:12
familiar 104:18
105:13,15
106:1 114:3
family 57:16
58:12 61:19
fantasize 78:9
far 26:9 46:8
49:15 91:15
fast 99:8 138:9
father 72:4
fault 120:20
favor 147:20
favorite 49:25
fear 75:25
February
141:17
federal 105:22
106:6
fee 52:8
feel 5:18 71:1
128:25
feeling 144:7
feelings 85:15
feels 144:13
fees 52:5,5
felt 5:1,10 7:4

120:15 136:8
147:2
**Fendell** 1:15
**figured** 42:24
**file** 117:17,17
119:11,16
120:7,10 133:2
**final** 25:24
45:17,23 48:16
89:25 96:24
102:9,17,20
**finance** 126:7
**financial** 126:11
**find** 6:2,13
46:16 108:13
117:1 146:14
148:5
**fine** 66:3,18
77:19 91:16
**finish** 149:5,13
**finished** 88:1,2,3
**fire** 83:19
**first** 5:6 14:4
17:23 19:1
22:17 30:13
38:4,6 45:7
47:7 49:2,3,9
89:24 91:13,13
92:14 94:8
110:21 121:1,9
134:3 142:9
**fiscal** 24:24,25
25:1,5
**fit** 145:7,8
**five** 80:21
**five-ish** 50:7
**flawless** 30:18
**flew** 58:14
**flight** 8:19 9:12
9:19,21 10:11
12:20,23,25
13:1,4,5,9
146:6
**floor** 1:21 5:2,11
**fly** 37:17
**FMLA** 36:18
96:18
**focuses** 93:24

98:2 100:9
**Foehl** 97:15
110:21 138:23
139:1,8 140:12
140:17 142:21
142:23,24
143:22 148:19
**folks** 110:20
**follow** 9:16
108:20
**followed** 11:22
11:24
**following** 14:14
42:20,24 44:10
46:10
**follows** 110:18
**Fore** 88:23
**foregoing**
110:17 113:18
113:23 151:3
**Foreman** 79:2
79:14 80:18
85:12,23 86:15
87:2,10 88:13
88:13,22,23
**forget** 71:7,9,11
**forgetful** 66:20
**forgets** 66:20,22
66:22
**forgiving** 85:8
**forgot** 140:22
**form** 90:4 94:12
**former** 84:16
87:5
**forward** 6:16
**found** 104:3
110:23 111:21
111:25 112:6
112:13 122:4
129:5,22,23
130:2 132:10
**four** 4:1 14:7
107:1 120:25
133:24 147:5
**free** 105:6,10
**frequently**
51:18 147:1
**Friday** 149:14

**friend** 54:14,18
88:13,14
**friendly** 49:20
**friends** 79:2
87:8
**front** 23:22
39:17 40:2
44:19 108:11
134:12
**frustration**
146:24,25
**full** 37:10,11
38:3,4,6 39:21
40:17,22 42:8
44:13 47:17,18
47:21 89:9
104:8 114:17
121:24 127:9
**full-time** 72:19
**fun** 58:19
**function** 66:17
131:21
**functions** 36:11
36:20 51:24
65:8 69:25
96:14,19
141:24
**further** 77:16
87:24 88:6
101:16 102:22
103:1,13
**FYI** 84:21

**G**

**G** 1:12
**gainfully** 81:13
**gangster** 85:6
**Garling** 151:8
**gather** 141:3,5
**gathered** 113:13
115:2
**generally** 3:21
3:22 127:20
**George** 33:12,24
34:22 35:9
37:4 38:12
39:2 42:3 44:9
44:13 48:4

93:11 95:25
99:14 100:18
**getting** 22:9
37:14 78:9
127:15
**gift** 50:6,11
**gifts** 49:23,24
50:1,4,8
**give** 9:4 11:17
13:13 42:21
50:13,14
116:21 124:23
137:9 140:19
141:3
**given** 109:18
111:14 134:22
144:9
**gives** 112:19
**glasses** 104:1,2
**go** 5:23 6:16
16:24 18:12
30:8 31:11
35:5,12 39:3
39:16 50:4
60:1 64:16
66:7 73:6,11
74:2 75:3 78:7
85:1 91:12,16
91:16,19 92:5
92:18,19 93:10
93:10,16 94:7
95:1,14 97:8
97:11,15 98:21
99:10 100:6,18
111:20 116:19
124:7 125:25
126:1 127:8
128:24 129:4,9
129:12 130:5
131:2 138:7,21
144:6,16
147:25
**goal** 30:14 32:1
91:3
**Goal/Project**
31:11 32:17
99:6
**goals** 30:13

**goals/project**
90:23,25 92:19
92:21 98:24
**goes** 79:7
**going** 5:23 6:10
16:1 19:25
23:19 43:21
50:1,7 51:15
51:19 66:17
67:22 70:1
81:20 85:18
109:3 116:22
124:14 130:12
138:21 141:16
143:6 144:1
147:9,25 148:1
148:24 149:12
149:17,18
150:5
**good** 26:13,15
26:16,23,24
31:16 40:10
46:16 67:14
90:8 93:9 99:3
100:16 104:15
104:16
**govern** 105:13
105:15,18
**grade** 17:18
41:1,1,11,11
41:13 42:18
45:14,17,20
**grades** 41:6
42:19,21 45:1
89:8
**graduate** 20:18
61:18 132:14
**grants** 19:13,14
19:15,18
**great** 57:15
61:10,17
**greeting** 50:17
50:18
**Greg** 62:4,5,6
78:17,20 83:19
85:10,16,25
87:17,18 89:1
101:7 117:6,15

117:18,22,24
118:15 119:5,6
120:11 122:3,4
123:3 125:24
126:3 127:9
128:8 130:7
131:4,9 132:20
132:23 133:14
136:24 141:20
143:20 148:24
**group** 121:25
**groups** 95:13
100:3
**guards** 105:23
**guess** 19:25 50:7
107:3
**guided** 35:19
**guideline** 42:24
**guidelines** 42:20

**H**
**half** 42:4 66:1
72:16
**hand** 104:6,6
**handed** 101:6
**handle** 68:10,14
127:4 143:8
**handled** 109:23
122:5
**handling** 38:18
**handwritten**
110:9
**happen** 31:22
38:12 65:18
101:6
**happened** 51:13
82:5 132:10
**happens** 116:16
**Happy** 59:5
**harassed** 48:12
141:18 144:8,8
144:14
**harasser** 48:25
58:6
**harassing** 54:21
**harassment**
105:6 143:1
**hard** 23:4 44:1

63:5 69:4
101:25
**Harris** 1:15 3:7
3:10 5:19,23
6:3,5,8,10,13
6:21,23 7:1 8:4
8:7,12,14 11:9
11:15 23:15,21
23:24 24:10,16
24:18,22 27:19
27:20 28:2,5
28:10 33:20,21
34:5,8,13
35:23 36:1
39:5,7 43:19
43:24 45:11,16
46:17,21 47:14
47:15 48:18,22
53:19,21,25
55:11,17 56:11
56:13,17,19,21
57:5,10 59:24
60:2,11,12,20
60:24 61:3
64:1,6,9,14,16
64:19 65:3,6
65:20 66:10,19
67:10,18,24
68:2,4,7,9,12
68:14,19,21,23
69:6,9,13,17
69:18 70:13
71:18 73:1,4,6
73:9,21 74:6,9
74:20,22 75:1
76:7,10,13,25
77:1,7,20,22
77:25 78:24
79:1,10,16,20
79:22 81:19,24
83:7,10,12,21
83:23 84:2,7,9
86:3,6,10,12
86:13 87:22,25
88:3,6 101:17
101:19,21
102:22 103:3
109:6 147:9

148:23 149:3
149:17,20,24
150:9,11
**harsh** 15:9
**hate** 137:25
**hateful** 85:5
**head** 62:1
**health** 63:12
67:15 72:9
**healthcare**
71:24 72:10
**hear** 8:24 30:11
71:10
**heard** 75:17
82:4 84:16
132:14
**hearing** 23:4
63:5 102:1
**hearsay** 65:1
**held** 18:6 105:1
**hell** 85:7
**help** 72:3
**helpful** 7:18,19
**hesitant** 81:2
**high** 66:15
**higher** 18:24
48:2 109:12
113:4
**highest** 18:2,19
48:4,25 49:15
**highest-ranking**
18:14
**highlight** 55:24
68:25 78:7
81:21,22 84:12
85:3 86:5
87:15 92:8,20
93:19 95:16
**highlighted** 36:8
76:21 80:14,16
129:10
**hired** 104:22
**history** 140:5
146:8
**hold** 113:2
**holding** 16:20
69:15
**holiday** 57:14,15

57:16 58:11
**home** 57:17
72:10 148:3
**homeland** 122:6
**honest** 29:17,18
41:1 42:10
53:15 80:5
140:11
**Honestly** 123:12
129:2
**honor** 3:7 6:1,14
11:4 24:19
35:18,23 43:17
48:19 55:15
57:6,7 59:24
60:23 64:7,9
64:16,19,23
65:3 68:9 69:9
70:5 73:1,18
75:2,7 76:5,22
77:9,16,23
79:6 84:3
87:25 88:7
96:8 101:14,17
103:19,21,25
104:11 109:4,6
121:10 124:9
138:14 139:11
139:15,17
141:13 145:11
147:9,13
148:14,23
149:6 150:16
**HONORABLE**
1:9
**honors** 72:24
**hope** 28:19
46:16 58:10
81:12 84:2
**hostile** 55:4
59:22 74:10,12
77:14 105:18
107:17 144:8
**hostility** 74:10
**hotel** 12:7,10
**hours** 65:15
**HR** 14:18 15:7
41:1 42:20

62:3 81:4,11
105:12 117:4
117:10,11
118:1,2,4,7
130:25 137:6
**hub** 7:15
**Human** 97:8,11
105:3 106:15
107:6 122:21
126:13,14
131:15 140:24
141:8 142:9,16
**hurry** 149:12

**I**
**idea** 114:3 116:5
149:5
**ideas** 37:18
**IDENT** 2:15
**identified** 73:15
101:23
**impact** 14:14
63:3
**impeach** 6:15
**impeaches** 65:6
67:1
**impeachment**
6:16 150:6
**important** 46:1
100:23 114:18
123:24 148:5
149:13
**impression**
70:12
**improve** 36:23
96:23
**improved** 99:2
**improvement**
36:24 41:6
42:11,22 96:23
**inaccurate**
12:16,18
**inappropriate**
82:8 116:10,12
117:14
**include** 107:12
107:15
**includes** 13:4,5

30:18 93:3
**including** 19:4
110:8,9
**inconsistency**
67:13
**inconsistent**
6:18 67:18
**INDEX** 2:1
**indicated** 63:2,6
73:17
**indicating** 61:20
**indiscernible**
12:22 24:6
58:16 65:17,21
65:25 66:8,11
67:11 68:2
74:6 75:2,20
80:21 99:4
**individual** 4:7
35:22 86:25
95:12 96:12
113:10
**individuals**
15:25 87:12
95:12 100:3
113:14 132:3
**indulgence** 8:4
46:18 53:19
64:10
**inefficiency**
137:18,19
**inflate** 41:13
42:21
**inflating** 41:5
**inflation** 41:1
**information** 9:4
11:17 12:2
13:13 17:2,4
61:12 62:18
87:4,7 110:14
110:20 113:14
113:20,24
122:16 139:2
140:7,9,17
143:3,23
**informed** 40:24
**infraction** 136:1
**infractions**

136:2
**initially** 121:21
**initials** 83:20,24
**Inn** 12:4
**inquiry** 73:10
**inspect** 52:22
**instructions**
134:22
**intend** 89:4
**interaction**
117:14 120:5
**interactions**
92:1 94:23
123:14
**interim** 23:1
89:22
**Interpersonal**
91:24 94:21
**interpretations**
66:6
**interrogatories**
109:13,16,22
109:25 112:25
113:9,12,17,19
**interrogatory**
110:13 111:14
111:22 112:2,3
**interview**
136:17 143:3
**interviewed**
110:8 114:20
131:24 143:6
**interviews**
114:22,23
**Intolerable** 56:9
**introduced** 8:8
**investigate**
107:23,24
108:2,5 110:7
118:20 127:5,8
132:17
**investigated**
107:21 110:22
114:15
**investigating**
114:10
**investigation**
108:21,23

110:10,11
114:7,17 115:1
115:3,5,6,7,18
115:21 118:14
118:15 126:18
126:23 127:1,6
127:7,10,11,14
129:14 136:23
142:22
**investigations**
108:25 114:4
130:7
**investigative**
67:2 127:13
**involved** 15:22
109:21,23
**Ironically**
124:14
**irrelevant** 73:13
73:14 77:10
**issue** 36:22
66:23 73:19,20
75:9,19 96:21
117:25 122:3
126:21 135:10
142:9 149:24
**issued** 116:1,4,6
116:14,15
117:9 118:5
133:7,23,23
134:25 145:17
145:18
**issues** 29:8 94:2
98:5 100:12
126:3,6,11,15
127:4 130:21
131:1
**issuing** 118:24
119:18
**itineraries** 9:7

_____

**J**

**J** 151:8
**J-hole** 80:6
**January** 135:11
**JDR** 1:19
**Jie** 59:11
**job** 7:19 12:19

26:13,20 40:9
65:8 90:8 93:9
102:15 103:4
105:5,9 134:21
136:3 146:4,13
149:13
**job's** 102:14
**John** 1:20 51:14
59:12,14,16
**Judge** 1:10 6:5
149:24
**July** 1:5 25:3,6
25:13 27:8
34:1 35:9 54:5
86:23 151:13
**June** 25:1,3,6,13
27:8 33:25
34:1 35:10
**jurors** 24:18
**jury** 1:10 3:4
6:19 24:11
28:5 34:8
35:15,24 45:12
48:18 53:23
55:13 57:5
60:1,7,24 61:8
68:15 77:8,22
79:17 83:16
84:1,3 141:16
147:10,25
148:6,11

_____

**K**

**Kaiser** 106:20
106:23
**keep** 65:25
117:2,16,17
130:4
**KELLY** 1:9
**Ken** 106:20
**Kennedy** 1:20
**kept** 117:6,9,10
130:12
**Keya** 21:8 92:15
92:15
**kind** 97:25
136:1
**Klein** 17:10,11

17:11 131:12
131:14
**knew** 12:9,12,18
12:18 41:6
81:10 123:5,22
123:22
**know** 4:11 10:19
11:13,13 12:3
12:13,21,25
13:16 14:5
15:17,17 18:4
19:1,2,12,12
19:13,24,24,24
19:25 20:3
21:20 34:15,17
37:14 38:22
39:22 40:23
41:3,4,11,24
42:9,17,18
43:7,11,23
44:18,25 45:1
45:2 46:5,6,23
50:11,24 51:3
51:22 52:6
53:14 56:16
58:23 62:11
66:18 67:22
68:10,14 70:9
71:4 75:5,13
80:4,6,8,23
85:17 87:17
100:24 106:6,9
109:16 112:18
112:18 117:21
117:21,23
120:19,20
122:14 123:7
123:12,17,18
123:23,24
125:10,12,16
127:22 131:3
131:24 132:1,1
132:10,11
133:3,9,11,18
133:18 134:24
135:5,15 136:9
137:5,17
140:11,16

141:8 142:17
143:11,19,20
145:17 146:3
146:11,25
147:4,21 148:3
148:5,13
149:11
**knowing** 38:16
**knowledge**
113:11,14,20
113:24 128:20
151:6
**known** 106:4
128:11,17
**Kwatney** 9:10
9:11
**Kwatny** 58:18
145:1

**L**

**L** 104:10
**Labor** 104:24,25
111:6 142:11
**lady** 85:23
146:12
**Lane** 99:8
**language** 74:15
87:23 130:15
130:19,22
**large** 130:24
**late** 65:14 70:19
**late-50s** 123:6
**Laughter**
147:22
**Laura** 1:11
**law** 1:13 105:22
106:6 148:4
**laws** 105:13,15
105:18 106:10
**lead** 31:6,7
146:18,22,23
146:23
**leader** 22:11
**leaders** 35:18
96:9
**leadership** 4:2
21:10 23:3,11
27:24 28:20

32:14 33:3
37:12 54:22
66:25
**learn** 136:23
**learned** 42:17
42:18 99:9
136:24
**learning** 37:17
**leave** 145:9
148:2
**leaves** 30:20
**leaving** 30:16
63:11
**led** 39:1 63:8
146:16 147:4
**left** 28:22,25
104:6
**legacy** 145:9
**less-than-aver...**
35:2
**lesson** 59:15
**let's** 31:11 35:5
39:16 88:11
89:9,12 90:3
91:19 92:5,18
92:19 93:10,10
93:16 94:7,8,9
94:19 95:1,14
95:14 96:2
97:4,21,21,22
97:23 98:8,21
99:10,11 100:6
100:18 124:7
129:7 134:14
141:12 144:6
144:16
**letter** 101:7,9,11
**level** 14:13
15:10 17:18,23
18:19,24 19:1
131:7,11
137:19 145:18
**levels** 107:1,1
**lewd** 74:15
**light** 102:25
136:15
**liked** 146:11
**limitation**

110:17
**limited** 77:12
93:3 101:17
148:25 149:1
150:4
**linchpin** 74:13
**line** 5:21 6:7,8
36:4 94:15
99:17
**list** 80:19
**listed** 29:23
64:11,12
**listened** 3:24
**litany** 14:18
**litigation** 109:18
141:2
**little** 39:8 66:4
73:15 121:23
148:2 149:7
**LITTLER** 1:16
**LLC** 1:13
**LLC./** 1:19
**load** 99:12
**Locust** 1:13
**long** 41:23 82:22
83:5 84:3
85:17 87:20
**look** 8:2 23:21
45:19 59:19
89:9,12 94:9,9
94:19 95:14
96:2 97:21,21
97:22,23 98:8
99:11 108:10
109:2 121:22
123:2,4,20
125:23 126:21
126:25 127:4,5
127:8 129:7
131:1 132:9,23
134:14 138:6,8
141:12
**looked** 42:19
72:13 122:2,4
126:4 133:16
**looking** 28:11,12
36:9 37:11
97:5 135:21

136:18 140:9
143:7
**lose** 146:12
**lost** 137:5,20
**lot** 20:8 37:6,10
53:1 82:4,5
108:11
**loud** 95:3 98:1
116:12 120:8
**low** 41:12,21
43:1
**Luncheon** 3:2

**M**

**ma'am** 8:15
15:21 24:1
27:22 30:2
36:8 44:4,19
45:3 46:2,22
47:22 49:17
58:24 73:12
82:16
**Madrid** 52:23
**maintaining**
16:20
**majority** 102:6
**making** 15:25
37:21 93:1
107:6 114:14
128:1 146:14
**man** 83:18
**manage** 91:25
94:23
**managed** 33:5
**management**
17:23,24
146:19
**manager** 18:1
117:2,5,5,11
118:20
**manager's**
117:10
**managers**
126:16 127:3
**mandatory**
137:22
**March** 14:8
22:21 24:14

133:24 134:8
134:13,18
135:19
**marked** 23:25
27:21 34:5
55:18 56:14,14
56:22 76:17
77:7,21 79:11
79:16 139:5
**Market** 1:4
**master** 58:16
**materials** 16:24
30:16,19
**matrix** 14:11
**matter** 142:15
151:5
**matters** 113:11
**Mattiacci** 1:11
1:13 6:1,7
64:23 65:17,22
66:1,13 67:2,5
67:8,17,20
68:16 73:13,19
74:3,8,19,21
75:2,4,7,12,15
75:17,23 76:1
76:3,5 103:19
104:11,14
109:4,8 121:10
121:11 124:13
124:17,18
131:6 134:16
134:17 138:5
138:11,13,16
138:19 139:11
139:14,17,19
139:21 141:13
141:15 142:4,5
147:13,15,18
147:21,24
148:14,17,19
149:6,10,15,23
150:13
**mean** 9:15 11:10
11:22 16:12
19:12 22:8
29:10 37:15
39:6 43:9,11

44:25 52:5,6
73:22 102:17
123:20 126:10
127:5,7 128:5
130:10 131:9
132:12 149:12
**meaning** 29:15
125:5 146:1
**means** 103:4
107:10
**meant** 17:21
81:15 98:23
**medical** 64:24
67:15
**meet** 30:23
131:2 141:19
**meeting** 25:20
26:19 27:2
62:9 130:23
141:21
**meetings** 99:1
**meets** 26:13
30:6 40:6,9
41:18 90:8,13
102:14 103:4,5
**member** 51:14
**members** 19:4
19:21 36:12,21
36:21 96:16,21
**memorialize**
119:12
**memory** 66:16
116:9 120:25
121:3 122:14
128:9 129:3
132:6 133:20
134:12 135:9
140:16
**MENDELSON**
1:16
**mental** 63:12
66:15
**mention** 145:2
**mentioned**
92:16 150:5
**merit** 108:7,24
111:21 112:6
112:13

**meritless** 110:23
111:25
**message** 57:17
76:14,23 77:2
77:17 78:1,23
78:25 79:12
82:24 87:9
142:14
**messages** 2:24
2:25 73:7
74:14 77:11
82:18 85:11,14
85:22,24 88:11
88:12,15,21,24
89:1,5
**Messenger**
76:15 88:16,16
88:21
**met** 30:17
102:15 129:3
131:5
**Michael** 131:12
131:14
**microphone**
23:6
**mid-** 123:6
**Middleman**
63:14,16,24
64:11,11
**mind** 28:16
75:20
**mine** 23:13
41:10 80:4
88:14
**minimal** 40:6,7
90:13 103:5
147:6,10
**minimum** 30:6
30:23
**minute** 6:2
104:3 124:8
**minutes** 60:1
**misogynist**
78:17
**misplaces** 66:21
**missed** 52:19
57:15 65:12
**missing** 45:10

141:8
**mistake** 135:17
136:5,8 146:5
**mistaken** 8:12
**mistakes** 65:9
71:4
**mister** 9:3
**mistreatment**
56:6
**mitigating** 38:21
**moment** 15:19
46:17
**moments** 111:10
**monitoring** 16:8
16:10
**month** 11:12
144:6
**months** 36:19
96:19 133:24
**morning** 5:9,12
8:21 11:16
54:2 63:1
81:22 140:23
141:19 148:1,7
149:8,22
150:15
**move** 5:7 121:10
138:12,17
139:11 150:3
**moved** 5:1,11
7:11 21:20
28:2 34:6
53:22 55:12
77:7 79:16
**multi** 19:12
**multi-million-**
19:17
**multi-million-...**
19:10
**multitasking**
66:20
**Munshi** 1:12
4:23 6:14,20
11:4 23:18
28:4 34:10
43:17 55:15
56:12,15,18,20
57:7 60:23

61:1 64:7 67:9
68:5 70:5,8,10
76:22 77:9,16
79:6 88:7,10
92:20 95:16,19
101:14 102:24
103:2,13,25
124:9

_____

**N**
**name** 63:14,15
82:5,11 104:8
**names** 66:22
82:16
**necessarily**
67:12 116:17
**necessary** 117:1
131:3
**need** 75:4 81:20
**needs** 93:25 98:3
100:10
**neglect** 136:2
137:19
**neglected** 73:6
135:1 146:4
**neglecting**
134:21 136:3
**neurological**
63:17
**neuropsychol...**
69:20,22 150:2
**neutral** 114:11
**never** 10:16
17:11 29:12
44:23 102:15
123:21 126:18
129:2,3 132:17
136:20,21,22
137:5,20
**new** 25:21 37:11
57:3,12,22
59:5
**next-to-last**
55:23
**nice** 59:17
146:12
**Nicholson** 22:24
24:7 25:16

26:22 89:21,22
97:13,18
**Nicholson's**
22:23,25 23:11
**Noisy** 7:16,17
**non-tenure** 87:3
87:6
**note** 59:3,18
119:11 120:6
**notes** 110:8,9
114:22 119:14
133:2
**November**
133:21 134:3
135:4,19
**NSF** 99:8
**number** 30:14
31:11 32:17
51:3 90:23
91:19,22 92:19
92:21 93:18,22
94:8,9,9,11,19
95:2 98:24
99:6,11,23
100:7 109:3
110:3,13
115:25
**numerous** 11:11
**NYC** 59:3

_____

**O**
**oath** 4:13 112:20
112:21 124:23
124:24,24,25
**object** 64:23
147:9
**objection** 6:5
11:4 23:18
28:4 34:9,10
55:14 57:7
60:22,23 61:1
64:5,7 76:22
77:10,16 109:6
139:15 147:12
147:14
**objections** 79:8
109:12 110:17
**objects** 66:22

110:13
occasions 4:1
  50:6,19
occur 114:23
October 51:15
  51:19 52:23
  53:2,6
offended 54:24
  73:25 74:18
  75:25 122:1,8
  125:17,22
offending
  129:14 143:12
offensive 127:23
  128:10
offer 37:7
offered 38:19
  61:25
offers 28:21
office 4:19 30:16
  37:17,17 80:23
  81:4 85:7
  92:11,25 93:4
  97:16 107:25
  108:1,3 109:24
  111:18 117:10
  120:18 121:24
  122:25 123:1
  127:17,20
  132:18,21
  141:25 143:8
  146:11 147:1
OFFICER 60:3
  104:5 148:8
  150:17
Offices 141:8
official 54:16,17
  126:22
oh 5:25 6:12
  16:16,18 23:23
  31:4 36:9
  44:12 46:5
  81:11 98:11
  100:24,24,24
  104:2 121:12
  138:6 139:11
  145:7 147:20
okay 3:15 4:20

4:25 5:19 6:12
  6:20 7:4,20,22
  8:21 9:2,9,18
  10:10,22 11:16
  11:20 12:12,14
  13:8,18 14:6
  15:10,20 16:19
  17:6,12,14,18
  18:1,12,13,15
  18:21 19:3
  20:1,13,22
  21:7,25,25
  22:6,10,14,17
  23:6,7,15,23
  23:23 25:8,15
  25:19,24 28:13
  28:14 29:18,23
  30:8 31:4,18
  32:1,18 33:11
  33:19,22 34:5
  34:7 38:11
  39:1 40:21
  41:21 42:6,23
  43:25 44:3,20
  44:21 46:3
  47:13,21 49:9
  49:17,22 50:6
  51:7,19,23
  52:7,10,13,15
  52:21 53:18
  54:15 55:10
  56:18,20 58:2
  58:8,25 59:17
  60:18 62:5,12
  62:18,23 63:14
  64:14 66:1
  68:2,7,23
  69:13,17,22
  70:3,8,12 71:7
  72:15,21 75:4
  75:15 76:2,5
  77:4,6 78:22
  79:5 80:2,13
  81:9 82:2 83:1
  83:6,10,15
  84:14 85:1,11
  86:11,20,25
  87:5,9,21

88:12 89:7,10
  89:11,14,19
  90:14,21 92:13
  92:24 93:21
  94:10 96:1
  97:4 98:8,16
  99:6,13,23
  100:6 101:2,14
  102:14,22
  103:13 107:9
  108:2,14 109:2
  109:9,25 111:1
  111:20 112:17
  116:19 118:8
  118:24 121:1
  121:19 122:7
  122:16 123:24
  124:4,14,19
  125:10,14
  127:13 128:20
  129:7,8,11
  130:14,18
  131:7 132:24
  133:21 134:4,7
  134:16,18
  135:3,11,12,18
  138:11 139:5
  139:17,22
  140:1,13,22
  141:7,11 144:4
  144:6,16,19
  145:6,14 146:5
  146:21 147:24
  148:10,12,21
  149:2,19,23
old 123:6
once 101:25
  126:22
one's 93:25
  100:10
one-day 137:9
one-half 44:14
opera 59:4
Operator 1:18
opinion 125:13
opportunity
  107:10 108:1
  126:24 131:18

opposed 75:13
  122:12
oranges 74:21
order 3:3 60:6
  66:7 114:6,25
organization
  63:4,8,11
  70:23 71:21
Organizational
  139:25
orientation
  93:24 97:25
  100:9
original 115:16
out-of-court
  64:25
outside 103:21
overall 32:25
  45:17,21
overcompensate
  71:6
overruled 11:6
  77:19 79:9
overseas 50:1
overseeing
  19:17 20:2,17
  20:17
overseen 25:16
overwhelmed
  70:25 71:1
owed 136:6
owned 136:7
ownership
  145:2
_____
       P
P-16 134:14
  144:6
P-17 144:16
P-26 109:3
P-3 115:24
P-5 53:21
P-6 2:17 138:20
  138:21 139:6
  139:12,20
P-62 109:2
P-65 138:6,8
P-7 55:11,18

P-9 141:12,15
p.m 1:9 3:2 60:4
  60:5 77:4
  148:11 150:19
page 5:20 6:8
  29:25 54:1
  55:23 73:7
  74:4 79:20,24
  83:10 84:8
  85:2 89:20
  90:9,21 91:13
  91:13,16,16,20
  92:14,18 93:16
  94:7 95:1
  97:21,22 98:21
  98:23 99:10,23
  100:6,7,19
  110:2 111:1,2
  124:14,15,19
  129:8,8,11
pages 85:20
Palladino 17:16
  21:15,16,20,24
  22:2 33:12,25
  34:22 35:9,19
  37:4 38:13
  39:2 41:12
  42:3,25 44:9
  44:13 48:4
  93:12 95:22,25
  96:10 97:9,19
  99:7,11,14
  100:18
Palladino's
  98:25
papers 58:13
paragraph 36:3
  55:23 58:9
  83:14 84:10
  85:1,2 86:4
pardon 27:14
  31:9 37:2 69:6
  101:18 147:14
part 18:7 65:11
  80:14,16 93:17
  105:5 110:9,11
  115:2,5 116:17
  136:10

partial 47:17
Participants 6:4
   8:11 64:4,13
   64:15 88:5
   98:14 138:4
   139:10 141:14
   142:3,7
particular 41:22
   100:19 110:1
   121:1
particularly
   49:19
party 109:17,19
pass 31:24
passed 142:21
   143:14
pasture 74:2
   119:23 121:15
   124:2 125:18
   128:2
Pause 8:6 46:20
   53:20 64:20
   98:22 103:24
   104:4
pay 134:19
   135:21,22,22
   135:24 136:4
   136:13 137:7
   144:12
PC 1:16
PDPs 40:24
penalty 113:22
pencil 85:6
pending 71:16
Pennsylvania
   1:1,5,14,17,21
people 37:9 41:4
   42:13 47:23
   85:20,22 86:2
   121:24 122:1
   123:21 127:16
   127:20,23
   131:1
people's 42:19
   66:22
percent 20:5
percentage
   19:20 20:1

perfect 41:2
Perform 22:8
performance
   2:19,20,21
   21:9,16 22:1,3
   22:6,10 23:2
   23:10 24:5
   26:9,13,25
   27:12 30:6
   31:21 35:2,6
   39:1,2 40:6,9
   40:10 42:10
   45:21 48:1
   89:7 90:8,9,13
   91:15 100:16
   101:22 102:5
   102:14 103:4,4
   140:24,25
   141:7 142:15
performance-...
   26:1,4
performance-...
   30:4
performed
   36:19 96:19
performer
   67:14
performing 7:19
   65:8 141:24
period 25:6,12
   25:15 27:7
   32:20 35:8,9
   37:13,23,25
   39:16 41:23
   44:6,17 47:16
   70:20 89:23
   125:3 135:5
perjure 43:21
perjury 113:22
permission
   109:5
person 18:5
   37:25 48:9
   52:1 58:8
   59:21 81:11
   114:10,13,14
   114:14 115:16
   118:1,2,4

128:11 131:3
   137:6,20
   148:20
personal 77:10
   94:1,3 98:3
   100:11,20
   113:11
personality
   130:20,21
personally 50:9
personnel 1:18
   122:21 126:3,6
   126:15 131:1
perspective
   129:23
Ph.D 20:7
Phase 30:14
Philadelphia 1:5
   1:14,17,21
   136:17
phone 9:23 10:2
   10:10,22,25
   11:12 132:7
   133:4 140:18
   145:16
phonetic 76:15
   79:3
photographs
   51:7 59:9,13
physical 93:4
   123:13
physically 123:8
   123:13
physician 63:23
pick 140:18
picked 145:16
pictures 58:15
   82:7
place 31:16
   104:6 116:22
   118:18 133:20
   137:1
plaintiff 1:3,11
   2:6 3:8 103:19
   104:7
plaintiff's 77:13
   108:12 109:13
   110:7 113:9,17

113:18 138:21
plan 31:14,16
planning 16:5
   70:23
played 6:25
playing 51:8
please 6:22,23
   35:5,12,12,15
   35:21 36:16
   46:17 55:11,13
   57:12 58:9
   61:8,16 80:15
   82:2 83:21
   84:12 85:3
   86:5,18 91:17
   92:18 93:11,19
   94:7,11 95:2
   95:15 96:6,12
   98:1 99:11,12
   99:12 100:8
   103:18 104:5,8
   115:25 129:7
   142:17
pleasure 28:18
point 84:18 97:8
   103:11 121:4
   122:19 138:22
   146:19
points 95:11
   100:2
policies 30:17
   107:5
policy 15:2,3
   116:13 117:8
   117:16 118:4,6
   136:13
poor 39:1 42:10
poorly 84:16
portion 38:8
   76:21
posed 129:13
poses 109:17
position 36:20
   61:11 72:13,19
   96:20 101:1
   105:1,3 113:2
   126:2,2 135:2
   136:17

possible 108:6
   123:15,16
   137:9 148:25
Possibly 124:3
post 20:7 58:18
postdating
   143:14
postiality 81:1
posts 88:16,20
power 78:11
practice 59:15
   118:7 130:6,23
   131:2
practices 95:9
   95:11 100:2
   105:8 107:7,8
   111:17
practicing 51:14
pre 87:2
preceding 14:14
predating 22:12
preferable 85:8
prepared 63:20
   63:22 149:8
present 3:4
   36:13 60:7
   96:17 150:1
presently
   113:20
president
   106:15,23
   107:2 139:24
pressure 71:3
pressured 71:4
prestigious
   136:19
pretty 82:21
   136:15
previous 38:24
   47:22 77:9
   79:7 87:10
   100:6,7
previously 3:8
   18:23 20:22
   38:11 39:17,18
   41:22 44:2
   65:7 79:8
   149:25

prior 14:13
15:11,12,17
17:6,12 37:24
37:25 38:12
46:4 63:10
67:13,18 69:25
97:6 102:11
priorities 31:14
private 76:23
77:2,10 88:16
88:20,20
privilege 110:15
probably 5:5
15:5 20:5
50:18 148:24
problem 68:7
122:9,25 130:9
130:20 149:21
problems 66:16
70:4 130:16
proceed 3:6 6:22
88:8 104:11
proceedings
1:23 3:2 8:6
46:20 53:20
60:5 64:20
98:22 103:24
104:4 150:18
151:5
process 30:18
produced 1:24
product 110:16
production
141:4
profanity 87:13
professional
63:12 67:15
71:24 93:1
126:13,14
professionalism
32:13,19
professionally
93:2
professor 7:24
9:3,14,19
10:25 11:17
13:8,13 26:22
59:11 87:3,6

proficient 99:8
prohibits 105:25
106:6 141:22
Project 30:14
31:11 32:8
projects 30:13
promotion
30:19
proper 105:8
properly 31:16
66:7
proposals 58:13
protect 107:8
protected
110:14
provide 12:2
27:10 35:16
50:4,6,8
provided 3:25
45:20 65:20,23
67:15
psych 63:17
psychological
65:23 66:2
publicly 78:9
publish 109:5
134:16 139:17
published 24:10
24:18 28:5
34:8 35:24
45:11 48:18
53:23 55:13
57:5 60:24
68:15 77:8,22
79:17 124:16
pulled 115:7
pulling 23:19
punishment
14:3 145:7,8
purpose 74:6,25
77:12 119:18
148:25 149:1
purposes 67:13
75:9 150:5,6
pushers 85:6
put 33:18 39:5
71:5 75:5,9,10
75:25 89:13

116:23 117:1
119:16,23
121:15 124:1
putting 125:18
128:1

——————
Q
qualifies 150:10
question 10:3,5
16:13 19:15
28:9 32:15
40:19,20 42:7
43:19 46:16,25
71:16 73:22,23
73:24 74:16
91:2 102:24
110:2 128:14
129:11,13,19
140:22 144:2
147:16
questions 3:16
4:7,11 46:2
54:3 67:21
68:18 69:12,14
70:7 88:6,8
102:23 103:13
104:17 109:17
109:19 110:2
124:22 141:25
quick 59:24

——————
R
R 1:15
Rachel 1:15
Rahul 1:12
raise 104:5,5
149:25
raised 35:17
96:7 111:4,11
112:4 142:18
Rand 151:8,14
ranked 18:24
ranking 18:2
rating 25:24
29:23 30:21
31:18 32:25
43:1 44:16
48:16 89:25

91:8,12 92:2
94:12 102:9
re-read 82:25
reached 110:10
139:1 144:20
reaches 140:16
140:17
reaching 54:8
145:22
read 6:15 26:7
26:14 30:13
31:12 35:15
36:7 57:11
58:9 61:8 69:7
80:2,15,20
82:2,23,24
83:13,16 84:1
84:3,14,15
86:7 87:11
90:7,25 91:3
91:13,22 92:21
93:5,22 94:11
95:2 96:6 98:1
99:12 100:8,20
100:20
reading 26:12
28:16 36:14
81:9 83:1,2
112:9
reads 102:14
realize 112:22
really 15:9 22:2
23:12 43:9
50:11 51:21
63:5 149:9,18
realm 149:16
reason 40:16
41:21 43:18
54:13 75:18
116:8,15
128:24 130:4
recall 3:11,15,23
4:6,9,18,25 5:3
7:7 8:21 9:10
10:19 11:5,14
13:18 18:5
20:22 21:7,9
22:17 23:2,4

23:10,12,14
27:12 29:23
33:11 34:22
37:20,24 47:4
49:19 50:20,22
51:2,3,5,15,19
52:25 53:2
54:2,4 55:20
60:13 70:24
71:13 76:14
82:17,21,21
83:1,4,8,9
119:24,25
120:3,4,17,21
124:20 127:15
127:15 133:20
133:24 134:6,9
135:6,22
receive 11:18
42:7 43:4,14
45:24 46:4
71:2
received 3:17
4:1 7:24 8:18
14:22 15:11
16:14 22:10
24:5,21 26:17
27:24 28:7
32:1,10 33:24
34:12 40:4
41:9,21 42:6
44:23 45:9
46:8 49:6,12
57:9 61:2
62:15 72:24
77:15 79:19
89:9 90:14
91:8 92:2
94:12 95:3
98:12 99:19
120:18 134:19
136:21,22
139:1,20
143:13
receiving 22:6
recess 3:2 59:25
60:4
recognize 8:15

24:1,3 27:22
33:22 35:6
56:23 79:12
95:7 99:25
109:9 122:7
125:19
**recognized**
15:10 122:9
**recollection**
43:12 52:22
**record** 64:24
75:5,10,10
79:6 104:9
150:4,7
**recorded** 1:18
1:23
**recording** 1:23
6:25 151:4
**records** 65:23
**RECROSS** 2:4
**RECROSS-E...**
101:20
**recruiting** 16:1
19:21
**REDIRECT** 2:4
88:9 103:1
**reduced** 115:9
**reference** 54:10
87:13
**referring** 47:16
56:3 74:15
78:20 80:7,8
80:11 81:7
82:9 84:22
85:9,10 86:25
87:12,16,16
144:19
**refers** 112:7
**reflect** 36:10
76:17 96:14
**reflects** 77:13
**refrain** 80:25
**refute** 19:6
**regarding** 4:7
7:24 29:4
85:15 100:19
125:24 130:5
130:13 140:18

**regardless**
100:23 101:1
**regards** 104:17
111:24 125:18
127:14 130:19
130:22 137:10
142:23 145:21
**registered** 52:13
**reimbursed**
9:13 10:13
**related** 8:22
30:19 31:20
141:24
**relates** 32:19
**relations** 104:24
104:25 111:7
113:3 142:11
**relationship**
26:23,24
**relationships**
126:4
**relax** 58:19
**relaxing** 58:11
**relay** 144:2
**relayed** 9:16,18
118:11 119:22
120:3 121:18
121:22 122:16
133:15 143:17
143:19,24
**relaying** 121:25
122:4,19
127:21
**relays** 125:17
**relevance** 76:1
**relevant** 25:15
65:1,3 75:19
113:15 114:19
115:1 131:25
**relieved** 5:7
**remains** 35:17
81:13 96:7
**remember** 5:4,6
5:9,11,14
11:16 15:3
18:9 19:8 22:6
22:9 27:15
43:2,16,18

51:7,21 65:13
69:12,19,24
70:14 71:14
80:18 85:17
132:7 140:20
144:3,5,5
**remind** 119:14
**repeat** 19:15
**rephrase** 147:13
147:15
**replied** 133:5
**reply** 15:6
140:20
**report** 63:20,22
64:3 67:25
68:1 106:14,17
116:1,18,24
135:9
**reported** 131:14
133:19
**reporting**
131:12
**reports** 31:14
106:20,23
**request** 59:14,15
62:10 63:22
71:25 72:1,2
141:2
**requested** 65:22
**requests** 112:3,3
**required** 36:20
71:12 96:20
99:1
**research** 20:4,6
20:8,17
**reservations**
12:4,5,6
**resign** 61:11,22
**resignation**
101:4,9,10
**resigned** 36:18
62:19,21,22
96:17
**resigning** 61:21
**Resources** 97:8
97:11 105:3
106:15 107:6
122:21 126:13

126:14 131:15
140:24 141:8
142:9,16
**respect** 47:23
93:3 95:6
99:24 120:1
122:12
**Respects** 95:9
95:11 100:2
**respond** 58:22
113:16 140:13
140:15 142:6
**responded**
10:16
**responds** 110:18
142:8
**response** 40:18
53:7 59:1,6
78:14,16 80:13
111:22 119:25
122:11 144:25
145:14
**responses**
109:13 113:23
124:23
**responsibilities**
25:17 31:24
36:10 96:14
134:21 136:3
**responsibility**
11:23 12:24
15:21 52:16,19
94:1,3 98:3
100:11,20
119:5 126:5
137:1 146:4
**responsible**
15:22 16:4,5,8
16:14,19 19:3
19:11,13,17
27:5 51:23,24
52:2 107:6
**restraint** 80:25
**result** 115:21
**results** 115:17
**resume** 3:2 60:5
**resumes** 3:8
60:8

**retain** 117:4
140:24
**retaliate** 106:10
106:11
**retaliation**
105:10,16
107:15 138:24
**retaliatory**
120:16
**retirements**
30:20
**retrieve** 103:25
**review** 44:10
118:5 141:7
142:16
**reviewed** 35:8
102:16 113:9
115:2,11,13
118:7
**reviewer** 31:2,3
44:9,11 45:20
45:23 89:19
92:13 93:5,11
95:20,25
**reviewer's** 31:1
**reviewing** 16:24
**reviews** 140:24
140:25
**Rhonda** 54:3
**Richard** 1:15
**right** 3:6 7:22
8:9 9:7 12:5,20
13:24 14:13
15:16 16:4
19:9 23:17,22
23:22 24:12
25:5,10 26:16
32:17 35:4
38:10 43:25
44:16 45:6,19
45:23 46:1,5
46:19 48:9
60:9 61:23,24
62:4 64:1,18
71:17 72:11
76:11 77:14,19
77:24 79:18
80:16,24 81:18

82:15 84:5
86:11,11,17
89:24,24 90:3
90:9 93:14
94:3,4,19 99:5
101:2,13
102:19 104:6
107:4 120:7
125:16 129:9
138:13,18,20
141:12 144:13
144:24 148:16
148:23 149:4
149:22 150:8
150:14,14
**rise** 60:3 148:8
150:17
**ROBERT** 1:9
**role** 18:1,6
22:25 37:14
38:15 54:16,17
61:21 72:13
**room** 41:6 42:10
42:21
**rose** 137:19
**routine** 28:22,24
**Rule** 150:3
**ruled** 76:4
**rules** 137:10,10
137:15,25
**ruling** 69:10,11
**running** 116:20
**Ruth** 1:2 2:8 3:8
25:20 59:3
78:5,8 81:21
83:13 84:11
86:4 88:11
89:8 94:11
97:4 101:2
103:3 116:1
120:4 122:9,11
125:5 126:22
127:12,24
130:5 133:25
134:18 140:5,9
141:17 142:9
142:14 144:17

**S**

**Sadeghipour**
21:8 27:4,7,25
28:18 29:20
41:25 92:15,16
97:13,18
**Sadeghipour's**
21:10 32:14
93:5
**sadness** 61:10
**safe** 58:19
**salaried** 18:20
18:21
**salary** 72:15
**Sandra** 110:20
140:12,17
143:22
**Sandy** 54:9,10
97:15 138:23
139:8,22
140:16 141:17
142:8,11,12,18
148:19
**Satinsky** 1:15
3:16 4:6 7:23
73:17 103:21
124:15 138:2
139:15 150:16
**saw** 7:7 45:3
88:15 103:6
**saying** 5:6,14
7:7 11:23
15:18 49:19
71:13 117:20
118:8 120:7
125:19 130:14
133:12 137:22
144:7,13
**says** 11:5 25:7,8
25:9,12,19
26:4,9,15
28:13,16 30:8
35:13 36:3
40:6,6,9 48:23
59:2 65:11,13
66:19 68:1,2,5
78:3,5,7,8,8

79:23,24 80:6
81:21 83:13,14
84:10 86:4
90:9,22 91:3
93:17 94:12
100:7,18
108:12,12
111:3,3 113:8
117:8,16 118:6
139:8,22
142:12 144:23
145:1,6
**scale** 39:11,13
91:12
**Schedule** 99:1
**school** 37:14
126:4 131:2
**schools** 126:16
130:25 131:1
**Science** 16:25
17:7 18:3
22:18 61:13,13
126:9,10 140:5
**sciences** 17:3,4
61:13 87:4,7
140:7
**score** 27:15 39:3
39:5 41:21
45:23 48:5,16
49:1,15 90:7
90:10 94:5,17
94:24 95:3
96:24 97:25
98:6,12,25
99:19 100:4,14
102:17,20
103:3
**scored** 102:3,7
**screaming**
133:13
**screen** 5:23
23:21 36:8
89:13 129:10
**scroll** 111:1
112:17
**scrolling** 111:2
**se** 120:10
**seated** 3:5,5,15

4:20 60:9
148:12
**second** 6:10 14:5
14:7,9 27:4
49:10,12 84:10
86:4 90:21
**seconds** 12:14
85:5
**section** 83:13
84:10
**see** 8:10 23:23
26:2,4,6 28:13
28:14,15 32:8
33:17 35:13,21
36:4 42:9 44:4
44:5 46:13
54:5 57:14
59:20 69:10
72:4 73:1 74:4
76:12 78:1,2
79:25 80:1
84:2,4 86:18
86:21 88:19
89:4,17 90:1,2
90:4,22 91:12
93:16 96:12
97:2,25 98:13
100:25 109:14
110:3,24 111:8
116:2 123:8
125:8 129:8,9
129:25 134:18
139:6 142:13
142:19,25
144:9 145:4,12
146:12
**seeing** 69:4
**seeking** 63:11
**seeks** 110:14
**seen** 49:15 68:9
101:12 123:9
123:13
**self-regulation**
91:25 94:22
**semester** 20:12
**send** 59:17
88:24 89:1
119:17

**sending** 51:5
60:13 76:14
**sends** 141:17
142:12
**Senior** 25:9
**sent** 9:7 57:11
57:16 61:5,20
85:11,14 101:3
110:1 117:15
117:18 132:6
133:4 143:22
144:7,13,16
**sentences** 112:9
**separate** 4:1
52:9
**separated** 71:21
**separation** 63:4
63:8
**series** 3:16 89:7
**serious** 136:9,10
**serve** 28:18
35:18 96:8
**service** 1:24
93:24 96:8
97:24 98:4
100:9,12 145:9
**SESSION** 1:9
3:1
**set** 31:14 94:14
99:16 109:13
**Setting** 16:22
**severe** 145:18
146:16
**severity** 14:2
144:21,23
145:17
**sex** 105:23,25
106:12 107:12
122:20 125:20
125:21 143:10
**sexist** 121:19
**share** 50:12
140:8
**Sharon** 106:14
106:17
**short** 23:13,14
37:23 39:18
42:2 58:15

149:17,18
**shortly** 5:24
**show** 6:23 43:11
  43:22 44:25
  76:17 79:11
  85:18 87:14
  91:19 95:23
  137:25
**showed** 39:24
  45:7 85:23
**showing** 23:25
  27:21 37:24
  45:14,15 55:18
  56:22 77:21
  112:25 139:5
**shown** 5:19 8:8
  23:15 27:19
  33:20 39:19
  44:2 46:8
  47:14 53:21
  55:11 56:11
  60:20 64:1
  76:10 78:24
  79:20 81:19
  83:7,10 84:7
  86:3 88:12
  89:7,8,16,25
  101:2
**shows** 42:10
  47:1
**sic** 7:23 16:25
  65:12 81:1
  129:17 131:12
  150:2
**side** 119:1
**sidebar** 64:17,21
  68:8,9 69:10
  73:4,5 76:6
**signature** 114:1
**significance**
  17:21
**significant** 63:7
**simple** 136:8
**simply** 144:2
**Singapore** 21:14
**single** 22:11
  74:5 102:11
**sir** 4:24 103:16

**sirens** 65:12
**sitting** 69:7
**situation** 111:24
  114:19 117:3
  117:13,22,24
  117:25 122:2
  142:10 145:17
  145:19
**situations** 132:8
**skills** 91:24
  94:21 146:15
**slower** 149:7
**smooth** 30:18
**social** 88:16
**solid** 26:13,15
  26:16 40:10
  90:8 100:16
**somebody** 86:8
  126:25
**somebody's**
  108:7
**sorry** 8:13,24
  10:5 13:14
  19:16 20:10
  22:22 23:4,5
  26:3 30:11
  32:15,22 34:19
  36:9 43:20
  45:11 46:14,25
  52:3 54:10
  58:9 60:19
  62:20 63:5
  71:8 76:21
  78:23 81:20
  85:21 91:2
  95:10 97:21
  98:13,23 102:1
  102:24 104:3,3
  113:1 119:4
  121:12 129:8
  129:11,12
  132:13 135:22
  138:6 139:8
  141:11 142:4,8
  145:7 147:15
**sort** 62:10
  114:22
**sound** 1:23

151:4
**sounds** 19:9
**Spain** 51:15,19
  51:22 52:23,23
**speak** 10:1,2
  29:8 84:16
  118:22 119:6
  120:12 129:4
  133:12
**speaking** 29:9
  130:15
**specific** 66:24
  118:6 120:3,21
  132:8
**specifically** 3:16
  3:20 5:1 7:10
  9:2 11:5 52:23
  52:25 53:22
  54:1 65:11,13
  67:24 74:1,13
  74:23 111:25
  128:3 132:1
**specifics** 116:23
**speculating**
  117:21
**spell** 83:25
  84:19
**spent** 20:6,20
  58:11
**spineless** 83:18
**spoke** 10:8,9
  14:18 37:5
  138:22 143:25
**stack** 73:16
**staff** 19:3,4 20:2
  36:12,21 38:19
  51:14 93:2
  96:16,21
  141:20
**stamp** 79:21
**stand** 3:8 5:17
  7:4 35:19 60:8
  76:25 77:9
  79:7 96:10
  148:13
**standards** 30:7
  30:17,23 40:7
  90:13 103:5

**start** 110:19
  121:6 146:20
  147:3
**started** 22:17
  24:14 47:20
  89:24
**starting** 5:20
**state** 75:4,20
  104:8
**stated** 79:8
**statement** 65:1
  67:15,19 74:3
  74:8 111:22
  112:6,12
  116:16 117:15
  122:24 123:1
  123:25
**statements**
  73:15
**states** 1:1,10
  130:8
**status** 81:3 93:1
**stay** 65:14 70:19
**stellar** 21:11
**step** 103:15,21
  148:9
**Stephen** 1:12
**steps** 110:6
**sting** 28:23,25
  29:17
**stipulated**
  139:14
**stop** 57:20
**story** 119:1
  120:3 121:18
  121:22 122:2,5
**Street** 1:4,13,16
**stress** 5:8
**strike** 33:25
  49:18
**strive** 36:23
  96:22
**strong** 35:18
  96:8
**stronger** 29:9
**struggle** 70:23
**stuck** 68:3,4,5
**students** 20:18

32:19 61:17
  93:1 132:15
  133:8,13
  141:25
**stuff** 50:3
**subject** 110:16
  113:21 148:4
**subjected** 77:13
**subjective** 74:9
**subjectively**
  73:25 74:17
**submissions**
  99:8
**submitting**
  58:13
**subsequently**
  31:7
**sufficient**
  113:15
**suggested** 81:3
**suggesting**
  73:22
**suggestion**
  81:10
**suit** 146:15
**Suite** 1:16
**summarizing**
  132:4
**summary** 67:3
  115:6,9 127:13
  127:15
**summer** 36:11
  53:14 96:15
**supervised** 33:6
  33:11 102:12
**supervising** 20:7
  131:21,23
**supervisor**
  44:24 116:4,12
  117:2 118:21
  134:22 141:19
  141:23
**supervisory**
  42:12
**support** 91:4,5
  116:15 120:7
**supporting**
  116:14 117:9

117:12
supposed 9:4
    11:17 13:2,3
    37:19 38:16,23
    40:23,25 41:12
    127:9,11
supposedly
    66:25
sure 3:19 4:10
    6:3 10:20
    12:15,17 14:20
    15:25 16:13
    28:11 30:15,17
    31:15 36:6
    39:4 42:21
    43:9 47:10,10
    47:11,12 51:17
    56:17 57:13
    61:9 70:2 71:5
    80:16 84:13
    85:4 86:19
    87:15 93:1
    105:7 107:7,20
    115:13 117:21
    121:6 122:14
    125:12 136:7
    140:14 143:5
    143:16,17,18
    143:20
surprised 30:1
    144:23
surrounding
    63:3
suspended
    136:4
suspension 8:17
    134:19 135:21
    135:23 136:12
    137:7,9,12,23
    144:12,21
SWORN 3:8
    104:7
System 109:12
    113:4

_____ T _____

T- 17:21
T-26 17:18

Tab 115:25
tabbed 109:3
take 6:5 31:6,7
    59:25 81:12
    87:21 94:8
    98:3 108:10
    109:2 121:12
    122:22 126:5
    126:15 134:14
    141:12
taken 36:22 60:4
    96:22 105:20
    110:6,11
    114:23 115:20
    124:20
takes 80:25 94:1
    94:3 100:11,22
talk 13:8 14:21
    54:14 62:15
    70:2 125:25
    126:1,2 127:16
    127:18,22
    128:3,25
    129:15 130:5
    130:12 132:20
    145:16 148:1
talked 9:11
    29:12 37:5
    38:11 41:3
    70:6 82:6 99:3
    118:2,16
    121:23 125:23
    127:25 128:4
    130:12 132:2,3
    133:17,18
    143:12,20
    145:15,21,22
talking 3:19
    4:10 41:8,9,10
    41:10,24 78:18
    85:25 87:12
    97:23 102:17
    121:14 129:13
    130:9 146:21
talks 42:16
tasks 28:22,25
    29:4 66:22
    70:21

taught 20:12
teacher 58:16
teaching 20:9,11
    20:15
Technology
    17:1,7 18:3
    22:18 61:14
    126:9,10 140:6
teeny 81:2
tell 3:20 10:10
    14:16 15:7
    25:8 27:16
    40:21 43:22
    44:25 45:1
    48:16 62:24
    85:19 89:19
    91:8 92:2,6,13
    95:3,15 98:9
    98:24 119:21
    120:19 124:15
    124:25
telling 37:21
    38:18 42:17
    45:2 69:24
    70:14 123:14
    123:16,16
tells 66:23
    118:21
Temple 1:6 3:18
    7:24 14:19
    43:13 58:14
    72:17 77:17
    89:2 91:23
    93:23 95:2
    100:16 103:11
    104:20 107:5
    109:9,11 110:1
    110:6,12,12,18
    110:22 111:5
    112:19,20,24
    113:3,5,7,10
    113:13,16
    117:8 118:4
    121:4 126:8
    136:11 141:9
Temple's 42:20
    90:4 91:1,10
    92:23 94:12

111:20,22
    112:2 116:13
ten-minute
    59:25
tendered 101:4
tension 5:8
tenth 5:2,11
tenure 18:3
    30:19
term 99:2
    147:10
termination
    66:2 101:6,11
    146:17,18,22
    146:23 147:5
terms 45:24
    113:21 114:17
terrible 145:9
tested 67:14
testified 13:23
    18:23 19:6
    47:22 48:10
    53:8,16 65:7
    74:11
testify 64:25
testifying 3:11
    8:21 11:16
    13:18 18:5,9
    20:22 34:22
    54:2 55:20
    67:13,16
testimony 3:24
    6:15 9:18 17:6
    49:17 63:1,6
    67:1 72:12,21
    75:18 140:23
testing 66:5
text 87:10
Thank 3:7 6:21
    6:23 7:22 23:9
    60:2,11 64:19
    75:1 76:5 84:7
    86:20,22,24
    87:22 93:21
    101:15 102:22
    103:14,16
    124:12 150:9
    150:11,13,16

thanks 59:3
that/ 6:19
thing 33:17
    136:2
things 38:18
    52:15 66:20,21
    66:21,23 71:7
    71:9,11 107:4
    122:5 126:5
    127:21
think 6:16 7:6
    15:9 18:23
    20:12 36:8
    38:22 41:11
    43:9 45:10
    46:10 48:4
    62:13 64:2
    66:16 71:22
    73:9,22 75:12
    78:17 81:15,20
    82:4 84:5
    87:19,25 88:3
    95:21,21 104:2
    118:18 119:10
    119:13,13,15
    120:25 124:4
    130:8 134:13
    137:16,19
    143:7,25
    145:24 147:10
    149:6,15 150:8
    150:12
third 14:5 92:18
    93:16 97:24
thorough 114:8
    115:1,6 127:1
    127:9
thought 13:18
    14:24 15:1
    29:21 41:12,14
    42:25 45:24
    123:15 135:8
    139:14
thoughts 85:6
thousand 24:14
threat 142:1
three 11:5 15:1
    33:8 50:23

65:24 66:1
71:20 107:1
134:19 135:23
144:12
**three-** 137:11
**three-day**
135:21 136:12
137:7,23
**three-day-wit...**
144:21
**time** 6:6 19:20
20:1,5,18,20
22:12 23:4,14
25:14 35:9
37:13,23 42:2
42:6 52:20
57:16 58:15
59:17 63:5
66:24 69:4
70:20 71:4,5
73:10 77:18
87:20 92:11
100:22 101:25
118:20 120:8
121:4,6,17
123:1,5 131:11
133:19 135:5,7
138:22
**times** 11:5,11
14:18 37:10
101:12 117:5
120:17 123:9
130:13 133:3
140:18 146:13
**tiny** 81:2
**Title** 105:20,22
**today** 55:20 83:1
83:2,2,18
104:17 124:24
**told** 9:14,15
13:11 42:15
61:22 66:8,12
70:7 74:1
118:15 119:25
120:15 121:22
125:22,23
127:16
**tomorrow** 148:1

148:7 149:8,22
150:14
**top** 58:24 79:23
79:24,25 111:3
116:2
**topic** 138:17
**topics** 107:20
**totally** 13:15
**tough** 34:24,25
41:16,17
**track** 87:3,6
**Tracy** 142:17
**traffic** 7:15
16:11
**trained** 127:3
**training** 37:15
140:2
**trait** 101:1
**transcript** 1:8
1:24 5:20
151:4
**transcription**
1:19,20,24
151:16
**Transcription...**
151:15
**Transcription...**
151:8
**transform** 35:20
96:11
**transition** 38:11
**travel** 13:3 16:2
52:8,11 53:8
53:10,10,11,13
135:1 136:16
136:20 137:2,4
**traveled** 51:18
51:22 52:25
**traveling** 53:2
**treated** 8:22
93:2
**treating** 55:2
63:23 71:23
**treatment** 37:7
63:11
**tremendous**
47:23
**trial** 1:8 92:6

93:11 95:15
98:9 134:14
**tried** 146:14
**trouble** 66:19
**true** 7:6,21 21:6
25:18,18 26:21
27:6 33:7
51:25 56:8
63:13 77:3
84:17 104:23
105:5 108:9
111:12,13
112:5,16,21
113:19,23
124:7 128:24
129:2,4,6
132:20
**trust** 81:11
**truth** 124:25
**try** 19:25 149:10
**trying** 6:14,16
59:20,22
129:12 139:9
145:24 147:18
**turn** 29:25
115:24 129:8
**turned** 82:22
**turning** 111:2
**twenty** 61:4
**two** 22:19,21
24:13 35:18,21
36:12,19,21
44:13 49:4,22
50:21 52:15
86:2 96:8,11
96:18,20 101:8
112:9 146:7

———————————
**U**
———————————
**Uh-huh** 20:16
21:4,13 29:19
31:13 32:3
35:1 40:11
57:21,24 72:11
82:3 84:25
91:18,21 92:22
94:20 95:24
96:1,3 145:20

uncomfortable
128:25
**undergraduate**
61:18
**underneath**
94:19
**understand** 9:3
15:15,21 16:13
17:6 21:1
24:16 25:9
26:1 29:18
40:19,20 49:17
52:21 54:19
62:19 63:10,16
65:18 66:7
69:9 72:12,21
81:1 95:7
99:25 101:22
105:22 125:3
136:5
**understanding**
3:24 116:9
119:7 128:8
133:14,16
134:25 138:25
143:5
**understood**
14:10 62:14
63:1,6 69:17
121:19 122:11
124:22
**undocumented**
146:21
**unfair** 8:23,25
13:19,20 14:25
15:1 48:14
**unfairly** 55:2
**Unfortunately**
31:23
**unhappy** 122:23
**uniform** 117:8
**union** 18:7,20
**UNITED** 1:1,10
**university** 1:6
3:18 7:25
10:13 14:19
16:1 24:23
43:13 72:17

91:5 106:24
107:2,25
109:11 110:13
110:18,22
111:6 113:4,5
113:7,11,13,16
126:8,17 127:4
130:24 136:18
137:11 145:10
**University's**
109:10
**unlawful** 142:13
143:1
**unprofessional**
116:10
**upheld** 105:8
**uphold** 107:7
**upset** 75:25
121:14 123:3
125:22 127:24
128:1,4,21
**upsetting** 75:21
**use** 23:6 68:17
68:22 70:11
74:24 83:20,24
87:13
**uses** 24:23
**usually** 53:14,15
116:16,20
132:7,11
140:16 141:5

———————————
**V**
———————————
**V** 1:2
**value** 95:8,9
100:1
**values** 94:15,16
95:11 99:16,18
100:2
**valuing** 95:6
99:24
**vast** 102:6
**verbal** 40:18
53:7 144:25
145:3
**verification**
112:19 113:1,6
113:22

**vice** 21:15,16
  33:11,13 96:9
  97:9,19 98:24
  99:6,10 106:14
  139:24
**vice-dean** 33:13
  33:14 40:25
  131:10 133:19
**victim** 81:12
**Video** 6:25
**videotaped** 4:15
**view** 95:11
**violation** 136:4
  137:11,13,14
  137:15,16,18
  137:22
**violin** 51:8 58:16
**visit** 118:25
**visiting** 135:1
  136:16 137:2
**visitor** 142:2
**visitors** 142:1
**voice** 65:25
**volunteered**
  36:11 96:15
**vs** 1:4
**vulgar** 74:15

———————
**W**
**Wacker** 62:4,5,6
  78:21 83:19
  85:10,16,25
  89:2 101:7
  117:6,18,22,24
  118:9,10,11
  119:5,6,9,17
  120:11 122:3
  122:17 123:3
  125:24 126:3
  127:9,25
  128:14 130:7
  131:4,7,9,12
  133:12,14
  136:24 143:14
  143:20,24,25
  144:2 148:25
**Wacker's**
  141:20

**wait** 104:2
**waiting** 6:11
  13:12 136:16
**waiver** 110:16
**Walton** 2:10
  60:14 61:6,25
  62:15 74:16
  85:16 86:1
  89:1 101:3
  103:20 104:7
  104:10,15
  111:5,21 112:4
  112:6,6 115:25
  137:6 142:11
**Walton/Foehl/...**
  2:17
**want** 28:11 36:6
  59:21 62:24
  68:18 69:15
  110:19 118:18
  146:12 147:4
  149:12,25
**wanted** 20:23
  72:3,4 146:1
  148:13 149:4
**wasn't** 12:17
  13:11 14:4
  19:1 21:11
  24:14 25:14
  33:5 37:10
  38:14,17,22,25
  39:14,15 41:10
  44:20 62:9
  87:2 120:19
  121:21 123:22
  126:1 130:23
  136:9 143:8
**watch** 35:20
  59:4,5 96:10
**way** 29:16 40:23
  112:14 132:21
**wayside** 28:23
  28:25
**we'll** 59:25
  87:15 89:13
  94:9 148:24
**we're** 40:25 41:9
  45:14,15 97:5

97:23 122:13
  124:14 138:21
  147:20 148:23
  149:17
**we've** 3:24 49:15
  75:17 79:8
  101:11 112:5
  127:3
**website** 58:18
**week** 149:5
**weenie** 80:23
  81:2,5,12
  83:18
**Weewee** 82:6,9
  82:13,14
**welcome** 100:22
**welcomed** 7:11
  7:12
**went** 11:11,11
  15:8 36:18
  47:5 53:5,14
  54:13 59:3
  87:11 96:18
  102:2 118:15
  132:2,17
  133:21 134:5
  136:25 149:7
**weren't** 9:7
  12:15 13:12
  29:6 38:22
  41:5
**Whaley** 7:24 9:3
  9:14,19 10:2
  11:1,17 13:8
  13:11,13
**Whaley's** 8:18
**William** 151:8
**wish** 57:15
  150:3
**withdraw** 43:19
**witness** 2:4 5:19
  5:22,25 6:9,12
  6:15 8:8,10,13
  11:7,10 23:15
  23:19,23 24:13
  24:17 27:19
  28:8 33:20
  39:6 43:20

45:14 47:14
  48:20 53:21
  55:11 56:11
  60:8,20 64:1
  68:25 69:2,4
  71:17 76:10,12
  78:24 79:20
  81:19,23 83:7
  83:8,10,22
  84:7 86:3
  87:23 95:18
  103:15,16,17
  103:22 104:7
  104:10 124:12
  130:17,19,21
  148:10,15
**witnesses** 3:25
  114:19 118:17
  131:25 148:21
  149:18
**women** 119:23
  121:15 122:5
  124:1 125:18
  128:1
**word** 5:5,5,14
  29:11 83:24
**wording** 11:13
**words** 82:4 83:9
**work** 7:12 24:24
  55:4 59:20,21
  59:22,23 65:15
  66:20 70:15,17
  70:19,21,25
  71:1,2,11
  74:10,12 77:14
  91:24 94:21
  105:18 107:17
  110:16 111:18
  130:25 135:9
  141:22 145:25
  146:14
**worked** 17:7,8
  17:11 86:2
  87:3 111:18
  146:10
**working** 72:16
  92:11 97:6
**workplace**

32:13 95:8
  100:1 105:6,10
**works** 14:16,17
  24:25
**world** 88:19
**wouldn't** 49:9
  108:23 111:16
  123:24 125:25
  129:15,18
  130:11 131:2,9
**wrestling** 67:6
**write** 82:7
**write-up** 118:1,3
  118:5,7 119:19
  119:22 120:4
  120:13 121:9
  133:21 134:9
  134:13,13
**write-ups** 134:6
**writeup** 144:9
**writeups** 146:7
**writing** 58:12
  83:2 86:8,10
  86:12 115:9
  132:4
**wrong** 78:22
  120:20 130:8
**wrote** 29:2 83:4
  86:14 129:17
  143:7
**Wu** 4:2 13:10
  15:22 19:3,22
  19:23 33:3,6,9
  43:6 44:23
  46:4,5,6,11,12
  46:24 47:2,4,5
  48:9 49:19
  50:1,4 51:15
  52:22 53:8
  54:22 56:1
  57:1,12,14
  58:16 59:11
  62:7,8 66:25
  74:2,14,16
  80:12 81:2,5,7
  81:12 82:6,9
  82:10,14 84:23
  84:24 85:15,25

88:24 97:6
102:12,16
116:4,11 117:6
117:13,18,20
117:22 118:9
118:12,16
119:22 120:9
120:22 121:14
122:12 123:1
125:18,25
126:1,2 127:12
127:17,18,22
127:25 128:6
128:11,25
129:1,3,16,23
130:2,5,13,23
131:5,8 132:3
132:14,21
133:7,12,17,19
133:20 136:25
143:13,18
146:25,25
**Wu's** 19:20
117:15 128:20

_____

**X**

_____

**Y**

**yeah** 5:17 10:4
16:17 19:5
21:25 22:14
23:21 25:18
39:13 50:17
51:6 63:12
67:8 72:18
82:21 86:8
95:23 98:11
99:1 101:10,10
111:16 135:17
136:7 145:15
147:17 149:9
149:15
**year** 3:13 22:9
24:23,24,25
25:1,5 28:19
37:10,11 38:3
38:4,6,25
39:18,21,21

40:17,22 42:3
42:4,8 44:14
46:10,13,23
47:8,10,17,17
47:18,21 49:2
49:3,9,10,12
53:5,9,11,12
53:13 59:5
89:16 93:10
95:15,16 96:24
98:10,12 99:2
133:23 135:8
**Year's** 57:3,12
57:22
**year-and-five-...**
135:5
**years** 33:8 35:21
44:13 65:24
66:2 71:20
96:11 121:5,8
123:6
**yelled** 29:12
117:14 132:14
133:8
**Yep** 92:9 93:20
139:19 147:17
**yesterday** 19:6
**young** 85:23

_____

**Z**

_____

**0**

_____

**1**

**1** 25:3 30:14
93:18,22 98:24
109:13
**1:06** 3:2
**1:11:55** 6:25
**1:16-cv-248** 1:3
**10** 46:15 60:1
89:12,15 90:22
94:8,9,11
121:4,8
**10/1/2011** 81:21
**101** 2:8
**104** 2:10

**11** 53:4 92:6,7
94:9,19
**11/09/2011**
116:2
**11:11:20** 6:25
**12** 93:11
**12/31/12** 2:22
**13** 95:2,15
**139** 2:17
**14** 98:9
**1400** 1:16
**14th** 86:23
**1525** 1:13
**16** 134:15
151:13
**1601** 1:16
**168** 5:20 6:8
**17** 1:5 101:24
**1880** 1:20
**19102** 1:14,17
**19103** 1:21
**19106** 1:5
**1999** 104:22
**1st** 61:14

_____

**2**

**2** 1:9 31:11,11
31:19 54:1
90:14,19,23,23
90:25 98:19,23
99:6
**2.0** 30:22 32:10
34:18 40:6
90:10,12 98:16
102:7 103:4,9
**2.09** 34:19
**2.28** 30:3
**2.7** 39:9 40:4
42:7,7 96:24
**2.8** 48:5
**2.83** 25:25 26:17
89:25 90:4,14
**2.88** 44:20 98:15
**2.9** 34:17
**2.91** 48:20,23
49:13
**2:10** 60:4
**2:22** 60:5

**20** 85:5 123:22
147:23
**2000** 53:3
**2004** 22:20,21
23:2,10 24:8
25:6,13 45:8,8
89:16 90:22
**2004/2005** 2:19
**2005** 22:22 23:3
23:11 24:8,17
25:6,13 27:8
89:17 90:22
**2005/2006** 2:20
**2006** 22:13 27:8
33:2,16 34:1
36:12 38:9
45:3,4 96:15
**2006/2007** 2:21
**2007** 33:16,25
34:1,16 35:9
38:5,6,9 95:18
**2007/2008** 39:17
**2008** 35:10 38:5
38:6 44:6
95:18 98:11,11
105:1
**2009** 22:12 33:6
44:6 45:3,4,8
46:13,15,24
47:1,5,20 49:6
98:11
**2009/2010** 49:3
**2010** 46:14,14
46:24 47:2
48:17 49:6,7
141:7
**2011** 46:14
48:17 51:15,20
52:24 53:2
65:2,24 66:24
71:20 81:16
134:3 135:4,19
**2012** 54:6 55:8
57:3 58:10
69:25 134:5
139:6
**2013** 14:8
108:15 111:3,4

**111:10** 133:24
134:8,18 135:4
135:19 141:17
144:17
**2014** 22:12
60:14 61:4,14
101:4 106:17
108:15 111:4
111:11 125:3
125:11 135:11
**2015** 77:4
**2016** 86:23
**2017** 3:12
**2018** 1:5 151:13
**23** 60:21
**24** 2:19
**24th** 77:4
**25** 85:5
**25th** 3:12 54:5
134:18
**26** 17:18,22
**28** 2:20
**2nd** 61:4

_____

**3**

**3** 2:8 32:1,17
42:13,16 90:15
90:19,20 92:19
92:21 93:17
97:21 98:19,20
100:7 115:25
**3.0** 26:13 40:9
40:12,21 41:18
43:4,14 44:21
44:22,23 45:9
46:4,8 48:2
90:4,7 98:16
99:2,3,8,21
100:15 102:7,9
102:14 103:3
**3.5** 26:12 94:6
94:25 99:20
100:5
**3/26/2013** 144:9
**3:15** 81:21
**30th** 25:1,3
**31st** 57:1
**34** 2:21 79:11

**341** 151:14
**38** 64:12 129:9
  129:11,12
**39** 129:8,8
**3rd** 61:4 139:6

---
**4**
---

**4** 5:21 6:8 22:21
  32:8 39:6
  98:21 99:10,12
  147:23
**4.0** 26:10 32:2
  39:11,13 91:9
  91:9,10,13,14
  92:4 93:7
  94:18 98:7
  99:21
**4/3/14** 2:23
**4:18** 148:11
**4:20** 150:19
**4:35** 77:4
**40** 123:23
**406** 79:20,21
**416** 83:11
**418** 84:8
**45** 123:11,15,19

---
**5**
---

**5** 22:21,21 91:16
  110:3,13
**50** 19:3 20:5
  123:23 125:13
**50s** 125:4,10,16
  125:19
**55** 119:23 123:5
  124:14,17,19
  128:2
**57** 2:22 123:5
**58** 145:10
**5th** 3:12

---
**6**
---

**6** 94:7 97:22
  99:23
**6/2006** 92:10
**60** 85:5 123:23
**601** 1:4
**61** 2:23

**6th** 1:21

---
**7**
---

**7** 91:19,23
  105:20,22
  110:2
**7/18/18** 150:18
**7/2004** 24:14
**7/2005** 92:10
**77** 2:24
**79** 2:25

---
**8**
---

**8/2/12** 2:17
**803** 150:3
**855)204-8184**
  1:22
**88,103** 2:8
**8th** 141:17
  144:17

---
**9**
---

**9:30** 148:1,6
  149:22 150:15