1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

RUTH V. BRIGGS,                    .
                                   . Case No. 1:16-cv-248
            Plaintiff,             .
                                   .
        vs.                        . 601 Market Street
                                   . Philadelphia, Pennsylvania 19106
                                   . July 18, 2018
                                   .
TEMPLE UNIVERSITY,                 .
                                   .
            Defendants.   .
. . . . . . . . . . . . . ..

TRANSCRIPT OF TRIAL
DAY 3 - A.M. SESSION
BEFORE THE HONORABLE ROBERT F. KELLY
UNITED STATES DISTRICT JUDGE
AND A JURY

APPEARANCES:

For the Plaintiff:          Laura Carlin Mattiacci, Esq.
                            Stephen G. Console, Esq.
                            Rahul Munshi, Esq.
                            CONSOLE MATTIACCI LAW, LLC
                            1525 Locust Street
                            Philadelphia, Pennsylvania 19102

For the Defendant:          Richard R. Harris, Esq.
                            Rachel Fendell Satinsky, Esq.
                            LITTLER MENDELSON, PC
                            1601 Cherry Street, Suite 1400
                            Philadelphia, Pennsylvania 19102

Audio Operator:             Electronically Recorded
                            by Court Personnel

Transcription Company:      JDR Acquisition, LLC./
                            Advanced Transcription
                            1880 John F. Kennedy Boulevard
                            6th Floor
                            Philadelphia, Pennsylvania 19103
                            (855)204-8184

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

1                         INDEX

2                                                    Page

3

4    ARGUMENT RE:  NEUROPSYCHOLOGIST RECORDS                3

5

6

7    WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

8

9    FOR THE PLAINTIFF

10

11   DEIRDRE WALTON               20     73     101

12

13

14

15

16

17   EXHIBIT                                   IDENT.  EVID.

18

19   P-31      2/6/14 Briggs/Walton Email(s)              29

20   P-36      3/14/14 Walton/DiMeo Email(s)              33

21   P-38      3/23/14 Briggs/Walton Email(s)             36

22   P-42      3/31/14 Walton/Wacker Email(s)             55

23   P-43      3/31/14 Walton/Wacker Email(s)             55

24   P-65      214 Temple Work Rules                      25

25

3

```
 1        (Proceedings commence at 9:14 a.m.)

 2        (Jury not present)

 3            THE COURT:  Okay.

 4            MR. HARRIS:  Good morning, Your Honor.

 5            THE COURT:  Good morning.

 6            MS. SATINSKY:  Good morning.

 7            MS. MATTIACCI:  Good morning.

 8            THE COURT:  You wanted to take up something?

 9            MR. HARRIS:  Yes, Your Honor.  At the conclusion of

10  yesterday, before we broke for the day, I raised the issue

11  regarding the medical examination that was conducted by the

12  neuropsychologist, in which Ms. Briggs was actually

13  evaluated.

14            Judge, for the purposes of my argument, may I have

15  Ms. Briggs sequestered, in the event that the Court decides

16  that I am able to re-present her.  I think that, out of an

17  abundance of caution and out of fairness, I should be able to

18  have -- make my argument without having her in the courtroom.

19            MS. MATTIACCI:  Your Honor, I've had to make all of

20  my arguments with Mr. Wacker sitting at defense counsel

21  table, so I don't know what they would possibly be saying --

22            THE COURT:  All right.  This is an argument to get

23  that -- the document, the record admitted.  Is that what it

24  is?

25            MR. HARRIS:  It is, Your Honor.  And specifically,
```

4

1    there are cogent points in the document that I want to

2    reference, that I don't want to alert to Ms. Briggs, in the

3    event this Court decides that she's able to be called in my

4    case-in-chief.

5              THE COURT:  Well, come to sidebar then.

6         (Sidebar)

7              THE COURT:  All right.  Let's go.

8              MR. HARRIS:  Judge, under Rule 803(4), which is the

9    medical records exception, I'm submitting that this document,

10   in addition to the statements that Ms. Briggs made to the

11   neuropsychologist, should be introduced into the evidence

12   under -- should be introduced or admitted into evidence under

13   the medical records exception.

14             Specifically -- and I'll provide this to the Court

15   -- if you look on the second page of this document, Ms.

16   Briggs describes that she was distracted, having trouble

17   keeping up with work, interruptions.  All -- and she also

18   says that she has a phobia and that she's fearful.  But what

19   she does not say in her diagnosis -- and she specifically --

20   there's a litany of reasons why she has been unable to

21   perform the essential functions of her job.  All of them

22   related to what she perceives, some sort of cognitive

23   problem; that's why she was referred by her treating

24   physician.

25             The reason why that's particular important is that

1    she's saying those same reasons were caused by Dr. Wu, in her

2    document, which was -- in this document, which was dated

3    August of 2011.  This would have been preceding what she has

4    now described as events that have been affecting her

5    workplace environment with Dr. Wu.  She does not mention Dr.

6    Wu at all in this report.  She does not say that he caused

7    her stress, does not say that he's humiliating her, does not

8    say that he's treating her unfairly.  I think that's

9    something that's particularly important, as she's getting a

10   diagnosis, and that's why that would be relevant and

11   admissible under the medical records exception.

12          MS. MATTIACCI:  The plaintiff hasn't even ever seen

13   this document.  This document was produced to them as a

14   result of a subpoena to the doctor's office.  This is from

15   her psychiatrist -- to and from a psychiatrist to an

16   evaluator, so there's no witness that can testify to this

17   document.  She's never even seen it.  So I don't know who's

18   going to authenticate this document.

19          The contents of the document are hearsay, they're

20   out-of-court statements being brought in for the truth of the

21   matter asserted.  There was never -- there was totally an

22   opportunity for defense counsel to subpoena and depose the

23   psychiatrist, the psychologist, the person that did the

24   evaluation; they never did.

25          Ms. Briggs -- he already had full opportunity to

1    question Ms. Briggs about the document and about the contents

2    of the document.  She testified that she had the evaluation

3    done, but she was concerned about dementia because of her

4    father.  And the results of her -- of the evaluation was that

5    her cognitive functions were intact.  There -- her memory was

6    intact, and she didn't have any dementia.

7            THE COURT:  That's -- you're not caring about the

8    results.

9            MR. HARRIS:  Right.

10           THE COURT:  You're just caring about what she said.

11           MR. HARRIS:  What she said, correct.

12           MS. MATTIACCI:  But she already testified to that,

13   he already asked her about it.

14           MR. HARRIS:  No, I was precluded from doing so.

15   Judge --

16           THE COURT:  Right.  Did you ask that

17   (indiscernible)

18           MR. HARRIS:  Yeah, I asked, and she said yes, she

19   was adopt -- she did adopt it; she said that, yes, she talked

20   to the medical health professional as of a result of that

21   because she thought that she had dementia.  But remember, I

22   wasn't able to ask her about -- to adopt the specific

23   statements in the document.

24           MS. MATTIACCI:  Yes, you were.  You asked her if

25   she was -- why she went there.  She said that she was --

1  because she was worried that she was forgetting things.

2  That's why she went, that's exactly what she testified to.

3          THE COURT:  See, what I didn't want you to do is

4  sit there, which is what you were about to do --

5          MR. HARRIS:  Correct.

6          THE COURT:  -- and obviously read from something,

7  and give the impression for the jury that, in effect, that

8  this thing was admitted.

9          MS. MATTIACCI:  And she didn't --

10          MR. HARRIS:  I wasn't trying to do that.  I was

11  only trying to read the statements that she said.

12          THE COURT:  Well, that's what you did.

13          MS. MATTIACCI:  Right, exactly.

14          THE COURT:  And that's what I stopped you from

15  doing.

16          MR. HARRIS:  And I understood that, and that's why

17  --

18          THE COURT:  And that's when I --

19          MR. HARRIS:  I understand.

20          THE COURT:  Then I allowed you to ask her

21  questions.  I just didn't want it to appear to be coming from

22  a document.

23          MR. HARRIS:  And I understood that.

24          THE COURT:  And didn't you do that?

25          MS. MATTIACCI:  Yes.

1      MR. HARRIS:  No, no.  What I did not was -- I

2  wanted her to actually say what she said, specifically.  And

3  I couldn't do that.  I wanted to actually show her what she

4  said, have her adopt what she said.  If she said those things

5  were true, fine.

6      UNIDENTIFIED:  (indiscernible)

7      MS. SATINSKY:  No.

8      MS. MATTIACCI:  Yes.

9      MR. HARRIS:  I did not.

10      MS. MATTIACCI:  You had an opportunity to ask her

11  those questions.  There's no reason that this document needs

12  to be admitted into evidence.

13     (Court and court personnel confer)

14      THE COURT:  Okay.

15      MR. HARRIS:  So, Judge -- so, ultimately, that's

16  what I would like for her to do, is to look at the document,

17  have her say, did you say --

18      THE COURT:  See, that's what I don't want.  I don't

19  want you using the document.  Okay?

20      MR. HARRIS:  Okay.  So --

21      THE COURT:  I mean, how many times do I have to say

22  that?

23      MR. HARRIS:  No, I guess we'll -- the reason why I

24  was asking -- I was really addressing counsel's point of

25  she's saying that she could -- she hasn't adopted those

9

1    statements.  And I'm just -- I'm saying to this Court, as I

2    understand the rule -- and I could be mistaken.  As I

3    understand the rule, what she's permitted to do is to say,

4    did you say A, B, and C to the neuropsychologist.  If she

5    says yes, or she can say no, but that's what I would like for

6    her to do.

7              MR. MUNSHI:  You did that already.

8              MS. MATTIACCI:  You already had the opportunity to

9    do that.  But what the Judge allowed you to do yesterday, if

10   you wanted to, and you could have done it then -- and I

11   believe you did.

12      (Pause in proceedings)

13              THE COURT:  Who's next?

14              MS. MATTIACCI:  We're going to continue with Ms.

15   Walton from HR, and the Sandy Foehl from EOC, and then we're

16   going to close our case.  We'll be done before lunch.

17      (Participants confer)

18      (Sidebar concluded)

19              THE COURT:  Do you want to play it back?

20              THE COURT OFFICER:  I'm sorry, Judge.

21              THE COURT:  Can you play it back, the recording?

22              THE COURT OFFICER:  Play this right now?

23              THE COURT:  Yeah.

24              THE COURT OFFICER:  I can try.  It will take a

25   minute.

10

1          THE COURT:  All right.

2          THE COURT OFFICER:  Do you want me to find the

3    whole sidebar from the beginning?

4          THE COURT:  No, not this sidebar, but the

5    testimony.

6       (Court and court personnel confer)

7          THE COURT OFFICER:  I can play back what was played

8    yesterday, in terms of Mr. Harris' testimony with Ms. Briggs.

9          THE COURT:  Yeah, and there was a question about

10   ...

11      (Court and court personnel confer)

12      (Participants confer)

13         MS. SATINSKY:  I was just going to say, if you can

14   just give us a minute, I can just pull the transcript.

15         THE COURT:  Even better.

16      (Participants confer)

17         THE COURT OFFICER:  Do you want to go off the

18   record for a minute, Judge?

19         THE COURT:  Yes.

20      (Off record.  Back on the record)

21         MS. MATTIACCI:  Ms. Briggs --

22         MS. SATINSKY:  Can you tell us what page you're at?

23         MS. MATTIACCI:  70.

24         MR. MUNSHI:  PM testimony.

25         MS. MATTIACCI:  Of the PM testimony yesterday.  Mr.

1    Harris asked, Line 14:

2          "Ms. Briggs, do you remember telling Dr. Esposito

3    that you were often distracted at work?

4          "Answer:  Yes.

5          "Question:  That you would miss assignments at

6    work?

7          "Answer:  Yes.

8          "Question:  That you'd have to stay after work late

9    because of your being easily distracted and compensating for

10   the time period that you couldn't complete your tasks during

11   the work day?

12         "Answer:  Yes.

13         "Question:  Did you struggle with organization and

14   planning?

15         "Answer:  I don't recall that, but...

16         "Question:  That you felt overwhelmed at work?

17         "Answer:  I did feel overwhelmed at work.

18         "Question:  Because of the amount of work that you

19   receive?

20         "Answer:  And because of the -- the -- the pressure

21   that they were -- I was pressured.  No mistakes, you know,

22   get it on time, so I did, I did put extra time in to make

23   sure to overcompensate for that.

24         "Question:  Okay.  And you would forget things?

25         "Answer:  I'm sorry?

12

1          "Question:  And that you would forget things?

2          "Answer:  I can't hear you.

3          "Question:  Yes.  That you would forget things at

4    work that you were required to --

5          "Answer:  I don't recall saying --

6          "Question:  remember?

7          "-- that.  No, I don't.  If I might say that I was

8    --"

9          And then you said:

10         "There's no question pending.

11         "The Witness:  All right."

12         And then he starts talking about the evaluation in

13   2011.

14         "Was this three years before you were actually from

15   your organization?

16         "Answer:  That is correct.  I think.

17         "And again, that was at the direction of your

18   treating healthcare professional?

19         "No, it was at my request."

20         So ...

21         MR. HARRIS:  Keep going.

22         MS. SATINSKY:  There's more.

23         MR. HARRIS:  There's more.

24         MS. MATTIACCI:  Oh, keep going.

25         "Because you wanted help?

13

1           "I wanted to see if I had Alzheimer's like my

2     father.

3           "But you did not have that?

4           "I did not have that.

5           "Ms. Briggs, are you currently employed?"

6           And then it goes to her current employment.  So he

7     had full opportunity to ask those questions, and he did ask

8     those questions --

9           THE COURT:  I think --

10          MS. MATTIACCI:  -- yesterday.

11          THE COURT:  It sounded like they were asked.

12          MR. HARRIS:  Well, there was one area that I did

13    not get into, Your Honor, which is the notion of her having a

14    phobia.  So, if you look on Page 2 of this document, and then

15    -- I'll come to sidebar.

16          THE COURT:  Come on up.  You want to ask her

17    something?

18          MR. HARRIS:  Yeah.  I want to -- I want you to see

19    the language, Your Honor, and I'll come to sidebar

20    (indiscernible)

21          THE COURT:  What part?

22       (Sidebar)

23          MR. HARRIS:  So, Page 2, on the paragraph -- third

24    paragraph.

25          THE COURT:  All right.

14

1          MR. HARRIS:  When he describes her emotional

2     health.

3               "She's generally happy and likes to joke; however,

4               she tends to cry easily."

5          That portion, Judge.

6       (Pause in proceedings)

7          THE COURT:  And you wanted to ask that paragraph,

8     is that --

9          MR. HARRIS:  I would like to, yes.

10         MS. MATTIACCI:  Your Honor, this isn't -- doesn't

11    have anything to do with her work.  She said she's afraid to

12    open her mail and listen to her voicemails, for fear of

13    getting bad news.  She has attributed that to her husband

14    leaving.  She's worried about paying the bills.  That has

15    nothing to do with -- it doesn't say anything about work.

16         THE COURT:  No, but it says about her and --

17         MR. HARRIS:  Right.

18         THE COURT:  But how would you ask -- how will you

19    ask that question?

20         MR. HARRIS:  That's a wonderful question.  But I

21    think the way that I would frame it is that her demeanor --

22    my guess is I would ask her questions about her demeanor

23    because she cried a lot yesterday.  And so, if her crying

24    dealt with some other reason, other than Dr. Wu, I think

25    that's how I'm going to present it.  Now, artfully, how I'm

15

1   going to ask that?  I haven't figured that part out, but I

2   think that's what I'm going to ask.

3            THE COURT:  And this, basically, is the doctor

4   reciting what she said --

5            MR. HARRIS:  Right.

6            THE COURT:  -- isn't it?

7            MR. HARRIS:  Uh-huh.

8            MS. MATTIACCI:  Well, he puts "phobias" in quotes.

9   What does he even mean?  Is he diagnosing her with a phobia,

10  or is he saying "phobia" in quotes because it's not really a

11  phobia.  It's just a little fear that she has because of

12  having to meet her bill paying, and she's nervous about

13  opening her mail.  I mean --

14           THE COURT:  And I worry about the context of what's

15  said, which is --

16           MS. MATTIACCI:  That's why I'm saying, we can't --

17           THE COURT:  -- (indiscernible) it was said.

18           MR. HARRIS:  Correct.  That's what it said.

19           THE COURT:  (indiscernible) from counsel --

20           MR. HARRIS:  Correct.

21           THE COURT:  -- what's -- he doesn't really care

22  whether it's true or not.

23           MR. HARRIS:  Correct.

24           THE COURT:  It's just --

25           MR. HARRIS:  What she told the doctor.

MS. MATTIACCI: Well, I think, if he wants to recall her in his case-in-chief to ask her these questions, but she's already been on the stand, cross-examined --

THE COURT: Okay. You want to ask her, did you tell the doctor this, this, and this.

MR. HARRIS: Yes.

THE COURT: Okay. But if you -- try to act as if you're reading from a script or something. Okay?

MR. HARRIS: Okay. I can do that. So I'll write it out, and then I won't use the document at all, just --

MS. MATTIACCI: And what you're going to ask her is, did she tell the doctor she was afraid to open her mail at home? Is that --

MR. HARRIS: I may.

THE COURT: Whatever is there.

MR. HARRIS: Right.

THE COURT: Whatever he recites that she said --

MR. HARRIS: Okay.

THE COURT: -- you can ask her here --

MR. HARRIS: Yes.

THE COURT: -- as a question and -- but again, you're going to be stuck with the answer.

MR. HARRIS: I'm going to be stuck with the answer, correct.

THE COURT: All right.

1        MR. HARRIS:  And I've asked that -- yes, so I'll --

2   yes, I'll limit it just to that.

3        MS. MATTIACCI:  Well, then I would -- I mean, if

4   he's going to refer to a psychiatric report in which he

5   relays this stuff, then we should be able to give the

6   conclusion that, in fact, she was not found to have any

7   cognitive deficiency, no mental deficiency, and read his

8   summary that he found her intact and completely emotionally

9   functioning and well.

10        MR. HARRIS:  Okay.

11        THE COURT:  (indiscernible) do that if you want to

12   do that.

13        MS. MATTIACCI:  Okay.

14        THE COURT:  All right.

15        MS. MATTIACCI:  Well, I mean, it's just --

16        THE COURT:  But I think you're reaching too far

17   with it, but you know --

18        MS. MATTIACCI:  I'm worried about the impression,

19   that's why I don't think that should be admissible.  Well,

20   first of all, the document itself, obviously, should not be

21   admissible.  But even these questions are impermissible,

22   based upon this, because there's no --

23        MR. HARRIS:  (indiscernible)

24        MS. MATTIACCI:  -- if he wants to -- if he wants to

25   ask it as, did you have these phobias, did you worry about

18

1    opening the mail, fine, but not in the context of telling a

2    psychiatrist because then we -- that opens a whole other can

3    of worms.

4              MR. HARRIS:  That's the whole point of the

5    exception, Judge.

6              MS. MATTIACCI:  (indiscernible)

7              MR. HARRIS:  Statements made for the purposes of

8    treatment and medical diagnosis.  That's the whole point of

9    the exception because it has a ring of trustworthiness and

10   reliability.

11             MS. MATTIACCI:  It's not a medical -- it's not --

12   it's --

13             THE COURT:  Yeah, but you're asking this witness

14   these questions.

15             MR. HARRIS:  Yes.

16             THE COURT:  And I'm not admitting them unless she

17   admits -- I mean, it doesn't become substantive evidence,

18   unless the witness admits that --

19             MR. HARRIS:  That she said it.

20             THE COURT:  -- she said this.  And so --

21             MR. HARRIS:  I understand.

22             THE COURT:  -- that's why I'm --

23             MS. MATTIACCI:  But I think the idea that she told

24   a psychiatrist --

25             THE COURT:  (indiscernible)

19

1          MS. MATTIACCI:  -- for the purpose of --

2          THE COURT:  -- ever made the statement, without

3  saying --

4          MS. MATTIACCI:  Yes.

5          THE COURT:  -- who it was made to.

6          MS. MATTIACCI:  Right, or do you have that.

7          MR. HARRIS:  Well, she already testified yesterday

8  that she spoke to Dr. Esposito, so that she's clear in who

9  we're talking about, the neuropsychologist.

10          THE COURT:  All right.

11          MS. MATTIACCI:  But that was for a brief

12  (indiscernible)

13          THE COURT:  I'll allow you to recall her for that

14  limited purpose.

15          MR. HARRIS:  Very well.  Thank you.

16          THE COURT:  And you do what you think you have to.

17          MS. MATTIACCI:  Okay.  Thank you.

18      (Sidebar concluded)

19          THE COURT:  And I'll go off the bench.  I'm not

20  sure whether the jury is here yet or not.

21          THE COURT OFFICER:  Yeah, I'll check, Judge.  All

22  rise.

23      (Recess taken at 9:32 a.m.)

24      (Proceedings resume at 9:44 a.m.)

25      (Jury present)

20

1            THE COURT:  You may be seated.  And you may

2    proceed.

3            MR. HARRIS:  Thank you, Your Honor.

4    DEIRDRE WALTON, WITNESS FOR THE PLAINTIFF, PREVIOUSLY SWORN,

5    RESUMES STAND.

6            CONTINUED DIRECT EXAMINATION

7    BY MS. MATTIACCI:

8    Q    Good morning, Ms. Walton.

9    A    Good morning.

10   Q    Between the time you left the stand yesterday and today,

11   right now, have you spoken to anyone about the case?

12   A    No.

13   Q    Okay.  Are you aware of who made the decision to

14   terminate Ms. Briggs?

15   A    Yes.

16   Q    Okay.  Who made the decision to terminate Ms. Briggs?

17   A    Greg Wacker and Dr. Wu.

18   Q    Okay.  Now, Greg Wacker, that's the same person that you

19   gave the assignment to investigate any complaints that Ms.

20   Briggs had in her workplace, correct?

21   A    I talked with Greg Wacker and I asked him to look into

22   Ms. Briggs' complaints.  Yes.

23   Q    Okay.  So the same person that looked into the

24   complaints was the person who made the decision to terminate

25   her?

21

1    A    He was part of the decision.  He talked with me.  I

2    counseled with him.  But he ultimately, along with Dr. Wu,

3    made that decision.

4    Q    Okay.  Did you approve the decision?

5    A    Yes, I did.

6    Q    So you'd agree with me that Mr. Wacker was not a neutral

7    investigator because he was also the person that decided to

8    terminate her, correct?

9    A    No, I wouldn't agree.  I would say that he was a neutral

10   investigator.  Yes.

11   Q    You're aware that Ms. Briggs received a disciplinary

12   action in January of 2014, correct?

13   A    Yes.

14   Q    And that was for being late in the morning, correct?

15   A    That was for being late and to reporting it properly,

16   not calling out properly.

17   Q    Okay.  If you could turn to P-30 in your document?

18        Okay.  Do you recognize this as the January 20th, 2014

19   writeup for being late?

20   A    Yes, I do.

21   Q    And she received a written warning?

22   A    Yes.

23   Q    A violation of Work Rules 8, 10 -- I'm sorry, B(10) down

24   there?

25   A    Yes.

22

```
1    Q    And it says:
2              "Inefficiency, failing to meet expected standards
3              of performance or productivity or efficiency."
4         Correct?
5    A    Yes, it does.
6    Q    Now, you never knew Ms. Briggs for being late before
7    this January 20th writeup, correct?
8    A    I never knew her to be disciplined, but I was aware that
9    she was late.  She had been late to work many times.  Excuse
10   me.
11   Q    Okay.
12             MS. MATTIACCI:  May I approach the witness, Your
13   Honor, with her deposition?
14             THE COURT:  Yes.
15   BY MS. MATTIACCI:
16   Q    Oh, good.  You already have one.
17        If you can turn to -- I'm sorry -- P-70, please -- Page
18   70?  You have it there?
19   A    Page 70.  Yes.
20   Q    Okay.  Okay.
21        Do you see Page 70, Line 11 at the top?  Sorry.
22        Did you give any sort of recommendation with regard to
23   this discipline, P-18, which is what we're looking at right
24   now?  That was the Deposition Exhibit P-18, but the January
25   20th writeup that we were just looking at, correct?
```

23

1    A    Yes.

2    Q    And it says:

3             "I'm sure any contacts made.

4             "And the discipline that is given here is a written

5    warning.  Do you see that?

6             "Yes."

7        And the question asked of you was:

8             "And prior to January 20th, 2014, did Ruth Briggs

9    have any ongoing issues with being tardy or not showing up to

10   work?"

11       And your answer then was:

12            "I don't know."

13       Do you see that?

14   A    Yes, I do.

15   Q    Okay.  So as of January 20th, 2014, you didn't know of

16   any issues of Ruth Briggs having issues of being tardy,

17   correct?  Or not showing up to work?

18   A    In my deposition, I'm not exactly sure why I answered

19   that way.  But I am aware that there were -- well, there were

20   complaints in regards to her attending the meetings between

21   her and Dr. Wu and Drew DiMeo where she didn't -- where she

22   called out from those meetings or she didn't report timely to

23   those meetings.

24   Q    Okay.  But your deposition was just taken on June 30th,

25   2017, correct?  It says on the front there.

24

1    A    Yes.

2    Q    And that deposition was under oath, correct?

3    A    Yes, it was.

4    Q    Okay.  Now, going back to this written warning --

5              MS. MATTIACCI:  And if you could put it up on the

6    screen there, that would be great.

7    BY MS. MATTIACCI:

8    Q    Okay.  B(10).  I'd like you to take a look at the work

9    rules.  And that's going to be P-65.

10        Are you familiar with this -- I'll give you a second to

11    get there.  P-65.

12             MS. SATINSKY:  Counsel, this hasn't yet been

13    admitted.

14             MS. MATTIACCI:  Okay.  I'll lay the foundation.

15    BY MS. MATTIACCI:

16    Q    I'm sorry about that.

17    A    It's okay.

18    Q    You okay?

19    A    I have the work rules.

20    Q    Okay.  So you recognize these as Temple University's

21    work rules --

22    A    Yes, I do.

23    Q    -- that were in effect in 2014?

24    A    Yes.

25    Q    Okay.

25

1        MS. MATTIACCI:  I move for the admission of P-65.

2        THE COURT:  Any objection?

3        MR. HARRIS:  No objection.

4        MS. SATINSKY:  No.

5        THE COURT:  It's admitted.

6    (P-65 received in evidence)

7        MS. MATTIACCI:  May I have permission to publish,

8  Your Honor?

9        THE COURT:  All right.

10        MS. MATTIACCI:  Okay.

11  BY MS. MATTIACCI:

12  Q    So we're taking a look at the work rules.  And these are

13  the rules that govern how discipline should be issued at

14  Temple University, correct?

15  A    Yes.

16  Q    Okay.  If you go to the second page, there is a

17  disclaimer here.  That's the legal language.  The third is

18  the table of contents.  Fourth is table of contents.  And

19  then it says, "Work Rules."

20        And at the bottom here, where it says, "Disciplinary

21  Procedure," can you see that?

22  A    Yes.

23  Q    It says:

24        "Any employee who violates a rule of conduct is

25        subject to the appropriate corrective disciplinary

26

1         action which is based on the category of Work Rule

2         Violation A, B, C or D, and the number of frequency

3         or previous violations within the preceding twelve-

4         month period.  Repeated violations of work rules

5         within a specific category over a twelve-month

6         period will lead to the next step in a progressive

7         disciplinary process."

8    Do you see that?

9  A    I do.

10  Q    Okay.  So when you're looking at violations, it's within

11  a twelve-month period, correct?

12  A    Yes.

13  Q    Okay.  And then here is how Temple lays out how many

14  violations in each category you need before termination

15  occurs.  And am I correct in reading this that if you get a

16  Category A violation, you need six violations of Category A

17  to make termination?

18  A    Yes.

19  Q    And for Category B, you need three violations?

20  A    Yes.

21  Q    Category C, two violations?

22  A    Yes.

23  Q    And Category D, only one?

24  A    Yes.

25  Q    And, now, if we look at the specific violations and how

27

1    they're defined, Category A, of which you need six to get to

2    termination, A(1) is excessive sick days, taking six or more

3    sick days with or without pay from work in any fiscal year.

4         You see that?

5    A    Yes, I do.

6    Q    And it says, Bullet Point 1:

7              "No disciplinary action usually will be taken for

8              the use of fewer than six days -- six sick days for

9              any illness in any fiscal year."

10        You see that?

11   A    Yes.

12   Q    And then A(2) is excessive lateness:

13             "Failing to report to work as scheduled six or more

14             times in any fiscal year.  Each subsequent lateness

15             is a separate violation."

16        So in order to get an A writeup, 1-A writeup, you have

17   to have six or more latenesses in a year, correct?

18   A    Yes.

19   Q    But in the violation that we just looked at that Ms.

20   Briggs was given on January 20th, she was given a Category B

21   violation, correct?

22   A    Yes, she was.

23   Q    And for B, you only need three violations in order to

24   get terminated, correct?

25   A    That's true.

1   Q     So why wasn't she given an A violation?

2   A     It didn't fall into excessive latenesses because of the

3   incident of that day which Ms. Briggs did not call in for --

4   for most of the day.  So she didn't report to work I believe

5   until late in the afternoon.  She made no attempt to call in

6   or notify anyone that she was not going to be in.  So it was

7   a B category because it's looked at as being inefficient.

8   She was aware of the rules and -- and she was aware of the

9   call-out procedures.  And she didn't -- she didn't follow

10  them.

11  Q     Okay.  Well, in fact, I mean, she -- this is her first

12  time that she's being late.  Looking at your previous

13  deposition, you're not aware of any other time she's being

14  late.  It's only the 20th day of the year.  So she was not

15  even late six or more times to qualify for an A violation as

16  of this time, correct?

17  A     In regards to the excessive latenesses, this happens to

18  be for people who report to work late if they --

19  unfortunately, with Ms. Briggs, she didn't report at all.

20  She didn't call.  She didn't notify anyone.  She didn't tell

21  anyone.  She made no attempt to notify her supervisor that

22  she was not going to be in.

23  Q     Okay.  So, instead -- instead of doing a Category A,

24  Temple chose a Category B, B(10), which is inefficiency,

25  failing to meet expected standards of performance,

29

1   productivity or efficiency?

2   A    Yes.

3   Q    And you have the discretion to choose whichever number

4   you want to put down in that written document, correct?

5   A    I have the discretion based on the facts of -- of the

6   situation.  Yes.

7   Q    Okay.  Let's look at the facts of the situation.

8        Please turn to P-31.

9        Okay.  P-31, you see that?

10  A    Yes.

11  Q    Okay.  That's an email from Ruth Briggs to you on

12  February 6, 2014, correct?

13  A    Yes.

14           MS. MATTIACCI:  I move for the admission of P-31,

15  Your Honor.

16           MS. SATINSKY:  No objection.

17           THE COURT:  It's admitted.

18       (P-31 received in evidence)

19           MS. MATTIACCI:  May I publish, Your Honor?

20           THE COURT:  You may.

21  BY MS. MATTIACCI:

22  Q    Okay.  So this is an email to you from Ms. Briggs in

23  regards to the writeup that we just saw.  So she contacted

24  you and she was upset about the severity of the discipline

25  that she was given, correct?

30

1   A    Yes.

2   Q    So then you did an investigation into this complaint,

3   correct?

4   A    What I did is I talked with Greg Wacker concerning the

5   situation.  Yes.

6   Q    And you were informed -- did you speak to Ms. Briggs as

7   well?

8   A    Yes, I did.

9   Q    And Ms. Briggs told you that she did call in on that

10  day, correct?

11  A    She called in, but she didn't follow the proper call-in

12  procedures.  For -- for instance, she called into a student.

13  Students aren't authorized to take call-outs from employees.

14  Q    Where is the policy that says that, Ms. Walton?

15  A    There isn't a specific policy.  But students are --

16  aren't managers and she's supposed to call in -- out to her

17  manager.

18  Q    And where is the written policy that says that, Ms.

19  Walton?

20  A    I'm -- I can't specifically state.  I know in our -- our

21  manual we state that you should call out properly.  And I

22  believe CST has a practice and they inform their employees

23  that they should call out to their supervisor.  We don't have

24  any employees that call out to students.  Students are not --

25  they do not work all day.  They're not in the office all day.

31

```
 1   And they're not authorized to take call-outs from employees.

 2   They're not managers.

 3   Q    Ms. Walton, there is no written policy that sets forth

 4   the procedure that somebody is supposed to follow in case

 5   there is a call-out, correct?

 6   A    Each individual department sets their call-out

 7   procedures.

 8   Q    That was not my question, Ms. Walton.

 9        There is no written policy of how someone is supposed to

10   call in if they're going to be late, correct?

11   A    I believe our guidebook provides some type of process of

12   calling out.  It's very general --

13   Q    Okay.

14   A    -- because each department sets their own standards for

15   how employees should call out.  Each --

16   Q    In writing?

17   A    Some, yes.  Some put it in writing.  They email their

18   employees.  They have meetings with their employees.  They --

19   the employees know if they should call -- if their call-out -

20   - if they can call out by email, if they can call out by

21   phone --

22   Q    Ms. --

23   A    -- what time they need to call out by.

24   Q    I want to focus on Ms. Briggs' department.

25   A    Okay.
```

32

1   Q    Where is the written policy that says what was proper

2   and not proper for her to do if she had to call out?

3   A    I don't know of their written policy.  I just know of

4   their practice.

5   Q    Okay.  And -- but this practice is not -- you don't have

6   any document -- you don't -- I'm just -- your counsel is

7   going to get a chance to question you in a little bit.  So if

8   there is a written policy, then I'm sure that he will bring

9   that forth.  But we have not seen that.

10       So --

11            MS. SATINSKY:  Objection, Your Honor.

12   Argumentative.

13            THE COURT:  Overruled.

14   BY MS. MATTIACCI:

15   Q    Now, isn't it true that Ms. Briggs said that when she

16   called in, she asked for Dr. Wu, and Dr. Wu was in a meeting?

17   A    Yes.

18   Q    And so she told the student worker who answered the

19   phone, let Dr. Wu know that I'm on my way, correct?

20   A    That's my understanding.

21       As I said to Ruth, she could have contacted anyone else

22   in authority besides Dr. Wu.  She didn't know when she was --

23   when that student was going to see Dr. Wu, if that student

24   was going to be there for most of the day.  Students have

25   classes.  She could have called out to Greg Wacker or to Drew

33

1    DiMeo.

2    Q    You don't dispute that she contacted the student,

3    correct?

4    A    No.  I don't dispute that.  That's the reason why she

5    was given inefficiency because she should not have talked to

6    the student.

7    Q    A student worker is supposed to be picking up the phone

8    at the office, correct?

9    A    Yes.

10   Q    Okay.  And, now, did you respond to Ms. Briggs'

11   complaints that she relays to you in P-31 that we just looked

12   at?

13   A    I believe I emailed her back.  From my memory, I believe

14   I emailed her back.

15   Q    Let's take a look at P-36.

16        Do you recognize this as an email between you and Drew

17   DiMeo dated March 14, 2014?

18   A    Yes.

19        MS. MATTIACCI:  Your Honor, I move for the

20   admission of P-36.

21        MS. SATINSKY:  No objection.

22        THE COURT:  It's admitted.

23        (P-36 received in evidence)

24        MS. MATTIACCI:  Permission to publish?

25        THE COURT:  If it's admitted, you may publish it.

34

1          MS. MATTIACCI:  Okay.  Do I need to ask, Your

2     Honor?  I don't want to keep asking.

3          THE COURT:  Please.  That's right.

4          MS. MATTIACCI:  Okay.

5     BY MS. MATTIACCI:

6     Q    Okay.  Let's take a look at this email.  We'll go from

7     the bottom.

8          So this is now three weeks later.  You, on March 13th,

9     2014, and just to orient ourselves, this is about two and a

10    half, two weeks before Ms. Briggs is terminated, correct?

11    A    I believe so.

12    Q    And you say to Drew DiMeo -- and Drew DiMeo was working

13    under Greg Wacker in the Dean's office, correct?

14    A    Yes.

15    Q    And you say to him:

16              "This is short notice, but I will be on the main

17              campus tomorrow morning.  Do you have some time

18              after 10 o'clock to meet with me and Ruth Briggs" -

19              -

20         Or it says:

21              "-- and Ruth Briggs for a short" -- "very short

22              meeting to clarify for Ruth the reason she was

23              given for a disciplinary report?"

24         You see that?

25    A    Yes.

35

```
1   Q    And that was in regards to the one that she got for

2   coming in late, correct?

3   A    I believe so.

4   Q    Were you intending to meet with Drew and Ms. Briggs

5   together?  Or is that a typo?

6   A    I believe it was to meet all three of us together.

7   Q    Did you, in fact, meet with all three of you together?

8   A    I don't recall.

9   Q    And then Mr. DiMeo responds back.  There's a back-and-

10  forth about the time period, and then you say, "I will stop

11  back at 10:30."  And this is on 3/14.

12  A    Yes.

13  Q    Okay.  Does this refresh your recollection that you just

14  met with Mr. DiMeo alone in regards to this situation?

15  A    I'm not sure.  I -- if I said -- if I told Andrew -- I

16  mean Drew that I was going to meet with him, then I did meet

17  with him.  I don't recall if I met with Drew alone or with

18  Ms. Briggs.

19  Q    Did you receive confirmation in that meeting that Ms.

20  Briggs did in fact speak with a student worker when she

21  called in when she was late?

22  A    In regards to that meeting, I'm not sure.  But I knew

23  talking to Ms. Briggs, as well as to Greg Wacker and Drew

24  that she had called in to a student.

25  Q    Okay.  Did you do anything to adjust the level of
```

36

1    discipline given to Ms. Briggs after meeting with Mr. DiMeo?

2    A    No, I did not.

3    Q    Let's take a look at P-38.

4        Okay.  Do you recognize this as a series of emails

5    starting on March 23rd between yourself and Ms. Briggs?

6    There's one at March 23rd, and then the next one is March

7    24th, and then the next one is March 25th.

8    A    Okay.

9            MS. MATTIACCI:  Move for the admission of P-38.

10           MS. SATINSKY:  No objection, Your Honor.

11           THE COURT:  It's admitted.

12       (P-38 received in evidence)

13   BY MS. MATTIACCI:

14   Q    Okay.  Let's take a look at the first email in the

15   series.  This is from Ms. Briggs to you on Sunday, March

16   23rd, 2014.  So this is about a week before Ms. Briggs is

17   terminated.  "Urgent.  Please contact me on Monday."

18       And she says:

19           "Dear Deirdre, my work situation with Drew DiMeo

20           and Dr. Wu is escalating.  And I need your help.

21           The issue is not just something that affects my

22           work week, but is causing anxiety and depression

23           throughout my weekends.  To mask this from my grown

24           children and grandchildren I report that I have the

25           flu so they stay away.  I am actually afraid to go

37

1          to work, especially Mondays, Wednesdays and Fridays

2          when I meet with Drew and Dr. Wu.  Before I go to

3          sleep and as soon as I wake, the anxiety I

4          experience is palpable and impacting the quality of

5          my personal life.  As the only staff member

6          required to meet with Dr. Wu and Drew, I would

7          think that my superiors would behave as

8          professionals by respecting my privacy.  In fact,

9          the meetings occur within earshot of my coworkers

10         and visitors, students, external constituents,

11         faculty.  The fact that I am singled out and

12         verbally assaulted in an open public area has been

13         the gristmill for gossip and rumors" --

14    I'm sorry.  Let me just get to the next section.

15         "-- which have been reported back to me from

16         employees in other departments.  Dr. Wu said that

17         Drew is there for protection as a witness, but I

18         have no protection and feel like an abuse victim.

19         Greg Wacker has never been present for one meeting,

20         but still recommends termination for me for which

21         was reported to me by Drew when he gave me the

22         discipline form for lateness.  The first time I

23         reached out to HR, I learned that I was disciplined

24         for using tardiness for intentionally avoiding

25         these meetings.  The next time we spoke, you told

38

1    me that it" -- "that it was because I failed to

2    report that I would be late.  The truth is that I

3    overslept.  I called the office and reported this

4    to Taylor Lentz who told Dr. Wu, but chose to

5    follow through with the discipline when he knew

6    that I had called.  Apparently, they are immune to

7    discipline for what I find intolerable, filing a

8    false discipline report against me.  Apparently,

9    the word of these three bullies carries more weight

10   than the truth.  I talked to Taylor Lentz, the

11   student worker who you were going to call to

12   confirm that I had called the morning I overslept

13   last week to ask if you had her after spring break.

14   When she inquired why you needed to talk to her, I

15   told her that you wanted to confirm that I called

16   to report the morning I overslept.  She said that

17   she did not know where Judy Lennon had gone.  She

18   disappears on a daily basis and gives no

19   explanation.  So she personally went to Dr. Wu's

20   office and told him that I called, overslept, and

21   was on my way in.  This means that he endorsed the

22   disciplinary actions against me even after he had

23   been given my message.  I hope you can understand

24   why it feels like there is a concerted effort to

25   get rid of me.  There was another incident on

39

1        Friday when Drew made an accusation that I had

2        provided evidence for my defense that was

3        manufactured afterward rather than admit the truth.

4        Knowing that Drew had lied about the day I

5        overslept and suffered no consequences for lying

6        did not contribute to my confidence in defending my

7        integrity when I was in the presence of two

8        bullies.  I offered to log into the travel

9        reimbursement system Concur because Drew suggested

10       that I had manufactured the screen shot I produced

11       from the night before.  I only wanted to defend

12       myself against another lie.  When I saw the cost

13       centers that were missing the day before on the

14       screen, I was in a state of disbelief because I

15       knew that Drew chose to cast doubt on my character

16       rather than admitting that he had not added Dr.

17       Wu's new grant number as Dr. Wu had requested last

18       week.  I did not leave the office until after nine

19       o'clock using the tutorials in Concur so that I

20       could allocate travel expenses to the grant for Dr.

21       Wu.  My access level was limited and I could only

22       request access to the new grant focals.  So my

23       screen shot listed the new grant numbers as access

24       pending.  If the numbers were pending at nine

25       o'clock the night before and were available the

1       following morning, they were added after the screen

2       shot taken.  I do not want to spend any more

3       personal time about job-related matters on my

4       personal time, but I want to discuss changes made

5       to my job description and responsibilies that

6       have been given to Hailey King, Jackie Herd's"

7       (phonetic) "replacement.  My essential functions

8       have been diminished to elementary clerical

9       functions.  I'm performing entry-level data entry

10      tasks while one student worker and Hailey King are

11      performing the functions of my job description.

12      The essential functions that were performed by our

13      former business manager Alex Grinchman" (phonetic)

14      "was" -- "were taken over by Drew, are assigned to

15      me with more frequency" -- "more and more

16      frequency.  Performing accounting functions are not

17      my area of expertise and not an essential function

18      of my job.  I am a team player, but I object to

19      performing the department secretary's job or being

20      summoned from the tenth floor to the third floor to

21      make coffee and bring cookies to Dr. Wu and his

22      guests, when Judy and a student worker are

23      available in the front office.  It appears to be

24      another strategy to diminish me, discount my

25      experience and talents in an effort to get my

41

1          resignation or termination."

2      And then she provides her cell phone and land line.

3      You received that email, correct?

4  A    Yes, I did.

5  Q    And then because she's making complaints there about Dr.

6  Wu and Dr. Wacker, you relayed those complaints to Dr. Wu and

7  Dr. Wacker, correct?

8  A      No.  I didn't talk to Dr. Wu.  But because of the

9  allegations that she was making, I did talk with both Drew

10  and Greg Wacker about some of the things that she said in

11  this email.

12  Q    Okay.  So you brought those -- that -- all that

13  information to Mr. Wacker with the intention that Mr. Wacker

14  then talk to Dr. Wu?

15  A    I took it to him to find out if some of these things --

16  you know, to get -- excuse me.

17      She made some accusations against Drew DiMeo about him

18  falsifying some records.  So I wanted to find out what was

19  going on in regards to the focal and in regards to Concur and

20  the things that she was stating.  So I asked Drew to look

21  into those things and to give me some background so that I

22  could get back to her.

23  Q    Were you angry with the email that she sent?

24  A    Was I angry?  No.

25  Q    Were you upset about that email?

42

1    A    No.

2    Q    You responded to her, correct?

3    A    Yes, I did.

4    Q    Okay.  So if you look at the next email up?

5         Now, at this point, when you send this email, had you

6    talking -- had you spoken to Mr. Wacker or Mr. DiMeo?

7    A    (Witness reviews exhibit)

8         I may have spoken to them.  Yes.

9    Q    Okay.  So you had spoken to them and you had determined

10   at this point that Ms. Briggs is not telling the truth?

11   A    What I'm -- I've determined is that there's very little

12   truth to some of the things that she's saying, that she's

13   bolstering some of the things that she's accusing Drew of and

14   -- and Greg Wacker, that they're falsifying documents.

15   Q    Well, they were accusing her of lying when she said that

16   she couldn't access the particular grant number, correct?

17   A    My understanding is that Drew didn't believe that she

18   couldn't access it.  Yes.

19   Q    Right.  And so when she was saying, I could access it,

20   Drew was saying that Ms. Briggs was lying.

21   A    I believe that's what he was saying.

22   Q    And then to determine who was telling the truth, you

23   went and spoke with Mr. DiMeo, correct?

24   A    I spoke with Mr. DiMeo.

25        But I also -- just to add my own background because I

43

1   don't handle expense reports -- I had talked with our

2   accounts payable department prior to talking with Drew to see

3   what her access was.

4   Q    Did you receive any evidence that confirmed that Ms.

5   Briggs had access to the grant number?

6   A    My understanding was that she did have access.

7   Q    My question was, do you have any evidence that Ms.

8   Briggs had access to the grant number?

9   A    I have what was a conversation that I had with accounts

10  payable.

11          MS. MATTIACCI:  I'm going to object to hearsay,

12  Your Honor.

13          THE COURT:  No.  In her business (indiscernible)

14  she doesn't -- she's not required to follow the rules of

15  evidence.  She can consider hearsay.

16          MS. MATTIACCI:  No.  But I'm -- I'm asking her --

17  she's about to say what somebody else, an out-of-court

18  statement that's being offered for the truth of the matter.

19  That is hearsay.  And so I'm saying, other than hearsay, and

20  that's why I want you to strike any hearsay.

21          My question was, do you have any evidence that she

22  had access to it.

23          THE COURT:  When you say "evidence," do you mean

24  evidence --

25          MS. MATTIACCI:  Documents.

44

1        THE COURT:  -- that would be admissible in court?

2        MS. MATTIACCI:  Yes, Your Honor.

3        MS. SATINSKY:  Your Honor --

4        THE COURT:  Do you think this witness knows the

5   rules?

6        MS. MATTIACCI:  Well, no.  That's why -- she is

7   about to speak of something somebody said outside of court as

8   a third party that is not here to testify or be subject to

9   cross-examination, that would be hearsay.

10        THE COURT:  We know what hearsay is, okay?

11        MS. MATTIACCI:  No, I know.  Well, that's why --

12   what she was about to say, I believe, was hearsay.  So that's

13   why I objected.

14        THE COURT:  Repeat your question to her.

15        MS. MATTIACCI:  Okay.

16        My question was, do you have any evidence that Ms.

17   Briggs did not have access to the grant number?

18        THE COURT:  To the -- to the grant number?

19        MS. MATTIACCI:  To the grant number.

20        THE COURT:  And you may answer that question.

21        THE WITNESS:  I don't have information with me

22   today.  So, again, I looked into it.

23   BY MS. MATTIACCI:

24   Q    So at one point, you did have evidence of it?

25   A    I received -- in talking to our accounts payable

45

1    department, I was told that she had access.

2    Q    Okay.  But other than that, do you get -- did you get an

3    email to that?  Did you get a screen shot?  Did you get some

4    sort of confirmation like a printout that says she had access

5    to it, anything like that?

6    A    I -- I may have.  I don't -- I don't recall.  But I know

7    that I did look into it.  I did talk with the department and

8    asked them to send me something or show me something that she

9    had access.

10   Q    And you believe they did show you something?

11   A    From my memory -- I don't remember if they showed me

12   anything.  I do remember calling and asking, does she have

13   access.  Because -- just so you understand, there was concern

14   that I thought maybe -- maybe she didn't.  Maybe there's a

15   glitch.  Maybe there was a problem with our system, our

16   computer system.  So I just wanted to double check and make

17   sure that she had access before, you know, I got back to her

18   and let her know that, you know, this -- this -- that she was

19   incorrect.

20   Q    Well, there's no dispute that she eventually got access

21   to the system.  You understand that, correct?

22   A    Absolutely.  Yes.

23   Q    Right.  So were you confirming whether she had access on

24   the night in question --

25   A    Yes.

46

1   Q    -- or whether she currently had access?

2   A    The night in question.

3   Q    So they were able to provide you with some sort of

4   documented proof that she did have access to the system on

5   the night in question?

6   A    Again, they -- I can't say they gave me a document or

7   anything.  All I can say is I called a person who's

8   responsible for that, that can look into the system and they

9   looked and said, she has access.

10  Q    This was an issue that led to the termination of her

11  employment, correct?

12  A    It's one of the things that led to her --

13  Q    One of the two things that are on the bullet point for

14  her termination letter, correct?

15  A    Yes.

16  Q    So wouldn't you want to get the documented proof from

17  that person that she in fact did have access that night?

18  A    I guess I should have gotten the documented proof, but

19  talking to them on the phone, having them verify was -- was

20  sufficient for me.

21  Q    Now, I'm looking still at P-38.  This is Ruth Briggs'

22  response to you.

23            "Deirdre, I do not know how to respond to this

24            email.  I am drowning here and have reached out to

25            you numerous times and waited and waited.  This is

47

1    affecting the quality of my work life and my

2    personal life.  All I want to do is continue to

3    work without being harassed.  Based on the content

4    of your email, I assume you contacted Drew, Greg

5    and Dr. Wu, when I asked that you refrain from

6    doing so because I know the harassment will

7    escalate without the protection of Human Resources.

8    The story that you are telling me about the

9    discipline is the third story I have been told.

10   Drew said that I did not call in, and you believed

11   him.  I have no idea what Greg said, other than

12   what Drew told me, and he wanted me fired.  And you

13   told me that I had not called in or followed

14   procedure.  We have no written procedures.  And I

15   did call in and rushed to work rather than spend

16   another" -- "or spend another five minutes to start

17   my computer and send an email stating the same

18   thing I told Taylor.  I was held to an unequal

19   standard and I am suffering the consequences

20   because I cannot bid out on another job.  I was

21   told by you that I could bid on a job without

22   stating that I had been disciplined, and I will not

23   lie on the application.  I will not retract the

24   comments I made because I believe them to be true.

25   Faculty and staff members tell me frequently that

48

1          they feel bad about the manner in which I am

2          treated and diminished in public.  I have nothing

3          more to say."

4      Now, there was no writeup for -- you received that

5  email.  Is that correct?

6  A    Yes, I did.

7  Q    And you understood that Ms. Briggs was upset, correct?

8  A    Yes.

9  Q    Now, was there a writeup done particularly for the

10  expense report issue?

11  A    No.  I don't think so.

12  Q    Now, if you turn to P -- I'm sorry, same -- same

13  document there.  If you scroll up, you -- this email from

14  Ruth Briggs that we just read went to you, and then you

15  forwarded it to Sandra Foehl, right?

16  A    Yes.

17  Q    On 3/25.  And you say, "FYI, for FYI and for

18  discussion," correct?

19  A    Yes, I did.

20  Q    So you wanted to discuss this with Ms. Foehl?

21  A    Yes.

22  Q    In terms of whether there should be discipline taken

23  against Ms. Briggs for her email?

24  A    No, not at all.  I sent that to her because she made

25  some accusations.  So I just wanted to check with Ms. Foehl

49

1    to see if she thought this should be looked into from their

2    perspective.

3    Q    Well, Ms. Foehl is in charge of investigating complaints

4    of age discrimination, sex discrimination, retaliation and

5    hostile work environment, correct?

6    A    Yes.  She is.

7    Q    So were you forwarding it to her to investigate whether

8    the -- whether the treatment that Ms. Briggs was receiving

9    was because of perhaps this conduct towards her was being

10   infested because of that bias?

11   A    No.  I wanted her to look into it to see if there was a

12   bias.  I didn't send it because I thought there was a bias.

13   She made some accusations, so I sent it to her.  Because I

14   knew that Ruth had been to her before, I sent it to Ms. Foehl

15   just to get her input.

16   Q    Okay.  And did you have a discussion with her at that

17   time?

18   A    I don't remember.  I'm not sure if Ms. Foehl emailed me

19   back or we had a discussion before Ms. Briggs was -- before

20   she had resigned.

21   Q    Now, March 25th, 2014, that is the year mark from the

22   last Level C violation that Ms. Briggs had, correct?

23   A    I'm sorry.  What do you mean?

24   Q    Remember the three-day suspension that she had for the -

25   - for the plane ticket in March?

50

1   A    Yes.

2   Q    It was issued to her on March 26th, 2013?

3   A    Okay.

4   Q    Do you recall that that was a Level C violation?

5   A    Yes.  That was.

6   Q    And in order to have a termination, you have to have two

7   Level C violations within a year?

8   A    Yes.

9   Q    And in that whole year, Ms. Briggs did not have a single

10  Level C violation.

11  A    In the year of 2014?

12  Q    Yeah.  Well, both.  In the year of 2014 and in the

13  twelve-month period before March 25th, 2014.

14  A    Okay.

15  Q    Correct?

16  A    Yes.

17  Q    Okay.  But, then, only less than a week after this, she

18  is terminated on April 1st, 2014, correct?

19  A    Yes.  No.  I'm sorry.  She resigned.  She wasn't

20  terminated.  She resigned.

21  Q    Okay.  So it was her choice to leave Temple?

22  A    She made that choice.

23  Q    If she didn't want to resign, she could have stayed?

24  A    She was given a choice to -- she basically -- when we

25  met with her, we offered her the option to resign or she

51

1    would have been terminated.

2    Q    Okay.  So she didn't really have a choice in terms of --

3    her employment was involuntarily ending one way or the other.

4    A    She could have chosen to take the termination if she did

5    not want to resign.  But she chose to resign.  She was given

6    the option.  She chose that option.

7    Q    You are aware as a HR professional and someone who is

8    familiar with the rules of discrimination or the laws against

9    discrimination that when someone is terminated because of age

10   or because of sex, that that's a violation of the law,

11   correct?

12   A    Yes.

13   Q    If the employer doesn't terminate the employee and,

14   instead, the employee just resigns, then it's possible that

15   the employer would not be held responsible for the

16   termination, correct?

17           MS. SATINSKY:  Objection, Your Honor.  That's a

18   legal conclusion.

19           THE COURT:  Sustained.

20   BY MS. MATTIACCI:

21   Q    Do you believe that it would be in Temple's best

22   interests if the employee chooses to resign rather than be

23   terminated?

24   A    No.  We offered her that option because we wanted -- we

25   were -- we wanted to be kind to her and allow her -- we

52

1    thought it would be in her best interests to resign.

2    Q     And isn't it true when you resign, you do not get

3    unemployment compensation?

4    A     The State -- the State of Pennsylvania will turn you

5    down for unemployment.  But what we said is that we would not

6    contest her unemployment application, and we would at -- we

7    would report to the State that she was given -- that it was -

8    - you know, that she was given an option.

9    Q     Well, if you turn to the termination letter, P-45, the

10   last sentence of the letter that she was given was:

11              "Effective the end of the day today, your

12              employment at Temple University is being

13              terminated."

14        Correct?

15   A     Yes.

16   Q     So it was Temple that terminated her employment,

17   correct?

18   A     Temple offered Ms. Briggs a option to take the

19   termination or to resign.  And she chose to resign.

20   Q     But it was a forced resignation.  Can you be --

21              THE COURT:  Well, it was before it became

22   effective, right?

23              MS. MATTIACCI:  The resignation was after the

24   termination letter, correct?

25              THE COURT:  But before it became effective.

53

1          MS. MATTIACCI:  No, Your Honor.

2          THE COURT:  No?

3          MS. MATTIACCI:  That's -- the termination was

4    effective April 1st, correct?

5          THE COURT:  The end of the day?

6          MS. MATTIACCI:  Yes.

7          THE COURT:  And when did she --

8    BY MS. MATTIACCI:

9    Q    And she didn't resign until April 3rd, correct?

10   A    Yes.  That's true.  She was given the letter and offered

11   either -- you know, you can have -- you can -- she was given

12   the option to resign or that at the end of the day she would

13   be terminated.

14   Q    It's for -- it would just be for her a technicality so

15   that she could tell people that she resigned while she looked

16   for another job, and not that she was terminated, correct?

17         MS. SATINSKY:  Objection, Your Honor.  That's for

18   the jury to decide if it's a technicality or not.

19         THE COURT:  I'm sorry.  Would you repeat that

20   objection?

21         MS. SATINSKY:  Sure, Your Honor.  I objected to

22   that question because I said it's an issue for the jury to

23   decide whether it's a technicality.

24         THE COURT:  Overruled.

25         Repeat your question to the witness.

54

1   BY MS. MATTIACCI:

2   Q    This difference between resignation and termination is

3   just a -- the result Would be the same thing.  Her employment

4   would be ending, correct?

5   A    Her employment -- her employment, yes, would have ended.

6   But she was given the option to resign.  She could have taken

7   the termination.

8   Q    I know.  But she couldn't have stayed there.  That

9   wasn't an option, correct?

10  A    Her staying there was not an option.

11  Q    So her employment was terminated one way or the other.

12  A    Yet she chose to resign.  She was given the option to

13  resign.  She -- she completed --

14       THE COURT:  All right.  We've gone over this

15  enough.  Please go to something else.

16       MS. MATTIACCI:  I will, Your Honor.

17  BY MS. MATTIACCI:

18  Q    You were involved in the decision to terminate.  And, in

19  fact, you exchanged drafts of the termination letter with Mr.

20  Wacker, correct?

21  A    Yes, I did.

22  Q    Okay.  Take a look at P-42.  This is an email between

23  you and Mr. Wacker, March 31st, 2014.

24  A    Yes.

25  Q    Do you see that?

55

1       MS. MATTIACCI:  Your Honor, I move for the

2   admission of P-42.

3       MS. SATINSKY:  No objection.

4       THE COURT:  It's admitted.

5   (P-42 received in evidence)

6   BY MS. MATTIACCI:

7   Q   You see here the email to you from Mr. Wacker, "Please

8   edit as necessary."

9       And that was the termination letter with the two bullet

10  points on it, correct?

11  A   Yes.

12  Q   I'm sorry.  From Wacker to you on March 31st, 2014.

13      And then if you look at P-43, this is an email from you

14  to Greg Wacker.  Do you recognize that?

15  A   Yes.

16      MS. MATTIACCI:  May I move for the admission of P-

17  43?

18      MS. SATINSKY:  No objection.

19      THE COURT:  It's admitted.

20  (P-43 received in evidence)

21  BY MS. MATTIACCI:

22  Q   Also on March 31st:

23          "Hi, Greg.  Please see the attached letter for

24          Ruth.  I just made a few changes.  I will come to

25          your office Tuesday before" -- "between 9:30 and 10

56

1              o'clock.  Please let me know if this time is okay."

2       You see that?

3   A    Yes.

4   Q    And at the time that you're going back and forth with

5   Mr. Wacker and drafting the letter of termination for Ms.

6   Briggs, a full and complete and fair investigation into her

7   claims of sex discrimination and age discrimination,

8   retaliation and hostile work environment had not been

9   completed, correct?

10  A    Again, the investigation -- he she complained to EOC,

11  they are responsible for taking those -- or looking into

12  those complaints.

13  Q    That's Sandy Foehl, right?

14  A    Yes.

15  Q    You had forwarded P-38 to Sandy Foehl, correct?

16  A    To Sandra Foehl?  Yes.

17  Q    Sandra Foehl.  A week before that, on 3/25, right?

18  Where you said, "FYI and for discussion."

19       Correct?

20  A    Yes.

21  Q    Okay.  So now you have given this to Sandy Foehl who

22  you're saying -- Foehl, who's supposed to do the

23  investigation.  And as of the time you're drafting the

24  termination letter, a full and thorough investigation into

25  her complaints of discrimination had not been completed,

57

1  correct?

2  A    Again, the email that I sent to her I didn't send

3  because I thought that she was being discriminated against.

4  I wanted Sandy to give me her opinion of what Ruth was saying

5  in that letter because I knew that Ruth had contacted her

6  before.

7  Q    But that's what Sandy Foehl does, right?  Her purview is

8  sex discrimination, age discrimination, retaliation.  That's

9  what her job is, correct?

10  A    Her job is to investigate.  Yes.

11  Q    Right.  Her job is to investigate.  And what I'm saying

12  is as of the time you were drafting the termination letter,

13  you don't know if the investigation was complete or not.

14  A    No.  I don't know if Ms. Foehl did an investigation.

15  But at the time of drafting the termination letter it was

16  based on the actions of Ms. Briggs that violated our policy.

17  Q    What was done to ensure that the decision to terminate

18  was not infested with bias against her because she had made

19  complaints of discrimination?

20  A    Well, for most of the time that she worked with Dr. Wu,

21  Greg Wacker had assigned Drew DiMeo to mediate conversations

22  with Dr. Wu and Ruth because of Ruth's complaints.  So every

23  time Ruth made a complaint to me in regards to how she

24  thought she was being treated, I talked with Greg Wacker.

25  Greg Wacker and both Drew looked into those situations.

58

1    Q    And Drew DiMeo, you -- would you agree with me,

2    approximately early thirties in terms of his age?

3    A    I'm not sure.  I would suspect.  I'm not sure.  I don't

4    know his age.

5    Q    Okay.  And he'd only been at Temple for a few years?

6    A    At the time, I think he had been there three to four

7    years.  Again, off the top of my head, I'm not sure.  Had he

8    worked -- I'm not sure if Drew had worked at Temple prior to

9    working for Greg Wacker.  So --

10   Q    And Mr. --

11   A    -- he was new to that office.

12   Q    -- Mr. DiMeo was not in HR, correct?

13   A    He was not -- he did not work in HR.  No.

14   Q    And he did not work in the Equal Employment Compliance

15   Department, correct?

16   A    No, he did not.

17   Q    He was just a person that worked in the Dean's office,

18   correct?

19   A    He worked in the Dean's office reporting to Greg Wacker

20   where they both handled personnel issues.

21   Q    And he was below Greg Wacker, correct?

22   A    He was below Greg Wacker.  Yes.

23   Q    Did Mr. DiMeo complete a full and thorough investigation

24   into complaints of discrimination?

25   A    Not that I know of.  But he -- he was able to relay to

59

1   me the things that went on in the office.  And then he was

2   sent down there to help Dr. Wu and to help Ms. Briggs.

3   Q    My question was, did he do a full and thorough

4   investigation of the complaints of discrimination?

5   A    That's not his job.

6   Q    Okay.  Do you know of anyone who did a full, complete

7   and thorough investigation into Ms. Briggs' complaints of

8   discrimination?

9   A    Again, Ms. Briggs did not complain specifically to me of

10  being discriminated against.  I know that she had talked to

11  Sandra Foehl.  I don't know what took place in those

12  conversations.

13  Q    Okay.  So then let's go on to P-50.  This is an email

14  exchange between you and Sandy Foehl on April 4th, 2014 which

15  is three days after Ms. Briggs is terminated, correct?

16  A    Yes.

17  Q    And at the bottom --

18       (Participants confer)

19  Q    You say to her -- let me get the date.  I'm sorry.

20       On April 4th, 2014, you write to Sandy Foehl --

21            MS. SATINSKY:  Objection, Your Honor.  This is not

22  from Sandy Foehl to Ms. Walton.  This is from Sandy Foehl to

23  Ms. Walton, not from Ms. Walton to Sandy Foehl.

24            MS. MATTIACCI:  I'm sorry.  I misspoke that.  I'm

25  sorry.

60

```
1            THE COURT:  All right.

2    BY MS. MATTIACCI:

3    Q    This is April 4, 2014 from Ms. Walton to Sandy Foehl.

4    So this is you speaking, correct?

5            MS. SATINSKY:  Your Honor, that's just what I said

6    --

7            MS. MATTIACCI:  I'm sorry.  I'm sorry.  I'm back

8    and -- I'm sorry.

9            THE COURT:  What --

10           MS. SATINSKY:  Your Honor, this email is from Ms.

11   Foehl to Ms. Walton.

12           MS. MATTIACCI:  That's my fault.  I'm going

13   backwards.

14           THE COURT:  All right.  Let's move along.

15   BY MS. MATTIACCI:

16   Q    This email went to you, correct?

17   A    Yes.

18   Q    Okay.  And it says:

19           "Deirdre, we didn't talk before Ruth Briggs met

20           with me Tuesday morning, April 1st.  Later the same

21           day, she let me know she'd been terminated.  When

22           we can meet, maybe next week, or have a

23           conversation, will you let me know whether Ruth

24           Briggs accepted the offer to resign?  I have an

25           appointment with the Department Chair this
```

61

```
 1            afternoon.  Sandy."

 2       So let's back up for a second.  April 1st, 2014, Ms.

 3   Briggs meets with Ms. Foehl, correct?

 4   A    That's my understanding from the email.  Yes.

 5   Q    And do you understand sitting here today that she

 6   relayed complaints of discrimination to Ms. Foehl on the

 7   morning of April 1st, 2014?

 8   A    Again, I don't know what their conversation was about.

 9   I would make that assumption because she went to see her.

10   But I don't know what their conversation was.

11   Q    So when -- after Ms. Briggs walked out of the meeting

12   with Ms. Foehl on April 1st, she left that meeting and was

13   called into a meeting with Mr. Wacker and was terminated,

14   correct?

15   A    Yes.

16   Q    Were you at that meeting?

17   A    Yes, I was.

18   Q    And is it your testimony that you had no discussion with

19   Ms. Foehl between the time that you said -- sent the P-38

20   email on March 25th in which you say, "FYI and for

21   discussion," and April 4th, three days after the termination,

22   in regards to Ms. Briggs?

23   A    No.  I didn't have a discussion that -- that I recall.

24   I don't recall having a discussion.  I was not aware of Ms.

25   Briggs meeting with her.
```

62

1   Q   Prior to Ms. Briggs' termination, you were aware that

2   Ms. Foehl had some conversations with Ms. Briggs, correct?

3   A   Yes.

4   Q   And so, prior to making a decision to terminate Ms.

5   Briggs' employment, you did not do anything to check with the

6   Equal Employment Opportunity Compliance Office to see if the

7   decision to terminate was free of discrimination or

8   retaliation, correct?

9   A   I did not talk with Ms. Foehl in regards to any

10   investigation that she was doing.  The decision that we made

11   I felt was free of any bias or discrimination based on the

12   fact that Ms. Briggs had violated the policy and that we were

13   sticking to our policy.

14   Q   But you didn't do any investigation into that, correct?

15   A   Into what?

16   Q   The claims of sex discrimination and retaliation.

17   A   No.  That -- that's Sandra Foehl's area.

18   Q   Okay.  And you didn't check with her before you made a

19   decision to terminate, correct?

20   A   I didn't check with her to see if she had decided to do

21   an investigation.  Ms. Foehl, she gets the complaints and

22   then she --

23   Q   Ms. Foehl --

24   A   -- determines if it's -- if it's a viable complaint to

25   investigate.

63

1   Q    Correct.  I totally agree.

2        But I'm just asking real simple questions so we can get

3   through.

4   A    Okay.

5   Q    Okay?

6        You didn't check with Ms. Foehl in regards to her

7   investigation before you terminated Ms. Briggs, correct?

8   A    No, I did not.

9   Q    Okay.  And in terms of the two Level C violations that

10  Ms. Briggs was terminated for, we already talked about the

11  expense report.

12       The other thing was that she booked a room at the Double

13  Tree in Center City for a professor instead of the Conwell --

14  instead of Conwell Inn for the professor, but it was on the

15  correct nights, correct?

16  A    I don't recall right now sitting here the specific

17  facts.  My understanding -- but that she made an error in

18  booking travel arrangements again.

19  Q    That -- and you recall that was back on March 13th and

20  14th?

21  A    I believe so.

22  Q    So that was several weeks before her termination,

23  correct?

24  A    Yes.

25  Q    If you look at P-45, the termination letter, the second

64

1   bullet point says, "You were directed to" -- I'm sorry.  I'll

2   give you a second there.

3           "You were directed to book a room reservation for a

4           colloquium speaker, Dr. Ness Shroff, for his

5           upcoming visit to Temple University on Thursday,

6           March 13th and 14th, 2014.  You booked a

7           reservation at the Conwell Inn; however, it was

8           booked for the wrong dates.  On the date of his

9           visit, at the last minute, you were able to secure

10          a room at the Double Tree in Center City."

11      Do you see that?

12  A   Yes, I do.

13  Q   Okay.  Let's go to the work rules, P-65.

14      Actually, before we get to that, for these two issues,

15  she was given a C(4) negligence/carelessness, neglecting job

16  duties or responsibilities or failing to carry out

17  instructions given by supervisor, and C(3) disruptive or

18  disorderly conduct engaging in any unruly, erratic or

19  undisciplined behavior that disrupts or may disrupt the

20  workplace, engaging in any course of conduct that does not --

21  that does or may undermine or interfere with supervisions.

22      You see that?

23  A   Yes, I do.

24  Q   In regards to the booking at the Double Tree for the

25  professor, was that in relation to C(4) or C(3)?

65

```
 1   A    C(4).

 2   Q    Negligence and carelessness?

 3   A    Yes.

 4   Q    Okay.  And so if you go back to the policy of Temple, P-

 5   65?  Do you see that?  I can blow it up on the screen.  Can

 6   you see the screen?

 7   A    Sure.

 8   Q    Okay.

 9        MS. MATTIACCI:  I'm sorry.  I didn't -- I wasn't

10   sure if she could see that screen on there.

11   BY MS. MATTIACCI:

12   Q    P-65, there were -- you did not -- you had the option of

13   choosing a B-level violation for that.

14        THE COURT:  It's still not blown up.

15        MS. MATTIACCI:  Yeah.  I'm sorry.  I'm going to

16   blow it up right now.

17        (Pause in proceedings)

18   BY MS. MATTIACCI:

19   Q    Unauthorized absence, chronic sick days, chronic

20   lateness, failure to record time in and time out, leaving

21   assigned area, early quit.  That's B(6).

22        B(7) is slowdowns, performing work other than Temple

23   work, unauthorized extra work by non-employees.

24        B(10) inefficiency.

25        B(11) -- which we saw before, failing to meet expected
```

66

1  standards of performance, productivity or efficiency,

2  correct?

3  A    Uh-huh.

4  Q    If she was given a B(10), you wouldn't have had two C

5  violations within the twelve-month period, correct?

6  A    No, that's -- that's incorrect, because she was -- the

7  memo detailed the C(4) and the C(3).  So she would have

8  gotten -- excuse me.  She would have gotten the discipline

9  for I think the C(3), if I'm not mistaken, for disruptive

10  behavior.

11  Q    But she wasn't given that as of March 25th, 2014, right?

12  There was no discipline issued to her for that until April

13  1st, correct?

14  A    All right.  So just so my understanding, you're asking

15  about the C -- the March discipline and not the termination

16  letter?

17  Q    There was no March discipline in 2014.

18  A    Okay.

19  Q    There was no -- the only discipline that happened in

20  2014 was for her sleeping -- oversleeping and coming in late.

21  And then she was terminated April 1st, 2014 for the -- and

22  the first time advised that there was these two violations.

23  Correct?

24  A    She was -- excuse me.

25       She was terminated because she was initially disciplined

1    -- she was suspended for a C violation.  And then this

2    occurred, the written letter.  So she was disciplined -- she

3    was terminated for -- or she was given the option to resign,

4    but she would have been terminated for the C(4).

5    Q    All right.  Let's look at what C(4) says.  C(4) is

6    negligence/carelessness.

7             "Neglecting job duties or responsibilities or

8             failing to carry out instructions given by

9             supervision, performing negligent or careless acts

10            during work time or on -- or on or with Temple

11            properties."

12   You see that?

13   A    Yes.

14   Q    So that basically applies to any mistake that any

15   employee makes at any time at Temple.

16   A    Yes.

17   Q    And if you -- so there -- under Temple's policy, you

18   make two mistakes in a year, you're terminated.

19   A    Well, no.  It -- it has to do with the level of the

20   mistake and the seriousness of the mistake.  And, again, Ms.

21   Briggs was disciplined for the initial travel mistake that

22   she made, which was pretty serious, and then again she made

23   another mistake regarding travel arrangements.

24   Q    Would you agree with me that one of the reasons that

25   professors are attracted to come to Temple is the fact that

68

1    it's so close to Center City, Philadelphia?

2    A    I'm -- to be honest, I'm not sure what attracts faculty,

3    besides that, you know, we're a well-known institution and

4    they want to come here to teach.

5    Q    And that Philadelphia is a good city?

6    A    I would say so.  Yes.

7    Q    And do you often bring professors into Center City to

8    show them Center City as a point of attraction for them to

9    come to Temple?

10   A    Honestly, I'm -- I don't get involved in faculty

11   visiting the University.

12   Q    If you can turn to P-55, please?

13       Do you recognize this as an email exchange between you

14   and Dr. Wu dated August 11, 2014?  I'm sorry.  I don't think

15   you're on this one.  Let me skip that

16       You're aware that there were -- there was another

17   complaint of sex discrimination made in the same department

18   by an Assistant Dean, correct?

19   A    Not from memory, I don't.  No.

20           MR. HARRIS:  Your Honor, may we see you at sidebar?

21           THE COURT:  Yes.

22       (Sidebar)

23           THE COURT:  What is it?

24           MR. HARRIS:  Your Honor, counsel mischaracterized,

25   I believe.  What we have as evidence is an anonymous

69

1    complaint.

2          MS. SATINSKY:  That's what she testified to in her

3    deposition, that it was an anonymous complaint, they don't

4    know who made it, and it was about multiple people in the

5    department.  She never said it was from a complaint from the

6    Assistant Dean.  That's not what her deposition says.

7          MS. MATTIACCI:  Yes, it does.  Yes, it does.

8          THE COURT:  What is it --

9          MS. MATTIACCI:  She had a -- she was -- she

10   received a complaint about Greg Wacker, a sex discrimination

11   complaint.  She investigated it.  It was about a Vice Dean --

12   or, rather, an Assistant -- female Assistant Dean --

13         MS. SATINSKY:  It was not from -- Your Honor --

14         THE COURT:  We're getting into this why?

15         MS. MATTIACCI:  Because it had to do with another

16   complaint about sex discrimination against Mr. Wacker to show

17   that his bias, that he had a complaint made against him.

18         MS. SATINSKY:  Your Honor, again, it was an

19   anonymous complaint.  Counsel characterized it as a complaint

20   made by an Assistant Dean.

21         MS. MATTIACCI:  It doesn't matter.  They took it

22   very seriously and they did an investigation.  So they know

23   how to do an investigation.  She did an investigation in that

24   case.  She doesn't do an investigation here.

25         THE COURT:  Let's not go -- let's not go through

70

1    that again.

2              What else do you have for this witness?

3              MS. MATTIACCI:  Well, she also came to the

4    conclusion there was no discrimination, or has never come to

5    the conclusion.  She says she doesn't do investigations, but

6    she did an investigation into that complaint, right?  Which

7    is -- that's what she said.

8              THE COURT:  How much time do you have --

9              MS. MATTIACCI:  I only have -- that was my last

10   section.

11             THE COURT:  Come on.  Let's pick it up.

12       (Sidebar concluded)

13             MS. MATTIACCI:  May I proceed, Your Honor?

14             THE COURT:  Yes, please.

15             MS. MATTIACCI:  Okay.

16   BY MS. MATTIACCI:

17   Q   If you can turn to your deposition, Page 22, please?

18             MS. SATINSKY:  Your Honor, I'm not sure what

19   counsel is doing.  The witness hasn't answered a question.

20             MS. MATTIACCI:  She said --

21             THE COURT:  I'm --

22             MS. SATINSKY:  Your Honor, I apologize.  The

23   witness hasn't answered a question, so I'm not sure what

24   counsel is doing referring the witness to her deposition

25   transcript.

71

1          MS. MATTIACCI:  I believe her answer was, I don't

2     recall.  So I was refreshing her recollection with her

3     deposition.

4          MS. SATINSKY:  Your Honor --

5          THE COURT:  Repeat your original question of the

6     witness.

7          MS. MATTIACCI:  Yes.

8     BY MS. MATTIACCI:

9     Q    Do you recall that there was a sex discrimination

10    complaint made in the same department in Mr. -- in the

11    Computer Information Sciences Department involving Mr.

12    Wacker?

13    A    I don't recall.

14    Q    Okay.  So if you go to your deposition, Page 22 -- Page

15    21.

16         (Participants confer)

17    BY MS. MATTIACCI:

18    Q    Start at Page 20, Line 14.

19    A    (Witness reviews exhibit)

20         Okay.

21    Q    Okay.  So now do you recall that there was a complaint

22    of sex discrimination made by a Assistant Dean, who was a

23    female, about several people, including the Dean, the Vice

24    Dean and Greg Wacker?

25    A    My understanding is, as I stated here, I thought it was

72

1   Assistant Dean.  It was, my understanding, a complaint that

2   came in anonymously into the office.  And in my deposition I

3   said I thought it was Assistant Dean.

4   Q    And that it was a female?

5   A    Yes.

6   Q    Okay.  And that you looked into this -- you looked into

7   this complaint, correct?

8   A    I did, along with Sandra Foehl.

9   Q    Okay.  So you personally participated into looking into

10  this complaint, correct?

11  A    Yes, I did.

12  Q    And when you looked into this complaint, you met with

13  everyone that was mentioned in the letter, correct?

14  A    Yes, I did.

15  Q    And that included the Dean, the Vice Dean and Mr.

16  Wacker, correct?

17  A    Yes.

18  Q    And you also met with several women, because it said

19  that there were other women that were affected, correct?

20  A    It made accusations that there were other people

21  affected.  So we met with some women in the department.  Yes.

22  Q    And, also, it mentioned Mr. -- Dean Klein, correct?

23  A    Yes, it did.

24          THE COURT:  Let's take a ten-minute recess.  The

25  jury may go out for 10 minutes.

73

1              THE COURT OFFICER:  All rise.

2         (Recess taken at 10:53 a.m.)

3         (Proceedings resume at 11:05 a.m.)

4         (Jury Present)

5         (Witness resumes stand)

6              THE COURT: Continue, please.

7              MS. MATTIACCI: I have no further questions, Your

8    Honor.

9              THE COURT: Do you have any questions?

10             MS. SATINSKY: I do, Your Honor.

11                  CROSS-EXAMINATION

12   BY MS. SATINSKY:

13   Q    Good morning, Ms. Walton.

14   A    Good morning.

15   Q    Before we broke, you testified about the complaint that

16   was made in an investigation you assisted in, do you remember

17   that?

18   A    Yes.

19   Q    What was the outcome of that investigation?

20   A    They did not find for any discrimination.

21   Q    That complaint, was it against the entire leadership of

22   the college?

23   A    Yes.

24   Q    Given the issues you've testified about regarding Ms.

25   Briggs performance, why wasn't she disciplined sooner?

74

1   A      Basically, the leadership in the school, they like Ms.

2   Briggs.  She thought she was a nice lady.  They didn't want

3   to start the discipline process.  What they wanted to do was

4   to develop her and help her to improve.  So, there wasn't any

5   action they wanted to take initially.  They wanted to talk

6   with her about her deficiencies and her errors and they

7   wanted to give her an opportunity to improve.

8   Q      Why wasn't she terminated sooner?

9   A      For the same reason.  They didn't take disciplinary

10  actions early on.  What they wanted to do was develop her and

11  help her to improve.  Also, they wanted to try to find other

12  employment for her at the University that would fit her skill

13  level better.

14  Q      What is the gender makeup of the CIS Department?

15  A      Specifically, my understanding of the CIS Department is

16  made up of women, mostly, and there are, you know, in faculty

17  there are a number of men, and the ages vary.  So, it's a

18  diverse department.

19  Q      I want to clarify a few points counsel made yesterday.

20         Could you please pull up the third exhibit for Ms.

21  Walton?

22         Ms. Briggs, we're going to start with page 38 and then

23  it will go into page 39.  But can you read the entire --

24              MS. MATTIACCI: Objection, Your Honor.  This is

25  hearsay testimony of -- previous testimony of the same

75

1    client.  They can ask her questions, but they can't just read

2    in her deposition.

3             MS. SATINSKY: Your Honor, yesterday --

4             MS. MATTIACCI: It's not a party opponent.

5             THE COURT: Wait a minute.  Your objection is, this

6    is hearsay?

7             MS. MATTIACCI: This is hearsay improper testimony.

8    They're just having the witness read in the deposition.

9             THE COURT: All right, okay.  What?

10            MS. SATINSKY: Your Honor, this is the witness's

11   deposition testimony.  She was shown this yesterday and only

12   told to read a portion of it.  I'd like the witness to read

13   the whole thing so that the jury can understand the context.

14            THE COURT: You may do so.

15            MS. SATINSKY: Thank you.

16            MS. MATTIACCI: For completeness, Your Honor, they

17   didn't say for completeness.  They just said --

18            THE COURT: I made a ruling -- don't keep arguing.

19            MS. MATTIACCI: Oh, I'm not arguing, Your Honor.

20   Just explaining why I was objecting.  That makes sense now.

21            THE COURT: Just, please, stop.  Let's hear it.

22   BY MS. SATINSKY:

23   Q    Ms. Walton, can you start here and then we'll move to

24   page 39?

25   A    Okay.

1          "Wouldn't it be easier for you --

2      Do you want me to read the question?

3  Q    Sure.

4  A         "Wouldn't it be easier for you just to talk to Dr.

5  Wu

6      yourself?"

7  Q    And you replied to that?

8  A         "I found it difficult.  There were conversations I

9  had  with Dr. Wu.  I found it difficult from my perspective

10 to communicate with him.  That is not the reason why I didn't

11 communicate with him, but, you know, he was very busy.  I

12 wasn't in the area.  There's space.  And, again, as I

13 explained earlier when we handled  personnel issues, I

14 usually worked with Greg and Drew.  They were the people that

15 handled personnel issues.  That doesn't mean I couldn't have

16 contacted Dr. Wu.  I just didn't.  I worked with Greg.  And

17 they were pretty much on top of the situation.  Greg, by

18 having Drew sit in on his meetings and kind of mediate the

19 issues between Drew and I mean between" --

20      I'm sorry.

21          "I mean between Dr. Wu and Ruth.  They usually had

22 firsthand knowledge."

23 Q    Thank you.

24      Earlier, you testified regarding Ms. Briggs' January

25 2014 discipline, do you recall that?

1    A    Yes.

2    Q    Counsel asked you a question whether prior to that

3    discipline, you were aware whether Ms. Briggs had ever been

4    late.  And I believe you said, you didn't know.  Do you

5    recall that?

6    A    Yes.  But I do also believe that I stated I was aware

7    that there was some latenesses.

8    Q    To fresh your recollection.

9        MS. SATINSKY: Could you please pull up page 92 of

10   the plaintiff's dep?  It will come right up on your screen.

11   BY MS. SATINSKY:

12   Q    Does this refresh your recollection that you were aware

13   of latenesses regarding Ms. Briggs prior to January of 2014?

14       MS. MATTIACCI: Your Honor, objection to refresh the

15   witness's recollection, not to publish it to the jury.

16       THE COURT: All right, don't publish it yet.  Go

17   ahead.

18       MR. HARRIS: Judge, my understanding, I thought the

19   witness testified regarding her deposition, so it was

20   certainly moved into evidence during her deposition, during

21   her testimony on direct.

22       THE COURT: Received.  Okay.  Thanks.

23       Yes, you were speaking?

24   BY MS. SATINSKY:

25   Q    Yes, Ms. Walton, I asked if viewing this page of your

78

1    deposition transcript refreshed your recollection that you

2    were aware Ms. Briggs leaving prior to January of 2014?

3    A    Yes.

4    Q    Yesterday, you testified that you were told that Dr. Wu

5    yelled at students, do you recall That?

6    A    Yes.

7    Q    Did anyone other than Ms. Briggs tell you that Dr. Wu

8    yelled at students?

9    A    That complaint I only received from Ms. Briggs.

10   Q    Were you ever aware that Dr. Wu yelled at employees?

11   A    No.  Again, only Ms. Briggs made those complaints.

12   Q    Were there any concerns Ms. Briggs raised to you about

13   anything that you didn't look into or you didn't direct

14   someone else to look into?

15   A    No.

16   Q    Were the concerns that Ms. Briggs raised with you time-

17   consuming?

18   A    Yes.

19   Q    Can you explain that?

20   A    Well, Ms. Briggs would call me or send me emails on a

21   frequent basis in regards to the issues that were going on in

22   her department.  And, so among other things that I handled at

23   the University, it took time to contact someone, to have them

24   look into, so it's time-consuming for both Greg, Drew, and

25   myself, yes.

1  Q     What role do you have in employee discipline?

2  A     Counseling, interpreting the University's policies and

3  procedures, and then coaching and counseling our managers on

4  how to deliver discipline to the University.

5  Q     Do you have responsibility for specific colleges?

6  A     I'm sorry; can you say that again?

7  Q     Sure.  Do you have responsibility for specific colleges?

8  A     No.  My responsibilities for the University is a whole.

9  Q     Approximately how many employees are there in the

10  University?

11  A     I believe we have over 9,000 employees, that's regular

12  full-time employees and faculty.

13  Q     You've talked about Drew DiMeo, who is Mr. DiMeo?

14  A     Mr. DiMeo is the assistant to Greg, so he's a manager

15  that reports to Greg Wacker, and works in the Dean's office.

16  Q     What was Mr. DiMeo's role in regard to Ms. Briggs?

17  A     His role was to go down and be a mediator and between

18  Dr. Wu and Ms. Briggs because of the complaints that Ms.

19  Briggs made to the Dean's office frequently.  So, Greg Wacker

20  asked Drew to go down and kind of mediate those

21  conversations, make sure things got done, and that, you know,

22  time lines were put in place and that they both understood

23  each other.

24  Q     What did Drew become involved?

25  A     Why did Drew become involved?

1    Q    Yes.

2    A    Because of Ms. Briggs' complaints to the Dean's office

3    and to Greg Wacker.  And, you know, Greg Wacker couldn't

4    spend time down in CIS, so he asked Drew to do it.

5         My understanding -- and he also when Ms. Briggs

6    complained to me and I called Mr. Wacker in regards to those

7    complaints, he decided to put Drew down there so he could,

8    you know, kind of have an eye to the situation.

9    Q    You spoke yesterday and today, as well, about how you

10   rely on Mr. Wacker to provide you with information.

11   A    Yes, I do.

12   Q    Is that true -- let me ask you something else?  Does Mr.

13   Wacker play that role for the whole college?

14   A    For College of Science Technology, yes.

15   Q    Is it unusual for Mr. Wacker to be involved in employee

16   relations type issues?

17   A    No.

18   Q    Do other employees in Mr. Wacker's position at other

19   colleges in the University play the same type of role?

20   A    Yes, they do.

21   Q    When would you refer something to Mr. Wacker, someone in

22   a similar position to him, as opposed to the EOC?

23   A    When I get complaints and, you know, and usually they're

24   about employment practices, you know, people who have

25   conflict with their supervisors or their coworkers, what I

81

1    will do initially, because we don't know what the basis of

2    the claims are, I'll have Greg Wacker look into it.  And I

3    did that with many -- with all of the business managers --

4    what I consider to be business managers for all of the

5    schools and colleges.

6    Q    We've spoken about EOC.  Is EOC and Human Resources in

7    the same department?

8    A    No, they're totally separate departments.

9    Q    Do you sit together?

10    A    No, we're in different locations.

11    Q    What's the difference between EOC and Human Relations?

12    A    Human Resources?

13    Q    Human Resources.

14    A    Okay.  So, obviously, Human Resources is responsible for

15    employment, recruitment, benefits, employee relations, labor

16    relations.  My area specifically looks into employment

17    practices.  And EOC basically investigates all discriminatory

18    and sexual harassment complaints at the University for both

19    employees and students.

20    Q    Rhonda Brown's name has come up in this case.  Who is Ms

21    Brown?

22    A    Ms. Brown was the, I believe, the Associate Vice

23    President for what was Multicultural Affairs and eventually

24    became IDEAL.

25    Q    In the 2010 to 2014 time period, did Ms. Brown work in

82

1    Human Resources?

2    A    She never worked in Human Resources.

3    Q    Did she work in EOC?

4    A    Not at that time, no.

5    Q    Was Ms. Brown responsible for conducting workplace

6    investigations at that time?

7    A    She was not.

8    Q    You spoke about giving Ms. Briggs the option to resign,

9    do you recall that?

10    A    Yes, I do.

11    Q    Is it common that employees are given the option to

12    resign in lieu of termination?

13    A    Yes, we do that -- we have done that many times.

14    Q    Did Dr. Wu participate in that decision to offer

15    resignation --

16    A    Yes.

17    Q    -- to Ms. Briggs?

18    A    Yes; yes, he did.

19    Q    And in what way?

20    A    He counseled with Greg Wacker and agreed to the decision

21    to allow her to resign.

22    Q    At the April 1st, 2014 meeting you had with Ms. Briggs

23    and Mr. Wacker, did you present her with the option to

24    resign?

25    A    Yes.

83

1   Q    Did Ms. Briggs ask you for time to consider that option?

2   A    Yes.

3   Q    Did you give that to her?

4   A    Yes, I did.

5   Q    Why?

6   A    I wanted her to, you know -- we wanted to be kind to

7   her.  You know, she was ultimately losing her job and wanted

8   to give her the option to think about, to go away with some

9   information so she can make an educated decision on what, you

10  know, in regards to what she wanted to do.

11  Q    Was the end of Ms. Briggs' employment processed as a

12  resignation?

13  A    Yes, it was.

14          MS. SATINSKY: If you could please pull D-23?

15  BY MS. SATINSKY:

16  Q    Ms. Briggs -- Ms. Walton, what is this document?

17  A    This is a letter from Ms. Briggs to me resigning from

18  the College of Science Technology.

19          MS. SATINSKY: I'd like to move this document into

20  evidence, Your Honor.

21          MS. MATTIACCI: No objection.  I think it's already

22  been admitted.

23          THE COURT: All right, it's admitted.

24  BY MS. SATINSKY:

25  Q    What is the date on this document?

84

1   A    April 3rd.

2   Q    Between April 1st and April 3rd, did Ms. Briggs contact

3   you?

4   A    I believe she did.

5   Q    Did she have questions for you?

6   A    I think -- yes.  She had questions in regards to

7   unemployment and I explained that to her.  And I believe that

8   she had questions regarding benefits and I talked to her

9   about her benefits.

10  Q    You testified about Ms. Briggs termination letter today.

11  A    Yes.

12  Q    Were you involved in making the decision to draft that

13  letter?

14  A    I was -- yes.

15  Q    Were you involved in counseling the College with regard

16  to the incidents discussed in that letter?

17  A    Yes.

18  Q    Did you help the College come to the conclusion that Ms.

19  Briggs should be terminated?

20  A    Yes, I did.

21  Q    After Ms. Briggs left Temple, do you know if she applied

22  for any positions at the University?

23  A    I believe that she did.

24  Q    Do you know whether or not she received them?

25  A    No, she didn't.

1    Q    Do you know why?

2    A    Most of the positions that she applied she was not

3    qualified for.

4    Q    Did Ms. Briggs also apply for positions within the

5    University while she was employed?

6    A    Yes, she did.

7    Q    Did you assist her with that?

8    A    Yes.

9    Q    In what way?

10   A    So, during Ms. Briggs' employment when she asked for my

11   help and to identify other positions at the yesterday, what I

12   told to her and as I've told other employees, you know, if

13   you send me the positions that you've identified, if you send

14   this to me I will make sure that they get in front of the

15   recruiter.  And if you're qualified I'll make sure the

16   recruiter sends you on and that you're kind of at the top of

17   the hiring manager's list of perspective candidates.

18   Q    Did you do that for Ms. Briggs?

19   A    I did that when -- yes, I did.  What I offered to Ms.

20   Briggs is when she sent me jobs, I forwarded it on.  Many

21   times, our recruiter said that she was not qualified.

22   Q    Are employees able to transfer within the University if

23   they have discipline?

24   A    No.  Once a person has a written discipline, they -- our

25   recruiters are able to look into a database to see if someone

1    has a written discipline.  If they see that they are, they

2    cannot forward them on.  But what we do many times when

3    employees are having difficulties in their department, we

4    will drop that rule and allow them to bid out.

5    Q    Did you do that for Ms. Briggs?

6    A    Yes.

7    Q    When an internal candidate applies for a position, can a

8    hiring manager review their discipline?

9    A    No.

10   Q    Do you know who replaced Ms. Briggs after she left at

11   Temple?

12   A    I believe it was a woman by the name of Marilyn

13   Grandshaw.

14   Q    Do you know how old Ms. Grandshaw is?

15   A    I only know prior to coming here yesterday.  I looked

16   that up.

17   Q    And what did you learn?

18   A    I learned that Ms. Grandshaw was, I believe, born in

19   1967.

20   Q    Does Ms. Grandshaw still work for Dr. Wu?

21   A    No, she does not.

22   Q    What is her current position?

23   A    My understanding is that she now works in the School of

24   Engineering.  She works in the School of Engineering, and I

25   believe she reports -- she works for Drew DiMeo.

87

1   Q     Was that a promotion?

2   A     Yes.

3   Q     Did somebody replace Ms. Grandshaw?

4   A     Yes.  A woman by the name of Yvette Sanchez.

5   Q     Do you know how old Ms. Sanchez is?

6   A     Yes.  I looked her information up prior to yesterday and

7   she had a birth date of 1964.

8   Q     Did you know Ms. Briggs before she started working for

9   Dr. Wu?

10  A     Yes, I did.

11  Q     In what way?

12  A     I have known Ms. Briggs since she worked in the College

13  of -- maybe not from the beginning.  I worked -- I knew her

14  from working in the Dean's office, from the early 2000's.

15  Q     What was your impression of Ms. Briggs at that time?

16  A     When I first met her?

17  Q     Around the time that you were just talking about?

18  A     I found Ms. Briggs to be a nice well meaning person That

19  was a little scattered or confused and did not perform well

20  in her position.

21  Q     Did Ms. Briggs' supervisors prior to Dr. Wu contact you?

22  A     Yes.

23  Q     About what?

24  A     Her job performance.

25  Q     Did they identify specific deficiencies?

88

1  A    They said that Ms. Briggs had --

2           MS. MATTIACCI: Objection, Your Honor; hearsay.

3           THE COURT: Yes.

4           MS. SATINSKY: Your Honor, the performance

5  evaluations for Ms. Briggs prior to her working for Dr. Wu

6  were moved into evidence.  I'm also asking about the

7  witness's impressions.

8           THE COURT: What was the last question?  Was it

9  impression or?

10          MS. SATINSKY: I can state the question if you like,

11 Your Honor.

12          THE COURT: All right.

13 BY MS. SATINSKY:

14 Q    Ms. Walton, from your interactions with Ms. Briggs'

15 supervisors prior to Dr. Wu, what was your impression, if

16 any, regarding her deficiencies?

17          MS. MATTIACCI: Objection; same objection, Your

18 Honor.  It's based on hearsay.

19          MS. SATINSKY: Your Honor, I asked her what her

20 impression as it goes to her state of mind.

21          THE COURT: No, it really calls on the basis of it,

22 but is this the kind of thing that she would rely on in her

23 position with Temple?

24          MS. SATINSKY: Ms. Walton?

25          THE COURT: Yes.

1          MS. SATINSKY: Yes.

2          THE COURT: Yeah, I'll allow it.  Overruled.

3     BY MS. SATINSKY:

4     A     For my interaction with the College and with Ms. Briggs,

5     her performance was not -- there was problems with her

6     performance.  She made many errors.  She had problem with

7     attention to detail.  And many of those errors were as a

8     assistant or admission assistant in the Dean's office, and

9     which is one of the reasons why eventually Ms. Briggs was

10    moved out of the Dean's office.

11    Q     Did Ms. Briggs come to you ever prior to have her

12    working for Dr. Wu?

13    A     Yes.

14    Q     What did she come to you about?

15    A     She came to me because they were bringing her errors.

16    The Dean's office (indiscernible) bringing Ms. Briggs errors

17    to her attention.  They were talking with her about it. She

18    was never disciplined, but they were bringing them to her

19    attention.

20          Greg Wacker was one of those people that was working

21    with her and her deficiencies.  They were bringing it to her

22    attention.  So, she would call me in regards to it.  She

23    would ask for assistance in bidding out of the Department,

24    and many times she also called to defend herself.

25          MS. SATINSKY: Could you please pull up D-72 and if

90

1   you could, please, publish it as well?

2   BY MS. SATINSKY:

3   Q    Ms. Walton, have you ever seen this document before and

4   there's pages that follow?

5   A    Yes.

6   Q    If we go to the second page.  If you look at A, do you

7   see where that is?

8   A    Yes.

9   Q    Were you aware of that?

10  A    From this email, yes.

11  Q    And if we go to B, is this something you were aware of?

12  A    Again, because I received the email -- because I saw

13  this, yes.

14  Q    And if we could expand C, D, and E.  Were these also

15  issues that you were aware of?

16  A    Yes.

17       MS. SATINSKY:   If we could please turn to the next

18  page?

19  BY MS. SATINSKY:

20  Q    Were these issues you were aware of as well?

21  A    Yes.

22  Q    Go back to the first page, the actual email.  What was

23  the date on this email?

24  A    November 19th, 2010.

25  Q    The categories that you just testified to that we just

1   looked at, were those issues you were aware of relating to

2   Ms. Briggs prior to November of 2011?

3   A    Yes.

4   Q    Did these issues result in discipline?

5   A    No, they did not.

6   Q    Why not?

7   A    At the time, I think doctor -- I don't think.  Dr. Wu

8   was not trying to discipline Ms. Briggs.  He was trying to

9   change her performance.  He was trying to improve on it. And

10  he was asking assistance for that.

11  Q    Were there any other issues that Dr. Wu, Mr. Wacker or

12  Mr. DiMeo brought to your attention about Ms. Briggs that did

13  not result in discipline?

14  A    I'm sure there was.

15  Q    Why didn't those result in discipline?

16  A    Again, they wanted to help Ms. Briggs. At some point,

17  Dr. Wu -- I did have a conversation with Dr. Wu.  He just

18  asked if there was a way to move her out into another

19  position that was more suitable for her.  They didn't want to

20  discipline her.  They thought she was as nice lady, thought

21  she was very nice.  They didn't want to discipline her.  They

22  wanted to improve her performance.

23  Q    Were there issues that Dr. Wu, Mr. Wacker and Mr. DiMeo

24  came to you about that that were not documented?

25  A    Yes.

92

1    Q    Why weren't they documented?

2    A    It was kind -- we were having conversations.  They were

3    coming to me for coaching, counseling, ideas of trying to

4    help Ms. Briggs and turn around her behavior.  So, it wasn't

5    something that we felt we needed to document.

6    Q    Is that common for employees that you work with?

7    A    It's common that when I counsel and coach departments

8    that I don't always document conversations about employees

9    and trying to improve their performance.

10   Q    At this email that's up on the screen, following this

11   email did you have conversations about potentially moving Ms.

12   Briggs to a different department?

13   A    I may have with Greg Wacker, but from my understanding

14   she had been moved to Dr. Wu's area because of deficiencies

15   in the Dean's office.  So, there was ongoing conversation,

16   but I don't think we ever moved her.

17   Q    You discussed the rules of conduct in your testimony

18   earlier.  Is that a document you frequently look at?

19   A    Yes.

20   Q    And why?

21   A    Why do I frequently look it?  Because I need to be

22   familiar with it.  We use it when we're dealing with many of

23   our -- many of the issues at the University.  Also, I use it

24   when I'm coaching and counseling managers and advising them

25   on taking disciplinary actions.

93

1    Q    Have you been involved in disciplining employees other

2    than Ms. Briggs?

3    A    Yes.

4    Q    Approximately how many times over your career at Temple?

5    A    Many that I lost count.

6    Q    What level employees have you been involved in

7    disciplining?

8    A    From entry level to executives.

9    Q    Have you been involved in disciplining other employees

10   for Category B violations?

11   A    Category B, yes.

12   Q    Have you been involved in disciplining other employees

13   for Category C violations?

14   A    Yes, I have.

15   Q    Have you been involved in disciplining employees for

16   Category D violations?

17   A    Yes, I have.

18   Q    Have you been involved in disciplining employees or

19   terminating employees for engaging in discrimination,

20   retaliation and harassment?

21   A    Yes.

22   Q    What level of employees have you been involved in

23   issuing discipline for, for those reasons?

24   A    What level of employees?

25   Q    Yes.

94

1   A     I think all levels.

2   Q     So, Ms. Walton, you testified what this discipline

3   related to, is that correct?

4   A     Yes.

5   Q     The candidate who was coming to interview, would he have

6   brought students with him?

7   A     My understanding, yes.  He would have brought students

8   and money to the University.

9   Q     Is that something the University takes lightly?

10  A     No, that was something that was very important to the

11  College of Science Technology and the University.

12  Q     Can you explain why you felt that Ms. Briggs errors here

13  necessitated a Category C violation as opposed to a different

14  category?

15  A     This responsibility was one of Ms. Briggs' essential

16  functions, so this is something that she does.  And the fact

17  that we had a faculty member, prestigious faculty member --

18  or I'm sorry; not faculty member, but a candidate for a

19  faculty position coming to the University and was bringing

20  monies as well as students and we ultimately lost this

21  candidate.  They never came.

22      I thought that was a C -- I felt it was negligence,

23  Because she did not perform her job responsibilities. So, it

24  wasn't that -- it didn't fall into the category inefficiency

25  because it wasn't just something that she just didn't do

95

1    well.  It was something she completely neglected and she did

2    not provide the travel arrangements for this individual.

3              MS. SATINSKY: If you could please pull up Exhibit

4    D-5, and the fourth page marked Temple 152?

5    BY MS. SATINSKY:

6    Q    Ms. Briggs [sic], I want to direct you down to -- I'm

7    sorry; Ms. Walton.  I apologize.

8    A    That's okay.

9    Q    To you and to Ms. Briggs.

10        Ms. Walton, if you go down to disciplinary procedure at

11   the bottom.

12   A    Yes.

13   Q    Counsel asked you some questions about this paragraph,

14   is that correct?

15   A    Yes, she did.

16   Q    Can you read the last sentence of this disciplinary

17   procedure?

18   A         "Repeated violations of work rules within a

19             specific category over a 12-month period will lead

20             to the next step in the progressive discipline

21             process."

22   Q    Can you explain what that means?

23   A    So, what that means is that within a one-year period if

24   the person violates a work rule in that same category that

25   the person will be violated for the -- will be --I'm sorry --

96

1    disciplined for the next step in that category if it's in the

2    one year period.

3    Q    Ms. Walton, you've testified about Sandy Foehl.  At any

4    time during Ms. Briggs' employment, did you learn the content

5    of Ms. Briggs' conversations with Ms. Foehl?

6    A    No.

7         MS. SATINSKY: If we could please turn to P-40?

8    BY MS. SATINSKY:

9    Q    Ms. Walton, this is a series of emails that counsel

10   discussed with you earlier today, do you recall that?

11   A    Yes, I do.

12   Q    You didn't read this first email on this page from you

13   to Ms. Briggs on March 25th, so the jury hasn't had an

14   opportunity to see that.  Could you please read that email

15   for us?

16   A    Sure.

17             "Good morning, Ruth.  Every time you have reached

18             out to me I have talked with you and looked into

19             your complaints and concerns.  I will agree not

20             always timing for you because of the

21             responsibilities and scheduled obligations.  I did

22             not ask you to lie about being disciplined, but

23             offered you the ability to bid out by letting the

24             general list know to not reject your application

25             because of the discipline.  You told me that you

1    reached out that you reached to Sandra Foehl for

2    help and did not hear from her. I talked to Sandra

3    and she replied to you and offered her services to

4    you several weeks ago and you have not replied back

5    to her. I did not contact Greg or Drew, but they

6    did call me concerning your Friday meeting and Dr.

7    Wu's expense report. Greg and Drew gave me the

8    facts of the situation. If you would like to

9    discuss further or dispute any of my facts, please

10    contact me."

11 Q If you like, you can go down through those emails and

12 take a look. They're also in the binder in front of you if

13 that might be easier.

14   But my question for you is in any of these emails that

15 Ms. Briggs sent to you, did she ever refer to her age, her

16 sex, or retaliation?

17 A No, she did not.

18    MS. SATINSKY: If we could please pull up P-9.

19 BY MS. SATINSKY:

20 Q Ms. Walton, this is an email you testified about

21 yesterday, do you recall that?

22 A Yes.

23 Q If you go down -- Ms. Foehl forwarded this email to you,

24 is that correct?

25 A Yes, she did.

98

1    Q    If you go down to Ms. Briggs' email to Ms. Foehl, is

2    there anything in Ms. Briggs' email to Ms. Foehl regarding

3    her age, her sex, or retaliation?

4    A    No, there isn't.

5    Q    Was it appropriate for Ms. Foehl to refer this to you?

6    A    Yes, it was.

7    Q    Why?

8    A    Because most of her complaints were more of employment

9    practices.

10         MS. SATINSKY: If you could please pull up P-17.

11   BY MS. SATINSKY:

12   Q    Ms. Walton, this is another email you testified about

13   yesterday, do you recall testifying about this?

14   A    Yes, I do.

15   Q    I like you to read this email and let me know if there's

16   anything in this email that Ms. Briggs wrote to you about her

17   being treated differently because of her age, sex, or

18   retaliation?

19   A    No.

20   Q    At any time, did Ms. Briggs tell you she was being

21   treated differently because of her age?

22   A    No, she didn't.

23   Q    At any time did Ms. Briggs tell you she was being

24   treated differently Because of her gender or sex?

25   A    No, she did not.

99

1   Q    At any time, did Ms. Briggs tell you she thought she was

2   being retaliated against?

3   A    No.

4          MS. SATINSKY: If we can please turn to D-24.

5   BY MS. SATINSKY:

6   Q    Ms. Walton, you testified that you participated in

7   drafting this letter.

8   A    Yes.

9   Q    When you drafted this letter, did you know whether Sandy

10  Foehl or the EOC office was conducting any investigation with

11  regard to Ms. Briggs?

12  A    No, I did not.

13  Q    If you turn to the two bullet points and take a look at

14  those.

15  A    Okay.

16  Q    What is the date of the first incident?

17  A    It was March 20th.

18  Q    What is the date of the second incident?

19  A    March 13th and 14th.

20  Q    Did both of those incidents fall within the calendar

21  year from the discipline that Ms. Briggs had received in

22  March of 2013?

23  A    Yes, it does.

24  Q    At any time during Ms. Briggs' employment at Temple,

25  were you aware that she complained about age discrimination?

100

1   A    Never, no.

2   Q    At any time during Ms. Briggs' employment at Temple,

3   were you aware if she complained of sex discrimination?

4   A    No.

5   Q    At any time during Ms. Briggs' employment at Temple,

6   were you aware she complained of retaliation?

7   A    No.

8   Q    At any time during Ms. Briggs' employment at Temple,

9   were you aware that she complained of being harassed because

10  of her age?

11  A    No, I was not aware.

12  Q    At any time during Ms. Briggs' employment at Temple,

13  were you aware that she complained of being harassed because

14  of her sex?

15  A    No, I was not aware.

16  Q    At any time, were you concerned that Ms. Briggs was

17  being treated differently because of her age?

18  A    No, I was never concerned about that.

19  Q    At any time, were you concerned that Ms. Briggs was

20  being treated differently because of her sex?

21  A    No.

22  Q    At any time, were you concerned that Temple was

23  retaliating against Ms. Briggs?

24  A    No.

25  Q    At any time, were you concerned that Ms. Briggs was

101

1    experiencing sex-based harassment?

2    A    No.

3    Q    At any time, were you concerned that Ms. Briggs was

4    experiencing age related harassment?

5    A    No.

6    Q   Did you agree with the progressive discipline that Ms.

7    Briggs received?

8    A    Yes, I did.

9    Q    Why?

10    A    I agree with it because of the infractions that she

11    violated and because followed our policy.

12    Q    Other than Ms. Briggs, have any employees come to you

13    about Dr. Wu?

14    A    No.

15    Q    The two women you mentioned earlier who replaced Ms.

16    Briggs, were they both over 50?

17    A    Yes.

18         MS. SATINSKY: I have no further questions at this

19    time, Your Honor.

20         THE COURT: You may question.

21         MS. MATTIACCI: Thank you, Your Honor.

22          REDIRECT EXAMINATION

23    BY MS. MATTIACCI:

24    Q    Let's start with Ms. Grandshaw, you said that her date

25    of birth is 1967.  So, at the time then that she replaced Ms.

102

1   Briggs that would make her either 46 or 47, depending on the

2   month of her birthday, correct?

3   A    If I was to do the math, I think so.

4   Q    Okay.  And counsel showed you D-72 which was that -- let

5   me back up for a second.

6        It's your testimony I understood it that Ms. Briggs was

7   so deficient in her performance, made so many mistakes, that

8   this has been going back for years before she even was in the

9   College of Science and Technology, correct?

10  A    No, that's not what I said.  It was during her time

11  working in the College of Science of Technology.  It began in

12  the Dean's office.

13  Q    Okay.  Was that 2005?

14  A    I think so.  I don't have the exact dates.  But it was

15  when she was working in the Dean's office and she was working

16  I believe as an exec assistant and reporting to George

17  Palladino.

18  Q    Right. So, George Palladino that pre-dated Dr. Wu,

19  correct?

20  A    Yes, he did.

21  Q    Okay.  And so, while Ms. Briggs was the executive

22  assistant to the Dean at that time prior to 2009 when Dr. Wu

23  joined, you're saying that Ms. Briggs' performance was so

24  deficient and making so many mistakes that it was impacting

25  the workplace?

1  A    Yes.

2  Q    Okay.  Dr. Wu didn't join Temple until 2009, you recall?

3  A    Yes.

4  Q    And Dr. Wu he was very important, wasn't he at that time

5  coming into Temple?

6  A    To be honest with you, I don't know about Dr. Wu coming

7  into Temple, so I would imagine he was the Chair of the CIS

8  Department that, you know, that he would be considered to be

9  important to have such a position.

10  Q    That's what I'm saying.  So, he was coming in and he's

11  going to get the position of the Chair of the Department of

12  Computer and Information Sciences, right?

13  A    Yes.

14  Q    And he was highly regarded, correct?

15  A    I would imagine.  Again, I can't speak to Dr. Wu's

16  credentials, but, yes.  I would imagine if we put a Chair in

17  place of that department, they would be highly regarded.

18  Q    And would you agree with me it was a lot of work to

19  recruit him to come to Temple, correct?

20  A    I don't know about the recruitment process.  I wasn't

21  involved.

22  Q    How about just generally when you're naming a new chair

23  of a department, that's a pretty big decision for Temple,

24  wouldn't you say?

25  A    I would imagine it's a big decision for the School of

1    Science and Technology, yes.

2    Q    And you want to make sure you have a very good executive

3    assistant assigned to that person when they're coming in,

4    correct?

5    A    Absolutely.  We want to put capable people in the

6    position that's reporting to someone.

7    Q    And Temple chose in 2009 to put Ms. Briggs in the

8    position of the executive assistant to Dr. Wu after she spent

9    several years being the executive assistant to the other

10   deans and chairs in that department, correct?

11   A    I don't know that for sure.  The decision was made

12   because the errors that she was making in the Dean's office

13   which is a much more prestigious office or much more

14   prestigious position, the Dean's office, and, you know, it

15   was an office that, you know, many people at the University

16   interacted with such as the President's office.  They thought

17   that her skill level was not a good fit for the Dean's

18   office, but could be a better fit for working in a

19   department, a smaller area, you know, assisting faculty.

20   They thought her skill level could be better there because it

21   wasn't a good fit for the Dean's office.

22   Q    She had the same title executive assistant, correct?

23   A    I don't believe so.  I'm not sure.  I believe she was

24   administrative assistant, so I'm not sure.

25   Q    You don't know.

1   A    But it was different responsibilities compared to Dean's

2   office.

3   Q    You know that for a fact?

4   A    The responsibilities?

5   Q    Yes.

6   A    I know that there's -- from my experience at the

7   University and working with many of the schools, I know that

8   the -- working for a chair in a department is much different

9   than working in a Dean's office; whereas, much more

10  visibility in the Dean's office with many of the contacts

11  outside and within the University.

12  Q    Okay.  Within a year of Ms. Briggs working for Dr. Wu,

13  he started making complaints that he didn't want her working

14  with him anymore, correct?

15  A    That's my understanding.

16  Q    And we saw that email that he wrote within a year

17  working or around a year of working with her that he asked

18  for her to be replaced, correct?

19  A    I believe.

20  Q    And then if you turn to D-43.  When he made that request

21  to Human Resources.  Now, this is from Sharon Boyle to Dr. Wu

22  and Gregory Wacker.  And Sharon Boyle she's your boss,

23  correct?

24  A    Yes, she is.

25  Q    And she wrote back to Dr. Wu,

106

1          "I'm writing the follow-up on our meeting regarding

2          the performance with Ruth Briggs.  Following our

3          meeting, I met with Ruth Briggs and based on the

4          discussions and information received in both

5          meeting, there is no basis for disciplining Ruth at

6          this time.  My recommendation is to continue to

7          assign tasks to Ruth through email with cc Alex and

8          to alert Alex any problems as soon as they become

9          evident.  As stated, Monica Washington, Deirdre

10          Walton and I are always available for consultation

11          as issues arise.  Sharon Boyle."

12     Do you see that?

13     A    Yes, I do.

14     Q    Were there any problems brought to the attention of Alex

15     as directed by this email from Human Resources in regards to

16     Ruth Briggs?

17     A    I'm not sure and I'm not sure who Ms. Boyle is referring

18     to in regards to Alex.

19     Q    Okay.  Let's go take a look at -- so, let me just jump

20     back for a second.  I was confused your testimony on direct

21     examination.  You were saying that Dr. Wu just wanted to

22     help, that he sent that email because he wanted to help her?

23     A    Yes.

24     Q    But, in fact, the email said he wanted to replace her.

25     A    What he was asking Ms. Boyle was her to be moved to

1  another department.

2  Q    Okay.  So, he didn't want to help her in that current

3  position.  He wanted her out?

4  A    He -- no, he did not want her terminated.  What he felt

5  was that he needed somebody else, that she didn't have the

6  skills that he needed.  And I believe Ms. Boyle was saying to

7  him was to work with her.

8  Q    Isn't it true that you -- when there is an investigation

9  done into an employee's complaints that you partner with

10  Sandy Foehl in regards to the investigations?

11 A    No, not all, but sometimes.  It depends.

12 Q    It depends.  Sometimes, you do partner with her?

13 A    If we receive a complaint that seems to cross between

14 employment practices and what could be discrimination, rather

15 than us do separate investigations, we partner.

16 Q    Okay. And you'd agree with me that the claims that Ms.

17 Briggs was bringing to your attention could be

18 discrimination, correct?

19 A    No, I didn't know.  I wanted Ms. Foehl to let me know if

20 she thought they were discrimination complaints.

21 Q    So, then you spoke to her about the complaints, is that

22 correct?

23 A    Ms. Foehl?

24 Q    Yes.

25 A    I don't remember if I did or not.  I know that I sent

108

1    her an email when Ruth sent as you had -- you showed the

2    email earlier.  I sent that email onto Ms. Foehl to get her

3    determination.

4    Q    Isn't it true that you explained to Ms. Foehl that you

5    were looking -- that you were going to look into the

6    complaints and that you were going to talk with Mr. Wacker

7    and Mr. DiMeo?

8    A    Yes.

9    Q    Okay.  And did you explain to Ms. Foehl that looking

10   into those complaints and concerns involving Mr. Wacker or

11   Mr. DiMeo involved Mr. DiMeo speaking with Dr. Wu about those

12   complaints?

13   A    Well, Ms. Briggs complaints were about Dr. Wu, so, yes,

14   I wanted Greg to look into it.  If he had to talk to Dr. Wu,

15   then he would have to talk to Dr. Wu.

16   Q    And you believe that he did talk to Dr. Wu about Ms.

17   Briggs' complaints?

18   A    Yes.

19          MS. MATTIACCI: The court's indulgence for one

20   second and then I think I'll be done.

21          THE COURT: All right.

22          MS. MATTIACCI: I have no further questions.  Thank

23   you.

24          MS. SATINSKY: I have no further questions, Your

25   Honor.

109

1          THE COURT: You may step down. Thank you.

2          THE WITNESS: Thanks.

3      (Witness excused)

4          THE COURT: It's about five after twelve.  Let's

5  recess for lunch until 1:15.

6          The jury is excused until 1:15.

7          THE COURT CLERK: All rise.

8      (Luncheon recess taken at 12:04 p.m.)

9      (Afternoon Session Continues in Separate Transcript)

10                    *****

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

110

CERTIFICATION

1

2        We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    Transcriptionists:  Cathryn Renzoni, Mary Zajaczkowski, and

8    Coleen Rand

9

10

11

12    _____        July 18, 2018

13    Coleen Rand, AAERT Cert. No. 341

14    Certified Court Transcriptionist

15    For Advanced Transcription

16

17

18

19

20

21

22

23

24

25

**A**

A(1) 27:2
A(2) 27:12
a.m 1:9 3:1
  19:23,24 73:2
  73:3
AAERT 110:13
ability 96:23
  110:5
able 3:16,17 4:3
  6:22 17:5 46:3
  58:25 64:9
  85:22,25
above-entitled
  110:4
absence 65:19
Absolutely
  45:22 104:5
abundance 3:17
abuse 37:18
accepted 60:24
access 39:21,22
  39:23 42:16,18
  42:19 43:3,5,6
  43:8,22 44:17
  45:1,4,9,13,17
  45:20,23 46:1
  46:4,9,17
accounting
  40:16
accounts 43:2,9
  44:25
accusation 39:1
accusations
  41:17 48:25
  49:13 72:20
accusing 42:13
  42:15
Acquisition 1:19
act 16:7
action 21:12
  26:1 27:7 74:5
actions 38:22
  57:16 74:10
  92:25
acts 67:9
actual 90:22

add 42:25
added 39:16
  40:1
addition 4:10
addressing 8:24
adjust 35:25
administrative
  104:24
admissible 5:11
  17:19,21 44:1
admission 25:1
  29:14 33:20
  36:9 55:2,16
  89:8
admit 39:3
admits 18:17,18
admitted 3:23
  4:12 7:8 8:12
  24:13 25:5
  29:17 33:22,25
  36:11 55:4,19
  83:22,23
admitting 18:16
  39:16
adopt 6:19,19
  6:22 8:4
adopted 8:25
Advanced 1:20
  110:15
advised 66:22
advising 92:24
Affairs 81:23
afraid 14:11
  16:12 36:25
afternoon 28:5
  61:1 109:9
afterward 39:3
age 49:4 51:9
  56:7 57:8 58:2
  58:4 97:15
  98:3,17,21
  99:25 100:10
  100:17 101:4
ages 74:17
ago 97:4
agree 21:6,9
  58:1 63:1
  67:24 96:19

101:6,10
  103:18 107:16
agreed 82:20
ahead 77:17
alert 4:2 106:8
Alex 40:13
  106:7,8,14,18
allegations 41:9
allocate 39:20
allow 19:13
  51:25 82:21
  86:4 89:2
allowed 7:20 9:9
Alzheimer's
  13:1
amount 11:18
Andrew 35:15
angry 41:23,24
anonymous
  68:25 69:3,19
anonymously
  72:2
answer 11:4,7
  11:12,15,17,20
  11:25 12:2,5
  12:16 16:22,23
  23:11 44:20
  71:1
answered 23:18
  32:18 70:19,23
anxiety 36:22
  37:3
anymore 105:14
apologize 70:22
  95:7
Apparently 38:6
  38:8
appear 7:21
APPEARAN...
  1:11
appears 40:23
application
  47:23 52:6
  96:24
applied 84:21
  85:2
applies 67:14
  86:7

apply 85:4
appointment
  60:25
approach 22:12
appropriate
  25:25 98:5
approve 21:4
approximately
  58:2 79:9 93:4
April 50:18 53:4
  53:9 59:14,20
  60:3,20 61:2,7
  61:12,21 66:12
  66:21 82:22
  84:1,2,2
area 13:12 37:12
  40:17 62:17
  65:21 76:12
  81:16 92:14
  104:19
arguing 75:18
  75:19
argument 2:4
  3:14,18,22
Argumentative
  32:12
arguments 3:20
arrangements
  63:18 67:23
  95:2
artfully 14:25
asked 6:13,18
  6:24 11:1
  13:11 17:1
  20:21 23:7
  32:16 41:20
  45:8 47:5 77:2
  77:25 79:20
  80:4 85:10
  88:19 91:18
  95:13 105:17
asking 8:24
  18:13 34:2
  43:16 45:12
  63:2 66:14
  88:6 91:10
  106:25
assaulted 37:12

asserted 5:21
assign 106:7
assigned 40:14
  57:21 65:21
  104:3
assignment
  20:19
assignments
  11:5
assist 85:7
assistance 89:23
  91:10
assistant 68:18
  69:6,12,12,20
  71:22 72:1,3
  79:14 89:8,8
  102:16,22
  104:3,8,9,22
  104:24
assisted 73:16
assisting 104:19
Associate 81:22
assume 47:4
assumption 61:9
attached 55:23
attempt 28:5,21
attending 23:20
attention 89:7
  89:17,19,22
  91:12 106:14
  107:17
attracted 67:25
attraction 68:8
attracts 68:2
attributed 14:13
Audio 1:18
August 5:3
  68:14
authenticate
  5:18
authority 32:22
authorized
  30:13 31:1
available 39:25
  40:23 106:10
avoiding 37:24
aware 20:13
  21:11 22:8

23:19 28:8,8
28:13 51:7
61:24 62:1
68:16 77:3,6
77:12 78:2,10
90:9,11,15,20
91:1 99:25
100:3,6,9,11
100:13,15

**B**

**B** 9:4 26:2,19
27:20,23 28:7
28:24 90:11
93:10,11
**B-level** 65:13
**B(10)** 21:23 24:8
28:24 65:24
66:4
**B(11)** 65:25
**B(6)** 65:21
**B(7)** 65:22
**back** 9:19,21
10:7,20 24:4
33:13,14 35:9
35:11 37:15
41:22 45:17
49:19 56:4
60:7 61:2
63:19 65:4
90:22 97:4
102:5,8 105:25
106:20
**back-and-** 35:9
**background**
41:21 42:25
**backwards**
60:13
**bad** 14:13 48:1
**based** 17:22
26:1 29:5 47:3
57:16 62:11
88:18 106:3
**basically** 15:3
50:24 67:14
74:1 81:17
**basis** 38:18
78:21 81:1

**88:21 106:5**
**began** 102:11
**beginning** 10:3
87:13
**behave** 37:7
**behavior** 64:19
66:10 92:4
**believe** 9:11
28:4 30:22
31:11 33:13,13
34:11 35:3,6
42:17,21 44:12
45:10 47:24
51:21 63:21
68:25 71:1
77:4,6 79:11
81:22 84:4,7
84:23 86:12,18
86:25 102:16
104:23,23
105:19 107:6
108:16
**believed** 47:10
**bench** 19:19
**benefits** 81:15
84:8,9
**best** 51:21 52:1
110:4
**better** 10:15
74:13 104:18
104:20
**bias** 49:10,12,12
57:18 62:11
69:17
**bid** 47:20,21
86:4 96:23
**bidding** 89:23
**big** 103:23,25
**bill** 15:12
**bills** 14:14
**binder** 97:12
**birth** 87:7
101:25
**birthday** 102:2
**bit** 32:7
**blow** 65:5,16
**blown** 65:14
**bolstering** 42:13

**book** 64:3
**booked** 63:12
64:6,8
**booking** 63:18
64:24
**born** 86:18
**boss** 105:22
**bottom** 25:20
34:7 59:17
95:11
**Boulevard** 1:21
**Boyle** 105:21,22
106:11,17,25
107:6
**break** 38:13
**brief** 19:11
**Briggs** 1:2 3:12
3:15 4:2,10,16
5:25 6:1 10:8
10:21 11:2
13:5 20:14,16
20:20 21:11
22:6 23:8,16
27:20 28:3,19
29:11,22 30:6
30:9 32:15
34:10,18,21
35:4,18,20,23
36:1,5,15,16
42:10,20 43:5
43:8 44:17
48:7,14,23
49:8,19,22
50:9 52:18
56:6 57:16
59:2,9,15
60:19,24 61:3
61:11,22,25
62:2,12 63:7
63:10 67:21
73:25 74:2,22
77:3,13 78:2,7
78:9,11,12,16
78:20 79:16,18
79:19 80:5
82:8,17,22
83:1,16,17
84:2,10,19,21

**85:4,18,20**
86:5,10 87:8
87:12,15,18
88:1,5 89:4,9
89:11,16 91:2
91:8,12,16
92:4,12 93:2
94:12 95:6,9
96:13 97:15
98:16,20,23
99:1,11,21
100:16,19,23
100:25 101:3,7
101:12,16
102:1,6,21
104:7 105:12
106:2,3,16
107:17 108:13
**Briggs'** 20:22
31:24 33:10
46:21 59:7
62:1,5 76:24
80:2 83:11
85:10 87:21
88:14 94:15
96:4,5 98:1,2
99:24 100:2,5
100:8,12
102:23 108:17
**Briggs/Walton**
2:19,21
**bring** 32:8 40:21
68:7
**bringing** 89:15
89:16,18,21
94:19 107:17
**broke** 3:10
73:15
**brought** 5:20
41:12 91:12
94:6,7 106:14
**Brown** 81:21,22
81:25 82:5
**Brown's** 81:20
**bullet** 27:6
46:13 55:9
64:1 99:13
**bullies** 38:9 39:8

**business** 40:13
43:13 81:3,4
**busy** 76:11

**C**

**C** 9:4 26:2,21
49:22 50:4,7
50:10 63:9
66:4,15 67:1
90:14 93:13
94:13,22
**C(3)** 64:17,25
66:7,9
**C(4)** 64:15,25
65:1 66:7 67:4
67:5,5
**calendar** 99:20
**call** 28:3,5,20
30:9,16,21,23
30:24 31:10,15
31:19,20,20,23
32:2 38:11
47:10,15 78:20
89:22 97:6
**call-in** 30:11
**call-out** 28:9
31:5,6,19
**call-outs** 30:13
31:1
**called** 4:3 23:22
30:11,12 32:16
32:25 35:21,24
38:3,6,12,15
38:20 46:7
47:13 61:13
80:6 89:24
**calling** 21:16
31:12 45:12
**calls** 88:21
**campus** 34:17
**candidate** 86:7
94:5,18,21
**candidates**
85:17
**capable** 104:5
**care** 15:21
**career** 93:4
**careless** 67:9

carelessness
  65:2
caring 6:7,10
Carlin 1:12
carries 38:9
carry 64:16 67:8
case 1:3 9:16
  20:11 31:4
  69:24 81:20
case-in-chief 4:4
  16:2
cast 39:15
categories 90:25
category 26:1,5
  26:14,16,16,19
  26:21,23 27:1
  27:20 28:7,23
  28:24 93:10,11
  93:13,16 94:13
  94:14,24 95:19
  95:24 96:1
Cathryn 110:7
caused 5:1,6
causing 36:22
caution 3:17
cc 106:7
cell 41:2
Center 63:13
  64:10 68:1,7,8
centers 39:13
Cert 110:13
certainly 77:20
CERTIFICA...
  110:1
Certified 110:14
certify 110:2
chair 60:25
  103:7,11,16,22
  105:8
chairs 104:10
chance 32:7
change 91:9
changes 40:4
  55:24
character 39:15
characterized
  69:19
charge 49:3

check 19:21
  45:16 48:25
  62:5,18,20
  63:6
Cherry 1:17
children 36:24
choice 50:21,22
  50:24 51:2
choose 29:3
chooses 51:22
choosing 65:13
chose 28:24 38:4
  39:15 51:5,6
  52:19 54:12
  104:7
chosen 51:4
chronic 65:19
  65:19
CIS 74:14,15
  80:4 103:7
city 63:13 64:10
  68:1,5,7,8
claims 56:7
  62:16 81:2
  107:16
clarify 34:22
  74:19
classes 32:25
clear 19:8
clerical 40:8
CLERK 109:7
client 75:1
close 9:16 68:1
coach 92:7
coaching 79:3
  92:3,24
coffee 40:21
cogent 4:1
cognitive 4:22
  6:5 17:7
Coleen 110:8,13
college 73:22
  80:13,14 83:18
  84:15,18 87:12
  89:4 94:11
  102:9,11
colleges 79:5,7
  80:19 81:5

colloquium 64:4
come 4:5 13:15
  13:16,19 55:24
  67:25 68:4,9
  70:4,11 77:10
  81:20 84:18
  89:11,14
  101:12 103:19
coming 7:21
  35:2 66:20
  86:15 92:3
  94:5,19 103:5
  103:6,10 104:3
commence 3:1
comments 47:24
common 82:11
  92:6,7
communicate
  76:10,11
Company 1:19
compared 105:1
compensating
  11:9
compensation
  52:3
complain 59:9
complained
  56:10 80:6
  99:25 100:3,6
  100:9,13
complaint 30:2
  57:23 62:24
  68:17 69:1,3,5
  69:10,11,16,17
  69:19,19 70:6
  71:10,21 72:1
  72:7,10,12
  73:15,21 78:9
  107:13
complaints
  20:19,22,24
  23:20 33:11
  41:5,6 49:3
  56:12,25 57:19
  57:22 58:24
  59:4,7 61:6
  62:21 78:11
  79:18 80:2,7

80:23 81:18
  96:19 98:8
  105:13 107:9
  107:20,21
  108:6,10,12,13
  108:17
complete 11:10
  56:6 57:13
  58:23 59:6
completed 54:13
  56:9,25
completely 17:8
  95:1
completeness
  75:16,17
Compliance
  58:14 62:6
computer 45:16
  47:17 71:11
  103:12
concern 45:13
concerned 6:3
  100:16,18,19
  100:22,25
  101:3
concerning 30:4
  97:6
concerns 78:12
  78:16 96:19
  108:10
concerted 38:24
concluded 9:18
  19:18 70:12
conclusion 3:9
  17:6 51:18
  70:4,5 84:18
Concur 39:9,19
  41:19
conduct 25:24
  49:9 64:18,20
  92:17
conducted 3:11
conducting 82:5
  99:10
confer 8:13 9:17
  10:6,11,12,16
  59:18 71:16
confidence 39:6

confirm 38:12
  38:15
confirmation
  35:19 45:4
confirmed 43:4
confirming
  45:23
conflict 80:25
confused 87:19
  106:20
consequences
  39:5 47:19
consider 43:15
  81:4 83:1
considered
  103:8
Console 1:12,13
constituents
  37:10
consultation
  106:10
consuming
  78:17
contact 36:17
  78:23 84:2
  87:21 97:5,10
contacted 29:23
  32:21 33:2
  47:4 57:5
  76:16
contacts 23:3
  105:10
content 47:3
  96:4
contents 5:19
  6:1 25:18,18
contest 52:6
context 15:14
  18:1 75:13
continue 9:14
  47:2 73:6
  106:6
CONTINUED
  20:6
Continues 109:9
contribute 39:6
conversation
  43:9 60:23

61:8,10 91:17
92:15
**conversations**
57:21 59:12
62:2 76:8
79:21 92:2,8
92:11 96:5
**Conwell** 63:13
63:14 64:7
**cookies** 40:21
**correct** 6:11 7:5
12:16 15:18,20
15:23 16:24
20:20 21:8,12
21:14 22:4,7
22:25 23:17,25
24:2 25:14
26:11,15 27:17
27:21,24 28:16
29:4,12,25
30:3,10 31:5
31:10 32:19
33:3,8 34:10
34:13 35:2
41:3,7 42:2,16
42:23 45:21
46:11,14 48:5
48:7,18 49:5
49:22 50:15,18
51:11,16 52:14
52:17,24 53:4
53:9,16 54:4,9
54:20 55:10
56:9,15,19
57:1,9 58:12
58:15,18,21
59:15 60:4,16
61:3,14 62:2,8
62:14,19 63:1
63:7,15,15,23
66:2,5,13,23
68:18 72:7,10
72:13,16,19,22
94:3 95:14
97:24 102:2,9
102:19 103:14
103:19 104:4
104:10,22

105:14,18,23
107:18,22
110:2
**corrective** 25:25
**cost** 39:12
**counsel** 3:20
5:22 15:19
24:12 32:6
68:24 69:19
70:19,24 74:19
77:2 92:7
95:13 96:9
102:4
**counsel's** 8:24
**counseled** 21:2
82:20
**counseling** 79:2
79:3 84:15
92:3,24
**count** 93:5
**course** 64:20
**court** 1:1,19 3:3
3:5,8,15,22 4:3
4:5,7,14 6:7,10
6:16 7:3,6,12
7:14,18,20,24
8:13,13,14,18
8:21 9:1,13,19
9:20,21,22,23
9:24 10:1,2,4,6
10:6,7,9,11,11
10:15,17,19
13:9,11,16,21
13:25 14:7,16
14:18 15:3,6
15:14,17,19,21
15:24 16:4,7
16:15,17,19,21
16:25 17:11,14
17:16 18:13,16
18:20,22,25
19:2,5,10,13
19:16,19,21
20:1 22:14
25:2,5,9 29:17
29:20 32:13
33:22,25 34:3
36:11 43:13,23

44:1,1,4,7,10
44:14,18,20
51:19 52:21,25
53:2,5,7,19,24
54:14 55:4,19
60:1,9,14
65:14 68:21,23
69:8,14,25
70:8,11,14,21
71:5 72:24
73:1,6,9 75:5,9
75:14,18,21
77:16,22 83:23
88:3,8,12,21
88:25 89:2
101:20 108:21
109:1,4,7
110:14
**court's** 108:19
**courtroom** 3:18
**coworkers** 37:9
80:25
**credentials**
103:16
**cried** 14:23
**cross** 2:7 107:13
**cross-examina...**
44:9 73:11
**cross-examined**
16:3
**cry** 14:4
**crying** 14:23
**CST** 30:22
**current** 13:6
86:22 107:2
**currently** 13:5
46:1

___

**D**
**D** 26:2,23 90:14
93:16
**D-23** 83:14
**D-24** 99:4
**D-43** 105:20
**D-5** 95:4
**D-72** 89:25
102:4
**daily** 38:18

**data** 40:9
**database** 85:25
**date** 59:19 64:8
83:25 87:7
90:23 99:16,18
101:24
**dated** 5:2 33:17
68:14
**dates** 64:8
102:14
**day** 1:9 3:10
11:11 28:3,4
28:14 30:10,25
30:25 32:24
39:4,13 52:11
53:5,12 60:21
**days** 27:2,3,8,8
59:15 61:21
65:19
**dealing** 92:22
**dealt** 14:24
**Dean** 68:18 69:6
69:11,12,20
71:22,23,24
72:1,3,15,15
72:22 102:22
**Dean's** 34:13
58:17,19 79:15
79:19 80:2
87:14 89:8,10
89:16 92:15
102:12,15
104:12,14,17
104:21 105:1,9
105:10
**deans** 104:10
**Dear** 36:19
**decide** 53:18,23
**decided** 21:7
62:20 80:7
**decides** 3:15 4:3
**decision** 20:13
20:16,24 21:1
21:3,4 54:18
57:17 62:4,7
62:10,19 82:14
82:20 83:9
84:12 103:23

103:25 104:11
**defend** 39:11
89:24
**Defendant** 1:15
**Defendants** 1:7
**defending** 39:6
**defense** 3:20
5:22 39:2
**deficiencies** 74:6
87:25 88:16
89:21 92:14
**deficiency** 17:7
17:7
**deficient** 102:7
102:24
**defined** 27:1
**Deirdre** 2:11
20:4 36:19
46:23 60:19
106:9
**deliver** 79:4
**demeanor** 14:21
14:22
**dementia** 6:3,6
6:21
**dep** 77:10
**department**
31:6,14,24
40:19 43:2
45:1,7 58:15
60:25 68:17
69:5 71:10,11
72:21 74:14,15
74:18 78:22
81:7 86:3
89:23 92:12
103:8,11,17,23
104:10,19
105:8 107:1
**departments**
37:16 81:8
92:7
**depending**
102:1
**depends** 107:11
107:12
**depose** 5:22
**deposition** 22:13

22:24 23:18,24
24:2 28:13
69:3,6 70:17
70:24 71:3,14
72:2 75:2,8,11
77:19,20 78:1
**depression**
36:22
**described** 5:4
**describes** 4:16
14:1
**description** 40:5
40:11
**detail** 89:7
**detailed** 66:7
**determination**
108:3
**determine** 42:22
**determined** 42:9
42:11
**determines**
62:24
**develop** 74:4,10
**diagnosing** 15:9
**diagnosis** 4:19
5:10 18:8
**difference** 54:2
81:11
**different** 81:10
92:12 94:13
105:1,8
**differently**
98:17,21,24
100:17,20
**difficult** 76:8,9
**difficulties** 86:3
**DiMeo** 23:21
33:1,17 34:12
34:12 35:9,14
36:1,19 41:17
42:6,23,24
57:21 58:1,12
58:23 79:13,13
79:14 86:25
91:12,23 108:7
108:11,11
**DiMeo's** 79:16
**diminish** 40:24

**diminished** 40:8
48:2
**direct** 2:7 20:6
77:21 78:13
95:6 106:20
**directed** 64:1,3
106:15
**direction** 12:17
**disappears**
38:18
**disbelief** 39:14
**disciplinary**
21:11 25:20,25
26:7 27:7
34:23 38:22
74:9 92:25
95:10,16
**discipline** 22:23
23:4 25:13
29:24 36:1
37:22 38:5,7,8
47:9 48:22
66:8,12,15,17
66:19 74:3
76:25 77:3
79:1,4 85:23
85:24 86:1,8
91:4,8,13,15
91:20,21 93:23
94:2 95:20
96:25 99:21
101:6
**disciplined** 22:8
37:23 47:22
66:25 67:2,21
73:25 89:18
96:1,22
**disciplining**
93:1,7,9,12,15
93:18 106:5
**disclaimer**
25:17
**discount** 40:24
**discretion** 29:3
29:5
**discriminated**
57:3 59:10
**discrimination**

49:4,4 51:8,9
56:7,7,25 57:8
57:8,19 58:24
59:4,8 61:6
62:7,11,16
68:17 69:10,16
70:4 71:9,22
73:20 93:19
99:25 100:3
107:14,18,20
**discriminatory**
81:17
**discuss** 40:4
48:20 97:9
**discussed** 84:16
92:17 96:10
**discussion** 48:18
49:16,19 56:18
61:18,21,23,24
**discussions**
106:4
**disorderly** 64:18
**dispute** 33:2,4
45:20 97:9
**disrupt** 64:19
**disruptive** 64:17
66:9
**disrupts** 64:19
**distracted** 4:16
11:3,9
**DISTRICT** 1:1
1:1,10
**diverse** 74:18
**doctor** 15:3,25
16:5,12 91:7
**doctor's** 5:14
**document** 3:23
4:1,9,15 5:2,2
5:13,13,17,18
5:19 6:1,2,23
7:22 8:11,16
8:19 13:14
16:10 17:20
21:17 29:4
32:6 46:6
48:13 83:16,19
83:25 90:3
92:5,8,18

**documented**
46:4,16,18
91:24 92:1
**documents**
42:14 43:25
**doing** 6:14 7:15
28:23 47:6
62:10 70:19,24
**double** 45:16
63:12 64:10,24
**doubt** 39:15
**Dr** 5:1,5,5 11:2
14:24 19:8
20:17 21:2
23:21 32:16,16
32:19,22,23
36:20 37:2,6
37:16 38:4,19
39:16,17,20
40:21 41:5,6,6
41:7,8,14 47:5
57:20,22 59:2
64:4 68:14
76:4,9,16,21
78:4,7,10
79:18 82:14
86:20 87:9,21
88:5,15 89:12
91:7,11,17,17
91:23 92:14
97:6 101:13
102:18,22
103:2,4,6,15
104:8 105:12
105:21,25
106:21 108:11
108:13,14,15
108:16
**draft** 84:12
**drafted** 99:9
**drafting** 56:5,23
57:12,15 99:7
**drafts** 54:19
**Drew** 23:21
32:25 33:16
34:12,12 35:4
35:16,17,23
36:19 37:2,6

37:17,21 39:1
39:4,9,15
40:14 41:9,17
41:20 42:13,17
42:20 43:2
47:4,10,12
57:21,25 58:1
58:8 76:14,18
76:19 78:24
79:13,20,24,25
80:4,7 86:25
97:5,7
**drop** 86:4
**drowning** 46:24
**duties** 64:16
67:7

**E**

**E** 90:14
**earlier** 76:13,24
92:18 96:10
101:15 108:2
**early** 58:2 65:21
74:10 87:14
**earshot** 37:9
**easier** 76:1,4
97:13
**easily** 11:9 14:4
**EASTERN** 1:1
**edit** 55:8
**educated** 83:9
**effect** 7:7 24:23
**effective** 52:11
52:22,25 53:4
**efficiency** 22:3
29:1 66:1
**effort** 38:24
40:25
**either** 53:11
102:1
**electronic** 1:24
110:3
**Electronically**
1:18
**elementary** 40:8
**email** 29:11,22
31:17,20 33:16
34:6 36:14

41:3,11,23,25
42:4,5 45:3
46:24 47:4,17
48:5,13,23
54:22 55:7,13
57:2 59:13
60:10,16 61:4
61:20 68:13
90:10,12,22,23
92:10,11 96:12
96:14 97:20,23
98:1,2,12,15
98:16 105:16
106:7,15,22,24
108:1,2,2
**Email(s)** 2:19,20
2:21,22,23
**emailed** 33:13
33:14 49:18
**emails** 36:4
78:20 96:9
97:11,14
**emotional** 14:1
**emotionally**
17:8
**employed** 13:5
85:5
**employee** 25:24
51:13,14,22
67:15 79:1
80:15 81:15
**employee's**
107:9
**employees** 30:13
30:22,24 31:1
31:15,18,18,19
37:16 78:10
79:9,11,12
80:18 81:19
82:11 85:12,22
86:3 92:6,8
93:1,6,9,12,15
93:18,19,22,24
101:12
**employer** 51:13
51:15
**employment**
13:6 46:11

51:3 52:12,16
54:3,5,5,11
58:14 62:5,6
74:12 80:24
81:15,16 83:11
85:10 96:4
98:8 99:24
100:2,5,8,12
107:14
**ended** 54:5
**endorsed** 38:21
**engaging** 64:18
64:20 93:19
**Engineering**
86:24,24
**ensure** 57:17
**entire** 73:21
74:23
**entry** 40:9 93:8
**entry-level** 40:9
**environment**
5:5 49:5 56:8
**EOC** 9:15 56:10
80:22 81:6,6
81:11,17 82:3
99:10
**Equal** 58:14
62:6
**erratic** 64:18
**error** 63:17
**errors** 74:6 89:6
89:7,15,16
94:12 104:12
**escalate** 47:7
**escalating** 36:20
**especially** 37:1
**Esposito** 11:2
19:8
**Esq** 1:12,12,13
1:15,16
**essential** 4:21
40:7,12,17
94:15
**evaluated** 3:13
**evaluation** 5:24
6:2,4 12:12
**evaluations** 88:5
**evaluator** 5:16

**event** 3:15 4:3
**events** 5:4
**eventually** 45:20
81:23 89:9
**EVID** 2:17
**evidence** 4:11,12
8:12 18:17
25:6 29:18
33:23 36:12
39:2 43:4,7,15
43:21,23,24
44:16,24 55:5
55:20 68:25
77:20 83:20
88:6
**evident** 106:9
**exact** 102:14
**exactly** 7:2,13
23:18
**examination**
3:11 20:6
101:22 106:21
**exception** 4:9,13
5:11 18:5,9
**excessive** 27:2
27:12 28:2,17
**exchange** 59:14
68:13
**exchanged**
54:19
**excuse** 22:9
41:16 66:8,24
**excused** 109:3,6
**exec** 102:16
**executive**
102:21 104:2,8
104:9,22
**executives** 93:8
**exhibit** 2:17
22:24 42:7
71:19 74:20
95:3
**expand** 90:14
**expected** 22:2
28:25 65:25
**expense** 43:1
48:10 63:11
97:7

**expenses** 39:20
**experience** 37:4
40:25 105:6
**experiencing**
101:1,4
**expertise** 40:17
**explain** 78:19
94:12 95:22
108:9
**explained** 76:13
84:7 108:4
**explaining**
75:20
**explanation**
38:19
**external** 37:10
**extra** 11:22
65:23
**eye** 80:8

———————

**F**

**F** 1:10,21
**fact** 17:6 28:11
35:7,20 37:8
37:11 46:17
54:19 62:12
67:25 94:16
105:3 106:24
**facts** 29:5,7
63:17 97:8,9
**faculty** 37:11
47:25 68:2,10
74:16 79:12
94:17,17,18,19
104:19
**failed** 38:1
**failing** 22:2
27:13 28:25
64:16 65:25
67:8
**failure** 65:20
**fair** 56:6
**fairness** 3:17
**fall** 28:2 94:24
99:20
**false** 38:8
**falsifying** 41:18
42:14

**familiar** 24:10
51:8 92:22
**far** 17:16
**father** 6:4 13:2
**fault** 60:12
**fear** 14:12 15:11
**fearful** 4:18
**February** 29:12
**feel** 11:17 37:18
48:1
**feels** 38:24
**felt** 11:16 62:11
92:5 94:12,22
107:4
**female** 69:12
71:23 72:4
**Fendell** 1:16
**fewer** 27:8
**figured** 15:1
**filing** 38:7
**find** 10:2 38:7
41:15,18 73:20
74:11
**fine** 8:5 18:1
**fired** 47:12
**first** 17:20 28:11
36:14 37:22
66:22 87:16
90:22 96:12
99:16
**firsthand** 76:22
**fiscal** 27:3,9,14
**fit** 74:12 104:17
104:18,21
**five** 47:16 109:4
**floor** 1:21 40:20
40:20
**flu** 36:25
**focal** 41:19
**focals** 39:22
**focus** 31:24
**Foehl** 9:15 48:15
48:20,25 49:3
49:14,18 56:13
56:15,16,17,21
56:22 57:7,14
59:11,14,20,22
59:22,23 60:3

60:11 61:3,6
61:12,19 62:2
62:9,21,23
63:6 72:8 96:3
96:5 97:1,23
98:1,2,5 99:10
107:10,19,23
108:2,4,9
**Foehl's** 62:17
**follow** 28:9
30:11 31:4
38:5 43:14
90:4
**follow-up** 106:1
**followed** 47:13
101:11
**following** 40:1
92:10 106:2
**forced** 52:20
**foregoing** 110:2
**forget** 11:24
12:1,3
**forgetting** 7:1
**form** 37:22
**former** 40:13
**forth** 31:3 32:9
35:10 56:4
**forward** 86:2
**forwarded**
48:15 56:15
85:20 97:23
**forwarding** 49:7
**found** 17:6,8
76:8,9 87:18
**foundation**
24:14
**four** 58:6
**fourth** 25:18
95:4
**frame** 14:21
**free** 62:7,11
**frequency** 26:2
40:15,16
**frequent** 78:21
**frequently**
47:25 79:19
92:18,21
**fresh** 77:8

**Friday** 39:1 97:6
**Fridays** 37:1
**front** 23:25
40:23 85:14
97:12
**full** 5:25 13:7
56:6,24 58:23
59:3,6
**full-time** 79:12
**function** 40:17
**functioning** 17:9
**functions** 4:21
6:5 40:7,9,11
40:12,16 94:16
**further** 73:7
97:9 101:18
108:22,24
**FYI** 48:17,17
56:18 61:20

_____

**G**

**G** 1:12
**gender** 74:14
98:24
**general** 31:12
96:24
**generally** 14:3
103:22
**George** 102:16
102:18
**getting** 5:9
14:13 69:14
**give** 7:7 10:14
17:5 22:22
24:10 41:21
57:4 64:2 74:7
83:3,8
**given** 23:4 27:20
27:20 28:1
29:25 33:5
34:23 36:1
38:23 40:6
50:24 51:5
52:7,8,10
53:10,11 54:6
54:12 56:21
64:15,17 66:4
66:11 67:3,8

73:24 82:11
**gives** 38:18
**giving** 82:8
**glitch** 45:15
**go** 4:7 10:17
19:19 25:16
34:6 36:25
37:2 54:15
59:13 64:13
65:4 69:25,25
71:14 72:25
74:23 77:16
79:17,20 83:8
90:6,11,22
95:10 97:11,23
98:1 106:19
**goes** 13:6 88:20
**going** 5:18 9:14
9:16 10:13
12:21,24 14:25
15:1,2 16:11
16:22,23 17:4
24:4,9 28:6,22
31:10 32:7,23
32:24 35:16
38:11 41:19
43:11 56:4
60:12 65:15
74:22 78:21
102:8 103:11
108:5,6
**good** 3:4,5,6,7
20:8,9 22:16
68:5 73:13,14
96:17 104:2,17
104:21
**gossip** 37:13
**gotten** 46:18
66:8,8
**govern** 25:13
**grandchildren**
36:24
**Grandshaw**
86:13,14,18,20
87:3 101:24
**grant** 39:17,20
39:22,23 42:16
43:5,8 44:17

44:18,19
**great** 24:6
**Greg** 20:17,18
20:21 30:4
32:25 34:13
35:23 37:19
41:10 42:14
47:4,11 55:14
55:23 57:21,24
57:25 58:9,19
58:21,22 69:10
71:24 76:14,16
76:17 78:24
79:14,15,19
80:3,3 81:2
82:20 89:20
92:13 97:5,7
108:14
**Gregory** 105:22
**Grinchman**
40:13
**gristmill** 37:13
**grown** 36:23
**guess** 8:23 14:22
46:18
**guests** 40:22
**guidebook**
31:11

_____

**H**

**Hailey** 40:6,10
**half** 34:10
**handle** 43:1
**handled** 58:20
76:13,15 78:22
**happened** 66:19
**happens** 28:17
**happy** 14:3
**harassed** 47:3
100:9,13
**harassment**
47:6 81:18
93:20 101:1,4
**Harris** 1:15 3:4
3:9,25 4:8 6:9
6:11,14,18 7:5
7:10,16,19,23
8:1,9,15,20,23

11:1 12:21,23
13:12,18,23
14:1,9,17,20
15:5,7,18,20
15:23,25 16:6
16:9,14,16,18
16:20,23 17:1
17:10,23 18:4
18:7,15,19,21
19:7,15 20:3
25:3 68:20,24
77:18
**Harris'** 10:8
**head** 58:7
**health** 6:20 14:2
**healthcare**
12:18
**hear** 12:2 75:21
97:2
**hearsay** 5:19
43:11,15,19,19
43:20 44:9,10
44:12 74:25
75:6,7 88:2,18
**held** 47:18 51:15
**help** 12:25 36:20
59:2,2 74:4,11
84:18 85:11
91:16 92:4
97:2 106:22,22
107:2
**Herd's** 40:6
**Hi** 55:23
**highly** 103:14,17
**hiring** 85:17
86:8
**home** 16:13
**honest** 68:2
103:6
**Honestly** 68:10
**Honor** 3:4,9,19
3:25 13:13,19
14:10 20:3
22:13 25:8
29:15,19 32:11
33:19 34:2
36:10 43:12
44:2,3 51:17

53:1,17,21
54:16 55:1
59:21 60:5,10
68:20,24 69:13
69:18 70:13,18
70:22 71:4
73:8,10 74:24
75:3,10,16,19
77:14 83:20
88:2,4,11,18
88:19 101:19
101:21 108:25
**HONORABLE**
1:10
**hope** 38:23
**hostile** 49:5 56:8
**HR** 9:15 37:23
51:7 58:12,13
**Human** 47:7
81:6,11,12,13
81:14 82:1,2
105:21 106:15
**humiliating** 5:7
**husband** 14:13

**I**
**idea** 18:23 47:11
**IDEAL** 81:24
**ideas** 92:3
**IDENT** 2:17
**identified** 85:13
**identify** 85:11
87:25
**illness** 27:9
**imagine** 103:7
103:15,16,25
**immune** 38:6
**impacting** 37:4
102:24
**impermissible**
17:21
**important** 4:25
5:9 94:10
103:4,9
**impression** 7:7
17:18 87:15
88:9,15,20
**impressions**

88:7
**improper** 75:7
**improve** 74:4,7
74:11 91:9,22
92:9
**incident** 28:3
38:25 99:16,18
**incidents** 84:16
99:20
**included** 72:15
**including** 71:23
**incorrect** 45:19
66:6
**INDEX** 2:1
**indiscernible**
6:17 8:6 13:20
15:17,19 17:11
17:23 18:6,25
19:12 43:13
89:16
**individual** 31:6
95:2
**indulgence**
108:19
**inefficiency** 22:2
28:24 33:5
65:24 94:24
**inefficient** 28:7
**infested** 49:10
57:18
**inform** 30:22
**information**
41:13 44:21
71:11 80:10
83:9 87:6
103:12 106:4
**informed** 30:6
**infractions**
101:10
**initial** 67:21
**initially** 66:25
74:5 81:1
**Inn** 63:14 64:7
**input** 49:15
**inquired** 38:14
**instance** 30:12
**institution** 68:3
**instructions**

64:17 67:8
**intact** 6:5,6 17:8
**integrity** 39:7
**intending** 35:4
**intention** 41:13
**intentionally**
37:24
**interacted**
104:16
**interaction** 89:4
**interactions**
88:14
**interests** 51:22
52:1
**interfere** 64:21
**internal** 86:7
**interpreting**
79:2
**interruptions**
4:17
**interview** 94:5
**intolerable** 38:7
**introduced** 4:11
4:12
**investigate**
20:19 49:7
57:10,11 62:25
**investigated**
69:11
**investigates**
81:17
**investigating**
49:3
**investigation**
30:2 56:6,10
56:23,24 57:13
57:14 58:23
59:4,7 62:10
62:14,21 63:7
69:22,23,23,24
70:6 73:16,19
99:10 107:8
**investigations**
70:5 82:6
107:10,15
**investigator**
21:7,10
**involuntarily**

51:3
**involved** 54:18
68:10 79:24,25
80:15 84:12,15
93:1,6,9,12,15
93:18,22
103:21 108:11
**involving** 71:11
108:10
**issue** 3:10 36:21
46:10 48:10
53:22
**issued** 25:13
50:2 66:12
**issues** 23:9,16
23:16 58:20
64:14 73:24
76:13,15,19
78:21 80:16
90:15,20 91:1
91:4,11,23
92:23 106:11
**issuing** 93:23

**J**
**Jackie** 40:6
**January** 21:12
21:18 22:7,24
23:8,15 27:20
76:24 77:13
78:2
**JDR** 1:19
**job** 4:21 40:5,11
40:18,19 47:20
47:21 53:16
57:9,10,11
59:5 64:15
67:7 83:7
87:24 94:23
**job-related** 40:3
**jobs** 85:20
**John** 1:21
**join** 103:2
**joined** 102:23
**joke** 14:3
**Judge** 1:10 3:14
4:8 6:15 8:15
9:9,20 10:18

14:5 18:5
19:21 77:18
**Judy** 38:17
40:22
**July** 1:5 110:12
**jump** 106:19
**June** 23:24
**jury** 1:11 3:2 7:7
19:20,25 53:18
53:22 72:25
73:4 75:13
77:15 96:13
109:6

**K**
**keep** 12:21,24
34:2 75:18
**keeping** 4:17
**KELLY** 1:10
**Kennedy** 1:21
**kind** 51:25
76:18 79:20
80:8 83:6
85:16 88:22
92:2
**King** 40:6,10
**Klein** 72:22
**knew** 22:6,8
35:22 38:5
39:15 49:14
57:5 87:13
**know** 3:21 5:17
11:21 17:17
23:12,15 30:20
31:19 32:3,3
32:19,22 38:17
41:16 44:10,11
45:6,17,18,18
46:23 47:6
52:8 53:11
54:8 56:1
57:13,14 58:4
58:25 59:6,10
59:11 60:21,23
61:8,10 68:3
69:4,22 74:16
76:11 77:4
79:21 80:3,8

80:23,24 81:1
83:6,7,10
84:21,24 85:1
85:12 86:10,14
86:15 87:5,8
96:24 98:15
99:9 103:6,8
103:20 104:11
104:14,15,19
104:25 105:3,6
105:7 107:19
107:19,25
**Knowing** 39:4
**knowledge**
76:22 110:5
**known** 87:12
**knows** 44:4

**L**

**labor** 81:15
**lady** 74:2 91:20
**land** 41:2
**language** 13:19
25:17
**late** 11:8 21:14
21:15,19 22:6
22:9,9 28:5,12
28:14,15,18
31:10 35:2,21
38:2 66:20
77:4
**lateness** 27:12
27:14 37:22
65:20
**latenesses** 27:17
28:2,17 77:7
77:13
**Laura** 1:12
**law** 1:13 51:10
**laws** 51:8
**lay** 24:14
**lays** 26:13
**lead** 26:6 95:19
**leadership**
73:21 74:1
**learn** 86:17 96:4
**learned** 37:23
86:18

**leave** 39:18
50:21
**leaving** 14:14
65:20 78:2
**led** 46:10,12
**left** 20:10 61:12
84:21 86:10
**legal** 25:17
51:18
**Lennon** 38:17
**Lentz** 38:4,10
**let's** 4:7 29:7
33:15 34:6
36:3,14 59:13
60:14 61:2
64:13 67:5
69:25,25 70:11
72:24 75:21
101:24 106:19
109:4
**letter** 46:14 52:9
52:10,24 53:10
54:19 55:9,23
56:5,24 57:5
57:12,15 63:25
66:16 67:2
72:13 83:17
84:10,13,16
99:7,9
**letting** 96:23
**level** 35:25
39:21 49:22
50:4,7,10 63:9
67:19 74:13
93:6,8,22,24
104:17,20
**levels** 94:1
**lie** 39:12 47:23
96:22
**lied** 39:4
**lieu** 82:12
**life** 37:5 47:1,2
**lightly** 94:9
**likes** 14:3
**limit** 17:2
**limited** 19:14
39:21
**line** 11:1 22:21

41:2 71:18
**lines** 79:22
**list** 85:17 96:24
**listed** 39:23
**listen** 14:12
**litany** 4:20
**little** 15:11 32:7
42:11 87:19
**LITTLER** 1:16
**LLC** 1:13
**LLC./** 1:19
**locations** 81:10
**Locust** 1:14
**log** 39:8
**look** 4:15 8:16
13:14 20:21
24:8 25:12
26:25 29:7
33:15 34:6
36:3,14 41:20
42:4 45:7 46:8
49:11 54:22
55:13 63:25
67:5 78:13,14
78:24 81:2
85:25 90:6
92:18,21 97:12
99:13 106:19
108:5,14
**looked** 20:23
27:19 28:7
33:11 44:22
46:9 49:1
53:15 57:25
72:6,6,12
86:15 87:6
91:1 96:18
**looking** 22:23,25
26:10 28:12
46:21 56:11
72:9 108:5,9
**looks** 81:16
**losing** 83:7
**lost** 93:5 94:20
**lot** 14:23 103:18
**lunch** 9:16 109:5
**Luncheon** 109:8
**lying** 39:5 42:15

42:20

**M**

**mail** 14:12 15:13
16:12 18:1
**main** 34:16
**makeup** 74:14
**making** 41:5,9
62:4 84:12
102:24 104:12
105:13
**manager** 30:17
40:13 79:14
86:8
**manager's**
85:17
**managers** 30:16
31:2 79:3 81:3
81:4 92:24
**manner** 48:1
**manual** 30:21
**manufactured**
39:3,10
**March** 33:17
34:8 36:5,6,6,7
36:15 49:21,25
50:2,13 54:23
55:12,22 61:20
63:19 64:6
66:11,15,17
96:13 99:17,19
99:22
**Marilyn** 86:12
**mark** 49:21
**marked** 95:4
**Market** 1:4
**Mary** 110:7
**mask** 36:23
**math** 102:3
**matter** 5:21
43:18 69:21
110:4
**matters** 40:3
**Mattiacci** 1:12
1:13 3:7,19
5:12 6:12,24
7:9,13,25 8:8
8:10 9:8,14

10:21,23,25
12:24 13:10
14:10 15:8,16
16:1,11 17:3
17:13,15,18,24
18:6,11,23
19:1,4,6,11,17
20:7 22:12,15
24:5,7,14,15
25:1,7,10,11
29:14,19,21
32:14 33:19,24
34:1,4,5 36:9
36:13 43:11,16
43:25 44:2,6
44:11,15,19,23
51:20 52:23
53:1,3,6,8 54:1
54:16,17 55:1
55:6,16,21
59:24 60:2,7
60:12,15 65:9
65:11,15,18
69:7,9,15,21
70:3,9,13,15
70:16,20 71:1
71:7,8,17 73:7
74:24 75:4,7
75:16,19 77:14
83:21 88:2,17
101:21,23
108:19,22
**mean** 8:21 15:9
15:13 17:3,15
18:17 28:11
35:16 43:23
49:23 76:15,19
76:21
**meaning** 87:18
**means** 38:21
95:22,23
**mediate** 57:21
76:18 79:20
**mediator** 79:17
**medical** 3:11 4:9
4:13 5:11 6:20
18:8,11
**meet** 15:12 22:2

28:25 34:18
35:4,6,7,16,16
37:2,6 60:22
65:25
**meeting** 32:16
34:22 35:19,22
36:1 37:19
61:11,12,13,16
61:25 82:22
97:6 106:1,3,5
**meetings** 23:20
23:22,23 31:18
37:9,25 76:18
**meets** 61:3
**member** 37:5
94:17,17,18
**members** 47:25
**memo** 66:7
**memory** 6:5
33:13 45:11
68:19
**men** 74:17
**MENDELSON**
1:16
**mental** 17:7
**mention** 5:5
**mentioned**
72:13,22
101:15
**message** 38:23
**met** 35:14,17
50:25 60:19
72:12,18,21
87:16 106:3
**mind** 88:20
**minute** 9:25
10:14,18 64:9
75:5
**minutes** 47:16
72:25
**mischaracteri...**
68:24
**missing** 39:13
**misspoke** 59:24
**mistake** 67:14
67:20,20,21,23
**mistaken** 9:2
66:9

**mistakes** 11:21
67:18 102:7,24
**Monday** 36:17
**Mondays** 37:1
**money** 94:8
**Monica** 106:9
**monies** 94:20
**month** 26:4
102:2
**morning** 3:4,5,6
3:7 20:8,9
21:14 34:17
38:12,16 40:1
60:20 61:7
73:13,14 96:17
**move** 25:1 29:14
33:19 36:9
55:1,16 60:14
75:23 83:19
91:18
**moved** 77:20
88:6 89:10
92:14,16
106:25
**moving** 92:11
**Multicultural**
81:23
**multiple** 69:4
**Munshi** 1:13 9:7
10:24

**N**

**name** 81:20
86:12 87:4
**naming** 103:22
**necessary** 55:8
**necessitated**
94:13
**need** 26:14,16
26:19 27:1,23
31:23 34:1
36:20 92:21
**needed** 38:14
92:5 107:5,6
**needs** 8:11
**neglected** 95:1
**neglecting** 64:15
67:7

**negligence** 65:2
94:22
**negligence/car...**
64:16 67:6
**negligent** 67:9
**nervous** 15:12
**Ness** 64:4
**neuropsychol...**
2:4 3:12 4:11
9:4 19:9
**neutral** 21:6,9
**never** 5:17,21,24
22:6,8 37:19
69:5 70:4 82:2
89:18 94:21
100:1,18
**new** 39:17,22,23
58:11 103:22
**news** 14:13
**nice** 74:2 87:18
91:20,21
**night** 39:11,25
45:24 46:2,5
46:17
**nights** 63:15
**nine** 39:18,24
**non-employees**
65:23
**notice** 34:16
**notify** 28:6,20
28:21
**notion** 13:13
**November**
90:24 91:2
**number** 26:2
29:3 39:17
42:16 43:5,8
44:17,18,19
74:17
**numbers** 39:23
39:24
**numerous** 46:25

**O**

**o'clock** 34:18
39:19,25 56:1
**oath** 24:2
**object** 40:18

43:11
**objected** 44:13
53:21
**objecting** 75:20
**objection** 25:2,3
29:16 32:11
33:21 36:10
51:17 53:17,20
55:3,18 59:21
74:24 75:5
77:14 83:21
88:2,17,17
**obligations**
96:21
**obviously** 7:6
17:20 81:14
**occur** 37:9
**occurred** 67:2
**occurs** 26:15
**offer** 60:24
82:14
**offered** 39:8
43:18 50:25
51:24 52:18
53:10 85:19
96:23 97:3
**office** 5:14 30:25
33:8 34:13
38:3,20 39:18
40:23 55:25
58:11,17,19
59:1 62:6 72:2
79:15,19 80:2
87:14 89:8,10
89:16 92:15
99:10 102:12
102:15 104:12
104:13,14,15
104:16,18,21
105:2,9,10
**OFFICER** 9:20
9:22,24 10:2,7
10:17 19:21
73:1
**Oh** 12:24 22:16
75:19
**okay** 3:3 8:14,19
8:20 11:24

16:4,7,8,9,18
17:10,13 19:17
20:13,16,18,23
21:4,17,18
22:11,20,20
23:15,24 24:4
24:8,14,17,18
24:20,25 25:10
25:16 26:10,13
28:11,23 29:7
29:9,11,22
31:13,23 32:5
33:10 34:1,4,6
35:13,25 36:4
36:8,14 41:12
42:4,9 44:10
44:15 45:2
49:16 50:3,14
50:17,21 51:2
54:22 56:1,21
58:5 59:6,13
60:18 62:18
63:4,5,9 64:13
65:4,8 66:18
70:15 71:14,20
71:21 72:6,9
75:9,25 77:22
81:14 95:8
99:15 102:4,13
102:21 103:2
105:12 106:19
107:2,16 108:9
**old** 86:14 87:5
**Once** 85:24
**one-year** 95:23
**ongoing** 23:9
92:15
**open** 14:12
16:12 37:12
**opening** 15:13
18:1
**opens** 18:2
**Operator** 1:18
**opinion** 57:4
**opponent** 75:4
**opportunity**
5:22,25 8:10
9:8 13:7 62:6

74:7 96:14
**opposed** 80:22
 94:13
**option** 50:25
 51:6,6,24 52:8
 52:18 53:12
 54:6,9,10,12
 65:12 67:3
 82:8,11,23
 83:1,8
**order** 27:16,23
 50:6
**organization**
 11:13 12:15
**orient** 34:9
**original** 71:5
**out-of-court**
 5:20 43:17
**outcome** 73:19
**outside** 44:7
 105:11
**overcompensate**
 11:23
**Overruled**
 32:13 53:24
 89:2
**oversleeping**
 66:20
**overslept** 38:3
 38:12,16,20
 39:5
**overwhelmed**
 11:16,17

———————
**P**
**P** 48:12
**P-** 55:16 65:4
**P-17** 98:10
**P-18** 22:23,24
**P-30** 21:17
**P-31** 2:19 29:8,9
 29:14,18 33:11
**P-36** 2:20 33:15
 33:20,23
**P-38** 2:21 36:3,9
 36:12 46:21
 56:15 61:19
**P-40** 96:7

**P-42** 2:22 54:22
 55:2,5
**P-43** 2:23 55:13
 55:20
**P-45** 52:9 63:25
**P-50** 59:13
**P-55** 68:12
**P-65** 2:24 24:9
 24:11 25:1,6
 64:13 65:12
**P-70** 22:17
**P-9** 97:18
**p.m** 109:8
**page** 2:2 4:15
 10:22 13:14,23
 22:17,19,21
 25:16 70:17
 71:14,14,18
 74:22,23 75:24
 77:9,25 90:6
 90:18,22 95:4
 96:12
**pages** 90:4
**Palladino**
 102:17,18
**palpable** 37:4
**paragraph**
 13:23,24 14:7
 95:13
**part** 13:21 15:1
 21:1
**Participants**
 9:17 10:12,16
 59:18 71:16
**participate**
 82:14
**participated**
 72:9 99:6
**particular** 4:25
 42:16
**particularly** 5:9
 48:9
**partner** 107:9
 107:12,15
**party** 44:8 75:4
**Pause** 9:12 14:6
 65:17
**pay** 27:3

**payable** 43:2,10
 44:25
**paying** 14:14
 15:12
**PC** 1:16
**pending** 12:10
 39:24,24
**Pennsylvania**
 1:1,5,14,17,22
 52:4
**people** 28:18
 53:15 69:4
 71:23 72:20
 76:14 80:24
 89:20 104:5,15
**perceives** 4:22
**perform** 4:21
 87:19 94:23
**performance**
 22:3 28:25
 66:1 73:25
 87:24 88:4
 89:5,6 91:9,22
 92:9 102:7,23
 106:2
**performed**
 40:12
**performing** 40:9
 40:11,16,19
 65:22 67:9
**period** 11:10
 26:4,6,11
 35:10 50:13
 66:5 81:25
 95:19,23 96:2
**permission** 25:7
 33:24
**permitted** 9:3
**person** 5:23
 20:18,23,24
 21:7 46:7,17
 58:17 85:24
 87:18 95:24,25
 104:3
**personal** 37:5
 40:3,4 47:2
**personally**
 38:19 72:9

**personnel** 1:19
 8:13 10:6,11
 58:20 76:13,15
**perspective** 49:2
 76:9 85:17
**Philadelphia** 1:5
 1:14,17,22
 68:1,5
**phobia** 4:18
 13:14 15:9,10
 15:11
**phobias** 15:8
 17:25
**phone** 31:21
 32:19 33:7
 41:2 46:19
**phonetic** 40:7,13
**physician** 4:24
**pick** 70:11
**picking** 33:7
**place** 59:11
 79:22 103:17
**plaintiff** 1:3,12
 2:9 5:12 20:4
**plaintiff's** 77:10
**plane** 49:25
**planning** 11:14
**play** 9:19,21,22
 10:7 80:13,19
**played** 10:7
**player** 40:18
**please** 22:17
 29:8 34:3
 36:17 54:15
 55:7,23 56:1
 68:12 70:14,17
 73:6 74:20
 75:21 77:9
 83:14 89:25
 90:1,17 95:3
 96:7,14 97:9
 97:18 98:10
 99:4
**PM** 10:24,25
**point** 8:24 18:4
 18:8 27:6 42:5
 42:10 44:24
 46:13 64:1

68:8 91:16
**points** 4:1 55:10
 74:19 99:13
**policies** 79:2
**policy** 30:14,15
 30:18 31:3,9
 32:1,3,8 57:16
 62:12,13 65:4
 67:17 101:11
**portion** 14:5
 75:12
**position** 80:18
 80:22 86:7,22
 87:20 88:23
 91:19 94:19
 103:9,11 104:6
 104:8,14 107:3
**positions** 84:22
 85:2,4,11,13
**possible** 51:14
**possibly** 3:21
**potentially**
 92:11
**practice** 30:22
 32:4,5
**practices** 80:24
 81:17 98:9
 107:14
**pre-dated**
 102:18
**preceding** 5:3
 26:3
**precluded** 6:14
**presence** 39:7
**present** 3:2
 14:25 19:25
 37:19 73:4
 82:23
**President** 81:23
**President's**
 104:16
**pressure** 11:20
**pressured** 11:21
**prestigious**
 94:17 104:13
 104:14
**pretty** 67:22
 76:17 103:23

previous 26:3
28:12 74:25
**PREVIOUSLY**
20:4
printout 45:4
prior 23:8 43:2
58:8 62:1,4
77:2,13 78:2
86:15 87:6,21
88:5,15 89:11
91:2 102:22
privacy 37:8
problem 4:23
45:15 89:6
problems 89:5
106:8,14
procedure 25:21
31:4 47:14
95:10,17
procedures 28:9
30:12 31:7
47:14 79:3
proceed 20:2
70:13
proceedings
1:24 3:1 9:12
14:6 19:24
65:17 73:3
110:4
process 26:7
31:11 74:3
95:21 103:20
processed 83:11
produced 1:25
5:13 39:10
productivity
22:3 29:1 66:1
professional
6:20 12:18
51:7
professionals
37:8
professor 63:13
63:14 64:25
professors 67:25
68:7
progressive 26:6
95:20 101:6

promotion 87:1
proof 46:4,16,18
proper 30:11
32:1,2
properly 21:15
21:16 30:21
properties 67:11
protection 37:17
37:18 47:7
provide 4:14
46:3 80:10
95:2
provided 39:2
provides 31:11
41:2
psychiatric 17:4
psychiatrist
5:15,15,23
18:2,24
psychologist
5:23
public 37:12
48:2
publish 25:7
29:19 33:24,25
77:15,16 90:1
pull 10:14 74:20
77:9 83:14
89:25 95:3
97:18 98:10
purpose 19:1,14
purposes 3:14
18:7
purview 57:7
put 11:22 24:5
29:4 31:17
79:22 80:7
103:16 104:5,7
puts 15:8

_____

**Q**
qualified 85:3
85:15,21
qualify 28:15
quality 37:4
47:1
question 6:1
10:9 11:5,8,13

11:16,18,24
12:1,3,6,10
14:19,20 16:21
23:7 31:8 32:7
43:7,21 44:14
44:16,20 45:24
46:2,5 53:22
53:25 59:3
70:19,23 71:5
76:2 77:2 88:8
88:10 97:14
101:20
questions 7:21
8:11 13:7,8
14:22 16:2
17:21 18:14
63:2 73:7,9
75:1 84:5,6,8
95:13 101:18
108:22,24
quit 65:21
quotes 15:8,10

_____

**R**
R 1:15
Rachel 1:16
Rahul 1:13
raised 3:10
78:12,16
Rand 110:8,13
re-present 3:16
reached 37:23
46:24 96:17
97:1,1
reaching 17:16
read 7:6,11 17:7
48:14 74:23
75:1,8,12,12
76:2 95:16
96:12,14 98:15
reading 16:8
26:15
real 63:2
really 8:24
15:10,21 51:2
88:21
reason 4:25 8:11
8:23 14:24

33:4 34:22
74:9 76:10
reasons 4:20 5:1
67:24 89:9
93:23
recall 11:15 12:5
16:2 19:13
35:8,17 45:6
50:4 61:23,24
63:16,19 71:2
71:9,13,21
76:25 77:5
78:5 82:9
96:10 97:21
98:13 103:2
receive 11:19
35:19 43:4
107:13
received 21:11
21:21 25:6
29:18 33:23
36:12 41:3
44:25 48:4
55:5,20 69:10
77:22 78:9
84:24 90:12
99:21 101:7
106:4
receiving 49:8
recess 19:23
72:24 73:2
109:5,8
recites 16:17
reciting 15:4
recognize 21:18
24:20 33:16
36:4 55:14
68:13
recollection
35:13 71:2
77:8,12,15
78:1
recommendat...
22:22 106:6
recommends
37:20
record 3:23
10:18,20,20

65:20
recorded 1:18
1:24
recording 1:24
9:21 110:3
records 2:4 4:9
4:13 5:11
41:18
**RECROSS** 2:7
recruit 103:19
recruiter 85:15
85:16,21
recruiters 85:25
recruitment
81:15 103:20
**REDIRECT** 2:7
101:22
refer 17:4 80:21
97:15 98:5
reference 4:2
referred 4:23
referring 70:24
106:17
refrain 47:5
refresh 35:13
77:12,14
refreshed 78:1
refreshing 71:2
regard 22:22
79:16 84:15
99:11
regarded 103:14
103:17
regarding 3:11
67:23 73:24
76:24 77:13,19
84:8 88:16
98:2 106:1
regards 23:20
28:17 29:23
35:1,14,22
41:19,19 57:23
61:22 62:9
63:6 64:24
78:21 80:6
83:10 84:6
89:22 106:15
106:18 107:10

**regular** 79:11
**reimbursement**
39:9
**reject** 96:24
**related** 4:22
94:3 101:4
**relating** 91:1
**relation** 64:25
**relations** 80:16
81:11,15,16
**relay** 58:25
**relayed** 41:6
61:6
**relays** 17:5
33:11
**relevant** 5:10
**reliability** 18:10
**rely** 80:10 88:22
**remember** 6:21
11:2 12:6
45:11,12 49:18
49:24 73:16
107:25
**Renzoni** 110:7
**repeat** 44:14
53:19,25 71:5
**Repeated** 26:4
95:18
**replace** 87:3
106:24
**replaced** 86:10
101:15,25
105:18
**replacement**
40:7
**replied** 76:7
97:3,4
**report** 5:6 17:4
23:22 27:13
28:4,18,19
34:23 36:24
38:2,8,16
48:10 52:7
63:11 97:7
**reported** 37:15
37:21 38:3
**reporting** 21:15
58:19 102:16

104:6
**reports** 43:1
79:15 86:25
**request** 12:19
39:22 105:20
**requested** 39:17
**required** 12:4
37:6 43:14
**reservation** 64:3
64:7
**resign** 50:23,25
51:5,5,22 52:1
52:2,19,19
53:9,12 54:6
54:12,13 60:24
67:3 82:8,12
82:21,24
**resignation** 41:1
52:20,23 54:2
82:15 83:12
**resigned** 49:20
50:19,20 53:15
**resigning** 83:17
**resigns** 51:14
**Resources** 47:7
81:6,12,13,14
82:1,2 105:21
106:15
**respecting** 37:8
**respond** 33:10
46:23
**responded** 42:2
**responds** 35:9
**response** 46:22
**responsibilities**
40:5 64:16
67:7 79:8
94:23 96:21
105:1,4
**responsibility**
79:5,7 94:15
**responsible** 46:8
51:15 56:11
81:14 82:5
**result** 5:14 6:20
54:3 91:4,13
91:15
**results** 6:4,8

**resume** 19:24
73:3
**resumes** 20:5
73:5
**retaliated** 99:2
**retaliating**
100:23
**retaliation** 49:4
56:8 57:8 62:8
62:16 93:20
97:16 98:3,18
100:6
**retract** 47:23
**review** 86:8
**reviews** 42:7
71:19
**Rhonda** 81:20
**Richard** 1:15
**rid** 38:25
**right** 3:22 4:7
6:9,16 7:13
9:22 10:1
12:11 13:25
14:17 15:5
16:16,25 17:14
19:6,10 20:11
22:23 25:9
34:3 42:19
45:23 48:15
52:22 54:14
56:13,17 57:7
57:11 60:1,14
63:16 65:16
66:11,14 67:5
70:6 75:9
77:10,16 83:23
88:12 102:18
103:12 108:21
**ring** 18:9
**rise** 19:22 73:1
109:7
**ROBERT** 1:10
**role** 79:1,16,17
80:13,19
**room** 63:12 64:3
64:10
**rule** 4:8 9:2,3
25:24 26:1

86:4 95:24
**rules** 2:24 21:23
24:9,19,21
25:12,13,19
26:4 28:8
43:14 44:5
51:8 64:13
92:17 95:18
**ruling** 75:18
**rumors** 37:13
**rushed** 47:15
**Ruth** 1:2 23:8
23:16 29:11
32:21 34:18,21
34:22 46:21
48:14 49:14
55:24 57:4,5
57:22,23 60:19
60:23 76:21
96:17 106:2,3
106:5,7,16
108:1
**Ruth's** 57:22

**———————**
**S**
**Sanchez** 87:4,5
**Sandra** 48:15
56:16,17 59:11
62:17 72:8
97:1,2
**Sandy** 9:15
56:13,15,21
57:4,7 59:14
59:20,22,22,23
60:3 61:1 96:3
99:9 107:10
**Satinsky** 1:16
3:6 8:7 10:13
10:22 12:22
24:12 25:4
29:16 32:11
33:21 36:10
44:3 51:17
53:17,21 55:3
55:18 59:21
60:5,10 69:2
69:13,18 70:18
70:22 71:4

73:10,12 75:3
75:10,15,22
77:9,11,24
83:14,15,19,24
88:4,10,13,19
88:24 89:1,3
89:25 90:2,17
90:19 95:3,5
96:7,8 97:18
97:19 98:10,11
99:4,5 101:18
108:24
**saw** 29:23 39:12
65:25 90:12
105:16
**saying** 3:21 5:1
8:25 9:1 12:5
15:10,16 19:3
42:12,19,20,21
43:19 56:22
57:4,11 102:23
103:10 106:21
107:6
**says** 4:18 9:5
14:16 22:1
23:2,25 25:19
25:20,23 27:6
30:14,18 32:1
34:20 36:18
45:4 60:18
64:1 67:5 69:6
70:5
**scattered** 87:19
**scheduled** 27:13
96:21
**school** 74:1
86:23,24
103:25
**schools** 81:5
105:7
**Science** 80:14
83:18 94:11
102:9,11 104:1
**Sciences** 71:11
103:12
**screen** 24:6
39:10,14,23
40:1 45:3 65:5

65:6,10 77:10
92:10
**script** 16:8
**scroll** 48:13
**seated** 20:1
**second** 4:15
24:10 25:16
61:2 63:25
64:2 90:6
99:18 102:5
106:20 108:20
**secretary's**
40:19
**section** 37:14
70:10
**secure** 64:9
**see** 7:3 8:18 13:1
13:18 22:21
23:5,13 25:21
26:8 27:4,10
29:9 32:23
34:24 43:2
49:1,11 54:25
55:7,23 56:2
61:9 62:6,20
64:11,22 65:5
65:6,10 67:12
68:20 85:25
86:1 90:7
96:14 106:12
**seen** 5:12,17
32:9 90:3
**send** 42:5 45:8
47:17 49:12
57:2 78:20
85:13,13
**sends** 85:16
**sense** 75:20
**sent** 41:23 48:24
49:13,14 57:2
59:2 61:19
85:20 97:15
106:22 107:25
108:1,2
**sentence** 52:10
95:16
**separate** 27:15
81:8 107:15

109:9
**sequestered**
3:15
**series** 36:4,15
96:9
**serious** 67:22
**seriously** 69:22
**seriousness**
67:20
**service** 1:25
**services** 97:3
**Session** 1:9
109:9
**sets** 31:3,6,14
**severity** 29:24
**sex** 49:4 51:10
56:7 57:8
62:16 68:17
69:10,16 71:9
71:22 97:16
98:3,17,24
100:3,14,20
**sex-based** 101:1
**sexual** 81:18
**Sharon** 105:21
105:22 106:11
**she'd** 60:21
**short** 34:16,21
34:21
**shot** 39:10,23
40:2 45:3
**show** 8:3 45:8
45:10 68:8
69:16
**showed** 45:11
102:4 108:1
**showing** 23:9,17
**shown** 75:11
**Shroff** 64:4
**sic** 95:6
**sick** 27:2,3,8
65:19
**sidebar** 4:5,6
9:18 10:3,4
13:15,19,22
19:18 68:20,22
70:12
**similar** 80:22

**simple** 63:2
**single** 50:9
**singled** 37:11
**sit** 7:4 76:18
81:9
**sitting** 3:20 61:5
63:16
**situation** 29:6,7
30:5 35:14
36:19 76:17
80:8 97:8
**situations** 57:25
**six** 26:16 27:1,2
27:8,8,13,17
28:15
**skill** 74:12
104:17,20
**skills** 107:6
**skip** 68:15
**sleep** 37:3
**sleeping** 66:20
**slowdowns**
65:22
**smaller** 104:19
**somebody** 31:4
43:17 44:7
87:3 107:5
**soon** 37:3 106:8
**sooner** 73:25
74:8
**sorry** 9:20 11:25
21:23 22:17,21
24:16 37:14
48:12 49:23
50:19 53:19
55:12 59:19,24
59:25 60:7,7,8
64:1 65:9,15
68:14 76:20
79:6 94:18
95:7,25
**sort** 4:22 22:22
45:4 46:3
**sound** 1:24
110:3
**sounded** 13:11
**space** 76:12
**speak** 30:6

35:20 44:7
103:15
**speaker** 64:4
**speaking** 60:4
77:23 108:11
**specific** 6:22
26:5,25 30:15
63:16 79:5,7
87:25 95:19
**specifically** 3:25
4:14,19 8:2
30:20 59:9
74:15 81:16
**spend** 40:2
47:15,16 80:4
**spent** 104:8
**spoke** 19:8
37:25 42:23,24
80:9 82:8
107:21
**spoken** 20:11
42:6,8,9 81:6
**spring** 38:13
**staff** 37:5 47:25
**stand** 16:3 20:5
20:10 73:5
**standard** 47:19
**standards** 22:2
28:25 31:14
66:1
**start** 47:16
71:18 74:3,22
75:23 101:24
**started** 87:8
105:13
**starting** 36:5
**starts** 12:12
**state** 30:20,21
39:14 52:4,4,7
88:10,20
**stated** 71:25
77:6 106:9
**statement** 19:2
43:18
**statements** 4:10
5:20 6:23 7:11
9:1 18:7
**STATES** 1:1,10

**stating** 41:20
47:17,22
**stay** 11:8 36:25
**stayed** 50:23
54:8
**staying** 54:10
**step** 26:6 95:20
96:1 109:1
**Stephen** 1:12
**sticking** 62:13
**stop** 35:10 75:21
**stopped** 7:14
**story** 47:8,9
**strategy** 40:24
**Street** 1:4,14,17
**stress** 5:7
**strike** 43:20
**struggle** 11:13
**stuck** 16:22,23
**student** 30:12
32:18,23,23
33:2,6,7 35:20
35:24 38:11
40:10,22
**students** 30:13
30:15,24,24
32:24 37:10
78:5,8 81:19
94:6,7,20
**stuff** 17:5
**subject** 25:25
44:8
**submitting** 4:9
**subpoena** 5:14
5:22
**subsequent**
27:14
**substantive**
18:17
**suffered** 39:5
**suffering** 47:19
**sufficient** 46:20
**suggested** 39:9
**suitable** 91:19
**Suite** 1:17
**summary** 17:8
**summoned**
40:20

**Sunday** 36:15
**superiors** 37:7
**supervision** 67:9
**supervisions**
64:21
**supervisor**
28:21 30:23
64:17
**supervisors**
80:25 87:21
88:15
**supposed** 30:16
31:4,9 33:7
56:22
**sure** 11:23 19:20
23:3,18 32:8
35:15,22 45:17
49:18 53:21
58:3,3,7,8 65:7
65:10 68:2
70:18,23 76:3
79:7,21 85:14
85:15 91:14
96:16 104:2,11
104:23,24
106:17,17
**suspect** 58:3
**suspended** 67:1
**suspension**
49:24
**Sustained** 51:19
**SWORN** 20:4
**system** 39:9
45:15,16,21
46:4,8

————————
**T**
**table** 3:21 25:18
25:18
**take** 3:8 9:24
24:8 30:13
31:1 33:15
34:6 36:3,14
51:4 52:18
54:22 72:24
74:5,9 97:12
99:13 106:19
**taken** 19:23

23:24 27:7
40:2,14 48:22
54:6 73:2
109:8
**takes** 94:9
**talents** 40:25
**talk** 38:14 41:8
41:9,14 45:7
60:19 62:9
74:5 76:4
108:6,14,15,16
**talked** 6:19
20:21 21:1
30:4 33:5
38:10 43:1
57:24 59:10
63:10 79:13
84:8 96:18
97:2
**talking** 12:12
19:9 35:23
42:6 43:2
44:25 46:19
87:17 89:17
**tardiness** 37:24
**tardy** 23:9,16
**tasks** 11:10
40:10 106:7
**Taylor** 38:4,10
47:18
**teach** 68:4
**team** 40:18
**technicality**
53:14,18,23
**Technology**
80:14 83:18
94:11 102:9,11
104:1
**tell** 10:22 16:5
16:12 28:20
47:25 53:15
78:7 98:20,23
99:1
**telling** 11:2 18:1
42:10,22 47:8
**Temple** 1:6 2:24
24:20 25:14
26:13 28:24

50:21 52:12,16
52:18 58:5,8
64:5 65:4,22
67:10,15,25
68:9 84:21
86:11 88:23
93:4 95:4
99:24 100:2,5
100:8,12,22
103:2,5,7,19
103:23 104:7
**Temple's** 51:21
67:17
**ten-minute**
72:24
**tends** 14:4
**tenth** 40:20
**terminate** 20:14
20:16,24 21:8
51:13 54:18
57:17 62:4,7
62:19
**terminated**
27:24 34:10
36:17 50:18,20
51:1,9,23
52:13,16 53:13
53:16 54:11
59:15 60:21
61:13 63:7,10
66:21,25 67:3
67:4,18 74:8
84:19 107:4
**terminating**
93:19
**termination**
26:14,17 27:2
37:20 41:1
46:10,14 50:6
51:4,16 52:9
52:19,24 53:3
54:2,7,19 55:9
56:5,24 57:12
57:15 61:21
62:1 63:22,25
66:15 82:12
84:10
**terms** 10:8

48:22 51:2
58:2 63:9
**testified** 6:2,12
7:2 19:7 69:2
73:15,24 76:24
77:19 78:4
84:10 90:25
94:2 96:3
97:20 98:12
99:6
**testify** 5:16 44:8
**testifying** 98:13
**testimony** 10:5,8
10:24,25 61:18
74:25,25 75:7
75:11 77:21
92:17 102:6
106:20
**Thank** 19:15,17
20:3 75:15
76:23 101:21
108:22 109:1
**Thanks** 77:22
109:2
**thing** 7:8 47:18
54:3 63:12
75:13 88:22
**things** 7:1 8:4
11:24 12:1,3
41:10,15,20,21
42:12,13 46:12
46:13 59:1
78:22 79:21
**think** 3:16 5:8
12:16 13:9
14:21,24 15:2
16:1 17:16,19
18:23 19:16
37:7 44:4
48:11 58:6
66:9 68:14
83:8,21 84:6
91:7,7 92:16
94:1 102:3,14
108:20
**third** 13:23
25:17 40:20
44:8 47:9

74:20
**thirties** 58:2
**thorough** 56:24
58:23 59:3,7
58:25 59:3,7
**thought** 6:21
45:14 49:1,12
52:1 57:3,24
71:25 72:3
74:2 77:18
91:20,20 94:22
99:1 104:16,20
107:20
**three** 12:14
26:19 27:23
34:8 35:6,7
38:9 58:6
59:15 61:21
**three-day** 49:24
**Thursday** 64:5
**ticket** 49:25
**time** 11:10,22,22
20:10 28:12,13
28:16 31:23
34:17 35:10
37:22,25 40:3
40:4 49:17
56:1,4,23
57:12,15,20,23
58:6 61:19
65:20,20 66:22
67:10,15 70:8
78:23 79:22
80:4 81:25
82:4,6 83:1
87:15,17 91:7
96:4,17 98:20
98:23 99:1,24
100:2,5,8,12
100:16,19,22
100:25 101:3
101:19,25
102:10,22
103:4 106:6
**time-** 78:16
**time-consuming**
78:24
**timely** 23:22
**times** 8:21 22:9

27:14 28:15
46:25 82:13
85:21 86:2
89:24 93:4
**timing** 96:20
**title** 104:22
**today** 20:10
44:22 52:11
61:5 80:9
84:10 96:10
**told** 15:25 18:23
30:9 32:18
35:15 37:25
38:4,15,20
45:1 47:9,12
47:13,18,21
75:12 78:4
85:12,12 96:25
**tomorrow** 34:17
**top** 22:21 58:7
76:17 85:16
**totally** 5:21 63:1
81:8
**transcript** 1:9
1:25 10:14
70:25 78:1
109:9 110:3
**transcription**
1:19,20,25
110:15
**Transcription...**
110:14
**Transcription...**
110:7
**transfer** 85:22
**travel** 39:8,20
63:18 67:21,23
95:2
**treated** 48:2
57:24 98:17,21
98:24 100:17
100:20
**treating** 4:23 5:8
12:18
**treatment** 18:8
49:8
**Tree** 63:13
64:10,24

**TRIAL** 1:9
**trouble** 4:16
**true** 8:5 15:22
27:25 32:15
47:24 52:2
53:10 80:12
107:8 108:4
**trustworthiness**
18:9
**truth** 5:20 38:2
38:10 39:3
42:10,12,22
43:18
**try** 9:24 16:7
74:11
**trying** 7:10,11
91:8,8,9 92:3,9
**Tuesday** 55:25
60:20
**turn** 21:17 22:17
29:8 48:12
52:4,9 68:12
70:17 90:17
92:4 96:7 99:4
99:13 105:20
**tutorials** 39:19
**twelve** 109:4
**twelve-** 26:3
**twelve-month**
26:5,11 50:13
66:5
**two** 26:21 34:9
34:10 39:7
46:13 50:6
55:9 63:9
64:14 66:4,22
67:18 99:13
101:15
**type** 31:11 80:16
80:19
**typo** 35:5

___
**U**

**Uh-huh** 15:7
66:3
**ultimately** 8:15
21:2 83:7
94:20

**unable** 4:20
**unauthorized**
65:19,23
**undermine**
64:21
**understand** 7:19
9:2,3 18:21
38:23 45:13,21
61:5 75:13
**understanding**
32:20 42:17
43:6 61:4
63:17 66:14
71:25 72:1
74:15 77:18
80:5 86:23
92:13 94:7
105:15
**understood** 7:16
7:23 48:7
79:22 102:6
**undisciplined**
64:19
**unemployment**
52:3,5,6 84:7
**unequal** 47:18
**unfairly** 5:8
**unfortunately**
28:19
**UNIDENTIFI...**
8:6
**UNITED** 1:1,10
**University** 1:6
25:14 52:12
64:5 68:11
74:12 78:23
79:4,8,10
80:19 81:18
84:22 85:5,22
92:23 94:8,9
94:11,19
104:15 105:7
105:11
**University's**
24:20 79:2
**unruly** 64:18
**unusual** 80:15
**upcoming** 64:5

**upset** 29:24
41:25 48:7
**Urgent** 36:17
**use** 16:10 27:8
92:22,23
**usually** 27:7
76:14,21 80:23

___
**V**

**V** 1:2
**vary** 74:17
**verbally** 37:12
**verify** 46:19
**viable** 62:24
**Vice** 69:11 71:23
72:15 81:22
**victim** 37:18
**viewing** 77:25
**violated** 57:16
62:12 95:25
101:11
**violates** 25:24
95:24
**violation** 21:23
26:2,16 27:15
27:19,21 28:1
28:15 49:22
50:4,10 51:10
65:13 67:1
94:13
**violations** 26:3,4
26:10,14,16,19
26:21,25 27:23
50:7 63:9 66:5
66:22 93:10,13
93:16 95:18
**visibility** 105:10
**visit** 64:5,9
**visiting** 68:11
**visitors** 37:10
**voicemails**
14:12
**vs** 1:4

___
**W**

**Wacker** 3:20
20:17,18,21
21:6 30:4

32:25 34:13
35:23 37:19
41:6,7,10,13
41:13 42:6,14
54:20,23 55:7
55:12,14 56:5
57:21,24,25
58:9,19,21,22
61:13 69:10,16
71:12,24 72:16
79:15,19 80:3
80:3,6,10,13
80:15,21 81:2
82:20,23 89:20
91:11,23 92:13
105:22 108:6
108:10
**Wacker's** 80:18
**Wait** 75:5
**waited** 46:25,25
**wake** 37:3
**walked** 61:11
**Walton** 2:11
9:15 20:4,8
30:14,19 31:3
31:8 59:22,23
59:23 60:3,11
73:13 74:21
75:23 77:25
83:16 88:14,24
90:3 94:2 95:7
95:10 96:3,9
97:20 98:12
99:6 106:10
**Walton/DiMeo**
2:20
**Walton/Wacker**
2:22,23
**want** 4:1,2 7:3
7:21 8:18,19
9:19 10:2,17
13:16,18,18
16:4 17:11
29:4 31:24
34:2 40:2,4
43:20 46:16
47:2 50:23
51:5 68:4 74:2

74:19 76:2
91:19,21 95:6
104:2,5 105:13
107:2,4
wanted 3:8 8:2,3
9:10 12:25
13:1 14:7
38:15 39:11
41:18 45:16
47:12 48:20,25
49:11 51:24,25
57:4 74:3,5,5,7
74:10,11 83:6
83:6,7,10
91:16,22
106:21,22,24
107:3,19
108:14
wants 16:1
17:24,24
warning 21:21
23:5 24:4
Washington
106:9
wasn't 6:22 7:10
28:1 50:19
54:9 65:9
66:11 73:25
74:4,8 76:12
92:4 94:24,25
103:4,20
104:21
way 14:21 23:19
32:19 38:21
51:3 54:11
82:19 85:9
87:11 91:18
we'll 8:23 9:16
34:6 75:23
we're 9:14,15
19:9 22:23
25:12 68:3
69:14 74:22
81:10 92:22
We've 54:14
81:6
Wednesdays
37:1

week 36:16,22
38:13 39:18
50:17 56:17
60:22
weekends 36:23
weeks 34:8,10
63:22 97:4
weight 38:9
well-known
68:3
went 6:25 7:2
38:19 42:23
48:14 59:1
60:16 61:9
weren't 92:1
whichever 29:3
witness 2:7 5:16
12:11 18:13,18
20:4 22:12
37:17 42:7
44:4,21 53:25
70:2,19,23,24
71:6,19 73:5
75:8,12 77:19
109:2,3
witness's 75:10
77:15 88:7
woman 86:12
87:4
women 72:18,19
72:21 74:16
101:15
wonderful 14:20
word 38:9
work 2:24 4:17
11:3,6,8,11,16
11:17,18 12:4
14:11,15 21:23
22:9 23:10,17
24:8,19,21
25:12,19 26:1
26:4 27:3,13
28:4,18 30:25
36:19,22 37:1
47:1,3,15 49:5
56:8 58:13,14
64:13 65:22,23
65:23 67:10

81:25 82:3
86:20 92:6
95:18,24
103:18 107:7
worked 57:20
58:8,8,17,19
76:14,16 82:2
87:12,13
worker 32:18
33:7 35:20
38:11 40:10,22
working 34:12
58:9 87:8,14
88:5 89:12,20
102:11,15,15
104:18 105:7,8
105:9,12,13,17
105:17
workplace 5:5
20:20 64:20
82:5 102:25
works 79:15
86:23,24,25
worms 18:3
worried 7:1
14:14 17:18
worry 15:14
17:25
wouldn't 21:9
46:16 66:4
76:1,4 103:24
write 16:9 59:20
writeup 21:19
22:7,25 27:16
27:16 29:23
48:4,9
writing 31:16,17
106:1
written 21:21
23:4 24:4 29:4
30:18 31:3,9
32:1,3,8 47:14
67:2 85:24
86:1
wrong 64:8
wrote 98:16
105:16,25
Wu 5:1,5,6

14:24 20:17
21:2 23:21
32:16,16,19,22
32:23 36:20
37:2,6,16 38:4
39:17,21 40:21
41:6,6,8,14
47:5 57:20,22
59:2 68:14
76:5,9,16,21
78:4,7,10
79:18 82:14
86:20 87:9,21
88:5,15 89:12
91:7,11,17,17
91:23 101:13
102:18,22
103:2,4,6
104:8 105:12
105:21,25
106:21 108:11
108:13,14,15
108:16
Wu's 38:19
39:17 92:14
97:7 103:15

X

Y

Yeah 6:18 9:23
10:9 13:18
18:13 19:21
50:12 65:15
89:2
year 27:3,9,14
27:17 28:14
49:21 50:7,9
50:11,12 67:18
96:2 99:21
105:12,16,17
years 12:14 58:5
58:7 102:8
104:9
yelled 78:5,8,10
yesterday 3:10
9:9 10:8,25
13:10 14:23

19:7 20:10
74:19 75:3,11
78:4 80:9
85:11 86:15
87:6 97:21
98:13
Yvette 87:4

Z

Zajaczkowski
110:7

0

1

1 27:6
1-A 27:16
1:15 109:5,6
1:16-cv-248 1:3
10 21:23 34:18
55:25 72:25
10:30 35:11
10:53 73:2
101 2:11
11 22:21 68:14
11:05 73:3
12-month 95:19
12:04 109:8
13th 34:8 63:19
64:6 99:19
14 11:1 33:17
71:18
1400 1:17
14th 63:20 64:6
99:19
152 95:4
1525 1:14
1601 1:17
18 1:5 110:12
1880 1:21
19102 1:14,17
19103 1:22
19106 1:5
1964 87:7
1967 86:19
101:25
19th 90:24
1st 50:18 53:4

60:20 61:2,7
61:12 66:13,21
82:22 84:2

**2**

**2** 13:14,23
**2/6/14** 2:19
**20** 2:11 71:18
**2000's** 87:14
**2005** 102:13
**2009** 102:22
  103:2 104:7
**2010** 81:25
  90:24
**2011** 5:3 12:13
  91:2
**2013** 50:2 99:22
**2014** 21:12,18
  23:8,15 24:23
  29:12 33:17
  34:9 36:16
  49:21 50:11,12
  50:13,18 54:23
  55:12 59:14,20
  60:3 61:2,7
  64:6 66:11,17
  66:20,21 68:14
  76:25 77:13
  78:2 81:25
  82:22
**2017** 23:25
**2018** 1:5 110:12
**20th** 21:18 22:7
  22:25 23:8,15
  27:20 28:14
  99:17
**21** 71:15
**214** 2:24
**22** 70:17 71:14
**23rd** 36:5,6,16
**24th** 36:7
**25** 2:24
**25th** 36:7 49:21
  50:13 61:20
  66:11 96:13
**26th** 50:2
**29** 2:19

**3**

**3** 1:9 2:4
**3/14** 35:11
**3/14/14** 2:20
**3/23/14** 2:21
**3/25** 48:17 56:17
**3/31/14** 2:22,23
**30th** 23:24
**31st** 54:23 55:12
  55:22
**33** 2:20
**341** 110:13
**36** 2:21
**38** 74:22
**39** 74:23 75:24
**3rd** 53:9 84:1,2

**4**

**4** 60:3
**43** 55:17
**46** 102:1
**47** 102:1
**4th** 59:14,20
  61:21

**5**

**50** 101:16
**55** 2:22,23

**6**

**6** 29:12
**601** 1:4
**65** 65:5
**6th** 1:21

**7**

**70** 10:23 22:18
  22:19,21
**73** 2:11

**8**

**8** 21:23
**803(4)** 4:8
**855)204-8184**
  1:22

**9**

**9,000** 79:11

**9:14** 3:1
**9:30** 55:25
**9:32** 19:23
**9:44** 19:24
**92** 77:9