IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| RUTH BRIGGS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 16-cv-0248 |
| | : | |
| TEMPLE UNIVERSITY | : | |
| | : | |
| Defendant. | : | |
| | : | |

**PLAINTIFF RUTH BRIGGS'S BRIEF IN OPPOSITION
TO DEFENDANT TEMPLE UNIVERSITY'S MOTION FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE,
FOR A NEW TRIAL OR, IN THE ALTERNATIVE, FOR A REMITTITUR**

CONSOLE MATTIACCI LAW, LLC

Laura C. Mattiacci, Esquire
Rahul Munshi, Esquire
1525 Locust St.
Ninth Floor
Philadelphia, PA 19102

Counsel for Plaintiff, Ruth Briggs

Dated: August 24, 2018

## TABLE OF CONTENTS

I.    INTRODUCTION AND PROCEDURAL HISTORY..........................................................1

II.   THE EVIDENCE FROM WHICH THE JURY REASONABLY FOUND THAT DEFENDANT DISCRIMINATED AGAINST PLAINTIFF, RETALIATED AGAINST PLAINTIFF, AND SUBJECTED PLAINTIFF TO A HOSTILE WORK ENVIRONMENT ......................................................................................................................3

    A.  Plaintiff Ruth Briggs's Employment at Defendant Temple University.........................3

    B.  Dr. Wu Makes an Age and Sex Discriminatory Comment to Plaintiff About Women in China Being Forced to Retire When They Reach Plaintiff's Age .................................5

    C.  Plaintiff Engages in Protected Activity by Complaining About Dr. Wu's Age and Sex Discriminatory Comment and Behavior .........................................................................7

    D.  Plaintiff Continues to Complain in 2013 About Discrimination and Ms. Foehl Does Nothing to Address the Toxic Environment Created by Dr. Wu.................................11

    E.  With No Progress Being Made to Remedy the Situation, Plaintiff Complains to Temple's In-House Counsel About the Discrimination and Hostile Environment She is Facing at Work.........................................................................................................12

    F.  Defendant Retaliates Against Plaintiff in 2013 By Giving Her an Unpaid 3-day Suspension .................................................................................................................13

    G.  Defendant Continues to Retaliate Against Plaintiff in January 2014 By Giving Her a Written Warning for Over-sleeping on One (1) Occasion...........................................15

    H.  Plaintiff is Retaliated Against and Continues to Complain About Dr. Wu in 2014 ...16

    I.  Defendant Terminates Plaintiff's Employment on April 1, 2014...............................19

III.  LEGAL ARGUMENT .......................................................................................................20

    A.  The Judgment Entered in Favor of Plaintiff Must Stand ........................................... 21

        1.  The Question at Issue is Whether There Was Sufficient Evidence to Support the Jury's Findings that Defendant Discriminated Against Plaintiff, Retaliated Against Plaintiff, and Subjected Plaintiff to a Hostile Work Environment.....22

        2.  There was Ample Evidence By Which the Jury Reasonably Concluded That Defendant Discriminated Against Plaintiff Because of Her Age and Subjected Her to an Age-based Hostile Work Environment ...........................................24

3.  Assuming, *Arguendo*, That the Consideration is Proper at the Post-verdict Stage, There was Sufficient Evidence to Support Both a Finding of a *Prima Facie* Case and Pretext..................................................................................28

    i.   Plaintiff Was Qualified For Her Position of Executive Assistant........29

    ii.  Plaintiff Was Terminated Under Circumstances That Give Rise to An Inference of Discrimination ..................................................................32

    iii. Plaintiff Has Set Forth Sufficient Evidence Such That a Reasonable Jury Could Conclude That Defendant's Asserted Reasons for Terminating Her Employment Are Pretextual..........................................................35

4.  There Was Ample Evidence By Which the Jury Reasonably Concluded That Defendant Retaliated Against Plaintiff By Terminating Her Employment and Subjecting Her to a Retaliatory Hostile Work Environment Because She Engaged in Protected Activity ........................................................................39

    i.   Plaintiff Engaged in Protected Activity ...............................................40

    ii.  There is Clear and Significant Causal Connection Between Plaintiff's Complaints and Defendant's Retaliatory Actions Taken Against Her..........................................................................................................43

5.  The Court Properly Charged the Jury With Regard to Willfulness Under the ADEA .............................................................................................................47

B.  Defendant's Motion for a New Trial Must Be Denied ................................................49

    1.  The Judgment is Not Against the Weight of the Evidence.............................49

    2.  The Jury Verdict Sheet...................................................................................50

    3.  The Jury Accurately Calculated Plaintiff's Back Economic Damages ..........53

C.  Judgment of $350,000 for Emotional Distress Damages Must Stand ........................56

IV.   CONCLUSION..................................................................................................................60

## **TABLE OF AUTHORITIES**

### **Cases**

Abrams v. Lightolier, Inc., 50 F.3d 1204 (3d Cir. 1995)....................................................33

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3d Cir. 1996) .................................35

AMTRAK v. Morgan, 536 U.S. 101 (2002)......................................................................26

Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir. 1990)........................................26

Avaya, Inc. v. Telecom Labs, Inc., 838 F.3d 354 (3d Cir. 2016) ......................................21

Barber v CSX Dist. Servs., 68 F.3d 694 (3d Cir. 1995) ...................................................35

Bhaya v. Westinghouse Elec. Corp., 922 F. 2d 184 (3d Cir. 1990)....................................50

Blum v. Witco, 829 F.2d 367 (3d Cir. 1987).....................................................................23

Braden v. Lockheed Martin Corp., 2017 U.S. Dist. LEXIS 207236 (D.N.J. Dec. 18, 2017)........59

Bruno v. W.B. Saunders Co., 882 F.2d 760 (3d Cir. 1989).................................................23

Castleberry v. STI Grp., 2017 U.S. App. LEXIS 12611 (3d Cir. July 14, 2017) .........................26

Corbetto v. Wyeth Pharma., 619 F.Supp.2d 142 (W.D. Pa. 2007)....................................28

Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358 (3d Cir. 2008) ...............................35

Ezold v. Wolf Block, 983 F.2d 509 (3d Cir. 1993) .............................................................28

Farrell v. Planters Lifesavers, Co., 206 F.3d 271 (3d Cir. 2001).......................................35

Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005)...................................................................40

Gentner v. Cheyney Univ., 1996 U.S. Dist. LEXIS 13545 (E.D. Pa. Sept. 17, 1996) .................51

Golod v. Bank of Am. Corp., 403 Fed. Appx. 699 (3d Cir. 2010) ...................................24

Grazier v. City of Philadelphia, 328 F.3d 120 (3d Cir. 2003) .........................................49

Gross v. FBL Fin. Servs., 557 U.S. 167 (2009)...........................................................51, 52

Iadimarco v. Runyon, 190 F.3d 151 (3d Cir. 1999)...........................................................35

Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1988) ........................................................36

Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403 (3d Cir. 1999)...................................28

Joyce v. Taylor Health & Rehab. Ctr., LLC, 2014 U.S. Dist. LEXIS 25583
(M.D. Pa. Feb. 28, 2014) ...............................................................................................52

Klein v. Hollings, 992 F.2d 1285 (3d Cir. 1993)...........................................................49

Lauren W. v. Deflaminis, 480 F.3d 259 (3d Cir. 2007)............................................43, 46

Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993)..................................21

Madile v. Clark Material Handling Co., 131 Fed. Appx. 836 (3d Cir. 2005)................21

Marra v. Philadelphia Housing Auth., 497 F.3d 286 (3d Cir. 2007) .............................43

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ....................22, 28, 29, 32, 35

Mikulan v. Allegheny Cty., 2017 U.S. Dist. LEXIS 83315 (W.D. Pa. May 31, 2017).................52

Miller v. Cigna Corp., 47 F.3d 586 (3d Cir. 1995) .......................................................52

Montgomery Cty. v. MicroVote Corp., 152 F. Supp. 2d 784 (E.D. Pa. 2001)...............49

Motter v. Everest & Jennings, Inc., 883 F.2d 1223 (3d Cir. 1989) ...............................56

Murray v. Fairbanks Morse, 610 F.2d 149 (3d Cir. 1979)............................................56

Noble Biomaterials v. Argentum Med., LLC,2011 U.S. Dist. LEXIS 109075
(M.D. Pa. Sept. 23, 2011) ..............................................................................................47

Neiderlander v. Am. Video Glass Co., 80 Fed. Appx. 256 (3d Cir. 2003)....................28

Parexel Int'l Corp. v. Felician, 2008 U.S. Dist. LEXIS 98195 (E.D. Pa. Dec. 4, 2008)...............49

Petrulio v. Teleflex Inc., 2014 U.S. Dist. LEXIS 156568 (E.D. Pa. Nov. 5, 2014) .....................40

Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133 (2000)................21, 22, 28, 32

Robinson v. City of Philadelphia, 491 Fed. Appx. 295 (3d Cir. 2012) .........................52

Roebuck v. Drexel Univ., 852 F.2d 715 (3d Cir. 1988) .................................................33

Sarullo v. U.S. Postal Serv., 352 F.3d 789 (3d Cir. 2003).............................................32

Scheidemantle v. Slippery Rock Univ., 470 F.3d 535 (3d Cir. 2006) ......................................28, 32

Schilling v. Napleton's Ellwood City Chrysler, 2015 U.S. Dist. LEXIS 146290
(W.D. Pa. Oct. 28, 2015) ...........................................................................................................52

Seman v. Coplay Cement Co., 26 F.3d 428 (3d Cir. 1994) ......................................................35

Sempier v. Johnson & Higgins, 45 F.2d 724 (3d Cir. 1995) ...............................................28, 29

Shanno v. Magee Indus. Enters., Inc., 856 F.2d 562 (3d Cir. 1988) ........................................49

Smith v. ABF Freight Systems, Inc., 2007 WL 3231969 (M.D. Pa. Oct. 29, 2007) ....................34

Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089 (3d Cir. 1995) .......................................48

St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993) ..........................................................35

Tucker v. Thomas Jefferson Univ., 484 Fed. Appx. 710 (3d Cir. 2012) ....................................29

USPS Bd. of Governors v. Aikens, 460 U.S. 711 (1983) .....................................................22, 23

Weldon v. Kraft, Inc., 896 F.2d 793 (3d Cir. 1990) ................................................................28

Williamson v. Consol Rail Corp., 926 F.2d 1344 (3d Cir. 1991) .............................................49

**Statutes**

Age Discrimination in Employment Act
   29 U.S.C. §621, *et seq* ........................................................................................ *passim*

Title VII of the Civil Rights Act of 1964
   42 U.S.C. §2000e, *et seq*...................................................................................... *passim*

Pennsylvania Human Relations Act
   43 P.S. §951, *et seq*............................................................................................. *passim*

**Other Authorities**

Fed.R.Civ.P. 50(b) ................................................................................21, 23, 39, 47

Fed.R.Civ.P. 59 .............................................................................................49

Fed.R.Civ.P. 61 .............................................................................................50

## I.      INTRODUCTION AND PROCEDURAL BACKGROUND

On January 20, 2016, Plaintiff Ruth V. Briggs commenced this employment discrimination, retaliation, and hostile work environment action against her former employer, Defendant Temple University, for violations of the Age Discrimination in Employment Act, as amended, 29 U.S.C. §621, *et seq.* ("ADEA"), the Pennsylvania Human Relations Act, as amended, 43 P.S. §951, *et seq.* ("PHRA"), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.* ("Title VII").  On July 31, 2017, Defendant filed a Motion for Summary Judgment (Doc. No. 26), to which Plaintiff responded on August 9, 2017 (Doc. No. 27).  On January 3, 2018, the Court denied Defendant's Motion in its entirety (Doc. No. 31) and subsequently scheduled the matter for trial.

On July 19, 2018, the jury in this matter rendered a verdict in favor of Plaintiff and against Defendant Temple University, awarding Plaintiff $250,000 in back pay economic loss damages (which were doubled as liquidated damages under the ADEA) and $350,000 in pain and suffering damages.[1]  The jury unanimously found in favor of Plaintiff on the following claims:

(1)   age discrimination in connection with the termination of Plaintiff's employment (Question 2);

(2)   retaliation in the form of termination against Plaintiff for complaining of age discrimination (Question 3);

(3)   age-based hostile work environment (Question 5);

(4)   retaliation in the form of hostile work environment against Plaintiff for complaining of age discrimination (Question 7); and

---

[1] By agreement among the parties and the Court, the jury was not asked, and did not determine, the amount of front pay damages that Plaintiff is entitled to recover as a result of Defendant's unlawful conduct.  Plaintiff's Motion for Front Pay Damages (Doc. No. 65) is currently pending before the Court.

    (5)  retaliation in the form of hostile work environment against Plaintiff for complaining

         of gender discrimination (Question 8).

<u>See</u> Verdict Sheet (Doc. No. 58).

    The unanimous jury further found that Defendant engaged in willful misconduct by intentionally discriminating against Plaintiff because of her age or retaliating against her because of her complaint of age discrimination (Question 10).  <u>Id.</u>  As a result of this finding, Plaintiff is entitled to liquidated damages of $250,000 (Plaintiff's back pay economic losses) under the ADEA.  On July 25, 2018, the Court entered an Amended Civil Judgement (Doc. No. 62) in accordance with the verdict sheet in the amount of $850,000.

    The jury in this case was fully attentive to the evidence presented.  It heard and saw that Defendant permitted a toxic work environment to fester under the leadership of Dr. Jie Wu, Defendant's Chair of the Department of Computer and Information Sciences ("CIS").  It heard and saw that Plaintiff Briggs complained on numerous occasions to employees within Defendant's Human Resources ("HR") department, Equal Opportunity Compliance ("EOC") office, and even Defendant's in-house counsel about the discrimination she faced at work.  It heard and saw that Defendant swept these complaints under the rug, and gave Ms. Briggs the run-around in an attempt to protect Dr. Wu.  It heard and saw the retaliatory actions taken by Defendant against Plaintiff because she complained of discrimination and harassment in the workplace, which culminated in Defendant's decision to terminate her on April 1, 2014 – just weeks after she alerted Defendant that she would be bringing a complaint to the Equal Employment Opportunity Commission ("EEOC").  Moreover, it heard and saw various witnesses at trial and appropriately judged each one's credibility in light of the evidence presented.

There was ample evidence to support the jury's verdict that Defendant discriminated against Plaintiff, retaliated against Plaintiff, and subjected Plaintiff to a hostile work environment. The jury's verdict in favor of Plaintiff must be respected. Further, the jury appropriately considered the evidence regarding Plaintiff's economic losses and reached an accurate and warranted decision to award her $250,000 in back economic losses. Finally, the jury was instructed to use its impartial judgment and experience to arrive at a fair and reasonable award of damages for emotional distress, a number for which there is no neat formula. The jury did as instructed, and its award must be respected. In short, this Court should deny Defendant's Motion in its entirety and order that the impartial jury's verdict be upheld.

## II. THE EVIDENCE FROM WHICH THE JURY REASONABLY FOUND THAT DEFENDANT DISCRIMINATED AGAINST PLAINTIFF, RETALIATED AGAINST PLAINTIFF, AND SUBJECTED PLAINTIFF TO A HOSTILE WORK ENVIRONMENT.

### A. Plaintiff Ruth Briggs's Employment at Defendant Temple University.

Plaintiff was born in 1954 and is currently almost sixty-four (64) years old. July 17, 2018 AM Trial Transcript ("7.17.18 AM TT") at 10:11-13; 16:15-17. At her termination date in April 2014, she was fifty-nine (59) years old. Plaintiff commenced employment with Defendant in or around February 2001 as an Editorial Assistant in the Center for Neurovirology and Cancer Biology. Id. at 15:23-16:14. In or around 2005, Defendant transferred Plaintiff to the position of Executive Assistant to the Dean of the College of Science and Technology. Id. at 17:8-23. In selecting Plaintiff over eighteen (18) other candidates, Defendant asserted regarding Plaintiff:

> The candidate was selected based on her outstanding communication skills both verbal and written. Her previous work experience in developing and writing grant applications, providing editorial assistance, customer service skills, prior university experience and education made her the best qualified candidate.

See Plaintiff's Trial Exhibit 1.

3

As Executive Assistant, Plaintiff initially reported to Interim Dean Allen Nicholson. 7.17.18 AM TT at 17:8-23. In this position of Executive Assistant to the Dean, Plaintiff's direct supervisors included Dean Nicholson, Dean Keya Sadeghipour, Dean Hai-Lung Dai, and Vice Dean George Palladino. Id. at 22:9-15. Over the approximately five (5) years working as an Executive Assistant to the Dean, Plaintiff never filed a complaint against any of those supervisors, and never went to HR or the EOC office regarding any of them. Id. at 22:17-23.

In or around October 2009, Plaintiff was transferred by Defendant and became the Executive Assistant to Dr. Jie Wu, the Chair of the Department of CIS. Id. at 26:7-16. As Executive Assistant to Dr. Wu, Plaintiff provided administrative support and performed a variety of functions, including directing all ongoing and special projects, developing programs and systems to manage daily activities, and planning and coordinating events. See generally Defendant's Trial Exhibit 4. The essential functions of the job included serving as a liaison for Dr. Wu with representatives of other University administrative and academic offices, and working with a wide array of University-wide constituents while ensuring the administrative operation of the department. Id. Plaintiff's duties included managing Dr. Wu's travel plans and travel expenses. 7.17.18 AM TT at 27:6-19.

Over the course of her eight (8) year career at Defendant prior to reporting to Dr. Wu, Plaintiff had never been written up for any reason at Defendant, been given any written discipline or suspended, and had never been placed on any sort of performance improvement plan. Id. at 22:24-23:13. At trial, Defendant did not call any witnesses to testify that Plaintiff's performance prior to working under Dr. Wu was deficient in any way.

Plaintiff testified in detail to how Dr. Wu treated her in the workplace. For example, Plaintiff testified that Dr. Wu would raise his voice at her and yell degrading things at her in public.

Id. at 29:25-30:13 ("There were times when he would come out and yell at me in the front office. I – on two separate occasions, I remember him looking at me and saying, what are you, stupid. And then another time when he said, can't you speak English. And I was – you know, I just don't know how to respond to those kinds of comments."). Dr. Wu's conduct caused Plaintiff to have embarrassment, and she feared him when he treated her in this way. Id. at 28:11-29:24.

### B. Dr. Wu Makes an Age and Sex Discriminatory Comment to Plaintiff About Women in China Being Forced to Retire When They Reach Plaintiff's Age.

Dr. Wu was born in China and lived there until 1987. July 16, 2018 PM Trial Transcript ("7.16.18 PM TT") at 51:10-16. Dr. Wu knows that in China there is a mandatory retirement law that requires white collar, professional women (such as Plaintiff) to retire at the age of fifty-five (55). Id. at 54:20-55:21. According to Dr. Wu, sometimes women in China retire at the age of forty (40), and his own sister in China retired while she was in her 30s. Id. at 56:4-57:21.

On November 9, 2011, Dr. Wu approached Plaintiff, who was turning fifty-seven (57) years old the next day, and asked her how old she was going to be. Plaintiff told him that she was turning fifty-seven (57). Dr. Wu responded with words to the effect of, "You know, in China, we put women out to pasture at 55." 7.17.18 AM TT at 31:1-13. Dr. Wu testified that he knew that Plaintiff was in her 50s. 7.16.18 PM TT at 60:5-12. The comment caused Plaintiff to be embarrassed, and she felt insulted by her supervisor because she had no plans to retire. 7.17.18 AM TT at 31:17-25.

Plaintiff replied to Dr. Wu by stating words to the effect of, "With all due respect, we're in America and not in China." Id. at 31:13-16. Within an hour, Plaintiff was called into the Dean's office to meet with Greg Wacker, Director of Finance and Administration. Id. at 32:1-12. Mr. Wacker informed Plaintiff that Dr. Wu told him that Plaintiff had been unprofessional to him in the office and that she was going to be written up. Plaintiff told Mr. Wacker what Dr. Wu had said

5

to her and how she responded, but Mr. Wacker stated that it did not matter.  Id. at 32:13-20; 34:3-11.

**For challenging Dr. Wu's biased view and discriminatory comment, Plaintiff was given a written warning for allegedly acting unprofessionally and inappropriately.**  See Plaintiff's Trial Exhibit 3.  This written discipline – which is dated November 9, 2011, the day before Plaintiff's 57th birthday – was the first ever written discipline that Plaintiff received in her over-10 year tenure at Defendant.  7.17.18 AM TT at 33:20-24; 34:17-22.

Neither Dr. Wu nor Director Wacker could testify as to why exactly Plaintiff received this discipline.  7.16.18 PM TT at 65:5-14 (Wu); July 16, 2018 AM Trial Transcript ("7.16.18 AM TT") at 55:9-56:1 (Wacker).  Dr. Wu testified that he has not seen, and did not create, any supporting documentation which states why Plaintiff received this discipline.  7.16.18 PM TT at 65:10-14; 66:4-8.  Director Wacker testified that he believes supporting documentation exists and that HR should have it, but he has never seen it.  7.16.18 AM TT at 55:18-56:1.  HR Director Deirdre Walton testified, however, that she has never seen any such documentation but she believes that either Dr. Wu or Director Wacker would have it.  July 17, 2018 PM Trial Transcript ("7.17.18 PM TT") at 117:12-17 ("[I]t was Dr. Wu's statement that he made to Greg [Wacker]; he sent him an email.").

**It is undisputed that – despite all this contradictory and circular testimony from Defendant's witnesses – no such documentation exists, nor was any supporting documentation presented at trial.**  The jury in this case was tasked, among other things, with determining who is telling the truth about why Plaintiff received this discipline dated November 9, 2011: (a) Plaintiff, who consistently testified to Dr. Wu's discriminatory and retaliatory conduct

on the day before her 57th birthday; or (b) Defendant's witnesses, who offered inconsistent testimony and no physical evidence to support their story.

### C. Plaintiff Engages in Protected Activity by Complaining About Dr. Wu's Age and Sex Discriminatory Comment and Behavior.

Plaintiff complained directly to HR Director Walton about Dr. Wu's discriminatory comment to her that in China women of Plaintiff's age are "put out to pasture." 7.17.18 PM TT at 121:12-122:1.  HR Director Walton understood that Plaintiff was offended and upset by Dr. Wu's conduct.  Id.; 122:7-15; 123:3-4.  As a result of Plaintiff's complaint, HR Director Walton specifically instructed Director Wacker to look into the situation and report back to her.  Id. at 127:7-12 ("[T]hat's what I mean by 'look into' was go and investigate her complaint. . . . He was supposed to do an investigation into the comment that Ruth Briggs said that Dr. Wu said.").

Director Wacker did as he was instructed by HR Director Walton, and reported back to her that Dr. Wu told him that the conversation did not occur in the way that Plaintiff described.  Id. at 122:2-6 ("I looked into that situation, into that story.  I gave Greg Wacker a call, as I always do when there's an issue, and Greg looked into it.  He found out that he was relaying a story about how things are handled with women in his homeland.").  **Director Wacker – per HR Director Walton's instructions – specifically talked with Dr. Wu about Plaintiff's complaints.**  Id. at 127:15-24 ("What I do recall is that [Wacker] called me and he told me he did talk to people in the office who were there when Dr. Wu made the comment.  He did talk to Dr. Wu.").  Director Wacker explained to Dr. Wu that his comment could be seen as offensive and Director Wacker **"made [Dr. Wu] aware that Ruth was upset by the comment."**  Id. at 127:22-24.

HR Director Walton further testified:

> Q.    But Dr. Wu would have known that the person that he made
> that comment to was Ms. Briggs, correct?

| A. | Yes. |
|---|---|
| Q. | And now he's having Mr. Wacker come back and question him about this comment, correct? |
| A. | Yes. |
| **Q.** | **So, then, he would have known that there was some complaint by Ms. Briggs about the comments, correct?** |
| **A.** | **Yes.** |
| Q. | Okay.  So, this knowledge that is in Mr. – in Dr. Wu's brain that Ms. Briggs is upset with him about the comment, correct? |
| A. | Yes. |

Id. at 128:11-13.

Plaintiff also complained to Director Wacker directly about Dr. Wu's comment to her about the policy of women of a certain age being forced into retirement in China.  7.17.18 AM TT at 33:25-34:16.  Director Wacker therefore suggested that Plaintiff speak with Sandra Foehl, Director of Defendant's Equal Opportunity Compliance Office ("EOC").  7.16.18 PM TT at 7:2-6.  Director Wacker knew that Ms. Foehl and the EOC office handle personnel complaints, and that Ms. Foehl, within her capacity in the EOC office, deals with age and gender issues in the workplace.  Id. at 7:22-8:2.

On July 25, 2012, Plaintiff emailed Ms. Foehl to set up a meeting with her.  See Plaintiff's Trial Exhibit 5 at p.2.  Plaintiff met with Ms. Foehl on July 30, 2012.  Plaintiff stated to Ms. Foehl that she felt that she was being discriminated against, feared retaliation, and she specifically relayed Dr. Wu's comment about older women being "put out to pasture" in China.  7.17.18 AM

TT at 38:6-16; July 18, 2018 PM Trial Transcript ("7.18.18 PM TT") at 4:22-5:4.[2]  In Ms. Foehl's handwritten notes from that meeting, she states that Plaintiff relayed to her: "Problems.  Dr. Wu yells and says demeaning things, e.g., 'Are you stupid?'  'In China, women your age are done.'" See Plaintiff's Trial Exhibit 4.  Ms. Foehl and Plaintiff discussed filing a formal complaint of discrimination during this meeting; however, Plaintiff expressed that she was scared.  Id. ("File age discrimination complaint?  I'm scared.").

On August 2, 2012, Plaintiff followed up with Ms. Foehl regarding her complaints:

> Dear Sandy,
>
> Thank you for meeting with me on Monday, July 30th to discuss several issues regarding my employment with the University.  If it is possible to review the letter to [Dean] Michael Klein before sending, please let me know.
>
> If not, I would appreciate a synopsis of the content presented in the "complaint," so that I will be prepared for my return to work after my son's surgery.  I am not having "buyer's remorse" but I am nervous about the manner with which I will be treated when I return after my son's surgery.
>
> I will be out of the office tomorrow, Friday, September 3[rd], but I will check my email.
>
> Thank you so much for your help.  I greatly appreciate your guidance.

See Plaintiff's Trial Exhibit 5 at p.1.

Immediately after receiving this email from Plaintiff, Ms. Foehl reached out to HR Director Walton and Eric Brunner of HR to solicit information **about Plaintiff**.  In her email, Ms. Foehl

---

[2] Plaintiff also discussed these issues with Rhonda Brown of Temple's Office of Institutional Diversity in 2012.  See Plaintiff's Trial Exhibit 5 at p.2 (email from Plaintiff to Ms. Foehl dated July 25, 2012) ("I spoke to Rhonda Brown regarding personal employment issues, about which I was encouraged to meet with you.").

specifically describes the situation with Plaintiff as "Employee complaint." See Plaintiff's Trial

Exhibit 6.  Ms. Foehl did not, however, send a similar email asking if anyone in HR had history

with Dr. Wu and the way that he treated people in the workplace.  7.18.18 PM TT at 26:22-25.

The following month, on September 9, 2012, Plaintiff circled back to Ms. Foehl to follow

up on their meeting from earlier that summer.  In her email correspondence to Ms. Foehl, Plaintiff

specifically references back to their conversation where Plaintiff complained to Ms. Foehl about

the discriminatory comments of Dr. Wu.  See Plaintiff's Trial Exhibit 7 ("Regarding our discussion

related to Dr. Wu's comments about my age . . .").  Plaintiff further complained to Ms. Foehl that

she was being underpaid compared to her male colleagues, and that her job responsibilities were

being taken from her and given to a student worker.  Id.; 7.18.18 PM TT at 18:5-8.  In response,

Ms. Foehl sent Plaintiff information on how to file an internal complaint with Temple.  See

Plaintiff's Trial Exhibit 8  ("Please be advised that complaints of unlawful discrimination may be

made to government compliance agencies as well as to this office.  The attachment here gives you

direction to the federal, state and municipal offices in Philadelphia.").

Because no progress was being made with Ms. Foehl, Plaintiff then reached back out to

Ms. Brown of the Office of Institutional Diversity to express her frustrations:

> Dear Rhonda,
>
> I regret having seen Sandy Foehl because I could not see the original
> complaint, nor have I heard if it was filed nor how it will be
> addressed.
>
> I am over my head now taking care of an invalid  24 year old and
> don't want to have the threat of joblessness in the face of this crisis.
>
> Sorry that I do not have time to write more about the complaints that
> I wish to be researched.  My son needs me now.

See Plaintiff's Trial Exhibit 7.

**D.  Plaintiff Continues to Complain in 2013 About Discrimination and Ms. Foehl Does Nothing to Address the Toxic Environment Created by Dr. Wu.**

In early 2013, Plaintiff continued to be harassed and bullied by Dr. Wu.  Plaintiff again raised her concerns with Ms. Foehl and Ms. Brown.  On February 7, 2013, Plaintiff wrote to Ms. Brown, "I am so bullied and harassed all day.  Two people in the Dean's office tell me that I can find another job.  That can't be right.  Ruth."  See Plaintiff's Trial Exhibit 10.  Ms. Brown responded to Plaintiff and told her to "[g]o to Sandy."  Id.

Plaintiff then emailed Ms. Foehl on February 8, 2013, stating:

> Sandy,
>
> I am so bullied and harassed all day.  Everyday morning, I must meet with, my direct supervisor and Greg Wahker's [sic] assistant, Drew DiMeo for "staff meeting" to discuss my failure to comply with a directive that prohibits any work activity that has not been approved by my supervisor, all of which are related to performing daily function in the office . . . such as answering questions from students or visitors to our building.  The threat of discipline for assisting a visitor or responding to a request from another office does not seem to have any actions of wrong doing, rather fulfilling a "customer service" expectation for the university.  No other staff member is required to meet daily for a dose of public humiliation and my request to move the meetings to a private location was flat out denied.
>
> When I asked for clarification on an assignment, it is reported to the dean's office as a challenge to his authority.  If he can have a someone there to protect his interests, there is more than an element of unfairness.  It is beginning to feel like psychological abuse.
>
> If my only resource to address this problem is through HR, this is unacceptable.  Can I contact a mediator?

See Plaintiff's Trial Exhibit 9.

Even though Ms. Foehl had just met and communicated with Plaintiff months earlier about Dr. Wu's discriminatory treatment towards, and comments about, Plaintiff, and even though they had been discussing the process of filing internal and external discrimination complaints, and even

11

though Ms. Foehl is specifically tasked with handling these types of complaints, instead of stepping in to mediate the situation Ms. Foehl simply kicked the can down the road to HR. Id. ("Ruth, this is an issue for Human Resources first. Address the situation and your concerns to Deirdre Walton in Labor and Employee Relations."). Even more shocking, Ms. Foehl forwarded Plaintiff's email to HR Director Walton, and remarked that she did not "see a claim of unlawful discrimination/harassment in Ruth Briggs' message." Id.

### E. With No Progress Being Made to Remedy the Situation, Plaintiff Complains to Temple's In-House Counsel About the Discrimination and Hostile Environment She is Facing at Work.

In February 2013, Plaintiff sought the help of Cameron Etezady, Esq. of Temple's Office of University Counsel. In emails dated February 9, February 10, and February 11, 2013, Plaintiff specifically communicated to Mr. Etezady that she was being discriminated against on the basis of her age and sex, and that she feared retaliation by Dr. Wu.

On February 9, 2013, Plaintiff wrote to Mr. Etezady: "I am contacting you to request a CONFIDENTIAL conversation **to discuss disparate treatment for me, which I believe is related to my age of 58. I am concerned about retaliation**." See Plaintiff's Trial Exhibit 12 (emphasis added).

The following day, Mr. Etezady confirmed receipt of Plaintiff's email and recommended that she speak with Ms. Foehl – who Plaintiff had already complained to on several occasions to no avail. Id.

Plaintiff responded and more fully explained why she was reaching out to Mr. Etezady:

> After a week of unrelenting bullying, I sent an email to Rhonda Brown and she told me to contact Sandy, Sandy told me to contact Diedre Walton. . . .
>
> **On numerous occasions, Jie Wu has mentioned that the professional lives of women my age (58) in China are over** and I

12

> wrote it off to cultural differences.  It was when he would make a
> comment that referenced my age and failure to attain the financial
> stability to be able to travel when I felt defensive and offended. . . .
>
> I do not want to take anymore of your time nor do want to re-visit
> the events from which I am already distraught.  I just want to know
> where the "buck stops."  I am a Quaker and I just want someone to
> assist me to mediate a personnel problem to find a mutually
> acceptable solution rather than another adversarial relationship
> within the university.

<u>See</u> Plaintiff's Trial Exhibit 13 (emphasis added).

Mr. Etezady directed Plaintiff to reach out to Fay Trachtenberg, Esq. of Temple's Office

of University Counsel, which she did on or about February 14, 2013.  <u>See</u> Plaintiff's Trial Exhibit

14; 7.17.18 AM TT at 56:17-20.  Plaintiff again relayed her concerns to Ms. Trachtenberg (who

was copied on the above correspondence between Plaintiff and Mr. Etezady) and again no action

was taken by Temple.  Instead, Ms. Trachtenberg simply told Plaintiff to speak with HR Director

Walton of HR again, even though Plaintiff had already communicated in vain with HR Director

Walton about these issues.  <u>Id.</u> at 57:11-17.

### F.  Defendant Retaliates Against Plaintiff in 2013 By Giving Her an Unpaid 3-Day Suspension.

Shortly after Plaintiff complained to Ms. Foehl, Ms. Brown, HR Director Walton, and in-

house counsel Mr. Etezady and Ms. Trachtenberg, Plaintiff was given an unpaid three-day

suspension for allegedly making an error in connection with an administrative duty.  <u>Id.</u> at 58:5-

59:17.  Plaintiff noticed the error herself and took ownership of the mistake.  <u>Id.</u>

Plaintiff complained to HR Director Walton that the unpaid three-day suspension was too

severe and that numerous mitigating factors were not taken into account when Dr. Wu issued this

sentence.  <u>See</u> Plaintiff's Trial Exhibit 17.  For example, Plaintiff herself recognized the error she

made and brought it to the supervisors' attention; she took ownership of the mistake; she had been

helping to cover another employee's workload while that person was on FMLA leave; and earlier that week, Dr. Wu had instructed Plaintiff to drop everything she was doing to work on an emergency project.  Id.  Dr. Wu admitted that Plaintiff took ownership of the mistake and that she never failed to book a plane ticket prior to this March 2013 write-up.  7.16.18 PM TT at 77:8-16. **This was the one and only time that Dr. Wu had ever issued an unpaid three-day suspension to any of his reports.** Id. at 79:12-14.

In August 2013, Plaintiff again reached out to Ms. Trachtenberg and Mr. Etezady of Temple's in-house counsel office because she continued to feel singled out by Dr. Wu and Mr. DiMeo, who had been working closely with Dr. Wu and had been meeting with Plaintiff routinely during this period.  Plaintiff's email to Mr. Etezady on August 6, 2013 stated that she was literally begging for help because she felt targeted by her supervisor.  She specifically wrote to Mr. Etezady:

> Dear Cameron,
>
> I am forwarding the email that I sent in February of this year to refresh your memory regarding my reason for reaching out to you about my situation.  I did contact Faye [sic] Trachtenberg, as suggested and she referred me to Deidre Walton. . . .
>
> I have very strong personal beliefs regarding our litigious society and feel a moral obligation to find solutions to problems in a manner that is not adversarial.  BUT NO ONE WILL RESPOND TO ME AND MY PROFESSIONAL LIFE IS ON THE LINE. . . .
>
> **My situation I believe is now compounded because of my age, my gender, and perhaps ethnicity.  I am begging for someone within Temple to help mediate this problem. . . .**
>
> My confidence has never been so low and at 58 years old, I have no[] options to change the course of my plummeting professional life because I am relegated to making coffee, secretarial functions even though I have never been a secretary.  Young female student workers occupy my former office area where they carry out my job functions while I was re-located from the third floor of Wachman to the 10th floor of Carnell.  Even though the 2 vs 1 meetings continue every morning in the main office and I am summoned to come down

> when Dr. Wu has guests who want coffee, I am so far removed from the CIS Department to appear as if I was banished from the department where I am told by well-intentioned faculty who want to remain anonymous and students that I am a scapegoat for the department.

<u>See</u> Plaintiff's Trial Exhibit 26.

Notwithstanding her cries for help, Temple continued to do nothing to assist in the situation. In response to Plaintiff's August 6, 2013 email, Mr. Etezady again directed Plaintiff to speak with Ms. Trachtenberg – the same attorney to whom Plaintiff had complained earlier that year and who then told Plaintiff to speak with HR Director Walton, to whom Plaintiff had already complained unsuccessfully on numerous occasions. <u>See</u> Plaintiff's Trial Exhibit 27.

### G. Defendant Continues to Retaliate Against Plaintiff in January 2014 By Giving Her a Written Warning for Over-sleeping on One (1) Occasion.

In January 2014, Plaintiff again received a disciplinary notice from Dr. Wu and Mr. DiMeo. Plaintiff overslept and arrived to work approximately three (3) hours late. 7.17.18 AM TT at 78:3-17. Before coming in, Plaintiff notified a student-worker that she overslept and was leaving her home soon. <u>Id.</u> Plaintiff asked to speak with Judy Lennon (CIS Department secretary), who was nowhere to be found. <u>Id.</u> Plaintiff asked to speak with Dr. Wu himself, but he was in a meeting. <u>Id.</u> Consequently, Plaintiff told the student-worker to inform them that she would be arriving at work shortly. <u>Id.</u> For this one incident, Plaintiff received a disciplinary note and a written warning. <u>See</u> Plaintiff's Trial Exhibit 30.

Plaintiff was surprised to get this discipline because she did not have a history of tardiness or absenteeism, and she would routinely work past her scheduled hours to get her work done. 7.17.18 AM TT at 78:23-79:21; 80:25-81:9. For example, on this day where she overslept, she stayed at work until 9pm or 10pm to finish her assignments. <u>Id.</u>

Frustrated that she just received a written warning even though she complied with Dr. Wu's rules on how to call out if running late, Plaintiff went back to HR Director Walton on February 22, 2014 and expressed her exasperation with the retaliation she was facing:

> I want you to understand how distressing it is when I have no one in the department and no one in human resources who will listen to me. I am honest and operate with integrity in every arena of my life and five days out of the week I a[m] battered emotionally, insulted, ignore[d], yelled at in front of peers and the department scapegoat. I am often accused for the mistakes and the misconduct of others. And there is no[] shortage of misconduct around here.  It is the irony of my life to be the "identified patient" in an environment that is beyond hostile.  I am appealing to you to assign someone who is fair and unbiased to conduct an investigation for the truth about these two incidences without prejudice in a timely manner.

See Plaintiff's Trial Exhibit 33.

At the same time that Plaintiff received written discipline for over-sleeping one (1) time, one (1) of Plaintiff's co-workers, a new hire named Hailey King, was a no call/no show for three (3) straight days.  7.17.18 AM TT at 81:13-82:2.  Ms. King was hired in the Fall of 2013 and worked under Dr. Wu.  7.16.18 PM TT at 82:3-11.  Ms. King was in her late 20s in 2014 and was still on probation as a newly hired employee.  7.17.18 AM TT at 82:6-19.  Dr. Wu admitted that Ms. King did not show up to work for three (3) days, never called in, and never told anybody where she was.  7.16.18 PM TT at 83:2-6.  Nevertheless, he did not issue Ms. King any written discipline.  Id. at 83:20-24.

### H.  Plaintiff is Retaliated Against and Continues to Complain About Dr. Wu in 2014.

Following the unwarranted discipline in January 2014, Plaintiff again contacted Ms. Foehl and HR Director Walton.  On February 25, 2014, Plaintiff specifically informed Ms. Foehl that she already had a phone intake with the EEOC:

> I have tried desperately to make my work situation tolerable, while my family and friends say that I need to take a pro-active defense

against my supervisor and two managers in the Dean's office. But I have reached my breaking point and need to be concerned with repairing my professional reputation. On numerous occasions, I have spoken to Diedre Walton who has not been helpful or timely at all. **I plan to file an EEOC complaint internally and have already had a phone intake with the EEOC.**

See Plaintiff's Trial Exhibit 34; see also 7.17.18 AM TT at 89:2-3.

Ms. Foehl then forwarded Plaintiff's email to HR Director Walton. See Plaintiff's Trial Exhibit 35. HR Director Walton testified that she informed Ms. Foehl that every time Plaintiff would raise a complaint with her, she would instruct Director Wacker or Mr. DiMeo to look into these complaints, and by that she meant she would have them **speak to Dr. Wu** about Plaintiff's concerns. July 18, 2018 AM Trial Transcript ("7.18.18 AM TT") at 108:4-18. HR Director Walton further testified that there were **no** concerns that Plaintiff raised that she did not look into, or have someone else look into. Id. at 78:12-15.

On March 13, 2014, Plaintiff wrote to HR Director Walton that she felt singled out, was being pushed out of Temple by her supervisors, and that Temple's actions were in violation of state and federal law. See Plaintiff's Trial Exhibit 37 at p.2. Plaintiff pleaded with HR Director Walton: "Please show me the same respect that you give to the person who has had a grudge against me for many years. In the eyes of the law, this could be viewed as unfair labor practices and discrimination, both of which violate federal and state laws." Id.

Plaintiff's growing frustration at the retaliation she was facing culminated in a March 23, 2014 email to HR Director Walton, where she explained:

> My work situation with Drew DiMeo and Dr. Wu is escalating and I need your help. The issue is not just something that affects my work week, but is causing anxiety and depression throughout my weekends. To mask this from my grown children and grandchildren, I report that I have the flu so that they stay away.

17

I am actually afraid to go to work, especially Mondays, Wednesdays and Fridays, when I meet with Drew and Dr. Wu. Before I go to sleep and as soon as I wake, the anxiety I experience is palpable and impacting the quality of my personal life. As the only staff member required to meet with Dr. Wu and Drew, I would think that my "superiors" would behave as professionals by respecting my privacy. In fact, the meetings occur within the earshot of my co-workers and visitors (students, external constituents, faculty). The fact that I am singled out and verbally assaulted in an open public area has been the "gristmill" for gossip and rumors, which have been reported back to me from employees in other departments. Dr. Wu said that Drew is there for protection and as a witness but I have no protection and feel like an abuse victim. . . .

I do not want to spend anymore personal time about job related matters on my personal time, but I want to discuss changes made to my job description and responsibilities that have been given to Hailey King, Jackie Harriz's replacement. My essential functions have been diminished to elementary clerical functions. I am performing entry level data entry tasks, while one student worker and Haley [sic] King are performing the functions of my job description. . . . I am a team player but I object to performing the department secretary's job, or being summoned from the 10th floor to the 3rd floor to make coffee and bring cookies to Dr. Wu and his guests when Judy [Lennon, Department Secretary] and a student worker are available in the front office. It appears to be another strategy to diminish me, discount my experience and talents in an effort to get my resignation or termination.

See Plaintiff's Trial Exhibit 38 at pp.3-4.

A few days later, Plaintiff again emailed HR Director Walton: "I am drowning here and have reached out to you numerous times and waited and waited. This is affecting the quality of my work life and my person[al] life. **All I want is to continue to work without being harassed.** Based on the content of your email, I assume that you contacted Drew, Greg and Dr. Wu when I asked that you refrain from doing so because I know that the harassment will escalate without the protection of human resources." Id. at p.1 (emphasis added). HR Director Walton forwarded the same to Ms. Foehl, stating, "FYI and for discussion." Id.

Again, as she had done in the past, HR Director Walton talked with Director Wacker and Mr. DiMeo and had them speak with Dr. Wu about Plaintiff's complaint. 7.18.18 AM TT at 57:22-25 ("So every time Ruth made a complaint to me in regards to how she thought she was being treated, I talked with Greg Wacker. Greg Wacker and both Drew looked into those concerns."); see also Plaintiff's Trial Exhibit 40 ("Every time you have reached out to me I have talked with you and looked into your complaints and concerns.").

Plaintiff also directly told Mr. DiMeo herself that she was speaking with Ms. Foehl about Dr. Wu's treatment of her. 7.17.18 AM TT at 91:4-13. Mr. DiMeo responded to Plaintiff, "Dr. Wu knows what's going on, and I'm – you know, and it's got to stop." Id. Even Director Wacker told Plaintiff that Dr. Wu knew that Plaintiff had complained about workplace issues. Id. at 91:8-10. Director Wacker threatened Plaintiff, stating, that "Dr. Wu knows what you're doing and if you want your job, you better cut it out." Id.

### I.   Defendant Terminates Plaintiff's Employment on April 1, 2014.

On April 1, 2014, Plaintiff met with Ms. Foehl in-person again to discuss the discrimination she was facing at Temple. 7.17.18 AM TT at 89:24-90:7. Ms. Foehl testified that Plaintiff asked her about conducting an investigation into her complaints of age and sex discrimination. 7.18.18 PM TT at 31:9-15. Ms. Foehl's notes from this meeting state that they discussed "age" and "standard for me extraordinary." See Plaintiff's Trial Exhibit 44. Plaintiff further complained about how she was being treated compared to her substantially younger counterpart, Hailey King. 7.18.18 PM TT at 33:18-20 ("I remember that Hailey King was the individual with whom she was comparing herself and saying that her discipline was unfair.").

Upon leaving the meeting, Plaintiff was instructed to meet with Director Wacker and HR Director Walton. Plaintiff was then given a termination notice stating that she was being

19

terminated for negligence/carelessness and disruptive or disorderly conduct. See Plaintiff's Trial Exhibit 45 ("Effective the end of the day today, your employment at Temple University is being terminated."). According to Director Wacker and Dr. Wu, the termination decision was made by Dr. Wu in conjunction with HR Director Walton. 7.16.18 AM TT at 44:2-14 (Wacker); 7.16.18 PM TT at 68:11 (Wu). According to HR Director Walton and Defendant's Interrogatory responses, however, the decision was made by Director Wacker and Dr. Wu. 7.18.18 AM TT at 20:16-17 (Walton); Plaintiff's Trial Exhibit 62 at p.6.

Although Plaintiff sent an email two (2) days later stating that she would resign in lieu of termination, it is undisputed that if she decided not to resign she would have been terminated involuntarily. 7.16.18 AM TT at 61:12-22; 7.16.18 PM TT at 44:1-4; 7.18.18 AM TT at 54:8-10 ("Her staying there was not an option."). Plaintiff was ultimately replaced by an employee who was 46 or 47 years old. 7.18.18 AM TT at 101:24-102:3.

## III.   LEGAL ARGUMENT

Defendant has moved for Judgment as a Matter of Law ("JMOL"), or a new trial, or remittitur. Specifically, Defendant argues:

- As to the judgment that Defendant discriminated against Plaintiff because of her age in terminating her employment and subjected her to a hostile work environment because of her age, Defendant has moved for JMOL, or, in the alternative, for a new trial.

- As to the judgment that Defendant retaliated against Plaintiff in terminating her employment because of her complaints of age discrimination and subjected her to a retaliatory hostile work environment because she complained of age and gender discrimination, Defendant has moved for JMOL, or, in the alternative, for a new trial.

- As to the judgment that Defendant engaged in willful misconduct – resulting in liquidated damages under the ADEA – Defendant has moved for JMOL.

- As to the judgment that Plaintiff is entitled to $250,000 in back pay damages, Defendant has moved for JMOL, a new trial, and/or a remittitur.

- As to the judgment that Plaintiff is entitled to $350,000 in emotional distress damages, Defendant has moved for JMOL, a new trial, and/or a remittitur.

Each of Defendant's motions should be denied for the reasons set forth below.

## A. The Judgment Entered in Favor of Plaintiff Must Stand.

A motion for judgment under Fed.R.Civ.P. 50(b) "should be granted only if, viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find" for the non-movant. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993); Madile v. Clark Material Handling Co., 131 Fed. Appx. 836, 838 (3d Cir. 2005). In making this determination, "the court may not weigh the evidence, determine the credibility of the witnesses, or substitute its version of the facts for the jury's version." Lightning Lube, 4 F.3d at 1166 (citing Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 190 (3d Cir. 1992)). The court must disregard all evidence favorable to the moving party that the jury is not required to believe. E.g., Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 151 (2000); Avaya, Inc. v. Telecom Labs, Inc., 838 F.3d 354, 373 (3d Cir. 2016).

Defendant's post-trial motion rehashes the exact same arguments that it made before summary judgment and during trial. The Court properly rejected those arguments then and found that there was sufficient evidence for the jury to decide if Defendant discriminated against Plaintiff, retaliated against Plaintiff, and/or subjected Plaintiff to a hostile work environment. The jury has now decided and Defendant does not get to re-try its case again on paper as if the Court is a super fact-finder. Defendant's post-trial motion should be denied in its entirety.

1.  **The Question at Issue is Whether There Was Sufficient Evidence to Support the Jury's Findings that Defendant Discriminated Against Plaintiff, Retaliated Against Plaintiff, and Subjected Plaintiff to a Hostile Work Environment.**

Defendant argues that it is entitled to judgment as a matter of law on Plaintiff's claims because she allegedly failed to satisfy certain "prongs" of the *prima facie* case set forth in the McDonnell-Douglas[3] burden-shifting framework, and further argues that assuming a *prima facie* case, Plaintiff allegedly failed to establish pretext of Defendant's supposed legitimate non-discriminatory reason for the termination.  Defendant's argument misses the point.  By incorrectly framing its Motion in these terms, Defendant fails to address the ultimate questions of discrimination, retaliation, and hostile work environment *vel non*.   See, e.g., USPS Bd. of Governors v. Aikens, 460 U.S. 711 (1983) (it was error for the court acting as trier of fact to focus on question of *prima facie* case rather than directly on question of discrimination).  Further, in focusing on the *prima facie* case rather than the ultimate issues of discrimination, retaliation, and hostile work environment, Defendant ignores evidence demonstrating bias and Plaintiff's engagement in protected activity that were considered by the jury in reaching its verdict.

As explained by the Supreme Court in Aikens, the McDonnell-Douglas burden-shifting framework is a sensible way to evaluate evidence – but is not the factual inquiry in a discrimination trial.  Id. at 716.  The factual inquiry that the fact-finder (here the jury) was to decide was whether Defendant intentionally discriminated against Plaintiff, retaliated against Plaintiff because she engaged in protected activity, or subjected to her a hostile work environment.   Id. at 716; see also, e.g., Reeves, 530 U.S. at 153 ("The ultimate question in every employment discrimination case

---

[3] McDonnell-Douglas v. Green, 411 U.S. 792 (1973).

involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination").

A Rule 50(b) Motion is not properly an opportunity for Defendant to rehash to the Court its evidence and arguments that Defendant's reason for termination should be believed and that it did not really discriminate or retaliate against Plaintiff. The jury considered the evidence, assessed credibility, and already decided that. The issue is whether there was evidence, direct or circumstantial, which when viewed cumulatively was sufficient for the jury to either disbelieve Defendant's articulated reason(s) or believe that an invidious discriminatory or retaliatory reason was more likely than not a determinative cause of the employer's action.

At the post-verdict stage, the issue of whether Plaintiff put forth sufficient evidence of a *prima facie* case is <u>not</u> properly before the Court. Rather, at this stage, the issue is simply whether there was sufficient evidence to support the jury's verdict, <u>not</u> whether there is sufficient evidence of a *prima facie* case. <u>See, e.g.,</u> <u>Aikens</u>, 460 U.S. at 716; <u>Bruno v. W.B. Saunders Co.</u>, 882 F.2d 760, 764 (3d Cir. 1989) ("Of course, after a case has been tried to a jury on the merits, 'it is unnecessary for the appellate court to decide whether a *prima facie* case had, in fact, been established.'") (quoting <u>Blum v. Witco</u>, 829 F.2d 367, 372 n.2 (3d Cir. 1987)).

In reaching this verdict, the jury considered *all* of the evidence and concluded that Defendant discriminated against Plaintiff, retaliated against her, and subjected her to a hostile work environment. The question now before this Court is only whether there was sufficient evidence to support the jury's verdict. As set forth below, there was ample evidence by which the jury reasonably reached its verdict, and therefore Defendant's Motion for JMOL must be denied.

**2. There was Ample Evidence By Which the Jury Reasonably Concluded That Defendant Discriminated Against Plaintiff Because of Her Age and Subjected Her to an Age-based Hostile Work Environment.**

The evidence from which the jury reasonably concluded that Defendant discriminated against Plaintiff because of her age and subjected her to a hostile work environment because of her age is set forth in detail with supporting citations in Section II, *supra*. The jury reasonably concluded that Dr. Wu had a bias against older females in the workplace, as demonstrated by his references to China's mandatory retirement law to Plaintiff herself. Dr. Wu acted with unchecked authority to harass, demean, and push out Plaintiff, and ultimately Defendant did **nothing** to stop Dr. Wu from exhibiting his bias in deciding to terminate Plaintiff's employment. Dr. Wu at the same time treated Plaintiff's substantially younger co-worker Hailey King and student workers more favorably than Plaintiff, giving them Plaintiff's job duties and not meaningfully disciplining Ms. King for disappearing for several days without any notice (as opposed to giving Plaintiff a written warning for oversleeping by three (3) hours on one (1) occasion).[4]

In summary, and without limitation, evidence of Defendant's age-based discrimination and animus against Plaintiff includes:

1. On November 9, 2011, Dr. Wu approached Plaintiff, who was turning fifty-seven (57) years old the next day, and asked her how old she was going to be. Plaintiff told him that she was turning fifty-seven (57). Dr. Wu responded with words to the effect of, "You know, in China, we put women out to pasture at 55." 7.17.18 AM TT at 31:1-13.

2. Dr. Wu testified that he knew that Plaintiff was in her 50s. 7.16.18 PM TT at 60:5-12. He further testified that he knows that in China there is a mandatory retirement law that requires white collar, professional women (such as Plaintiff) to retire at the age of fifty-five (55). Id. at 54:20-55:21. According to Dr. Wu, sometimes women in China retire at the age of forty (40), and his own sister in China retired while she was in her 30s. Id. at 56:4-57:21.

---

[4] It should be noted that Plaintiff is not *required* to establish comparator evidence to support an inference of discrimination. See Golod v. Bank of Am. Corp., 403 Fed. Appx. 699, 702 n.2 (3d Cir. 2010).

24

3. Plaintiff explained in subsequent emails to HR, EOC, and Defendant's in-house counsel – and testified to the same at trial – that she was being bullied and singled out by Dr. Wu. See, e.g., Plaintiff's Trial Exhibit 9 ("No other staff member is required to meet daily for a dose of public humiliation and my request to move the meetings to a private location was flat out denied."); Plaintiff's Trial Exhibit 13 ("On numerous occasions, Jie Wu has mentioned that the professional lives of women my age (58) in China are over and I wrote it off to cultural differences. It was when he would make a comment that referenced my age and failure to attain the financial stability to be able to travel when I felt defensive and offended. . . ."); Plaintiff's Trial Exhibit 33 ("[F]ive days out of the week I a[m] battered emotionally, insulted, ignore[d], yelled at in front of peers and the department scapegoat. I am often accused for the mistakes and the misconduct of others.").

4. Plaintiff explained on numerous occasions that her job responsibilities as Executive Assistant were being taken away from her and given to younger workers. See, e.g., Plaintiff's Trial Exhibit 7 ("Regarding our discussion related to Dr. Wu's comments about my age, I am forwarding an email that was sent to a student worker in our office about yet another of my job functions assigned to her. . . . Additionally, last week, I was informed in front of Mary Kate that she would be handling all his travel arrangements, too."); Plaintiff's Trial Exhibit 26 ("I am relegated to making coffee, secretarial functions even though I have never been a secretary. Young female student workers occupy my former office area where they carry out my job functions while I was re-located from the third floor of Wachman to the 10th floor of Carnell."); Plaintiff's Trial Exhibit 38 ("I want to discuss changes made to my job description and responsibilities that have been given to Hailey King, Jackie Harriz's replacement. My essential functions have been diminished to elementary clerical functions. I am performing entry level data entry tasks, while one student worker and Haley [sic] King are performing the functions of my job description.").

5. At the same time that Plaintiff received written discipline for over-sleeping one (1) time, Ms. King – who is undisputedly substantially younger than Plaintiff - was a no call/no show for three (3) straight days. 7.17.18 AM TT at 81:13-82:2. Dr. Wu admitted that Ms. King did not show up to work for three (3) days, never called in, and never told anybody where she was. 7.16.18 PM TT at 83:2-6. Nevertheless, he did not issue Ms. King any written discipline. Id. at 83:20-24; see also 7.18.18 PM TT at 33:18-20 ("I remember that Hailey King was the individual with whom she was comparing herself and saying that her discipline was unfair.").

To succeed in a claim for hostile work environment, a plaintiff must establish that she: (1) suffered intentional discrimination because of a protected trait; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination detrimentally affected a reasonable person in like circumstances; and (5) the existence of respondeat superior

liability. See Castleberry v. STI Grp., No. 16-3131, 2017 U.S. App. LEXIS 12611, at *5 (3d Cir.

July 14, 2017). It is well established that evaluation of a hostile work environment claim requires

consideration of the totality of the circumstances; a court must not focus on individual incidents,

but on the overall scenario. Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990).

By their very nature, such claims involve unlawful employment practices that "occur over a series

of days or perhaps years." AMTRAK v. Morgan, 536 U.S. 101, 115 (2002).

Here, the record is replete with evidence of Defendant's severe or pervasive conduct

towards Plaintiff and how the conduct detrimentally affected Plaintiff (or any reasonable person

in Plaintiff's shoes). In addition to the information set forth above, evidence of Defendant's severe

or pervasive conduct towards Plaintiff, and its effect on her, includes, without limitation:

1. Plaintiff testified that Dr. Wu would raise his voice at her and yell degrading things at her in public. 7.17.18 AM TT at 29:25-30:13 ("There were times when he would come out and yell at me in the front office. I – on two separate occasions, I remember him looking at me and saying, what are you, stupid. And then another time when he said, can't you speak English. And I was – you know, I just don't know how to respond to those kinds of comments."). Dr. Wu's conduct caused Plaintiff to have embarrassment, and she feared him when he treated her in this way. Id. at 28:11-29:24.

2. Dr. Wu's comment that in China women of Plaintiff's age are "put out to pasture" caused Plaintiff to be embarrassed, and she felt insulted by her supervisor because she had no plans to retire. Id. at 31:17-25. Plaintiff complained directly to HR Director Walton about Dr. Wu's discriminatory comment to her that in China women of Plaintiff's age are "put out to pasture." 7.17.18 PM TT at 121:12-122:1. HR Director Walton understood that Plaintiff was offended and upset by Dr. Wu's conduct. Id. at 122:7-15; 123:3-4.

3. Plaintiff stated to Ms. Foehl that she felt that she was being discriminated against, feared retaliation, and she specifically relayed Dr. Wu's comment about older women being "put out to pasture" in China. 7.17.18 AM TT at 38:6-16; 7.18.18 PM TT at 4:22-5:4. In Ms. Foehl's handwritten notes from that meeting, she states that Plaintiff relayed to her: "Problems. Dr. Wu yells and says demeaning things, e.g., 'Are you stupid?' 'In China, women your age are done.'" See Plaintiff's Trial Exhibit 4.

4. Plaintiff further complained to Ms. Foehl that she was being singled out, bullied, and harassed. See Plaintiff's Trial Exhibit 9 ("I am so bullied and harassed all day. . . No other staff member is required to meet daily for a dose of public humiliation and my

request to move the meetings to a private location was flat out denied. . . . It is beginning to feel like psychological abuse."); Plaintiff's Trial Exhibit 34 ("I have tried desperately to make my work situation tolerable, while my family and friends say that I need to take a pro-active defense against my supervisor and two managers in the Dean's office. But I have reached my breaking point and need to be concerned with repairing my professional reputation.").

5.  Plaintiff made similar complaints to in-house counsel Mr. Etezady by email.  See Plaintiff's Trial Exhibit 13 ("After a week of unrelenting bullying, I sent an email to Rhonda Brown and she told me to contact Sandy, Sandy told me to contact Diedre Walton. . . . I do not want to take anymore of your time nor do want to re-visit the events from which I am already distraught.  I just want to know where the 'buck stops.'").

6.  Plaintiff further complained to HR Director Walton about the hostile work environment to which she was subjected.  See Plaintiff's Trial Exhibit 33 ("I want you to understand how distressing it is when I have no one in the department and no one in human resources who will listen to me.  I am honest and operate with integrity in every arena of my life and five days out of the week I a[m] battered emotionally, insulted, ignore[d], yelled at in front of peers and the department scapegoat."); Plaintiff's Trial Exhibit 38 at p.3 ("My work situation with Drew DiMeo and Dr. Wu is escalating and I need your help.  The issue is not just something that affects my work week, but is causing anxiety and depression throughout my weekends.  To mask this from my grown children and grandchildren, I report that I have the flue so that they stay away.  I am actually afraid to go to work, especially Mondays, Wednesdays and Fridays, when I meet with Drew and Dr. Wu."); Id. at p.1 ("I am drowning here and have reached out to you numerous times and waited and waited.  This is affecting the quality of my work life and my person[al] life.  All I want is to continue to work without being harassed.  Based on the content of your email, I assume that you contacted Drew, Greg and Dr. Wu when I asked that you refrain from doing so because I know that the harassment will escalate without the protection of human resources.").

For the reasons set forth above, the ongoing harassment that Plaintiff faced at work was severe or pervasive and because of her protected traits and activities.  The evidence shows that Plaintiff was treated differently by Dr. Wu because she is an older woman and Dr. Wu harbors a bias based on gender stereotypes of women in the workforce.  Further, there is no question that Defendant's treatment of Plaintiff – including the utter failure of anyone in HR, the EOC, or the legal department to remediate the toxic environment – detrimentally affected her.  In sum, there was ample evidence by which the jury reasonably reached its verdict that Defendant discriminated

against Plaintiff because of her age in terminating her employment and subjected her to a hostile

work environment because of her age, and therefore the verdict should not be disturbed.  See, e.g.,

Reeves, 530 U.S. at 153.

### 3. Assuming, *Arguendo*, That the Consideration is Proper at the Post-verdict Stage, There was Sufficient Evidence to Support Both a Finding of a *Prima Facie* Case and Pretext.

Assuming *arguendo* that it is appropriate for the Court to consider a JMOL on liability that

addresses an issue other than simply whether there was sufficient evidence to support the jury's

verdict, there was in this case sufficient evidence considered by the jury to support a *prima facie*

case and pretext.

Courts routinely find that there is a **low bar** for establishing a *prima facie* case of

employment discrimination.  See Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 (3d

Cir. 2006); Ezold v. Wolf Block, 983 F.2d 509, 523 (3d Cir. 1993) ("Because the *prima facie* case

is easily made out, it is rarely the focus of the ultimate disagreement.").  Establishing a *prima facie*

case is not an onerous burden and is easily met.  See Corbetto v. Wyeth Pharma., 619 F.Supp.2d

142 (W.D. Pa. 2007) (quoting Sempier v. Johnson & Higgins, 45 F.2d 724, 728 (3d Cir. 1995)).

Cases in the Third Circuit hold that strict interpretations of the *prima facie* case should not be used

to deny the plaintiff an opportunity to demonstrate that an employer's justifications for its actions

are pretextual.  See Sempier, 45 F.3d at 729; see also Neiderlander v. Am. Video Glass Co., 80

Fed. Appx. 256, 261 (3d Cir. 2003) (the burden of establishing a *prima facie* case is "not onerous"

and is a "low threshold").  The *prima facie* case should be flexible, tailored to fit the specific

context in which it is applied and not squeezed into a one-size-fits-all formula.  Jones v. Sch. Dist.

of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999); Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d

Cir. 1990) ("The framework set forth in McDonnell Douglas . . . was never intended to be rigid,

mechanized or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.") (internal citations omitted).

To establish a *prima facie* case of discrimination under the <u>McDonnell-Douglas</u> burden-shifting framework, a plaintiff alleging wrongful termination must show: 1) she is a member of the protected class; 2) she was qualified for the position; 3) she was terminated; and 4) under circumstances raising an inference of discrimination based on her age. <u>E.g.</u>, <u>Tucker v. Thomas Jefferson Univ.</u>, 484 Fed. Appx. 710, 712 (3d Cir. 2012). Here, Defendant argues that Plaintiff has failed to meet the second, third, and fourth prongs of the *prima facie* test. Although unnecessary to prove at this stage of the proceedings, *supra*, there is ample evidence that Plaintiff has shown all of these prongs and evidence of pretext.

### i. Plaintiff Was Qualified For Her Position of Executive Assistant.

Defendant argues that Plaintiff cannot meet the second prong of the *prima facie* case because she was not qualified for her position as Executive Assistant. For this second prong of the *prima facie* case, the Court must "determine a plaintiff's qualifications for purposes of proving a prima facie case by an objective standard." <u>Sempier</u>, 45 F.3d at 729.

Here, Plaintiff has set forth sufficient evidence that she was qualified for the Executive Assistant position that she held for nearly ten (10) years under several supervisors. In or around 2005, Plaintiff became an Executive Assistant to the Dean of the College of Science and Technology at Defendant. 7.17.18 AM TT at 17:8-23. In selecting Plaintiff over eighteen (18) other candidates, Defendant asserted regarding Plaintiff:

> The candidate was selected based on her outstanding
> communication skills both verbal and written. Her previous work
> experience in developing and writing grant applications, providing

editorial assistance, customer service skills, prior university
experience and education made her the best qualified candidate.

<u>See</u> Plaintiff's Trial Exhibit 1.

As Executive Assistant, Plaintiff initially reported to Interim Dean Allen Nicholson.
7.17.18 AM TT at 17:8-23.  In this position of Executive Assistant to the Dean, Plaintiff's direct
supervisors included Dean Nicholson, Dean Keya Sadeghipour, Dean Hai-Lung Dai, and Vice
Dean George Palladino.  <u>Id.</u> at 22:9-15.  In or around October 2009, Plaintiff was transferred by
Defendant and became the Executive Assistant to Dr. Jie Wu, the Chair of the Department of CIS.
<u>Id.</u> at 26:7-16.  Over the course of her eight (8) year career at Defendant prior to reporting to Dr.
Wu, Plaintiff had **<u>never</u>** been written up for any reason at Defendant, been given any written
discipline or suspended, and had never been placed on any sort of performance improvement plan.
<u>Id.</u> at 22:24-23:13.  At trial, Defendant did not call any witnesses to testify that Plaintiff's
performance prior to working under Dr. Wu was deficient in any way.

At no point during Plaintiff's career at Defendant did she receive an annual evaluation that
stated that she failed to meet the overall expectations of the job.  Rather, each annual performance
evaluation that Plaintiff received from Defendant throughout her employment resulted in a score
that fell between a 2.0 ("Performance meets minimal expectations and standards") and a 3.0
("Performance meets job expectations. GOOD SOLID PERFORMANCE.").  <u>See</u> Defendant's
Trial Exhibits 10-17. With regard to specific goals/projects and competencies upon which Plaintiff
was assessed, Plaintiff often received a 3.5 or the full 4.0 score (Performance consistently far
exceeds expectations) and **never once** received a 1.0 score ("Performance consistently fails to
meet minimal expectations") before Dr. Wu for **any** skill or goal/project or competency.  By way
of example only:

1. 2005 Evaluation (Defendant's Trial Exhibit 10): 4.0 score on Goal/Project 2 ("Assist and support the Dean during University activities, such as, commencement, award ceremonies, etc.); and Competency 7 ("Interpersonal Skills – Ability to work effectively with others using empathy and self-regulation to manage interactions with others").

2. 2006 Evaluation (Defendant's Trial Exhibit 11): 4.0 score on Goal/Project 3 ("Bring the dean's office to a professional status making sure students/faculty/staff are treated professionally and with respect. This includes but is not limited to the physical appearance of the office.").

3. 2007 Evaluation (Defendant's Trial Exhibit 12): 4.0 score on Competency 10 ("Ethics – Demonstrates the ability to adhere to an appropriate and effective set of core values and beliefs and acts in line with those values.") and 3.5 score on Competency 1 ("Client/Customer Service Orientation – Focuses one's efforts on exceeding the customer's needs. Takes personal responsibility for dealing with and/or correcting customer service issues and concerns."); Competency 11 ("Interpersonal Skills – Ability to work effectively with others using empathy and self-regulation to manage interactions with others."); and Competency 13 ("Respect and Valuing Diversity – Demonstrates the ability to recognize, understand, accept and appreciate the value of workplace diversity, respects the practices, values, and points of view of other individuals and groups.").

4. 2011 Evaluation (Defendant's Trial Exhibit 15): 3.5 score on Goal/Project 1 ("Assist Chair in outreach activities") ("She is excellent in this category. She has done a very good job in organizing department events, including CIS award ceremony."); and Competency 2 ("Technical/Professional Skills – Achieves a proficient level of technical and professional skills/knowledge in job-related areas. Continues to grow with the changing requirements of the job. Involves continual assessment and skill development.").

Further, in its Brief, Defendant inaccurately argues that "Ms. Briggs admitted to the errors and deficiencies articulated in the warnings and discipline that led to the end of her employment." See Defendant's Brief at p.7. This cannot be farther from the truth. As discussed in more detail below, Plaintiff vehemently denied the two (2) instances described in her April 1, 2014 termination letter. See Plaintiff's Trial Exhibit 45 (termination letter); 7.17.18 AM TT at 93:7-94:9 (denying that she booked the hotel for the wrong dates); 99:12-101:16 (denying that she had access to the requisite computer system); see also Defendant's Trial Exhibit 71.

31

In sum, the evidence clearly shows, based on her long tenure within the position of Executive Assistant, lack of performance improvement plan or any disciplinary write-up before working under Dr. Wu, and the satisfactory performance evaluations she received from **multiple** supervisors, that Plaintiff has met her low burden on this second prong of the *prima facie* analysis that she was qualified for the position.[5]

### ii. Plaintiff Was Terminated Under Circumstances That Give Rise to An Inference of Discrimination.

Plaintiff satisfies the third and fourth prongs by introducing evidence from which a jury could conclude that Defendant's termination of Plaintiff occurred under circumstances which give rise to an inference of discrimination.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).  Taking the evidence on the record in the light most favorable to Plaintiff, she has certainly presented ample evidence to satisfy the third and fourth prongs of the *prima facie* case, which, again, the Third Circuit has explained is a **low bar**.  Scheidemantle, 470 F.3d at 539.

Defendant first argues that Plaintiff did not suffer from an adverse employment action because she allegedly resigned in lieu of termination.  Defendant advances this argument despite the uncontroverted fact that on April 1, 2014, Defendant handed Plaintiff a letter stating, "Effective the end of the day today, **your employment at Temple University is being terminated**."  See Plaintiff's Trial Exhibit 45.  Plaintiff did explain that she submitted a resignation email **two (2)**

---

[5] Defendant's blanket argument that Plaintiff cannot establish that she was "qualified" for her position because of her alleged performance deficiencies would – if accepted – uproot the entire McDonnell Douglas doctrine for employment discrimination claims.  In essence, Defendant argues that no employee can prevail where they were disciplined or discharged for alleged performance issues, notwithstanding the employee's evidence of pretext or any other evidence that discrimination and/or retaliation were the real reasons for the adverse action.  That is not and cannot be the law.  Moreover, to the extent that Defendant points to evidence of alleged subjective performance deficiencies of Plaintiff, a jury is not required to accept challenged testimony from interested sources.  Reeves, 530 U.S. at 151.

**days later** under duress. 7.17.18 PM TT at 62:24-25; 101:2-10. However, regardless, the end result was the same – under no circumstances was Plaintiff going to be allowed to remain an employee of Defendant, and the involuntary end of her employment was a decision that **Defendant** made. 7.16.18 AM TT at 61:12-22 (Wacker) (she would have been terminated involuntarily); 7.18.18 AM TT at 54:8-10 (Walton) ("Her staying there was not an option."). Under these circumstances, it is absurd to argue that Plaintiff did not suffer an adverse employment action at the hands of Defendant. She was fired.

Further, the circumstances surrounding the termination give rise to an inference of discrimination. For many of the reasons based on the evidence set forth above, the jury reasonably determined that Defendant discriminated against Plaintiff because of her age.

First, Dr. Wu exhibited his age discriminatory bias against older female workers by **telling** Plaintiff – the day before her 57th birthday - that in his home country, women of Plaintiff's age are "put out to pasture." A reasonable jury could infer from Dr. Wu's unsolicited statement that he personally adheres to this belief that Plaintiff, at her age, should retire from the workforce. That the comment occurred in November 2011 and not immediately before Plaintiff was terminated is a red herring argument. What matters is that the jury was permitted to infer from Dr. Wu's comment – as well as his overall demeanor and credibility – what he meant when he said what he said. The comment, made by a decisionmaker in this action, is relevant to this age discrimination action and the jury was permitted to give it appropriate weight. See Abrams v. Lightolier, Inc., 50 F.3d 1204, 1215 (3d Cir. 1995) ("[D]iscriminatory comments made by nondecisionmakers, or statements temporally remote from the decision at issue, may properly be used to build a circumstantial case of discrimination.") (citing Roebuck v. Drexel Univ., 852 F.2d 715, 733 (3d Cir. 1988)).

Second, Plaintiff explained on numerous occasions that her job responsibilities as Executive Assistant were being taken away from her and given to **younger workers**.  See, e.g., Plaintiff's Trial Exhibits 7, 26, 38.[6]  Moreover, the evidence showed that Dr. Wu inconsistently applied discipline to his subordinates in favor of the younger worker.  At the same time that Plaintiff received written discipline for over-sleeping one (1) time, Ms. King – who is undisputedly substantially younger than Plaintiff - was a no call/no show for three (3) straight days.  7.17.18 AM TT at 81:13-82:2.  Dr. Wu admitted that Ms. King did not show up to work for three (3) days, never called in, and never told anybody where she was.  7.16.18 PM TT at 83:2-6.  Nevertheless, he did not issue Ms. King any written discipline.  Id. at 83:20-24; see also 7.18.18 PM TT at 33:18-20 ("I remember that Hailey King was the individual with whom she was comparing herself and saying that her discipline was unfair.").

Third, viewing the facts and inferences in the light most favorable to Plaintiff, it is clear that Dr. Wu's treatment of Plaintiff was outrageous and targeted.  Throughout her reporting relationship to Dr. Wu, Plaintiff would be singled out and subjected to arbitrary yelling, degradation, and public humiliation by Dr. Wu.  See, e.g., Plaintiff's Trial Exhibits 9, 13, 33.

In its Motion, Defendant seeks to splice each single piece of evidence and view each one individually in a vacuum.  The Third Circuit repeatedly has held that evidence in an employment discrimination case should not viewed in that manner.  Rather, the Third Circuit explains:

> A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the

---

[6] Defendant's citation to Smith v. ABF Freight Systems, Inc., No. 04-2231, 2007 WL 3231969 (M.D. Pa. Oct. 29, 2007) is inapposite to this matter.  In that case, the plaintiff argued that reassignment of duties in and of itself constituted an adverse employment action.  In contrast, in the present case Plaintiff submitted evidence that Dr. Wu's decision to take job duties from Plaintiff and to give them to younger, student workers constituted evidence of his age bias and his desire to push Plaintiff out of the workforce.

34

> overall scenario . . . What may appear to be a legitimate justification
> for a single incident of alleged harassment may look pretextual when
> viewed in the context of several other incidents.

See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996) (internal citations omitted).

Here, taking all the pieces of evidence in account and viewing them in totality, the jury considered sufficient evidence from which to reasonably conclude that the fourth prong of the *prima facie* analysis was satisfied. As set forth above, there was ample evidence from which the jury could reasonably conclude that Plaintiff was discriminated against, and treated differently, because of her age.

### iii. Plaintiff Has Set Forth Sufficient Evidence Such That a Reasonable Jury Could Conclude That Defendant's Asserted Reasons for Terminating Her Employment Are Pretextual.

"Once a plaintiff establishes a *prima facie* case the law creates a presumption of unlawful discrimination, and the defendant employer must articulate a legitimate nondiscriminatory explanation for the employer's adverse employment action." Barber v CSX Dist. Servs., 68 F.3d 694, 698 (3d Cir. 1995) (quoting Seman v. Coplay Cement Co., 26 F.3d 428, 432 (3d Cir. 1994)). If the employer is able to meet its burden, the burden of production shifts back to the plaintiff to demonstrate evidence from which a jury could conclude that the employer's stated reason is a pretext for discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993).

"The *prima facie* case and pretext inquiries often overlap." Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008). Therefore, "evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the McDonnell Douglas formula requires [the Court] to ration the evidence between one stage or the other." Id. (citing Farrell v. Planters Lifesavers, Co., 206 F.3d 271, 286 (3d Cir. 2001)); Iadimarco v. Runyon, 190 F.3d 151, 166 (3d

Cir. 1999) (explicitly referring to the evidence of the *prima facie* case in finding evidence supporting pretext); Jalil v. Avdel Corp., 873 F.2d 701, 709 n.6 (3d Cir. 1988) ("Although this fact is important in establishing plaintiff's *prima facie* case, there is nothing preventing it from also being used to rebut the defendant's proffered explanation.").

Here, in addition to the evidence set forth above in support of Plaintiff's satisfaction of the fourth prong of the *prima facie* case, Plaintiff can point to numerous facts that could lead a reasonable jury to either disbelieve Defendant's asserted reasons for terminating Plaintiff's employment or believe that a discriminatory reason more likely than not caused the action.

The termination letter handed to Plaintiff on April 1, 2014 describes two (2) alleged incidents that resulted in Plaintiff's receipt of C-level discipline and termination: (1) Plaintiff's alleged intentional failure to submit Dr. Wu's travel reimbursements; and (2) Plaintiff's alleged failure to book a hotel for a speaker for the correct nights. At trial, Plaintiff testified to these incidents and explained what happened. The jury heard both sides of each story and ultimately agreed with Plaintiff.

With regard to the travel reimbursements, Plaintiff testified that one of her job duties as an Executive Assistant had been to submit her supervisor's travel expenses. 7.18.18 AM TT at 96:5-11. She would utilize Defendant's internal system, called Concur, after she was given access and permission to allocate the expenses to a particular grant number. Id. at 96:12-97:2. On March 20, 2014, at 3:53pm, Dr. Wu sent an email to Drew DiMeo stating that Defendant had not yet administratively inputted Dr. Wu's grant number into his account. See Defendant's Trial Exhibit 71 at p.3. At 3:56pm that same day, Mr. DiMeo emailed Plaintiff, telling her to submit the travel reimbursement into the system by 5:00pm that day. Id. at p.2. At 5:27pm that day, Plaintiff sent Mr. DiMeo a lengthy email explaining that she still did not have access to the grant number in the

system, and therefore she did not have the requisite "permission" on the computer to submit the report.  Id. at pp.1-2.  Plaintiff further identified what she believed was the technical issue within the system that denied her the access she needed to complete the project.  Id.  Mr. DiMeo did not respond to Plaintiff's last email.  Plaintiff stayed at work, however, and attempted to remedy the problem herself but she was unable to do so without the required computer access.  7.18.18 AM TT at 100:4-11.

Defendant argued at trial that Plaintiff did in fact have the required access, and instead intentionally failed to submit the expense report on Dr. Wu's behalf.  Defendant's argument fell flat, as it was unable to produce any credible testimony on what occurred or any documents in support of its position (except for Defendant's Trial Exhibit 71, which is consistent with Plaintiff's position that she was unable to access the account through no fault of her own).  HR Director Walton could not explain whether she did or did not receive any documentation showing that Plaintiff did in fact have access to the account that night.  7.18.18 AM TT at 45:2-46:9.  And Dr. Wu testified that Mr. DiMeo obtained written documentation and that he has even seen it, but no such document was ever presented to the jury.  7.18.18 PM TT at 94:6-23.  Defendant did not call Mr. DiMeo as a witness in this case.  Accordingly, the jury had ample evidence on this issue to conclude that Defendant's stated reason for terminating Plaintiff's employment cannot be believed.

With regard to the second incident set forth in Plaintiff's termination letter – Plaintiff's alleged failure to book a hotel room for the correct nights – Plaintiff testified that Dr. Wu himself asked her to change the reservations, and she followed his instructions appropriately.  7.17.18 AM TT at 93:16-23.  Dr. Wu testified that he does not even recall this incident at all – even though it's specifically delineated in the termination letter and Dr. Wu was an individual who made the

37

decision to terminate Plaintiff's employment.  7.16.18 PM TT at 91:23-92:7.  Again, the jury had ample evidence on this issue to conclude that Defendant's stated reason for terminating Plaintiff's employment cannot be believed.

Plaintiff argued at trial that the stated reasons for the termination of her employment were pure pretext.  Plaintiff highlighted Defendant's policies which state that two (2) C-level disciplines in one (1) year will result in termination.  See Plaintiff's Trial Exhibit 45.  Plaintiff received her first-ever C-level discipline on March 26, 2013.  Then, almost exactly one-year to the day, Defendant issued Plaintiff another C-level discipline for the two (2) alleged incidents set forth above.  Plaintiff argued that this is not a coincidence – Defendant wanted Plaintiff out, and dug up anything they could on Plaintiff as the one-year mark was approaching so that the termination would appear to be non-discriminatory and non-retaliatory.  Defendant denied this, of course. However, the jury did not believe Defendant that its articulated reasons were the real reasons and found in favor of Plaintiff.

Moreover, the jury saw and heard evidence that the previous disciplines given to Plaintiff during her tenure under Dr. Wu were entirely unwarranted and pretextual.  For example, not one witness for Defendant could explain a non-retaliatory reason for why Plaintiff was given a written discipline on November 9, 2011, the day Dr. Wu stated to Plaintiff that women her age in China are "put out to pasture" and Plaintiff responded in opposition, "With all due respect, we're in America and not in China."  Additionally, the jury heard that Dr. Wu issued Plaintiff a written discipline for oversleeping on one (1) occasion by three (3) hours, but her substantially younger co-worker, Ms. King, was not given any discipline for not calling out or showing up to work for three (3) **days** straight.  Finally, despite Dr. Wu's testimony that Plaintiff made "hundreds" of mistakes, there was simply no evidence to back up that assertion.  7.16.18 PM TT at 97:6-11.

A Rule 50(b) motion does not give a defendant a second bite at the apple.  It is not properly an opportunity for Defendant to rehash its arguments that its reason for termination should be believed and that it really didn't discriminate against Plaintiff.   The jury has already considered the evidence, heard the witnesses, assessed their credibility, and decided.  The issue before the Court is not whether the Court would believe Defendant's articulated reason for the termination. The issue is whether there was evidence, direct or circumstantial, which when viewed cumulatively was sufficient for the jury to either disbelieve Defendant's articulated reason(s) or believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's action.  To the extent that Defendant even articulated to the jury why specifically Plaintiff was terminated, the jury did not believe it.  Their finding is amply supported and must be respected.

> **4. There Was Ample Evidence By Which the Jury Reasonably Concluded That Defendant Retaliated Against Plaintiff By Terminating Her Employment and Subjecting Her to a Retaliatory Hostile Work Environment Because She Engaged in Protected Activity.**

The jury in this case found in favor of Plaintiff with regard to three (3) retaliation-based questions: (1) whether Defendant retaliated against Plaintiff in the form of termination because she complained of age discrimination (Question 3); (2) whether Defendant retaliated against Plaintiff in the form of retaliatory hostile work environment because she complained of age discrimination (Question 7); and (3) whether Defendant retaliated against Plaintiff in the form of retaliatory hostile work environment because she complained of gender discrimination (Question 8). See Verdict Sheet (Doc. No. 58).  Each one of these jury findings is amply supported by the record, as the evidence is clear that Plaintiff engaged in protected activity on numerous occasions, and there is a causal connection between her protected activity and the adverse actions taken against her.

To establish a claim of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) she was subjected to a materially adverse action by the employer; and (3) there was a causal connection between the protected activity and the employer's adverse action.  Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005).  To establish a claim for retaliatory hostile work environment, a plaintiff must prove that: (1) she suffered intentional discrimination because of her protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; (5) she suffered materially adverse action or actions in relation to the hostile work environment; and (6) a basis for employer liability is present.  Petrulio v. Teleflex Inc., No. 12-7187, 2014 U.S. Dist. LEXIS 156568, at *26 (E.D. Pa. Nov. 5, 2014).

### i.     Plaintiff Engaged in Protected Activity.

First, Defendant argues that the *only* protected activity that Plaintiff engaged in was her complaints of age and gender discrimination to Ms. Foehl (Director of EOC) and Mr. Etezady (in-house counsel).  See Defendant's Brief at p.20.  **Defendant's argument is belied by its own sworn and verified Interrogatory responses in this matter.**  See Plaintiff's Trial Exhibit 62 at pp.7-8.  On May 16, 2016 – over two (2) years ago - in response to Interrogatory No. 5, Defendant substantively answered:

> Temple University investigated Briggs' claims of discrimination and found them to be meritless.  Sandra Foehl of Temple University, Director, Office of Equal Opportunity Compliance, met with Briggs on various occasions in 2012, 2013 and 2014, and investigated Briggs' claims of discrimination.  Ms. Foehl found Briggs' claims of discrimination to be unsubstantiated.  In 2012 and 2013, Briggs discussed her claims of discrimination with Rhonda Brown, formerly at Temple University, Office of Institutional Diversity, Equity, Advocacy and Leadership.  Ms. Brown also found Briggs' claims unfounded.  **In 2013 and 2014, Briggs raised her claims of discrimination with Deirdre Walton, Temple University, Department of Labor and Employee Relations.  Ms. Walton**

> **found no merit to Briggs' claims.**  In early 2013, Briggs contacted
> Cameron Etezady, Esquire, Temple University, Office of University
> Counsel, regarding her claims of discrimination.   Mr. Etezady
> referred Briggs to and [sic] Fay Trachtenberg, Esquire, Temple
> University, Office of University Counsel.  Both Mr. Etezady and
> Ms. Trachtenberg discussed Briggs' complaints, and found them to
> be without merit.

Id. (emphasis added).

The jury saw and heard Defendant's sworn Interrogatory response which unequivocally states that Plaintiff complained of discrimination to not just Ms. Foehl and Mr. Etezady, but also Ms. Brown, Ms. Trachtenberg, **and HR Director Walton**.  Defendant's Interrogatory response is entirely consistent with Plaintiff's trial testimony, where she explained that she complained of discrimination to all of these individuals.  7.17.18 AM TT at 34:23-35:4; 46:10-17; 56:17-57:17. Nevertheless, the jury saw and heard HR Director Walton take the witness stand and testify that Plaintiff did <u>not</u> complain of discrimination to her.  7.17.18 PM TT at 108:15-18.  HR Director Walton testified this way in front of the jury **even though she was the very person who executed Defendant's Interrogatories under oath and penalty of perjury.**  <u>See</u> Plaintiff's Trial Exhibit 62 at p.14; 7.17.18 PM TT at 112:24-114:2.

The role of the jury is to judge the facts of the case and the credibility of the witnesses.  It was certainly within the province of the jury to determine that Defendant told the truth in its May 2016 sworn Interrogatory response that Plaintiff did indeed engage in protected activity by complaining to HR Director Walton, and that Defendant did not tell the truth when it asserted the exact opposite at trial in this case.

Further, to accept Defendant's argument that Plaintiff *only* complained to Ms. Foehl and Mr. Etezady – in contravention of Defendant's own sworn Interrogatory response - the Court and the jury would have to ignore the following facts, all of which must be reviewed in their totality.

41

1. Plaintiff immediately challenged Dr. Wu's age and sex discriminatory comment that in China women of Plaintiff's age are "put out to pasture," telling him that, "Well, with all due respect, we're in America right now." 7.17.18 AM TT at 31:13-16.

2. Plaintiff complained directly to HR Director Walton about Dr. Wu's discriminatory and offensive comment to her. 7.17.18 PM TT at 121:12-122:1. HR Director Walton understood that Plaintiff was offended and upset by Dr. Wu's conduct. Id. at 122:7-15; 123:3-4.

3. Plaintiff also complained to Director Wacker directly about Dr. Wu's comment to her about the policy of women of a certain age being forced into retirement in China. 7.17.18 AM TT at 33:25-34:16.

4. On February 7, 2013, Plaintiff wrote to Ms. Brown, "I am so bullied and harassed all day." See Plaintiff's Trial Exhibit 10.

5. On March 13, 2014, Plaintiff wrote to HR Director Walton that she felt singled out, was being pushed out of Temple by her supervisors, and that Temple's actions were in violation of state and federal law. See Plaintiff's Trial Exhibit 37 at p.2.

6. A few days later, Plaintiff again emailed HR Director Walton: "I am drowning here and have reached out to you numerous times and waited and waited. This is affecting the quality of my work life and my person[al] life. All I want is to continue to work without being harassed." See Plaintiff's Trial Exhibit 38 at p.1.

7. Plaintiff told Mr. DiMeo herself that she was speaking with Ms. Foehl about Dr. Wu's treatment of her. 7.17.18 AM TT at 91:4-13. Mr. DiMeo responded to Plaintiff, "Dr. Wu knows what's going on, and I'm – you know, and it's got to stop." Id.

8. Director Wacker told Plaintiff that Dr. Wu knew that Plaintiff had complained about workplace issues. Id. at 91:8-10. Director Wacker threatened Plaintiff, stating, that "Dr. Wu knows what you're doing and if you want your job, you better cut it out." Id.

Accordingly, while Defendant admits that Plaintiff did engage in some protected activity in its Motion, Defendant utterly fails to address all the other instances presented to the jury of Plaintiff specifically complaining of discrimination to various officials at Defendant.

> **ii.  There is Clear and Significant Causal Connection Between Plaintiff's Complaints and Defendant's Retaliatory Actions Taken Against Her.**

For the reasons set forth in Section III(A)(3)(ii), *supra*, Defendant involuntarily terminated Plaintiff's employment on April 1, 2014. She was fired. In light of the overwhelming evidence of protected activity by Plaintiff, and the clear fact that Defendant terminated her employment, the subsequent question, therefore, is whether Plaintiff has established sufficient evidence of a causal link between her protected activity and the adverse actions taken against her.

A plaintiff may rely on a "broad array of evidence" to demonstrate a causal link between her protected activity and the adverse action taken against her. Marra v. Philadelphia Housing Auth., 497 F.3d 286, 302 (3d Cir. 2007). To establish a causal link in a retaliation case, a plaintiff may show either "(1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007).

Defendant's primary argument is that the decisionmakers in this action – Dr. Wu, Director Wacker, and HR Director Walton - could not have retaliated against Plaintiff because they did not know she complained. Of course, in light of Defendant's own Interrogatory responses, *supra*, the jury could easily find that HR Director Walton did in fact have first-hand knowledge of Plaintiff's complaints – she swore to the same under penalty of perjury over two (2) years ago. Further, viewing all facts in the light most favorable to Plaintiff, it is clear that both Director Wacker and Dr. Wu had direct knowledge that Plaintiff was making repeated complaints about Dr. Wu (even though they both deny this).

HR Director Walton testified that she instructed Director Wacker to "look into" and ask Dr. Wu about **every** complaint that Plaintiff raised with her. See Plaintiff's Trial Exhibit 40

("Every time you have reached out to me I have talked with you and looked into your complaints and concerns."); 7.18.18 AM TT at 57:22-25 ("So every time Ruth made a complaint to me in regards to how she thought she was being treated, I talked with Greg Wacker. Greg Wacker and both Drew looked into those concerns."); 7.18.18 AM TT at 108:4-18 (Wacker talked to Dr. Wu about Plaintiff's complaints); 7.17.18 PM TT at 127:15-24 ("What I do recall is that [Wacker] called me and he told me he did talk to people in the office who were there when Dr. Wu made the comment.  He did talk to Dr. Wu."); 7.17.18 PM TT at 127:22-24 (Director Wacker "made [Dr. Wu] aware that Ruth was upset by the comment."); 7.17.18 PM TT at 128:11-13 (Dr. Wu would have known from Director Wacker that Plaintiff raised a complaint and that she was upset with Dr. Wu about his age and gender discriminatory comment).

Moreover, after Plaintiff told Mr. DiMeo that she was speaking with Ms. Foehl about Dr. Wu's treatment of her, Mr. DiMeo responded to Plaintiff, "Dr. Wu knows what's going on, and I'm – you know, and it's got to stop." 7.17.18 AM TT at 91:4-13.  Even Director Wacker told Plaintiff that Dr. Wu knew that Plaintiff had complained about workplace issues.  Id. at 91:8-10.  Director Wacker threatened Plaintiff, stating, that "Dr. Wu knows what you're doing and if you want your job, you better cut it out."  Id.

Notably, Dr. Wu was not the sole decisionmaker in this action.  The termination decision was made by a combination of Dr. Wu, Director Wacker, and HR Director Walton.  Even if the Court finds, despite the above evidence, that Dr. Wu had no knowledge of Plaintiff's protected activity, there can be no dispute that the other decisionmakers were fully aware of Plaintiff's complaints.[7]

---

[7] Dr. Wu testified at trial that he learned of Plaintiff's complaints "only this year."  7.16.18 PM TT at 111:11-20.  That testimony in and of itself is suspect and contradicted by Defendant's own documents and witnesses.  Even Ms. Foehl testified that she relayed to Dr. Wu all of Plaintiff's

The timing and pattern of antagonism towards Plaintiff while she was engaging in protected activity for years is clear evidence of a causal link. The evidence plainly supports Plaintiff's core allegation that Dr. Wu is not a supervisor who reacts well to having his authority challenged. For example, immediately after Plaintiff objected to Dr. Wu's age and gender discriminatory comment about women of a certain age being "put out to pasture" in China, Dr. Wu issued the first written discipline that Plaintiff had ever received during her career at Defendant. There is ample support for the jury to conclude that **for challenging Dr. Wu's biased view and discriminatory comment, Plaintiff was given a written warning for allegedly acting unprofessionally and inappropriately.**

Neither Dr. Wu nor Director Wacker could testify as to why exactly Plaintiff received this discipline. 7.16.18 PM TT at 65:5-14 (Wu); 7.16.18 AM TT at 55:9-56:1 (Wacker). And, despite contradictory and circular testimony from Dr. Wu, Director Wacker, and HR Director Walton, it is clear that no documentation exists which states any other reason why Plaintiff was disciplined, and no such documentation supporting Defendant's narrative was presented at trial.

Dr. Wu repeatedly issued severe and unwarranted discipline to Plaintiff. For example, shortly after Plaintiff complained to Ms. Foehl, Ms. Brown, HR Director Walton, and in-house counsel Mr. Etezady and Ms. Trachtenberg, Plaintiff was given a three-day unpaid suspension for allegedly making an error in connection with an administrative duty. Plaintiff herself recognized the error she made and brought it to the supervisors' attention; she took ownership of the mistake; she had been helping to cover another employee's workload while that person was on FMLA leave; and earlier that week, Dr. Wu had instructed Plaintiff to drop everything she was doing to work on

---

complaints as early as April 2014 – over four (4) years ago. 7.18.18 PM TT at 35:23-37:7; Plaintiff's Trial Exhibit 49; Plaintiff's Trial Exhibit 55.

an emergency project.  See Plaintiff's Trial Exhibit 17.   Nevertheless, Dr. Wu issued Plaintiff a three-day unpaid suspension – **the first and only time in Dr. Wu's career that he's issued that level of discipline to any employee.**  7.16.18 PM TT at 79:12-14.

By way of further example, again shortly after she complained about Dr. Wu's treatment of her, Plaintiff received written discipline for oversleeping for three (3) hours on one (1) occasion even though she followed Dr. Wu's protocol on how to call in when running late.  Finally, the termination decision itself came mere weeks after Plaintiff's repeated complaints to HR Director Walton, and her specific assertion to Ms. Foehl that she had a phone intake with the EEOC.  See Plaintiff's Trial Exhibit 34; see also 7.17.18 AM TT at 89:2-3.

As set forth above, this is the precise situation where a causal link can be established based on "a pattern of antagonism coupled with timing to establish a causal link."  Deflaminis, 480 F.3d at 267.  The jury in this matter saw and heard ample evidence that Plaintiff engaged in protected activity, which was causally connected to Defendant's retaliatory actions taken against her.  For the same reasons set forth in Section III(A)(3)(iii), Plaintiff presented more than sufficient evidence such that a reasonable jury could conclude that Defendant's asserted reasons for terminating her employment are pretextual.  By way of further example, Defendant's HR Director contradicted **her own sworn statement** regarding Plaintiff's complaints of discrimination.  Further, for the same reasons set forth in Section III(A)(2), the retaliation that Plaintiff faced because she engaged in protected activity was severe or pervasive and detrimentally affected her (or any reasonable person in Plaintiff's shoes).  The verdict that Defendant retaliated against Plaintiff by terminating her employment and subjecting her to a retaliatory hostile work environment must stand.

### 5. The Court Properly Charged the Jury With Regard to Willfulness Under the ADEA.

Defendant moves for JMOL with regard to liquidated damages under the ADEA on the grounds that the Court erred in charging the jury with an instruction on willfulness. See Defendant's Brief at pp.27-28. At the outset, Defendant has waived this argument. Defendant submitted a proposed jury instruction on liquidated damages under the ADEA which the Court largely adopted. See Defendant's Proposed Jury Instruction No. 22 (Doc. No. 44). Further, during the Charging Conference, Defendant raised no objection to charging the jury on liquidated damages. 7.18.18 PM TT at 70:14-24. Moreover, Defendant never raised in a Rule 50(a) motion or otherwise in any way before the jury returned its verdict that there was an insufficient basis to award liquidated damages as a matter of law. Because Defendant failed to assert the argument that it was entitled to judgment as a matter of law on Plaintiff's entitlement to liquidated damages before the question was submitted to the jury, Defendant has waived its right to do so in its Rule 50(b) motion. See, e.g., Noble Biomaterials v. Argentum Med., LLC, No. 08-1305, 2011 U.S. Dist. LEXIS 109075, at \*\*9-10 (M.D. Pa. Sept. 23, 2011) (holding that defendant who failed to raise punitive damages in Rule 50(a) motion cannot argue for judgment as a matter of law on punitive damages in a Rule 50(b) motion).

Even assuming *arguendo* that Defendant has not waived its right to move for judgment under Rule 50(b), its Motion should be denied because there is ample evidence to support the jury's verdict that Defendant's conduct was willful in discriminating against Plaintiff because of her age or retaliating against her because she complained of age discrimination. See Verdict Sheet (Doc. No. 58) at Question 10. As set forth in the Third Circuit Model Jury Instructions, the jury **must** find a defendant's violation of the ADEA to be willful if it knew or showed reckless disregard for whether the adverse actions were prohibited by the law. See Third Circuit Model Jury

Instruction at 8.4.3.  The instruction does not include any requirement that the defendant's conduct must have been outrageous.  Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1099 n.2 (3d Cir. 1995).  What matters is whether the defendant knew or showed reckless disregard for whether its actions were prohibited by law.

Here, Defendant is a sophisticated employer and all the relevant individuals involved in the adverse actions taken against Plaintiff are fully familiar with anti-discrimination and anti-retaliation laws.  See, e.g., 7.17.18 PM TT at 105:12-106:13 (Walton); 7.18.18 PM TT at 42:4-18 (Wu).  The individuals to whom Plaintiff complained about unlawful conduct even included two (2) of Defendant's in-house lawyers (Mr. Etezady and Ms. Trachtenberg), Defendant's HR Director (Walton), and Defendant's Director of Equal Opportunity Compliance (Ms. Foehl). There can be no credible argument that Defendant simply was unaware of the laws prohibiting discrimination and retaliation that were applicable to this matter.

Rather, what is clear from the evidence is that Defendant knew or showed reckless disregard for whether its conduct violated the law.  Plaintiff **repeatedly** complained of discrimination, retaliation, and hostile work environment to **numerous** individuals who are allegedly tasked with ensuring that Defendant protects its employees from discrimination and retaliation in the workplace.  In the face of these complaints, Defendant swept them under the rug and gave Plaintiff the run-around while she was simply trying to remedy the toxic work environment to which she was subjected.  The jury saw and heard all the evidence showing Defendant's callous attitude towards Plaintiff, including their recurring and intentional failure to intervene despite Plaintiff's cries for help.  The Court properly charged the jury with an instruction on willfulness – to which Defendant never objected at trial – and the jury considered the evidence in rendering its decision.  The jury's verdict must stand.

48

**B. Defendant's Motion for a New Trial Must Be Denied.**

Granting a new trial under Rule 59 requires meeting a "high threshold." Parexel Int'l Corp. v. Felician, 2008 U.S. Dist. LEXIS 98195 (E.D. Pa. Dec. 4, 2008) (citing Grazier v. City of Philadelphia, 328 F.3d 120, 128 (3d Cir. 2003)). "Absent a showing of substantial injustice or prejudicial error, a new trial is not warranted and it is the court's duty to respect a plausible jury verdict." Id. (quoting Montgomery Cty. v. MicroVote Corp., 152 F. Supp. 2d 784, 795 (E.D. Pa. 2001)); see also, e.g., Shanno v. Magee Indus. Enters., Inc., 856 F.2d 562, 567 (3d Cir. 1988) (absent a finding of a miscarriage of justice, the judge must respect the jury's verdict).

**1. The Judgment is Not Against the Weight of the Evidence**

Because granting a new trial based on the weight of the evidence is akin to a court substituting its judgment for that of the jury and usurping the jury's role as fact-finder, a district court has limited discretion to grant a new trial on this basis, with the exercise of such discretion receiving close scrutiny on appeal. Klein v. Hollings, 992 F.2d 1285, 1287 (3d Cir. 1993). This is particularly true where, as in here, the subject matter was relatively simple and within a layperson's understanding. Id. at 1290 (quoting Williamson v. Consol Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991)). A jury's verdict should stand against a challenge based on the weight of the evidence unless it would result in a miscarriage of justice or shocks the conscience. See, e.g., Klein, 992 F.2d at 1290.

In support of its Rule 59 Motion for a New Trial based on the weight of the evidence, Defendant relies on its arguments in support of its JMOL Motion. As noted above, those arguments are without merit. The jury's finding that Defendant discriminated against Plaintiff because of her age, retaliated against her, and subjected her to a hostile work environment was

amply supported by the evidence presented.  Defendant does not meet its heavy burden of showing that the jury's verdict was a miscarriage of justice or shocks the conscience.

### 2.  The Jury Verdict Sheet

Defendant asserts that a new trial is warranted because of an alleged error committed by the jury on the Verdict Sheet.  However, Defendant ignores the plain fact that not all errors are equal.  Under the law, a new trial is warranted **only** if the error actually causes harm.  Here, any error the jury committed is the archetypal "harmless error" that should **not** result in a new trial.

Defendant's motion for a new trial requires the Court to consider: 1) whether an error was in fact committed; and 2) whether that error was so prejudicial that denial of a new trial would be inconsistent with substantial justice.  Bhaya v. Westinghouse Elec. Corp., 922 F. 2d 184, 187 (3d Cir. 1990); Fed.R.Civ.P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.  **At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights**.").

Here, the jury answered in the affirmative Question 2: Has Ms. Briggs proved, by a preponderance of the evidence, that but-for her age, Temple University would not have terminated her position.  See Verdict Sheet (Doc. No. 58).  Although the Court instructed the jurors to skip to Question 8 if they answer Question 2 in the affirmative, the jury did answer Questions 3-7.  However, the jury's actions have **no impact** on their primary finding that Defendant discriminated against Plaintiff because of her age in terminating her employment.  The jury's findings on Questions 3-7 are irrelevant to the question of liability in this case because the jury already found in favor of Plaintiff on Question 2.  The jury went on to award Plaintiff economic and non-

economic damages. Their actions are wholly consistent – first they found liability and then they awarded damages. To the extent that there was error, it was entirely harmless.

Defendant cites to this Court's opinion in Gentner v. Cheyney Univ., No. 94-7443, 1996 U.S. Dist. LEXIS 13545 (E.D. Pa. Sept. 17, 1996) in support of its argument. However, the situation in Gentner is not at all analogous to the present matter. In that retaliation employment case, this Court ruled as a matter of law that plaintiffs engaged in protected activity. The jury found that defendant did take an adverse action against plaintiffs; however, the jury also found that defendant did **not** retaliate against plaintiffs – in other words, there was no causal connection between the protected activity and the adverse action. Nevertheless, the jury awarded damages. A new trial based on the inconsistent verdict sheet was appropriate in Gentner because the jury's award of damages could not be harmonized with its finding against liability against defendant. That is a far cry from the situation in the present matter, where the jury appropriately found liability and then awarded Plaintiff damages.

Defendant next argues that a new trial is warranted because the jury found in favor of Plaintiff on both Questions 2 (age discrimination) and 3 (age retaliation). In essence, the jury found that Defendant both discriminated against Plaintiff because of her age and retaliated against her because she complained of age discrimination. Defendant argues that both things cannot happen at the same time, even though the Supreme Court never reached such a holding in Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009) or any other case. Defendant is erroneously arguing in favor of a **sole cause** standard, which repeatedly has been rejected by the courts. To conclude otherwise would lead to an absurd result where a plaintiff is unsuccessful just because her employer both discriminated against her because of her age and retaliated against her for

51

complaining. The law would never permit such a perverse incentive on the part of an employer where it could avoid liability for engaging in two (2) different types of unlawful conduct.

Defendant's argument is further incompatible with the Third Circuit Model Jury Instructions and commentary, which were last updated in **March 2018** and are replete with references to Gross. Model Jury Instruction 8.1.1 (Disparate Treatment) describes the proof required for a plaintiff to prevail on an age discrimination case. The commentary to Rule 8.1.1 still cites approvingly to Miller v. Cigna Corp., 47 F.3d 586 (3d Cir. 1995), which held that requiring a finding of "sole cause" was reversible error in an age discrimination case. Tellingly, Defendant does not cite to any post-Gross case which has held that the new standard in age discrimination cases is "sole cause." Rather, it is clear that – even post-Gross – "sole cause" is still the incorrect standard. See, e.g., Robinson v. City of Phila., 491 Fed. Appx. 295, 299 (3d Cir. 2012) ("We do not require that age discrimination be the sole cause for an adverse employment decision to prevail on an age discrimination claim . . . and it is reversible error for a District Court to so rule.") (citing Miller, 47 F.3d at 588); Schilling v. Napleton's Ellwood City Chrysler, No. 15-0145, 2015 U.S. Dist. LEXIS 146290, at *9 (W.D. Pa. Oct. 28, 2015) (rejecting the identical argument advanced by Defendant here and ruling, "This Court finds that the 'sole' and the 'but for' cause of something are very different."); Mikulan v. Allegheny Cty., No. 15-1007, 2017 U.S. Dist. LEXIS 83315, at **17-18 (W.D. Pa. May 31, 2017) (same); Joyce v. Taylor Health & Rehab. Ctr., LLC, No. 12-1124, 2014 U.S. Dist. LEXIS 25583, at *12 n.2 (M.D. Pa. Feb. 28, 2014) (citing Robinson, 491 Fed.Appx. at 299).

It should be noted that *even if* the Court throws out the jury's verdict with regard to Questions 2 and 3, Plaintiff will **still** prevail in this action. The jury also found that Defendant subjected Plaintiff to a hostile work environment because of her age (Question 5), Defendant

retaliated against Plaintiff in the form of hostile work environment because she complained of age discrimination (Question 7), **and** Defendant retaliated against Plaintiff in the form of hostile work environment because she complained of gender discrimination (Question 8). Again, *even if* the jury rendered an incompatible verdict with regard to age discrimination and age retaliation (which they plainly did not), the error is the very definition of harmless – Plaintiff still wins on liability.

### 3.   The Jury Accurately Calculated Plaintiff's Back Economic Damages

Defendant next argues for a new trial based on the jury's award of $250,000 in economic damages. The jury's award is consistent with the record and must stand. Further, the Court did not commit any error in allowing the jury to re-hear Plaintiff's testimony in the case regarding her economic damages, and did not commit any error with regard to the jury instructions provided to the jury on the calculation of economic damages.

Plaintiff testified that her annual compensation at Defendant was $50,000 with benefits. 7.17.18 AM TT at 119:13-15. The benefits she received from Defendant are set forth in Defendant's Interrogatory responses and include health insurance, dental insurance, life insurance, disability insurance, vacation, and contribution to a 403(b) Defined Contribution Plan. Id. at 119:16-23; Plaintiff's Trial Exhibit 62 at pp.11-12. In total, Plaintiff's annual compensation at Defendant was approximately $69,500.

From April 1, 2014 until August 2016, Plaintiff was unemployed. 7.17.18 AM TT at 119:6-9. Plaintiff ultimately secured a position in August 2016 as a home health aide with Liberty Home Resources, where she continues to work. Id. at 118:24-119:5. As a home health aide, Plaintiff initially earned $10.50 per hour and now earns $10.70 per hour. Id. at 119:10-12. In total, Plaintiff has earned around $44,000 since August 2016, or $22,000 per year. Id. at 120:14-18. In contrast, at Defendant, Plaintiff earned approximately $69,500 in salary and benefits

annually.  Id. at 119:13-15; Plaintiff's Trial Exhibit 62 at pp.11-12.  Plaintiff's total economic losses from her termination date on April 1, 2014 through the end of trial on July 19, 2018 are approximately $250,000.  The jury awarded Plaintiff $250,000 in economic losses as a result of Defendant's unlawful conduct.  See Verdict Sheet at Question 9.  Despite Defendant's arguments to the contrary, there was simply no error in the jury's calculation of Plaintiff's back economic damages.

Defendant further argues that the Court committed error in responding to the jury question of, "How do we calculate the lost wages?"  July 19, 2018 AM Trial Transcript ("7.19.18 AM TT") at 84:25-85:2.  After some back and forth regarding the evidence – outside the presence of the jury – counsel for Defendant stated, "Judge, I think we have the trial transcript, and I would direct counsel to find it in the trial transcript."  Id. at 86:17-19.  After Plaintiff's counsel explained that Plaintiff testified to her annual salary and that her annual benefits were in evidence through Defendant's Interrogatory response, Defendant's counsel stated, "I'll rest on the record if it's in the record."  Id. at 89:19-20.  Thereafter, Plaintiff's counsel read from the trial transcript two (2) questions and answers regarding her salary at Defendant and her subsequent income over the last two (2) years.  Id. at 92:5-16.

At **no point** did Defendant's counsel cite to any specific portion of the record to be read back to the jury; similarly, at no point did this Court deny Defendant the ability to provide additional information.  Only after the jury resumed deliberations did Defendant's counsel state that Defendant was still looking for a clip regarding Plaintiff's job search efforts.  Id. at 92:20-24. The Court committed no error whatsoever in this regard.   There can be no violation of the rule of completeness when the moving party fails to provide the alleged missing information.

Finally, Defendant argues – with no legal support – that Plaintiff's damages should be cut off from the time she commenced work in August 2016.  The Court properly instructed the jury to consider Plaintiff's duty to mitigate damages and explained that it is **Defendant's** burden to prove that Plaintiff failed to mitigate:

> You are further instructed that Ms. Briggs has a duty to mitigate her damages.  That is, she has – she is required to make reasonable effort under the circumstances to reduce her damages.  And it's Temple University's burden to prove that Ms. Briggs has failed to mitigate.  So if Temple University persuades you by a preponderance of the evidence that Ms. Briggs failed to obtain substantially equivalent job opportunities that were reasonably available to her, you must reduce the amount of damages by the amount of wages that Ms. Briggs reasonably could have earned if she obtained those opportunities.

Id. at 62:11-21.

Here, Plaintiff testified that after she was terminated by Defendant, she undertook diligent search efforts online and in-person to find another job, including applying to over 100 jobs in total and many positions at Temple.  7.17.18 AM TT at 111:22-114:19; 117:11-16.  Positions that Plaintiff applied to at Defendant after her termination included: Faculty Recruiter, Admissions Counselor, Department Coordinator, Administrative Operators Coordinator, Community Outreach Coordinator, Senior Administrative Specialist, Coordinator for the Annual Fund for Athletics, Research Specialist, Technical Writer, Community Outreach Worker, Program Manager, Event Planning Coordinator, and Tristate Regional Coordinator.  Id. at 112:24-114:19; Plaintiff's Trial Exhibit 59.  Defendant did not offer Plaintiff any of these positions.  7.17.18 AM TT at 113:14-15.  In addition to positions at Defendant Temple University, Plaintiff applied for jobs at other education institutions, and also applied for cashier and clerk positions.  Id. at 117:11-118:1; Plaintiff's Trial Exhibit 67. Ultimately, after searching for **over two (2) years** Plaintiff secured a

position in August 2016 as a home health aide with Liberty Home Resources, where she continues to work. Id. at 118:24-119:5.

Defendant did not introduce any evidence that Plaintiff did not "make reasonable effort under the circumstances to reduce her damages" or that she "failed to obtain substantially equivalent job opportunities that were reasonably available to her." In fact, Defendant did not offer any evidence of _any_ job that was available to Plaintiff that she did not pursue. Rather, Plaintiff testified – and the jury saw – that Plaintiff applied to numerous jobs at Defendant, among other places, and Defendant did not hire her. The jury was properly instructed to consider Plaintiff's mitigation efforts and that it was **Defendant's** burden to prove that she acted unreasonably. There was no error, and therefore the award must remain.

### C. Judgment of $350,000 for Emotional Distress Damages Must Stand.

Defendant argues for a new trial, or in the alternative, a remittitur on the jury's award of $350,000 to Plaintiff in compensatory damages. In reviewing the propriety of a jury verdict, it is the court's "obligation to uphold the jury's award if there exists a reasonable basis to do so." Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir. 1989). The Third Circuit has cautioned: "While a district court has discretion in determining whether a jury's verdict is excessive, it is undisputed that the court _may not_ vacate or reduce the award merely because it would have granted a lesser amount of damages. For the court to disturb a jury verdict, 'the damages assessed by the jury must be so unreasonable as to offend the conscience of the Court.'" Id. (quoting Murray v. Fairbanks Morse, 610 F.2d 149, 152 (3d Cir. 1979)).

Evidence of Plaintiff's emotional distress damages as a result of Defendant's conduct permeated her testimony and the documentary evidence presented to the jury. While employed at Defendant, Plaintiff begged – literally – for help from the very individuals who were tasked with

protecting employees from discrimination, retaliation, and hostile work environment.  She was met with inaction from those individuals, and further harassment from her supervisor.  7.17.18 AM TT at 28:11-30:13 ("There were times when he would come out and yell at me in the front office.  I – on two separate occasions, I remember him looking at me and saying, what are you, stupid.  And then another time when he said, can't you speak English.  And I was – you know, I just don't know how to respond to those kinds of comments.").

Plaintiff's contemporaneous emails describe in detail the significant damage that Defendant's actions caused.  See, e.g., Plaintiff's Trial Exhibit 9 ("I am so bullied and harassed all day . . . It is beginning to feel like psychological abuse."); Plaintiff's Trial Exhibit 13 ("I do not want to take anymore of your time nor do want to re-visit the events from which I am already distraught."); Plaintiff's Trial Exhibit 26 ("My confidence has never been so low and at 58 years old, I have no[] options to change the course of my plummeting professional life because I am relegated to making coffee, secretarial functions even though I have never been a secretary."); Plaintiff's Trial Exhibit 33 ("I want you to understand how distressing it is when I have no one in the department and no one in human resources who will listen to me.  I am honest and operate with integrity in every arena of my life and five days out of the week I a[m] battered emotionally, insulted, ignore[d], yelled at in front of peers and the department scapegoat."); Plaintiff's Trial Exhibit 38 ("I am actually afraid to go to work, especially Mondays, Wednesdays and Fridays, when I meet with Drew and Dr. Wu.  Before I go to sleep and as soon as I wake, the anxiety I experience is palpable and impacting the quality of my personal life. . . . Dr. Wu said that Drew is there for protection and as a witness but I have no protection and feel like an abuse victim."); Id. ("I am drowning here and have reached out to you numerous times and waited and waited.  This

is affecting the quality of my work life and my person[al] life.  All I want is to continue to work

without being harassed.").

On April 2, 2014, the day after Defendant terminated her employment, Plaintiff described

her emotional distress to Ms. Foehl via email:

> This has never happened to me before and I am so full of grief.  Of
> course, I fear the financial disaster that I will face when I have rent
> and utilities to pay on May 1st, but I miss the only community I have
> had since my children left home, the Temple undergrads and grad
> students and an incredible group of inspiring faculty members.  **A
> wave of grief has pulled me under the surf and it's hard to
> breathe.**

Plaintiff's Trial Exhibit 46 (emphasis added).

A few weeks later, Plaintiff again emailed Ms. Foehl and wrote in part:

> My prospects to find full-time employment with a similar salary,
> health insurance and contributions to my retirement account are
> slim.  My two sons and I will lose health insurance on April 30th and
> the rent must come from my retirement account, for which the
> penalty will be substantial to my current and future financial status.
> My distress is not unreasonable, especially when my termination
> resulted because the standards to which I was held were unfair and
> unequal.   I hope that you will consider this as you move to
> investigate my complaint.

Plaintiff's Trial Exhibit 53.

In addition to reading her emails on the witness stand, Plaintiff testified directly to the jury

about the significant emotional upset she endured after being terminated at age fifty-nine (59) and

searching (and being rejected from) over 100 jobs.  Plaintiff explained that she was distraught, felt

that she had let her children down, and that she was forced to move into low-income, subsidized

housing just to survive.  7.17.18 AM TT at 118:2-23.  She testified:

> I'm pretty much bankrupt.  I mean, I didn't file bankruptcy.  But you
> know what?  Because I don't have anything.  But I lost everything.
> I finally – you know what?  I finally looked into senior housing,
> subsidized  housing  in  Philadelphia,  through  the  Philadelphia

> Commission on Aging. And the ones I looked at were like you could
> smell urine in the hallways, and it was – it was so – you know, I
> knew I was going to have to make this move because I couldn't
> afford my apartment. But I thought that that was one step before I
> stepped into my grave, if I moved into there. And I was just about
> ready to give up, and I was able to find another source for subsidized
> housing, for people in situations like mine, that wasn't in a senior
> home.

Id.

Plaintiff further testified that she has gone on food stamps, and that her retirement fund has depleted from $100,000 to $5,000. Id. at 122:13-23. Her relationships with her family members have changed dramatically. She couldn't put up a Christmas tree or get Christmas gifts for her three (3) grandchildren. Id. at 123:13-21. The jury heard and saw Plaintiff testify, and appropriately awarded her $350,000 in emotional distress damages.

Defendant cites to various cases (from over 20 years ago) in support of its argument that the emotional distress award should be reduced to zero or remitted to some smaller number. But this Court should not disturb the jury's award. It is entirely appropriate given the evidence in this case, and it is in line with recent awards within the Third Circuit in similar cases. For example, in a recent age discrimination trial in the District of New Jersey, the jury awarded – and the court upheld on post-trial motion – an emotional distress award of $520,000. See Braden v. Lockheed Martin Corp., No. 14-4215, 2017 U.S. Dist. LEXIS 207236, at *55 (D.N.J. Dec. 18, 2017). The court in Braden upheld the award even though no other witness testified to plaintiff's emotional distress, no medical treatment commenced as a result of the defendant's actions, and there was no expert report on damages. This Court should do the same and uphold the jury's award.

The jury in this case appeared to be extremely attentive and conscientious of their duties. It heard Plaintiff's testimony, witnessed her demeanor, observed her emotional reactions when testifying, and assessed her credibility. The jury was properly charged on how to come up with a

fair and reasonable award, appeared by all accounts to fully understand their charge, and did so in assessing an award of $350,000 in emotional distress damages.  The award should not be disturbed.

IV.     **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion in its entirety.

Respectfully submitted,

**CONSOLE MATTIACCI LAW, LLC**

Laura C. Mattiacci, Esq.
Rahul Munshi, Esq.
1525 Locust St., Ninth Floor
Philadelphia, PA 19102
(215) 545-7676 (t)
(215) 814-8920 (f)
mattiacci@consolelaw.com
munshi@consolelaw.com

Attorneys for Plaintiff, Ruth Briggs

Dated: August 24, 2018