**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RUTH V. BRIGGS | Civil Action No. 2:16-cv-00248 |
| Plaintiff, | |
| v. | |
| TEMPLE UNIVERSITY | |
| Defendant. | |

## NOTICE OF APPEAL

Notice is hereby given that Defendant Temple University hereby appeals to the United States Court of Appeals for the Third Circuit from the Order entered in the above matter on October 16, 2018 denying Defendant's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or, in the Alternative, for a Remittitur.

*/s/ Rachel Fendell Satinsky*

Richard R. Harris
Rachel Fendell Satinsky
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3000 – telephone
267.402.3131 – facsimile
rharris@littler.com
rsatinsky@littler.com

*Attorneys for Defendant
Temple University*

Dated: November 15, 2018

## CERTIFICATE OF SERVICE

I, Rachel Fendell Satinsky, hereby certify that Defendant Temple University's Notice of

Appeal was filed using the ECF system, through which this document is available for viewing

and downloading, causing a notice of electronic filing to be served upon the following counsel of

record.

> Laura C. Mattiacci, Esq.
> Rahul Munshi, Esq.
> Console Mattiacci Law
> 1525 Locust Street, 9th Floor
> Philadelphia, PA 19102
> 215.545.7676 – telephone
> 215.814.8920 – facsimile
> mattiacci@consolelaw.com
> munshi@consolelaw.com
> *Attorneys for Plaintiff Ruth Briggs*

> /s/ Rachel Fendell Satinsky
> Rachel Fendell Satinsky
> **LITTLER MENDELSON, P.C.**
> Three Parkway
> 1601 Cherry Street, Suite 1400
> Philadelphia, PA  19102.1321
> 267.402.3000 – telephone
> 267.402.3131 – facsimile
> rsatinsky@littler.com
>
> *Counsel for Defendant*
> *Temple University*

Dated: November 15, 2018

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RUTH BRIGGS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 16-248 |
| | : | |
| TEMPLE UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER

**AND NOW**, this 16th day of October, 2018, upon consideration of Defendant Temple University's ("Temple") Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or, in the Alternative, for a Remittitur; Plaintiff Ruth Briggs' ("Briggs") Motion for Front Pay Damages and for a New Trial on Punitive Damages Only; and all responses and replies, it is hereby **ORDERED** that:

1.  Temple's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or, in the Alternative, for a Remittitur (Doc. No. 64) is **DENIED**;

2.  Briggs' Motion for Front Pay Damages and for a New Trial on Punitive Damages Only (Doc. No. 65) is **GRANTED** with respect to an award for front pay damages in the amount of $60,670.20, but **DENIED** with respect to a new trial on punitive damages; and

3.      the Clerk of Court shall amend the Judgment to reflect the $850,000 jury award plus the $60,670.20 front pay award, for a total award of $910,670.20.

BY THE COURT:

/s/ Robert F. Kelly
ROBERT F. KELLY
SENIOR JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| RUTH BRIGGS, | : | CIVIL ACTION |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | No. 16-248 |
|  | : |  |
| TEMPLE UNIVERSITY, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                   **OCTOBER 16, 2018**

Plaintiff Ruth Briggs ("Briggs") filed suit in this Court against her former employer, Defendant Temple University ("Temple"), on January 20, 2016.  Briggs alleged Temple discriminated against her because of her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.*, and because of her gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* and the PHRA.  (*See generally* Compl.)  Additionally, Briggs claimed that Temple subjected her to a hostile work environment and retaliated against her for complaining of age and gender discrimination in the workplace.  (*See id.*)

The case was tried before a jury for four days, from July 16, 2018, through July 19, 2018. The jury returned a verdict in Briggs' favor on five claims:  (1) age discrimination in connection with the termination of employment; (2) retaliation in the form of termination for complaining of age discrimination; (3) age-based hostile work environment; (4) retaliatory hostile work environment for complaining of age discrimination; and (5) retaliatory hostile work environment

for complaining of gender discrimination.  (*See* Verdict Form, Doc. No. 58.)  The jury awarded back pay in the amount of $250,000 and $350,000 in compensatory damages.  (*See id.*)  The jury also found that Temple's actions regarding the age-based claims were willful, therefore, the back pay award was doubled as liquidated damages under the ADEA.  (*See id.*)  Accordingly, the total verdict was $850,000.  (*See id.*)

Presently before the Court are the Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or, in the Alternative, for a Remittitur filed by Temple (Doc. No. 64); the Brief in Opposition to the Motion for Judgment as a Matter of Law filed by Briggs (Doc. No. 74); the Motion for Front Pay Damages and for a New Trial on Punitive Damages Only filed by Briggs (Doc. No. 65); the Response in Opposition to Motion for Front Pay and New Trial filed by Temple (Doc. No. 75); the Reply in Further Support of Motion for Front Pay and New Trial filed by Briggs (Doc. No. 76); and the Surreply in Opposition to Motion for Front Pay and New Trial filed by Temple (Doc. No. 77).

| I. | | BACKGROUND | .................................................. | 4 |
|----|---|---|---|---|
| II. | | LEGAL STANDARD | .......................................... | 15 |
| III. | | DISCUSSION | ................................................. | 17 |
| | A. | Discrimination Based on Briggs' Age | ........................... | 17 |
| | | 1. | Prima Facie Case | .......................................... | 19 |
| | | 2. | Pretext | .................................................. | 27 |
| | B. | Retaliation for Complaints Regarding Age Discrimination | ................. | 34 |
| | | 1. | Prima Facie Case | .......................................... | 35 |
| | | 2. | Pretext | .................................................. | 40 |
| | C. | Jury's Responses to Verdict Sheet are not Inconsistent | ................. | 41 |
| | D. | Hostile Work Environment Based on Age | .......................... | 45 |
| | E. | Retaliatory Hostile Work Environment Based on Complaints of Age and Gender Discrimination | .................. | 50 |
| | F. | Back Pay and Front Pay | .................................. | 51 |
| | | 1. | Temple Misunderstands Briggs' Duty to Mitigate | ................. | 52 |
| | | 2. | The Jury Properly Calculated Briggs' Back Pay Award | ............ | 58 |
| | | 3. | The Court did not Err in Answering a Question Submitted by the Jury during Deliberations | ................. | 59 |
| | | 4. | Briggs is Entitled to a Front Pay Award | ..................... | 62 |
| | G. | Willfulness under the ADEA | .................................. | 66 |
| | H. | Compensatory Damages | .................................. | 72 |
| | I. | Briggs' Motion for a New Trial on Punitive Damages | ................. | 78 |
| IV. | | CONCLUSION | .................................................. | 80 |

I.   **BACKGROUND**

Briggs began working for Temple in February 2001 as an Editorial Assistant in the Center for Neurovirology and Cancer Biology.  In 2005, she became an Executive Assistant to Interim Dean Allen Nicholson of the College of Science and Technology.  At trial, Briggs presented a report prepared by or for Temple's Human Resources Department that explained the reasons Briggs was selected for this position:  "The candidate was selected based on her outstanding communication skills both verbal and written.  Her previous work experience in developing and writing grant applications, providing editorial assistance, customer service skills, prior university experience, and education made her the best qualified candidate."  (Pl.'s Trial Ex. 1, at 2.)  Over the next five years, Briggs would work for not only Dean Nicholson, but Dean Keya Sadeghipour, Dean Hai-Lung Dai, and Vice Dean George Palladino.  (07/17/2018 AM, Trial Tr. 22:9–15.)

A.    **Briggs Begins Working as an Executive Assistant for Dr. Jie Wu**

In October 2009, Briggs became the Executive Assistant to then-Chair of the Department of Computer Information Services ("CIS"), Dr. Jie Wu ("Wu").  At this time, Briggs also indirectly reported to Greg Wacker ("Wacker"), former Director of Finance and Administration and current Assistant Dean of Finance and Administration.  As an Executive Assistant to Wu, Briggs provided administrative support and performed a variety of functions, including directing all ongoing and special projects, developing programs and systems to manage daily activities, and planning and coordinating events.  The essential functions of her job also included serving as a liaison for Wu and representatives of other Temple administrative and academic offices, as well as working with a wide array of Temple constituents while ensuring the administrative operation of the CIS department.

Despite testimony that, during her eight years of employment at Temple prior to 2009, Briggs had never been written up for any reason, been given any written discipline or suspension, nor ever been placed on any sort of performance improvement plan, (*id.* at 22:24–23:13), Briggs testified that Wu would raise his voice at her and yell degrading things at her in public. (*Id.* at 29:25–30:13 ("There were times when he would come out and yell at me in the front office. I—on two separate occasions—I remember him looking at me and saying, what are you, stupid. And then another time when he said, can't you speak English. And I was—you know, I just don't know how to respond to those kinds of comments.").) Briggs further testified that this conduct caused her embarrassment and that she feared him when he treated her in this way. (*Id.* at 28:11–29:24.)

### B.      Wu Makes Age-Related Comment to Briggs

During trial, the jury heard testimony from Briggs that, on November 9, 2011, Wu, who was born in China and had lived there until the late 1980s, discovered that Briggs' birthday was the following day. He asked Briggs how old she was turning, and Briggs responded that she was turning fifty-seven. Wu responded, "You know, in China women are put out to pasture by your age." (*Id.* at 31:1–13.) Embarrassed, Briggs replied to Wu, in essence, "With all due respect, we're in America and not in China." (*Id.* at 31:17–25.) Within an hour, Briggs was called into a meeting with Wacker where he informed her that Wu claimed that she had been unprofessional to him and that she was going to be written up. (*Id.* at 32:13–17.) Briggs explained Wu's remark that had prompted her comment, but Wacker said it did not matter. (*Id.* at 32:15–20; *see also* 07/16/2018 AM, Trial Tr. 7:2–10.)

During his own testimony, Wu admitted that, at the time, he knew Briggs was in her 50s, but denied ever saying such a phrase. However, he admitted having discussed "cultural

differences" between the United States and China with Briggs. (07/16/2018 PM, Trial Tr. 61:13–62:19.)

Briggs received her first written warning for the November 9, 2011 incident. (Pl.'s Trial Ex. 3.) However, neither Wu nor Wacker could explain to the jury what the exact motivation was for this discipline. (*See* 07/16/2018 AM, Trial Tr. 55:9–56:1 (Wacker); 07/16/2018 PM, Trial Tr. 65:5–14 (Wu).) Wu testified that he never reviewed any documentation regarding the November 9 incident and resulting discipline. (07/16/2018 PM, Trial Tr. 65:13–20.) Likewise, Wacker testified that, although he never reviewed any documentation regarding this incident, he was certain that the discipline was not a result of Briggs' comments to Wu on November 9. (07/16/2018 AM, Trial Tr. 56:13–19.) When asked about any supporting documentation, Wacker testified that either his assistant, Drew DiMeo ("DiMeo"), or Human Resources Director Dierdre Walton ("Walton") would have it. (*Id.*) During her own testimony, however, Walton contradicted Wacker, stating that the discipline was indeed related to Briggs' "blowout between her and Dr. Wu," but that she had never received any supporting emails or documentation concerning the incident from Wu or Wacker. (07/17/2018 PM, Trial Tr. 116:9–12, 119:17–24.)

## C.   Briggs Makes a Complaint to Temple's Equal Opportunity Compliance Office

After receiving her warning, Briggs contacted Walton directly to explain her story and make a complaint about Wu's comments regarding women in China. (*Id.* at 121:12–122:6.) Walton testified that it was clear that "Briggs had a problem with the comment" and "was offended by it." (*Id.* at 122:1, 9.) As a result, Walton instructed Wacker to "look into" the incident by conducting an investigation into Wu's comment to Briggs. (*Id.* at 127:3–12.) Accordingly, Wacker discussed Briggs' complaint with Wu and other potential witnesses in the office. (*Id.* at 127:15–128:23.)

Additionally, Briggs complained directly to Wacker about Wu's comments.  (07/17/2018 AM, Trial Tr. 33:25–34:6.)  Wacker suggested that Briggs discuss her complaints with Sandra Foehl ("Foehl"), Temple's Director of the Equal Opportunity Compliance Office ("EOC").  (07/16/2018 PM, Trial Tr. 7:2–6.)  Though Wacker testified that he did not believe Briggs to be making a complaint of age or gender discrimination, he still referred her to Foehl because she handled such personnel complaints.  (*Id.* at 7:7–8:2.)

On July 25, 2012, Briggs emailed Foehl to set up a meeting.  (*See* Pl.'s Trial Ex. 5, at 2.)  At that meeting, Briggs informed Foehl that she felt she was being discriminated against, feared retaliation from Wu and Wacker, and described Wu's comment regarding women in China.  (07/17/2018 AM, Trial Tr. 38:9–16; 07/18/2018 PM, Trial Tr. 4:22–5:4; *see also* Pl.'s Trial Ex. 4 (notes taken by Foehl during meeting with Briggs outlining issues with Wu).)  Foehl informed Briggs that she could file a formal complaint of discrimination; however, Briggs admitted that she was scared to do so.  (Pl.'s Trial Ex. 4 ("File age discrimination complaint?  I'm scared.").)  However, Briggs did request that Foehl bring this issue up with the new Interim Dean, Michael Klein.  (*Id.*)

On August 2, 2012, Briggs sent Foehl a follow-up email regarding her complaints— primarily asking for a synopsis of the complaint Foehl would send to Dean Klein and again reiterating her trepidation with making the "complaint."  (Pl.'s Trial Ex. 5, at 1.)  After receiving Briggs' follow-up email, Foehl emailed Walton and another member of the Human Resources Department, Eric Brunner, to solicit information about Briggs.  (Pl.'s Trial Ex. 6 ("Do either of you have some history with Ruth Briggs in the College of Science and Technology, especially since her assignment to [CIS]?  If so, will you share?").)

On September 9, 2012, Briggs again followed-up with Foehl.  (Pl.'s Trial Ex. 7.)  Again, Briggs referenced Wu's comment and further complained that she was being underpaid compared to her male colleagues and that her job responsibilities were being taken from her and given to a student-worker, Hailey King ("King").  (*Id.*)  In response, Foehl provided Briggs with information regarding how to further inquire about her compensation and opportunities available to file additional complaints of unlawful discrimination to government compliance agencies.  (Pl.'s Trial Ex. 8.)  Foehl also requested more information regarding specific instances of bullying, threats, and expressions of age bias by Wu and Wacker in order to proceed further with her complaint.  (*Id.*)  Unsatisfied by the lack of progress with Foehl, Briggs emailed Rhonda Brown ("Brown"), the Vice President of the Diversity Department.  (Pl.'s Trial Ex. 7.)  In her email, Briggs explained that she was unaware if Foehl had ever filed her complaint or what issues the complaint addressed.  (*Id.*)

### D.   Briggs Continues to Complain about Disparate Treatment at Temple

Briggs further testified that she was being bullied and harassed by Wu.  In early 2013, Briggs raised concerns to Foehl and Brown.  In a February 7, 2013 email to Brown, Briggs said, "I am so bullied and harassed all day.  Two people in the Dean's office tell me that I can find another job.  That can't be right."  (Pl.'s Trial Ex. 10.)  Brown responded by telling Briggs to address these issues with Foehl.  (*Id.*)

Accordingly, Briggs sent another email to Foehl on February 8, 2013, stating:

> Sandy,
>      I am so bullied and harassed all day.  Everyday [sic] morning, I must meet with my direct supervisor and Greg Wahker's [sic] assistant, Drew DiMeo for "staff meetings" to discuss my failure to comply with a directive that prohibits any work activity that has not been approved by my supervisor, all of which are related to performing daily functions in the office . . . such as answering questions from students or visitors to our

building. The threat of discipline for assisting a visitor or responding to a request from another office does not seem to have any actions of wrong doing, rather fulfilling a "customer service" expectation for the university. *No other staff member is required to meet daily for a dose of public humiliation and my request to move the meetings to a private location was flat out denied*.

When I asked for clarification on an assignment, it is reported to the dean's office as a challenge to his authority. If he can have a someone [sic] there to protect his interests, there is more than an element of unfairness. It is beginning to feel like psychological abuse.

If my only resource to address this problem is through HR, this is unacceptable. Can I contact a mediator?

(Pl.'s Trial Ex. 9 (emphasis added).) Foehl responded that this was an issue for Human Resources and that Briggs should contact Walton. Foehl then forwarded Briggs' email to Walton with a note saying that she did not believe there was a claim of unlawful discrimination or harassment, but that Walton should let her know if Briggs raised an EOC complaint. (*Id.*)

In or around the same time, Briggs contacted Cameron Etezady ("Etezady"), University Counsel. Briggs informed Etezady that she was being discriminated against on the basis of her age and gender, and that she feared retaliation from Wu. (Pl.'s Trial Exs. 12–14.) Etezady directed Briggs back to Foehl. (Pl.'s Trial Ex. 12.) Briggs replied to Etezady, explaining that she was being given the run-around and had already talked to Foehl to no avail. (Pl.'s Trial Ex. 13.) Etezady then placed Briggs in contact with another member of the University Counsel's office, Fay Trachtenberg ("Trachtenberg"). (Pl.'s Trial Ex. 14.) However, Trachtenberg merely told Briggs to contact Walton. (07/17/2018 AM, Trial Tr. 57:11–17.)

### E.    **Briggs Receives Second Discipline for Failing to Book Itinerary**

In March 2013, Briggs received her second written discipline, which, this time, was accompanied by a three-day unpaid suspension. (*Id.* at 57:24–58:4.) According to Briggs' testimony at trial, she was working with Assistant Chair Eugene Kwatny ("Kwatny") on the

hiring committee for the department.  (*Id.* at 58:7–12.)  Briggs was responsible for arranging

faculty candidates to come to Philadelphia to interview by booking their travel, lodging, and food

arrangements.  (*Id.*)  After exchanging proposed itineraries with one particular candidate, Briggs

informed Kwatny that there was some difficulty scheduling the candidate's trip.  (*Id.* at 58:13–

59:3.)  Kwatny told Briggs to tell the candidate that he should proceed with booking his own

travel arrangements and that Temple would reimburse him afterwards.  However, Briggs

admitted that she never followed up with the candidate and that he never came to Temple for his

interview.  (*Id.*)  For this mistake, Briggs received a three-day unpaid suspension from Wu,

which was the only time he had ever issued such a punishment.  (07/16/2018 PM, Trial Tr.

79:12–14.)

     In an April 8, 2013 email to Walton, Briggs explained that she believed the punishment

was overly harsh and highlighted what she perceived to be "different standards for performance

and productivity."  (Pl.'s Trial Ex. 17.)  Briggs also provided certain mitigating factors, which

included an increase in her workload because another coworker was on leave, causing her to

have more responsibilities than normal with no help.  (*Id.*)  Additionally, Briggs pointed to the

fact that she took ownership of the mistake and had tried to make it right to show that she was

not negligent or careless.  (*Id.*; 07/16/2018 PM, Trial Tr. 77:8–17.)

     On August 6, 2013, Briggs again emailed University Counsel Etezady because she

continued to feel singled out by Wu and DiMeo.  Etezady referred her again to Walton and

Trachtenberg.  (Pl.'s Trial Ex. 27.)

     **F.**    **Briggs Receives Third Discipline for Arriving Late to Work**

     Briggs received another disciplinary notice from Wu in February 2014.  (07/17/2018 AM,

Trial Tr. 78:3–17.)  In this instance, Briggs had overslept for work by three hours.  (*Id.*)  Upon

realizing that she was late, Briggs attempted to reach Judy Lennon, the department secretary, and Wu. (*Id.*) After being unable to do so, she informed a student-worker to let either of them know that she would be arriving at work shortly. (*Id.*) Briggs testified that she worked late that day to make up for the lost time. (*Id.* at 79:19–21.) Briggs also disputed testimony provided by Wu that she was late multiple times a week. (*Compare id.* at 79:22–80:7 ("I feel that that's another way to . . . assassinate my character with—there's no documentation, either."), *with* 07/16/2018 PM, Trial Tr. 80:24–25 ("Q: Every week, she was late?  A: Yeah.") *and* 81:10–14 ("Q: Dr. Wu, I'm asking you if there is documentation that Ms. Briggs was late every week.  A: Yeah, almost every week.  Q: Where is the documentation of that?  A: There is no documentation.").)

The jury also heard testimony from Briggs and Wu that, around the same time that Briggs was late, King, who was considerably younger than Briggs, did not show up to work for three straight days. (07/17/2018 AM, Trial Tr. 81:15–82:2; 07/16/2018 PM, Trial Tr. 82:3–83:21.) King never called into work to tell anyone where she was, but nevertheless, King received no written discipline. (07/16/2018 PM, Trial Tr. 83:20–24.) Wu testified that King was shown leniency due to a hurricane that had left her without power for three days and Temple without power for one. (*Id.* at 83:15–17; 83:25–84:2.) However, Wu was unable to specify which hurricane had occurred.[1]

### G.     Briggs Has Phone Intake with Equal Employment Opportunity Commission and Continues to Raise Concerns with Administration

As a result of this latest discipline, Briggs emailed Walton on February 22, 2014, to express her exasperation with the alleged retaliation she was facing. (Pl.'s Trial Ex. 33.) She claimed she was "battered emotionally, insulted, ignore[d], yelled at in front peers, and [made

---

[1] Notably, the timeline regarding the King incident is not well established. Briggs claims that King missed three days of work "around the same time" as when Briggs showed up three hours late. Testimony and evidence show that to be February 2014. Likewise, King was hired in the Fall of 2013, and it is unclear that any hurricane impacted the Philadelphia area between then and February 2014.

into] the department scapegoat." (*Id.*)  She further complained that no one in the department or human resources was taking her complaints seriously. (*Id.*)

On February 25, 2014, Briggs, frustrated from the lack of help from Walton, contacted Foehl and informed her that she had conducted a phone intake with the Equal Employment Opportunity Commission ("EEOC"). (Pl.'s Trial Ex. 34; 07/17/2018 AM, Trial Tr. 88:9–89:3.) Foehl forwarded Briggs' email to Walton. (Pl.'s Trial Ex. 35.)  On March 13, 2014, Briggs wrote again to Walton that she felt singled out, was being pushed out of Temple by her supervisors, and that Temple's actions were in violation of state and federal law. (Pl.'s Trial Ex. 37, at 2.)

Briggs' rate of emails increased and, on March 23, 2014, she emailed Walton to explain what she believed to be a concerted effort to get rid of her. (Pl.'s Trial Ex. 38, at 3.)  In this email, Briggs detailed an account of the student-worker she had contacted the day she was late and who had personally informed Wu of when Briggs would be arriving. (*Id.* at 3.)  Briggs also wrote that the essential functions of her job had been diminished to "elementary clerical functions" and her responsibilities given to the younger King. (*Id.* at 4.)  She explained the toll this had taken on her personal and professional life, but also asked that Walton keep this communication confidential, as she feared further retaliation from Wu, Wacker, and DiMeo. (*Id.* at 3.)

In this email, Briggs also raised concerns about a more recent incident that had occurred the previous Friday. (*Id.* at 4.)  According to Briggs' email, she was supposed to input a travel reimbursement into Temple's reimbursement system, Concur, on behalf of Wu.  However, she was unable to access the appropriate accounts in the system because she had not yet been granted the appropriate access by the IT department. (*Id.*; 07/17/2018 AM, Trial Tr. 99:3–11.)  Briggs

went on to explain that, after raising this issue to DiMeo and asking him to look into her account access, DiMeo accused her of lying and manufacturing screenshots that showed she had no access.  (Pl.'s Trial Ex. 38, at 4.)

Walton discussed the issues raised in the email with Wacker and DiMeo.  (07/18/2018 AM, Trial Tr. 41:12–22; 42:5–8.)  On March 24, 2014, Walton provided responses to Briggs' "serious allegations."  (Pl.'s Trial Ex. 38, at 2.)  With respect to Briggs' February tardiness, Walton dismissed Briggs' efforts to contact Wu, writing that Briggs failed to follow the appropriate procedure by talking to a student-worker and not emailing Wu directly.  (*Id.*)  Because of this, Wu requested that Briggs be disciplined.  (*Id.* ("This discipline is not a false report unless any of the facts . . . stated above are incorrect.").)  As to Briggs' Concur incident, Walton wrote that the Account Payable Department confirmed that DiMeo had updated the permissions the prior Monday.  (*Id.*)

Briggs scheduled a meeting with Foehl on April 1, 2014 to discuss the discrimination she was facing at Temple.  (07/17/2018 AM, Trial Tr. 89:24–90:7.)  Briggs informed DiMeo that she was going to speak to Foehl about Wu's treatment of her.  (*Id.* at 91:4–13.)  Briggs testified that DiMeo responded, "Dr. Wu knows what's going on, and . . . it's got to stop."  (*Id.*)  However, despite DiMeo's remark, during Briggs' meeting with Foehl on April 1, 2014, Foehl testified that Briggs asked her about conducting an investigation into her complaints of age and gender discrimination.  (07/18/2018 PM, Trial Tr. 31:9–15.)

### H. <u>Briggs is Terminated from Temple</u>

Immediately after Briggs' meeting with Foehl, Briggs met with Wacker at his request.  (07/17/2018 AM, Trial Tr. 91:16–25.)  Walton was also in the meeting with Briggs and Wacker.  Briggs was then given a termination notice stating that she was being terminated for

"Negligence/Carelessness" and "Disruptive or Disorderly Conduct." (Pl.'s Trial Ex. 45 ("Effective the end of the day today, your employment at Temple University is being terminated.").) According to testimony provided by Wacker and Wu, the termination decision was made together by Wu and Walton. (07/16/2018 AM, Trial Tr. 44:2–14 (Wacker); 07/16/2018 PM, Trial Tr. 68:11 (Wu).) However, according to Walton and Temple's interrogatory responses, the decision was made by Wacker and Wu. (07/18/2018 AM, Trial Tr. 20:16–17; Pl.'s Trial Ex. 62, at 6.)

The termination letter noted two incidents that led to Briggs' termination: (1) the above mentioned failure to complete the Concur invoice; and (2) booking a hotel reservation for a high-profile visitor on the wrong dates. (Pl.'s Trial Ex. 45; 07/16/2018 AM, Trial Tr. 35:25–36:9, 36:17–37:1.) Regarding the second reason, Wacker testified at trial that Briggs was to book a reservation for a visitor of Wu's at the Conwell Inn. Temple prefers to have visiting guests stay at the Conwell Inn because it is on or close to Temple's campus. However, because Briggs booked the wrong dates, she had to scramble to find him accommodations at the Doubletree Hotel in Center City, Philadelphia. (07/16/2018 AM, Trial Tr. 36:17–37:1; *see also* Pl.'s Trial Ex. 45.) Briggs testified that she changed the reservation dates at the request of Wu. (07/17/2018 AM, Trial Tr. 93:7–94:5.) According to Briggs, she had to change the dates from what she originally booked by shifting the stay by one day. (*Id.* at 93:12–23.) However, upon realizing there was a miscommunication, she was able to arrange for lodging that night at a hotel in Center City, Philadelphia. (*Id.* at 94:1–2.)

Two days after receiving her termination notice, Briggs sent an email stating that she would resign in lieu of termination. However, it is undisputed that had she decided not to resign, Briggs would have been terminated involuntarily. (07/16/2018 AM, Trial Tr. 61:12–22;

07/16/2018 PM, Trial Tr. 44:1–4; 07/18/2018 AM, Trial Tr. 54:8–10 ("Her staying there was not an option.").)  Briggs was ultimately replaced by an employee, Marilyn Grandshaw, who is currently forty-six years old.  (07/17/2018 AM, Trial Tr. 114:20–115:3.)

## II.    LEGAL STANDARD

### A.    Judgment as a Matter of Law

In deciding a motion for judgment as a matter of law ("JMOL") under Federal Rule of Civil Procedure 50(b), the court must consider whether, "viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is sufficient evidence from which a jury could find liability."  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citing *Wittekamp v. Gulf & Western Inc.*, 991 F.2d 1137, 1141 (3d Cir. 1993)).  The court is not allowed to weigh the evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.  *See Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 113 (3d Cir. 1987).  Additionally, the court must draw factual inferences in favor of the non-moving party; however, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."  *Kotas v. Eastman Kodak Co.*, No. 95-1634, 1997 WL 570907, at *7 (E.D. Pa. Sept. 4, 1997) (Kelly, J.) (quoting *Lightning Lube*, 4 F.3d at 1166).

### B.    Granting a New Trial

The decision to grant a new trial is left to the sound discretion of the district court.  *See Blackiston v. Johnson*, No. 91-5111, 1995 WL 563834, at *1 (E.D. Pa. Sept. 21, 1995) (citing *Gutzan v. Altair Airlines, Inc.*, 766 F.2d 135, 140 (3d Cir. 1985)).  New trials may be granted where (1) a jury "fails properly to perform the functions confided to it by law" and reaches a

verdict that is against the weight of the evidence or (2) "the trial court delivered the jury from a possibly erroneous verdict arising from circumstances over which the jury had no control," such as allowing improperly admitted evidence, prejudicial statements by counsel, an improper charge to the jury, or newly discovered evidence.  *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir. 1960).

In the latter instance, there is "no usurpation by the court of the prime function of the jury as the trier of facts and the trial judge necessarily must be allowed wide discretion in granting or refusing a new trial."  *Id.*  However,

> When the district court grants a motion for a new trial based on the weight of the evidence, the court has:
>> To some extent at least, substituted [its] judgment of the facts and the credibility of the witnesses for that of the jury.  Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over . . . the prime function of the jury as the trier of facts.

*Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991) (first alteration in original) (quoting *Lind*, 278 F.2d at 90).  Accordingly, the district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand.  *Id.* (citing *EEOC v. Del. Dep't of Health and Soc. Servs.*, 865 F.2d 1408, 1413 (3d Cir. 1989)).

### C.  Remittitur

The remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported or excessive.  *See Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986) (citing *Kazan v. Wolinski*, 721 F.2d 911 (3d Cir. 1983); *Keystone Floor Prods. Co. v. Beattie Manuf. Co.*, 432 F. Supp. 869 (E.D. Pa. 1977)).  Granting a remittitur is clearly within the discretion of the district court because the judge is in

the "best position to evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion." *Id.* (citing *Murray v. Fairbanks Morse*, 610 F.2d 149, 152–53 (3d Cir. 1979)).  "[W]here no clear judicial error or 'pernicious influence' can be identified but where the verdict is so large as to shock the conscience of the court[,] the court [must order a] plaintiff to remit the portion of the verdict in excess of the maximum amount supportable by the evidence." *Kazan*, 721 F.2d at 914 (citing *Scott v. Plante*, 641 F.2d 117, 136 (3d Cir. 1981); *Perzeproski v. Am. President Lines, Ltd.*, 319 F. Supp. 1329, 1330 (E.D. Pa. 1970)).  However, if the remittitur is refused, the court must order a new trial.  *See id.*

## III.   DISCUSSION

### A.   Discrimination Based on Briggs' Age

During trial, both Briggs and Temple moved for JMOL under Rule 50(a), and the Court denied both Motions.  (07/18/2017 PM, Trial Tr. 43:13–58:7, 61:7–13.)  In its post-trial Motion for Judgment as a Matter of Law, Temple contends that Briggs failed to establish a disparate-treatment claim under the ADEA and the PHRA because she failed to prove:  (1) a prima facie case of age discrimination; and (2) Temple's legitimate nondiscriminatory reason for its actions was a pretext for discrimination.[2]  (Def.'s Mem. Law Supp. Mot. J. as a Matter of Law/New

---

[2] Temple points out that Briggs' EEOC Charge of Discrimination alleged it discriminated against her by disciplining her on January 20, 2014, and discharging her on April 1, 2014.  (Def.'s Mem. Law Supp. 9 n.3 (citing Compl., Ex. 1).)  "The ADEA and the PHRA make it unlawful for an employer to discharge an individual because of that individual's age, and require that a plaintiff first exhaust administrative remedies before suing for violations of the ADEA or the PHRA." *Koller v. Abington Mem'l Hosp.*, 251 F. Supp. 3d 861, 863–64 (E.D. Pa. 2017).  "The ADEA requires a plaintiff to file a charge with the Equal Employment Opportunity Commission ('EEOC') within 300 days of the alleged discriminatory conduct." *Id.* (citing 29 U.S.C. § 626(d); *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 383 (3d Cir. 2007) ("In deferral states, such as Pennsylvania, the charge must be filed within 300 days of the allegedly illegal act.").)  "The PHRA requires a plaintiff to file a complaint with the Pennsylvania Human Relations Commission ('PHRC') within 180 days of the alleged discriminatory conduct." *Id.* (citing 43 Pa. Cons. Stat. § 959(h); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925–27 (3d Cir. 1997)).  However, "the Supreme Court has made clear that, even where the statute of limitations prevents a plaintiff from asserting a claim based on a discrete discriminatory act, the statute does not 'bar an employee from using the prior act[ ] as background evidence in support of a timely claim.'" *Hite v. Manor Junior Coll.*, 301 F. Supp. 3d 478, 483 (E.D. Pa. 2018) (quoting *Nat'l R.R. Passenger Corp. v.*

Trial/Remittitur ("Def.'s Mem. Law Supp.") 6–19.)  According to Temple, "[t]he trial record

supports only one conclusion:  Ms. Briggs' age was not the *but-for* cause of Temple's decision to

end Ms. Briggs' employment."  (*Id.* at 6 (emphasis in original).)

"The ADEA provides that '[i]t shall be unlawful for an employer . . . to fail or refuse to

hire or to discharge any individual or otherwise discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such

individual's age.'"[3]  *Terrell v. Main Line Health, Inc.*, 320 F. Supp. 3d 644, 655 (E.D. Pa. 2018)

(quoting 29 U.S.C. § 623(a)(1)).  In order "[t]o succeed on an age discrimination claim based on

disparate impact, a plaintiff must demonstrate that age 'was the 'but-for' cause of the employer's

adverse decision.'"  *Id.* at 656 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176

(2009)).

In the absence of direct evidence of age discrimination, as we have here, the familiar

burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is

applied.  *Id.* (citations omitted).  "Under this framework, the initial burden of establishing a

prima facie case rests with the plaintiff."  *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802).  "If

the plaintiff makes out a prima facie case, the burden shifts to the defendant to 'articulate some

legitimate, nondiscriminatory reason' for its adverse action."  *Id.* (citing *McDonnell Douglas*,

411 U.S. at 802).  "If the defendant articulates such a reason, the burden shifts back to the

---

*Morgan*, 536 U.S. 101, 113 (2002)).  Briggs timely filed a Charge of Discrimination with the PHRC and the EEOC
on or about April 23, 2014, and filed an Amended Charge on or about October 13, 2014.  (Compl., Exs. 1, 2.)
[3] The PHRA declares it to be an unlawful discriminatory practice for an employer "to bar or to discharge" an
individual from employment because of, *inter alia*, their age.  *See* 43 Pa. Cons. Stat. § 955(a).  We will collectively
address Briggs' claims under the ADEA and PHRA "[b]ecause the same analysis applies to claims under the ADEA
and the analogous provision of the PHRA[.]"  *Terrell*, 320 F. Supp. 3d at 655 n.14 (citing *Willis v. UPMC
Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)).

plaintiff, who must then show by a preponderance of the evidence that the employer's proffered

legitimate reason is pretextual." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

### 1.      Prima Facie Case

A prima facie case of discrimination in ADEA cases requires that the plaintiff show:

> (1) that the plaintiff was forty years of age or older; (2) that the
> defendant took an adverse employment action against the plaintiff;
> (3) that the plaintiff was qualified for the position in question; and
> (4) that the plaintiff was ultimately replaced by another employee
> who was sufficiently younger to support an inference of
> discriminatory animus.

*Id.* (citing *Smith v. City of Allentown*, 589 F.3d 684, 689–90 (3d Cir. 2009)).  At the prima facie

stage, plaintiff's burden is "not onerous."  *Id.* (quoting *Simpson v. Kay Jewelers*, 142 F.3d 639,

646 (3d Cir. 1998)).

There is no question that Briggs was fifty-nine years old at the time that her employment

with Temple ended.  Temple argues that Briggs has not demonstrated a prima facie case of

disparate treatment because of the following:  she was not qualified for her position; she did not

suffer an adverse employment action; and she failed to establish an inference of discrimination.

(Def.'s Mem. Law Supp. 6–14.)  The Court finds that the jury had a legally sufficient evidentiary

basis to determine that Briggs established a prima facie case of age discrimination under the

ADEA.

#### a.      *Qualified For Position*

Temple argues that Briggs had the education and technical skills required for an

Executive Assistant, but that her "repeated, admitted mistakes and violations of Temple's

policies rendered her unqualified to remain in her position."  (*Id.* at 6 (citing cases)); *see also*

*Bloch v. Mack Trucks, Inc.*, 240 F. Supp. 3d 365, 372 (E.D. Pa. 2017) ("An employee who is

terminated for cause has not met the third element of the test for a *prima facie* case by showing

that he was qualified for the position from which he was terminated."); *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 387 (E.D. Pa. 2013) (finding that plaintiff failed to establish that he was qualified due to "the volume of Defendant's evidence demonstrating Plaintiff's shortcomings as a Store Manager and the dearth of Plaintiff's evidence offered in support of his qualifications"). It states that:

> Ms. Briggs admitted that her supervisors consistently rated her "below average," that "below average" was the highest performance rating she received during her tenure at Temple, 2.91 (on a 4-point scale) was the highest score she received on any evaluation (still below an "average" score of 3.0), and that she received this highest score from Dr. Wu. Moreover, Ms. Briggs admitted to the errors and deficiencies articulated in the warnings and discipline that led to the end of her employment. Said differently, there is no dispute in the record that Temple disciplined Ms. Briggs and Temple offered her the choice to resign in lieu of termination (and Ms. Briggs then chose to resign) because of these errors and deficiencies, and because of Ms. Briggs' repeated violations of Temple's policies.

(Def.'s Mem. Law Supp. 7.)

Briggs argues that she was qualified for an Executive Assistant position and has put forth tangible evidence disputing part of her record of deficient performance and Temple's disciplinary actions. (Pl.'s Br. Opp'n Def.'s Mot. J. as a Matter of Law/New Trial/Remittitur ("Pl.'s Br. Opp'n") 29–31.) Relying upon Temple's decision to hire Briggs over eighteen other candidates in 2005, and her employment history, including her evaluations from 2005, 2006, 2007, and 2011, Briggs argues that she has "set forth sufficient evidence that she was qualified for the Executive Assistant position that she held for nearly ten (10) years under several supervisors." (*See id.* (citing Def.'s Trial Exs. 10–12, 15).) She also states that "[o]ver the course of her eight (8) year career at Defendant prior to reporting to Dr. Wu, Plaintiff had *never* been written up for any reason at Defendant, been given any written discipline or suspended, and

had never been placed on any sort of performance improvement plan." (*Id.* at 30 (citing 07/18/2018 AM, Trial Tr. 22:24–23:13).)  She points out that "[a]t trial, Defendant did not call any witnesses to testify that Plaintiff's performance prior to working for Dr. Wu was deficient in any way.  (*Id.*)  In response to Temple's performance evaluation evidence, Briggs asserts:

> At no point during Plaintiff's career at Defendant did she receive an annual evaluation that stated that she failed to meet the overall expectations of the job.  Rather, each annual performance evaluation that Plaintiff received from Defendant throughout her employment resulted in a score that fell between a 2.0 ("Performance meets minimal expectations and standards") and a 3.0 ("Performance meets job expectations. GOOD SOLID PERFORMANCE.").  *See* Defendant's Trial Exhibits 10–17. With regard to specific goals/projects and competencies upon which Plaintiff was assessed, Plaintiff often received a 3.5 or the full 4.0 score (Performance consistently far exceeds expectations) and *never once* received a 1.0 score ("Performance consistently fails to meet minimal expectations") before Dr. Wu for *any* skill or goal/project or competency.

(*Id.* at 30 (citing Def.'s Trial Exs. 10–12, 15).)

Regarding Temple's argument that Briggs admitted to the errors and deficiencies articulated in the warnings and discipline that led to the end of her employment, Briggs adamantly disagrees, stating that she "vehemently denied the two (2) instances described in her April 1, 2014 termination letter."  (*Id.* at 31 (citing Pl.'s Trial Ex. 45 (termination letter); 07/17/2018 AM, Trial Tr. 93:7–94:9 (denying that she booked the hotel for the wrong dates); 99:12–101:16 (denying that she had access to the requisite computer system); Def.'s Trial Ex. 71).)

Examining the record as a whole, we conclude that Briggs has put forth substantial evidence that she was qualified for the Executive Assistant position.  "[C]ase law requires that a court consider a plaintiff's 'objective job qualifications,' and should leave 'the question of whether an employee possesses a subjective quality, such as leadership or management skill . . .

to the later stage of the *McDonnell Douglas* analysis.'"  *Howell v. Millersville Univ. of Pa.*, 283

F. Supp. 3d 309, 323 (E.D. Pa. 2017), *aff'd*, No. 17-3538, 2018 WL 4236592 (3d Cir. Sept. 6,

2018) (quoting *DiFrancesco v. A–G Adm's, Inc.*, No. 13-4284, 2014 WL 4379114, at *7 (E.D.

Pa. Sept. 4, 2014), *aff'd*, 625 F. App'x 95 (3d Cir. 2015)).  "When a defendant's argument

regarding a plaintiff's qualifications is intertwined with its assertion of a legitimate reason for the

employment action, courts should be careful not to collapse the entire *McDonnell Douglas*

analysis in [the] first step."  *Id.* (quoting *DiFrancesco*, 2014 WL 4379114, at *7).  Since

Temple's contention that Briggs' lack of qualifications is intertwined with its legitimate

nondiscriminatory reasons regarding Briggs' job-related issues, and Briggs presented evidence

refuting both Temple's reasons and her record of deficient performance, this argument will be

addressed later.  Nevertheless, both Temple's assessment that Briggs was minimally qualified for

the Executive Assistant position, and her nearly ten years of experience employed in the position,

provide a legally sufficient evidentiary basis for a reasonable jury to find that she was qualified

for the Executive Assistant position.  *See id.* at 324 ("Therefore, because the University found

[plaintiff] minimally qualified for his position, the Court finds that [plaintiff] can establish the

second element of the prima facie case.").

> b.     *Adverse Employment Action*

"To satisfy the third element of the prima facie case, an employee must allege an adverse

employment action sufficiently severe to have altered the employee's compensation, terms,

conditions, or privileges of employment, or to have deprived or tended to deprive him of

employment opportunities or otherwise adversely affected his status as an employee."  *Id.*

(citations omitted).  "The plaintiff does not have to show economic or tangible discrimination,

but at the same time, not every insult, slight, or unpleasantness gives rise to a valid claim." *Id.* (citation omitted).

Temple argues that Briggs did not suffer an adverse employment action because she resigned in lieu of termination. (Def.'s Mem. Law Supp. at 8–9.) Briggs responds that "[Temple] advances this argument despite the uncontroverted fact that on April 1, 2014, [it] handed Plaintiff a letter stating, 'Effective the end of the day today, *your employment at Temple University is being terminated*.'" (Pl.'s Br. Opp'n 32 (citing Pl.'s Trial Ex. 45) (emphasis in original).) She goes on to state:

> Plaintiff did explain that she submitted a resignation email *two (2) days* later under duress. However, regardless, the end result was the same—under no circumstances was Plaintiff going to be allowed to remain an employee of Defendant, and the involuntary end of her employment was a decision that *Defendant* made. 07/16/2018 AM, Trial Tr. 61:12–22 (Wacker) ("[S]he would have been terminated involuntarily."); 07/18/2018 AM, Trial Tr. 54:8–10 (Walton) ("Her staying there was not an option."). Under these circumstances, it is absurd to argue that Plaintiff did not suffer an adverse employment action at the hands of Defendant. She was fired.

(*Id.*)

Here, there is no doubt that Briggs presented a legally sufficient evidentiary basis for a reasonable jury to find that she suffered an adverse employment action. In light of the clear language contained in the April 1, 2014 letter stating that, "Effective the end of the day today, your employment at Temple University is being terminated," and the testimony of decision-makers, Wacker and Walton, regarding the termination of Briggs' employment, there was legally sufficient evidence for a jury to find that the third prong of the prima facie case was proven by a preponderance of the evidence. Moreover, we point out that Temple itself argues in the instant Motion that "age was not the "*but-for*" cause of *[its] decision to end Ms. Briggs' employment*."

(Def.'s Mem. Law Supp. 6 (emphasis added).)  Given the facts of this case, and what evidence and testimony were presented to the jury, we flatly reject Temple's blanket assertion that Briggs' resignation forecloses any argument that she suffered an adverse employment action.

c.  *Plaintiff was Replaced by Another Employee Sufficiently Younger to Support an Inference of Discriminatory Animus*

The fourth element of a prima facie case of age discrimination under the ADEA is that plaintiff was "replaced by a sufficiently younger employee to support an inference of age discrimination."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citing *Smith*, 589 F.3d at 689); *see also Willis*, 808 F.3d at 644; *Giuliani v. Polysciences, Inc.*, 275 F. Supp. 3d 564, 576 (E.D. Pa. 2017); *Cridland*, 929 F. Supp. 2d at 385.

> With respect to what age differential will be considered sufficient as a matter of law (i.e., sufficiently younger), the United States Court of Appeals for the Third Circuit ["Third Circuit"] has stated that "there is no particular age difference that must be shown, but while different courts have held . . . that a five year difference *can* be sufficient, . . . a one year difference cannot."

*DeCicco v. Mid-Atl. Healthcare, LLC*, 275 F. Supp. 3d 546, 554 (E.D. Pa. 2017) (quoting *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 236 (3d Cir. 1999)); *see also Carter v. Mid-Atl. Healthcare, LLC*, 228 F. Supp. 3d 495, 503 (E.D. Pa. 2017) ("[S]everal other decisions within this circuit have concluded that an age differential of less than five years is insufficient— as a matter of law—to establish the final element of a prima facie case of age discrimination."). Here, the thirteen-year age difference between fifty-nine-year-old Briggs and her forty-six-year-old replacement, Marilyn Grandshaw, is sufficient.[4]  (07/16/2018 PM, Trial Tr. 38:21–39:3; 07/17/2018 AM, Trial Tr. 114:20–115:3.)

---

[4] Neither Briggs nor Temple mention the age of Marilyn Grandshaw in their post-trial arguments.  During trial, Briggs testified that she was replaced by Marilyn Grandshaw, who was forty-six years old, and Temple did not refute it.  (07/16/2018 PM, Trial Tr. 38:21–39:3; 07/17/2018 AM, Trial Tr. 114:20–115:3.)

Nevertheless, Temple argues that there is insufficient evidence to support an inference of discriminatory animus; that is, whether Temple's decisions regarding Briggs resulted from age (or any other) animus.  (Def.'s Mem. Law Supp. 9.)  Specifically, it asserts:

> Ms. Briggs premised her age discrimination claim on:  (1) Dr. Wu *once* commented about women in China retiring at 55, (2) Temple disciplined Hailey King, a younger female employee, less severely than Ms. Briggs, and (3) Temple reassigned some of Ms. Briggs' job duties to female student workers when Ms. Briggs relocated to the tenth floor.  This paucity of evidence fails to prove that any of Temple's decisions made regarding Ms. Briggs resulted from age (or any other) animus.

(*Id.*)

Taking all of the pieces of evidence into account and viewing them in totality, Briggs counters Temple's arguments by stressing that there was sufficient evidence for the jury to conclude that the circumstances surrounding the termination give rise to an inference of discrimination.  (Pl.'s Br. Opp'n 33–35.)  She sets forth that "Dr. Wu exhibited his age discriminatory bias against older female workers by *telling* Plaintiff—the day before her 57th birthday—that in his home country, women of Plaintiff's age are 'put out to pasture.'"  (*Id.*) Acknowledging that the comment by Wu, who was a decision-maker in Briggs' termination, was in November 2011, well before the end of Briggs' employment, Briggs argues that the jury was permitted to infer from his unsolicited comment, and his overall demeanor and credibility, what he meant when he said it.  (*Id.* at 33 (citing *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1215 (3d Cir. 1995) ("[D]iscriminatory comments made by non-decision-makers, or statements temporally remote from the decision at issue, may properly be used to build a circumstantial case of discrimination.")); *see also Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 368 (3d Cir. 2008), *order clarified*, 543 F.3d 178 (3d Cir. 2008) (observing that "stray remarks by decision-makers, which were unrelated to the decision-making process . . . could provide background

evidence that may be critical to a jury's determination of whether the decision-maker was more likely than not acting out of a discriminatory motive").

Additionally, Briggs argues that she "explained on numerous occasions that her job responsibilities as Executive Assistant were being taken away from her and given to younger workers." (*Id.* at 34 (citing Pl.'s Trial Exs. 7, 26, 38).) She goes on to state:

> Moreover, the evidence showed that Dr. Wu inconsistently applied discipline to his subordinates in favor of the younger worker. At the same time that Plaintiff received written discipline for over-sleeping one (1) time, Ms. King—who is undisputedly substantially younger than Plaintiff—was a no call/no show for three (3) straight days. 07/17/2018 AM, Trial Tr. 81:13–82:2. Dr. Wu admitted that Ms. King did not show up to work for three (3) days, never called in, and never told anybody where she was. Nevertheless, he did not issue Ms. King any written discipline. *Id.* at 83:20–24; *see also* 07/18/2018 PM, Trial Tr. 33:18–20 ("I remember that Hailey King was the individual with whom she was comparing herself and saying that her discipline was unfair.")

(*Id.*)

According to Briggs, she submitted evidence that Wu's decision to take job duties from her and to give them to younger student workers constituted evidence of his age bias and his desire to push her out of the workforce. (*Id.* at 34 n.6.) She also asserts that "viewing the facts and inferences in the light most favorable to Plaintiff, it is clear that Dr. Wu's treatment of Plaintiff was outrageous and targeted. Throughout her reporting relationship to Dr. Wu, Plaintiff would be singled out and subjected to arbitrary yelling, degradation, and public humiliation by Dr. Wu." (*Id.* (citing Pl.'s Trial Exs. 9, 13, 33).)

Since Briggs presented at trial that it was uncontroverted that she was replaced by a person significantly younger, and in light of the other aforementioned arguments and evidence adduced at trail regarding her January 20, 2014 discipline and April 1, 2014 discharge, we cannot find, as Temple argues, that she presented no evidence sufficient to establish an inference of

discrimination.  We find that Briggs presented a legally sufficient evidentiary basis for a

reasonable jury to find that she satisfied the fourth prong of her prima facie case of age

discrimination.

### 2.      Pretext

Briggs has successfully established a prima facie case creating an inference of

discrimination; therefore, the burden shifts to Temple to "articulate a legitimate

nondiscriminatory reason for the adverse employment action."  *Willis*, 808 F.3d at 644 (citations

omitted).  There is no question that Temple provided evidence that its decisions were made for

legitimate nondiscriminatory reasons; namely, it disciplined Briggs and offered her the option to

resign in lieu of termination due to her repeated behavioral and job performance issues.  (Def.'s

Mem. Law Supp. 15.)  If the employer satisfies this second step, the burden shifts back to the

plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate,

nondiscriminatory reason was pretextual.  *Willis*, 808 F.3d at 644 (citation omitted).

For Briggs to meet her burden of proving pretext, she must submit "evidence that allows

a fact finder to either (1) disbelieve or discredit the employer's justification; or (2) believe

discrimination was more likely than not a 'but-for' cause for the adverse employment action."

*Abels v. DISH Network Serv., LLC,* 507 F. App'x 179, 183 (3d Cir. 2012) (citing *Fuentes v.*

*Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  "Regardless of the method, the plaintiff's evidence

must allow a reasonable jury to find, by a preponderance of the evidence, that age discrimination

was a 'but for' cause of the adverse employment action."  *Id.* (citing *Gross*, 557 U.S. at 177–78;

*Smith*, 589 F.3d at 691).

Regarding the first prong, in order to discredit the employer's proffered reason, a

plaintiff:

> cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence.

*Andersen v. Mack Trucks, Inc.*, 118 F. Supp. 3d 723, 741 (E.D. Pa. 2015), *aff'd*, 647 F. App'x 130 (3d Cir. 2016) (quoting *Fuentes,* 32 F.3d at 765).  Regarding the second prong, "a plaintiff must provide evidence that allows the fact finder to infer that discrimination was 'the "but-for" cause of the employer's adverse decision.'"  *Id.* (citations omitted) (quoting *Gross*, 557 U.S. at 176).

Temple argues that Briggs failed to prove that its legitimate non-discriminatory reason for its actions was a pretext for discrimination.  (Def.'s Mem. Law Supp. 15–19.)  It explains that it is entitled to judgment as a matter of law because:

> Given Temple's legitimate, non-discriminatory reason, Ms. Briggs had to adduce evidence from which the jury either reasonably could (a) disbelieve Temple's articulated legitimate reason; or (b) believe that an invidious discriminatory reason was more likely than not the "but-for' cause of Temple University's action.  She did neither. Evidence of disparate treatment is fundamental to the adequacy of a verdict in a discrimination case. Without such evidence, a verdict cannot stand. Ms. Briggs' presented no evidence of discriminatory animus and, thus, showed no evidence of disparate treatment.

(*Id.* (citing *McGrath v. Lumbermens Merchandising Corp.*, 851 F. Supp. 2d 855, 860 (E.D. Pa. 2012) (citing *Hodczak*, 451 F. App'x at 241–42 as reflecting the modification to *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994) and its progeny — from "motivating or determinative cause" to "but-for cause" — because of Gross, 557 U.S. 167)).)

We conclude that Briggs provided sufficient evidence from which a jury could reasonably infer that Temple's proffered reason is pretext for discrimination.  That is, Briggs produced sufficient evidence supporting an inference that her age had a "determinative influence" on Temple's decision; she did not merely show that her age was a factor motivating Temple's decisions.  "The *prima facie* case and pretext inquiries often overlap."  *Doe*, 527 F.3d at 370.  Therefore, "evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires [the Court] to ration the evidence between one stage or the other."  *Id.* (citations omitted).

Briggs relies on the evidence set forth above in support of her satisfaction of the fourth prong of the prima facie case, as well as numerous other facts set forth below, that could lead a reasonable jury to find that she established pretext.  For instance, Briggs focuses on the termination letter handed to her on April 1, 2014, which sets forth the following two alleged incidents that resulted in her receipt of C-level discipline and termination:  (1) her alleged intentional failure to submit Dr. Wu's travel reimbursements; and (2) her alleged failure to book a hotel for a speaker for the correct nights.  (Pl.'s Br. Opp'n 36.)  Regarding the travel reimbursement issue, Briggs argues that:

> [she] testified that one of her job duties as an Executive Assistant had been to submit her supervisor's travel expenses.  She would utilize Defendant's internal system, called Concur, after she was given access and permission to allocate the expenses to a particular grant number.  On March 20, 2014, at 3:53pm, Dr. Wu sent an email to Drew DiMeo stating that Defendant had not yet administratively inputted Dr. Wu's grant number into his account. At 3:56pm that same day, Mr. DiMeo emailed Plaintiff, telling her to submit the travel reimbursement into the system by 5:00pm that day.  At 5:27pm that day, Plaintiff sent Mr. DiMeo a lengthy email explaining that she still did not have access to the grant number in the system, and therefore she did not have the requisite "permission" on the computer to submit the report.  Plaintiff further identified what she believed was the technical issue within

> the system that denied her the access she needed to complete the project.  Mr. DiMeo did not respond to Plaintiff's last email. Plaintiff stayed at work, however, and attempted to remedy the problem herself but she was unable to do so without the required computer access.
>
> Defendant argued at trial that Plaintiff did in fact have the required access, and instead intentionally failed to submit the expense report on Dr. Wu's behalf. Defendant's argument fell flat, as it was unable to produce any credible testimony on what occurred or any documents in support of its position (except for Defendant's Trial Exhibit 71, which is consistent with Plaintiff's position that she was unable to access the account through no fault of her own). HR Director Walton could not explain whether she did or did not receive any documentation showing that Plaintiff did in fact have access to the account that night.  And Dr. Wu testified that Mr. DiMeo obtained written documentation and that he has even seen it, but no such document was ever presented to the jury. Defendant did not call Mr. DiMeo as a witness in this case.

(*Id.* at 36–37 (citations omitted).)  Thus, Briggs asserts, and we agree, that the jury had ample evidence on this issue to conclude that Temple's stated reason for terminating her employment cannot be believed.  (*Id.* at 37.)  Also, we note that Temple's lack of evidence, which includes documentation that was testified to, but never presented, and its decision not to have DiMeo testify, amounted to a weak defense concerning the issue at hand that the jury may have also taken into account in reaching its decision.

Regarding Briggs' alleged failure to book a hotel room for the correct nights, she testified that "Dr. Wu himself asked her to change the reservations, and she followed his instructions appropriately" and "Dr. Wu testified that he does not even recall this incident at all—even though it's specifically delineated in the termination letter and Dr. Wu was an individual who made the decision to terminate Plaintiff's employment."  (*Id.* at 37–38 (citing 07/17/2018 AM, Trial Tr. 93:16–23; 07/16/2018 PM, Trial Tr. 91:23–92:7).)  Thus, Briggs again asserts, and we

agree, that the jury had ample evidence on this issue to conclude that Temple's stated reason for

terminating her employment cannot be believed.

In further support of her claim that Temple's stated reasons for her termination were pure

pretext, Briggs also argues:

> Plaintiff highlighted Defendant's policies which state that two (2) C-level disciplines in one (1) year will result in termination. Plaintiff received her first-ever C-level discipline on March 26, 2013. Then, almost exactly one-year to the day, Defendant issued Plaintiff another C-level discipline for the two (2) alleged incidents set forth above. Plaintiff argued that this is not a coincidence— Defendant wanted Plaintiff out, and dug up anything they could on Plaintiff as the one-year mark was approaching so that the termination would appear to be non-discriminatory and non-retaliatory. Defendant denied this, of course. However, the jury did not believe Defendant that its articulated reasons were the real reasons and found in favor of Plaintiff.

(*Id.* at 38 (citations omitted).) Briggs goes on to argue that:

> Moreover, the jury saw and heard evidence that the previous disciplines given to Plaintiff during her tenure under Dr. Wu were entirely unwarranted and pretextual. For example, not one witness for Defendant could explain a non-retaliatory reason for why Plaintiff was given a written discipline on November 9, 2011, the day Dr. Wu stated to Plaintiff that women her age in China are "put out to pasture" and Plaintiff responded in opposition, "With all due respect, we're in America and not in China." Additionally, the jury heard that Dr. Wu issued Plaintiff a written discipline for oversleeping on one (1) occasion by three (3) hours, but her substantially younger co-worker, Ms. King, was not given any discipline for not calling out or showing up to work for three (3) *days* straight. Finally, despite Dr. Wu's testimony that Plaintiff made "hundreds" of mistakes, there was simply no evidence to back up that assertion.

(*Id.* (citation omitted).)

Additionally, Briggs summarized evidence of Temple's age-based discrimination and animus against her as follows[5]:

1.  On November 9, 2011, Dr. Wu approached Plaintiff, who was turning fifty-seven (57) years old the next day, and asked her how old she was going to be. Plaintiff told him that she was turning fifty-seven (57). Dr. Wu responded with words to the effect of, "You know, in China, we put women out to pasture at 55." 07/17/2018 AM, Trial Tr. 31:1–13.

2.  Dr. Wu testified that he knew that Plaintiff was in her [fifties]. 07/16/2018 PM, Trial Tr. 60:5–12. He further testified that he knows that in China there is a mandatory retirement law that requires white collar, professional women (such as Plaintiff) to retire at the age of fifty-five (55). *Id.* at 54:20–55:21. According to Dr. Wu, sometimes women in China retire at the age of forty (40), and his own sister in China retired while she was in her [thirties]. *Id.* at 56:4–57:21.

3.  Plaintiff explained in subsequent emails to HR, EOC, and Defendant's in-house counsel——and testified to the same at trial—that she was being bullied and singled out by Dr. Wu. *See, e.g.*, Pl.'s Trial Ex. 9 ("No other staff member is required to meet daily for a dose of public humiliation and my request to move the meetings to a private location was flat out denied."); Pl.'s Trial Ex. 13 ("On numerous occasions, Jie Wu has mentioned that the professional lives of women my age (58) in China are over and I wrote it off to cultural differences. It was when he would make a comment that referenced my age and failure to attain the financial stability to be able to travel when I felt defensive and offended . . . ."); Pl.'s Trial Ex. 33 ("[F]ive days out of the week I a[m] battered emotionally, insulted, ignore[d], yelled at in front of peers and the department scapegoat. I am often accused for the mistakes and the misconduct of others.").

4.  Plaintiff explained on numerous occasions that her job responsibilities as Executive Assistant were being taken away from her and given to younger workers. *See, e.g.*, Pl.'s Trial Ex. 7 ("Regarding our discussion related to Dr. Wu's comments about my age, I am forwarding an email that was sent to a student worker in our office about yet another of my job functions assigned to her . . . .   Additionally, last week, I was informed in

---

[5] Briggs also relies on this summary of evidence to support her age-based hostile work environment claims. (*See* Pl.'s Br. Opp'n 24–28.)

front of Mary Kate that she would be handling all his travel arrangements, too."); Pl.'s Trial Ex. 26 ("I am relegated to making coffee, secretarial functions even though I have never been a secretary. Young female student workers occupy my former office area where they carry out my job functions while I was re-located from the third floor of Wachman to the 10th floor of Camell."); Pl.'s Trial Ex. 38 ("I want to discuss changes made to my job description and responsibilities that have been given to Hailey King, Jackie Harriz's replacement. My essential functions have been diminished to elementary clerical functions. I am performing entry level data entry tasks, while one student worker and Haley [sic] King are performing the functions of my job description.")

5. At the same time that Plaintiff received written discipline for over-sleeping one (1) time, Ms. King——who is undisputedly substantially younger than Plaintiff—was a no call/no show for three (3) straight days. Dr. Wu admitted that Ms. King did not show up to work for three (3) days, never called in, and never told anybody where she was. Nevertheless, he did not issue Ms. King any written discipline.

(*Id.* at 24–25.)

Considering the whole record, and viewing the evidence in the light most favorable to Briggs, we find that she has produced sufficient evidence to show that Temple's stated reasons for terminating her employment were pretextual. Acknowledging that it is Briggs' burden to prove that Temple's stated reasons for her termination were pretext, we also note that the trial record, and specifically, Temple's defense, failed to present a solid reason as to why many of the events unfolded as they did. For instance, regarding Wu's travel expenses, Briggs testified that she did not have access to the account and provided a supporting email stating as such. Temple asserted that she, in fact, did have access, but it did not proffer any proof of such access. Even though Wu testified that DiMeo obtained written documentation showing that Briggs had access, such documentation was never presented and DiMeo was never called to testify.[6] Regarding

---

[6] The jury heard testimony from Briggs, Wu, Walton, and Wacker about the interactions that occurred surrounding Briggs' termination. Witnesses that could corroborate Temple's theory appeared to be unprepared and testified

Briggs' alleged failure to book a hotel for the correct nights, the only record evidence we have is Briggs' testimony that she appropriately followed Wu's instructions to change the reservations and Wu's testimony that he does not recall the incident.  Of course, it is within the jury's province to assess the credibility of both Briggs and Wu regrading this critical issue of the travel arrangements.

Giving every fair and reasonable inference to Briggs, a reasonable jury could conclude that, based on the above, Temple's decision to terminate Briggs' employment was a pretext for unlawful age discrimination.  Thus, it was appropriately left to the factfinder to decide what happened, why, and whether unlawful age discrimination was a "but for" reason for Temple's action.  Here, Briggs adduced sufficient evidence from which a jury could reasonably find that Temple's legitimate nondiscriminatory reasons for her termination were pretextual and that age was a "but for" cause of the adverse employment action.

### B.    Retaliation for Complaints Regarding Age Discrimination

Temple also moves for judgment as a matter of law on Briggs' claim of retaliation under the ADEA and PHRA.  To establish a prima facie case of retaliation, a plaintiff must prove "(1) [that she engaged in] protected employee activity; (2) an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (alteration in original) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).  Once the plaintiff establishes her prima facie

---

solely within the framework of Briggs' case-in-chief, leaving the trial without a strong presentation of a comprehensive defense, which not only impacted trial, but has also impacted our consideration of Temple's arguments regarding judgment as a matter of law.  Inexplicably, Temple did not call a single witness, opting instead to play a brief video deposition segment.  Specifically, Temple did not call DiMeo, who played a significant role in the facts of this lawsuit.  Based on the testimony given by each witness viewed cumulatively, a reasonable jury could conclude that such testimony supported Briggs' claim that Temple's stated reasons for her termination were pretextual.

case, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for taking the adverse employment action.  *Id.*  "If the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'"  *Id.* (quoting *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006)).

Temple advances arguments on all three elements of the prima facie case in support of its argument that judgment as a matter of law is warranted.  First, it claims that only Briggs' complaints of discrimination to Etezady and Foehl constitute protected activity.  (Def.'s Mem. Law Supp. 20.)  Second, Temple once again argues that Briggs did not suffer an adverse employment action.  (*Id.*)  Third, Temple asserts that there is no causal connection between Briggs' discrimination complaints to Etezady and Foehl and the end of her employment.  (*Id.*)  And lastly, it states that, even if Briggs has established a prima facie case of retaliation, Temple rebutted any inference of discrimination by providing legitimate, non-discriminatory reasons for its actions.  (*Id.* at 21–22.)  We disagree with all of Temple's arguments and conclude that there was sufficient evidence in the record for the jury to find that Temple retaliated against Briggs for her complaints of age discrimination.

### 1.    Prima Facie Case

#### a.    *Protected Activity*

The Third Circuit has held that "[f]or purposes of the first prong of a prima facie case of retaliation, protected 'opposition' activity includes not only an employee's filing of formal charges of discrimination against an employer but also 'informal protests of discriminatory employment practices, including making complaints to management.'"  *Daniels*, 776 F.3d at 193 (quoting *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir.

2006)).  In a retaliation case, the plaintiff "need not prove the merits of the underlying

discrimination complaint," [but] she must have "act[ed] under a good faith, reasonable belief that

a violation existed."  *Id.* (second alteration in original) (quoting *Moore*, 461 F.3d at 344).  "This

standard requires an 'objectively reasonable belief' that the activity the plaintiff opposed

constituted unlawful discrimination under the relevant statute."  *Id.* at 193–94 (quoting *Wilkerson*

*v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008)).

  As to the protected activity prong of Briggs' prima facie case, Temple simply

"acknowledges that Ms. Briggs' complaints of age and gender discrimination to Cameron

Etezady and Ms. Foehl constitute protected activity."  (Def.'s Mem. Law Supp. 20.)  Conversely,

Briggs points to numerous instances in the record, including Temple's sworn and verified

responses to interrogatories, where Briggs complained of discrimination to various individuals.

  Despite Temple's assertion at this stage of the proceedings that Briggs' complaints to

Etezady and Foehl constitute the only protected activity in this case, its responses to

interrogatories clearly indicate there were other instances of protected activity.  Significantly,

Walton verified Temple's interrogatory responses and provided as follows:  "In 2013 and 2014,

Briggs raised her claims of discrimination with Deirdre Walton, Temple University, Department

of Labor and Employee Relations.  Ms. Walton found no merit to Briggs' claims."  (Pl.'s Trial

Ex. 62, at 7–8.)  In addition to Foehl, Etezady, and Walton, Temple also responded that Briggs

raised her complaints of discrimination to Rhonda Brown and Fay Trachtenberg.  (*Id.*)  Thus,

Temple's argument that the only instances of protected activity are Briggs' complaints to Foehl

and Etezady is clearly belied by its own interrogatory responses.

  Turning to the specific evidence adduced at trial, we believe there were ample complaints

of age discrimination that constitute protected activity, including complaints made to the

decision-makers who ultimately decided to terminate Briggs' employment.  For instance, when Wu made the comment to Briggs that, in China, women her age are put out to pasture, Briggs responded immediately and stated, "Well, with all due respect, we're in American right now." (07/17/2018 AM, Trial Tr. 31:13–16.)  Just one hour later, Briggs was summoned to Wacker's office and was given discipline for being unprofessional to Wu.  (*Id.* at 32:3–20.)  At that meeting, Briggs explained what Wu said, indicating that Wacker was aware of Wu's discriminatory comment.  (*Id.* at 34:4–11.)

Later on, Briggs complained to Walton about Wu's comment.  (07/17/2018 PM, Trial Tr. 121:12–122:1.)  Walton then directed Wacker to look into the situation, who in turn spoke with Wu about the comment.  (*Id.* at 122:2–6, 128:11–23.)  Walton testified that Wu would have known that Briggs complained about his comment.  (*Id.* at 128:11–23.)

Briggs also testified about responses DiMeo and Wacker made when Briggs informed them she was speaking with Foehl about workplace issues.  When Briggs told DiMeo about how she was speaking with Foehl about Wu's treatment, DiMeo responded, "Dr. Wu knows what's going on, and I'm – you know, and it's got to stop."  (07/17/2018 AM, Trial Tr. 91:4–13.) Similarly, Wacker threatened Briggs, stating "Dr. Wu knows what you're doing and if you want your job, you better cut it out."  (*Id.*)

Moreover, as we explained above, Walton verified Temple's responses to interrogatories and provided that Briggs made complaints of discrimination to her in 2013 and 2014.  (Pl.'s Trial Ex. 62 at 7–8.)  Significantly, Briggs emailed Foehl on February 25, 2014, stating that she "plan[ned] to file an EEOC complaint internally and ha[d] already had a phone intake with the EEOC."  (Pl.'s Trial Ex. 34; 07/17/2018 AM, Trial Tr. 89:2–3.)  Foehl then forwarded Briggs' email to Walton.  (Pl.'s Trial Ex. 35.)  Briggs also emailed Walton directly, stating she was being

subjected to "unfair labor practices and discrimination, both of which violate federal and state laws."  (Pl.'s Trial Ex. 37, at 2.)

Contrary to Temple's assertion, we believe that Briggs' direct opposition to Wu's comment, and her complaints of discrimination to Walton and Wacker (among others), qualify as protected activity because Briggs specifically complained of discrimination.  *See Daniels*, 776 F.3d at 193.

### b.  *Adverse Employment Action*

As before regarding Briggs' disparate treatment claim under the ADEA, Temple once again argues that Briggs' prima facie case of retaliation fails because she did not suffer an adverse employment action.  For the reasons set forth above, Briggs clearly presented a legally sufficient evidentiary basis for a reasonable jury to find that she suffered an adverse employment action by being terminated by Temple.  Thus, the adverse employment action prong of her prima facie case was met.

### c.  *Causation*

Temple next argues it is entitled to judgment as a matter of law because "there was no causal connection between Ms. Briggs['] complaints and the end of her employment."  (Def.'s Mem. Law Supp. 21.)  Specifically, Temple asserts that Briggs' claim of retaliation fails as a matter of law because the decision-makers, Wu, Walton, and Wacker, had no knowledge of Briggs complaining of discrimination.  (*Id.*)

The Third Circuit has held that, to establish the requisite causal connection, a plaintiff "must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir.

38

2007) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503–04 (3d Cir. 1997); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920–21 (3d Cir. 1997)).  "Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality . . . ." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).  If the temporal proximity is not unusually suggestive, then we must look to whether the proffered evidence, as a whole, supports an inference of discrimination.  *Id.* at 232 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)).

We believe both the temporal proximity between the protected activity and Briggs' termination, and the record as a whole, supports the inference that Temple retaliated against Briggs.  As to the temporal proximity, the jury saw Temple's responses to interrogatories, which provided that Walton was aware of Briggs' complaints of discrimination in 2013 and 2014.  (*See* Pl.'s Trial Ex. 62 at 7–8.)  Indeed, Foehl forwarded Briggs' February 25, 2014 email to Walton, where Briggs wrote that she already had a phone intake with the EEOC and planned to file an internal EEOC complaint.  (Pl.'s Trial Ex. 34; 07/17/2018 AM, Trial Tr. 89:2–3.)  Briggs was terminated on April 1, 2014.  Therefore, just one month after Walton was aware that Briggs was initiating action with the EEOC, Walton, Wacker, and Wu decided to terminate Briggs' employment.  Accordingly, we believe there was sufficient evidence for the jury to conclude the temporal proximity between the protected activity and the adverse employment action was "unusually suggestive."

The trial evidence was also sufficient for the jury to conclude that the record, as a whole, created an inference of retaliation.  As we explained above, Wu, Wacker, and Walton were all aware that Briggs had complained about Wu's discriminatory comment.  When Briggs told

DiMeo and Wacker about how she was complaining to Foehl, both responded in a similar

fashion.  DiMeo told Briggs that Wu knew about her complaints and that "it's got to stop."

(07/17/2018 AM, Trial Tr. 91:4–13.)  Wacker responded even more harshly, stating that "Dr. Wu

knows what you're doing and if you want your job, you better cut it out."  (*Id.*)  We conclude

that this evidence alone established an inference of discrimination.

For the reasons set forth above, the Court concludes that Briggs adduced sufficient

evidence at trial to establish her prima facie case of retaliation under the ADEA.

## 2.      Pretext

Temple alternatively argues that even if Briggs established her prima facie case of

retaliation, judgment as a matter of law should, nevertheless, be granted because she failed to

rebut Temple's legitimate, non-retaliatory reasons for her termination.  Temple relies on the

same legitimate, non-discriminatory reasons for the retaliation claim as it did in Briggs' age

discrimination claim.  (Def.'s Mem. Law Supp. 21 ("For the same reasons Ms. Briggs lacks

evidence that Temple's legitimate, non-discriminatory reason was a pretext for her age

discrimination claim, . . . she also lacks evidence that the reason was a pretext for retaliation."));

*see* discussion *supra*, Section III-A-2.

As discussed above, we believe that Briggs adduced sufficient evidence from which a

jury could reasonably find Temple's legitimate nondiscriminatory reasons for her termination

were pretextual and that age was a "but for" cause of the adverse employment action.

Therefore, we need not separately analyze the pretext analysis for the age discrimination and

retaliation claims.  *See Raskind v. Res. for Human Dev., Inc.*, No. 16-629, 2017 WL 5070725, at

*16 (E.D. Pa. Nov. 3, 2017) (Kelly, J.) (declining to analyze pretext on retaliation claim after

analyzing pretext on disparate treatment claim); *Szostek v. Drexel Univ.*, No. 12-2921, 2013 WL 4857989, at *15 (E.D. Pa. Sept. 11, 2013) (same).

Accordingly, Temple's Motion for Judgment as a Matter of Law on Briggs' claim of retaliation under the ADEA is denied.

## C.    Jury's Responses to Verdict Sheet are not Inconsistent

Temple next argues that the jury verdict sheet is "irreconcilably inconsistent," which entitles it to judgment as a matter of law or a new trial.  (Def.'s Mem. Law Supp. 29–32 (citing *Acumen, LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 218 (3d Cir. 2009) ("[A] judgment as a matter of law was the proper remedy where a jury reached an internally incompatible verdict . . . ."); *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1345 (Fed. Cir. 2010) (holding that "the district court was required to grant a new trial because the jury's verdicts . . . were irreconcilably inconsistent.").)  Since the jury affirmatively answered the question about whether Briggs proved, "by a preponderance of the evidence, that *but-for* her age, Temple University would not have terminated her position," Temple asserts that it was "internally incompatible" for the jury to also find in the affirmative on her age retaliation claim, that "*but-for* her reasonable, good-faith complaint regarding age discrimination, Temple University would not have terminated [Briggs'] position."  (*See* Def.'s Mem. Law Supp. 29–30; *see also* Verdict Form.)

Temple relies on *Gross* to argue that a plaintiff cannot prevail on more than one claim requiring proof of but-for causation.  (Def.'s Mem. Law Supp. 30 (citing *Gross*, 557 U.S. at 176).)  Temple asserts that in order to "qualify as the 'but-for' cause, the alleged cause must be 'the "reason" that the employer decided to act'" and that "to permit a lesser 'but-for' standard would contradict the Supreme Court's repeated explanation of the exacting requirements of 'but-

for' causation." (*Id.* (quoting *Gross*, 557 U.S. at 176) (citing *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013); *Burrage v. United States*, 571 U.S. 204 (2014)).)

 *Gross* distinguishes claims brought under the ADEA from those under Title VII and the framework laid out in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See Gross*, 557 U.S. at 178–79. In Title VII cases, a plaintiff can succeed if she shows "that discrimination was a 'motivating' or 'substantial' factor in the employer's action." *Id.* at 171 (quoting *Price Waterhouse*, 490 U.S. at 258). This "mixed-motives" instruction means that "when an employee alleges that he suffered an adverse employment action because of both permissible and impermissible considerations . . . the employee must present 'direct evidence that an illegitimate criterion was a substantial factor in the . . . decision.'" *Id.* at 171–72 (quoting *Price Waterhouse*, 490 U.S. at 276.) A defendant-employer may avoid liability only by proving by a preponderance of the evidence that it would have made the same decision, even if it had not taken the unlawful factor into account. *See id.* at 173–74 (citing *Price Waterhouse*, 490 U.S. at 258).

 However, the Court in *Gross* refused to extend this framework to ADEA claims. *See id.* at 175 ("This Court has never held that this burden-shifting framework applies to ADEA claims. And, we decline to do so now."). The Court notes that, following the *Price Waterhouse* decision, Congress amended Title VII by "explicitly authorizing discrimination claims in which an improper consideration was a 'motivating factor' for an adverse employment decision." *Id.* However, Congress made no such change to the ADEA. *See id.* (citing *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 256 (1991)) ("When Congress amends one statutory provision but not another, it is presumed to have acted intentionally.").

 Under the ADEA, "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, *because of* such individual's age."
*Id.* (quoting 29 U.S.C. § 623(a)(1)).  The *Gross* Court explained that "the ordinary meaning of
the ADEA's requirement that an employer took adverse action 'because of' age is that age was
the 'reason' that the employer decided to act."  *Id.* at 176 (citing *Hazen Paper Co. v. Biggins*,
507 U.S. 604, 610 (1993)).  Thus, a plaintiff must establish that age was the 'but-for' cause of
the employer's adverse action.  *See id.* (citing *Ky. Ret. Sys. v. EEOC*, 554 U.S. 135, 138–42,
146–51 (2008); *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 141, 143 (2000)).

The Supreme Court further illustrates this point in *Burrage*, which Temple incorporates
into its brief:

> Thus, where A shoots B, who is hit and dies, we can say
> that A [actually] caused B's death, since but for A's conduct B
> would not have died.  The same conclusion follows if the predicate
> act combines with other factors to produce the result, so long as the
> other factors alone would not have done so—if, so to speak, it was
> the straw that broke the camel's back. Thus, if poison is
> administered to a man debilitated by multiple diseases, it is a but-
> for cause of his death even if those diseases played a part in his
> demise, so long as, without the incremental effect of the poison, he
> would have lived.
>
> This but-for requirement is part of the common
> understanding of cause. Consider a baseball game in which the
> visiting team's leadoff batter hits a home run in the top of the first
> inning. If the visiting team goes on to win by a score of 1 to 0,
> every person competent in the English language and familiar with
> the American pastime would agree that the victory resulted from
> the home run. This is so because it is natural to say that one event
> is the outcome or consequence of another when the former would
> not have occurred but for the latter. It is beside the point that the
> victory also resulted from a host of other necessary causes, such as
> skillful pitching, the coach's decision to put the leadoff batter in the
> lineup, and the league's decision to schedule the game. By contrast,
> it makes little sense to say that an event resulted from or was the
> outcome of some earlier action if the action merely played a
> nonessential contributing role in producing the event. If the visiting
> team wound up winning 5 to 2 rather than 1 to 0, one would be

surprised to read in the sports page that the victory resulted from
the leadoff batter's early, non-dispositive home run.

*Burrage*, 571 U.S. at 211–12 (internal citations and quotation marks omitted).  Temple highlights

the baseball example in *Burrage* to show that despite a host of necessary and contributing causes

(skillful pitching, the coach's decision to put the leadoff batter in the lineup, and the league's

decision to schedule the game), there was only one "but-for" cause of victory (the home run).

(Def.'s Mem. Law Supp. 31–32.)  Temple construes this to mean that there can only ever be one

"but-for" cause.  (*See id.* (citing *Milillo v. Thomas Jefferson Univ. Hosp.*, No. 14-3143, 2015 WL

5964992, at *4 n.7 (E.D. Pa. Oct. 13, 2015)).[7]  However, that is not what *Gross* or *Burrage* state.

For example, imagine the baseball example in *Burrage*, with the visiting team still

winning 1 to 0, the home team loads the bases in the bottom of the ninth.  With two outs, the

home team batter hits a long, fly ball over the wall.  However, the outfielder is able to reach over

the wall and catch the ball for the final out of the game.  Clearly, this scenario creates two "but-

for" causes for the visiting team's victory:  if not for the lead-off home run, the game would have

been tied and gone to extra innings following the outfielder's final out in the ninth inning and; if

not for the outfielder's over-the-wall catch, the home team would have won the game 4 to 1.  The

victory would not have occurred, but-for the lead-off home run and the outfielder's catch.  *See*

*Burrage*, 571 U.S. at 212 ("[I]t is natural to say that one event is the outcome or consequence of

another when the former would not have occurred but for the latter.").

Therefore, it is entirely consistent with *Gross* and *Burrage* to state that Briggs was

terminated by Temple because of her age and because of her complaints about discriminatory

conduct.  *Gross* rejected the "mixed-motive" theory applied to Title VII claims, where

---

[7] Temple points out that *Milillo v. Thomas Jefferson Univ. Hosp.* is a case handled by Briggs' counsel.  Temple cites
this case for the proposition that age must be *the* but-for cause, not merely *a* but-for cause.  (Def.'s Mem. Law Supp.
32.)  However, neither the opinion nor the briefing address a scenario involving multiple "but-for" causes, thus
making it harder to apply it to the case at hand.

impermissible factors, along with permissible factors, merely had to be motivating the adverse action. *See Gross*, 557 U.S. at 173, 176. Here, however, the jury found that there were no, or they did not believe there were any, permissible factors for terminating Briggs; rather the jury found two impermissible factors: age discrimination and retaliation. Additionally, Temple's argument is further belied by the lack of supporting authority that has rejected a finding of both age discrimination and retaliation under the ADEA. *Cf. Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir. 2014) (noting that a single event can have multiple but-for causes).

For these reasons, we find that Temple is not entitled to judgment as a matter of law or a new trial based on the answers provided by the jury on the verdict sheet.[8]

### D.   Hostile Work Environment Based on Age

Regarding a hostile work environment claim under the ADEA, a plaintiff must show: "(1) [s]he suffered intentional discrimination because of [her] age; (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected [her]; (4) the harassment would detrimentally affect a reasonable person in that position; and (5) respondeat superior liability." *Howell*, 283 F. Supp. 3d at 332 (citations omitted). "The alleged harassment 'must be so severe or pervasive that it alters the conditions of the [plaintiff's] employment and creates an abusive

---

[8] On the verdict sheet, we included an instruction that the jury should skip questions concerning retaliation following an affirmative finding of age discrimination. We included the instruction after hearing arguments from the parties at the charging conference. (07/18/2018 PM, Trial Tr. 64:14–68:14.) Because the jury ignored the instruction and answered each question, Temple argues that the answers are inconsistent and entitles it to a new trial. However, after further review of the applicable caselaw, we believe that we erred in including that instruction. As we describe above, we believe it is not legally incompatible to have multiple but-for causes. Nevertheless, even though the jury ignored the verdict sheet instruction and answered each question, we believe it is a harmless error that does not warrant a new trial. *See Montgomery Cty. v. MicroVote Corp.*, 152 F. Supp. 2d 784, 795 (E.D. Pa. 2001) (Kelly, J.) (quoting *Banks v. Millar Elevator Servs. Co.*, No. 98-997, 2000 WL 274005, at *1 (E.D. Pa. Mar. 10, 2000)) ("Trial errors are considered harmless when it is highly probable that the error did not affect the outcome of the case. Unless a substantial right of the party is affected, a non-constitutional error in a civil case is harmless.")

environment.'"  *Id.* (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001)).  "Stray

remarks made by non-decision-makers that are discriminatory generally are considered

insufficient to support an inference of discrimination."  *Id.* (citing *Ezold v. Wolf, Block, Schorr &*

*Solis–Cohen*, 983 F.2d 509, 545 (3d Cir. 1992)).

"To determine whether conduct is sufficiently hostile to support a claim, a court must

consider the totality of the circumstances, which 'may include the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance.'"  *Johnson v. Phila. Hous. Auth.*, 218 F. Supp. 3d 424, 438 (E.D. Pa. 2016)

(quoting *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005)).  "However, 'offhanded

comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a

hostile work environment claim."  *Id.* (quoting *Caver*, 420 F.3d at 263).  "When the alleged

harasser is a supervisor, vicarious liability is established if the harassment culminates in a

tangible employment action."  *Id.* (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 423 (2013)).

Temple argues that there was no evidentiary basis for the jury to conclude that Temple

subjected Briggs to an age-based hostile work environment.  (Def.'s Mem. Law Supp. 23–26.)  It

contends that the conduct alleged by Briggs in support of her hostile work environment claim

does not rise to the level of a hostile work environment.  (*Id.* at 23.)  Specifically, it asserts:

> This conduct does not rise to the level of a hostile work
> environment because (1) the alleged harassment was not severe or
> pervasive; (2) an objectively, reasonable person would not have
> been affected detrimentally by the incidents Ms. Briggs testified to;
> and (3) the evidentiary record demonstrates that Ms. Briggs was
> not subjectively offended by the supposed conduct. Finally, Ms.
> Briggs offered no evidence linking the infrequent and sporadic
> comments about her performance deficiencies and a single alleged
> comment about women in China being "put out to pasture" at 55 to
> any discriminatory animus based on her age or any other

46

characteristic.

(*Id.*)

Briggs argues that the record is replete with evidence of Temple's severe or pervasive conduct towards her and how the conduct detrimentally affected her or any reasonable person in her shoes.  (Pl.'s Br. Opp'n 26.)  In support of her argument, Briggs relies on her evidence of Temple's age-based discrimination and animus towards her in support of her age-based discrimination claims, and set forth the following evidence of Temple's severe or pervasive conduct towards her, and its detrimental effect on her, without limitation:

1. Plaintiff testified that Dr. Wu would raise his voice at her and yell degrading things at her in public. 07/17/2018 AM, Trial Tr. 29:25–30:13 ("There were times when he would come out and yell at me in the front office.   I——on two separate occasions, I remember him looking at me and saying, what are you, stupid. And then another time when he said, can't you speak English. And I was—you know—I just don't know how to respond to those kinds of comments.").  Dr. Wu's conduct caused Plaintiff to have   embarrassment, and she feared him when he treated her in this way.

2. Dr. Wu's comment that, in China, women of Plaintiff's age are "put out to pasture" caused Plaintiff to be embarrassed, and she felt insulted by her supervisor because she had no plans to retire.   Plaintiff complained directly to HR Director Walton about Dr. Wu's discriminatory comment to her that in China women of Plaintiff's age are "put out to pasture."  HR Director Walton understood that Plaintiff was offended and upset by Dr. Wu's conduct.

3. Plaintiff stated to Ms. Foehl that she felt that she was being discriminated against, feared retaliation, and she specifically relayed Dr. Wu's comment about older women being "put out to pasture" in China.   In Ms. Foehl's handwritten notes from that meeting, she states that Plaintiff relayed to her:  "Problems. Dr. Wu yells and says demeaning things, e.g., 'Are you stupid?' 'In China, women your age are done.'"

4. Plaintiff further complained to Ms. Foehl that she was being singled out, bullied, and harassed. *See* Pl.'s Trial Ex. 9 ("I am so bullied and harassed all day . . . .  No other staff member is required to meet daily for a dose of public humiliation and my request to move the meetings to a private location was flat out denied. . . .  It is beginning to feel like psychological abuse."); Pl.'s Trial Ex. 34 ("I have tried desperately to make my work situation tolerable, while my family and friends say that I need to take a pro-active defense against my supervisor and two managers in the Dean's office.  But I have reached my breaking point and need to be concerned with repairing my professional reputation.")

5. Plaintiff made similar complaints to in-house counsel Mr. Etezady by email. *See* Pl.'s Trial Ex. 13 ("After a week of unrelenting bullying, I sent an email to Rhonda Brown and she told me to contact Sandy, Sandy told me to contact Deirdre Walton.  . . . I do not want to take any more of your time nor do I want to re-visit the events from which I am already distraught. I just want to know where the 'buck stops.'")

6. Plaintiff further complained to HR Director Walton about the hostile work environment to which she was subjected.  *See* Pl.'s Trial Ex. 33 ("I want you to understand how distressing it is when I have no one in the department and no one in human resources who will listen to me.   I am honest and operate with integrity in every arena of my life and five days out of the week I a[m] battered emotionally, insulted, ignore[d], yelled at in front of peers, and the department scapegoat."); Pl.'s Trial Ex. 38, at p. 3 ("My work situation with Drew DiMeo and Dr. Wu is escalating and I need your help. The issue is not just something that affects my work week, but is causing anxiety and depression throughout my weekends.   To mask this from my grown children and grandchildren, I report that I have the flu so that they stay away.   I am actually afraid to go to work, especially Mondays, Wednesdays, and Fridays, when I meet with Drew and Dr. Wu."); *Id.* at p.1 ("I am drowning here and have reached out to you numerous times and waited and waited.   This is affecting the quality of my work life and my person[al] life. All I want is to continue to work without being harassed.  Based on the content of your email, I assume that you contacted Drew, Greg, and Dr. Wu when I asked that you refrain from doing so because I know that the harassment will escalate without the protection of human resources.")

(*Id.* at 26–27.)

We agree with Briggs that the evidence presented at trial reasonably supports the jury's verdict in her favor regarding her hostile work environment claim under the ADEA. Wu's conduct, and the treatment by Temple's HR, EOC, and legal department, towards Briggs could be viewed by a reasonable juror as sufficiently "severe or pervasive" to support a hostile work environment claim. The "severe or pervasive" standard requires conduct that is sufficient "to alter the conditions of [the employee's] employment and create an abusive working environment." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214–15 (3d Cir. 2017) (citation and internal quotation marks omitted). "The 'severe or pervasive' standard is disjunctive and so a plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Id.* at 215 n.12 (citation omitted). Looking at the totality of the circumstances, including Wu's comment about putting older women out to pasture and the overall treatment presented by Briggs that she received from Temple until she was handed the April 1, 2014 letter, and viewing such circumstances in her favor, there was adequate evidence for the jury to find a sufficiently hostile or abusive environment that could be considered humiliating, which unreasonably interfered with her work performance.

As we previously noted, simple teasing, offhand comments, and isolated incidents (unless extremely serious) are insufficient to sustain a hostile work environment claim. *See Johnson*, 218 F. Supp. 3d at 438. However, after assessing the totality of the circumstances as proffered by Briggs, the case that she presented at trial did not just deal with offhand comments or isolated incidents. It involved conduct, as well as apparent failures to take effective measures regarding

49

some of Briggs' complaints, that were never adequately explained by Temple, which could be viewed as permeating her workplace with discriminatory intimidation, ridicule, and insult so as to have altered the conditions of her employment and created an abusive environment in which to work.

Also, Briggs' account provided a sufficient basis from which a reasonable juror could infer that Temple's conduct detrimentally affected her and would have affected a reasonable person in similar circumstances. Briggs' testimony, and documentary evidence, listed above clearly showed that she subjectively perceived the environment to be abusive. In light of Wu's comment and what transpired with Briggs' employment, a reasonable person in Briggs' position would have experienced it to be so severe as to effect a change in the terms and conditions of her employment. Thus, there was sufficient evidence by which the jury reasonably reached its verdict regarding Brigg's hostile work environment claim under the ADEA.

### E. Retaliatory Hostile Work Environment Based on Complaints of Age and Gender Discrimination

The jury returned a verdict in Briggs' favor regarding her retaliatory hostile work environment claims based on her age under the ADEA, and her gender under Title VII.[9] In order to prevail on a retaliatory hostile work environment claim, the following is required to be proven:

> (1) the plaintiff suffered intentional discrimination because of a protected activity; (2) the employer's intentional discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; (5) the plaintiff suffered materially adverse action or actions in relation to the hostile work environment; and (6) a basis for employer liability.

---

[9] "A pure retaliation claim and a claim of retaliatory hostile work environment are technically two separate claims." *Turner v. City of Phila.*, No. 16-4476, 2017 WL 3129622, at *7 (E.D. Pa. July 24, 2017) (Kelly, J.) (citing cases).

*Byrd v. Elwyn*, No. 16-02275, 2016 WL 5661713, at *6 (E.D. Pa. Sept. 30, 2016) (citing *Petrulio v. Teleflex Inc.*, No. 12-7187, 2014 WL 5697309, at *10 (E.D. Pa. Nov. 5, 2014)).

Temple argues that there was no evidentiary basis for the jury to conclude that it subjected Briggs to a retaliatory hostile work environment.  (Def.'s Mem. Law Supp. 27.) Specifically, Temple states that:

> Ms. Briggs' retaliatory hostile work environment claim is premised upon the same conduct that purportedly supports her hostile work environment claims.  For the same reasons articulated in [the age-based hostile work environment discussion], supra,  the conduct about which Ms. Briggs testified was not sufficiently severe or pervasive to create an objectively or subjectively hostile work environment, retaliatory or otherwise, and therefore, she did not prove her retaliatory hostile  work environment claim.  Likewise, Ms. Briggs' retaliatory hostile work environment fails as a  matter of law because, for the same reasons articulated in [the age-based retaliation discussion], *supra*, Ms. Briggs  failed to demonstrate a causal link between her protected activity and the supposed harassment.

(*Id.*)

Since we have found that the jury's verdict regarding Briggs' hostile work environment claim is supported by the evidence, and in light of the fact that we similarly reached the same conclusion concerning her retaliation claim, we reject Temple's argument.  Based on our previous analysis of Briggs' hostile work environment and retaliation claims, we find that the jury had a legally sufficient evidentiary basis to find for Briggs on her retaliatory hostile work environment claims.

### F.    **Back Pay and Front Pay**

In its Motion, Temple argues that it is entitled to a new trial on the jury's award of $250,000 in back pay damages.  (Def.'s Mem. Law Supp. 33–35.)  Temple argues that there was insufficient evidence for the jury to conclude that Briggs properly mitigated her damages after

becoming a home healthcare aide.  (*Id.* at 33.)  Relatedly, Temple claims that the Court's "failure to provide adequate instructions on applicable limitations to back pay damages," namely, refusing "Temple's counsel . . . permission to read back testimony concerning Ms. Briggs' failure to mitigate her damages," resulted in the unsupported damages award.  (*Id.*)  In addition, Temple argues that, even if the jury ignored Briggs' failure to mitigate, it still miscalculated the award amount.  (*Id.* at 35.)  Finally, since the legal authority and arguments made by both parties in support of, and in opposition to, this motion are substantially similar, if not altogether directly repeated, in their arguments in opposition and in support, respectively, to Briggs' Motion for Front Pay, we will consider the issue of back pay and front pay together here.  (*Compare* Def.'s Mem. Law Supp. 33–35, *and* Pl.'s Br. Opp'n 53–56, *with* Pl.'s Mem. Law Supp. Front Pay 2–7, Def.'s Resp. Opp'n 1–4, Pl.'s Reply Br. 1–4, *and* Def.'s Surreply Br. 1–4.)

### 1.      Temple Misunderstands Briggs' Duty to Mitigate

Temple argues that Briggs failed to mitigate her damages by not seeking employment after accepting a job as a home healthcare aide in August 2016, thus ending any additional award for back pay from that point forward and outright precluding an award for front pay.  (Def.'s Mem. Law Supp. 34; Def.'s Resp. Opp'n 1–4; Def.'s Surreply Br. 1–4.)  We believe Temple's argument, however, is inherently flawed.

The ADEA and Title VII allow a successful plaintiff to recover back pay damages and permit reinstatement to prevent future lost wages.  *See* 29 U.S.C. § 626 (ADEA); 42 U.S.C. § 2000e–5(g) (Title VII).  Courts acknowledge that, in certain circumstances, reinstatement may not be feasible, such as where there is no position available or the "relationship between the parties [is] so damaged by animosity that reinstatement is impracticable."  *Maxfield v. Sinclair Int'l.*, 766 F.2d 788, 796 (3d Cir. 1985).  In these situations, courts typically allow for front pay

52

damages instead.  *Id.*  However, a plaintiff has a duty to mitigate both back pay and front pay damages by "demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment."  *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864–65 (3d Cir. 1995) (citing *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994); *Ford v. Nicks*, 866 F.2d 865, 873 (6th Cir. 1989)).

Nevertheless, "although the statutory duty to mitigate damages is placed on a . . . plaintiff, the employer has the burden of proving a failure to mitigate."  *See id.* at 864; (*see also* Def.'s Resp. Opp'n 3 (acknowledging Temple's burden).)  The employer must establish that the plaintiff was not reasonably diligent in obtaining substantially equivalent employment or that the plaintiff withdrew entirely from the employment market.  *See Caufield v. Ctr. Area Sch. Dist.*, 133 F. App'x 4, 10–11 (3d Cir. 2005).  "Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the [ADEA] claimant has been discriminatorily terminated."  *Holocheck v. Luzerne Cty. Head Start, Inc.*, No. 04-2082, 2007 WL 954308, at *13 (M.D. Pa. Mar. 28, 2007).  In a case where the plaintiff withdrew from the employment market, the employer need not provide evidence that substantially equivalent employment actually existed.  *See Caufield*, 133 F. App'x at 10–11; *Tubari Ltd. v. N.L.R.B.*, 959 F.2d 451, 454 (3d Cir. 1992) ("[A]n employer need not establish that the employee would have secured [adequate interim] employment, for the employer meets its burden on the mitigation issue by showing that the employee has withdrawn from the employment market.").

Temple believes it has successfully met its burden by showing that Briggs failed to mitigate her losses following her employment as a home healthcare aide in August 2016 because she no longer actively sought employment.  (*See* Def.'s Mem. Law Supp. 34 ("[B]ecause Ms.

Briggs admitted that she stopped looking for work in August 2016, Ms. Briggs was entitled to [back pay] only for the two years and four months she was out of work."); Def.'s Resp. Opp'n 3 ("Ms. Briggs is not entitled to front pay, because she *admittedly* withdrew from the labor market, magnifying her damages because of her continued loss of earnings.").)

Temple's only evidence to support its argument is a single, brief exchange during its cross-examination of Briggs:

> [TEMPLE'S COUNSEL] QUESTION:  Your current employment, I believe you're a health—home healthcare assistant?
>
> [BRIGGS] ANSWER:  Aide, right.  Uh-huh.  Yes.
>
> QUESTION:   And as I understand your testimony, you have not looked for a position since you've been in that current role?
>
> ANSWER:  No.

(07/17/2018 PM, Trial Tr. 72:9–14.)  Indeed, Temple's only argument against a back pay or front pay award is that Briggs voluntarily withdrew from employment market, thus "magnifying her damages."  (*See* Def.'s Resp. Opp'n 3.)   Importantly, Temple accepts that Briggs adequately mitigated her damages during the twenty-eight months following her termination from Temple until August 2016 by including that time period in its calculation of Briggs' back pay and a lack of argument attacking Briggs' efforts to mitigate her damages during that initial twenty-eight-month period.  (*See* Def.'s Mem. Law Supp. 35; Def.'s Resp. Opp'n 2–3 (arguing failure to mitigate began after August 2016); *see also* Pl.'s Mem. Law Supp. Front Pay 3 (highlighting Briggs' two-year job search inside and outside Temple University); Pl.'s Reply Br. 1 (same).) Despite that, Temple now asks this Court to ignore the very efforts that Briggs made to secure employment and focus, exclusively, on the fact that she has not actively sought employment since becoming employed.

Briggs argues that she was under no duty to continue searching for employment after accepting the home healthcare aide position in August 2016.  (*See* Pl.'s Reply Br. 3.)  Quoting *Tubari*, Briggs explains that "a discriminatee who accepts suitable interim employment, even at a lower wage, has no continuing duty to search for a more lucrative job."  (*Id.* (quoting *Tubari*, 959 F.2d at 458).)  Temple summarily rejects that argument by stating that *Tubari* "was referring only to 'interim employment,' not permanent employment."  (*See* Def.'s Surreply Br. 2.)  Therefore, Temple argues that Briggs still had a duty to continue to search for a substantially equivalent position because she "did not secure her home healthcare job as 'interim employment,'" but rather "she took the job as permanent employment."  (Def.'s Surreply Br. 2–3 (arguing that Briggs' "admission that she stopped looking for any other work once she secured employment . . . confirms that she took the job as permanent employment").)  By way of further explaining its argument, Temple concedes that "had Ms. Briggs taken the home healthcare aide job as *temporary or 'interim'* employment while continuing to search for *suitable, permanent* employment, then the argument that she was not required to search for more lucrative interim work would be more appropriate."  (*Id.* at 2 n.1 (emphasis added).)

However, Temple's interpretation of *Tubari* is misguided.  In *Tubari*, the Third Circuit made no distinction between interim employment and permanent employment.  Nor did it equate interim employment to temporary employment, as Temple's surreply brief implies.  Rather, the term "interim" is more generally used to describe employment between the date of an employee's unlawful termination and the date of reinstatement or judgment in the employee's favor.  *See* Woolworth, F.W., Co., 90 N.L.R.B. 283, 292–93 (1950) ("[L]oss of pay [shall] be computed on the basis of each separate calendar quarter or portion thereof during the period from the Respondent's discriminatory action to the date of a proper offer of reinstatement."); *see, e.g.*,

*Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1275 (4th Cir. 1985) (quoting *Merriweather v. Hercules, Inc.*, 631 F.2d 1161, 1168 (5th Cir. 1980) ("[T]he amount of the back pay award should be reduced by any earnings acquired during the *interim period* . . . .'" (emphasis added)); *Horton v. Lawrence Cty. Bd. of Educ.*, 449 F.2d 793, 795 (5th Cir. 1971) ("[I]t is true that payment of back wages must be diminished by earnings received during the *interim period* . . . ." (emphasis added)); *see also N.L.R.B. v. S. Silk Mills*, 242 F.2d 697, 700 (6th Cir. 1957) ("The fact that . . . [an] employee is being supported . . . during the discharge period should not relieve her of the obligation to accept suitable employment."). Furthermore, the Third Circuit uses the term "interim employment" interchangeably with, or along with, terms such as "adequate employment" or "substantially equivalent employment" when defining the legal standard for the mitigation of damages. *See, e.g.*, *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 88–89 (3d Cir. 2009) (quoting 42 U.S.C. § 2000e–5(g)) ("Damages are reduced under Title VII for 'interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against."); *Booker*, 64 F.3d at 864 (same); *Tubari*, 959 F.2d at 454 ("Generally, the employee must seek interim employment 'substantially equivalent' to the position of which he or she was unlawfully deprived . . . .").

Temple is unable to provide caselaw that supports a distinction between interim employment and permanent employment. Although the "right to damages" ends when an employee finds equivalent or better employment, that is not the case here. *See Donlin*, 581 F.3d at 88. It is widely understood that, in order to adequately mitigate damages, an employee may need to lower her sights following a reasonable period of unsuccessfully searching for equivalent employment. *See Tubari*, 959 F.2d at 456 (citing *N.L.R.B. v. Madison Courier, Inc.*, 472 F.2d 1307 (D.C. Cir. 1972)) ("[A]fter unsuccessfully attempting for a reasonable period of time to

secure substantially equivalent interim employment, a discriminatee is required to 'lower his sights' by seeking less remunerative work."). Here, Briggs presented sufficient evidence that, after an extensive job search, she was unable to secure an equivalent position inside or outside of Temple University. (*See* Pl.'s Mem. Law Supp. Front Pay 3; Pl's Reply Br. 1–2.)

Typically, courts must balance the "tension between a discriminatee's duty to seek substantially equivalent interim employment and the subsequent duty to lower his or her sights after a 'reasonable' period of time." *Tubari*, 959 F.2d at 456–57. However, Temple does not argue that Briggs was unreasonable in lowering her sights by accepting the position of home healthcare aide at less than half of her previous salary at Temple. Furthermore, based on the caselaw provided by Temple, it appears that Briggs was justified in accepting the position. *See id.* at 454 (noting courts determine reasonableness of employee's efforts by such factors as the economic climate and the employee's skills, qualifications and age).

Temple's proffered interpretation of the caselaw would transform a plaintiff's "duty to mitigate" into a "duty to absolve." It is Temple's burden to prove that Briggs was not reasonably diligent in obtaining substantially equivalent employment or that she withdrew completely from the labor market. *See Caufield*, 133 F. App'x at 10–11. However, Briggs has not withdrawn at all. Since August 2016, she has continually mitigated her damages as a home healthcare aide. Temple does not argue that she was insufficiently diligent in obtaining her current employment, that her current employment is not substantially equivalent, or that she lowered her sights too quickly. Instead, Temple would rather the Court place the burden on Briggs that she must always be searching for a non-existent job that has not presented itself in over twenty-eight months or that she may never be allowed to let go or move on with her life.

### 2. The Jury Properly Calculated Briggs' Back Pay Award

Temple further alleges that the jury miscalculated Briggs' back pay award of $250,000. (Def.'s Mem. Law Supp. 34–35.)  Temple claims that "even if the jury ignored [Briggs'] failure to mitigate her damages, she would only be entitled to $170,332."  (*Id.* at 35.)  Temple arrives at this figure by considering Briggs' base salary of $50,000 pro-rated for the twenty-eight months she was unemployed—$116,666—plus her pro-rated base salary minus her wages as a home healthcare aide of $22,000 per year during the twenty-three months between her August 2016 start date and trial—$53,666.  (*Id.*)  Adding those figures together, Temple believes Briggs was entitled to $170,332.  (*Id.*)

However, Temple neglects to include the value of Briggs' benefits she received during her employment with Temple, including health insurance, dental insurance, life insurance, and retirement contributions.  "Back pay is designed to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination." *Donlin*, 581 F.3d at 84 (citing *Loeffler v. Frank*, 486 U.S. 549, 558 (1988)).  It is widely understood that back pay should include all amounts received by a discriminatee, including applicable benefits.  *See Fillman v. Valley Pain Specialists, P.C.*, No. 13-1609, 2016 WL 192656, at *4 (E.D. Pa. Jan. 15, 2016) (citing *Donlin,* 581 F.3d at 78 n.1) (including plaintiff's benefits in back pay and front pay calculation); *Anderson v. Consol. Rail Corp.*, No. 98-6043, 2000 WL 1622863, at *3 (E.D. Pa. Oct. 25, 2000) (citing *Gelof v. Papineau*, 829 F.2d 452, 457 (3d Cir. 1987)) ("A back pay award can also consist of non-wage benefits lost between termination and trial such as insurance premiums and pension contributions that the employer would have made on behalf of the plaintiff during that time.").

Since Temple makes no argument that these benefits should not be considered for some reason, we will consider their exclusion a minor oversight.  In fact, a break-down of Briggs'

benefits was provided by Temple in its response to Briggs' interrogatories.  (Pl.'s Trial Ex. 62, at 11–12.)  According to Temple's response, Temple paid $1,334.66 per month for health insurance; $28.25 per month for dental insurance; $1.15 per month for life insurance; and $17.09 per month to Briggs' 403(b) Defined Contribution Plan.  (*Id.*)  The sum of these benefits is $16,573.80 per year.

Incorporating this benefit amount into Temple's above calculation, the resulting figure equals $247,769.24.  This calculation takes into account Briggs' salary of $51,171.48[10] plus $16,573.80 in benefits.  Pro-rated over twenty-eight months equals $159,171.48 and over twenty-three months—less Briggs' $22,000 per year salary as a home healthcare aide—equals $88,597.76.  The resulting total is Briggs' back pay award.  Therefore, the jury's award of $250,000 in back pay damages is well within reason of the evidence provided at trial.

### 3.    The Court did not Err in Answering a Question Submitted by the Jury during Deliberations

Temple makes a related argument that we failed to "provide adequate instructions on applicable limitations to back pay damages."  (Def.'s Mem. Law Supp. 33.)  This issue arises from a question that was submitted to the Court by the jury after deliberations began.  The question was:  "[H]ow do we calculate lost wages?"  (07/19/2018, Trial Tr. 90:14–15.)  The jury explained that it had not heard the relevant wage numbers outside of closing arguments and had only seen them on the screen.  (*Id.* at 90:24–25, 91:3–5.)  After hearing arguments from both Temple and Briggs, as well as an off-the-record discussion between counsel for the parties, Briggs' counsel ultimately read back the following testimony to the jury:

> [BRIGGS' COUNSEL] QUESTION: And while you were
> working at Temple, what was your annual salary?

---

[10] While the figure $50,000 was widely used to describe Briggs' annual salary, evidence was presented at trial showing that Briggs earned $51,651.12 in 2011.  (Pl.'s Trial Ex. 7.)

> [BRIGGS] ANSWER: From $50,000 with benefits.
>
> QUESTION: And at the $10.70 that you are—that you've been making in total, how much have you made working as a home healthcare aide for two years?
>
> ANSWER: It's about 22,000 a year, so two—it's been two years now, so forty-four.

(*Id.* at 92:5–13.)  The Court then confirmed that this response had adequately answered the jury's question.  After deliberations resumed, Temple asked the Court to consider providing the jury with testimony "where Ms. Briggs said that she stopped looking for a job."  (*Id.* at 92:21–23.) However, we believed that we had given the jury what they had asked.  (*Id.* at 92:25–93:1.)

Temple argues that this violated the common law "rule of completeness," as codified in Federal Rule of Evidence 106, and allowed Briggs' counsel to read "one-sided" testimony that unfairly prejudiced the jury.  (Def.'s Mem. Law Supp. 33–34 (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171–72 (1988); *Bland v. PNC Bank, N.A.*, No. 15-1042, 2016 WL 10536026, at *4 (W.D. Pa. Dec. 30, 2016)).)  Rule 106 establishes the following:  "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  It is further established that it is for the court to determine whether "additional portions of same or other writings or recorded statements . . . in fairness ought to be considered at the same time."  *Bland*, 2016 WL 10536026, at *8 (citing *Fed. Rules of Evid. Manual* § 106.01 at 106-4 (11th ed. 2015) ("The rule does not mean that an entire writing or recording is automatically admissible whenever part of it is introduced.").)

We find that fairness did not require that we allow Briggs' trial testimony to be read back to the extent that it showed an "admission that she stopped looking for work once she became a

home healthcare aide, even though she was earning less than half of what she earned while working for Temple University."  (Def.'s Mem. Law Supp. 34.)  The testimony requested by Temple did not pertain to the question posed by the jury.  The jury's question concerned the calculation of lost wages.  The testimony read back included references to Briggs' compensation and years working as a home healthcare aide.  The testimony Temple wished to include pertained directly to Temple's burden of establishing that Briggs failed to mitigate her damages.  (Def.'s Resp. Opp'n 3 ("Ms. Briggs' *admitted* failure to mitigate her damages, which resulted in a willful loss of the difference in wages she earns as a home healthcare aide and the wages she earned as a Temple employee." (emphasis in original).)

The jury's question did not concern whether Briggs had mitigated her damages.  Rather, the jury made clear that it was unsure about the compensation values and yearly figures that it needed to consider.  (07/19/2018, Trial Tr. 90:24–25 ("The only place we saw it [salary figures] was during the closing arguments."); 91:3–5 ("I didn't see anywhere that we actually heard the number.  We just saw it on the screen at one point.").)  Because the jury did not ask about Briggs' duty to mitigate, we must assume that they understood the relevant jury instruction provided at charging:

> If you award back pay, you are instructed to deduct from the back pay a figure, whatever wages Ms. Briggs has obtained from other employment during that period.  . . . .
>
> You are further instructed that Ms. Briggs has a duty to mitigate her damages.  That is, she has—she is required to make reasonable effort[s] under the circumstances to reduce her damages.  And it's Temple University's burden to prove that Ms. Briggs has failed to mitigate.  So if Temple University persuades you by a preponderance of the evidence that Ms. Briggs failed to obtain substantially equivalent job opportunities that were reasonably available to her, you must reduce the amount of damages by the amount of wages that Ms. Briggs reasonably could have earned if she had obtained those opportunities.

For these reasons, a new trial is not warranted.  Therefore, Temple's Motion for a New Trial is denied as it relates to this Court's response to the jury's question during deliberations.

### 4.   Briggs is Entitled to a Front Pay Award

Next, we will address Briggs' motion for front pay damages.[11]  Briggs argues that she is entitled to an award of front pay to "make her whole and restore her, 'so far as possible . . . to a position where [she] would have been were it not for the unlawful discrimination.'"  (Pl.'s Mem. Law Supp. Mot. for Front Pay 2 (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)).)

#### a.   *Third Circuit Rule Regarding Front Pay Calculation*

Before we address the merits of Briggs' request, we briefly consider the role this Court plays in awarding front pay.  It is well established law that courts may determine whether an award of front pay is available; however the Third Circuit is clear that the actual amount is to be determined by the jury.  *See Maxfield*, 766 F.2d at 796 ("Since reinstatement is an equitable remedy, it is the district court that should decide whether reinstatement is feasible.  Of course the amount of damages available as front pay is a *jury question*." (emphasis added)); *see also Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1421 (4th Cir. 1991) ("The Third, Sixth, and Ninth Circuits have . . . ruled that the quantification of front pay . . . should be submitted to the jury.").  However, we believe it is appropriate, in this case, for this Court to determine the amount of front pay to be awarded.  In *Berndt v. Kaiser Aluminum & Chem. Sales, Inc.*, the Third Circuit upheld a district court's award of front pay where the issue was submitted to the court by the parties, separate from the trial.  789 F.2d 253 (3d Cir. 1986) ("By agreement of the parties, the

---

[11] "At trial and prior to the jury's deliberation, the Court and the parties agreed that if the jury returned a verdict in Plaintiff's favor, Plaintiff would submit a post-trial application to the Court on front pay damages for the Court's determination."  (Pl.'s Mem. Law Supp. Mot. for Front Pay 2 (quoting 07/19/2018 AM, Trial Tr. 68:20–69:5).)

issue of damages was submitted to the district court upon a stipulated set of facts which

established the monetary value of certain items claimed as damages . . . .  The district court

[determined that] an award of six months' front pay was appropriate.").  Similarly, the parties

here request that this Court address the issue in much the same way.  (07/19/2018, Trial Tr.

68:20–69:5.)

Therefore, we find it is appropriate and within our discretion to award Briggs front pay

damages in the amount of $60,670.20—the equivalent of her lost wages until her expected

retirement age of sixty-five.  The calculation is based on her current age of sixty-three, a salary

rate of $51,651.12 per year, plus her entitled yearly benefits equaling $16,573.80, less her current

salary as a home healthcare aide of $22,000 per year.[12]

b.   *An Award of Front Pay Is Supported by the Evidence*

The front pay calculation of $60,670.20 is based on Briggs' motion requesting a front pay

award equal to ten years of lost wages.  (*See* Pl.'s Mem. Law Supp. Front Pay 5.)  However, we

disagree that Briggs is entitled to lost wages for ten years.  While Briggs is correct in her

argument in support of a ten-year award that courts routinely uphold awards of ten years or

more, most of the cases she cites involve plaintiffs several years removed from the age of sixty-

five or another definitive retirement age.  *See Broadnax v. City of New Haven*, 141 F. App'x 18,

---

[12] As noted above, evidence was introduced at trial showing Briggs earned a yearly salary of $51,651.12 and received benefits in the yearly amount of $16,573.80.  (*See* Pl.'s Trial Ex. 7; Pl.'s Trial Ex. 62, at 11–12.); *see also* discussion *supra* Section III-F-2.  Additionally, Briggs provided testimony that her salary as a home healthcare aide is $22,000 per year.  (07/17/2018 AM, Trial Tr. 122:24–123:8.)  The figures have been pro-rated for 15.75 months, in order to account for the entire time from the date of verdict, July 19, 2018, until Briggs' sixty-fifth birthday on November 10, 2019.  (*See* Pl.'s Mem. Law Supp. Front Pay 6 n.2); *see also Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement."); *Berndt*, 604 F. Supp. at 966 (calculating expected future damages as equal to base salary and fringe benefits from the time of trial until plaintiff's expected retirement).

Notably, Briggs requests that we use a calculation that adopts $69,500 as her total yearly compensation from Temple.  (*See* Pl.'s Mem. Law Supp. Front Pay at 4.)  However, it is unclear how Briggs arrived at that figure, but because of its relative proximity to our own calculation of her yearly compensation, we consider it a rounding error and choose to ignore it.

22–23 (2d Cir. 2005) (finding that because plaintiff was forty-two years old, an extensive award

of front pay to her retirement age was warranted); *Bianchi v. City of Phila.*, 80 F. App'x 232, 237

(3d Cir. 2003) ("The jury . . . could infer that at age 52, [plaintiff] had approximately thirteen

more years to work left until his retirement.  The award was not unreasonable."); *Belk v. City of*

*Eldon*, 228 F.3d 872, 883 (8th Cir. 2000) (finding front pay award of ten years would allow

plaintiff adequate time to find commensurate employment or taken her to "normal retirement

age"); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 511–12 (9th Cir.

2000) (holding front pay award utilizing a twenty-two-year "expected remaining work life" was

appropriate where plaintiff would have reached age of sixty-five); *Gotthardt v. Nat'l R.R.*

*Passenger Corp.*, 191 F.3d 1148, 1156 (9th Cir. 1999) (upholding front pay calculation that

assumed plaintiff would work until the mandatory retirement age of seventy); *Padilla v. Metro-*

*North Commuter R.R.*, 92 F.3d 117, 125 (2d Cir. 1996) (finding a twenty-year front pay award

appropriate where it would have taken employee to the age of sixty-seven and eligible for his

pension); *Pierce v. Atchison, Topeka and Santa Fe Ry. Co.*, 65 F.3d 562, 574–75 (7th Cir. 1995)

(finding additional evidence sufficient to establish retirement age was sixty-five and benefits

fully vested at sixty-five); *Bates v. Bd. of Educ. Capital Sch. Dist.*, No. 97-394, 2000 WL

376405, at \*10 (D. Del. Mar. 31, 2000) (modifying front pay award from twenty years to

seventeen years because plaintiff testified she would want to work until she was sixty-five).

　　　　If Briggs worked another ten years, she would retire at age seventy-four—nine years after

a normal retirement age of sixty-five.  (Pl.'s Mem. Law Supp. Mot. Front Pay 5.)  In support of

this argument, Briggs relies on testimony that she had not considered retirement and that Temple

"employs staff members within [Briggs'] former department who are in their 70s."  (*See id.* at 4,

6–7 (citing 07/18/2018 AM, Trial Tr. 122:24–123:8; 07/16/2018 PM, Trial Tr. 113:15–114:7).)

However, we find that the evidence before us is too vague and insufficient to warrant a front pay award of ten years.  *See Anastasio v. Schering Corp.*, 838 F.2d 701, 709 (3d Cir. 1988) (holding that the question of when a plaintiff would have retired is properly left to the finder of fact).  "A [plaintiff's] work and life expectancy are pertinent factors in calculating front pay, just as they are in assessing damages for future loss of earnings in breach of employment contract and personal injury cases."  *See id.* (citing *EEOC v. Prudential Fed. Savings & Loan Ass'n.*, 763 F.2d 1166, 1173 (10th Cir. 1985)).  While expert testimony is "not always required to prove damages in cases where projected future [loss of] earnings are part of the calculation, . . . a lay witness [must] have a 'reasonable basis grounded either in experience or specialized knowledge for arriving at the opinion he or she expresses.'"  *Donlin*, 581 F.3d at 82 (quoting *Eichorn v. AT & T Corp.*, 484 F.3d 644, 649, 650 n.3 (3d Cir. 2007)).  We find that, although Briggs is sufficiently qualified to provide evidence regarding her yearly salary and benefit amounts, her testimony that she "had never even considered retirement" is insufficient to support a front pay award until the age of seventy-four.  (*See* 07/17/2018 AM, Trial Tr. 122:24–123:8); *Eichorn*, 484 F.3d at 649–50 (upholding district court's decision to bar lay witness' assumption regarding when plaintiff would have retired due to witness' lack of "experience or specialized knowledge").

As we noted previously, Temple reiterates its argument that Briggs is no longer entitled to front pay because she has failed to mitigate her damages after accepting the home healthcare aide position in August 2016.  (*See* Def.'s Resp. Opp'n 2–4; Def.'s Surreply Br. 1–4.)  We again reject this argument on the same grounds as above.  Otherwise, Temple offers no challenge to the amount or duration requested in Briggs' motion for front pay.

For these reasons, Briggs' Motion for Front Pay is granted.  We award Briggs front pay in the amount of $60,670.20.

### G.   Willfulness under the ADEA

Temple next contends that the Court erred in charging the jury with willfulness on Briggs' claims under the ADEA, arguing there was no evidence of willfulness and that it is entitled to judgment as a matter of law on the issue.  (Def.'s Mem. Law Supp. 27–29.)  We disagree.

The ADEA provides liquidated damages, or "double damages," on an employee's award of back pay when the employer's discriminatory conduct is willful.  *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1099 (3d Cir. 1995) (citing 29 U.S.C. § 626(b)).  "An ADEA violation is willful if the employer either 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.'"  *Id.* (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 614 (1993)).  However, "[i]f an employer incorrectly but in good faith and nonrecklessly believes that the statute permits a particular age-based decision, then liquidated damages should not be imposed."  *Hazen Paper*, 507 U.S. at 616 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 n.13 (1988)).  An award of liquidated damages is punitive in nature and "is intended to deter willful conduct."  *Id.* (citing *Trans-World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125 (1985)).

Temple presents two related arguments for our consideration:  (1) whether the Court committed error in charging the jury with willfulness under the ADEA; and (2) that judgment as a matter of law is warranted on the jury's finding of willfulness because there was insufficient evidence presented at trial.  We will first consider Temple's second argument because, if there

was sufficient evidence for the jury to find willfulness, then the Court necessarily did not err in charging the jury.

In this case, Question 10 of the Verdict Form asked whether Temple "engaged in willful misconduct by intentionally discriminating against [Briggs] because of age *or* retaliating against her because of her complaint of age discrimination?"  (Verdict Form, Doc. No. 58 (emphasis added).)  As to retaliation, Temple's sole argument is that it could not have retaliated against Briggs because the decision-makers, Walton, Wacker, and Wu, had no knowledge that Briggs complained of harassment and discrimination during her employment.[13]  (Def.'s Mem. Law Supp. 28.)  Without the decision-makers' knowledge of the complaints, Temple claims it could not have retaliated against Briggs (let alone willfully) for complaining of discrimination.  (*Id.*)

We believe there was sufficient evidence presented at trial for the jury to conclude that Temple acted willfully in retaliating against Briggs for her complaints of age discrimination. Indeed, the trial evidence belies Temple's contention that Walton, Wacker, and Wu did not know about Brigg's complaints of age discrimination.  For instance, just one hour after Wu commented that "in China, we put women out to pasture at 55," (07/17/2018 AM, Trial Tr. 31:12–13), Briggs was called into Wacker's office and was given discipline for being unprofessional to Wu, (*Id.* at 32:3–20).  At the meeting with Wacker, Briggs specifically told him what Wu had said to her about women being "put out to pasture at 55."  (*Id.* at 34:4–11.)

Briggs also complained directly to Walton about Wu's comment.  (07/17/2018 PM, Trial Tr. 121:12–122:1.)  Walton testified that Briggs told her the story of what Wu said and that Briggs was offended by it.  (*Id.*)  Walton then directed Wacker to look into the situation, (*Id.* at 127:7–12), who in turn spoke with Wu about the comment, (*Id.* at 122:2–6).  In fact, Walton

---

[13] Because we find there was clearly sufficient evidence that Temple willfully retaliated against Briggs for her complaints of age discrimination, we need not consider whether Temple willfully discharged her because of her age.

testified that Wu would have known that Briggs made a complaint about the comment.  (*Id.* at 128:11–23.)

The above testimony clearly establishes that all of the decision-makers in Briggs' termination from Temple had knowledge of her complaints of age discrimination.  However, what proves fatal to Temple's argument is that Walton, *inter alia*, knew that Briggs had a phone intake with the EEOC and planned to file an EEOC compliant just over one month before her termination.  On February 25, 2014, Briggs informed Foehl via email that she "plan[ned] to file an EEOC complaint internally and ha[d] already had a phone intake with the EEOC."  (Pl.'s Trial Ex. 34; 07/17/2018 AM, Trial Tr. 89:2–3.)  Foehl forwarded Briggs' email to Walton. (Pl.'s Trial Ex. 35.)  Therefore, just over one month prior to Briggs' termination, Walton had direct knowledge that Briggs had a phone intake with the EEOC and was planning on filing an internal EEOC complaint due to the allegations of discriminatory conduct.

Temple's consistent assertion that the decision-makers regarding Briggs' termination (in particular, Walton) did not know of her complaints of age discrimination is also somewhat unsettling.  As we noted above, Briggs directly complained of Wu's discriminatory comment to Walton and Wacker.  Walton even verified Temple's responses to Briggs' interrogatories, which provided that "[i]n 2013 and 2014, Briggs raised her complaints of discrimination with Deirdre Walton, Temple University, Department of Labor and Employee Relations.  Ms. Walton found no merit to Briggs' claims."  (Pl.'s Trial Ex. 62 at 7–8.)  Despite Briggs complaining of Wu's comment to Walton immediately after it was made, and Temple admitting in its sworn interrogatories that Briggs complained of discrimination to Walton in 2013 and 2014, the jury heard Walton take the witness stand and testify that in 2013 and 2014, Briggs did not complain of discrimination to her.  (07/17/2018 AM, Trial Tr. 108:15–18.)  In a similar fashion, Wu

testified he did not know of Briggs' complaints about age and gender discrimination and retaliation until only this past year.  (07/16/2018 PM, Trial Tr. 100:1–22.)  Wu testified this way even though Walton testified that every time Briggs made a complaint about Wu, Walton would have Wacker and DiMeo look into it.  (07/18/2018 AM, Trial Tr. 57:22–25 ("So every time [Briggs] made a complaint to me in regards to how she thought she was being treated, I talked with Greg Wacker.  Greg Wacker and both Drew [DiMeo] looked into those situations."); Pl.'s Trial Ex. 40 ("Every time you have reached out to me I have talked with you and looked into your complaints and concerns.").)

As indicated, Walton, Wacker, and Wu were the decision-makers in terminating Briggs' employment at Temple.  The jury heard testimony and saw documentary evidence showing consistent complaints from Briggs about age discrimination from the very day Wu made the comment until her termination.  Moreover, the jury was entitled to believe Temple acted willfully after hearing numerous contradictions from Temple's witnesses.  There was sufficient evidence for the jury to conclude that Temple's actions, at the very least, constituted reckless disregard when it terminated Briggs' employment after her complaints of age discrimination and, in particular, her phone intake with the EEOC and plan to file an internal EEOC complaint.

Other courts have sustained the jury's finding of willfulness in retaliatory conduct in violation of the ADEA.  In *Ray v. Iuka Special Mun. Separate Sch. Dist.*, the plaintiff filed an application for a high school principal position and any other administrative position.  51 F.3d 1246, 1248 (5th Cir. 1995).  The plaintiff was not hired for the principal position, and he subsequently filed an EEOC complaint against the defendant for age discrimination.  *Id.*  After responding to the EEOC charge, the defendant hired numerous individuals for other administrative positions, but failed to hire the plaintiff.  *Id.*  At trial, the jury found that the

decision not to hire for a different position was in retaliation for his EEOC charge and that the

defendant's conduct was a willful violation of the ADEA. *Id.* at 1249. The court awarded

liquidated damages, and the defendant filed a motion for judgment as a matter of law. *Id.*

On review, the United States Court of Appeals for the Fifth Circuit affirmed the district

court's denial of judgment as a matter of law on the issue of willfulness. *Id.* at 1251–52. The

court rejected the notion that there can be "accidental" retaliation, and it specifically held that

when the jury finds retaliation in the filing of an EEOC complaint, "no more proof than that is

required" to find willfulness. *Id.* at 1252; *see also Powell v. Rockwell Int'l Corp.*, 788 F.2d 279,

286 (5th Cir. 1986) (stating that under the facts of the case, "the jury finding of retaliatory

discharge necessarily found 'willfulness' as defined by *Thurston*"); *Amos v. Hous. Auth. of

Birmingham Dist.*, 927 F. Supp. 416, 420 (N.D. Ala. 1996) (stating that the court "finds it

difficult, if not impossible, to conceive of an employer who is motivated by an intent to punish

an employee for filing an EEOC charge (an action willful by its very nature), not also being

guilty of an intent to violate the law or at least guilty of reckless disregard for the law").

While there may not necessarily be a per se rule that, whenever an employer terminates

an employee in retaliation for age-based discrimination complaints, there is a willful violation of

the ADEA, we conclude that under the facts presented here, there was sufficient evidence for the

jury to find willfulness. In particular, all of the decision-makers knew about Briggs' complaints

of age discrimination, and Walton specifically knew that Briggs was undertaking action with the

EEOC just before Briggs was terminated. Walton was also aware that employment

discrimination laws, in particular Title VII and the ADEA, prohibit retaliation. (07/18/2018 AM,

Trial Tr. 105:12–106:13.) Accordingly, Temple's Motion is denied to the extend it seeks

judgment as a matter of law on the jury's finding of willfulness under the ADEA.

Because the Court concludes there was sufficient evidence for the jury to find that Temple violated the ADEA willfully, the Court necessarily did not err in charging the jury on willfulness. Nevertheless, we conclude Temple waived this argument because it failed to object to the charge during the charging conference. Under Federal Rule of Civil Procedure 51(c)(1), "[a] party who objects to an instruction . . . must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). A party who does not state its objection to the inclusion or exclusion of a jury instruction and the specific grounds for the objection waives any subsequent argument. *See Lesende v. Borrero*, 752 F.3d 324, 335 (3d Cir. 2014) (citing Fed. R. Civ. P. 51); *Galena v. Leone*, 638 F.3d 186, 201 (3d Cir. 2011) (citations omitted); *Thabault v. Chait*, 541 F.3d 512, 525 (3d Cir. 2008); *Simmons v. City of Phila.*, 947 F.2d 1042, 1078 (3d Cir. 1991) (citations omitted); *Valentin v. Crozer-Chester Med. Ctr.*, 986 F. Supp. 292, 302 (E.D. Pa. 1997) (citations omitted); *see also Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 276 (3d Cir. 1998) (stating that "Rule 51 plays a critical role in both the trial and appellate processes" because "the rule ensures that the district court is made aware of and given an opportunity to correct any alleged error in the charge before the jury begins its deliberations"); *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 759 (3d Cir. 1990) (declining to consider jury charge deficiency under Rule 51 when party failed to specifically and clearly object to the charge).

The charging conference in this case took place on July 18, 2018. (07/18/2018 PM, Trial Tr. 61:6–75:7.) The topic of liquidated damages was squarely discussed, and it was Briggs who objected to additional language that *Temple* proposed as to the charge. (*Id.* at 70:15–16 (Briggs' counsel stating "[w]e object to the additional language that [Temple] ha[s] inserted here").) On the subject of liquidated damages during the charge, Temple's counsel simply stated,

> Your Honor, liquidated damages are only recoverable under the
> ADEA; they're not recoverable under Title VII, they're not
> recoverable for a harassment claim.  The jury needs to be keenly
> aware that, if they find for the plaintiff on a claim, *other than her
> age claim*, they are not to award liquidated damages.  *That is only
> if they find for the plaintiff on an age claim.*

(*Id.* at 70:17–23 (emphasis added).)  Temple not only failed to object to the jury being charged

on willfulness under the ADEA, but consented to Briggs being able to recover liquidated

damages if the jury found for her on an age-related claim.  (*Id.*)  Accordingly, Temple waived its

argument on the willfulness charge, and we will deny its Motion on that basis as well.

### H.    Compensatory Damages

Temple also moves for judgment as a matter of law or, alternatively, a remittitur, on

Briggs' $350,000 award of compensatory damages, arguing there was insufficient evidence to

warrant such an award.  (Def.'s Mem. Law Supp. 36–38.)  Again, we disagree.

Briggs is entitled to compensatory damages only if she presented evidence of actual

injury.  *See L.T. Blackshear v. City of Wilmington*, 15 F. Supp. 2d 417, 430 (D. Del. 1998) (citing

*Gunby v. Pa. Elec. Co.*, 840 F.2d 1108, 1121 (3d Cir. 1988)).  When the only evidence of

emotional distress is the plaintiff's own testimony about depression and humiliation, "and there

is no evidence of physical suffering, the need for professional care or the like, then there is no

'reasonable probability, rather than a mere possibility, that damages due to emotional distress

were in fact incurred as a result of' the wrongful act."  *Rush v. Scott Specialty Gases, Inc.*, 930 F.

Supp. 194, 199 (E.D. Pa. 1996), *rev'd on other grounds*, 113 F.3d 476 (3d Cir. 1997) (internal

quotation marks omitted) (quoting *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198,

1201 (3d Cir. 1986)).  "[N]either medical evidence nor corroborating testimony is necessarily

required in order to support an award of mental anguish damages."  *Moussa v. Commonwealth of

Pa. Dep't of Pub. Welfare*, 289 F. Supp. 2d 639, 665 (W.D. Pa. 2003) (citing cases).  Indeed,

"courts have held that intangible injuries such as sleeplessness, headaches, and feelings of humiliation and embarrassment are sufficient to support an award of compensatory damages." *Id.* at 666 (citing *Blackshear*, 15 F. Supp. 2d at 430).

Temple first claims that it is entitled to judgment as a matter of law on Briggs' award of compensatory damages because, other than herself, Briggs presented no witness to testify about any injury or emotional distress suffered and "presented no evidence from which the jury could conclude that she was damaged emotionally." (Def.'s Mem. Law Supp. 37.) Second, Temple argues that if the Court does not grant judgment for Temple, then a remittitur of the jury's award of compensatory damages is appropriate. (*Id.*)

As to Temple's first argument, we believe there was sufficient evidence in the record to sustain the jury's award of $350,000 in compensatory damages. The evidence at trial not only included Briggs' testimony about emotional distress, but the jury also saw documentary evidence in the form of emails Briggs sent that clearly warranted pain and suffering damages. In emails to numerous individuals during her employment at Temple, Briggs stated as follows:

- "I am so bullied and harassed all day. . . . It is beginning to feel like *psychological abuse*. (Pl.'s Trial Ex. 9 (emphasis added).)

- "I do not want to take anymore [sic] of your time nor do want [sic] to re-visit the events from which I am already *distraught*." (Pl.'s Trial Ex. 13 (emphasis added).)

- "My *confidence has never been so low* and at 58 years old, I have no[] options to change the course of my plummeting professional life . . . ." (Pl.'s Trial Ex. 26 (emphasis added).)

- "I want you to understand how *distressing* it is when I have no one in the department and no one in human resources who will listen to me. I am honest and operate with integrity in every arena of my life and five days out of the week I a[m] *battered emotionally, insulted, ignore[d], yelled at in front of peers and [am] the department scapegoat*." (Pl.'s Trial Ex. 33 (emphasis added).)

- "I am actually *afraid to go to work*, especially Mondays, Wednesdays and Fridays, when I meet with [DiMeo] and Dr. Wu.  Before I go to sleep and as soon as I wake, the *anxiety I experience is palpable and impacting the quality of my personal life*. . . . Dr. Wu said that [DiMeo] is there for protection and as a witness but I have no protection and feel like an *abuse victim*. . . . *I am drowning here* and have reached out to you numerous times and waited and waited.  This is *affecting the quality of my work life and my person[al] life*.  All I want is to continue to work without being harassed."  (Pl.'s Trial Ex. 38 (emphasis added).)

On April 2, 2014, the day following her termination from Temple, Briggs wrote to Foehl that

> [t]his has never happened to me before and I am *so full of grief*.  Of course, I fear the financial disaster that I will face when I have to rent [sic] and utilities to pay on May 1st, but I miss the only community I have had since my children left home, the Temple undergrads and grad students and an incredible group of inspiring faculty members.  *A wave of grief has pulled me under the surf and it's hard to breathe*.

(Pl.'s Trial Ex. 46 (emphasis added).)  A few weeks later, Briggs emailed the following to Foehl:

> My prospects to find full-time employment with a similar salary, health insurance and contributions to my retirement account are slim.  My two sons and I will lose health insurance on April 30th and the rent must come from my retirement account, for which the penalty will be substantial to my current and future financial status.  My *distress* is not unreasonable, especially when my termination resulted because the standards to which I was held were unfair and unequal.  I hope that you will consider this as you move to investigate my complaint.

(Pl.'s Trial Ex. 53 (emphasis added).)

Briggs also presented credible testimony at trial about her emotional state.  For instance, as a result of losing her employment at Temple, her retirement fund has gone from $100,000 to $5,000; she could not put up a Christmas tree or buy her grandchildren Christmas gifts; she was forced to find subsidized housing; and she is now on food stamps.  (07/17/2018 AM, Trial Tr. 118:2–23; 122:13–23; 123:13–21.)

While an award of $350,000 may appear to be at the larger range of compensatory damages in an employment discrimination case, it is important to remember that "[t]here is 'no legal yardstick by which to measure accurately' reasonable compensation for pain and suffering." *Rush*, 930 F. Supp. at 199 (citing *McDonald v. United States*, 555 F. Supp. 935, 971 (M.D. Pa. 1983)).  The issue for the Court to decide "is not the size of the award alone, but the evidence supporting the award." *Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 354 (3d Cir. 2001) (*Blakey v. Cont'l Airlines, Inc.*, 992 F. Supp. 731, 737 (D.N.J. 1998)).  We believe the above-cited documentary and testimonial evidence shows actual injury sufficient for Briggs to sustain an award of pain and suffering damages.  The emails she sent to various individuals at Temple and testimony at trial clearly show her damaged emotional state, in which she described, *inter alia*, like she was drowning, being pulled under a wave of grief, having no confidence, being battered emotionally, and being afraid to go to work.  She even stated that her work environment was beginning to feel like psychological abuse.  After her employment with Temple ended, she testified her retirement savings went from $100,000 to $5,000 and that she was not able to afford Christmas presents for her grandchildren, eliciting an emotional response during the trial.  In sum, we do not believe medical evidence or corroborating testimony was necessary for Briggs to sustain her award of compensatory damages, and we will deny Temple's motion for judgment as a matter of law on this issue.

Temple alternatively moves the Court to remit the jury's award of compensatory damages, citing *Valentin* and *Rush* in support.  In *Valentin*, the jury returned a verdict in favor of the plaintiff on her claims of national origin discrimination and retaliation under Title VII. *Valentin*, 986 F. Supp. at 297.  The jury awarded the plaintiff $209,000 for pain and suffering,

and the defendant filed a motion for a new trial on the basis that the award was against the weight of the evidence. *Id.* at 304.

As to the pain and suffering damages award, the court conditionally granted the defendant's motion for a new trial unless the plaintiff accepted a remittitur in the amount of $52,250. *Id.* at 305. The court reasoned that the $209,000 award of compensatory damages was "grossly excessive" because the plaintiff offered no evidence, other than her own testimony, that she was feeling depressed and upset by her termination. *Id.* She also explained that it was humiliating to explain the circumstances of her termination to future employers. *Id.* The court found that under those circumstances, "an award of compensatory damages in the amount of $209,000 shocks the conscience," and believed a remittitur to $52,250 was the appropriate remedy. *Id.*

In *Rush*, the plaintiff prevailed on her claims of discrimination and hostile work environment, and the jury awarded her $1,000,000 in pain and suffering damages. *Rush*, 930 F. Supp. at 196–97. The defendant filed a motion for a new trial on the issue or a remittitur, arguing that plaintiff's expert testified that she suffered only from mild to moderate depression, and that her friends and family testified she was currently performing well in her life. *Id.* at 199. The plaintiff pointed to testimony from expert witnesses, friends, and family that corroborated her testimony that she suffered emotionally while working for the defendant. *Id.* In addition, numerous witnesses testified that the plaintiff's personality changed during her time in defendant's employ and that she spent much of her free time sleeping at home. *Id.*

The court found the plaintiff presented evidence that she suffered emotionally while working for the defendant, but nevertheless concluded that the $1,000,000 award was excessive.

*Id.*  Without any additional analysis, the court conditioned the denial of the defendant's motion for a new trial on the plaintiff's acceptance of a remittitur in the amount of $100,000.  *Id.*

Briggs' trial evidence regarding her emotional distress is certainly more substantial than the plaintiff's in *Valentin*.  In *Valentin*, the plaintiff merely stated she was depressed and was humiliated when informing future employers of the circumstances of her termination.  *Valentin*, 986 F. Supp. at 305.  Briggs, on the other hand, presented not only trial testimony of her emotional distress (particularly her inability to buy her grandchildren Christmas presents, going on food stamps, and losing her retirement savings), but she also presented countless contemporaneous emails to numerous individuals at Temple evidencing her damaged emotional state.  Therefore, we do not believe the plaintiff in *Valentin* is comparable to Briggs, and the court's remittitur in that case is not persuasive.

Unlike the plaintiff in *Rush*, who presented expert witnesses and family and friends to corroborate her testimony that she suffered emotional distress while working at the defendant, Briggs was the sole witness to testify as to her emotional distress.  "However, neither medical evidence nor corroborating testimony is necessarily required in order to support an award of mental anguish damages."  *Moussa*, 289 F. Supp. 2d at 665 (citing *Blackshear*, 15 F. Supp. 2d at 430).  While the court in *Rush* found that the $1,000,000 award for pain and suffering was excessive, and consequently conditioned its denial of the defendant's motion for a new trial on the plaintiff accepting a remittitur to $100,000, we believe that Briggs' award of $350,000 was supported by the weight of the evidence and is not "so large as to appear contrary by reason."  *Evans*, 273 F.3d at 354 (quoting *Blakey*, 992 F. Supp. at 735).  Although Briggs' award is likely on the higher end of the spectrum, courts have found similar awards to be appropriate.  *See id.* at 355–56 (affirming district court's remittitur of pain and suffering damages to $375,000);

*Moussa*, 289 F. Supp. 2d at 665–66 (declining to remit emotional distress damages below $300,000).  Accordingly, Temple's motion for a new trial or a remittitur is denied as to the jury's award of compensatory damages.[14]

## I.      Briggs' Motion for a New Trial on Punitive Damages

We next address Briggs' argument that she is entitled to a new trial only on the issue of punitive damages, contending that the Court committed error in failing to charge the jury accordingly.  Prior to trial, the parties agreed to bifurcate the trial on punitive damages.  (07/16/2018 PM, Trial Tr. 3:13–4:21.)  The jury would first determine whether punitive damages should be assessed and, if so, then a second phase of the trial would begin where the jury would determine the amount of punitive damages.  (*Id.*)  While Briggs raises an interesting argument on the jury's finding of willfulness under the ADEA to mean there should have been a jury instruction and a corresponding question on the Verdict Form about punitive damages under Title VII, we believe her argument is waived because she failed to object to the absence of such an instruction during the charging conference.

Briggs' motion for a new trial is centered on the Court's failure to charge the jury on the issue of punitive damages.  (Pl.'s Mot. Mem. Law Supp. Punitive Damages 7–8.)  However, as we explained above regarding Temple's failure to object to the Court's jury instruction on willfulness under the ADEA, "[a] party who objects to an instruction . . . must do so on the record, stating distinctly the matter objected to and the grounds for the objection."  Fed. R. Civ. P. 51(c)(1).  A party who does not state its objection to the inclusion or exclusion of a jury

---

[14] Title VII's amendments allow a plaintiff to recover compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3).  Under federal law, when the defendant "has more than 500 employees in each of 20 or more calendar weeks in the current or preceding year," the amount of compensatory damages available to a plaintiff is capped at $300,000.  *Id.* § 1981a(b)(3)(D).  The PHRA, on the other hand, places no cap on compensatory damages.  *See Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 570 (3d Cir. 2002).  Accordingly, there is no need to apply Title VII's statutory cap because the excess compensatory damages can be appropriately apportioned to the claims under the PHRA.

instruction and the specific grounds for the objection waives any subsequent argument.  *See Lesende v. Borrero*, 752 F.3d 324, 335 (3d Cir. 2014) (citing Fed. R. Civ. P. 51); *Galena v. Leone*, 638 F.3d 186, 201 (3d Cir. 2011) (citations omitted); *Thabault v. Chait*, 541 F.3d 512, 525 (3d Cir. 2008); *Simmons v. City of Phila.*, 947 F.2d 1042, 1078 (3d Cir. 1991) (citations omitted); *Valentin v. Crozer-Chester Med. Ctr.*, 986 F. Supp. 292, 302 (E.D. Pa. 1997) (citations omitted); *see also Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 276 (3d Cir. 1998) (stating that "Rule 51 plays a critical role in both the trial and appellate processes" because "the rule ensures that the district court is made aware of and given an opportunity to correct any alleged error in the charge before the jury begins its deliberations"); *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 759 (3d Cir. 1990) (declining to consider jury charge deficiency under Rule 51 when party failed to specifically and clearly object to the charge).

In this case, Briggs submitted proposed jury instructions and a proposed verdict sheet that included punitive damages under Title VII.  (*See* Doc. No. 49 at 11 (Proposed Jury Instructions); Doc. No. 46, Question 11 (Proposed Verdict Form).)  However, during the charging conference the issue of punitive damages was raised, but Briggs' counsel failed to object, let alone with any specificity, to the Court's intention not to charge on punitive damages.  (07/18/2018 PM, Trial Tr. 73:18–25.)  The following exchange took place:

> [BRIGGS' COUNSEL]:  Yes, Your Honor.  We wanted to submit a jury instruction that – we thought we did – but is for punitive damages under Title VII.
>
> THE COURT: I'm not charging on punitive damages.
>
> [BRIGGS' COUNSEL]:  Okay.  So you're denying that motion.
>
> THE COURT: That's right.
>
> [BRIGGS' COUNSEL]:  Okay.  Thank you.

(*Id.*)  The following day, the Court presented the parties with a verdict form to review prior to their closing arguments.  (07/19/2018, Trial Tr. 3:2–8:18.)  Once again, Briggs' counsel failed to raise any objection to the absence of a question on the verdict form on the issue of liability for punitive damages.  (*See generally id.*)

As indicated above, Briggs' counsel failed to object to the absence of a jury instruction on punitive damages or the absence of such a question on the verdict form.  Like Temple waived its argument on the Court's jury instruction on willfulness under the ADEA, Briggs similarly waived her argument as to the absence of a jury instruction on punitive damages under Title VII.  *See* Fed. R. Civ. P. 51(c)(1).  Accordingly, Briggs' Motion for a New Trial on the issue of punitive damages is denied.

## IV.  **CONCLUSION**

Based on the foregoing reasons, Temple's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or, in the Alternative, for a Remittitur is denied in its entirety.[15] Briggs' Motion for Front Pay Damages and for a New Trial on Punitive Damages Only is granted with respect to a front pay award of $60,670.20, but denied as to a New Trial on punitive damages.

An appropriate Order follows.

---

[15] Considering that we find that the jury's verdict is not against the weight of evidence or erroneous, we deny Temple's alternative Motion for a New Trial.  *See Lind*, 278 F.2d at 90.  Likewise, as the Court's own damages calculations showed, the jury was well-supported by the evidence and did not "shock the conscience."  *See* discussion *supra* Section III-F-2.  Therefore, we find a remittitur is unwarranted, and Temple's alternative Motion for a Remittitur is denied.  *See Kazan*, 721 F.2d at 914 (citing *Scott*, 641 F.2d at 136).